# APPENDIX

**SMITH, et al v. CHAMPION, et al**
302CV212

|  | Appendix Page |
|---|---|
| Letter from CORE dated March 9, 1998 re: Elizabeth Boone | 1 |
| Letter from Champion, dated April 2, 1998 re: Elizabeth Boone | 3 |
| CORE Case Management, dated July 29, 1998 re: Darrell Hill | 4 |
| Doctor's Statement, dated August 24, 1998 re: Mary Lee Dixon | 7 |
| The Relevance of Documents Requested of CORE | 8 |
| The Relevance of Facts to be Discovered in Rule 30(b)(6) Deposition of CORE | 14 |



# CORE

March 9, 1998

Ms. Elizabeth Boone
P.O. Box 1301
Canton, NC 28716

Re: **Long Term Disability Benefits Plan for Hourly Employees of Champion International Corporation #703 ("Plan")**

SS#: 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

Date of Disability: 11/5/87

Dear Ms. Boone:

Champion, as part of its disability management program, has retained CORE, Inc. to assist the Plan Supervisor in reviewing your continuation of Long Term Disability Benefits.

After review, we are unable to approve your disability.

The explanation below indicates why your claim has not been approved, the applicable Plan section(s):

Not disabled as defined in the Plan.

**The Independent Medical Examination has determined you are able to perform sedentary work.**

(Section 2.1(z)(i) of the Plan defines Total Disability as the inability to perform duties required by your employment; Section 2.1(z)(ii) defines Total Disability after 30 months as the inability to engage in any occupation for wages or profit; Section 2.1(z)(iv) states that if there is a difference of opinion as to whether you are disabled, the decision of the Plan Supervisor shall be final and conclusive.)

App. 1

200 Wheeler Road, 5th Floor • Burlington, Massachusetts 01803 • 617/229-9400 • Fax 617/229-9429

48

You have the right to appeal this decision. We are enclosing a copy of the Appeal Rights & Process, as well as an Explanation of Plan Benefits For Champion.

If you have any questions, please contact Mary Lee Dixon at 513-868-4630.

Sincerely,

*DBeavers*

J. D. Beavers, MD
Medical Director
Champion Disability Management Program


C:   Benefits Representative
     Plan Supervisor
     Mary Lee Dixon – Benefits Services Coordinator


Champion International Corporation

April 2, 1998

Elizabeth Boone
PO Box 1301
Canton, NC 28716

Re: Long Term Disability
    SSN: 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

Dear Ms. Boone:

This letter will serve as notification that your Long Term Disability benefits will terminate on April 30, 1998. The check that you will received on or about May 1, 1998 represents the final payment under the Long Term Disability Plan.

If you have any questions regarding this matter, please contact our office.

Sincerely,

Mary Lee Dixon
Benefits Services Coordinator

cc: Tracy Hecht-Palkowski

45

## CORE CASE MANAGEMENT

Confidential Service Report #5
July 29, 1998

### PATIENT INFORMATION

Case Number:   1339497
DARRELL HILL
47 BUNNY LANE
SMATHERS COVE
CANTON, NC  28716
DOB: 03/04/51      Age: 47
Relationship: SELF

### POLICY INFORMATION

Member Name: DARRELL HILL
Member SSN:  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
Employer: CANTON MILL

Client:    CHAMPION LTD
Policy #:  NOT AVAILABLE

### LOCATION OF SERVICES/ PHYSICIAN

PATIENT IS AT HOME
ADDRESS AS ABOVE

Physician: JOSEPH DEMENT
Specialty: ORTHOPEDIC SURGERY

### CLINICAL INFORMATION

Diagnosis:    STATUS POST (S/P) RIGHT
              BELOW KNEE AMPUTATION, S/
              RIGHT KNEE CARTILAGE TEA

### CASE MANAGEMENT

Referral Date:      01/30/97
Case Closure Date:  07/29/98

### SAVINGS PROJECTIONS

Estimated to Date:    $75,850.00

### SUMMARY

Disability information regarding Darrell Hill is as follows: Mr. Hill has remained out of work on disability since 11/5/90. Upon annual review, this case was referred to a CORE, INC. physician consultant to determine the employee's continued Long Term Disability (LTD) status. The physician consultant reviewed recent attending physician office notes and made severa attempts to contact the referenced physician, but without success. Therefore, an independent medical examination (IME) was scheduled and performed on 6/25/98. The IME found that Mr. Hill could work 8 hours per day, 5 days per week in a sedentary job with restrictions. A transferable skills assessment (TSA) was also performed and found that the employee had transferable skills that could be applied to 3 job titles. This case was presented to the CORE, INC. denial committee and the consensus was to deny continued LTD benefits based on an able IME and the employee's transferable skills. The location's Sharon Spain was contacted with CORE, INC.'s

App. 4

CORE CASE MANAGEMENT

1339497
July 29, 1998
Page 2

## SUMMARY (CONTINUED)

recommendation of denial and she agreed with the recommendation.

## VOCATIONAL INFORMATION

Return to Work Date: DEFERRED-ACTIVE
Estimated Length of Disability: 2790 DAYS
Job Title:

## MEDICAL HISTORY

- Gout
- Traumatic arthritis
- 1/95 Anterior fusion of right ankle
- 3/95 Fusion of the right ankle
- 1996 Below the knee amputation of the right leg
- Hypertension
- Right knee pain, secondary to cartilage tears, and inability to wear right leg prosthesis
- 4/6/98 Right knee arthroscopic cartilage tear repair
- 6/98 Independent medical examination found employee able to perform sedentary work 8 hours per day, 5 days per week
- 7/98 Transferable skills analysis found the employee had transferable skills and also listed 3 job titles that would be appropriate
- Employee reports that he has been awarded Social Security Disability Insurance (SSDI)

## CURRENT TREATMENT PLAN

- Home setting
- Medical management by Dr. Dement as indicated
- Medications:
  Indocin
- Right leg prosthesis
- Cane/walker as needed

## POTENTIAL CLINICAL COMPLICATIONS

- Chronic pain syndrome
- Increased activity intolerance
- Injuries due to gait deviations

CORE CASE MANAGEMENT

1339497
July 29, 1998
Page 3

## RECOMMENDATIONS

Long Term Disability (LTD) Case Management recommends the following:

1. Denial of LTD benefits, initially effective 5/6/91, as this employee was found able to perform sedentary work 8 hours per day, 5 days per week, and was found to have transferable skills.

2. LTD benefits denial effective 7/29/98 with case closure.

## SAVINGS ANALYSIS

Please refer to the estimated savings analysis for the service period of 7/29/98 to 4/1/2016. The cost savings reflect the employee's LTD salary per month over the next 18 years. It is anticipated that the employee would have remained on LTD benefits if it had not been for Case Management's assessment and intervention.

**Statement from Dr. James P. McCarrick, Jr.:**

I was misquoted in Mary Lee Dixon's letter to Lois Lynn on July 7, 1998. I did not say Lois Lynn could "work 6 hours per day, 5 days per week in a sedentary capacity." You already have a copy of my letter to Unival of May 5. Please refer to Page 4, Paragraph 3 of my letter in the section: IMPRESSION: "It is my impression that the patient does have clinically significant bronchiectasis. Clearly, this is a chronic disease which has a progressive nature to it. Although her symptoms are not consistent with typical items that we search for assessing impairment such as pulmonary function studies and general performance, it should be commented that she is at increased risk for developing infections on exposure to various populations. These infections could be potentially significant in her cases, and it is likely that she would require more antibiotic care and increased hospitalization if she had them."

(Signed) _JMcCarrick_
(Date) _8/24/98_

James P. McCarrick, Jr., M.D
Internal Medicine
Pulmonary Disease

## THE RELEVANCE OF DOCUMENTS REQUESTED OF CORE

1. All documents regarding CORE's evaluation of the long term disability claim of each plaintiff (as identified in the caption);

2. All correspondence, e-mail transmissions, notes, summaries, or any other documents concerning communications by and between CORE and Champion International concerning each plaintiff's long term disability (LTD) claim;

3. All records, reports, or any other documents or information considered by any employee, staff person or manager of CORE or any independent contractor performing services requested by CORE in evaluating each plaintiff's LTD claim;

**RELEVANCE:** The documents described in ¶¶ 1-3 bear on the administrative record or an explanation of the record. Given the importance of CORE's investigation and recommendation of denial of each plaintiff's disability, the ultimate acts of Champion in terminating benefits can only be understood with reference to the documents underlying CORE's investigation.

*******************************************

4. All documents regarding the procedures, policies, regulations, and guidelines governing the consideration of long term disability claims by CORE from January 1, 1995 through May, 2000;

**RELEVANCE:** Given the importance of CORE's recommendations of denial, any procedures, policies or rules followed by CORE in determining each plaintiff's disability are critical to an understanding of the ultimate denials, and thus relevant to plaintiffs' claims.

*******************************************

5. All documents regarding the cost savings analyses prepared by CORE and/or any entity on its behalf in regard to long term disability claims of each of the plaintiffs and disabled employees of Champion, generally;

6. All documents regarding CORE's pay and compensation policies, including any incentives, bonuses, commissions, or other benefits provided to managers, employees or other agents of CORE who evaluated long term disability claims from January 1,

App. 8

7.  1995 through May, 2000;
    All documents regarding financial analyses performed by CORE and/or any entity on its behalf of Champion's LTD plans, including analyses of amounts received and expenditures or disbursements;

**RELEVANCE:** The documents described in ¶¶ 5-7 bear on the economic incentives for CORE and Champion in terminating benefits of a large number of claimants who had been receiving benefits for an extended period of time—thus, establishing the conflict of interest of CORE, initially, and Champion, ultimately, between their Plan responsibility of factually determining disability and their desire to save money.

******************************************

8.  All documents regarding the CORE Services Agreement and any other contracts or agreements between CORE and Champion, and any communications between CORE and Champion concerning the negotiation, administration, interpretation and execution of said contracts and agreements;

**RELEVANCE:** These documents go to the heart of the relationship between CORE and Champion—a relationship which bears directly on the establishment of the administrative records and the potential conflicts of interest of Champion and CORE.

******************************************

9.  All documents generated by the CORE Denial Committee referenced in the CORE Confidential Service Reports regarding the plaintiffs;
10. All documents regarding the customized, dedicated unit workflow developed by CORE to service Champion disability management as referenced in the CORE Services Agreement dated January 1, 1996;
11. All documents, including minutes, exhibits, and reports generated at or related to the quarterly meetings conducted for the purpose of reviewing services and performances as referenced in the CORE Services Agreement dated January 1, 1996;
12. CORE-generated quarterly management reports provided to Champion as referenced in the CORE Services Agreement dated January 1, 1996;
13. All documents identifying the key service personnel identified as the Account Executive, Team Leader and Lead Case Manager as referenced in the CORE Services Agreement dated January 1, 1996;

App. 9

14. All documents regarding the regular process review to evaluate ways to enable the program to be delivered more efficiently and at a lower cost as referenced in the CORE Services Agreement dated January 1, 1996;

**RELEVANCE:** The documents described in ¶¶ 9-14 are relevant to the procedures used by CORE, and its adherence to the procedures outlined in the contracts between CORE and Champion—all of which are directly or indirectly relevant to CORE's review of the claims and any potential conflicts of interest.

*******************************************

15. CORE monthly billing statements to Champion for services to be rendered using data from Champion's employee eligibility tape;

**RELEVANCE:** The documents described in ¶ 15 bear on the financial relationship between CORE and Champion, which may lead to evidence concerning a conflict of interest.

*******************************************

16. All documents, tapes, or other forms of data regarding employee eligibility provided to CORE from Champion as referenced in the CORE Services Agreement dated January 1, 1996;

**RELEVANCE:** The documents described in ¶ 16 may be relevant to show any claimants who were targeted by Champion in their initial instructions to CORE, providing some indication as to how Champion perceived the claims and attempted to lower its costs.

*******************************************

17. All adjustments to the monthly billing statements provided to CORE by Champion on a quarterly basis as referenced in the CORE Services Agreement dated January 1, 1996;

**RELEVANCE:** The documents described in ¶ 17 bear on the financial relationship between CORE and Champion, which may lead to evidence concerning a conflict of interest.

*******************************************

18. A copy of the CORE-maintained comprehensive liability insurance policies naming Champion as an additional insured as referenced in the CORE and SCORE

Services Agreements with Champion;

**RELEVANCE:** The documents described in ¶ 18 bear on the financial relationship between CORE and Champion, which may lead to evidence concerning a conflict of interest.

*******************************************

19. CORE-retained copies of all records related to the provision of services in Exhibit A as referenced in Section 9.1 of the CORE Services Agreement dated January 1, 1996;
20. All documents concerning meetings or actions of the CORE Denial Committee from January 1, 1996 to December 31, 2000, and identifying the members of the CORE Denial Committee, as referenced in the CORE Confidential Service Agreements regarding the plaintiffs;
21. Copies of all monthly Confidential Service Reports as referenced in the CORE Services Agreement dated January 1, 1996;
22. All case history reports referred to in Exhibit A regarding Workflow Champion Disability Management Program integration with Social Security Disability Consultants as referenced in the CORE Services Agreement dated January 1, 1996;
23. SSDC quarterly reports furnished to CORE regarding the status of open cases concerning each disabled employee as referenced in Exhibit A of the CORE Services Agreement dated January 1, 1996;

**RELEVANCE:** The documents described in ¶¶ 19-23 are documents referenced in the contract between CORE and Champion, which may reveal information concerning CORE's financial relationship with Champion, and its efforts to satisfy Champion in reducing benefits—thereby supporting plaintiffs' claims of a conflict of interest with an adverse impact on the decisions made concerning the plaintiffs' claims.

*******************************************

24. CORE monthly billing for fees to Champion on time and materials basis upon the opening of the LTD file as referenced under Service Fees in the CORE Services Agreement;

**RELEVANCE:** The documents described in ¶ 24 relate to the financial relationship between CORE and Champion, which may reveal information relevant to CORE's conflict of interest in

App. 11

developing the administrative files, and Champion's ultimate conflict of interest in terminating benefits of LTD claimants, including the plaintiffs.

*******************************************

25. CORE monthly, quarterly and annual Champion customized and associated ad hoc reports as referenced under Custom Analytic Reporting in the CORE Services Agreement dated January 1, 1996;

26. Surveys of employees with closed cases regarding the performance of CORE as referenced in Exhibit C to the CORE Services Agreement dated January 1, 1996;

27. Supervisors, Human Resources staff and Medical Department staff surveys as referenced in Exhibit C to the CORE Services Agreement dated January 1, 1996;

28. CORE-generated Medical Substantiation forms and call logs regarding any denial to a Champion employee as referenced in Exhibit C to the CORE Services Agreement dated January 1, 1996;

**RELEVANCE:** The documents described in ¶¶ 25-28 are referenced in the service contract between CORE and Champion, and may reveal CORE's intent, upon positive financial incentives or negative pressure, to lower the costs of Champion's disability claims by developing administrative records conducive to terminating the benefits of LTD claimants, including plaintiffs.

*******************************************

29. All reports and records regarding incentive compensation paid to CORE by Champion as referenced in Exhibit D to the CORE Services Agreement dated January 1, 1996;

30. SCORE itemized invoices for capitated services and services rendered on a fee for service basis as referenced in the SCORE Services Agreement dated January 1, 1999;

31. All documents regarding Champion's written notification of invoice discrepancies as referenced in the SCORE Services Agreement dated January 1, 1999;

32. Any written requests submitted for arbitration between the parties to the SCORE Services Agreement dated January 1, 1999;

**RELEVANCE:** The documents described in ¶¶ 29-32, as referenced in the service agreement between SCORE and Champion (dated January 1, 1999), are directly relevant to the financial relationship between CORE (through SCORE) and Champion.

App. 12

************************************

33.	All documents or computer-generated reports by CORE provided to Champion regarding the status of claims, including on-line access and minutes or other documents generated regarding the quarterly claim status meetings as referenced in the SCORE Services Agreement dated January 1, 1999;

34.	All documents or other materials outlining information-driven protocols and guidelines used as referenced in the SCORE Services Agreement dated January 1, 1999;

35.	Data generated by Sedgwick's data management system (JURIS) and furnished to Champion and CORE, including, but not limited to, Claim and Expense Report (monthly); Transaction Register (monthly); Loss Analysis Report (quarterly) and State Reports (as needed), as referenced in the SCORE Services Agreement dated January 1, 1999;

36.	All data from Data Repository construed to perform transactional and Financial Reports such as Budget Status Reports and Disability Performance Reports as referenced in the SCORE Services Agreement dated January 1, 1999;

37.	Financial ("Monthly") and Program Performance ("Quarterly") Reports, as referenced in the SCORE Services Agreement dated January 1, 1999; and

38.	Evaluations of SCORE as referenced in Exhibit C to the SCORE Services Agreement dated January 1, 1999;

**RELEVANCE:**  The documents described in ¶¶ 33-38 are directly referenced in the services contract between SCORE and Champion, and are directly relevant to the financial relationship between CORE (through SCORE) and Champion which may have created a conflict of interest and tainted the ultimate decisionmaking process.

## THE RELEVANCE OF FACTS TO BE DISCOVERED IN RULE 30(B)(6) DEPOSITION OF CORE

4. CORE's evaluation of the long term disability claim of each plaintiff (as identified in the case caption);

**RELEVANCE:** Plaintiffs are entitled to inquire about CORE's evaluation of each plaintiffs' LTD claim to determine and explain the administrative record, and to discover any potential conflict of interest which may have tainted the ultimate decisionmaking process.

*******************************************

5. The procedures, policies, regulations, and guidelines governing the consideration of long term disability claims by CORE, Inc. from January 1, 1995 through May, 2000, including claims by employees of Champion;

**RELEVANCE:** The areas of inquiry described in ¶ 2 may be relevant to determining and explaining the administrative record in each plaintiffs' case, and any potential conflict of interest.

*******************************************

6. The projected and actual cost savings analyses prepared by CORE and/or any entity on its behalf in regard to long term disability claims of each of the plaintiffs, and disabled employees of Champion, generally;

7. CORE's pay and compensation policies, including any incentives, bonuses, commissions, or other benefits provided to managers, employees or other agents of CORE who evaluated long term disability claims from January 1, 1995 through May, 2000;

8. Financial analyses performed by CORE and/or any entity on its behalf, of Champion's LTD plans, including analyses of amounts received by claimants and expenditures or disbursements;

**RELEVANCE:** The areas of inquiry described in ¶¶ 3-5 are relevant to any potential conflicts of interest which may have tainted the decisionmaking process concerning plaintiffs' claims.

*******************************************

9. The contracts and agreements between CORE and

App. 14

    Champion, and any communications between CORE and Champion concerning the negotiation and execution of their contracts;

10.  The implementation and administration of the contracts and agreements between CORE and Champion;

11.  The CORE Denial Committee(s) as referenced in CORE Confidential Service Reports regarding the plaintiffs and the identities of its members; and

  **RELEVANCE:** The areas of inquiry described in ¶¶ 6-8 focus on the financial and professional relationship between CORE and Champion which may be relevant to establishing and explaining the administrative records, and revealing any potential conflicts of interest which may have tainted the ultimate decisionmaking process.

  *****************************************

12.  The identity, provenance, authenticity and substance of documents identified in Attachment B and produced in response to the subpoena served on CORE, Inc.

  **RELEVANCE:** The area of inquiry described in ¶ 9 is directly related to the documents to be produced pursuant to the notice and subpoena. *See App.* ___.