UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HARRY L. SMITH, LOIS L. LYNN, | : | D.N. 302CV212 (GLG) |
| DARRELL KEITH HILL, ELIZABETH | | |
| CASE BOONE, WILEY H. HAYNES, | : | |
| ROSA LEE BROOKSHIRE, HARRISON | | |
| YOUNG CLARK, FRANZISKA FINNEY, | : | |
| JUDITH CASE KIRKPATRICK, WILSON | | |
| DANIEL McCLURE, CELIA DARLENE | : | |
| METCALF, CHARLES R. REECE, | | |
| DOLPHUS LUTHER TREADWAY, JR., | : | |
| MARTHA BURNETTE WHITLEY, | | |
| | : | |
| *Plaintiffs,* | | |
| | : | |
| v. | | |
| | : | |
| CHAMPION INTERNATIONAL | | |
| CORPORATION; LONG TERM | : | |
| DISABILITY BENEFITS PLAN FOR | | |
| SALARIED EMPLOYEES OF | : | |
| CHAMPION INTERNATIONAL | | |
| CORPORATION #506; LONG TERM | : | |
| DISABILITY BENEFITS PLAN FOR | | |
| CERTAIN HOURLY EMPLOYEES OF | : | |
| CHAMPION INTERNATIONAL | | |
| CORPORATION #703; and | : | |
| INTERNATIONAL PAPER COMPANY, | | |
| | : | |
| *Defendants.* | | |
| | : | Jan. 21 , 2004 |

**SUPPLEMENTAL MEMORANDUM IN
OPPOSITION TO MOTION OF CORE, INC.,
TO QUASH DEPOSITION SUBPOENAS AND/OR
FOR A PROTECTIVE ORDER, AND IN SUPPORT
OF PLAINTIFFS' MOTION TO COMPEL
DISCOVERY FROM CORE, INC.**

## INTRODUCTION

### Purpose of this Memorandum

Plaintiffs Harry L. Smith, et al,[1] submit this supplemental memorandum in opposition to the motion for protective order and to quash deposition subpoenas filed by Core, Inc., and certain of its employees[2] on Oct. 21, 2003 (DN 53), and in reply to CORE's memorandum in opposition to Plaintiffs' motion to compel, filed Nov. 24, 2003 (DN 57);[3] the memorandum of Defendants Champion International Corp., et al,[4] in opposition to Plaintiffs' motion to compel, filed Nov. 18, 2003 (DN 56); and CORE's reply, filed Nov. 14, 2003 (DN 55),[5] to Plaintiffs' memorandum in response to CORE's motion for a protective order and to quash subpoenas.

### Summary of Argument

Recent depositions show that CORE was wrong in saying that since Champion made all benefit decisions no relevant information could be gained from deposing CORE and its employees.  The CORE depositions will uncover information supporting Plaintiffs'

---

[1]    Hereinafter collectively "Plaintiffs."

[2]    Hereinafter collectively "CORE."

[3]    Hereinafter "CORE Memo."

[4]    Hereinafter collectively "Defendants" or "Champion."

[5]    Hereinafter "Second CORE Memo."

2

allegations that (1) Defendants abused their discretion by
abandoning their duty under ERISA to CORE; (2) Defendants did not
make the benefit determinations at issue with unbiased judgment
and an adequate factual foundation; and (3) CORE's decisions,
which were those of Defendants, were affected by financial
conflict of interest.  CORE has not met its burden of proving
just cause for a protective order and an order quashing Plain-
tiffs' deposition subpoenas.

### ARGUMENT

### New Evidence Shows That CORE Participated in Benefit Decisions, Maintained the Administrative Record and Told Champion <u>the Cost Savings of Each Benefit Decision</u>

#### CORE's False Claims

CORE says that the initial services agreement (the CORE
agreement) and the SCORE services agreement set forth the entire
relationship between Champion and CORE and SCORE.[6]  A CORE em-
ployee named Bernstein says[7] that under the Jan. 1, 1996 initial
services agreement Champion retained full authority and responsi-
bility for determining who got benefits, and amounts to be paid,

---

[6]    CORE Memo at 9.

[7]    Bernstein's affidavit was initially submitted in support
of CORE's motion for summary judgment.  CORE resubmitted the
affidavit in support of its motion to quash.

3

under its plans.   CORE made written recommendations to Champion

on employee applications for benefits, CORE says, but CORE had no

responsibility for any benefit or medical care decisions, and

CORE was not the named fiduciary and had no fiduciary duties

under ERISA.[8]

CORE represented to this Court as a fact that "Champion, not

CORE, compiled and evaluated the administrative record." [9]  CORE

said "CORE does not know the actual parameters of the administra-

tive record." [10]  CORE claimed that its role was "strictly lim-

ited to making benefit disability recommendations to Champion."[11]

CORE denied that it could have had any financial stake in

the benefit decisions because under the contract between Champion

and CORE (and later SCORE) its direct compensation was not

affected by cost reduction.  "It is inconceivable that Champion's

relationship with CORE could have influenced Champion's decisions

to terminate the plaintiffs' LTD benefits for financial

---

[8]    Bernstein Aff., Ex. A to CORE Memo.

[9]   CORE Memo at 9.

[10]   Second CORE Memo at 3.

[11]   CORE Memo at 9.

4

reasons."[12]   CORE denies that its views on costs could be rele-
vant to this action because the relevant question is whether
Champion was influenced by cost considerations.[13]   CORE denied
influencing Champion with cost considerations; there was no
"logical or factual nexus between Champion's benefit decision and
CORE." [14]

CORE argues in general terms that testimony from its employ-
ees would be meaningless because "only Champion can explain what
constitutes the administrative record and the reasons for termi-
nating the plaintiff's LTD benefits." [15]   CORE says that since
review is limited to the administrative record, and it had
nothing to do with the record, deposing CORE or its employees
could not produce admissible evidence or lead to the discovery of
admissible evidence.[16]

**How Plaintiffs Learned
That CORE's Claims Were False**

---

[12]   CORE Memo at 11.

[13]   Second CORE Memo at 4.

[14]   CORE Memo at 11.

[15]   CORE Memo at 9.

[16]   CORE Memo at 10.

Plaintiffs learned that CORE's claims were false in its November depositions of Champion and its employees.  The relationship between CORE and Champion was not the limited one described in the contracts.  Champion ceded its decision making responsibility to CORE; Champion did not maintain the administrative record; and CORE told Champion the cost savings of each benefit decision.  Detailed examination of the actual relationship between CORE and Champion shows that CORE and Champion did not tell the truth.

### Testimony of Champion by Mark Lehman

Champion was deposed under Fed. R. Civ. P. 30(b)(6) on Nov. 13, 2003.[17]  The designee was Mr. Mark David Lehman,[18] Director of Champion's Benefits Administration and Integrated Personnel Systems.[19]  Mr. Lehman became Director in 1993, well before CORE became administrator.[20]  His department was responsible for

---

[17]  Lehman Dep. Tr. at 2.  Copies of the relevant pages of the Lehman deposition transcript are attached as Exhibit 1 hereto.

[18]  Lehman Dep. Tr. at 14-18.

[19]  Lehman Dep. Tr. at 6; see 7 Moore's Federal Practice: Civil § 30.25[3] (2004 CD-ROM ed.) ("a Rule 30(b)(6) designee testifies on behalf of the corporation, and binds the entity with its testimony.").

[20]  Lehman Dep. Tr. at 8.

6

delivering the benefit plans that Champion offered to employees and retirees.[21]  The Benefits Department was both the designated plan supervisor and the entity tasked with administering the plans by the plans' Pension and Employee Benefits Committees.[22]

Less than five percent of Mr. Lehman's responsibilities consisted of deciding claims or doing the work of benefits administration,[23] and he had no training in handling such claims.[24]  Mr. Lehman's educational background was in finance[25] and his work experience was in accounting and information systems development.[26]  Before 1993 Mr. Lehman had never worked with benefit plans.[27]  Mr. Lehman had no particular medical expertise.[28]  Mr. Lehman never decided any claims himself.[29]  At the time of his deposition Mr. Lehman was unable to testify of his

---

[21]  Lehman Dep. Tr. at 22.

[22]  Lehman Dep. Tr. at 69.

[23]  Lehman Dep. Tr. at 22.

[24]  Lehman Dep. Tr. at 53.

[25]  Lehman Dep. Tr. at 19.

[26]  Lehman Dep. Tr. at 8-12.

[27]  Lehman Dep. Tr. at 18-21.

[28]  Lehman Dep. Tr. at 98.

[29]  Lehman Dep. Tr. at 56.  Mr. Lehman was sure that he never had any input into the claims of any of the Plaintiffs in this case. Lehman Dep. Tr. at 127.

own personal knowledge about any particular claim denial.[30]  His

testimony was limited to his review of Champion's claim files

which, he acknowledged, were not complete.[31]

Out of the 40 to 55 people who worked in Benefits adminis-

tration, only one, or at times two, worked on LTD claims.[32]  From

1993 to 1998 the employee principally responsible was Mary Lee

Dixon.[33]  Ms. Dixon's primary responsibilities, Mr. Lehman testi-

fied, were to work with the outside administrator, to get infor-

mation to the administrator, to work with the Payroll Department

to get claimants who had been approved for LTD paid, and to

decide first level appeals.[34]  Ms. Dixon also provided materials

and information to the committee which handled second level

appeals.[35]  It was the administrator's responsibility, not Mrs.

---

[30]  Lehman Dep. Tr. at 127-29.

[31]  Lehman Dep. Tr. at 127.

[32]  Lehman Dep. Tr. at 29-32.

[33]  Lehman Dep. Tr. at 35.  From 1995 to 1998 Ms. Dixon had
an assistant.  Id.

[34]  Lehman Dep. Tr. at 42-43, 46, 56-57.

[35]  Lehman Dep. Tr. at 46.

Dixon's, to gather all of the medical and vocational data pertaining to a claim.[36]

Champion would not know that a claim for benefits had been made until CORE informed it that the claim had been approved or denied.[37]  CORE, not Ms. Dixon, assigned an LTD claim number.[38] CORE's computer system was entirely separate from that of Champion[39] and CORE did not have computer terminals in Champion's Benefits Department.[40]

Mr. Lehman testified that he expected Ms. Dixon to look at the first level appeal, and, if there was any additional information provided by the employee, to ask for documentation.[41]  If there was no additional information, Mr. Lehman testified, he would expect Ms. Dixon to go back to CORE and to make sure that it had the information which supported the initial denial so the denial could be supported.[42]  Ms. Dixon had discretion to deter-

---

[36]  Lehman Dep. Tr. at 177.

[37]  Lehman Dep. Tr. at 177.

[38]  Lehman Dep. Tr. at 172-73.

[39]  Lehman Dep. Tr. at 173.

[40]  Lehman Dep. Tr. at 176.

[41]  Lehman Dep. Tr. at 79.

[42]  Lehman Dep. Tr. at 79.

mine how much documentation she needed.[43]  If Ms. Dixon found

that CORE had not supported its decision, she was expected to

send the denial back with a request for more information and

another recommendation.[44]  CORE was obligated to cooperate with

such requests for information,[45] but Mr. Lehman was not aware of

a single case in which Ms. Dixon overturned what CORE had done.[46]

There were no rules, procedures, criteria or regulations to

assist decision makers under the plans, or governing the consid-

eration of LTD claims under the plans, other than the language of

the plans themselves and their summary plan descriptions.[47]

There were no guidelines or definitions of disabling diseases or

conditions for use by individuals involved in the claims review

process.[48]  Ms. Dixon was expected to rely upon the administrator

for decisions involving medical or vocational expertise.[49]  She

was not expected to independently evaluate medical or vocational

---

[43]   Lehman Dep. Tr. at 180.

[44]   Lehman Dep. Tr. at 80-81.

[45]   Lehman Dep. Tr. at 182-83.

[46]   Lehman Dep. Tr. at 85.

[47]   Lehman Dep. Tr. at 88-90.

[48]   Lehman Dep. Tr. at 98-99.

[49]   Lehman Dep. Tr. at 83.

evidence.[50]  Mr. Lehman testified that Ms. Dixon did not have any
training in carrying out her duties, at least during the period
1993 through 2000.[51]  The Champion Legal Department provided
general training in the steps of the appeal process, the respon-
sibilities involved in each step, and the provisions of the plan
document and summary plan description,[52] but Mr. Lehman himself
never got that training.[53]  Mr. Lehman learned about the plans by
reading them and by speaking occasionally, perhaps once a quar-
ter, with a member of Champion's Legal Department.[54]

Under the plan, Mr. Lehman said, the decision on disability
of a physician chosen by the plan supervisor is conclusive.[55]
The plan supervisor did not choose physicians - CORE did, without
any rules or other limitations imposed by Champion.[56]  Under the
language of the plan the decision of a CORE doctor was final.[57]

---

[50]  Lehman Dep. Tr. at 84.

[51]  Lehman Dep. Tr. at 51-52.

[52]  Lehman Dep. Tr. at 53.

[53]  Lehman Dep. Tr. at 54.

[54]  Lehman Dep. Tr. at 55.

[55]  Lehman Dep. Tr. at 86-87.

[56]  Lehman Dep. Tr. at 87-88.

[57]  Lehman Dep. Tr. at 87-88.

11