Mr. Lehman testified that he would have expected the third party administrators, including CORE, to keep records of the number of disability claims, assigning a number to each claim with the information whether it had been approved, denied or withdrawn and the date of the action.[58] From this information it would be possible to tell how many claims had been granted, denied or withdrawn in a particular year, and, to some degree, the cost to Champion of the claims which had been granted.[59] Mr. Lehman testified that International Paper most likely wouldn't have the data; if he were asked to get this information today, knowing what he knows from having been the head of Champion's Benefits Department, he would go back to the administrators, including CORE.[60]

CORE gave a presentation to Champion about its program and gave out a book called "Champion Disability Medical Management Program." [61] Mr. Lehman attended the presentation and saw the

---

[58] Lehman Dep. Tr. at 183-84, 188.
[59] Lehman Dep. Tr. at 185-86.
[60] Lehman Dep. Tr. at 192.
[61] Lehman Dep. Tr. at 208.

12

book.[62] The book outlines the financial benefits to Champion, expressed in both reduced payouts and return on investment, as a result of CORE's trademarked "workability" approach to benefits management.[63] CORE gave Champion sample quarterly reports, not only on payouts by the plan, but the difference between the LTD claims which employees are going to make based on their own doctors and the claims which CORE is going to approve based on the reports from its staff members.[64] CORE told Champion that the savings likely to result from CORE's efforts could be calculated by comparing Champion's existing LTD costs to those of existing CORE customers.[65] Mr. Lehman acknowledged that these reports would show cost savings from CORE's work.[66]

CORE generated confidential service reports for Champion on employees receiving benefits.[67] Each report contained a section

---

[62] Lehman Dep. Tr. at 207-08.
[63] Lehman Dep. Tr. at 208-11.
[64] Lehman Dep. Tr. at 214.
[65] Lehman Dep. Tr. at 215-16.
[66] Lehman Dep. Tr. at 218-19.
[67] Lehman Dep. Ex. at 245 and Ex. 9.

13

estimating the savings to the plan as a result of CORE's work on the employee discussed in the report.[68]

The administrator was Travelers from 1993 to 1995. From 1996 through 1998 it was CORE, and in 1999 SCORE took over.[69] When Travelers was hired Champion shipped its LTD files to Travelers' offices in Hartford.[70] When CORE was hired Travelers sent CORE the files.[71]

Mr. Lehman testified that the administrator received claims for benefits, reviewed them, gathered medical information, reviewed the medical history and made the determinations on the claims.[72] The initial claims went to the administrator, not Champion,[73] and under its contract with Champion the administrator made decisions, not just recommendations.[74] The administra-

---

[68] Lehman Dep. Tr. at 245 and Ex. 9; See Barnes Aff., attached as Ex. 2 hereto, ¶ 3 and Exs. A, B & C.

[69] Lehman Dep. Tr. at 42.

[70] Lehman Dep. Tr. at 178-79.

[71] Lehman Dep. Tr. at 179.

[72] Lehman Dep. Tr. at 58, 75.

[73] Lehman Dep. Tr. at 71.

[74] Lehman Dep. Tr. at 43, 71-72, 75. Mr. Lehman testified that the Pension and Employee Benefits Committee of Champion had delegated this authority to CORE. Lehman Dep. Tr. at 162.

14

tor sent the original notice of determination.[75] The administrator followed up on people who had been approved to make sure that they were still disabled within the meaning of the plan.[76] Mr. Lehman expected a review at least once a year.[77] The process used for initial claims was used in exactly the same way when CORE terminated the benefits of employees who, like the Plaintiffs herein, had already been approved.[78]

---

[75] Lehman Dep. Tr. at 113.
[76] Lehman Dep. Tr. at 58.
[77] Lehman Dep. Tr. at 112.
[78] Lehman Dep. Tr. at 81.

### Testimony of Mary Lee Dixon

Mary Lee Dixon was deposed on Nov. 19, 2003.[79] Champion's administrator of short and long term disability benefits, Ms. Dixon's title was "LTD Administrator."[80] Ms. Dixon candidly testified that virtually every decision and function of the plans, including the decisions which Mr. Lehman testified that Ms. Dixon made, was handled by CORE.

After 1992, when Travelers became third party administrator,[81] Ms. Dixon did not make any disability determinations, with or without consultation with a doctor.[82] She set up the file and sent it to the administrator.[83] Ms. Dixon's review was limited to determining that the file was adequate, the claim forms were in, and the appropriate communications were made to the claimant.[84] The administrator reviewed all the medical data

---

[79] The referenced pages of Ms. Dixon's deposition are attached as Exhibit 3 hereto.

[80] Dixon Dep. Tr. at 19.

[81] Dixon Dep. Tr. at 20.

[82] Dixon Dep. Tr. at 25, 34.

[83] Dixon Dep. Tr. at 24.

[84] Dixon Dep. Tr. at 34.

16

and made eligibility determinations.[85]  This method of making eligibility decisions remained the same when CORE and SCORE replaced Travelers.[86]  CORE became the administrator Jan. 1, 1996.[87]

CORE decided when and if to deny claims.[88]  CORE, and CORE alone, decided whether a person was permanently disabled.[89]  CORE sent notice of its decision to deny to Ms. Dixon[90] and to the employee.[91]  It was CORE's responsibility to satisfy ERISA's requirements for initial denials, namely the reasons for the decision, the additional information that would be required to change the decision, and the appeal rights.[92]  Ms. Dixon notified the employee of CORE's decision, but her letter was not a denial

---

[85] Dixon Dep. Tr. at 24.

[86] Dixon Dep. Tr. at 25.

[87] Dixon Dep. Tr. at 35.

[88] Dixon Dep. Tr. at 102.

[89] Dixon Dep. Tr. at 187.

[90] "CORE would notify me of the decision of denial."  Dep. Tr. 103.  The notice was sent definitely in writing and also sometimes by telephone.  Dixon Dep. Tr. at 107.

[91] Dixon Dep. Tr. at 105.

[92] Dixon Dep. Tr. at 105-06.

17

letter under ERISA – CORE sent the ERISA letter.[93] Ms. Dixon notified payroll to stop paying benefits.[94]

Ms. Dixon was happy to have Travelers and CORE administer the LTD claims because she knew that she lacked the medical and vocational knowledge to do so.[95] Ms. Dixon had only a high school education[96] and lacked medical[97] and vocational training.[98] She relied on other people for opinions and resources about LTD decisions.[99] Ms. Dixon's view of her role was so limited that she would not take action as Champion's LTD Administrator even if she received information that a beneficiary might not be entitled to benefits.[100]

First level appeals of denial of benefits by CORE went to Ms. Dixon, but she did not get a copy of CORE's file to review.[101]

---

[93]  Dixon Dep. Tr. at 106.
[94]  Dixon Dep. Tr. at 103.
[95]  Dixon Dep. Tr. at 89.
[96]  Dixon Dep. Tr. at 13.
[97]  Dixon Dep. Tr. at 31.
[98]  Dixon Dep. Tr. at 31.
[99]  Dixon Dep. Tr. at 32.
[100] Dixon Dep. Tr. at 54.
[101] "I got nothing." Dixon Dep. Tr. at 106.

She sent whatever information she had to CORE.[102] CORE communicated the results of its review to Ms. Dixon in the form of case notes.[103]

Ms. Dixon decided the appeal in accordance with CORE's recommendation.[104] Whatever the recommendation was, she would do it.[105] She never went against CORE's recommendation.[106] CORE in

---

[102] To use Ms. Dixon's exact words:

> They [CORE] initially denied the claim, then the employee had their appeal rights. If they appealed at the first level, which was me, that appeal would come into me, and if they had any additional clinical information, I would send that appeal along with any additional information up to CORE for a review.

Dixon Dep. Tr. at 102; see also Dixon Dep. Tr. at 106 ("When I got the appeal I would send it up to CORE to review.").

[103] Dixon Dep. Tr. at 112.

[104] Dixon Dep. Tr. at 107.

[105] Dixon Dep. Tr. at 107 ("Q. Whatever their recommendation was you would do it? A. Yes, sir.").

[106] Dixon Dep. Tr. at 138 ("Q. And you never went against them? A. Basically, no, I did not."); see also Dixon Dep. Tr. 149 ("I relied totally on CORE's recommendation ... the bottom line was I was going with their recommendation.").

19

effect made the decision.[107]  Ms. Dixon followed CORE's recommendation in the appeals of the Plaintiffs herein.[108]

> Q. [I]n order for us to totally understand why the decision was made to cut these people [Plaintiffs] off from disability, we would have to, as you've been saying, talk to CORE; isn't that true?
> A. Yes.[109]

Ms. Dixon never made any independent investigation of the facts for the purpose of appeal.[110]  Ms. Dixon took the statements made by CORE at face value and had no way of knowing whether the events described in CORE's reports ever took place.[111]  Ms. Dixon did not interview the claimant, the claimant's doctors, or any vocational people who had given opinions.[112]  Ms. Dixon did not attempt to reconcile conflicting statements in the medical

---

[107] Dixon Dep. Tr. at 116 ("Q. So to make that clear on the record, when you would make your decision at the second level, what we've been calling the first appeal, when you would make that decision, CORE would actually make that decision?  A. That is correct.").

[108] Dixon Dep. Tr. at 168-69.

[109] Dixon Dep. Tr. at 169.

[110] Dixon Dep. Tr. at 114-15.  Ms. Dixon testified that it was "not within her role" to speak with doctors.  Dixon Dep. Tr. at 160.

[111] Dixon Dep. Tr. at 160, 170-71.

[112] Dixon Dep. Tr. at 115.

evidence; she let CORE do that.[113] Ms. Dixon made no distinction between the opinion of a treating doctor and the results of an IME.[114] She couldn't have reconciled conflicts if she wanted to because she didn't have either the information[115] or the expertise.[116] All Ms. Dixon had to make decisions with was one report by CORE.[117]

Ms. Dixon gave no weight in the appeal process to the fact that Champion had previously found an employee totally and permanently disabled; she followed what CORE said about that employee.[118] Ms. Dixon acknowledged that the physical condition of employees tends to worsen as they age, but testified that she did not take that fact into account in deciding appeals unless CORE did; she went with CORE's recommendation.[119] Ms. Dixon did not consider the employee's education in deciding disability

---

[113] Dixon Dep. Tr. at 115.

[114] Dixon Dep. Tr. at 136.

[115] Dixon Dep. Tr. at 116.

[116] Dixon Dep. Tr. at 116-17.

[117] Dixon Dep. Tr. at 116. Ms. Dixon later testified that when CORE based its recommendation upon an IME or vocational study, she got a copy along with the case notes. Dixon Dep. Tr. at 145, 147.

[118] Dixon Dep. Tr. at 129.

[119] Dixon Dep. Tr. at 129-30.

issues on appeal; she assumed that CORE had done so and went with CORE's recommendation.[120] She would have followed CORE's recommendation even if CORE had not considered educational level in determining disability.[121] Ms. Dixon did not consider an employee's work history when hearing appeals because she assumed that CORE had done so; she followed CORE's recommendation.[122] She followed it even if CORE had not adequately considered the factor of work history.[123] Ms. Dixon did not independently take into consideration an employee's pain level in disability determinations; she assumed that CORE had done so and followed CORE's recommendation.[124] Ms. Dixon gave no weight to functional capacity evaluations unless CORE did; she followed CORE's recommendation.[125] Ms. Dixon would not have considered any additional medical evidence supplied by the employee because she followed

---

[120] Dixon Dep. Tr. at 130-31.

[121] Dixon Dep. Tr. at 131.

[122] Dixon Dep. Tr. at 131-32.

[123] Dixon Dep. Tr. at 133.

[124] Dixon Dep. Tr. at 134 ("A. I relied on CORE.  Q. Relied totally on CORE?  A. Yes, I did.  Q. And if they did not take into consideration a person's pain level, then you did not?  A. Yes.").

[125] Dixon Dep. Tr. at 137-38.

medical evidence supplied by the employee because she followed CORE's recommendation.[126] Ms. Dixon assumed that CORE had considered all relevant factors[127] and made no independent findings.[128] All Ms. Dixon did was send the employee notice of the decision[129] and give as the reason for denial the reasons CORE had given her.[130]

There were no formal or written Champion policies on the criteria for reviewing LTD claims; Ms. Dixon made handwritten notes, as she saw fit, on things she needed to remember.[131] CORE had its own written guidelines on those issues but Ms. Dixon does not recall seeing anything other than procedural guidelines.[132] Documents relating to Plaintiff Kirkpatrick refer to a guideline to the effect that a person who can work six hours a day at a

---

[126] Dixon Dep. Tr. at 156, 161, 164, 168, 171, 174, 177-78, 181, 184.

[127] Dixon Dep. Tr. at 132.

[128] Dixon Dep. at 147-48.

[129] Dixon Dep. Tr. at 108.

[130] Dixon Dep. Tr. at 114.

[131] Dixon Dep. Tr. at 121-22.

[132] Dixon Dep. Tr. at 122.

23