IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

HARRY L. SMITH, LOIS L. LYNN,                    )
DARRELL KEITH HILL, ELIZABETH                    )
CASE BOONE, WILEY H. HAYNES,                     )
ROSA LEE BROOKSHIRE, HARRISON                    )      CIVIL ACTION NUMBER
YOUNG CLARK, FRANZISKA FINNEY,                   )      3:02cv00212 (CFD)
JUDITH CASE KIRKPATRICK, WILSON                  )
DANIEL McCLURE, CELIA DARLENE                    )
METCALF, CHARLES R. REECE,                       )
DOLPHUS LUTHER TREADWAY, JR.,                    )
and MARTHA BURNETTE WHITLEY,                     )
                                                 )
                         Plaintiffs,             )
                                                 )
v.                                               )
                                                 )
CHAMPION INTERNATIONAL                           )
CORPORATION, LONG TERM                           )
DISABILITY BENEFITS PLAN FOR                     )
SALARIED EMPLOYEES OF                            )
CHAMPION INTERNATIONAL                           )
CORPORATION #506, LONG TERM                      )
DISABILITY BENEFITS PLAN FOR                     )
CERTAIN HOURLY EMPLOYEES OF                      )
CHAMPION INTERNATIONAL                           )
CORPORATION #703; INTERNATIONAL                  )
PAPER COMPANY; and CORE, INC.                    )
                                                 )
                         Defendants.             )      APRIL 4, 2005
_____    )

**DEFENDANTS' MEMORANDUM
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") and

Local Rule 56(a), defendants Champion International Corporation ("Champion International"),

Long Term Disability Benefits Plan for Salaried Employees of Champion International

Corporation #506 ("Salaried LTD Plan"), Long Term Disability Plan for Certain Hourly

Employees of Champion International Corporation #703 ("Hourly LTD Plan")(collectively

referred to as "LTD Plans" of "Plans"), and International Paper Company ("International

Paper"), by counsel, state as follows in support of their Motion for Summary Judgment in the

above-captioned action:

### Statement of the Case

Fourteen former Champion International employees from North Carolina seek

disability benefits pursuant to the LTD Plans; both of which are employee welfare benefit

plans within the meaning of the Employee Retirement Income Security Act of 1974, 29 U.S.C.

§§1001, et seq. ("ERISA").  See Complaint, ¶¶6-7 (Dkt. Entry 1) & Answer, ¶¶6-7 (Dkt. Entry

10).  The LTD Plans provide income benefits to eligible employees who are prevented from

engaging in employment as a result of "Total Disability" as defined in the LTD Plans.  See

Answer, ¶11 (Dkt Entry 10).

Plaintiffs received long-term disability ("LTD") benefits pursuant to the LTD Plans,

and allege that the LTD Plans improperly re-evaluated and terminated each of their disability

benefits.  See, e.g., Complaint, ¶39 (Dkt. Entry 1).  Plaintiffs contend that Champion

International and CORE, Inc. (a third-party vendor retained by Champion International to

assist in claim administration and to serve as the Plans' medical consultant) "instituted a re-

examination of all disabled participants who were receiving LTD benefits for the purpose of

denying and terminating their rights to benefits."  See Complaint, ¶19 (Dkt. Entry 1).

2

On February 4, 2002, plaintiffs filed their four-count Complaint in the above-captioned action. In Count I, plaintiffs Smith, McClure and Lynn seek LTD benefits from the Salaried LTD Plan. See Complaint, ¶¶252-54 (Dkt. Entry 1)(relying on 29 U.S.C. §1132(a)(1)(B)). In Count II, the remaining plaintiffs seek LTD benefits from the Hourly LTD Plan. See Complaint, ¶¶255-57 (Dkt. Entry 1)(relying on 29 U.S.C. §1132(A)(1)(B)). In Counts I and II, plaintiffs seek judicial review of the Plans' decisions denying their claims for disability benefits. Plaintiffs demand, *inter alia*, "LTD benefits pursuant to the [LTD Plans] for the period of his or her disability, and continuing thereafter." See Complaint, ¶253 & ¶¶252-57 (Dkt. Entry 1).

In Count III, plaintiffs purport to assert a claim based on defendants' alleged violation of 29 U.S.C. §1133. See Complaint ¶¶258-61 (Dkt. Entry 1). In Count IV, plaintiffs purport to assert a claim pursuant to 29 U.S.C. §1132(a)(3) based on defendants' alleged breach of fiduciary duty. See Complaint, ¶¶262-65, 282 (Dkt. Entry 1)(relying on 29 U.S.C. §1132(a)(3)).

Discovery has ended. Defendants' Motion for Summary Judgment is now ripe for review.

## Summary Judgment Standard

Summary judgment is "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S. Ct. 2548, 2555 (1986)(citations omitted). Parties who bear the burden of proof on a crucial issue at trial cannot survive summary judgment

without sufficient evidence to sustain their burden of proof on that point. <u>Id</u>., at 327, 106 S. Ct. at 2555. As the Supreme Court noted in <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986), "a scintilla of evidence in support of the plaintiff's position will be insufficient [to overcome summary judgment]; there must be evidence on which the [fact finder] could reasonably find for the plaintiff." Plaintiffs, as the non-moving parties, "may not rely on conclusory allegations or unsubstantiated speculation." <u>See</u> <u>Scotto v. Almenas</u>, 143 F.3d 105, 114 (2nd Cir. 1998).

## Summary of Argument

Plaintiffs have failed to state a claim pursuant to 29 U.S.C. §1132(a)(1)(B), §1133 or §1132(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"). Their Complaint, therefore, should be dismissed, with prejudice. As demonstrated below:

- Because plaintiffs Finney, Hill, McClure and Treadway failed to exhaust their administrative remedies, their benefits claims in Counts I and II of their Complaint should be dismissed, with prejudice;

- The LTD Plans' decisions to terminate and deny plaintiffs' claims for LTD benefits were not arbitrary and capricious. <u>See</u> Complaint, ¶¶252-57 (Dkt. Entry 1);

- Plaintiffs cannot state a claim pursuant to 29 U.S.C. §1133 because the alleged procedural violations on which plaintiffs rely do not give rise to an independent cause of action under ERISA. <u>See</u> Complaint, ¶¶258-61 (Dkt. Entry 1); and

- Plaintiffs' cannot state a claim for breach of fiduciary duty pursuant to 29 U.S.C. §1132(a)(3) because they have a remedy under 29 U.S.C. §1132(a)(1)(B). In addition,

although plaintiffs identify several ways in which they allege that defendants breached their fiduciary duty, even if such a claim did exist in the instant case, none of plaintiffs' allegations support a breach of fiduciary duty claim, and the great majority are time-barred.

**Argument**

I.     Finney's, Hill's, McClure's and Treadway's Claims for LTD Benefits Should be Dismissed, with Prejudice, Based on their Failure to Exhaust their Plan Remedies.

It is well-settled that "[a]n ERISA welfare benefit plan participant must both pursue and exhaust plan remedies before gaining access to the federal courts." Gayle v. United Parcel Service, ___ F.3d ___, 2005 U.S. App. LEXIS 3935 (4th Cir. 2005).[1]  See also Kennedy v. Empire Blue Cross & Blue Shield, 989 F.2d 588, 594-95 (2nd Cir. 1993).  Requiring exhaustion of administrative remedies gives force to ERISA's explicit requirement that benefit plans covered by ERISA provide internal dispute resolution procedures for participants whose claims for benefits have been denied.  See Smith v. Sydnor, 184 F.3d 356 (4th Cir. 1999).  Exhaustion also "enables plan fiduciaries to efficiently manage their funds; correct their errors; interpret plan provisions; and assemble a factual record which will assist a court in reviewing the fiduciaries' actions."  Id.  As courts consistently have recognized, "Congress intended plan fiduciaries, not the federal courts, to have primary responsibility for claims processing."  Makar v. Health Care Corp., 872 F.2d 80, 83 (4th Cir. 1989).

---

[1]The Fourth Circuit has designated its decision in Gayle for publication, but the decision has not yet appeared in the Federal Reporter.  A copy of the Gayle decision is appended hereto as Exhibit A.

Indeed, the Second Circuit has held that failure to exhaust administrative remedies is sufficient ground for dismissal of an ERISA claim.  See Kennedy, 989 F.2d at 594-95. According to the Second Circuit, a dismissal, with prejudice, for failure to exhaust would "promote the purposes of [ERISA] by enabling the plan committee to perform the function that Congress contemplated that it would perform."  See Davenport v. Harry N. Abrams, Inc., 249 F.3d 130, 134 (2nd Cir. 2001).

Here, although fully-advised of their administrative remedies, plaintiffs Finney, Hill, McClure and Treadway failed to exhaust their Plan remedies.[2]  Their claims, therefore, should be dismissed, with prejudice.  See Davenport, 249 F.3d at 136 (dismissal with prejudice for failure to exhaust plan remedies); Gayle, 2005 U.S. App. LEXIS 3935 *18 (same).

More specifically, on February 26, 1997, the Hourly LTD Plan notified Finney that her LTD benefits were being terminated because she no longer satisfied the Plan's Disability definition.  See Defendants' Local Rule 56(a)(1) Statement of Facts (hereinafter "Facts"), ¶168, which is incorporated herein by reference pursuant to Fed. R. Civ. P. 10(c).  On October 1, 1997, Finney requested the Plan to review the termination of her benefits.  See Facts, ¶169. The Plan did so and, on February 9, 1998, denied Finney's claim for LTD benefits.  See Facts, ¶172.  The Plan informed Finney that she had sixty days to appeal the denial of her claim for benefits and provided to her a copy of the Plan, including its claims procedures.  See Facts,

_____

[2]Consistent with the claims regulations applicable at the time, see 29 C.F.R. §2560.503-1 (1993), a copy of which is appended hereto as Exhibit C, the Plans had a two-step claims review and appeal procedure.  See Defendants' Local Rule 56(a)(1) Statement of Facts

¶172. Finney, however, never appealed the adverse benefits decision. <u>See</u> Facts, ¶173. She, therefore, failed to exhaust her administrative remedies and her benefits claim should be dismissed, with prejudice. <u>See</u> <u>Davenport</u>, 249 F.3d at 136; <u>Gayle</u>, 2005 U.S. App. LEXIS 3935 *18.

On July 19, 1998, the Hourly LTD Plan notified Hill that his LTD benefits were being terminated because he no longer satisfied the Plan's Disability definition. <u>See</u> Facts, ¶221. On October 19, 1998, Hill requested the Plan to review the termination of his benefits. <u>See</u> Facts, ¶223. The Plan did so and, on February 7, 1999, denied Hill's claim for LTD benefits. <u>See</u> Facts, ¶226. The Plan informed Hill that he had sixty days to appeal the denial of his claim for benefits and provided to him a copy of the Plan, including its claims procedures. <u>See</u> Hill 0159-0160 (NB 10). Hill, however, never appealed the adverse benefits decision. <u>See</u> Facts, ¶227. He, therefore, failed to exhaust his administrative remedies and his benefits claim should be dismissed, with prejudice. <u>See</u> <u>Davenport</u>, 249 F.3d at 136; <u>Gayle</u>, 2005 U.S. App. LEXIS 3935 *18.

On October 16, 1996, the Salaried LTD Plan notified McClure that his LTD benefits were being terminated because he no longer satisfied the Plan's Disability definition. <u>See</u> Facts, ¶349. On December 13, 1996, McClure requested the Plan to review the termination of his benefits. <u>See</u> Facts, ¶350. The Plan did so and, on April 9, 1997 (after requesting an extension as provided for in the Plan), denied McClure's claim for LTD benefits. <u>See</u> Facts,

---

(hereinafter "Facts"), ¶12, which is incorporated herein by reference pursuant to Fed. R. Civ. P. 10(c).

¶¶354, 353.  The Plan informed McClure that he had sixty days to appeal the denial of his claim for benefits and provided to him a copy of the Plan, including its claims procedures.  <u>See</u> Facts, ¶354; McClure 0032-0034 (NB 17).  McClure, however, never appealed the adverse benefits decision.  <u>See</u> Facts, ¶¶355-58.  He, therefore, failed to exhaust his administrative remedies and his benefits claim should be dismissed, with prejudice.  <u>See</u> <u>Davenport</u>, 249 F.3d at 136; <u>Gayle</u>, 2005 U.S. App. LEXIS 3935 *18.

On September 11, 1998, the Hourly LTD Plan notified Treadway that his LTD benefits were being terminated because he no longer satisfied the Plan's Disability definition.  <u>See</u> Facts, ¶438.  On December 22, 1998, Treadway requested the Plan to review the termination of his benefits.  <u>See</u> Facts, ¶439.  The Plan did so and, on February 8, 1999, denied Treadway's claim for LTD benefits.  <u>See</u> Facts, ¶440.  Treadway initially indicated that he intended to appeal the adverse benefits decision, but then withdrew his appeal on February 24, 1999.  <u>See</u> Facts, ¶443.  He, therefore, failed to exhaust his administrative remedies and his benefits claim should be dismissed, with prejudice.  <u>See</u> <u>Davenport</u>, 249 F.3d at 136; <u>Gayle</u>, 2005 U.S. App. LEXIS 3935 *18.

The facts in <u>Gayle</u> are similar to those at issue in the instant case, and the Court's analysis is instructive.  The plaintiff in <u>Gayle</u> received LTD benefits for approximately eighteen months before the ERISA plan in which she was a participant informed her by letter that she no longer was eligible for benefits.  The Plan notified the plaintiff that, if she disagreed with the decision to terminate her benefits, she must submit an appeal pursuant to the deadlines defined in the Plan.  The Plaintiff, however, failed to submit a timely appeal.

After reviewing the important reasons justifying the exhaustion requirement, the Fourth Circuit held that her benefits should be dismissed, with prejudice, because she failed to exhaust her plan remedies.  According to the Court, "[t]his must follow from the legal conclusion that [plaintiff] has neglected to exhaust her Plan remedies, and for lack of timeliness, cannot now do so."  See Gayle, 2005 U.S. App. LEXIS *18.[3]  Like those of the plaintiff in Gayle, Finney's, Hill's, McClure's and Treadway's benefits claims should be dismissed, with prejudice, based on their failure to exhaust their Plan remedies.

II.     In a Proper Exercise of their Discretion, the Salaried LTD Plan and the Hourly LTD Plan Properly Terminated and Denies Plaintiffs' Claims for Long Term Disability Benefits.

A.     The Arbitrary and Capricious Standard of Review

The benefits at issue here were provided pursuant to employee benefit plans governed by ERISA, and "[w]here 'the written plan documents confer upon a plan administrator the discretionary authority to determine eligibility,'" the standard for the Court's review is whether the determination "was arbitrary and capricious."  See Piscottano v. Metropolitan Life Ins. Co., 118 F. Supp.2d 200, 210 (D. Conn. 2000), quoting, Pagan v. NYNEX Pension Plan, 52 F.3d 438, 441 (2nd Cir. 1995).  As this Court has recognized, "[a] court may set aside a decision to deny benefits as 'arbitrary and capricious' only if it was 'without reason, unsupported by

---

[3]The facts in the instant case are even less compelling from the plaintiffs' point of view than those which existed in Gayle.  There, unlike the instant case, the plaintiff eventually filed and pursued an untimely appeal.  In addition, she alleged that her lawyer was responsible for the late filing.  Nevertheless, the Court dismissed her benefits claim, with prejudice.  Here, plaintiffs Finney, Hill and McClure never filed an appeal at all, and Treadway withdrew his appeal.

substantial evidence or erroneous as a matter of law.'" Id., quoting, Pagan, 52 F.3d at 442.

This standard is "highly deferential," Zervos v. Verizon New York, Inc., 277 F.3d 635, 646

(2nd Cir. 2002), and, in determining whether the challenged benefits decision was "arbitrary

and capricious," the Court "must consider whether the decision was based on a consideration

of the relevant factors and whether there has been a clear error of judgment." Pagan, 52 F.3d

at 442.

  An adverse benefits decision will be upheld if it is supported by "substantial evidence."

See Miller v. United Welfare Fund, 72 F.3d 1066, 1070 (2nd Cir. 1995). "Substantial

evidence" is defined as that "evidence that a reasonable mind might accept as adequate to

support the conclusion reached by the [decisionmaker and] . . . requires more than a scintilla

but less than a preponderance." Piscottano, 118 F. Supp.2d at 210, quoting, Miller, 72 F.3d

1072). This is true "even if the evidence presently in the record could reasonably support a

contrary determination." Piscottano, 118 F. Supp.2d at 211, citing, Donato v. Metropolitan

Life Ins. Co., 19 F.3d 375, 380 (7th Cir. 1994).[4]  As the Second Circuit consistently has

recognized, "[a] court is 'not free to substitute [its] own judgment for that of the [plan

administrator] as if [it] were considering the issue of eligibility anew.'" Zeros, 277 F.3d at

650, quoting, Pagan, 52 F.3d at 442. See also Peterson v. Continental Cas. Co., 282 F.3d 112,

---

  [4]A plan administrator's denial of benefits is not arbitrary and capricious where the "decision simply came down to a permissible choice between the position of . . . [the plan's] independent medical consultant, and the position of [the claimant's physicians]." See Donato, 19 F.3d at 380.

117 (2nd Cir. 2002)("federal courts have a narrow role in reviewing the discretionary acts of ERISA plan administrators").

Pursuant to the Salaried LTD Plan and the Hourly LTD Plan, the decisionmaker had "the power and authority in its sole, absolute and uncontrolled discretion to control and manage the operation and administration of the Plan(s)" and had "all powers necessary to accomplish these purposes." See Facts, ¶10. Those duties and powers included, *inter alia*, the power to "determine[e] all questions relating to the eligibility of Employees to participate," to "determine[e] the amount and kind of benefits payable to any Employee," and to "interpret[] the provisions of the Plan(s)." See Facts, ¶10.

Pursuant to this grant of "discretionary authority," the Court will not disturb the benefits decisions at issue here unless they are "arbitrary and capricious." See Pagan, 52 F.3d at 441. As demonstrated below, the Plans' decisions to terminate and deny plaintiffs' claims for LTD benefits were not arbitrary and capricious.

B.     Plaintiff's Claims for Benefits

The Salaried LTD Plan and Hourly LTD Plan define two distinct periods during which a plan participant may be entitled to LTD benefits. During the first, known as the "own occupation" or "own occ" period, the participant must be unable "to perform the duties of his employment with the Employer." See Facts, ¶¶4 & 5. During the second, known as the "any occupation" or "any occ" period, the participant must be unable "to engage in *any* occupation or business for wage or profit" for which the participant is, may become or becomes reasonably qualified by training, education or experience. See Facts, ¶¶7 & 8.

Here, the LTD Plans terminated and denied plaintiffs' requests for LTD benefits because they did not satisfy the more stringent "any occ" standard for LTD benefits. As demonstrated below, "substantial evidence" supports the LTD Plans' benefits decisions in this matter.[5]

       1.    <u>Elizabeth Boone</u>

Plaintiff Elizabeth Boone was an hourly employee at Champion International's facility in Canton, North Carolina. <u>See</u> Facts, ¶22. According to Boone's treating physician, Boone had "anterior diskectomy with interbody fusion C4-5 on 6-23-87 . . . and continues to have neck pain. <u>See</u> Facts, ¶27. As a result, Boone began receiving benefits pursuant to the Hourly LTD Plan.

On December 11, 1997, while evaluating whether Boone was entitled to continuing LTD benefits under the "any occ" standard, the Medical Director of the Champion International's Disability Management Program spoke to Boone's treating physician. <u>See</u> Facts, ¶35. During that telephone call, Boone's treating physician stated that "she's not sure if [Boone] is any-occupation disabled." <u>See</u> Facts, ¶35. The Plan, therefore, scheduled Boone for an independent medical examination ("IME") with Charles Shields, M.D., a physiatrist. <u>See</u> Facts, ¶36.

Dr. Shields reviewed Boone's medical records and, on February 3, 1998, examined Boone. At the conclusion of his examination, Dr. Shields was unable to find any absolute

---

[5]The following discussion is not intended to be an exhaustive discussion of each plaintiff's claim for benefits. For a more thorough discussion of plaintiffs' claims for benefits,

sensory deficits to light touch, found Boone's motor strength to be "within normal limits and certainly there is no focal area of weakness," and was unable to find any specific atrophy. Moreover, Dr. Shields noted "interestingly enough she only has eight of the eighteen usually fibromyalgic tender points. Some of the controls are also positive." See Facts, ¶39.

Dr. Shields recommended that Boone could "work five to six hours a day at a sedentary physical demand level with specific restrictions to the left side of the body." He also "believe[d] that they could increase the number of hours that [Boone] would be able to work up to 40 hours a week." See Facts, ¶40. According to Dr. Shields, Boone could not return to her regular occupation but could return to work with modifications "now." See Facts, ¶41. He stated that Boone could work five to six hours a day, five days a week, and certified Boone's physical modification as "sedentary only," with lifting restriction of ten pounds, standing restriction of one to two hours, sitting restriction as five to six hours and walking restrictions of "for personal needs only." See Facts, ¶41.

The Plan also commissioned Alan Marks, M.D., to conduct a Peer Review Analysis of Boone's claim and determine whether Boone was disabled from any occupation. Dr. Marks reviewed Boone's records and concluded on May 7, 1998, that Boone was not disabled from any occupation. See Facts, ¶¶48-49.

During the claims review process, Boone's treating physician stated that, in her opinion, Boone was "unable to be employed at any level of job including sedentary." See

see Facts, ¶¶22-495.

Facts,¶56.[6]  However, Boone also submitted office notes from another physician who was treating her in which the physician stated that Boone's "gait appears normal.  Active range of motion of both upper extremities is normal, as is strength in both upper extremities."  <u>See</u> Facts, ¶55.

To further evaluate her claim, the Plan commissioned a Transferable Skills Analysis ("TSA") of Boone.  The TSA considered Boone's work experience at Champion International as a paper sorter and counter and concluded "there are a number of jobs Ms. Boone could perform that are within the same occupational category, yet in different industries."  The TSA identified various occupational titles that conformed with Boone's physical restrictions and skills.  <u>See</u> Facts, ¶¶57-58.

On September 24, 1998, the Plan's Claims Review Committee discussed Boone's claim.  The Committee reviewed Boone's file and discussed its contents; it then voted to uphold the denial of Boone's claim for LTD benefits.

> "The Committee noted that Boone's doctors, while stating she was disabled, did not provide any clinical analysis other than opinion.  An Independent Medical Evaluation was conducted by Dr. Shields on 2/3/98.  Dr. Shields, in a 7 page report, after setting forth his conclusions and primary diagnosis, stated that Ms. Boone can work 5-6 hours a day at a sedentary physical demand level with specific restrictions to the left side of the body.  The Committee reviewed the Physician's Report of the Physical Capacity and the Modifications Checklist that  Dr. Shields completed which restated that Ms. Boone could work 5-6 hours a day, 5 days a week, sit 5-6 hours, stand 1-2 hours, lift up to 10 pounds, and operate a motor vehicle, with restrictions.
>
> Further, the Committee noted that on 12/11/97 Dr. Beavers of CORE (the Plan's medical reviewer) discussed Ms. Boone with her doctor, Dr. Vargo.  While Dr. Vargo

---

[6]This was in contrast to Dr. Vargo's earlier statement to the Plan's consulting physician that "she's not sure if [Boone] is any-occupation disabled."  <u>See</u> Facts, ¶35.

would not clear Ms. Boone to return to work, Dr. Vargo was "not sure" if she is any-occupation disabled and said that "there are no objective findings to report."

Further a Transferable Skills analysis identified various occupations that Ms. Boone might perform."

<u>See</u> Facts, ¶62.  Based on the foregoing, the Plan's benefits denial was supported by substantial evidence and was not arbitrary and capricious.  <u>See</u> Facts, ¶¶22-68.

       2.    <u>Rosa Lee Brookshire</u>

Plaintiff Rosa Lee Brookshire was an hourly employee at Champion International's facility in Canton, North Carolina.  <u>See</u> Facts, ¶69.  Brookshire described her alleged disabling condition as chronic low back pain and obesity, <u>See</u> Facts, ¶70, and began receiving benefits pursuant to the Hourly LTD Plan in July 1995. <u>See</u> Facts, ¶75.

On July 23, 1997, while evaluating whether Brookshire was entitled to continuing LTD benefits under the "any occ" standard, the Medical Director of the Champion International Disability Management Program, spoke to David Mulholland, M.D., Brookshire's treating physician.  Dr. Mulholland informed the Plan that he "inherited" Brookshire as a patient, "never disabled her himself," and that "she is probably capable of sedentary work."  <u>See</u> Facts, ¶82.

At Dr. Mulholland's suggestion, the Plan then scheduled Brookshire for a Functional Capacity Evaluation ("FCE"), which was conducted on September 18, 1997.  The FCE revealed that Brookshire was "able to work at the LIGHT Physical Demand Level for an 8 hour day . . ."  <u>See</u> Facts, ¶¶85-86.  These findings were consistent with an earlier FCE which

revealed that Brookshire was "able to work at the SEDENTARY-LIGHT Physical Demand Level for an 8 hour day . . . ."  See Facts, ¶73.

After the FCE, Brookshire's treating physician refused to comment on Brookshire's disability status.  See Facts, ¶88.  To further evaluate Brookshire's medical condition, the Plan, therefore, scheduled Brookshire for an IME with a physiatrist, Andrew Rudins, M.D., at the Southeastern Spine Center in Asheville, North Carolina.  See Facts, ¶89.

Dr. Rudins examined Brookshire on December 2, 1997.[7]  Dr. Rudins diagnosed Brookshire with "degenerative disc disease of the lumbar spine, with associated myofascial pain on a chronic basis, and obesity."  However, according to Dr. Rudins, Brookshire was "presently at a light physical demand level" and could "work at some occupation" eight hours per day, five days per week with restrictions including maximum lifting capacity of fifteen pounds.  See Facts, ¶95.  See Facts, ¶¶91-95 (more comprehensive discussion of the IME).

During the claims and appeal process, Brookshire's former legal counsel submitted, inter alia, a January 26, 1998, progress note from Stewart J. Harley, M.D., which also supports the Plan's conclusion that Brookshire did not satisfy the "any occ" disability standard.  See Facts, ¶¶99-101.  In his progress note, Dr. Harley indicated that Brookshire "has degenerative arthritis in her lumbar spine" and stated

---

[7]Prior to examining Brookshire, Dr. Rudins reviewed Brookshire's September 28, 1997, FCE, Brookshire's Personal Profile Evaluation, and Dr. Mulholland's Attending Physician Statement.  Dr. Rudins also examined x-rays of Brookshire's lumbar spine performed in June 1995, an MRI performed in September 1992, and a CT scan of the lumbar spine done in April 1994.  See Facts, ¶90.

> "[t]his lady says she is unable to work because of severity of her pain. If this lady does return to work, she should return to work under the guidelines of the functional capacities evaluation. Reviewing the guidelines of the FCE, I think she could return to work but with severe restrictions . . . ."

See Facts, ¶100.

To assist in reviewing her claim, the Plan commissioned a TSA of Brookshire, which was completed on July 1, 1998. The TSA revealed that there were several positions Brookshire could perform related to her nursing experience and several sedentary and light occupational titles which Brookshire could perform based on the skills associated with the position she held at Champion International. See Facts, ¶102.

The Plan also commissioned John Nemunaitis, M.D., to conduct a Peer Review Analysis of Brookshire's appeal.[8] Based on his review, Dr. Nemunaitis recommended that "the decision of denial be upheld, for the patient is not disabled for any occupation." Dr. Nemunaitis based his recommendation on the rationale that there "is no objective verification of a radiculopathy" in Brookshire's x-rays, MRI and CT Scan, that the FCE indicated Brookshire was "able to work at a light physical demand level for an eight hour day," that Brookshire's lifting capacity during the IME and other RCC's were appropriate, and that the IME "did not verify radiculopathy nor acute disc pathology." See Facts, ¶¶103-04.

---

[8]Dr. Nemunaitis completed his review on July 10, 1998, after reviewing the July 1, 1998, Transferable Skills Analysis, Dr. Harley's progress notes submitted in support of Brookshire's appeal, the December 2, 1997, IME performed by Dr. Rudins, Dr. Mulholland's June 23, 1997, Attending Physician Statement, the December 12, 1998, Modification Checklist, the December 15, 1997, Champion Return to Work form, the September 28, 1997, FCE, correspondence from Dr. Mulholland, and the December 18, 1997, case management notes. See Facts, ¶103.

The Plan's Claims Review Committee reviewed Brookshire's claim at its meeting on September 24, 1998.  The Committee reviewed Brookshire's claims file, including notes from the Plan's consulting physician's conversation with Brookshire's treating physician, Dr. Mulholland, indicating that Brookshire was "probably capable of sedentary work," Dr. Rudin's December 2, 1997, IME, and all medical records submitted to the Plan on Brookshire's behalf. During the meeting, the Committee examined this information against the Plan's definition for total disability and voted to uphold the decision to deny Brookshire's claim for LTD benefits. See Facts, ¶106.  Based on the foregoing, the Plan's decision to deny Brookshire's claim for LTD benefits was supported by substantial evidence and was not arbitrary and capricious.  See Facts, ¶¶69-111.

### 3.     Harrison Clark

Plaintiff Harrison Clark was an hourly employee at Champion International's facility in Canton, North Carolina.  See Facts, ¶112.  Clark was diagnosed with "chronic back pain – myositis-fibromyalgia and ekbom syndrome or restless leg syndrome." See Facts, ¶115.  As a result, Clark began receiving benefits pursuant to the Hourly LTD Plan.  See Facts, ¶116.

In August 1997, while evaluating whether Clark was entitled to continuing LTD benefits under the "any occ" standard, the Medical Director of the Champion International Disability Management Program, spoke to Dr. Eglinton, Clark's treating physician.  Dr. Eglinton reported to the Plan during that telephone conversation that Clark was "not disabled from any occupation and that there are jobs he could do."  See Facts, ¶123.  See also Facts,

¶122 (Dr. Eglinton's office note which indicates he informed the Plan that "I cannot certify [Clark] is totally and completely disabled from all work activity").

On November 15, 1997, Clark's treating physician completed a Modification Checklist on which he indicated that may initially work four to six hours a day, three to four days a week with an increase in hours as tolerated. According to Dr. Eglinton, Clark could perform a "sedentary job only, may walk for personal needs only, may sit 30 minutes with position changes, and may stand 30 minutes with position changes." See Facts, ¶126.

The Plan then commissioned Andrew Rudins, M.D., to conduct an IME of Clark. Dr. Rudins reviewed Clark's medical records, reviewed Clark's medical symptoms and history, and, on January 12, 1998, examined Clark. Dr. Rudins concluded that Clark had at least a "full time sedentary capacity." In fact, according to Dr. Rudins, Clark "really has no significant objective findings to limit him to a sedentary work capacity. This restriction is based predominantly on his past history and submaximal performance on the FCE." See Facts, ¶¶128-30.[9]

---

[9]At the conclusion of his examination of Clark, Dr. Rudins opined that Clark suffered from a chronic lumbar sprain, "fibromyalgia by history, but no significant findings to suggest this diagnosis on physical exam," restless legs syndrome, and severe chronic pain/disability syndrome related to all of the other diagnoses. According to Dr. Rudins, "Mr. Clark's perception of his disability is much greater than any objective evidence indicates." Dr. Rudins concluded:

"that Mr. Clark does have a work capacity, though at a sedentary level at 8 hours per day. He should be allowed to frequently change positions i.e. sit to stand to walk at least every 15 minutes. He should avoid any extensive or repetitive bending or twisting. Maximal lifting is 10 pounds on an occasional basis. I expect that if he is

On January 12, 1998, Dr. Rudins completed a Modification Checklist on which he indicated that Clark could return to work on January 12, 1998, with the following modifications: sedentary job only; eight hours a day, five days per week; may lift up to ten pounds; may walk, sit, or stand fifteen minutes at a time; no modification to the upper extremity, avoidance of repetitive use of the lower extremity with use being limited to fifteen minutes at a time. See Facts, ¶131.

During the claims and appeal process, the Plan also commissioned Frank Nisenfeld, M.D., to conduct a Peer Review Analysis of Clark's claim and determine whether Clark was disabled from any occupation. Dr. Nisenfeld reviewed Clark's file and claim and, on April 28, 1998, concluded that Clark was not disabled from any occupation. According to Dr. Nisenfeld:

> "[t]here was no documentation of anything in the records which would totally disable him from any and all employment. The fact that he is unable to do heavy physical labor does not physically disqualify him from all work. An additional IME is not needed to arrive at these conclusions, and the need for additional information does not appear to be present."

See Facts, ¶135.

On September 2, 1998, the Plan commissioned a TSA to determine whether Clark had transferable skills given the restrictions defined by the IME physician. The TSA was completed on September 3, 1998, and revealed that Clark had transferable skills and

---

> unable to return back to a productive job, his actual capabilities will more than likely improve if he is able to stay on the job."

See Facts, ¶¶128-30.

identified several occupational titles that conformed with Clark's physical restrictions and the listed skills.  See Facts, ¶¶139-40.

Finally, in response to receiving an opinion from Craig A. Mills, M.D., that Clark was "totally disabled from fibromyalgia," which had been submitted to the Plan on Clark's behalf by his counsel, the Plan commissioned William Augerson, M.D., to conduct another Peer Review Analysis of Clark's claim for benefits.  On November 30, 1998, Dr. Augerson contacted Dr. Mills by telephone, but Dr. Mills did not support Clark's claim for total disability benefits.  Rather, Dr. Mills informed Dr. Augerson that the office note "stating the claimant is unable to work, and has trouble standing for long periods" was a mere quote of "what he thought a rheumatologist and orthopedic surgeon had concluded about disability." Dr. Mills advised Dr. Augerson that he only treated Clark for his diabetes (not fibromyalgia) and that "he could not provide information about impairments of [activities of daily living] nor any compelling reason why sedentary work was impossible."  Dr. Augerson subsequently reported that "he cannot conclude this claimant is totally disabled, through impaired, sedentary work should be possible."  See Facts, ¶¶143-46.

On December 2, 1998, the Plan's Claims Review Committee discussed Clark's claim for LTD benefits.  After the Committee reviewed Clark's file and discussed its contents, it voted to uphold the denial of Clark's claim for LTD benefits.  The Committee relied on, *inter alia*, the following information in reaching its decision to uphold the denial of Clark's LTD claim.

"On 8/25/97, Dr. Beavers of CORE had a discussion with Dr. Eglinton, Mr. Clark's doctor. Dr. Eglinton said that Mr. Clark 'is not disabled from any occupation and that there are jobs he could do.' On 10/15/97, a Functional Capacity Evaluation found that Mr. Clark is capable of a sedentary physical demand level of work. Dr. Eglinton signed a Modification Checklist on 11/5/97 stating that Mr. Clark can work 4-6 hours a day, 3-4 days a week in a sedentary job with restrictions. An Independent Medical Evaluation was performed by Dr. Rudins on 1/12/98. Dr. Rudins found that Mr. Clark 'does have a work capacity, though at a sedentary level at 8 hours per day' with restrictions. Dr. Rudins also stated that he 'really has no significant objective findings to limit him to a sedentary work capacity' and that 'his work capacity can be potentially increased.' Dr. Rudins' Modification Checklist stated that Mr. Clark can work 8 hours a day, 5 days a week in a sedentary job. A Transferable Skills Analysis identified potential jobs that Mr. Clark could perform.

Mr. Clark's attorney, Lori Loftis, submitted additional information in this case by letter dated 11/24/98. With that letter she forwarded Dr. Mill's evaluation of Mr. Clark. The Committee considered Dr. Mill's report, noting that both Ms. Loftis and Dr. Mills made several conclusions regarding Mr. Clark's medical condition which were not supported by the objective information. Dr. Mills discussed Mr. Clark's diabetes but did not say that Mr. Clark was disabled due to diabetes.

See Facts, ¶¶147-48. Based on the foregoing, the Plan's decision to deny Clark's claim for benefits was supported by substantial evidence and was not arbitrary and capricious. See Facts, ¶¶112-52.

4.      Franziska Finney

Plaintiff Franziska Finney was an hourly employee at Champion International's facility in Canton, North Carolina. See Facts, ¶153. She was diagnosed with "chronic supinator pain," See Facts, ¶155, and began receiving benefits pursuant to the Hourly LTD Plan in November 1994. See Facts, ¶159.

On June 11, 1997, after she had passed into the more stringent "any occ" period of disability, Finney's treating physician submitted an Attending Physician's Statement in which

he reported that Finney was not totally disabled from any occupation because she "can do sedentary work."  He also completed a Physician's Report of Physical Capacity on which he estimated that Finney could, *inter alia*, sit, stand and walk seven to eight hours per shift, make repetitive use of both feet for seven to eight hours per shift, could twist, climb, reach above shoulder level, crouch and stoop, kneel, balance and push three to four hours per shift, could use both hands for "low speed assembly" for seven to eight hours per shift, and could use both hands for "high speed assembly" for one to two hours per shift.  See Facts, ¶¶162-63.

Finney's treating physician then ordered an FCE of Finney so he could accurately evaluate Finney's functional capacities.  An FCE was performed on July 23, 1997, which revealed that

> "Ms. Finney presents with multiple pain complaints that she attributes mainly to arthritis and fibromyalgia.  Subjectively, she is pain limited in most functional activities with ratings of 7/10.  Objectively, she demonstrates the ability to sustain work at a light pdd."

The FCE recommended that Finney pursue a position with the restriction that she can only function at the light level, lift a maximum of twenty pounds, and carry a maximum of twenty pounds.  Finney's treating physician agreed that the FCE "place[d] her in the light work capacity.  See Facts, ¶¶164-66.

During the claims process, Finney provided the following synopsis of her medical condition:

> "I know with my pain, sleeplessness, chronic fatigue, fibromyalgia and other discomfort, that I am not able to function at home with my housework, shopping, etc. without stress and having to stop and take periodic rests.  I feel that I am unable to function wisely and safely at any type of job at this time due to my disabilities."

She also submitted x-ray findings and physician notes from Jane Brummer, M.D., dated August 30, 1997, See Facts, ¶169, in which Dr. Brummer described Finney's diagnosis as sponylarthritis, degenerative disc disease, and fibromyalgia in 1994. See Facts, ¶169. However, CORE's occupational health physician subsequently spoke to Dr. Brummer and Dr. Brummer stated during that conversation that she "ha[d] no opinion about this employee's disability status" and "was not qualified to make a determination about disability in this case." See Facts, ¶¶169, 171.

Based on the foregoing, on February 9, 1998, the Plan advised Finney that her claim for continuing LTD benefits had been denied. Although the Plan advised Finney of her right to appeal, Finney did not request further review of the denial of her LTD claim. See Facts, ¶¶172-73. Based on the foregoing, the Plan's decision to deny Finney's claim for benefits was based on substantial evidence and was not arbitrary and capricious. See Facts, ¶¶153-76.[10]

5. Wiley Haynes

Plaintiff Wiley Haynes was an hourly worker at Champion International's facility in Canton, North Carolina. See Facts, ¶177. Haynes identified "low back syndrome/degenerative discogic disease" as his alleged disabling condition, See Facts, ¶180, and began receiving benefits pursuant to the Hourly LTD Plan in 1994. See Facts, ¶181.

_____

[10]As a threshold matter, Finney's benefits claim should be dismissed, with prejudice, based on her failure to exhaust her administrative remedies. See *supra* at 5-8.

On March 27, 1996, as part of its periodic review of Haynes' continuing claim for LTD benefits, the Plan contacted Haynes and requested that he update his medical information.  See Facts, ¶¶177, 189.

In response to this request, Kate T. Queen, M.D., Haynes' treating physician submitted an Attending Physician Statement dated April 9, 1996, in which she opined that Haynes was totally disabled from any occupation.  Dr. Queen declined to complete the "Restrictions and Limitations" portion of the Attending Physician Statement and, instead, stated that Haynes "would have to have [a] physician capacity eval — we do not do these evals."  She then referred Haynes to Susan Kimel, P.T., at Haywood Rehabilitation Center in Clyde, North Carolina, for an FCE.  See Facts, ¶¶190-91.

Pursuant to Dr. Queen's request for an FCE, Ms. Kimel examined Haynes and reported that Haynes could not squat, kneel or crawl, but could sit and reach "frequently" and could stand, walk, bend and climb "occasionally."  Based on these and additional functional assessments, Ms. Kimel concluded that Haynes was "able to work at the SEDENTARY-LIGHT Physical Demand Level for an 8 hour day."  See Facts, ¶192.

To further evaluate Haynes' claim and disability status, the Plan commissioned Peter Johnson, M.D., at the Asheville Rehabilitation Center in Asheville, North Carolina, to conduct an IME of Haynes.  The Plan asked Dr. Johnson to analyze whether Haynes "was medically able or not able to perform the essential functions required by any occupation."  Dr. Johnson examined Haynes on January 20, 1997.  See Facts, ¶198.

Dr. Johnson's examination revealed that Haynes has "had recurrent back problems and is left with chronic back pain which is regional in nature" and his "degenerative disk changes as well as arthritic changes in his back and in the small joints of his hands and in the weight bearing joints by history."   However, Dr. Johnson concluded that,

> "based on the results of his Functional Capacity Evaluation and my examination, I feel that he is able to function at a <u>sedentary</u> physical demand level.  Specifically, he would have restrictions on material handling and would require flexible posture. He could not squat or kneel, or crawl but would be able to work 40 hours a week within the limits of his Functional Capacity Evaluation."

<u>See</u> Facts, ¶199.

The Plan's Claims Review Committee discussed Haynes' claim at its November 25, 1997, meeting.  The Committee reviewed Haynes' claims file and the records submitted by Haynes' treating physician, Dr. Queen.  In voting to deny Haynes' claim for continuing LTD benefits, the Committee relied on, *inter alia*, the October 21, 1996, FCE, "which states that Mr. Haynes is able to work at the sedentary – light physical demand level for an 8 hour day," and Dr. Johnson's January 20, 1997, IME in which Dr. Johnson opined that, based on the FCE and his examination, Haynes was capable of functioning at a sedentary demand level.  <u>See</u> Facts, ¶209.  <u>See</u> also CRC 0011 (NB 9).  Based on the foregoing, the Plan's decision to deny Haynes' claim for benefits was based on substantial evidence and was not arbitrary and capricious.  <u>See</u> Facts, ¶¶177-213.

6.    <u>Darrell Hill</u>

Plaintiff Darrell Hill was an hourly employee at Champion International's facility in Canton, North Carolina.  <u>See</u> Facts, ¶214.  Hill had an injury to his right ankle and leg, <u>See</u> Facts, ¶215, and began receiving benefits pursuant to the Hourly LTD Plan.  <u>See</u> Facts, ¶216. He subsequently had a below the knee amputation of the right leg.  <u>See</u> Facts, ¶215.

In 1998, as part of the Plan's periodic review of Hill's disability status, Hill's claim was referred to CORE's physician consultant.  <u>See</u> Facts, ¶217.  To further evaluate Hill's disability status, the Plan scheduled Hill for an IME, which was performed on June 25, 1998.  Upon examination, the IME physician opined that Hill could work eight hours per day, five days per week in a sedentary job with restrictions.[11]  <u>See</u> Facts, ¶219.

The Plan also commissioned Jennifer Mikeska, MRC, to perform a Transferable Skills Analysis of Hill.  By report dated July 27, 1998, Ms. Mikeska analyzed Hill's transferable skills, education, functioning and employment history, including his experience as a Millwright, Roll Repairer, Machinist and Machinist Apprentice, and identified several positions which were suitable for Hill given his physical restrictions.  <u>See</u> Facts, ¶220.

During the claims process in 1998, Hill and his wife submitted additional information and medical records which they alleged supported his claim for benefits.  <u>See</u> Facts, ¶¶222-24. For example, they submitted progress notes from J.M. Dement, M.D., but Dr. Dement indicated that Hill's

---

[11]The Plan commissioned the IME after CORE's physician consultant made "several" unsuccessful attempts to contact Hill's treating physician.  See Facts, ¶218.

"stump is benign. Examination of the knee reveals small local area of discomfort on the lateral thermal condyle. The rest of the knee examination is really quite benign. There is no effusion. He has excellent strength, good control with [the] prosthesis on, there is quadriceps atrophy.  Some of this [is] obviously chronic and long-standing in nature. The patient feels very confident when he is ambulating. The pain is markedly decreased . . . He does not wish to take any medication. . . ."

They also submitted a letter from Paul Conrad, M.D., in which Dr. Conrad reported that Hill "suffers from chronic gout and high blood pressure" and had "extensive problems with this ankle on the right secondary to an injury in the past and in December 1995 had a below the knee amputation."  Dr. Conrad, however, opined that Hill had been doing reasonably well since his amputation with his prosthesis and he "otherwise Seems to be in good health."  See Facts, ¶¶222-24.

In order to evaluate Hill's request for reconsideration, the Plan asked its consulting physician to review the materials submitted by Hill and on Hill's behalf (including Dr. Dement's progress notes and Dr. Conrad's letter), the results of the IME, the Transferable Skills Analysis and all information provided by Hill's wife.  Upon review, the Plan's consulting physician concurred with the results of the IME and opined that Hill would be physically capable of performing "[s]edentary work activities."  See Facts, ¶226.

On February 17, 1999, the Plan informed Hill of its decision to uphold the denial of his claim for continuing LTD benefits.  The Plan based its decision on the medical records

provided by Dr. Conrad and Dr. Dement, the IME, the Transferable Skills Analysis and the Plan physician consultant's recommendation. See Facts, ¶226; Hill 0159-0160 (NB 10).[12]

Although the Plan notified Hill of his appeal rights, Hill did not appeal the Plan's decision to terminate his LTD benefits. See Facts, ¶227. Based on the foregoing, the Plan's decision to deny Hill's claim for benefits was supported by substantial evidence and was not arbitrary and capricious. See Facts, ¶¶214-30.[13]

> 7.   Judith Kirkpatrick

Plaintiff Judith Kirkpatrick was an hourly employee at Champion International's facility in Canton, North Carolina. See Facts, ¶231. According to Kirkpatrick, "IV disc disease" and "connective tissue disease with fibromyalgia" were the causes of her alleged disability, See Facts, ¶233, and she began receiving benefits pursuant to the Hourly LTD Plan in May 1994. See Facts, ¶234.

In March 1998, after Kirkpatrick had passed into the "any occ" disability period, the Plan began one of its periodic reviews to determine whether Kirkpatrick was entitled to continuing LTD benefits. See Facts, ¶¶238-40. During that review, the Medical Director for

---

[12]When it terminated his LTD benefits on July 19, 1998, the Plan informed Hill that his LTD benefits had been terminated because

> "[t]he independent medical examination found you capable of work 8 hours per day, 5 days per week in a sedentary job. The Transferable Skills Analysis revealed skills that can be utilized in jobs of a Drafter Assistant, a Drafter Apprentice, and a Stuffer (toy sport equipment production)."

See Facts, ¶221.

the Champion International Disability Management Program, J.D. Beavers M.D., M.P.H.,
spoke by telephone with Dr. Mendelsohn, Kirkpatrick's treating physician.  Dr. Mendelsohn
advised Dr. Beavers that he believed Kirkpatrick "could do sedentary work."  On May 11,
1998, Dr. Mendelsohn verified in writing that Kirkpatrick "can do sedentary or sit-stand work,
6 hours per day, five days per week."  See Facts, ¶¶241-44.

The Plan also commissioned a TSA of Kirkpatrick to evaluate her claim that she was
entitled to continuing LTD benefits.  The Vocational Counselor evaluated Kirkpatrick's work
history, education, and medical limitations.  By report dated December 8, 1998, the Vocational
Counselor concluded that Kirkpatrick had transferable skills and that there were several
occupational titles within Kirkpatrick's previous work field that Kirkpatrick could perform that
were within her sedentary restrictions.  See Facts, ¶253.

Prior to the Claims Review Committee's deliberations, the Plan also commissioned
Alan Marks, M.D., a rheumatologist, to perform a Peer Review Analysis of the previous denial
of Kirkpatrick's claim for continuing LTD benefits.  Dr. Marks reviewed Kirkpatrick's clinical
documentation and recommended that the Plan uphold the previous denial of Kirkpatrick's
claim for LTD benefits.  Dr. Marks concluded that Kirkpatrick "should be able to perform
sedentary work with a restriction of no repetitive bending or lifting."  See Facts, ¶¶254.

On December 11, 1998, the Claims Review Committee met and discussed Kirkpatrick's
claim.  After the Committee reviewed Kirkpatrick's file and discussed its contents, it voted to

---

[13]As a threshold matter, Hill's benefits claim should be dismissed, with prejudice, based
on his failure to exhaust his administrative remedies.  See *supra* at 5-8.

uphold the denial of Kirkpatrick's claim for LTD benefits.  In reaching its decision to uphold

the denial of Kirkpatrick's LTD claim, the Committee relied on the following information:

> "On 3/24/94 and 4/30/96, Dr. Mendelsohn, Ms. Kirkpatrick's doctor, stated that she
> could do light sedentary work.  On 5/5/98, Dr. Beavers, of CORE, talked with Dr.
> Mendelsohn, who said that there are 'no objective findings to suggest she is totally
> disabled and that she could do sedentary work, 6 hours/day, 5 days/week.  On 7/6/98,
> Dr. Mendelsohn stated that Ms. Kirkpatrick 'can only now do just mild sedentary type
> activities up to 6 hours a day."  On 8/27/98, he further stated that 'Patient is not able to
> return to work at this point and will never be able to return to any heavy lifting,
> carrying, straining type activities such as she had at Champion. A Transferable Skills
> analysis identified various other job she could perform."

See Facts, ¶¶255-56.  Based on the foregoing, the Plan's decision to deny Kirkpatrick's claim

for benefits was based on substantial evidence and was not arbitrary and capricious.  See Facts,

¶¶231-58.

> 8.     Lois Lynn

Plaintiff Lois Lynn was a salaried employee at Champion International's facility in

Canton, North Carolina.  See Facts, ¶259.  Lynn has been diagnosed with bronchiectasis,

which is a lung disease which can be accompanied by drug resistant infections.  See Facts,

¶¶263, 269.

Lynn's claim was subject to periodic review, See Facts, ¶265, and, on September 8,

1997, while reviewing Lynn's continuing entitlement to LTD benefits under the "any

occupation" definition of disability, Dr. Beavers, the Medical Director for Champion

International's Disability Management Program, spoke with Robert Boerner, M.D., Lynn's

treating physician, and Lynn's primary care physician, Dr. Freeman.  Dr. Beavers reported

that:

> "[a]ccording to Dr. Boerner, her pulmonologist, he Sees her twice a year and she
> doesn't look that sick when he Sees her, though she complains of frequent upper
> respiratory infections.  When asked about disability he was very reluctant to give an
> opinion saying that he can't comment and hasn't been looking at her from that point of
> view.  He suggested I talk to her primary care physician, Dr. Nancy Freeman.  Dr.
> Freeman said she has no true disabling condition and can do sedentary work.  She has
> takes [sic] antibiotics when she gets infections but her pulmonary function has been
> stable.  Her pulmonary impairment was described as a moderate obstruction."

Based on this information, Dr. Beavers recommended that the Plan not certify Lynn's claim for

continuing disability benefits because "neither physician is supporting her claim.  Her

pulmonary function impairment does not suggest disability from any occupation.  There is no

subjective data that suggests she is disabled from any occupation."  See Facts, ¶271.

In addition, on September 10, 1997, Lynn's primary care physician, Dr. Freeman

completed a Modification Checklist and verified that Lynn could return to work with

modifications on September 11, 1997.  Dr. Freeman certified that Lynn could work 6-8 hours

per day, 5 days per week, with a modification of "sedentary job only."  Dr. Freeman gave

Lynn lifting restrictions of paper work only, walking restrictions of "for personal needs only,"

sitting restrictions of 6-8 hours, and standing restrictions of 15-20 minutes at a time.  See

Facts, ¶272.

During the claims and appeal process, the Plan scheduled Lynn for an IME with James

McCarrick, M.D., a pulmonary medicine specialist.  Dr. McCarrick reviewed Lynn's medical

records and, on May 5, 1998, conducted an IME of Lynn.  At the conclusion of his

examination, Dr. McCarrick concluded that Lynn was not at a significantly higher risk of

infection from working in a sedentary job than she is from her usual daily activities.  He

confirmed that Lynn is able to work at least six hours per day, five days per week in a sedentary capacity.  See Facts, ¶278.  See also Facts, ¶277 (additional information regarding the IME).

The Plan also commissioned a TSA of Lynn to evaluate Lynn's education and work history and determine if Lynn had transferable skills given the restrictions defined by Dr. Freeman and Dr. McCarrick.  The TSA revealed that Lynn had transferable skills and that, even given her medical restrictions, could perform numerous jobs.  See Facts, ¶279.

On June 10, 1998, CORE, the Plan's medical consultant, recommended "upholding the previous denial of LTD benefits based on the TSA and the IME physician's statement that he believes the employee is able to work at least 6 hours per day, 5 days per week in a sedentary capacity."  CORE noted Dr. Freeman's initial determination that Lynn was able to return to work six to eight hours per day, five days per week and Dr. McCarrick's concurrence with that assessment during his IME of Lynn.  See Facts, ¶280.

On September 24, 1998, the Claims Review Committee discussed Lynn's appeal of the denial of her claim for LTD benefits.  After the Committee reviewed Lynn's file and discussed its contents, it voted to "table its decision pending receipt of a report from CORE resolving contradictions in the statements from Dr. McCarrick, the Independent Medical Evaluator."  See Facts, ¶286.[14]

---

[14]In its initial denial of Lynn's claim for continuing LTD benefits, the Plan relied on Dr. McCarrick's May 26, 1998, statement that Lynn was able to work at least 6 hours per day, five days per week in a sedentary capacity.  See Facts, ¶¶278, 281.  However, on August 24, 1998,

To resolve this apparent contradiction, the Plan's consulting physician contacted Dr. McCarrick by telephone on October 1, 1998. He reported back to the Committee that "Dr. McCarrick says that he has not changed the opinion he expressed on his IME and follow-up letters. That opinion is that she is not totally disabled. He has told her this frankly." Dr. McCarrick subsequently confirmed in writing that Lynn "can work at least 6 hours per day, 5 days per week in a sedentary capacity." See Facts, ¶¶287-89.

At its November 13, 1998, meeting, the Claims Review Committee again discussed Lynn's claim for LTD benefits. After the Committee reviewed Lynn's file, discussed its contents, and verified that Dr. McCarrick's apparent contradictions were clarified, it voted to uphold the denial of Lynn's claim. The Committee relied on, *inter alia*, the following information:

> "On 9/9/97, Dr. Beavers from CORE had a conversation with Dr. Freeman, Ms. Lynn's primary care doctor. Dr. Freeman stated that Ms. Lynn "has no truly disabling condition and could do sedentary work." Her pulmonary impairment was described as a moderate obstruction.
>
> An Independent Medical Examination dated 5/5/98 performed by Dr. McCarrick, a pulmonologist, indicated that Ms. Lynn has clinically significant bronchiectasis, but he was unable to determine any other factors which would preclude her from going to work. An IME Addendum Form dated 5/26/98 stated that she is not at a higher risk of infection from working in a sedentary job and that she could return to work for at least 6 hours per day, 5 days per week in a sedentary capacity. The letter from Dr. McCarrick dated 8/24/98 caused the Committee to table its decision pending a definitive statement relative to her employability. CORE received a statement from Dr. McCarrick that Ms. Lynn can work at least 6 hours per day, 5 days per week in a sedentary capacity.

---

Lynn submitted a statement asserting that Dr. McCarrick had been "misquoted." See Facts, ¶285.

A Transferable skills analysis identified various jobs that Ms. Lynn might perform." See Facts, ¶¶290-91. Based on the foregoing, the Plan's decision to deny Lynn's claim for benefits was supported by substantial evidence and was not arbitrary and capricious. See Facts, ¶¶259-95.

### 9. Celia Metcalf

Plaintiff Celia Metcalf was an hourly employee at Champion International's facility in Canton, North Carolina. See Facts, ¶296. In October 1997, Metcalf described her disabling diagnoses to be heal spurs, plantar fascia (left and right), osteoporsis and fibromyalgia (since 1979). See Facts, ¶302. See also Metcalf 0026 (NB 15).

As Metcalf approached the expiration of her "own occupation" period of benefits, the Plan began to gather information to determine whether Metcalf could satisfy the more stringent "any occ" or "any occupation" disability definition. See Facts, ¶¶307-09. As part of that review, Dr. Beavers, the Plan's physician consultant, spoke by telephone with Steven Mendelsohn, M.D., Metcalf's treating physician. Dr. Mendelsohn informed the Plan that Metcalf was "not totally disabled but continues to be able to do sedentary work." See Facts, ¶¶310-11.[15]

On October 26, 1999, CORE, the Plan's medical consultant, commissioned Lisa Bossardt, a Vocational Rehabilitation Consultant, to perform a Vocational Rehabilitation

---

[15]Dr. Beavers had had a previous telephone conversation with Dr. Mendelsohn during which Dr. Mendelsohn also stated that Metcalf "could do sedentary work but he doesn't think she will ever be able to return to full duty again." See Facts, ¶306.

Analysis of Metcalf.  The purpose of Ms. Bossardt's evaluation was to assess Metcalf's education and work history to determine if Metcalf has transferable skills given the restrictions defined by Dr. Mendelsohn.  Ms. Bossardt, noting that Metcalf's functional capacity included a permanent restriction of sedentary work, performed both a Vocational and a Transferable Skills Analysis.  In her report dated November 1, 1999, Ms. Bossardt concluded that "it appears that there are suitable employment opportunities for Ms. Celia Metcalf within her Sedentary Duty physical capacity."  See Facts, ¶¶313-14.

On November 15, 1999, CORE, the Plan's medical consultant recommended to the Plan that Metcalf's LTD benefits be terminated effective November 13, 1999.  CORE cited and relied on, *inter alia*, Dr. Mendelsohn's opinion that Metcalf could do sedentary work, and the vocational analysis indicating there were suitable work opportunities for Ms. Metcalf within her sedentary duty physical capacity.  See Facts, ¶315.

On June 15, 2000, after granting Metcalf's counsel two extensions to submit additional claims materials, Plan's Claims Review Committee met to discuss Metcalf's claim for continuing LTD benefits.  After the Committee reviewed Metcalf's file and discussed its contents, it voted to uphold the denial of Metcalf's claim for continuing LTD benefits.  In reaching its decision to uphold the denial of Metcalf's LTD claim, the Committee relied on the following information:

"On 10/20/99, Dr. Beavers spoke with Metcalf's physician, Dr. Mendelsohn, who stated
    that she 'is not totally disabled but continues to be able to do sedentary work . . . there
    is no significant new finding that would disable her.'  Dr. Beavers recommended not to

certify disability from any occupation.  LTD benefits were denied based on Dr. Mendelsohn's release.

On appeal Ms. Metcalf and her attorney, Robert Elliott, submitted additional medical information.  SCORE reviewed the information, and a Peer Review Analysis determined that 'There is no objective medical substantiation for total disability after 11/13/99 . . . There is no information however to indicate on an objective basis that the patient is unable to perform sedentary work.'  In addition, SCORE stated that most of the medical information submitted predated Ms. Metcalf's dates of disability and did not impact the original denial of benefits on 11/13/99.

SCORE's Vocational Analysis Report identified various jobs that Ms. Metcalf might perform."

See Facts, ¶¶335-36.[16]  Based on the foregoing, the Plan's decision to deny Metcalf's claim for benefits was based on substantial evidence and was not arbitrary and capricious.  See Facts, ¶¶296-340.

　　　　10.    Wilson McClure

Plaintiff Wilson McClure was a salaried employee at Champion International's facility in Canton, North Carolina.  See Facts, ¶¶341, 343.  McClure had been diagnosed with

---

[16]Metcalf's counsel submitted voluminous documents to the Claims Review Committee.  See Facts, ¶¶325-31.  These documents were reviewed by a medical consultant retained by CORE who concluded that nothing in the documents contradicted the conclusion that Metcalf was able to perform sedentary work.  See Facts, ¶332.  In fact, Metcalf submitted: (a) an October 19, 1999, office note from Dr. Mendelsohn in which he stated that "I feel [Metcalf] could do sedentary work if she was inclined and such work was available"; (b) a December 28, 1999, office note from Dr. Mendelsohn in which he states that he and Metcalf had "discussed about long term disability as she does not qualify under the present Champion guidelines.  She will need to find some form of gainful employment that she can do in a sedentary way"; and (c) a March 30, 2000, office note in which Dr. Mendelsohn states that he "tried to encourage [Metcalf] to be as active as she is comfortable getting back to some sedentary type activity if she can find gainful employment.  Unfortunately jobs have been quite limited with her background."  See Facts, ¶330(e), (f) & (g).

spondyloarthritis and began receiving LTD benefits pursuant to the Hourly LTD Plan.  See

Facts, ¶343; McClure 0021 (NB 17).

As part its periodic review of McClure's disability status, the Plan scheduled McClure

for an IME on July 15, 1996, with C. Ruffin Stephenson, M.D., of Greenville, South Carolina.

During the examination, McClure reported that he "had pain in his right knee" that "ultimately

spread to a fairly generalized pain in the upper and lower extremities primarily affecting the

hands . . . ."  Dr. Stephenson's review of McClure's x-rays showed "normal sacroiliac, hips,

hands and feet."  Dr. Stephenson's physical exam revealed tenderness in McClure's ankle and

"slight restriction in lateral flexion to the right and left" in his cervical spine.  Dr. Stephenson's

examination also indicated that McClure's "[e]lbows, wrists, MCP's and IP's look normal . . . ,"

"grip strength Seems to be fairly good" and "hips are normal."  See Facts, ¶¶344-47.

Based on his physical examination of McClure and his review of McClure's medical

records, Dr. Stephenson noted that there was no evidence of "rheumatoid disease . . . nor any

definite evidence of spondyloarthropathy . . . ."  Dr. Stephenson concluded that McClure could

not perform the duties of his Maintenance Supervisor position but stated McClure would

"certainly. . . be able to do some type of sedentary work or desk job, particularly one where he

could get up and move around when his back gets stiff and sore, and would allow him such

freedom as that."  See Facts, ¶348.

On December 13, 1996, during the claims process, McClure's former legal counsel

requested review of the Plan's determination.  He outlined McClure medical history, including

treatment by Donald L. Mullis, M.D., Kate T. Queen, M.D., and E.B. Goodwin. M.D.  He also

submitted the Social Security Administration's decision granting McClure's claim for disability income benefits.  The Plan's medical consultant reviewed this documentation and recommended that McClure's claim for continuing LTD benefits be denied.  See Facts, ¶¶350, 353; McClure 0031 (NB 17).

On April 9, 1997, the Plan notified McClure of its decision to deny his claim for LTD benefits.  The Plan informed McClure that it had based its decision on the results of the IME which indicated that he "would be able to do some type of sedentary work or desk job . . ." and the May 9, 1994, examination notes of McClure's treating physician Dr. Queen which indicated that McClure had the physical capacity to perform other types of work other than the job he was performing at Champion International.  See Facts, ¶354.

Although the Plan advised McClure of his right to appeal, McClure never appealed the denial of his claim for LTD benefits.  See Facts, ¶¶354-58.  Based on the foregoing, the Plan's decision to deny McClure's claim for benefits was based on substantial evidence and was not arbitrary and capricious.  See Facts, ¶¶341-62.[17]

11.    Charles Reece

Plaintiff Charles Reece was an hourly employee at Champion International's facility in Canton, North Carolina.  See Facts, ¶363.  Reece had been diagnosed with "congestive cardiomyopathy" and began receiving benefits pursuant to the Hourly LTD Plan in January 1996.  See Facts, ¶¶366-67.

---

[17]As a threshold matter, McClure's benefits claim should be dismissed, with prejudice, based on his failure to exhaust his administrative remedies.  See supra at 5-8.

As Reece approached the conclusion of his "own occupation" benefits period, the Plan began to collect information to determine whether Reece could satisfy the more stringent "any occ" or "any occupation" disability definition. For example, in order to fully evaluate whether Reece was disabled from any occupation, the Plan referred Reece's claim for LTD benefits to Chester Conrad, M.D., a cardiologist, for a Peer Review Analysis. See Facts, ¶372.

Dr. Conrad reviewed Reece's December 8, 1997, Personal Profile Evaluation, a December 9, 1997, Attending Physician Statement, and a December 11, 1997, Physician's Report of Physical Capacity. Dr. Conrad also spoke with Doug Burnett, P.A., Reece's attending health care provider. Based on his review, Dr. Conrad reported that "there is no clear evidence that the patient's functional impairment would preclude him from performing any occupation." According to Dr. Conrad, Reece's attending health care provider

> "indicated that [Reece] has been clinically stable, with no recent overt heart failure . . . that [Reece] would be considered Class II (i.e. comfortable at rest, with slight limitation of physical activity, and some symptoms with ordinary activity) . . . [and] that [Reece] would probably not be capable of doing work involving heavy physical exertion, [but] could likely do work that was largely sedentary."

See Facts, ¶373. See also Facts, ¶¶369-71.

On February 6, 1998, the Plan asked Reece's healthcare provider to confirm that Reece "could do sedentary work." In response, Reece's healthcare provider completed a Modification Checklist on which he confirmed that Reece could work eight hours per day five days per week; lift up to twenty five pounds; walk two blocks; sit, stand and change positions as needed; and climb two flights of stairs. The Modification Checklist completed by Reece's

healthcare provider further indicated that Reece could perform sedentary work.  Vladimir

Curkovik, M.D., later verified the Modification Checklist.  See Facts, ¶¶374.

The Plan then scheduled Reece for an IME with Michael Keogh, M.D., a cardiologist

in Clyde, North Carolina.  Dr. Keogh reviewed Reece's medical records, including a radiology

diagnostic report, a report from Dr. N.V. Patel, and a report from Dr. Hanich, and, on July 30,

1998, examined Reece.  Based on his review and examination, Dr. Keogh concluded that

Reece had "class two congestive heart failure due to nonischemic dilated cardiomyopathy" and

that Reece "is capable of performing some occupation."  Dr. Keogh's report further indicated

that Reece preferred to try to return to his previous occupation and that Dr. Keogh thought that

this would be "okay" for Reece.  Dr. Keogh also completed a Modification Checklist on which

he indicated that Reece could work six to eight hours per day, four to five days per week; lift

up to ten pounds; and walk, sit, stand and change positions "as needed."  See Facts, ¶¶376-77.

See also Facts, ¶377 (The IME physician's opinion that Reece could "work at least 6 hours per

day 5 days per week").

To further assist in determining whether Reece was disabled from performing any

occupation, the Plan commissioned a TSA of Reece, which was completed on October 5,

1998.  The TSA revealed that Reece does have "transferable skills that are vocationally

appropriate and applicable to the same occupational category as well as to others" and that

"[t]hese skills should enable him to return to the working community."  See Facts, ¶¶378-79.

The Plan also submitted Reece's claim to Gerald Evans, M.D., for a Peer Review

Analysis.  After the completion of his review, Dr. Evans, a cardiologist, concluded that the

claim denial should be upheld.  Dr. Evans found Dr. Keogh's IME report to be "detailed and specific" and agreed that Reece "should be able to work at least 6 hours per day, 5 days per week and over time increase that to 8 hours per day."  See Facts, ¶382.

On September 9, 1999, the Claims Review Committee discussed Reece's claim for benefits.  The Committee reviewed Reece's claims file and all information submitted by Reece and his counsel, including, the January 23, 1998, Peer Review analysis which "found there was no clear evidence that Mr. Reece's functional impairment would preclude him from performing any occupation"; the March 31, 1998, Modification Checklist prepared by Reece's health care provider confirming that Reece "may work 8 hours/day, 5 days/week in a sedentary job"; Dr. Keogh's July 20, 1998, IME report in which he stated that Reece "is capable of performing some occupation and is not disabled from all employment"; Dr. Keogh's Modification Checklist in which he indicated that Reece could work six to eight hours per day; the Transferable Skills Analysis which identified various jobs that Mr. Reece could perform; and Reece's Notice of Award from the Social Security Administration.  See Facts, ¶387.

At the conclusion of its discussion, the Committee voted to uphold the denial of benefits.  See Facts, ¶388.  Based on the foregoing, the Plan's decision to deny Reece's claim for benefits was based on substantial evidence and was not arbitrary and capricious.  See Facts, ¶¶363-92.

12.   Harry Smith

Plaintiff Harry Smith was a salaried employee at Champion International's facility in Canton, North Carolina.  See Facts, ¶393.  Smith had been diagnosed with "degenerative disc

disease" and began receiving benefits pursuant to the Salaried LTD Plan on December 22, 1993.  See Facts, ¶397.  See also Smith 0002 (NB 20).

In 1997, as part of its periodic review of Smith's disability status, See Facts, ¶401, the Plan's consulting physician interviewed the physicians who Smith had identified as his treating physicians:  Dr. Culclasure (on April 7, 1997) and Dr. Shields (on April 23, 1997).  Dr. Culclasure reported that he saw Smith once and couldn't make any comments about his alleged disability.  Dr. Shields reported that Smith has several significant problems, but could not "confirm or deny [that Smith] is disabled from any occupation."  Dr. Shields felt that a formal work capacity evaluation should be done to clarify Smith's disability status.  Dr. Culclasure agreed that an FCE was necessary to determination Smith's restrictions.  See Facts, ¶403.

The Plan then scheduled Smith for an IME with Peter G. Johnson, M.D., of Clyde, North Carolina.  Dr. Johnson reviewed Smith's medical history and examined Smith on August 4, 1997.  In his IME report, Dr. Johnson stated that Smith had a "failed back syndrome" and he concluded that Smith was at maximum medical improvement.  Dr. Johnson also recommended an FCE to "give additional information to determine Mr. Smith's functional status" and, specifically, whether Smith had "any work capacity at the sedentary or light physical demand level."  See Facts, ¶¶404-05.

Pursuant to Dr. Johnson's recommendation, the Plan contacted Smith's treating physician Dr. Shields, and requested a prescription for an FCE.  Dr. Shields agreed and referred Smith to Registered Physical Therapist Susan Kimel at Haywood Rehabilitation Center in Clyde, North Carolina.  The FCE of Smith was conducted on September 25, 1997,

and September 26, 1997.  At the conclusion of the testing and evaluation, Ms. Kimel, who had

been chosen by Smith's treating physician, concluded that Smith was "able to work at the

LIGHT Physical Demand Level for an 8 hour day."  See Facts, ¶¶406-07.

Dr. Johnson, the IME physician, then reviewed the FCE Report.  Dr. Johnson then

opined that Smith could "work full time in the Light Physical Demand Level . . . ."  See Facts,

¶408.

During the claims process, Smith's counsel submitted x-rays, a  December 17, 1997,

Vocational Evaluation commissioned by his counsel and performed by Randy L. Adams,

M.Ed., and an evaluation prepared on April 29, 1997, by James C. Johnson, M.D., for the

Social Security Administration.  See Facts, ¶411-413.  The Plan forwarded these materials to

its medical consultant who, after reviewing them, concluded that none of the information

submitted by or on Smith's behalf justified overturning the Plan's decision to deny Smith's

claim for LTD benefits based on the "any occ" definition.  See Facts, ¶¶414-16.

The Claims Review Committee discussed Smith's claim at its December 2, 1997,

meeting.  After reviewing Smith's claims file, the Committee voted to table its decision

pending review of additional information submitted by Smith's counsel and the completion of

a TSA to determine whether Smith had any transferable skills.  See Facts, ¶423.

The TSA was completed on December 5, 1998, and revealed that Smith "does have

transferable skills that are vocationally appropriate and applicable to the same occupational

group and category."  According to the TSA report, Smith's transferable skills should enable

[Smith] to return to the work community."  Based on Smith's "employment history with

Champion," and, more specifically, Smith's position as a recovery operator helper which he held for twenty-five years at Champion," the TSA report identified several jobs considered appropriate for Smith.  See Facts, ¶424.

The Plan then commissioned a Peer Review Analysis of Smith's claim, which was completed on December 10, 1998, by John Nemunaitis, M.D., a Physical Medicine and Rehabilitation Specialist.  Dr. Nemunaitis reviewed, *inter alia*, Dr. Culclasure's November 19, 1998, letter, Dr. Rudins' November 18, 1998, nerve conduction study, Dr. Maxwell's office notes, the September 25 & 26, 1997, FCE, and the August 4, 1997, IME.  At the conclusion of his review, Dr. Nemunaitis opined that the newly submitted information did not substantiate Smith's claim that he was totally disabled and unable to function at light duty physical demand level.  Dr. Nemunaitis, therefore, recommended that the "earlier determination of denial should be upheld."  See Facts, ¶425.

The Claims Review Committee then reconvened on December 11, 1998, and considered Smith's claim for benefits.  The Committee reviewed Smith's claims file, the information submitted by Smith's counsel, Dr. Nemunaitis' Peer Review Analysis, the Transferable Skills Analysis performed by Ms. Mikeska, Dr. Peter Johnson's IME Report, the September 25, 1997, FCE, Mr. Adams' Vocational Evaluation, Smith's x-rays, Dr. James Johnson's Disability Determination Evaluation, Dr. Culclasure's November 19, 1998, letter, Dr. Maxwell's office note, and Dr. Rudins' Report.  The Committee examined this information against the Plan's definition for total disability and voted to uphold the decision to deny Smith's claim for LTD benefits.  See Facts, ¶426.  Based on the foregoing, the Plan's decision

to deny Smith's claim for benefits was based on substantial evidence and was not arbitrary and capricious. See Facts, ¶¶393-428.

13.    Dolphus Treadway

Plaintiff Dolphus Treadway was an hourly employee at Champion International's facility in Canton, North Carolina. See Facts, ¶429. Treadway was diagnosed with coronary artery disease, See Treadway 0029 (NB 22), and began receiving benefits pursuant to the Hourly LTD Plan in June 1996. See Facts, ¶432.

When Treadway reached the expiration of his initial "own occupation" period of benefits, the Plan began to collect information to determine whether Treadway could satisfy the more stringent "any occupation" disability definition, thereby entitling Treadway to continue receiving LTD benefits. In order to assist in this determination, the Plan scheduled Treadway for an IME with Juan L. Aldrich, M.D., FACC, a cardiologist in Hendersonville, North Carolina. Dr. Aldrich reviewed Treadway's medical records, family medical history, medications and, on June 29, 1998, examined Treadway. According to Dr. Aldrich,

> "the issue at hand is [Treadway's] exercise capacity. He has not returned to work in spite of two stress tests which have revealed reasonable exercise capacity. The second test did reveal a somewhat shorter length of exercise on the same protocol."

Therefore, Dr. Aldrich recommended "an echocardiogram for left ventricular function and a stress thallium (the same test performed in December 1995)" to address Treadway's condition "precisely." See Facts, ¶¶435.

Pursuant to Dr. Aldrich's recommendation, the Plan scheduled Treadway for a stress test and an echocardiogram. Upon review of the results of the stress test and echocardiogram,

Dr. Aldrich concluded that Treadway was "capable of returning back to work" with the restrictions noted in the modification checklist.  The Modification Checklist prepared by Dr. Aldrich indicated that Treadway could work eight hours per day, five days per week, lift up to twenty-five pounds, walk up to one thousand feet, stand for six hours and walk up two flights of stairs.  <u>See</u> Facts, ¶¶436.

To further assist in determining whether Treadway satisfied the "any occupation" disability definition, the Plan commissioned Jennifer Mikeska, MRC, to perform a Transferable Skills Analysis.  By report dated September 1, 1998, Ms. Mikeska noted that Treadway's transferable skills included comparing, tending and taking instructions-helping. Ms. Mikeska examined Treadway's employment history and concluded that Treadway "is capable of working as a chip deliverer which is the position he previously held at Champion." She also identified several additional jobs considered appropriate for Treadway.  <u>See</u> Facts, ¶437.

On September 11, 1998, based on, <i>inter alia</i>, the IME report and the Transferable Skills Analysis, the Plan notified Treadway that it was terminating his LTD benefits because he was "[n]ot disabled as defined in the Plan."  The Plan informed Treadway that

> "[t]he final independent Medical Examination determination made after reviewing your 7/23/98 Stress Thallium Test, and your 8/6/98 Echo Cardiogram found you capable of working 8 hours per day, 5 days per week with restrictions of no lifting of more than 25 pounds, and no stair climbing of more than 2 flights, standing 6 hours and walking 1000 feet.  A Transferable Skills Analysis found you capable of working as a Chip Deliverer. Other positions have also been identified."

<u>See</u> Facts, ¶438.

Treadway subsequently appealed the Plan's decision to terminate his LTD benefits, but later withdrew his claim.  See Facts, ¶¶439-443.  Based on the foregoing, the Plan's decision to deny Treadway's claim for benefits was based on substantial evidence and was not arbitrary and capricious.  See Facts, ¶¶429-46.[18]

14.    <u>Martha Whitley</u>

Plaintiff Martha Whitley was an hourly employee at Champion International's facility in Canton, North Carolina.  See Facts, ¶447.  Whitley had been diagnosed with fibromyalgia, See Facts, ¶¶454, 464, and began receiving benefits pursuant to the Hourly LTD Plan in 1988.  See Facts, ¶452.  Whitley received benefits for several years, and nothing in the record or the manner in which the Plan administered Whitley's claim indicates that the Plan's ultimate termination and denial of her claim was arbitrary and capricious.

For example, on September 9, 1994, the Plan Supervisor notified Whitley that the Plan was terminating her LTD benefits because the Plan had been "advised that you own and operate Tonya's Hair house and have done so since October 1, 1988."  The Plan based its decision to terminate Whitley's LTD benefits on an investigative report prepared by a private investigative service, which observed Whitley cutting hair at Tonya's Hair House.  See Facts, ¶¶452-53.

However, despite this evidence that Whitley may be working, when Whitley's claim made its way to the Claims Review Committee, the Committee postponed a final decision until

---

[18]As a threshold matter, Treadway's benefits claim should be dismissed, with prejudice, based on his failure to exhaust his administrative remedies.  See *supra* at 5-8.

48

Whitley could be examined by an independent medical examiner and her counsel could be provided copies of the investigative reports and an opportunity to comment on their contents. See Facts, ¶¶459-60.

The IME physician subsequently confirmed Whitley's fibromyalgia diagnosis and concluded that he did not believe that Whitley was "employable at this time or in the foreseeable future." See Facts, ¶461. The Claims Review Committee met again on September 13, 1995, and based in large part on the IME report, the Committee overruled the previous decision denying Whitley's claim for benefits and reinstated her LTD payments. See Facts, ¶462.

The Plan's subsequent decision to terminate Whitley's LTD benefits is based on an equally principled decision making process and also is supported by substantial evidence. More specifically, on March 11, 1999, the Claims Review Committee denied Whitley's claim for continuing LTD benefits because the condition that her treating physician now was certifying as her disabling condition (herpes zoster): (a) did not manifest itself until after Whitley's LTD benefits had been terminated in January 1998; and (b) it was unrelated to her underlying disabling condition. See Facts, ¶481 (treating physicians diagnosis of herpes zoster as the new disabling condition and confirming its onset date of April 1998); Facts, ¶482 (Peer Review Analysis confirming the treating physician's diagnosis of herpes zoster and that it was "not related to her underlying condition").

The Committee determined that only the original disabling condition was relevant to her claim for benefits; if Whitley's on-set of herpes zoster was after the termination of benefits,

49

and unrelated to her underlying disabling condition, it would have no bearing on the

termination of benefits.  See Facts, ¶¶487, 490.  According to the Committee

> "[d]uring the appeal process, Dr. Queen, Ms. Whitley's doctor, stated in a letter dated 10/15/98 that Ms. Whitley's pain 'has been further complicated by the recent development of herpes zoster.'  A CORE physician then stated that Ms. Whitley was disabled 'with disabling diagnosis being herpes zoster superimposed on a chronic pain syndrome.'  However, upon further investigation, CORE determined that the on-set of the herpes zoster was in 4/98 and therefore after the original denial of benefits on 1/31/98.

Consistent with the language of the Plan, See Plan 0060 (NB 66), the Committee determined

that its review should focus only on Whitley's alleged disabling condition at the time her claim

for continuing LTD benefits was denied – that is, January 1998; not the unrelated herpes zoster

which did not manifest itself until well after that date.  See Facts, ¶490.  See also Facts, ¶¶481-

82, 484, 486-90.

Prior to the onset of herpes zoster, the FCE of Whitley indicated that Whitley

"completed test activities at the SEDENTARY physical demand level or work," See Facts,

¶466, and Dr. Rudins' December 3, 2007, IME report indicated that Whitley has "a full time

work capacity, at the sedentary to light level." See Facts, ¶¶469-72.  In addition, a

Transferable Skills Analysis identified various jobs that Whitley could perform.  See Facts,

¶483.  Whitley, therefore, was not entitled to LTD benefits.  See Facts, ¶491.  Based on the

foregoing, the Plan's decision to deny Whitley's claim for benefits was based on substantial

evidence and was not arbitrary and capricious.  See Facts, ¶¶447-95.

III.    <u>Plaintiffs Cannot State a Claim Pursuant to 29 U.S.C. §1133</u>.

In Count III of their Complaint, plaintiffs allege that defendants "breach[ed]" the LTD Plans and "29 U.S.C. §1133, and the regulations thereunder," when the LTD Plans denied plaintiffs' claims for benefits.  <u>See</u> Complaint, ¶260 (Dkt. Entry 1).  Plaintiffs list the ways in which defendants allegedly "violated their duties under ERISA"; each of which relate or refer to allegations regarding the claims process.  <u>See</u> Complaint, ¶260 (Dkt. Entry 1).  Contrary to plaintiffs' contention, they cannot sustain a claim pursuant to 29 U.S.C. §1133, "or the regulations thereunder."

First, as a threshold matter, 29 U.S.C. §1133 imposes certain obligations only on "employee benefit plan[s]."  Plaintiffs, therefore, cannot state a claim pursuant to this statute against Champion International (even it still existed) or International Paper.

Second, according to the Supreme Court in <u>Massachusetts Mutual Life Ins. Co. v. Russell</u>, 473 U.S. 134, 144, 105 S. Ct. 3085, 3091 (1985), an ERISA plan's alleged violation of the procedural requirements of 29 U.S.C. §1133 does not give rise to a private right of action. Instead, the plan participant may "bring a civil action to have the merits of his application determined, just as he may bring an action to challenge an outright denial of benefits."  <u>Id</u>. Indeed, the Supreme Court has refused to recognize or create a remedy in favor of a plan participant who alleges that the ERISA plan in which he participated improperly processed his claim for benefits.  The Court examined ERISA's "six carefully integrated civil enforcement provisions" and concluded that they "provide strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly."  <u>Id</u>. at 146, 105 S. Ct.

at 3092.  See also Ashenbaugh v. Crucible, Inc., 1975 Salaried Retirement Plan, 854 F.2d

1516, 1532 (3rd Cir. 1988)("an employer's or plan's failure to comply with ERISA's procedural

requirements does not entitle a claimant to a substantive remedy").

　　　　The alleged procedural violations on which plaintiffs rely in Count III of their

Complaint are simply factors to be considered in determining whether the Plans erred in

denying plaintiffs' claims for LTD benefits, See e.g., Zervos, 277 F.3d at 638 (participant

entitled to benefits because plan's process was arbitrary and capricious), or relate to an alleged

conflict of interest.  See Whitney v. Empire Blue Cross & Blue Shield, 106 F.3d 475 (2nd Cir.

1997).  They do not give rise to an independent cause of action under ERISA.

　　　　Third, even if such a claim did exist, the record evidence is undisputed that the LTD

Plans did violate any of the duties and obligations described in 29 U.S.C. §1133.  The LTD

Plans provided adequate notice of the reason for the termination and denial of plaintiffs' claims

for LTD benefits, including the plan provisions and record evidence on which the decsion

maker had relied.  See, e.g., Facts, ¶¶44, 52, 63, 96, 98, 107, 132, 137, 149, 168, 172, 200,

205, 210, 221, 226, 245, 247, 257, 270, 281, 292, 316, 318, 337, 349, 353, 380, 384, 389, 409,

417, 438, 452, 474.  The LTD Plans notified plaintiffs of their claim and appeal rights and

provided plaintiffs' adequate opportunity to present evidence and arguments in support of their

claims for benefits.  See, *e.g.*, Facts, ¶¶44, 52, 96, 98, 132, 137, 168, 172, 200, 205, 221, 226,

245, 247, 273, 281, 316, 349, 353, 380, 384, 409, 417, 438.  The LTD Plans provided plaintiffs

access to the records, evidence and plan documents on which the Plans relied in evaluating

plaintiffs' claims for benefits.  See, *e.g.*, Facts, ¶¶44, 52, 67, 98, 110, 137, 168, 172, 200, 205,

221, 226, 245, 273, 281, 316, 339, 349, 353, 380, 384, 409, 417, 438, 445, 494.  The LTD

Plans relied on a principled decision making process in making their benefits decisions.  See,

e.g., Facts, ¶¶62, 106, 148, 209, 256, 290-91, 336, 387, 426, 486, 490.  In short, even if a claim

did exist, plaintiffs cannot establish that defendants violated 29 U.S.C. §1133 in the processing

of plaintiffs' claims for benefits.  See also 29 C.F.R. §2560.503-1 (1993), a copy of which is

appended hereto as Exhibit C.

IV.    Plaintiffs Cannot State a Claim for Breach of Fiduciary Duty.

     A.    Plaintiffs may not Recast their Benefits Claims as Fiduciary Duty Claims.

In Count IV of their Complaint, plaintiffs allege that defendants "breached their

fiduciary duties with respect to each plaintiff."  See Complaint, ¶¶265, 262-265, 282 (Dkt.

Entry 1).  According to plaintiffs, defendants' alleged breach of fiduciary duty has "deprived

[them] of LTD benefits on a continuing basis," and they seek other "appropriate equitable

relief pursuant to 29 U.S.C. §1132(a)(3)."  See Complaint, ¶282 (Dkt. Entry 1).  Contrary to

plaintiffs' contention, they cannot state a claim for breach of fiduciary duty under 29 U.S.C.

§1132(a)(3) because they have an adequate remedy (and indeed have asserted claims) under 29

U.S.C. §1132(a)(1)(B).

In Varity Corp. v. Howe, 516 U.S. 489, 512, 116 S. Ct. 1065, 1078 (1996), the

Supreme Court held that Section 502(a)(3) of ERISA, 29 U.S.C. §1132(a)(3), "acts as a safety

net, offering appropriate equitable relief for injuries caused by [ERISA] violations that §502

does not elsewhere adequately remedy."  According to the Court, "where Congress elsewhere

provided adequate relief for a beneficiary's injury, there will likely be no need for further

equitable relief, in which case such relief normally would not be 'appropriate'" as required by Section 502(a)(3).  Id. at 515, 116 S. Ct. at 1079.  See also Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 209-10, 122 S. Ct. 708, 712 (2002)(reiterating narrow scope of equitable relief under 29 U.S.C. §1132(a)(3)).

"Congress did not contemplate that [29 U.S.C. §1132(a)(3)] would be used by plaintiffs Seeking individual relief."  Coyne & Delany Co. v. Blue Cross & Blue Shield of Virginia, 102 F.3d 712, 715 (4th Cir. 1996).  A breach of fiduciary duty claim pursuant to 29 U.S.C. §1132(a)(3) "was primarily intended to address violations affecting a plan more generally," while, as the Second Circuit has recognized, 29 U.S.C. §1132(a)(1)(B) "was to be the avenue for redressing a wrongful denial of benefits."  Id., citing, Romney v. Lin, 94 F.3d 74, 81 (2nd Cir. 1996).  When participants, such as plaintiffs in the instant case, "'simply want[] what was supposed to have been distributed under the plan, the appropriate remedy is [29 U.S.C. §1132(a)(1)(B)],'" not a claim for breach of fiduciary duty.  Id.  See also Wald v. Southwestern Bell Corp. Customcare Medical Plan, 83 F.3d 1002, 1006 (8th Cir. 1996).

Thus, regardless of how plaintiffs attempt to recast their claims in the instant case, their description of their claims as alleged breaches of fiduciary duty "does not alter the fact that [they are] seeking . . . benefits which [they] claim[] are owed . . . ."  Coyne & Delany Co., 102 F.3d at 714.  See also Romney, 94 F.3d at 81.  Plaintiffs in the instant case have plead in Counts I and II of their Complaint Section 502(a)(1)(B) claims, pursuant to which they may recover benefits "and clarify [their] rights to future benefits."  See 29 U.S.C. §1132(a)(1)(B). As such, they cannot state a claim for breach of fiduciary duty.  See, e.g., Wald, 83 F.3d at

1006 (no cause of action for breach of fiduciary duty where plaintiff seeks in essence benefits pursuant to an ERISA plan); <u>Tolson v. Avondale Industries, Inc</u>., 141 F.3d 604, 610 (5th Cir. 1998)("relief through the application of S1132(a)(3) would be inappropriate" because the plaintiff has a remedy available for alleged wrong denial of benefits under §1132(a)(1)).

　　　　This conclusion is underscored by the fact that each of the alleged breaches of fiduciary duty on which plaintiffs rely relate to some alleged failure or misconduct in the processing or administration of their claims for benefits.  <u>See</u> Plaintiffs' Response to Defendants' Second Interrogatories, Attachment A thereto, ¶¶9, 23, 26, 38, 41, 53, 54, 56, 68, 69, 71, 83, 86, 98, 101, 113, 114, 116, 128, 131, 143, 145, 157, 160, 174, 186, 189, 201, 204, 216, 219, appended hereto as Exhibit B.  Congress did not contemplate that a breach of fiduciary duty claim would be available in such circumstances.  Rather, a breach of fiduciary duty claim "was primarily intended to address violations affecting a plan more generally," while a denial of benefits claim "was to be the avenue for redressing a wrongful denial of benefits." <u>Coyne & Delany Co</u>., 102 F.3d at 715.  Plaintiffs' claim under Section 502(a)(3), <u>See</u> 29 U.S.C. §1132(a)(3), therefore, should be denied.  <u>See</u> <u>Massachusetts Mutual Life</u>, 473 U.S. at 134, 105 S. Ct. at 3085 (Supreme Court declining to craft a remedy for such alleged procedural violations).

　　　　B.　　　<u>Plaintiffs' Fiduciary Duty Claims are Time Barred or otherwise without Merit</u>.

　　　　Pursuant to ERISA, an ERISA claimant must file an action for breach of fiduciary duty no later than "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation." <u>See</u> 29 U.S.C. §1113.  Here, plaintiffs identify several ways in which they allege that defendants breached their fiduciary duty.  <u>See</u> Plaintiffs' Responses to

Defendants' Second Interrogatories, appended hereto as Exhibit B.  None of these support a breach of fiduciary duty claim, and the great majority are time-barred.

For example, as noted above, the alleged breaches of fiduciary duty on which plaintiffs rely relate to some alleged failure or misconduct in the processing or administration of their claims for benefits, and most of those alleged breaches occurred at or before the time the Plans made their final adverse benefits decision.  See Plaintiffs' Response to Defendants' Second Interrogatories, Attachment A thereto, ¶¶9, 23, 38, 53, 54, 68, 69, 83, 98, 113, 114, 128, 143, 157, 186, 201, 216, appended hereto as Exhibit B.  Here, however, plaintiffs did not file suit until February 4, 2002, See Complaint (Dkt. Entry 1), and the Plans rendered their final decisions in the Boone, Brookshire, Clark, Finney, Haynes, Kirkpatrick, Lynn, McClure and Smith matters more than three years prior to that date.  See Facts, ¶¶63, 107, 149, 172, 210, 257, 292, 354, 427.  Therefore, any alleged claims for breach of fiduciary duty arising from the manner in which the Plans processed these plaintiffs' claims, even if cognizable, are time-barred.  See 29 U.S.C. §1113.

Nor may plaintiffs assert a claim for breach of fiduciary duty based on their counsel's requests that the Plans "reconsider[]" the denial of their claims for benefits.  In each of the claims at issue here, plaintiffs' counsel requested the Plans to "reconsider[] . . . the decision to terminate [the plaintiff's] benefits."  See Facts, ¶¶68, 111, 152, 176, 213, 230, 258, 295, 340, 362, 392, 428, 446, 495.  In the vast majority of these cases, however, they did not make these requests until two, two and one-half, three, or three and one-half years after the Plans' made

their final claims decisions.  Id.[19]  Nothing in ERISA, its implementing regulations or the Plans' claims procedures required the Plans to consider plaintiffs' requests for reconsideration at all, not to mention at such late dates.  See, e.g., 29 U.S.C. §1104; 29 C.F.R. §2560.503-1 (1993), copy of which is appended hereto as Exhibit C; Facts, ¶12.  The Plans' decision not to grant these requests, therefore, does not constitute a breach of fiduciary duty.

### Conclusion

Based on the foregoing, defendants, by counsel, request the Court to enter an Order granting their Motion for Summary Judgment; dismissing plaintiff's Complaint, with prejudice; awarding them the attorneys' fees and costs they incurred in the defense of this action; and providing such other relief as the Court deems just and proper.

---

[19]Plaintiff Metcalf waited eight months.  See Facts, ¶340.  Plaintiff Smith waited one year.  See Facts, ¶428.

This the 4th day of April, 2005.

DEFENDANTS – CHAMPION INTERNATIONAL
CORPORATION, LONG TERM DISABILITY BENEFITS
PLAN FOR SALARIED EMPLOYEES OF CHAMPION
INTERNATIONAL CORPORATION #506, LONG TERM
DISABILITY BENEFITS PLAN FOR CERTAIN HOURLY
EMPLOYEES OF CHAMPION INTERNATIONAL
CORPORATION #703; and INTERNATIONAL PAPER
COMPANY

By:     _____
        Barry J. Waters – ct05520

MURTHA CULLINA LLP
Whitney Grove Square
Two Whitney Avenue
P.O. Box 704
New Haven, Connecticut  06503-0704
203.772.7700
203.772.7723 (facsimile)

Bruce M. Steen – ct23613
MCGUIREWOODS LLP
Bank of America Corporate Center
100 North Tryon Street, Suite 2900
Charlotte, North Carolina  28202
704.353.6244
704.353.6200 (facsimile)

Their Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Defendant's Memorandum in Support of

Motion for Summary Judgment was mailed by first-class mail, postage prepaid, on April 4,

2005, to counsel as follows:

> Robert M. Elliot, Esquire
> ELLIOT, PISHKO, GELBIN & MORGAN, P.A.
> 426 Old Salem Road
> Winston-Salem, North Carolina  27101;
>
> Richard B. Harper, Esquire
> LAW OFFICES OF RICHARD B. HARPER
> P.O. Box 395
> Sylva, North Carolina  28779-0395; and
>
> William B. Barnes, Esquire
> ROSENSTEIN & BARNES
> 1100 Kings Highway East
> Suite 1C
> Fairfield, Connecticut  06432; and

> _____/s/_____
> Barry Waters – ct05520