disability as required by 29 U.S.C. § 1133. International received said information and documentation on or about November 27, 2000. Despite its receipt of substantial evidence establishing Haynes' continuing total disability, including facts ignored by Champion and CORE, International refused to reconsider the termination decision.

87.     As a direct and proximate result of defendants' wrongful actions, Haynes has lost his benefits.

88.     Champion's decision to terminate Haynes' LTD benefits was made to reduce Champion's costs and expenses, and for other reasons unrelated to Haynes' continuing total disability.

### Plaintiff Rosa Lee Brookshire

89.     Plaintiff Rosa Lee Brookshire (hereafter "Brookshire") was born on October 30, 1937, and is presently 64 years of age.

90.     On October 15, 1979, Brookshire was initially employed by Champion in the position of rewinder operator.

91.     From 1979 to 1995, Brookshire was continuously employed with Champion, and remained in the position of a rewinder operator until her disability, as described below.

92.     On or about January 3, 1995, Brookshire became totally disabled from her employment with Champion. Brookshire has remained totally disabled from her occupation or any other gainful employment activity since that time because she suffers from a severe and incapacitating back impairment, diabetes, congestive heart failure, severe pulmonary condition, chronic pain, and other disabling conditions.

93.     In approximately June, 1995, Brookshire applied for LTD benefits in accordance with the Plan. Champion determined that Brookshire was totally disabled and awarded benefits. Champion's determination was based on the independent opinions and evaluations of Brookshire's conditions by her physicians, as well as other evidence of her totally disabling conditions provided to Champion.

94.     Following approval for LTD benefits, Brookshire began receiving monthly payments.

95.     On or about July 30, 1995, based on the substantial medical and vocational evidence, the Social Security Administration determined that Brookshire was totally and permanently disabled

from all substantial and gainful employment activity as of January 2, 1995, and granted Social Security disability benefits pursuant to Title II of the Social Security Act, 42 U.S.C §401, *et seq.*

96.     From the date of the initial determination of Brookshire's total disability by Champion to 1997, Brookshire's condition worsened.

97.     Nevertheless, in 1997, Champion, through CORE, notified Brookshire that the company was re-evaluating her condition and her right to continuing LTD benefits, although there had been no improvement in Brookshire's condition. CORE required Brookshire to be undergo further evaluation by CORE's selected providers.

98.     In compliance with CORE's instructions, Brookshire was evaluated by CORE's selected providers, who were biased and influenced by CORE to support the termination of Brookshire's LTD benefits.

99.     On December 18, 1997, CORE, ignoring the overwhelming evidence confirming Brookshire's total disability, sent Brookshire a letter stating that, in its view, Smith was not disabled under the Plan. On January 9, 1998, Champion notified Brookshire that her LTD LTD benefits were terminated, effective January 31, 1998.

100.    Following CORE's and Champion's termination decision, Brookshire requested review through the internal review procedures provided by the Plan. Brookshire, through her attorney, submitted medical and vocational evidence and documentation of her total disability. At each level and finally on May 1, 1998, Champion upheld the decision terminating Brookshire's LTD benefits, despite the overwhelming evidence of her disabling conditions.

101.    On March 22, 2001, Brookshire, through counsel, sent International, as Champion's successor, complete and updated records concerning the medical treatment of Brookshire, vocational evidence and other proof of Brookshire's continuing total disability which had not been obtained or considered by Champion and CORE in their re-evaluation of her condition. Brookshire requested reconsideration of her claim on the ground that at the time her benefits were terminated, defendants Champion and CORE did not conduct a full and fair review of all relevant evidence concerning her disability as required by 29 U.S.C. § 1133. International received said information and documentation on or about March 26, 2001. Despite its receipt of substantial evidence establishing Brookshire's continuing total disability, including facts ignored by Champion and CORE,

14

International refused to reconsider the termination decision.

102.    As a direct and proximate result of defendants' wrongful actions, Brookshire has lost her benefits.

103.    Upon information and belief, Champion's decision to terminate Brookshire's LTD benefits was made to reduce Champion's costs and expenses, and for other reasons unrelated to Brookshire's continuing total disability.

### *Plaintiff Harrison Young Clark*

104.    Plaintiff Harrison Young Clark (hereafter "Clark") was born on June 8, 1949, and is presently 52 years of age.

105.    On May 5, 1981, Clark was initially employed by Champion as a paper machine operator.

106.    From 1981 to 1990, Clark was continuously employed with Champion. In 1984, Clark suffered a serious on-the-job injury. Clark continued to work, although his injuries restricted his ability to perform heavy work or lifting, and he was transferred to the position of filing clerk. Clark attempted to perform his job until he became totally disabled in 1990.

107.    On or about December 9, 1990, Clark became totally disabled from his employment with Champion. Clark has remained totally disabled from his occupation or any other gainful employment activity since that time because he suffers from a severe and incapacitating back impairment, chronic pain, and other disabling conditions.

108.    In approximately May, 1991, Clark applied for LTD benefits in accordance with the Plan. Champion determined that Clark was totally disabled from his employment and awarded benefits. Champion's determination was based on the independent opinions and evaluations of Clark's condition by his physicians, as well as other evidence of his totally disabling conditions provided to Champion.

109.    Following approval for LTD benefits, Clark began receiving monthly payments.

110.    In or about September, 1992, based on the substantial medical and vocational evidence, the Social Security Administration determined that Clark was totally and permanently disabled from all substantial and gainful employment activity as of December 22, 1990, and granted Social Security disability benefits pursuant to Title II of the Social Security Act, 42 U.S.C §401, *et*

*seq.*

111.    From the date of the initial determination of Clark's total disability by Champion to 1998, Clark's condition worsened.

112.    In or about February, 1998, Champion, through CORE, notified Clark that the company was re-evaluating his condition and his right to continuing medical benefits although there had been no improvement in Clark's condition. CORE required Clark to undergo further evaluation by CORE's selected providers.

113.    In compliance with CORE's instructions, Clark was evaluated by CORE's selected providers, who were biased and influenced by CORE to support the termination of Clark's medical benefits.

114.    On February 4, 1998, CORE, ignoring the overwhelming evidence confirming Clark's total disability, sent Clark a letter stating that, in its view, Clark was not disabled under the Plan. On the same date, CORE submitted a report to Champion projecting significant savings from the termination of Clark's benefits. On February 26, 1998, Champion notified Clark that his medical benefits were terminated, effective March 31, 1998.

115.    Following CORE's and Champion's termination decision, Clark requested review through the internal review procedures provided by the Plan. Clark submitted medical and vocational evidence and documentation of his total disability. At each level, Champion upheld the decision terminating Clark's medical benefits, despite overwhelming evidence of his disabling conditions.

116.    On December 11, 2000, Clark, through counsel, sent International, as Champion's successor, complete and updated records concerning the medical treatment of Clark, and vocational evidence and other proof of Clark's continuing total disability which had not been obtained or considered by Champion and CORE in their re-evaluation of his condition. Clark requested reconsideration of his claim on the ground that at the time his medical benefits were terminated, Champion and CORE did not conduct a full and fair review of all relevant evidence concerning his disability as required by 29 U.S.C. § 1133. International received said information and documentation on or about December 15, 2000. Despite its receipt of substantial evidence establishing Clark's continuing total disability, including facts ignored by Champion and CORE,

16

International refused to reconsider the termination decision.

117.     As a direct and proximate result of defendants' wrongful actions, Clark has lost his medical benefits.

118.     Champion's decision to terminate Clark's medical benefits was  made to reduce Champion's costs and expenses, and for other reasons unrelated to Clark's continuing total disability.

### Plaintiff Franziska Finney

119.     Plaintiff Franziska Finney (hereafter "Finney") was born on October 3, 1945, and is presently 56 years of age.

120.     On August 11, 1984, Finney was initially employed by Champion in technical control.

121.     From 1984 to 1994, Finney was continuously employed with Champion.  After a series of transfers, Finney was ultimately promoted to the position of conveyor operator in or about 1993 where she remained until her disability, as described below.

122.     On or about November 7, 1994, Finney became totally disabled from her employment with Champion.  Finney has remained totally disabled from her occupation or any other gainful employment activity since that time because she suffers from a severe and incapacitating back impairment, osteoarthritis, chronic pain, and other disabling conditions.

123.     In approximately May, 1995, Finney applied for LTD benefits in accordance with the Plan.  Champion determined that Finney was totally disabled and awarded benefits.  Champion's determination was based on the independent opinions and evaluations of Finney's condition by her physicians, as well as other evidence of her totally disabling conditions provided to Champion.

124.     Following the approval for LTD benefits, Finney began receiving monthly payments.

125.     In or about May, 1996, based on the substantial medical and vocational evidence, the Social Security Administration determined that Finney was totally and permanently disabled from all substantial and gainful employment activity as of October, 1995, and granted Social Security disability benefits pursuant to Title II of the Social Security Act, 42 U.S.C § 401, et seq.

126.     From the date of the initial determination of Finney's total disability by Champion to 1997, Finney's condition worsened.

127.     Nevertheless, in or about August, 1997, Champion, through CORE, notified Finney that the company was re-evaluating her condition and her right to continuing LTD benefits although

17

there had been no improvement in Finney's condition. CORE required Finney to undergo further evaluation by CORE's selected providers.

128. In compliance with CORE's instructions, Finney was evaluated by CORE's selected providers, who were biased and influenced by CORE to support the termination of Finney's LTD benefits.

129. On August 26, 1997, CORE, ignoring the overwhelming evidence confirming Finney's total disability, sent Finney a letter stating that, in its view, Finney was not disabled under the Plan. On September 11, 1997, Champion notified Finney that her LTD benefits were terminated, effective September 30, 1997.

130. Following CORE's and Champion's termination decision, Finney requested review through the internal review procedures provided by the Plan. Finney submitted medical and vocational evidence and documentation of her total disability. At each level, and finally on February 9, 1998, Champion upheld the decision terminating Finney's LTD benefits, despite the overwhelming evidence of her disabling conditions.

131. On December 11, 2000, Finney, through counsel, sent International, as Champion's successor, complete and updated records concerning the medical treatment of Finney, vocational evidence and other proof of Finney's continuing total disability which had not been obtained or considered by Champion and CORE in their re-evaluation of her condition. Finney requested reconsideration of her claim on the ground that at the time her benefits were terminated, Champion and CORE did not conduct a full and fair review of all relevant evidence concerning her disability as required by 29 U.S.C. § 1133. International received said information and documentation on or about December 15, 2000. Despite its receipt of substantial evidence establishing Finney's continuing total disability, including facts ignored by defendants Champion and CORE, International refused to reconsider the termination decision.

132. As a direct and proximate result of defendants' wrongful actions, Finney has lost her benefits.

133. Champion's decision to terminate Finney's LTD benefits was made to reduce Champion's costs and expenses, and for other reasons unrelated to Finney's continuing total disability.

*Plaintiff Judith Case Kirkpatrick*

134.    Plaintiff Judith Case Kirkpatrick (hereafter "Kirkpatrick") was born on February 20, 1944, and is presently 57 years of age.

135.    On November 1, 1976, Kirkpatrick was initially employed by Champion in the position of machine operator.

136.    From 1976 to 1993, Kirkpatrick was continuously employed with Champion. After a series of promotions, Kirkpatrick was ultimately promoted to the position of poly recovery helper. Kirkpatrick remained in that position until her disability, as described below.

137.    On or about November 26, 1993, Kirkpatrick became totally disabled from her employment with Champion. Kirkpatrick has remained totally disabled from her occupation or any other gainful employment activity since that time because she suffers from a severe and incapacitating back impairment, arthritis, chronic pain and other disabling conditions.

138.    In approximately May, 1994, Kirkpatrick applied for LTD benefits in accordance with the Plan. Champion determined that Kirkpatrick was totally disabled and awarded benefits. Champion's determination was based on the independent opinions and evaluations of Kirkpatrick's condition by her physicians, as well as other evidence of her totally disabling conditions provided to Champion.

139.    Following approval for LTD benefits, Kirkpatrick began receiving monthly payments.

140.    On or about October 27, 1995, based on the substantial medical and vocational evidence, the Social Security Administration determined that Kirkpatrick was totally and permanently disabled from all substantial and gainful employment activity as of November 22, 1993, and granted Social Security disability benefits pursuant to Title II of the Social Security Act, 42 U.S.C §401, *et seq.*

141.    From the date of the initial determination of Kirkpatrick's total disability by Champion to 1998, Kirkpatrick's condition worsened.

142.    Nevertheless, in 1998, Champion, through CORE, notified Kirkpatrick that the company was re-evaluating her condition and her right to continuing LTD benefits, although there had been no improvement in Kirkpatrick's condition. Subsequently, CORE contacted Kirkpatrick's physician, and informed him that, based on the Plan, he should consider Kirkpatrick totally disabled

19

only if she was "bedridden," or was unable to dress herself, and otherwise care for her personal needs, thereby misrepresenting the terms of the Plan.

143.   On May 12, 1998, CORE, ignoring the overwhelming evidence confirming Kirkpatrick's total disability, sent Kirkpatrick a letter stating that, in its view, Kirkpatrick was not disabled under the Plan. On May 14, 1998, CORE submitted a report to Champion projecting savings of $49,826.25 from the termination of Kirkpatrick's benefits. On June 1, 1998, Champion notified Kirkpatrick that her LTD benefits were terminated, effective June 30, 1998.

144.   Following CORE's and Champion's termination decision, Kirkpatrick requested review through the internal review procedures provided by the Plan. Kirkpatrick submitted medical and vocational evidence and documentation of her total disability. At each level and finally, on November 6, 1998, Champion upheld the decision terminating Kirkpatrick's LTD benefits, despite overwhelming evidence of her disabling conditions.

145.   On February 2, 2001, Kirkpatrick, through counsel, sent International, as Champion's successor, complete and updated records concerning the medical treatment of Kirkpatrick, vocational evidence and other proof of Kirkpatrick's continuing total disability which had not been obtained or considered by Champion and CORE in their re-evaluation of her condition. Kirkpatrick requested reconsideration of her claim on the ground that at the time her benefits were terminated, Champion and CORE did not conduct a full and fair review of all relevant evidence concerning her disability as required by 29 U.S.C. § 1133. International received said evidence on or about February 7, 2001. Despite its receipt of substantial evidence establishing Kirkpatrick's continuing total disability, including facts ignored by Champion and CORE, International refused to reconsider the termination decision.

146.   As a direct and proximate result of defendants' wrongful actions, Kirkpatrick has lost her benefits.

147.   Champion's decision to terminate Kirkpatrick's LTD benefits was made to reduce Champion's costs and expenses, and for other reasons unrelated to Kirkpatrick's continuing total disability.

### *Plaintiff Wilson Daniel McClure*

148.   Plaintiff Wilson Daniel McClure (hereafter "McClure") was born on September 12,

20

1945, and is presently 56 years of age.

149.    On October 1, 1966, McClure was initially employed by Champion in the position of machine operator.

150.    From 1966 to 1989, McClure was continuously employed with Champion. After a series of promotions and transfers, McClure was ultimately promoted to the position of work control analyst in the maintenance department. McClure remained in that position until his disability, as described below.

151.    On or about February 1, 1989, McClure became totally disabled from his employment with Champion. McClure has remained totally disabled from his occupation or any other gainful employment activity since that time because he suffers from severe and incapacitating rheumatoid arthritis, chronic pain and other disabling conditions.

152.    In approximately July, 1989, McClure applied for LTD benefits in accordance with the Plan. Champion determined that McClure was totally disabled and awarded benefits. Champion's determination was based on the independent opinions and evaluations of McClure's condition by his physicians, as well as other evidence of his totally disabling conditions provided to Champion.

153.    Following approval for LTD benefits, McClure began receiving monthly payments.

154.    On or about January 26, 1995, based on the substantial medical and vocational evidence, the Social Security Administration determined that McClure was totally and permanently disabled from all substantial and gainful employment activity as of February 1, 1989, and granted Social Security disability benefits pursuant to Title II of the Social Security Act, 42 U.S.C §401, *et seq.*

155.    From the date of the initial determination of McClure's total disability by Champion to 1996, McClure's condition worsened.

156.    Nevertheless, in or about June, 1996, Champion, through CORE, notified McClure that the company was re-evaluating his condition and his right to continuing LTD benefits, although there had been no improvement in McClure's condition. CORE required McClure to undergo further evaluation by CORE's selected providers.    157.    In compliance with CORE's instructions, McClure was evaluated by CORE's selected providers, who were biased and influenced by CORE

to support the termination of McClure's LTD benefits.

158.    On October 16, 1996, CORE, ignoring the overwhelming evidence confirming McClure's continuing total disability, sent McClure a letter stating that, in its view, McClure was not disabled under the Plan. Shortly thereafter, Champion notified McClure that his LTD benefits were terminated, effective October 31, 1996.

159.    Following CORE's and Champion's termination decision, McClure requested review through the internal review procedures provided by the Plan. McClure submitted medical and vocational evidence and documentation of his total disability. At each level, and finally in April, 1997, Champion upheld the decision terminating McClure's LTD benefits, despite the overwhelming evidence of his disabling conditions.

160.    On December 28, 2000, McClure, through counsel, sent International, as Champion's successor, complete and updated records concerning the medical treatment of McClure, vocational evidence and other proof of McClure's continuing total disability which had not been obtained or considered by Champion and CORE in their re-evaluation of his condition. McClure requested reconsideration of his claim on the ground that at the time his benefits were terminated, Champion and CORE did not conduct a full and fair review of all relevant evidence concerning his disability as required by 29 U.S.C. § 1133. International received said request and evidence on or about January 2, 2001. Despite its receipt of substantial evidence establishing McClure's continuing total disability, including facts ignored by defendants Champion and CORE, International refused to reconsider the termination decision.

161.    As a direct and proximate result of defendants' wrongful actions, McClure has lost his benefits.

162.    Champion's decision to terminate McClure's LTD benefits was made to reduce Champion's costs and expenses, and for other reasons unrelated to McClure's continuing total disability.

### *Plaintiff Celia Darlene Metcalf*

163.    Plaintiff Celia Darlene Metcalf (hereafter "Metcalf") was born on October 12, 1947, and is presently 54 years of age.

164.    On April 23, 1979, Metcalf was initially employed by Champion in the position of

22

transfer pool employee.

165.    From 1979 to 1997, Metcalf was continuously employed with Champion. After a series of promotions, Metcalf was ultimately promoted to the position of weigher/stenciler. Metcalf remained in that position until her disability, as described below.

166.    On or about March 16, 1997, Metcalf became totally disabled from her employment with Champion. Metcalf has remained totally disabled from her occupation or any other gainful employment activity since that time because she suffers from severe and incapacitating fibromyalgia, and other disabling conditions.

167.    In approximately October, 1997, Metcalf applied for LTD benefits in accordance with the Plan. Champion determined that Metcalf was totally disabled and awarded benefits. Champion's determination was based on the independent opinions and evaluations of Metcalf's condition by her physicians, as well as other evidence of her totally disabling conditions provided to Champion.

168.    Following the approval for LTD benefits, Metcalf began receiving monthly payments.

169.    In or about April, 1999, based on the substantial medical and vocational evidence, the Social Security Administration determined that Metcalf was totally and permanently disabled from all substantial and gainful employment activity, and granted Social Security disability benefits pursuant to Title II of the Social Security Act, 42 U.S.C §401, *et seq*.

170.    From the date of the initial determination of Metcalf's total disability by Champion to 1999, Metcalf's condition worsened.

171.    Nevertheless, in or about October, 1999, Champion, through CORE, notified Metcalf that the company was re-evaluating her condition and her right to continuing LTD benefits although there had been no improvement in Metcalf's condition. Subsequently, CORE represented to Metcalf's treating physician that he should consider Metcalf totally disabled only if she was "ready for a nursing home;" and was unable to dress herself, and to provide for her personal needs. CORE's statements in this regard misrepresented the terms of the Plan.

172.    On November 15, 1999, CORE (acting with Sedgwick James as SCORE), ignoring the overwhelming evidence confirming Metcalf's total disability, sent Metcalf a letter stating that, in its view, Metcalf was not disabled under the Plan. Metcalf was notified that her LTD benefits were

23

terminated, effective January 31, 2000.

173. Following CORE's and Champion's termination decision, Metcalf requested review through the internal review procedures provided by the Plan. Metcalf submitted medical and vocational evidence and documentation of her total disability. At each level, and finally, on June 15, 2000, Champion upheld the decision terminating Metcalf's LTD benefits, despite the overwhelming evidence of her total disability.

174. On February 20, 2001, Metcalf, through counsel, again sent International (as Champion's successor) complete and updated records concerning the medical treatment of Metcalf, vocational evidence and other proof of Metcalf's continuing total disability which had not been obtained or considered by Champion and CORE in their re-evaluation of her condition. Metcalf requested reconsideration of her claim on the ground that at the time her benefits were terminated, Champion and CORE did not conduct a full and fair review of all relevant evidence concerning her disability as required by 29 U.S.C. § 1133. International received said request and evidence on or about February 26, 2001. Despite its receipt of substantial evidence establishing Metcalf's continuing total disability, including facts ignored by Champion and SCORE, International refused to reconsider the termination decision.

175. As a direct and proximate result of defendants' wrongful actions, Metcalf has lost benefits.

176. Champion's decision to terminate Metcalf's LTD benefits was made to reduce Champion's costs and expenses, and for other reasons unrelated to Metcalf's continuing total disability.

### Plaintiff Charles R. Reece

177. Plaintiff Charles R. Reece (hereafter "Reece") was born on January 28, 1946, and is presently 56 years of age.

178. On January 27, 1969, Reece was initially employed by Champion in the position of general laborer.

179. From 1969 to 1995, Reece was continuously employed with Champion. After a series of promotions, Reece was ultimately promoted to the position of oiler mechanic in or about 1970. Reece remained in that position until his disability, as described below.

24

180.    On or about June 26, 1995, Reece became totally disabled from his employment with Champion.  Reece has remained totally disabled from his occupation or any other gainful employment activity since that time because he suffers from severe and incapacitating heart disease, and other disabling conditions.

181.    In approximately January, 1996, Reece applied for LTD benefits in accordance with the Plan. Champion determined that Reece was totally disabled and awarded benefits.  Champion's determination was based on the independent opinions and evaluations of Reece's condition by his physicians, as well as other evidence of his totally disabling conditions provided to Champion.

182.    Following the approval for LTD benefits, Reece began receiving monthly payments.

183.    In or about June, 1996, based on the substantial medical and vocational evidence, the Social Security Administration determined that Reece was totally and permanently disabled from all substantial and gainful employment activity as of June 28, 1995, and granted Social Security disability benefits pursuant to Title II of the Social Security Act, 42 U.S.C §401, *et seq.*

184.    From the date of the initial determination of Reece's total disability by Champion to 1998, Reece's condition worsened.

185.    Nevertheless, in the fall of 1998, Champion, through CORE, notified Reece that the company was re-evaluating his condition and his right to continuing LTD benefits although there had been no improvement in Reece's condition. CORE required Reece to undergo further evaluation by CORE's selected providers.

186.    In compliance with CORE's instructions, Reece was evaluated by CORE's selected providers, who were biased and influenced by CORE to support the termination of Reece's LTD benefits.

187.    On October 9, 1998, CORE, ignoring the overwhelming evidence confirming Reece's total disability, sent Reece a letter stating that, in its view, Reece was not disabled under the Plan On October 19, 1998, Champion notified Reece that his LTD benefits were terminated, effective December 31, 1998.

188.    Following CORE's and Champion's termination decision, Reece requested review through the internal review procedures provided by the Plan. Reece submitted medical and vocational evidence and documentation of his total disability. At each level, and finally, on March

25

24, 1999, Champion upheld the decision terminating Reece's LTD benefits, despite the overwhelming evidence of his disabling conditions.

189.    On December 29, 2000, Reece, through counsel, sent International, as Champion's successor, complete and updated records concerning the medical treatment of Reece, vocational evidence and other proof of Reece's continuing total disability which had not been obtained or considered by Champion and CORE in their re-evaluation of his condition. Reece requested reconsideration of his claim on the ground that at the time his benefits were terminated, Champion and CORE did not conduct a full and fair review of all relevant evidence concerning his disability as required by 29 U.S.C. § 1133. International received said request and evidence on or about January 3, 2001. Despite its receipt of substantial evidence establishing Reece's continuing total disability, including facts ignored by Champion and CORE, International refused to reconsider the termination decision.

190.    As a direct and proximate result of defendants' wrongful actions, Reece has lost his benefits.

191.    Champion's decision to terminate Reece's LTD benefits was made in order to reduce Champion's costs and expenses, and for other reasons unrelated to Reece's continuing total disability.

### Plaintiff Dolphus Luther Treadway, Jr.

192.    Plaintiff Dolphus Luther Treadway, Jr. (hereafter "Treadway") was born on January 26, 1944, and is presently 58 years of age.

193.    On May 17, 1972, Treadway was initially employed by Champion in the position of bark belt tender.

194.    From 1972 to 1995, Treadway was continuously employed with Champion. After a series of promotions and transfers, Treadway was ultimately promoted to the position of first operator. Treadway remained in that position until his disability, as described below.

195.    In or about December, 1995, Treadway became totally disabled from his employment with Champion. Treadway has remained totally disabled from his occupation or any other gainful employment activity since that time because he suffers from severe and incapacitating heart disease.

196.    In approximately June, 1996, Treadway applied for LTD benefits in accordance with

26

the Plan. Champion determined that Treadway was totally disabled and awarded benefits. Champion's determination was based on the independent opinions and evaluations of Treadway's condition by his physicians, as well as other evidence of his totally disabling condition provided to Champion.

197.    Following the approval for LTD benefits, Treadway began receiving monthly payments.

198.    On or about June 8, 1996, based on the substantial medical and vocational evidence, the Social Security Administration determined that Treadway was totally and permanently disabled from all substantial and gainful employment activity as of December 19, 1995, and granted Social Security disability benefits pursuant to Title II of the Social Security Act, 42 U.S.C § 401, *et seq.*

199.    From the date of the initial determination of Treadway's total disability by Champion to 1998, Treadway's condition worsened.

200.    Nevertheless, in approximately August, 1998, Champion, through CORE, notified Treadway that the company was re-evaluating his condition and his right to continuing LTD benefits, although there had been no improvement in Treadway's condition. CORE required Treadway to undergo further evaluation by CORE's selected providers.

201.    In compliance with CORE's instructions, Treadway was evaluated by CORE's selected providers, who were biased and influenced by CORE to support the termination of Treadway's LTD benefits.

202.    On October 19, 1998, CORE, ignoring the overwhelming evidence confirming Treadway's total disability, sent Treadway a letter stating that, in its view, Treadway was not disabled under the Plan. Treadway was informed that his LTD benefits were terminated, effective December 31, 1998.

203.    Following CORE's and Champion's termination decision, Treadway requested review through the internal review procedures provided by the Plan. Treadway submitted medical and vocational evidence and documentation of his total disability. At each level, and finally, on February 8, 1999, Champion upheld the decision terminating Treadway's LTD benefits, despite the overwhelming evidence of his disabling conditions.

204.    On January 9, 2001, Treadway, through counsel, sent International, as Champion's

27

successor, complete and updated records concerning the medical treatment of Treadway, vocational evidence and other proof of Treadway's continuing total disability which had not been obtained or considered by Champion and CORE in their re-evaluation of his condition. Treadway requested reconsideration of his claim on the ground that at the time his benefits were terminated, Champion and CORE did not conduct a full and fair review of all relevant evidence concerning his disability as required by 29 U.S.C. § 1133. International received said request and evidence on or about January 13, 2001. Despite its receipt of substantial evidence establishing Treadway's continuing total disability, including facts ignored by Champion and CORE, International refused to reconsider the termination decision.

205.    As a direct and proximate result of defendants' wrongful actions, Treadway has lost his benefits.

206.    Champion's decision to terminate Treadway's LTD benefits was made to reduce Champion's costs and expenses, and for other reasons unrelated to Treadway's continuing total disability.

### Plaintiff Martha Burnette Whitley

207.    Martha Burnette Whitley (hereafter "Whitley") was born on January 8, 1957, and is presently 45 years of age.

208.    On April 8, 1980, Whitley was initially employed by Champion.

209.    From 1980 to 1988, Whitley was continuously employed with Champion. After a series of promotions and transfers, Whitley was ultimately promoted to the position of stencil finisher. Whitley remained in that position until her disability, as described below.

210.    On or about March 29, 1988, Whitley became totally disabled from her employment with Champion. Whitley has remained totally disabled from her occupation or any other gainful employment activity since that time because she suffers from a severe and incapacitating back impairment, heart condition, fibromyalgia, chronic pain and other disabling conditions.

211.    In approximately September, 1988, Whitley applied for LTD benefits in accordance with the Plan. Champion determined that Whitley was totally disabled and awarded benefits. Champion's determination was based on the independent opinions and evaluations of Whitley's condition by her physicians, as well as other evidence of her totally disabling conditions provided

28

to Champion.

212.    Following the approval for LTD benefits, Whitley began receiving monthly payments.

213.    On or about December 19, 1989, based on the substantial medical and vocational evidence, the Social Security Administration determined that Whitley was totally and permanently disabled from all substantial and gainful employment activity as of March 29, 1988, and granted Social Security disability benefits pursuant to Title II of the Social Security Act, 42 U.S.C § 401, *et seq.*

214.    From the date of the initial determination of Whitley's total disability by Champion to 1998, Whitley's condition worsened.

215.    Nevertheless, in or about December, 1997, Champion, through CORE, notified Whitley that the company was re-evaluating her condition and her right to continuing LTD benefits, although there had been no improvement in Whitley's condition. CORE required Whitley to undergo further evaluation by CORE's selected medical providers.

216.    In compliance with CORE's instructions, Whitley was evaluated by CORE's selected providers, who were biased and influenced by CORE to support the termination of Whitley's LTD benefits.

217.    On December 22, 1997, CORE, ignoring the overwhelming evidence confirming Whitley's total disability, sent Whitley a letter stating that, in its view, Whitley was not disabled under the Plan. On January 29, 1998, Champion notified Whitley that her LTD benefits were terminated, effective January 31, 1998.

218.    Following CORE's and Champion's termination decision, Whitley requested review through the internal review procedures provided by the Plan. Whitley submitted medical and vocational evidence and documentation of her total disability. At each level, and finally, on or about March 11, 1999, Champion upheld the decision terminating Whitley's LTD benefits, despite the overwhelming evidence of her disabling conditions.

219.    On February 20, 2001, Whitley, through counsel, sent International, as Champion's successor, complete and updated records concerning the medical treatment of Whitley, vocational evidence and other proof of Whitley's continuing total disability which had not been obtained or

29

considered by Champion and CORE in their re-evaluation of her condition. Whitley requested reconsideration of her claim on the ground that at the time her benefits were terminated, Champion and CORE did not conduct a full and fair review of all relevant evidence concerning her disability as required by 29 U.S.C. § 1133. International received said request and evidence on or about February 23, 2001. Despite its receipt of substantial evidence establishing Whitley's continuing total disability, including facts ignored by Champion and CORE, International refused to reconsider the termination decision.

220.    As a direct and proximate result of defendants' wrongful actions, Whitley has lost her benefits.

221.    Champion's decision to terminate Whitley's LTD benefits was made to reduce Champion's costs and expenses, and for other reasons unrelated to Whitley's continuing total disability.