IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HARRY L. SMITH, LOIS L. LYNN, | ) | |
| DARRELL KEITH HILL, ELIZABETH | ) | |
| CASE BOONE, WILEY H. HAYNES, | ) | |
| ROSA LEE BROOKSHIRE, HARRISON | ) | CIVIL ACTION NUMBER |
| YOUNG CLARK, FRANZISKA FINNEY, | ) | 3:02cv00212 (CFD) |
| JUDITH CASE KIRKPATRICK, WILSON | ) | |
| DANIEL McCLURE, CELIA DARLENE | ) | |
| METCALF, CHARLES R. REECE, | ) | |
| DOLPHUS LUTHER TREADWAY, JR., | ) | |
| and MARTHA BURNETTE WHITLEY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHAMPION INTERNATIONAL | ) | |
| CORPORATION, LONG TERM | ) | |
| DISABILITY BENEFITS PLAN FOR | ) | |
| SALARIED EMPLOYEES OF | ) | |
| CHAMPION INTERNATIONAL | ) | |
| CORPORATION #506, LONG TERM | ) | |
| DISABILITY BENEFITS PLAN FOR | ) | |
| CERTAIN HOURLY EMPLOYEES OF | ) | |
| CHAMPION INTERNATIONAL | ) | |
| CORPORATION #703; INTERNATIONAL | ) | |
| PAPER COMPANY; and CORE, INC. | ) | |
| | ) | |
| Defendants. | ) | APRIL 4, 2005 |
| _____ | ) | |

## DEFENDANTS' LOCAL RULE 56(a)(1) STATEMENT OF FACTS

Pursuant to Local Rule 56(a)(1), defendants Champion International Corporation

("Champion International"), Long Term Disability Benefits Plan for Salaried Employees of

Champion International Corporation #506 ("Salaried LTD Plan"), Long Term Disability

Benefits Plan for Certain Hourly Employees of Champion International Corporation #703

("Hourly LTD Plan"), and International Paper Company ("International Paper") (collectively

referred to as "Defendants"), by counsel, submit this statement of material facts as to which

Defendants contend there is no genuine issue to be tried.

## Table of Contents

|  | Paragraphs |
| --- | --- |
| Salaried LTD Plan & Hourly LTD Plan | 1-21 |
| Elizabeth Boone | 22-68 |
| Rosa Lee Brookshire | 69-111 |
| Harrison Clark | 112-152 |
| Franziska Finney | 153-176 |
| Wiley Haynes | 177-213 |
| Darrell Hill | 214-230 |
| Judith Kirkpatrick | 231-258 |
| Lois Lynn | 259-295 |
| Celia Metcalf | 296-340 |
| Wilson McClure | 341-362 |
| Charles Reece | 363-392 |
| Harry Smith | 393-428 |
| Dolphus Treadway | 429-446 |

Martha Whitley                                    447-495

**The Salaried LTD Plan & Hourly LTD Plan**

1.      Plaintiffs are former employees of Champion International and participants in either the Salaried LTD Plan or Hourly LTD Plan (collectively referred to as "the Plans").  <u>See</u> Complaint, ¶4 (Dkt. Entry 1).  <u>See</u> also Plan 0001-0047 (terms of Salaried LTD Plan and Plan 0049-0099)(NB 66); Plan 0049-0099 (terms of the Hourly LTD Plan)(NB 66).[1]

2.      As participants in either the Hourly LTD Plan or Salaried LTD Plan, Plaintiffs were eligible to apply for long term disability benefits pursuant to the Plans.

3.      The purpose of both of these Plans was to provide a source of income to a participating Employee who was prevented from engaging in active employment as a result of a total disability, as that term was defined by each Plan.  <u>See</u> Plan 0006, 0053 (NB 66).

4.      Pursuant to the Salaried LTD Plan, for the first thirty months, a participant was eligible for long term disability benefits if he was unable "to perform the duties of his employment with the Employer as a result of an injury which occurs or a sickness which first manifests itself while employed by the Employer . . . ."  <u>See</u> Plan 0014 (NB 66).

5.      Similarly, pursuant to the Hourly LTD Plan, for the first thirty months, a participant was eligible for long term disability benefits if he was unable "to perform the duties

_____

[1]Pursuant to their March 31, 2005, Joint Stipulation, the parties have filed the documents which may be relevant to plaintiffs' claims for benefits.  The citation form "(NB__)" refers to the notebook in which the document being cited is found.

of his employment with the Employer as a result of an injury which occurs or an illness which first manifests itself while employed by the Employer . . . ."  See Plan 0060 (NB 66).

6.      The period of disability referred to in ¶¶4 and 5 is commonly referred to as the participant's "own occupation" or "own occ" period of long term disability ("LTD") benefits.

7.      Pursuant to the Salaried LTD Plan, at the conclusion of the "own occ" period, a participant is entitled to continuing LTD benefits only if he or she is unable "to engage in _any_ occupation or business for wage or profit for which he is or may become reasonably qualified by training, education or experience."  See Plan 0014 (emphasis added)(NB 66).

8.      Similarly, pursuant to the Hourly LTD Plan, at the conclusion of the "own occ" period, a participant is entitled to continuing LTD benefits only if he or she is unable "to engage in _any_ occupation or business for wage or profit for which he is or becomes reasonably qualified by training, education or experience."  See Plan 0060 (emphasis added)(NB 66).

9.      The period of disability referred to in ¶¶7 and 8 is commonly referred to as the participant's "any occupation" or "any occ" period of LTD benefits.

10.      Pursuant to both Plans, Champion International's Pension and Employee Benefits Committee ("PEBC") was the Plan Administrator and had "the power and authority in its sole, absolute, and uncontrolled discretion to control and manage the operation and administration of the Plan(s)" and had "all powers necessary to accomplish these purposes" including the responsibility and authority to "determin[e] all questions relating to the eligibility of Employees to participate" and to "interpret[] the provisions of the Plan(s) . . . . "  See Plan 0009, 0024-0025 (Salaried LTD Plan) & Plan 0055, 0072-0073 (Hourly LTD Plan)(NB 66).

4

11.    However, by express plan provision, the PEBC appointed the Plan Supervisor, defined as Champion International's Employee Benefits Department, to act on its behalf and delegated parts of its powers to the Plan Supervisor.  See Plan 0009, 0013, 0023-0024, 0055-0056, 0059, 0072-0073 (NB 66).

12.    In addition, both Plans granted the PEBC the authority to appoint a subcommittee to, among other things, interpret the Plans and make claims decisions.  See Plan 0023-0024, 0072-0073 (NB 66).  Pursuant to that authority, the PEBC appointed the Claims Review Committee to interpret the Plans and make claims decisions, See PEBC 02421, 02424 (NB 64), and the claims procedure under the Plans is a two-step process.

    a.    First, a participant or beneficiary may seek benefits (or challenge the termination of benefits) by filing a claim with the Plan Supervisor.  The Plan Supervisor then generally has ninety days to review and decide the claim.  See Plan 0029, 0079 (NB 66).

    b.    If the Plan denies the claim at the first step, the participant or beneficiary may, within sixty days of receipt of the adverse benefits decision, file a request for review.  The Plan's Claims Review Committee then generally has sixty days to review and decide the claim.  See Plan 0031-32, 0081-82 (NB 66).

13.    According to each Plan, "if there is a difference of opinion as to whether a Participant meets the requirements of Total Disability under either Plan, the decision of the Plan Supervisor shall be final and conclusive."  See Plan 0015, 0061 (NB 66).

14.     Participation in the each Plan "shall terminate . . . the date the Participant otherwise no longer meets or complies with the terms, provisions and/or requirements for participation in the Plan."  See Plan 0016, 0063 (NB 66).

15.     In order to assist in determining participant eligibility, the Plan Supervisor may require the Participant to "submit to an examination by a Physician selected by the Plan Supervisor when and as often as it may reasonably require."  See Plan 0019, 0067 (NB 66).

16.     Participants are required to submit to the Plans "such documents, evidence, medical data or other information" as the Plan Supervisor considers necessary for the administration of the participant's continuing eligibility for benefits.  See Plan 0027-0028, 0077 (NB 66).

17.     CORE, Inc. provides employee absence management services to employers, third party administrators and insurance carriers.  CORE's services include Integrated Disability Management, Peer Review Analysis, and other services including case management services.  See Affidavit of Andrew Bernstein which was attached to CORE, Inc.'s Local Rule 9(c)(1) Statement (Dkt. Entry 14).

18.     Effective January 1, 1996, CORE and Champion International entered into a Services Agreement whereby CORE furnished disability evaluation services to Champion. See CORE 0001-0039 (NB 67).

19.     Effective January 1, 1999, CORE, Champion and Sedgwick Claims Management Services entered into a SCORE Services Agreement whereby CORE and

Sedgwick furnished disability management services to Champion.  See CORE 0040-0067 (NB 67).

21.     In June 2000, pursuant to a merger agreement, Champion International became a subsidiary of International Paper Company ("International Paper").  In December 2000, Champion merged into International Paper.

21.     As a result of International Paper's acquisition of Champion in 2000, responsibility for administering the Plans and paying benefits pursuant to those Plans was transferred to International Paper for those employees found to be disabled prior to January 1, 2001.  The Plans, the PEBC, the Claims Review Committee, and the Plan Supervisor, as defined by the Plans, ceased to operate.  Champion International terminated CORE's involvement in the SCORE Services Agreement effective December 31, 2000.

**Elizabeth Boone's Claim for Benefits**

22.     Plaintiff Elizabeth Boone ("Boone") worked as an hourly employee at Champion International's facility in Canton, North Carolina.  Boone's hire date was August 23, 1976.  Boone 0314 (NB 1).

23.     Boone's last day of active employment with Champion International was May 4, 1987.  See Boone 0314 (NB 1).

24.     Boone was approved for short-term disability benefits, which commenced on May 5, 1987, and terminated effective November 2, 1987.  See Boone 0001, 0313 (NB 1).

25.     The last position Boone held with Champion International prior to qualifying for disability benefits was that of a cutter sort checker.  See Boone 0001 (NB 1).

26.     As a Champion International employee, Boone was eligible to apply for long-term disability income ("LTD") benefits under the Hourly LTD Plan.

27.     In applying for benefits under the Hourly LTD plan, Boone described her condition as "cervical disc. cervical radiculopathy," and, in support of her claim for these benefits, Boone submitted an Attending Physician's Statement which stated "patient had anterior cervical diskectomy, with interbody fusion C4-5 on 6-23-87 and the patient continues to have neck pain." See Boone 0339, 0341 (NB 1).

28.     On November 23, 1987, the Plan notified Boone that it had approved her application for LTD benefits effective November 3, 1987. At that time, the Plan advised Boone that her "LTD benefits may continue for 24 months provided you are wholly and continuously disabled and are unable to perform each and every duty of your regular job." See Boone 0034 (NB 1). However, Champion specifically cautioned Boone that:

> "[a]fter the first 24 months, benefits will continue up to your retirement date only if you are under the regular care of a licensed and qualified physician and are unable to work at any job, within the Company or elsewhere, for which you are reasonably qualified by your education, training, or experience."

See Boone 0034 (NB 1).

29.     Boone's monthly benefit amount from the Hourly LTD Plan was $200.00. See Boone 0034, 0313-0315 (NB 1).

30.     Under the Hourly LTD Plan, Boone's continuation of LTD benefits depended on certification of Boone's continuing disability. See Plan 0067 (NB 66).

31.     From November 1991 through November 1997, the Plan periodically provided Boone forms to submit so the Plan could periodically review her claim to verify the status of her disability. Boone complied with the Plan's requests for information and the information submitted to the Plan supported the continuation of LTD benefits.  See Boone 0232-0234, 0245-0279, 0282-0284, 0285-0287, 0290, 0294-0304, 0306-0311, 0327-0335, 0469-0470, 00476-0483, 0500, 0504-0505 (NB 1).

32.     On November 13, 1997, the Plan requested Boone to provide additional personal profile and medical information for the Plan's periodic review of her claim.  See Boone 0447 (NB 1).

33.     In response to this request for information, Boone submitted a Personal Profile Evaluation dated November 19, 1997 describing her present physical or psychiatric complaints and limitations as "left side of my body, arm, neck, back, leg, and foot."  See Boone 0441-0444 (NB 1).  In this evaluation, Boone answered that she did not expect to return to either her last occupation or any occupation.  See Boone 0443 (NB 1).

34.     Also in response to this request for information, Boone submitted various medical records and an Attending Physician Statement from Jill Vargo, M.D., on which Dr. Vargo stated that Boone was ambulatory, verified that Boone's condition had not improved or regressed, and diagnosed her disabling condition as fibromyalgia.  Without completing the restriction and limitation section of the Attending Physician Statement, Dr. Vargo stated that Boone was totally disabled from any occupation.  See Boone 0439-0440 (NB 1).

35.     In reviewing Boone's continuation of LTD benefits under the "any occupation" definition of disability, the Medical Director for the Champion Disability Management Program, J.D. Beavers, M.D., M.P.H., spoke with Boone's treating physician by telephone on December 11, 1997.  Dr. Vargo advised Dr. Beavers that "there are no objective findings to report.  There is no synovitis.  She simply complains of pain all over."  Boone's treating physician stated "she's not sure if [Boone] is any-occupation disabled."  See Boone 0217 (NB 1).

36.     Consequently, Dr. Beavers recommended to "not certify any-occupation disability."  His rationale for this recommendation was "there is no objective evidence of disability."  However, because Dr. Vargo would not clear Boone to return to work, Dr. Beavers recommended that, if further evaluation is needed, the Plan should obtain an Independent Medical Examination ("IME") with a physiatrist.  See Boone 0217 (NB 1).

37.     Pursuant to Dr. Beavers' recommendation, the Plan scheduled an IME of plaintiff with Charles R. Shields, M.D.  See Boone 0437, 0430, 0428-0429 (NB 1).

38.     Dr. Shields reviewed Boone's medical records and, on February 3, 1998, examined Boone.  See Boone 0159-0165 (NB 1).  According to Dr. Shields, the focus of Boone's pain "is at the suboccipital level giving a general feeling of severe pain which she has difficulty describing . . . it is worse with walking, standing, sitting, or bending, or being in any position."  Boone further complained that she feels she is getting worse.  See Boone 0161 (NB 1).

39.    Dr. Shields was unable to find any absolute sensory deficits to light touch, found Boone's motor strength to be "within normal limits and certainly there is no focal area of weakness," and was unable to find any specific atrophy.  Moreover, Dr. Shields noted "interestingly enough she only has eight of the eighteen usually fibromyalgic tender points. Some of the controls are also positive."  See Boone 0162 (NB 1).

40.    Among other things, Dr. Shield diagnosed Boone with "left sided body pain which has been diagnosed as fibromyalgia, though today's examination does not fit the criteria absolutely" and recommended that Boone "can work five to six hours a day at a sedentary physical demand level with specific restrictions to the left side of the body."  Dr. Shields also "believe[d] that they could increase the number of hours that [Boone] would be able to work up to 40 hours a week."  See Boone 0164 (NB 1).

41.    In addition to the IME, Dr. Shields completed a Modification Checklist dated February 3, 1998, which indicated that Boone could not return to her regular occupation but could return to work with modifications "now."  See Boone 0215 (NB 1).  He stated that Boone could work 5 to 6 hours a day, five days a week, and certified Boone's physical modification as "sedentary only," with lifting restriction of 10 lbs, standing restriction of 1-2 hours, sitting restriction as 5-6 hours and walking restrictions of "for personal needs only." See Boone 0215 (NB 1).  Dr. Shields further verified Boone had no upper or lower extremity restrictions on her right side and no restrictions for overhead reaching.  See Boone 0215 (NB 1).  Dr. Shields also completed a Physician's Report of Physical Capacity, received by the Plan

on February 12, 1998, that verified the information on the Modification Checklist.  See Boone

0418-0419 (NB 1).

42.     On February 19, 1998, Dr. Shields, the IME physician, supplemented his

opinion regarding Boone's condition and stated that Boone "can work up to 6 hours per day, 5

days per week with the restrictions given."  See Boone 0417 (NB 1).  See also Boone 0201

(NB 1).

43.     On March 3, 1998, CORE recommended "a denial of continued LTD benefits

initially effective 11/05/87 given the results of the independent medical exam which indicate

the employee can perform sedentary work" and "work at a sedentary physical demand level 6

hours a day, 5 days a week."  In its report, CORE also noted that Boone's own treating

physician (Dr. Vargo) was "not sure" if Boone was disabled from any occupation.  See Boone

0412-0415 (NB 1).

44.     On March 9, 1998, the Plan notified Boone that it was terminating her LTD

benefits because "the Independent Medical Examination has determined you are able to

perform sedentary work" and she, therefore, was not disabled as defined in the Plan.  The Plan

informed Boone of her right to appeal the decision and enclosed a copy of the Appeal Rights

& Process.  See Boone 0031-0032 (NB 1).

45.     The Plan subsequently notified Boone that her LTD benefits would terminate

on April 30, 1998.  See Boone 0073-0074 (NB 1).

46.     On or about April 8, 1998, the Plan Supervisor received a March 24, 1998,

letter from Dr. Vargo in which she asserted that, based on her opinion "as a board certified

rheumatologist and in following this patient over a long period of time, I can say that there has

not been a substantial change in her disability status." See Boone 0240-0241 (NB 1).  Dr.

Vargo concluded in her letter that she did "not ever expect Ms. Boone to improve to the point

where she can return to gainful employment."  She stated that, "if this letter does not serve the

purpose of reinstating her disability, then I have advised my patient to obtain legal counsel."

See Boone 0240 (NB 1).

47.     By letter dated April 8, 1998, Boone appeal the denial of her claim for benefits

but failed to provide any additional clinical information regarding her claim for benefits.  See

Boone 0027-0028 (NB 1).

48.     On April 29, 1998, CORE commissioned Alan Marks, M.D., to conduct a Peer

Review Analysis of Boone's claim and determine whether Boone was disabled from any

occupation, and whether another IME should be conducted.  See Boone 0396 (NB 1).

49.     Dr. Marks reviewed the submitted medical records and concluded on May 7,

1998, that Boone was not disabled from any occupation nor would he recommend another

IME.  See Boone 0398 (NB 1).  According to Dr. Marks, "[p]atients with neck pain, left arm

and leg pain, without demonstrable neurological abnormalities (weakness, hyperesthesia,

hyperesthesias, upper motor neuron findings) cannot be thought of as being disabled from any

occupation, even though the individual patient may feel incapable of holding down a job." See

Boone 0398 (NB 1).

50.     On May 13, 1998, CORE recommended that the Plan "uphold the previous

denial of LTD benefits, effective 3/2/98, based on the CORE physician consultant's decision

on appeal, that the employee is not disabled from performing any occupation." CORE noted

that Dr. Shields concluded in his IME report that Boone could work at a sedentary demand

level six hours per day, five days per week, and that Dr. Marks concluded in his independent

peer review that Boone "is not disabled from any occupation." See Boone 0144-0146 (NB 1).

   51.  On June 25, 1998, Congressman Charles Taylor wrote Champion International

on behalf of Boone. See Boone 0015-0021 (NB 1). He requested the Plan to review Boone's

claim for benefits and submitted to the Plan Dr. Vargo's previously referenced March 24,

1998, letter to Champion International, See Boone 0020-0021, and April 6, 1998, office notes

from Sean R. Maloney, M.D. See Boone 0017-0019 (NB 1).

   52.  On July 2, 1998, the Plan Supervisor notified Boone that her April 8, 1998

correspondence was treated as an initial claim under ERISA and advised Boone that, "[b]ased

on the review by CORE, our decision is to uphold the denial of LTD benefits." See Boone

0013-0014 (NB 1). The Plan stated in its letter to Boone that

> "[w]e have reviewed the documentation provided by you from Dr. Jill Vargo. A
> CORE physician reviewed the above information and determined that you are not
> disabled from any occupation. He also stated 'The rheumatology notes and the
> independent medical exam notes do not reveal any neurological abnormalities nor areas
> of weakness, this is largely subjective symptamology without demonstrable objective
> findings to qualify for medical disability.'"

See Boone 0013 (NB 1). In her letter, Ms. Dixon further advised Boone of her rights to obtain

further review of her claim and enclosed a copy of the Hourly LTD Plan for reference. See

Boone 0014 (NB 1).

53.     By letter dated August 16, 1998, Boone appealed the denial of her claim for benefits.  Boone stated that she had "severe pain in [her] leg and hip and left side of [her] body" and expressed her hope that Champion International "will take into consideration my reports from the doctors."  See Boone 0010 (NB 1).

54.     Although her letter of appeal did not provide any additional clinical information, See Boone 0010 (NB 1), in the several weeks between the July 2, 1998, denial of her claim and her August 16, 1998, appeal, Boone did submit additional information to the Plan.

55.     More specifically, by the time of her August 16, 1998, appeal, Boone had submitted to the Plan correspondence from John Stringfield, M.D., dated July 2, 1998, in which he reported that he was currently treating Boone for her medical problems that include "hiatal hernia with gastroesophageal reflux disease, chronic sleep disturbance, and most significantly a history of cervical spine disease" and concluded that he supports "this patient's continued disability."  See Boone 0066-0070 (NB 1).  Boone also submitted office notes from Dr. Maloney dated May 18, 1998, in which he noted that "Ms. Boone's gait appears normal. Active range of motion of both upper extremities is normal, as is strength in both upper extremities."  See Boone 0069 (NB 1).

56.     By letter dated July 16, 1998, Dr. Vargo stated that, in her opinion, Boone was "unable to be employed at any level of job including sedentary."  See Boone 0012 (NB 1).

57.    As noted above, Boone appealed the denial of her claim by letter dated August 16, 1998.  See Boone 0010 (NB 1).  On September 3, 1998, the Plan commissioned a Transferable Skills Analysis ("TSA") of Boone.  See Boone 0096-0114 (NB 1).

58.    The TSA considered Boone's work experience at Champion International as a paper sorter and counter and concluded "there are a number of jobs Ms. Boone could perform that are within the same occupational category, yet in different industries."  The TSA identified various occupational titles that conformed with Boone's physical restrictions and skills.  See Boone 0096-0099 (NB 1).

59.    On September 11, 1998, the Plan notified Boone that the Plan's Claims Review Committee was scheduled to consider her appeal at its September 24, 1998, meeting.  The Plan invited Boone to provide no later than September 11, 1998, any additional information she wished the Committee to consider.  See Boone 0007 (NB 1).

60.    The only information Boone provided to the Plan were three documents already in the claims file.  See Boone 0116-0119 (NB 1).

61.    On September 24, 1998, the Claims Review Committee discussed Boone's appeal of the Plan's denial of her claim for LTD benefits.  After the Committee reviewed Boone's file and discussed its contents, it voted to uphold the denial of Boone's claim for LTD benefits.  See CRC 0704-0708 (NB 2).  See also CRC 0709-0954 (NB 2).[2]

---

[2]The Chair of the Committee "ordered that a copy of the documentation relative to the requests for review previously distributed to the Committee, as well as the Transferable Skills Analysis brought to the meeting, be filed with the minutes of the meeting."  See CRC 0704, CRC 0709-0954 (NB 2).

62.     The Committee relied on, *inter alia*, the following information in reaching its decision to uphold the denial of Boone's LTD claim:

> "The Committee noted that Boone's doctors, while stating she was disabled, did not provide any clinical analysis other than opinion.  An Independent Medical Evaluation was conducted by Dr. Shields on 2/3/98.  Dr. Shields, in a 7 page report, after setting forth his conclusions and primary diagnosis, stated that Ms. Boone can work 5-6 hours a day at a sedentary physical demand level with specific restrictions to the left side of the body.  The Committee reviewed the Physician's Report of the Physical Capacity and the Modifications Checklist that  Dr. Shields completed which restated that Ms. Boone could work 5-6 hours a day, 5 days a week, sit 5-6 hours, stand 1-2 hours, lift up to 10 pounds, and operate a motor vehicle, with restrictions.
>
> Further, the Committee noted that on 12/11/97 Dr. Beavers of CORE (the Plan's medical reviewer) discussed Ms. Boone with her doctor, Dr. Vargo.  While Dr. Vargo would not clear Ms. Boone to return to work, Dr. Vargo was "not sure" if she is any-occupation disabled and said that "there are no objective findings to report."
>
> Further a Transferable Skills analysis identified various occupations that Ms. Boone might perform."

See CRC 0705 (NB 2).

63.     On October 21, 1998, the Plan notified Boone that the Claims Review Committee met on September 24, 1998, and decided to uphold the denial of her claim for benefits.  The Plan described to Boone the basis of its decision that she was not entitled to disability benefits.  See Boone 0005-0006 (NB 1).

64.     By letter dated October 28, 1998, Boone's former legal counsel notified the Plan that he had been retained to represent Boone in her appeal and requested information regarding appealing the adverse benefits decision.  See Boone 0047 (NB 1).

65.     The Plan responded to Boone's former legal counsel on November 12, 1998, and informed him that "the decision of the Plan's Claims Review Committee is the final administrative step under ERISA and the Plan."  See Boone 0003 (NB 1).

66.     Approximately one year later, by letter dated September 10, 1999, Boone's current legal counsel notified Champion International that they had been retained by Boone concerning her claim for LTD benefits, and requested copies of all plan documents related to the Hourly LTD Plan and Boone's claims file.  See Boone 0964-0965 (NB 25).

67.     Champion International and the Plan complied with Boone's counsel's request.  See Boone 0962, 0959-0960, 0956-0957 (NB 25).

68.     On April 10, 2001, which was two and one-half years after the Claims Review Committee denied her appeal and approximately eighteen months after the Plan complied with her counsel's request for information, Boone's counsel requested the Plan to "reconsider[] . . . the decision to terminate [Boone's] benefits."  See Boone 0951 (NB 25).  Boone's counsel submitted to International Paper medical and other information they alleged supported Boone's claim for LTD benefits.  See Boone 0951-0955, 0508-0512, 0035-0043, 0585-0947, 0514-0584 (NB 25). (NB 25).

**Rosa Lee Brookshire's Claim for Benefits**

69.     Plaintiff Rosa Lee Brookshire ("Brookshire") worked as a Rewind Operator at Champion International's facility in Canton, North Carolina.  Brookshire's date of hire was October 15, 1979.  See Brookshire 0237 (NB 3).

70.     Brookshire's last date of active service was January 3, 1995.  <u>See</u> Brookshire 0001 (NB 3).  She alleged that she ceased work due to chronic low back pain and obesity, <u>See</u> Brookshire 0160 (NB 3), and received short-term disability benefits from January 3, 1995, until June 4, 1995.  <u>See</u> Brookshire 0001 (NB 2)..

71.     As a Champion International hourly employee, Brookshire was eligible to apply for disability income benefits pursuant to Hourly LTD Plan.

72.     On May 5, 1995, Champion International advised Brookshire that she might be eligible for LTD benefits.  <u>See</u> Brookshire 0221-0222 (NB 3).  Champion International thereafter submitted an LTD Claim Form on Brookshire's behalf.  <u>See</u> Brookshire 0214 (NB 3).

73.     In order to evaluate Brookshire's claim for LTD Benefits, Brookshire was scheduled for a Functional Capacity Evaluation ("FCE") with Susan Kimel, P.T., at Haywood Rehabilitation Center in Clyde, North Carolina.  <u>See</u> Brookshire 0163-0167 (NB 3).  At the conclusion of the testing and evaluation, Ms. Kimel reported that Brookshire was "able to work at the SEDENTARY-LIGHT Physical Demand Level for an 8 hour day . . . " and that "[h]er specific acceptable Leg Lift capacity was 18 lbs. and Torso Lift Capacity was 0 lbs." <u>See</u> Brookshire 0163 (NB 3).

74.     The Plan also evaluated an Ergonomic Job Analysis Checklist and a Job Analysis for Brookshire's Rewinder Operator position.  <u>See</u> Brookshire 0168-0174 (NB 3). Upon review of the FCE and job specific materials, the Plan determined that Brookshire was

disabled from her occupation as a Rewinder Operator.  See Brookshire 0160, 0152-0153 (NB 3).

75.     On July 26, 1995, the Plan notified Brookshire that her application for LTD benefits had been approved effective June 5, 1995.  See Brookshire 0152-0153 (NB 3).

76.     The Plan also notified Brookshire that in order to continue receiving LTD benefits beyond the "own occupation" period, she must be "unable to do any job for which [she was] reasonably qualified by [her] training, education and experience," and that approval of her claim will terminate when she is "no longer disabled as defined in the plan."  See Brookshire 0152-0153 (NB 3).

77.     Brookshire's monthly benefit from the Plan was $361.12.  See Brookshire 0159 (NB 3).

78.     On May 22, 1996, CORE recommended to the Plan that Brookshire's "LTD benefit [be extended] through 6/4/97 at which time LTD Case Management will review whether [Brookshire] is totally and permanently disabled from any occupation."  See Brookshire 0133-0134 (NB 3).

79.     When Brookshire reached the expiration of her initial "own occupation" period of benefits, the Plan began to collect information to determine whether she could satisfy the more stringent "any occ" or "any occupation" disability definition, thereby entitling Brookshire to benefits beyond the initial thirty months of benefits.  See Brookshire 0119-0120 (NB 3).

80.     On June 23, 1997, David Mulholland, M.D., completed an Attending Physician Statement indicating Brookshire's diagnosis as "degenerative disc disease" and "obesity."  See

Brookshire 0121-0122 (NB 3).  Dr. Mulholland opined that Brookshire would "never" be able to return to perform her previous job and that she would "never" be able to resume any work due to her back pain.  See Brookshire 0122 (NB 3).  Dr. Mulholland also indicated that Brookshire was diagnosed previously by Earnest Goodwin, M.D.  See Brookshire 0121 (NB 3).  Dr. Mulholland's Report of Physical Capacity indicated that Brookshire could work zero hours and that it was "unknown" when she would be released to full-time work activity.  See Brookshire 0125 (NB 3).

81.     On June 30, 1997, Brookshire submitted a Personal Profile Evaluation in which she stated that she was only capable of returning to her previous occupation if her back problems could be eliminated.  See Brookshire 0127, 0130 (NB 3).  Brookshire also reported that she served as a nursing assistant for twenty years prior to working at Champion International.  See Brookshire 0128-0129 (NB 3).

82.     On July 23, 1997, the Plan's consulting physician, Dr. Beavers, spoke with Dr. Mulholland by telephone.  During that conversation, Dr. Mulholland stated that he "inherited" Brookshire as a patient, "never disabled her himself," and that "she is probably capable of sedentary work."  See Brookshire 0118 (NB 3).  After this conversation, the Plan asked Dr. Mulholland to prepare a Modification Checklist.  See Brookshire 0116-0117 (NB 3).

83.     Dr. Mulholland refused to prepare the Modification Checklist and, instead, opined that Brookshire needed a "disability evaluation to determine what she is qualified to do."  See Brookshire 0114 (NB 3).  Pursuant to Dr. Mulholland's recommendation, the Plan

scheduled Brookshire for a Functional Capacity Evaluation ("FCE").  See Brookshire 0111 (NB 3).

84.     On September 18, 1997, Susan Kimel, P.T., examined Brookshire and conducted an FCE.  See Brookshire 0084-0101 (NB 3).

85.     Based on her examination, Ms. Kimel reported that Brookshire "is able to work at the LIGHT Physical Demand Level for an 8 hour day . . ." with a thirty pound lifting restriction and a working height restriction of twelve inches.   See Brookshire 0084-0086 (NB 3).  Ms. Kimel found that Brookshire could "occasionally" sit, walk, stand, and could "occasionally" engage in forward bending and overhead reaching.  See Brookshire 0095 (NB 3).

86.     Ms. Kimel also noted that Brookshire "failed 12% of her Validity Criteria giving her an Equivocal Validity Profile, indicating partial submaximal effort" but that "[r]etesting with maximum effort would in our opinion yield a functioning ability less than the MEDIUM Physical Demand Level."  See Brookshire 0084 (NB 3).

87.     On October 2, 1997, the Plan forwarded the results of the FCE to Dr. Mulholland and requested that he prepare a Modification Checklist based on his evaluation of the FCE.  See Brookshire 0081 (NB 3).

88.     Dr. Mulholland responded on October 16, 1997, and refused to comment on Brookshire's disability.  He stated that he did not perform disability physicals nor did he "disable people or recommend them to be disabled."  Dr. Mulholland noted that Brookshire's previous physician, Dr. Goodwin, considered her "disabled."  Based on Dr. Goodwin's

opinion, Dr. Mulholland stated "she is disabled until she is fully evaluated by a disability

physician."  Dr. Mulholland, Brookshire's treating physician, also asked that the Plan refrain

from any additional contact with his office.  See Brookshire 0079 (NB 3).  Dr. Mulholland

stated that "disability is between you and your clients.  Please leave me out of it."  See

Brookshire 0079 (NB 3).

      89.     To further evaluate Brookshire's medical condition, the Plan scheduled

Brookshire for an Independent Medical Examination ("IME") with a physiatrist, Andrew

Rudins, M.D., at the Southeastern Spine Center in Asheville, North Carolina.  See Brookshire

0075 (NB 3).

      90.     Dr. Rudins examined Brookshire on December 2, 1997.  See Brookshire 0068-

0071 (NB 3).  Prior to examining Brookshire, Dr. Rudins reviewed Brookshire's September 28,

1997, FCE, Brookshire's Personal Profile Evaluation, and Dr. Mulholland's Attending

Physician Statement.  Dr. Rudins also examined x-rays of Brookshire's lumbar spine

performed in June 1995, an MRI performed in September 1992, and a CT scan of the lumbar

spine done in April 1994.  See Brookshire 0069-0070 (NB 3).

      91.     Upon examination, Brookshire reported that she had pain across the very lower

lumbosacral spine, occasional numbness in the right lateral buttock, and pain in the middle

three toes on her right foot.  See Brookshire 0068 (NB 3).

      92.     Brookshire's physical examination revealed that she was "quite tender in the

sacrum extending into the buttocks"; that "on the right, she develops low back pain about 45

degrees, and is able to tolerate SLR to about 60 degrees, though with increased back pain"; has

"negative neutral hip rotations"; and "shows a slight tendency to lose her balance during toe and heel walking."  See Brookshire 0070 (NB 3).

93.    Brookshire's examination, however, further revealed that Brookshire is able to walk normally and successfully, has "no visible deformity to her low back," she "forward flexes to her knees, and extends about 5 to 10 degrees at most"; has "no superficial tenderness"; "no pain with pseudo-rotation or cervical axial loading"; and "shows no signs evidence of overreaction without any obvious pain behaviors."  See Brookshire 0070 (NB 3).

94.    The x-rays, MRI and CT scan presented to Dr. Rudins for review showed "some disc space narrowing . . .", "mild bulge" and "degenerative changes to the lumbar spine as well as disc bulging," but no "significant abnormal motion on flexion/extension" and "no evidence in any case of any significant neurological impingement."  See Brookshire 0070 (NB 3).

95.    Dr. Rudins diagnosed Brookshire with "degenerative disc disease of the lumbar spine, with associated myofascial pain on a chronic basis, and obesity."  According to Dr. Rudins, Brookshire was "presently at a light physical demand level" and could "work at some occupation" eight hours per day, five days per week with restrictions including maximum lifting capacity of fifteen pounds.  See Brookshire 0070-0071, 0073 (NB 3).

96.    On December 18, 1997, the Plan notified Brookshire that her LTD benefits had been terminated because she could not satisfy the "any occupation" standard of total disability pursuant to Dr. Rudin's finding that she was "able to work 8 hours per day, 5 days per week in

a light duty capacity."  The Plan also informed Brookshire of her right to request review of this decision.  See Brookshire 0059-0060 (NB 3).

97.    On February 2, 1998, Brookshire requested reconsideration of the Plan's decision to deny her benefits.  Brookshire also submitted page four of Dr. Rudin's IME Report and stated "I do not believe I can perform at the level that has been decided for me. Doctor Andrew Rudins states that for all practical purposes the partial disability I have are permanent . . . ."  See Brookshire 0048-0049 (NB 3).

98.    On May 1, 1998, the Plan notified Brookshire that her February 2, 1998, letter had been treated as an initial claim under ERISA, and advised Brookshire that, "[b]ased on the review by CORE, our decision is to uphold the denial of LTD benefits."  The Plan explained the basis of its decision – including her treating physician's statement that he "does not provide disability physicals nor does he disable people or recommend them to be disabled" – and informed Brookshire of her right to appeal the decision.  See Brookshire 0045-0046 (NB 3).

99.    On May 22, 1998, Brookshire's former legal counsel appealed the Plan's decision to deny her claim for benefits.  See Brookshire 0037-0044 (NB. 3).

100.    In support of her appeal, Brookshire submitted a January 26, 1998, progress note from Stewart J. Harley, M.D., and the Notice of Award of benefits from the Social Security Administration.  See Brookshire 0039-0044 (NB 3).  The progress note indicated that Brookshire "has degenerative arthritis in her lumbar spine" and stated

"[t]his lady says she is unable to work because of severity of her pain.  If this lady does return to work, she should return to work under the guidelines of the functional capacities evaluation.  Reviewing the guidelines of the FCE, I think she could return to work but with severe restrictions  . . . ."

See Brookshire 0039 (NB 3).  Brookshire also noted her subjective belief that she was unable to perform any of the requirements of work because of severe back pain.  See Brookshire 0038 (NB 3).

101.    By Notice of Award dated July 30, 1995, the U.S. Social Security Administration notified Brookshire that her application for Social Security disability income benefits had been approved. The Social Security Administration concluded that Brookshire became disabled effective January 2, 1995, and was eligible for payment beginning July 1995. See Brookshire 0146-0148 (NB 3).[3]

102.    To assist in reviewing Brookshire's appeal, the Plan commissioned Jennifer Mikeska, MRC, to perform a Transferable Skills Analysis.  By Report dated July 1, 1998, Ms. Mikeska identified Brookshire's transferable skills as "Comparing," "Taking Instructions-Helping," and "Tending" based on her sixteen-year employment history with Champion International and her eighteen years of experience as a nursing assistant.  See Brookshire 0021 (NB 3).  Ms. Mikeska reported that there were several positions Brookshire could perform related to her nursing experience and several sedentary and light occupational titles which Brookshire could perform based on the skills associated with the position she held at Champion International.   See Brookshire 0021-0032, 0034 (NB 3).

103.    The Plan also commissioned John Nemunaitis, M.D., to conduct a Peer Review Analysis of Brookshire's appeal.  Dr. Nemunaitis completed his review on July 10, 1998.  Dr. Nemunaitis reviewed the July 1, 1998, Transferable Skills Analysis, Dr. Harley's progress notes submitted in support of Brookshire's appeal, the December 2, 1997, IME performed by Dr. Rudins, Dr. Mulholland's June 23, 1997, Attending Physician Statement, the December 12, 1998, Modification Checklist, the December 15, 1997, Champion Return to Work form, the September 28, 1997, FCE, correspondence from Dr. Mulholland, and the December 18, 1997, case management notes.   See Brookshire 0019, 0063-0064 (NB 3).

104.    Based on his review, Dr. Nemunaitis recommended that "the decision of denial be upheld, for the patient is not disabled for any occupation."  Dr. Nemunaitis based his recommendation on the rationale that there "is no objective verification of a radiculopathy" in Brookshire's x-rays, MRI and CT Scan, that the FCE indicated Brookshire was "able to work at a light physical demand level for an eight hour day," that Brookshire's lifting capacity during the IME and other RCC's were appropriate, and that the IME "did not verify radiculopathy nor acute disc pathology."  Dr. Nemunaitis further opined that another IME was not necessary.  See Brookshire 0019-0020 (NB 3).

105.    On August 27, 1998, the Plan informed Brookshire that her claim for benefits would be reviewed at the September 24, 1998, Claims Review Committee meeting.  The Plan

---

[3]The Plan previously received a copy of this Notice of Award on July 30, 1997.  See Brookshire 0146 (NB 3).

encouraged Brookshire to provide any additional information she wished to be considered by the Committee.  See Brookshire 0012 (NB 3).

106.    The Claims Review Committee considered Brookshire's claim at its meeting on September 24, 1998.  See CRC 0704-0708 (NB 4).  The Committee reviewed Brookshire's claims file, including notes from the Plan's consulting physician's conversation with Brookshire's treating physician, Dr. Mulholland, indicating that Brookshire was "probably capable of sedentary work," Dr. Rudin's December 2, 1997, IME, and all medical records submitted to the Plan on Brookshire's behalf.  During the meeting, the Committee examined this information against the Plan's definition for total disability and voted to uphold the decision to deny Brookshire's claim for LTD benefits.  See CRC 0705-0706, 0955-1210 (NB 4).[4]

107.    On October 23, 1998, the Plan informed Brookshire of its decision to uphold the denial of her claim for LTD benefits.  See Brookshire 0545-0546 (NB 3).

108.    On November 3, 1998, Brookshire's former legal counsel requested copies of documents which formed the basis for the Plan's denial.  See Brookshire 0544 (NB 3).  The Plan complied with this request on November 12, 1998.  See Brookshire 0543 (NB 3).

109.    On November 10, 2000, Brookshire's current legal counsel informed Champion International that they had been consulted by Brookshire regarding her claim for LTD benefits,

---

[4]The Chair of the Committee "ordered that a copy of the documentation relative to the requests for review previously distributed to the Committee, as well as the Transferable Skills Analysis brought to the meeting, be filed with the minutes of the meeting."  See CRC 0704-0706, 0955-1210 (NB 4)

and requested Brookshire's claims file and copies of the Plan documents.  See Brookshire 0290 (NB 26).

110.    The Plan complied with Brookshire's counsel's request and sent them copies of Brookshire's claims file and the Plan documents.  See Brookshire 0267-0288 (NB 26).

111.    On March 22, 2001,which was two and one-half years after the Claims Review Committee denied her appeal, Brookshire's counsel requested the Plan to "reconsider[] . . . the decision to terminate [Brookshire's] benefits."  See Brookshire 0262-0266 (NB 26). Brookshire's counsel submitted to International Paper medical and other information they alleged supported Brookshire's claim for benefits.  See Brookshire 0292-0295, 0004-0011, 0011A-0011C, 0296-0542 (NB 26).

**Harrison Clark's Claim for Benefits**

112.    Plaintiff Harrison Y. Clark ("Clark") worked as an hourly employee at Champion International's facility in Canton, North Carolina.  His hire date was May 25, 1981, and his last day of active employment was December 9, 1990.  See Clark 0004, 0186 (NB 5).

113.    Between December 10, 1990 and June 9, 1991, Clark received short-term disability benefits from Champion International.  See Clark 0001 (NB 5).

114.    As a Champion International employee, Clark was eligible to apply for LTD benefits under the Hourly LTD Plan.

115.    On April 30, 1991, Clark applied for LTD benefits.  See Clark 0032-0033 (NB 5).  Clark reported that he was disabled due to "chronic back pain – myositis-fibromyalgia and

ekbom syndrome or restless leg syndrome." <u>See</u> Clark 0040-0041 (NB 5). <u>See</u> also Clark

0042, 0034-0038 (NB 5).

116.    By letter dated July 29, 1991, the Plan notified Clark that he was eligible for

LTD benefits and advised that LTD benefits "may continue for 24 months provided you are

wholly and continuously disabled and are unable to perform each and every duty of your

regular job." <u>See</u> Clark 0047 (NB 5). The Plan specifically advised Clark that "after the first

24 months, benefits will continue up to your retirement date only if you are under the regular

care of a licensed and qualified physician and are unable to work at any job, within the

company or elsewhere, for which you are reasonably qualified by your education, training, or

experience." <u>See</u> 0047 (NB 5).

117.    Effective June 10, 1991, Clark's benefit was $164.25 per month. <u>See</u> Clark

0044-0046 (NB 5). Effective September 1, 1991, Clark's LTD benefit was $190 per month.

<u>See</u> Clark 0049-0050 (NB 5).

118.    During the next several years, in order to determine Clark's ongoing entitlement

to LTD benefits, the Plan conducted periodic reviews of Clark's medical condition. <u>See</u> Clark

0053-0058, 0064, 0068-0084, 0104-0114, 0173-0189 (NB 5).[5]

---

[5]On January 13, 1994, Clark entered into a settlement agreement with Champion
International for workers' compensation benefits, in which Clark agreed, in consideration for a
lump sum payment by Champion International in the amount of $90,000.00, to release
Champion International from any liability for Clark's LTD benefits. <u>See</u> Clark 0085-0103 (NB
5). Due to this release and the language in the Hourly LTD Plan that mandates that workers
compensation benefits offset LTD benefits, Clark's LTD benefits were suspended. <u>See</u> Clark
0116, 0132-0134, 0137-0140, 0143-0144, 0146-0147, 0155-0156 (NB 5). The parties agreed
Clark would be entitled to continuing medical benefits under the Hourly LTD Plan but not a

119.    For example, on June 17, 1997, CORE contacted Clark and asked him to provide updated medical information regarding his condition and to submit several updated LTD forms.  See 0191-0192 (NB 5).

120.    On August 21, 1997, Clark's treating physician, Dr. Eglinton submitted an Attending Physician's Statement on which he diagnosed Clark with restless leg syndrome and fibromyalgia, noted that his condition was unimproved, and stated that Clark is totally disabled from any occupation.  See Clark 0194-0195 (NB 5).  Dr. Eglinton further submitted part of a physical capacity examination sheet which indicated that, in his opinion, Clark could not work at all with the limitations described.  See Clark 0196 (NB 5).

121.    Clark also submitted a Personal Profile Evaluation dated July 15, 1997, on which he described his present condition as "chronic back pain syndrome, restless legs syndrome or knew [sic] as ekbom's syndrome, chronic myofacial fibromyalgia, can't stand, walk, sit, or lay long at any time due to chronic pain, bend, push, pull or climb, lift, also degenerative disc disease."  See Clark 0197-0200 (NB 5).

122.    Dr. Eglinton also submitted to the Plan his office notes dated July 23, 1997, and August 25, 1997.  See Clark 0202 (NB 5).  In his August 25 office note, Dr. Eglinton stated that he had:

---

monthly payment until Clark reimbursed the Plan for the overpayment of LTD benefits caused by the workers compensation settlement.  See Complaint, ¶133 (Dkt. Entry 1).  Clark continued to receive medical benefits under the Hourly LTD Plan until the benefits later were terminated.

> "[t]alked with independent medical examiner for Champion Paper concerning Mr. Clark. At this time, the patient has not gone out of the category where he is disabled from his work alone but goes into a permanent disability rating. As I stated before, I cannot certify Harrison is totally and completely disabled from all work activity. All they can do at this time is to repeat a functional capacity and See where he stands."

See Clark 0202 (NB 5).

123.    In his August 25, 1997, office note, Dr. Eglinton was referencing a conversation he had with Dr. Beavers of Champion International's Disability Management program, who described the conversation as follows:

> "According to the doctor this patient has true restless legs syndrome, also known as Ekbom syndrome. The symptoms are that he can't sit still or sleep well. However he says that when he Sees him in his office, he looks good. He says that he is not disabled from any occupation and that there are jobs he could do. He recommends that he have an FCE."

See Clark 0214 (NB 5). Based on this information from Clark's treating physician, Dr. Beavers recommended that the Plan "not certify disability from any occupation" because "his doctor is not supporting the claim of disability from any occupation. If further evaluation is contemplated I would recommend an FCE done at Asheville Rehabilitation with Charlie Robbins." See Clark 0214 (NB 5).

124.    Pursuant to Dr. Beavers' recommendation, the Plan commissioned Charles Robbins, P.T., at Asheville Rehabilitation, to evaluate Clark's functional capacity. See Clark 0216, 0218 (NB 5).

125.    Mr. Robbins conducted a Functional Capacity Evaluation ("FCE") of Clark on October 15, 1997, and noted that, based on "all the submaximal efforts documented during Maximum Voluntary Effort Test and Jamar Hand Grip Testing as well as mild positive found

on Waddell's testing, [Clark's] overall effort is considered submaximal and therefore I am

unable to validate the test results today."  See Clark 0220-0223 (NB 5).  Mr. Robbins

concluded that:

> "[b]ased on the material handling capabilities as observed today, the physical demand
> level of work is sedentary . . . Because of high pain levels and hesitation by Mr. Clark
> to complete all tests, I am unable to indicate that he is capable of returning to work.
> Note a submaximal effort on consistency testing today.  I anticipate with a maximal
> effort, performance would be improved."

See Clark 0220-0223 (NB 5).

126.    On October 23, 1997, CORE then forwarded a Modification Checklist to

Clark's treating physician, Dr. Eglinton.  See Clark 0224 (NB 5).  Dr. Eglinton completed this

checklist on November 15, 1997, indicating Clark may initially work 4-6 hours a day, 3-4 days

a week with an increase in hours as tolerated.  See Clark 0226 (NB 5).  Clark's treating

physician stated that Clark could perform a "sedentary job only, may walk for personal needs

only, may sit 30 minutes with position changes, and may stand  30 minutes with position

changes."  See Clark 0226 (NB 5).

127.    CORE forwarded the Modification Checklist to the Plan and recommended that

Clark undergo an Independent Medical Examination ("IME").  See Clark 0227 (NB 5).  See

also Clark 0229-0231 (CORE's report recommending a continuation of LTD benefits "while

awaiting the results of the impending IME")(NB 5).

128.    The Plan then commissioned Andrew Rudins, M.D., to conduct an IME of

Clark.  See Clark 0235 (NB 5).

129.     Dr. Rudins reviewed Clark's medical records, reviewed Clark's medical symptoms and history, and, on January 12, 1998, examined Clark.  See Clark 0236-0240 (NB 5).  According to Dr. Rudins, Clark summarized his condition as:

> "if he does nothing, he gets by pretty well.  He is able to do some light yard work.  His walking tolerance is about 20 minutes, after which he needs to sit.  He is unable to sit for any prolonged period of time, often requiring changing positions.  He is able to do some very light lifting, perhaps 5 to 10 pounds at most, but still does drop objects."

See Clark 0236 (NB 5).

130.     At the conclusion of his examination of Clark, Dr. Rudins opined that Clark suffered from a chronic lumbar sprain, "fibromyalgia by history, but no significant findings to suggest this diagnosis on physical exam," restless legs syndrome, and severe chronic pain/disability syndrome related to all of the other diagnoses.  See Clark 0238 (NB 5).  According to Dr. Rudins, "Mr. Clark's perception of his disability is much greater than any objective evidence indicates."  See Clark 0238 (NB 5).  Dr. Rudins concluded:

> "that Mr. Clark does have a work capacity, though at a sedentary level at 8 hours per day.  He should be allowed to frequently change positions i.e. sit to stand to walk at least every 15 minutes.  He should avoid any extensive or repetitive bending or twisting.  Maximal lifting is 10 pounds on an occasional basis.  I expect that if he is unable to return back to a productive job, his actual capabilities will more than likely improve if he is able to stay on the job."

See Clark 0239 (NB 5).  Dr. Rudins concluded that Clark had at least a "full time sedentary capacity."  In fact, according to Dr. Rudins, Clark "really has no significant objective findings to limit him to a sedentary work capacity.  This restriction is based predominantly on his past history and submaximal performance on the FCE."  See Clark 0239 (NB 5).

34

131.    On January 12, 1998, Dr. Rudins completed a Modification Checklist which indicated that Clark could return to work on January 12, 1998, with the following modifications: sedentary job only; 8 hours a day, 5 days per week; may lift up to 10 pounds; may walk, sit, or stand 15 minutes at a time; no modification to the upper extremity, avoidance of repetitive use of the lower extremity with use being limited to 15 minutes at a time. See Clark 0241 (NB 5).

132.    By letter dated February 4, 1998, Dr. Beavers, Medical Director of the Champion Disability Management Program, notified Clark that the Plan was terminating his LTD benefits because he no longer met any occupational definition of disability and, therefore, was "not disabled as defined in the Plan." Dr. Beavers advised Clark that "the 1/12/98 Independent Medical Examination found you able to perform sedentary work 8 hours per day 5 days per week with some restrictions." See Clark 0250-0251 (NB 5). Dr. Beavers informed Clark of his right to appeal the decision and enclosed a copy of the Appeal Rights & Process. See Clark 0251 (NB 5). See also Clark 0255, 0257 (notice to Clark that his disability benefits will terminate effective March 31, 1998)(NB 5).

133.    On April 3, 1998, Clark's former legal counsel requested the Plan to review its decision to terminated Clark's LTD benefits. See Clark 0262-0263 (NB 5). Clark's counsel informed the Plan that the Social Security Administration had continued Clark's benefits until at least August 1, 2004, and further advised that Clark "is unable to engage in any occupation or business for wage or profit for which he is or become reasonably qualified by training,

education, or experience."  Clark's counsel did not provide any additional clinical information regarding Clark's condition.  See Clark 0262 (NB 5).[6]

134.    The Plan then commissioned Frank Nisenfeld, M.D., to conduct a Peer Review Analysis of Clark's claim and determine whether Clark was disabled from any occupation, and whether another IME should be conducted.  See Clark 0264 (NB 5).

135.    Dr. Nisenfeld reviewed Clark's file and claim and, on April 28, 1998, concluded that Clark was not disabled from any occupation nor would he recommend another IME.  See Clark 0266 (NB 5).  According to Dr. Nisenfeld:

> "[t]here was no documentation of anything in the records which would totally disable him from any and all employment.  The fact that he is unable to do heavy physical labor does not physically disqualify him from all work.  An additional IME is not needed to arrive at these conclusions, and the need for additional information does not appear to be present."

Clark 0266 (NB 5).

136.    On April 30, 1998, CORE recommended that the Plan uphold the denial of Clark's claim for LTD benefits effective February 3, 1998, "based on the CORE INC. physician consultant's decision on appeal, that the employee is not disabled from performing any occupation."  See Clark 0268-0271 (NB 5).

---

[6]On March 10, 1998, prior to his counsel's request for review, Clark forwarded a letter to the Plan Supervisor setting forth the history of his injury.  See Clark 0258-0260 (NB 5).  At that time, he did not provide any additional clinical information regarding his condition.  See Clark 0258-0260 (NB 5).  By letter dated March 10, 1998, Clark's psychiatrist, Robert Harned, M.D., advised the Plan that he had been treating Clark for his depression since March 2, 1998, and that Clark "has had milder levels of depression in the past, but his current medical condition and stress over his disability status caused an episode that has been more severe."  Dr Hamed failed to address whether Clark could return to work.  See Clark 0261 (NB5).

137.     On May 29, 1998, the Plan informed Clark's counsel that the Plan considered her April 3, 1998, letter to be an initial claim and notified Clark's counsel that the Plan had denied Clark's claim for benefits because Clark did not satisfy the definition of disability as defined by the Plan.  The Plan informed Clark's counsel that the Plan had reviewed, *inter alia*, Clark's medical records from Dr. Van Blaricom, Dr. Harned and Dr. Eglinton, the results of Clark's FCE, the Social Security Administration's letter of award and a vocational rehabilitation report regarding Mr. Clark.  See Clark 0272 (NB 5).  The Plan advised her of Clark's rights to obtain further review of his claim for LTD benefits.  See Clark 0272-0273 (NB 5).

138.     By letter dated July 27, 1998, Clark's legal counsel requested a review of the Plan's decision to deny Clark's claim for LTD benefits.  Clark's counsel did not provide any additional clinical information supporting Clark's claim for benefits.  See Clark 0276 (NB 5).

139.     On September 2, 1998, CORE commissioned a Transferable Skill Analysis ("TSA") to be performed on Clark to determine whether Clark had transferable skills given the restrictions defined by the IME physician.  See Clark 0278 (NB 5).

140.     Jennifer Mikeska performed the TSA on September 3, 1998, at the conclusion of which she determined that Clark had the following transferable skills: compiling, coordinating, copying, speaking/signaling, taking instructions/helping, operation/controlling, and handling.   From this list of transferable skills, Ms. Mikeska identified several occupational titles that conformed with Clark's physical restrictions and the listed skills.  See Clark 0283-0286 (NB 5).

141.    On September 15, 1998, CORE recommended that the Plan "uphold the denial of LTD benefits, originally effective 2/3/98, based on the results of the Transferable Skills Analysis which found several job titles which should be considered appropriate for this employee."  See Clark 0280-0282 (NB 5).

142.    On November 6, 1998, the Plan notified Clark's counsel that Clark's claim would be reviewed at the Claims Review Committee's December 2, 1998, meeting.  The Plan advised Clark's counsel that this would be the final appeal under ERISA and invited Clark's counsel to submit, no later than November 25, 1998, any new or additional documentation or evidence that Clark is totally disabled and unable to engage in any work at all.  See Clark 0198 (NB 5).

143.    By letter dated November 24, 1998, Clark's counsel forwarded to the Committee a medical note from Craig A. Mills, M.D., in which Dr. Mills stated that Clark was "totally disabled from his fibromyalgia" and "is unable to work."  See Clark 0327-0328 (NB 5).

144.    Based on this supplemental information and prior to the Claims Review Committee's review of Clark's claim, CORE requested another Peer Review Analysis with the following instruction to the physician: "Please contact the attending physician and report your opinion of the employee's disability status."  See Clark 0299-0300 (NB 5).

145.    On November 30, 1998, William Augerson, M.D., an outside consultant retained by CORE, contacted Dr. Mills by telephone.  Dr. Mills informed Dr. Augerson that the office note "stating the claimant is unable to work, and has trouble standing for long

periods" was a mere quote of "what he thought a rheumatologist and orthopedic surgeon had concluded about disability." See Clark 0299-0300 (NB 5). Dr. Mills advised Dr. Augerson that he only treated Clark for his diabetes (not fibromyalgia) and that "he could not provide information about impairments of [activities of daily living] nor any compelling reason why sedentary work was impossible." See Clark 0300 (NB 5).

146.     Based on his review of Clark's medical records and his conversation with Clark's treating physician, Dr. Augerson reported that "he cannot conclude this claimant is totally disabled, though impaired, sedentary work should be possible." See Clark 0300 (NB 5).

147.     On December 2, 1998, the Claims Review Committee discussed Clark's appeal of the denial of his claim for LTD benefits. After the Committee reviewed Clark's file and discussed its contents, it voted to uphold the denial of Clark's claim for LTD benefits. See CRC 1349-1351 (NB 6). See also CRC 1352-1643 (NB 6).[7]

148.     The Committee relied on, *inter alia*, the following information in reaching its decision to uphold the denial of Clark's LTD claim.

> "On 8/25/97, Dr. Beavers of CORE had a discussion with Dr. Eglinton, Mr. Clark's doctor. Dr. Eglinton said that Mr. Clark 'is not disabled from any occupation and that there are jobs he could do.' On 10/15/97, a Functional Capacity Evaluation found that Mr. Clark is capable of a sedentary physical demand level of work. Dr. Eglinton signed a Modification Checklist on 11/5/97 stating that Mr. Clark can work 4-6 hours a day, 3-4 days a week in a sedentary job with restrictions. An Independent Medical

---

[7]The Chair of the Committee "ordered that a copy of the documentation relative to the requests for review previously distributed to the Committee, as well as the Transferable Skills Analysis brought to the meeting, be filed with the minutes of the meeting." See CRC 1349-1351, 1352-1643 (NB 6).

Evaluation was performed by Dr. Rudins on 1/12/98.  Dr. Rudins found that Mr. Clark 'does have a work capacity, though at a sedentary level at 8 hours per day' with restrictions.  Dr. Rudins also stated that he 'really has no significant objective findings to limit him to a sedentary work capacity' and that 'his work capacity can be potentially increased.'  Dr. Rudins' Modification Checklist stated that Mr. Clark can work 8 hours a day, 5 days a week in a sedentary job.   A Transferable Skills Analysis identified potential jobs that Mr. Clark could perform.

Mr. Clark's attorney, Lori Loftis, submitted additional information in this case by letter dated 11/24/98.  With that letter she forwarded Dr. Mill's evaluation of Mr. Clark.  The Committee considered Dr. Mill's report, noting that both Ms. Loftis and Dr. Mills made several conclusions regarding Mr. Clark's medical condition which were not supported by the objective information.  Dr. Mills discussed Mr. Clark's diabetes but did not say that Mr. Clark was disabled due to diabetes.

See CRC 1350-1351 (NB 6).

149.    On January 29, 1999, the Plan notified Clark's counsel that the Claims Review Committee met on December 2, 1998, and decided to uphold the denial of his claim for benefits.  The Plan described to Clark the basis of its decision that he was not entitled to disability benefits.  See Clark 0329-0330 (NB 6).

150.    On September 10, 1999, eight months after the Claims Review Committee denied Clark's appeal, Clark's current legal counsel notified the Plan that they had been retained by Clark concerning his claim for benefits.  Clark's counsel requested Clark's claims file and copies of  plan documents related to the Hourly LTD Plan.  See Clark 0741-0743 (NB 27).

151.    The Plan and Champion International complied with Clark's counsel's request for information.  See Clark 0739, 0736-0737, 0733-0734 (NB 27).

152.    By letter dated December 11, 2000, which was almost two years after the Claims Review Committee had denied Clark's appeal, and more than a year after the Plan had responded to Clark's request for information, Clark's counsel requested the Plan to "reconsider[] . . . . the decision to terminate [Clark's] benefits."  See Clark 0722 (NB 27). Clark's counsel submitted to International Paper medical and other information they alleged supported Clark's claim for benefits.  See Clark 0722-0726, 03234-0351, 0354-0412 (NB 27).

**Franziska Finney's Claim for Benefits**

153.    Plaintiff Franziska Finney ("Finney") worked as an hourly employee at Champion International's facility in Canton, North Carolina.  Her original hire date was August 9, 1983, and her last day of active employment was November 6, 1994.  See Finney 0157, 0181 (NB 7).

154.    Beginning on November 7, 1994, Finney received short-term disability benefits from Champion International.  See Finney 0190 (NB 7).

155.    On November 9, 1994, Al Osbahr, M.D., completed a Temporary Disability Initial Report regarding Finney.  See Finney 0190 (NB 7).  Dr. Osbahr diagnosed Finney with "chronic supinator pain."  According to Dr. Osbahr, Finney could "return to work with limitations" but could not resume her full duties.  See Finney 0190 (NB 7).

156.    Dr. Osbahr then referred Finney to Susan Kimel, P.T., at Haywood Rehabilitation Center for a Functional Capacity Evaluation ("FCE") on November 11, 1994. See Finney 0193-214 (NB 7).

157.    Ms. Kimel examined Finney and, based on her examination, concluded that Finney "is able to work at the LIGHT-MEDIUM Physical Demand Level for an 8 hour day according to the Dictionary of Occupational Titles, U.S. Department of Labor, 1991." See Finney 0193 (NB 7). Ms. Kimel based her findings on the fact that Finney had a 0% Functional Strength Deficit which indicated that Finney's "impairment does not appear to be having an impact on her functional ability." See Finney 0193 (NB 7).

158.    As a Champion International employee, Finney was eligible to apply for LTD benefits pursuant to the Hourly LTD Plan, and Finney began receiving LTD benefits at the conclusion of her short-term disability period because she was not able to return to her own occupation. See Finney 0191 (NB 7).

159.    From November 1994 through August 1997, the Hourly LTD Plan periodically provided Finney forms to submit so the Plan could review her claim to verify the status of her disability. Finney complied with the Plan's requests for information and the information submitted to the Plan supported the continuation of LTD benefits through the "own occupation period" as defined by the Plan. See Finney 0258-0259, 0260, 0265, 0216-0235, 0243-0250, 0253-0259 (NB 7).

160.    By early 1997, Finney was approaching the more stringent "any occ" standard for determining whether she was entitled to continuing LTD benefits.

161.    On April 1, 1997, Finney submitted a Personal Profile Evaluation dated April 1, 1997, on which she described her physical complaints and limitations as "fibromyalgia, degenerative disc disease C5-6 and C6-7, L5-S1 disk, sclerosis of the SIJs bilaterally,

spondyloarthritis, chenoromalacia of the patella, high blood pressure." See Finney 0261-0264 (NB 7). In this evaluation, Finney responded that she expected to return to work at her last occupation "as my health and cond. Allows me to." See Finney 0263 (NB 7).

162.    On June 11, 1997, Dr. Osbahr submitted an Attending Physician's Statement in which he stated that Finney was not totally disabled from any occupation because she "can do sedentary work." See Finney 0266-0267 (NB 7).

163.    Dr. Osbahr also completed a Physician's Report of Physical Capacity on which he estimated that Finney could, *inter alia*, sit, stand and walk seven to eight hours per shift, make repetitive use of both feet for seven to eight hours per shift, could twist, climb, reach above shoulder level, crouch and stoop, kneel, balance and push three to four hours per shift, could use both hands for "low speed assembly" for seven to eight hours per shift, and could use both hands for "high speed assembly" for one to two hours per shift. See Finney 0273-0274 (NB 7).

164.    Dr. Osbahr then ordered another FCE so he could accurately evaluate Finney's functional capacities. See Finney 0266 (NB 7). See also Finney 0273-0274 (NB 7).

165.    On July 23, 1997, an FCE of Finney was performed at Haywood Regional Rehabilitation Center which noted:

> "Ms. Finney presents with multiple pain complaints that she attributes mainly to arthritis and fibromyalgia. Subjectively, she is pain limited in most functional activities with ratings of 7/10. Objectively, she demonstrates the ability to sustain work at a light pdd."

See Finney 0270 (NB 7).  The FCE recommended that Finney pursue a position with the restriction that she can only function at the light level, lift a maximum of 20 pounds, and carry a maximum of 20 pounds.  See Finney 0270 (NB 7).

166.    Thereafter, Finney's treating physician, Dr. Osbahr, noted the following on his progress records:

> "The functional capacity evaluation done 7/23/97 to assess current status.  Last FCE 2 years ago.  No identified symptom magnification on FCE.  Left capabilities 20 lbs. from floor to overhead.  Push/pull 60 lbs force maximum with pain. Grip below average 50 lb force.  Carry 20 lbs 100 feet.  This places her in the light work capacity. She is not able to do usual work activities here at Champion.  If trained or posses skills for white collar jobs, she could do light work activities only."

See Finney 0271 (NB 7).

167.    On August 25, 1997, CORE recommended "denial of LTD benefits at the any occupation point, based on the FCE findings and Dr. Osbahr's agreement that the employee can perform light duty work activities."  See Finney 0022 (NB 7).  CORE's report to the Plan included the following:

> "Ms. Finney remains out of work since 11/7/94.  In 5/96, Dr. Osbahr noted that the employee could perform sedentary work but remained disabled from her medium duty work at Champion.  Dr. Osbahr noted in a 6/97 Report of Physical Capacity that Ms. Finney could sit, stand and walk for 7-8 hours but that activities were 'anticipated capabilities' and the employee 'needs another FCE.'  Case Management obtained a prescription for a Functional Capacity Evaluation from Dr. Osbahr which was subsequently performed on 7/23/97.  The FCE found that Ms. Finney could perform light duty work for an eight hour period.'"

See Finney 0021-0023 (NB 7).

168.    On August 26, 1997, the Plan notified Finney that it was terminating her LTD benefits because she was "not disabled as defined in the Plan."  See Finney 0020 (NB 7).  The

Plan stated that its denial of Finney's claim for benefits was "based on the 7/23/97 Functional

Capacity Evaluation (FCE)" which concluded that Finney was "able to perform light duty

work for 8 hours per day." See Finney 0020 (NB 7). The Plan informed Finney of her right to

appeal the decision and enclosed a copy of the Appeal Rights & Process. See Finney 0020

(NB 7). The Plan also informed Finney that her LTD benefits would terminate effective

September 30, 1997. See Finney 0017-0018 (NB 7).

     169.    On October 1, 1997, Finney appealed the termination of her LTD benefits. See

Finney 0010-0016 (NB 7). Finney provided a synopsis of her medical condition and stated:

> "I know with my pain, sleeplessness, chronic fatigue, fibromyalgia and other
> discomfort, that I am not able to function at home with my housework, shopping, etc.
> without stress and having to stop and take periodic rests. I feel that I am unable to
> function wisely and safely at any type of job at this time due to my disabilities."

Finney 0012 (NB 7). Finney submitted x-ray findings and physician notes from Jane

Brummer, M.D., dated August 30, 1997. These physician notes included Dr. Brummer's

diagnosis of sponylarthritis, degenerative disc disease, and fibromyalgia in 1994, the July 1997

FCE that found Finney "to have the ability to do sustained work at only a light level," and Dr.

Osbahr's subsequent assessments of Finney's ability to return to work with limitations. See

Finney 0015 (NB 7).

     170.    On December 22, 1997, CORE recommended "upholding of the previous denial

of further long term disability benefits" because "FCE testing in 7/97 found the employee able

to work in a light duty position for a full day, findings supported by the employee's physician

at that time.  Upon appeal, no new information was submitted in support of disability from any occupation."  <u>See</u> Finney 0009, 0007-0009 (NB 7).

171.    CORE relied on, *inter alia*, Dr. Brummer's August 30, 1997, physician notes addressing Finney's work status, and Dr. Brummer's subsequent refusal to complete a Modification Checklist.  CORE also reported to the Plan that CORE's occupational health physician spoke to Dr. Brummer during which Dr. Brummer reported that she "ha[d] no opinion about this employee's disability status" and "was not qualified to make a determination about disability in this case."  <u>See</u> Finney 0007-0008 (NB 7).

172.    On February 9, 1998, the Plan advised Finney that her October 1, 1997, correspondence was treated as an initial claim denial under ERISA and further advised Finney that, "[b]ased on the review by CORE, our decision is to uphold the denial of LTD benefits." <u>See</u> Finney 0002-0003 (NB 7).  The Plan informed Finney that

> "[w]e have reviewed the documentation provided by you from Dr. Jane Brummer and Dr. Richard Lang with Haywood Regional Medical Center.  This information does not substantiate your disability as being totally and permanently disabled from any occupation as defined in the Plan."

<u>See</u> Finney 0002-0003 (NB 7).  The Plan further advised Finney that she was entitled to obtain further review of the denial of her claim by notifying Champion in writing within sixty days of receipt of the denial and enclosed a copy of the Hourly LTD Plan for reference.  <u>See</u> Finney 0003 (NB 7).

173.    Finney did not request further review of the denial of her LTD claim.

174.    By letter dated September 10, 1999, which was one year and seven months after the Plan denied Finney's claim and instructed her that she had sixty days to appeal the claims denial, Finney's current legal counsel requested copies of all plan documents related to the Hourly LTD Plan and Finney's claims file.  See Finney 0322 (NB 28).

175.    The Plan and Champion International complied with Finney's counsel's request and sent to them copies of Finney's claims file and the relevant plan documents.  See Finney 0320, 0317-0318, 0314-0315 (NB 28).

176.    On December 11, 2000, which was two and one-half years after the Plan denied Finney's claim and more than a year after the Plan complied with Finney's counsel's request for information, requested the Plan to "reconsider[] . . . the decision to terminate [Finney's] benefits."  See Finney 0024 (NB 28).  Finney's counsel submitted to International Paper medical and other information they alleged supported Finney's claim for benefits.  See Finney 0024-0312 (NB 28).

**Wiley Haynes' Claim for Benefits**

177.    Plaintiff Wiley Haynes ("Haynes") worked as a Machine Back Tender at Champion International's facility in Canton, North Carolina.  Haynes' date of hire was December 23, 1958.  See Haynes 0039 (NB 8).

178.    Haynes' last day of active service was August 3, 1993.  Haynes received short-term disability benefits from August 4, 1993, until March 1, 1994.  See Haynes 0003 (NB 8).

179.    As a Champion International hourly employee, Haynes was eligible to apply for disability income benefits pursuant to the Hourly LTD Plan.

180.     On January 13, 1994, Champion International submitted an LTD Claim Form on Haynes' behalf.  Haynes identified "low back syndrome/degenerative discogic disease" as the alleged cause of disability.   See Haynes 0039 (NB 8).

181.     On February 21, 1994, the Plan notified Haynes that his application for LTD benefits had been approved.  See Haynes 0044-0045 (NB 8).

182.     The Plan also informed Haynes that "in order to continue receiving Long Term Disability benefits, [he] must be totally disabled as defined in the policy"; that after the first 24 months he needed to be considered "totally and permanently disabled" or "unable to do any job for which [he was] reasonably qualified by [his] training, education and experience"; and that approval of his claim would be terminated when he was "no longer disabled as defined in the plan."  See Haynes 0044-0045 (NB 8).

183.     Haynes' LTD benefit was $805 per month.  See Haynes 0052 (NB 8).

184.     On December 10, 1994, the Social Security Administration notified Haynes that his application for Social Security disability income benefits had been approved.  The Social Security Administration concluded that Haynes became disabled effective August 4, 1993, and was eligible for payment beginning in February 1994.  See Haynes 0075-0077 (NB 8).

185.     As Haynes approached the expiration of his initial "own occupation" period of benefits, the Plan began to collect information to determine whether Haynes could satisfy the more stringent "any occupation" disability definition, thereby entitling Haynes to benefits beyond the initial thirty month period.  On August 15, 1995, the Plan requested Haynes to

provide an Authorization to Disclose Information and a Personal Profile Evaluation.  See Haynes 0083 (NB 8).

186.    On August 28, 1995, Haynes completed his Personal Profile Evaluation in which he indicated that "with [his] back & limitations" he could not return to work at this time."  See Haynes 0085-0088 (NB 8).

187.    On September 1, 1995, Kate T. Queen, M.D., Haynes' treating physician, submitted an Attending Physician Statement in which she stated that Haynes "has worked very hard in Rehab programs to return to work—But without success. Recommend long term-total Disability."  Dr. Queen submitted examination notes which included her opinion that Haynes had "severe degenerative disc disease, lumbar spine with osteoarthritis and intermittent sciatica."  See Haynes 0089-0093 (NB 8).  In her Physician's Report of Physical Capacity prepared on August 30, 1995, Dr. Queen opined that Haynes could work zero hours per day and was unlikely to ever return to full-time work activity.  See Haynes 0091-0093 (NB 8).

188.    On September 29, 1995, after reviewing the information Haynes submitted, the Plan determined that Haynes qualified for LTD benefits under the "any occupation" standard. See Haynes 0095 (NB 8).

189.    As part of its periodic review of Haynes' disability status, the Plan contacted Haynes on March 27, 1996, and requested that he update his medical information by providing a Personal Profile Evaluation, Authorization for Release of Information, and Attending Physician Statement.   See Haynes 0097 (NB 8).

190.    In response to this request, Dr. Queen completed an Attending Physician Statement on April 9, 1996, in which she opined that Haynes was totally disabled from any occupation.  Dr. Queen declined to complete the "Restrictions and Limitations" portion of the Attending Physician Statement and, instead, stated that Haynes "would have to have [a] physician capacity eval ─ we do not do these evals."  See Haynes 0101-0102 (NB 8).

191.    Dr. Queen then referred Haynes to Susan Kimel, P.T., at Haywood Rehabilitation Center in Clyde, North Carolina, for a Functional Capacity Evaluation ("FCE"). See Haynes 0105-0116 (NB 8).

192.    Ms. Kimel found and reported that Haynes could not squat, kneel or crawl, but could sit and reach "frequently" and could stand, walk, bend and climb "occasionally."  Based on these and additional functional assessments, Ms. Kimel concluded that Haynes was "able to work at the SEDENTARY-LIGHT Physical Demand Level for an 8 hour day."  See Haynes 0106-0107 (NB 8).

193.    On November 27, 1996, the Plan contacted Dr. Queen, Haynes' treating physician, and requested that she prepare a Modification Checklist for Haynes based on her review of the FCE results.  Dr. Queen refused to complete the Modification Checklist.  See Haynes 0119-0121 (NB 8).

194.    To further assist in the ongoing review of Haynes' disability status, the Plan referred the Haynes matter to William Augerson, M.D., for a Peer Review Analysis.  The Plan asked that Dr. Augerson assess whether Haynes' "disabilities preclude all forms of work at any occupation."  See Haynes 0122 (NB 8).

195.    Dr. Augerson reviewed Haynes' medical records, the Plan's referral form and spoke with Dr. Queen.  Dr. Augerson reported that "[t]he claimant has limited ability to walk very far, to lift, bend or stand for prolonged periods."  Dr. Augerson, however, also reported that

> "[t]he attending physician says she determined disability in the context of the jobs available for the patient and no one had previously discussed vocational rehab efforts with her. The attending physician agrees with the Haywood assessment that the patient can move some, sit, drive, and could, with accommodations, perform some sedentary work if he had the requisite skills. I and the attending physician therefore do not conclude that the patient is disabled from all work, though he is significantly impaired. I agree with attending physician that the patient might require some vocational instruction to perform sedentary work."

See Haynes 0123-0125 (NB 8).

196.    On December 18, 1996, the Plan asked Dr. Queen to elaborate in writing regarding her conversation with Dr. Augerson in which she indicated that Haynes could perform a sedentary job with proper training.  See Haynes 0126 (NB 8).

197.    Dr. Queen responded on January 7, 1997.  She noted that the Plan already had her office notes summarizing Haynes' complaints and limitations in its possession.  She also stated that she couldn't "offer any other objective or  . . . further clarification of [Haynes'] current status."  See Haynes 0127 (NB 8).

198.    After receiving Dr. Queen's response, the Plan commissioned Peter Johnson, M.D., at the Asheville Rehabilitation Center in Asheville, North Carolina, to conduct an Independent Medical Examination ("IME") of Haynes.  See Haynes 0128 (NB 8).  The Plan

asked Dr. Johnson to analyze whether Haynes "was medically able or not able to perform the essential functions required by any occupation." <u>See</u> Haynes 0129-Haynes 0131 (NB 8).

199.    Dr. Johnson examined Haynes on January 20, 1997. Dr. Johnson's examination revealed that Haynes has "had recurrent back problems and is left with chronic back pain which is regional in nature" and his "degenerative disk changes as well as arthritic changes in his back and in the small joints of his hands and in the weight bearing joints by history." Dr. Johnson also stated that, "in my medical opinion, [Haynes] is at maximum medical improvement, and further investigations and treatment will not significantly alter his medical or functional status." Dr. Johnson concluded

> "based on the results of his Functional Capacity Evaluation and my examination, I feel that he is able to function at a <u>sedentary</u> physical demand level. Specifically, he would have restrictions on material handling and would require flexible posture. He could not squat or kneel, or crawl but would be able to work 40 hours a week within the limits of his Functional Capacity Evaluation."

<u>See</u> Haynes 0132 (NB 8).

200.    On February 6, 1997, after considering the results of the FCE, the Peer Review Analysis, the Attending Physician Statement and the results of the IME, the Plan notified Haynes that his LTD benefits had been terminated. <u>See</u> Haynes 0136-0138, 0139-0141 (NB 8). The Plan also informed Haynes of his right to request review of the Plan's decision. <u>See</u> Haynes 0140-0141 (NB 8). The Plan subsequently notified Haynes that his LTD benefits would be terminated effective February 28, 1997. <u>See</u> Haynes 0150 (NB 8).

201.    On February 17, 1997, Haynes requested a review of the Plan's decision. In support of his request, Haynes stated that he suffered from a degenerative back condition as

well as carpal tunnel syndrome, tendonitis in his hands and shoulders, and degeneration of his right knee joint.  Haynes also stated that he could not participate in normal life activities, including attending church services, ball games and the movies.  Haynes further noted that there are times that he cannot button his shirt, put on his socks or get into a tub without assistance.  See Haynes 0142-0145 (NB 8).

202.    Along with his request for reconsideration, Haynes submitted examination notes and a letter from Dr. Queen, dated February 19, 1997, in which Dr. Queen stated that Haynes "has a long-standing history of degenerative disc disease and generalized osteoarthritis with involvement in multiple joints."  Dr. Queen further stated that she had "serious concerns" about the conclusion that Haynes could perform sedentary work.  According to Dr. Queen, Haynes "repeatedly explains that he has difficulty with certain activities of daily living and has never been able to sit or stand for any period of time since he had his last exacerbation of back pain and found it necessary to accept disability."  See Haynes 0146-0147, 0148-0149 (NB 8).

203.    Dr. Queen's examination notes indicate that Haynes has "C-spine . . . discomfort on all arcs of motion"; "significant restriction in lateral rotation"; "mild discomfort in the groin, but particularly discomfort in the low back with manipulation of the hip"; and "difficulty assuming an upright position."  The examination notes, however, also show Haynes' "[s]houlder range of motion is maintained"; "wrist and small hand joints [are] without any clear evidence for synovitis or tendonitis at this time"; and no "focal swelling or discoloration of the right mid foot."  See Haynes 0148 (NB 8).

204.    By letter dated May 9, 1997, Dr. Queen submitted additional examination notes.  Dr. Queen indicated that Haynes had been in touch with her on two different occasions to report intolerance to medication.  She stated in her April 25, 1997, examination notes that Haynes reported increased pain over the last two weeks due to a "very mild increase in his activity level."  The notes also indicate that he is "ambulating with a cane" due to pain in his knee.  See Haynes 0151-0153 (NB 8).

205.    After reviewing the information submitted by Haynes and Dr. Queen in support of Haynes' appeal, the Plan notified Haynes on June 17, 1997, of its decision to uphold the denial of his claim for LTD benefits.   The Plan specifically informed Haynes that

> "[w]e have reviewed the additional documentation provided by you and Dr. Kate T. Queen. This information was previously reviewed and discussed by CORE with Dr. Queen. You had a Functional Capacity Evaluation performed on October 10, 1996 prescribed by the above Physician. Also, you had an Independent Medical Evaluation performed on January 20, 1997 of which both found you able to perform sedentary/light duty work at 8 hours per day. Therefore, you do not meet the definition of disability as defined in the Plan."

The Plan also informed Haynes of his right to appeal the Plan's decision.  See Haynes 0154, 0155-0156 (NB 8).

206.    Haynes subsequently appealed the Plan's denial.  In support his appeal, Haynes noted his disagreement with the conclusions of his IME and stated that he lives with pain every day, that he has "good days and bad days" and that he feels that he cannot hold down a job due to his arthritis.  See Haynes 0157-0161 (NB 8).  On July 29, 1997, Haynes' wife also submitted a statement in support of Haynes' appeal along with pictures of his hands during a "recent flare-up" of his arthritis.  See Haynes 0162-0164 (NB 8).

207.    By letter dated August 20, 1997, Dr. Queen submitted an "update" on Haynes' clinical information.  Dr. Queen stated she recently received "clear evidence for rheumatoid arthritis on [Haynes'] laboratory testing."  Dr. Queen did not submit the results of the laboratory tests.  Dr. Queen again noted that Haynes continues to struggles with low back pain, peripheral joint pain, stiffness and increasing swelling.  See Haynes 0165-0166 (NB 8).

208.    On August 27, 1997, the Plan acknowledged receipt of Haynes' appeal and informed him that the Plan's termination of his LTD benefits would be reviewed by the Claims Review Committee.  The Plan encouraged Haynes to provide any additional information he wished to be considered by the Committee.  See Haynes 0167, 0180 (NB 8).

209.    The Claims Review Committee discussed Haynes' claim at its November 25, 1997, meeting.  See CRC 0009-0011, 0508-0511 (NB 9).  The Committee reviewed Haynes' claims file, records submitted by Haynes' treating physician, Dr. Queen, the results of the October 21, 1996, FCE, and Dr. Johnson's January 20, 1997, IME in which Dr. Johnson opined that Haynes was capable of functioning at a sedentary demand level.  During the meeting, the Committee examined this information against the Plan's definition for total disability and voted to uphold the decision to deny Haynes' claim for LTD benefits.  See CRC 0508-0511, 0512-0680 (NB 9).[8]

210.    On December 26, 1997, the Plan informed Haynes of its decision to affirm the previous denial of his claim for LTD benefits.  See Haynes 0178-0179 (NB 8).

211.    Almost two years later, by letter dated September 10, 1999, Haynes's legal counsel requested copies of Haynes' claims file and all plan documents related to the Hourly LTD Plan.  See Haynes 0407 (NB 29).

212.    On November 22, 1999, the Plan and Champion International complied with Haynes' counsel's request for information.  See Haynes 0399 (NB 29).  See also Haynes 0407, 0405, 0404 (NB 29).

213.    By letter dated November 22, 2000, which was almost three years after the Claims Review Committee denied Haynes' benefits appeal and one year after the Plan complied with Haynes' counsel's request for information, Haynes' current legal counsel requested the Plan to "reconsider[] . . . the decision to terminate [Haynes'] benefits."  See Haynes 0411 (NB 29).  Haynes' counsel submitted to International Paper medical and other information they alleged supported Haynes' claim for benefits.  See Haynes 0411-0419, 0421-0438, 0440-0810 (NB 29).

### Darrell Hill's Claim for Benefits

214.    Plaintiff Darrell Keith Hill ("Hill") worked as an hourly employee at Champion International's facility in Canton, North Carolina.  Hill's date of hire was June 21, 1972.  See Hill 0161 (NB 10).

215.    Hill's last day of active service was November 5, 1990.  Hill had injured his right ankle and leg, and subsequently had a below the knee amputation of his right leg.  He

---

[8]The Chair of the Committee "ordered that a copy of the documentation relative to the requests for review previously distributed to the Committee, be filed with the minutes of the

thereafter received short-term disability benefits from Champion International.  See Hill 0118-0120 (NB10).

216.     As a Champion International hourly employee, Hill was eligible to apply for disability income benefits pursuant to the Hourly LTD Plan, and the Plan initially approved Hill for LTD benefits on May 6, 1991.  See Hill 0118-0120 (NB 10).

217.     In 1998, as part of the Plan's periodic review of Hill's disability status, Hill's claim was referred to CORE's physician consultant.  See Hill 0118 (NB 10).

218.     CORE's physician consultant reviewed the notes from Hill's attending physician, J.M. Dement, M.D., See Hill 0118, 0134 (NB 10), and then "made several attempts to contact [Dr. Dement], but without success."  See Hill 0118 (NB 10).

219.     Therefore, to further evaluate Hill's disability status, the Plan scheduled Hill for an Independent Medical Examination ("IME"), which was performed on June 25, 1998.  Upon examination, the IME physician opined that Hill could work eight hours per day, five days per week in a sedentary job with restrictions.  See Hill 0118-0120 (NB 10).

220.     The Plan also commissioned Jennifer Mikeska, MRC, to perform a Transferable Skills Analysis.  By report dated July 27, 1998, Ms. Mikeska analyzed Hill's transferable skills, education, functioning and employment history, including his experience as a Millwright, Roll Repairer, Machinist and Machinist Apprentice, and concluded that three positions were suitable for Hill.  See Hill 0121 (NB 10).

---

meeting."  See CRC 0508-0511, 0512-0680 (NB 9).

221.    On July 19, 1998, the Plan informed Hill that his LTD benefits had been terminated because he could not satisfy the Plan's definition of Total Disability.  More specifically, the Plan informed Hill that

> "[t]he independent medical examination found you capable of work 8 hours per day, 5 days per week in a sedentary job. The Transferable Skills Analysis revealed skills that can be utilized in jobs of a Drafter Assistant, a Drafter Apprentice, and a Stuffer (toy sport equipment production)."

The Plan informed Hill of his right to a review of this decision, See Hill 0115-0116 (NB 10), and notified him that his benefits would terminate on October 31, 1998.  See Hill 0123 (NB 10).

222.    On October 1, 1998, Hill's wife submitted information from the North Carolina Employment Security Commission regarding the Drafter, Drafting Apprentice and Toy Stuffer positions.  See Hill 0126-0133 (NB 10).  Hill's wife disagreed with the conclusion that these positions were applicable to her husband.  She also submitted progress notes from J.M. Dement, M.D., indicating that Hill's

> "stump is benign. Examination of the knee reveals small local area of discomfort on the lateral thermal condyle. The rest of the knee examination is really quite benign. There is no effusion. He has excellent strength, good control with [the] prosthesis on, there is quadriceps atrophy.  Some of this [is] obviously chronic and long-standing in nature. The patient feels very confident when he is ambulating. The pain is markedly decreased . . . He does not wish to take any medication. . . ."

See Hill 0134 (NB 10).

223.    By letter dated October 19, 1998, Hill's wife requested a review of the Plan's decision to deny her husband's claim for continuing LTD benefits.  She reported that Hill "does not sleep at night," has difficulty assisting her with housework, and that, in her opinion,

there is no way that he "could hold down a job" or perform the jobs suggested by the Plan. See Hill 0152-0154 (NB 10).  She also stated that she believed that denying him LTD benefits would result in a greater cost to Champion International because she works at Champion International and he would be covered by her healthcare plan sponsored by Champion International.  See Hill 0154 (NB 10).

224.    Hill's wife also submitted additional medical records including a letter from Paul Conrad, M.D.  In his letter, Dr. Conrad indicated that he started treating Hill in August 1998, and reported that Hill "suffers from chronic gout and high blood pressure" and had "extensive problems with this ankle on the right secondary to an injury in the past and in December 1995 had a below the knee amputation."  Dr. Conrad, however, opined that Hill had been doing reasonably well since his amputation with his prosthesis and he "otherwise Seems to be in good health."  See Hill 0136 (NB 10).  The additional records submitted included Dr. Dement's progress notes from December 1995 through July 1998, which had previously been submitted to the Plan.  See Hill 0137-0151 (NB 10).

225.    In order to evaluate Hill's request for reconsideration, the Plan asked its consulting physician to review the materials submitted by Hill and on Hill's behalf (including Dr. Dement's progress notes and Dr. Conrad's letter), the results of the IME, the Transferable Skills Analysis and all information provided by Hill's spouse.  See Hill 0156-0158 (NB 10). Upon review, the Plan's consulting physician concurred with the results of the IME and opined that Hill would be physically capable of performing "[s]edentary work activities."  See Hill 0157 (NB 10).

226.     On February 17, 1999, the Plan informed Hill of its decision to uphold the denial of his claim for continuing LTD benefits.  The Plan also notified Hill that he had a right to appeal the denial.  See Hill 0159-0160 (NB 10).

227.     Hill did not appeal the Plan's decision to terminate his LTD benefits.

228.     By letter dated September 10, 1999, Hill's legal counsel requested copies of Hill's claims file and all plan documents related to the Hourly LTD Plan.  See Hill 0110 (NB 30).

229.     On November 22, 1999, the Plan and Champion International complied with Hill's counsel's request for information.  See Hill 0102 (NB 30).  See also Hill 0107 (NB 30).

230.     On December 27, 2000, almost two years after the Plan denied his request for benefits and informed him of his right to appeal, Hill's legal counsel requested the Plan to "reconsider[] . . . the decision to terminate [Hill's] benefits."  See Hill 0002 (NB 30).  Hill's counsel submitted to International Paper medical and other information they alleged supported Hill's claim for benefits.  See Hill 0002-0100 (NB 30).

**Judith Kirkpatrick's Claim for Benefits**

231.     Plaintiff Judith C. Kirkpatrick ("Kirkpatrick") worked as an hourly employee at Champion International's facility in Canton, North Carolina.  Her hire date was November 1, 1976 and her last day of active employment was November 21, 1993.  See Kirkpatrick 0018 (NB 11).

232.     Between November 26, 1993, and May 26, 1994, Kirkpatrick received short-term disability benefits from Champion International.  See Kirkpatrick 0018 (NB 11).

233.    As a Champion International employee, Kirkpatrick was eligible to apply for LTD benefits pursuant to the Hourly LTD Plan and, prior to the expiration of her short-term disability benefits, Kirkpatrick applied for LTD benefits, citing "IV disc disease" and "connective tissue disease with fibromyalgia" as the cause of her alleged disability.  See Kirkpatrick 0018-0020 (NB 11).  See also Kirkpatrick 0021, 0027-0028, 0033-0034, 0045 (NB 11).

234.    The Plan approved Kirkpatrick's claim for LTD benefits effective May 27, 1994.  See Kirkpatrick 0044 (NB 11).

235.    Kirkpatrick's LTD benefit was $386.25 per month.  See Kirkpatrick (NB 11).

236.    Pursuant to the Hourly LTD Plan, Kirkpatrick's continuation of LTD benefits depended on certification of Kirkpatrick's continuing disability.  See Plan 0067 (NB 66).  In addition, to qualify for continuing benefits after the first twenty-four months of LTD benefits, the participant must be unable to engage in any occupation or business for which he is or becomes reasonably qualified by training, education or experience.  See Plan 0060 (NB 66).

237.    The Plan, through the Champion Disability Management Program and CORE, thereafter conducted periodic reviews of Kirkpatrick's continuing eligibility for LTD benefits.  See Kirkpatrick 0065-0066, 0073, 0066-0070, 0071-0072, 0058, 0077, 0073, 0089-0092, 0095-0096, 0097-0099 (NB 11).

238.    On March 27, 1998, Champion's Disability Management Program requested from Kirkpatrick additional personal profile and medical information.  See Kirkpatrick 0105 (NB 11).

239.    In response, Kirkpatrick submitted a Personal Profile Evaluation dated April 8, 1998, in which she stated that she had "constant pain from her waist to the bottom of her foot, left shoulder, elbow and hands," and "swelling in her hands, knees, calves of legs and feet." See Kirkpatrick 0106-0107 (NB 11).  Kirkpatrick reported that she had "gone to a psychologist to help deal with the pain but she had to quit because she could not afford it."  See Kirkpatrick 0106-0107 (NB 11).  She also confirmed that she did not need special help to take care of her personal needs and grooming, but did not anticipate returning to her occupation or any other type of occupation.  See Kirkpatrick 0089 (NB 11).

240.    Kirkpatrick also submitted an Attending Physician statement dated April 23, 1998, signed by Dr. Mendelsohn, which confirmed his diagnosis of "generalized OA [osteoarthritis] and fibromyalgia."  Dr. Mendelsohn stated that Kirkpatrick had not regressed or improved.   Kirkpatrick 0109-0110 (NB 11).

241.    In reviewing Kirkpatrick's continuation of LTD benefits, the Medical Director for the Champion Disability Management Program, J.D. Beavers M.D., M.P.H., spoke by telephone with Kirkpatrick's treating physician, Dr. Mendelsohn.  Dr. Mendelsohn advised Dr. Beavers that he believed Kirkpatrick "could do sedentary work."  Dr. Mendelsohn further stated that he was willing to put that professional opinion in writing.  See Kirkpatrick 0113 (NB 11).

242.    On May 5, 1998, Dr. Beavers forwarded to Dr. Mendelsohn a letter which confirmed Dr. Mendelsohn's statement that  Kirkpatrick "is not totally disabled from any occupation and could, for instance, do sedentary or sit-stand work of some kind for 6 hours per

day five days per week."  See Kirkpatrick 0114 (NB 11).  On May 11, 1998, Dr. Mendelsohn

verified in writing to CORE that Judith Kirkpatrick "can do sedentary or sit-stand work, 6

hours per day, five days per week."  See Kirkpatrick 0115 (NB 11).

243.    By this point in time, Kirkpatrick was subject to the more stringent "any

occupation" definition of total disability which governed Kirkpatrick's LTD benefits after the

first twenty-four months of LTD benefits.

244.    After reviewing Kirkpatrick's continuing eligibility for LTD benefits, Dr.

Beavers concluded that Kirkpatrick should not be certified disabled from any occupation based

on the fact that "there is no objective medical substantiation of total disability."  See

Kirkpatrick 0113 (NB 11).  CORE then recommended that the Plan terminate Kirkpatrick's

LTD benefits.  See Kirkpatrick 0120 (NB 11).

245.    By letter dated May 12, 1998, the Plan notified Kirkpatrick that it was

terminating her LTD benefits because her treating physician, Dr. Mendelsohn, released her to

work in a sedentary job six hours per day, five days per week effective May 11, 1998.  See

Kirkpatrick 0117-0118 (NB 11).  Kirkpatrick, therefore, failed to satisfy the Plan's "any

occupation" disability definition.  The Plan advised Kirkpatrick that she had a right to appeal

the decision and enclosed a copy of the applicable appeal procedures.  See Kirkpatrick 0117-

0118 (NB 11).  Kirkpatrick's LTD benefits terminated effective June 30, 1998.  See

Kirkpatrick 0123 (NB 11).

246.    On June 14, 1998, Kirkpatrick sent a letter to the Plan describing her current medical condition.  She did not provide any additional clinical information regarding her condition.  See Kirkpatrick 0124-0126 (NB 11).  See also Kirkpatrick 0128 (NB 11).

247.    By letter dated August 7, 1998, the Plan notified Kirkpatrick that the Plan considered her June 14, 1998, letter to be an initial claim under the Plan.  The Plan informed Kirkpatrick that, after reviewing her initial claim, the Plan had decided to uphold the denial of LTD benefits.  See Kirkpatrick 0129 (NB 11).  The Plan stated that Kirkpatrick did not meet the definition of disability as defined by the Plan because "Dr. Mendelsohn released you to return to work in a sedentary job 6 hours per day, 5 days per week effective May 11, 1998." The Plan noted that Kirkpatrick did not submit any additional clinical information for review. See Kirkpatrick 0129 (NB 11).

248.    On October 6, 1998, Kirkpatrick sent a letter to the Plan Supervisor describing her current medical condition and medications.  She did not provide any additional clinical information, but did state that "on my visit with Dr. Mendelsohn in August, I showed him your letter.  He told me he had replied to CORE stating that I could not return to Champion." See Kirkpatrick 0133-0134.[9]

249.    The Plan treated Kirkpatrick's October 6, 1998, letter as an appeal and notified her on November 6, 1998, that the Plan's Claims Review Committee would review her claim for benefits.  See Kirkpatrick 0136-0137 (NB 11).

250.    In its November 6, 1998, letter, the Plan advised Kirkpatrick that, under the terms of the Hourly LTD Plan, "in order to receive benefits after the 30th month in which the benefits first began (which would include six months of STD and the first twenty-four months of LTD benefits), an individual must be totally disabled and unable to 'engage in any occupation or business for wage or profit for which he is or becomes reasonably qualified by training, education, or experience." See Kirkpatrick 0136 (NB 11).  The Plan also notified Kirkpatrick that "it is important that you provide any new or additional documentation or evidence that you are totally disabled and unable to engage in any work at all" and asked Kirkpatrick to "forward any such documentation or evidence" to the Plan by November 25, 1998, so that it could be included in the materials to be considered by the Plan's Claims Review Committee.  See Kirkpatrick 0136-0137 (NB 11).

251.    In response to the Plan's invitation to submit additional information, Dr. Mendelsohn forwarded to the Plan for inclusion in the claims record before the Committee his office notes from July 6, 1998, and August 27, 1998.  In his July 6, 1998, office notes, Dr. Mendelsohn stated that Kirkpatrick "would not be able to return to her previous job description at Champion that she can only now do just mild sedentary type activities up to 6 hours a day." See Kirkpatrick 0139 (NB 11).  In his August 27, 1998, office notes, Dr. Mendelsohn stated that Kirkpatrick "is not able to return to work at this point and will never be able to return to

---

[9]Because Kirkpatrick was in the "any occ" phase, the relevant inquiry under the Hourly LTD Plan was not whether Kirkpatrick could return to Champion, but, rather, whether Kirkpatrick could return to work at any occupation.  See Plan 0060 (NB 66).

any heavy lifting, carrying, straining type activities such as she had at Champion." <u>See</u> Kirkpatrick 0140 (NB 11).

252.    Kirkpatrick also submitted to the Plan a letter dated November 30, 1998, in which she stated that "I have no formal education, do not know the first thing about computers. I'm not dumb, but I do have a hard time consternation.  I live by myself so I do not have anyone that helps me." <u>See</u> Kirkpatrick 0141 (NB 11).  Kirkpatrick did not submit any documentation relating to her vocational abilities.

253.    The Plan then commissioned Vocational Counselor Jennifer Mikeska, MRC, to conduct a Transferable Skills Analysis ("TSA") to aid its review of Kirkpatrick's claim for continuing LTD benefits.  The Vocational Counselor evaluated Kirkpatrick's work history, education, and medical limitations.  By report dated December 8, 1998, the Vocational Counselor concluded that Kirkpatrick had transferable skills and that there were several occupational titles within Kirkpatrick's previous work field that Kirkpatrick could perform that were within her sedentary restrictions.  <u>See</u> 0143-0146, 0147-0166 (NB 11).

254.    Prior to the Claims Review Committee's deliberations, the Plan also commissioned a Peer Review Analysis to evaluate the previous denial of Kirkpatrick's claim for continuing LTD benefits.  <u>See</u> Kirkpatrick 0167 (NB 11).  The Peer Review Analysis was performed by Alan Marks, M.D., a rheumatologist.  Dr. Marks reviewed the clinical documentation submitted to him and recommended that the Plan uphold the previous denial of Kirkpatrick's claim for LTD benefits.  Dr. Marks concluded that Kirkpatrick "should be able to

perform sedentary work with a restriction of no repetitive bending or lifting." See Kirkpatrick 0167 (NB 11).

255.    On December 11, 1998, the Claims Review Committee met and discussed Kirkpatrick's claim for benefits.  After the Committee reviewed Kirkpatrick's file and discussed its contents, it voted to uphold the denial of Kirkpatrick's claim for LTD benefits. See CRC 1933, 1934-1935, 1937-2106 (NB 12).[10]

256.    In reaching it decision to uphold the denial of Kirkpatrick's LTD claim, the Committee relied on the following information:

> "On 3/24/94 and 4/30/96, Dr. Mendelsohn, Ms. Kirkpatrick's doctor, stated that she could do light sedentary work.  On 5/5/98, Dr. Beavers, of CORE, talked with Dr. Mendelsohn, who said that there are 'no objective findings to suggest she is totally disabled and that she could do sedentary work, 6 hours/day, 5 days/week.  On 7/6/98, Dr. Mendelsohn stated that Ms. Kirkpatrick 'can only now do just mild sedentary type activities up to 6 hours a day."  On 8/27/98, he further stated that 'Patient is not able to return to work at this point and will never be able to return to any heavy lifting, carrying, straining type activities such as she had at Champion. A Transferable Skills analysis identified various other job she could perform."

See CRC 0705 (NB 12).

257.    On January 29, 1999, the Plan notified Kirkpatrick that the Claims Review Committee had denied her claim for continuing LTD benefits.  See Kirkpatrick 0286-0287 (NB 12).

---

[10]The Chair of the Committee ordered that a copy of the documentation relative to the requests for review previously distributed to the Committee, be filed with the minutes of the meeting.  See CRC 21-23, 1933, 1934-1935, 1937-2106 (NB 12).

258.    On February 2, 2001, which was over two years after the Plan denied Kirkpatrick's appeal, Kirkpatrick's legal counsel requested the Plan to "reconsider[] . . . the decision to deny [Kirkpatrick's] benefits."  See Kirkpatrick 0168 (NB 31).  Kirkpatrick's counsel submitted medical and other information to International Paper which they alleged supported Kirkpatrick's claim for LTD benefits.  See Kirkpatrick 0168-0284 (NB 31).

**Lois Lynn's Claim for Benefits**

259.    Plaintiff Lois Lynn ("Lynn") worked as a salaried employee at Champion International's facility in Canton, North Carolina.  Her date of hire was February 1, 1977, and her last day of active employment was December 31, 1991.  See Lynn 0358 (NB 13).

260.    The last position Lynn held with Champion International prior to qualifying for disability benefits was that of an Executive Secretary.  See Lynn 0357 (NB 13).

261.    Between January 1, 1992, and June 29, 1992, Lynn received short-term disability benefits from Champion International.  See Lynn 0358 (NB 13).

262.    As a Champion employee, Lynn was eligible to apply for long-term disability income ("LTD") benefits under the Salaried LTD Plan.

263.    Lynn applied for LTD benefits and described her condition as "bronchiectasis with recurrent, drug resistant infections."  See Lynn 0356 (NB 13).  See also Lynn 0184 (June 22, 1992, attending physician statement diagnosing Lynn with "bronchiectasis, bilaterally productive since childhood, status post resection left lower lobe and right middle lobe of lung, chronic bronchitis, and chronic peptic ulcer disease"), 0183 & 0185 (correspondence from treating physician)(NB13).

264.    On August 26, 1992, the Plan notified Lynn that it had approved her application for LTD benefits, effective August 23, 1992.  See Lynn 0361 (NB 13).  The Plan advised Lynn that her "LTD benefits may continue for 24 months provided you are wholly and continuously disabled and are unable to perform each and every duty of your job."  See Lynn 0361-0362 (NB 13).  The Plan also informed Lynn that:

> "[a]fter the first 24 months, benefits will continue up to your retirement date only if you are under the regular care of a licensed and qualified physician and are unable to work at any job, within the Company or elsewhere, for which you are reasonably qualified by your education, training, or experience."

See Lynn 0361 (NB 13).[11]

265.    Pursuant to the terms of the Salaried LTD Plan, Lynn's right to continuing LTD benefits depended on certification of Lynn's continuing disability, and the Plan continued to evaluate Lynn's claims on a periodic basis.  See Lynn 0190-196, 0197-0216, 0277-0290, 0328-0339, 0340-0348, 0365-0368, 0370-371, 0429, 0478-0485 (NB 13).

266.    On June 17, 1997, and August 1, 1997, Champion's Disability Management Program requested additional personal profile and medical information from Lynn to facilitate the Plan's periodic review of Lynn's claim for continuing LTD benefits.  See Lynn 0375-0377 (NB 13).

---

[11]The Plan estimated Lynn's net monthly benefit from the Salaried LTD Plan to be $912.51.  See Boone 0361 (NB 13).  This benefit calculation included an estimated Social Security benefit offset of $984.00.  See Lynn 0361-363 (NB 13).  The Social Security Administration initially denied Lynn's claim, but, upon reconsideration, granted her monthly benefits in the amount of $931.00.  See Lynn 0349-0350, 0189 (NB 13).  Lynn's net monthly LTD benefit then was adjusted to $978.51, through the date of her normal retirement on August 1, 2001.  See Lynn 0424-0427 (NB 13).

267.     By this time, Lynn was in the more stringent "any occ" period as defined by the Salaried LTD Plan.

268.     In response, Lynn submitted a Personal Profile Evaluation dated July 16, 1997, describing her present physical complaints and limitations as "frequent respiratory infections requiring antibiotics and bed rest; chronic fatigue, shortness of breath."  See Lynn 0213-0216 (NB 13).  Lynn indicated that her daily activities consisted of the following:

> "When I do not have an active infection I am able to do light housework, some shopping, and limited visiting with friends and family.  I continue at least 30 minutes of walking on a flat surface at least 12 times a month for exercise.  Most of my time is spent reading and crocheting."

See Lynn 0213 (NB 13).  In this evaluation, Lynn answered that she did not expect to return to either her last occupation or any occupation.  See Lynn 0215 (NB 13).

269.     Lynn also submitted an Attending Physician Statement from Robert Boerner, M.D., who failed to complete the restrictions and limitations part of the Statement and merely noted "pt 100% disabled due to lung disease."  See Lynn 0514 (NB 13).  Lynn also submitted an incomplete Physician's Report of Physical Capacity from Dr. Boerner that only noted "patient 100% disabled due to lung disease" in the margin and failed to provide any of the requested physical capacity information.  See Lynn 0217-0218 (NB 13).

270.     On August 26, 1997, CORE requested Dr. Boerner to send to the Plan "the last six months of office notes, including test results and consultations."  See Lynn 0381 (NB 13).  In response, Dr. Boerner forwarded his office notes dated December 11, 1996 and June 25, 1997.  See Lynn 0384-0385 (NB 13).  According to Dr. Boerner's June 25, 1997, office note,

Lynn was stable, had little wheezing, had a clear sinus drain, and a cough.  See Lynn 0384

(NB 13).

271.    On September 8, 1997, while reviewing Lynn's continuing entitlement to LTD

benefits under the "any occupation" definition of disability, Dr. Beavers, the Medical Director

for Champion's Disability Management Program, spoke with Dr. Boerner and Lynn's primary

care physician, Dr. Freeman.  Dr. Beavers noted:

> "According to Dr. Boerner, her pulmonologist, he Sees her twice a year and she doesn't
> look that sick when he Sees her, though she complains of frequent upper respiratory
> infections.  When asked about disability he was very reluctant to give an opinion
> saying that he can't comment and hasn't been looking at her from that point of view.
> He suggested I talk to her primary care physician, Dr. Nancy Freeman.  Dr. Freeman
> said she has no true disabling condition and can do sedentary work.  She has takes [sic]
> antibiotics when she gets infections but her pulmonary function has been stable.  Her
> pulmonary impairment was described as a moderate obstruction."

See Lynn 0219 (NB 13).  Based on this information, Dr. Beavers recommended that the Plan

not certify Lynn's claim for continuing disability benefits because "neither physician is

supporting her claim.  Her pulmonary function impairment does not suggest disability from

any occupation.  There is no subjective data that suggests she is disabled from any

occupation."  See Lynn 0219 (NB 13).

272.    CORE then contacted Dr. Freeman, Lynn's primary care physician, and

requested that she complete a Modification Checklist outlining Lynn's current work capacity.

See Lynn 0379-0380 (NB 13).  Dr. Freeman responded on September 10, 1997, and verified

that Lynn could return to work with modifications on September 11, 1997.  See Lynn 0225

(NB 13).  Dr. Freeman certified that Lynn could work 6-8 hours per day, 5 days per week,

with a modification of "sedentary job only."  Dr. Freeman gave Lynn lifting restrictions of

paper work only, walking restrictions of "for personal needs only," sitting restrictions of 6-8

hours, and standing restrictions of 15-20 minutes at a time.  See Lynn 0225 (NB 13).  Dr.

Freeman noted that Lynn could not work in an area with high humidity or dust.  See Lynn

0225 (NB 13).  Dr. Freeman provided no restrictions to Lynn's use of her upper or lower

extremities.  See Lynn 0225 (NB 13).

273.    On January 19, 1998, the Plan notified Lynn that it was terminating her LTD

benefits.  The Plan informed Lynn that she "was not disabled as defined in the Plan" because

"Dr. Nancy Freeman has released you to work 6-8 hours per day at a sedentary job."  See Lynn

0226-0227 (NB 13).  The Plan notified Lynn of her right to appeal the decision and enclosed a

copy of the Appeal Rights & Process.  See Lynn 0027 (NB 13).

274.    On January 20, 1998, Lynn wrote to Dr. Freeman advising her that Champion

International was terminating her LTD benefits on Dr. Freeman's recommendation that Lynn

was able to return to work.  Lynn asked Dr. Freeman to reconsider that recommendation.  She

stated in her letter to Dr. Freeman that, "since you [Freeman] do not treat my primary

problems, I feel that perhaps you were a little premature with your determination."  See Lynn

0410-0411 (NB 13).

275.    On February 17, 1998, Lynn requested a review of the Plan's decision to

discontinue her LTD benefits.  Lynn enclosed a letter from her current pulmonary doctor,

Harry J. Lipham, M.D., dated February 3, 1998, which advised Lynn that he had reviewed her

history and exam, gone over her lung functioning tests, and chest x-rays, etc. and finds that she

has a "significant degree of bronchiectasis with frequent and recurrent infections that are

inadequately controlled and serve as an ongoing source of disability." <u>See</u> Lynn 0460-0462

(NB 13). Dr. Lipham further opined that "the exposure of the person [with bronchiectasis] in

the workplace to ambient viruses causes progression of their bronchiectasis disease and thus

someone with your degree of bronchiectasis should be disabled to prevent progression of their

disease." <u>See</u> Lynn 0462 (NB 13). Lynn had just begun <u>See</u>ing Dr. Lipham, so there were no

supporting physician notes enclosed. <u>See</u> Lynn 0462 (NB 13).

     276. On April 7, 1998, the Plan notified Lynn that it had scheduled her for an

Independent Medical Examination ("IME") with James McCarrick, M.D., a pulmonary

medicine specialist. The IME was scheduled for May 5, 1998. <u>See</u> Lynn 0397 (NB 13).

     277. Dr. McCarrick reviewed Lynn's medical records and, on May 5, 1998,

conducted an IME of Lynn. <u>See</u> Lynn 00465-0476 (NB 13). According to Dr. McCarrick,

Lynn "related at this time she experiences shortness of breath with any incline. She does,

however, perform gardening tasks and can walk on flat surfaces ad lib." <u>See</u> Lynn 0465 (NB

13). Dr. McCarrick further noted:

> "She has a cough productive [sic] occasional yellowish or white phlegm. She was
> recently placed on cycling antibiotics by Dr. Harry Lipham of Waynesville, utilizing
> ciprofloxacin and bactrim for the first ten days of each month. Since that time three
> and a half months ago, she has not sustained any further lung infections and is actually
> feeling better."

<u>See</u> Lynn 0466 (NB 13). From this examination and history, Dr. McCarrick stated that:

> "[i]t is my impression that the patient does have clinically significant bronchiectasis.
> Clearly, this is a progressive disease which has a progressive nature to it. Although her
> symptoms are not consistent with typical items that we search for assessing impairment

73

> such as pulmonary function studies and general performance, it should be commented that she is at increased risk for developing infections on exposure to various populations. These infections could be potentially significant in her case, and it is likely that she would require more antibiotic care and increased hospitalization is she had them."

See Lynn 0468 (NB 13). From this impression, Dr. McCarrick ultimately concluded "I am unable to determine any other factors which would preclude her from going to work." See Lynn 0468 (NB 13).[12] See also Lynn 0320 (NB 13).

278.     On May 26, 1998, the Plan asked Dr. McCarrick to clarify the results of his IME. See Lynn 0413 (NB 13). In response, Dr. McCarrick verified that Lynn was not at a significantly higher risk of infection from working in a sedentary job than she is from her usual daily activities. He confirmed that Lynn is able to work at least six hours per day, five days per week in a sedentary capacity. See Lynn 0321 (NB 13).

279.     CORE also commissioned Jennifer Mikeska, MRC, to perform a Transferable Skills Analysis ("TSA") of Lynn. The purpose of the TSA was to evaluate Lynn's education and work history to determine if Lynn had transferable skills given the restrictions defined by Dr. Freeman and Dr. McCarrick. The TSA revealed that Lynn had transferable skills and that, even given her medical restrictions, could perform numerous jobs. See Lynn 0322-0323 (NB 13).

---

[12]Prior to the IME, the Plan requested Dr. McCarrick to "examine the patient with special attention to the condition of 'bronchiectasis' and any other complaints the patient has within your specialty." The Plan advised Dr. McCarrick that the purpose of the IME was to "determine if the patient is medically ABLE OR NOT ABLE to perform the essential duties required by ANY OCCUPATION." See Lynn 0398 (NB 13).

280.    On June 10, 1998, CORE recommended "upholding the previous denial of LTD benefits based on the TSA and the IME physician's statement that he believes the employee is able to work at least 6 hours per day, 5 days per week in a sedentary capacity."  See Lynn 0233 (NB 13).  CORE noted Dr. Freeman's initial determination that Lynn was able to return to work 6-8 hours per day, 5 days per week and Dr. McCarrick's concurrence with that assessment during his IME of Lynn.  See Lynn 0231-0233 (NB 13).

281.    On July 7, 1998, the Plan advised Lynn that the Plan was treating her February 17, 1998, letter as an initial claim under ERISA and further advised Lynn that, "[b]ased on the review by CORE, our decision is to uphold the denial of LTD benefits."  See Lynn 0236-0238 (NB 13).  The Plan informed Lynn that the Plan

> "reviewed the documentation provided by you from Dr. Harry Lipham.  As a result of this information you were sent for an Independent Medical Exam on 5/5/98 with Dr. James McCarrick.  Dr. McCarrick states 'that you do have a clinically significant degree of bronchiectasis.'  However, it is of his opinion that you are able to work at least 6 hours per day, 5 days per week in a sedentary capacity.  Therefore, you do not meet the definition of disability as defined in the Plan."

See Lynn 0236 (NB 13).  The Plan also advised Lynn of her rights to obtain further review of her claim.  See Lynn 0237 (NB 13).

282.    On July 23, 1998, Lynn appealed the denial of her claim for continuing LTD benefits.  She "enclosed copies of documents previously sent to Ms. Dixon," but did not provide any additional clinical information in support of her appeal.  See Lynn 0457-0459 (NB 13).

283.    On August 3, 1998, the Plan notified Lynn that the Plan's Claims Review Committee would consider her appeal at its September 24, 1998, meeting.  See Lynn 0489-0490 (NB 13).  The Plan advised Lynn that the Committee's review of her claim would constitute her last appeal and would be "final and binding."  The Plan invited Lynn to submit any additional documentation to support her claim that she is totally disabled and cannot engage in any work at all.  See Lynn 0489-0490 (NB 13).

284.    On August 17, 1998, Lynn sent a letter to the Plan, and an August 11, 1998, statement from her physician, Harry Lipham, M.D., in which he reported that

> "Lois Lynn has 'a significant degree of bronchiectasis with frequent and recurrent infections that are inadequately controlled and serve as an ongoing source of disability. In addition, the exposure of the person in the work place to ambient viruses causes progression of their bronchiectasis disease and thus someone with your degree of bronchiectasis should be disabled to prevent progression of their disease."

Lynn 0245 (NB 13).  Lynn also attached medical documentation from Dr. Hapke that had previously been provided to the Salaried LTD Plan.

285.    Lynn also submitted an August 24, 1998, statement signed by Dr. McCarrick in which he stated that he had been "misquoted in Mary Lynn Dixon's letter to Lois Lynn on July 7, 1998."  According to Dr. McCarrick, he "did not say Lois Lynn could 'work 6 hours per day, 5 days per week in a sedentary capacity.'"  See Lynn 0491-0492 (NB 13).

286.    On September 24, 1998, the Claims Review Committee discussed Lynn's appeal of the denial of her claim for LTD benefits.  After the Committee reviewed Lynn's file and discussed its contents, it voted to "table its decision pending receipt of a report from

CORE resolving contradictions in the statements from Dr. McCarrick, the Independent

Medical Evaluator."  See CRC 0706 (NB 14).[13]

287.    Dr. Beavers then contacted Dr. McCarrick by telephone on October 1, 1998,

and reported that "Dr. McCarrick says that he has not changed the opinion he expressed on his

IME and follow-up letters.  That opinion is that she is not totally disabled.  He has told her this

frankly."  See Lynn 0156 (NB 13).  See also Lynn 0176 (NB 13).

288.    The Plan then asked CORE to verify in writing whether Dr. McCarrick wished

to retract his August 24, 1998, statement in light of his October 1, 1998, conversation with Dr.

Beavers during which Dr. McCarrick stated that Lynn was not totally disabled.  See Lynn

0158-0160 (NB 13).

289.    In response to CORE's inquiry, Dr. McCarrick again confirmed, in writing, that

Lynn "can" work at least 6 hours per day, 5 days per week in a sedentary capacity.  See CRC

1298-1299 (NB 14).

290.    At its November 13, 1998, meeting, the Claims Review Committee again

discussed Lynn's claim for LTD benefits.  See CRC 1346-1348 (NB 14).  After the Committee

reviewed Lynn's file, discussed its contents, and verified that Dr. McCarrick's apparent

contradictions were clarified, it voted to uphold the denial of Lynn's claim.  See CRC 1346-

1347 (NB 14).

_____

[13]The Chair of the Committee "ordered that a copy of the documents relative to the
requests for review previously distributed to the Committee, as well as Transferable Skills
Analyses brought to the meeting, be filed with the minutes of the meeting."  See CRC 0704,
1211-1345 (NB 14).

291.    In deciding to deny Lynn's appeal and deny her claim for LTD benefits, the

Committee relied on the following information:

"On 9/9/97, Dr. Beavers from CORE had a conversation with Dr. Freeman, Ms. Lynn's
primary care doctor.  Dr. Freeman stated that Ms. Lynn "has no truly disabling
condition and could do sedentary work."  Her pulmonary impairment was described as
a moderate obstruction.

An Independent Medical Examination dated 5/5/98 performed by Dr. McCarrick, a
pulmonologist, indicated that Ms. Lynn has clinically significant bronchiectasis, but he
was unable to determine any other factors which would preclude her from going to
work.  An IME Addendum Form dated 5/26/98 stated that she is not at a higher risk of
infection from working in a sedentary job and that she could return to work for at least
6 hours per day, 5 days per week in a sedentary capacity.  The letter from Dr.
McCarrick dated 8/24/98 caused the Committee to table its decision pending a
definitive statement relative to her employability.  CORE received a statement from Dr.
McCarrick that Ms. Lynn can work at least 6  hours per day, 5 days per week in a
sedentary capacity.

A Transferable skills analysis identified various jobs that Ms. Lynn might perform."

See Lynn 1347-1348 (NB 14)

292.    On November 30, 1998, the Plan notified Lynn that the Claims Review

Committee met on November 13, 1998, to consider the appeal of her denial of benefits under

the Salaried LTD Plan and had concluded that the denial of benefits should be upheld.  See

Lynn 0151-0152 (NB 14).

293.    On September 10, 1999, approximately nine months after the final denial of

Lynn's claim, Lynn's current legal counsel notified Champion International that they had been

retained by Lynn concerning her claim for LTD Benefits.  They requested Lynn's claims file

and copies of the plan documents.  See Lynn 0445 (NB 32).

294.    The Plan and Champion International complied with Lynn's counsel's request for information.  <u>See</u> Lynn 0443, 0440, 0437-0438 (NB 32).

295.    On December 28, 2000, which was more than two years after the final claims denial and more than one year after the Plan and Champion International complied with Lynn's counsel's request for information, Lynn's counsel requested the Plan to "reconsider[] . . . the decision to terminate [Lynn's] benefits."  <u>See</u> Lynn 0132 (NB 32).  Lynn's counsel submitted to International Paper medical and other information they alleged supported Lynn's claim for benefits.  <u>See</u> Lynn 0132-0150, 0556, 0561-1043 (NB 32).

### Celia Metcalf's Claim for Benefits

296.    Plaintiff  Celia D. Metcalf ("Metcalf") worked as an hourly employee at Champion International's facility in Canton, North Carolina.  Her hire date was April 23, 1979, and her last day of active employment was April 13, 1997.  <u>See</u> Metcalf 0006, 0026 (NB 15).

297.    The last position Metcalf held with Champion prior to qualifying for short-term disability benefits was rewinder assistant.  <u>See</u> Metcalf 0038 (NB 15).

298.    Metcalf received short-term disability benefits under Champion International's Short-Term Disability Plan from April 16, 1997, until October 12, 1997.  <u>See</u> Metcalf 0003 (NB 15).

299.    As a Champion International employee, Metcalf was eligible to apply for LTD benefits under the Hourly LTD Plan.

300.    On October 8, 1997, Champion's Disability Management Program notified Metcalf that she might be eligible for LTD benefits and requested that she provide certain

information to CORE as soon as possible "to avoid delays or interruptions in your benefit."

<u>See</u> Metcalf 0017 (NB 15).

301.    On October 9, 1997, Metcalf submitted a Disability Request Form on which she

stated that she was filing for a "temporary disability" and described condition as a "heal spur."

<u>See</u> Metcalf 0018 (NB 15).

302.    Metcalf also submitted a Personal Profile Evaluation dated October 12, 1997,

wherein she described her complaints as:

> "neck and shoulder pain going into the arms and hands, degenerative disc disease phase
> II, lumbar pain, fibromyalgia (1979), depression because of constant pain, osteoporosis
> [sic](Jan 08, 1997), broken wrist (Dec. 7, 1996), compressed fractures in neck T2 T3
> (Jan 08, 1997), surgery on heel spur . . . heel spur, right foot.  Plantar fascia—surgery
> on both feet 4-13-97 and 5-1-97, bulging disc –L4 L5.  Pain in both feet, left hip,
> shoulders and neck.  Have trouble standing, climbing steps . . . ."

<u>See</u> Metcalf 0020 (NB 15).  Metcalf stated that she did not need any special care of her

personal needs "other than taking extra time in doing things."  <u>See</u> Metcalf 0020 (NB 15).

Metcalf also confirmed on this evaluation that "I have been released to go back to work by Dr.

Osbahr but Gerald Ray says he cannot meet my restrictions 1. No lift > 45 lbs. no overhead >

35 lbs 2.carry 40 lbs. 3. push/pull 65 lbs."  <u>See</u> Metcalf 0022 (NB 15).

303.    Metcalf also submitted an Employee Statement dated October 21, 1997, <u>See</u>

Metcalf 0026-0029 (NB 15), and a Physician's Report of Physical Capacity from Al Osbahr,

M.D., dated October 17, 1997.  <u>See</u> Metcalf 0024-0025 (NB 15).  According to Dr. Osbahr's

Physician's Report of Physical Capacity, Metcalf had certain restrictions related to bending

over, twisting, reaching above shoulder level (overhead limit 35 lbs), and lifting (no more than

25 lbs continually and 26-50 lbs 33-66% of the time), but could work seven to eight hours per day.  <u>See</u> Metcalf 0025 (NB 15).

304.    Metcalf also submitted a November 5, 1997, Attending Physician's Statement from Dr. Osbahr in which he noted that Metcalf had an MRI performed in 1997 demonstrating a compressed fracture of the T2 and T3, suffered from osteoporosis, a lumbar disc bulging and a heel spur.  <u>See</u> Metcalf 0031 (NB 15).  Dr. Osbahr stated that Metcalf was disabled from her own occupation but was not totally disabled from any occupation.  <u>See</u> Metcalf 0032 (NB 15).

305.    On November 19, 1997, the Plan notified Metcalf that her claim for LTD benefits had been approved.  The Plan advised Metcalf that to "qualify for the first 24 months of Long Term Disability benefits, you must be under the regular care of a physician and your physician must certify that you are unable to perform any part of your regular job" – the "own occupation" phase.  <u>See</u> Metcalf 0036 (NB 15).  The Plan also advised Metcalf that "in order for your Long Term Disability benefits to continue beyond 24 months, you must be considered totally and permanently disabled.  This means you are unable to do any job for which you are reasonably qualified by your training, education, and experience" – the "any occupation" phase.  <u>See</u> Metcalf 0036 (NB 15).  <u>See</u> also Metcalf 0035 (CORE's recommendation that Metcalf's claim for LTD benefits be approved)(NB 15).

306.    On September 24, 1998, Dr. Beavers, the Medical Director of the Champion International Disability Management Program, spoke by telephone with Steven Mendelsohn, M.D., <u>See</u> Metcalf 0060 (NB 15), one of Metcalf's treating physicians.  During that conversation, Dr. Mendelsohn stated that Metcalf "could do sedentary work but he doesn't

think she will ever be able to return to full duty again." See Metcalf 0060 (NB 15). Because Metcalf was still in the "own occupation" period of disability benefits, Dr. Beavers recommended that the Plan continue LTD benefits "for one year. She can return to work at sedentary work only." See Metcalf 0060 (NB 15).

307.     As Metcalf approached the expiration of her "own occupation" period of benefits, the Plan began to gather information to determine whether Metcalf could satisfy the more stringent "any occ" or "any occupation" disability definition; thereby entitling Metcalf to continuing LTD benefits. See Metcalf 0064-0066, 0073-0074 (NB 15).

308.     In August and September 1999, Metcalf submitted Personal Profile Evaluations in which she indicated that "Dr. Mendelsohn states that I will not be returning to full or part time to any job due to muscle weakness and fatigue." See Metcalf 0075-0078 (NB 15). She described fibromyalgia, depression, bulging disc at the L4-5, compression fracture at T2-3, degenerative disc disease, osteoporsis and midline disc bulges L5-S1 as the basis for her disability. See Metcalf 0075 (NB 15). See also Metcalf 0067-0070 (NB 15).

309.     In September and October 1999, Metcalf's treating physician, Dr. Mendelsohn, completed Attending Physician Statements in which he stated that Metcalf was totally disabled. He diagnosed Metcalf with "CTD, Generalized OA and fibromyalgia" and noted that her condition had not regressed or improved. See Metcalf 0071-0072 (NB 15). See also Metcalf 0079-0080 (NB 15).

310.     Dr. Beavers, the Plan's physician consultant, then reviewed Metcalf's claim for benefits under the "any occ" definition. See Metcalf 0082 (NB 15). On October 20, 1999, Dr.

Beavers spoke again by telephone with Dr. Mendelsohn; this time to determine whether Metcalf satisfied the more stringent "any occupation" definition of total disability which now governed Metcalf's LTD benefits.  According to Dr. Mendelsohn, Metcalf "is not totally disabled but continues to be able to do sedentary work."  See Metcalf 0082 (NB 15).

311.    On that same day, October 20, 1999, Dr. Mendelsohn verified in writing that "Celia Metcalf may work with the above restriction" – that is, "sedentary work only."  See Metcalf 0081 (NB 15).

312.    Dr. Beavers recommended that Metcalf's LTD benefits be terminated based on the "any occupation" definition "because there is no objective medical substantiation of disability and no disabling provider."  See Metcalf 0082 (NB 15).

313.    On October 26, 1999, CORE commissioned Lisa Bossardt, a Vocational Rehabilitation Consultant, to perform a Vocational Rehabilitation Analysis of Metcalf.  The purpose of Ms. Bossardt's evaluation was to assess Metcalf's education and work history to determine if Metcalf has transferable skills given the restrictions defined by Dr. Mendelsohn. See Metcalf 0083-0089 (NB 15).

314.    Ms. Bossardt, noting that Metcalf's functional capacity included a permanent restriction of sedentary work, performed both a Vocational and a Transferable Skills Analysis. In her report dated November 1, 1999, Ms. Bossardt concluded that "it appears that there are suitable employment opportunities for Ms. Celia Metcalf within her Sedentary Duty physical capacity and geographic area.  Potential wages in these employment options range from $6.00

to $8.00 per hour as determined by contact with the North Carolina Employment Security Commission."  See Metcalf 0090-0097 (NB 15).

315.    On November 15, 1999, CORE recommended to the Plan that Metcalf's LTD benefits be terminated effective November 13, 1999.  CORE cited and relied on, *inter alia*, Dr. Mendelsohn's opinion that Metcalf could do sedentary work, and the vocational analysis indicating there were suitable work opportunities for Ms. Metcalf within her sedentary duty physical capacity.  See Metcalf 0099-0101 (NB 15).

316.    On November 15, 1999, the Plan notified Metcalf that her claim for continuing LTD benefits had been terminated because Metcalf was not disabled as defined by the Plan. See Metcalf 0102-0103 (NB 15).  The Plan cited Dr. Mendelsohn's opinion that Metcalf was capable of performing sedentary duty work and the Transferable Skills Analysis which indicated there were suitable employment opportunities for her within her sedentary duty and physical capacity limitations.  The Plan advised Metcalf that she had a right to appeal the decision and enclosed a copy of the applicable appeal procedures.  See Metcalf 0102-0105 (NB 15).

317.    By letter dated December 6, 1999, Metcalf requested that the Plan review her claim for LTD benefits, but did not provide any additional information regarding her claim. See Metcalf 0107 (NB 15).

318.    On December 13, 1999, the Plan acknowledged Metcalf's request for review and advised her that the Plan was "willing to consider any additional information which would

support a change in [its] decision." See Metcalf 0108 (NB 15). On January 7, 2000, the Plan Supervisor denied Metcalf's claim for continuing benefits. See Metcalf 0112 (NB 15).

319.    Metcalf then sent three letters to the Plan in which she advised the Plan that she was "still having the same symptoms and problems of the fibromyalgia that I have had for nearly twenty years. The muscle fatigue and constant pain are with me every day. They do not ever leave. I feel that I still have the inability to perform duties required by any employer, as my whole body is affected." She advised the Plan that she had spoken with Dr. Mendelsohn on December 28, 1999, and was advised that "Champion does not have any sedentary work." She stated that her "status has not changed from the beginning of my disability. It was approved in the beginning and Social Security has approved my disability. I am requesting a review and will be Seeing my family doctor for a further examination." Metcalf did not submit any other information in support of her claim for benefits. See Metcalf 0109-0112 (December 17, 1999, letter); Metcalf 0113 (January 17, 2000, letter); Metcalf 0114-0115 (March 6, 2000, letter).

320.    On March 8, 2000, the Plan notified Metcalf that her claim had been referred to the Plan's Claims Review Committee for review, that she would be notified of the date when the Committee was scheduled to meet and discuss her claim. The Plan reiterated the language of the Hourly LTD Plan and informed Metcalf that this definition required her to "be unable to use [her] skills to work at any job, not just [her] former job with Champion" to continue to receive LTD benefits. See Metcalf 0116 (NB 15). The Plan invited Metcalf to forward, no

later than April 3, 2000, any documentation or evidence supporting her claim that she is totally disabled and unable to engage in any work at all. <u>See</u> Metcalf 0116 (NB 15).

321.    By letter dated April 12, 2000, Metcalf's legal counsel contacted the Plan and, on Metcalf's behalf, requested an extension of time for submitting materials concerning Metcalf's condition. <u>See</u> Metcalf 0117 (NB 15). The Plan granted Metcalf's counsel's request.

322.    On May 4, 2000, Metcalf forwarded to the Plan a letter written by Erich G. Buehler, M.D., of Waynesville Family Practice. Dr. Buehler reported that he evaluated Metcalf in his office on March 20, 2000, and concluded that "because of her significant wrist and arm tendonitis, she is currently unable to participate in any work or occupation and is at this point totally disabled." <u>See</u> Metcalf 0119-0120 (NB 15).

323.    On May 31, 2000, Metcalf's legal counsel requested another extension of time for submitting materials concerning Metcalf's claim for benefits. <u>See</u> Metcalf 0121 (NB 15).

324.    The Plan notified Metcalf's counsel that he had until June 6, 2005, to submit additional information because the Claims Review Committee was scheduled to meet on June 15, 2000, to review Metcalf's claim. <u>See</u> Metcalf 0122 (NB 15).

325.    On June 5, 2000, Metcalf's counsel submitted to the Plan medical records from Blue Ridge Bone & Joint Clinic, Haywood Regional Medical Center, Harris Regional Hospital, Dr. Coy Brown, Dr. J Thomas, Asheville Arthritis Center, Waynesville Family Practice, Smoky Mountain Foot Clinic, William B. Owen, Junaluska Orthopaedics, Midway Medical Center, and Paul Stapf. <u>See</u> Metcalf 0123-0414 (NB 15).

326.    The majority of the materials submitted by Metcalf's counsel either were previously submitted by Metcalf or irrelevant to Metcalf's medical condition at the time the Plan denied her claim for continuing LTD benefits in November of 1999.  See Metcalf 0123-0414 (NB 15).

327.    For instance, in the records submitted from Paul Stapf, P.C., Mr. Stapf stated that "I have not examined/treated this individual since 1992 and really have no idea of her present health status."  See Metcalf 0126 (NB 15).  The documents Metcalf submitted from the Blue Ridge  Bone and Joint Clinic were mostly dated 1994 and centered on  Metcalf's initial fibromyalgia symptoms.  See Metcalf 0158-0167 (NB 15).  There was one medical note dated July 1, 1997, that discussed plantar fascias of both her feet but that was irrelevant to the time period of the LTD denial.  See Metcalf 0166-0167 (NB 15).

328.    According to the records from Waynesville Family Practice and Dr. Buehler, Metcalf first saw Dr. Buehler on November 19, 1999, which was four days after the Plan denied her claim for continuing LTD benefits.  Those records demonstrate the following:

a.    Dr. Buehler's office notes dated November 19, 1999, indicate that Metcalf "presents with a chief complaint of swelling at the base of her neck 2 days with trouble moving her neck.  This came on fairly suddenly 2 days ago, hasn't really improved any."  Dr. Buehler noted that her examination revealed spasm of the muscles in the neck worse on the left than the right and he prescribed Daypro.  See Metcalf 0128 (NB 15).

b.      Dr. Buehler examined Metcalf on January 19, 2000, for tingling and pain in Metcalf's left hand going into her arm.  He noted that "her grip was getting worse.  She has a little bit of a problem on the right hand but not as severe.  She used to work at Champion, doing a lot of repetitive motion.  She's been disabled for 3 years with fibromyalgia, however."  <u>See</u> Metcalf 0128 (NB 15).  Dr. Buehler further noted that Metcalf has "no visible deformity or swelling or redness however. Strength otherwise fairly normal in the upper extremities, no abnormal neurologic function noted otherwise."  <u>See</u> Metcalf 0129 (NB 15).  He diagnosed Metcalf with carpal tunnel syndrome and mild des Quervain's tenosynovitis, placed her in a left-handed cockup splint to wear at night, and increased her dosage of Vioxx.  <u>See</u> Metcalf 0129 (NB 15).

c.      Metcalf then saw Dr. Buehler for a follow-up visit on February 17, 2000, where he noted that Metcalf's "wrist is perhaps a little bit better, but not significantly so."  An examination of her wrist revealed continued tenderness and mild swelling with minimal erthema" and he asked Metcalf to come back in 3-4 weeks for a follow-up visit.  <u>See</u> Metcalf 0129 (NB 15).  It was during this follow-up visit on March 20, 2000, that Dr. Buehler noted that Metcalf "is being denied for her disability insurance claim and requests that I write a letter.  I will do this stating that she is currently totally disabled because of her baseline medical condition as well as that of her hands, although this disability may not be permanent."  <u>See</u> Metcalf 0133 (NB 15).  There is no indication in these notes that Dr. Buehler reviewed the definition of total

88

disability when making his assessment nor is there any indication in the record that Dr. Buehler ever treated Metcalf for her "baseline medical condition." See Metcalf 0127-0135 (NB 15).

        d.      On April 24, 2000, Dr. Buehler examined Metcalf for a follow-up on hypertension and pain in her bowels.  He noted "hypertension, now well-controlled."  Metcalf 0135 (NB 15).  There is no indication in the record that Dr. Buehler ever treated Metcalf after this April  24, 2000, visit.  See Metcalf 0135 (NB 15).

      329.     Metcalf's legal counsel also submitted office notes from J. Thomas McClure, M.D., of Mountain Orthopedic dated February 23, 2000, which was three months after Champion denied LTD benefits.  See Metcalf 0136-0138 (NB 15).  Dr. McClure's office notes on this same date verify that Metcalf "complains of approximately a five-year progressive history of pain in her left wrist and thumb.  This is located mainly around the base of the thumb.  It does radiate up the arm some.  She notes this is worse with activity.  She has mainly an aching-type pain with stiffness in her thumb."  Dr. McClure diagnosed Metcalf with degenerative joint disease of the carpometacarpal articulation in the left thumb and possible carpal tunnel syndrome, talked to her about the possibility of injecting Metcalf's thumb joint, and noted that Metcalf "is not really having severe pain at the current time."  He then placed her in a carpometacarpal thumb fit band.  See Metcalf 0137-0138 (NB 15).  There is no evidence in the record that Metcalf was treated by Dr. McClure after this February 23, 2000, office visit.

330.    Metcalf's counsel also submitted office notes from Dr. Mendelsohn which were not initially reviewed by the Plan or the Plan's consultants. <u>See</u> Metcalf 0148-0155 (NB 15). These notes demonstrate the following:

       a.    On June 29, 1998, Dr. Mendelsohn noted "Patient with a smoldering CTD and fibromyalgia who is continuing to have increasing whole body pain, aching, soreness, stiffness, and feelings of frustration.  Her husband has not been particularly supportive."  Dr. Mendelsohn's impression was that Metcalf had smoldering CTD which is behaving like SLE complicated now more by arthralgia and fibromyalgia.  He recommended a follow-up visit in three months. <u>See</u> Metcalf 0148 (NB 15).

       b.    On September 28, 1998, while Metcalf was still under the "own occupation" period of LTD benefits, Dr. Mendelsohn made the notation that "we discussed long-term disability.  The patient is clearly not to the point where she could return to gainful employment at Champion, and I suggested she apply for long-term disability." <u>See</u> Metcalf 0149.  Metcalf returned to Dr. Mendelsohn on November 30, 1998.  He noted there was increasing fibromyalgia soreness, encouraged Metcalf to engage in more exercise, and noted a follow-up visit in three months. <u>See</u> Metcalf 0150 (NB 15).

       c.    On March 1, 1999, Dr. Mendelsohn examined Metcalf and reported that:

> "patient with a generalized OA fibromyalgic condition who continues to have a multitude of symptoms, mostly recently with tiredness and fatigue to the point where her face and jaw get tired with just eating.  She has an upcoming disability hearing and can feel a fair amount of stress with the above.  She is

still quite sore overall but is taking no anti-inflammatory or analgesic
medications . . . ."

See Metcalf 0151 (NB 15).  Dr. Mendelsohn prescribed Celebrex, a long acting

analgesic, and indicated that he would See her in three months.  That follow-up visit on

June 1, 1999, did not indicate any significant change in Metcalf's condition.  See

Metcalf 0152 (NB 15).

     d.    Dr. Mendelsohn examined Metcalf again on September 20, 1999, and

noted that Metcalf was "pertinent for mild degenerative changes throughout the upper

and lower extremities.  Muscles around the neck, shoulders, low back girdle area are

somewhat tight and stiff on ROM with tender spots throughout.  However, I can

appreciate no warmth or erythema about the joints and no significant loss of [range of

motion]."  See Metcalf 0153 (NB 15).

     e.    Dr. Mendelsohn also made a note that, on October 19, 1999, "Dr.

Beavers called advising about [Metcalf's] work capacity.  I feel she could do sedentary

work if she was inclined and such work was available."  See Metcalf 0153 (NB 15).

     f.    Metcalf returned to See Dr. Mendelsohn on December 28, 1999.  In his

office notes, Dr. Mendelsohn reports:

"Pertinent for moderate degenerative changes about the upper and lower
extremities.  She has no warmth about the joints.  Although her hips are more
sore than usual they have good [range of motion].  Appreciated no deformities.
She has no localizing weakness or neurologic deficits ***but pain far in excess of
findings***.

See Metcalf 0154 (emphasis added)(NB 15).  Dr. Mendelsohn noted that he "discussed about long term disability as she does not qualify under the present Champion guidelines.  She will need to find some form of gainful employment that she can do in a sedentary way."  See Metcalf 0154 (NB 15).

       g.     On March 30, 2000, Dr. Mendelsohn examined Metcalf again and noted that he "tried to encourage her to be as active as she is comfortable getting back to some sedentary type activity if she can find gainful employment.  Unfortunately jobs have been quite limited with her background."  See Metcalf 0155 (NB 15).

331.    The remaining medical records submitted by Metcalf's counsel either were irrelevant to, or did not support her claim for LTD benefits.

       a.     All documents from Haywood Regional Medical Center/Occupation Health Services are dated 1996 and refer to Metcalf's previous symptoms of fibromyalgia which necessitated Champion International placing her on restricted duty.  See Metcalf 0168-0187 (NB 15).  Of particular note are Metcalf's Functional Capacity Test results dated December 3, 1996, which indicated that "testing suggests that the patient perceives herself as rating below a sedentary physical demand level which is inconsistent with her actual performance."  See Metcalf 0179 (NB 15).

       b.     All documents from Harris Regional Hospital were dated 1997 and referred to Metcalf's endoscopic plantar fasciotomy on both feet, which are irrelevant to Metcalf's denial of LTD benefits.  See Metcalf 0188-0206 (NB 15).

      c.      All documents from Dr. Coy Brown, Optometrist, related to Metcalf's vision and were irrelevant to Metcalf's denial of continuation of LTD Benefits. <u>See</u> Metcalf 0207-0210 (NB 15).

      d.      All documents from Banks Smokey Mountain Foot Clinic were dated 1996 and 1997 and referred to Metcalf's endoscopic plantar fasciotomy on both feet. <u>See</u> Metcalf 0211-0257 (NB 15). According to a September 12, 1997, office note, Metcalf presented "90% relieved of right heel pain and 100% left" and was subsequently discharged from the Foot Clinic's care. <u>See</u> Metcalf 0257 (NB 15). Therefore, these documents also were irrelevant to Metcalf's medical condition at the time the Plan denied her claim for continuing LTD benefits.

      e.      All documents from William B. Owen, Jr., M.D. (that were not Haywood County Hospital) were dated 1995 and 1996 and refer to a twisted knee and pain in Metcalf's right wrist caused by a fall. <u>See</u> Metcalf 0258-0264 (NB 15).

      f.      All documents from Junaluska Orthopaedics were dated 1993 and 1994 and refer to back pain. <u>See</u> Metcalf 0265-0271 (NB 15).

      g.      All documents from Midway Medical Center range from 1978 to 1998 and are either irrelevant to Metcalf's present condition or are copies of medical documents from Metcalf's other medical providers which previously were provided to the Plan. <u>See</u> Metcalf 0272-0412 (NB 15).

332.    On June 7, 2000, Jerome Siegal, M.D., a medical consultant retained by CORE, reported that he had reviewed all case notes, medical records, and progress notes and

concluded that "there is no objective medical substantiation for total disability after 11/13/99" and that "there is no information to indicate an objective basis that the patient is unable to perform sedentary work.  There has been no trial or attempt at sit down work noted."  See Metcalf 0413-0414 (NB 15).

333.    On June 13, 2000, Metcalf's counsel forwarded additional medical records to the Plan from Dr. Leonard Verges and Mission St. Joseph's Hospital and requested that such medical records be included in the materials to be reviewed by the Plan's Claims Review Committee.  See Metcalf 0418-0482 (NB 15).

334.    On June 14, 2000, CORE informed the Plan that it had reviewed the additional medical records submitted by Metcalf's counsel, but "the newly submitted information does not impact the original denial of 11/13/99, as the information does not support a total disability at the time of the 11/13/99 denial."  See Metcalf 0483 (NB 15).

335.    On June 15, 2000, the Plan's Claims Review Committee discussed Metcalf's appeal of the denial of her claim for continuing LTD benefits.  After the Committee reviewed Metcalf's file and discussed its contents, it voted to uphold the denial of Metcalf's claim for continuing LTD benefits.  See CRC 2456-2459, 2460-2943 (NB 16).[14]

336.    In reaching its decision to uphold the denial of Metcalf's LTD claim, the Committee relied on the following information:

---

[14]The Chair of the Committee "ordered that a copy of the documentation relative to the requests for review previously distributed to the Committee be filed with the minutes of the meeting."  See CRC 2456, 2460-2943 (NB 16).

"On 10/20/99, Dr. Beavers spoke with Metcalf's physician, Dr. Mendelsohn, who stated

that she 'is not totally disabled but continues to be able to do sedentary work . . . there is no significant new finding that would disable her.'  Dr. Beavers recommended not to certify disability from any occupation.  LTD benefits were denied based on Dr. Mendelsohn's release.

On appeal Ms. Metcalf and her attorney, Robert Elliott, submitted additional medical information.  SCORE reviewed the information, and a Peer Review Analysis determined that 'There is no objective medical substantiation for total disability after 11/13/99 . . . There is no information however to indicate on an objective basis that the patient is unable to perform sedentary work.'  In addition, SCORE stated that most of the medical information submitted predated Ms. Metcalf's dates of disability and did not impact the original denial of benefits on 11/13/99.

SCORE's Vocational Analysis Report identified various jobs that Ms. Metcalf might perform."

See CRC 2456-2457 (NB 16).

337.    On June 16, 2004, the Plan notified Metcalf that the Claims Review Committee met on June 15, 2000, to consider her claim for LTD benefits and decided to uphold the denial of her claim.  See Metcalf 0528-0529 (NB 15).

338.    On August 10, 2000, Metcalf's counsel requested copies of Metcalf's claims file and the plan documents.  See Metcalf 0484 (NB 33).

339.    The Plan and Champion International complied with Metcalf's counsel's request for plan and claim information.  See Metcalf 0002, 0486 (NB 33).

340.    On February 20, 2001, which was eight months after the Claims Review Committee denied Metcalf's appeal and claim for benefits, Metcalf's current counsel requested the Plan to "reconsider[] . . . the decision to terminate [Metcalf's] benefits."  See Metcalf 0487

(NB 33).  Metcalf's counsel submitted medical and other information to International Paper

they alleged supported her claim for benefits.  See Metcalf 0484-0286, 2, 0487-0526 (NB 33).

**Wilson McClure's Claim for Benefits**

341.    Plaintiff Wilson Daniel McClure ("McClure") worked as a Maintenance

Supervisor at Champion International's facility in Canton, North Carolina.  McClure's last day

of active service was February 1, 1989.  See McClure 0017, 0021 (NB 17).

342.    McClure began receiving short-term disability benefits under Champion

International's short-term disability plan on February 1, 1989.  See McClure 0021 (NB 17).

343.    As a Champion International salaried employee, McClure was eligible to apply

for disability income benefits pursuant to the Salaried LTD Plan, and his application for LTD

benefits was approved in August 1989.  See McClure 0022 (NB 17).

344.    As part its periodic review of McClure's disability status, the Plan scheduled

McClure for an Independent Medical Examination ("IME") on July 15, 1996, with C. Ruffin

Stephenson, M.D., of Greenville, South Carolina.  See McClure 0013 (NB 17).

345.    McClure refused to submit to the examination.  On June 28, 1996, the Plan

contacted McClure and notified him that, pursuant to the terms of the Plan, his refusal to

cooperate would result in the termination of his LTD benefits, effective August 1, 1996.  See

McClure 0013 (NB 13).

346.    McClure eventually complied with the Plan's request and submitted to the IME.

Dr. Stephenson reviewed McClure's medical records, including x-rays, and, on July 15, 1996,

examined McClure.  See McClure 0014-0018 (NB 17).

347.     During the examination, McClure reported that he "had pain in his right knee" that "ultimately spread to a fairly generalized pain in the upper and lower extremities primarily affecting the hands . . . ."  Dr. Stephenson's review of McClure's x-rays showed "normal sacroiliac, hips, hands and feet."  See McClure 0014-0016 (NB 17).  Dr. Stephenson's physical exam revealed tenderness in McClure's ankle and "slight restriction in lateral flexion to the right and left" in his cervical spine.  Dr. Stephenson's examination also indicated that McClure's "[e]lbows, wrists, MCP's and IP's look normal  . . . ," "grip strength Seems to be fairly good" and "hips are normal."  See McClure 0017 (NB 17).

348.     Based on his physical examination of McClure and his review of McClure's medical records, Dr. Stephenson noted that there was no evidence of "rheumatoid disease . . . nor any definite evidence of spondyloarthropathy . . . ."  Dr. Stephenson concluded that McClure could not perform the duties of his Maintenance Supervisor position but stated McClure would "certainly. . . be able to do some type of sedentary work or desk job, particularly one where he could get up and move around when his back gets stiff and sore, and would allow him such freedom as that."  See McClure 0017-0018 (NB 17).

349.     On October 16, 1996, the Plan notified McClure that, based on the results of Dr. Stephenson's IME, the Plan was terminating his LTD benefits because he was not disabled as defined by the Plan.  The Plan also informed McClure of his right to request a review of this decision.  See McClure 0023-0025 (NB 17).  See also McClure 0021-0023 (NB 17).

350.     On December 13, 1996, McClure's former legal counsel requested review of the Plan's determination.  He outlined McClure medical history, including treatment by Donald L.

Mullis, M.D., Kate T. Queen, M.D., and E.B. Goodwin. M.D.  He also submitted the Social

Security Administration's decision granting McClure's claim for disability income benefits.[15]

See McClure 0027-0029 (NB 17).

351.    On January 6, 1997, the Plan notified McClure that it was treating his counsel's

December 13, 1996, letter as an initial claim for benefits, and that he would receive a response

to his claim within ninety days unless special circumstances required an extension of time to

180 days.  The Plan also invited McClure to provide any additional information he wished to

submit for review.  See McClure 0030 (NB 17).

352.    McClure did not offer any additional information in support of his claim for

benefits.

353.    After viewing the documentation submitted by McClure and comparing the

information to the results of the IME, the Plan decided to uphold the denial of the McClure's

claim for LTD benefits.  See McClure 0031 (NB 17).

354.    On April 9, 1997, the Plan notified McClure of its decision to deny his claim

for LTD benefits.  The Plan informed McClure that it had based its decision on the results of

the IME which indicated that he "would be able to do some type of sedentary work or desk job

. . ." and the May 9, 1994, examination notes of McClure's treating physician Dr. Queen which

indicated that McClure had the physical capacity to perform other types of work other than the

---

[15]On February 28, 1993, McClure filed for disability income benefits with the U.S.
Social Security Administration.  On January 26, 1995, the Social Security Administration
granted his claim for benefits, effective February 1, 1989.  See McClure 0002-0006 (NB 17).

job he was performing at Champion International. The Plan also informed McClure that he had sixty days to appeal the Plan's determination. <u>See</u> McClure 0032-0034 (NB 17).

355.    On July 1, 1997, McClure's counsel notified the Plan Supervisor that he had received the Plan's April 9, 1997, denial of McClure's claim for LTD benefits. He indicated that he was in the process of collecting medical information and requested an additional sixty days to collect such records. <u>See</u> McClure 0035 (NB 17).

356.    More than fifteen months later, by letter dated October 19, 1998, McClure's counsel contacted the Plan Supervisor to inquire about the status of McClure's claim. According to McClure's counsel, he "ha[d] been informed by [McClure] that [the Plan had] received various additional medical evidence regarding [McClure's] claim for long term disability benefits following the decision of April 9, 1997." McClure's counsel inquired as to whether the Plan ever had "receive[d] additional medical evidence in the form of documents from Mr. McClure." <u>See</u> McClure 0036 (NB 17).

357.    The Plan Supervisor investigated the suggestion that McClure had submitted additional materials and, on November 16, 1998, informed McClure's counsel that the Plan had never received any additional information from or on behalf of McClure. <u>See</u> McClure 0036 (NB 17).

358.    McClure never appealed the denial of his claim for benefits.

359.    One year later, by letter dated November 22, 1999, McClure's current legal counsel, informed Champion International that they had been consulted by McClure regarding

his claim for LTD benefits, and requested McClure's claims file and copies of the Plan documents.  See McClure 0279 (NB 34).

360.    The Plan complied with McClure's counsel's request and  sent to them copies of McClure's claims file and relevant plan documents.  See McClure 0277, 0276, 0272 (NB 34).

361.    On July 3, 2000, McClure filed suit in the General Court of Justice Superior Court Division, Forsyth County, North Carolina.  See McClure 0071-0076 (NB 34).  McClure later voluntarily dismissed that suit.

362.    On December 28, 2000, which was more than three and one-half years after the Plan denied his initial claim and invited him to seek a review of that denial, McClure's counsel requested the Plan to "reconsider[] . . . the decision to terminate [McClure's] benefits." McClure's counsel submitted to International Paper medical and other information they alleged supported McClure's claim for benefits.  See McClure 0080-0270 (NB 34).

### Charles Reece's Claim for Benefits

363.    Plaintiff Charles R. Reece ("Reece") worked as an Oiler Mechanic at Champion International's facility in Canton, North Carolina.  His date of hire was January 27, 1969.  See Reece 0002 (NB 18).

364.    Reece's last day of active service was June 26, 1995.  See Reece 0004 (NB 18). Between June 27, 1995 and January 24, 1996, Reece received short-term disability benefits from Champion International.  See Reece 0002 (NB 18).

365.    As a Champion International hourly employee, Reece was eligible to apply for disability income benefits pursuant to the Hourly LTD Plan.

366.    Champion International submitted an LTD Claim Form on Reece's behalf to Traveler's Insurance Company, which, at that time, served as the third-party claims processor for the Hourly LTD Plan.  Reece listed "congestive cardiomyopathy" as the cause of disability. See Reece 0004 (NB 18).

367.    On January 25, 1996, the Plan notified Reece that his application for LTD benefits had been approved.  The Plan further informed Reece that it would

> "continue to certify your workplace absence by contacting your physician provider to obtain current medical information. You will also be contacted periodically by a CORE Service Representative to discuss your daily routine and current medical situation."

See Reece 0071 (NB 18).

368.    As part of its periodic review of Reece's disability status, the Plan contacted Reece on December 30, 1997, and requested that he update his medical information by providing a Personal Profile Evaluation, Authorization for Release of Information, Attending Physician Statement, and Physician's Report of Physical Capacity or Psychiatric Functional Capacity Evaluation.  See Reece 0079 (NB 18).

369.    Reece completed his Personal Profile Evaluation on February 14, 1997.  See Reece 0101-0104 (NB 18).  In the Evaluation, Reece noted that he did not know whether he would return to his former occupation as a mechanic.  Reece also indicated that he did not

intend to return to another occupation on a full or part-time basis due to his belief because of his "health reasons another Co. or facility will not hire me."  See Reece 0103 (NB 18).[16]

370.    Reece also submitted a February 5, 1997, Attending Physician Statement prepared by Cardiologist Gutuam K. Patel, M.D..  Dr. Patel indicated that Reece's condition had "improved" but that it was "unknown" whether Reece would be able to return to work.  See Reece 0082 (NB 18).  Dr. Patel further indicated in his Physician's Report of Physical Capacity that Reece was currently capable of working zero hours per day.  See Reece 0083-0084 (NB 18).  Dr. Patel also referred Reece to Robert Hanich, M.D., for a second opinion on Reece's condition.  See Reece 0038-0041 (NB 18).

371.    Dr. Hanich examined Reece and determined that Reece had "class II congestive heart failure."  See Reece 0040 (NB 18).  In addition to various medications, Dr. Hanich recommended that Reece engage in a "regular walking program."   See Reece 0040-0041 (NB 18).

372.    As Reece approached the conclusion of his "own occupation" benefits period, the Plan began to collect information to determine whether Reece could satisfy the more stringent "any occ" or "any occupation" disability definition.  For example, in order to fully evaluate whether Reece was disabled from any occupation, the Plan referred Reece's claim for

---

[16]In an additional Personal Profile Evaluation submitted on December 8, 1997, Reece indicated that he did not expect to return to work or some other type of occupation on full or part-time basis because "nothing is available at this time."  See Reece 0111, 0109-0112 (NB 19).

LTD benefits to Chester Conrad, M.D., a cardiologist, for a Peer Review Analysis.  See Reece

0119-0121 (NB 18).

373.    Dr. Conrad  reviewed Reece's December 8, 1997, Personal Profile Evaluation,

the December 9, 1997, Attending Physician Statement, and the December 11, 1997,

Physician's Report of Physical Capacity.  Dr. Conrad also spoke with Doug Burnett, P.A.,

Reece's attending health care provider.  Based on his review, Dr. Conrad reported that "there is

no clear evidence that the patient's functional impairment would preclude him from

performing any occupation."  See Reece 0120-0121 (NB 18).  According to Dr. Conrad,

Reece's attending health care provider

> "indicated that [Reece] has been clinically stable, with no recent overt heart failure . . .
> that [Reece] would be considered Class II (i.e. comfortable at rest, with slight
> limitation of physical activity, and some symptoms with ordinary activity) . . . [and]
> that [Reece] would probably not be capable of doing work involving heavy physical
> exertion, [but] could likely do work that was largely sedentary."

See Reece 0121 (NB 18).

374.    On February 6, 1998, the Plan asked Reece's healthcare provider to confirm that

Reece "could do sedentary work."  See Reece 0122 (NB 18).  In response, Reece's healthcare

provider completed a Modification Checklist on which he indicated that Reece could work

eight hours per day five days per week; lift up to twenty five pounds; walk two blocks; sit,

stand and change positions as needed; and climb two flights of stairs.  The Modification

Checklist further indicated that Reece could perform sedentary work.  See Reece 0123 (NB

18).  Vladimir Curkovik, M.D., later verified the Modification Checklist.  See Reece 0127 (NB

18).

375.    On July 1, 1998, the Plan scheduled Reece for an Independent Medical Examination ("IME") with Michael Keogh, M.D., a cardiologist in Clyde, North Carolina.  <u>See</u> Reece 0131-0132 (NB 18).

376.    Dr. Keogh reviewed Reece's medical records, including a radiology diagnostic report, a report from Dr. N.V. Patel, and a report from Dr. Hanich, and, on July 30, 1998, examined Reece.  <u>See</u> Reece 0133-0134 (NB 18).  Based on his review and examination, Dr. Keogh concluded that Reece had "class two congestive heart failure due to nonischemic dilated cardiomyopathy" and that Reece "is capable of performing some occupation."  <u>See</u> Reece 0134 (NB 18).  Dr. Keogh's report further indicated that Reece preferred to try to return to his previous occupation and that Dr. Keogh thought that this would be "okay" for Reece. <u>See</u> Reece 0134 (NB 18).

377.    Dr. Keogh also completed a Modification Checklist on which he indicated that Reece could work six to eight hours per day, four to five days per week; lift up to ten pounds; and walk, sit, stand and change positions "as needed."  <u>See</u> Reece 0135 (NB 18).  Dr Keogh further opined in an addendum to his IME report that Reece could "work at least 6 hours per day 5 days per week."  <u>See</u> Reece 0139 (NB 18).

378.    To further assist in determining whether Reece was disabled from performing any occupation, the Plan commissioned Jennifer Mikeska, MRC, to perform a Transferable Skills Analysis.  <u>See</u> Reece 0143-0144 (NB 18).

379.    By report dated October 5, 1998, Ms. Mikeska concluded that Reece does have "transferable skills that are vocationally appropriate and applicable to the same occupational

category as well as to others" and that "[t]hese skills should enable him to return to the working community."  <u>See</u> Reece 0143 (NB 18).

380.    On October 9, 1998, the Plan notified Reece that it was terminating his LTD benefits on the grounds that he was not disabled as defined by the Plan.  The Plan also informed Reece that he had the right to appeal the denial of his claim for LTD benefits.  <u>See</u> Reece 0153-0154 (NB 18).  The Plan notified Reece that, effective December 31, 1998, his LTD benefits would terminate.  <u>See</u> Reece 0155 (NB 18).

381.    On December 4, 1998, Reece's former legal counsel requested the Plan to review the termination of Reece's LTD benefits.  <u>See</u> Reece 0157 (NB 18).

382.    In order to evaluate Reece's request for reconsideration, the Plan submitted Reece's claim to Gerald Evans, M.D., for a Peer Review Analysis.  After the completion of his review, Dr. Evans, a cardiologist, concluded that the claim denial should be upheld.  Dr. Evans found Dr. Keogh's IME report to be "detailed and specific" and agreed that Reece "should be able to work at least 6 hours per day, 5 days per week and over time increase that to 8 hours per day." <u>See</u> Reece 0159, 0160-0162 (NB 18).

383.    On March 15, 1999, Reece's legal counsel notified the Plan that Reece disagreed with the conclusions of the Transferable Skills Analysis.  More specifically, Reece's counsel did not believe Reece had the training or experience for the jobs selected.  <u>See</u> Reece 0163 (NB 18).

384.    On March 24, 1999, the Plan notified Reece that based on the Plan's "any occupation" disability definition, the Plan had upheld the denial of his claim for LTD benefits.

The Plan reiterated that the IME physician, Dr. Keogh, "determined that [Reece] was capable of working 6 hours per day, 5 days per week with restrictions. Therefore, [Reece] does not meet the definition of disability as defined in the Plan." See Reece 0164-0165 (NB 18). The Plan informed Reece of his right to appeal this adverse benefits decision. See 0165 (NB 18).

385.   On May 27, 1999, Reece's former legal counsel appealed to the Plan's Claims Review Committee the Plan's decision to uphold the denial of his LTD benefits. See Reece 0166-0167 (NB 18). Reece submitted a report from Bruce Holt, R.N., Certified Case Manager, Certified Life Care Planner, of Armstrong & Associates, Inc. Mr. Holt reviewed Reece's medical records and recommended "another opinion with a cardiologist, outside of Haywood County, to include a current echocardiogram to evaluate left ventricular ejection fraction, cardiac efficiency, ability to undertake physical activities, and definition of physical demand level of work." See Reece 0171 (NB 18). Mr. Holt's recommendation was based, in part, on the fact that it had "been almost a year since Mr. Reece's last examination." See Reece 0170 (NB 18). Mr. Holt did not offer any rationale for his belief that Reece should be examined by a cardiologist "outside of Haywood County."

386.   The Plan acknowledged receipt of Reece's appeal and informed Reece that the Plan's Claims Review Committee would meet on September 9, 1999, to review his claim. See Reece 0278-0279 (NB 18). The Plan also invited Reece to submit any additional documentation or evidence showing that Reece is "totally disabled and unable to engage in any work at all." See Reece 0279 (NB 18).

387.    The Claims Review Committee discussed Reece's claim for benefits at its September 9, 1999, meeting.  See CRC 2263-2265 (NB 19).  The Committee reviewed Reece's claims file and all information submitted by Reece and his counsel, including, the January 23, 1998, Peer Review analysis which "found there was no clear evidence that Mr. Reece's functional impairment would preclude him from performing any occupation"; the March 31, 1998, Modification Checklist prepared by Reece's health care provider noting Reece "may work 8 hours/day, 5 days/week in a sedentary job"; Dr. Keogh's July 20, 1998, IME report in which he stated that Reece "is capable of performing some occupation and is not disabled from all employment"; Dr. Keogh's Modification Checklist in which he indicated that Reece could work six to eight hours per day; the Transferable Skills Analysis which identified various jobs that Mr. Reece could perform; and Reece's Notice of Award from the Social Security Administration.[17]  See CRC 2266-2441 (NB 19).

388.    During the meeting, the Committee examined this information against the Plan's definition for Total Disability and voted to uphold the denial of benefits.   See CRC 2263-2265 (NB 19).[18]

389.    On September 14, 1999, the Plan notified Reece's legal counsel that his appeal had been denied.  The Plan notified Reece's counsel that the Committee's actions represented

---

[17]On June 22, 1996, the United States Social Security Administration notified Reece that his application for Social Security disability income benefits had been approved. The Social Security Administration concluded that Reece became disabled effective June 28, 1995, and was eligible for payment beginning in December 1995.  See Reece 0076-0078 (NB 18).

the "final appeal as required by Section 503 of the Employee Retirement Income Security Act of 1974." <u>See</u> Reece 0275-0276 (NB 18).

390.    On October 11, 1999, Reece's current legal counsel informed Champion International that they had been consulted by Reece regarding his claim for LTD benefits, and requested Reece's claims file and copies of the Plan documents. <u>See</u> Reece 0181 (NB 35).

391.    The Plan complied with Reece's counsel's request and sent to them copies of Reece's claims file and the relevant plan documents. <u>See</u> 0179, 0178, 0173 (NB 35).

392.    More than one year later, on December 29, 2000, Reece's counsel requested the Plan to "reconsider[] . . . the decision to terminate [Reece's] benefits." <u>See</u> Reece 0185 (NB 35). Reece's counsel submitted to International Paper medical and other information they alleged supported Reece's claim for benefits. <u>See</u> Reece 0185-0274 (NB 35).

**Harry Smith's Claim for Benefits**

393.    Plaintiff Harry L. Smith ("Smith") worked as a Recovery Supervisor-Shift Foreman at Champion International's facility in Canton, North Carolina. Smith's date of hire was January 10, 1969. <u>See</u> Smith 0005 (NB 20).

394.    Smith's last day of active employment was May 23, 1993. <u>See</u> Smith 0005 (NB 20). Smith began receiving short-term disability benefits from Champion International on May 20, 1993. Those benefits terminated on November 15, 1993. <u>See</u> Smith 0002 (NB 20).

---

[18]The Chair of the Committee "ordered that a copy of the documentation relative to the requests for review previously distributed to the Committee be filed with the minutes of the

395.    As a Champion International salaried employee, Smith was eligible to apply for disability income benefits pursuant to the Salaried LTD Plan.

396.    On October 7, 1993, Champion International advised Smith that he might be eligible for LTD benefits, See Smith 0039-0040 (NB 20), and a Champion International benefits administrator subsequently submitted an LTD Claim Form on Smith's behalf.  The LTD Claim form listed Smith's "back" as the cause of disability.   See Smith 0043 (NB 20). Smith's Statement of Claim form, dated October 29, 1993, indicated that the nature of his illness was "Disk Rupture and Spinal Stenosis."  See Smith 0050-0051 (NB 20).

397.    On December 22, 1993, the Plan notified Smith that his application for LTD benefits had been approved effective November 16, 1993.  See Smith 0079-0080 (NB 20). The Plan notified Smith that "in order to continue receiving Long Term Disability benefits, you must be totally disabled as defined by the policy"; that after the first 24 months he needed to be considered "totally and permanently disabled" or "unable to do any job for which [he was] reasonable qualified by [his] training, education and experience"; and, that approval of his claim would terminated when he is "no longer disabled as defined in the plan."  See Smith 0080 (NB 20).

398.    Smith's monthly benefit was $3,278.33.  See Smith 0081 (NB 20).

399.    On April 18, 1994, the U.S. Social Security Administration notified Smith that his application for Social Security disability income benefits had been approved, effective May 19, 1993.  In its Notice of Award, the Social Security Administration noted that the "doctors

meeting."  See CRC 2263, 2266-2441 (NB 19).

and other trained personnel who decided that you are disabled expect your health to improve. Therefore, we will review your case in February 1995. . . ." See Smith 0101-0103 (NB 20).[19]

400.    On June 1, 1995, the Plan notified Smith that in order to receive benefits beyond November 16, 1995, he would have to be "totally disabled from any occupation" as provided by the Plan. See Smith 0130 (NB 20).

401.    On January 30, 1997, as part of its periodic review of Smith's disability status, the Plan requested that Smith provide a Personal Profile Evaluation, Authorization for Release of Information, Attending Physician Statement and Physicians Report of Physical Capacity or Psychiatric Functional Capacity Evaluation. See Smith 0145 (NB 20). See also Smith 0146, 0147 (NB 20).

402.    As part of the review, the Plan's consulting physician interviewed Smith on March 3, 1997. Smith reported that he had "good days and bad days" and that his condition was "worse in colder weather." See Smith 0143 (NB 20). Smith also reported in his Personal Profile Evaluation that he did not feel he would be "physically able to hold down a full or part time Job or my Past Job or Any Job at this time." See Smith 0153 (NB 20).

403.    The Plan's consulting physician also interviewed the physicians who Smith had identified as his treating physicians: Dr. Culclasure (on April 7, 1997) and Dr. Shields (on April 23, 1997). See Smith 0143 (NB 20). Dr. Culclasure reported that he saw Smith once

---

[19]As a result of his receipt of Social Security benefits, Smith's benefit pursuant to the Plan was reduced to $2,079.33, effective June 1, 1994. See Smith 0105-0109 (NB 20). Effective September 1, 1994, Smith's LTD benefit pursuant to the Plan was reduced further to

and couldn't make any comments about his alleged disability.  See Smith 0143 (NB 20).  Dr. Shields reported that Smith has several significant problems, but could not "confirm or deny [that Smith] is disabled from any occupation."  Dr. Shields felt that a formal work capacity evaluation should be done to clarify Smith's disability status.  See Smith 0143 (NB 20).  Dr. Culclasure agreed that a Functional Capacity Evaluation ("FCE") was necessary to determination Smith's restrictions.  See Smith 0159 (NB 20).

404.    After speaking with Smith's treating physicians and reviewing Smith's records, the Plan's consulting physician noted that Smith "clearly has many problems and has been out of work for a long time. Though there is not enough objective evidence to certify disability from any occupation at this time, an FCE might make this clearer."  See Smith 0168 (NB 20). Therefore, on July 11, 1997, the Plan scheduled Smith for an Independent Medical Examination ("IME") with Peter G. Johnson, M.D., of Clyde, North Carolina.  See Smith 0184 (NB 20).

405.    Dr. Johnson reviewed Smith's medical history and examined Smith on August 4, 1997.  In his IME report, Dr. Johnson stated that Smith had a "failed back syndrome" and he concluded that Smith was at maximum medical improvement.  See Smith 0187-0188 (NB 20). Dr. Johnson recommended an FCE to "give additional information to determine Mr. Smith's functional status" and, specifically, whether Smith had "any work capacity at the sedentary or light physical demand level."  See Smith 0188 (NB 20).

---

$1,480.33 per month because one of his dependents also had been approved for Social Security benefits.  See Smith 0114-0118 (NB 20).

406.    Pursuant to Dr. Johnson's recommendation, the Plan contacted Smith's treating physician Dr. Charles Shields, and requested a prescription for an FCE.  Dr. Shields agreed and referred Smith to Registered Physical Therapist Susan Kimel at Haywood Rehabilitation Center in Clyde, North Carolina.  See Smith 0190-0191, 0213 (NB 20).

407.    The FCE of Smith was conducted on September 25, 1997, and September 26, 1997.  See Smith 0191, 0191-0207 (NB 20).  At the conclusion of the testing and evaluation, Ms. Kimel concluded that Smith was "able to work at the LIGHT Physical Demand Level for an 8 hour day."  See (NB 20).

408.    Dr. Johnson, the IME physician, then reviewed the FCE Report.  Dr. Johnson then opined that Smith could "work full time in the Light Physical Demand Level . . . ."  See Smith 0210 (NB 20).

409.    On October 29, 1997, the Plan notified Smith that it was terminating his LTD benefits.  Based on its review of Dr. Johnson's IME report, the Plan concluded that Smith failed to satisfy the Plan's "any occupation" disability definition.  See Smith 0216-0217 (NB 20).  The Plan notified Smith that his LTD benefits would terminate effective November 30, 1997.  See Smith 0219 (NB 20).

410.    On December 5, 1997, Smith's legal counsel requested review of the Plan's decision to terminate Smith's LTD benefits.  See Smith 0220-0221 (NB 20).  Smith requested review of the Plan's decision on the grounds that Smith

> "is, as noted, by his physicians, a failed back syndrome case wherein he has undergone some four (4) back surgeries in order to try and get better. That effort has failed and he lives with continuous pain. He is frequently unable to sleep, much less work. He

averages less than five (5) hours of sleep per night and is on medications to try and assist him to live with the pain."

See Smith 0220 (NB 20).  Smith's counsel also indicated that he would provide the Plan with additional information supporting his appeal on or before January 4, 1998.  See Smith 0221 (NB 20).

411.    On January 2, 1998, Smith submitted x-rays, a  December 17, 1997, Vocational Evaluation commissioned by his counsel and performed by Randy L. Adams, M.Ed., and an evaluation prepared on April 29, 1997, by James C. Johnson, M.D., for the Social Security Administration.  See Smith 0237-0240, 0222-0236, 0241-0247 (NB 20).

412.    Based on a vocational interview and vocational testing of Smith, Mr. Adams opined that Smith was "not employable in any job in the national economy."  See Smith 0234 (NB 20).  Mr. Adams made his determination, in part, on the grounds that Smith "would be limited to unskilled work" because the skills learned in his position as shift supervisor were not transferable; jobs in the clerical area could not be considered due to low academic performance; jobs in the sales category would be greatly limited to simple cashier positions which would not required involved ledger work or balancing of the cash register; jobs in the service category would range in the light to medium physical demand level, requiring the individual to stand and walk for extended periods; and, jobs in the industrial category at the unskilled level would require an individual to remain in static positions for long periods of time.  Mr. Adams also took issue with the FCE performed by the examiner recommended by

Smith's treating physician because the examination only lasted four hours and forty-five minutes.  See Smith 0230, 0231-0233 (NB 20).

413.    Dr. Johnson noted in his report that Smith has "[s]evere degenerative disc disease status post op lumbosacral fusion from L-3 to S-1."  According to Dr. Johnson, Smith had "marked limitation of extension beyond neutral in the standing position and has lost considerable lateral bending, rotation and thoracolumbar flexion . . ."; he had "recurrent leg pain and some intermittent sensory loss in the lateral aspect of his right ankle and foot"; and, "the right lower extremity both at the knee and ankle" are definitely depressed "by comparison with the left side."  See Smith 0174-0175 (NB 20).  Dr. Johnson also noted that Smith had "full range of motion" in the upper extremities; "no muscular problems"; "no neurologic problems"; "full use of his hands with no impairment to perform dexterous movements"; "good ability to grasp and raise his arms over his head"; and "full range of motion in his hips, knees and all joints of the lower extremities."  See Smith 0174 (NB 20).

414.    The Plan forwarded to Dr. Beavers, its consulting physician, for review the information it received from Smith, the September 25, 1997 FCE, and the October 13, 1997 IME report.  See Smith 0248-0250 (NB 20).

415.    Dr. Beavers analyzed the vocational assessment submitted by Mr. Smith, and disagreed with Mr. Adams' view that Smith's age was relevant to his claim for LTD benefits. See Smith 0248 (NB 20).[20]  He also rejected Mr. Adams' view that the FCE was suspect

---

[20]Age is not a factor in either Plan's definition of "disability."  See Plan 0060 (Hourly LTD Plan) & 0014 (Salaried LTD Plan)(NB 20).

because it lasted "only" four hours and forty-five minutes; in Dr. Beavers' view, the FCE "was as thorough an FCE as I have ever Seen." See Smith 0248 (NB 20). Dr. Beavers also disagreed with Mr. Adams' comment that a man of fifty-one years of age could not undertake a new job and learn new skills. See Smith 0248 (NB 20).

416.    Dr. Beavers concluded that he "did not See any information, medical or otherwise, that would justify overturning the denial of the claim that this employee is totally disabled form any occupation." See Smith 0248-0251 (NB 20).

417.    On July 6, 1998, the Plan notified Smith that it upheld the denial of his claim for LTD benefits. See Smith 0253-0255 (NB 20). In reaching this determination, the Plan reviewed Dr. James Johnson's Report, Mr. Adams' Vocational Evaluation, Dr. Charles Johnson's IME and the September 25, 1997 FCE. See Smith 0253 (NB 20).

418.    On September 2, 1998, Smith's legal counsel appealed to the Plan's Claims Review Committee the Plan's termination of Smith's LTD benefits. See Smith 0257-0259 (NB 20).

419.    On November 6, 1998, the Plan notified Smith's counsel that the Plan's Claims Review Committee would review Smith's claim on December 2, 1998, and invited Smith to provide "any new or additional document or evidence that [Smith] is totally disabled and unable to engage in any work at all." See Smith 0262-0263 (NB 20).

420.    On November 23, 1998, Smith submitted additional information for consideration including a letter dated November 19, 1998, from his former treating physician Dr. Culclasure, an office note from Keith M. Maxwell, M.D., and, a November 18, 1998

Electro Diagnostic Consultation Report by Andrew Rudins, M.D.  <u>See</u> Smith 0264-0269 (NB 20)

421.    The office note from Dr. Maxwell indicated the Smith met with him to review his CT myelogram that showed "moderate relatative stenosis at L2/3 secondary to disk protrusion and probably ligament hypertrophy" and "some elements of aracnoiditis." <u>See</u> Smith 0266 (NB 20).  Dr. Maxwell also recommended a nerve conduction study, <u>See</u> Smith 0267 (NB 20), completed on November 18, 1998, by Dr. Rudins.  According to Dr. Rudins

> "there is electrophysiologic evidence for chronic right L5-S1 radiculopathies, though a lumbosacral plexopathy could not be absolutely ruled out.  No abnormal spontaneous activity was present to indicate active denervation, but this can occur with a slowly progressive process, which is likely in this case."

<u>See</u> Smith 0268 (NB 20).

422.    Dr. Culclasure's November 19, 1998, letter noted that he examined Smith and reviewed his medical records.  The records reviewed included Dr. Rudins' nerve conduction study and the vocational evaluation performed by Mr. Adams.  Dr. Culclasure diagnosed Smith with "severe lumbar degenerative disc disease, L5 and S1 radiculopathies and lumbar post-laminectomy syndrome" and opined that Smith was "totally disabled and unable to engage in any occupation or business for wage or profit for which he is qualified by training education or experience." <u>See</u> Smith 0265 (NB 20).

423.    The Claims Review Committee discussed Smith's claim at its December 2, 1997, meeting.  The Committee reviewed Smith's claims file and voted to table its decision pending the completion of a review of Smith's doctors' reports included with a November 23,

1998, letter from Smith's attorney and the results of a Transferable Skills Analysis.  <u>See</u> CRC 1349-1351 (NB 21).[21]

424.     Jennifer Mikeska, MRC, completed the Transferable Skills Analysis on December 5, 1998.  <u>See</u> Smith 0271-0285 (NB 21).  Ms. Mikeska reported that Smith "does have transferable skills that are vocationally appropriate and applicable to the same occupational group and category."  <u>See</u> Smith 0271(NB 21).  According to Ms. Mikeska, Smith's transferable skills should enable [Smith] to return to the work community."  Based on Smith's "employment history with Champion," and, more specifically, Smith's position as a recovery operator helper which he held for twenty-five years at Champion," Ms. Mikeska identified several jobs considered appropriate for Smith.  <u>See</u> Smith 0271-0285 (NB 21).

425.     The Plan then commissioned a Peer Review Analysis of Smith's claim, which was completed on December 10, 1998, by John Nemunaitis, M.D., a Physical Medicine and Rehabilitation Specialist.  <u>See</u> Smith 0286-0287 (NB 20).  Dr. Nemunaitis reviewed, <i>inter alia</i>, Dr. Culclasure's November 19, 1998, letter, Dr. Rudins' November 18, 1998, nerve conduction study, Dr. Maxwell's office notes, the September 25 & 26, 1997, FCE, and the August 4, 1997, IME.  At the conclusion of his review, Dr. Nemunaitis opined that the newly submitted information did not substantiate Smith's claim that he was totally disabled and unable to function at light duty physical demand level.  Dr. Nemunaitis, therefore, recommended that the "earlier determination of denial should be upheld."  <u>See</u> Smith 0287 (NB 20).

---

[21]The Chair of the Committee "ordered that a copy of the documentation relative to the requests for review previously distributed to the Committee be filed with the minutes of the

426.    The Claims Review Committee then reconvened on December 11, 1998, and considered Smith's claim for benefits.  <u>See</u> CRC 0023 (NB 21).  The Committee reviewed Smith's claims file, the information submitted by Smith's counsel, Dr. Nemunaitis' Peer Review Analysis, the Transferable Skills Analysis performed by Ms. Mikeska, Dr. Peter Johnson's IME Report, the September 25, 1997, FCE, Mr. Adams' Vocational Evaluation, Smith's x-rays, Dr. James Johnson's Disability Determination Evaluation, Dr. Culclasure's November 19, 1998, letter, Dr. Maxwell's office note, and Dr. Rudins' Report.  The Committee examined this information against the Plan's definition for total disability and voted to uphold the decision to deny Smith's claim for LTD benefits.  <u>See</u> CRC 1933-1935 (NB 21).

427.    On January 29, 1999, the Plan notified Smith that based on the Plan's "any occupation" disability definition, the Plan upheld the denial of his claim for LTD benefits.  <u>See</u> Smith 0288-0289 (NB 20).

428.    On January 9, 2001, one year after the Plan denied Smith's claim for LTD benefits, Smith's current counsel requested the Plan to "reconsider[] . . . the decision to terminate [Smith's] benefits."  <u>See</u> Smith 0290 (NB 36).  Smith's counsel submitted to International Paper medical and other information they alleged supported Reece's claim for benefits.  <u>See</u> Smith 0290-0589 (NB 36).

### Dolphus Treadway's Claim for Benefits

---

meeting."  <u>See</u> CRC 1349, 1644-1932 (NB 21).

429.    Plaintiff Dolphus L. Treadway ("Treadway") worked as a Chip Deliverer at Champion International's facility in Canton, North Carolina.  He was an hourly employee and his is date of hire was April 17, 1972.  <u>See</u> Treadway 0008 (NB 22).

430.    Treadway's last day of active service was December 20, 1995.  <u>See</u> Treadway 0007 (NB 22).  Treadway was diagnosed with coronary artery disease, <u>See</u> Treadway 0029 (NB 22), and received and exhausted the short-term disability benefits available to him from Champion International.  <u>See</u> Treadway 0029 (NB 22).

431.    As a Champion International hourly employee, Treadway was eligible to apply for disability income benefits pursuant to the Hourly LTD Plan.

432.    Treadway applied for LTD benefits, and, on June 27, 1996, the Plan notified Treadway that his application for LTD benefits had been approved, effective June 19, 1996.  <u>See</u> Treadway 0003-0004 (NB 22).

433.    Treadway's LTD benefit was $556.17 per month.  <u>See</u> Treadway 0003 (NB 22).

434.    When Treadway reached the expiration of his initial "own occupation" period of benefits, the Plan began to collect information to determine whether Treadway could satisfy the more stringent "any occupation" disability definition, thereby entitling Treadway to benefits beyond the initial thirty months of benefits.

435.    In order to assist in this determination, the Plan scheduled Treadway for an Independent Medical Examination ("IME") with Juan L. Aldrich, M.D., FACC, a cardiologist in Hendersonville, North Carolina.  <u>See</u> Treadway 0010-0012 (NB 22).  Dr. Aldrich reviewed

Treadway's medical records, family medical history, medications and, on June 29, 1998, examined Treadway.  See Treadway 0010-0012 (NB 22).  According to Dr. Aldrich

> "the issue at hand is [Treadway's] exercise capacity. He has not returned to work in spite of two stress tests which have revealed reasonable exercise capacity. The second test did reveal a somewhat shorter length of exercise on the same protocol."

See Treadway 0011 (NB 22).  Therefore, Dr. Aldrich recommended "an echocardiogram for left ventricular function and a stress thallium (the same test performed in December 1995)" to address Treadway's condition "precisely."  See Treadway 0012 (NB 22).

436.    Pursuant to Dr. Aldrich's recommendation, the Plan scheduled Treadway for a stress test and an echocardiogram.  See Treadway 0013-0018 (NB 22).  Upon review of the results of the stress test and echocardiogram, Dr. Aldrich concluded that Treadway was "capable of returning back to work" with the restrictions noted in the modification checklist. See Treadway 0022-0023 (NB 22).  The Modification Checklist prepared by Dr. Aldrich indicated that Treadway could work eight hours per day, five days per week, lift up to twenty-five pounds, walk up to one thousand feet, stand for six hours and walk up two flights of stairs. See Treadway 0024 (NB 22).  Dr. Aldrich further noted that Treadway's

> "ability could be even greater with less restriction if some revamping of his medical therapy could be performed. This is primarily based on the fact that this patient began to have burning discomfort in the chest presumably angina pectoris from peri-infarction ischemia at a heart rate of 110 though he was able to increase his rate up to 140 without ischemic electrocardiographic changes.  With higher does of beta blockers, I believe that this patient's subjective discomfort could be lessened and possibly his exercise capacity enhanced further. Even having said this, it is still not clear whether the burning in the chest is truly cardiac ischemia since the EKG revealed no change [and the] thallium scan revealed minimal peri-infarction redistribution which is a very common finding."

120

<u>See</u> Treadway 0022 (NB 22).

437.    To further assist in determining whether Treadway satisfied the "any occupation" disability definition, the Plan commissioned Jennifer Mikeska, MRC, to perform a Transferable Skills Analysis.  <u>See</u> Treadway 0025-0027 (NB 22).  By report dated September 1, 1998, Ms. Mikeska noted that Treadway's transferable skills included comparing, tending and taking instructions-helping.  Ms. Mikeska examined Treadway's employment history and concluded that Treadway "is capable of working as a chip deliverer which is the position he previously held at Champion."  <u>See</u> Treadway 0025 (NB 22).  She also identified several additional jobs considered appropriate for Treadway.  <u>See</u> Treadway 0025-0027 (NB 22).

438.    On September 11, 1998, based on, *inter alia*, the IME report and the Transferable Skills Analysis, the Plan notified Treadway that it was terminating his LTD benefits because he was "[n]ot disabled as defined in the Plan."  <u>See</u> Treadway 0035-0036 (NB 22).  <u>See</u> also Treadway 0029-0031 (NB 22).  The Plan informed Treadway that

> "[t]he final independent Medical Examination determination made after reviewing your 7/23/98 Stress Thallium Test, and your 8/6/98 Echo Cardiogram found you capable of working 8 hours per day, 5 days per week with restrictions of no lifting of more than 25 pounds, and no stair climbing of more than 2 flights, standing 6 hours and walking 1000 feet.  A Transferable Skills Analysis found you capable of working as a Chip Deliverer. Other positions have also been identified."

<u>See</u> Treadway 0035-0036 (NB 22).  The Plan notified Treadway of his right to request reconsideration of the decision, <u>See</u> Treadway 0036 (NB 22), and that his LTD benefits would terminate effective December 31, 1998.  <u>See</u> Treadway 0039 (NB 22).

439.    On December 22, 1998, Treadway's legal counsel appealed the Plan's termination of Treadway's LTD benefits.  See Treadway 0042 (NB 22).  See also Treadway 0043-0045 (NB 22).

440.    On February 8, 1999, the Plan notified Treadway's counsel that it was treating his December 22, 1998, letter as an initial claim for benefits, and that Treadway would receive a response to his claim within ninety days, unless special circumstances warranted an extension to 180 days.  See Treadway 0046-0047 (NB 22).

441.    The Plan further informed Treadway's counsel that, pursuant to the Plan, "[in] the event he did not receive a response, [he] should consider [his] claim denied" and that he, thereafter, would have a right to appeal the decision to the Champion International Vice President-Benefits for further review of the claim.  See Treadway 0046-0047 (NB 22).

442.    The Plan also provided to Treadway's counsel "the transferable skills analysis, Independent Medical Exam results and modification checklist from Dr. Juan Aldrich, reports from Haywood Regional Medical Center and stress test report from Haywood County Hospital."  See Treadway 0046 (NB 22).

443.    On or about February 24, 1999, Treadway withdrew his claim for Benefits.  See Treadway 0050 (NB 22).

444.    On October 11, 1999, Treadway's current legal counsel informed Champion International that they had been consulted by Treadway regarding his claim for LTD benefits, and requested copies of Treadway's claims file and plan documents.  See Treadway 0061 (NB 37).

445.    The Plan complied with Treadway's counsel's request and sent to them copies of Treadway's claims file and relevant plan documents.  See Treadway 0058, 0053 (NB 37).

446.    On January 9, 2001, which was more than two years and three months after the Plan denied Treadway's claim for continuing benefits, more than two years after Treadway filed the appeal he later withdrew, and more than one year after the Plan responded to Treadway's request for information, Treadway's counsel requested the Plan to "reconsider[] . . . the decision to terminate [Treadway's] benefits."  See Treadway 0065 (NB 37).  Treadway's counsel submitted to International Paper medical and other information they alleged supported Treadway's claim fro benefits.  See Treadway 0065-243 (NB 37).

### Martha Whitley's Claim for Benefits

447.    Plaintiff Martha B. Whitley ("Whitley") worked as an hourly employee at Champion International's facility in Canton, North Carolina.  Her hire date was April 8, 1980.  See Whitley 0206, 0002, 0116 (NB 23).

448.    Whitley's last day of active employment was March 29, 1988.  See Whitley 0206 (NB 23).  At that time, she held the position of package sealer, machine (i.e., stencil finisher).  See Whitley 0189 (NB 23).

449.    Whitley began receiving short-term disability benefits under Champion International's Short-Term Disability Plan on March 30, 1988.  Those benefits terminated on September 27, 1988.  See Whitley 0205 (NB 23).

450.    As a Champion International hourly employee, Whitley was eligible to apply for disability income benefits pursuant to the Hourly LTD Plan.

451.    On or about September 28, 1988, Whitley began receiving benefits pursuant to the Hourly LTD Plan.  Her disabling diagnosis was fibromyalgia.  See Whitley 0206, 0244-0359 (NB 23).

452.    On September 9, 1994, the Plan Supervisor notified Whitley that she no longer met the requirements for continuation of LTD benefits under the more stringent "any occupation" disability definition because the Plan had been "advised that you own and operate Tonya's Hair house and have done so since October 1, 1988."  See Whitley 0011-0013 (NB 23).  Because Whitley had been engaging in an occupation or business for wage and profit, the Plan Supervisor terminated her benefits retroactive to October 1, 1988.  See Whitley 0011 (NB 23).

453.    The Plan based its decision to terminate LTD benefits on an investigative report prepared by Morgan Associates, a private investigative service, which observed Whitley cutting hair at Tonya's Hair House.  See Whitley 0005-0010 (NB 23).

454.    By letter dated October 10, 1994, Whitley's legal counsel requested the Plan to review the denial of Whitley's continuing LTD benefits.  See Whitley 0020-0056 (NB 23).  Whitley asserted that the hair salon was owned and operated by Whitley's husband.  See Whitley 0033-0056 (NB 23).  Whitley's counsel also submitted the U.S. Social Security Administration's December 19, 1989, Notice of Award granting Whitley Social Security benefits effective March 29, 1988, See Whitley 0024-0032 (NB 23), and a letter from Kate Queen, M.D., of Mountain Medical Center dated October 3, 1994.  Dr. Queen stated that she had been treating Whitley for six or seven years, that she had diagnosed Whitley with

fibromyalgia, that Whitley "had diffuse muscoskeletal pain and soft tissue tenderness," and that Whitley "remains currently unable to engage in any occupation or business for wage or profit for which she is reasonably qualified by training, education or experience."  Whitley 0022-0023 (NB 23).

455.    The Plan notified Whitley and her counsel that it would treat her counsel's October 10, 1994, letter as an initial claim and review it within ninety days.  See Whitley 0057 and 0058 (NB 23).

456.    On December 7, 1994, the Plan notified Whitley's counsel that it had upheld the denial of her claim for continuing LTD benefits because Whitley did not meet the "any occupation" definition of disability under the Hourly LTD Plan.  The Plan's decision was based on the fact that "Tonya's Hair House was visited on more than one occasion by investigators retained by the Plan and they observed your client actually at work as a beautician," and further "other employees at Tonya's hair house stated that Mrs. Whitley was the proprietor and worked as a beautician."  Whitley 0059-0060 (NB 23).  The Plan advised Whitley and her counsel that they could request a review of the denial of LTD benefits within sixty days of receipt of the denial letter.  Whitley 0060 (NB 23).

457.    On January 31, 1995, Whitley's new legal counsel appealed the denial of her claim for continuing LTD benefits.  See Whitley 0062-0066 (NB 23).  In support of Whitley's appeal, her counsel submitted a January 6, 1995, letter from Glenn Arrants, M.D., in which he advised that he had counseled Whitley since January 18, 1994, noted that Whitley "has multiple physical problems that affect her mental and emotional states of mind," and

concluded that "due to her mental pains she cannot maintain any physical activity for consistent, measurable lengths of time." See Whitley 0064 (NB 23). Whitley also submitted a January 10, 1995, letter from Dr. Queen in which Dr. Queen noted that Whitley "has a severe and incapacitating problem with fibromyalgia," and "has never been able to regain full independent function and an ability to meet not only the demands of her own personal care and the care of her family at home, as well as work related responsibilities." Dr. Queen stated that "based on her pain and impairments she has in function that [Whitley] would not be able to engage in any occupation or business for wage or profit for which she is reasonably qualified by training, education, or experience." See Whitley 0066 (NB 23).

458.    On May 5, 1995, the Plan notified Whitley's counsel that the Plan's Claims Review Committee would consider Whitley's claim at its May 12, 1995, meeting. See Whitley 0071 (NB 23).

459.    On May 12, 1995, the Claims Review Committee reviewed Whitley's claims file, including the investigative reports stating that Whitley had been actively at work at her business and had a "current cosmetology license." See CRC 0320-0322 (NB 24). The Committee decided to postpone a final decision until Whitley could be examined by an independent medical examiner and her counsel could be provided copies of the investigative reports and an opportunity to comment on their contents. See CRC 0320-0322 (NB 23).[22]

---

[22]The Chair of the Committee "ordered that a copy of the documentation relative to the requests for review previously distributed to the Committee be filed with the minutes of the meeting." See CRC 0320, 0323-0482 (NB 23).

460.    By letter dated June 29, 1995, the Plan notified Whitley's counsel of its decision to postpone its decision, and that an Independent Medical Examination ("IME") of Whitley had been scheduled for July 6, 1995, with C.R. Stephenson, M.D., of Greenville, South Carolina.  The Plan also sent to Whitley's counsel copies of the investigative reports and asked her counsel to respond to the reports.  See Whitley 0072-0073 (NB 23).

461.    Dr. Stephenson reviewed Whitley's medical records and, on August 14, 1995, conducted his IME of Whitley.  See Whitley 0079-0081 (NB 23).[23]  According to Dr. Stephenson, Whitley "is tender everywhere, literally.  There may be some accentuation over the tender points of fibromyalgia, but by and large she is tender absolutely everywhere she is touched."  See Whitley 0080 (NB 23).  From his IME, Dr. Stephenson diagnosed Whitley with fibromyalgia and chronic fatigue, and concluded that he did not believe that Whitley was "employable at this time or in the foreseeable future."  See Whitley 0081 (NB 23).

462.    On September 13, 1995, the Claims Review Committee again considered Whitley's claim for continuing LTD benefits.  After reviewing the claims materials, including Dr. Stephenson's IME report, the Committee overruled the previous decision denying Whitley's claim for benefits and reinstated her LTD payments.  See CRC 0062-0064 (NB 24).[24]

---

[23]The IME had to be rescheduled for August 14, 1995, so that Dr. Stephenson would have adequate time to review Whitley's medical records.  See Whitley 0074-0078 (NB 23).

[24]The Chair of the Committee "ordered that a copy of the documentation relative to the requests for review previously distributed to the Committee be filed with the minutes of the meeting."  See CRC 0062, 0067-0319 (NB 24).

463.    Pursuant to the terms of the Plan, Whitley was required to periodically certify her continuing disability status.  Such a review was conducted in 1996, and, at the conclusion of the review, CORE recommended the continuation of Whitley's LTD benefits.  See Whitley 0114-0117, 0116, 0118-0119, 0120-0121 (NB 23).

464.    On June 16, 1997, Dr. Queen completed an Attending Physician Statement where she identified Whitley's diagnosis as fibromyalgia.  Although she stated that Whitley was totally disabled from both her regular occupation and any other occupation, Dr. Queen did not identify Whitley's restrictions or limitations.  See Whitley 0122-0123 (NB 23).

465.    On July 5, 1997, Whitley submitted a Personal Profile Evaluation where she detailed her present condition as "fibromyalgia-feel like I have the flu all the time ache all over, sore, swelling, neck turns numb."  See Whitley 0124-0127 (NB 23).  According to Whitley, she expected to return to some other type of occupation on a full-time or part-time basis "if I get able to."  See Whitley 0126 (NB 23).

466.    On July 7, 1997, Whitley's treating physician referred her to Thomas Rehabilitation Hospital for a Functional Capacity Evaluation ("FCE") "to assist with assessing the client's disability status."  See Whitley 0128-0140 (NB 23).  According to the FCE report, "Whitley completed test activities at the SEDENTARY physical demand level of work. Performance in testing was limited by moderate material handling difficulty and reported pain."  See Whitley 0128, 0139 (NB 23).  The report further concluded:

> "Based on performance in testing: sitting, standing, forward reaching, handling and fingering are limited to the frequent basis.  Walking, stair climbing, stooping, overhead reaching and bended reaching are limited to the occasional basis.  Ladder climbing,

kneeling, crouching and crawling are impaired.  Floor to bench height lifting, lifting above shoulder height and 2 hand carrying are limited to 10 lbs at the occasional basis."

Whitley 0139 (NB 23).

467.    Whitley submitted medical notes from Mark L. Moody, M.D., dated August 5, 1997, which indicated that a "cervical scan shows some slight disc bulging present at 5-6 and 6-7, but no nerve root impingement."  See Whitley 0141 (NB 23).  The notation further indicated that Whitley "has been complaining of some left upper extremity tingling.  I feel this is part of the fibromyalgia picture . . . we will not have her follow-up on a regular basis."  See Whitley 0141 (NB 23).

468.    After receiving the FCE, CORE requested Whitley's treating physician, Dr. Queen, to complete a Modification Checklist.  On September 15, 1997, Dr. Queen completed this modification checklist which states "I do not feel patient can return to regular employment.  Is on . . . medication in an effort to manage her fibromyalgia so that she can function."  See Whitley 0142 (NB 23).

469.    The Plan then scheduled Whitley for an IME with Andrew Rudins, M.D.  Dr. Rudins reviewed Whitley's medical records, her symptoms and medical history, and, on December 3, 1997, examined Whitley.  See Whitley 0143-0146 (NB 23).  According to Dr. Rudins, Whitley complained:

"of a lot of pain in her anterior knees into the anterior tibias proximally . . . numbness in her left lateral neck . . . trouble with her left upper extremity . . . pain in both buttocks into the lateral hip . . . pain in the midline in the lumbosacaral spine . . . numbness in her feet and burning in her heels and arches . . . swelling in her hands,

> usually in the summer . . . pain around her neck . . . sleeps poorly, often awakening during the night . . . sitting appears to be the most difficult."

See Whitley 0143 (NB 23).  Dr. Rudins further noted "from a functional standpoint she is basically independent in all her [activities of daily life], though she admits her husband occasionally helps her out of the tub."  See Whitley 0144 (NB 23).

470.    Dr. Rudins diagnosed Whitley as having "fibromyalgia, with resultant chronic pain syndrome, with some evidence of symptom magnification with 3 out of 5 Waddell signs positive."  See Whitley 0145 (NB 23).  According to Dr. Rudins, Whitley also had "underlying multilevel degenerative disc disease, that is likely contributing a mild amount to her overall symptom complex."  See Whitley 0145 (NB 23).

471.    Dr. Rudins concluded that "Whitley does have a full time work capacity, at the sedentary to light level."  He stated that Whitley's "restrictions to sedentary to light activities with a 10 pound lifting restriction should be considered permanent, since I do not See any change in the foreseeable future."  See Whitley 0146 (NB 23).

472.    On December 12, 1997, Dr. Rudins completed a Modification Checklist on which he indicated that Whitley could return to work on December 3, 1997, with the following modifications: sedentary job only; lift up to 10 pounds; may walk, sit, and stand up to 30 minutes; must change positions every 30 minutes; avoid repetitive use of her upper extremities; and no excessive bending, twisting, or squatting.  See Whitley 0152 (NB 23).

473.    On December 22, 1997, J.D. Beavers, M.D., the Medical Director for the Champion Disability Management Program, notified Whitley that the Plan was terminating her

LTD benefits because she was "not disabled as defined in the Plan." <u>See</u> Whitley 0154-0155 (NB 23). Dr. Beavers informed Whitley that "the independent medical evaluation found you are able to perform sedentary to light duty work." <u>See</u> Whitley 0154-0155 (NB 23). Whitley, therefore, did not satisfy the "any occupation" definition of disability under the hourly LTD Plan. <u>See</u> also Whitley 0156-0158 (NB 23).

474.    The Plan notified Whitley that her LTD benefits would terminate effective January 31, 1998. <u>See</u> Whitley 0159 (NB 23). The Plan also informed Whitley that she had the right to appeal the adverse decision and provided her a document describing her appeal rights. <u>See</u> Whitley 0155 (NB 23).

475.    On February 20, 1998, Whitley's former legal counsel requested the Plan to review the termination of Whitley's LTD benefits. <u>See</u> Whitley 0161 (NB 23).

476.    In support of Whitley's appeal, her counsel submitted a May 11, 1998, Notice from the Social Security Administration indicating Whitley's Social Security benefits would continue, <u>See</u> Whitley 0165 (NB 23), and two letters dated February 23, 1998, and May 5, 1998, from Dr. Queen, Whitley's treating physician. In her February 23 letter, Dr. Queen stated that "this patient has had significant and continuing problems with pain and fatigue as a consequence of her fibromyalgia that have not responded to repeated efforts at rehabilitation and management." <u>See</u> Whitley 0164 (NB 23). In her May 5 letter, Dr. Queen stated that, in her opinion, Whitley "currently remains unable to work at a level sufficient to maintain regular employment." <u>See</u> Whitley 0167-0168 (NB 23).

477.     On May 27, 1998, CORE commissioned Alan Marks, M.D., a specialist in rheumatology, to conduct a Peer Review Analysis of Whitley's claim.  CORE asked Dr. Marks to address the issue of whether Whitley was "disabled from any occupation."  CORE asked Dr. Marks whether he agreed with the previous denial or would recommend a second IME.  <u>See</u> Whitley 0169 (NB 23).  Dr. Marks reviewed Whitley's claim and, on June 3, 1998, reported that he "concur[red] with the independent medical examiner.  I believe this patient is capable of sedentary work."  <u>See</u> Whitley 0169 (NB 23).

478.     On June 8, 1998, CORE recommended that the Plan "uphold the previous denial of LTD benefits, effective 12/19/97."  CORE based its recommendation on, *inter alia*, Dr. Marks' determination "that the employee is capable of sedentary work," <u>See</u> Whitley 0172-0174 (NB 23), and Dr. Rudins' IME in which he concluded that Whitley has "a fulltime work capacity, at sedentary to light level."  <u>See</u> Whitley 0172 (NB 23).  <u>See</u> also Whitley 0170 (NB 23).

479.     On July 13, 1998, the Plan notified Whitley that the Plan had decided to uphold the denial of her claim for continuing LTD benefits.  <u>See</u> Whitley 0175-0176 (NB 23).  The Plan advised Whitley that the decision was based on the results of the IME and a CORE physicians' subsequent review of the documentation.  <u>See</u> Whitley 0175-0176 (NB 23).  The Plan advised Whitley of her right to appeal the decision.  <u>See</u> Whitley 0176 (NB 23).

480.     On July 30, 1998, Whitley's legal counsel requested the Plan to review the denial of Whitley's claim for continuing LTD benefits.  <u>See</u> Whitley 0180 (NB 23).  Whitley's

legal counsel re-submitted the May 11,1998, Notice from the Social Security Administration

and the May 5, 1998, letter from Dr. Queen.

481.    On October 22, 1998, Whitley's counsel submitted an October 15, 1998, letter

from Dr. Queen in which Dr. Queen stated that she saw Whitley on October 15 and "continue

to find her severely impaired with chronic and unrelenting non-articular musculoskeletal pain.

Her pain has been further complicated by *the recent development of herpes zoster*."  <u>See</u>

Whitley 0183-0184 (emphasis added)(NB 23).  Dr. Queen stated that Whitley was "disabled

from engaging in any occupation or business for wage or profit."  <u>See</u> Whitley 0184 (NB 23).

482.    On November 5, 1998, based on "the new information regarding the herpes

zoster," CORE commissioned Rose S. Fife, M.D., a rheumatology and internal medicine

specialist, to conduct a Peer Review Analysis of Whitley's claim.  <u>See</u> Whitley 0185, 0186-

0187 (NB 23).  Dr. Fife reviewed Whitley's claim and spoke to Dr. Queen, Whitley's treating

physician.  Dr Fife concluded that Whitley was totally disabled and that the "disabling

diagnosis now is herpes zoster superimposed on a chronic pain syndrome."  <u>See</u> Whitley

0186(NB 23).  Dr. Fife concluded, however, that Whitley's "herpes zoster is not related to her

underlying condition."  <u>See</u> Whitley 0186 (NB 23).

483.    The Plan also commissioned Jennifer Mikeska, a vocational rehabilitation

specialist, to conduct a Transferable Skills Analysis of Whitley, to determine if Whitley had

transferable skills given the restrictions defined by Dr. Rudins.  Ms. Mikeska completed her

analysis on December 8, 1998, and concluded that Whitley "does have transferable skills that

are vocationally appropriate and applicable to the different occupational groups and categories." See Whitley 0189, 0189-0193 (NB 23).

484.    On December 21, 1998, CORE reported to the Plan Supervisor that the physician who completed the Peer Review Analysis had concluded that Whitley's "herpes zoster is not related to [her] condition of fibromyalgia, the original disabling diagnosis. The employee is totally disabled at this time with the disabling diagnosis being herpes zoster superimposed on a chronic pain syndrome." CORE also reported that Whitley was "not vocationally disabled based on the results of the Transferable Skills Analysis." See Whitley 0194-0197 (NB 23).

485.    On January 18, 1999, the Plan notified Whitley's counsel that Whitley's claim would be considered by the Plan's Claims Review Committee, and invited Whitley's counsel to submit any new or additional documentation or evidence that might support Whitley's claim for benefits. See Whitley 0198 (NB 23).

486.    The Plan's Claims Review Committee discussed Whitley's claim at its March 2, 1999, meeting. See CRC 2107-2110 (NB 24). After the Committee reviewed Whitley's claim, it voted to "table its decision to its next meeting on March 11, 1999, pending receipt of additional information from CORE regarding the date of the on-set of Ms. Whitley's herpes zoster." A subsequent disability after denial of benefits would be irrelevant to Whitley's claim. The Committee, therefore, needed to determine the date of the onset of Whitley's herpes zoster; her current disabling condition. See CRC 2110 (NB 24).

487.    On March 3, 1999, Victor Paganucci, on behalf of the Committee, See CRC 2107 (NB 24), directed CORE to ask Dr. Fife "to determine the date of diagnosis and on-set of herpes zoster."  If Whitley's "on-set of the herpes zoster was after the termination of benefits, it would have no bearing on the termination of benefits and the appeal therefrom."  See Whitley 0199 (NB 23).

488.    That same day, CORE asked Dr. Fife to report as to whether Whitley's herpes zoster was present in January 1998 when her claim for continuing LTD benefits was denied. See Whitley 0200 (NB 23).

489.    Dr. Fife spoke to Whitley's treating physician and reported on March 10, 1999, that, according to Whitley's treating physician, Whitley's herpes zoster began in April, 1998, See Whitley 0200 (NB 23), which was four months after the denial of Whitley's claim for continuing LTD benefits.

490.    The Claims Review Committee discussed Whitley's claim again at its March 11, 1999, meeting.  See CRC 2111-2116 (NB 24).  After the Committee reviewed Whitley's file and discussed its contents, it voted to uphold the denial of Whitley's claim.  See CRC 2115-2116 (NB 24).  The Committee noted that

> "[d]uring the appeal process, Dr. Queen, Ms. Whitley's doctor, stated in a letter dated 10/15/98 that Ms. Whitley's pain 'has been further complicated by the recent development of herpes zoster.'  A CORE physician then stated that Ms. Whitley was disabled 'with disabling diagnosis being herpes zoster superimposed on a chronic pain syndrome.'  However, upon further investigation, CORE determined that the on-set of the herpes zoster was in 4/98 and therefore after the original denial of benefits on 1/31/98.

See CRC 2115 (NB 24).  The Committee determined that its review should focus only on

Whitley's alleged disabling condition at the time her claim for continuing LTD benefits was

denied – that is, January 1998.  Whitley's herpes zoster did not begin until April 1998, and,

therefore, was not a factor in the original denial of benefits and should not be considered in the

appeal process."  See CRC 2115 (NB 24).[25]

491.    Prior to the onset of herpes zoster, the FCE of Whitley indicated that Whitley

"completed test activities at the SEDENTARY physical demand level or work" and Dr.

Rudins' December 3, 2007, IME report indicated that Whitley has "a full time work capacity,

at the sedentary to light level."  In addition, a Transferable Skills Analysis identified various

jobs that Whitley could perform.  Whitley, therefore, was not entitled to LTD benefits.  See

CRC 2115-2116 (NB 24).

492.    On March 30, 1999, the Plan notified Whitley's counsel that the Claims Review

Committee met on March 2 and 11, 1999, to consider the appeal of the denial of Whitley's

claim and had voted to uphold the denial of her claim for continuing LTD benefits.  See

Whitley 0787-0788 (NB 23).

493.    On August 10, 2000, almost eighteen months after the Plan denied Whitley's

final appeal, Whitley's current legal counsel informed Champion International that they had

been consulted by Whitley regarding her claim for LTD benefits, and requested copies of

Whitley's claims file and plan documents.  See Whitley 0201 (NB 23).

---

[25]The Chair of the Committee "ordered that a copy of the documentation relative to the
requests for review previously distributed to the Committee be filed with the minutes of the

494.    The Plan complied with Whitley's counsel's request and sent to them copies of Whitney's claims file and the Plan documents.  <u>See</u> Whitley 0202, 0203 (NB 23).

495.    On February 20, 2001, almost two years after the Claims Review Committee denied her appeal, Whitley's counsel requested the Plan to "reconsider[] . . . the decision to terminate [Whitley's] benefits."  <u>See</u> Whitley 0360 (NB 38).  Whitley's counsel submitted to International Paper medical and other information they alleged supported Whitley's claim for benefits.  <u>See</u> Whitley 0360-0365, 0366-0386, 0520-0785 (NB 38).

---

meeting."  <u>See</u> CRC 2111, 2117-2235 (NB 24).

This the 4th day of April, 2005.

DEFENDANTS – CHAMPION INTERNATIONAL
CORPORATION, LONG TERM DISABILITY BENEFITS
PLAN FOR SALARIED EMPLOYEES OF CHAMPION
INTERNATIONAL CORPORATION #506, LONG TERM
DISABILITY BENEFITS PLAN FOR CERTAIN HOURLY
EMPLOYEES OF CHAMPION INTERNATIONAL
CORPORATION #703; and INTERNATIONAL PAPER
COMPANY


By:     __/s/_____
        Barry J. Waters – ct05520

MURTHA CULLINA LLP
Whitney Grove Square
Two Whitney Avenue
P.O. Box 704
New Haven, Connecticut  06503-0704
203.772.7700
203.772.7723 (facsimile)

Bruce M. Steen – ct23613
MCGUIREWOODS LLP
Bank of America Corporate Center
100 North Tryon Street, Suite 2900
Charlotte, North Carolina  28202
704.353.6244
704.353.6200 (facsimile)

Their Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Defendant's Statement of Facts was mailed by first-class mail, postage prepaid, on April 4, 2005, to counsel as follows:

Robert M. Elliot, Esquire
ELLIOT, PISHKO, GELBIN & MORGAN, P.A.
426 Old Salem Road
Winston-Salem, North Carolina  27101;

Richard B. Harper, Esquire
LAW OFFICES OF RICHARD B. HARPER
P.O. Box 395
Sylva, North Carolina  28779-0395; and

William B. Barnes, Esquire
ROSENSTEIN & BARNES
1100 Kings Highway East
Suite 1C
Fairfield, Connecticut  06432; and

_____/s/_____
Barry Waters – ct05520