IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HARRY L. SMITH, LOIS L. LYNN, | ) | |
| DARRELL KEITH HILL, ELIZABETH | ) | |
| CASE BOONE, WILEY H. HAYNES, | ) | |
| ROSA LEE BROOKSHIRE, HARRISON | ) | |
| YOUNG CLARK, FRANZISKA FINNEY, | ) | |
| JUDITH CASE KIRKPATRICK, WILSON | ) | |
| DANIEL McCLURE, CELIA DARLENE | ) | |
| METCALF, CHARLES R. REECE, | ) | |
| DOLPHUS LUTHER TREADWAY, JR., and | ) | |
| MARTHA BURNETTE WHITLEY, | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. |
| | ) | 302CV212 (CFD) |
| v. | ) | |
| | ) | |
| CHAMPION INTERNATIONAL | ) | |
| CORPORATION; LONG TERM | ) | |
| DISABILITY BENEFITS PLAN FOR | ) | |
| SALARIED EMPLOYEES OF | ) | |
| CHAMPION INTERNATIONAL | ) | |
| CORPORATION #506; LONG TERM | ) | |
| DISABILITY BENEFITS PLAN FOR | ) | |
| CERTAIN HOURLY EMPLOYEES OF | ) | |
| CHAMPION INTERNATIONAL | ) | |
| CORPORATION #703; and INTERNATIONAL | ) | |
| PAPER COMPANY, | ) | |
| | ) | April 4, 2005 |
| Defendants. | ) | |
| _____ | ) | |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

*Item*                                                                                                    *Page*

TITLE PAGE

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   i

EXPLANATION OF CITATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   ix

OPENING STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

       *The LTD Plan.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

       *Champion and CORE.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

       *Savings by CORE.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

    This Court Should Find Each of the Plaintiffs
    Totally Disabled and Reinstate Their Benefits Based
    on a *De Novo* Review of all of the Evidence in the Record. . . . . . . . . . . . . . . .   8

       *The Standard of Review.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

       *The Court Should Review Champion's
       Benefit Decisions De Novo.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

       *The Court Should Consider Material
       Outside the Claims Record.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

    This Court Should Find Each of the Plaintiffs Totally
    Disabled and Reinstate Their Benefits Even If Its
    Review of the Record is Based on the Arbitrary
    and Capricious Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

       *Prior Certifications of Disability.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

       *Pain.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

*Item*                                                                          *Page*

      *Treating Physicians.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     16

      *Social Security Decisions.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     17

      *Vocational Evidence.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     18

      *Consideration of FCEs, IMEs and TSAs.* . . . . . . . . . . . . . . . . . . . . . . .     18

THE PLAINTIFFS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     19

   Elizabeth Case Boone. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     19

      *Champion/CORE Denied Ms. Boone a Full and Fair*
      *Review and Wrongfully Terminated Her LTD Benefits.* . . . . . . . . . . . . .     19

      *Champion/CORE's Decision.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     20

      *Pain.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     21

      *Treating Physicians.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     22

      *Insufficiency of Information on Which to Base Denial.* . . . . . . . . . . . . .     22

      *Vocational Evidence.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     23

      *Conclusion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     24

   Rosa Lee Brookshire. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     24

      *Champion/CORE Denied Ms. Brookshire a Full and Fair*
      *Review and Wrongfully Terminated Her LTD Benefits.* . . . . . . . . . . . . .     25

      *Champion/CORE's Decision.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     26

      *Champion/CORE's Evidence Was Unreliable.* . . . . . . . . . . . . . . . . . . . . .     26

      *IME.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     27

      *TSA.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     27

*Item*                                                                                          *Page*

  *Peer Review Analysis.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

  *Champion/CORE Ignored Critical Evidence.* . . . . . . . . . . . . .. . . . . . . . .   28
  *Conclusion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

Harrison Young Clark. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..   29

  *Champion/CORE Denied Ms. Brookshire a Full and Fair*
  *Review and Wrongfully Terminated Her LTD Benefits.* . . . . . . . . . . . . . . .   30

  *Champion/CORE Ignored Critical Evidence.* . . . . . . . . . . . . . . . . . . . . . . .   31

  *Conclusion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

Franziska Finney. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

  *Champion/CORE Denied Ms. Finney A Full and*
  *Fair Review and Wrongfully Terminated Her*
  *LTD Benefits.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

  *Champion/CORE's Evidence Was Unreliable.* . . . . . . . . . . . . . . . . . . . . . .   34

  *Champion/CORE Ignored Critical Evidence.* . . . . . . . . . . . . . . . . . . . . . .   35

  *Pain.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

  *Vocational Evidence.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

  *Conclusion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36

Wiley H. Haynes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

  *Champion/CORE Denied Mr. Haynes a Full*
  *and Fair Review and Wrongfully Terminated*
  *His LTD Benefits.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

  *Champion/CORE's Evidence was Unreliable.* . . . . . . . . . . . . . . . . . . . . . .   39

  *Champion/CORE Ignored Critical Evidence.* . . . . . . . . . . . . . . . . . . . . . .   40

  *Pain.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

*Item*                                                                 *Page*

      *Vocational Evidence*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

      *Conclusion*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

Darrell Keith Hill. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

      *Champion/CORE Denied Mr. Hill a Full*
      *and Fair Review and Wrongfully Terminated*
      *His LTD Benefits*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

      *Champion/CORE's Decision*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

      *IME*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

      *Chronic Pain*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

      *Vocational Evidence*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

      *Supplementary Evidence*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

      *Conclusion*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46

Judith Case Kirkpatrick. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  47

      *Champion/CORE Denied Ms. Kirkpatrick*
      *a Full and Fair Review and Wrongfully*
      *Terminated Her LTD Benefits*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

      *CORE/Champion's Decision; Reliance*
      *on Flawed Evidence; Ignorance of Crucial Evidence*. . . . . . . . . . . . . .  49

Lois L. Lynn. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  52

      *Champion/CORE Denied Ms. Lynn a Full*
      *and Fair Review and Wrongfully Terminated*
      *her LTD Benefits*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ......53

      *Champion/CORE's Decision*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

      *Champion/CORE's Evidence Was Unreliable*. . . . . . . . . . . . . . . . . . .  55

| *Item* | *Page* |
|---|---|
| *IME.* | 56 |
| *Champion/CORE Ignored Critical Evidence.* | 58 |
| *Vocational Evidence.* | 58 |
| *Supplementary Evidence.* | 59 |
| *Conclusion.* | 59 |
| Wilson Daniel McClure. | 60 |
| *Champion/CORE Denied Mr. McClure a Full and Fair Review and Wrongfully Terminated His LTD Benefits.* | 61 |
| *CORE/Champion's Decision.* | 62 |
| *Champion/CORE's Evidence Was Unreliable.* | 62 |
| *Champion/CORE Ignored Critical Evidence.* | 63 |
| *Pain.* | 63 |
| *Vocational Evidence.* | 63 |
| *Supplementary Evidence.* | 64 |
| *Other Information.* | 64 |
| *Conclusion.* | 65 |
| Celia Darlene Metcalf. | 65 |
| *Champion/CORE Denied Ms. Metcalf a Full and Fair Review and Wrongfully Terminated Her Benefits.* | 66 |
| *CORE Decision.* | 66 |
| *Champion/CORE's Evidence Was Unreliable.* | 67 |

_Item_                                                                                      _Page_

     _Champion/CORE/SCORE Ignored Critical Evidence._. . . . . . . . . . . . . . . .  68

     _Pain._. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  68

     _Vocational Evidence._. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  68

     _Supplementary Evidence._. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  69

     _Conclusion._. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  69

   Charles R. Reece. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  69

     _Champion/CORE Denied Mr. Reece a Full_
     _and Fair Review and Wrongfully_
     _Terminated His LTD Benefits._. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  70

     _Champion/CORE's Evidence Was Unreliable._. . . . . . . . . . . . . . . . . . .  71

     _Champion/CORE Ignored Critical Evidence._. . . . . . . . . . . . . . . . . . . .  72

     _Pain._. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  72

     _Vocational Evidence._. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  73

     _Supplementary Evidence._. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  73

   Harry L. Smith. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  73

     _Champion/CORE Denied Mr. Smith a Full_
     _and Fair Review and Wrongfully_
     _Terminated His LTD Benefits._. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  74

     _Champion/CORE's Evidence Was Unreliable._. . . . . . . . . . . . . . . . . . .  76

     _IME._. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  76

     _FCE._. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  77

     _Addendum to IME._. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  78

     _TSA._. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  78

*Item*                                                                                    *Page*

      *Champion/CORE Ignored Critical Evidence.* . . . . . . . . . . . . . . . . . . . . . . .    79

      *Pain.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    79

      *Vocational Evidence.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    79

      *Supplementary Information.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    81

      *Conclusion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    81

Dolphus Luther Treadway, Jr.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    81

      *Champion/CORE Denied Mr. Treadway a Full*
      *and Fair Review and Wrongfully*
      *Terminated His LTD Benefits.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    82

      *Champion/CORE's Evidence Was Unreliable.* . . . . . . . . . . . . . . . . . . . .    84

      *Champion/CORE Ignored Critical Evidence.* . . . . . . . . . . . . . . . . . . . . . . .    85

      *Pain.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    85

      *Vocational Evidence.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    85

Martha Burnette Whitley. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    87

      *Champion/CORE Denied Ms. Whitley a Full*
      *and Fair Review and Wrongfully*
      *Terminated His LTD Benefits.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    87

      *Champion/CORE's Decision.* . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . ..    89

      *FCE.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    90

      *IME.* . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    90

      *TSA.* . . . . . . . . .. . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    91

      *Champion/CORE Ignored Critical Evidence.* . . . . . . . . . . . . . . . . . . . . . . .    91

      *Vocational Evidence.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    92

*Item*                                                                    *Page*

    *Ms. Whitley's Condition of Herpes Zoster.* . . . . . . . . . . . . . . . . . . . . . . . .   93

    *Conclusion.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   95

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   96

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   98

<u>**EXPLANATION OF CITATIONS**</u>

*Documents Filed With The Court*

The parties have filed 76 binders of documents with the court. Each notebook is described in the Parties' Amended Joint Stipulation and Notice of Filing, dated Mar. 31, 2005. The notebooks contain documents produced in discovery and deposition transcripts and deposition exhibits.

Plaintiffs' Local Rule 56(a)1 Statement references documents produced in discovery as follows: "NB", meaning "notebook", by number, followed by a page number. There are three types of page number. Documents numbered "CE-" come from the CORE/SCORE files. Documents numbered "CRC-" come from the files of the Champion Review Committee. Documents which begin with the name of a plaintiff come from the claim file of that plaintiff. If the notebook has tabs, the tab number is given before the page number.

Examples:

• "NB 41: CE-01147" means Notebook 41, Core documents, page 01147

• "NB 76: Tab 5, CE 0001-0039" means Notebook 76, Tab 5, Core documents, pages 1-39

• "NB 6: CRC 1601" means Notebook 6, Champion Review Committee documents, page 1610

• "NB 28: Finney-58" means Notebook 28, Plaintiff Finney's file, page 58

At times the numbers are followed by an explanatory parenthetical, such as "(Hourly Employee Plan)"

Deposition transcripts are cited by notebook number, tab within that notebook, last name of deponent, the word "Dep." and, lastly, the deposition page number and line. Thus, "NB 75:

-ix-

Tab 1, Lehman Dep. p. 74, L. 14-19" means Tab 1 of Notebook 75, the Lehman deposition

transcript, page 74, lines 14-19.

*Plaintiffs' Appendix*

Plaintiffs have collected documents of particular importance in a separate appendix which

is being filed with their brief and Local Rule 56(a)1 Statement.  Plaintiffs' Appendix includes a

brief biographical sketch and photograph of each Plaintiff, affidavits in support of the motion for

summary judgment, and a selection of critical documents from the binders.  Plaintiffs cite to the

numbered tabs in the Appendix.  Thus, "Pl. App. 1" means Plaintiff's Appendix, Tab 1.

> Providing equal justice for poor and rich, weak and powerful alike is an age-old problem.  People have never ceased to hope and strive to move closer to that goal.

*Griffin v. Illinois*, 351 U.S. 12, 16, 76 S. Ct. 585, 100 L. Ed. 891 (1956).

> ERISA was enacted "to promote the interests of employees and their beneficiaries in employee benefit plans," *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90 (1983), and "to protect contractually defined benefits," *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. [134] at 148 [(1985)].

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113,109 S. Ct. 948, 103 L. Ed. 2d 80 (1989).

## OPENING STATEMENT

This is an ERISA denial of benefits case.  The fourteen plaintiffs all became disabled while working in one of defendant Champion's paper mills in rural North Carolina.  For years, with  Champion's active approval, the plaintiffs collected benefits under Champion's self-funded long term disability plans.  This changed in 1996.  Champion hired a nationally known consulting company called CORE to manage its short and long term disability claims.  CORE sold itself to Champion by promising to cut costs.  Through a variety of means, from superficial testing to selective review of medical records to flat refusal to recognize debilitating pain and weakness, CORE determined that the plaintiffs were not disabled after all.  The status reports CORE gave Champion on the plaintiffs first explained CORE's reasons for terminating their claims and then, at least as to some plaintiffs, openly calculated how much money this finding by CORE had saved Champion.  Though the plaintiffs submitted extensive medical and vocational evidence, much of it previously accepted by the company, Champion cut off the plaintiffs' benefits and denied every appeal.  This lawsuit followed.

The self-evident conflict of interest which tainted Champion's decision-making calls for *de novo* review. Plaintiffs believe that this court will have little difficulty finding them disabled and ordering reinstatement of benefits. The evidence is so great that the same result should obtain if Champion's decisions are reviewed under the arbitrary and capricious standard. Plaintiffs' interests in the long term disability plans upon which they have relied for many years should be protected.

## FACTS

**The LTD Plan:** Champion in 1970 established the two long term disability (LTD) plans (hereafter jointly referred to as "the Plans") for salaried and hourly employees respectively, named as defendants in this action. The Plans are identical in all pertinent parts (Pl. LR 56 St., p. 1-2, ¶¶ 5, 6).

The Plans provide long term disability coverage to "participants" - the employees who participate in them. Participants who become totally disabled receive benefits calculated as a percentage of their average monthly earnings. Champion pays the benefits from its general assets. (Pl. LR 56 St., p.3, ¶ 13).

The "named fiduciaries" of the Plans are the members of the Pension and Employee Benefits Committee, "appointed by the Board of Directors of Champion International Corporation to administer the Plans, or its delegates." (Pl. LR 56 St., p. 3, ¶ 12). The Pension Employee Benefits Committee is authorized, as a fiduciary, to "jointly administer the Plan in accordance with its terms and shall have all powers necessary to carry out the provisions of the Plan." The Committee has the "power and authority . . . to control and manage the operation and administration of the Plan." The Plans provide that the Committee has appointed a "Plan

Supervisor," defined as the "Employee Benefits Department of the Company." (Pl. LR 56 St., p. 4, ¶ 21), and may appoint others "to act on its behalf, and may delegate to the Plan Supervisor and such agents, representatives or subcommittees any part or all of the powers of the Committee;" and any action of the delegates shall be considered the action of the Committee when they are "acting within the scope of the authority delegated to it by the Committee." (NB 66: Plan-24, 72).

During the first 30 months after the onset of disability (24 months after payments commence), the Plans define "Total Disability" as "the inability of an Employee [Participant] to perform the duties of his employment with the Employer as a result of an injury which occurs or a sickness which first manifests itself while employed by the Employer which results in a benefit being paid or payable to the Employee [Participant] during the first 180 days pursuant to the Temporary Disability Plan." (Pl. LR 56 St., p. 2, ¶¶ 9, 10; Pl. App. 2). "Total Disability" after this period is defined as "the inability to engage in any occupation or business for wage or profit for which he is or may become reasonably qualified by training, education or experience." (Pl. LR 56 St., p. 2, ¶ 11; Pl. App. 2).

The initial decision whether an employee is totally disabled is delegated to the Plan Supervisor. Upon approval of the claim, the employee is entitled to LTD benefits as long as she remains totally disabled. The Plan Supervisor may require the employee to "undergo a physical examination at periodic intervals" to determine if there has been any change in the employee's disability status. (NB 66: Plan-19, 67).

The Plan Supervisor has duties under ERISA which must be carried out if a claim for total disability is denied. The Plan Supervisor must issue written notice in accordance with

ERISA, 29 U.S.C. § 1133, "in a manner calculated to be understood by the Participant," specifying the reasons for denial, the "Plan Provision on which such denial is based," a "description of any additional material or information necessary for such Participant to perfect his claim and an explanation of why such material or information is necessary," and the procedure for the employee to seek review. (Pl. LR 56 St., p. 4, ¶ 22).

An employee whose claim is denied has the right under ERISA, 29 U.S.C. § 1133, to a "full and fair review." This review includes the right to inspect documents in his file, and to submit a statement in support of his claim. (Pl. LR 56 St., p. 4, ¶ 23). The Plan Supervisor is required to set forth "in a manner calculated to be understood by the Participant," "the specific reason or reasons for the decision on review," and "specific reference to the pertinent Plan Provisions on which the decision on review is based." (Pl. LR 56 St., pp. 4-5 ¶¶ 24-25).

***Champion and CORE:*** From approximately 1997 to 1999, Champion officials explored methods of reducing costs. (Pl. LR 56 St., p. 5, ¶ 26). In the mid-1990s, Champion identified its LTD system as a source of excessive costs. (Pl. LR 56 St., p. 5, ¶ 27). Champion sought a new provider to manager its LTD claims. (Pl. LR 56 St., p. 5, ¶ 28)

CORE, Inc. (CORE) made a presentation to Champion in the Fall of 1995. (Pl. LR 56 St., p. 5, ¶ 29). CORE explained its WorkAbility system, a program to return employees to work and reduce losses in employee absences. CORE compared an employee's medical condition to a "norm" in CORE's database, which provided CORE with a presumed time out of work. CORE did not accept variations from the norm. If the employee was out longer than the norm, CORE utilized various devices to terminate the disability, including discussions with the employee's treating physician, functional capacities evaluations (FCEs) and independent medical evaluations

-4-

(IMEs) from providers selected by CORE.  CORE also relied on physicians within its network

and its own employees who performed transferable skills analyses (TSAs). (Pl. App. 45).

Champion was impressed and bought the service.  CORE (either alone, 1996-1998, or

through "SCORE," 1999-2000,—a joint venture with Sedgewick James, which handled workers

compensation claims)[1] managed Champion's LTD system from 1996 to 2000.  The first contract

between Champion and CORE, effective Jan. 1, 1996, lasted three years.  (Pl. LR 56 St., p. 6, ¶

32).  The second contract, between Champion and SCORE, lasted until 2000, when Champion

was sold to another company.

Benefit determinations changed when CORE was hired.  The Plans explicitly provide that

any decision concerning a participant's eligibility for LTD benefits must be decided by the Plan

Supervisor at the initial level.  Champion ignored this part of the Plan.  "Plan Supervisor"

became just a title.  CORE effectively determined the disability claims of the plaintiffs and other

claimants.[2]     The evidence is uncontroverted[3] that CORE made the initial decision concerning

---

[1]Both CORE and SCORE are referred to as CORE throughout this brief.

[2]*See* Plaintiffs' "Supplemental Memorandum in Opposition to Motion of CORE, Inc., to Quash Deposition Subpoenas and/or for a Protective Order, and in Support of Plaintiffs' Motion to Compel Discovery from CORE, Inc.," filed January 21, 2004 (with attached deposition excerpts) (hereafter "Plaintiffs' Suppl. Memo. re CORE").

[3] CORE and the defendants initially took the position that CORE only made a "recommendation" to Champion as to whether the claim should be denied or accepted.  They cited their contracts in support of their positions.  *See* CORE's Motion for Summary Judgment, and supporting brief and affidavit; and *Smith v. Champion International Corp.*, 220 F. Supp. 2d 124 (D.Conn. 2002).  The evidence obtained in discovery directly contradicts this position.  The contract language which CORE used to obtain summary judgment is now irrelevant.

the termination of plaintiff's claim.[4]   Mary Lee Dixon, the designated LTD Administrator of

Champion, testified that she had absolutely no input into the decision.

Ms. Dixon testified that with respect to all of the LTD claims, she adhered to the

following practice and procedure:  Champion maintained no records concerning an individual

participant's LTD file; upon receiving a report from CORE providing for termination, Ms. Dixon

would copy the paragraph from CORE's report stating the grounds for its decision into a form

letter which she maintained in her computer system, and send the letter to the employee,

informing the employee of the termination of benefits.  (Pl. LR 56 St., p. 7, ¶ 38).  Ms. Dixon

made it clear that she never deviated from this procedure with respect to any of the plaintiffs'

claims.  She emphasized that she conducted no independent investigation or evaluation, reviewed

no records, and provided no input into the decisions.   Ms. Dixon testified that her "decision" as

to each plaintiff was simply an adoption of CORE's position, and if CORE had taken the

opposite position - in favor of continuing LTD disability status - Champion would not have

terminated benefits.  (Pl. LR 56 St., p. 7, ¶ 38 b, d).

CORE's domination of the process continued in the next level of review.  A claimant

could appeal CORE's initial decision.  The appeals went to Ms. Dixon, but she did not decide

them.  Ms. Dixon did not review claims records or CORE's file.  She sent whatever information

---

[4] The notices of termination sent to the plaintiffs by CORE and Champion varied slightly from case to case.  In some cases CORE acknowledged that it was making the decision.  CORE found the plaintiff  "not disabled," and provided some of the information which was required by the Plans.  In these cases Champion merely sent a follow up letter informing the plaintiff as to the specific date of termination of LTD benefits.  (Pl. LR 56 St., p. 7, ¶ 38).  In others cases CORE's letter notifying the plaintiff of its decision indicated that it was a "recommendation;" and Champion sent a follow up letter containing all of the information required under the Plans.   The form of the letter is not important since CORE was clearly the decision maker in every case.

she had to CORE.  After a second review CORE would send another report to Ms. Dixon.  (Pl. LR 56 St., p. 7, ¶ 38).

Ms. Dixon invariably decided the appeal in accordance with CORE's position.  She never went against CORE's findings and never made any independent investigation of the facts.  Ms. Dixon took the statements made by CORE at face value and inserted them in her notice to the employee of the decision.  (Pl. LR 56 St., p. 7, ¶ 38 b, d) ("I relied totally on CORE's recommendation . . . . the bottom line was I was going with their recommendation.").

A second and final appeal went to an entity called the  Champion Claims Review Committee (CRC).  Plaintiffs asked questions about this procedure at a Rule 30(b)(6) deposition of Champion.  Mark Lehman, the company's designee, testified that the CRC was the final level of review with Champion; that it generally received its information from CORE; that it had no access to medical or vocational expertise outside of CORE and that if it had questions, it would refer them to CORE for further investigation.  (Pl. LR 56 St., p. 8-9, ¶ 44 a, f).  The CRC provided no independent review whatsoever.  It simply read a selected portion of the record and upheld CORE's decision or sent the case back to CORE for further information. (Pl. LR 56 St., p. 8-9, ¶ 44 a, f, g).

***Savings by CORE:*** CORE maintained a record of the money it saved Champion by discontinuing LTD benefits to disabled participants.  Champion and CORE produced some documents showing the "savings" resulting from the termination of benefits; similar documents were not available in discovery for every plaintiff but there is no reason to believe that they did not exist at one time.  (Pl. LR 56 St., p. 10, ¶ 49; Pl. App. 12, 23, 37, 41, 53).  Champion's costs were reduced as a result of CORE's efforts  (Pl. App. 12, 23, 37, 41, 53).

**ARGUMENT**

**This Court Should Find Each of the Plaintiffs
Totally Disabled and Reinstate Their Benefits Based
on a *De Novo* Review of All of the Evidence in the Record**

*The Standard of Review*

The decision of an ERISA plan administrator or fiduciary to deny a claim for benefits is subject to *de novo* review unless the plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case the court applies the narrower arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 103 L.Ed.2d 80, 109 S.Ct. 948 (1989); *but see* Mark D. DeBofsky, *The Paradox of the Misuse of Administrative Law in ERISA Benefit Claims*, 37 J. Marshall L. Rev. 727, 738-44 (2004) (benefit plans so unlike government agencies that importation of arbitrary and capricious standard from administrative law inappropriate).

Upon *de novo* review a district court may render a determination on a claim without deferring to an administrator's evaluation of the evidence, and is free to evaluate the opinion of a treating physician, and the reviews of nontreating physicians, in the context of any factors it considers relevant, such as the length and nature of the relationship between the participant and the doctor, the level of the doctor's expertise, and the compatibility of the opinion with the other evidence. *Sheehan v. Metro. Life Ins. Co.*, 01 Civ. 9182 (CSH) ,2005 U.S. Dist. LEXIS 4087, *66-*67 (S.D.N.Y. Mar. 17, 2005), *citing Locher v. UNUM Life Ins. Co. of America.*, 389 F.3d 288, 293 (2d Cir. 2004).

Arbitrary and capricious review is narrower. A decision is arbitrary and capricious if it was without reason, unsupported by substantial evidence or erroneous as a matter of law. *Pagan*

-9-

*v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995). The plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies. *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999).

If a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion. *Firestone Tire & Rubber Co.*, 489 U.S. at 115.

The classic conflict of interest arises when the entity which makes the eligibility determinations pays the claims. *Id.* There are other conflicts. A plan administrator has a clear incentive to contract with a company whose medical experts are inclined to find that employees are not entitled to continued LTD benefits. The company, in turn, has a clear incentive to make a finding of "not disabled" in order to save its employer's money and to preserve its own consulting arrangements. *See Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516, 528 (6th Cir. 2003); *Regula v. Delta Family-Care Disability Survivorship Plan*, 266 F.3d 1130, 1143 (9th Cir. 2001), *rev'd on other grounds,* 539 U.S. 901, 123 S. Ct. 2267; 156 L. Ed. 2d 109 (2003).

If a conflict of interest is proven, and the court finds that the administrator was in fact influenced by that conflict of interest, the arbitrary and capricious standard falls away and the decision is reviewed *de novo*. *Fay v. Oxford Health Plan*, 287 F.3d 96, 108-09 (2d Cir. 2002); *Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 92 (2d Cir. 2000); *Whitney v. Empire Blue Cross and Blue Shield*, 106 F.3d 475, 476-77 (2d Cir. 1997); *Sullivan v. LTV Aerospace and Defense Co.*, 82 F.3d 1251,1256 (1996); *Pagan*, 52 F.3d at 442-43.

The burden of proving that the administrator was in fact influenced by the conflict of interest rests on the plaintiff. *Sullivan*, 82 F.3d at 1256. That burden cannot be too heavy,

however, for an excessive burden would effectively eliminate the role which conflict of interest plays in the test set forth in *Firestone*, a point explained at length in *DeFelice v. American Int'l Life Assurance Co.*, 112 F.3d 61, 66-67 & n. 3 (2d Cir. 1997). The court in *Sullivan* found proof that the administrator was likely affected by the conflict of interest when there were bad business conditions, layoffs were likely, the fiduciary duty of the plan committee members to the company, and to the beneficiaries of the plan, were likely to conflict, and a manager might have exerted undue influence on the committee's actions. 82 F.3d at 1256-57.

### The Court Should Review Champion's Benefit Decisions De Novo

There was a clear conflict of interest. Champion both made benefit decisions and paid the benefits. Champion furthermore had an incentive to contract with CORE, a company whose medical experts are inclined to find that employees are not entitled to continued LTD benefits, and CORE had an incentive to make a finding of "not disabled" in order to save Champion's money and to preserve its own consulting arrangements.

Based on the conflict, the LTD benefits decisions at issue here should be reviewed *de novo*, because there is evidence that these conflicts affected benefit decisions. CORE sold its services to Champion by promising cost savings through reduced benefits. CORE was under pressure to handle the present contract so as to get the next one. CORE's reports to Champion reveal the conflict. CORE reported to Champion on each LTD benefits case. With respect to many of the reports, the body of the report contained medical and vocational data, but the last paragraph stated exactly how much money CORE had saved the company by reducing or denying benefits in that particular case. Since Plaintiffs have met their burden of showing that the conflict of interest affected benefit decisions, they are entitled to *de novo* review.

-11-

There is another reason why Plaintiffs are entitled to *de novo* review. Champion's benefit decisions were not the result of individualized discretion. *See Harris v. First Unum Life Ins. Co.*, 2004 U.S. Dist. LEXIS 10245 *13 n.7 (N.D.N.Y. 2004) (unnecessary to determine if conflict of interest affected benefit decisions if plan administrator did not exercise discretion).

A plan administrator's decision to approve or disapprove payment of benefits is reviewed under the arbitrary and capricious standard because in so doing the plan administrator has exercised the broad discretion conferred upon it by the plan documents. *See Firestone*, 489 U.S. at 111. Nondiscretionary determinations by a plan administrator, however, are not entitled to this deferential review. *See, e.g., Jebian v. Hewlett-Packard Company Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1103 (9th Cir. 2003) (denials of benefits not on the merits, but rather because application "deemed denied" through passage of time, are reviewed *de novo* because the administrator did not exercise its discretion and hence is not entitled to the arbitrary and capricious standard of review).

CORE used a system called WorkAbility, and carefully designed protocols, to eliminate discretion from benefits decisions. (NB 75: Taylor Dep. pp. 31, L. 3-14 and 20-22; 125, L. 2-20; 150, L. 8-19; 199-200, L. 16-24 and 1-12; 221, L. 14-24; 222, L. 1-6). Standardized protocols were used to eliminate individualized decisionmaking. (NB 75: Taylor Dep. pp. 250, L. 11-16; 251, L. 2-9; 254, L. 14-24; 255, L. 1-13). There was no place in CORE's  system for individual discretion.

Since the benefits decisions made on the basis of the WorkAbility system and CORE's protocols were not the product of individualized discretion, Champion is not entitled to arbitrary and capricious review of those decisions.

-12-

### *The Court Should Consider Material Outside the Claims Record*

Whether to consider evidence outside the record when reviewing a factual issue in a denial of benefits case is discretionary with the district court. That discretion ought not to be exercised without good cause. *Locher*, 389 F.3d at 293-95; *Ray v. UNUM Life Ins. Co.*, 314 F.3d 482, 487-88 (10th Cir. 2002); *DeFelice*, 112 F.3d at 66; *Napoli v. First UNUM Life Ins. Co.*, 99 Civ. 1329 (GEL), 2005 U.S. Dist, LEXIS 1018, *5 (S.D.N.Y. Jan. 25, 2005).

Conflict of interest may be good cause to consider evidence outside the record. In this context, the plaintiff need not demonstrate that the conflict caused her actual prejudice. *DeFelice*, at 67. The conflict of interest which arises when the plan is both reviewer and payor is ordinarily not sufficient to trigger consideration of evidence outside the record, *Napoli*, *6, though it is possible that in a particular case such a conflict might be sufficient. *Locher*, at 296. To justify use of evidence outside the record, such a conflict of interest should usually be bolstered by some other factor. *See, e.g., Locher*, at 296 (failure to maintain sufficient procedures for initial or appellate review); *DeFelice*, 112 F.3d at 66 (the appeals committee consisted entirely of employees of the employer; there were no established criteria for determining an appeal and the committee had a practice of destroying or discarding all records within minutes of hearing an appeal).

The conflict of interest, in this case, as described above, is so strong that by itself it justifies consideration of facts outside the record. *See Locher*, at 296. Procedural irregularities bolster this conclusion. The Plan states that a Champion "Plan Supervisor" will decide all benefits cases at the first level with an appeal to a Champion committee. The service agreements between Champion and CORE do nothing to change this arrangement. There is irrefutable

evidence, however, that CORE made these decisions for Champion (Pl. LR 56 St., p. 8-9, ¶ 44 c, f, g).  The combination of conflict of interest and procedural irregularities indicates that evidence outside the record should be received.

**This Court Should Find Each of the Plaintiffs Totally
Disabled and Reinstate Their Benefits Even If Its Review of
the Record Is Based on the Arbitrary and Capricious Standard**

Title 29 of the U.S. Code, § 1133, says that an ERISA plan must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." *29 U.S.C. § 1133(2)*. Under a full and fair review, the fiduciary must obtain and consider all pertinent evidence to the issue of the participant's total disability.  Under a full and fair review, the fiduciary must consider all relevant factors pertinent to the participant's total disability.  Under a full and fair review, the fiduciary must make a reasoned decision, after considering all of the evidence pertinent to the claim.  Under a full and fair review, the fiduciary is not permitted to give inordinate weight to evidence supporting denial; but must consider all of the evidence in context in the determination of the participant's total disability.

Champion and CORE did not meet the standard of full and fair review.  A plan administrator may not deny benefits by ignoring or distorting evidence in the file; selecting those portions of the medical reports which favor discontinuation of benefits while disregarding the rest, or misusing evidence by claiming that it says or means something other than it does.  *See McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 170-171 (6th Cir. 2003) (report referring to mere possibility of working insufficient to deny benefits), *citing Mein v. Pool*

-14-

*Company Disabled International Employee Long Term Disability Benefit Plan,* 989 F.Supp.

1337, 1350 (D. Colo. 1998); *Morgan v. UNUM Life Ins. Co. of America*, 346 F.3d 1173, 1178

(8th Cir. 2003) (insurer could not end payments because it "discovered" facts about the plaintiff

it knew when it granted coverage); *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356,

361-62 (6th Cir. 2002) (plan sent only the most favorable PCE (Physical Capacity Evaluation) to

the TSA (Transferable Skills Analysis) consultant, withholding a less favorable PCE and several

unfavorable doctor's reports); *Paese v. Hartford Life & Accident Ins. Co.*, 02 Civ. 9778 (DC),

2004 U.S. Dist. LEXIS 6040, *29-*33 (S.D.N.Y. April 9, 2004) (plan used wrong description of

job and *cherry-picked* sections of medical reports); *Gannon v. Metropolitan Life Ins. Co.*, Civil

Action No. 01-40192-NMG, 2003 U.S. Dist. LEXIS 24930 *17-*37 (D. Mass. June 12, 2003)

(insurer used brief sections of treating doctor's medical notes while ignoring his finding that the

plaintiff was disabled; relied on the findings of a consultant who neither examined the plaintiff

nor conducted a thorough review of her medical history; relied on an investigator's observations

which did not establish anything about the plaintiff; cited a Functional Capacity Evaluation's

positive conclusions though the plaintiff was in pain throughout the evaluation; used a TSA

which was flawed because it was based on the bad FCE; and made use of a vocational consultant

though she did not consider the credible medical evidence); *Cecchanecchio v. Continental Cas*

*Co.*, Civil Action No. 00-4925, 2001 U.S. Dist. LEXIS 18704, *21-*26 (E.D. Pa. Nov. 15, 2001)

(administrator denied coverage, claiming a preexisting condition, even though its medical reports

showed uncertainty when the condition began; administrator never got an opinion from a

competent specialist to counter those of plaintiff's physicians); *see generally* Jayne E. Zanglein

and Susan J. Stabile, *ERISA Litigation* 364 (2003) (collecting cases).

*Prior certifications of disability:* CORE gave no apparent consideration to the fact that many disabled employees receiving LTD benefits had been previously certified as totally disabled under the Plans by Champion for years. In fact, of the 14 plaintiffs, most of the plaintiffs had been deemed totally disabled under the any-occupation definition prior to termination by CORE. (Pl. App. 1).

While the Plans clearly provide that Champion can review a participant's status periodically, "[e]ach person entitled to benefits shall be required to undergo a physical examination at periodic intervals as requested by the Plan Supervisor" - such review does not give the Plan Supervisor the right to change the status of a participant arbitrarily, with impunity. Under any common evidentiary principles, these prior certifications of disability would be considered an admission, at minimum, that the participant has previously met the standard, and that any change in her status should be based on some change in her circumstances.

In *Connors v. Connecticut General Life Co.*, 272 F.3d 127 (2nd Cir. 2001), the court recognized this principle in reversing the district court's judgment in favor of the administrator in an LTD case. Finding that the plaintiff had received LTD benefits for "fifty-four months" before it terminated its benefits, and "almost 30 months over the second, more stringent definition," the court found error in the district court's failure to consider the administrator's "reversal in policy preceded by no significant change in Connors' physical condition."

Under any standard of review, the fact that CORE reversed Champion's consistent and prior certifications of total disability of some of the plaintiffs, without considering the inconsistency of its exercise of authority, is inimical to the principles underlying ERISA—to protect participants from arbitrary conduct by fiduciaries.

-16-

*Pain:* Champion and CORE also erred in their refusal to consider pain as a cause of total disability. A plan administrator may not discount complaints of pain as merely subjective. The subjective element of pain is an important factor to be considered in determining disability. A district court may find a particular claim of pain not credible, but it may not hold subjective complaints of pain legally insufficient to support long term disability benefits. *Connors v. Connecticut General Life Ins. Co.*, 272 F.3d 127, 136 -37 (2d Cir. 2001) ("The subjective evidence of appellant's pain, based on her own testimony and medical reports of examining physicians, is more than ample to establish her disability, if believed."); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979) ; *accord Pollini v. Raytheon Disability Employee Trust*, 54 F.Supp. 2d 54, 59-60 (D. Mass. 1999); *see generally Krizek v. CIGNA Group Ins.*, 345 F.3d 91 (2d Cir. 2003) (plaintiff may be incapacitated, despite significant accomplishments, when they were achieved at the cost of severe pain). Nor may a reviewing physician disregard the patient's reports of pain, and a treating doctor's reports of pain, merely because they are not supported by objective evidence. *Chan v. Hartford Life Ins. Co.*, 02 Civ. 2943 (LMM), 2004 U.S. Dist. LEXIS 17962 , *23-*24 (S.D.N.Y. Sept. 8, 2004); *Cortes v. Metlife, Inc.*, 122 F.Supp.2d. 121, 132 (D.P.R. 2000). Finally, a plan administrator may not disregard pain by calling it something else. *See Petroff v. Verizon North, Inc. Long -Term Disability Income Plan*, Civil Action No. 02-318 Erie, 2004 U.S. Dist. LEXIS 8138, *45 (W.D.Pa. May 4, 2004) (plan called plaintiff's symptoms "periodic discomforts").

*Treating physicians:* Champion and CORE mishandled the opinions of plaintiffs' physicians. A plan administrator may not disregard substantial reports from treating physicians familiar with the employee in favor of less substantial, speculative or erroneous reports from

people who never saw the patient. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) ("Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician"); *Govindajarian v. FMC Corp.*, 932 F.2d 634, 637 (7th Cir. 1991) (administrator's conclusion that there was no physical cause for plaintiff's back pain contrary to numerous statements by treating physicians that the pain and disability were due to specific back injuries); *Finazzi v. Paul Revere Life Ins. Co.*, 327 F.Supp.2d 790, 795-96 (W.D.Mich. 2004) (exclusive reliance on doctors who never examined plaintiff made denial of benefits arbitrary and capricious when both treating doctors believed, strongly and with good reason based on their experience with their patient, that plaintiff was disabled); *Meyer v. Metropolitan Life Ins. Co.*, 341 F.Supp.2d 865, 873 (S.D. Ohio 2004) (denial of benefits arbitrary and capricious when reviewing doctor never examined employee and his opinion did not follow from reports of treating physicians); *Gannon*, at *17-*37; *Roig v. The Limited Long Term Disability Program*, Civ. A. 99-2460, 2000 U.S. Dist. LEXIS 11379, *34-*42 (E.D.La. Aug. 4, 2000) (plan did not interview plaintiff, did not independently observe her activities, and did not order an independent medical examination or review by a vocational rehabilitation expert; plan's medical findings contrary to those of treating physician and based on claim analyst's misreading of MRI scans); *Cortes*, 122 F.Supp.2d at 132 ("MetLife's wholesale disregard of the opinion of three treating physicians and one treating psychiatrist that Cortes was totally disabled to work ... was not reasonable and renders MetLife's decision arbitrary and capricious."); *cf. Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 391 (3d Cir. 2002) ("once a claimant makes a prima facie showing of disability through physicians' reports ... and if the insurer wishes to call into question the

-18-

scientific basis of those reports ... then the burden will lie with the insurer to support the basis of its objection.").

     ***Social Security decisions***:  Champion and CORE erred in refusing to consider plaintiffs' receipt of Social Security benefits.  The Social Security Administration's determination of disability is not binding on a plan, *see Dorsey*, 167 F. Supp. 2d at 856 n.11, but it may be considered as a factor in determining whether the plan's decision was arbitrary and capricious. *Id*., *see also Rosen v. Provident Life and Accident Ins. Co.*, 2003 U.S. Dist. LEXIS 17402 (E.D.Pa. 2003); *Wilkerson v. Reliance Standard Life Ins. Co.*, 2001 U.S. Dist. LEXIS 5366 (E.D.Pa. 2001).  Many decisions in this Circuit note a plan beneficiary's receipt of Social Security benefits.  *See, e.g., Kinstler*, 181 F.3d at 247; *Hartranft v. Hartford Life & Accident Ins. Co.*, No. 3:01cv1879(JBA), 2004 U.S. Dist. LEXIS 21088 (D. Conn. Sept. 20, 2004); *Rasile v. Liberty Life Assurance Co.*, 03 Civ. 4316 (NRB), 2004 U.S. Dist. LEXIS 9940, *2 (S. D.N.Y., June 2, 2004).  Core vocational experts have noted the evidentiary value of Social Security decisions.  (Pl. App. 5).

     ***Vocational Evidence:***  The importance of vocational evidence in making benefit determinations has been emphasized by CORE's own experts.  (Pl. App. 5).  Courts should take note of this information when presented by the employee, not merely when presented by the plan. *See, e.g., Willis v. Baxter International, Inc.*, 175 F.Supp.2d 819, 825 (W.D.N.C. 2001).

     ***Consideration of FCEs, IMEs and TSAs:***  The evidence shows that CORE used the common devices of FCEs (functional capacity evaluations), IMEs (independent medical examination), TSAs (transferable skills analysis) to support their decisions to terminate plaintiffs' benefits.  While such devices can, if properly conducted, provide some evidence

-19-

concerning disability, courts have recognized their limitations and susceptibility to abuse. *See* Pl. App. 3, 5. For example, a plan administrator may not rely on TSAs when the preparer was not familiar with all the medical reports, the results contradict the FCE or the employee plainly could not perform the jobs identified. *See Gannon*; *Ramos v. Bellsouth Long Term Disability Plan*, Civil Action No. 01-0013 Section: E Magistrate Div. 1, 2001 U.S. Dist. LEXIS 18271, *20-*28 (E.D.La. Nov. 2, 2001) (none of the plans listed in the plan's Labor Market Survey/Transferable Skills Analysis could be obtained or performed by employee). Nor may a plan administrator rely on an FCE which ignores the employee's pain and and/or is contrary to the medical reports. *Gannon*. Vocational reports saying that the employee can work have no value if poorly prepared or contradicted by medical reports. *Spangler*, 313 F.3d at 361-62.

### THE PLAINTIFFS

### ELIZABETH CASE BOONE

The evidence in Ms. Boone's claims record proves the following:

- Ms. Boone' date of birth is November 5, 1946; at the time of the termination of her benefits under the Plan, Ms. Boone was 51 years of age. (Pl. LR 56 St., p. 11, ¶ 5; Pl. App. 1).

- Ms. Boone has a 9th grade education and subsequently obtained a G.E.D.. (Pl. LR 56 St., p. 11, ¶ 56; Pl. App. 1).

- Ms. Boone was employed by Champion for 11 years, from 1976 to 1987, when she became disabled from any work. (Pl. LR 56 St., p. 11, ¶ 57; Pl. App. 1).

- Ms. Boone's disabling conditions arise from severe pre-existing back and neck conditions in her cervical discs. (Pl. LR 56 St., pp.12-13, ¶¶ 61-17; Pl. App. 10-11).

- Throughout her disability, Ms. Boone has been treated by Dr. Vargo and Dr. Maloney, and her family physician, Dr. Stringfield. All of her doctors

have repeatedly certified that Ms. Boone was totally disabled from any work.  (Pl. LR 56 St., p.14, ¶ 68; Pl. App. 6).

- From 1987 to 1998, Champion consistently determined that Ms. Boone was totally disabled from her regular job and any other job for which she was qualified by "training, education or experience," and entitled to LTD benefits under the Plan.  (Pl. LR 56 St., pp. 15-16, ¶¶ 69-73; Pl. App. 6).

- Although Ms. Boone's condition did not improve, in 1998, CORE decided that Ms. Boone was no longer totally disabled under the Plan, and Champion finally upheld the termination on October 21, 1998. (Pl. LR 56 St., pp. 20, 23, ¶ 89-90, 101).

## Champion/CORE Denied Ms. Boone a Full and Fair Review and Wrongfully Terminated Her LTD Benefits

Ms. Boone's evidence consistently established that she was totally disabled under the Plan.  Champion repeatedly certified Ms. Boone's disability under the Plan for 11 years, from 1987 to 1998, because the relevant facts unequivocally demonstrated that Ms. Boone had been unable to work.  (Pl. LR 56 St., p. 14, ¶ 68; Pl. App. 6).

Foremost among the facts were those establishing Ms. Boone's credibility.  She had a good work record with Champion.  She had worked in pain for years before she was forced to leave work.  Her reported symptoms and chronic pain were specific, descriptive and consistent in the record, and were supportive by the objective evidence of the massive deterioration of her spine. (Pl. LR 56 St., pp. 11-13, ¶¶ 57-60, 65; Pl. App. 8-11).

Ms. Boone was paid LTD benefits for 11 years because she was totally disabled under the Plan definition, and Champion and its administrators knew it.  (Pl. LR 56 St.,  pp.15-16, 18, ¶¶ 69-74, 80; Pl. App. 8-9).

## Champion/CORE's Decision

-21-

It was only when CORE took over Champion's case management that questions were raised.  In its review, Dr. Beavers apparently assumed  that under its Workability System Ms. Boone should be able to work in some occupation and contacted her physician, Dr. Vargo.  Dr. Beavers indiated that Dr. Vargo was "not sure" of her opinion that Ms. Boone was totally disabled, although Dr. Vargo had never indicated any uncertainty.  (Pl. LR 56 St., p.20, ¶ 87).

In order to support Dr. Beaver's assumption, CORE contracted for an independent medical evaluation (IME) with Dr. Charles Shields.  Dr. Shields, a specialist in "physical medicine and rehabilitation,"  examined Ms. Boone on a single occasion on February 3, 1998. (Pl. LR 56 St., p. 17, ¶ 79).  According to Ms. Boone, his examination consisted of his putting "ink spots" on Ms. Boone's arm, and having her walk down the hall and back and it lasted no more than 45 minutes. (NB 25: Boone-510).   Based on his review of her history and this limited examination, Dr. Shields expressed the opinion that Ms. Boone "can work 5-6 hours a day at a sedentary physical demand level with specific restrictions to the left side of the body." (Pl. LR 56 St., p. 17, ¶ 79). Nevertheless, Dr. Shields recommended further evaluation.  Dr. Shields did not explain the basis for his opinion, and the grounds for his disagreement with the opinions of Ms. Boone's two long-time treating physicians.  (Pl. LR 56 St., p. 17, ¶ 79).

CORE's Dr. Beavers was not satisfied with Dr. Shields' report as written, apparently since it only indicated Ms. Boone's capacity for part-time work.  Through a series of communications, Dr. Beavers influenced Dr. Shields to issue an "Addendum," dated February 19, 1998, in which Dr. Shields altered his opinion (without further examination), stating that Ms. Boone "can work up to 6 hours per day, 5 days per week, with the restrictions given."  (Pl. LR 56 St., pp.18-19, ¶¶ 82-85).  Dr. Shields rationalized his change with the explanation that the CORE

-22-

"form only has the 5-6 hours per day type boxes to mark." *Id.* This statement was untrue and inconsistent with at least one of the forms that Dr. Shields had earlier completed. (Pl. LR 56 St., p. 19, ¶ 86).

On March 9, 1998, based solely on the IME, and without any attempted explanation for the inconsistency between the IME and the opinions of Ms. Boone's treating physicians, CORE notified Ms. Boone that her claim was being denied. (Pl. LR 56 St., p. 20, ¶ 89). Champion, without any independent evaluation of the evidence, approved the denial, effective April 30, 1998. (Pl. LR 56 St., p. 20, ¶ 90).

*Pain:* CORE ignored Ms. Boone's history of chronic pain and other debilitating symptoms. With its limitation to "objective" evidence, CORE simply dismissed Ms. Boone's complaints of pain, despite CORE's own acknowledgment that the subjectivity of her complaints "is common to patients with chronic pain." (NB 2: CRC-870). CORE made no effort to determine Ms. Boone's credibility by interviewing Ms. Boone or other witnesses who knew her; it made no analysis as to the consistency of her complaints with the significant objective evidence of the deterioration of her spine. (Pl. LR 56 St., pp. 12-13, ¶¶ 63-66). CORE simply disregarded this evidence, which was the foundation of the long-term certifications by Ms. Boone's treating physicians and Champion, of her total disability. (Pl. LR 56 St., pp. 14-16, ¶¶ 68-74; Pl. App. 6).

*Treating physicians:* CORE made minimal effort to explain its disregard of the opinions of Ms. Boone's treating physicians, Dr. Vargo and Dr. Maloney. Dr. Beavers apparently questioned Dr. Vargo, and noted in his records that Dr. Vargo was "not sure" of her opinions. (Pl. LR 56 St., p. 20, ¶ 87). Dr. Beavers does not indicate what level of certainty he would

-23-

require in order to give weight to a treating physician's opinions.  In any event, Dr. Vargo never documented any lack of certainty, at least to a reasonable professional degree,  and emphasized in responding to CORE's decision, that, based on her 10 year history of treatment of Ms. Boone, there had been no "substantial change in her condition to warrant a change in her disability status." (Pl. LR 56 St., p. 22, ¶ 97).  Dr. Maloney was just as adamant.  (Pl. App. 10).

The IME qualifiedly supporting some part-time work, in view of CORE's disregard of the opinions of Ms. Boone's treating physicians, and Ms. Boone's sincere statements of her debilitating pain—pain caused by her damaged spine—cannot constitute "substantial evidence," or convincing evidence in support of CORE/Champion's denial.

### Insufficiency of Information on Which to Base Denial

Even considering Dr. Shields' opinion, CORE/Champion cannot justify its denial of Ms. Boone's claim.  As stated above, Dr. Shields reached a conclusion that Ms. Boone could work "5-6 hours per day," or "up to 6 hours per day," depending on which draft of his report is considered.  For the reasons stated above, Ms. Boone's ability to perform work at this level—even if believed—is not sufficient to support the termination.  The Plan definition clearly contemplates that a participant who is unable to perform work in any occupation "for business or profit," is totally disabled.  This definition contemplates *full-time* work—and for good reason.  If a participant is able to perform part-time work, then the Plan language indicates that they are still totally disabled, although any amounts earned in the part-time work would constitute "other income," which would be deducted from their benefits.  Champion has never defined "total disability" in a manner to include part-time work.  And, the customary definition of "any occupation" would include only full-time work at 8 hours per day, 40 hours per week.

-24-

*Vocational evidence:* At the very least, if CORE/Champion intended to show that Ms. Boone could engage in "any occupation" for which she is reasonably fit, then vocational evidence would be necessary to establish this point. Neither CORE nor Champion produced any vocational evidence demonstrating that Ms. Boone could work under their restrictions, other than a TSA performed by CORE's Cost Review Services department. (Pl. LR 56 St., p.23, ¶ 102). This report does no more than list several occupations from the CORE's database which theoretically could be performed by a person who could work, without restrictions, at a sedentary level. Without personalizing the information to Ms. Boone or analyzing her ability to obtain such employment, or at least, verifying that such jobs were available on a part-time basis in the local economy, such evidence is essentially meaningless. *See* (Pl. LR 56 St., p. 24, ¶ 102).

In short, there was no evidence to justify CORE/Champion's termination of Ms. Boone's claim, particularly after so many years of certifying her disability.

## Conclusion

The overwhelming evidence conclusively establishes that Ms. Boone was disabled in 1998, as she was for the preceding decade. In summary, Ms. Boone's injuries are real and objective; her medical evidence, based on the consistent opinions of her treating specialists, is uncontroverted and consistent; her symptoms and reports of chronic pain are believable and consistent with the medical evidence.

In addition, the vocational evidence presented by Ms. Boone in her supplementary evidence answered questions left unresolved by the deficiencies in CORE's process. In his vocational assessment report, Mr. Randy L. Adams, a licensed vocational evaluator, made a realistic assessment of whether there were jobs in the local economy for which Ms. Boone would

be reasonably fit considering her age, education, past employment and her medical restrictions.

He determined, based on this assessment, that Ms. Boone was unemployable.  (Pl. LR 56 St., p. 24, ¶ 103).

Accordingly, the evidence of record establishes that the plaintiff, Elizabeth Case Boone, was, at all times pertinent to this action, totally disabled from work.  Ms. Boone is entitled to judgment establishing her total disability under the Plan.

### ROSE LEE BROOKSHIRE

The evidence in Ms. Brookshire's claims record proves the following:

- Ms. Brookshire's date of birth is October 30, 1937 and at the final denial of her benefits she was almost 61.   (Pl. LR 56 St., p. 25, ¶ 105).

- Ms. Brookshire completed the10th grade. (Pl. LR 56 St., p. 25, ¶ 106).

- Ms. Brookshire worked for Champion as a rewind operator for more than 15 years,  from 1979 to 1995 until she became disabled.   (Pl. LR 56 St., pp.25-26, ¶¶ 107-108).

- Ms. Brookshire's disability resulted from her long-standing degenerative disc disease, severe chronic pain, chronic tachychardia, reflux disease, hypertension and depression.  (Pl. LR 56 St., pp. 26-27, ¶¶ 109-111).

- Throughout her disability, Ms. Brookshire has been treated by Dr. Goodwin, her family physician and when he retired, by Dr. Mulholland.   Dr. Goodwin and Dr. Mulholland both certified that Ms. Brookshire was disabled from any occupation. (Pl. LR 56 St., p.27, ¶ 115, p. 29, ¶ 123, p. 30-31, ¶¶ 132, 134-137, p. 32, ¶ 139).

- From 1995 to 1996, Champion determined that Ms. Brookshire was totally disabled from her regular job and from 1997 to 1998, from any occupation (Pl. LR 56 St., pp. 32-34, ¶¶ 141-142, 144, 146).

- Although her condition did not improve, in December, 1997, CORE decided that Ms. Brookshire was no longer totally disabled, and terminated benefits.  Upon review, CORE and Champion upheld the termination, and Champion's CRC upheld final termination of LTD benefits on July 16, 1998.   (Pl. LR 56 St., p. 40, ¶ 171).

-26-

**Champion/CORE Denied Ms. Brookshire a Full and Fair Review and
Wrongfully Terminated Her LTD Benefits.**

Full and fair review of the evidence reveals that Ms. Brookshire was totally disabled,
primarily because of long-term chronic back pain which began in 1980 and stemmed from
degenerative disc disease, degenerative arthritis and osteoarthritis of the spine. Although she
worked in pain for years, in January, 1995, she was unable to return to work. She received LTD
benefits from June 5, 1995 until January 31, 1998. (Pl. LR 56 St., p. 27, ¶¶ 114). On January 26,
1998, her treating physician, Dr. Harley, described her back pain as disabling and chronic, and
her degenerative spinal arthritis as very obviously progressive. (Pl. LR 56 St., pp.27-28, ¶¶ 115-
116; Pl. App. 18). She was certified as totally and permanently disabled from work in her
occupation on January 11, 1995 and from any occupation on April 29, 1996.(Pl. LR 56 St., pp.
32-33, ¶¶ 141-143). She was also determined by the Social Security Administration to be totally
disabled from any employment, effective January 2, 1995. (Pl. LR 56 St., p. 34, ¶ 149).

**CORE/Champion's Decision**

On December 18, 1997, CORE recommended denial of Ms. Brookshire's LTD benefits,
which were eventually terminated. A telephone conversation between CORE medical director
Dr. Beavers and Ms. Brookshire's treating physician, Dr. Mulholland, on July 23, 1997 led to
that termination. Only one month earlier, Dr. Mulholland had certified in an Attending
Physician's Statement that Ms. Brookshire was totally disabled from any occupation and would
never be able to return to work. (Pl. LR 56 St., p. 32, ¶ 139; Pl. App. 15). However, according
to Beavers' version of the July 23, 1997 conversation with Dr. Mulholland, Dr. Mullholland

-27-

supposedly did not claim that Ms. Brookshire was disabled from any occupation; and after
obtaining an FCE and an IME, CORE, on December 18, 1997, recommended denial of further
LTD benefits. (Pl. LR 56 St., pp. 34-35, ¶¶ 151-153). That decision was upheld.  Ms. Brookshire
appealed on February 2, 1998, and Champion upheld the CORE denial on May 1, 1998, without
further investigation. Ms. Brookshire appealed.

　　　CORE commissioned a TSA on July 1, 1998, and a Peer Review Analysis on July 10,
1998. Champion's Claims Review Committee upheld the termination of benefits.

**Champion/CORE's Evidence Was Unreliable**

　　　***FCE:*** CORE's FCE was performed by a physical therapist who never explained any
rational basis for extrapolating from the FCE, a few-hours test, her conclusion that Ms.
Brookshire could sustain competitive work activity for 40 hours a week.  The FCE contained no
follow-up as to how the test itself may have affected Ms. Brookshire's pain thereafter. CORE
instructed the FCE administrator to consider only impairments related to chronic degenerative
lumbar disc disease with osteoarthritis, so disability related to her other conditions, such as
tachycardia, reflux disease, hypertension, and depression  was not considered.  (Pl. LR 56 St.,
pp.35-36, ¶155).

　　　***IME:*** CORE's IME was done by Dr. Rudins, who saw Ms. Brookshire one time, and
based his review of her condition primarily on the FCE performed by CORE's physical therapist.
(Pl. LR 56 St., p. 37, ¶ 158).  He did not review records from either Ms. Brookshire's longtime
treating family physician, Dr. Goodwin, who had first declared her disabled, or her longtime
treating orthopaedist, Dr. Harley.  The IME did state that "the partial disability and current
restrictions are for all practical purposes permanent," and recommended a work tolerance

program, but nonetheless hypothesized that she could work at some occupation. There was little in the IME to support Rudins' opinion that there was a possibility that Ms. Brookshire would be able to obtain and sustain competitive full-time employment. There is little or no attention in the IME to the effects of Ms. Brookshire's chronic pain on her ability to sustain light work. There is no indication as to the effects of Ms. Brookshire's medications on her ability to perform light work; there is no indication as to whether there were employers in the local economy who would provide such work to Ms. Brookshire, given her limitations and restrictions. In fact, thirteen days later, on December 15, 1997, when a CORE nurse sent the Champion mill in Canton a "Partial/Modified RTW Opportunities" form on Ms. Brookshire, recommending return to work, a Champion nurse responded immediately that the mill was "unable to accommodate modifications." (Pl. LR 56 St., p. 38, ¶ 159(e); Pl. App.17).

*TSA:* Like the FCE and the IME, the TSA was flawed in that it contained no discussion of the impact of Ms. Brookshire's symptoms such as pain and other physical problems on her ability to obtain and sustain competitive work. It did not include a labor market survey indicating whether any of the jobs recommended for Ms. Brookshire existed in significant numbers in her local economy. Morever, the TSA failed to explain why another employer would want to hire the 60-year old Ms. Brookshire with her 19th grade education and restrictions, when Champion would not.

*Peer Review Analysis:* This document was prepared by a doctor who never saw Ms. Brookshire or even spoke with her. Nothing in the report indicates the doctor ever considered the effects of her chronic pain, other subjective complaints or her medications, on her ability to obtain and sustain competitive employment. (Pl. LR 56 St., p. 42, ¶ 173).

-29-

**Champion/CORE Ignored Critical Evidence**

Champion and CORE both exhibited a total disregard for evidence of chronic, disabling pain; they both failed to acknowledge the objective foundation for Ms. Brookshire's conditions of chronic pain, numbness and muscle spasms that had been documented over the years by her treating physicians. In addition, Champion and CORE both failed to consider vocational evidence such as Ms. Brookshire's advanced age, her lack of education (10th grade), and her absence from the workforce during the three years she had been certified as disabled, in deciding whether to deny her benefits. Consistent with the corporate policy enunciated by CORE's Glen Taylor, their designated 30(b)(6) witness, that the claimant's age was never a factor in CORE reviews, Champion and CORE ignored the fact that Ms. Brookshire was almost 61 when her LTD benefits were terminated. (Pl. App. 98). No consideration was given to the fact that Champion itself had refused to re-employ Ms. Brookshire with her restrictions and other limitations.

Finally, Champion and CORE failed to consider Ms. Brookshire's supplementary evidence submitted during her appeals, which might have resolved various issues. (Pl. LR 56 St., p. 44, ¶ 179).

**Conclusion**

Based on Champion/CORE's reliance on unreliable and flawed devices such as the FCE, IME, TSA and Peer Review Analysis, and their refusal to consider critical evidence, their decision to terminate Ms. Brookshire's LTD benefits was not the result of a full and fair evidentiary review; it was not the result of a reasoned decision-making process. It was the culmination of an incomplete and unfair review, and of a denial-oriented process. A full and fair

review, and a reasoned decision-making process, considering all medical and vocational factors (including her age) would have established Ms. Brookshire's continued total disability under the Plan.

## HARRISON YOUNG CLARK

The evidence in Mr. Clark's claims record proves the following:

- Mr. Clark's date of birth is June 8, 1949; at the time of the final denial of his benefits, Mr. Clark was 49 years old. (Pl. LR 56 St., p. 44, ¶ 180).

- Mr. Clark has an eighth grade education. (Pl. LR 56 St., p. 44, ¶ 181).

- Mr. Clark was employed by Champion for 9 years from 1981 to 1990, when he became disabled from any work. (Pl. LR 56 St., p. 44, ¶ 183).

- Mr. Clark's disabling conditions arise from his traumatic, on-the-job back injury in 1984, chronic pain syndrome, recurrent herniated discs, nerve impingement, prolonged recurrent depression, restless leg or Ekbom Syndrome, sleep disturbance, fibromyalgia, myositis, chronic lumbar strain and Type II diabetes. (Pl. LR 56 St., pp. 45-46, ¶¶ 187-189).

- Throughout his disability, Mr. Clark was treated by a number of doctors, including Dr. Van Blaricom, a spine specialist, Dr. Eglinton, Dr. Mills, Dr. Mendelsohn, and Dr. Harned. His attending physicians repeatedly certified that he was totally disabled from any work. (Pl. LR 56 St., p. 46, ¶ 192; p.47, ¶ 194; p. 49, ¶ 201; p. 51, ¶ 208, 212).

- From 1991 to 1997, Champion consistently determined that Mr. Clark was totally disabled from his regular job and any occupation and eligible for LTD benefits under the Plan. (Pl. LR 56 St., p. 46, ¶ 191; pp. 48-50, ¶¶ 197, 198, 202-203; p. 51, ¶¶ 209-211).

- Although Mr. Clark's condition did not improve, in February, 1998, CORE decided that Mr. Clark was no longer totally disabled under the Plan, and Champion finally upheld the termination on December 2, 1998. (Pl. LR 56 St., p. 57, ¶ 248).

**Champion/CORE Denied Mr. Clark a Full and Fair Review and
Wrongfully Terminated His LTD Benefits**

If looked at fully and fairly, the evidence demonstrates that Mr. Clark was totally disabled from any occupation in 1998, just as he had been since the early 1990s. He survived a serious on-the-job injury in November of 1984 when he was struck in the back by a large run-away log. That injury kept him out of work for eighteen months. Nevertheless, he returned to work, although his back continued to bother him, and he was left with a 25-30% permanent impairment of his spine. (Pl. LR 56 St., pp. 45-46, ¶¶ 187-189). That, coupled with a medley of other problems including chronic pain syndrome, recurrent herniated disc, nerve impingement, prolonged recurrent depression, restless leg or Ekbom Syndrome, sleep disturbance, fibromyalgia, myositis, chronic lumbar strain and Type II diabetes, together with his limited 8th grade education and lack of transferable job skills, clearly disables him from any occupation. (Pl. LR 56 St., pp.45-46, ¶¶ 187-189).

Although CORE had earlier certified his disability from any occupation, CORE subsequently set a course to deny Mr. Clark's benefits. Although his condition did not improve, in February, 1998, CORE decided that Mr. Clark was no longer totally disabled, and terminated his LTD benefits. (Pl. LR 56 St., pp. 53-54, ¶ 225). As was its pattern and practice, CORE's tools for termination involved an IME examination by a physician, Dr. Rudins, who was not furnished a complete record to review (Pl. LR 56 St., p. 52, ¶ 218)., exaggeration and mis-characterization of the findings of the IME (Pl. LR 56 St., p. 52, ¶ 218; p. 53, ¶¶ 224-225), intimidation of the treating physician, Dr. Eglinton, by CORE's Medical Director, Dr. Beavers (Pl. LR 56 St., pp. 51-52, ¶¶ 212-214), and a vague TSA (Pl. LR 56 St., p. 55, ¶ 237; p. 56, ¶ 244).

Yet another notable deficiency in CORE's review of the evidence was its myopic pretense that Mr. Clark has but one medical problem - "fibromyalgia" or, alternatively, "back pain." He had many problems, and their combined effect was the basis for the Social Security Administration's decision finding him permanently disabled from competitive employment. (Pl. LR 56 St., p. 52, ¶ 216; pp. 45-46, ¶ 189; p. 47, ¶ 196).

**Champion/CORE Ignored Critical Evidence**

On October 15, 1997, an FCE was performed by a physical therapist who concluded: "Because of high pain levels and hesitation by Mr. Clark to complete all tests, I am unable to indicate that he is capable of returning to work." (Pl. LR 56 St., p. 52, ¶ 215). Undeterred, CORE referred Mr. Clark to Dr. Rudins for an IME, which was performed on January 12, 1998. (Pl. LR 56 St., p. 52, ¶ 218). Although Dr. Rudins speculated that Mr. Clark could potentially work at a sedentary level 8 hours per day with significant restrictions, his realistic opinion was that "considering that Mr. Clark has been out of work for essentially seven years, the probability of his being able to return to a productive job is quite low". (Pl. LR 56 St., p. 52, ¶ 218). Dr. Rudins also recommended that Mr. Clark be offered a trial of work hardening with access to a psychologist therein to assist in increasing work capacity. (Pl. LR 56 St., p. 53, ¶¶ 220-221).

Ignoring the practical and the probable, CORE seized upon Dr. Rudins' opinion that Mr. Clark might be able to work, without paying any attention to his bottom-line projection that "the probability of his being able to return to a productive job is quite low" (emphasis added). CORE also ignored his recommendation of work hardening and psychological pain counseling. Instead, CORE pronounced Dr. Rudins' examination an "able IME" and asked if Champion's Canton mill would re-employ Mr. Clark with the restrictions advanced by Dr. Rudins: "He should be

-33-

able to frequently change positions- i.e. sit, to stand, to walk, at least every fifteen minutes. He should avoid any extensive or repetitive bending or twisting.  Maximal lifting is ten pounds on an occasional basis."(Pl. LR 56 St., p. 53, ¶ 222).   However, the location "said to proceed with denial as they could not accommodate the restrictions of sedentary job" imposed by Dr. Rudins. (Pl. LR 56 St., p. 53, ¶ 223; Pl. App. 22).

On September 3, 1998, a TSA was conducted by a CORE employee who never reviewed Mr. Clark's medical records, never interviewed him personally, and never  performed a labor market survey to test her hypothesis that "Mr. Clark is capable of working as a production clerk, which is the position he previously held at Champion."  (Pl. LR 56 St., p. 56, ¶ 239).   In their rush to terminate benefits, CORE and Champion ignored the reality of Mr. Clark's multiple severe medical and vocational problems, and made a mockery of the standard of "full and fair review."

### Conclusion

CORE and Champion's decision to terminate Mr. Clark's benefits based on mis-characterizing or exaggerating some evidence and ignoring other evidence falls far short of the full and fair review to which he was entitled. Rather, the decision to terminate was simply the inevitable result of an unfair, denial-oriented process.   A full and fair review of the evidence demonstrates Mr. Clark's entitlement to on-going benefits under the Plan.  Champion's unwillingness to risk bringing Mr. Clark back to their job site is strong and practically conclusive evidence of his total disability from any occupation.

**FRANZISKA FINNEY**

-34-

The evidence in Ms. Finney's claims record proves the following:

- Ms. Finney's date of birth is October 3, 1945; at the time of the final denial of her benefits under the Plan, Ms. Finney was 52 years of age.  (Pl. LR 56 St., p. 59).

- Ms. Finney has an 11th grade  high school education (equivalency from Germany).   (Pl. LR 56 St., p. 59, ¶ 258; Pl. App.1).

- Ms. Finney was employed by Champion for 10 years, from 1984 to 1994, when she became disabled from any work.  (Pl. LR 56 St., p. 60, ¶ 259; Pl. App. 1).

- Ms. Finney's disabling conditions include disc degeneration, fibromyalgia, osteoarthritis and chondromalacia of the patella at the L5-S1 and C5-6, 6-7 levels of her spine.  (Pl. LR 56 St., p.60, ¶ 263; Pl. App. 1).

- Throughout her disability, Ms. Finney has been treated by her primary treating physicians: Dr. Brummer, Dr. Rardin, Dr. Queen, and Champion's doctor, Dr. Osbahr, who certified that Ms. Finney was totally disabled from work.  (Pl. LR 56 St., p. 60, ¶ 264).

- From 1994 to 1997, Champion consistently determined that Ms. Finney was totally disabled from her regular job and eligible for LTD benefits under the Plan.  (Pl. LR 56 St., p. 61, ¶¶ 264-270).

- Although Ms. Finney's condition did not improve, in October 1, 1997, CORE decided that Ms. Finney was no longer totally disabled under the Plan, and terminated her LTD benefits; Champion finally upheld the termination on February 9, 1998.  (Pl. LR 56 St., p.65, ¶ 286).

### Champion/CORE Denied Ms. Finney a Full and Fair Review and Wrongfully Terminated Her LTD Benefits

A full and fair review of the evidence in Ms. Finney's record establishes that she worked for Champion on a conveyor at Champion's plant for approximately 10 years.  Ms. Finney was forced to stop working because of her chronic pain—she stated that her "whole body hurts;" that she had pain in her "back and knees, arthritis in her neck, fibromyalgia in her shoulders, arms and legs, fatigue all the time." (NB 7: CE-81; Pl. LR 56 St., pp. 16-62, ¶¶ 267, 274; Pl. App.1).  In

her early 50s, Ms. Finney's prospects for continuing to work under her disabling pain seemed bleak, at best.

One of Ms. Finney's treating physicians was Dr. Al Osbahr. Dr. Osbahr was the company physician for Champion. Repeatedly, during the first several years of her disability, Dr. Osbahr found that Ms. Finney could not perform her regular work at Champion, and thus, was disabled under the Plan. (Pl. App. 2). Dr. Osbahr indicated some potential that Ms. Finney could perform sedentary work, but limited Ms. Finney to "3-4 hours" in his reports of her physical capacity. (NB 7: Finney-227, 232). The company doctor also indicated early on that it was unclear "whether Ms. Finney would ever be able to return to work of any kind." (NB 7: Finney-234).

Ms. Finney was never able to go back to work. When Dr. Osbahr suggested that Ms. Finney could return to work in a sedentary position at Champion, Champion would not accommodate her, responding that there was "nothing 'sit down' for employees at Champion." (NB 42: CE-76)(Pl. LR 56 St., p. 64, ¶ 282; Pl. App. 26).

Ms. Finney was totally disabled under the Plan, both medically and vocationally, due to her chronic pain and its impact on her functional capacity and her concentration.

Neither CORE nor Champion engaged in a full and fair review of Ms. Finney's evidence. Instead, Champion ultimately terminated Ms. Finney's LTD benefits based on evidence which was unreliable, at best, and findings which ignored critical evidence in support of Ms. Finney's claim.

### Champion/CORE's Evidence Was Unreliable

-36-

In order to support its decision to terminate Ms. Finney, CORE relied on an FCE performed by its company doctor. In the FCE report, dated July 23, 1997, Dr. Osbahr again found that Ms. Finney was unable to do her regular work, but stated that she could perform work in a position which required light work capacity. The company doctor elaborated: "If trained or possessed skills for white collar type jobs, she could do light work activities only." (Pl. LR 56 St., p. 62, ¶ 275).

The Champion doctor's FCE is questionable, at best. Dr. Osbahr failed to reconcile his earlier FCE which limited Ms. Finney to "3-4 hours per day" part-time work. The FCE, which consists of a one-page form fails to provide any basis for its conclusory findings. Ms. Finney has described Dr. Osbahr's FCE as a "20-minute test." (NB 28: Finney-29).

In short, the evidence on which Champion/CORE based its denial was questionable, at best, and did not support the termination decision.

### Champion/CORE Ignored Critical Evidence

*Pain:* Champion/CORE ignored Ms. Finney's complaints of pain. While CORE had emphasized Ms. Finney's "Intractable pain," and "Chronic fatigue" as potential complications with respect to Ms. Finney's work capacity, they fail to take her credible complaints of pain and fatigue into consideration in determining the ultimate issue of Ms. Finney's disability. Ms. Finney's complaints of pain were consistent, were objectively based and were believable. Yet, neither CORE nor Champion made any effort to interview Ms. Finney to consider this critical evidence. (Pl. LR 56 St., p. 62, ¶ 274).

*Vocational Evidence:* Just as glaring was Champion/CORE's failure to consider the various factors which would clearly make Ms. Finney's return to work improbable, if not

-37-

impossible.  As noted above, Champion had recognized her limitations, and refused to even consider Ms. Finney for re-employment in spite of her employment record, dismissing Dr. Osbahr's inquiry with the sweeping denial that there were no  "sitting" positions at Champion. (Pl. App. 26).  Champion's reaction to the inquiries concerning Ms. Finney's potential for re-employment is the best evidence that there was probably no employer who was going to hire Ms. Finney, given her limitations.

And in fact, Ms. Finney had already been informed that she was not employable in any occupation.  On her doctor's referral, Ms. Finney spoke with a vocational rehabilitation counselor who interviewed her and informed her that considering her "pain, sleeplessness, chronic fatigue, high blood pressure and other symptoms," she would be "unable to work at any kind of job for an 8-hour shift regardless of what type of work."  (NB 7: Finney-11) (Pl. LR 56 St., p. 65, ¶ 285). CORE was informed of this report, and the name of the counselor, but never followed up.  *Id.*

Ms. Finney's supplementary evidence provided a comprehensive vocational assessment from a certified vocational counselor, Dr. Benson Hecker.  After a thorough review of Ms. Finney's history, her conditions and her medical treatment, as well as an assessment of her credibility concerning her pain, Dr. Hecker found that "[f]unctionally, Ms. Finney is extremely limited in her capacities for sitting, standing, walking, climbing, lifting, carrying, stooping, squatting, turning/twisting of the spine and forward bending," and that she suffered from "profound sleep disturbance."  Dr. Hecker also determined, judging Ms. Finney's credibility, that her pain is "moderate to moderately severe pain with no significant relief," and that it increased with physical activities.  Dr. Hecker concluded that Ms. Finney is unable to effectively perform "sedentary or light work requirements, and is totally and permanently disabled."  (Pl. LR 56 St.,

-38-

p. 66, ¶ 287). Champion/CORE refused to consider this evidence or any other substantive

evidence concerning the vocational aspects of Ms. Finney's total disability.

### Conclusion

In short, there is no substantial evidence to support the termination of Ms. Finney's long

term disability benefits, and no reasoned decision-making process led to Champion/CORE's

decision.  Since Champion/CORE failed to engage in a full and fair review of Ms. Finney's

claim, Champion's final decision should be rejected.

The total record demonstrates that Ms. Finney was totally disabled under the Plan and

therefore entitled to LTD benefits.

### WILEY H. HAYNES

The evidence in Mr. Haynes' claims record proves the following:

- Mr. Haynes' date of birth is November 1, 1938; at the time of the final
  denial of his benefits under the Plan, Mr. Haynes was 59 years of age.  (Pl.
  LR 56 St., p. 66, ¶ 288; Pl. App. 1).

- Mr. Haynes has a high school education.  (Pl. LR 56 St., p. 66, ¶ 289; Pl.
  App. 1).

- Mr. Haynes was employed by Champion for 35 years from 1958 to 1993,
  when he became disabled from any work.  (Pl. LR 56 St., p. 67, ¶ 290; Pl.
  App. 1).

- Mr. Haynes' disabling conditions stem from his severe back conditions,
  requiring several surgeries and resulting in severe chronic pain and loss of
  function.  (Pl. LR 56 St., pp. 67-68, ¶¶ 295-301; Pl. App. 1).

- Throughout his disability, Mr. Haynes has been treated by Dr. Kate Queen,
  a board certified rheumatologist, who has repeatedly certified that Mr.
  Haynes was totally disabled from any work.  (Pl. LR 56 St., pp. 68-69, ¶¶
  302-303; Pl. App. 27, 28).

-39-

- From 1993 to 1997, Champion consistently determined that Mr. Haynes was totally disabled from his regular job and any other job for which he was qualified by training, education or experience, and entitled to LTD benefits under the Plan. (Pl. LR 56 St., p. 69, ¶¶ 304-307).

- Although Mr. Haynes' condition did not improve, in February 1997, CORE decided that Mr. Haynes was no longer totally disabled under the Plan, and terminated his LTD benefits, and Champion finally upheld the termination. (Pl. LR 56 St., pp.74, 77, ¶¶ 320, 331).

### Champion/CORE Denied Mr. Haynes a Full and Fair Review and Wrongfully Terminated His LTD Benefits

The evidence in Mr. Haynes' claims record establishes Mr. Haynes' total disability as a matter of law. The evidence depicts Mr. Haynes as hard working individual who gave the best of his working life—35 years—to Champion; who worked for years in pain and under a disability to his back; who initially refused to accept the fact that he was disabled; who endured weeks in a work hardening program to try to return to work, even against medical advice and was ultimately unsuccessful; and who had to seek counseling to accept his total disability. (Pl. LR 56 St., p. 69, ¶ 303; Pl. App. 29; NB 8: Haynes-8, 40, 59-67). Dr. Queen, Mr. Haynes' treating board-certified rheumatologist, was adamant, based on the objective evidence and Mr. Haynes' credible complaints of pain that he could not return to work: (Pl. LR 56 St., p. 75, ¶ 327).

In 1994 and 1995, Champion (and its claims administrator, Travelers) completed Vocational Rehabilitation Profiles in which they evaluated Mr. Haynes' ability to return to work under a number of factors. Considering Haynes' age, education, medical status, and, Champion's refusal to accommodate his limitation, Mr. Haynes was rated low on his work rehabilitation potential. Significantly, Mr. Haynes was rated high on his interest in returning to work, but it was noted that he was too impaired to do so. Based on the ratings on each test,

Champion/Travelers determined that Mr. Haynes should not be referred for rehabilitation. (Pl. LR 56 St., p. 69, ¶ 307; Pl. App. 30, 31).

Through various actions, Champion and its prior administrator, Travelers, recognized Mr. Haynes' total disability. Repeatedly, Champion certified his total disability under the Plan without question. Repeatedly, Champion acknowledged not only that Mr. Haynes could not work in any occupation, but also that there was no potential rehabilitation that could assist him in returning to work. In short, there was never any question concerning Mr. Haynes' total and permanent disability, and his right to continuing LTD benefits until CORE was hired by Champion. (Pl. LR 56 St., p. 69, ¶¶ 304-307).

Within nine months of Champion's last certification of Mr. Haynes' total disability from any work, and within six months of Champion's last vocational profile determining that Mr. Haynes should not be rehabilitated for work; and with no evidence in the record indicating anything but Mr. Haynes' total disability, CORE decided to review Mr. Haynes' claim. (Pl. LR 56 St., p. 70, ¶ 310). Within a year, CORE had determined, inconsistent with all of the above evidence, that Mr. Haynes was no longer disabled.

### Champion/CORE's Evidence Was Unreliable

CORE based its ultimate decision on an FCE and IME. Neither was reliable in refuting the consistent evidence and opinions of Mr. Haynes' treating physician, Dr. Queen, that Mr. Haynes was disabled.

***FCE:*** The FCE was performed by a physical therapist, Susan Kimel. There is no indication in the record that Ms. Kimel was qualified to perform an FCE or to reach any conclusions concerning Mr. Haynes' disability based on the results. Ms. Kimel concluded, based

-41-

on the 3 ½ hour test, conducted on October 21, 1996, that Mr. Haynes was "able to work at the sedentary-light physical demand level for an 8 hour day." (Pl. LR 56 St., p. 71, ¶ 312).

Ms. Kimel never attempted to reconcile her findings with her previous unsuccessful work hardening program which she had conducted with Mr. Haynes less than two years earlier. During that program, which was designed to assist Mr. Haynes in returning to work, Ms. Kimel had noted Mr. Haynes' "very complicated [medical] history" with several back surgeries, including spinal fusion; had acknowledged Mr. Haynes' chronic and severe pain "with progressive worsening;" and had ultimately found that Mr. Haynes was "at risk for re-injury or further injury if he returns to his job as described by his employer." (Pl. LR 56 St., p.67, ¶ 294). Nevertheless, there is no mention of her previous test in her report.

In fact, the FCE was simply a snapshot of Mr. Haynes' ability and strength during a 3 ½ hour block of a day. According to Mr. Haynes, his pain increased severely after the test was conducted, and he spent two days lying on a heating pad to get over it. (Pl. LR 56 St., p. 71, ¶ 312). There is no basis for the leap to conclusions made by this technician that because Mr. Haynes could carry out some activities for a short period of time, he was able to work in a sedentary/light position for 8 hours a day, 40 hours a week.

*IME:* Equally unreliable was the IME on which Champion/CORE based its decision. Dr. Peter Johnson, a physician specializing in "rehabilitation," saw Mr. Haynes on a single occasion on January 20, 1997, for less than an hour. Dr. Johnson noted Mr. Haynes' "progressive symptoms which interfered" with his work activities, and his chronic pain which resulted from serious back problems which had resulted in two different surgeries, including fusion. Based

-42-

primarily on the FCE, Dr. Johnson concluded that Mr. Haynes could work at a sedentary level with certain restrictions.  (Pl. LR 56 St., p. 72, ¶ 313).

The one-time examination by Dr. Johnson cannot be reconciled with the consistent reports of Mr. Haynes' treating physician, Dr. Queen.  In short, given the brevity of his exposure to Mr. Haynes' limitations, Dr. Johnson's IME amounts to a conclusion without a foundation.

**Champion/CORE Ignored Critical Evidence**

*Pain:*  Consistent with Champion/CORE's policies, they failed to consider the impact of Mr. Haynes' chronic and severe pain on his ability to work.  While the pain is documented throughout the record, both by Mr. Haynes and his doctor; and while it is acknowledged throughout the record by Champion and CORE, they made no effort to analyze the credibility of Mr. Haynes' reports of pain and its significance in his overall work capacity.  Champion's experience with Mr. Haynes' during his long years of employment and his unsuccessful attempts to return to work following the work hardening program, gave Champion ample exposure to Mr. Haynes' work ethic and his character for truthfully reporting his severe limitations from pain. (Pl. LR 56 St., p. 69, ¶ 303).

In addition, Mr. Haynes was quite articulate in documenting his desire to return to work, his continuing impairment from pain, and his "depression" from his ultimate resignation that he would no longer be able to work.  (Pl. LR 56 St., p. 76, ¶ 329; Pl. App. 34).  Combined with Dr. Queen's documentation of objective findings and Mr. Haynes' underlying  impairments, there could be no full and fair review without some analytical consideration of the significant impairment  of Mr. Haynes' pain.

***Vocational evidence:*** In addition, Champion/CORE made no effort to consider the vocational component of Mr. Haynes' disability. Before a disabled participant can be found able to work "in any occupation or business for profit for which he is reasonably qualified . . , " the fiduciary must consider his obstacles to employment. Champion/CORE made no effort to analyze Mr. Haynes' employment prospects, even assuming that he was able to perform sedentary work with the noted restrictions.

In fact, Champion had already determined that Mr. Haynes' prospects for employment were so low that, even though Mr. Haynes wanted to return to work, rehabilitation for work was not justified because he was "[t]oo impaired." (Pl. LR 56 St., p. 69, ¶ 307; Pl. App. 30-31). Based on his profile, on two different occasions, Champion (and its administrator, Travelers) instructed Mr. Haynes' case manager: "Do not refer for rehab review." *Id.*

Just as revealing was Champion's reaction, following the FCE, when the company was asked whether it would re-employ Mr. Haynes in light/sedentary work. Sharon Spain, Champion's employee in the Canton, North Carolina plant, was adamant that Champion would not consider Mr. Haynes for work consistent with his restrictions. (Pl. LR 56 St., p. 73, ¶ 314; Pl. App. 32). Given Mr. Haynes' work history, Champion's refusal to consider Mr. Haynes for re-employment is strong, and perhaps conclusive, evidence that Mr. Haynes was unemployable.

In fact, the vocational assessment provided by Mr. Haynes in his supplementary filing, established this fact. After comprehensively reviewing Mr. Haynes' personal, employment and medical records, and interviewing Mr. Haynes to determine the limitations of his chronic pain, Mr. Randy Adams concluded that Mr. Haynes was unemployable—and thus, disabled—from any occupation. (Pl. LR 56 St., p. 77, ¶ 332).

-44-

**Conclusion**

Given the internal inconsistencies in Champion/CORE's claims records, it is clear that Champion/CORE failed to conduct a full and fair review of Mr. Haynes' claim.  Given the substantiating evidence in the record, Mr. Haynes' total disability from working in any occupation is established as a matter of law.

**DARRELL KEITH HILL**

The evidence in Mr. Hill's claims record proves the following:

- Mr. Hill's date of birth is March 4, 1952; at the time of the final denial of his benefits under the Plan, Mr. Hill was 46  years of age.  (Pl. LR 56 St., p. 78, ¶ 333; Pl. App. 1).

- Mr. Hill has a high school education.  (Pl. LR 56 St., p. 78, ¶ 334; Pl. App. 1).

- Mr. Hill was employed by Champion for 18 years, from 1972 to 1990, when he became disabled from any work.  (Pl. LR 56 St., p. 78, ¶ 335; Pl. App. 1).

- Mr. Hill's disabling conditions arise from traumatic injuries to his right leg and post-traumatic degenerative arthritis and eight surgeries on his right ankle and foot, culminating in the amputation of his right leg.  (Pl. LR 56 St., pp. 78-79, ¶ 338; Pl. App. 35).

- Throughout his disability, Mr. Hill has been under the regular care of his primary treating physician: Dr. Dement, who has repeatedly certified that Mr. Hill was totally disabled from any work.  (Pl. LR 56 St., p. 79, ¶ 334; Pl. App. 35).

- From 1990 to 1998, Champion consistently determined that Mr. Hill was totally disabled from his regular job and any other job for which he was qualified by training, education or experience, and entitled to LTD benefits under the Plan.  (Pl. LR 56 St., p. 80, ¶¶ 345-348).

- Although Mr. Hill's condition did not improve, in July, 1998, CORE decided that Mr. Hill was no longer totally disabled under the Plan, and

-45-

Champion finally upheld the termination of his LTD benefits on February 7, 1999.  (Pl. LR 56 St., p. 83, ¶ 364).

### Champion/CORE Denied Mr. Hill a Full and Fair Review and Wrongfully Terminated His LTD Benefits

Mr. Hill's disability is based on his chronic and long-standing injuries to his right leg, which required eight surgeries over the years, culminating in the amputation of his leg below the knee.  He has also experienced persistent infection of his leg and his stump, which has required intermittent treatment.  Because of the loss of his leg, Mr. Hill has put more strain on his back, from which he suffered with degenerative arthritis, and his left leg. (Pl. LR 56 St., p. 79, ¶ 340; Pl. App. 35-36).

Mr. Hill's treating physician, Dr. Dement, had repeatedly expressed the opinion that Mr. Hill was totally disabled and would never be able to work.  His opinion was based on the obvious objective limitations in Mr. Hill's function, as well as his infections and pain. (Pl. LR 56 St., p. 79, ¶ 344; Pl. App. 35).  Mr. Hill was recognized as totally disabled by Champion for eight years, from 1990 to 1998.  Due to the severity and chronicity of his symptoms, Champion had never questioned his total disability.  (Pl. LR 56 St., p. 80, ¶¶ 345-348).

### Champion/CORE's Decision

*IME:*  In its Confidential Service Report # 5, dated July 29, 1998, CORE indicates that an IME has been conducted concerning Mr. Hill on June 25, 1998. (NB 10:Hill-0118)  No record of the IME appears in Mr. Hill's claims file. (Pl. LR 56 St., p. 82, ¶ 357).

There is no other evidence in the record to support Champion/CORE's finding that Mr. Hill is not disabled.

-46-

***Chronic Pain:***  Mr. Hill's claims file is replete with references to his pain and infections. Mr. Hill's wife attempts to describe his years of enduring persistent and progressive leg problems, and the multiples surgeries,  and ultimately his amputation.  Ms. Hill stated that her husband had "been to hell and back in the last 10 years;" that he "has suffered more than any one person should ever suffer in a lifetime, and it's not over yet, he still feels the pain as though his foot is still there."  She related that Mr. Hill "does not sleep at night, he rolls and tumbles and cries out in pain." (Pl. LR 56 St., p. 82, ¶ 358; Pl. App. 36).

Dr. Dement's records document Mr. Hill's repeated complaints of pain, as well. (Pl. LR 56 St., p. 79, ¶¶ 342-344; Pl. App. 35). Moreover,  CORE had identified "Chronic Pain Syndrome," as a potential clinical complication which could affect Mr. Hill's return to work.  (Pl. LR 56 St., p. 82, ¶ 355).

Yet, in view of all of the evidence that pain was a major and chronic problem, Champion/CORE made no effort to assess this impairment or its impact on Mr. Hill's work capacity.

***Vocational Evidence:***  Champion/CORE also largely ignored any vocational evidence. There was no evidence that Champion ever offered Mr. Hill re-employment, considering his restrictions.  There is no assessment in the record of the various factors which would impact on Mr. Hill's ability to obtain and sustain gainful employment in any occupation.  (Pl. LR 56 St., p. 83, ¶¶ 361-361).

CORE's Costs Services employee prepared a transferable skills analysis (TSA). Champion/CORE relied on the TSA in their ultimate denial.  However, the TSA is nothing more than a list of job titles from the employee's database which, according to the employee, require

-47-

skills consistent with the position Mr. Hill held at Champion. (Pl. LR 56 St., p. 81, ¶ 354).  There

is no indication in the TSA that any of the jobs listed are available in the local economy; there is

no indication that any of the jobs could actually be performed by Mr. Hill, considering his

restrictions and limitations; and there is no indication in the report of what training might be

required before Mr. Hill could even be considered for such positions.

  ***Supplementary Evidence:***  Champion/CORE also refused to consider Mr. Hill's

supplementary evidence.  Included in the evidence was a comprehensive vocational assessment

of Mr. Hill by Dr. Henry D. Wong, a certified rehabilitation counselor.  After a thorough review

of Mr. Hill's personal, employment and medical history; a personal interview with Mr. Hill; and

testing, Dr. Wong concluded:  "Due to his approaching advanced age, training would require a

substantial amount of vocational adjustment and therefore is not recommended.  Consequently,

there are no jobs that could be identified or recommended for Mr. Hill by this evaluator."  (Pl.

LR 56 St., p. 84, ¶ 365).  In reaching his conclusion, Dr. Wong also challenged the job titles

suggested in the TSA, concluding:

> Using the Classification of Jobs 2000, this evaluator finds these
> jobs are not recommended and are inappropriate based on the
> Apticom test results indicating he does not meet the minimum
> aptitudes required for jobs in Engineering, Technology, or
> Elemental Work: Industrial.  Specifically, the client does not meet
> aptitudes in Numerical, Spacial Perception, Intelligence Motor
> Coordination, Finger Dexterity, and Manual Dexterity.  Secondly,
> the jobs require physical demands of reaching, handling, feeling,
> and fingering at the frequent or constant level.  He did not meet the
> minimum performance criteria for physical demands in these jobs.

(Pl. LR 56 St., p. 84, ¶ 365).

Dr. Wong also summarized Mr. Hill's medical history over the years and concluded: "Based on the above, I find his condition is chronic, persistent and recurrent with exacerbations. Consequently, he is unemployable since May 6, 1991 and remains unemployable to the present date."

(Pl. LR 56 St., p. 84, ¶ 365).

Mr. Hill also submitted his Social Security Administration decision, as well as his affidavit. Both include substantiating statements concerning Mr. Hill's history and impairment.

### Conclusion

In short, the evidence in the record reflects the deficiencies in Champion/CORE's review of Mr. Hill's claim. There is no indication of any change in condition which would justify a change of Champion's finding that Mr. Hill was totally disabled. To the contrary, all evidence reflects Mr. Hill's continuing deterioration as a result of his chronic conditions.

The record does indicate other motivations for Champion/CORE's termination of Mr. Hill's benefits. In its Confidential Service Report #5, dated July 29, 1998, CORE reports to Champion:

> SAVINGS ANALYSIS
> Please refer to the estimated savings analysis for the service period of 7/29/98 to 4/1/2016. The costs savings reflect the employee's LTD salary per month over the next 18 years. It is anticipated that the patient would have remained on LTD benefits if it had not been for Case Management's assessment and intervention.

(Pl. LR 56 St., p.85, ¶ 366; Pl. App. 37). The estimated savings analysis reflects savings for Champion of over $75,000. *Id.*

-49-

The record establishes that Mr. Hill is totally disabled under the Plan, and eligible for

LTD benefits.

### JUDITH CASE KIRKPATRICK

The evidence in Ms. Kirkpatrick's claims record proves the following:

- Ms. Kirkpatrick's date of birth is February 20, 1944; at the time of the final denial of her benefits, she was 54 years old. (Pl. LR 56 St., p 85, ¶ 367).

- Ms. Kirkpatrick has a high school education. (Pl. LR 56 St., p. 85, ¶ 368).

- Ms. Kirkpatrick was employed by Champion on for 17 years from 1976 to 1993 when she became disabled and unable to work. (Pl. LR 56 St., p. 85, ¶ 369).

- Ms. Kirkpatrick's disabling conditions arise from degenerative back disease, connective tissue disease with fibromyalgia, generalized osteoarthritis and chronic advanced periodontitis of her teeth associated with bone loss in her upper and lower jaws. (Pl. LR 56 St., pp. 85-86, ¶¶ 372-375).

- Throughout her disability, Ms. Kirkpatrick has been treated by Dr. Brown, her family doctor, Dr. Mendelsohn, a rheumatologist, and Dr. Blaricon, an orthopaedist. (Pl. LR 56 St., p. 87, ¶ 380) Her doctors repeatedly certified her as disabled. (Pl. LR 56 St., p. 88, ¶ 385, ¶ 387; pp. 89-90 ¶ 392; pp. 91-92, ¶ 402; pp.97-98, ¶ 429).

- From 1994 to 1998, Champion consistently determined that Ms. Kirkpatrick was totally disabled first from her regular job and then from any occupation. (Pl. LR 56 St., p.90, ¶ 394; pp. 92-94, ¶¶ 404, 409, 413, 414; Pl. App. 39).

- Although Ms. Kirkpatrick's condition did not improve, in May, 1998, CORE decided that she was no longer totally disabled under the Plan, and terminated her LTD benefits, and Champion finally upheld the termination on December 15, 1998. (Pl. LR 56 St., pp. 99-100, ¶¶ 434-437).

- The Social Security Administration found her totally disabled effective November 22, 1993. (Pl. LR 56 St., p. 91, ¶ 399).

-50-

**Champion/CORE Denied Ms. Kirkpatrick a Full and Fair Review and
Wrongfully Terminated Her LTD Benefits**

When all the evidence is considered in Ms. Kirkpatrick's case, the inevitable conclusion
is that since she came out of work on November 21, 1993, she was and has been totally disabled,
not only from her prior work at Champion, but from any other occupation. She suffers from a
medley of physical problems that combine to clearly disable her from competitive work, chronic
low back pain as a result of multiple on the job back injuries; degenerative back disease;
connective tissue disease with fibromyalgia; generalized osteoarthritis; degenerative arthritis;
progressive bone loss through the back (osteopenia); moderate degenerative changes through
upper and lower extremities; trochanteric bursitis; Inflammatory polyarthropy; chronic advanced
periodonitis, having lost most of her teeth due to the severity of bone loss in her upper and lower
jaws; numbness in both hands, feet and ankles. (Pl. LR 56 St., p. 86, ¶¶ 374-375; pp. 86-87, ¶
379).

These problems have left Ms. Kirkpatrick with chronic intractable pain for which she
takes medications (Pl. LR 56 St., pp. 87-88, ¶ 383) and lies down; it severely limits her activity.
Ms. Kirkpatrick was an excellent Champion worker for more than 17 years before being
disabled. For years, Champion, through both Travelers and CORE certified Ms. Kirkpatrick to
be totally disabled from any occupation. (Pl. LR 56 St., p. 94, ¶ 414). Considerations of all
appropriate aspects of her claim as directed by the Plan compels the conclusion, yet again, that
she is totally disabled from any occupation. Had the process been full and fair in 1998, the
conclusion would have been as it was when she was younger and in better health: that she was
unable to perform any occupation.

-51-

**CORE/Champion's Decision; Reliance on Flawed Evidence;
Ignorance of Crucial Evidence**

Once Dr. Beavers, CORE's medical director, took over management of Ms. Kirkpatrick's claim, the review process was anything but full and fair. For years, Dr. Mendelsohn indicated that theoretically he believed Ms. Kirkpatrick capable of light sedentary work. However, when he moved from the hypothetical to the practical, he indicated that for all intents and purposes, Ms. Kirkpatrick was permanently and totally disabled. (Pl. LR 56 St., pp. 93-94, ¶¶ 410-411).

When Dr. Beavers took over the file, he chose to espouse an incorrect standard of disability which ignored subjective evidence. Then, he claimed that "there was no objective finding to suggest that she [Ms. Kirkpatrick] is totally disabled." (Pl. LR 56 St., p. 95, ¶ 416). Dr. Beavers was wrong twice. First, there was objective evidence to support her total disability. (Pl. LR 56 St., p.87, ¶ 381). Second, the law mandates that consideration be given to subjective complaints of pain as well as objective evidence. There was overwhelming and consistent evidence of disabling, intractable, chronic pain in Ms. Kirkpatrick's case. In its Confidential Service Report #3 where denial of benefits was recommended, CORE noted as "potential clinical compensations - intractable pain, activity intolerance, worsening fibromyalgic symptoms, depression and decreased range of motion." (Pl. LR 56 St., p. 86, ¶ 375; Pl. App. 42). However, Dr. Beavers ignored these clinical complications, as did the CORE Denial Committee, Mary Lee Dixon, and the Claims Review Committee. (Pl. LR 56 St., p. 96, ¶ 422; pp. 99-100, ¶¶ 435-436; Pl. App. 42).

Dr. Beavers also completely ignored the vocational evidence that had previously been considered by Travelers and CORE prior to the 1998 denial process. A pretense at consideration of those issues was made in the December 8, 1998 TSA offered by CORE. However, close analysis