of that document reveals a concerted effort to ignore the realities. The TSA begins its

"conclusion" – a vague hypothesis that she can do some work because she has some skills. (Pl.

LR 56 St., p. 98, ¶ 432; Pl. App. 43). However, CORE and Champion had previously

documented multiple times that she lacked transferable skills as a result of her laborer-like work

for Champion for 17 years. Moreover, the TSA ignores Ms. Kirkpatrick's relative lack of

education, her residence in a rural mountainous western North Carolina county, the fact that she

had been out of work for more than 4 years, and the fact that Champion itself, the largest

employer in her county, had no desire to take her back given her restrictions. The TSA ignored

many of her restrictions, but it did offer the curious proposal that since she had loaded and

unloaded boxcars, with the appropriate education, she might get a job as a ticket reservationist at

a public railway station. (Pl. LR 56 St., p. 98, ¶ 432; Pl. App. 43). Were it not being utilized in

such a nefarious fashion to deprive a very needy and worthy employee of important benefits, the

TSA would indeed be a laughable document.

  The minutes of the CRC's final consideration of Ms. Kirkpatrick's claim indicate that the

CRC considered the following:

  What is most notable about this excerpt from the CRC minutes is the stark absence of any

vocational evidence, other than the deficient TSA. The CRC ignored the vocational profile that

it had previously filled out that indicated that Ms. Kirkpatrick was not a candidate for

vocational rehabilitation or other work. (Pl. LR 56 St., pp. 99-100, ¶ 436; Pl. App. 38). It

ignored the multiple findings that she had no transferable skills, and accepted at face value the

claim of the TSA that such skills existed. It ignored the nuances of what Dr. Mendelsohn had

said when he distinguished between the theoretical possibility of Ms. Kirkpatrick being

potentially able to do some work, and the reality that for all intents and purposes she was permanently and totally disabled.

The CRC embraced the notion of Dr. Beavers, CORE's employee, that there were "no objective findings to suggest she is totally disabled." It ignored the objective evidence of progressive bone loss in her teeth and back. It ignored the x-rays that documented degenerative disc disease. It ignored the objective evidence that she was taking, and had taken for years, medications to control pain. The CRC ignored the subjective but very credible evidence of this hard-working employee's inability to continue to work after on-the-job injuries. It ignored the fact that Dr. Mendelsohn on August 27, 1998 said that Ms. Kirkpatrick was not even theoretically able to attempt sedentary work at that point. (Pl. LR 56 St., pp. 97-98, ¶ 429).

Champion compounded its errors by failing to consider supplementary evidence offered by the plaintiff once she obtained representation. That evidence addressed issues such as whether or not she had any transferable skills. Ms. Kirkpatrick offered the thorough vocational evaluation of Dr. Benson Hecker done September 24, 2000 where he concluded:

> after an interview with her and extensive review of the medical records all in stark contrast to the TSA upon which the Claims Review Committee relied - that given her age, education, vocational background and transferable skills, her impairments, the limitations that those impairments impose upon her, as well as her continuing limitations due to chronic moderately severe to severe pain, it is my opinion that Judy C. Kirkpatrick is unable to perform any substantial gainful work activity which exists in significant numbers in open competition with others.

(Pl. LR 56 St., p. 100, ¶ 438(b)).

The CRC's minutes are also notable for ignoring the report of CORE rheumatologist, Dr. Rose Fife, who considered medical records and had a telephone conversation with Dr. Mendelsohn on July 18, 1996, several years before Dr. Beavers' "conversation." Dr. Fife noted:

> The patient is a 53 year old female with osteoarthritis of her knees, hands, wrists, shoulders, elbows, neck, ankles and feet. She also has fibromyalgia. She is unable to perform any job requiring lifting, bending, climbing, pulling, pushing, repetitive fine motor movements, repetitive upper extremity movements, walking, and standing. She could perform less than sedentary work, such as with no repetitive use of the upper extremities, if she were appropriately trained, and if such work were available...However in the absence of such a sedentary job she cannot work, and she is disabled with respect to all of her previous jobs.

(Pl. LR 56 St., p. 92, ¶¶403-404 ; Pl. App. 39).

There was no evidence before the CRC that a real job existed that could accommodate these very real limitations on Ms. Kirkpatrick recognized by CORE's consultant. Because the CRC ignored critical evidence and accepted exaggerated reports of other evidence, its process was not full, it was not fair, and it must be overturned.

## LOIS L. LYNN

The evidence in Ms. Lynn's claims record proves the following:

- Ms. Lynn's date of birth is July 9, 1936; at the time of the final denial of her benefits under the Plan, Ms. Lynn was 62 years of age. (Pl. LR 56 St., p. 102, ¶ 442; Pl. App. 1).

- Ms. Lynn has a high school education. (Pl. LR 56 St., p.102, ¶ 443; Pl. App. 1).

- Ms. Lynn was employed by Champion for 14 years from 1977 to 1991, when she became disabled from any work. (Pl. LR 56 St., p. 102, ¶ 448; Pl. App. 45).

-52-

- Ms. Lynn's disabling conditions arise from a rare life-long chronic lung disease known as bronchiectasis accompanied by severe and frequent pulmonary infections from drug resistant organisms which are life-threatening.  (Pl. LR 56 St., p. 102, ¶ 448; Pl. App. 45).

- Throughout her disability, Ms. Lynn has been treated by several pulmonary specialists: Dr. Hapke, Dr. Boerner and Dr. Lipham, all of whom have consistently certified her total disability.  (Pl. LR 56 St., p. 102, ¶ 449).

- From 1992 to 1998, Champion consistently determined that Ms. Lynn was totally disabled from her regular job or any other job for which she was qualified by training, education or experience, and entitled to LTD benefits under the Plan.  (Pl. LR 56 St., p. 104, ¶¶ 456-460; Pl. App. 44).

- Although Ms. Lynn's condition did not improve, in January, 1998, CORE decided that Ms. Lynn was no longer totally disabled under the Plan, and Champion finally upheld the termination of LTD benefits on November 30, 1998.  (Pl. LR 56 St., pp. 109, 114, ¶¶ 475, 489).

### Champion/CORE Denied Ms. Lynn a Full and Fair Review and Wrongfully Terminated Her LTD Benefits

The evidence in Ms. Lynn's claims record establishes her total disability as a matter of law.  Ms. Lynn suffers from a rare chronic lung disease known as bronchiectasis, a life-threatening illness characterized by severe and frequent pulmonary infections from drug-resistant organisms.  (Pl. LR 56 St., p. 102, ¶ 448; Pl. App. 45).  Ms. Lynn's treating pulmonary specialist, Dr. Edith Hapke, has described her disease as

> a ticking time bomb that could explode at any time. ... [I]n summary, the claimant's problem is her persistent and chronic bronchial infections.  She is never infection-free as the infections can go from bad to worse and are completely drug-resistant.

(Pl. LR 56 St., p. 103, ¶¶ 450, 453; Pl. App. 45).  Dr. Hapke has noted that "she is only aware of 5 patients with this condition and two others have already died."  (Pl. LR 56 St., p. 103, ¶ 450).

-53-

In spite of her disease, Ms. Lynn worked for years with constant coughing, shortness of breath, and fatigue. But as she grew older, her body was less able to fight. In 1991, Ms. Lynn's pulmonary specialist advised her to stop working to reduce her exposure to large populations of people and her vulnerability to infection. Ms. Lynn's presence at work had become less reliable because of her frequent absences due to infection.[1] (Pl. LR 56 St., p.104, ¶ 455; Pl. App.44-46). Because of Ms. Lynn's struggle to work despite her severe disease, Champion never questioned Ms. Lynn's need to go out of work and certified her for disability each year under the Plan. (Pl. LR 56 St., p. 104, ¶¶ 456-459).

Considering her age, education and the nature of her illness, Champion (and its administrator, Travelers) determined in Ms. Lynn's Vocational Rehabilitation Profile that there was no potential for rehabilitation or work in the future. (Pl. LR 56 St., p. 104, ¶ 460; Pl. App. 47). In 1995, just six months before CORE's involvement, Travelers noted that Ms. Lynn's condition "has deteriorated over the years and no improvement is expected;" and "based on [her diagnosis] and restrictions, she is not a candidate for rehab [rehabilitation]." (NB 13: Lynn-369).

Ms. Lynn's treating pulmonary specialists continued to certify her for total disability under the Plan, and, indeed, her disease worsened throughout the period of her disability. Dr. Lipham, her treating pulmonary specialist at the time, emphasized the progressive nature of her disease, and her vulnerability to exposures in the work place in his letter of February 3, 1998, just before Champion/CORE terminated Ms. Lynn's benefits. (Pl. LR 56 St., p. 111, ¶ 484; Pl. App. 46).

---

[1]In fact, although Ms. Lynn had agreed to train her successor, she was unable to complete the training because of her sickness due to infection.

In short, the evidence in the claims record both before and after CORE's involvement, establishes Ms. Lynn's total disability under the Plan.

## Champion/CORE's Decision

CORE initially agreed with this assessment.  In its report on August 20, 1996, CORE acknowledged that in light of her symptoms and history, Ms. Lynn "remains totally and permanently disabled."  CORE continued Ms. Lynn on LTD "based on the acuity and severity of employee's symptoms."  (Pl. LR 56 St., p. 107, ¶ 467).

On the same date, CORE's case manager noted that because of her disease, Ms. Lynn had to use inhalers, had frequent respiratory infections, and "experiences fatigue and generally overall poor health;" that her "PFT on 12/7/95 shows moderate to severe obstruction;" and that she is "unable to perform the central functions of any occupation." (Pl. LR 56 St., p.108, ¶ 469; Pl. App. 48).

Nothing changed in Ms. Lynn's condition after these initial acknowledgments by CORE case managers that Ms. Lynn was totally disabled.  During the next year, on July 25, 1997, Ms. Lynn's treating pulmonary specialist, Dr. Boerner, again certified that Ms. Lynn was "100% disabled."  (Pl. LR 56 St., p. 108, ¶ 470).

In spite of the consensus that Ms. Lynn was totally disabled, CORE's Dr. Beavers determined that her benefits should be terminated.  (Pl. LR 56 St., p. 110, ¶ 479).

## Champion/CORE's Evidence Was Unreliable

Dr. Beavers tried to justify his decision by relying on a physician who had never treated Ms. Lynn for her disease – Ms. Lynn's family physician, Dr. Nancy Freeman.  Dr. Beavers called Dr. Freeman and solicited the opinion that Ms. Lynn could work in a sedentary position for "6-8

hours per day." (Pl. LR 56 St., p.110, ¶ 479). However, Dr. Freeman was not a specialist in respiratory disease; did not have significant knowledge concerning Ms. Lynn's "rare" disease of bronchiectasis; and had never treated Ms. Lynn for her disease. (Pl. LR 56 St., p. 111, ¶ 486). Therefore, Dr. Freeman was unaware of the risks and frequency of the infections that Ms. Lynn had experienced on a progressive basis.

One would be hard-pressed to find less reliable evidence on which to base a change in a disability determination than the opinion of a family physician who had never treated the specific disabling illness, especially in the face of the unanimous conclusions of specialists who had regularly treated the illness. CORE's reliance on Dr. Freeman's opinion is not only unjustified; it shows the lengths to which CORE would go to support Dr. Beavers' pre-ordained decision to terminate benefits.[2]

*IME:* Recognizing the need for additional evidence, CORE arranged for an IME with a pulmonary specialist, Dr. McCarrick. After a single examination of Ms. Lynn on May 5, 1998, Dr. McCarrick agreed that due to Ms. Lynn's rare disease, she would be "at increased risk for developing infections on exposure to various populations." (Pl. LR 56 St., pp. 105-107, ¶ 465; Pl. App. 51). In his initial report, Dr. McCarrick did not express an opinion as to Ms. Lynn's specific work capacity, and in his follow up form, he stated that her work capacity on a daily basis is "unknown, not associated with assessing functional status." *Id.* Incredibly, however, on further requests by CORE, Dr. McCarrick signified "Yes" to the question of whether Ms. Lynn

---

[2]Dr. Beavers also indicated in his note to the file that Ms. Lynn's treating specialist, Dr. Boerner, had been "reluctant" to give an opinion on disability. This notation by Dr. Beavers is unsupported in the claims record. As stated above, Dr. Boerner had consistently expressed his opinion on Ms. Lynn's disability, including his certification less than two months before that she was "100% disabled." (Pl. LR 56 St., p. 108, ¶ 470).

could work "at least 6 hours a day, 5 days per week in a sedentary capacity," on a form provided by CORE. *Id.* Dr. McCarrick did not explain how or why his opinion of Ms. Lynn's work capacity had changed from "unknown" to "able to work a 6- hour day." *Id.*

Within the next several months, Champion again upheld the termination of Ms. Lynn's benefits based on Dr. McCarrick's opinion. Since his opinion had not appeared in the original IME report, Ms. Lynn questioned him about it, and he issued a statement that he had "been misquoted in Mary Lee Dixon's letter to Lois Lynn on July 7, 1998. I did not say Lois Lynn could 'work 6 hours per day, 5 days a week in a sedentary capacity.'" (Pl. LR 56 St., p. 113, ¶ 488 d; Pl. App. 50). He referred to his initial report, and did not reveal that he had subsequently changed his statement in response to CORE's requests.

Faced with these inconsistencies, Champion (through its CRC) sought clarification when the case was first presented to the CRC in September, 1998. Dr. Beavers again talked to Dr. McCarrick and sent him a document in which he could signify his agreement to the statement that Ms. Lynn could work "at least 6 hours per day, 5 days per week in a sedentary capacity." Dr. McCarrick did as solicited. (Pl. LR 56 St., pp. 113-114, ¶ 488f; Pl. App.51).

Faced with the inexplicable shifts in Dr. McCarrick's statements, CORE's employees understandably questioned whether they should obtain another IME. Dr. Beavers and the CORE Denial Committee indicated that no additional IME would be necessary, and moved forward with the termination. Champion (through its CRC) followed CORE's recommendation and finally denied Ms. Lynn's claim. (Pl. LR 56 St., p.114, ¶¶ 488 g-489).

***TSA:*** CORE also arranged for CORE's Costs Services employee to prepare a transferable skills analysis from her database. Without considering any personal characteristics of Ms.

Lynn's restrictions, the employee listed job titles which, presumably, a person with Ms. Lynn's employment history who had no medical restrictions, could handle. (Pl. LR 56 St., p. 107, ¶ 466). Given the evidence concerning Ms. Lynn's frequent infections and resulting absences, and Champion's own refusal to accommodate the restrictions, this report is meaningless.

### Champion/CORE Ignored Critical Evidence

***Vocational evidence***:  Not only did Champion/CORE ignore the consistent evidence of Ms. Lynn's treating specialists in its above actions; it also failed to address the vocational components of Ms. Lynn's disability.

First, even if Ms. Lynn could work "5-6 per day," this evidence does not disqualify Ms. Lynn from total disability under the Plan.  To the contrary, Ms. Lynn's ability to perform some part-time work would not render her able to engage in any occupation that requires full-time hours.  Neither Champion nor CORE ever explained their conclusion that one who can work 5-6 hours per day should be considered fully capable of performing any occupation.  (Pl. LR 56 St., p. 107, ¶ 466).

In any event, the claims record revealed (consistent with all of the claims records) that Champion was *not* willing to accommodate Ms. Lynn, based on her work restrictions. Champion's contact person, Sharon Spain, said that Champion was "unable to accommodate" Ms. Lynn's restrictions and recommended that CORE "proceed as usual" in denying Ms. Lynn's claim.  (Pl. LR 56 St., p.110, ¶ 478; Pl. App. 49). In view of Ms. Lynn's work history and Champion's need for secretaries, Champion's refusal to accommodate her supports the conclusion that no theoretical employer in the local, state, or national economy would hire a person with Ms. Lynn's medical history and restrictions.

***Supplementary Evidence***: Champion also failed to consider Ms. Lynn's supplementary evidence.  Given the void in its claims record, there was clearly "good cause" to support a supplementary submission.  The evidence underscored that Ms. Lynn was not employable.

Ms. Lynn was evaluated by a certified evaluator, Dr. Henry D. Wong.  (Pl. LR 56 St., p. 114, ¶ 490).  Dr. Wong determined, after a comprehensive review of Ms. Lynn's personal, employment and medical history, that she was unemployable—that there are no jobs in the local, state or national economy which Ms. Lynn could expect to obtain.

In addition to the vocational assessment, Ms. Lynn provided her affidavit, which included additional biographical information and updated medical records, all of which supported that she was unemployable.

### Conclusion

The above scenario demonstrates CORE's tactics and Champion/CORE's willingness to ignore evidence inconsistent with its objective of termination.  There can be no justification to support Champion/CORE's total disregard for the consistent opinions of Ms. Lynn's treating pulmonary specialist, while relying on the opinion of a family physician who has not treated her disease.  Under any fair review, the opinion of this unknowledgeable physician would not be considered.  There can be no justification for relying on the work capacity assessment of an IME physician who has initially stated that he could not provide one, and subsequently, provided inconsistent responses.  Under any fair review, this physician would have no credibility. Champion/CORE's actions in this regard justify Ms. Lynn's impassioned statement in her unsuccessful plea to Champion to recognize what it was doing.

CORE's motivations appear in its "savings analysis" which it reported to Champion. During its review of Ms. Lynn's claim, CORE had calculated that its termination of Ms. Lynn's LTD benefits would result in "savings" to Champion in the amount of $42, 075.93. (Pl. LR 56 St., p. 115, ¶ 491; Pl. App. 53). In it's final decision upholding the termination, Champion, of course, realized the savings promised by CORE.

The overwhelming evidence establishes Ms. Lynn's continued total disability. Champion/CORE's actions with respect to Mr. Lynn's claim were outrageous, and constitutes a charade of a claims process evidencing their general mission to terminate claims to achieve savings for Champion.

### WILSON DANIEL McCLURE

The evidence in Mr. McClure's claims record proves the following:

- Mr. McClure's date of birth is September 12, 1945; at the time of the termination of his benefits under the Plan, Mr. McClure was 51 years of age. (Pl. LR 56 St., p. 115, ¶ 492; Pl. App. 1).

- Mr. McClure has a high school education. (Pl. LR 56 St., p. 115, ¶ 493; Pl. App. 1).

- Mr. McClure was employed by Champion for 35 years from 1966 to 1993, when he became disabled from any work. (Pl. LR 56 St., p. 115, ¶ 494; Pl. App. 1).

- Mr. McClure' disabling conditions arise from his arthritis and severe joint pain. (Pl. LR 56 St., p. 116, ¶ 497; Pl. App. 56).

- Throughout his disability, Mr. McClure has been treated by Dr. Rardin who has certified that Mr. McClure was totally disabled from any work. (Pl. LR 56 St., p. 117, ¶ 504; Pl. App. 54).

- From 1989 to 1996, Champion consistently determined that Mr. McClure was totally disabled from his regular job and any other job for which he

-60-

was qualified by training, education or experience, and entitled to LTD benefits under the Plan.  (Pl. LR 56 St., p. 117, ¶¶ 505-507; Pl. App. 54).

• Although Mr. McClure's condition did not improve, in 1996, CORE decided that Mr. McClure was no longer totally disabled under the Plan, and Champion finally upheld the termination of LTD benefits in June, 1997 (Pl. LR 56 St., p. 121, ¶ 524).

### Champion/CORE Denied Mr. McClure a Full and Fair Review and Wrongfully Terminated His LTD Benefits

Under a full and fair review of the claims evidence, the facts establish that Mr. McClure is totally disabled from any occupation.  Mr. McClure's history reveals his strong work ethic and every motivation to avoid disability.  He worked for Champion for 23 years and, with a high school education, attained the level of a supervisor in maintenance.  (Pl. LR 56 St., p. 116, ¶ 495).

Mr. McClure suffers from spondoloarthritis, a disease affecting all of his joints, particularly in his back, hip, and knees.  He has also had a knee replacement.  Mr. McClure's treating rheumatologist, Dr. Rardin, had documented his disability and impairment based on his treatment of Mr. McClure from 1989 throughout his disability and has certified Mr. McClure's continuing disability under the Plan.  (Pl. LR 56 St., p.117, ¶ 504; Pl. App. 54-55).

In a note on February 1, 1993, relatively early in Mr. McClure's period of disability, Champion's administrator, Travelers, noted the diagnosis of "degenerative spondoloarthritis, knee replacement with infection and painful back, chronic arthritis of the back/hip/knees;" "positive rheumatoid factor 1:16;" "total knee replacement 1979, another knee surgery 3/89;" and "complaints of stiffness, myalgias arthralgias synovitis, pain and joint swelling;" "a decreased grip, trouble walking and climbing."  (NB 17: McClure-301).  The note also acknowledged that

-61-

Mr. McClure was under the regular care of a rheumatologist and "[b]ased on EE [employee] experience along with progressive physical restrictions,  EE continues to be TD any occ [any occupation].  Continue approval." *Id.*

At this particular point in time then, Champion and its administrator, Travelers, believed, based on Mr. McClure's work history, and the credibility of his reports of his severe and debilitating pain, that he was totally disabled from any occupation.  Moreover, in his personal profile, Mr. McClure described his symptoms from his rheumatoid arthritis—his stiffness, soreness, pain.  He stated that his relief for the pain was hot water, hot baths, heating pads.  (Pl. LR 56 St., p. 116, ¶ 501).  There is no indication that Mr. McClure's condition improved—to the contrary, all indications are that his condition has continued to deteriorate.

Champion acknowledged Mr. McClure's total disability from 1989 to 1996.  Repeatedly, upon annual reviews, Champion certified Mr. McClure as totally disabled under the Plan.  (Pl. LR 56 St., p. 117, ¶¶ 505-507; Pl. App.56).

### CORE/Champion's Decision

Nevertheless, CORE immediately challenged Mr. McClure's disability after it was hired by Champion in 1996.  Although Mr. McClure's condition did not improve, on October 16, 1996, CORE decided that Mr. McClure was no longer totally disabled under the Plan, and terminated his LTD benefits.  Upon review, CORE and Champion upheld the termination.  (Pl. LR 56 St., p. 120, ¶ 517).

### Champion/CORE's Evidence Was Unreliable

***IME:*** In order to support its termination of benefits, CORE arranged for an IME,  initially in July, 1996, with Dr. Ruffin Stephenson.  Dr. Stephenson saw Mr. McClure on a single

occasion and found that while Mr. McClure was unable to do his prior work, he could perform

"some type of sedentary work or desk job" under limitations and restrictions. (Pl. LR 56 St., p.

118, ¶ 512).  In his report, Dr. Stephenson noted that, based on Mr. McClure's symptoms, "it

appears he has been physically disabled from doing much because of the symptoms over the last

number of years and he says the problem is actually worse and not better."  The one-shot IME

contrasts with the certifications of Mr. McClure's total disability by his treating rheumatologist,

Dr. Rardin.  (Pl. App. 54-55).  And while Dr. Stephenson acknowledges Mr. McClure's chronic

pain in his report, he  makes no effort to reconcile Mr. Mclure's debilitating pain with his

conclusion of Mr. McClure's work capacity.  Dr. Stephenson's report is not sufficient to

constitute substantial evidence to support the denial of Mr. McClure's claim in view of Mr.

McClure's long history of disability as substantiated by the medical reports and Mr. McClure's

own statements.

### Champion/CORE Ignored Critical Evidence

*Pain:* CORE's Dr. Beavers purports to require "objective" evidence for his conclusions.

Champion/CORE, however, largely ignored the objective evidence of Mr. McClure's consistent

complaints of pain that appear throughout his medical history and the effects of his pain on his

ability to carry out any activities.  CORE noted Mr. McClure's "chronic joint pain" and "chronic

fatigue" as potential clinical complications to his work potential, but then, inexplicably, failed to

assess the impact of the pain on his ability to work.  (Pl. LR 56 St., p. 120, ¶¶ 413-514).

*Vocational Evidence:* Champion/CORE also largely ignored the vocational factors of Mr.

McClure's disability.  There is no indication in the record that Champion/CORE assessed the

various obstacles to Mr. McClure's employment, even in a sedentary occupation.  It is clear from

the record that Champion never offered Mr. McClure re-employment  nor offered to provide

vocational training or education to assist Mr. McClure in returning to work.  (Pl. LR 56 St.,

p.120, ¶¶ 518-519).

    ***Supplementary Evidence:*** Champion/CORE also refused to consider Mr. McClure's

supplementary evidence, including the vocational assessment of Mr. McClure by Randy L.

Adams, a licensed vocational evaluator.  Mr. Adams filled the void in Champion/CORE's record,

providing a thorough vocational evaluation to determine Mr. McClure's work capacity from a

vocational perspective.

    After reviewing Mr. McClure's personal, employment and medical history, and

interviewing Mr. McClure at some length, Mr. Adams concluded that Mr. McClure was "not

capable of performing any substantial, gainful activity as it can be found in the local, state, or

national economy," since Mr. McClure would not be able to "consistently meet the demands of

competitive employment."  In explanation, Mr. Adams noted from Mr. McClure's medical

history that Mr. McClure would "be unreliable in the workplace and would have to be absent

more frequently than would be allowed." Mr. Adams concluded that Mr. McClure is

"permanently and totally disabled."  (Pl. LR 56 St., p. 122, ¶ 525 b).

    In order to determine Mr. McClure's totally disability under the Plan, the vocational

component of his disability is critical.  Without a vocational assessment, any conclusion that Mr.

McClure can perform "sedentary work" is essentially meaningless, and certainly not a substantial

basis for Champion/CORE's denial.

    ***Other Information:*** In addition to the vocational evidence, Mr. McClure submitted his

affidavit with additional personal information.  Considering Champion/CORE's failure to

interview Mr. McClure to obtain additional facts or determine his credibility concerning his complaints of pain, such information is important and perhaps critical.  In addition, Mr. McClure submitted his Social Security Administration decision finding him totally disabled and additional medical information, updating his record, all of which support his inability to work.  (Pl. LR 56 St., pp. 122-123, ¶ 525).

**Conclusion**

Champion/CORE failed to conduct a full and fair review of Mr. McClure's claim. Accordingly, there is no substantial evidence to support the termination of his LTD benefits.

Upon a full and fair review, the facts substantiate that Mr. McClure is totally disabled under the Plan, as acknowledged by Champion for seven years prior to CORE's involvement. Accordingly, Mr. McClure's total disability is established, and his right to LTD benefits should be upheld.

**CELIA DARLENE METCALF**

The evidence in Ms. Metcalf's claims records proves the following:

- Ms. Metcalf's date of birth is October 12, 1947; at the time of the final denial of her benefits, Ms. Metcalf was 52 years old. (Pl. LR 56 St., p. 123, ¶ 526).

- Ms. Metcalf has a high school education.  (Pl. LR 56 St., p. 123, ¶ 527).

- Ms. Metcalf was employed by Champion for 18 years, from 1979 to 1997, when she became disabled from any work.   (Pl. LR 56 St., p. 123, ¶ 528).

- Ms. Metcalf's disabling conditions arose primarily from her long-pre-existing conditions, four foot/heel surgeries, and severe chronic pain and loss of function.   (Pl. LR 56 St., pp. 124-125, ¶¶ 530-532; pp.125-127, ¶¶ 538-542).

-65-

- During her disability, Ms. Metcalf was treated by a number of doctors, including Dr. Goodwin, Dr. Lesene and Dr. Mendelsohn, a rheumatologist; Dr Banks, a podiatrist; Dr. Osbahr, the mill physician; and Dr. Buehler. She was repeatedly certified by doctors that she was totally disabled from any work. (Pl. LR 56 St., p. 126, ¶ 539; pp. 129-130, ¶ 551).

- From 1997 to 1999, Champion consistently determined that Ms. Metcalf was totally disabled. (Pl. LR 56 St., pp. 128-131, ¶¶546-552).

- Although Ms. Metcalf's condition did not improve, in October of 1999, CORE decided that she was no longer totally disabled, and terminated her LTD benefits, and Champion finally upheld the termination on June 15, 2000. (Pl. LR 56 St., p. 137, ¶ 577).

- In March of 1999, the Social Security Administration determined that Ms. Metcalf was totally disabled from any gainful employment. (Pl. LR 56 St., p. 131, ¶ 554).

### Champion/CORE Denied Ms. Metcalf a Full and Fair Review and Wrongfully Terminated Her Benefits

Ms. Metcalf had worked for Champion for approximately eighteen years at the time she was disabled on April 15, 1997 due to a combination of medical problems, including severe and chronic pain, fibromyalgia, four foot/heel surgeries, hypothyroidism, connective tissue disorder, osteoarthritis, disc bulge, compression fracture, a Dowager's hump, shingles and osteoporosis. (Pl. LR 56 St., pp. 123-127, ¶¶ 528, 530-532, 538, 540, 542). In 1989 she had suffered an on-the-job injury, yet returned to work; in 1995 she suffered both a right radius fracture and a left ankle sprain, but again returned to work after a three-month convalescence. (Pl. LR 56 St., p. 124, ¶ 531). Eventually, her demonstrably strong desire to work succumbed to the pain and impairments produced by the combined effect of her physical and psychological problems.

### CORE Decision

-66-

On November 15, 1999, CORE decided that Ms. Metcalf's LTD benefits should be terminated on the grounds that there was no objective medical substantiation of disability (Pl. LR 56 St., p. 134, ¶ 563). CORE notified Ms. Metcalf that her LTD benefits were terminated as of November 23, 1999; Champion made no independent review of Ms. Metcalf's claim, but inserted grounds stated by CORE in the letter. (Pl. LR 56 St., p. 134, ¶ 564).

On December 6,1999, Ms. Metcalf appealed CORE's decision.(Pl. LR 56 St., p. 135, ¶ 568). Champion, her employer of many years, did not offer her any work. In the meantime Ms. Metcalf submitted new medical information from Dr. Buehler, noting diagnoses of wrist and arm tendonitis. (Pl. LR 56 St., pp.129-130, ¶ 551 Pl. App. 64).

Upon Ms. Metcalf's appeal, CORE sent the claim to Champion. On March 8, 2000, Champion wrote Ms. Metcalf, informing her that her claim would be referred to the Plan's Claims Review Committee. CRC members received records developed by CORE and arranged by Champion's legal department, with the legal department's summary and chronology.

The CRC was to have met on June 15, 2000. However, Confidential Service Report #1 was issued on June 9, 2000 by CORE's Denial Committee, affirming its initial denial on precisely the same grounds; and in addition, on the grounds that additional medical information reviewed by a physician consultant came to a conclusion that "patient does not appear totally disabled at the time of the original denial on 11/13/99," and that there was "no objective medical substantiation for total disability after 11/13/99." (Pl. LR 56 St., p. 135, ¶ 569; Pl. App. 67).

**Champion/Core's Evidence Was Unreliable**

The records for CRC members consisted of 477 pages, hand-numbered by Champion's legal department, and not organized in any coherent fashion. (NB 15: Metcalf 6-483; (Pl. LR 56 St., pp. 136-137, ¶ 575).

On June 15, 2000, the CRC upheld CORE's denial of Ms. Metcalf's LTD benefits, and stated in its minutes that the benefits were denied based on Dr. Mendelsohn's release after discussion with Dr. Beavers.  However, the evidence indicates that CORE's Dr. Beavers, misinterpreting the definition of total disability under the Plan, (Pl. App. 62), coerced Dr. Mendelsohn into abandoning his statement that Ms. Metcalf was totally and permanently disabled one day after signing his attending physician's statement. (Pl. App. 60-61). Also, important additional medical information was not addressed. (Pl. App. 64).

### Champion/CORE/SCORE Ignored Critical Evidence

*Pain:*  As is their pattern and practice, Champion/CORE minimized or ignored  the subjective evidence of Ms. Metcalf's pain**,** and failed to acknowledge the well-documented objective evidence thereof.  This pattern expresses the truth described in the American Medical Association's Guide to the Evaluation of Permanent Impairment**,** 5th ed., at p. 566, which states that "to have great pain is to have certainty, to hear that another person has pain is to have doubt."  (NB 75: Tab 7, Taylor Exh. 7, citing Scarry, E., The Body in Pain, NY, NY, Oxford University Press, 1985). (Pl. LR 56 St., p. 127, ¶¶ 542-543; Pl. App. 67).

*Vocational Evidence:*  Champion/CORE also failed  to give meaningful consideration to vocational evidence in making its decision to terminate.  Its reliance on the TSA was faulty, since the TSA did not fairly evaluate Ms. Metcalf's vocational limitations, giving  no consideration to either her age or the impact of her chronic pain and related symptoms upon her ability to obtain

and sustain gainful employment.  It gave no consideration to the fact that Champion had long

been unable or unwilling to accommodate her restrictions, and no plausible explanation as to why

another employer would accommodate her restrictions when Champion would not.  The TSA

contained no labor market survey.  There was nothing in  the TSA to indicate whether any of the

jobs CORE suggested (from its Maine office) were appropriate for Ms. Metcalf in rural North

Carolina actually existed in significant numbers in the local economy. (Pl. LR 56 St., pp.132-

133, ¶¶ 560-561).

Randy Adams, licensed vocational counselor, did take into consideration Ms. Metcalf's

age, education, past employment, her medical conditions and restrictions, as well as the types of

jobs available in the local economy, and found that Ms. Metcalf was unemployable at the time of

the termination of her LTD benefits.  He concluded that there were no jobs for which Ms.

Metcalf was "reasonably qualified by training, education or experience."(Pl. LR 56 St., pp. 137-

138, ¶ 578(b)).

*Supplementary evidence:*  Again, Champion/CORE totally ignored and failed to consider

relevant supplementary evidence submitted by Ms. Metcalf, including Ms. Metcalf's affidavit,

Mr. Randy Adam's vocational assessment report, the Social Security Administration Notice of

Award, and her updated medical records. (NB 15-16).  A full and fair review of those documents

would have revealed that Ms. Metcalf's condition had not improved, but had in fact continued to

decline since Champion's last determination of disability.

## Conclusion

CORE/Champion's denial of Ms. Metcalf's benefits was the culmination of a flawed,

denial-oriented prcess.  Dr. Buehler's express opinion that she was disabled from any occupation

was ignored.  Pain, fatigue and other subjective symptoms were ignored.  Ms. Metcalf's strong

work ethic and demonstrated willingness to return to work after sickness and injury were never

mentioned.  The supplemental evidence was totally rejected.  Carefully picking and choosing

which evidence to emphasize and what evidence to ignore, Champion and CORE ignored the

practical reality that Ms. Metcalf is totally disabled from any occupation.

### CHARLES R. REECE

The evidence in Mr.  Reece's claims record proves the following:

- Mr. Reece' date of birth is January 28, 1946; at the time of the final denial of his benefits he was 52 years old.  (Pl. LR 56 St., p. 138, ¶ 579).

- Mr. Reece has a high school education.  (Pl. LR 56 St., p. 138, ¶ 580).

- Mr. Reece was employed by Champion for 29 years from 1969 to 1995, when he became disabled from any work.  (Pl. LR 56 St., p. 138, ¶ 581).

- Mr. Reece's disabling conditions arise from his congestive cardiomyopathy which include symptoms of exertional dyspnea, fatigue, shortness of breath, orthopnea and pedal edema.  (Pl. LR 56 St., p. 139, ¶ 584).

- Throughout his disability, Mr. Reece has been treated by Dr. Bradley, a general practitioner, and later treated by Dr. Patel, a cardiologist, who have repeatedly certified that Mr. Reece was totally disabled from any work.  (Pl. LR 56 St., p. 139, ¶ 585).

- From 1995 to 1998, Champion consistently determined that Mr. Reece was totally disabled from his regular job and from any occupation, and eligible for LTD benefits under the Plan.  (Pl. LR 56 St., p. 142, ¶ 594).

- Although Mr. Reece' condition did not improve, in October, 1998 CORE decided that he was no longer totally disabled, and terminated his LTD benefits, and Champion finally upheld the termination on March 24, 1999.  (Pl. LR 56 St., p. 148, ¶ 621).

**Champion/CORE Denied Mr.  Reece a Full and Fair Review and**

**Wrongfully Terminated His LTD Benefits**

Review of the evidence contained in Mr. Reece's file fully and fairly demonstrates that he was and remains totally disabled from any occupation.   In the language of the Plan, he is "not able to engage in any occupation or business for wage or profit for which he is or becomes reasonably qualified by training, education or experience."   The evidence demonstrating his total disability is as follows:

- He suffers from a number of significant medical conditions including: congestive heart failure, emphysema, paroxysmal nocturnal dyspnea, ulcerative colitis, pleural effusions, pancreatitis and cirrhosis of the liver.  (NB 19: CRC-2376;  NB 49: CE-690, 693, 696, 699, 702, 705; Pl. LR 56 St., pp. 139140, ¶¶ 584, 586).

- The combination of those impairments, together with vocational factors, left his employer of 29 years unable to accommodate his restrictions.  (Pl. LR 56 St., p. 143, ¶ 609; Pl. App. 70).  Further, CORE and Champion had determined that he was not a candidate for vocational rehabilitation.

- The Social Security Administration, because of his physical problems, the restrictions imposed thereby, and his age, education and lack of transferable job skills, had found him to be permanently and totally disabled from any competitive employment as a result of the combination of his impairments and restrictions. (Pl. LR 56 St., p. 142, ¶ 595).

CORE and Champion did not engage in a full and fair review of Mr. Reece's situation. Instead, their review reflects a denial-oriented process.

**Champion/CORE's Evidence Was Unreliable**

The CRC minutes (NB 19: CRC-2264-2265; Pl.  RL 56 St., p.144, ¶ 606) indicate that the September 9, 1999 final termination of benefits was primarily based on the following: the January 23, 1998 CORE Peer Review Analysis (NB 19: CRC-2389); the March 31, 1998 CORE Modification Checklist signed by a physician's assistant and later endorsed by a physician (who

may not have ever seen the employee); a July 30, 1998 IME by Dr. Keogh; a CORE IME

Addendum by Dr. Keogh dated September 22, 1998; and a TSA created by CORE. For the

reasons set out below, each of these reports was flawed or incomplete, and thus could not, either

separately or collectively, constitute a full and fair review of Mr. Reece's claim. Therefore, the

review was incomplete and termination of his benefits unfair.

- The January 23, 1998 CORE Peer Review Analysis was responding to the
  question, "Is this EE disabled from performing **any** occupation?" [CORE's
  emphasis] Thus, CORE, as was its practice, over simplified the standard for
  consideration of an employee's employability. The issue was more complicated
  and required a consideration of whether he was unable to "engage in any
  occupation or business for wage or profit" for which he was "reasonably qualified
  by training, education or experience." (Pl. LR 56 St., p. 144, ¶ 606).

- The March 31, 1998 Modification Checklist was signed by D. Burnett, a
  physician's assistant, who had previously indicated that the employee was
  permanently and totally disabled from any occupation. (Pl. LR 56 St., p. 145, ¶
  608). There was no explanation for or documentation of any improvement
  between the time Burnett said Mr. Reece was unable to work at any occupation,
  and the conclusion that he could work 5 days a week, 8 hours a day in a sedentary
  job. This document is unreliable.

- On July 30, 1998, the IME by Dr. Keogh found that Mr. Reece was capable of
  performing "some occupation." Again, Dr. Keogh was responding to an
  inaccurate description of the test of employability when in CRC-2401 CORE had
  asked him "could he do any occupation with restrictions or did he have no work
  capacity?" and required objective findings to support such a conclusion. (Pl. LR
  56 St., pp. 145-146, ¶ 611). In addition, Dr. Keogh was only provided records
  that were more than 2 ½ years old. Finally, Dr. Keogh recommended a stress test
  to provide "some objective quantification of what he can do regarding physical
  activity." Thus, Dr. Keogh's IME was made without objective quantification of
  what he could do on a physical basis, and is therefore unreliable.

- The IME Addendum that Dr. Keogh filled out on September 22, 1998 for CORE
  on their stationary is similarly unreliable. The document was not signed by Dr.
  Keogh, which casts doubts on its reliability.

- Finally, the CRC indicated that it relied upon the TSA with the speculation that
  Mr. Reece could find work. This TSA is not reliable for a number of reasons: 1)

what she denominated "transferable skills" were actually aptitudes.   2) Her conclusion was so vague as to be illusory.   3) She pointed out the contradictory statements in the Keogh IME, but she accepts those sedentary restrictions, but acknowledges that with sedentary restrictions, he has a "narrow chance of returning to work." The TSA also lacked a Labor Market Survey.  (Pl. LR 56 St., pp. 146-147, ¶ 613).

### Champion/CORE Ignored Critical Evidence

*Pain*:  Consistent with Champion/CORE's pattern and practice, they failed to consider the impact of Mr.  Reece's chronic and severe pain on his ability to work.  While the pain is documented throughout the record, both by Mr.  Reece and his doctor, and while it is acknowledged throughout

the record by Core and Champion, they make no effort to analyze the credibility of Mr.  Reece's pain reports and its significance in his overall work capacity. (Pl. LR 56 St., pp. 139-140, ¶ 586).

In addition, Dr.  Keogh in his IME had recommended a stress test be performed to provide "some objective quanitification of what he can do regarding physical activity."  (NB 19: CRC-2404).  This recommendation was ignored by Champion and CORE.

*Vocational Evidence:*  Finally, CORE and Champion ignored the practical vocational evidence. On April 6, 1998 when the modification list was discussed with Champion employee, Sharon Spain, she said the location could not accommodate those restrictions, and recommended termination of his benefits.  (NB 49: CE-761; (Pl. LR 56 St., p. 145, ¶ 609).  Given Mr.  Reece's 29 ½ years of work for Champion, Champion's refusal to consider him for re-employment and its inability to accommodate his restrictions is strong, if not conclusive evidence that he was unemployable from a practical standpoint.

*Supplementary Evidence:* Mr. Reece's affidavit was instructive as to his actual ability to sustain work activities. CORE and Champion refused to consider this evidence and the vocational report of Dr. Henry Wong. Dr. Wong concluded Mr. Reece was and remains totally disabled from a practical standpoint based on his review of the medical records, his interview with Mr. Reece, his testing of Mr. Reece, and his knowledge of the local job market. (Pl. LR 56 St., pp. 149-150, ¶ 623). That was significant evidence that should have at least been considered and distinguished by CORE and Champion, were they truly engaged in a full and fair review.

Given the substantiated evidence in the record, Mr. Reece's total disability from working in any occupation is established as a matter of law.

### HARRY L. SMITH

The evidence in Mr. Smith' claims record proves the following:

- Mr. Smith's date of birth is February 26, 1946; at the time of the final termination of his benefits under the Plan, Mr. Smith was 51 years of age. (Pl. LR 56 St., p.151, ¶ 627; Pl. App. 1).

- Mr. Smith has a high school education. (Pl. LR 56 St., p. 151, ¶ 628; Pl. App. 1).

- Mr. Smith was employed by Champion for 25 years from 1969 to 1993, when he became disabled from any work. (Pl. LR 56 St., p. 151, ¶ 629; Pl. App. 1).

- Mr. Smith' disabling conditions stem from his long-standing back injuries, requiring several surgeries and resulting in severe chronic pain and loss of function. (Pl. LR 56 St., p. 151, ¶¶ 632-638; Pl. App.1).

- Throughout his disability, Mr. Smith has been treated by specialists who have certified that Mr. Smith was totally disabled from any work. (Pl. LR 56 St., p.152, ¶ 639).

- From 1993 to 1997, Champion consistently determined that Mr. Smith was totally disabled from his regular job and any other job for which he

was qualified by training, education or experience, and entitled to LTD benefits under the Plan.  (Pl. LR 56 St., p. 153, ¶¶ 640-642; Pl. App. 75).

•    Although Mr. Smith' condition did not improve, in November, 1997, CORE decided that Mr. Smith was no longer totally disabled under the Plan, and Champion finally upheld the termination of LTD benefits on December 11, 1998.  (Pl. LR 56 St., p. 161, ¶ 668).

### Champion/CORE Denied Mr. Smith a Full and Fair Review and Wrongfully Terminated His LTD Benefits

Mr. Smith is totally disabled as a result of his deteriorating spine.  He endured debilitating pain to continue in his employment with Champion, but finally, in 1993, after 24 years service, Mr. Smith's back simply gave out.

Mr. Smith has had four back surgeries.  The surgeries have been performed at various levels of his spine and have involved a laminectomy, fusion, and insertion of metal rods to stabilize his spine.  He has been diagnosed with additional and similar disk problems at other levels of his spine. (Pl. LR 56 St., pp. 151-152, ¶¶ 632-636).

Mr. Randy L. Adams, a certified vocational evaluator, summarized Mr. Smith's history as follows:

> Mr. Smith has a long stable work history serving as a Vietnam Veteran for two years in the Army and working for 25 years with Champion Mills.  He has consistently returned to work after having several physical difficulties such as breaking his ankle in three places, chemical burn to eyes, and two back surgeries.  Following his last two back surgeries which ended with a fusion, stabilization plates and screws, he has not been able to return to work.  He has also been treated for degenerative disk disease, fibromyalgia, arthritis, knee pain, burning feet, restless legs syndrome, hypothyroidism, and elevated cholesterol levels.  Mr. Smith is presently taking 12 prescribed medications to deal with these difficulties.  His activities of daily living are very low and it appears that most of his time is spent with managing the symptoms of his diagnosed chronic pain syndrome.

(Pl. LR 56 St., p. 156, ¶ 649; Pl. App. 78).

Mr. Smith's physicians have consistently determined that he is totally disabled from any occupation as a result of his failed back and resulting pain and other symptoms.  (Pl. LR 56 St., p. 152, ¶ 639; Pl. App. 75, 76, 79).

Considering Mr. Smith's work record and medical history, and the objective evidence of his ravaged spine, there is no basis to question Mr. Smith's total disability from any occupation. And neither Champion nor its administrators raised any issues concerning his disability from 1993 to 1997.

CORE questioned Ms. Smith's disability for the first time in 1997.  Despite the objective evidence concerning Mr. Smith's conditions, and the consistency of his complaints of disabling pain, Champion/CORE ultimately terminated his LTD benefits.  In doing so, they offered the following: (1) an IME and FCE that purportedly confirmed Mr. Smith's ability to do light work; (2) the absence of "objective findings" that would indicate disability; and (3) a transferable skills analysis (TSA) that indicated that there were jobs which Mr. Smith could perform.

Upon a full and fair review, the grounds for Champion/CORE's denial, in view of the overwhelming evidence of Mr. Smith's total disability, do not support the final decision.

### Champion/CORE's Evidence Was Unreliable

*IME:* CORE's first action leading to the termination of Mr. Smith's benefits was to arrange for an IME.  Champion's contact person at the Canton, North Carolina plant, Sharon Spain, called CORE and, apparently based on her past experience, recommended  Dr. Peter Johnson, a local doctor, to perform the IME.  (NB 50: CE-554).

Dr. Johnson met with Mr. Smith on a single occasion on August 4, 1997.  After

reviewing some of Mr. Smith's history, and conducting a brief examination, Dr. Johnson offered

the following assessment:

> Mr. Smith has a failed back syndrome.  He has had
> numerous surgical procedures, and he is left with regional low
> back pain with radicular pain symptoms.
>
> In my opinion, Mr. Smith is at maximum medical
> improvement.  I feel that his condition is stable.  He is weak and
> deconditioned and requires medication to enable him to get
> through his daily activities.  The issue under consideration is
> whether he has any work capacity.  The physical examination
> shows that he would be unable to work at any job beyond the <u>light</u>
> demand level.  I am unable to answer the question as to whether he
> has work capacity at or below that physical level.

(Pl. LR 56 St., p. 154, ¶ 647).  Dr. Johnson also indicated that Mr. Smith would have restrictions

in any activity.  *Id*.

Thus, while  Dr. Johnson concluded that Mr. Smith was disabled from performing work

above the light level, he was unable to determine whether Mr. Smith had work capacity at the

sedentary or light level.

*FCE*: CORE arranged for Mr. Smith to undergo an FCE.  CORE contracted with Susan

Kimel, a physical therapist, who had done other FCEs for CORE.  The claims record does not

reflect any qualifications of Ms. Kimel to conduct the test, or more importantly, to reach

conclusions based on the tests as to Mr. Smith's functional work capacity.  (Pl. LR 56 St., p. 155,

¶ 648).

Nevertheless, Ms. Kimel stated in her report "that Mr. Smith is able to work at the

LIGHT Physical Demand Level for an 8 hour day."  (Pl. LR 56 St., p. 155, ¶ 648).

Significantly, Ms. Kimel noted in her report that the evaluation "was performed on 9/25/97 and 9/26/97, lasting 4:45 hours." *Id.* While Ms. Kimel notes that Mr. Smith's pain affected some of his testing, she does not indicate why the FCE was performed on two different days. *Id.*

In his vocational assessment, Mr. Randy Adams answers this question, based on his review of the report and his interview with Mr. Smith:

> It should be noted that the functional capacity evaluation was performed on two days (9/25/97 and 9/26/97) and lasted a total of four hours and 45 minutes. When asked why the functional capacity evaluation took two days to complete, Mr. Smith related that he was unable to complete it in one day due to increased back pain. He stated that he had to increase pain medications in order to continue with the functional capacity evaluation the following day. He related that he was only able to sleep the night between the two days approximately two hours due to increased pain.

(Pl. LR 56 St., p. 156, ¶ 649; Pl. App.78). (NB 20: Smith-224).

Mr. Adams points out the glaring inconsistency between the manner in which the test was conducted, and Ms. Kimel's broad conclusions:

> It should also be noted that this functional capacity evaluation estimates Mr. Smith should be able to sit and stand "occasionally" which would equal six of eight hours, however, the functional capacity evaluation itself took only four hours and 45 minutes and lasted over a two day period.

*Id.*

A full assessment of Mr. Smith's functional capacities would require some explanation in the report as to why he could not complete the testing in one day. As Mr. Adams pointed out, the conclusion, which is dictated from these facts, is that Mr. Smith cannot perform the activities he was required to perform in the FCE on a continuing and sustained basis—i.e., 8 hours per day

and 40 hours per week.  Without such explanation, the FCE is inconclusive, at best, and misrepresentative of Mr. Smith's work capacity.

*Addendum to IME:*  Nevertheless, without asking the above questions, Dr. Johnson apparently accepted Ms. Kimel's conclusion on its face.  Accordingly, his entire evaluation concerning Mr. Smith's ability to sustain employment in a sedentary/light job comes to the following brief addendum to his IME dated October 13, 1997:

> I have reviewed the F.C.E. on Mr. Harry Smith, dated 9/25/97.  It is my opinion that he can work fulltime in the Light Physical Demand Level, within the limits of the Functional Capacity Evaluation.

(Pl. LR 56 St., p. 156, ¶ 650).

Dr. Johnson's assessment was based solely on the flawed FCE, and it fails from the same glaring deficiencies.

*TSA:*  CORE also arranged for CORE's Costs Services employee to prepare a transferable skills analysis from her database. (Pl. LR 56 St., p. 161, ¶ 667). Without considering any personal characteristics of Mr. Smith's restrictions, the employee listed job titles which, presumably, a person with Mr. Smith's employment history who had no medical restrictions, could handle.  Given the evidence concerning Mr. Smith's debilitating back conditions and Champion's own refusal to accommodate the restrictions, this report is meaningless. (Pl. App. 78).

### Champion/CORE Ignored Critical Evidence

*Pain:* In accordance with their customary practice of ignoring complaints of chronic pain, Champion/CORE based the termination of Mr. Smith's LTD benefits primarily on the conclusion

-79-

that there were no "objective findings" in support of Mr. Smith's total disability. (Pl. LR 56 St., p. 158, ¶ 653). In fact, Mr. Smith's history is replete with objective evidence showing the deterioration of his spine. (Pl. LR 56 St., p. 152, ¶ 635; Pl. App. 75). And not a single doctor who has examined Mr. Smith has ever questioned that these objective findings would result in severe and chronic, if not crippling, pain.

In fact, CORE's own reports noted as potential complications the fact of Mr. Smith's continuing chronic pain. (Pl. LR 56 St., p. 157, ¶ 651). Mr. Smith's supplementary evidence shows that the pain became so unbearable that Mr. Smith was forced to have a morphine pump inserted in his back. (Pl. LR 56 St., p.162, ¶ 669a).

Given Mr. Smith's credibility, his work history, and his work ethic, there is no basis on which to disregard his pain.

***Vocational Evidence:*** As in other cases, CORE totally disregarded the vocational evidence. As stated above, Randy Adams, a certified vocational evaluator, prepared a comprehensive report considering and applying a number of different factors to determine the issue of whether Mr. Smith was disabled. He considered Mr. Smith's personal, employment, and medical history; as indicated above, he reviewed Ms. Kimel's FCE, which he found deficient; he interviewed Mr. Smith at length; and he conducted testing. Based on his review, he concluded the following:

> Based on all of the information available to me and considering all of the above factors, it is my opinion that Mr. Smith is not employable in any job in the national economy. He is totally disabled from performing any substantial gainful activity. Based on his age, educational level, residual functioning, and diagnosis of

> chronic pain syndrome, it is my opinion that he should be
> considered permanently disabled.

(Pl. LR 56 St., p. 156, ¶ 649; Pl. App. 78).

Champion/CORE's response to Mr. Adams' report is confined to a single page questioning some of the factors considered by Adams. Inexplicably, with respect to Mr. Smith's age, Dr. Beavers states that "I fail to see that this is in any way relevant to his claim to be totally disabled." (NB 20: Smith-248). He then concludes that Mr. Smith's complaints of chronic pain are "entirely subjective and there is no objective substantiation that this is disabling." *Id*.

As stated above, the claims record is replete with objective evidence of Mr. Smith's serious back problems, and CORE had previously noted that his chronic pain would be an obstacle to employment. (Pl. LR 56 St., p. 160, ¶ 666). Under any full and fair review, the participant's age is relevant to his employability. (Pl. App. 78).

Champion/CORE failed to consider the vocational evidence presented by Mr. Smith and failed to obtain its own vocational assessment. As indicated above, CORE's TSA, which disregarded Mr. Smith's personal characteristics and limitations, provided no evidence in this regard.

Perhaps the strongest indicator that Mr. Smith was disabled and unemployable was Champion's own reaction to the prospects for accommodating Mr. Smith's restrictions, based on the IME and FCE. Given Mr. Smith's excellent work history, there would be no reason to deny him re-employment if Champion truly believed he could work. Its failure to offer re-employment provides strong evidence that Mr. Smith Champion found him totally disabled, and that no employer would hire him. (Pl. LR 56 St., p. 158, ¶¶ 655-656).

***Supplemental Information:*** Mr. Smith also provided supplemental information, including additional medical information, his affidavit, and a supplemental vocational assessment from Mr. Adams responding to documents which were not available at the time of his initial evaluation. (Pl. LR 56 St., p. 161, ¶ 669).  All of this information supports his continuing total disability.

As stated above, this information included a medical update establishing that Mr. Smith's physician had inserted a morphine pump in an effort to help him cope with the disabling pain. This evidence, which was unavailable at the time of the initial review, supports Mr. Smith's credibility concerning his continuing complaints of chronic pain. *Id.*

**Conclusion**

Champion/CORE failed to conduct a full and fair review of Mr. Smith's claim for LTD benefits.  The evidence on which it relied in terminating his benefits was insubstantial and unreliable.  The failure to consider relevant evidence concerning Mr. Smith's disability was unsupportable.

A full and fair review of the entire claims record demonstrates that Mr. Smith is totally disabled from working in any occupation.

**DOLPHUS LUTHER TREADWAY, JR.**

The evidence in Mr. Treadway's claims record proves the following:

- Mr. Treadway's date of birth is January 26, 1944; at the time of the final denial of his benefits, Mr. Treadway was 53 years old.  (Pl. LR 56 St., p. 162, ¶ 670).

- Mr. Treadway has an eighth grade education.  (Pl. LR 56 St., p.162, ¶ 671).

-82-

- Mr.  Treadway was employed by Champion for 23 years from 1972 to 1995, when he became disabled from any work. (Pl.  LR 56 St., pp. 162-163, ¶ 672).

- Mr.  Treadway had a heart attack in 1994 and heart surgery with six (6) coronary artery bypass grafts performed on April 22, 1994. (Pl.  LR 56 St., p. 163, 164, ¶¶ 674, 680).

- Mr.  Treadway's disabling conditions arise from his coronary artery disease, coronary artery bypass graft, exertional angina, cardiac ischemia, myocardial infarction, and hypertension. (Pl.  LR 56 St., pp. 163-164, ¶¶ 674, 677, 680, 682-683).

- Throughout his disability, Mr. Treadway has been treated by Dr. Linger, a specialist in internal medicine, and Dr. Keogh, who certified that Mr. Treadway was totally disabled from any work.  (Pl. LR 56 St., pp. 163-165, ¶¶ 679, 681, 685).

- From 1996 to 1998, Champion determined that Mr. Treadway was totally disabled from his regular job and eligible for LTD benefits under the Plan. (Pl. LR 56 St., pp. 165-166, ¶¶ 686, 688-689, 690-692).

- Although Mr. Treadway's condition did not improve, in September, 1998, CORE decided that Mr. Treadway was no longer totally disabled under the Plan, and Champion finally upheld the termination. (Pl. LR 56 St., p. 173, ¶¶ 721-722).

- In June 1996, the Social Security Administration found Mr. Treadway totally disabled effective December 19, 1995.  (Pl. LR 56 St., p. 166-167, ¶ 693).

### Champion/CORE Denied Mr.  Treadway a Full and Fair Review and Wrongfully Terminated His LTD Benefits

The evidence in Mr.  Treadway's claims record establishes his total disability with clarity.

Looking at him as an individual, the evidence reveals a hard-working employee who gave the

best part of his working life–23 years–to Champion before a heart attack and surgery involving

six (6) coronary artery bypasses forced him out of work.  The unrefuted evidence is that he has

chest pain with even mild activity such as walking to and from his mailbox fifty (50) yards from

his home, or walking on a treadmill for seven (7) minutes as revealed by the stress test.  (Pl. LR 56 St., p. 168, ¶ 699; Pl. App. 83).

Although none of the attending physician statements were provided by CORE or Champion in their documents production, CORE's common statement indicated that when the person's disability related to cardiac problems, there was a functional capacity  classification according to the American Heart Association and the person was to be graded by the physician from a Class 1 (no limitation), Class 2 (slight limitation), Class 3 (marked limitation) and Class 4 (complete limitation).  For instance, see plaintiff Charles' Reece's file (Pl. App. 69).  Dr.  Linger, Mr.  Treadway's treating physician, indicated that he had a Class 4 complete limitation in terms of his functional capacity.   (Pl. App. 80).  Dr.  Aldrich completely omitted this evaluation from his IME report, and neither CORE nor Champion requested clarification. (Pl. LR 56 St., pp. 167-168, ¶¶ 695-698).

A review of Dr.  Linger's reports, and even the IME by Dr.  Aldrich, makes it clear that when both the physical and the psychological components of Mr. Treadway's condition are considered, he is not able to work.  Understandably, given his father's death by heart attack at age 51 (Mr.  Treadway's age at the time his benefits were terminated), Mr.  Treadway is frightened when he has an onset of chest pain radiating into his left arm with activity as slight as the seven (7) minute walk on the treadmill, or when he walks uphill 150 feet to his house from his mailbox. (Pl. LR 56 St., pp. 163, 168, ¶¶ 678, 699; Pl. App. 83).

Although Mr.  Treadway had been approved for LTD benefits for more than two (2) years, there had been no prior decision with respect to his entitlement to benefits under the "any occupation" standard.  However, the treating physician had made it clear that he thought Mr.

-84-

Treadway was disabled in light of both his physical impairments and vocational issues. (Pl. LR 56 St., p. 165, ¶ 685).

## Champion/CORE's Evidence was Unreliable

CORE based its decision on an IME by Dr. Aldrich, a stress test and echocardiogram. Even if the IME is accepted at face value, Dr. Aldrich's letters of June 29, 1998 and August 21, 1998 make it clear that psychological assistance will be necessary even if Mr. Treadway is physically capable or returning to work. (Pl. App. 84). However, the IME is, at best, inconclusive and upon close scrutiny, unreliable.

Dr. Aldrich saw Mr. Treadway on one occasion; he would not issue a disability opinion until there had been some additional tests performed, one of which was a stress test. (Pl. LR 56 St., p. 167, ¶ 695). That stress test had to be terminated after seven minutes because Mr. Treadway began developing chest pain which radiated into his left arm, the classic symptoms of a heart attack. (Pl. LR 56 St., p. 168, ¶ 699; Pl. App. 83). The defendant's own "potential clinical complications" in their Confidential Service Reports indicate that a recurrent myocardial infarction or heart attack is a recognized complication. (NB 51: CE-384) This onset of pain caused Mr. Treadway apprehension, as it always does when he experiences that pain, and it was sufficient pain for the administrator to terminate the test. While he denominated the test "adequate", and Dr. Aldrich extrapolated the adequacy of the test to establish a physical capacity to return to work, common sense would dictate otherwise.

In the first place, such pain with radiation into the left arm is a classic heart attack symptom. Second, the stress test's production of chest pain indicates that Mr. Treadway is not able to obtain and sustain competitive work, which involves more stress, both physical and

emotional, than is presented by seven minutes of exercise on a treadmill.  The stress test results proved disability– not employability.  While  Dr. Aldrich was somehow able to project a physical capacity to work from the seven minute stress test, even he felt that Mr. Treadway had significant pain and anxiety associated with his symptoms. (Pl. LR 56 St., p. 168, ¶ 700).

In addition, there are few medical records in Mr.  Treadway's claims review file.  How Champion/CORE could claim to make a full and fair evaluation without having medical and vocational records, is a mystery.

### Champion/CORE Ignored Critical Evidence

*Pain:*  Consistent with Champion/CORE's pattern and practice, they failed to consider the

psychological impact of Mr.  Treadway's recurrent chest pain on his ability to work.  While the pain and his anxiety is documented throughout the record, both by Mr.  Treadway and his doctor, and while it is acknowledged throughout the record by Champion and CORE, they made no effort to analyze the credibility of Mr.  Treadway's reports of pain and its significance in his overall work capacity.  Clearly, Mr.  Treadway's 23 years of employment prior to his heart attack had given Champion ample proof of his work ethic.

Dr.  Aldrich twice recommended a psychological evaluation of that component of Mr. Treadway's disability.  CORE and Champion ignored his recommendation.  In fact, not only did they not provide psychological counseling, CORE and Champion did not even obtain a psychological evaluation of Mr.  Treadway's situation to determine if he was employable from a psychological standpoint.  Because the subjective pain and psychological component of his condition was ignored, the review was not full or fair.  (NB 22: Treadway-10-12; 22-23).

***Vocational Evidence:*** In addition, Champion and CORE made no worthwhile effort to consider the vocational component of Mr. Treadway's disability. Although his sparse claims file does not contain the vocational profiles contained in other files, given his eighth grade education, age and lack of transferable job skills, his employment prospects elsewhere would obviously be bleak. Moreover, there is no indication in the file that Champion itself offered him re-employment, despite Dr. Aldrich's optimistic projections. (NB 22; NB 51).

In its TSA dated September 1, 1998, CORE speculated that Mr. Treadway was capable of working as a chip deliverer, the position he previously held at Champion. That was the theoretical speculation of the CORE employee who prepared the report. (Pl. LR 56 St., pp. 169-170, ¶ 706). In reality, Champion never offered Mr. Treadway an opportunity to return to work, but simply terminated his LTD benefits. As was their pattern and practice, CORE and Champion embraced a speculative TSA that vaguely discussed theoretical employability, and ignored the practical reality that neither Champion nor anyone else would hire Mr. Treadway, given his age, lack of education, and physical and psychological problems.

Given Mr. Treadway's excellent work history, Champion's refusal to consider him for re-employment is strong, if not, conclusive evidence that he was unemployable. In fact the vocational assessment provided by Mr. Treadway in his supplemental file establishes this fact. After comprehensively reviewing Mr. Treadway's personal, employment and medical records and interviewing Mr. Treadway to determine his impairment from cardiac problems, Dr. Henry D. Wong concluded that Mr. Treadway was "unemployable since 12/20/95 and remains unemployable to the present day." (Pl. LR 56 St., p. 173, ¶ 723b).

Given the internal inconsistencies and lack of medical and vocational documentation in Champion/CORE's claims record, it is clear that Champion/CORE failed to conduct a full and fair review of Mr. Treadway's claim. Given the substantiating evidence in the file, Mr. Treadway's total disability from any occupation is established as a matter of law.

### MARTHA BURNETTE WHITLEY

The evidence in Ms. Whitley' claims record proves the following:

- Ms. Whitley' date of birth is January 8, 1957; at the time of the termination of her benefits under the Plan, Ms. Whitley was 41 years of age. (Pl. LR 56 St., p.174, ¶ 725; Pl. App. 1).

- Ms. Whitley has a high school education. (Pl. LR 56 St., p. 174, ¶ 726; Pl. App. 1).

- Ms. Whitley was employed by Champion for 8 years from 1980 to 1988, when she became disabled from any work. (Pl. LR 56 St., p. 174, ¶ 727; Pl. App. 1).

- Ms. Whitley' disabling conditions include fibromyalgia, chronic pain syndrome, rheumalis, degenerative disc disease and herpes zoster. (Pl. LR 56 St., p. 175, ¶ 730; Pl. App. 86).

- Throughout her disability, Ms. Whitley has been treated by Dr. Kate Queen, a board certified rheumatologist, who has repeatedly certified that Ms. Whitley was totally disabled from any work. (Pl. LR 56 St., p. 176, ¶ 736; Pl. App. 85-86).

- From 1988 to 1998, Champion consistently determined that Ms. Whitley was totally disabled from her regular job and any other job for which she was qualified by training, education or experience, and entitled to LTD benefits under the Plan. (Pl. LR 56 St., p. 176, ¶¶ 737-740; Pl. App. 87).

- Although Ms. Whitley' condition did not improve, in December, 1997, CORE decided that Ms. Whitley was no longer totally disabled under the Plan, and Champion finally upheld the termination of LTD benefits on March 11 1999. (Pl. LR 56 St., p. 188, ¶ 780; Pl. App. 96).

### Champion/CORE Denied Ms. Whitley a Full and Fair Review and

**Wrongfully Terminated Her LTD Benefits**

After years of enduring debilitating pain, Ms. Whitley became totally disabled from her employment with Champion on March 29, 1988.  Ms. Whitley had been diagnosed with severe fibromyalgia with chronic pain syndrome and other conditions; and after being certified for total disability, she began receiving LTD benefits.  (Pl. LR 56 St., p. 176, ¶ 738).

Champion continued certifying Ms. Whitley from 1988 to 1998.  At one point during this period, questions were raised concerning Ms. Whitley's disability.  During Champion's annual review in 1995, Champion's claims administrator, Travelers, arranged for an IME by a rheumatologist, Dr. Ruffin Stephenson.  Dr. Stephenson examined Ms. Whitley on August 14, 1995, and reported to Travelers that Ms. Whitley suffered  from fibromyalgia and chronic fatigue, and described her symptoms as follows:

> The patient has extreme severe symptoms as mentioned above, probably as bad or worse as [sic] anyone I have seen in my entire practice, though I think there may be an overriding component of depression which may make her coping abilities difficult and may increase the amount of pain she experiences.

(Pl. LR 56 St., p. 178, ¶ 741; Pl. App. 88).  He then expressed his opinion that Ms. Whitley's "[f]unctional limitations are extreme and I do not think she could be employable at this time or in the foreseeable future." *Id.*

Travelers agreed.  Travelers' case manager noted that Ms. Whitley has :

> Soft tissue tenderness involving multiple joints, particularly severe in the posterior cervical and shoulder girdle musculature as well as paravertical musculature.  Also, she has had problems with fatigue, insomnia and intermittent awakening related to pain and depression.

-89-

> In the past, she participated in a pain management program and
> went through functional capacities evaluation which according to
> Dr. Queen's notes indicated Mrs. Whitley did not have the capacity
> to return to her usual job at Champion.

The case manager then emphasized "that Mrs. Whitley's file is very well documented

from the medical standpoint," and that the evidence supports total disability from any occupation.

The case manager then concluded: "Unless convincing evidence that would militate against a

finding of disability is obtained (e.g., proof that Mrs. Whitley is working on a sustained basis),

termination of benefits would not be appropriate on this claim."  (Pl. LR 56 St., p.177, ¶ 740; Pl.

App. 1).

No "convincing evidence" indicating Ms. Whitley's ability to work was ever produced.

The claims file indicates that Ms. Whitley's condition continued to decline, and her symptoms,

particularly of pain, progressed to the point where even her ability to provide personal care and

the care for her family at home was threatened.  (Pl. LR 56 St., p. 185, ¶ 770; Pl. App. 86).

### CORE/Champion's Decision

Initially, after CORE took over the management of Ms. Whitley's claim, CORE seemed

to agree with the findings of the prior nine years.  In June, 1996, there was discussion between

CORE and Mary Lee Dixon, Champion's claims supervisor, as to "how aggressive CORE should

be in determining [Ms. Whitley's] disability status, i.e, coordinating an FCE."  (Pl. LR 56 St., p.

180, ¶ 749; Pl. App. 89).  Apparently, Sharon Spain, Champion's contact person in the Canton,

North Carolina plant, raised issues because she had seen Ms. Whitley exercising at the fitness

center. (NB 24: CRC-2147).  After reviewing the file, the CORE case manager recommended

against a new FCE, given the results of the FCE of the previous year, concluding that an FCE

-90-

would be a "waste of money," since Ms. Whitley's "clinical status is unchanged." It was determined that Ms. Whitley had been at the fitness center solely to "increase her quality of life." (Pl. LR 56 St., p. 180, ¶ 750; Pl. App.89).

CORE issued its Confidential Services Report #1 on July 26, 1996, noting Dr. Stephenson's opinion that Ms. Whitley's "extremely severe symptoms" were "probably as bad or worse as anyone I have seen in my entire practice;" and CORE concluded that an FCE would not be beneficial "since the EE's clinical status was unimproved and her case was extensively reviewed last year." (Pl. LR 56 St., p. 180, ¶ 751; Pl. App. 90).

Nevertheless, the next year, 1997, CORE engaged in a new effort to terminate Ms. Whitley's disability. In order to support its objective, CORE arranged an FCE, an IME, and had its employee prepare a TSA.

**FCE:** CORE scheduled an FCE through Ronald S. Hoechstetter, an "exercise psychologist." Mr. Hoechstetter evaluated Ms. Whitley on July 7, 1997. In his report, Mr. Hoechstetter confirmed that Ms. Whitley was unable to engage in some of the activities even in the relatively brief time period of the test. He concluded that Ms. Whitley could satisfy some of the requirements at the sedentary demand level, but that she was limited in others by her conditions and pain. He recommended a pain management program, but determined that Ms. Whitley was unable to meet the maximum requirements for sedentary work. (Pl. LR 56 St., p. 180, ¶ 754).

**IME:** CORE contracted for an IME with Dr. Andrew Rudins. Dr. Rudins saw Ms. Whitley on a single occasion on December 3, 1997. Dr. Rudins expressed his belief that Ms. Whitley could perform sedentary work, but acknowledged that he had not seen the FCE

conducted by Mr. Hoechstetter, and apparently assumed that Mr. Hoechstetter had concluded that Ms. Whitley was able to perform the full range of sedentary work.

Dr. Rudins qualified his report with the following statement: "Considering that she had been out of work since 1988, however, the chance for her successfully returning to work is quite low. I expect that she will continue to have pain whether she is at work or at home." (Pl. LR 56 St., pp.181-182, ¶ 757).

Dr. Rudins' IME is equivocal, at best. Given the inconsistencies in his report and the limitations of his evaluation, the IME does not constitute substantial evidence in support of the denial.

Champion's contact person, Sharon Spain, was apparently quite happy with Dr. Rudins' IME, and noted to CORE that she would "support a denial if the CORE, Inc. Denial Committee recommends a denial." She asked to see a copy of the IME "because she wants to see how Dr. Rudins presents his cases." (Pl. App. 89).

*TSA:* On December 8, 1998, CORE's Costs Services employee prepared a transferable skills analysis of Ms. Whitley's job skills. In the report, the employee listed a number of job titles from her database which she found "appropriate for employment, given Ms. Whitley's past employment experience." She did not consider chronic pain or other symptoms and obstacles to Ms. Whitley's return to work. (Pl. LR 56 St., p. 183, ¶ 759).

Without personalized attention to Ms. Whitley's specific job restrictions and limitations, the TSA is essentially meaningless.

### Champion/CORE Ignored Critical Evidence

*Pain*: As indicated above, Ms. Whitley's claims file was replete with evidence of her chronic, disabling pain. Ms. Whitley had described the pain as "flu-like, aches all over—my body aches like the flu, my bones [feel] like my bones are coming out of my skin." (Pl. LR 56 St., p.175, ¶ 734). Dr. Stephenson , who performed the initial IME for Champion in 1995, noted that Ms. Whitley "is tender absolutely everywhere she is touched . . . she cried throughout most of [the examination] due to pain." He then described her "extreme severe symptoms" as "probably as bad or worse as anyone I have seen in my entire practice." (Pl. LR 56 St., p. 178, ¶ 741; Pl. App. 88).

As indicated above, both Champion and its claims administrator, Travelers, and initially, CORE, accepted this clear and uncontroverted evidence of total disability. However, in its review in 1997-1998, CORE disregarded the evidence. Regardless of any other evidence which was considered by Champion/CORE, its failure to consider subjective evidence of pain in its review of Ms. Whitley's claim is fatal.

*Vocational Evidence:* CORE's IME physician, Dr. Rudins, predicted that Ms. Whitley would not be able to return to work. (Pl. LR 56 St., p. 181, ¶ 757; Pl. App. 88). Ms. Whitley's treating specialist, Dr. Queen, stated repeatedly that Ms. Whitley was not able to work, based on her severe case of fibromyalgia and unrelenting pain. (Pl. LR 56 St., p. 185, ¶ 770; Pl. App. 86). Fairly late in the review, CORE had its employee prepare a TSA, as noted above, but the TSA did not assess Ms. Whitley's ability to obtain employment given her limitations and pain.

In her supplementary filing, Ms. Whitley provided a comprehensive vocational assessment by Dr. Henry D. Wong, certified rehabilitation counselor. Dr. Wong reviewed Ms. Whitley's personal, employment, and medical record; he evaluated Ms. Whitley's aptitudes and

-93-

transferable skills.  Dr. Wong noted that Ms. Whitley was "restricted from performing sedentary

activities—no lifting over ten pounds," and other limitations.  (Pl. LR 56 St., p. 189, ¶ 784b).  Dr.

Wong concluded, based on all of the information:

> Due to her age, training would not benefit her due to employer preferential attitudes to hire younger workers, would require a  substantial amount of vocational adjustment, and therefore, is not recommended.  Consequently, there are no jobs that could be identified or recommended for Ms. Whitley by this evaluator.
>
> She was unemployable since March 29, 1988 and remains unemployable to the present day due to the above rationale.  This evaluator finds her condition chronic, persistent with exacerbations and variable daily pain.  The functional limitations to walk distances and to climb stairs without resting due to dyspnea, difficulty climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, feeling, difficulty concentrating, poor memory and fatigue, preclude her from employment.

*Id.*

The comprehensive vocational assessment by Dr. Wong, in combination with the other

evidence in Ms. Whitley's claims record, establishes that she was totally disabled from any work

at the time of the termination of her benefits.

**Ms. Whitley's condition of herpes zoster:** Relatively late in the review period, prior to

the final decision terminating benefits, Champion/CORE received a letter from Dr. Queen in

which she continued to "find [Ms. Whitley] severely impaired with chronic and unrelenting non-

articular musculoskeletal pain;" and added that Ms. Whitley's pain "has been further complicated

by the recent development of herpes zoster." (Pl. LR 56 St., pp. 186-187, ¶ 774; Pl. App. 86).

Dr. Queen then emphasized that Ms. Whitley continues to be "totally disabled from engaging in any occupation or business for wage or profit." *Id.*

Following its receipt of this information, on November 5, 1998, CORE's physician consultant, Dr. Fife, submitted a report to CORE noting Ms. Whitley's "long history of chronic pain due to fibromyalgia, osteoarthritis and degenerative disk disease of the spine;" that "[h]er pain has persisted despite a therapeutic regimen consisting of multiple analgesics, anti-depressants and muscle relaxants, as well as physical therapy; and that :

> Superimposed on this background of chronic pain, she has now developed acute pain due to herpes zoster. This makes it impossible for her to perform any kind of work at present. This condition directly affects the sensory nerves and is very painful in and of itself. It can be anticipated that this condition will last at least six months. At that time, she should be re-evaluated to determine her functional ability.

(Pl. LR 56 St., p. 187, ¶ 775; Pl. App.91).

With this new information, all agreed that Ms. Whitley was totally disabled from any work. However, CORE's Denial Committee took the position that Ms. Whitley's total disability was based on a condition which arose after its review and, therefore, Ms. Whitley was "not vocationally disabled." (Pl. LR 56 St., p. 187, ¶ 776).

In its initial meeting to review CORE's denial, the CRC requested further investigation. (Pl. LR 56 St., p. 188, ¶ 778; Pl. App. 95). After discussing Ms. Whitley's disease of herpes zoster, the CRC, through Champion's general counsel, decided that only medical conditions which existed at the time of the initial denial should be considered in determining whether Ms. Whitley was totally disabled under the Plan. Champion instructed CORE to determine the date of onset of Ms. Whitley's disease. (Pl. App. 94).

CORE requested that its requesting physician, Dr. Fife, determine the onset date of Ms. Whitley's herpes zoster. According to Dr. Fife's report, she determined from Ms. Whitley's family physician, Dr. Daniell, that Ms. Whitley's disease "began in 4/1998." (Pl. LR 56 St., p. 188, ¶ 779).

Since the reported "onset date" of the herpes was after the original denial, the CRC denied Ms. Whitley's claim. (Pl. LR 56 St., p.188, ¶ 780; Pl. App. 96).

The basis of Champion's decision—that Ms. Whitley's disease of herpes zoster must have been diagnosed prior to the initial denial in January, 1997— is not clear in the Plan or in the evidence. In fact, since Ms. Whitley was permitted under the Plan to present evidence and new information up to the final denial, it would appear that any information received concerning her disability should be considered. Champion's decision in this regard was arbitrary and capricious, and was not supported by the plain language of the Plan.

In any event, even under Champion's interpretation of the Plan, its decision was wrong. In her supplementary submission, Ms. Whitley presented medical records of her treating physicians, including the records of her family physician, Dr. Daniell. (Pl. LR 56 St., p. 190, ¶ 784c). In her examination of Ms. Whitley on October 22, 1997, Dr. Daniell noted symptoms of herpes zoster—"red blotches in a mid-right thoracic distribution on her back and on her breasts—" and stated that Ms. Whitley had "a [r]ash consistent with early herpes zoster." Dr. Daniell commenced medication in hopes of avoiding "any post-herpetic neuralgia problems." (Pl. LR 56 St., p. 188, ¶ 781; Pl. App. 97). Thereafter, Dr. Daniell continued treating her herpes zoster. (NB 38: Whitley-640, 644, 645).

These records reflect and establish that Ms. Whitley's herpes zoster was diagnosed on October 22, 1997 and treatment was commenced. (Pl. App. 97). Clearly, there is good cause to support the consideration of this evidence.

Accordingly, Ms. Whitley is totally disabled, based on her chronic pain due to fibromyalgia, and her additional condition of herpes zoster.

## Conclusion

Champion/CORE failed to provide a full and fair review of all of Ms. Whitley's conditions. With respect to her historical problem of fibromyalgia and chronic pain, Champion/CORE had no substantial evidence to support its termination, and its reversal of its prior certifications. With respect to Ms. Whitley's herpes zoster, it is uncontroverted that she is totally disabled from any occupation.

## CONCLUSION

In her statement on appeal, the plaintiff, Lois L. Lynn, asked a pertinent question, with reference to Champion/CORE's misrepresentation of an IME report:

> Is CORE, Inc., this careless in their research and reporting, or do they deliberately distort facts in order to raise their body count? Both should be unacceptable to Champion. I am in total sympathy with the economic realities that all companies must cut costs and save money wherever possible in order to stay in business. However, surely Champion has not fallen to the position of saving dollars at the price of their integrity.

(NB 13: Lynn-60). Ms. Lynn's question is not only relevant to her own claim, but is also pertinent to the claims of all of the plaintiffs, and other employees who were terminated during CORE's tenure. Champion/CORE's "body count" is considerable, and the impact of the effort to reduce the LTD rolls is substantial, in human terms.

Indeed, the evidence in this case is unique. Champion/CORE's actions make a mockery of ERISA's standards and its underlying premise that a "fiduciary" acts in the interest of the participants. This case calls for remedial action by this court.

For all of the reasons stated above, the plaintiffs request the following relief:

(1) That this Court initiate a *de novo* review, and determine, as a matter of law, that each of the plaintiffs is totally disabled under the Plan, and entitled to a reinstatement of benefits;

(2) That, upon any deferential standard of review, this Court determine, as a matter of law, that Champion/CORE denied plaintiffs a full and fair review process, and wrongfully terminated their LTD disability benefits.

This the 4th day of April, 2005.

THE PLAINTIFFS
HARRY L. SMITH, ET AL


BY:_____

WILLIAM B. BARNES (CT0268)
Rosenstein & Barnes
1100 Kings Hwy. East
P.O. Box 687
Fairfield, CT 06432
Tel (203) 367-7922
Fax (203) 367-8110
E-mail wbarnes@rosenbar.com

ROBERT M. ELLIOT (CT21210)
Elliot Pishko Morgan, P.A.
426 Old Salem Road
Winston-Salem, NC 27101
Tel (336) 724-2828
Fax (336) 724-3335
E-mail rmelliot@epmlaw.com


RICHARD B. HARPER
Harper Law Office
Post Office Box 395
Sylva, NC 28779
Tel (828) 586-3305
Fax (828) 586-4795
E-mail rbharper@dnet.net

## CERTIFICATE OF SERVICE

I certify that a copy of the Plaintiffs' Brief in Support of Plaintiffs' Motion for Summary

Judgment was sent by Mail on April 4, 2005 to the following:

**ADDRESSEES:**

Bruce M. Steen, Esq.
McGuire Woods
Bank of America Corporate Center
100 North Tryon St., Suite 2900
Charlotte, NC 28202

Barry J. Waters, Esq.
Murtha Cullina, LLP
Whitney Grove Sq.,
Two Whitney Ave.,
P.O. Box 704
New Haven, CT 06503-0704


_____
ROBERT M. ELLIOT