**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **HARRY L. SMITH, LOIS L. LYNN,** ) | |
| **DARRELL KEITH HILL, ELIZABETH** ) | |
| **CASE BOONE, WILEY H. HAYNES,** ) | |
| **ROSA LEE BROOKSHIRE, HARRISON** ) | |
| **YOUNG CLARK, FRANZISKA FINNEY,** ) | |
| **JUDITH CASE KIRKPATRICK, WILSON** ) | |
| **DANIEL McCLURE, CELIA DARLENE** ) | |
| **METCALF, CHARLES R. REECE,** ) | |
| **DOLPHUS LUTHER TREADWAY, JR., and** ) | |
| **MARTHA BURNETTE WHITLEY,** ) | |
| ) | |
| **Plaintiffs,** ) | **CIVIL ACTION NO.** |
| ) | **302CV212 (CFD)** |
| **v.** ) | |
| ) | |
| **CHAMPION INTERNATIONAL** ) | |
| **CORPORATION; LONG TERM** ) | |
| **DISABILITY BENEFITS PLAN FOR** ) | |
| **SALARIED EMPLOYEES OF** ) | |
| **CHAMPION INTERNATIONAL** ) | |
| **CORPORATION #506; LONG TERM** ) | |
| **DISABILITY BENEFITS PLAN FOR** ) | |
| **CERTAIN HOURLY EMPLOYEES OF** ) | |
| **CHAMPION INTERNATIONAL** ) | |
| **CORPORATION #703; and INTERNATIONAL** ) | |
| **PAPER COMPANY,** ) | |
| ) | **April 4, 2005** |
| **Defendants.** ) | |
| _____ ) | |

**PLAINTIFFS' LOCAL RULE 56(a)1 STATEMENT**

# TABLE OF CONTENTS

**Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**The LTD Plans** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**Champion and CORE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**

**Facts Concerning Individual Plaintiffs**

      **Elizabeth Case Boone** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
      **Rosa Lee Brookshire** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**
      **Harrison Young Clark** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **44**
      **Franziska Finney** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **59**
      **Wiley H. Haynes** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **66**
      **Darrell Keith Hill** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **78**
      **Judith Case Kirkpatrick** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **85**
      **Lois L. Lynn** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **102**
      **Wilson Daniel McClure** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **115**
      **Celia Darlene Metcalf** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **123**
      **Charles R. Reece** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **138**
      **Harry L. Smith** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **151**
      **Dolphus Luther Treadway, Jr.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **162**
      **Martha Burnette Whitley** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **174**

Pursuant to Local Rule 56(a)1, plaintiffs submit the following statement of material facts as to which they contend there is no genuine issue to be tried by the Court:

## Background

1.      Champion International Corporation (hereafter "Champion") was initially established in July, 1941, in North Carolina. Champion engaged in the business of paper manufacturing. (Def. Champion's Answer, p. 3, ¶ 8; p. 4, ¶ 15).

2.      Over the years, Champion grew.  By the mid-1990's, Champion operated plants in North Carolina and other states, and employed thousands of employees. (Def. Champion's Answer, p. 4, ¶ 16).

3.      International Paper Company (hereafter "International") was also engaged in the paper manufacturing business.  On May 12, 2000, International acquired the assets and stocks of Champion through a merger agreement.  (NB 75: Lehman Dep., p. 5, L. 14-15).

4.      The plaintiffs were employed at Champion's plant in Canton, North Carolina. Canton is in a rural area of the mountains of western North Carolina. (Pl. App.1[1]; NB 20:Smith-222).

## The LTD Plans

5.      In 1970, Champion established two long term disability ("LTD") plans (hereafter, unless otherwise specified, referred to as "the Plans") for its salaried and hourly employees, entitled: "Long Term Disability Benefits Plan for Salaried Employees of Champion International Corporation #506," which covered certain salaried employees (hereafter "participants"), including the plaintiffs, Harry L. Smith, Lois L. Lynn, and Wilson Daniel McClure (NB 66: Plan-1-48); and "Long Term

---

[1] Plaintiffs' Appendix 1 includes a chart providing basic biographical information and a photograph of each plaintiff.

Disability Benefits Plan for Certain Hourly Employees of Champion International Corporation #703" which covered certain hourly employees (hereafter "participants"), including all other plaintiffs. (NB 66: Plan-49-99).

6.    The Plans are identical, in pertinent part, as applied to the respective plaintiffs' claims in this action. (NB 66: Plan-1-48, 49-99).

7.    The Plans were drafted by Champion.  (NB 66: Plan-1-48, 49-99).

8.    The Plans provide for the payment of LTD benefits, as defined and calculated under the Plans, to employees who were totally disabled and were otherwise eligible for benefits under the Plans (hereafter "disabled participants").    (NB 66: Plan-1-48, 49-99; Pl. App. 2).

9.    "Total disability" during the first 30 months of disability is defined in the Salaried Employee Plan as "the inability of an Employee to perform the duties of his employment with the Employer as a result of an injury which occurs or a sickness which first manifests itself while employed by the Employer which results in a benefit being paid or payable to the Employee during the first 180 days pursuant to the Temporary Disability Plan" (hereafter "total disability from regular occupation").   (NB 66: Plan-14; Pl. App. 2).

10.    "Total disability" during the first 30 months of disability is defined in the Hourly Employee Plan as "the inability of an Participant  to perform the duties of his employment with the Employer as a result of an injury which occurs or a sickness which first manifests itself while employed by the Employer which results in a benefit being paid or payable to the Participant pursuant to the Temporary Disability Plan" (hereafter "total disability from regular occupation"). (NB 66: Plan-60; Pl. App. 2).

11.     "Total disability" after 30 months from the onset of disability is defined in the Plans as "the inability to engage in any occupation or business for wage or profit for which he is or may become reasonably qualified by training, education or experience" (hereafter "total disability from any occupation"). (NB 66: Plan-14, 60; Pl. App. 2).

12.     The "named fiduciaries" of the Plans were the members of Champion's Pension and Employee Benefits Committee, who were appointed by Champion's board of directors. (NB 66: Plan-24, 72).

13.     The Plans provide that LTD benefits payable under the Plan are paid by Champion from its general assets.  (NB 66: Plan-27, 76).

14.     Champion was responsible for paying LTD benefits to disabled participants who were eligible for LTD benefits under the Plans at all times pertinent to this action, including the time period during which the plaintiffs' claims were terminated.  (NB 66, Plan-1-48, 49-99).

15.     Effective May 12, 2000, upon the acquisition of Champion by International, International was responsible for paying LTD benefits to all disabled participants who were eligible for LTD payments under the Plans. (NB 68: Champion-32-34).

16.     Since May 12, 2000, International has administered the Plan through its employee benefits department.  (NB 75: Lehman Dep., p. 5, L.14-17; p.101, L. 14- p.103, L.9).

17.     Other than as defined above, the Plans do not define or explain the terms  "total disability."  (NB 66: Plan-1-48, 49-99).

18.     Other than as defined above, the Plans do not define or explain the terms "any occupation or business for wage or profit for which he is or may become reasonably qualified by

training, education or experience" which are included in the definition of "total disability" after 30 months from the onset of disability of the Participant. (NB 66: Plan-1-48, 49-99).

19.     There exist no rules, regulations, procedures, protocols, or documents which further define or explain the definitions of "Total Disability" which are provided in the Plans. (NB 66: Plan-1-48, 49-99).

20.     There exist no rules, regulations, procedures, protocols, or documents which further define or explain the terms "any occupation or business for wage or profit for which he is or may become reasonably qualified by training, education or experience" which are included in the definition of "total disability from any occupation" within the Plan. (NB 66: Plan-1-48, 49-99).

21.     The Plans provide that the initial decision concerning a participant's eligibility for LTD benefits will be made by Champion's "Plan Supervisor." (NB 66: Plan-29, 79).

22.     The Plans provide that if the claim is initially denied "or benefits terminated", the Plan Supervisor must notify the Participant in writing of the denial, setting forth in a manner calculated to be understood by the Participant, the specific reasons for the denial, a specific reference to the pertinent Plan Provisions on which the denial is based, a description of any additional material or information necessary for the Participant to perfect his claim and an explanation of why such material or information is necessary, and appropriate information as to the steps to be taken if the Participant wishes to submit his claim for further review. (NB 66: Plan-30, 80).

23.     The Plans provide that upon an initial denial by the Plan Supervisor, the Participant has rights to a full and fair review, including the rights to inspect pertinent documents concerning his/her claim, and to submit issues and comments in writing. (NB 66: Plan-30, 81).

4

24.    The Plans provide that upon the Participant's request for review, Champion will provide a full and fair review of the Plan Supervisor's initial decision by its fiduciaries.  (NB 66: Plan-30, 81).

25.    The Plans provide that upon a final denial of the Participant's claim after review by the fiduciaries, the Plan Supervisor shall provide written notice to the Participant of the decision "in a manner calculated to be understood by the Participant," and shall include "the specific reason or reasons for the decision on review," and "specific reference to the pertinent Plan Provisions on which the decision on review is based."  (NB 66: Plan-32, 83).

## Champion and CORE

26.    From approximately 1995 to 1999, Champion officials explored ways of reducing their costs throughout the company.  (NB 75: Gorski Dep., p. 26, L. 16-24; p. 27, L. 5-12; NB 75: Lehman Dep., p. 226, L. 10 - p. 227, L. 17)**.**

27.    During the same time period, Champion determined that its  implementation of the Champion LTD Plans had become too costly as a result of the number of participants who had become disabled. (NB 75: Taylor Dep., p. 240, L. 15 - p. 243, L. 8).

28.    Prior to 1996, Champion contracted with Travelers Insurance Company as its claims administrator to manage, investigate, and evaluate LTD claims and disabled Participants under the Plans, including the plaintiffs.  (NB 75:  Lehman Dep., p. 42, L. 22-23).

29.    CORE, Inc. (hereafter "CORE") promoted its expertise in reducing and eliminating disability costs by obtaining evidence and information to use in the denial or termination of LTD benefits of disabled participants.  (NB 75: Lehman  Dep., p.207, L. 24 - p. 211, L. 5; NB 76: Dep. Exh.10).

5

30.     Effective January 1, 1996, Champion contracted with CORE as its claims administrator to manage, investigate, and evaluate LTD claims and disabled Participants under the Plans, including the plaintiffs.  (NB 76: Dep. Exh. 5, CORE 1-39).

31.     Effective January 1, 1999, CORE performed its contractual duties in this regard through a joint venture with another company, Sedgwick James, known as SCORE (hereafter referred to as "CORE" with respect to the time period after January 1, 1999).  (NB76: Dep. Exh.6, CORE 40-67).

32.     From 1996 to 2000, CORE managed all of Champion's LTD claims, including those of the plaintiffs.  (NB 76: Dep. Exh. 5, CORE 1-39; Dep. Exh. 6, CORE 40-67).

33.     From 1996 to 2000, CORE was authorized to take all actions necessary to evaluate, investigate and determine the "total disability" of LTD participants and claimants under the Plans. (NB 76: Dep. Exh. 5, CORE 1-39; Dep. Exh. 6, CORE 40-67).

34.     From 1989 to 1999, Mary Lee Dixon, an employee of Champion, was Champion's designated LTD Administrator.  (NB 75: Dixon Dep., p. 19, L. 17-p. 20, L. 15).

35.     Mary Lee Dixon has a high school education and no additional formal education (NB 75: Dixon Dep., p. 13, L. 3-20); was employed by Champion in 1975  (NB 75: Dixon Dep., p. 14, L. 18- p. 15, L 2); worked for Champion in various capacities in medical and dental claims until 1989, when she was promoted to her position as LTD Administrator.  (NB 75: Dixon Dep., p. 15, L. 3- p. 20, L. 15).

36.     Mary Lee Dixon had no special education, training or expertise in considering any medical issues raised in connection with Participants' claims for LTD benefits under the Plans.  (NB 75: Dixon Dep., p. 31, L. 15-19).

6

37.   Mary Lee Dixon had no special education, training or expertise in considering any vocational issues raised in connection with Participants' claims for under the Plans. (NB 75: Dixon Dep., p. 31, L. 20-24).

38.   During the period when CORE was the claims administrator for Champion, Champion's general policy and procedure in processing on-going LTD claims (such as that of each of the fourteen plaintiffs) under the Plans was the following:

    a.   CORE would decide if and when to initiate review of an on-going claim.

    b.   Upon CORE's recommendation or decision to deny or terminate an LTD claim, Ms. Dixon would notify the LTD participant of the decision. In doing so, Ms. Dixon would engage in no independent investigation or evaluation of the grounds for CORE's decision or recommendation, but would rely solely on the information provided by CORE, and would adopt its findings on behalf of Champion.

    c.   If the LTD participant appealed Champion/CORE's first decision denying or terminating LTD benefits, Ms. Dixon would send the claim back to CORE for its recommendation or decision.

    d.   Upon receiving CORE's recommendation or decision denying or terminating an LTD claim at the second level of review, Ms. Dixon would again notify the LTD participant that the initial decision was being upheld. In doing so, Ms. Dixon would engage in no independent evaluation or investigation of the grounds for CORE's decision or recommendation, but would rely solely on

7

the information provided by CORE, and would adopt its findings on behalf

of Champion.  (NB 75: Dixon Dep., p. 147, l. 23 - p. 148, l. 10).

    e.    In making disability determinations, CORE's Rule 30(b)(6) corporate

    spokesman  testified that a claimant's age was never a factor.  (NB 75:

    Taylor Dep., p. 62, l. 16-22).

39.    From 1996 to 2000, CORE initiated the review of Champion's LTD participants

receiving LTD benefits, including those who had previously been determined to be totally disabled

from any occupation under the Plans by Champion and/or Travelers. (NB 75: Taylor Dep. Exh. 4,

pp. CORE-27-28).

40.    Except with respect to plaintiff Metcalf, whose claim was administered by SCORE,

in accordance with the above general procedure, CORE alone determined the LTD claims and

decided to terminate the LTD benefits of each of the plaintiffs at the first and second levels of review

under the Plans, without input from Champion's LTD Administrator, Mary Lee Dixon. (NB 75:

Dixon Dep., p. 147, L. 23 - p. 148, L. 10).

41.    From 1996 to 2000, CORE substantially reduced the number of Champion's LTD

participants receiving LTD benefits. (NB 75: Lehman Dep., p. 153, L. 23 - p. 154, L. 1).

42.    From 1996 to 2000, Champion delegated to its Claims Review Committee (hereafter

"CRC") the responsibility to conduct the final review of claims of LTD participants under the Plans

which had been denied or terminated by Champion and/or CORE. (NB 75: Lehman Dep., p. 74, L.

14-19).

43.    From 1996 to 2000, the CRC was composed of  five to ten members, all of whom

were employees of Champion, and none of whom had any specialized education, training or

instruction in medical or vocational issues which might be presented in LTD claims for total disability under the Plans. (NB 75: Lehman Dep., p. 96, L. 18-21; p. 97, L. 18 - p. 98, L. 18; NB 75: Lewis Dep., p. 28, L. 1 - p. 29, L. 8).

44.    Based on its general policy and practice, from 1996 to 2000, Champion's CRC would carry out its responsibilities in providing the final review of LTD claims under the following procedure:

      a.    Upon a request for final review, Champion's general counsel and his staff would copy selected portions of records concerning the claim received from CORE and would hand-number the pages.

      b.    The general counsel and his staff would make no effort to organize the above records in any particular order.

      c.    The general counsel and his staff would distribute the prepared records of claims to be considered to members of the CRC in advance of the CRC meeting.

      d.    The CRC took no independent actions to investigate any LTD claims, but relied solely on CORE to provide the records and information concerning the claims.

      e.    The CRC members would discuss the claim during its meeting.

      f.    If there were questions concerning the facts of the claim, the general counsel would send the claim back to CORE with a request for information.

g.    If there were no questions concerning the claim, the CRC could uphold or reverse CORE's denial or termination of the claim, or table the claim for further review at a later time.

(NB 75: Taylor Dep., p. 54, L. 1 - p 74, L. 10).

45.    Considering all the claims that were presented to the CRC from 1996 to 2000, the CRC minutes establish that CORE's denial or termination of the LTD claims were upheld with respect to at least 88% of the claims. (Pl. App. 4).

46.    Under the above claims review procedure from 1996 to 2000, in the event that CORE's denial or termination of an LTD claim was reversed by the CRC, CORE was authorized to reevaluate the claim thereafter, and deny or terminate the LTD benefits upon a new review. (NB 24: CRC-28-29).

47.    Under the procedure from 1996 to 2000, some of the LTD claims which were upheld by the CRC and reinstated for benefits, were subsequently denied or terminated upon subsequent review. (NB 24: CRC-28-29).

48.    At all times pertinent to this action, CORE had and exercised discretionary authority, control and responsibilities with respect to the management and administration of the Plans. (NB 75: Tab 5, Dixon Dep., p. 147, L. 23 - p. 148, L. 10; Tab 6, Taylor Dep. Exh. 4, CORE-65).

49.    CORE maintained a record of the "savings" it netted for Champion and International by assisting in the termination of LTD benefits to disabled participants; with respect to each plaintiff, CORE reported the "savings" resulting from the termination of his/her benefits. (Pl. App. 12, 23, 37, 41, 53) .

50.    As a result of Champion's and CORE's efforts, Champion's costs were reduced.

10

(Pl. App. 12, 23, 37, 41, 53).

51.    From 1996 to 2000, Champion was administering the Plans and determining the LTD claims under a conflict of interest.  (NB 66: Plan-0001-0048 (Salaried Employees Plan); NB 66: Plan-49-99; Pl. App. 12, 23, 37, 41, 53).

52.    As a general policy from 1996 to 2000, Champion and CORE denied LTD claims which were based primarily on subjective complaints of chronic pain. (NB 75: Tab 6, Taylor Dep., p. 38, L. 19 - p. 39, L. 8).

53.    As a general policy from 1996 to 2000, Champion and CORE conducted no labor survey, or vocational assessment or made contact with any employers in the participant's community to determine whether an LTD participant was employable prior to denying or terminating a claim for total disability from any occupation.  (NB 1 - NB 52).

54.    As a general policy from 1996 to 2000, Champion and CORE gave no consideration to whether an LTD participant whose claim had previously been approved on the ground that he/she was totally disabled from any occupation had improved or had a change of condition prior to terminating his/her claim.  (NB 1 - NB 52).

## FACTS CONCERNING INDIVIDUAL PLAINTIFFS

### *Plaintiff Elizabeth Case Boone*

### Background

55.    Ms. Boone's date of birth is November 5, 1946. (NB 1: Boone-1).

56.    Ms. Boone attended school through the 9th grade, and subsequently obtained a G.E.D. from Haywood Community College.   (NB 1: Boone-249).

11

57.     Ms. Boone worked for Champion from August 23, 1976 until she was disabled on May 5, 1987.  (NB 1: Boone-1).

58.     At the time of her disability, Ms. Boone was a cutter/sorter/checker which required her to cut and inspect paper products.   (NB 1: Boone-1, 310).

59.     Ms. Boone had suffered from severe pre-existing back and neck conditions in her cervical discs.  Despite her problems, Ms. Boone continued to work until she became totally disabled from work and was advised by his treating physician to remain out of work.  (NB1: Boone-312-313).

60.     Ms. Boone became totally disabled from her employment with Champion or any other work on May 5, 1987. (NB 1: Boone-1).

### Ms. Boone's Disability

61.      Ms. Boone has suffered from debilitating back injuries, which had required multiple cervical spine surgeries in  1982, 1987 and  1988, and a cervical spine fusion and carpal tunnel release of her left wrist in 1993.  She also suffered from chronic pain and loss of function as a result of fibromyalgia.  (NB 1: Boone-17-19).   In his evaluation of April 6, 1998, Dr. Sean Maloney assessed Ms. Boone's condition as follows:

> Chronic, severe myofacial pain in the neck, shoulders, low back and hips associated with multi-level degenerative disk disease of the cervical spine, particularly at the C3, 4, C4,5; C6-7 vertibral levels. There had been previous diskectomies at the C3,4 and C6,7 levels with bi-clinical history [of] a pseudo-arthrosis at the C6,7 vertibral level.  There continues to be a significant posterior osteophyte at the C4,5 level which indents upon the interior portion of the spinal cord, by MRI scan on January 18, 1996.

(NB 1:Boone 18-19).

12

62.    Throughout Ms. Boone's disability, Ms. Boone has been under the regular care of her primary treating physicians: Dr. Jill Vargo and Dr. Sean Maloney, and her family physician, Dr. John Stringfield.  Dr. Vargo, who is board certified in the specialties of internal medicine and rheumatology, has treated Ms. Boone from 1989 to the present.  Dr. Maloney also began treating Ms. Boone in 1989.  (NB 1:Boone-134, 139, 142).

63.    Since 1982, Ms. Boone has undergone seven neck surgeries, culminating in fusion procedures at the C-3 through C-7 levels.  (NB 1: Boone-159, 278; Pl. App. 6).

64.    Ms. Boone's treating physicians have objectively documented her conditions with extensive testing, including x-rays, MRIs and myelograms  (NB 1: Boone-17, 177, 278, 25, 135; NB 2: CRC-950).  For example, on May 18, 1998, Dr. Sean Maloney noted that:

> X-rays were taken of the cervical spine on April 13, 1998.  The plain x-rays showed complete interior fusion extending from C3 through C6.  There was noted a nonunion at C6, 7 and reversal of the normal curvature of the cervical spine due to muscle tightness or spasm.  There was also noted mild bony encroachment on the Left neural foraman at C6, 7.  X-rays of the lumbosacral spine were interpreted as normal.

(NB 1: Boone-25; Pl. App. 10).

65.    Throughout the period of her disability, Ms. Boone has had debilitating symptoms such as chronic numbness in her left arm and hand (NB 2:CRC-936), chronic left leg pain and swelling in her fingers (NB 2:CRC-935),  sleep disturbance (NB 1:Boone-24), muscle spasms and headaches.  (NB 1:Boone-25).  For example, Dr. Maloney noted on May 18 1998 as follows:

> Status-post seven surgical spine procedures with fusion between C3 C6 and a nonunion between C6 and C7.  There is noted persistent muscle spasm in the neck with loss of lordotic curve...Ms. Boone's Headaches are probably related to cervical spondylosis and muscle spasm in the neck and occipital muscles.

(NB 1: Boone-25).  She has also had  restrictions in her functional activities of walking, standing, lifting, stooping, bending, squatting and climbing.  (NB 2: CRC-885).

66.    Throughout the period of her disability, Ms. Boone has suffered from severe and chronic pain in the neck, left arm, and left leg which limited her in her activities.  (NB 1: Boone-20, 24).

67.    Throughout the period of her disability, Ms. Boone has taken, among other medications, the following medications on a regular basis in an attempt to control her pain and other symptoms: Hydrocodone (for pain), Percocet (for pain), Amitriptylene (for sleeping problems), Naprosym (for inflammation), Vicodin (for headaches) and Xantac (for any stomach problems).  (NB 1: Boone-297-278; NB 2: CRC-950, 904).

### Medical Opinions of Ms. Boone's Continuing Disability

68.    All of Ms. Boone's treating physicians, including Dr. Vargo, Dr. Maloney and Dr. Stringfield, have determined and certified to Champion and its administrator, Travelers consistently that she was permanently and totally disabled from work in any occupation because of her condition and the chronic pain and other documented symptoms.  (NB 1: Boone-300, 306, 258, 246, 462, 224, 17, 134, 12; NB 2:CRC-862; Pl. App. 6, 10, 11).

a.    Specifically, Dr. Vargo wrote on March 24, 1998 that "I do not expect Ms. Boone to improve to the point where she can return to gainful employment." (NB 1:Boone-20) She also wrote on July 16, 1998 the following to Champion:

> I stated in my note dated March 24, 1998, that I feel
> that Ms. Boone is unable to be employed at any level

of job including sedentary. Because of her chronic pain, I do not feel that she could work consistently enough at type of job.

I have reviewed the recent evaluation by Dr. Maloney dated April 6, 1998. This includes x-rays and an MRI scan. There has been no change in her condition and I do not suspect that there will ever be any improvement in her condition to the point that she would be able [to] be gainfully employed at any level of employment. Thus, she will now have two physicians who are stating that there has not been any change in her condition since her initial disability and it is not anticipated that she will ever be well enough to do even sedentary work.

(NB 1:Boone-12).

    b.    Specifically, Dr. Maloney wrote on April 6, 1998 that "It is my opinion that, due to Ms. Boone's severe cervical spondylosis at multiple levels, as well as her severe fibromyalgia with the requirement of frequent rests during the day, including lying down, that she is currently disabled and unable to do even sedentary work on a consistent basis." (NB 1:Boone-18-19).

    c.    Specifically, Dr. Stringfield stated on October 21, 1998: "I support this patient's continued disability." (NB 2: CRC-756).

**Champion's Certification of Ms. Boone's Total Disability From 1987 to 1998**

69.    Effective, November 3, 1987, Champion initially approved Ms. Boone for disability under the Plan definition of "total disability," certifying that Ms. Boone was totally disabled from work in that she was unable "to perform the duties of her employment with the Employer as a result of an injury which occurs or an illness which first manifests itself while employed by the Employer . . .." (NB 66: Plan-60).

70.    Ms. Boone began receiving LTD benefits through the Plan, commencing November 3, 1987.  (NB 1: Boone-313).

71.    On November 3, 1989, Champion continued Ms. Boone on LTD benefits under the Plan definition of "total disability" which required that Ms. Boone was unable "to engage in any occupation or business for wage or profit for which he is or becomes reasonably qualified by training, education or experience."   (NB 2: CRC-951; NB 66: Plan-60; Pl. App 2).

72.    Ms. Boone was reviewed periodically and certified as totally disabled under the Plan by Champion on a continuing basis from 1987 to 1998.  (NB 1: Boone-1, 297, 258, 246, 195, 224, 39, 439, 232;  Pl. App. 6).

73.    Specifically:

   a.    On November 21, 1996, Ms. Boone was certified by Champion [and its administrator, CORE] as totally disabled from "any occupation or business," with CORE issuing its Confidential Service Report #1 wherein its LTD Case Management recommended continuation of Ms. Boone's LTD benefits, "initially effective 11/05/87, based on the chronicity and persistence of symptoms." (NB 2:CRC-871;  Pl. App. 6).

74.    On November 23, 1992, Champion and its claims administrator Travelers began a Vocational Rehabilitation Profile on  Ms. Boone, but the form is incomplete; a notation by the case manager says "to be determined after medical update." Apparently, the profile was never completed. (NB 2:CRC-942).

**Social Security Administration's Determination of Ms. Boone's Disability**

75.    In November of 1989, the Social Security Administration determined that Ms. Boone was totally disabled from engaging in any substantial or gainful employment activity, and awarded benefits on that basis. (NB 1: Boone-175).

## CORE Review

76.    Ms. Boone's medical condition has not improved since Champion's last certification that she was totally disabled from "any occupation or business" under the Plan. (NB 1: Boone-12, 17).

77.    On November 13, 1997, Ms. Boone was notified that CORE had been retained by Champion to conduct a review to determine her continuing disability status. (NB 1: Boone-231).

78.    Ms. Boone provided factual information to CORE and Champion describing her limitations and daily activity and pain in the form of a Personal Profile Evaluation dated November 19, 1997 (NB1: Boone-225-228), and handwritten letters dated April 8, 1998 (NB 1:Boone-27, 28) and August 16, 1998 (NB 1: Boone-10). During its review of Ms. Boone's claim, CORE did not interview Ms. Boone to determine the disabling effects of Ms. Boone's chronic pain, the impact of her symptoms and limitations on her daily activities, and her credibility in reporting her subjective symptoms. (NB 25:Boone-511).

79.    CORE contracted for an independent medical evaluation (IME) with Dr. Charles Shields, a specialist in "physical medicine and rehabilitation." Dr. Shields saw Ms. Boone on a single occasion on February 3, 1998. Based on his examination and review, Dr. Shields recommended further evaluation, and stated that Ms. Boone "can work five to six hours a day at a

17

sedentary physical demand level with specific restrictions to the left side of the body." (NB 1: Boone-159).

    a.    There is no document in the record to indicate any qualifications of Dr. Shields to form this conclusion.

    b.    There is no explanation in the record as to Dr. Shield's basis for concluding that, based on the test results during the evaluation, Ms. Boone would be able to perform sedentary work on a sustained basis, for 5-6 hours a day, 5 days per week.

    c.    There is much discussion in the report as to Ms. Boone's chronic pain, but there is no indication in the report as to the effects of Ms. Boone's pain on her ability to perform sedentary work.

    d.    There is no indication in the report as to the effects of Ms. Boone's medications on her ability to perform sedentary work.

    e.    There is no indication in the report or record as to whether there are employers in the local economy who would provide sedentary work to Ms. Boone, given her limitations and restrictions.

    f.    There is no indication in Dr. Shield's report as to whether Ms. Boone could perform such work on a sustained basis for 5-6 hours a day, 5 day per week.

(NB 1-NB 2, NB 39)

80.    In Confidential Service Report #1, dated November 21, 1996, CORE identified the following as Ms. Boone's "potential clinical complications": "Intractable pain, Increase in activity intolerance, Depression due to altered lifestyle, Medication dependence, Total dependence on others

for activities of daily living;" and recommended continued benefits for "total disability" "based on the chronicity and persistence of symptoms." (NB 1: Boone-232; Pl. App. 9).

81.    The claims record does not reveal that either CORE or Champion or Dr. Shields, who performed the IME for CORE, specifically considered the impact of the "potential clinical complications" identified specifically by CORE in Confidential Service Report #1, dated November 21, 1996, on Ms. Boone's ability to obtain and sustain competitive employment prior to reaching their later conclusions leading to the termination of Ms. Boone's LTD benefits. (NB 1: Boone-155, 145).

82.    Dr. Shields, in his Physician's Report of Physical Capacity, dated February 12, 1998, stated in response to the question, "within the restrictions described above, how many hours can the patient work?  Please check one....5-6 hours x."  He also noted that "she probably could do more most of the time, but not maintain long term secondary to flareups."  (NB 1:Boone-216).

83.    In his form, completed on February 3, 1998, Dr. Shields stated that Ms. Boone could "return to work with modifications," but that she could "never" "return to work regular duty/regular hours."  In response to the question on the form concerning "Hourly Modification: May work ____ hours/day, ____ days/week," Dr. Shields entered the following: "5-6 hours/day, 5 days/week."  (NB 1: Boone-215).

84.    On February 7, 1998, CORE sent an "IME Addendum Form" to Dr. Shields with the following request:

> Requesting clarification regarding the modification checklist.
> It was noted on the modification checklist the employee could
> work 5-6 hours/day.  Based on your findings, would the
> employee be able to work at least 6 hour/day?

(NB 1:Boone-201).

19

85.     On February 19, 1998, Dr. Shields replied to CORE's request for clarification

as follows:

> This note is your requested rapid reply re hours of work that Ms.
> Boone can reasonably do.  Your form only has the 5-6 hours per
> day type boxes to mark.   This is the reason for giving those
> numbers.  Specifically, it is my opinion she can work up to
> 6 hours per day, 5 days per week with the restrictions given.

(NB 1:Boone-33).

86.     The form which Dr. Shields initially completed concerning Ms. Boone's hourly

modifications did not include a "5-6 hours per day" box to mark; it only included a space or blank

for the physician's projected numbers of modified hours per day and days per week.  In this blank,

Dr. Shields, as noted above, inserted in the blank for "hours/day" in his own handwriting, "5-6".  Dr.

Shields was in no way limited from inserting whatever number he felt was appropriate, based on his

one-time examination and initial evaluation.  (NB 1:Boone-2, 5).

87.     In its Confidential Service Report #3, dated March 3, 1998, CORE Dr. Beavers stated

that "Dr. Vargo was 'not sure' if the employee was any occupation disabled."  (NB 1:Boone-155).

Dr. Jill S. Vargo, Ms. Boone's treating rheumatologist, had never indicated in any of her

documentation to CORE that "she was 'not sure' if the employee was any occupation disabled."  (Pl.

App. 11).

88.     Nonetheless, on March 3, 1998, CORE issued its Confidential Service Report # 3,

recommending that Ms. Boone's LTD benefits be terminated.  CORE's recommendation was based

on its IME.  (NB 1: Boone-155).

89.     On March 9, 1998, CORE sent a letter to Ms. Boone stating that CORE was "unable

to approve your disability."  CORE provided no supporting reasoning for its decision except that Ms.

20

Boone was "[n]ot disabled as defined in the Plan" since "[T]he Independent Medical Examination has determined you are able to perform sedentary work." (NB 1: Boone-31).

90.     Based solely on CORE's recommendation, and without further consideration or investigation of any relevant facts, Champion, through its LTD Administrator, Mary Lee Dixon, adopted CORE's finding that Ms. Boone was not disabled and terminated her long term disability benefits, effective April 30, 1998. (NB 1: Boone-29).

91.     When shown various denial letters at her deposition in this matter on November 19, 2003 and asked if she relied totally on CORE's opinion, Mary Lee Dixon stated, "I relied totally on CORE's recommendation based on their experience, you know, their expertise." (Dixon Dep., p. 148, L. 24 - p. 149, L. 4).

92.     Neither CORE nor Champion made any effort to provide vocational training or education to assist Ms. Boone in returning to work. (NB 1-NB2, NB 39).

93.     There is no evidence in the record that Champion considered re-employment of Ms. Boone within the restrictions provided in the IME or medical record. (NB 1-NB2, NB 39).

94.     There is no evidence in the record showing that Champion/CORE considered the following factors in determining whether Ms. Boone, given her restrictions and limitations, could work in an "occupation or business for wage or profit for which she is or becomes reasonably qualified by training, education or experience:"

      a.     Her age;

      b.     Her educational level;

      c.     Her continued absence from work as a result of Champion's prior certifications of her total disability;

      d.     Champion's unwillingness to consider Ms. Boone for re-employment.

(NB 1-NB2, NB 39).

### Appeal/Review

95.    Ms. Boone requested review of CORE's initial decision on April 8, 1998.  (NB 1: Boone-27).

96.    In response to CORE's and Champion's decisions to terminate Ms. Boone's LTD benefits, Dr. Vargo, Ms. Boone's treating physician, who had previously determined and certified that Ms. Boone was totally and permanently disabled from work in any occupation, had written the following on March 24, 1998: "The patient has had ongoing chronic pain in the neck, left arm and left leg.  She has undergone a cervical fusion and a left carpal tunnel release without any relief of her symptoms.  She is on medication to help her with her pain and has reached maximum medical improvement.  I do not ever expect Ms. Boone to improve to the point where she can return to gainful employment."  (NB 1:Boone-20;  Pl. App. 11).

97.    Dr. Vargo also stated to Champion in her March 24, 1998 letter, in reference to the "one-time evaluation by Dr. Charles Shields which resulted in her denial of disability benefits, as follows:

> Based on my opinion as a board certified rheumatologist and in following this patient over a long period of time, I can say that there has not been a substantial change in her condition to warrant a change in her disability status....I certainly hope that you will give appropriate weight to this opinion since I have had the opportunity to follow this patient for almost 10 years.  It is certainly not fair to base your judgment on a brief, one-time evaluation which the patient states her exam consisted of asking her to walk back and forth down the hall. If this letter does not serve the purpose of reinstating her disability, then I have advised the patient to obtain legal counsel.

(NB 1:Boone-20).

98.     On July 2, 1998, based solely on CORE's recommendation, and without further consideration or investigation of any relevant facts, Champion, through its LTD Administrator, Mary Lee Dixon, again denied Ms. Boone's claim for continuing LTD benefits.   (NB 1: Boone-13).

99.     On August 16, 1998, Ms. Boone requested review through the Champion Claims Review Committee (CRC).  (NB 1: Boone-10).

100.    Prior to the meeting of the CRC, Champion's legal staff prepared records for members of the committee.  The records, consisting of 204 pages, were not organized in any particular manner, but were numbered by handwritten numbers in the bottom right corner.  (NB 1: Boone-115-319 ).


101.    On October 21, 1998, based solely on the records provided by Champion's legal staff, and without further consideration or investigation of any facts concerning Ms. Boone's claims, the CRC affirmed CORE's prior denial of Ms. Boone's long term disability benefits.  Its decision was conveyed in a letter from its general counsel stating that the basis of its decision was the IME of Dr. Shields (finding that Ms. Boone could work up to "5-6 hours per day"), the TSA of CORE, and its view that Dr. Vargo was "not sure" in her opinion that Ms. Boone was totally disabled.  (NB 1: Boone-5).

102.    CORE's Cost Review Services employee, Jennifer Mikeska, MRC, prepared a transferable skills analysis (TSA) of Ms. Boone's job skills on September 3, 1998.  In the report that was issued, it was determined that based on her employment at Champion, Ms. Boone had transferable skills of "Comparing," "Taking Instruction–Helping," and "Handling;" and that there

23

were a number of occupations where an employee with these skills, and Ms. Boone's employment

background, would be considered "appropriate for employment."  (NB 1: Boone-96).

      a.    There is no indication in the report as to whether Ms. Boone was able, given

           her medical restrictions, to perform the listed occupations.

      b.    There is no indication in the report to indicate whether any such jobs existed

           in significant numbers in the local economy.

      c.    There is no indication or documentation in the report to indicate any

           qualifications of the CORE employee who performed the transferable skills

           analysis.

(NB 1-NB2, NB 39).

103.    Following the review of her claim by the CRC, Ms. Boone submitted additional

evidence to Champion/International through her counsel, which was relevant to the determination

of her disability, and clarified and resolved conflicts in the evidence previously considered by

Champion and CORE.  Specifically, Ms. Boone provided:

      a.    <u>Ms. Boone's affidavit</u>: Ms. Boone provided specific facts concerning her

           background,  disability and treatment, some of which were not solicited by

           Champion/CORE in their review.  (NB 25: Boone-508-512).

      b.    <u>Vocational assessment report</u>: Mr. Randy L. Adams, a licensed vocational

           evaluator, considered Ms. Boone's age, education, past employment, her

           medical condition and any restrictions, as well as the types of jobs available

           in the economy and vocational testing which she performed, and found that

24

Ms. Boone had been totally disabled from any employment since she was
initially certified for LTD benefits by Champion" (NB 25: Boone-35-43).

c. <u>Updated medical records</u>: These documents included comprehensive medical
records from all of Ms. Boone's providers, many of which had not been
obtained by Champion/CORE in their review, and which showed that Ms.
Boone's condition had not improved since Champion had previously certified
Ms. Boone's total disability. (NB 25: Boone-585-947).

d. <u>Medical information regarding Ms. Boone's Conditions</u> (NB 25:Boone-514-
584).

Champion refused to consider this additional evidence of Ms. Boone's total disability.

### Savings to Champion in the Termination of Ms. Boone's LTD Benefits

104. CORE issued a "Savings Analysis" stating the following:

> It is anticipated that without the intervention of LTD Case
> Management, the employee would continue to receive LTD benefits
> through the age of 65. The cost savings therefore reflects the
> anticipated duration of the entire LTD benefit, 259 months, versus the
> actual LTD benefit utilized of 123 months, equating to the 136
> months saved.

CORE concluded that in the denial of Ms. Boone's benefits, Champion had saved $27,200 which
it would have paid to Ms. Boone throughout her disability if CORE/Champion had not determined
that she was not disabled and terminated her benefits. (NB 1: Boone-157, 200; Pl. App. 2).

### *Plaintiff Rosa Lee Brookshire*

### **Background**

25

105.    Ms. Brookshire's date of birth is October 30, 1937. (NB 4: CRC-957).

106.    Ms. Brookshire has a 10th grade education.  (NB 4: CRC-1202).

107.    Ms. Brookshire was employed by Champion for more than fifteen years, from October 15, 1979 until she was disabled on January 3, 1995.  (NB 4: CRC-957).

108.    At the time of her disability, Ms. Brookshire  was a rewind operator, a position she had held for the fifteen years she worked at Champion. (NB 4: CRC-957).  According to the Dictionary of Occupational Titles, a rewind[er] operator "tends  machine that winds paper from one roll to another to form compact rolls of specified footage or diameter prior to cutting: Threads end of parent roll into feeding mechanism of machine and adjusts friction brake by hand to maintain tension of paper.  Slides rewind cores (tubes) on shafts and starts machine.  Verifies perforations, size, and alignment of rewind rolls. Adjusts machine, using hand tools.  Removes wound roll from shaft and places it on conveyor.  May cut defects from paper and splice cut ends together, using tape."  (NB 4: CRC-970).

109.    Ms. Brookshire suffered from back pain for a number of years prior to being certified for disability.  According to  Dr. Stewart J. Harley, he had known her for many years and had taken care of her for her back pain: "She has had back pain since 1980."  (NB 4: CRC-1137).

110.     She also treated with Dr. James H. Lipsey, a specialist in occupational orthopaedics at Junaluska Orthopaedics, in 1994 for back problems, and he noted "recurrence of pain in the low back on the right side...some radiation into the right posterior thigh...pain aggravated by sitting, standing, bending, lifting, walking or riding in a car or working.  It does sometimes keep her awake at night.  She describes some numbness in the left leg, weakness in the right..." (NB 4: CRC-1128).

Dr. Lipsey diagnosed "degenerative arthritis lower lumbar spine, chronic, recurrent, many years duration." (NB 4: CRC-1129).

111.    Ms. Brookshire also has been diagnosed with chronic tachychardia (NB 4:CRC-1018, 1019); osteoarthritis (NB 4: CRC-1099); hiatal hernia with gastroesophageal reflux disease (NB 26: 02/06/99 note of Dr. David Mulholland; see also NB 4:CRC-1029 for reflux disease); Type II diabetes (NB 26: 05/24/98 note of Haywood Regional Medical Center Urgent Care Center); see also 5/17/00 History & Physical, Westcare Health System, Harris Regional Hospital); chronic obstructive pulmonary disease with hypoxemia (NB 26: Discharge Summary of West care Health System, Harris Regional Hospital); hypertension (NB 4:CRC-1029) and depression (NB40:CE-01398). She has also had bilateral carpel tunnel surgical releases (NB 26: 5/17/00 History & Physical, Westcare Health System, Harris Regional Hospital); kidney stone surgery (NB 40: CRC-1152) an appendectomy (NB 4:CRC-1019); iron deficiency anemia (NB 26: 5/18/00 note of Dr. Robert J. Adams, MD); and congestive heart failure (NB 26: 4/20/00 note of Dr. Richard Lang, Midway Medical Center, re: chest x-rays).

112.    Ms. Brookshire became disabled from her employment with Champion on January 3, 1995 because she was unable to work as a result of her condition of degenerative lumbar disc disease, osteoarthritis of the spine, and chronic disabling back pain secondary to degenerative disc disease (DDD) at L4-5 and L5-S1.   (NB 4: CRC-957).

113.    Champion approved Ms. Brookshire for disability under its Plan §2.1(z)(i), finding that Ms. Brookshire was totally disabled from work in that she was unable "to perform the duties of her employment with the Employer as a result of an injury which occurs or a sickness which first

manifest itself while employed by the Employer..." (NB 66: p.60) and as a result, Ms. Brookshire received short-term disability benefits from January 3, 1995 until June 4, 1995. (NB 4: CRC-957).

114.    Ms. Brookshire received long term disability benefits through the Plan from June 5, 1995 until January 31, 1998.   (NB4: CRC-957).

### Ms. Brookshire's Disability

115.    Ms. Brookshire suffered for years with chronic lower back pain with disc degeneration at L4-5 and L5-S1 (NB4: CRC-1137); it was eventually described on January 26, 1998 by Dr. Stewart J. Harley  as "chronic disabling back pain secondary to DDD [degenerative disc disease] L4-5 and L5-S1," (NB 4: CRC-989).  Dr. Harley's observation was made only four (4) days before Champion ultimately terminated her LTD benefits. (NB 4: CRC-0957).

116.    Ms. Brookshire also suffered from lumbar facet joint arthritis (NB 4: CRC-1138), described by Dr. Harley on January 26, 1998 as "very obvious progression of the degenerative arthritis in her lumbar spine," (Pl. App. 18; NB 4: CRC- 0989).  She also suffered from weight gain over the years as her back problems worsened, leading to a diagnosis of  obesity with poor muscle tone. (NB 4: CRC-1137).

117.    Throughout Mrs. Brookshire's disability, she was  under the regular care of her primary treating physician,  Dr. Ernest B. Goodwin, Jr., a  family physician, (NB 4: CRC-1206) and Dr. David  Mulholland, a family physician who took over Dr. Goodwin's practice. (NB 4: CRC-1076)  She has also treated with Dr. Stewart J. Harley, who is board certified in the specialty of orthopaedic surgery, (NB 4: CRC-989)  and with Dr. Lipsey, as mentioned above.

118.    On April 6, 1994, Dr. Lile, a radiologist at Haywood County Hospital, sent Dr. Jim

Lipsey a diagnostic imaging report on Ms. Brookshire, which noted "mild sclerosis of the L5-S1 facet joints...circumferential bulging of the L4-5 disc...the L5-S1 disc demonstrates vacuum phenomonen [sic] and diffuse bulging." (NB 4: CRC-1126).

119.    On June 26, 1995, Dr. Harley reviewed Dr. Lile's CT scan of April 6, 1994, and noted "some bulging at L4,5," and said Mr. Brookshire "had a[n] MRI prior to that which showed disc degeneration. Her plain film x-rays have shown some disc narrowing at L5, S1 associated with disc degeneration." (NB 4: CRC-1137).

120.    On January 26, 1998, Dr. Harley noted that he had reviewed Ms. Brookshire's x-rays; he stated "in fact, I have had x-rays taken in 1994, 1995 and then x-rays taken today. There is very obvious progression of the degenerative arthritis in her lumbar spine...At L4-5, there is considerable narrowing and spurring which has significantly advanced since 1995. The disc space is much more narrowed than it was, and there are more spurs than there were in 1995. This is also true at L5-S1 with further narrowing and degeneration." (Pl. App. 18; NB 4: CRC-989).


121.    Throughout the period of her disability, Ms. Brookshire has had debilitating symptoms, including muscle spasms (NB 4: CRC-1163, 1197, 1204, 1205, 1207); low back pain (NB 4: CRC-1163, 1175, 1176, 1177, 1197, 1204, 1205, 1207, 1208, 1209); and low back pain going down her legs. (NB 4: CRC-1128, 1203).

122.    Throughout the period of her disability, Ms. Brookshire has had restrictions in her functional activities. On January 11, 1995, treating physician Dr. E. B. Goodwin, Jr. noted her total inability to lift or carry at that time, and indicated that her total disability period from performing her occupation would continue for an undetermined time. (NB 4: CRC-1206).

29

123.     On February 1, 1995, Dr. Goodwin noted Ms. Brookshire "is not doing well enough to return to work."  (NB 4: CRC-1209).

124.     On May 24, 1995, Ms. Brookshire completed a Personal Profile for Champion and indicated that while she did not need any special help to take care of her personal needs, she did need assistance with daily cooking, dusting and washing dishes.  (NB 4: CRC-1146).

125.     On an undated claim form that appears in Champion's records immediately prior to the aforementioned Personal Profile, Ms. Brookshire indicated that her home duties were limited in the areas of "vacuum[ing] [sic], sweeping, mop[p]ing [sic], washing dishing [sic], and making beds." (NB 4: CRC-1144).

126.     A Champion diary memo screen note dated June 5,1995 noted "EE indicates has problem performing household chores."  (NB 4:CRC-1157).

127.     On June 26, 1995, in a letter from Dr. Harley, orthopaedist, to her treating physician, Dr. Goodwin, Dr. Harley stated that "she has back symptoms related to disc degeneration and lumbar facet joint arthritis but I think that there is nothing specific that I can do for her." (NB 4: CRC-1138).

128.     In his office notes of the same date, Dr. Harley stated after examining Ms. Brookshire that "she says that it [back pain] seems to be getting worse...She can't wash dishes now very well...She finds that her pain is very definitely worse when she stands for prolonged periods of time, lifts and tries to bend."  (NB 4: CRC-1137).

129.     On July 20, 1995, a  case manager completed a "Vocational Rehabilitation Profile for LTD and CMD Claims" and scored Ms. Brookshire with the lowest category of scores possible (13 points or less), which indicated "do not refer for rehab review." (Pl. App 13; NB 4: CRC-1111).

130.     On April 29, 1996,  Dr. Goodwin's attending physician statement noted that "patient

30

has severe pain with activities of daily living," and indicated that her prognosis was unimproved from January 2, 1994 through the present.  (NB 4: CRC-1090).

131.    On June 18, 1997, Ms. Brookshire completed another Personal Profile Evaluation for Champion and indicated that she helped with washing clothes, cooking and dishes, but "all other chores are done by my family."  (NB 4: CRC-1077)  She further indicated that she needed assistance with laundry, washing dishes and shopping, and stated that "my husband helps do housework and all the outside work."  (NB 4: CRC-1078).

132.    On June 23, 1997, Dr. David Mulholland completed a Physician's Report of Physical Capacity, and indicated that Ms. Brookshire was unable to twist, climb, reach above shoulder level, crouch/stoop, kneel, balance or push for any amount of time on a work shift, and could only stand, walk or bend over for one to two hours per work shift, and that she was never to lift any amount of weight, she was not to operate equipment or be around moving equipment and/or machinery or walk on uneven ground, and that even within her restrictions, she could work zero (0) hours.  (NB 4: CRC-1075, 1076).  On that same date, Dr. Mulholland noted "back pain with activities of daily living."  (NB 4: CRC-1072).

133.    At various times throughout the period of her disability, Ms. Brookshire has taken various medications including the following, to control her pain and other symptoms: Elavil (NB 4: CRC-1019, 1021); Flexeril (NB 4: CRC-1209; Tylenol with Codeine (NB 4: CRC-1209); Robaxin (NB 4: CRC-1208); Inderol (NB 4: CRC-1019, 1152);  Zantac (NB 4: CRC-1019; Relafen (NB 4: CRC-1152); Dyazide (NB 4: CRC-1019, 1152); Orudis (NB 4: CRC-1149, 1176); Soma Compound (NB 4: CRC-1209); and Wygesic (NB 4: CRC-1149).

**Medical Opinions of Ms. Brookshire's Continuing Disability**

31

134.    On January 11, 1995, Dr. Goodwin determined and certified to Champion (and its administrator, Travelers) that Ms. Brookshire was totally and permanently disabled from performing work in her occupation for an undetermined time.   (NB 4: CRC-1206).

135.    On February 1, 1995, Dr. Goodwin stated that Ms. Brookshire "is not doing well enough to return to work."  (NB 4: CRC-1209).

136.    On February 28, 1995, a CORE diary memo screen stated that "AP [attending physician] indicated that EE could not RTN [return to work] to previous job at this time based on condition."  (NB 4: CRC-1141).

137.    On April 29, 1996, Dr. Goodwin indicated that Ms. Brookshire was unimproved, and was "now totally disabled for any occupation," and that in his opinion, she would never be able to resume any work.  (Pl. App. 14; NB 4:CRC-1090).

138.    On May 22, 1996, a CORE representative spoke with Dr. Goodwin, "looking for a little more information," and noted from their conversation that Dr. Goodwin "does not foresee pt [patient] RTW [returning to work] in any capacity.  Does not know what she could do given her limited sitting and standing tolerance."  (NB 40: CE-1459).

139.    On June 23, 1997, Dr. David Mulholland (who had taken over Dr. Goodwin's practice) indicated that Ms. Brookshire was unimproved since January of 1994, and was totally disabled for any occupation, and would, in his opinion, never be able to resume any work.  (Pl. App. 15; NB 4: CRC-1072).

140.    On January 26, 1998, Dr. Harley diagnosed Ms. Brookshire's chronic disabling back pain secondary to DDD [degenerative disc disease] L4-5 and L5-S1, and noted that "this lady says she is unable to work because of severity of her pain.  If this lady does return to work, she should

return to work under the guidelines of the functional capacities evaluation.  Reviewing the guidelines of the FCE, I think she could return to work but with severe restrictions.  If the patient is unable to perform that highly restricted job because of her persistence of pain, then I think this lady should remain on long-term disability until her retirement commences." (NB 4: CRC-989-990).

**Champion's Certification of Ms. Brookshire's Total Disability**

141.    From January 3, 1995 until June 4, 1995, Champion certified Ms. Brookshire for short-term disability benefits.  (NB 4: CRC-957).

142.    From June 5, 1995 until January 31, 1998, Champion certified Ms. Brookshire for long-term disability benefits. (NB 4: CRC-947).  Specifically, Ms. Brookshire was notified by letter dated July 26, 1995 that her claim for Long Term Disability had been approved effective June 5, 1995.  (NB 4: CRC-1102).

143.    Champion continued to certify Ms. Brookshire as totally disabled from 1995 to 1998, despite an FCE performed by Susan Kimel, a physical therapist at Haywood Rehabilitation Center on July 13, 1995, which concluded that Ms. Brookshire was able to work at the sedentary-light physical demand level for an 8 hour day.  (NB 4: CRC-1113).

        a.    There is no document in the administrative record to indicate any qualifications of Ms. Kimmel to form this conclusion.

        b.    There is no explanation in the record as to Ms. Kummel's basis for concluding that, based on the test results during the evaluation, Ms. Brookshire would be able to perform such activity on a sustained basis, 8 hours a day, 40 hours per week.

c.      There is no indication in the report as to how the test may have affected Ms. Brookshire thereafter, and what impact the test may have had on her symptoms, including pain.

d.      There is no indication in the report as to the effects of Ms. Brookshire's medications on her ability to perform sedentary light work.

e.      There is no indication in the report or record as to whether there were employers in the economy who would provide sedentary light work to Ms. Brookshire, given her limitations and restrictions.

144.    In fact, a CORE diary memo note dated July 20, 1995, one week after Ms. Kimel's FCE, reviewed Kimmel's FCE and stated that even though, based on the FCE, "EE capable of sedentary light job, PH has no modified light duty job and agrees EE TD (totally disabled) her occ." (NB 4: CRC-1110).

145.    On April 19, 1996 Ms. Brookshire was notified by CORE of an annual review of her disability status as part of Champion's Disability Management Program.  (NB 4: CRC-1091).

146.    On May 22, 1996, CORE's Confidential Service Report #1 indicated that the LTD Disability Case Management recommended "extension of this employee's LTD benefit through 6/4/97 at which time LTD Case Management will review whether Ms. Brookshire is totally and permanently disabled from any occupation."  (NB4: CRC-1083).

147.    Again on June 30, 1997, Ms.  Brookshire was notified by CORE of an annual review of her disability status as part of Champion's Disability Management Program.  (NB 4: CRC-1069).

148.    On December 18, 1997, CORE's Confidential Service Report #2 indicated that the

34

LTD Case Management recommended "denial of further benefits..." (NB 4: CRC-1015).

**Social Security Administration's Determination of Ms. Brookshire's Disability**

149.    On July 30, 1995, the Social Security Administration determined that Ms. Brookshire was totally disabled from engaging in any substantial or gainful employment activity, effective January 2, 1995, and awarded benefits on that basis. (NB 4: CRC-0991). The Social Security Administration has continued to find Ms. Brookshire totally disabled from employment since that date.

**CORE Review**

150.    As stated above, Ms. Brookshire was notified by CORE on June 30, 1997 of an annual investigation to determine her continuing disability status.  (NB 4: CRC-1069).

151.    On July 23, 1997, Dr. J.D. Beavers, CORE Medical Director, spoke with Dr. Mulholland, the physician who had taken over a practice from Ms. Brookshire's long time treating physician, Dr. Goodwin.  Dr. Beavers' "Physician Review Note" of the conversation interpreted Dr. Mulholland's statements as indicating that "her doctor is not claiming that she is disabled from any occupation" (NB 4: CRC-1068), when in fact Dr. Mulholland had, exactly one month prior, certified in an Attending Physician's Statement that Ms. Brookshire was totally disabled from any occupation and would never be able to resume any work.  (NB 4: CRC-1072).

152.    Apparently, what Dr. Mulholland had communicated to Dr. Beavers was that he had not done the original disability certification on Ms Brookshire, since he inherited her as a patient from Dr. Goodwin. On  July 24, 1997, one day after his conversation with Dr. Beavers, Dr. Mulholland was asked to complete a Modification Checklist for CORE nurse Carole Bishop; she wrote in a fax cover sheet to Dr. Mulholland that "per your conversation with our MD (medical

35

director), Dr. Beavers, on 7/23/97, you did not feel Mrs. Brookshire was disabled from any occupation. Please complete the attached form and fax back to Kristin Haydon, RN..." (NB 4: CRC-1066).

153.    In response, Dr. Mulholland did not complete the Modification Checklist, but wrote at the bottom of the form the following statement: "This pt needs a disability evaluation to determine what she is qualified to do. I do not provide this service. Thank you." (NB 4: CRC-1064).

154.    On August 14, 1997, CORE nurse Kristin Haydon asked Dr. Mulholland via fax to provide CORE with a prescription for an FCE on Ms. Brookshire, which he did. (NB 4:1062, 1061).

155.    On September 18, 1997, CORE had the FCE performed on Ms. Brookshire at Haywood Rehabilitation Center by physical therapist Susan Kimel, an employee of GENEX, who concluded that Ms. Brookshire could return to work at a light physical demand level, with restrictions. (NB 4: CRC-1034,1035, 1052).

    a.    There is no document in the administrative record to indicate any qualifications of Susan Kimel to form this conclusion.


    b.    There is no explanation in the record as to Susan Kimel's basis for concluding that, based on the test results during the evaluation, Ms. Brookshire would be able to perform such activity on a sustained basis, 8 hours a day, 40 hours per week.

    c.    There is no indication in the report or the record as to how the test may haveaffected Ms. Brookshire thereafter, and what impact the test may have had on Ms. Brookshire's symptoms, including pain.

36

    d.    There is no indication in the report or record as to whether there were employers in the economy who would provide light work to Ms. Brookshire, given her limitations and restrictions.

    e.    The administrator of the FCE, Susan Kummel, was instructed by CORE to consider only impairment related to "chronic degenerative lumbar disc disease with osteoarthritis," (NB 4: CRC-1057), so disability related to other conditions was not to be considered.

156.    On October 16, 1997, Dr. Mulholland wrote CORE nurse Kristen Haydon and mentioned that he followed Ms. Brookshire for her medical needs, including "hypertension, chronic back pain and reflux disease. She was disabled a number of years ago by Dr. Earnest Goodwin. I, myself, do not perform disability physicals nor do I disable people or recommend them to be disabled. I leave this up to occupational medicine physicians who are trained and well-versed in the AMA guidelines concerning disability. I will not comment on Ms. Brookshire's disability. As far as I am concerned, she is disabled until she is fully evaluated by a disability physician. I do not consider her evaluation by the physical therapist to be reason enough to put her back to work." (Pl. App. 16, NB 4: CRC-1028).

157.    On October 16, 1997 in the above-referenced letter, Dr. Mulholland further instructed CORE nurse Haydon not to contact his office again, or to ask him again to comment on Ms. Brookshire's disability; he stated that he had filled out the functional capacity referral at the nurse's request, "but now I regret it. From now on, disability is between you and your clients. Please leave me out of it." (Pl. App.16; NB 4: CRC-1028).

158.    On December 2, 1997, CORE then had Dr. Andrew Rudins perform an "independent

medical examination;" however, the primary record he reviewed was the FCE performed on September 18, 1997 by Susan Kummel, the physical therapist selected by CORE, together with one attending physician statement dated 6/23/97 from Dr. Mulholland, the physician review note from CORE's medical director, Dr. Beavers, and a personal profile evaluation completed by Ms. Brookshire on 6/18/97. (NB 4: CRC-1019)  He did not review any medical records from Dr. Goodwin, Ms. Brookshire's longtime treating family physician, who first declared her disabled, or from her longtime treating orthopaedist, Dr. Harley, who had taken care of her for back pain since 1980 (NB 4: CRC-1137), or from Dr. Lipsey, a specialist in occupational orthopaedics who had treated her for back problems in 1994 and diagnosed "degenerative arthritis lower lumbar spine, chronic, recurrent, many years duration," (NB 4: CRC-1129) or any of her x-rays or MRI's.  He did not review her extensive medical history, stating "previously forwarded records were reviewed.  This basically was a functional capacity evaluation dated 10/1/97 from Haywood Rehabilitation Center." (NB 4: CRC-1019).

159.    Dr. Rudins stated that "the partial disability and current restrictions are for all practical purposes permanent," but nonetheless concluded that Ms. Brookshire could work at some occupation, although he did recommend consideration of a work tolerance program.  (NB 4: CRC-1021).

  a. There is no document in the record to indicate any qualifications of Dr. Rudins to form this conclusion.

  b. There is no explanation in the record as to Dr. Rudin's basis for concluding that, based on the test results during his single evaluation, Ms. Brookshire

would be able to perform work on a sustained basis, 8 hours a day, 40 hours a week, at a light physical demand level.

c.     There is no indication in the report as to the effects of Ms. Brookshire's chronic pain on her ability to perform light work.

d.     There is no indication in the report as to the effects of Ms. Brookshire's medications on her ability to perform light work.

e.     There is no indication in the report or record as to whether there are employers in the local economy who would provide light work to Ms. Brookshire, given her limitations and restrictions. In fact, thirteen days later, on December 15, 1997, CORE nurse Kristin Haydon sent the Champion mill in Canton a "Partial/Modified RTW Opportunities" form on Ms. Brookshire, recommending an immediate and full time return to work, (NB 4: CRC-1017). and that same day, December 15, 1997, Champion representative Sharon Spain, RN, responded to CORE's recommendation that the mill was "unable to accommodate modifications." (Pl. App. 17; NB 4: CRC-1016).

160.    Neither CORE nor Champion made any effort to provide training or education to assist Ms. Brookshire in returning to work. (NB 3-NB 4, NB 40).

161.    During its review of Ms. Brookshire's claim, CORE made no effort to interview her and to determine the extent of her symptoms and the effects of her symptoms and limitations on her daily activities. (NB 3-NB 4, NB 40).

162.    There is no vocational evidence in the record showing the ability of Ms. Brookshire,

given her restrictions and limitations, to work in an "occupation or business for wage or profit for which she is or may become qualified by training, education or experience," as required by the LTD plan definition. (Pl. App. 2).

163.   On December 18, 1997, CORE issued Confidential Service Report #2, recommending denial of further LTD benefits, and faxed the same to Champion representative Mary Lee Dixon. (NB 4: CRC-1011 through 1015).

164.   When shown a copy of the above-referenced Confidential Service Report dated December 18, 1997 at her deposition in this case on November 19, 2003 and asked if that was the document on which she would have based her denial letter to Ms. Brookshire , Mary Lee Dixon answered "Yes." (Dixon Dep. p. 153, L.2-19).

165.   When asked if she had any recollection of reviewing any other documents concerning Ms. Brookshire at the time she wrote her denial letter, Ms. Dixon said "I don't remember," and when asked "in any event, even if you did review those documents you would have followed whatever CORE said? Ms. Dixon replied, "that is true." (Dixon Dep. p. 153, L. 20 - p. 154, L. 9).

**Appeal/Review**

166.   Ms. Brookshire requested review of CORE's initial decision on February 2, 1998. (NB 4: CRC-995, 998).

167.   Based solely on CORE's recommendation, and without further consideration or investigation of any relevant facts, Champion, through its LTD Administrator, Mary Lee Dixon, on May 1, 1998, denied Ms. Brookshire's claim for continuing long term disability. (NB 4: CRC-995).

40

168.    On May 22, 1998, attorney James M. Spiro, on behalf of Ms. Brookshire, requested review through the Champion Claims Review Committee (CRC), and submitted additional documentation in support of her appeal.  (NB 4: CRC-987-988).

169.    As of July 28, 1998, Mr. Spiro had received no response to his appeal, so he again wrote Champion concerning Ms. Brookshire's appeal.  (NB 4: CRC-976).

170.    Champion responded by letter from William C. Foster dated August 27, 1998, informing Mr. Spiro that the CRC would consider Ms. Brookshire's appeal on Sept. 24, 1998. (NB 4: CRC-0975).

171.    However, Champion's had apparently already held what they denominated a "Denial Meeting" on July 14, 1998,  according to a Champion interoffice memo dated July 17, 1998, and determined to uphold the original denial of Ms. Brookshire's LTD benefits. (NB 4: CRC-977).

172.    Champion's Confidential Service Report #1 dated July 16, 1998 (NB 4: CRC-979-981) recommended upholding the previous denial of Ms. Brookshire's LTD benefits, based on the FCE, the IME and a TSA performed by Jennifer Mikeska, MRC with CORE on July 1, 1998, which concluded Ms. Brookshire had 5 "transferrable skills" and that there were 7 "job titles" that should be considered appropriate for her. (NB 4: CRC-984; see also NB 4: CRC-962 to 973).

       a.    There is no indication in the report as to whether Ms. Brookshire was either qualified by training, education or experience, or reasonably fit, to undertake the listed job titles.

       b.    There is no indication in the report to indicate whether any such jobs existed in significant numbers in the local economy.

41

c.    There is no indication or documentation in the report to indicate any qualifications of the person who performed the transferrable skills analysis.

d.    Ms. Mikeska stated that the "scope of this Transferrable Skills Analysis (TSA) only considered the position Ms. Brookshire held as a rewinder operator while at Champion for sixteen years," (NB 4: CRC-962) but then proceeded to consider her past job as a nurse's assistant in deciding what job titles should be considered appropriate for employment. (NB 4: CRC-984).

e.    In fact, Ms. Mikeska states in the conclusion of her TSA that "This TSA did not consider Ms. Brookshire's eighteen years of experience as a nursing assistant," but in the very next paragraph, states that "Ms. Brookshire could utilize her nursing skills in one of the following positions..." (NB 4: CRC-962).

f.    The TSA had no discussion of the impact of her physical problems on Ms. Brookshire's ability to obtain and retain these jobs. (NB 4: CRC-962-965).

g.    When CORE ordered the TSA, the cover sheet from CORE nurse Kristin Haydon did not indicate what documents were supplied to aid the TSA. (NB 4: CRC-985).

h.    Contrary to the July 16, 1998 Memo from the July 15, 1998 "Denial Meeting," which stated that the TSA "revealed manager positions," (NB 4: CRC-977) none of the positions listed in the TSA were "manager positions."

173.    CORE issued a "Peer Review Analysis" dated July 10, 1998 from Dr. John Nemunaitis, which stated that "based on the information available for review, the patient is able to return to work at light physical demand level full time."  (NB 4: CRC-983).

    a.    There is no document in the record to indicate any qualifications of Dr. Nemunaitis to form this conclusion.

    b.    There is no document in the record to indicate that Dr. Nemunaitis ever saw Ms. Brookshire, or ever spoke with her.

    c.    There is no indication in the record that Dr. Nemunaitis ever considered the effects of Ms. Brookshire's chronic pain on her ability to perform light physical demand work.

    d.    There is no indication in the record to indicate that Dr. Nemunaitis ever considered the effects of Ms. Brookshire's medications on her ability to perform such work.

(NB 3-NB 4; NB 40).

174.    There is no evidence in the record showing that either Champion or CORE considered the following factors in determining whether Ms. Brookshire, given her restrictions and limitations, could work in an "occupation or business for wage or profit for which she is or may become qualified by training, education or experience." (Pl. App. 2).

    a.    Her age - Ms. Brookshire was almost 61 years of age by the time of Champion's denial of her LTD benefits. (NB 4: CRC-957).

    b.    Her educational level - 10th grade.  (NB 4: CRC-966).

      c.      Her continued absence for years from work as a result of Champion's prior certifications of her total disability.

      d.      Champion's unwillingness to consider Ms. Brookshire for re-employment.

(NB 3-NB 4; NB 40).

175.    There is nothing in the claims file to indicate that Champion's Claims Review Committee ever met on September 24, 1998, as correspondence from William C. Foster dated August 27, 1998 had stated to Ms. Brookshire's attorney, James Spiro. (NB3-NB4; NB 40).

176.    There is no final determination of denial in the claims file. (NB 3-NB4, NB 40).

177.    Of the 236 pages of records in the Champion claims file, only 70 pages are medicaland/or vocational records, of which 14 are duplicates; that left 56 pages of medical/vocational records, including correspondence, 2 pages of which are illegible; that left 54 pages out of the 236 pages that were medical/vocational, which constituted a mere 23% of the documents in the claims file. (NB3-NB4).

178.    Following the review of her claim and denial by the CRC, Ms. Brookshire submitted additional evidence to Champion through her counsel, which was relevant to the determination of her disability, and clarified and resolved conflicts in the evidence previously considered by Champion and CORE.  Specifically, she provided:

      a.      Affidavit of Rosa Lee Brookshire - Ms. Brookshire provided facts concerning her background, disability and treatment, some of which were not solicited by Champion/CORE in their review; (NB 26: Brookshire 292-295).

      b.      A Vocational Evaluation by Dr. Henry Wong, indicating that Ms. Brookshire was in fact disabled within the definition of the plan; (NB 26: Brookshire

4-11).

c.    So1ial Security Administration Notice of Award;  (NB 26: Brookshire-11A-
C) and

d.    Complete and updated medical records concerning the treatment of Ms.
Brookshire's disability. (NB 26: Brookshire 296-542).

179.    Champion refused to consider this additional evidence of Ms. Brookshire's disability.
(NB 3-NB 4).

### Plaintiff Harrison Young Clark

### Background

180.    Mr. Clark's date of birth is June 8, 1949.   (NB 6: CRC-1632).

181.    Mr. Clark has  an eighth grade education.  (NB 27: Clark-727).  He has no other
special schooling or training.   (NB 6: CRC-1409).

182.    He was in the U.S. Army from 1969 to 1971 where he served as an infantryman.  He
received no other special training and possesses no skills from his military service.  He was given
an honorable discharge in 1971.  (NB 6: CRC-1391).

183.    Mr. Clark was employed by Champion from May 25, 1981 until he was disabled on
December 10, 1990.   (NB 6: CRC-1395).

184.    During his employment with Champion, Mr. Clark worked primarily as a machine
operator. (NB 6: CRC-1391-1392).

185.    According to Stephen D. Carpenter, M.E., C.R.C., C.I.R.S.,  a vocational consultant,
this job was unskilled and Mr. Clark possessed no transferrable skills as a result.  (NB 6: CRC-1392
and 1393).

45

186.    At the time he became totally disabled, Mr. Clark was a laboratory assistant/filing clerk.  Because he had no special training or degrees in laboratory technology, it was classified as unskilled to semi-skilled, and Mr. Clark possessed no transferrable skills as a result of that employment, according to Mr. Carpenter.  (NB 6: CRC-1392).

187.    Mr. Clark had suffered an on-the-job injury on November 14, 1984, when he was struck in the back by a large log.  Despite his injury, he returned to work eighteen months later on light duty. (NB 6: CRC- 1610).   Surgical intervention was not indicated for Mr. Clark, but he was initially assigned a 15% permanent impairment of his spine by Dr. Van Blaricom as a result of the 1984 accident. (NB 6: CRC -1379, 1438).

188.    Later, on January 29, 1987, Dr. Blaricom noted that "his current symptoms however are occupationally disabling.  If one were to rate Mr. Clark with his current symptoms, physical findings, and known past abnormalities of the intervertebral disc, the rating would be in the range of 25-30%, which is higher than the 15% rating that he was given."  (NB 27: Clark-388-389).

189.    When he returned to work, his back continued to bother him and he developed a number of  physical and psychological problems, including chronic pain syndrome, recurrent herniated disc, nerve impingement, prolonged,  recurrent depression  (NB 6: CRC- 1613, 1633), restless leg or Ekbom Syndrome (NB 6: CRC-1354), sleep disturbance (NB 6: CRC-1633), fibromyalgia (NB 6: CRC-1642),  myositis (NB 41: CE-1126), chronic lumbar strain  (NB 6: CRC-1632),  and Type II diabetes. (NB 6: CRC-1642).

**Mr. Clark's Disability**

190.    Although Mr. Clark began missing work as a result of his multiple medical problems in 1984, he continued to work until late1990, when he became totally disabled from his employment

46

with Champion or any other work on December 10, 1990.  (NB 6: CRC-1354).

191.    Effective December 10, 1990, Champion initially approved Mr. Clark for short-term disability under the Plan definition of "total disability," certifying that he was totally disabled from work in that he was unable "to perform the duties of his employment with the Employer as a result of an injury which occurs or an illness which first manifests itself while employed by the Employer ..."  (NB 6: CRC-1354; NB 66: Plan-60; Pl. App. 2).

192.    On June 18, 1991, Dr. Daniel Eglinton completed and signed an attending physician's statement of disability indicating that Mr. Clark was "now totally disabled for any occupation."  (NB 6: CRC-1398).

193.    By letter dated July 29, 1991, Mr. Clark was notified by Mary Lee Dixon that his application for long-term disability (LTD) benefits was approved effective June 10, 1991.  The letter specifically stated that:   "Long term disability benefits may continue for 24 months provided you are wholly and noncontinuously disabled and are unable to perform each and every duty of your regular job.  After the first 24 months, benefits will continue up to your retirement date only if you are under the regular care of a licensed and qualified physician and are unable to work at any job, within the company or elsewhere, for which you are reasonably qualified by your education, training or experience."  (NB 6: CRC-1402).

194.    Throughout Mr. Clark's disability, Mr. Clark has been under the regular care of a number of treating physicians:  Dr. Craig Mills (diabetes and fibromyalgia) (NB 6: CRC-1642); Dr. Daniel Eglinton (back condition) (NB 41: CE-1142);  Dr. Steven Mendelsohn (rheumatological management) (NB 41: CE-1124);  and Dr. Robert Harned (psychiatric management).  (NB 6: CRC-1621 ; NB 41: CE-1124).

47

**Social Security Administrations's Determination of Mr. Clark's Disability**

195.    On September 15, 1992, the Social Security Administration determined that Mr. Clark was totally disabled from engaging in any substantial or gainful employment activity, effective December 22, 1990, and awarded benefits on that basis.   The Administrative Law Judge found: "Considering the claimant's combination of severe medical impairments, he cannot be expected to make a vocational adjustment to work which exists in significant numbers in the national economy." (NB 6: CRC-1356, 1411-1413).

**Medical Opinions of Mr. Clark's Continuing Disability, and Champion's Certification Thereof**

196.    On November 23, 1992, Champion and its claims administrator Travelers began work on a Vocational Rehabilitation Profile to assess whether Mr. Clark was a candidate for rehabilitation evaluation.   The assessment included consideration of such factors as his age, education, medical status, employer cooperation , and vocational motivation; however, the form was not completed - in fact, only Mr. Clark's name and social security number appear on the Profile, with a notation by the case manager, Gloria Lopez, under "Comments" that reads, "to be determined after medical update." (Pl. App. 19, NB 6: CRC-1414). There is no evidence in the record to indicate that the Vocational Rehabilitation Profile was ever actually completed. (NB 5-NB 6; NB 41).

197.    On January 25, 1993, the claim record contains the following diary entry:

> With current restrictions, APS [attending physician statement] from Dr. Eglinton too vague, lack of specific limitations do not correlate with never RTW [return to work].  However, voc rehab consultant assessment done 3/2/92 and vocational assessment done 5/28/91 (reports supplied by EE) both give excellent detailed hx [history], assessment parameters [sic], survey of job market; both reports indicate a severely limited functional capacity with both exertional

and non exertional impairments preventing a full day of even sedentary job activities, and both reports indicate that with limited 8th grade educ[ation] and all manual labor work exp[erience], EE no suitable job skills and would not be a suitable candidate for any voc rehab program.  These reports take into consideration that EE is a younger worker, age 43.  Note that EE was recently approved SSDI eff[ective] 9/92.   Medical hx [history] includes prior work absences for herniated disc in 84 and 89. EE attempted RTW  but finally was not able to work past 12/10/90. While an APS [attending physician statement] from Dr. Eglinton (6/91) indicates a referral to voc rehab for less strenuous work, the 2 functional/vocational assessments seem to more completely evaluate the EE within the context of his functional limitations, no transferrable job skills, and labor market survey indicating no work available within EE's limitations.

Initial and continuing disabling dx [diagnosis] is s/p back surgeries [sic - no surgeries, but permanent injuries] and chronic fibromyalgia, AP indicates that condition is unchanged and that EE will never RTW.  EE is on Flexeril for muscle spasms.  EE's PPE [personal profile evaluation] indicates severe limitations to daily activities, EE has difficult time getting out of bed, walks just around the house, wife does increasing share of chores.

Based on documented dx, 2 voc assessments indicating EE not employable and EE's indication of severe limitations, this case manager gives conditional approval of T.D. [total disability] any occ[upation] (date is 6/10/93).  Plan: to check with PH if there is any further info on Ee before formal approval.

(NB 6: CRC-1429, CRC-1433)

198.    By letter dated  February 9, 1993, Mr. Clark was advised that "the medical evidence reviewed substantiates your claim for total disability as defined in the contract.  Therefore, approval of your claim will continue."  (NB 6: CRC-1430).  Thus,  Champion continued Mr. Clark on LTD benefits under the Plan definition of "total disability" which provided that Mr. Clark was unable "to engage in any occupation or business for wage or profit for which he is or becomes reasonably qualified by training, education or experience."   (NB 66: Plan-60; Pl. App. 2).

199.    On January 13, 1994, Mr. Clark settled his worker's compensation claim arising out of his on-the-job accident of November 14, 1984. (NB 6: CRC 1437-1453). As part of that settlement, it was agreed that Mr. Clark would not receive any further monthly payments through the long term disability plan. (NB 6: CRC-1443). It was also understood and agreed that any continuing entitlement to benefits of any kind [i.e. medical coverage] was "subject to the terms, conditions and qualifications of the plan." (NB 6: CRC-1443).

200.    In February 1994, Mr. Clark was sent to a pain management clinic for a spinal cord stimulator but he could not afford it. (NB 41: CE-1144).

201.    On August 22, 1994, Dr. Eglinton completed and signed an attending physician's statement indicating that Mr. Clark's physical condition was unchanged, and that he would never recover sufficiently to perform the duties of his job, and that he was not a candidate for vocational rehabilitation. (NB 6: CRC-1461-1462).

202.    On August 9, 1995, the claims file reports that Mr. Clark's doctor "states EE will never RTW". (NB 41: CE-1144).

203.    On or about August 25, 1995, the claims file contains a "Reinvestigation Approval Summary" which includes the following entry on a diary memo screen:

> "claimant has been out on disability since 1990. Has 8 years of education leve[l], and worked for Champion for 8 years. Claimant suffers from chronic fibromyalgia, lumbar disc disease, severe pain in back and leg. Claimant is restricted from sitting/standing/walking for more than ½ hr. Unable to lift/carry more than 30 lbs. Based on restrictions and limited education, not a candidate for rehab. Will continue approval and re-investigate in 1 year."

(NB 6: CRC-1457; NB 6: CRC-1520).

204.    Mr. Clark's treating physicians have objectively documented his back injury with a

50

lumbar myelogram and a CAT scan that demonstrated disc herniation. (NB 6: CRC-1379). Subsequently, as Mr. Clark's back condition worsened, a lumbar MRI was done that showed degenerative disc changes in the three lower intervertebral discs.  (NB 6: CRC-1379).

205.    Throughout the period of his disability, Mr. Clark has suffered from moderate to severe and chronic pain in his low back, which severely limits him in his activities, as noted in the functional capacity evaluation performed by Charlie Robbins, PT: "Because of high pain levels and hesitation by Mr. Clark to complete all tests, I am unable to indicate that he is capable of returning to work."  (NB 6: CRC-1573).

206.    Throughout the period of his disability, Mr. Clark has taken the following medications on a regular basis to control his pain and other symptoms: Anaprox DS and  Tagamet (NB 6: CRC-1554);  Klonopin (NB 6: CRC-1588); Goody's Powders (NB 6: CRC-1572);  Motrin, Clinoril, Flexoril, and Prozac (NB 6: CRC-1389).  He reported that some of these medications made him drowsy.  (NB 6: CRC-1389).

## CORE Review

207.    By letter dated June 21, 1996, Mr. Clark was notified that CORE had been retained by Champion to conduct a review to determine his continuing disability status.  (NB 6:  CRC- 1527).

208.    On August 13, 1996,  Dr. David L. Jarrett, one of Dr. Eglinton's partners at the time, completed and signed an attending physician's statement indicating that Mr. Clark's prognosis was unimproved, and that he was totally disabled from any occupation, and that he would never be able to resume any work.  (NB 6: CRC-1534-1535).

209.    On August 26, 1996, CORE noted: "EE with long standing hx of pain, and

fibromyalgia...suffers with Ekbom syndrome.  Is unable to perform ADLs w/out max  assist.  He is depressed.  Has no transferrable skills and is not a candidate for rehab."  (NB 41: CE-1145).

210.    On August 27, 1996, CORE's Confidential Service Report #1 stated that "the attending physician's statement indicates an unimproved condition, and he continues to be totally and permanently disabled from any occupation."  (NB 6: CRC-1538).

211.    CORE's LTD Case Management therefore recommended "a continuation of LTD benefits given the employee's debilitated condition and on-going symptomatology." (NB 6: CRC-1539).

212.    In an attending physician report dated August 21, 1997, Dr. Eglinton completed and signed a disability statement indicating that Mr. Clark's physical condition was unimproved and that he was now totally disabled for any occupation.  (Pl. App. 20; NB 6: CRC-1559-1560).

213.    Four days later, on August 25, 1997, Dr. Beavers of CORE spoke with Dr. Daniel Eglinton.  Beavers represented that Dr. Eglinton reported that the patient has true restless legs syndrome and can't sit still or sleep well.   However, Beavers said "he says that he is not disabled from any occupation, and that there are jobs he could do."  (NB 41: CE-1146).

214.    August 25, 1997, Dr. Eglinton noted "talked with independent medical examiner for Champion Paper concerning Mr. Clark...I cannot certify Harrison totally and completely disabled from all work activity.  All they can do at this time is to repeat a functional capacity and see where he stands.  We will be happy to send copies of all our notes to J.B. Beavers, Inc." (NB 6: CRC-1554).

215.    On October 15, 1997, a Functional Capacity Evaluation was performed by Charlie Robbins, PT, who concluded: "Because of high pain levels and hesitation by Mr. Clark to complete

all tests, I am unable to indicate that he is capable of returning to work." (NB 6: CRC-1573). Addressing the question, "Can patient work now?", Mr. Robbins indicated "No." (NB 6, CRC-1574).

216.    On November 10, 1997, CORE nurse Carole Bishop prepared an "IME Chart Preparation Form" for Dr. Peter Johnson, a physiatrist. The form indicated that Mr. Clark had only one diagnosis - fibromyalgia. (NB 6: CRC-1579).

217.    On or about December 9, 1997, CORE became aware that the Social Security Administration had reevaluated Mr. Clark and found him to remain  totally disabled from employment and had scheduled his next evaluation of his condition for seven years later on August 1, 2004. (NB 6, CRC- 1556; NB 41: CE-1171).

218.    On January 12, 1998, an IME was performed by Dr. Andrew Rudins. (NB 6: CRC-1588 to 1593).  Dr. Rudins indicated  that Mr. Clark could potentially work at a sedentary level 8 hours per day with significant restrictions, but he  stated that  "considering that Mr. Clark has been out of work for essentially seven years, the probability of his being able to return to a productive job is quite low." (Pl. App. 21; NB 6: CRC-1591).

219.    Dr. Rudins also observed: "I expect that if he is able to return back to a  productive job, his actual capabilities will more than likely improve if he is able to stay on the job." (NB 6: CRC- 1591).

220.    Dr. Rudins also wrote: "I believe that significant potential exists, and that his work capacity can be potentially increased.  I therefore would recommend a trial of work hardening program, using a multi-disciplinary approach, including a psychologist trained in pain management. This would likely be a daily program extending four to six weeks. Mr. Clark's work restrictions may

53

then be re-evaluated at the completion of that program." (NB 6: CRC-1591).

221. The record does not reveal that any of the additional evaluative procedures recommended by Dr. Rudins, i.e. a multi-disciplinary trial work hardening program, with pain management by a psychologist, were ever offered or implemented by CORE or Champion. (NB 41, NB 6).

222. Dr. Rudins' restrictions were as follows: "he should be able to frequently change positions - i.e. sit, to stand, to walk, at least every fifteen minutes. He should avoid any extensive or repetitive bending or twisting. Maximal lifting is ten pounds on an occasional basis." (NB 6: CRC -1591).

223. On February 2, 1998, in response to a specific inquiry by CORE, Champion's local plant [the "location"] "said to proceed with denial as they could not accommodate restrictions of sedentary job" provided in the Rudins IME. (Pl. App. 22; NB 41: CE-1147).

224. On February 3, 1998, the case was presented to the CORE Denial Committee, and "consensus was to deny further LTD benefits as EE found able by IME." (NB 41: CE-1147).

225. On February 4, 1998, CORE medical director J.D. Beavers, M.D., wrote Mr. Clark and advised him that "the 1/12/98 Independent Medical Examination found you able to perform sedentary work 8 hours per day 5 days per week with some restrictions." Therefore, Beavers advised "we are unable to approve your disability." (NB 6: CRC-1602).

226. On February 4, 1998, CORE issued its Confidential Service Report # 4, recommending that Mr. Clark's LTD benefits be terminated. CORE's recommendation was based on an "able IME." (NB 6: CRC-1601).

227. By letter to Mr. Clark dated February 26, 1998, based solely on CORE's

recommendation, and without further consideration or investigation of any relevant facts, Champion, through its LTD Administrator, Mary Lee Dixon, adopted CORE's finding that Mr. Clark was not disabled and terminated his long term disability benefits effective March 31, 1998.  (NB 6: CRC-1607).

228.    When shown a copy of that letter at her deposition in this case on November 19, 2003, together with another CORE case report recommended denial, and asked if those were the documents on which she would have based her denial letter to Mr. Clark, Mary Lee Dixon responded affirmatively.  (Dixon Dep., p. 154, L. 10– p. 156, L. 11).

229.    When asked if she had any recollection of receiving any other documentation concerning Mr. Clark at the time she wrote her denial letter. Ms. Dixon said "No, I do not", and when asked "in any event, whether or not you received any further documentation you would have followed CORE's recommendation in this case?" Ms. Dixon replied, "yes, sir." (Dixon Dep., p. 156, L. 12 – L. 18).

**Appeal/Review**

230.    On April 2, 1998, CORE received a letter of appeal from Mr. Clark.  (NB 41: CE-1147).


231.    On April 17, 1998, the case was re-opened and information sent to "physician review".  (NB 41: CE-1147).

232.    On April 28, 1998, CORE received a decision from a physician consultant, Frank Nisenfeld, indicating the consultant's finding that "1.  the EE is not disabled from any occupation; 2. would not recommend another IME.  Rationale: there was not documentation of anything in the

records which would totally disable him from any and all employment."  (NB 41: CE-1147-1148).

233.    On April 30, 1998, the case was presented again to the CORE Denial Committee, and the consensus was to proceed with denial of LTD benefits on appeal, based on the CORE, Inc.'s consultant decision that the EE was not disabled from any occupation.  (NB 41: CE-1148).

234.    On April 30, 1998, CORE sent a "fax to MLD [Mary Lee Dixon], informing her to uphold denial."  (NB 41: CE-1148).

235.    On May 29, 1998, Mary Lee Dixon sent Mr. Clark's attorney a letter notifying him that "based on a review by CORE, Inc., our decision is to uphold the denial for LTD benefits." (NB 6: CRC-1624 to 1625).

236.    By a letter dated July 27, 1998 of attorney David Gantt, the denial was again appealed. (NB 6: CRC - 1626-1628).

237.    On August 25, 1998, Champion requested that a TSA [transferrable skills analysis] be performed.  (NB 41: CE-1148).

238.    On September 3, 1998, a TSA was performed by CORE employee Jennifer Mikeska, MRC, which opined that there were " several job titles within the same work field and industry that should be considered appropriate."  (NB 6: CRC -1635-1638;  NB 41: CE-1148).


239.    The TSA found that "Mr. Clark is capable of working as a production clerk, which is a position he previously held at Champion."  (NB 6: CRC 1636).

240.    The TSA by CORE employee Jennifer Mikeska did not discuss the impact of Mr. Clark's eighth grade education on his employability.  Ms. Mikeska did not explain why she thought he would be able to return to work doing the job he had done before, when the location had

previously indicated that it could not accommodate the restrictions imposed by the IME. (NB 6: CRE -1635-1638; NB 41: CE-1147).

241.    There was no labor market survey in the TSA to indicate whether Mr. Clark's combination of medical impairments would enable him to obtain and sustain competitive employment in one of the identified, potential jobs. (NB 5-NB 6; NB 41).

242.    The qualifications of Jennifer Mikeska, the CORE employee who performed the transferable skills analysis, are not defined in the report or elsewhere in the claims record. (NB 5-NB 6; NB 41).

243.    In Confidential Service Report #1 dated April 30, 1998, CORE identified the following as Mr. Clark's "potential clinical complications: chronic pain syndrome, recurrent herniated disc, prolonged activity/work intolerance, nerve impingement and prolonged, recurrent depression." (NB 6: CRC-1623).

244.    Although identified specifically as "potential clinical complications" by CORE, the CORE TSA by Jennifer Mikeska made no mention as to how Mr. Clark might be able to obtain and sustain competitive employment despite these known "clinical complications." (NB 6: CRC-1635-1638).


245.    On November 16, 1998, Dr. Craig Mills, Mr. Clark's family physician, noted that Mr. Clark is a patient who is "totally disabled from fibromyalgia, chronic pain syndrome...he is unable to work....Mr. Clark was diagnosed as a Type II diabetic." (NB 6: CRC 1642).

246.    On November 30, 1998, Joan Callahan-Barlowe, CORE employee, noted "- this is an expedited appeal, if he wants to call it an appeal but the decision is at the Corporate level."

(NB 41: CE-1351).

247.    Prior to the meeting of the CRC, Champion's legal staff prepared records for members of the committee.  The records consisted of an initial summary, and selected excerpts of Mr. Clark's claims record, as compiled by CORE.  The records, consisting of 283 pages were not organized in any particular manner, but were numbered by handwritten numbers in the bottom right corner. (NB 6:  CRC-1359-1640).

248.    On December 2, 1998, based solely on the records provided by Champion's legal staff, and without further consideration or investigation of any facts concerning Mr. Clark's claims, the CRC affirmed CORE's prior denial of Mr. Clark's long term disability benefits.  (NB 6, CRC-1349-1351).

249.    On December 10, 1998, Confidential Service Report #1 of the same date, indicates that the case was again presented to CORE's Denial Committee on that date and "the consensus was to uphold the original denial based on the results of the CORE, INC. physician's recommendation." Mary Lee Dixon was notified of this recommendation via fax.  (NB 41: CE 1123).

250.    The Claims Review file does not contain a final written denial to Mr. Clark. (NB 5-NB 6).


251.    Neither CORE nor Champion made any effort to provide vocational training or education or to otherwise assist Mr. Clark in returning to work. (NB 5-NB 6; NB 41).

252.    In Confidential Service Report #1 dated September 15, 1998, CORE identified the following as Mr. Clark's "potential clinical complications: chronic pain syndrome, recurrent herniated disc, nerve impingement [and] prolonged, recurrent depression."  (NB 6: CRC-1633).

253.   Although identified specifically as "potential clinical complications" by CORE, the Claims Record does not reveal that either CORE or Champion specifically considered how Mr. Clark might be able to obtain and sustain competitive employment despite these known "clinical complications" prior to terminating Mr. Clark's benefits.   (NB 6: CRC-1633).

254.   Following the review of his claim by the CRC, Mr. Clark submitted additional evidence to Champion/International which was relevant to the determination of his disability, and clarified and resolved conflicts in the evidence previously considered by Champion and CORE. Specifically, Mr. Clark provided:

a.   <u>Mr. Clark's affidavit</u>: Mr. Clark provided specific facts concerning his background, disability and treatment, some of which were not solicited by Champion/CORE in their review.  (NB 27: Clark-727-730).

b.   <u>Vocational assessment report</u>: Dr. Benson Hecker, a licensed vocational counselor, considered Mr. Clark's age, education, past employment, his medical condition and any restrictions, as well as the types of jobs available in the economy, and found that Mr. Clark was unemployable at the time of the termination of his LTD benefits in that there were no jobs for which Mr. Clark was "reasonably qualified by training, education or experience." (NB 27: Clark-334-351).

c.   <u>Notice of Social Security Administration Award</u> (NB 5:CRC-1356, 1411-1413).

d.   <u>Updated medical records</u>: These documents included comprehensive medical records from all of Mr. Clark's providers, many of which had not been

59

obtained by Champion/CORE in their review, and which showed that Mr.

Clark's condition had deteriorated since Champion had previously certified

Mr. Clark's total disability.  (NB 27: Clark-354-412).

Champion refused to consider this additional evidence of Mr. Clark's total disability. (NB 5-NB 6).

255.    Of the 283 pages of documents reviewed by the Claims Review Committee, only 51

pages, or 18%, were medical and/or vocational records, including attending physician reports, FCE's,

the IME and the TSA. (NB 5-NB 6; NB 41).

### Savings to Champion in the Termination of Mr. Clark's LTD Benefits

256.    Confidential Service Report #4 dated February 4, 1998 contained "Savings

Projections" and a "Savings Analysis" reflecting that in the denial of Mr. Clark's benefits, Champion

had saved $4,469.36 which it would have paid to Mr. Clark "if it had not been for [CORE] case

management's intervention and assessment in this case."  (Pl. App. 23, NB 6: CRC- 1599,  1601).

### *Plaintiff Franziska Finney*

### Background

257.    Ms. Finney's date of birth is October 3, 1945. (NB 7: Finney-7).

258.    Ms. Finney has an 11th grade education (equivalency from Germany). (NB 28:

Finney-29).

259.    Ms. Finney worked for Champion from August 11, 1984 until she was disabled in

November, 1994.   (NB 28: Finney-58).

260.    At the time of her disability, Ms. Finney worked in a position on conveyor #13 which

required her to keep the bins full of wood chips and to shovel chip blockages by hand.  This position

required constant lifting, bending, reaching and stooping. (NB 28: Finney-29).

261.    Ms. Finney became totally disabled from her employment with Champion on November 7, 1994.  (NB 28: Finney-58).

262.    Thereafter, Ms. Finney's condition deteriorated.  She became totally disabled from any work in October, 1995.  (NB 7: Finney-52).

### Ms. Finney's Disability

263.    Ms. Finney has suffered from disk degeneration, fibromyalgia, osteoarthritis and chondromalacia of the patella at the L5-S1 and C5-6, 6-7 levels of her spine.  (NB 7: Finney-15).

264.    Throughout Ms. Finney's disability, she has been under the regular care of her primary treating physicians: Dr. Jane Brummer, Dr. Thomas E. Rardin, Dr. Kate Queen; and Ms. Finney has also been treated by Dr. Albert Osbahr, Champion's doctor.  Dr. Brummer, a family practitioner, has treated Ms. Finney since 1993.   Dr. Rardin, a rheumatologist, initially treated Ms. Finney from 1994 until his retirement; and Dr. Queen, a rheumatologist, has treated Ms. Finney from 1997 to the present.  (NB 28: Finney-29).

265.    Ms. Finney's treating physicians have objectively documented her conditions through x-rays, and have found degenerative changes in her joints.  (NB 7: Finney-13).

266.    Throughout the period of her disability, Ms. Finney has had debilitating symptoms and restrictions in her functional activities of lifting, walking, standing and sitting for prolonged periods.  (NB 28: Finney-34).

267.    Throughout the period of her disability, Ms. Finney has suffered from severe and chronic pain in her back, hip, arms and legs, which limited her work activities.  (NB 7: Finney-11).

61

268.    Throughout the period of her disability, Ms. Finney has taken the following medications on a regular basis to control her pain and other symptoms: pain relievers, muscle relaxants, steroids, sleep medications.  These medications have caused drowsiness and fatigue. (NB 7: Finney-21; Pl. App. 2).

**Champion's Certification of Ms. Finney's Total Disability From 1994 to 1997**

269.    Effective May 5, 1995, Champion initially approved Ms. Finney for disability under the Plan definition of "total disability," certifying that Ms. Finney was totally disabled from work in that she was unable "to perform the duties of her employment with the Employer as a result of an injury which occurs or an illness which first manifests itself while employed by the Employer . . .." (NB 7:  Finney-21).

270.    Ms. Finney began receiving LTD benefits through the Plan, commencing May 5, 1995.  (NB 28: Finney-31).

**Social Security Administration's Determination of Ms. Finney's Disability**

271.    On May 28, 1996, the Social Security Administration determined that Ms. Finney was totally disabled from engaging in any substantial or gainful employment activity, effective October 3, 1995, and awarded benefits on that basis.  The Social Security Administration has continued to find Ms. Finney totally disabled from employment since that date.  (NB 28: Finney-59).

**CORE Review**

272.    Ms. Finney's medical condition has deteriorated since Champion's last certification that she was totally disabled under the Plan.   (NB 28: Finney-11).

273.    In January, 1996, CORE commenced a review to determine Ms. Finney's continuing

62

disability status.  (NB 42: CE-6).

274.    In her initial conversation with a CORE employee, Ms. Finney stated that her "whole body hurts," and that she had pain in her "back and knees, arthritis in her neck, fibromyalgia in shoulders, arms and legs.  Fatigue all the time." Ms. Finney informed CORE that her pain was constant and unrelenting, kept her from doing any strenuous activities on a prolonged basis, and affected her concentration.  (NB 42: CE-81).  During its review of Ms. Finney's claim, thereafter, CORE did not interview Ms. Finney further to determine the disabling effects of Ms. Finney's chronic pain, the impact of her symptoms and limitations on her daily activities, and her credibility in reporting her subjective symptoms.  (NB 7; NB 42).

275.    CORE requested a functional capacities evaluation (FCE) by its company physician, Dr. Al Osbahr.  According to his report, Dr. Osbahr concluded that Ms. Finney was able to do light work if she could be trained for "white collar type jobs."  (NB 7: Finney-21).

     a.    There is no document in the administrative record to indicate any qualifications of Dr. Osbahr to form this conclusion.

     b.    There is no indication in the FCE report as to how long testing took.

     c.    There is no explanation in the record as to Dr. Osbahr's basis for concluding that Ms. Finney would be able to perform light work on a sustained basis, 8 hours a day, 40 hours per week.  In fact, Dr. Osbahr, states that it is "unclear" whether Ms. Finney could hold a full-time job at Champion.

     d.    There is no indication in the report as to how the test may have affected Ms.

Finney thereafter; and what impact the test may have had on Ms. Finney's symptoms, including pain.

e.    There is no indication in the report as to the effects of Ms. Finney's medications on Ms. Finney's ability to perform light work.

f.    There is no indication in the report or record as to whether there were employers in the economy who would provide light work to Ms. Finney, given her limitations and restrictions.

(NB 7; NB 42).

276.    In Confidential Service Report #2, dated August 25, 1997, CORE identified the following as Ms. Finney's "potential clinical complications": "Intractable chronic pain, Chronic fatigue, Depression, Chronic weakened grip and lifting strength, Progressive uncontrolled hypertension." (NB 7: Finney-22).

277.    The claims record does not reveal that either CORE or Champion or Dr. Osbahr, who performed the FCE for CORE, specifically considered the impact of the "potential clinical complications" identified specifically by CORE in Confidential Service Report #2, dated August 25, 1997, on Ms. Finney's ability to obtain and sustain competitive employment prior to reaching their conclusions leading to the termination of Ms. Finney's LTD benefits.  (NB 7; NB 42).

278.    On August 26, 1997, CORE notified Ms. Finney that her "claim" for LTD benefits was denied based on "the 7/23/97 . . .[FCE]." (NB 7: Finney-22).

279.    CORE's Denial Committee recommended denial of Ms. Finney's claim, and termination of her benefits on August 25, 1997, on the basis of the FCE.  (NB 42: CE-119).

64

280.    Based solely on CORE's decision, and without further consideration or investigation of any relevant facts, Champion, through its LTD Administrator, Mary Lee Dixon, terminated Ms. Finney's long term disability benefits, effective September 30, 1997. (NB 7: Finney-17).

281.    Neither CORE nor Champion made any effort to provide vocational training or education to assist Ms. Finney in returning to work. (NB 7; NB 42).

282.    In response to a specific inquiry by CORE, Champion refused to consider re-employment of Ms. Finney within the restrictions imposed by Dr. Osbahr. (NB 42: CE-76-78; Pl. App. 26).

283.    There is no evidence in the record showing that Champion/CORE considered the following factors, in determining whether Ms. Finney, given her restrictions and limitations, could work in an "occupation or business for wage or profit for which she is or becomes reasonably qualified by training, education or experience:"

      a.     Her age;

      b.     Her educational level;

      c.     Her continued absence from work as a result of Champion's prior certifications of her total disability;

      d.     Champion's unwillingness to consider Ms. Finney for re-employment.

(NB 7; NB 42).

**Appeal/Review**

284.    Ms. Finney requested review of CORE's initial decision on October 1, 1997.  (NB 7: Finney-10; Pl. App. 24).

285.    In her appeal from CORE/Champion's initial denial, Ms. Finney informed CORE/Champion that she had been referred by her family doctor to Vocational Rehabilitation, and interviewed with "therapist Tim Acker" to discuss her vocational status.  Ms. Finney reported that "with my pain, sleepiness, chronic fatigue, high blood pressure and other symptoms that he felt I was unable to work at any kind of job for an 8 hour shift regardless of what type of work."  (NB 7: Finney-11).  While CORE had knowledge of this report, it failed to discuss the findings of the counselor, Mr. Acker, with him.  (NB-7: Finney-8).

286.    Based solely on CORE's decision, and without further consideration or investigation of any relevant facts, Champion, through its LTD Administrator, Mary Lee Dixon, again denied Ms. Finney's claim for continuing long term disability on February 9, 1998.  (NB 7: Finney-1-2).

287.    Following the review of her claim, Ms. Finney submitted additional evidence to Champion/International which was relevant to the determination of her disability, and clarified and resolved conflicts in the evidence previously considered by Champion and CORE.  Specifically, Ms. Finney provided:

        a.    <u>Ms. Finney's affidavit</u>: Ms. Finney provided specific facts concerning her background,  disability and treatment, some of which were not solicited by Champion/CORE in their review.  (NB 28: Finney-29).

        b.    <u>Vocational assessment report</u>: Dr. Benson Hecker, a licensed vocational counselor, considered Ms. Finney's age, education, past employment, her

66

medical condition and any restrictions, as well as the types of jobs available in the economy, and found that because of her impairment and chronic pain Ms. Finney was "unable to perform any substantial gainful work activity which exists in significant number" in the economy and that she is totally disabled from work.  (NB 28: Finney-34).

c.    Updated medical records: These documents included comprehensive medical records from all of Ms. Finney's providers, most of which had not been obtained by Champion/CORE in their review, and which showed that Ms. Finney's condition had not improved since Champion had initially certified Ms. Finney's total disability.  (NB 28: Finney-61-312).

Champion refused to consider this additional evidence of Ms. Finney's total disability.

### *Plaintiff Wiley H. Haynes*

### Background

288.    Mr. Haynes' date of birth is November 1, 1938.  (NB 8:  Haynes-420).

289.    Mr. Haynes has a high school education and attended one year of college.  (NB 8: Haynes-12).

290.    Mr. Haynes worked for Champion from December 23, 1958 until he was disabled on August 3, 1993.   (NB 8:  Haynes-420).

291.    At the time of his disability, Mr. Haynes was a machine tender which required heavy lifting, walking and standing.  (NB 8:  Haynes-420, 8).

67

292.    Mr. Haynes suffered from long-standing back injuries. After surgery in 1978, Mr. Haynes had continuing severe pain in his lower back, but continued to work. His pain and functional limitations increased, and he again had surgery in 1990, which did not alleviate his symptoms. Mr. Haynes continued working until his pain and loss of motion rendered him unable to do his job in 1993. (NB 8: Haynes-23-24, 35).

293.    Mr. Haynes became totally disabled from his employment with Champion or any other work on August 4, 1993. (NB 8: Haynes-44).

294.    In December, 1993-January, 1994, Mr. Haynes underwent a work hardening program with a physical therapist to attempt to return to work. The program was unsuccessful and Mr. Haynes was unable to return to work, as scheduled, in January, 1994. In a functional capacities evaluation performed by Ms. Kimel on January 5, 1994, Ms. Kimel concluded that "Mr. Haynes is at risk for reinjury or further injury if he returns to his job as described by his employer." (NB 8, Haynes-20; Pl. App. 29).

**Mr. Haynes' Disability**

295.    Mr. Haynes has suffered from chronic back pain as a result of prior back injuries and degenerative disc disease; joint disease; and bilateral knee injury. (NB 8: Haynes-23-24, 35).

296.    Throughout Mr. Haynes' disability, Mr. Haynes has been under the regular care of his primary treating physician: Dr. Kate T. Queen. Dr. Queen, who is board certified in the specialty of rheumatology, has treated Mr. Haynes since 1990. (NB 8: Haynes-41, 56).

297.    Mr. Haynes has undergone two surgeries on his lower back. One physician

recommended spinal fusion, but on the advice of his treating physician, Mr. Haynes declined the surgery because of the risk of additional injury. (NB 8: Haynes-24).

298.    Mr. Haynes' treating physicians have objectively documented his back and knee injuries. (NB 8: Haynes-32, 35, 37).

299.    Throughout the period of his disability, Mr. Haynes has had debilitating restrictions in his functional activities, as evidenced by his loss of motion, and limitations in lifting, walking, standing and sitting. (NB 8: Haynes-24, 17, 11, 42, 78).

300.    Throughout the period of his disability, Mr. Haynes has suffered from severe and chronic pain in his lower back, which has limited him in his activities. (NB 8: Haynes-59-67, 157; NB 43: CE-1107).

301.    Throughout the period of his disability, Mr. Haynes has taken medication on a regular basis to control his pain, and to treat his joint disease, as well as other symptoms. (NB 8: Haynes-36).

### Medical Opinions of Mr. Haynes' Continuing Disability

302.    Mr. Haynes' treating physician, Dr. Queen, determined and certified to Champion (and its administrator, Travelers) consistently from 1993 to 1997 that he was permanently and totally disabled from work in any occupation because of his "degenerative disc disease, lumbar spine with osteoarthritis and intermittent sciatica.". (NB 8: Haynes-40, 56, 146; Pl. App. 27).

303.    On February 3, 1994, Dr. Queen stated in her certification of disability that "[t]his patient has worked hard in rehab [rehabilitation] and has tried hard to RTW [return to work]—without success. Recommend long term disability." Dr. Queen also responded that Mr.

Haynes was not a suitable candidate for vocational rehabilitation. (NB 8: Haynes-40; Pl. App. 27).

**Champion's Certification of Mr. Haynes' Total Disability From 1993 to 1997**

304.    Effective February 4, 1994, Champion initially approved Mr. Haynes for disability under the Plan definition of "total disability," certifying that as of August 4, 1993 Mr. Haynes was totally disabled from work in that he was unable "to perform the duties of his employment with the Employer as a result of an injury which occurs or an illness which first manifests itself while employed by the Employer . . .." (NB 8:  Haynes-44, 68; Pl. App. 2, 27).

305.    Mr. Haynes began receiving LTD benefits through the Plan, commencing February 4, 1994. (NB 8:  Haynes-44).

306.    Champion continued Mr. Haynes on LTD benefits under the Plan definition of "total disability" which required that Mr. Haynes was unable "to engage in any occupation or business for wage or profit for which he is or becomes reasonably qualified by training, education or experience."  (NB 8: Haynes-95; Pl. App. 2, 27).

307.    On February 22, 1994, Champion (and its claims administrator Travelers) completed a Vocational Rehabilitation Profile, concluding that Mr. Haynes should not be considered for rehabilitation for work, based on his age, education, medical status, and the fact that Champion had no position which Mr. Haynes could perform.  The profile indicates that Mr. Haynes had demonstrated interest in returning to work, but was too impaired.  On September 9, 1995, Champion (through Travelers) completed another Vocational Rehabilitation Profile with the same conclusions and a final decision not to refer Mr. Haynes for vocational rehabilitation.  (NB 8: Haynes-47, 94; Pl. App. 30-31).

70

**Social Security Administration's Determination of Mr. Haynes' Disability**

308.     On December 10, 1994, the Social Security Administration determined that Mr. Haynes was totally disabled from engaging in any substantial or gainful employment activity, effective February, 1994, and awarded benefits on that basis.  The Social Security Administration has continued to find Mr. Haynes totally disabled from employment since that date. (NB 8: Haynes-75).

**CORE Review**

309.     Mr. Haynes' medical condition has deteriorated since Champion's last certification that he was totally disabled from "any occupation or business" under the Plan.   (NB 8:  Haynes-99, 117).

310.     On March 27, 1996, Mr. Haynes was notified that CORE had been retained by Champion to conduct a review to determine his continuing disability status.  (NB 8:  Haynes-97).

311.     During its review of Mr. Haynes' claim, CORE did not interview Mr. Haynes to determine the disabling effects of Mr. Haynes' chronic pain, the impact of his symptoms and limitations on his daily activities, and his credibility in reporting his subjective symptoms.  (NB 8-NB 9; NB 43).

312.     CORE contracted for a functional capacities evaluation (FCE) with a physical therapist, Susan Kimel, who had conducted the prior FCE.  According to the report, Kimel concluded that Mr. Haynes was able to work in a sedentary/light position. (NB 8:  Haynes-105).

    a.     There is no document in the administrative record to indicate any

71

qualifications of Kimel to form this conclusion.

b.    There is no indication in the FCE report as to how long the testing took.

c.    There is no explanation in the record as to the inconsistencies between the FCE and her prior FCE conducted in 1994.

d.    There is no explanation in the record as to Kimel's basis for concluding that, based on the test results during the evaluation, Mr. Haynes would be able to perform such activity on a sustained basis, 8 hours a day, 40 hours per week.

e.    There is no indication in the report as to how the test may have affected Mr. Haynes thereafter; and what impact the test may have had on Mr. Haynes' symptoms, including pain.  Mr. Haynes reported that the activities required of him in the FCE resulted in dramatic escalation of his pain which resulted in his going to bed for two days with a heating pad.  (NB 8: Haynes-157).

f.    There is no indication in the report as to the effects of Mr. Haynes' medications on Mr. Haynes' ability to perform sedentary/light work.

g.    There is no indication in the report or record as to whether there were employers in the economy who would provide sedentary/light work to Mr. Haynes, given his limitations and restrictions.

(NB 8-NB 9, NB 43).

313.    CORE contracted for an independent medical evaluation (IME) with Dr. Peter Johnson.  Dr. Johnson saw Mr. Haynes on a single occasion on January 20, 1997.  Based on the FCE of Kimel, and his examination of Mr. Haynes,  Dr. Johnson concluded that Mr. Haynes was able to

72

perform sedentary work with restrictions. (NB 8:  Haynes-132).

    a.    It is not clear from the record as to what previous medical history Dr. Johnson reviewed prior to performing his examination of Mr. Haynes and issuing his report.

    b.    There is no document in the record to indicate any qualifications of Dr. Johnson to form his conclusions.

    c.    There is no explanation in the record as to Dr. Johnson's basis for concluding that, based on the FCE and his one-time examination, Mr. Haynes would be able to perform sedentary work on a sustained basis, 8 hours a day, 40 hours per week.

    d.    There is no indication in the report as to the effects of Mr. Haynes' chronic pain on his ability to perform sedentary work

    e.    There is no indication in the report as to the effects of Mr. Haynes' medications on his ability to perform sedentary work.

    f.    There is no indication in the report or record as to whether there are employers in the economy who would provide sedentary work to Mr. Haynes, given his limitations and restrictions.

(NB 8-NB 9, NB 43).

    314.    On October 29, 1996, CORE contacted Sharon Spain, Champion's contact employee in its Canton, North Carolina plant.  Spain informed CORE that she had spoken with Mr. Haynes "who  stated his FCE were light/sedentary work capacity and that Carole Bishop was going to get

him a job."  CORE's case manager, Carole Bishop, explained that she had "never stated that," and Spain responded that "she didn't think [Bishop] would."  Bishop asked if there was a [light/sedentary job] available and [Spain] stated, "no."  (NB 43: CE-1060; Pl. App. 33).

315.    On January 31, 1997, Sharon Spain, Champion's contact employee in its Canton, North Carolina plant, contacted CORE and, with reference to Dr. Johnson's IME, stated that the IME was "good, Dr. Johnson did a good job."  (NB 43: CE-1033).

316.    In Confidential Service Report #1, dated February 6, 1997, CORE identified the following as Mr. Haynes' "potential clinical complications": "Increase in activity intolerance, Chronic pain syndrome, and Nerve impingement." (NB 8:  Haynes-137).

317.    The claims record does not reveal that either CORE, Champion, Dr. Johnson who performed the IME for CORE, or Susan Kimel who performed the FCE for CORE, specifically considered the impact of the  "potential clinical complications" identified specifically by CORE in Confidential Service Report #1, dated February 6, 1997, on Mr. Haynes' ability to obtain and sustain competitive employment prior to reaching their conclusions leading to the termination of Mr. Haynes' LTD benefits. (NB 8-NB 9, NB 43).

318.    CORE's Denial Committee recommended that Mr. Haynes' LTD benefits be terminated.  (NB 8:  Haynes-137).

319.    In its Confidential Service Report # 1, dated February 6, 1997, CORE  recommended that Mr. Haynes' LTD benefits be terminated.  CORE's recommendation was based on the IME and FCE, and on the recommendation of its Denial Committee.   (NB 8:  Haynes-136).

320.    On February 6, 1997, CORE notified Mr. Hayes that his claim was denied.  (NB 8:

74

Haynes-210).

321.    Based solely on CORE's recommendation, and without further consideration or investigation of any relevant facts, Champion, through its LTD Administrator, Mary Lee Dixon, adopted CORE's finding that Mr. Haynes was not disabled and terminated his LTD benefits, effective February 28, 1997.  (NB 8:  Haynes-150).

322.    Champion/CORE made no vocational assessment or evaluation concerning Mr. Haynes' work capacity, given his limitations and restrictions, and chronic pain. (NB8-NB9, NB 43).

323.    Neither CORE nor Champion made any effort to provide vocational training or education to assist Mr. Haynes in returning to work. (NB 8-NB 9, NB 43).

324.    In response to a specific inquiry by CORE, Champion refused to consider re-employment of Mr. Haynes within the restrictions provided in the IME and FCE. (NB 43: CE-1060; Pl. App. 32).

325.    There is no evidence in the record showing that Champion/CORE considered the following factors, in determining whether Mr. Haynes, given his restrictions and limitations, could work in an "occupation or business for wage or profit for which he is or becomes reasonably qualified by training, education or experience:"

      a.      His age;

      b.      His educational level;

      c.      His continued absence from work as a result of Champion's prior certifications of his total disability;

      d.      Champion's unwillingness to consider Mr. Haynes for re-employment.

(NB 8-NB 9, NB 43).

## Appeal/Review

326.    Mr. Haynes requested review of CORE's initial decision on February 17, 1997. (NB 8:  Haynes-143).

327.    In response to CORE's and Champion's decisions to terminate Mr. Haynes' LTD benefits, Dr. Queen, Mr. Haynes' treating physician, provided additional documentation discussing Mr. Hayes' disabling pain, symptoms and limitations, stating:

> Mr. Haynes now has clear evidence for rheumatoid arthritis on his laboratory testing.  I have seen him today, and he has made the decision to commit to a more aggressive program of treatment hoping to prevent any serious sequelae to this illness, but at the present time he does continue to struggle with not only low back pain but significant peripheral joint pain, stiffness and increasing swelling.
>
> I think it is very important to review the decision recently made indicating that Mr. Haynes was capable of returning to regular employment, because I think for a variety of reasons this is an inappropriate and unrealistic decision.

(NB 8:  Haynes-166, 146, 148; Pl. App. 28).  There is no indication that Champion/CORE considered the letter by Mr. Haynes' treating specialist, Dr. Queen. (NB 8-NB 9, NB 43).

328.    Based solely on CORE's recommendation, and without further consideration or investigation of any relevant facts, Champion, through its LTD Administrator, Mary Lee Dixon, again denied Mr. Haynes' claim for continuing long term disability.  (NB 8:  Haynes-155).

329.    On July 29, 1997, Mr. Haynes requested review through the Champion Claims Review Committee (CRC).  (NB 8:  Haynes-146 ).  In his letter, Mr. Haynes referred to the fact that

he had sent personal information and statements concerning his symptoms and indicated that CORE

had disregarded his complaints.

> I had to take another FCE test which caused my pain index to go up
> to about an (8).  I was in bed on a heating pad for (2) days following
> the tests.  The reports do not show this! ...
>
> I live with pain everyday.  There are days when I cannot tie
> my shoes or button my shirts or even put my shirttail in my pants
> because of the arthritic pain in my hands.  How can a 59 year old man
> hold down a public job in this condition.  I have good days and bad
> days.  I may be able to work (1 day—maybe 2) but then the pain
> starts—in my back, in my hands and my knees.  Sitting for any
> extended period of time increases the pain in my back.  If I have any
> distance to walk I use a cane to steady myself and to take weight off
> my right knee.  I also keep crutches with me because I had to use
> them for 3 days because of my right knee flaring up.  I couldn't put
> any weight at all on my right leg.  I could not take anti-inflammatory
> drugs because of my stomach.  Of course all of this is in past reports.
>
> If I could work at any job I would.  This continued worrying
> has done nothing to help my medical problem or my mental state.  I
> wake up to it every morning and go to sleep with it every
> night—trying to find a way to explain to you and make you see that
> I cannot hold down a public job....
>
> Please give my review fair consideration.  Arthritis is a very
> painful disease—especially if you cannot take medication to control
> it.  The only way I can control it is by hot and cold compresses and
> limit my activity.  Being disable [sic] is demoralizing in itself.
> Having someone to doubt your disability is even more so.

(NB 8: Haynes-157; Pl. App. 34).

330.    Prior to the meeting of the CRC, Champion's legal staff prepared records for members

of the committee.  The records consisted of an initial summary, and selected excerpts of Mr. Haynes'

claims record, as compiled by CORE.  The records, consisting of 163 pages were not organized in

any particular manner, but were numbered by handwritten numbers in the bottom right corner.

(NB 9: CRC-518-680).

331.    On December 26, 1997, based solely on the records provided by Champion's legal staff, and without further consideration or investigation of any facts concerning Mr. Haynes' claims, the CRC affirmed CORE's prior denial of Mr. Haynes' LTD benefits.(NB 8:  Haynes-178).

332.    Following the review of his claim by the CRC, Mr. Haynes submitted additional evidence to Champion/International which was relevant to the determination of his disability, and clarified and resolved conflicts in the evidence previously considered by Champion and CORE. Specifically, Mr. Haynes provided:

<blockquote>
a.    Mr. Haynes' affidavit: Mr. Haynes provided specific facts concerning his background,  disability and treatment, some of which were not solicited by Champion/CORE in their review.  (NB 29: Haynes-421).

b.    Vocational assessment report: Mr. Randy Adams, a certified vocational counselor, considered Mr. Haynes' age, education, past employment, his medical condition and any restrictions, as well as the types of jobs available in the economy, and found that Mr. Haynes was unemployable at the time of the termination of his LTD benefits in that there were no jobs for which Mr. Haynes was "reasonably qualified by training, education or experience." (NB 29: Haynes-425).

c.    Updated medical records: These documents included comprehensive medical records from all of Mr. Haynes' providers, many of which had not been obtained by Champion/CORE in their review, and which showed that Mr.
</blockquote>

Haynes' condition has deteriorated since Champion had previously certified

Mr. Haynes' total disability.  (NB 29: Haynes-440-810).

Champion refused to consider this additional evidence of Mr. Haynes' total disability.

### *Plaintiff Darrell Keith Hill*

### Background

333.    Mr. Hill's date of birth is March 4, 1952. (NB10:  Hill-141).

334.    Mr. Hill has a high school education.  (NB 30:  Hill-7).

335.    Mr. Hill worked for Champion from June 12, 1972  until he was disabled in
November, 1990.   (NB 44: CE-565).

336.    At the time of his disability, Mr. Hill was a millwright which required him to
maintain and repair machinery in the plant. (NB 30:  Hill-7).

337.    Mr. Hill became totally disabled from his employment with Champion or any
other work in November, 1990.  (NB 30:  Hill-7).

### Mr. Hill's Disability

338.    Mr. Hill suffers from chronic and long-standing injuries to his right leg which
required eight surgeries over the years, including the amputation of his leg below the knee, and
management of persistent infections and other severe and disabling symptoms and conditions; post-
traumatic degenerative arthritis; gout in his left and right foot; low back pain, degenerative arthritis
of multiple disks, lateral epicondolitis of the right elbow; and, in addition, all his teeth have been
removed as a result of a condition known as pyorrhea.  (NB 44: CE-5113, 5122, 5191,5074).

79

339.    Throughout Mr. Hill's disability, Mr. Hill has been under the regular care of his primary treating physician: Dr. Joseph M. Dement.  Dr. Dement , who is a specialist in orthopaedics, has treated Mr. Hill since 1995. (NB 30:  Hill-7).

340.    Throughout the period of his disability, Mr. Hill has undergone eight surgeries on his right ankle and foot, culminating in the amputation of his right leg and subsequent surgery to his knee.  (NB 44: CE-5122).

341.    Throughout the period of his disability, Mr. Hill has had debilitating symptoms and restrictions in his functional activities of lifting and walking. (NB 10:  Hill-137; Pl. App. 35).

342.    Throughout the period of his disability, Mr. Hill has suffered from severe and chronic pain in his right lower extremity, lower back and left lower extremity, which limited him in his activities. (NB 10:  Hill-137; Pl. App. 35).

343.    Throughout the period of his disability, Mr. Hill has taken medication on a regular basis to control his pain and other symptoms. (NB 10:  Hill-137; Pl. App. 35).

### Medical Opinions of Mr. Hill's Continuing Disability

344.    Mr. Hill's treating physician, Dr. Dement determined and certified to Champion consistently from 1990 to 1999 that he was permanently and totally disabled from work in any occupation because of his injuries and the chronic pain and other symptoms, and his resulting functional limitations and restrictions.  (NB 10:  Hill-150; Pl. App. 35).

### Champion's Certification of Mr. Hill's Total Disability From 1990 to 1998

345.    In November, 1990, Champion initially approved Mr. Hill for disability under the Plan definition of "total disability," certifying that Mr. Hill was totally disabled from work in that

he was unable "to perform the duties of his employment with the Employer as a result of an injury which occurs or an illness which first manifests itself while employed by the Employer . . .." (NB 44: CE-565; Pl. App. 2).

346.    Mr. Hill began receiving LTD benefits through the Plan, commencing November, 1990.  (NB 30:  Hill-7).

347.    In 1992 and thereafter, Champion continued Mr. Hill on LTD benefits under the Plan definition of "total disability" which required that Mr. Hill was unable "to engage in any occupation or business for wage or profit for which he is or becomes reasonably qualified by training, education or experience."   (NB 30:  Hill-7; Pl. App. 2).

348.    Mr. Hill was reviewed periodically and certified as totally disabled under the Plan by Champion on a continuing basis from 1992 to 1998.  (NB 30:  Hill-7).

### Social Security Administration's Determination of Mr. Hill's Disability

349.    On January 27, 1992, the Social Security Administration determined that Mr. Hill was totally disabled from engaging in any substantial or gainful employment activity, effective November 5, 1990, and awarded benefits on that basis.  The Social Security Administration has continued to find Mr. Hill totally disabled from employment since that date.  (NB 30:  Hill-11).

### CORE Review

350.    Mr. Hill's medical condition has deteriorated since Champion's last certification that

81

he was totally disabled from "any occupation or business" under the Plan. (NB 10: Hill-137).

351.    In 1996, CORE was retained by Champion to conduct a review to determine Mr. Hill's continuing disability status.  (NB 44: CE-565).

352.    During its review of Mr. Hill's claim, CORE did not interview Mr. Hill to determine the disabling effects of Mr. Hill's chronic pain, the impact of his symptoms and limitations on his daily activities, and his credibility in reporting his subjective symptoms.  (NB 8-NB 9, NB 43).

353.    On July 13, 1998, Dr. Dement noted that Dr. Beavers had called, and that Dr. Beavers "understands that I do feel that Mr. Hill is unable to work at this time. . . .will clarify this . . ." (NB 10: Hill-137-151; Pl. App. 35).

354.    On July 27, 1998, CORE's Cost Review Services prepared a transferable skills analysis (TSA) of Mr. Hill's job skills.  In the report that was issued, it was determined that Mr. Hill had transferrable skills of "Compiling, Analyzing, Taking instructions-Helping, Setting up and Precision working."   The report listed several positions which it considered "appropriate for employment."  (NB 10: Hill-121).

        a.    There is no indication in the report as to whether Mr. Hill was reasonably fit to undertake the listed occupations.

        b.    There is no indication in the report to indicate whether any such jobs existed in significant numbers in the local or national economy.

        c.    There is no indication or documentation in the report to indicate any qualifications of the person who performed the transferable skills analysis.

82

355.    In Confidential Service Report #5, dated July 29, 1998, CORE identified the following as Mr. Hill's "potential clinical complications": "Chronic pain syndrome, Increased activity intolerance, and Injuries due to gait deviations." (NB 10: Hill-118).

356.    The claims record does not reveal that either CORE or Champion considered the impact of the "potential clinical complications" identified specifically by CORE in Confidential Service Report #5, dated July 29, 1998, on Mr. Hill's ability to obtain and sustain competitive employment prior to reaching their conclusions leading to the termination of Mr. Hill's LTD benefits. (NB 8-NB 9, NB 43).

357.    On July 29, 1998, CORE issued its Confidential Service Report #5, recommending that Mr. Hill's LTD benefits be terminated.  CORE's recommendation was based on the IME and TSA.  (NB 10:  Hill-118).  No IME appears in the record. (NB 8-NB 9, NB 43).

358.    On October 19, 1998, Mr. Hill's wife stated that Mr. Hill had been "to 'hell' and back in the last 10 years;" he " has suffered more than any one person should ever suffer in a lifetime, and it's not over yet, he still feels the pain as though his foot is still there."  Ms. Hill related that Mr. Hill "does not sleep at night, he rolls and tumbles and cries out in pain."  (NB 10: Hill-152; Pl. App. 36).

359.    Based solely on CORE's recommendation, and without further consideration or investigation of any relevant facts, Champion, through its LTD Administrator, Mary Lee Dixon, adopted CORE's finding that  Mr. Hill was not disabled and terminated his long term disability benefits, effective October 31, 1998.  (NB 10: Hill-123).

360.    Neither CORE nor Champion made any effort to provide vocational training or education to assist Mr. Hill in returning to work.  (NB 8-NB 9, NB 43).

361.    There is no evidence in the record that Champion offered Mr. Hill employment within his medical restrictions.(NB 8-NB 9, NB 43).

362.    There is no evidence in the record showing that Champion/CORE considered the following factors, in determining whether Mr. Hill, given his restrictions and limitations, could work in an "occupation or business for wage or profit for which he is or becomes reasonably qualified by training, education or experience:"

      a.     His age;

      b.     His educational level;

      c.     His continued absence from work as a result of Champion's prior certifications of his total disability;

      d.     Champion's unwillingness to consider Mr. Hill for re-employment.

(NB 8-NB 9, NB 43).

**Appeal/Review**

363.    Mr. Hill requested review of CORE's initial decision on October 1, 1998. (NB 10: Hill-126).

364.    On February 17, 1999, based solely on CORE's recommendation, and without further consideration or investigation of any relevant facts, Champion, through its LTD Administrator, Mary Lee Dixon, again denied Mr. Hill's claim for continuing long term disability. (NB 10: Hill-159).

365.    Following the review of his claim, Mr. Hill, through counsel, submitted additional evidence to Champion/International which was relevant to the determination of his disability, and

clarified and resolved conflicts in the evidence previously considered by Champion and CORE. Specifically, Mr. Hill provided:

a.  Mr. Hill's affidavit: Mr. Hill provided specific facts concerning his background, disability and treatment, some of which were not solicited by Champion/CORE in their review. (NB 30: Hill-7).

b.  Vocational assessment report: Dr. Henry D. Wong, certified vocational rehabilitation counselor, considered Mr. Hill's age, education, past employment, his medical condition and any restrictions, as well as the types of jobs available in the economy, and found that Mr. Hill was unemployable at the time of the termination of his LTD benefits in that there were no jobs which could be identified for which Mr. Hill was "reasonably qualified by training, education or experience." (NB 30: Hill-18).

c.  Updated medical records: These documents included comprehensive medical records from all of Mr. Hill's providers, many of which had not been obtained by Champion/CORE in their review, and which showed that Mr. Hill's condition had not improved since Champion had previously certified Mr. Hill's total disability. (NB 30: Hill-27-100).

Champion refused to consider this additional evidence of Mr. Hill's total disability.

### Savings to Champion in the Termination of Mr. Hill's LTD Benefits

366.    CORE issued a "Savings Analysis" reflecting that in the denial of Mr. Hill's benefits,

85

Champion had saved $75,850 which it would have paid to Mr. Hill throughout his disability if Champion had not determined that he was not disabled and terminated his benefits in accordance with CORE's recommendation.  (NB 10: Hill-118; Pl. App. 37).

### Plaintiff Judith Case Kirkpatrick

### Background

367.    Ms. Kirkpatrick's date of birth is February 20, 1944.  (NB 12: CRC-1939)

368.    Ms. Kirkpatrick has a 12th grade education.  (NB 12: CRC-1984)

369.    Ms. Kirkpatrick was employed by Champion for more than seventeen years,  from November 1, 1976, until she was disabled on November 26, 1993.  (NB 12: CRC-1935, 1939)

370.    Throughout the course of her employment with Champion, she was required to do a great deal of heavy physical work typical of a  laborer.  (NB 45: CE-1575).

371.    At the time of her disability, Ms. Kirkpatrick's job title was "Poly Recovery Helper" which required her to, among other things,  operate a "jitney" ( forklift) loading and unloading boxcars, shovel, sweep, stoop, lift, kneel, climb and clean the boxcars once they were emptied and other areas.  (NB 12: CRC-1963, 1964).

372.    Prior to becoming disabled, Ms. Kirkpatrick had experienced a collapsed lung which required surgery.  She also suffered from generalized, chronic advanced periodonitis of her teeth associated with bone loss in her upper and lower jaws.  (NB 12:CRC-1955, 2081) .

373.    Ms. Kirkpatrick had a family  history  of rheumatoid arthritis (father) and osteoarthritis (mother).  (NB 12: CRC-1955).

374.     Ms. Kirkpatrick suffered on-the-job back injuries in 1991 (while lifting the tine of a forklift) and 1992 (when she missed a step coming down a ladder), and despite her injuries, continued to try to work.  (NB 12: CRC-1944).

375.     Although Ms. Kirkpatrick suffered some on-going low back and bilateral leg pain as a result of the first on-the-job accident, the second on-the-job accident  greatly increased her symptoms (NB 12: CRC-1944); eventually her low-back injuries and bilateral leg pain, together with degenerative back disease, connective tissue disease with fibromyalgia and generalized osteoarthritis forced her out of work in November of 1993.  (NB 12: CRC-1939, 1955, 1956).

376.     Ms. Kirkpatrick was determined to be entitled to short-term disability benefits (STD) from November 26, 1993 to May 26, 1994.  (NB 12: CRC-1939).

377.     Effective May 27, 1994, Ms. Kirkpatrick was found to be entitled to long- term disability benefits (LTD).  (NB12: CRC-1939).

378.     Ms. Kirkpatrick's monthly LTD benefit was $386.25. (NB 12: CRC- 1982).

### Ms. Kirkpatrick's Disability

379.     Ms. Kirkpatrick  suffers from degenerative back disease (NB 12: CRC-1939, 2043); connective tissue disease with fibromyalgia (NB 12: CRC-1939,  CRC-1946, 1958, 2043); generalized  osteoarthritis (NB 12: CRC-1939, 1946, 2043); degenerative arthritis (NB 12: CRC-2079); progressive bone loss through the back (osteopenia) (NB 12: CRC-2043); moderate degenerative changes throughout the upper and lower extremities (NB 12: CRC-2043); trochanteric bursitis (NB 45: CE-1573); inflammatory polyarthropathy (NB 12: CRC-1956); chronic advanced periodonitis, having  lost most of her teeth due to the severity of bone loss in her upper and lower

jaws (NB 12: CRC-2081); and numbness in both hands, feet and ankles. (NB 12: CRC-1944).

380.    Throughout Ms. Kirkpatrick's disability, she has been under the regular care of two primary treating physicians: her family doctor, Dr. George Brown (NB 12:CRC-1952), and a rheumatologist, Dr. Steven Mendelsohn, who began treating Ms. Kirkpatrick on February 7, 1994. (NB 12: CRC-1955 and CRC-1956).  She was evaluated for her back injuries by Dr. L.S. Van Blaricom, an orthopaedist (NB 12: CRC-1944 and CRC-1953)  She treats with Dr. Michael Gillespie, a dentist, for her long-standing periodontitis.  (NB 12: CRC-2081).

381.    Ms. Kirkpatrick's treating physicians have objectively documented her conditions through bone density studies (NB 12: CRC-2043),  x-rays (NB 12: CRC-1951, CRC-1952, CRC-1955,  CRC-1956 and CRC-1998) and  MRI's.  (NB 12: CRC-1945, CRC-1953).

382.    Throughout the period of her disability, Ms. Kirkpatrick has had debilitating symptoms, including severe and chronic pain and soreness  in her back, neck, legs, hands, ankles, knees, elbows, and shoulder joints  (NB 12: CRC-1944, CRC-1955, CRC-2043),  marked muscle spasms, and sleep disturbance (NB 12: CRC- 2079); bilateral leg pain, (NB 12: CRC-1944); and numbness in her hands, feet and ankles. (NB 12: CRC-1944).

## Medications

383.    Throughout the period of her disability, Ms. Kirkpatrick has taken a number of medications on a regular basis in an effort  to control her pain, sleep disturbance, depression  and other symptoms.  Those medications have included:  Zoloft, Disalcid, Paxil, Trazadone, Celebrex, Ultram, Zantac, Relafen, Ambien, Amitriptyline, Evista Neurontin, and Fosamax.  (NB 12: CRC-2025, 2041, 2043, 2078, 2079).

88

**Restrictions**

384.    Throughout the period of her disability, Ms. Kirkpatrick has had significant restrictions in her functional activities, including avoidance of any heavy lifting, straining,  and excessive activities.  (NB 12: CRC-1946) .

385.    Dr. Mendelsohn noted on March 24, 1994, "at this point [she] would not be able to return to her previous job description, and is unlikely to be able to find a light duty, sedentary type job at Champion."  (NB 12: CRC-1946).

386.    Later in 1996, a  rheumatologist with CORE, Dr. Fife, determined that Ms. Kirkpatrick was only capable of doing less than sedentary work with no repetitive use of upper extremities, if she were appropriately trained and if such work were available.  According to Dr. Fife, Ms. Kirkpatrick would be unable to perform any job requiring lifting, bending, climbing, pulling, pushing, repetitive fine motor movements, repetitive upper extremity movements, walking and standing.  (NB 12: CRC-2016).

387.    Later, on August 27, 1998, Dr. Mendelsohn stated that Ms. Kirkpatrick "is not able to return to work at this point, and will never be able to return to any heavy lifting, carrying, straining type activities."  (NB 12: CRC-2079)**.**

**Medical Opinions of Ms. Kirkpatrick's Continuing Disability**
**And**
**Champion's Certification of Ms. Kirkpatrick's Total Disability From 1994 to 1998**

388.    On February 8, 1993, Dr. Van Blaricom, a spine specialist, saw Ms. Kirkpatrick

regarding back and lower extremity problems she was having following two on-the-job accidents involving back injuries.  Dr. Van Blaricom noted:  "This pain is made worse by bending over, sweeping, trying to get in and out of bed, or walking up or down steps.  In her job she has to do a lot of sweeping and shoveling, she is at the point that she does not know if she can continue to do this work."  (NB 12: CRC-1944).

389.    Nine months later, Ms. Kirkpatrick came out of work on  November 21, 1993.  (NB 12: CRC-1939).

390.    On November 23, 1993, she was seen by Dr. George Brown for back pain radiating into the left hip and down the left leg.  (NB 12: CRC-1952).  When her symptoms persisted and no surgical solution was apparent to spine specialist Dr. L.S. Van Blaricom (NB 12: CRC-1953), she was referred to Dr. Steven Mendelsohn, a rheumatologist.  (NB 12: CRC-1952) .

391.    By letter dated March 9, 1994, Travelers informed Ms. Kirkpatrick that it was "in receipt of a Long Term Disability claim submitted on your behalf by your employer."  (NB 12: CRC-1965).

392.    On several occasions Dr. Mendelsohn determined and certified to Champion and its administrators that Ms. Kirkpatrick was totally and permanently disabled from her prior work at Champion because of her generalized osteoarthritis, degenerative back disease, and fibromyalgia,  He indicated  she might be able to do some light duty or sedentary work , but she definitely could not return to any heavy lifting.  (NB 12: CRC-1985, 1997; NB 45 CE-1548).

393.    On April 5, 1994, Ms. Kirkpatrick completed a Personal Profile Evaluation wherein she reported that she had "pain from waist down to end of toes.  Cannot grip because of pain in

hands, wrists & elbows.  Cannot lift." She indicated that while she was able to do some household chores, she required assistance with vacuuming and mopping.  She indicated that she did not expect to return to her prior job or any other type of occupation on either a full or part-time basis.  (NB 12: CRC-1971,1972).

394.    On May 18, 1994, Champion initially approved Ms. Kirkpatrick for disability under the Plan definition of "total disability," certifying that Ms. Kirkpatrick was totally disabled from work in that she was unable "to perform the duties of her employment with the Employer as a result of an injury which occurs or an illness which first manifests itself while employed by the Employer . . ." (NB12: CRC-1982; NB 66: Plan-60).

395.    On May 19, 1994, a case manager, Gloria Lopez, completed a Vocational Rehabilitation  Profile for LTD and CMD Claims" on Ms. Kirkpatrick.  Considering her "net monthly benefit, age, education, medical status," and the fact that "ER has no position available for this claimant," Ms. Lopez's score of 9 put  Ms. Kirkpatrick in  the  lowest possible score category (13 or less), which indicated that she was not to be referred for rehab review.  (Pl. app. 38, NB 12: CRC-1984).

396.    On May 26, 1994, Travelers wrote Ms. Kirkpatrick to see if she felt that vocational rehabilitation might be feasible for her.  If she felt that vocational rehabilitation was not feasible, the letter specified that "you are under no obligation to become involved."  (NB 12: CRC-1988).

397.    Ms. Kirkpatrick began receiving LTD benefits through the Plan, commencing May 27, 1994.  (NB 12: CRC-1939, 1982).

398.    On September 29, 1994, Dr.  George Brown noted "fell 3 weeks ago injuring left

foot." (NB 12: CRC-1998).

### Social Security Administration's Determination of Ms. Kirkpatrick's Disability

399.    On October 27, 1995, the Social Security Administration determined that Ms. Kirkpatrick was totally disabled from engaging in any substantial or gainful employment activity, effective November 22, 1993, and awarded benefits on that basis.   The Social Security Administration has continued to find Ms. Kirkpatrick totally disabled from employment since that date.  (NB 45: CE-1515).

### CORE Review

400.    On March 27,  1996, Ms. Kirkpatrick was notified that CORE had been retained by Champion to conduct a review to determine her continuing disability status.  (NB 12: CRC-2005).

401.    On or about April 15, 1996, Ms.  Kirkpatrick advised CORE of the following: "I hurt from my hips to the bottom of my feet.  Cannot stand on my feet for long; if I do my left hip especially starts hurting.  Neck, shoulder, elbows and hands hurt.  Cannot hold onto items.  I am bad to fall.  My hands swell.  I have a hard time when I first get up walking.  I have to rest in the afternoon."  (NB 12: CRC-2009).

402.    On April 30, 1996, in an AP statement, Dr. Mendelsohn stated that  Ms. Kirkpatrick was "unimproved" from prior occasions when he had certified her to be totally  disabled from her prior work because of her generalized osteoarthritis and fibromyalgia, with the notation that "patient could possibly do light, sedentary type work but she has no job experience with the above." (NB 12: CRC-2011).

403.    On July 19, 1996, Dr. Rose Fife, a rheumatologist with CORE, reviewed medical

records, talked with Dr. Mendelsohn and considered whether Ms. Kirkpatrick's disability precluded all forms of work for which she is qualified.   Dr. Fife concluded  that Ms. Kirkpatrick was only capable of doing less than sedentary work with no repetitive use of upper extremities, if she were appropriately trained and if such work were available.  According to Dr. Fife, Ms. Kirkpatrick would be unable to perform any job requiring lifting, bending, climbing, pulling, pushing, repetitive fine motor movements, repetitive upper extremity movements, walking and standing.  (Pl. App. 39; NB 12: CRC-2016).

404.    Dr. Fife thought  that Ms. Kirkpatrick could perform "less than sedentary work, such as that which would have no repetitive use of the upper extremities, if she were appropriately trained and if such work were available...However, in the absence of such a sedentary job, she cannot work, and she is disabled with respect to all of her previous jobs."  (NB 12: CRC-2016).

405.    On July 22, 1996, the CORE claims diary contains this notation:

> "annual review performed to determine her potential disability from any occ.  Per APS, EE has generalized OA and fibromyalgia.  The MD stated she 'could possibly do a light sedentary type but she has no job experience with the above.'  This case was reviewed by CORE's rheumatologist who, following a conversation with the EE's AP, determined that this EE could performed [sic] 'less than sedentary type work...if she were appropriately trained and if such work were available.'  Given the EE's age, lack of transferrable skills (worked as a laborer for 17 yrs) and 12th grade education, we recommend disability from performing any occ and cont of LTD benefits."

(Pl. App. 40, NB 45: CE-01575).

406.    On July 22, 1996, CORE Case  Management issued Confidential Service Report Number 1 recommending the following: "In light of Ms. Kirkpatrick's age, education, and lack of

93

transferrable skills, we recommend continuation of her LTD benefits." (NB 12: CRC- 2021).

407.    The report noted Dr. Fife's evaluation that Ms. Kirkpatrick was "unable to perform any job requiring lifting, bending, climbing, pulling, pushing, repetitive fine motor movements, repetitive upper extremity movements, walking, and standing." (NB 12: CRC-2020,2021).

408.    In addition, the report documented the CORE rheumatologist's opinion that "she could perform less than sedentary work...if she were appropriately trained and if such work were available." (NB 12: CRC-2021).

409.    On July 22, 1996 [approximately 30 months from the onset of disability], Champion continued Ms. Kirkpatrick on LTD under the Plan definition of "total disability" which required that Ms. Kirkpatrick was unable "to engage in any occupation or business for wage or profit for which he is or becomes reasonably qualified by training, education or experience." (NB 12: CRC-2020-2022; Pl. App. 2). Specifically, on July 22, 1996, Ms. Kirkpatrick was certified by Champion as totally disabled from "any occupation or business." (NB12: CRC-2020-2022; NB 45 CE-1516-1518).

410.    On May 15, 1997, a CORE notepad entry records a telephone call to Dr. Mendelsohn's office wherein it quoted Dr. Mendelsohn's opinion : [Ms. Kirkpatrick] "cannot work because there is no job with a less than sedentary focus.  She cannot perform repetitive tasks with her arms.  She cannot bend, lift, kneel or stoo[p]...She is really not able to work." (Pl. App. 40; NB 45: CE-1548).

411.    Seeking clarification of Dr. Mendelsohn's opinion that "EE could possibly work," the CORE representative was told by Dr. Mendelsohn "that she really can't, but if a job were around

where she could sit, change position at will and not have to perform fine motor activities with her hands, maybe.  For all intent and purpose, this EE is T&P disabled." (Pl. App. 40, ; NB 45: CE-1548).

412.    The May 15, 1997, CORE claims diary also contains this entry:

> She has generalized O/A and fibromyalgia.  She has swollen fingers and she [sic] cannot perform any physical task.  Her physician feels that she could possibly work at a less than sedentary job with no repetitive function.  She has no transferrable skills in that she has always done physical manual labor. Based on all the clinical and vocational information, the employee continues to be T&P from any occupational."

(Pl. App. 40; NB 45, CE-1577).

413.    On May 15, 1997, Ms. Kirkpatrick was certified by Champion for continuation of LTD benefits.  (NB 12: CRC-2036-2038; NB 45: CE-1519-1521).

414.    Ms. Kirkpatrick was reviewed periodically and certified as totally disabled under the Plan by Champion on a continuing basis from 1994 to 1998. (NB 12: CRC-1935, 1939). Specifically, Ms. Kirkpatrick was certified for continuing total disability, determining that Ms. Kirkpatrick was totally disabled from "any occupation or business," on the following dates: July 22, 1996  (NB 12: CRC-2020-2022) and May 15, 1997.  (NB 12: CRC-2036-2038; NB 45: CE-1519 to 1521).

415.    On May 5, 1998, the case was referred to Dr. J.D. Beavers, CORE medical director, "who will determine disability status of this EE."  (NB 45: CE-1571).

416.    On May 5, 1998, the CORE diary reports a conversation with Dr. Mendelsohn about Ms. Kirkpatrick.  Dr. Beavers notes "She has some back pain and osteoporosis but no objective

95

findings to suggest she is totally disabled." His recommendation was "Do not certify disability from any occupation." His rationale was: "There is no objective medical substantiation of total disability." (NB 45: CE-1571).

417.     On May 5, 1998, Dr. Beavers prepared on his letterhead a letter to Dr. Steven Mendelsohn. Dr. Beavers indicated that he understood that Dr. Mendelsohn believed that from a medical standpoint, she could do "sedentary or sit-stand work of some kind for 6 hours per day, five days per week." (NB 12: CRC-2053).

418.     On May 11, 1998, Dr. Mendelsohn signed the document indicating that from a medical standpoint, that he believed she could do sedentary or sit-stand work 6 hours per day, five days per week. (NB 12: CRC-2054).

419.     Dr. Mendelsohn subsequently advised Ms. Kirkpatrick that when he spoke with Dr. Beavers, Dr. Beavers informed him that based on the plan, he should consider Ms. Kirkpatrick totally disabled only if she was "bedridden," or was unable to dress herself and otherwise care for her personal needs. (NB 31: Kirkpatrick-177).

420.     On May 12, 1998, the case was presented to the CORE Inc. Denial Committee "who denied continued LTD based on AP release in the O/O." (NB 45: CE-1571).

421.     On May 14, 1998, CORE issued its Confidential Service Report #3 recommending that Ms. Kirkpatrick's LTD benefits be terminated. CORE's recommendation was based on Dr. Beavers' discussion with Dr. Mendelsohn, and Dr. Beavers' representation that Dr. Mendelsohn believed she could do sedentary work and was willing to put that in writing. (NB 12: CRC-2054; NB 12: CRC-2058 to CRC-2060; NB 45: CE-1522-CE-1524).

422.    Neither Dr. Beavers nor the Confidential Service Report of May 14, 1998, addressed how Ms. Kirkpatrick was expected to be able to obtain and sustain sedentary work in light of the "potential clinical complications" listed in that report, including "intractable pain, activity intolerance, worsening fibromyalgic symptoms, depression and decreased range of motion." (NB 12: CRC-2059, 2058, 2052).

423.    Effective June 1, 1998, and  based solely on CORE's recommendation, and without further consideration or investigation of any relevant facts, Champion, through its LTD Administrator, Mary Lee Dixon, adopted CORE's opinion that Ms. Kirkpatrick was not disabled and terminated her long term disability benefits.  (NB 12: CRC-2062;  NB 61: Dixon Dep., p. 32, L 1-7; p. 114, L 16-  p. 117, L l5; p. 147, L 23- p. 148, L 10, p. 167, L 21- p.169, L 13).

424.    In response to a specific inquiry by CORE, Champion agreed to denial of benefits without offering any job to Ms. Kirkpatrick within the restrictions provided in the medical record. (NB 45: CE-1571).

425.    There is no evidence in the record showing that Champion/CORE in 1998 considered the following factors in determining whether Ms. Kirkpatrick, given her restrictions and limitations, could work in an "occupation or business for wage or profit for which she is or becomes reasonably qualified by training, education or experience:"

    a.    Her educational level;

    b.    Her absence from work for more than four years  as a result of her physical problems;

    c.    Champion's prior  certifications of her total disability from any

97

occupation;

    d.      Champion's unwillingness to consider Ms. Kirkpatrick for re-employment.

(NB 11-NB 12, NB 45).

### Appeal/Review

426.    Ms. Kirkpatrick requested review of CORE's initial decision on June 14, 1998. (NB 12 CRC-2063-2065).

427.    On August 7, 1998, based on CORE's recommendation, Champion, through its LTD Administrator, Mary Lee Dixon, again denied Ms. Kirkpatrick's claim for continuing long-term disability.  (NB 12:  CRC-2068.)

428.    When asked about the basis of the Champion decision to deny Ms. Kirkpatrick's appeal of the discontinuation of her long-term disability benefits, Champion employee, Mary Lee Dixon, testified that she based her decision to uphold CORE's initial denial totally on CORE's recommendation.  (Dixon Dep., p. 168, L. 23, p. 169, L. 7).

429.    On August 27, 1998, Dr. Mendelsohn noted that "patient has longstanding degenerative arthritis, chronic low back pain, muscle aching, soreness and stiffness, sleep disturbance and marked muscle spasm." He stated, "patient is not able to return to work at this point and will never be able to return to any heavy lifting, carrying, straining type activities such as she had at Champion."  (NB 12: CRC-2079).

430.    On October 6, 1998, Ms. Kirkpatrick requested review through the Champion Claims Review Committee (CRC).  (NB 12: CRC-2072-2073).

431.    On  June 14  and October 6, 1998, Ms. Kirkpatrick provided factual statements to CORE and Champion  stating  that "I cannot  perform  my duties as required by Champion... I do have to lie down during the day and elevate my legs and feet.   There is not a day goes by that my lower back,  hips  and  legs  hurt  so  bad  that  I have to take pain medicine.  Because of all the medication I take, I do not function very well."  (NB 12: CRC-2063-2065, 2072-2073).

432.    On or before December 8, 1998, CORE requested its own employee, Jennifer Mikeska, to perform a transferable skills analysis (TSA) of Ms. Kirkpatrick's job skills.  In the TSA dated December 8, 1998 that she created, although lengthy (23 pages), no jobs were identified that were  within  Ms. Kirkpatrick's restrictions.   Ms. Mikeska speculated that  Ms. Kirkpatrick's experience cleaning out boxcars might, with vocational retraining, aid her in becoming "a reservationist or ticket distributor at the public railways stations."  There was no discussion as to whether those jobs were within her physical limitations.  There was no labor market survey to indicate whether any such jobs existed in significant numbers in the local or national economy. There is also no documentation in the report to indicate any qualifications of the person who performed the transferable skills analysis.  (Pl. App. 43; NB 12: CRC-2082-2105).

433.    Prior to the meeting of the CRC, Champion's legal staff prepared records for members of the committee.   The records consisted of an initial summary, and selected excerpts of Ms. Kirkpatrick's claims record, as compiled by CORE .  The records, consisting of approximately 133 pages were not organized in any particular manner, but were numbered by handwritten numbers in the bottom right corner.  (NB 12: CRC-2075, NB 12: CRC-1944-2076).

434.    On December 15, 1998, based solely on the records provided by Champion's legal

staff, and without further consideration or investigation of any facts concerning Ms. Kirkpatrick's claims, the CRC affirmed CORE's prior denial of Ms. Kirkpatrick's long term disability benefits. (NB 45: CE-1514-1515).

435.    According to Champion's minutes, in voting to deny Ms. Kirkpatrick's final appeal of the cutoff of her benefits, the committee considered the following:

> On 3/24/94 and 4/30/96, Dr. Mendelsohn, Ms. Kirkpatrick's doctor, stated that she could do light sedentary work.  On 5/5/98, Dr. Beavers, of CORE, talked with Dr. Mendelsohn, who said that there are "no objective findings to suggest she is totally disabled" and that she could do sedentary work. On 5/11/98, Dr. Mendelsohn stated that Ms. Kirkpatrick can do sedentary work, 6 hours/day, 5 days/week. On 7/6/98, Dr. Mendelsohn stated that Ms. Kirkpatrick "can only now do just mild sedentary type activities up to 6 hours a day." On 8/27/98, he further stated that "Patient is not able to return to work at this point and will never be able to return to any heavy lifting, carrying, straining type activities such as she had at Champion." A Transferable Skills Analysis identified various other jobs she could perform.

(NB 12: CRC-1935)

436.    The Claims Review Committee did not consider vocational  factors such as the impact of Ms. Kirkpatrick's age, lack of education, subjective pain complaints, the fact that the employer had demonstrated no desire to take her back at any job, and the fact that she had been out of work for over four (4) years on her ability to obtain and sustain competitive employment.  They did not consider a Labor Market Survey or a Vocational Evaluation of Ms. Kirkpatrick that considered the items listed above.  (NB 11-NB 12, NB 45).

437.    During its review of Ms. Kirkpatrick's claim, CORE did not interview Ms. Kirkpatrick to determine the disabling effects of Ms. Kirkpatrick's chronic pain, the impact of her

symptoms and limitations on her daily activities, and her credibility in reporting her subjective symptoms.  (NB 31: Kirkpatrick-178).

438.    Following the review of her claim by the CRC, Ms. Kirkpatrick submitted additional evidence to Champion/International which was relevant to the determination of her disability, and clarified and resolved conflicts in the evidence previously considered by Champion and CORE. Specifically, Ms. Kirkpatrick provided:

a.    <u>Ms. Kirkpatrick's affidavit</u>: Ms. Kirkpatrick provided specific facts concerning her background, disability and treatment, some of which were not solicited by Champion/CORE in their review. (NB 31: Kirkpatrick-175-179).

b.    <u>Vocational assessment report</u>: Dr. Benson Hecker, a licensed vocational counselor, considered Ms. Kirkpatrick's age, education, past employment, her medical condition and any restrictions, as well as the types of jobs available in the economy, and found that Ms. Kirkpatrick was unemployable at the time of the termination of her LTD benefits in that there were no jobs for which  Ms. Kirkpatrick was "reasonably qualified by training, education or experience."  (NB 31: Kirkpatrick-180-191).

c.    <u>Notice of Social Security Award</u> (NB 31: Kirkpatrick-192-195); and

101