Updated medical records: These documents included comprehensive

medical records from all of Ms. Kirkpatrick's providers, many of which had not been obtained by

Champion/CORE in their review, and which showed that Ms. Kirkpatrick's condition had

deteriorated since Champion had previously certified Ms. Kirkpatrick's total disability.  (NB 31:

Kirkpartrick-196-283; NB 12: CRC-2078, 2079, 2081).

439.    Ms. Kirkpatrick's medical condition has not improved since Champion's last

certification that she was totally disabled from "any occupation or business" under the Plan.   In

fact she has continued to fall and has sustained fractures of bones in both feet as well as

additional depression. (NB 12: CRC-2063-2065, 2079; NB 45: CE-1540; NB 31: Kirkpatrick-

177-178).  Champion refused to consider this additional evidence of Ms. Kirkpatrick's total

disability.

440.    As stated above, there were 133 pages of documents presented to the Champion

Claims Review Committee as it considered the final appeal of the termination of Ms.

Kirkpatrick's benefits.  (NB 12: CRC-1944 to 2076).  Of those 133 pages, only 48 pages were

medical and/or vocational records  (including Attending Physician Reports, FCE  and Vocational

Evaluations).  This constitutes 36%  of the papers presented to the Claims Review Committee.

**Savings to Champion in the Termination of Ms.  Kirkpatrick's LTD Benefits**

441.    CORE's Confidential Service Report #3 dated May 14, 1998 contained "Savings

Projections" and a "Savings Analysis" reflecting that in the denial of Ms. Kirkpatrick's benefits,

Champion had saved $49,826.25 which it would have paid to Ms. Kirkpatrick "if it had not been

for [CORE] case management's intervention and assessment in this case."  (Pl. App. 41, NB 12:

CRC-2058, 2059 and 2060; Pl. App. 42, NB 45: CE-1524, 1523 and 1523).

## *Plaintiff Lois L. Lynn*

### Background

442.    Ms. Lynn's date of birth is July 9, 1936.  (NB 13: Lynn-2).

443.    Ms. Lynn has a high school education.  (NB 13: Lynn-20).

444.    Ms. Lynn worked for Champion from February 1, 1977 until she was disabled on December 31, 1991.   (NB 13: Lynn-2).

445.    At the time of her disability, Ms. Lynn was an executive secretary which required her to perform normal clerical and administrative duties. (NB 13: Lynn-357).

446.    Ms. Lynn became totally disabled from her employment with Champion or any other work on December 31, 1991.  (NB 13: Lynn-358).

447.    Following her initial disability, Ms. Lynn attempted to train her successor, but was unable to continue with the training because of her constant sickness.  (NB 13: Lynn-370, 17, 340).

### Ms. Lynn's Disability

448.    Ms. Lynn has suffered from a rare life-long chronic lung disease known as bronchiectasis accompanied by severe and frequent pulmonary infections from drug resistant organisms which are life-threatening.  (NB 13: Lynn-4).

449.    Throughout Ms. Lynn's disability, Ms. Lynn has been under the regular care of her primary treating physicians all of whom are pulmonary specialists: Dr. Edith Hapke, Dr. Robert Boerner and Dr. Harry Lipham.  Dr. Hapke treated Ms. Lynn from 1977 until she retired in 1993. Dr. Boerner treated Ms. Lynn from 1994 to 1997.  Dr. Lipham treated Ms. Lynn, starting in 1997. (NB 13: Lynn-11, 23, 51).

450.     A note in the record relates a conversation with Ms. Lynn's treating specialist, Dr. Edith Hapke, who stated that Ms. Lynn's "illness ...  is rare"

> and that she is sitting on a ticking time bomb that could explode at any time.  The doctor notes that she is only aware of 5 patients with this condition and two of them have already died.  The claimant is completely drug resistant.  The problem is not in her breathing, but rather the infections.  The infections are chronic and persistent and are only treated when there is a significant worsening. . . . In summary, the claimant's problem is her persistent and chronic bronchial infections.  She is never infection-free as the infections can go from bad to worse and are completely drug-resistant.

(NB 13: Lynn-104).

451.     Relatively early in her disease history, Ms. Lynn had undergone resections of her left lower lobe and right middle lobe of her lungs.  (NB 13: Lynn-11).

452.     Ms. Lynn's treating physicians have objectively documented her conditions in pulmonary function studies, x-rays.  (NB 13: Lynn-11, 51, 333).

453.     Throughout the period of her disability, Ms. Lynn has had increasingly severe frequent pulmonary infections which are drug-resistant and have required frequent hospitalizations; in addition, Ms. Lynn generally suffers from symptoms of shortness of breath, some pain in her chest, general weakness, chronic fatigue, and chronic coughing with "purulent sputum."  (NB 13: Lynn-4, 11, 28).

-103-

454.    Throughout the period of her disability, Ms. Lynn has taken antibiotics and used an inhaler to control infections and alleviate her symptoms.  (NB 13: Lynn-11).

### Medical Opinions of Ms. Lynn's Continuing Disability

455.    All of Ms. Lynn's treating pulmonary specialists, including Dr. Hapke, Dr. Boerner and Dr. Lipham determined and certified to Champion consistently from 1992 to 1998 that she was permanently and totally disabled from work in any occupation because of her disease and its resulting infections and threat to her life and health.  (NB 13: Lynn-4-6, 24-26, 51; Pl. App.44).

### Champion's Certification of Ms. Lynn's Total Disability From 1992 to 1998

456.    Effective July 1, 1992, Champion initially approved Ms. Lynn for disability under the Plan definition of "total disability," certifying that Ms. Lynn was totally disabled from work in that she was unable "to perform the duties of her employment with the Employer as a result of an injury which occurs or an illness which first manifests itself while employed by the Employer . . . ." (NB 13: Lynn-2, 358).

457.    Ms. Lynn began receiving LTD benefits through the Plan, commencing July 1, 1992. (NB 13: Lynn-2).

458.    On May 19, 1994, Champion continued Ms. Lynn on LTD benefits under the Plan definition of "total disability" which required that Ms. Lynn was unable "to engage in any occupation or business for wage or profit for which she is or becomes reasonably qualified by training, education or experience."   (NB 13: Lynn-336).

459.    Ms. Lynn was reviewed periodically and certified as totally disabled under the Plan by Champion on a continuing basis thereafter from 1994 to 1998.  (NB 13: Lynn-369, 32; Pl. App. 44).

460.    On September 29, 1992, Champion and its claims administrator Travelers completed a Vocational Rehabilitation Profile, concluding that Ms. Lynn had no potential for rehabilitation for work, based on her age, education and medical status.  (NB 13: Lynn-7; Pl. App. 47).

### Social Security Administration's Determination of Ms. Lynn's Disability

461.    On November 14, 1992, the Social Security Administration determined that Ms. Lynn was totally disabled from engaging in any substantial or gainful employment activity, effective December 31, 1991, and awarded benefits on that basis.  The Social Security Administration has continued to find Ms. Lynn totally disabled from employment since that date.  (NB 13: Lynn-10).

### CORE Review

462.    Ms. Lynn's medical condition has deteriorated since Champion's last determination that she was totally disabled from "any occupation or business" under the Plan.    (NB 13: Lynn-369).

463.    In 1996, CORE commenced its review to determine her continuing disability status. (NB 13: Lynn-32).

464.    Ms. Lynn provided factual statements to CORE and Champion describing her symptoms, limitations and daily activities.  (NB 13: Lynn-34).  During its review of Ms. Lynn's claim, CORE did not interview Ms. Lynn to determine the disabling effects of Ms. Lynn's infections and symptoms, the impact of her symptoms and limitations on her daily activities, and her credibility in reporting her subjective symptoms. (NB 13-NB 14, NB 46).

465.    CORE contracted for an independent medical evaluation (IME) with Dr. James P. McCarrick. Dr. McCarrick saw Ms. Lynn on a single occasion on May 5, 1998.  Based on his examination and review,  Dr. McCarrick concluded that Ms. Lynn was "at increased risk for

developing infections on exposure to various populations" in the workplace.  (NB 13: Lynn-170).

In his IME, Dr. McCarrick did not express an opinion as to Ms. Lynn's specific work capacity.  On

May 20, 1998, Dr. McCarrick noted that Ms. Lynn's actual work capacity on a daily basis is

"unknown—not associated with assessing functional status."  (NB 13: Lynn-320).  Then, upon

further requests by CORE, Dr. McCarrick signed a form dated May 26, 1998, in which he stated

"Yes" to the question of whether Ms. Lynn could work "at least 6 hours per day, 5 days per week

in a sedentary capacity."  (NB 13: Lynn-321).

a.   It is not clear from the record as to what previous medical history Dr. McCarrick reviewed prior to performing his examination of Ms. Lynn and issuing his various reports. (NB 13-NB 14, NB 46).

b.   There is no explanation in the record as to Dr. McCarrick's changing opinions, or the basis for concluding that Ms. Lynn would be able to perform sedentary work on a sustained basis, at  6 hours a day.  (NB 13-NB 14, NB 46).

c.   There is no indication in the reports as to the effects of Ms. Lynn's recurrent infections requiring frequent hospitalizations and unavailability for work on her ability to perform sedentary work on a sustained basis.  (NB 13: Lynn-370, 17, 340).

d.   There is no indication in the reports or record as to whether there are employers in the economy who would provide sedentary work to Ms. Lynn for 6 hours per day, given her limitations and restrictions, and the prospect of absenteeism due to her frequent infections.  (NB 13: Lynn-39).

466.     No vocational analysis was conducted by champion or CORE to determine Ms. Lynn's employability, considering her medical restrictions and other relevant factors.  CORE's Cost Review Services prepared a transferable skills analysis of Ms. Lynn's job skills.  In the report that was issued, it was determined that Ms. Lynn's skills, based on her employment at Champion, would transfer and render her fit for a number of occupations. (NB 13: Lynn-67).

      a.     There is no indication in the report as to whether Ms. Lynn was reasonably fit given her medical restrictions and other relevant factors, to undertake the listed occupations.

      b.     There is no indication in the report or record as to whether there are employers in the economy who would provide sedentary work to Ms. Lynn for 6 hours per day, given her limitations and restrictions, and the prospect of absenteeism due to her frequent infections.  (NB 13: Lynn-39).

      c.     There is no indication in the report to indicate whether any such jobs existed in significant numbers in the local or national economy.

      d.     There is no indication or documentation in the report to indicate any qualifications of the person who performed the transferable skills analysis.

(NB 13-NB 14, NB 46).

467.     In Confidential Service Report #1, dated August 20, 1996, CORE identified the following as Ms. Lynn's "potential clinical complications": "Pneumonia, Respiratory failure, Activity intolerance, Depression related to altered lifestyle, and self care deficit."(NB 13: Lynn-33). In the report, CORE concluded, based on the medical evidence, that Ms. Lynn "remains totally and permanently disabled from performing any occupation;" and recommended continuation of LTD

benefits "based on the acuity and severity of employee's symptoms." (NB 13: Lynn-32). The claims record does not reveal any evidence indicating any improvement in Ms. Lynn's symptoms thereafter. (NB 13-NB 14, NB 46).

468.    The claims record does not reveal that either CORE or Champion or Dr. McCarrick, who performed the IME specifically considered the impact of the "potential clinical complications" identified specifically by CORE in Confidential Service Report #1, dated August 20, 1996, on Ms. Lynn's ability to obtain and sustain competitive employment prior to reaching their conclusions leading to the termination of Ms. Lynn's LTD benefits. (NB 13: Lynn-32).

469.    On August 20, 1996, the CORE case manager noted that Ms. Lynn had congenital bronchiectiases, was unable to perform the central functions of any occupation, uses inhalers, has frequent respiratory infections, experiences fatigue and is generally in overall poor health, and her pulmonary function tests on December 7, 1995, shows "moderate to severe obstruction." (NB 46: CE-1690).

470.    On July 25, 1997, Dr. Boerner, one of Ms. Lynn's treating pulmonary specialists, expressed the opinion that Ms. Lynn was "100% disabled." (NB 13: Lynn-38).

471.    On January 19, 1998, CORE issued its Confidential Service Report #3, recommending that Ms. Lynn's LTD benefits be terminated. CORE's recommendation was based on the ground that Ms. Lynn's family physician had stated that she could work 6-8 hours per day; and that Champion "is unable to accommodate the modifications as outlined by Dr. Freeman." (NB 13: Lynn-390).

472.    Dr. Nancy Freeman, Ms. Lynn's former family doctor, expressed the opinion that Ms. Lynn could perform sedentary work for 6-8 hours per day. Her opinion is not credible in that:

a.      she provided no basis for her opinion;

b.      she is not a pulmonary specialist;

c.      she never treated Ms. Lynn for her pulmonary or respiratory problems; and

d.      her opinions are inconsistent with those of Ms. Lynn's treating specialist.

(NB 13: Lynn-46).

473.    In Confidential Service Report #3, dated January 19, 1998, CORE identified the following as Ms. Lynn's "potential clinical complications": "Recurrent bronchitis, Pneumonia, Respiratory failure, Chronic work/activity intolerance, Depression related to altered lifestyle." (NB 13: Lynn-390).

474.    The claims record does not reveal that either CORE or Champion or Dr. McCarrick, who performed the IME for CORE specifically considered the impact of the "potential clinical complications" identified specifically by CORE in Confidential Service Report #3, dated January 19, 1998, on Ms. Lynn's ability to obtain and sustain competitive employment prior to reaching their conclusions leading to the termination of Ms. Lynn's LTD benefits. (NB 13: Lynn-390).

475.    On January 19, 1998, CORE notified Ms. Lynn that, based on Dr. Freeman's report, she was not disabled, and that her claim was being denied. (NB 13: Lynn-47).

476.    Based solely on CORE's recommendation, and without further consideration or investigation of any relevant facts, Champion, through its LTD Administrator, Mary Lee Dixon, adopted CORE's finding that Ms. Lynn was not disabled and terminated her LTD benefits, effective February 28, 1998. (NB 13: Lynn-52).

477.    Neither CORE nor Champion made any effort to provide vocational training or education to assist Ms. Lynn in returning to work. (NB 13-NB 14, NB 46).

-109-

478.   CORE notified Sharon Spain, Champion's employee at the Canton, North Carolina plant and asked if Champion would consider employing Ms. Lynn based on her restrictions, provided by Dr. Freeman, of sedentary work of 6-8 hours per day.  Champion, through its employee, Sharon Spain, refused to accommodate Ms. Lynn and to offer her re-employment.  (NB 13: Lynn-1665, 44, 390; Pl. App. 49).

479.   No employee of Champion, Travelers or CORE had ever questioned Ms. Lynn's disability until CORE's medical director, Dr. Beaver, did so.  On September 9, 1997, Dr. Beavers noted in the file that based on Dr. Freeman's opinion, Ms. Lynn should not be considered disabled. Dr. Beavers did not discuss the fact that Dr. Freeman was not Ms. Lynn's treating pulmonary specialist.  (NB 13: Lynn-40).

480.   The CORE Denial Committee recommended denial of Ms. Lynn's claim.  (NB 13: Lynn-390).

481.   On January 19, 1998, CORE issued its Confidential Service Report #3 in which CORE noted that Champion was unwilling to "accommodate the modifications as outlined by Dr. Nancy Freeman and recommended that CORE 'proceed as usual' with this case."   CORE recommended denial of the claim.  (NB 13: Lynn-390).

482.   There is no evidence in the record showing that Champion/CORE considered the following factors, in determining whether Ms. Lynn, given her restrictions and limitations, could work in an "occupation or business for wage or profit for which she is or becomes reasonably qualified by training, education or experience:"

　　　　a.   Her age;

　　　　b.   Her educational level;

c.      Her continued absence from work as a result of Champion's prior certifications of her total disability;

d.      Champion's unwillingness to consider Ms. Lynn for re-employment.

(NB 13-NB 14, NB 46).

## Appeal/Review

483.    Ms. Lynn requested review of CORE's initial decision on February 17, 1998. (NB 13: Lynn-383).

484.    In response to CORE's and Champion's decisions to terminate Ms. Lynn's LTD benefits, Dr. Lipham, Ms. Lynn's treating pulmonary specialist, wrote in support of her claim. (NB 13: Lynn-51).

485.    Based solely on CORE's recommendation, Champion, through its LTD Administrator, Mary Lee Dixon, again denied Ms. Lynn's claim for continuing LTD benefits. (NB 13: Lynn-57).

486.    On July 23, 1998, Ms. Lynn sent a letter to Champion questioning CORE's role in distorting the facts concerning her disability.  Ms. Lynn pointed out that Dr. McCarrick in his IME had recognized the risks to her health; that Drs. Hapke, Boerner and Lipham, her specialists, had all supported her disability after thorough testing; that Dr. Freeman had never treated her condition and had never conducted any testing.  Ms. Lynn then stated: "My entire adult life has been spent convincing people that I was able to work, now my role is reversed and I must try to convince them that I am not able to work." (NB 13: Lynn-60).  Ms. Lynn requested review through the Champion Claims Review Committee (CRC) and submitted a supporting statement from her pulmonary specialist, Dr. Lipham.  (NB 13: Lynn-60, 65).

-111-

487.    Prior to the meeting of the CRC, Champion's legal staff prepared records for members of the committee. The records consisted of an initial summary, and selected excerpts of Ms. Lynn's claims record, as compiled by CORE. The records, consisting of 68 pages were not organized in any particular manner, but were numbered by handwritten numbers in the bottom right corner. (NB 14: CRC-126-1282).

488.    On September 30, 1998, the CRC met to discuss Ms. Lynn's appeal. Based on the inconsistencies in Dr. McCarrick's reports, and the interpretation of his reports by CORE, the CRC requested clarification. (NB 13: Lynn-159). Champion noted four documents which raised questions concerning Dr. McCarrick's credibility:

> a.    As noted above, in his IME of May 5, 1998, Dr. McCarrick stated that due to Ms. Lynn's rare disease, she would be "at increased risk for developing infections on exposure to various populations" in the workplace. (NB 13: Lynn-170). In his IME, Dr. McCarrick did not express an opinion as to Ms. Lynn's specific work capacity.

> b.    On May 20, 1998, Dr. McCarrick noted that Ms. Lynn's actual work capacity on a daily basis is "unknown—not associated with assessing functional status." (NB 13: Lynn-320).

> c.    Upon further requests by CORE, Dr. McCarrick signed a form dated May 26, 1998, in which he stated "Yes" to the question of whether Ms. Lynn could work "at least 6 hour per day, 5 days per week in a sedentary capacity." (NB 13: Lynn-321).

-112-

d.    On August 24, 1998, Dr. McCarrick issued a statement that he had been "misquoted in Mary Lee Dixon's letter to Lois Lynn on July 7, 1998.  I did not say Lois Lynn could 'work 6 hours per day, 5 days per week in a sedentary capacity.'  You already have a copy of my letter to Unival of May 5, please refer to Page 4, ¶3 of my letter in the section." (NB 13: Lynn-84).

e.    On October 1, 1998, Dr. Beavers, in response to the CRC's request, reported that he had discussed the inconsistencies with Dr. McCarrick who stated that "[h]e has not changed the opinion that he expressed in his IME and follow up letters—that she is not totally disabled."  (NB 13: Lynn-56).

f.    On October 7, 1998, Dr. Beavers sent a letter to Dr. McCarrick pointing out the inconsistencies in his various writings and providing a blank for Dr. McCarrick to signify that Ms. Lynn could work "at least 6 hours per day, 5 days per week in a sedentary capacity."  Dr. McCarrick signified that Ms. Lynn could do so, and signed the statement.  (NB 13: Lynn-86).

g.    On November 6, 1998, Dr. Beavers was asked whether CORE should recommend another IME, given Dr. McCarrick's various inconsistent responses.  The issue was reviewed with the CORE Denial Committee, and the decision was made that no additional IME would be necessary.  CORE recommended the denial of Ms. Lynn's LTD benefits be upheld. (NB 13: Lynn-461; NB 46: CE-1754).

489.   On November 30, 1998, based on CORE's recommendation, and without further consideration or investigation of any facts concerning Ms. Lynn's claims, the CRC affirmed CORE's prior denial of Ms. Lynn's LTD benefits.  (NB 13: Lynn-151).

490.   Following the review of her claim by the CRC, Ms. Lynn submitted additional evidence to Champion/International which was relevant to the determination of her disability, and clarified and resolved conflicts in the evidence previously considered by Champion and CORE. Specifically, Ms. Lynn provided:

   a.   <u>Ms. Lynn's affidavit</u>: Ms. Lynn provided specific facts concerning her background,  disability and treatment, some of which were not solicited by Champion/CORE in their review.  (NB 32: Lynn-138).

   b.   <u>Vocational assessment report</u>: Dr. Henry D. Wong, a certified vocational counselor, considered Ms. Lynn's age, education, past employment, her medical condition and any restrictions, as well as the types of jobs available in the economy, and found that Ms. Lynn was unemployable at the time of the termination of her LTD benefits in that there were no jobs for which Ms. Lynn was "reasonably qualified by training, education or experience." (NB 32: Lynn-142).

   c.   <u>Updated medical records</u>: These documents included comprehensive medical records from all of Ms. Lynn's providers, many of which had not been obtained by Champion/CORE in their review, and which showed that Ms. Lynn's condition had not improved [had deteriorated] since Champion had previously certified Ms. Lynn's total disability.  (NB 32: Lynn-587).

-114-

Champion refused to consider this additional evidence of Ms. Lynn's total disability.

### Savings to Champion in the Termination of Ms. Lynn's LTD Benefits

491.    CORE issued a "Savings Analysis" reflecting that in the denial of Ms. Lynn's benefits, Champion had saved $42.075.93 which it would have paid to Ms. Lynn throughout her disability if Champion had not determined that she was not disabled and terminated her benefits in accordance with CORE's recommendation.  (NB 13: Lynn-389; Pl. App. 53).

### *Plaintiff Wilson Daniel McClure*

### Background

492.    Mr. McClure's date of birth is September 12, 1945. (NB 17:  McClure-12).

493.    Mr. McClure has a high school education.  (NB 17:  McClure-301).

494.    Mr. McClure worked for Champion from October 1, 1966 until he was disabled in 1989.  (NB 17:  McClure-301).

495.    At the time of his disability, Mr. McClure was a work control analyst in maintenance which required him to supervise maintenance workers who maintained and repaired machinery in the plant.  (NB 34: McClure-17).

496.    Mr. McClure became totally disabled from his employment with Champion or any other work in January, 1989. (NB 17: McClure-301).

### Mr. McClure's Disability

497.    Mr. McClure has suffered from spondoloarthritis which affects all of his joints, particularly his back, hip and knees.  He also has severe limitations in his knee due to a knee replacement.  (NB 17:  McClure-298-300).

498.    Throughout Mr. McClure's disability, he has been under the regular care of his primary treating physician: Dr. Thomas Rardin.  Dr. Rardin , who is a rheumatologist, has treated Mr. McClure since 1989.  (NB 17:  McClure-299).

499.    During his disability, Mr. McClure has undergone knee replacement and regular treatment for his arthritis.  (NB 17: McClure-301).

500.    Mr. McClure's conditions have been objectively documented through x-rays and testing.  (NB 17:  McClure-294, 298, 300).

501.    Throughout the period of his disability, Mr. McClure has had debilitating pain and restrictions in his functional activities limiting him to one hour of sitting, no walking or standing, lifting no more than 10 pounds occasionally, and no repetitive motion .  (NB 17:  McClure-300-303).

502.    Throughout the period of his disability, Mr. McClure has suffered from severe and chronic pain in his back, hop and legs which have limited him in his activities.  (NB 17:  McClure-303).

503.    Throughout the period of his disability, Mr. McClure has taken medication on a regular basis to control his pain and other symptoms.   (NB 17:  McClure-294).

**Medical Opinions of Mr. McClure's Continuing Disability**

504.    Mr. McClure's treating physician, Dr. Rardin, determined and certified to Champion and its administrator, Travelers, consistently from 1989 to 1996  that he was permanently and totally disabled from work in any occupation because of his disease and conditions, his chronic pain and other symptoms, and his resulting functional limitations and restrictions.  (NB 17:  McClure-294, 300; Pl. App. 54).

**Champion's Certification of Mr. McClure's Total Disability From 1989 to 1996**

505.    Effective July 1, 1989, Champion initially approved Mr. McClure for disability under the Plan definition of "total disability," certifying that Mr. McClure was totally disabled from work in that he was unable "to perform the duties of his employment with the Employer as a result of an injury which occurs or an illness which first manifests itself while employed by the Employer . . .." (NB 17: McClure-301; Pl. App. 2).

506.    Mr. McClure began receiving LTD benefits through the Plan, commencing July 31, 1989.  (NB 17: McClure-8, 301).

507.    From 1991 to 1996, Champion continued to certify Mr. McClure as totally disabled and eligible for LTD benefits under the Plan definition of "total disability" which required that Mr. McClure was unable "to engage in any occupation or business for wage or profit for which he is or becomes reasonably qualified by training, education or experience."   (NB 17: McClure-301; Pl. App. 2).

### Social Security Administration's Determination of Mr. McClure's Disability

508.    On January 26, 1995, the Social Security Administration determined that Mr. McClure was totally disabled from engaging in any substantial or gainful employment activity, effective February 1, 1989, and awarded benefits on that basis.  The Social Security Administration has continued to find Mr. McClure totally disabled from employment since that date.  (NB 17: McClure-28).

### CORE Review

509.    There is no evidence in the record that Mr. McClure's medical condition  improved since Champion's certification that he was totally disabled from "any occupation or business" under the Plan. (NB 17; NB 49).

-117-

510.    In 1996, CORE conducted a review to determine Mr. McClure's continuing disability status.  (NB 48: CE-888).

511.    Mr. McClure provided factual statements to CORE and Champion describing the limitations in his daily activities and pain.  (NB 17: McClure-303).  During its review of Mr. McClure's claim, CORE did not interview Mr. McClure to determine the disabling effects of Mr. McClure's chronic pain, the impact of his symptoms and limitations on his daily activities, and his credibility in reporting his subjective symptoms. (NB 17; NB 48).

512.    CORE contracted for an independent medical evaluation (IME) with Dr. Ruffin Stephenson.  Dr. Stephenson saw Mr. McClure on a single occasion in July, 1996.  Based on his examination and review,  Dr. Stephenson concluded that Mr. McClure "continues to be totally and permanently disabled from his former occupation," but able to do "some type of sedentary work or desk job" which would permit him to move around, and to avoid standing or walking for the most part. (NB 17:  McClure-18).

        a.    It is not clear from the record what previous medical history Dr. Stephenson reviewed prior to performing his examination of Mr. McClure and issuing his report.

        b.    There is no document in the record to indicate any qualifications of Dr. Stephenson to form this conclusion.

        c.    There is no explanation in the record as to Dr. Stephenson's basis for concluding that, considering his examination and the history he received from Mr. McClure concerning his symptoms and limitations, Mr. McClure would

be able to perform sedentary work on a sustained basis, 8 hours a day, 40 hours per week.

d.    There is no indication in the report as to the effects of Mr. McClure's chronic pain on his ability to perform sedentary work.

e.    There is no indication in the report as to the effects of Mr. McClure's medications on his ability to perform sedentary work.

f.    There is no indication in the report or record as to whether there are employers in the economy who would provide sedentary work to Mr. McClure, given his limitations and restrictions.

(NB 17; NB 48).

513.    In Confidential Service Report #2, dated October 15, 1996, CORE identified the following as Mr. McClure's "potential clinical complications": "Chronic joint pain, Chronic fatigue, Activity/work intolerance." In spite of the noted complications, CORE determined that Mr. McClure was no longer disabled and that his claim should be denied." (NB 17: McClure-21).

514.    The claims record does not reveal that either CORE or Champion or Dr. Stephenson, who performed the IME for CORE, considered the impact of the "potential clinical complications" identified specifically by CORE in Confidential Service Report #2, dated October 15, 1996, on Mr. McClure's ability to obtain and sustain competitive employment prior to reaching their conclusions leading to the termination of Mr. McClure's LTD benefits. (NB 17; NB 48).

515.    CORE notified Mr. McClure that his "claim for benefits is denied." (NB 17: McClure-23).

516.    Mr. McClure appealed CORE's decision through his attorney. (NB 17: McClure-27).

-119-

517.    Based on CORE's recommendation, Champion, through its LTD Administrator, Mary Lee Dixon, upheld CORE's decision, stating that with "significant additional education and training," Mr. McClure could perform "some type of sedentary work or a desk job" within certain limitations.  (NB 17:  McClure-32).

518.    Neither CORE nor Champion made any effort to provide vocational training or education to assist Mr. McClure in returning to work. (NB 17; NB 48).

519.    There is no evidence in the record that Champion offered re-employment to Mr. McClure  within the restrictions provided in the IME. (NB 17; NB 48).

520.    There is no evidence in the record showing that Champion/CORE considered the following factors, in determining whether Mr. McClure, given his restrictions and limitations, could work in an "occupation or business for wage or profit for which he is or becomes reasonably qualified by training, education or experience:"

      a.    His age;

      b.    His educational level;

      c.    His continued absence from work as a result of Champion's prior certifications of his total disability;

      d.    Champion's unwillingness to consider Mr. McClure for re-employment.

(NB 17; NB 48).

### Appeal/Review

521.    Mr. McClure, through counsel, requested review of Champion's decision, and requested an extension of time to submit additional information.  (NB 17:  McClure-35).

522.    Champion did not respond to Mr. McClure's request for review. (NB 17; NB 48).

-120-

523.    On October 19, 1998, Mr. McClure, through counsel, requested information regarding the status of his claim.  (NB 17:  McClure-36).

524.    Champion provided no review on Mr. McClure's appeal of Champion's decision of April 9, 1997. (NB 17; NB 48).

525.     Following the review of his claim by Champion, Mr. McClure submitted additional evidence to Champion/International which was relevant to the determination of his disability, and clarified and resolved conflicts in the evidence previously considered by Champion and CORE. Specifically, Mr. McClure provided:

     a.     <u>Mr. McClure's affidavit</u>: Mr. McClure provided specific facts concerning his background,  disability and treatment, some of which were not solicited by Champion/CORE in their review.  (NB 34: McClure-85).

     b.     <u>Vocational assessment report</u>: Randy L. Adams, a Certified Vocational Counselor, considered Mr. McClure's age, education, past employment, his medical condition and any restrictions, as well as the types of jobs available in the economy, and found that Mr. McClure was unemployable at the time of the termination of his LTD benefits.  Mr. Adams reviewed Mr. McClure's history and noted that as a result of his condition, Mr. McClure has constant joint pain, swelling and stiffness "all over;" his early activities are very limited; his pain averages moderately severe to severe during the day; that as a result of his pain, Mr. McClure takes hot baths, uses a heating pad, or a warm water bed and has to lie down for 1-1 ½ hours several times a day; and that Mr. McClure's treating rheumatologist, Dr. Rardin, had concluded that

-121-

Mr. McClure is functional during the activities of daily living but he is not functional in a vocational capacity.  Based on this evidence, Dr. Adams concluded that Mr. McClure is "not capable of performing any substantial, gainful activity as it can be found in the local, state, or national economy.  It is not felt he could consistently meet the demands of competitive employment.  I believe that the medical notes indicate that Mr. McClure would be unreliable in the work place and would have to be absent more frequently than would be allowed.  Dr. Adams concluded that Mr. McClure should be "permanently and totally disabled."  (NB 34: McClure 90).

c.    Updated medical records: These documents included comprehensive medical records from all of Mr. McClure's providers, many of which had not been obtained by Champion/CORE in their review, and which showed that Mr. McClure's condition had not improved since Champion had previously certified Mr. McClure's total disability. (NB 34: McClure-101).

Champion refused to consider this additional evidence of Mr. McClure's total disability. (NB 17; NB 48).

### *Plaintiff Celia Darlene Metcalf*

### **Background**

526.    Ms. Metcalf's date of birth is October 12, 1947. (NB 16: CRC-2462, 2487).

527.    Ms. Metcalf has a 12th grade education.  (NB 16: CRC-2462, 2487, 2551).

528.    Ms. Metcalf was employed by Champion for almost eighteen years, from April 23, 1979 until she was disabled on April 15, 1997.   (NB 16: CRC-2462, 2537).

529.    At the time of her disability, Ms. Metcalf was a "Rewind Assistant Operator" which required her to assist rewinder in roll changes, shaft changes, push shaft out of rolls and into paper rolls, keep work area clear of debris, operate forklift, cut cones to required length, plug inserts into rolls, push broke buggy to baller, and operate baller machine.  (NB 16:  CRC-2462, 2545; NB 47: CE-931).  Her job required her to stand 90 % to 95% of her shift, to lift and carry up to 99 pounds, to push and pull 7000 pounds, and as needed, to bend, climb, squat and reach.  (NB 47:CE-931; NB 16: CRC-2814).

530.    Prior to the termination of her benefits, Ms. Metcalf had been diagnosed with a number of medical conditions, including the following:  hysterectomy (NB 16: CRC-2736, 2792); endometriosis with ovarian cystectomy (NB 16: CRC-2742, 2792); situational depression following the death of a child and a divorce (NB 16: CRC-2737);  cholecystectomy (gall bladder removal) (NB 16: CRC-2792); kidney stones (NB 16: CRC-2792, 2898); sprained ankle (NB 16: CRC-2773, 2720); hypothyroidism with related musculo-skeletal pain (NB 16: CRC-2787, 2780); sleep disturbance (NB 16: CRC-2780); fibromyalgia (NB 16: CRC-2602, 2793); connective tissue disorder (smoldering CTD). (Pl. App. 60; NB 16: CRC-2614 and NB 16:CRC-2607; longstanding CTD). (NB 16:CRC-2610); osteoarthritis (NB 16: CRC-2605); L4-5 disc bulge (NB 16: CRC-2825, 2908, 2909, 2910); fractured wrist (NB 16: CRC-2722, 2724); suggestion of cervical   nerve root impingement (NB 16: CRC-2621, 2624, 2648); T2-3 compression fracture (NB 16: CRC-2627, 2648, 2658); plantar fasciitis in both feet (NB 16: CRC-2627, 2673, 2679, 2680, 2690, 2698); pronounced Dowager's hump with fibrotic tissue at the CT junction (NB 16:CRC-2682); shingles (NB 16:CRC-2658); and osteoporosis. (NB 16: CRC-2468-2470).

531.    Ms. Metcalf suffered an on-the-job injury in 1989 of acute muscle strain, and despite her injury, returned to work. (NB 16:CRC-2783).  Ms. Metcalf also suffered a right radius fracture and left ankle sprain on December 8, 1995, but  returned to work on February 21, 1996.  (NB 47: CE-946, 950).

532.    In 1992, Ms. Metcalf was hospitalized with a urinary tract infection (UTI),  epticemia and hypothyroidism, and was out of work for approximately three months (7/9/92 to 10/11/92) due to urosepsis ecoli bacteremia and pyelonephritis-left pleural effusion. (NB 16:CRC-2804).

533.    On November 6, 1992 after her initial diagnosis of fibromyalgia on October 20, 1992, Ms. Metcalf was seen at Haywood Rehabilitation Center for a  limited functional capacity evaluation following nine  work hardening sessions subsequent to her three month absence from work.   At this time Ms. Metcalf was found to be functioning at a medium physical demand level, but the therapist who performed the FCE,  Linda M. Nye, placed various restrictions on her: a maximum safe lifting limit of 35 pounds;  could bend, reach, climb, squat, kneel, walk, crawl and perform repetitive leg/arm movements on occasional basis; walking could be done frequently; static activities of sitting and standing for 0-2 hours, if allowed to shift and change positions frequently.  She  noted Ms. Metcalf  would be more successful in a light physical level job.  (NB 16: CRC-2814-2816).

534.    Although Ms. Metcalf began missing work as a result of her multiple medical problems years before,  she continued to strive to work until she became totally disabled from work; the last day she worked was April 15, 1997.  (NB 16: CRC-2462, 2487, 2519, 2520, 2610).

535.    Ms. Metcalf became totally disabled from her employment with Champion  on April 15, 1997.  (NB 16: CRC-2462, NB 47: CE-931).

536.    Ms. Metcalf was determined to be entitled to short-term disability benefits (STD) from April 16, 1997 to October 12, 1997.  (NB 16: CRC-2462).

537.    Effective October 13, 1997, Ms. Metcalf was found to be entitled to long-term disability benefits (LTD).  (NB 16: CRC-2462).

### Ms. Metcalf's Disability

538.    Ms. Metcalf has suffered from a compressed fracture of T2-3, a bulging disc at L4-5, plantar fasciitis, a broken wrist, heel spur surgeries on January 13, 1997 and November 26, 1997 (NB 16: CRC-2487), osteoporosis, osteoarthritis, hypothyroidism, fibromyalgia, depression, connective tissue disease, and pain in both feet, left hip, shoulders, back and neck.  (NB 16: CRC-2481, 2487, 2603, 2605; NB 47: CE-932).

539.    Throughout Ms. Metcalf's disability, she has been under the regular care of a number of doctors, including her primary treating physicians, Dr. Goodwin, Dr. Mulholland and Dr. Lesesne at Midway Medical Center; a rheumatologist - Dr. Steven Mendelsohn; a podiatrist -Dr. William Banks (NB 16:CRC-2673); Dr. Albert  Osbahr, the Champion Canton mill physician; Dr. John Spencer (NB 16:CRC-2930, 2931); and Dr. Erich Buehler (NB16:CRC-2589). Ms. Metcalf has been treated at Midway Medical Center since at least 1977. Dr. Mendelsohn has treated Ms. Metcalf from August 4,1994 to the present.  Dr. William Banks began treating Ms. Metcalf on or about July 10,1996.  Dr. Osbahr treated Ms. Metcalf from November 20, 1996 until March 10, 1998.  Dr. Erich Buehler began treating Ms. Metcalf on or about November 19, 1999.  (NB 16: CRC- 2738,  2601, 2602, 2673, 2630, 2589; NB 47: CE-970).

540.    Throughout her disability, Ms. Metcalf has undergone the following procedures as a result of some of her conditions: two  foot surgeries in 1997 (endoscopic plantar fascia surgical

releases of heels of both feet, or fasciotomies, on April 16, 1997 and May 1, 1997, (NB 16:CRC-2708)), as well as two heel spur surgeries on January 13, 1997 and November 26, 1997.  (NB 16: CRC-2605, 2690, 2698).

541.    Ms. Metcalf's treating physicians have objectively documented her conditions in multiple x-rays, MRIs, bone density tests, myelograms and bone scans.  (NB 16: CRC-2477, 2622, 2626, 2648, 2723, 2724, 2842, 2845, 2886, 2908, 2909).

542.    Throughout her disability, Ms. Metcalf has suffered from severe and chronic pain in both feet, left hip, shoulders, and neck, which severely limited her in her activities, as noted in Dr. Banks's reports of May 27, 1997 (NB 16: CRC-2702), and July 27, 1997 (NB 16: CRC-2713), and Dr. Mendelsohn's report of December 2l, 1997.  (NB 16: CRC-2702, 2713).  She also had neck and shoulder pain which went into her arms and hands. (NB 16:CRC-2487) She also had "objective joint swelling and synovitis intermittently." (Pl. App. 59, NB 47; CE-972).

**Medications**

543.    Throughout her disability, Ms. Metcalf has taken the following medications on a regular basis to attempt to control her pain and other symptoms: Ultram, Synthroid, Nortriptyline, Panelor, Effexor, Acupril, Vioxx, Norflex, Fosamax, Hydroxycholroquine sulfate, Torticollis, Daypro, an Plaquenil.  (NB 16: CRC-2589, 2594, 2614, 2615).

**Restrictions**

544.    Prior to her disability in 1997, on December 3, 1996, Dr. Osbahr at Champion had contracted for a functional capacities evaluation (FCE) of Ms. Meltcalf with Haywood Regional Hospital.  According to Don Sinyard's report,  Dr. Osbahr concluded that Ms. Metcalf was able to work in a light/medium position with restrictions of maximum carrying weight of 45 pounds, floor

to thigh carrying at 35 pounds, 12 inches to thigh carrying at 35 pounds, shoulder overhead carrying at 20 pounds, and pushing and pulling at 35 pounds. (NB 16: CRC-2637-2642).

545.    During her disability, Ms. Metcalf has had debilitating symptoms such as pain in both feet, left hip, shoulders, back and neck (NB 16:CRC-2481); neck and shoulder pain which went into her arms and hands (NB 16:2487); morning stiffness, joint swelling and soreness and pain throughout the upper and lower extremities including the small joints of the hands, wrists, ankles, and feet, with knees, ankles, and feet quite sore and tender on ROM (range of motion), and neck, shoulders and back all quite tight (NB 16:CRC-2605). She also had restrictions in her functional activities, such as a lifting restriction (NB 47:CE-00964), and trouble standing, climbing steps and climbing uphill. (NB 16: CRC-2481).

### Medical Opinions of Ms. Metcalf's Continuing Disability

### And

### Champion's Certification of Ms. Metcalf's Total Disability From 1997 to 1999

546.    CORE's Confidential Service Report #1 dated November 20, 1997 documented that Ms. Metcalf had been out of work on disability since April 16, 1997, and "has been deemed disabled from performing her own occupation." (NB 47: CE-931).

547.    On November 15, 1997, Champion doctor Osbahr certified that Ms. Metcalf was totally disabled from her regular occupation as of April 13, 1997 for an indefinite period of time. (NB 16: CRC-2493).

548.    On November 19, 1997, Champion initially approved Ms. Metcalf for disability under the Plan definition of "total disability," certifying that Ms. Metcalf was totally disabled from

work in that she was unable "to perform the duties of her employment with the Employer as a result of an injury which occurs or an illness which first manifests itself while employed by the Employer . . ." (NB 16: CRC-2462, 2496; NB 66: Plan-60).

549. Ms. Metcalf began receiving LTD benefits through the Plan, commencing November 20, 1997, but effective October 13, 1997. (NB 16: CRC-2499, 2500; NB 47: CE-931, 932).

550. Ms. Metcalf was reviewed periodically and certified as disabled from performing her own occupation by the plant physician at first, and then by her treating physician under the Plan by Champion on a continuing basis from 1997 to 1998. (NB 16: CRC-2502, 2503, 2510, 2512, 2522 to 2524). Ms. Metcalf was certified for continuing total disability, (disabled from her performing her own occupation) on the following dates: December 29, 1997; May 7, 1998; and September 30, 1998. (NB 16: CRC-2502, 2503, 2510-5512, 2522-2524).

Specifically:

a. On December 29, 1997, Ms. Metcalf was certified by Champion and its administrator, CORE, as totally disabled from "performing her own occupation." (NB 16: CRC-2502, 2503; NB 47: CE-933, 934).

b. On May 7, 1998, Ms. Metcalf was certified by Champion and its administrator, CORE, as totally disabled from performing "all aspects of her job." (NB 16: CRC-2510-2512; NB 47: CE-935-937).

c. On September 30, 1998, Ms. Metcalf was certified by Champion and its administrator, CORE, as disabled from "her own job functions." (NB 16: CRC-2522-2524; NB 47: CE-938- 940).

-128-

551.    On September 2, 1998, Dr. Steven Mendelsohn determined and certified to Champion, and its administrator,  CORE, that Ms. Metcalf was totally and permanently disabled from work in any occupation because of her connective tissue disease, osteoarthritis, and fibromyalgia. (NB 16:CRC-2519-2520). All of Ms. Metcalf's treating physicians, including Dr. Steven Mendelsohn and  Dr. Buehler, determined consistently that she was permanently and totally disabled from work in any occupation.  (NB 16:  CRC-2519-2520, 2532-2522, 2540- 2541, 2464).

    a.    On September 2, 1998, Dr. Mendelson certified that Ms. Metcalf was totally and permanently disabled from work in any occupation because of her connective tissue disease and fibromyalgia.  (NB 16: CRC-2519, 2520).

    b.    On September 24, 1998, Dr. Beavers discussed case with Dr. Mendelsohn and certified Ms. Metcalf disabled from her own occupation as she suffers from non-specific systemic inflammatory condition and connective tissue disorder (NB 16: CRC-2521).

    c.    On September 27, 1999, Dr. Mendelsohn certified that Ms. Metcalf was totally and permanently disabled from work in both her regular occupation and for any occupation because of her generalized osteoarthritis and fibromyalgia. (NB 16: CRC-2532, 2533).

    d.    On October 19, 1999, Dr. Mendelsohn again certified that Ms. Metcalf was totally and permanently disabled from work in both her occupation and for any occupation because of her generalized osteoarthritis and fibromyalgia. (NB 16: CRC-2540, 2541).

e.     On April 14, 2000, Dr. Buehler determined that "because of her significant wrist and arm tendonitis, she [Ms. Metcalf] is currently unable to participate in any work or occupation and is at this point totally disabled."  (NB 16: CRC- 2579).

552.    On September 30, 1998, Champion continued Ms. Metcalf on LTD under the Plan definition of disability, which required that Ms. Metcalf be unable "to engage in any occupation or business for wage or profit for which she is or becomes reasonably qualified by training, education or experience."  This would continue through October of 1999 (30 months from the onset of disability).  (NB 16: CRC-2522-2524, 2563).

553.    Ms. Metcalf's medical condition has deteriorated since Champion's last certification that she was disabled from "performing her own occupation" or "any occupation or business" under the Plan.   (NB 16: CRC-2579).

**Social Security Administration's Determination of Ms. Metcalf's Disability**

554.    By March 30, 1999, the Social Security Administration had determined that Ms. Metcalf was totally disabled from engaging in any substantial or gainful employment activity and awarded benefits on that basis.  (NB 33: Metcalf 507 - 509; NB 16: CRC-2539, 2873).  The Social Security Administration has continued to find Ms. Metcalf totally disabled from employment since that date.

**CORE Review**

555.    On November 19, 1997, Ms. Metcalf was notified that CORE had been retained by Champion to conduct a review to determine her continuing disability status.  (NB 16: CRC-2497).

-130-

556.    Ms. Metcalf provided factual statements to CORE and Champion stating that she had limitations in bending, reaching, and  needed to rest during activities.  (NB 16: CRC-2481-2484, 2515-2518, 2528-2531, 2536-2539).  During its review of Ms. Metcalf's claim, CORE did not interview Ms. Metcalf to determine the disabling effects of Ms. Metcalf's chronic pain, the impact of her symptoms and limitations on her daily activities, and her credibility in reporting her subjective symptoms. (NB 15-NB 16; NB 47).

557.    On October 19, 1999, Dr. Mendelsohn determined that Ms. Metcalf was totally disabled per an attending physician's statement (Pl. App. 61; NB 16: CRC-2540-2541), but he was contacted by Dr. Jerry Beavers of CORE on the same day regarding Ms. Metcalf's disability, and appeared to entertain conflicting opinions about Ms. Metcalf's disability. (Pl. App. 60; NB 16: CRC 2614).  The change in his opinion appears to have resulted from Dr. Beaver's communicating an incorrect standard of total disability from any occupation (needing a nursing home or assistance dressing – Pl. App. 63, NB 16: CRC- 2575). (NB 16: CRC-2532, 2533).

558.    On October 30, 1999, Ms. Metcalf's case manager, Carole Bishop, who had been assigned the case on October 14, 1999, presented Ms. Metcalf's case to Dr. Jerry Beavers of CORE for review.  (NB 16: CRC 2543; NB 47: CE-974).

559.    On October 20, 1999, a CORE diary documents a conversation with Dr. Mendelsohn and Dr. Jerry Beavers about Ms. Metcalf.  Dr. Beavers notes, "the doctor says she is not totally disabled but continues to be able to do sedentary work...there is no significant new finding that would disabled [sic] her." His recommendation was "Do not certify disability from any occupation." His rationale was: "There is no objective medical substantiation of disability and no disabling provider." (NB 16: CRC-2543).

560.    CORE contracted Lisa M. Bossardt, M.S. CAS, CRC, LRC in Brunswick, Maine for a Vocational Analysis/TSA [transferable skills analysis] of Ms. Metcalf's job skills.  In the report of November 1, 1999 that was issued, Ms. Bossardt said that "based upon Ms. Celia Metcalf's education, training, work history, skills and aptitudes in relation to her Sedentary Duty Work Capacity rating, Ms. Celia Metcalf **may** be able to secure and successfully maintain suitable employment within a number of Sedentary Duty Occupations listed below," emphasis added. (Pl. App. 62; NB 16: CRC-2556).

      a.    There is no indication in the report as to whether Ms. Metcalf was reasonably fit to undertake the listed occupations.

      b.    There is no indication in the report to indicate whether any such jobs existed in significant numbers in the local economy; Ms. Bossardt made one call to the North Carolina Employment Security Commission, bu there is nothing in her report indicating what, if any, information she obtained from them.

      c.    There is no indication or documentation in the report to indicate any qualifications of the person who performed the transferable skills analysis other than the designations of "M.S. CAS, CRC, LRC, Vocational Rehabilitation Consultant."

      d.    Age was never a consideration for Ms. Bossardt, and none was given in this TSA regarding Ms. Metcalf. (NB 75: Tab 7, Taylor Dep., p. 62, L. 16 - p. 64, L. 6).

561.    There is a reference to a functional capacity evaluation of October 20, 1999 by Dr.

Steven Mendelsohn, which consisted of a one typed page provided by Dr. Jerry Beavers of CORE to Dr. Mendelson, with no place for the attending physician to note any other limitations/restrictions other that Ms. Metcalf's work level of "sedentary work only". Ms. Bossardt appears to have based the limitation of "sedentary work only" for her TSA on this one page "functional capacity evaluation". (NB 16: CRC 2552-558).

562.    On November 2, 1999 a CORE diary notes a call from Zelda Schutte reporting that Ms. Metcalf earned $16.20 per hour before disability and that her LTD check was for $445.08 per month.  (NB 47: CE-975).

563.    On November 15, 1999, CORE issued its Confidential Service Report #5, recommending that Ms. Metcalf's LTD benefits be terminated.  CORE's recommendation was based on a discussion by Dr. Jerry Beavers with Dr. Mendelsohn on whether Ms. Metcalf could work at a sedentary level.  Dr. Mendelsohn was quoted as saying "she could do sedentary work, but he doesn't think she will ever be able to return to full duty again."  CORE's denial was made on the grounds that, according to Dr. Beavers, there were no objective findings to support Ms. Metcalf's disability.  (NB 16: CRC-2560, 2561; NB 47: CE-941,942).

564.    Based solely on CORE's recommendation, and without further consideration or investigation of any relevant facts, Champion, through its LTD Coordinator, SCORE Disability Management Program, Jodie Conley, adopted CORE's finding that  Ms. Metcalf was not disabled and terminated her long term disability benefits, effective January 31, 2000.  (NB 16: CRC-2563, 2564).

565.    Neither SCORE nor Champion made any effort to provide vocational training or education to assist Ms. Metcalf in returning to work. These is a note that says she refused vocational

assessment to her case manager, Ms. Bishop, but there is nothing in the file to substantiate this claim. In Ms. Conley's letter of November 15, 1999, she also mentions the conversation with Ms. Metcalf and Ms. Bishop, the case manager, in which Ms. Bishop advised her that if she were "interested in pursuing vocational rehabilitation that she could provide you with the name of the state program." (NB 16: CRC-2560, 2561, 2563, 2564).

566.    In response to specific inquiries by CORE on May 30, 1997; August 7, 1997; August 28, 1997; September 29, 1997; and October 7, 1997, Champion refused to consider re-employment of Ms. Metcalf within the restrictions provided in the medical record. (NB 47: CE-954, 958, 959, 961, 964).

567.    There is no evidence in the record showing that Champion/CORE considered the following factors, in determining whether Ms. Metcalf, given her restrictions and limitations, could work in an "occupation or business for wage or profit for which she is or becomes reasonably qualified by training, education or experience:"

    a.    Her age;

    b.    Her educational level;

    c.    Her continued absence from work as a result of Champion's prior certifications of her total disability;

    d.    Champion's unwillingness to consider Ms. Metcalf for re-employment.

(Pl. App. 58; NB 47: CE-959; NB 47: CE-931,954, 958, 961, 964).

### Appeal/Review

568.    Ms. Metcalf requested review of CORE's initial decision on December 6, 1999. (NB 16: CRC-2568).

-134-

569.    Based solely on CORE's recommendation, and without further consideration or investigation of any relevant facts, Champion, through its LTD Disability Manager, Jodie Conley, again denied Ms. Metcalf's claim for continuing long term disability.   (NB 16: CRC-2569).

570.    On December 17, 1999, Ms. Metcalf requested review through the Champion Claims Review Committee (CRC).  (NB 16: CRC-2570, 2571).

571.    On May 4, 2000, Ms. Metcalf presented to Champion/CORE further documentation of her disability, which was not considered by CORE in its final decision to deny her benefits. (NB 16: CRC-2580; NB 47: CE-986).

572.    On June 6, 2000, the CORE diary notes "needs a MD review..."   This review was performed by Dr. Jerome Siegel, MPH Occupational and Internal Medicine. (NB 47: CE-977).

573.    Dr. Siegel performed his review on June 7, 2000, with a review of medical records and progress notes.  He lists Ms. Metcalf's history of "fibromyalgia and chronic pain syndrome" and problems with "thyroid disorder and osteoporosis."   He later notes the problems of "fibromyalgia with sleep problems, pain cycle, deconditioning and nonspecific connective tissue disease" with generalized pain complaints.  Dr. Siegel's recommendation based on a review of the medical records submitted was that the patient does not appear totally disabled at the time of the original denial on 11/13/99, with a rationale as follows: "There is no objective medical substantiation for total disability after 11 /13/99."  (NB 16: CRC-2874-2875, Pl. App. 66; NB 47: CE-977-978).

574.    Within Ms. Metcalf's file there are notes of four separate Claims Review Committee meetings.  Of these four meetings only one discussed Ms. Metcalf.  (NB 16: CRC-2442-2445, 2446-2450, 2451-2455, 2456-2469).

575.    Prior to the meeting of the CRC, Champion's legal staff prepared records for members of the committee.  The records consisted of an initial summary, and selected excerpts of Ms. Metcalf's claims record, as compiled by CORE.  The records, consisting of 477 pages, were not organized in any particular manner, but were numbered by handwritten numbers in the bottom right corner.  (NB 16: CRC- 2467- 2943).

576.    On June 9, 2000, based solely on the records provided by Champion's legal staff, and without further consideration or investigation of any facts concerning Ms. Metcalf's claims, the CRC affirmed CORE's prior denial of Ms. Metcalf's long term disability benefits.  (P. App. 67; NB 47: CE-928, 929, 930).

577.    In the Claims Review Committee meeting of June 15, 2000, Ms. Metcalf's appeal was considered.  The CRC issued its Confidential Service Report # 1 dated June 15, 2000 and ruled these was no objective medical substantiation for total disability after November 13, 1999, totally disregarding an April 14, 2000 letter sent to Champion and sent along to CORE from Dr. Erich G. Buehler that found Ms. Metcalf as totally disabled from any work.  (NB 16: CRC-2579, 2456- 2469; Pl. App. 67; NB 47: CE-926; Pl. App. 64; NB 16: CRC-2579).

578.    Following the review of her claim by the CRC, Ms. Metcalf submitted additional evidence through her counsel,  to Champion/International which was relevant to the determination of her disability, and clarified and resolved conflicts in the evidence previously considered by Champion and CORE.  Specifically, Ms. Metcalf provided:

    a.    Ms. Metcalf's affidavit: Ms. Metcalf provided specific facts concerning her background,  disability and treatment, some of which were not solicited by Champion/CORE in their review.  (NB33: Metcalf-493- 498).

-136-

b.  <u>Vocational assessment report</u>: Mr. Randy Adams, licensed vocational counselor, considered Ms. Metcalf's age, education, past employment, her medical condition and any restrictions, as well as the types of jobs available in the economy, and found that Ms. Metcalf was unemployable at the time of the termination of her LTD benefits in that there were no jobs for which Ms. Metcalf was "reasonably qualified by training, education or experience." (NB 33: Metcalf-499-505).

c.  <u>Social Security Administration Notice of Award</u>. (NB 33: Metcalf-507-509).

d.  <u>Updated medical records</u>: These documents included comprehensive medical records from all of Ms. Metcalf's providers, many of which had not been obtained by Champion/CORE in their review, and which showed that Ms. Metcalf's condition but had deteriorated since Champion had previously certified Ms. Metcalf's total disability. (NB: 33 Metcalf-510-526).

Champion refused to consider this additional evidence of Ms. Metcalf's total disability. (NB 15-16; NB 47).

### *Plaintiff Charles R. Reece*

### **Background**

579.  Mr. Reece's date of birth is January 28, 1946.  (NB19: CRC-2268).

580.  Mr. Reece has a 12th grade education. (NB 19: CRC-2373).

581.  Mr. Reece was employed by Champion for approximately 26½ years, from January 27, 1969 until he was disabled on June 27, 1995.  (NB 19: CRC-2268).

582.  During his employment with Champion, Mr. Reece held the following positions:

laborer and lubrication/oiler mechanic. Mr. Reece's last position was lubrication/oiler mechanic. (NB 19: CRC-2318). In this position, Mr. Reece was responsible for oiling, lubricating and maintaining the machines. This position required him to be on his feet for six and a half to seven hours per day. He was expected to lift, stoop and crawl during his shift. Some of the places that he worked were extremely hot and dusty. He remained in this position until he stopped working as a result of his disability. (NB 19: CRC-2304; 2305; 2318; 2413).

583.    Mr. Reece suffered from a number of pre-existing medical conditions, including: congestive heart failure, alcohol abuse, emphysema, paroxysmal nocturnal dyspnea, ulcerative colitis, pleural effusions, pancreatitis, rotator cuff tear and cirrhosis of the liver. (NB 19: CRC-2376; NB 49: CE-690, 693, 696, 699, 702, 705; NB 35: Reece-190-191).

584.    Mr. Reece was disabled from his employment with Champion on June 27, 1995, because he was unable to work as a result of congestive cardiomyopathy. The symptoms of cardiomyopathy include: exertional dyspnea, fatigue, shortness of breath, orthopnea and pedal edema. (NB 19: CRC-2268, 2308, 2325; NB 66: Plan-60; Pl. App. 2).

585.    Throughout Mr. Reece's disability, Mr. Reece was under the regular care of several treating physicians: Dr. Nachiket V. Patel, Dr. Teresa Bradley, and Dr. Robert Hanich, and numerous physicians at the VA hospital.     (NB 19: CRC-2290, 2297, 2308-2311; NB 49: CE-689, 693).

586.    Throughout his disability, Mr. Reece has had debilitating symptoms and restrictions in his functional activities including fatigue, shortness of breath and severe and chronic pain, which severely limits him in his activities. These symptoms will most likely result in Mr. Reece never

being able to return to work. (NB 19: CRC-2268, 2291, 2293, 2297-2298; 2308, 2325, 2330; NB 49: CE-709-711, 818).

587.    Throughout the period of his disability, Mr. Reece has taken the following medications on a regular basis in an effort to manage his pain and other symptoms: Catopril, Larix, Aldactone, Potassium, Coumadin, Dioxin and a Nitroglycerin patch. There is no indication in the IME as to the effects of these medications on Mr. Reece's ability to perform sedentary/light work. (NB 19: CRC-2376).

### Medical Opinions of Mr. Reece's Continuing Disability

588.    Dr. Patel determined and certified to Champion and its administrator, Travelers, on July 19, 1995 that Mr. Reece was totally and permanently disabled from work in any occupation because of his congestive cardiomyopathy (heart failure), blood clots in his heart, right torn rotator cuff, chronic pain and other symptoms and his resulting functional limitations and restriction. (NB 19: CRC-2268, 2291, 2293, 2297, 2298, 2330; NB 49: CE-709; 711).

>    a.    On February 5, 1997, Dr. Patel determined that Mr. Reece was totally and permanently disabled from work in any occupation because of his cardiac disease, chronic pain and other symptoms, and his resulting functional limitations and restrictions. (NB 19: CRC-2352).

>    b.    On December 9, 1997, Doug Burnett, P.A. determined that Mr. Reece was totally and permanently disabled from work in any occupation because of his disease, chronic pain and other symptoms, and his resulting functional limitations and restrictions. (NB 19: CRC-2384).

### Champion's Certification of Mr. Reece's Total Disability From 6/27/95 to 12/31/98

-139-

589.    On December 26, 1995, Champion initially approved Mr. Reece for disability under the Plan definition of "total disability," certifying that Mr. Reece was totally disabled from work in that he was unable "to perform the duties of his employment with the Employer as a result of an injury which occurs or an illness which first manifests itself while employed by the Employer . . .." (NB 19: CRC-2376, 2270; NB 49: CE-693).

590.    Mr. Reece was approved to begin receiving long term disability benefits on January 11, 1996.  Mr. Reece began receiving long term disability benefits through the Plan, commencing January 25, 1996 and ending December 31, 1998.  (NB 19: CRC-2268; NB 49: CE-709).

591.    On January 30, 1997, the following CORE Notepad entry appears: "The EE has a myriad of medical issues - cirrhosis of the liver, congestive cardiomyopathy, and an estimated ejection fraction of 15-20%.  Will never RTW."  (Pl. App. 68; NB 49: CE-710).

592.    On February 24, 1997, the following CORE Notepad entry appears: "The EE has been OOW for 1 yr.  Has an ejection fraction of 15-20% He will never be able to RTW.  He has to have frequent rest periods and he is exertionally exhausted and with chest pain..." (NB 49: CE-711).

593.    On February 24, 1997, [30 months from the onset of disability], Champion continued Mr. Reece on LTD under the Plan definition of "total disability" which required that Mr. Reece was unable "to engage in any occupation or business for wage or profit for which he is or becomes reasonably qualified by training, education or experience." (NB 49: CE-711; NB 66: Plan-60 for plan definition of disability from "any occupation").  Mr. Reece's medical condition has not improved since Champion's last certification that he was totally disabled from "any occupation or business" under the Plan.  (NB 49: CE-711).  In fact, his condition has worsened.  (NB 35: Reece-192).

-140-

594.    Mr. Reece was reviewed periodically and certified as totally disabled under the Plan by Champion on a continuing basis from December 26, 1995 to December 31, 1998.  (NB 19: NB 19: CRC-2270, 2376; NB 49: CE-693).  Specifically, Mr. Reece was certified for continuing total disability, determining that Mr. Reece was totally disabled from "any occupation or business," on the following dates:  January 30, 1997 (NB 49: CE 825, 818; NB 19: CRC- 2375; NB 49: CE 827, 818, 825, 818; NB 19: CRC-2376, 2270; NB  49: CE-693) and also on February 24, 1997 (NB 49: CE 827, 818).

### Social Security Administration's Determination of Mr. Reece's Disability

595.    On June 22, 1996, the Social Security Administration determined that Mr. Reece was totally disabled from engaging in any substantial or gainful employment activity, effective December 1995, and awarded benefits on that basis.  (NB 19: CRC-2346).  The Social Security Administration has continued to find Mr. Reece totally disabled from employment since that date.

### CORE Review

596.    On January 30, 1997, Mr. Reece was notified that CORE had been retained by Champion to review and undergo an investigation to determine his continuing disability status. (CRC-2349, 2378).

597.    Neither CORE nor Champion made any effort to provide vocational training or education to assist Mr. Reece in returning to work.  (NB 19: CRC-2436).

598.    Mr. Reece provided factual statements to CORE and Champion stating his limitations and daily activity and pain.  (NB 19: CRC-2293, 2317, 2371-2374, 2379-2382).  During its review of Mr. Reece's claim, CORE did not interview Mr. Reece to determine the disabling effects of Mr.

Reece's chronic pain, the impact of his symptoms and limitations on his daily activities, and his credibility in reporting his subjective symptoms.  (NB 35: Reece-192).

599.    On February 5, 1997, Dr.  Nachiket Patel, VA Cardiologist, filled out a Physician's Report of Physical Capacity and indicated that Mr. Reece was unable to work from any occupation as well as his own occupation.  (NB 19: CRC-2352).

600.    On February 24, 1997, Mr.  Reece filled out a  Personal Profile Evaluation and indicated that he wasn't sure that he could go back to his former work because medical problems kept him from working now.  With respect to his ability to obtain some other type of occupation, he indicated, "No - because of health reasons another company or facility will not hire me."  (NB 19: CRC-2373).

601.    On November 14, 1997, Mr.  Reece again filled out a Personal Profile Evaluation wherein he indicated that he did not expect to be able to return to his last occupation because he could not do the job, and he also indicated that he did not expect to be able to return to some other type of occupation on a full-time or part-time basis.  (NB 19: CRC-2379-2381).

602.    On December 9, 1997,  Doug Burnett, a VA Medical Center Physician's Assistant in Cardiology, indicated that Mr. Reece was totally disabled for any occupation and his regular occupation.  (Pl. App. 69; NB 19: CRC-2384).

603.    On December 11, 1997, Doug Burnett, P.A. filled out a Physicians Report of Physical Capacity and indicated that Mr. Reece could not work at all.  (NB 19: CRC-2386).

604.    On January 19, 1998, the following CORE notepad entry appears:  "AP indicates the

employee cannot lift >30 lbs. occasionally; may sit, stand or walk for 1 hour intermittently. Employee cannot lift heavy objects, cannot climb stairs, cannot bend, stoop or lift above head.  Class III Cardiac pre-condition is improving, still get dizzy at times when I get up fast.  Become SOB [short of breath], tires easily and cannot climb stairs."  (NB 49: CE-775; NB 19: CRC-2387).

605.    On January 23, 1998, an Internal Peer Review Referral Form was filled out by CORE wherein the question posed regarding Mr.  Reece was, "Is this employee disabled from performing any occupation?"  The form did not ask whether he was unable to engage in "any occupation for wage or profit for which he is or becomes qualified by training, education or experience,"  (NB 19: CRC-2389).

606.    On January 23, 1998, a Peer Review Analysis was completed by Chester Conrad, MD.  The reason for the referral was "Is this employee disabled from performing any occupation?"  Dr. Conrad noted, "The patient has evidently not had a recent exercise test, so that there is no objective measure of present exercise capability, but from the available clinical information it appears that the patient probably has a moderate impairment of exercise capability."  He concluded, "Thus, there is no clear evidence that the patient's functional impairment would preclude him from performing any occupation." Dr. Conrad did not address whether the plaintiff's functional impairment would preclude him from "engaging in any occupational business for wage or profit for which he is or becomes qualified by training, education or experience." (NB 19: CRC-2390, 2391).

607.    On February 6, 1998, Mary Kane, a nurse with CORE Case Management, sent a fax to Doug Burnett indicating, "per your conversation with our physician reviewer, Dr.  Conrad, it was indicated that Charles could do sedentary work."  (NB 19: CRC-2392).

-143-

608.    On March 31, 1998, D.  Burnett, P.A., filled out a CORE-prepared Modification Checklist.  He indicated that Mr.  Reece could do sedentary work only, and he said he may lift up to 25 lbs., may walk 2 blocks, may sit as needed, may stand as needed, may change positions as needed, and can only climb 2 flights of stairs maximum.  (NB 19: CRC-2393).

609.    On April 16, 1998, the CORE diary contains the following entry: "Discuss Modification Check List with Sharon.  Sharon recommends proceeding with denial, as the location cannot accommodate the restrictions."  (Pl. App. 70; NB 49: CE-761).

610.    On or about July 1, 1998, CORE prepared an IME Chart Preparation Form.  The only diagnosis listed was cardiomyopathy.  The client's specific questions were: "...Is this employee capable of performing any occupation 6 hours a day, 5 days per week? 2. If yes, please note any restrictions.  3. If the employee has no work capacity, what are the objective findings to support the disability?" The IME Chart Preparation Form did not ask whether Mr. Reece was unable "to engage in any occupational business for wage or profit for which he is or becomes qualified by training, education or experience."  (Pl. App. 71;  NB 19: CRC-2401).

611.    CORE contracted for an independent medical evaluation (IME) with Dr. Michael Keogh.  Dr. Keogh saw Mr. Reece on a single occasion on July 30, 1998.  Based on his examination and any review which he undertook, Dr. Keogh concluded that Mr. Reece was able to perform some type of work. (NB 19: CRC- 2270; Pl. App. 72, NB 19: 2403-2404).

  a.     There is no indication in the report as to the effects of Mr. Reece's chronic pain on his ability to perform sedentary/light work.

  b.     There is no indication in the report as to the effects of Mr. Reece's medications on his ability to perform sedentary/light work.

-144-

      c.      There is no indication in the report or record as to whether there are employers in the local economy who would provide work to Mr. Reece, given his limitations and restrictions.

      d.      There is no indication in Dr. Keogh's report as to whether Mr. Reece could obtain and sustain competitive work given vocational consideration(s).

(NB 18-NB 19; NB 49).

612.    On September 1, 1998, Mary Kane, a case manager with Champion, completed a Vocational Rehabilitation Referral on Mr. Reece. Since he scored a "13 or less", he was not referred to vocational rehabilitation. (Pl. App. 73; NB 19: CRC-2406-2407; NB 49: CE 783).

613.    CORE requested its own employee, Jennifer Mikeska, MRC, to do a Transferable Skills Analysis of Mr. Reece's job skills. In the report that was dated October 5, 1998, it was determined that Mr. Reece's skills, based on his employment at Champion, would transfer and render him fit for some form of an occupation. (NB 19: CRC- 2413).

      a.      There is no indication in the report as to whether Mr. Reece was reasonably fit to undertake the listed occupations.

      b.      There is no indication in the report to indicate whether any such jobs existed in significant numbers in the local economy.

      c.      There is no documentation in the report to indicate any qualifications of the person who performed the transferable skills analysis.

614.    Based solely on CORE's recommendation, and without further consideration or investigation of any relevant facts, Champion, through its LTD Administrator, Mary Lee Dixon,

adopted CORE's finding that Mr. Reece was not disabled and terminated his long term disability benefits, effective October 7, 1998. (NB 19: CRC-2422 – 2425; NB 61: Dixon Dep., p. 174, L. 18-L. 24, p. 175, L. 1-20).

615.     On October 9, 1998, CORE issued its Confidential Service Report # 5, that made a recommendation that Mr. Reece's long term disability benefits be terminated. CORE's recommendation was based on an IME on the grounds that there was no objective findings to support Mr. Reece's disability. (NB 19: CRC-2420-2422).

616.     On December 29, 1998, CORE's LTD case management issued Confidential Service Report #1, recommending that the original termination of benefits be upheld. This document made no mention of IME Dr. Keogh's recommendation that a stress test be done on Mr. Reece. (Pl. App. 74; NB 19: CRC-2430-2432).

617.     At her November 19, 2003 deposition in this case, Champion LTD Administrator, Mary Lee Dixon, when shown a copy of the CORE report dated December 29, 1998, recommending denial of Mr. Reece's benefits; she was asked if that was the document(s) on which she based her denial; she stated: "Yes, it is." (NB 61: Dixon Dep. p. 175, L. 14-20). When asked in general if she "just did what CORE said" with reference to denial of long term disability, Ms. Dixon testified, "I based my decision on their recommendation. Yes." (NB 61: Dixon Dep., p. 138, L 2-4). When then asked, "and you never went against them?" Ms. Dixon replied, "Basically, no, I did not." (NB 61: Dixon Dep., p. 138, L. 5-6).

**Appeal/Review**

-146-

618.    Mr. Reece, by and through counsel, Thomas Ramer, requested a review of the Champion Claims Review Committee (CRC) initial decision via a letter dated December 4, 1998. (NB 19: CRC-2270, 2427, 2433, 2436-2437).

619.    A CORE Peer Review Analysis was performed by Dr. Gerald Evans.  The data he reviewed was "CHAM referral form, submitted clinical highlights [of unknown description] in previous CORE Review." His recommendation was that the denial should be upheld.  He referred to "A January echo which showed 40% ejection fraction."  That report to which he referred was not attached to his analysis.  (NB 19: CRC-2429).

620.    Prior to the meeting of the CRC, Champion's legal staff prepared records for members of the committee.  The records consisted of an initial summary, and selected excerpts of Mr. Reece's claims record, as compiled by CORE.  The records, consisting of 169 pages, were not organized in any particular manner, but were numbered by handwritten numbers in the bottom right corner. (NB: 19: CRC- 2274-2441).

621.    On March 24, 1999, based solely on the records provided by Champion's legal staff, and without further consideration or investigation of any facts concerning Mr. Reece's claims, the CRC affirmed CORE's prior denial of Mr. Reece's long term disability benefits.  (NB 19: CRC-2270, 2434-2435; NB 61: Dixon Dep., pp. 174, L. 18-L. 24, pp. 175, L. 1-20).


622.    Following the review of his claim by the CRC, Mr. Reece submitted additional evidence to Champion/International which was relevant to the determination of his disability, and clarified and resolved conflicts in the evidence previously considered by Champion and CORE. Specifically, Mr. Reece provided:

a.   Mr. Reece's affidavit: Mr. Reece provided specific facts concerning his background, disability and treatment, some of which were not solicited by Champion/CORE in their review.  (NB 35: Reece-190-193).

b.   Notice of Social Security Administration Award (NB 35: Reece-202-204); and

c.   Updated medical records: These documents included comprehensive medical records from all of Mr. Reece's providers, many of which had not been obtained by Champion/CORE in their review, and which showed that Mr. Reece's condition had deteriorated since Champion had previously certified Mr. Reece's total disability.  (NB 35: Reece-205-274; NB 19: CE-2437).

d.   Vocational assessment report: Performed by Dr. Henry D. Wong on September 18, 2000 and more fully discussed below.  (NB 35: Reece-194-201).

623.   On September 18, 2000, a Vocational Assessment was performed by Dr. Henry D. Wong, RHD, CRC, a doctor of rehabilitation and a certified rehabilitation counselor.  He did a personal interview of Mr. Reece, and he also reviewed medical records, did testing on Mr. Reece, and as a result of his evaluation, he indicated that the job suggested in the TSA would not be appropriate for Mr. Reece because "they exceed his general educational development aptitudes in reasoning, math and language.  Physical demands of these jobs require constant reaching, handling and frequent fingering and feeling with the hands.  Additionally, environmental conditions involve extreme heat which exceeds his tolerance.  A specific preparation training time for two (2) years up to and including four (4) years would require substantial adjustment given his approaching advanced

age...Given his age and time since being unemployed, it is highly unlikely that he would benefit from training due to employer preferential attitudes of hiring younger workers and a substantial adjustment that would be needed.  In his summary, Dr.  Wong indicated "due to his age, training would not benefit due to employer preferential attitudes to hire younger workers, would require substantial amount of vocational adjustment, and therefore is not recommended.  Consequently, there are no jobs that could be identified or recommended for Mr.  Reece by this evaluator.  He was unemployable since June 27, 1995, and remains unemployable to the present date due to the above rationale.  This evaluator finds this condition chronic with episodes of shortness of breath and fatigue upon exertion."  (NB 35: Reece-200-201).

624.    Dr. Wong concluded that "the functional limitations to walk distances and climb stairs without resting due to dyspnea, difficulty climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, feeling and fatigue preclude him from employment." (NB 35: Reece-201).

625.    Champion refused to consider this additional evidence of Mr. Reece's total disability. (NB 18-NB 19; NB 49).


626.    A review of the Claims review file indicates that Mr.  Reece was never provided a final decision denying his appeal of the termination of his benefits. (NB 18-NB 19; NB 49).

### *Plaintiff Harry L. Smith*

### Background

627.    Mr. Smith's date of birth is February 26, 1946. (NB 20:  Smith-222).

628.    Mr. Smith has a high school education.  (NB 20:  Smith-222).

629.     Mr. Smith worked for Champion from January 10, 1969 until he was disabled on May 19, 1993.  (NB 20:  Smith-2).

630.     At the time of his disability, Mr. Smith was a supervisor in the Recover and Utility Department of Champion's plant, which required him to supervise employees in maintenance in the recovery of boilers.  Mr. Smith was required to stand, walk, climb, kneel and bend most of the workday.  (NB 20:  Smith-41, 50).

631.     Mr. Smith became totally disabled from his employment with Champion or any other work on May 19, 1993.  (NB 20:  Smith-2).

### Mr. Smith's Disability

632.     Mr. Smith suffered from a failed back syndrome, after four back surgeries resulting in constant, severe pain and limitations in his functional capacity; arthritis, fibromyalgia and degenerative disc disease.  (NB 20:  Smith-143, 167, 164, 16).

633.     Throughout Mr. Smith's disability, Mr. Smith has been under the regular care of his primary treating physicians: Dr. Keith Maxwell, Dr. John Culclasure, and Dr. Charles Shields.  Dr. Maxwell, who is an orthopaedist has treated Mr. Smith since 1993.  Dr.Culclasure, a pain specialist treated Mr. Smith from 1996 to 1998.  Dr. Shields, also a pain specialist, has treated Mr. Smith from 1997 to the present.  (NB 20:  Smith-93, 266, 265, 176).

634.     Throughout the period of his disability, Mr. Smith has undergone four back surgeries at the L3, L4, L5 levels of his spine, including laminectomy, fusion and insertion of instrumentation to stabilize his spine on December 23, 1993.  In addition, disc problems have been diagnosed at the L5/S1, and L2/3 levels of his spine.  (NB 20:  Smith-93, 16, 32, 265-268; Pl. App. 77).

635.    Mr. Smith's treating physicians have objectively documented his conditions in x-rays, MRIs, CT Scans and nerve condition studies.  (NB 20: Smith-160, 266, 268).

636.    Throughout the period of his disability, Mr. Smith has had debilitating symptoms and severe restrictions in all of his functional activities.  (NB 20: Smith-47, 50, 222; Pl. App. 78).

637.    Throughout the period of his disability, Mr. Smith has suffered from severe and chronic pain in his back and legs which limited him in his activities.  (NB 20: Smith-121, 164, 50, 222, 140, 180; NB 21: CRC-1826).

638.    Throughout the period of his disability, Mr. Smith has taken various medications on a regular basis to control his pain and other symptoms and to treat his conditions. (NB 20: Smith-223, 173).

### Medical Opinions of Mr. Smith's Continuing Disability

639.    Mr. Smith's treating physicians, Dr. Maxwell and Dr. Culclasure determined and certified to Champion and its administrators consistently from 1993 to 1998 that he was permanently and totally disabled from work in any occupation because of his back condition, his chronic pain and other symptoms, and his resulting functional limitations and restrictions.  (NB 20:  Smith-8, 10, 66, 265, 172, 159; Pl. App. 75-77, 79).

### Champion's Certification of Mr. Smith's Total Disability From 1993 to 1997

640.    On December 22, 1993, Champion (through its administrator, Travelers) initially approved Mr. Smith for disability under the Plan definition of "total disability," certifying that Mr. Smith was totally disabled from work in that he was unable "to perform the duties of his employment with the Employer as a result of an injury which occurs or an illness which first manifests itself while employed by the Employer . . .."   (NB 20: Smith-79; Pl. App. 2).

-151-

641.    Mr. Smith began receiving LTD benefits through the Plan, commencing November 16, 1993.  (NB 20: Smith-81).

642.    From 1995 to 1997, Champion continued Mr. Smith on LTD benefits under the Plan definition of "total disability" which required that Mr. Smith was unable "to engage in any occupation or business for wage or profit for which he is or becomes reasonably qualified by training, education or experience."  (NB 20: Smith-2; Pl. App. 2).

### Social Security Administration's Determination of Mr. Smith's Disability

643.    On April 18, 1994, the Social Security Administration determined that Mr. Smith was totally disabled from engaging in any substantial or gainful employment activity, effective May 19, 1993, and awarded benefits on that basis.  The Social Security Administration has continued to find Mr. Smith totally disabled from employment since that date.  (NB 20: Smith-101).

### CORE Review

644.    Mr. Smith's medical condition has deteriorated since Champion's certification that he was totally disabled from "any occupation or business" under the Plan.  (NB 20: Smith-172, 266).

645.    In 1997, CORE commenced its review to determine Mr. Smith's continuing disability status.  (NB 20: Smith-143).

646.    Mr. Smith provided factual statements to CORE and Champion describing his condition, and his limitations in daily activities and chronic pain.  (NB 20: Smith-151)  During its review of Mr. Smith's claim, CORE did not interview Mr. Smith to determine the disabling effects

-152-

of Mr. Smith's chronic pain, the impact of his symptoms and limitations on his daily activities, and his credibility in reporting his subjective symptoms.  (NB 20-NB 21; NB 50).

647.    CORE contracted for an independent medical evaluation (IME) with Dr. Peter Johnson.  Sharon Spain, a manager at Champion's Canton, North Carolina plant, suggested that Dr. Johnson to conduct the IME.  (NB 50: CE 554). Dr. Johnson saw Mr. Smith on a single occasion on August 14, 1997.  Based on his examination and review,  Dr. Johnson assessed that:

> Mr. Smith has a failed back syndrome.  He has had numerous surgical procedures, and he is left with regional low back pain with radicular pain symptoms.  In my opinion, Mr. Smith is at maximum medical improvement.  I feel that his condition is stable.  He is weak and deconditioned and requires medication to enable him to get through his daily activities.  The issue under consideration is whether he has any work capacity.  The physical examination shows that he would be unable to work at any job beyond the light physical demand level.  I am unable to answer the question as to whether he has work capacity at or below that physical demand level.
>
>  . . . .
>
> In summary, in my opinion, Mr. Smith is at maximum medical improvement, and additional information is needed to determine whether he has any work capacity at the <u>sedentary</u> <u>light</u> physical demand level.

(NB 20: Smith-185).

648.     CORE contracted for a functional capacities evaluation (FCE) with a physical therapist, Susan Kimel.  The FCE was conducted over the course of two days (9/25/97 and 9/26/97), although it only lasted four hours and 45 minutes.  The reason the test was divided into two days was because Mr. Smith was in so much pain following the first part of the test that he had to stop.  Mr. Smith did not sleep but two hours during the night between, and increased his pain medications in order to continue the evaluation the following day.  (NB 20: Smith 222).   In her report, Ms. Kimel concluded that Mr. Smith was able to work at the light physical demand level.  (NB 20: Smith-191).

    a.     There is no document in the claims record to indicate any qualifications of Kimel to form this conclusion.

    b.     There is no explanation in the report as to Kimel's basis for concluding that, based on the test results during the evaluation, particularly since Mr. Smith could not complete the 4:45 hour test in one day due to pain, Mr. Smith would be able to perform such activity on a sustained basis, 8 hours a day, 40 hours per week.

    c.     There is no indication in the report as to how the test may have affected Mr. Smith thereafter; and what impact the test may have had on Mr. Smith's symptoms, including pain.

    d.     There is no indication in the report as to the effects of Mr. Smith's medications on his ability to perform light work.

-154-

     e.     There is no indication in the report or record as to whether there were employers in the economy who would provide light work to Mr. Smith, given his limitations and restrictions.

(NB 20-NB 21; NB 50).

649.     Mr. Randy Adams performed a vocational evaluation of Mr. Smith which determined that Mr. Smith had no transferrable skills; that Mr. Smith's academic levels are lower than the levels of most supervisors in other settings; the FCE performed by Ms. Kimel did not fairly rate Mr. Smith's ability to work on a fulltime basis; that the conclusion of Ms. Kimel that Mr. Smith could work at a light physical demand level on a "qualified fulltime basis" is not valid given the limitations of time in her testing; that Mr. Smith's chronic pain syndrome would affect his ability to perform work on a regular basis; and that: "Mr. Smith is not employable in any job in the national economy. He is totally disabled from performing any substantial gainful activity. Based on his age, education level, residual functioning, and diagnosis of chronic pain syndrome, it is my opinion that he should be considered permanently and totally disabled." (NB 20: Smith-234; Pl. App. 78). Mr. Adams' curriculum vitae supports his qualification to assess Mr. Smith's vocational capacity. (NB 20: Smith 235).

650.     Following Kimel's FCE, Dr. Johnson, CORE's IME doctor, reviewed the FCE and wrote an addendum to his report on October 13, 1997, in which he stated that, based on Kimel's FCE: "It is my opinion that he can work fulltime in the Light Physical Demand Level, within the limits of the Functional Capacity Evaluation." (NB 20: Smith 210). Dr. Johnson's opinion in his addendum to the IME was totally dependent on the findings of Ms. Kimel and her FCE. In the

absence of the FCE, Dr. Johnson would have had no opinion concerning Mr. Smith's work capacity. (NB 20: Smith 210).   In addition:

  a.  It is not clear from the record as to what previous medical history Dr. Johnson reviewed prior to performing his examination of Mr. Smith and issuing his report.

  b.  There is no document in the record to indicate any qualifications of Dr. Johnson to form this conclusion.

  c.  There is no indication in the report as to the effects of Mr. Smith's chronic pain on his ability to perform sedentary or light work

  d.  There is no indication in the report as to the effects of Mr. Smith's medications on his ability to perform sedentary or light work.

  e.  There is no indication in the report or record as to whether there are employers in the economy who would provide sedentary or light work to Mr. Smith, given his limitations and restrictions.

  f.  There is no indication in Dr. Johnson's report as to whether Mr. Smith could perform such work on a sustained basis for 8 hours a day, 40 hours per week.

(NB 20-NB 21; NB 50).

651.   In Confidential Service Report #2, dated October 28, 1997, CORE identified the following as Mr. Smith's "potential clinical complications": "Recurrent disc herniation, Recurrent spinal instability, Worsening peripheral neuropathy, Worsening joint pain, Activity/work intolerance, Neural impingement with resultant paresis/parsthesia, Bowel/bladder dysfunction, Depression related to altered lifestyle."  (NB 20: Smith-214).

652.    Neither CORE or Champion or Dr. Johnson, who performed the IME for CORE, specifically considered the impact of the "potential clinical complications" identified specifically by CORE in Confidential Service Report #2, dated October 28, 1997, on Mr. Smith's ability to obtain and sustain competitive employment prior to reaching their conclusions leading to the termination of Mr. Smith's LTD benefits. (NB 20-NB 21; NB 50).

653.    On October 28, 1997 CORE issued its Confidential Service Report # 2, recommending that Mr. Smith's LTD benefits be terminated.  CORE's recommendation was based the IME of Dr. Johnson.  (NB 20: Smith-214).

654.    Based solely on CORE's determination, and without further consideration or investigation of any relevant facts, Champion, through its LTD Administrator, Mary Lee Dixon, adopted CORE's finding that  Mr. Smith was not disabled and terminated his long term disability benefits, effective November 30, 1997.  (NB 20: Smith-219).

655.    Neither CORE nor Champion made any effort to provide vocational training or education to assist Mr. Smith in returning to work. (NB 20-NB 21; NB 50).

656.    There is no evidence in the record that Champion ever offered re-employment to Mr. Smith  within the restrictions provided in the IME and FCE, or medical record. (NB 20-NB 21; NB 50).

657.    CORE and Champion considered Mr. Smith's age irrelevant in the determination of whether he was disabled from work under the Plan definition.  (NB 20: Smith-248).

658.    On October 29, 1997, CORE informed Mr. Smith that his claim was denied based on the IME of Dr. Johnson.  (NB 20: Smith-216).

659.    There is no evidence in the record showing that Champion/CORE considered the following factors, in determining whether Mr. Smith, given his restrictions and limitations, could work in an "occupation or business for wage or profit for which he is or becomes reasonably qualified by training, education or experience:"

    a.    His age;

    b.    His educational level;

    c.    His continued absence from work as a result of Champion's prior certifications of his total disability;

    d.    Champion's unwillingness to consider Mr. Smith for re-employment.

(NB 20-NB 21; NB 50).

## Appeal/Review

660.    Mr. Smith, through counsel, requested review of CORE's initial decision on December 5, 1997 (NB 20: Smith-220); and provided additional information in support of his claim on January 2, 1998.  (NB 20: Smith-238).

661.    On February 10, 1998, CORE issued its Confidential Service Report #2, recommending that Mr. Smith's LTD benefits be terminated.  In its recommendation CORE argued against Mr. Smith's evidence of disability, and concluded that there was no objective evidence to support Mr. Smith's claim that his back injuries and his chronic pain were disabling.   (NB 20: Smith-250).

662.    On July 6, 1998, based solely on CORE's recommendation, and without further consideration or investigation of any relevant facts, Champion, through its LTD Administrator, Mary Lee Dixon, again denied Mr. Smith's claim for continuing long term disability. (NB 20: Smith-253).

663.    On September 2, 1998, Mr. Smith requested review through the Champion Claims Review Committee (CRC).  (NB 20: Smith-257).

664.    Prior to the meeting of the CRC, Champion's legal staff prepared records for members of the committee.  The records consisted of an initial summary, and selected excerpts of Mr. Smith's claims record, as compiled by CORE.  The records, consisting of 258 pages were not organized in any particular manner, but were numbered by handwritten numbers in the bottom right corner. (NB21: CRC-1651).

665.    Following his appeal, Mr. Smith, through counsel, provided additional information and evidence in support of his claim, including a CT myelogram demonstrating new evidence of the deterioration of Mr. Smith's spine in its finding of "moderate relative sterosis at L2/3 secondary to disk protrusion and probably ligament hypertrophy . . . and arachnoiditis;" an abnormal nerve conduction study showing "evidence for chronic right L5-S1 radiculopathies;" and the opinion of Dr. Culclasure, Mr. Smith's pain specialist, that, based on the above nerve conduction study and the vocational evaluation of Mr. Randy Adams, "Mr. Smith is totally disabled and unable to engage in any occupation or business for wage or profit for which he is qualified by training, education or experience."  (NB 20: Smith-264-269).

666.    The x-rays, CT myelogram and nerve conduction studies, as described above, as well as facts concerning Mr. Smith's multiple back surgeries, constitute objective evidence substantiating his reports of chronic, debilitating pain in his back and legs.  (NB 20: Smith-265-269).

667.    CORE's Cost Services prepared a transferable skills analysis (TSA) of Mr. Smith's job skills.  In its report CORE determined that Mr. Smith's had transferrable skills of "compiling, speaking-signaling, and operation-controlling, and listed a number of light duty 'job titles'" from the

Dictionary of Occupational Titles (DOT) which it considered "appropriate for employment." (NB 20: Smith-271).

       a.      There is no indication in the report as to whether Mr. Smith was reasonably fit, given his condition and restrictions, to undertake the listed jobs.

       b.      There is no indication in the report to indicate whether any such jobs existed in significant numbers in the local or national economy.

       c.      There is no indication in the report or record as to whether there are employers in the economy who would provide sedentary or light work to Mr. Smith, given his limitations and restrictions.

       d.      There is no documentation in the record to indicate any qualifications of the person who performed the TSA.

(NB 20-NB 21; NB 50).

668.    On December 11, 1998, based solely on the records provided by Champion's legal staff, and without further consideration or investigation of any facts concerning Mr. Smith's claims, the CRC upheld CORE's prior denial of Mr. Smith's LTD benefits.  (NB 20: Smith-288).

669.    Following the review of his claim by the CRC, Mr. Smith submitted additional evidence to Champion/International which was relevant to the determination of his disability, and clarified and resolved conflicts in the evidence previously considered by Champion and CORE. Specifically, Mr. Smith provided:

       a.      <u>Mr. Smith's affidavit</u>: Mr. Smith provided specific facts concerning his background,  disability and treatment, some of which were not solicited by Champion/CORE in their review.  (NB 36: Smith-295).

-160-

      b.    <u>Supplemental vocational assessment report</u>: Randy Adams supplemented his earlier report, with some discussion of new information concerning Mr. Smith's condition.  (NB 36: Smith-300).

      c.    <u>Updated medical records</u>: These documents included comprehensive medical records from all of Mr. Smith's providers, many of which had not been obtained by Champion/CORE in their review, and which showed that Mr. Smith's condition had deteriorated since Champion had previously certified Mr. Smith's total disability.  (NB 36: Smith-320).

Champion refused to consider this additional evidence of Mr. Smith's total disability.

### *Plaintiff Dolphus Luther Treadway, Jr.*

### Background

670.    Mr. Treadway's date of birth is January 26, 1944.  (NB 51: CE-376).

671.    Mr. Treadway has an 8th grade education.  (NB 37: Treadway-70).

672.    Mr. Treadway was employed by Champion from May 17, 1972 until he was disabled on December 20, 1995.  He worked for more than twenty-three (23) years before becoming disabled. (NB 51: CE-489, 392).

673.    At the time of his disability, Mr. Treadway was a "First Operator," which required him to operate heavy equipment and load and unload wood chips as a chip handler. (NB 51: CE-486).

674.    Mr. Treadway had suffered from a pre-existing heart condition, having had myocardial infarction (heart attack) and bypass surgery in April of 1994, and lower back surgery. (NB 22: Treadway-10, 11; NB 51: CE-489).

675.     Mr. Treadway was hospitalized on December 20, 1995 for chest pain and unstable angina.  (NB 51: CE-381, 489).

676.     Mr. Treadway became totally disabled from his employment with Champion on December 20, 1995.  (NB 51: CE-379,381).

### Mr. Treadway's Disability

677.     Mr. Treadway has been diagnosed with coronary artery disease (CAD), coronary artery bypass graft, exertional angina, cardiac ischemia, myocardial infarction, hypertension, cephalalgia and edema.  (NB22: Treadway-10, 11; NB 51: CE-379, 381, 452, 486, 489).

678.     Mr. Treadway has a family history of heart disease: his father had cancer but died at age 51 of myocardial infarction, one brother had a heart attack in his early 50's, and one sister also had heart disease.  (NB 22: Treadway-11).

679.     Throughout Mr. Treadway's disability, Mr. Treadway has been under the regular care of his primary treating physicians: Dr. Craig Linger and Dr. Keogh.  Dr. Craig Linger has treated Mr. Treadway from approximately 1995, but there are no actual medical records in the claims file of Dr. Linger to verify when he began seeing Mr. Treadway.  (NB 51: CE-489).

680.     Throughout the period of his disability, Mr. Treadway has undergone the following procedures as a result of his condition: six vessel bypass surgery (6 vessel CABG for severe 3 vessel disease) on April 22, 1994, and various stress tests.  (NB 22: Treadway -10, 11, 16; NB 51: CE-486, 489).

681.     Mr. Treadway's treating physicians have objectively documented his conditions, but there are no medical records or attending physician statements of Dr. Linger or Dr. Keogh in the

-162-

claims file, only the IME report of Dr. Aldrich and subsequent testing he ordered.  (NB 22: Treadway-2-244; NB 51: CE-394).

682.    Throughout the period of his disability, Mr. Treadway has had debilitating symptoms including fatigue, angina, edema, dyspnea upon exertion,  and restrictions in his functional activities such as lifting, walking, etc.  (NB 51: CE-468, 486; NB 22: Treadway-16, 10, 12, 22-23).  No medical records of Dr. Linger or Dr. Keogh were in the file from which to cite.  (NB 22: Treadway-2-244).

683.    Throughout the period of his disability, Mr. Treadway has suffered from a severe heart condition (Class 4 per American Heart Association) (Pl. App. 80; NB 51: CE-468) which severely limited him in his activities, as noted in CORE representative D. Warren's Notes # 2, 3 and 4.  (NB 51: CE-486).

684.    Throughout the period of his disability, Mr. Treadway has taken the following medications on a regular basis to attempt to control his pain and other symptoms: Pepcid, Atenolol, Klonopin, Minocylicine, Fluribipropen, and aspirin. Also upon occasion, he took NTG: (nitroglycerin) for cephalalgia. (NB 22: Treadway-11; NB 51: CE-377).

### Medical Opinions of Mr. Treadway's Continuing Disability

685.    As of January 20, 1996, Dr. Linger informed Champion that Mr. Treadway was totally and permanently disabled from work in any occupation because of his heart condition. (NB 51: CE-486).  Specifically, CORE employee D. Warren noted that Mr. Treadway had exertional angina, was "fearful of any and all activity and is not able to perform the essential functions of his own job o[r] any other.  He will never RTW/ he has had 6 bypass surgeries and he leads a sedentary lifestyle.  No improvement expected, restrictions will never be reduced and stree [sic- should be

stress] increases his pain.  Class 4 limitation.  Recc (recommend) approval at the medd review thru

the annual review date of 6/97."  (Pl. App. 82; NB 51: CE-486).

### Champion's Certification of Mr. Treadway's Total Disability From 1996 to 1998

686.     On May 17, 1996, Champion initially approved Mr. Treadway for long term disability

under the Plan definition of "total disability," certifying that Mr. Treadway was totally disabled from

work in that he was unable "to perform the duties of his employment with the Employer as a result

of an injury which occurs or an illness which first manifests itself while employed by the Employer

. . ."  (NB 51:CE-379-380; Pl. App.2).

687.     Mr. Treadway began receiving LTD benefits through the Plan, commencing June 19,

1996.  (NB 22: Treadway-9; NB 51: CE-379-380).

688.     On November 20, 1996, CORE's long term disability case management

recommended a continuation of his long term disability benefits, "based on the severity and acuity

of symptoms."  (NB 51: CE-00382) On August 18, 1997, CORE's Dr. Beavers noted "it appears that

the EE is disabled from any occupation . . ."  (Pl. App. 81; NB 51: CE-464).

689.     On September 15, 1997, CORE's long term disability case management once again

recommended continuation of Mr. Treadway's long term disability benefits, "based on the

employee's inability to work as a First Operator as he is unable to perform physically demanding job

duties."  (NB 51: CE-384).

690.     On May 28, 1998, CORE's long term disability case management recommended

continuation of Mr. Treadway's long term disability benefits, "through the pending IME date,"

(NB 51: CE-386).

691.    On July 31, 1998 (30 months from the onset of disability), CORE long term disability case management recommended a continuation of Mr. Treadway's long term disability benefits through the pending IME final disability determination, under the Plan definition of "total disability" which required that Mr. Treadway was unable "to engage in any occupation or business for wage or profit for which he is or becomes qualified by training, education or experience." (NB 51: CE-388-390).

692.    Thus, Mr. Treadway was reviewed periodically and certified as totally disabled under the Plan by Champion on a continuing basis from 1996 to 1998. (NB 51: CE-379-380, 381-382, 383- 384, 385-387).

**Social Security Administration's Determination of Mr. Treadway's Disability**

693.    In June 1996, the Social Security Administration determined that Mr. Treadway was totally disabled from engaging in any substantial or gainful employment activity, effective December 19, 1995, and awarded benefits on that basis. (NB 37: Treadway-81).   The Social Security Administration has continued to find Mr. Treadway totally disabled from employment since that date.

**CORE Review**

694.    According to CORE medical director, Dr. J. D. Beavers' notes from a conversation with Dr. Linger on May 27, 1998, Mr. Treadway's condition was "stable," following Champion's last certification on September 15, 1997 that he was totally disabled from "any occupation or business" under the Plan.   There are no medical records of Dr. Linger or Dr. Keogh, Mr Treadway's treating physicians, in the file, from which to cite as to whether Dr. Linger or Dr. Keogh noted lack of improvement, stabilization of symptoms, or any change in his condition. (NB 51: CE-376-493).

695.     CORE contracted for an independent medical evaluation (IME) with Dr. Juan Aldrich at Hendersonville Cardiology.  Dr. Aldrich saw Mr. Treadway on a single occasion on June 29, 1998.  Based on his examination, subsequent thallium test and echocardiogram, and any review which he undertook, Dr. Aldrich concluded that Mr. Treadway was able to perform sedentary work.  (Pl. App. 84; NB 22: Treadway-10-12).

696.     It is not clear from the record as to what previous medical history Dr. Aldrich reviewed prior to performing his examination of Mr. Treadway and issuing his report. (NB 22; NB 51).

697.     There is no document in the record to indicate any qualifications of Dr. Aldrich to form this conclusion.  (NB 22; NB 51).

698.     There is no explanation in the record as to Dr. Aldrich's basis for concluding that, based on the test results during the evaluation, Mr. Treadway would be able to perform sedentary work on a sustained basis, 8 hours a day, 40 hours per week. (NB 22; NB 51).

699.     On July 23, 1998, Mr. Treadway underwent a stress test at Haywood County Hospital, during which he developed dyspnea (shortness of breath) and angina (chest burning) with radiation to his left arm starting at HR 110 (heart rate), and which progressed with exercise.  (Pl. App. 83 NB 22: Treadway-16)  The person administering the test noted on the stress test report that the test was stopped after a duration of seven (7) minutes for two reasons: "adequate test" and "angina."  The symptoms of angina and dyspnea were noted and the final impression noted in the stress test report was "symptomatically positive, ECG negative."  (Pl. App. 83; NB 22: Treadway-16).

700.     In a letter dated August 21, 1998, after the thallium test, the echocardiogram and the stress test had been performed, Dr. Aldrich suggested that a higher dosage of beta blockers might

help, proposed some revamping of medical therapy, and again recommended, for the second time, psychological counseling. Specifically, Dr. Aldrich stated, "I believe fear has become a major problem for this patient." (Pl. App. 85; NB 22: Treadway-22-23).

701.    There is no explanation in either of Dr. Aldrich's reports/letters as to why Dr. Aldrich believed Mr. Treadway capable of working 8 hours per day, 5 days per week when the July 23, 1998, stress test revealed that he could not walk for seven (7) minutes without suffering chest pain radiating into his left arm to such a degree that the administrator suspended the test. (Pl. App. 83; NB 22: Treadway-16).

702.    An August 21, 1998 modification checklist written by Dr. Aldrich stated that Mr. Treadway had restrictions of lifting to 25 pounds, walking 1000 feet, no limit to sitting, may stand for 6 hours, no limit to changing positions, and no climbing over 2 flights of stairs. (NB 22: Treadway-10-12;  NB 51: CE-405, 412).

703.    Dr. Aldrich does not explain why he indicated in the modification checklist that Mr. Treadway was capable of walking 1000 feet when he had noted in his IME report of June 29, 1998, that walking to Mr. Treadway's mailbox, which is 50 yards away (150 feet), brings on a "syndrome of a tight burning feeling in the retro sternal region and inner scapular region associated with dyspnea and fatigue." (Pl. App. 84; NB 22: Treadway-10).

704.    There is no indication in the IME report as to the effects of Mr. Treadway's medications on his ability to perform sedentary work, other than the possibility of increasing doses of beta blockers.  (NB 22: Treadway-22).

705.    There is no indication in the IME report or record as to whether there are employers in the economy who would provide sedentary work to Mr. Treadway, given his limitations and restrictions.  (NB 22; NB 51).

706.    On September 1, 1998, CORE had its own employee, Jennifer Mikeska, MRC, prepare a Transferable Skills Analysis (TSA) of Mr. Treadway's job skills.  In her report she concluded that  Mr. Treadway's skills, based on his employment at Champion, would transfer and render him fit for five (5) occupations.  (NB 22: Treadway-0025-0027; NB 51: CE-405, 412).

> a.    There is no indication in the report as to whether Mr. Treadway was reasonably fit to undertake the listed occupations.  This report only notes jobs compared to his former occupation, which was at moderate work level and not at light work level.
>
> b.    There is no indication in the report to indicate whether any such jobs existed in significant numbers in the local economy.
>
> c.    There is no indication or documentation in the report to indicate any qualifications of the person who performed the transferable skills analysis.

707.    On September 9, 1998, CORE issued its Confidential Service Report #6, recommending that Mr. Treadway's LTD benefits be terminated.  CORE's recommendation was based on an "able TSA" and an "able IME." (NB 51: CE-376-378, 410).

708.    Based solely on CORE's recommendation, and without further consideration or investigation of any relevant facts, Champion, through its LTD Administrator, Mary Lee Dixon, adopted CORE's finding that Mr. Treadway was not disabled and terminated his long term disability benefits, effective December 31, 1998.  (NB 22: Treadway-39, 35-36).

709.    Neither CORE nor Champion made any effort to provide vocational training or education to assist Mr. Treadway in returning to work.  (NB 51: CE-405).

710.    There is no evidence in the record showing that Champion/CORE considered the following factors, in determining whether Mr. Treadway, given his restrictions and limitations, could work in an "occupation or business for wage or profit for which he is or becomes reasonably qualified by training, education or experience:"

    a.    His age;

    b.    His educational level;

    c.    His continued absence from work as a result of Champion's prior certifications of his total disability;

    d.    Champion's unwillingness to consider Mr. Treadway for re-employment.

 (NB 22: Treadway-30; NB 51: CE-376-378).

711.    The CORE Denial Committee appeared to base their decision to terminate Mr. Treadway's benefits on the "able" IME and "able" TSA.  (NB 51: CE-410).

### Appeal/Review

712.    Mr. Treadway requested review of CORE's initial decision on September 30, 1998. (NB 22: Treadway-37-38).

713.    Based solely on CORE's recommendation, and without further consideration or investigation of any relevant facts, Champion, through its LTD Administrator, Mary Lee Dixon, again denied Mr. Treadway's claim for continuing long term disability.  (NB 22: Treadway-28-34, 40).

714.    On November 19, 2003, at her deposition in this case, Champion LTD Administrator,

-169-

Mary Lee Dixon, was shown four documents concerning Mr. Treadway's denial of long term

disability benefits:

> – Exh. 34, the standard CORE denial letter;
>
> – Exh. 35, a CORE service report;
>
> – Exh. 36, Champion's standard notice letter that Mr. Treadway's benefits had been
>
> terminated; and
>
> – Exh. 37, Champion's denial letter of February 8, 1999, addressed to Mr.
>
> Treadway's attorney (NB 22: Treadway-46).

(NB 61: Dixon Dep., p. 178, L. 20-p. 180, L. 10).

715.    When asked if she had any recollection of ever receiving various reports mentioned

in Exh. 37, including the transferrable skills analysis, or the IME results and modification checklist

from Dr. Juan Aldrich, she stated "I do not recall."  (NB 61: Dixon Dep., p. 181, L. 13-17).

716.    When asked "in any event, regardless of what those documents said or any other

documents you might have reviewed, you would have followed CORE's recommendation that is in

Exh. 34; is that correct?"  Ms. Dixon testified. "Yes–it's 35 actually."  (NB 61: Dixon Dep., p. 181,

L. 13-23).

717.    On December 22, 1998, and again on February 4, 1999, Mr. Treadway, through his

attorney Thomas Ramer, requested further information in the appeal process of CORE's decision

to terminate his benefits.  (NB 22: Treadway-42, 43).

718.    On February 4, 1999, Mr. Treadway, again through his attorney Thomas Ramer,

requested further information and response from Dr. Beaver's and Mary Lee Dixon regarding the

decision to terminate  Mr. Treadway's benefits.  (NB 22: Treadway-43).

719.    On February 8, 1999, Mary Lee Dixon acknowledged Mr. Treadway's appeal and enclosed information that Mr. Ramer, Mr. Treadway's attorney, had requested an extension of time in which to appeal Mr. Treadway's appeal.   (NB 22: Treadway-46).

720.    On March 12, 1999, Mr Ramer, Mr. Treadway's attorney, wrote a letter to Mary Lee Dixon acknowledging receipt of the requested documents, but raised the issue of the psychological counseling that Dr. Aldrich had noted in his IME.  Mr. Ramer requested an opportunity to obtain a psychological evaluation as well as advice regarding jobs that would be offered to Mr. Treadway based on the determination of him being capable of returning to work.  (NB 22: Treadway-51).

721.    There is no further documentation in Mr. Treadway's file of either a final notice of termination or a response to Mr. Ramer's requests in his letter of March 12, 1999. (NB 22; NB 51).

722.    There is no acknowledgment in Mr. Treadway's record that Mr. Treadway's appeal was ever considered by the Champion Claims Review Committee; it appears that his termination was handled directly and solely by the CORE Denial Committee (on September 9, 1998) and that no other meeting was held to discuss Mr. Treadway's appeal.  (NB 51: CE-410).

723.    Following the review of his claim, Mr. Treadway submitted additional evidence to Champion/International which was relevant to the determination of his disability, and clarified and resolved conflicts in the evidence previously considered by Champion and CORE.  Specifically, Mr. Treadway provided:

> a.    <u>Mr. Treadway's affidavit</u>: Mr. Treadway provided specific facts concerning his background,  disability and treatment, some of which were not solicited by Champion/CORE in their review.  (NB 37: Treadway-70-73).

b.   Vocational assessment report of September 5, 2000: Dr. Henry Wong, licensed vocational counselor, considered Mr. Treadway's age, education, past employment, his medical condition and any restrictions, as well as the types of jobs available in the economy, and found that Mr. Treadway was unemployable at the time of the termination of his LTD benefits in that there were no jobs for which Mr. Treadway was "reasonably qualified by training, education or experience."  (NB 37: Treadway-74-80).

c.   Social Security Administration: Notice of Award determining total disability effective December 19, 1995; (NB 37: Treadway-81); and

d.   Updated medical records: These documents included comprehensive medical records from all of Mr. Treadway's providers, many of which had not been obtained by Champion/CORE in their review, and which showed that Mr. Treadway's condition had deteriorated since Champion had previously certified Mr. Treadway's total disability.  (NB 37: Treadway-82-243).

Champion refused to consider this additional evidence of Mr. Treadway's total disability. (NB 22; NB 51).

724.    There were 241 pages in the Champion documents file numbered Treadway-2 through Treadway-244. (NB22-37).  Of these 241 pages of documents, there are only 18 pages of medical records, including the TSA, which was included twice in those documents.  There were no office notes of any of Mr. Treadway's treating physicians nor any attending physician statements regarding his disability or restrictions.  This constitutes a mere 7% of the Champion Claim Review documents. (NB 22).

-172-

### *Plaintiff Martha Burnette Whitley*

### Background

725.     Ms. Whitley's date of birth is January 8, 1957. (NB 24: CRC-2121).

726.     Ms. Whitley has a high school education.  (NB 24: CRC-2159).

727.     Ms. Whitley worked for Champion April 8, 1980, until she was disabled on March 29, 1988.  (NB 24: CRC-2119).

728.     At the time of her disability, Ms. Whitley held the position of stencil finisher in which she prepared shipments. This position required constant lifting, standing, kneeling and stooping. (NB 24: CRC-2148).

729.     Ms. Whitley became totally disabled from her employment with Champion or any other work on March 29, 1988.  (NB 24: CRC-2119).

### Ms. Whitley's Disability

730.     Ms. Whitley has suffered from fibromyalgia with chronic pain syndrome, rheumalis, degenerative disk disease, and herpes zoster.  (NB 24: CRC-163, 2189, 2222).

731.     Throughout Ms. Whitley's disability, Ms. Whitley has been under the regular care of her primary treating physicians: Dr. Kate Queen and Dr. Rebecca Daniell.  Dr. Queen, who is board certified in the specialty of rheumatology, has treated Ms. Whitley since 1988.   Dr. Daneill, Ms. Whitley's family physician, has treated Ms. Whitley since 1989.  (NB 24: CRC-2157).

732.     Ms. Whitley's treating physicians have objectively documented her conditions through x-rays, laboratory testing, and physical examination.  (NB 24: CRC-2199).

733.     Throughout the period of her disability, Ms. Whitley has had debilitating symptoms and limitations of all of her activities, including her personal care.  Dr. Queen, Ms. Whitley's treating

rheumatologist has stated that Ms. Whitley "struggles simply to perform her own personal activities of daily living and to meet the responsibilities she has as a mother to care for the needs of her daughter."  (NB 24: CRC-2199).

734.    Throughout the period of her disability, Ms. Whitley has suffered from severe and chronic pain which she has consistently described as "flue-like" aches all over—" my body aches like the flue; my bones [feel] like my bones are coming out [of] my skin."  Ms. Whitley's physicians have noted her tenderness and sensitivity to the debilitating pain during examinations: "she is tender absolutely everywhere she is touched. . . she cried throughout most of the [the examination] due to pain."  (NB 24: CRC-2137, 2149).

735.    Throughout the period of her disability, Ms. Whitley has taken multiple medications on a regular basis to control her pain and other symptoms.  (NB 24: CRC-2136).

### Medical Opinions of Ms. Whitley's Continuing Disability

736.    Ms. Whitley's treating physician, Dr. Kate Queen, has consistently determined and certified to Champion and its administrators, from 1989 to 1998 that she was permanently and totally disabled from work in any occupation because of her disease and her chronic pain and other symptoms, and her resulting functional limitations and restrictions.  (NB 24: CRC-286, 283, 280, 282, 277, 279, 2129, 125, 163, 2153, 2157, 2177, 2199, 2203, 2219; Pl. App. 85, 86).

### Champion's Certification of Ms. Whitley's Total Disability From 1988 to 1998

737.    Effective September 28, 1988, Champion initially approved Ms. Whitley for disability under the Plan definition of "total disability," certifying that Ms. Whitley was totally disabled from work in that she was unable "to perform the duties of her employment with the Employer as a result

of an injury which occurs or an illness which first manifests itself while employed by the Employer
. . ..."  (NB 24: CRC-2119; Pl. App. 2).

738.    Ms. Whitley began receiving LTD benefits through the Plan, commencing September
28, 1988.  (NB 24: CRC-2119).

739.    From 1990 to 1998, Champion periodically reviewed Ms. Whitley's condition, and
continued Ms. Whitley on LTD benefits under the Plan definition of "total disability" which required
that Ms. Whitley was unable "to engage in any occupation or business for wage or profit for which
she is or becomes reasonably qualified by training, education or experience."  (NB 24: CRC-2131,
2192, 2155; Pl. App. 2).

740.    On October 20, 1994, the Travelers case manager for Ms. Whitley's claim reviewed
the file and noted the following symptoms and facts:

> —    "[she has] soft tissue tenderness involving multiple joints,
>         particularly severe in the posterior cervical and shoulder
>         girdle musculature as well as paravertical musculature.  Also,
>         she has had problems with fatigue, insomnia and intermittent
>         awakening related to pain and depression."
>
> —    "In the past, she participated in a pain management program
>         and went through functional capacities evaluation which
>         according to Dr. Queen's notes indicated Mrs. Whitley did
>         not have the capacity to return to her usual job at Champion."
>
> —    "This reviewer feels that Mrs. Whitley's file is very well
>         documented from the medical standpoint.  This reviewer feels

that the evidence supports total disability from any occupation. Unless convincing evidence that would [indicate] against a finding of disability is obtain, (e.g., proof that Mrs. Whitley is working on a sustained basis), termination of benefits would not be appropriate on this claim."

— "Fibromyalgia is a disease syndrome. This means that it is a scientifically derived unique set of symptoms and physical signs, but there is as yet no identified anatomical pathology and no specific biochemical markers. This is not unusual in the history of medical science. Parkinson's Disease, Systemic Lupus, Tuberculosis, to name a few, went through this stage.

— The treatment for fibromyalgia is limited to control. The condition is incurable....

(NB 24: CRC-2131; Pl. App. 87).

741.    In its next annual review in 1995, Travelers contracted for an independent medical examination by Dr. Ruffin Stephenson, a rheumatologist in Greenville, South Carolina. After examining Ms. Whitley on August 14, 1995, Dr. Stephenson prepared a report which was provided to Travelers. In his report, Dr. Stephenson diagnosed Ms. Whitley's disease as fibromyalgia and chronic fatigue. He then stated the following:

The patient has extreme severe symptoms as mentioned above, probably as bad or worse as anyone I have seen in my entire practice, though I think there may be an overriding component of depression

-176-

which may make her coping abilities difficult and may increase the

amount of pain she experiences.

He then expressed his opinion that Ms. Whitley's "[f]unctional limitations are extreme and I do not

think she could be employable at this time or in the foreseeable future." (NB 24: CRC-2135;

Pl. App. 88).

742.    In his IME, Dr. Stephenson described Ms. Whitley's symptoms and lifestyle: "She

can usually work as much as 2 hours around the house, though usually much less than this.  Some

days she will feel so bad she cannot function at all and basically lies in bed and cries."  After a full

examination, Dr. Stephenson noted the following:

> I certainly do not doubt that she has fibromyalgia and she may even
>
> have psychogenic rheumatism from the diffuse nature of her
>
> complaints, but she has no withdrawal.  I certainly think there may
>
> well be a component of depression but she is on antidepressants.  I
>
> really have nothing to suggest in terms of therapy.  The patient has a
>
> learned pain syndrome at this point and the chances of getting her
>
> back to work are probably zero.

(NB 24: CRC-2135; Pl. App. 88).

743.    On September 11, 1995, Travelers' case manager, referring to Dr. Stephenson's IME

report stated: "While the IME did not provide objective documentation, the information Dr.

Stephenson did provide corresponds with the information we had been receiving all along." (NB 24: CRC-160).

### Social Security Administration's Determination of Ms. Whitley's Disability

744.    On December 19, 1989, the Social Security Administration determined that Ms. Whitley was totally disabled from engaging in any substantial or gainful employment activity, effective March 29, 1988, and awarded benefits on that basis.  In its decision, the Administration noted that Ms. Whitley's "subjective complaints are credible and supported by the medical evidence of record."  The Social Security Administration has continued to find Ms. Whitley totally disabled from employment since that date.  (NB 24: CRC-147, 2215).

### CORE Review

745.    Ms. Whitley's medical condition has deteriorated since Champion's last certification that she was totally disabled from "any occupation or business" under the Plan.  (NB 24: CRC-2199).

746.    In 1996, CORE was retained by Champion to take over the management of Ms. Whitley's claim.  (NB 52: CE-194).

747.    Ms. Whitley provided additional factual statements to CORE and Champion describing her limitations and her daily activities and pain.  (NB 24: CRC-2159).  During its review of Ms. Whitley's claim, CORE did not interview Ms. Whitley to determine the disabling effects of her chronic pain, the impact of her symptoms and limitations on her daily activities, and her credibility in reporting her subjective symptoms.  (NB 23-NB 24; NB 52).

748.    In response to CORE/Champion's annual review, Ms. Whitley provided her personal profile, and her treating specialist, Dr. Queen, provided a certificate of her disability, stating that Ms.

Whitley was unimproved, and "would never return to work, and was totally disabled."  (NB 24: CRC-2149-2153).

749.    On June 5, 1996, a CORE representative discussed with Mary Lee Dixon, Champion's claims supervisor, "how aggressive CORE should be in determining [Ms. Whitley's] disability status, i.e., coordinating an FCE."  (NB 52: CE-194).

750.    On July 25, 1996, CORE recommended against a new FCE given the effort of the previous year, and Champion agreed that an FCE would be a "waste of money," since Ms. Whitley's "clinical status is unchanged."  (NB 52: CE-192, 190, 188, 189).

751.    On July 26, 1996, CORE issued its Confidential Service Report #1, noting Dr. Stephenson's opinion that Ms. Whitley's "extremely severe symptoms" were "probably as bad or worse as anyone I have seen in my entire practice."  Based on the IME, CORE concluded that an FCE would not be beneficial "since the EE's clinical status is unimproved and her case was extensively reviewed last year."  (NB 24: CRC-2155; Pl. App. 90).

752.    On June 4, 1997, Ms. Whitley provided her personal profile to CORE, describing her symptoms and daily activities.  In response to the question of whether she expected to return to work, Ms. Whitley responded: "I would love a merical [sic] to happen."  (NB 24: CRC-2159).

753.    On June 16, 1997, Dr. Queen, Ms. Whitley's treating specialist, again certified her total disability, noting that Ms. Whitley's prognosis was "unimproved," and that she was totally disabled from any occupation.  (NB 24: CRC-2158; Pl. App. 85).

754.    CORE contracted for a functional capacities evaluation (FCE) with Ronald S. Hoechstetter, an "exercise physiologist." In his report dated July 7, 1997, Hoechstetter noted that Ms. Whitley was "consistent and cooperative;" that his physical testing was limited "by moderate

material handling difficulty and reported pain;" that he recommended a pain management program; and that Ms. Whitley was unable to meet all of the requirements for sedentary work for a full day. (NB 24: CRC-2163).

    a.    There is no document in the administrative record to indicate any qualifications of Mr. Hoechstetter to form this conclusion.

    b.    There is no indication in the FCE report as to how long the testing took.

    c.    There is no indication in the report as to how the test may have affected Ms. Whitley thereafter; and what impact the test may have had on Ms. Whitley's symptoms, including pain.

    d.    There is no indication in the report or record as to whether there were employers in the economy who would provide sedentary work to Ms. Whitley, given her limitations and restrictions.

(NB 23-NB 24; NB 52).

755.    On August 5, 1997, CORE received a report of an MRI conducted on Ms. Whitley, showing a bulging disk, degenerative disk disease, and fibromyalgia. (NB 24: CRC-2176).

756.    On October 6, 1997, Sharon Spain, Champion's employee at its Canton, North Carolina plant, expressed that CORE was repeatedly using the same doctors for IME, and that she was attempting to locate other doctors to perform IMEs for CORE/Champion.  (NB 52: CE-173).

757.    CORE contracted for an independent medical evaluation (IME) with Dr. Andrew Rudins.  Dr. Rudins saw Ms. Whitley on a single occasion on December 3, 1997.  Based on his examination and review, Dr. Rudins believed that Ms. Whitley was able to perform sedentary work, but qualified his belief with the acknowledgment that he had not seen the FCE conducted by Mr.

Hoechstetter, and apparently assumed that Mr. Hoechstetter had concluded that Ms. Whitley was able to work without qualifications in a sedentary position.  Dr. Rudins further qualified his belief with the following: "Considering that she had been out of work since 1988, however, the chance for her successfully returning to work is quite low.  I expect that she will continue to have pain whether she is at work or at home."  (NB 24: CRC-2180).

      a.     It is not clear from the record as to what previous medical history Dr. Rudins reviewed prior to performing his examination of Ms. Whitley and issuing his report.

      b.     There is no document in the record to indicate any qualifications of Dr. Rudins to form this conclusion.

      c.     There is no explanation in the record as to Dr. Rudins' basis for concluding that, based on the test results during the evaluation, Ms. Whitley would be able to perform sedentary work on a sustained basis, 8 hours a day, 40 hours per week.

      d.     There is no indication in the report as to the effects of Ms. Whitley's chronic pain on her ability to perform sedentary work

      e.     There is no indication in the report as to the effects of Ms. Whitley's medications on her ability to perform sedentary work.

      f.     There is no indication in the report or record as to whether there are employers in the economy who would provide sedentary work to Ms. Whitley, given her limitations and restrictions.

(NB 23-NB 24; NB 52).

758.    Neither CORE nor Dr. Rudins, who performed CORE's IME, explained the inconsistency between Dr. Rudins' findings and those of Dr. Stephenson who performed the IME for Travelers in 1995. (NB 23-NB 24; NB 52).

759.    On December 8, 1998, CORE's Cost Services prepared a transferable skills analysis of Ms. Whitley's job skills.  In the report that was issued, it was determined that, based on her employment at Champion, Ms. Whitley's skills of "comparing, taking instructions–helping, tending" would transfer and that a number of occupations were considered "appropriate for employment." (NB 24: CRC-2225).

> a.    There is no indication in the report as to whether Ms. Whitley was reasonably fit to undertake the listed occupations.
>
> b.    There is no indication in the report to indicate whether any such jobs existed in significant numbers in the local or national economy.
>
> c.    There is no indication in the report or record as to whether there are employers in the economy who would provide work to Ms. Whitley, given her limitations and restrictions.
>
> d.    There is no documentation in the record to indicate the qualifications of the person who performed the transferable skills analysis.

(NB 23-NB 24; NB 52).

760.    On December 18, 1997, Sharon Spain reported to the CORE case manager that she was "pleased with the IME results and will support a denial if the CORE's Denial Committee recommends a denial."  She requested "CM [case manager] fax copy of IME because she 'wants to see how Dr. Rudins presents his cases.'"  (NB 52: CE-154).

761.    On December 19, 1997, CORE's Denial Committee agreed that Ms. Whitley's claim should be denied.  (NB 24: CRC-2192; NB 52: CE-152).

762.    In Confidential Service Report #3, dated December 23, 1997, CORE identified the following as Ms. Whitley's "potential clinical complications": "Chronic fatigue, Increased activity intolerance, Depression, and Chronic decreased range of motion."  (NB 24: CRC-2193).

763.    The claims record does not reveal that either CORE or Champion or Dr. Rudins, who performed the IME for CORE, specifically considered the impact of the "potential clinical complications" identified specifically by CORE in Confidential Service Report #3, dated December 23, 1997, on Ms. Whitley's ability to obtain and sustain competitive employment prior to reaching their conclusions leading to the termination of Ms. Whitley's LTD benefits. (NB 23-NB 24; NB 52).

764.    On December 22, 1997, CORE notified Ms. Whitley that, based on the IME of Dr. Rudins, CORE had determined that she was not disabled under the Plan, and that her claim was denied.  (NB 24: CRC-2189).

765.    On December 23, 1997, CORE issued its Confidential Service Report #3, recommending that Ms. Whitley's LTD benefits be terminated.  CORE's recommendation was based on the IME of Dr. Rudins.  CORE's report noted that Ms. Whitley's treating specialist, Dr. Queen, "would not release Ms. Whitley to work, even after two requests by Case Management."  The report failed to acknowledge that Dr. Rudins' IME was, in part, based on the FCE by Mr. Hoechstetter, which indicated that Ms. Whitley could not perform the full range of sedentary work.  (NB 24: CRC-2192).

766.    On January 29, 1998, based solely on CORE's recommendation, and without further consideration or investigation of any relevant facts, Champion, through its LTD Administrator, Mary

-183-

Lee Dixon, adopted CORE's finding that Ms. Whitley was not disabled and terminated her LTD

benefits, effective January 30, 1998. (NB 24: CRC-2194).

767.    Neither CORE nor Champion made any effort to provide vocational training or

education to assist Ms. Whitley in returning to work. (NB 23-NB 24; NB 52).

768.    There is no evidence in the record showing that Champion/CORE considered factors

of her educational level and her continued absence from work as a result of Champion's prior

certifications of her total disability, in determining whether Ms. Whitley, given her restrictions and

limitations, could work in an "occupation or business for wage or profit for which she is or becomes

reasonably qualified by training, education or experience." (NB 23-NB 24; NB 52).

### Appeal/Review

769.    Ms. Whitley requested review of CORE's initial decision on February 20, 1998.

(NB 24: CRC-2196).

770.    In response to CORE's and Champion's decisions to terminate Ms. Whitley's LTD

benefits, Dr. Queen, Ms. Whitley's treating specialist, wrote the following:

> Mrs. Whitley has a chronic and unrelenting problem with non-
> articular musculoskeletal pain. Her history and physical exam, and
> laboratory testing has repeatedly supported the diagnosis of
> fibromyalgia.
>
> Through the years of my participation of Mrs. Whitley's care,
> we have repeatedly made efforts to adjust the treatment program and
> have undertaken a variety of interventions including trials on multiple
> medications, involvement in efforts at rehabilitation and

-184-

reconditioning, as well as introduction of chronic pain management techniques.

It has been my impression that Mrs. Whitley has made a good effort to be compliant with her medications and has also followed through the recommendations that have been made regarding exercise, reconditioning, and pain management.

Despite our combined efforts, Mrs. Whitley has never successfully controlled her symptoms to allow her to consistently manage her own personal care and her responsibilities at home.

Dr. Queen followed with another note stating "[I]t is my opinion that the patient currently remains unable to work at a level sufficient to maintain regular employment." (NB 24: CRC-2198, 2203; Pl. App. 86).

771.   CORE's Denial Committee again recommended denial of Ms. Whitley's claim on June 8, 1998. (NB 24: CRC-2207).

772.   Based solely on CORE's recommendation, and without further consideration or investigation of any relevant facts, Champion, through its LTD Administrator, Mary Lee Dixon, again denied Ms. Whitley's claim for continuing LTD benefits on July 13, 1998. (NB 24: CRC-2210).

773.   On July 30, 1998, Ms. Whitley, through counsel, requested review through the Champion Claims Review Committee (CRC). (NB 24: CRC-2215).

774.   On October 22, 1998, Ms. Whitley, through counsel, supplemented the record with a letter from Dr. Queen, Ms. Whitley's treating specialist, stating: "We have seen Martha today, and

-185-

continue to find her severely impaired with chronic and unrelenting non-articular musculoskeletal pain. Her pain has been further complicated by the recent development of herpes zoster. I continue to find Mrs. Whitley totally disabled from engaging in any occupation or business for wage or profit." (NB 24: CRC-2219).

775.    On November 5, 1998, CORE's physician consultant, Dr. Fife submitted a report to CORE noting Ms. Whitley's "long history of chronic pain due to fibromyalgia, osteoarthritis and degenerative disk disease of the spine;" that "[h]er pain has persisted despite a therapeutic regimen consisting of multiple analgesics, anti-depressants and muscle relaxants, as well as physical therapy;" and that "[t]he claimant has been compliant with treatment." She then stated the following:

> Superimposed on this background of chronic pain, she has now developed acute pain due to herpes zoster. This makes it impossible for her to perform any kind of work at present. This condition directly affects the sensory nerves and is very painful in and of itself. It can be anticipated that this condition will last at least six months. At that time, she should be re-evaluated to determine her functional ability.

Dr. Fife also recommended "a psychiatric evaluation . . . as part of the future assessment of her ability to work as she has documented psychological overlay to her chronic complaints." (NB 24: CRC-2221). Based on her conversation with Dr. Queen, Dr. Fife noted that the herpes zoster infection resulted "in severe post herpetic neuralgia in a thoracic distribution of the left chest." Dr.

Fife expressed the opinion that Ms. Whitley was totally disabled from any work.  (NB 24: CRC-2221; Pl. App. 91).

776.    On December 21, 1998, CORE issued its Confidential Service Report #1 recommending the continued denial of Ms. Whitley's disability on the ground that her "herpes zoster superimposed on a chronic pain syndrome" did not render Ms. Whitley "vocationally disabled." (NB 24: CRC-2230; Pl. App. 92).

777.    Prior to the meeting of the CRC, Champion's legal staff prepared records for members of the committee.  The records consisted of an initial summary, and selected excerpts of Ms. Whitley's claims record, as compiled by CORE.  The records, consisting of 109 pages were not organized in any particular manner, but were numbered by handwritten numbers in the bottom right corner. (NB 24: CRC-2124).

778.    On March 2, 1999, Champion's CRC met to consider Ms. Whitley's appeal. Champion's general counsel, Mr. Foster, advised Champion that Ms. Whitley's new disabling condition of herpes zoster did not render her totally disabled under the Plan unless the onset of the condition preceded the denial of her claim.  Ms. Whitley's appeal was tabled by the CRC pending investigation as to the onset of her new condition.  (NB 24: CRC-2110; Pl. App. 95).

779.    On March 3, 1999, CORE's medical consultant, Dr. Fife, reported that Ms. Whitley's family doctor, Dr. Daniell, had informed Dr. Fife that "the patient's bout of herpes zoster began in 4/1998," and that "the symptoms continue in a relatively unrelenting fashion requiring neurontin for severe post-herpetic neuralgia."  (NB 24: CRC-2235; Pl. App. 94).

780.    On March 11, 1999, the CRC met and denied Ms. Whitley's claim on the grounds of the IME report of Dr. Rudins, and on the ground that "CORE determined that the on-set of the herpes

zoster was in 4/98 and therefore after the original denial of benefits on 1/31/98." (NB 24: CRC-2241; Pl. App. 96).

781.    The onset of Ms. Whitley's herpes zoster disease was during the Fall of 1997, and was first noted in her medical records by her family doctor, Dr. Daniell, in October, 1997. (NB 38: Whitley-637-638; Pl. App. 97).

782.    CORE misrepresented the facts in representing that the onset of Ms. Whitley's condition of herpes zoster was in April, 1998, rather than during the Fall of 1997. As a direct result of CORE's misrepresentation and failure to properly investigate the facts, Champion's CRC acted on inaccurate information in denying Ms. Whitley's claim and upholding the termination of her benefits. (NB 24: CRC-2241).

783.    If Champion had been provided accurate information concerning the onset of Ms. Whitley's condition of herpes zoster, Champion's CRC would have reversed Champion/CORE's prior termination, and reinstated Ms. Whitley's LTD benefits. (NB 24: CRC-2241).

784.    Following the review of her claim by the CRC, Ms. Whitley submitted additional evidence to Champion/International which was relevant to the determination of her disability, and clarified and resolved conflicts in the evidence previously considered by Champion and CORE. Specifically, Ms. Whitley provided:

      a.    Ms. Whitley's affidavit: Ms. Whitley provided specific facts concerning her background, disability and treatment, some of which were not solicited by Champion/CORE in their review. (NB 38: Whitley-366).

      b.    Vocational assessment report: Dr. Henry D. Wong, certified vocational counselor, considered Ms. Whitley's age, education, past employment, her

medical condition and any restrictions, as well as the types of jobs available in the economy, and found that Ms. Whitley was unemployable at the time of the termination of her LTD benefits in that there were no jobs for which Ms. Whitley was "reasonably qualified by training, education or experience." (NB 38: Whitley-370).

     c.    <u>Updated medical records</u>: These documents included comprehensive medical records from all of Ms. Whitley's providers, many of which had not been obtained by Champion/CORE in their review, and which showed that Ms. Whitley's condition had deteriorated since Champion had previously certified Ms. Whitley's total disability.  The records included Dr. Daniell's treatment records reflecting the onset date of Ms. Whitley's condition of herpes zoster. (NB 38: Whitley-520, 637-638).

Champion refused to consider this additional evidence of Ms. Whitley's total disability.

This the 4th day of April, 2005.

William B. Barnes(CT0268)
Rosenstein & Barnes
1100 Kings Hwy. East
P.O. Box 687
Fairfield, CT 06432
Tel (203) 367-7922
Fax (203) 367-8110
E-mail wbarnes@rosenbar.com


Robert M. Elliot (CT21210)
Elliot Pishko Morgan, P.A.
426 Old Salem Road
Winston-Salem, NC 27101
Tel (336) 724-2828
Fax (336) 724-3335
E-mail rmelliot@epmlaw.com


Richard B. Harper
Attorney at Law
PO Box 395
Sylva, NC 28779
Tel (828) 586-3305
Fax (828) 586-4795
E-mail rick@harperlaw.org

## CERTIFICATION

A copy of the foregoing was mailed first class mail, postage prepaid, this 4th day of April, 2005, to the following counsel:

Bruce M. Steen, Esq.
McGuire Woods
3700 Bank of America Plaza
101 South Tryon St., Suite 3700
Charlotte, NC 28280-0008

Barry J. Waters, Esq.
Murtha Cullina, LLP
Whitney Grove Sq.,
Two Whitney Ave.,
P.O. Box 704
New Haven, CT 06503-0704

ROBERT M. ELLIOT