## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HARRY L. SMITH, LOIS L. LYNN, DARRELL KEITH HILL, ELIZABETH CASE BOONE, WILEY H. HAYNES, ROSA LEE BROOKSHIRE, HARRISON YOUNG CLARK, FRANZISKA FINNEY, JUDITH CASE KIRKPATRICK, WILSON DANIEL McCLURE, CELIA DARLENE METCALF, CHARLES R. REECE, DOLPHUS LUTHER TREADWAY, JR., and MARTHA BURNETTE WHITLEY, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. 302CV212(CFD) |
| v. | ) ) | |
| CHAMPION INTERNATIONAL CORPORATION; LONG TERM DISABILITY BENEFITS PLAN FOR SALARIED EMPLOYEES OF CHAMPION INTERNATIONAL CORPORATION #506; LONG TERM DISABILITY BENEFITS PLAN FOR CERTAIN HOURLY EMPLOYEES OF CHAMPION INTERNATIONAL CORPORATION #703; and INTERNATIONAL PAPER COMPANY, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

_____

### PLAINTIFFS' BRIEF IN RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      *Procedural Note* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Champion/CORE's Motives** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      *Champion's Studies of LTD* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      *Champion Hires CORE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Champion/CORE's Procedures to Reduce LTD Costs** . . . . . . . . . . . . . . . . . . 5

      *Champion's Abdication of Responsibilities to CORE* . . . . . . . . . . . . . . . . . . . 5

      *CORE's Pattern and Practice in Terminating LTD Claimants* . . . . . . . . . . . . . . 7

      *The Rubberstamp Review Process* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Legal Principles** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      *Plaintiffs' Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**All of Champion/CORE's Decisions in this Action
Should Be Set Aside on the Grounds That They Violated
the Law and Their Responsibilities under the Plans** . . . . . . . . . . . . . . . . . . . . . . 21

      *Champion/CORE's Failure to Consider Pain
      and Other Subjective Symptoms* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      *Champion/CORE Failed to Consider Vocational Factors* . . . . . . . . . . . . . . . . 25

      *Champion/CORE's Failure to Acknowledge its
      Prior Inconsistent Decisions with Respect to Most
      of the Plaintiffs Is Fatal to its Procedure* . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

INDIVIDUAL CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

     *Elizabeth Case Boone* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

     *Rosa Lee Brookshire* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

     *Harrison Young Clark* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

     *Franziska Finney* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Wiley H. Haynes* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Darrell Keith Hill* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Judith Case Kirkpatrick* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Lois L. Lynn* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Wilson Daniel McClure* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Celia Darlene Metcalf* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Charles Reece* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*Harry L. Smith* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*Dolphus Treadway* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

*Martha Whitley* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

**INTRODUCTION**

The motives of Champion/CORE to terminate plaintiffs and other employees from their long term disability ("LTD") rolls is found in the "savings analyses" routinely provided to CORE by Champion. (*See e.g.*, Pl. LR 56 St., ¶¶ 104, 256, 366, 441, 491). CORE documented in these calculations savings achieved for Champion in the termination of LTD benefits through CORE's "intervention." *Id.* As obvious as this was, CORE's need to take credit for its financial results in those few lines of text speak volumes in terms of Champion/CORE's perception of their mission.[1] And with this glimpse of their motive, it becomes remarkably clear:

- *why* claimants, some of whom had been repeatedly certified for total disability under the Plans were suddenly subjected to a different kind of review under CORE;

- *why* CORE assumed so much power under the Plans which they had not been delegated;

- *why* CORE's procedures ignored, disregarded or mischaracterized critical evidence which Champion (and its prior administrator, Travelers) had found convincing;

- *why* Champion/CORE refused to consider each plaintiff's debilitating pain as a factor of his/her disability; and

- *why* Champion/CORE failed to take into consideration vocational factors which clearly render each plaintiff totally disabled under the Plans.

In short, Champion/CORE set out on a course in 1996 to cut Champion's LTD rolls to save money, without any true concern for whether or not the plaintiffs' and others were totally disabled.

---

[1] Indeed, the money saved by CORE's "intervention" could only be relevant to its claims-cutting mission. It was certainly not relevant to any findings concerning an individual's disability.

1

The procedural deficiencies which produced "savings" for Champion were designed for that very purpose, and Champion/CORE's actions which followed can only be understood in this context.

### *Procedural Note*

On April 4, 2005, plaintiffs filed their motion for summary judgment, and supporting documents. In their brief, plaintiffs discussed much of the evidence in the voluminous record of this case, and applied the prevailing legal standards to the evidence to establish, as a matter of law, that plaintiffs are entitled to relief.

In their initial filings, as well as this brief, plaintiffs are requesting relief at several levels. At minimum, plaintiffs contend that all decisions made by Champion/CORE should be reversed based on the clear evidence of Champion/CORE's bias, and the general procedural deficiencies in their review of claims. At most, plaintiffs have contended that with the reversal of Champion/CORE's decisions, plaintiffs should be reinstated to their benefits under the Plans.

In this brief, plaintiffs will respond to defendants' arguments, on the law and the facts, and will reiterate their contentions that they are entitled to some of the above relief as a matter of law pursuant to their motion; or alternatively, that they are entitled to a trial before the Court, with the opportunity to present all relevant evidence concerning their claims to the finder of fact. To avoid undue repetition on this voluminous record, plaintiffs hereby incorporate the facts and discussion included in their initial brief.[2]

### Champion/Core's Motives

Champion's LTD coordinator was Mary Lee Dixon. Ms. Dixon had a high school education.

---

[2] In this brief, plaintiffs will use the abbreviations set forth in their "Explanation of Citations," provided with their initial brief. (*See* Brief in Support of Plaintiffs' Motion for Summary Judgment) (hereafter "Pl. Br. Supp. SJ"), p. ix.

Ms. Dixon had no specialized training in the medical or vocational aspects of disability. She received no policies, summaries or guidelines as to how to interpret the Plans, or how the various terms in the Plans were defined. (Pl. LR 56 St., ¶¶ 34-37). Prior to 1996, Ms. Dixon was assisted in her responsibilities by Travelers Insurance Company, who was Champion's LTD administrator.

### Champion's Studies of LTD

In the mid-1990s, Champion determined that it needed to reduce the costs of its LTD program. Champion had previously established an "LTD Committee." The LTD Committee was apparently designed to find new ways of reducing LTD costs, by removing claimants from LTD payments. (NB 75: Lehman Dep.). The LTD Committee apparently met every quarter, and operated under the supervision of the Internal Audit Department of Champion. (NB 75: Lehman Dep.).

The witnesses were vague as to any findings of the committee, or any actions taken by the committee. (NB 75: Lehman Dep.).[3] Accordingly, the LTD Committee remains somewhat a mystery. Nevertheless, it appears from the evidence that the committee was designed to take a more aggressive approach towards LTD claimants and claims than Champion had in the past.

In late 1995, Champion commissioned a study of its LTD program by the Hewett Associates. The study entitled "Long-Term Disability Valuation," included specific figures and statistics concerning LTD claims of Champion as of January 1, 1996. (NB 68: Champion-166). The study showed that as of that date, Champion was paying $421,820 each month in LTD benefits to 533

---

[3] Following the depositions of several of Champion's managers concerning the LTD Committee, plaintiffs requested all documents concerning meetings of the committee, including minutes, resolutions or other such documents; and noticed a Rule 30(b)(6) deposition of Champion regarding the LTD Committee. Champion responded that there were no other witnesses who recalled the specific details of the LTD Committee, and that documentation concerning the meetings of the committee was no longer available.

claimants, and that Champion had established a reserve of over $19 million to cover its obligations. (NB 68: Champion-170). Significantly, of all of the Champion facilities, the Canton, North Carolina, plant, accounted for the highest number of LTD claimants, by far, under each of the Plans (salaried and hourly). (NB 68: Champion-188). Accordingly, the North Carolina facility in Canton must have appeared to be a primary target for the reduction of LTD claims.

### Champion Hires CORE

Sometime during the fall of 1995, Champion and CORE scheduled a presentation by CORE to determine the feasibility of CORE's LTD management program. CORE's presentation included a description of its "Workability System." In its presentation, CORE promised to reduce the costs of LTD claims and general employee absences from work as a result of disability. (Pl. LR 56 St., ¶ 29).

At the time of its presentation, CORE had operated its Workability program for a number of companies. (Pl. LR 56 St., ¶ 29). CORE's reputation for its aggressive approach to LTD cases was becoming well-known.

Perhaps for that reason, Champion retained CORE to take over the management of its LTD program. (Pl. LR 56 St., ¶ 30). CORE and Champion entered into a contract dated January 1, 1996. Under the contract, CORE agreed to provide its services as an administrator of the LTD program for the period from January 1, 1996 to December 31, 1999. (Pl. LR 56 St., ¶ 30). Significantly, CORE's contract with Champion provided only that it would provide services in managing and monitoring LTD claims, including obtaining the medical evidence, investigating claims, and making recommendations concerning claims. (Pl. LR 56 St., ¶ 30). Champion did not delegate its

4

responsibility to interpret the Plans or to make decisions concerning individual claims[4]  *Id.*

CORE was to be paid primarily on a fee basis for all claims which it reviewed.  (Pl. LR 56 St., ¶ 30).  However, CORE was subject to incentive payments for good performance.  (Pl. LR 56 St., ¶ 30).  There were no witnesses available, apparently, who could testify as to the amounts paid by Champion to CORE over the years of CORE's management, and specifically what amounts were paid as incentive payments.[5]  Nevertheless, one can infer from the CORE contract that CORE's actions in helping to reduce the costs of Champion's LTD claims—or of producing "savings" to Champion through CORE's "intervention"—was a significant basis for additional compensation, and, of course, marketing potential.

### Champion/CORE's Procedures to Reduce LTD Costs

#### *Champion's Abdication of Responsibilities to CORE*

What was structured as an advisory relationship between CORE and Champion became something entirely different.  In disregard of the limitations of its contract, CORE became the key player in deciding LTD claims.  Specifically, CORE had almost unlimited responsibility to (1) investigate LTD claims; (2) implement strategies to contest disability; (3) define the terms of the Plans; (4) determine disability and eligibility at the first two levels of review; and (5) carry out Champion's obligations of notice to the claimants.  (Pl. LR 56 St., ¶ 38).

---

[4]  Nor are there any other records documenting any such delegation of authority under the Plans to CORE.

[5]  Plaintiffs specifically noticed CORE for a Rule 30(b)(6) deposition.  Following Court proceedings, Judge Garfinkel ordered CORE to produce a witness for, among other purposes, the purpose of providing information concerning its compensation.  CORE presented a single witness as its Rule 30(b)(6) witness—Glenn M. Taylor.  Mr. Taylor had no knowledge concerning Champion's compensation payments to CORE, and CORE was unable to produce any documents concerning compensation. (NB 75: Taylor Dep.).

5

The individual responsible for carrying out CORE's strategies was primarily Dr. Beavers, its medical director. The record reflects little information concerning Dr. Beavers' qualifications or background. It reflects, however, much activity on the part of Dr. Beavers in CORE's "intervention" of LTD claims to accomplish savings. There are multiple examples in the records of this action demonstrating Dr. Beavers' aggressive and somewhat deceptive approach in setting the course for the termination of LTD claims. (*See, e.g.*, Pl. LR 56 St., ¶ 87).

Champion employee Sharon Spain was the contact person for CORE for cases involving the Canton, North Carolina plant. Ms. Spain's name appears throughout the plaintiffs' files. Interestingly, in the references to Ms. Spain, she is suggesting actions or strategies to terminate existing LTD claims, supporting CORE's actions in terminating claims, and cheering CORE on following the termination of claims. (*See, e.g.,* Pl. LR 56 St., ¶¶ 749, 756). In addition, Ms. Spain is apparently always the Champion employee who determined whether an LTD claimant who had been found able to work would be reemployed by Champion, and her answer was invariably *no*. (Pl. LR 56 St., ¶ 478).

The Champion employee who had little to do with the process, other than signing her name on letters, was Mary Lee Dixon. As noted above, Ms. Dixon was the long-time LTD coordinator for Champion who apparently was delegated authority by the Plan Supervisor to make decisions concerning claims at the first two levels. (Pl. LR 56 St., ¶ 38). However, the evidence is undisputed that Ms. Dixon became little more than a cleric under CORE's system, parroting CORE's decisions, and any grounds which CORE conveyed to her. (Pl. LR 56 St., ¶ 38). In short, Ms. Dixon made no independent decisions on behalf of Champion, and never questioned any action taken by CORE. *Id*.

In addition to Dr. Beavers, the CORE Denial Committee played a part in terminating claims.

6

Little is conveyed concerning the CORE Denial Committee other than the fact that it was generally involved in the final decision by CORE, and it always reaffirmed the initial decision by CORE.  (Pl. LR 56 St., ¶ 318).

The final entity in the decision making process was the Champion Claims Review Committee (CRC).  This committee, led by Champion's lawyers and composed of managers of Champion, met quarterly to consider the final reviews for appeals of LTD claimants.  While the CRC purported to be independent of CORE, the facts belie this contention.  The evidence is undisputed that CORE provided all information on which the CRC based its decision, any necessary medical investigation, and all documents used by the CRC in its review of each claim.  It was no wonder then, that the CRC affirmed CORE's terminations in at least 9 out of every 10 reviews.  (Pl. LR 56 St., ¶ 44; Pl. App. 4).[6]  The evidence exposes the CRC as the final level of a rubberstamp process.

### CORE's Pattern and Practice in Terminating LTD Claimants

**Questioning the treating physician:** CORE's doctor, Dr. Beavers, assumed an active role in questioning treating physicians of LTD claimants.  His manner of questioning, as revealed in the record, seems designed to dissuade the treating physician of any opinion in support of total disability under the Plans by questioning the qualifications of the doctor, by imposing an unfair standard of certainty, or by interpreting the definitions of the Plans in an unreasonably narrow way.

Dr. Beavers' approaches to the treating physicians are exemplified in a number of cases, including the following:

- Ms. Boone's case: Dr. Beavers questioned Ms. Boone's treating physician, Dr. Vargo,

---

[6] As pointed out in the documentation concerning the CRC's affirmance rates, the actual percentage could be 100% since Champion refused to provide information as to the final disposition of those few claims which it sent back to CORE for questioning.  (Pl. App. 4).

who had treated Ms. Boone for many years.  Following his questioning, Dr. Beavers wrote a note to Ms. Boone's file stating that Dr. Vargo was "not sure" of her opinion that Ms. Boone was totally disabled.  Contrary to Dr. Beavers' note, Dr. Vargo subsequently wrote letters supporting Ms. Boone's continued total disability under the Plan, without ever indicating any lack of certainty.[7]  (Pl. LR 56 St., ¶¶ 87, 97).

- Ms. Lynn's case: Dr. Beavers quoted Ms. Lynn's treating physician, Dr. Boerner, as being uncertain in his opinion, although Dr. Boerner's opinion seems certain in the record, and there was no corroboration for Dr. Beavers' statement.  (Pl. LR 56 St., ¶ 470).  Dr. Beavers then called Ms. Lynn's family physician, Dr. Freeman, who had never treated Ms. Lynn for her rare life-threatening lung disease, bronchiectasis and solicited her opinion that Ms. Lynn could work in a sedentary capacity.  (Pl. LR 56 St., ¶¶ 471, 472).  Both CORE and the CRC relied on the family physician's statement as a basis for their termination of Ms. Lynn's benefits in the face of two pulmonary specialists who had treated Ms. Lynn specifically for her pulmonary disease and had consistently found her disabled.

- Ms. Brookshire's claim: After a telephone conversation on July 23, 1997, with Dr. Beavers, Ms. Brookshire's treating physician, Dr.Mulholland, refused to give his opinion on the ground that he could not assess Ms. Brookshire's disability, although one month earlier, Dr. Mulholland had certified that Ms. Brookshire was totally disabled from any occupation and would never be able to resume any work.  (Pl. LR 56 St. ¶¶ 151-153).  Dr. Beavers then reported "her doctor is not claiming that she is disabled from any occupation."  (NB 4: CRC-1068). Actually, after talking with Dr. Beavers, Dr. Mulholland simply refused to be involved any longer in the medico-legal issues. (Pl. LR 56 St. ¶¶ 151-153).

- Mr. Clark's claim: On August 21, 1997, Dr. Eglinton, Mr. Clark's treating orthopaedist, signed an Attending Physician's Statement indicating that Mr. Clark's condition was unimproved and that he was totally disabled for any occupation. (Pl. LR 56 St. ¶ 212).  Four days later, after a telephone conversation with Dr. Beavers, Dr. Eglinton withdrew his opinion on the purported ground that he could not assess Mr. Clark's disability.  (Pl. LR 56 St. ¶¶ 213, 214).  Dr. Eglinton's notes indicate he thought he was speaking with an independent medical examiner when he spoke with Dr. Beavers, whom he believed to be with "J.B. Beavers, Inc."  (NB 6: CRC-1554).  The record does not contain a full account of that conversation, but it is impossible to tell if Dr. Eglinton was just confused or was actually deceived by Dr. Beavers as to Beavers' actual role in the evaluation of Mr. Clark's disability.  The record does not indicate what definition of disability Dr. Beavers communicated to Dr. Eglinton.

---

[7] Interestingly, Dr. Beavers never questioned any IME physician as to whether they were "certain" on opinions purportedly qualifying a claimant for work.

- <u>Ms. Kirkpatrick's claim</u>: Dr. Mendelsohn, Ms. Kirkpatrick's rheumatologist, certified that she was totally disabled from work on several occasions. (Pl. LR 56 St. ¶¶392, 410, 411). After a telephone conversation on May 5, 1998, with Dr. Beavers, Dr. Mendelsohn withdrew his opinion that she was totally disabled from any work. ( Pl. LR 56 St. ¶¶ 416-418). Dr. Mendelsohn subsequently told his patient that during his conversation with Dr. Beavers, Beavers informed him that based on the Plan, he should consider Ms. Kirkpatrick totally disabled only if she was "bedridden," or was unable to dress herself and otherwise care for her personal needs. (Pl. LR 56 St. ¶ 419).

- <u>Ms. Metcalf's claim</u>: On October 19, 1999, Dr. Mendelsohn, Ms. Metcalf's rheumatologist, certified that she was totally disabled from any occupation, as he had done on several prior occasions. (Pl. LR 56 St. ¶¶551(d), 551(a)-(c)). Later that same day, after a telephone conversation with Dr. Mendelsohn, Dr. Beavers succeeded in persuading her treating physician, Dr. Mendelsohn, to retreat from his opinion that Ms. Metcalf was totally disabled from any work. (Pl. LR 56 St. ¶¶ 557, 559). Dr. Mendelsohn subsequently told his patient that during his conversation with Dr. Beavers, Beavers informed him that based on the Plan, he should consider Ms. Kirkpatrick totally disabled only if she was "bedridden," or was unable to dress herself and otherwise care for her personal needs. (Pl. LR 56 St. ¶557; Pl. App. 63, NB 16: CRC-2575).

While the record is replete with examples of Dr. Beavers' questioning of treating physicians who have found plaintiffs totally disabled, there is not a single reference to indicate Dr. Beavers ever scrutinized his IME specialists who found a plaintiff able to work—even when the IME doctor's opinion was qualified or internally inconsistent. (*See* Pl. LR 56 St., ¶ 757).

In short, Dr. Beavers' actions do not depict an administrator who is seeking to determine the truth concerning a claimant's disability. Dr. Beavers' conduct, instead, reflects the conduct of a man on a mission—to rid the rolls of LTD claimants.

**FCEs:** Functional Capacities Evaluations are often used to assist in disability determinations. CORE depended heavily on FCEs to support its determinations that claimants were able to work.

But while an FCE can provide limited information concerning a claimant's physical

capacities, the test must meet certain criteria to be reliable as an indicator of physical capacity. These criteria include most importantly, the qualifications of the evaluator; the length of the assessment, and the projection of the results of the test to an 8-hour work day. (*See* Pl. App. 3). Ultimately, it has been recognized time and again that FCEs provide but a *snapshot* of a disabled person's life, and the ability of an evaluator to project from this limited activity an individual's ability to work on a sustained basis for 8 hours a day, 40 hours a week, is questionable, at best. (Pl. App. 3, 5).

   None of the FCEs in the record provide any explanation of their projections of the testing of a plaintiff to the finding that the plaintiff could work in a full-time capacity. Without a reliable explanation of this projection, the conclusory opinions are without foundation. Perhaps the best example of a tester's ability to "stretch" her findings to broad conclusions appears in Mr. Smith's case. The record reflects that Mr. Smith submitted to an FCE by Ms. Kimel on September 25-26, 1997. The FCE was apparently designed to take approximately 4-5 hours. However, after approximately two hours, Mr. Smith was unable to complete the test, and had to go home for the night. At home, Mr. Smith took pain relief medication, and attempted to sleep. He returned to Ms. Kimel's clinic the next morning and completed another two hours of testing. While Ms. Kimel's report documents that the test was taken in two days, she omits any reference to the reason for the interruption—Mr. Smith's pain—and any explanation as to how an individual who has not been able to complete the limited physical testing required in a time frame of approximately two hours can work on a full-time basis, 8 hours per day, 40 hours per week. (Pl. LR 56 St., ¶ 648). These omissions render the FCE in Mr. Smith's case totally unreliable. But more importantly, Champion/CORE's reliance on this flawed FCE in Mr. Smith's case reflects their pattern of

accepting, without question, information which supports termination.

Other FCEs in the record are quite qualified in the results. However, neither Champion/CORE never question the limitations of the findings in their reliance on the FCEs. For example, in Ms. Whitley's case, Mr. Hoechstetter, conducted an FCE finding that Ms. Whitley was unable to perform the maximum requirements of sedentary work, and concluding that Ms. Whitley was only able to perform certain sedentary tasks "4 hours per day." (Pl. LR 56 St., ¶ 754). Nevertheless, Champion/CORE cite Mr. Hoechstetter's FCE in support of their decision terminating benefits; and neither CORE nor Champion question his qualifications.

Multiple cases have recognized the limitations of FCEs, and noted their unreliability and the unfairness of using the FCEs as the primary basis for LTD denials and terminations. Nevertheless, Champion/CORE rely most heavily in their denial strategy on FCEs.

**IMEs:** CORE also relied heavily on IMEs. An IME can provide helpful information assessing a claimant's disability as long as the limitations of the IME are recognized as the result of a non-treating doctor's one-time examination.

Champion/CORE's use of IMEs is quite suspect in this case. First, the record reflects that Sharon Spain, Champion's contact person, was often involved in the selection of the IME physician. And Ms. Spain expressed her pleasure to CORE representatives when one of her selected physicians had disagreed with the treating physician to find a plaintiff able to work. (*See,* Pl. LR 56 St., ¶ 760) (with respect to Ms. Whitley's claim, Spain remarked that she was "pleased with the IME results" and asked to see the IME to see how the doctor "presents his cases.").

CORE never questioned an IME which found a claimant *able* to work. And the pattern shows that the IMEs should have been questioned based on the brevity of the doctor's exposure to

11

the claimant; qualifications in the opinions; and the fact that the doctor failed to consider the disabling symptom of pain.  This pattern is exemplified in the following:

- Whitley claim: The IME found that Ms. Whitley was able to perform sedentary work on a full-time basis while recognizing that the prospects for Ms. Whitley's successful return to work were "quite low."  (Pl. LR 56 St., ¶ 757).  Champion/CORE never questioned the inconsistency of these findings.

- Lynn claim: The reliability of Dr. McCarrick's IME was accepted, even though he had given multiple inconsistent opinions concerning Ms. Lynn's ability to perform some part-time work.  (Pl. LR 56 St., ¶ 488).

- Boone claim: Dr. Shields' IME is never questioned by Champion/CORE even though the record reflects that he altered his opinions at the solicitation of CORE's Dr. Beavers.  (Pl. LR 56 St., ¶¶ 79, 84-86).

**Vocational Factors:** There is a clear pattern in CORE's refusal to consider reliable vocational information in determining the plaintiffs' abilities to return to work.  In fact, the only effort in any of the cases was to provide a TSA by a CORE employee.  The TSAs were conducted by a CORE employee, Ms. Mikeska, who was assigned to the Cost Review Department.  Ms. Mikeska's qualifications to conduct a TSA are not provided in the record.  Ms. Mikeska's report consisted generally of listing unexplained "traits or skills" which an individual might have considering his past work history, and various occupations listed in her resources which might be "appropriate" for that individual.  Ms. Mikeska did not consider any personal information concerning the plaintiff's various disabilities; did not conduct a labor market survey to determine the availability of such jobs in the economy; and did not make any effort to consider such factors as the individual's age, chronicity of pain, or lack of training to the listing of available job occupations.  Without such individualized consideration, the TSA is essentially meaningless.  The TSA certainly does not provide reliable information to determine whether there are jobs  "for which the [individual] is or

becomes reasonably qualified by his training, education and experience." (*See* Pl. App. 2).

**Other patterns in CORE's process:** As discussed in more detail below, Champion/CORE had a policy and practice of ignoring pain or other subjective symptoms in determining disability. In almost every case, CORE and Champion's CRC note that a plaintiff's "subjective symptoms" are not "substantiated by objective findings." (*See, e.g.*, NB 12: CRC-2058). In fact, there are objective findings to support every plaintiff's report of chronic severe pain. Champion/CORE's adherence to this policy and practice ensured the termination of all the plaintiffs' LTD benefits. This policy is exemplified in the following:

- Mr. Smith's claim: Both CORE and Champion's CRC found that Mr. Smith's "subjective symptoms" were not supported by "objective findings." (Pl. LR 56 St., ¶ 661). Mr. Smith had undergone at least four surgeries on his back, which included lamenectomies, fusion, and installation of steel rods and plates in his spine—clearly, objective findings enough to substantiate Mr. Smith's reports of debilitating pain. (Pl. LR 56 St., ¶ 632).

- Ms. Boone's claim:  Both CORE and Champion's CRC found that Ms. Boone's "subjective symptomalogy" was not supported by "objective findings." (NB 1: Boone-146). Ms. Boone had undergone seven surgeries on her back, which included lamenectomies and fusion of her vertebrae. Again, Ms. Boone's consistent and historical complaints of disabling pain substantiated by these objective findings. (Pl. LR 56 St., ¶ 61).

Similarly, Champion/CORE's policy that their past inconsistent decisions in favor of total disability over the years required no explanation was unsupportable. Most of the plaintiffs had been consistently found totally disabled under the "any occupation" definition of the Plan, some for many years. Yet, CORE in its review, totally ignored these prior "admissions," and consistently treated plaintiffs' terminations as "initial claims." (Pl. LR 56 St., ¶ 90). For example:

- Ms. Whitley's claim: Ms. Whitley was consistently found totally disabled under from any occupation for 8 years. In 1995, Ms. Whitley's continuing total disability was questioned by Travelers, Champion's administrator.  An IME conducted by Dr.

13

Stephenson found that Ms. Whitley was disabled, primarily because of her pain. In 1998, CORE commissioned a new IME which found Ms. Whitley able to perform sedentary work, although the doctor predicted that she could not successfully return to work. CORE made no effort to explain the contradictions in their positions, or to demonstrate any worsening of Ms. Whitley's conditions. (Pl. LR 56 St., ¶ 742).

•    Lynn claim: Ms. Lynn was approved for total disability under the Plans for 6 years. Her respiratory conditions did not improve. Nevertheless, in 1998, CORE terminated her disability without any explanation as to the inconsistency in Champion's various decisions, and without any effort to show any change in circumstances. (Pl. LR 56 St., ¶ 475).

### *The Rubberstamp Review Process*

Another pattern reflected in the record is the rubberstamp process provided by Champion/CORE under the Plans. Champion invariably accepted CORE's determination at the first two levels of review, and adopted CORE's grounds for termination without any independent consideration. And at the final level, the CRC agreed with CORE on almost every claim. (*See* Pl. App. 4)

### ARGUMENT

### Legal Principles

### *Standard of Review*

In their initial brief, plaintiffs argued that this Court should apply a *de novo* standard of review to plaintiffs' claims. (*See*, Pl. Br. Supp. SJ, p. 10). Plaintiffs contend that the *de novo* standard is appropriate because Champion/CORE were operating under a conflict of interest which affected the decision making process. *Fay v. Oxford Health Plan*, 287 F.3d 96, 108-09 (2d Cir. 2002); *Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 92 (2d Cir. 2000); *Whitney v. Empire Blue Cross and Blue Shield*, 106 F.3d 475, 476-77 (2d Cir. 1997); *Sullivan v. LTV Aerospace and Defense Co.*, 82 F.3d 1251,1256 (1996).

14

Champion's conflict of interest is undisputed.  According to the Plans, Champion is responsible for paying LTD benefits and, therefore, operates under a conflict. *Sullivan v. LTV Aerospace and Defense Co.*, 82 F.3d 1251,1256 (1996).  There was an additional conflict in the fact that Champion had made a decision at the time it hired CORE to reduce its LTD costs.  *Id.*

In addition, the evidence shows that Champion/CORE's decision making process was affected by the conflict.  In short, Champion/CORE's pattern and practice of reviewing plaintiffs' claims establishes that their interest in their reviews was not to find the truth of whether the plaintiffs were totally disabled under the Plans, but to find a means to terminate each claim. To the extent these are factual issues to be resolved, this Court should resolve them on a *de novo* basis.

There is another reason that *de novo* review should apply in this case.  The obvious rationale for deferential review is that the Plan language confers discretionary authority in the fiduciary, and that the courts should defer to the fiduciary's exercise of authority based on the Plan language. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989).  However, this rationale does not apply when the fiduciary does not exercise its authority under the Plan.  *Sharkey v. Ultramar Energy*, 70 F.3d 226, 229 (2nd Cir. 1995) (where the Second Circuit remanded plaintiff's pension claim to the district court with the directive to review the claim *de novo* where executives of the company that acquired the plan sponsor, and not the Pension Committee as prescribed by the Plan, determined the plaintiff's pension benefits).  *See also Jebian v. Hewlett-Packard Company Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1103 (9th Cir. 2003) (denials of benefits not on the merits, but rather because application "deemed denied" through passage of time, are reviewed *de novo* because the administrator did not exercise its discretion and hence is not entitled to the arbitrary and capricious standard of review).

15

The evidence in this case, developed more specifically below, shows that Champion had authority under the Plans to administer the Plans, interpret the Plans and to define Plan language, and make decisions concerning eligibility for LTD benefits. However, the undisputed evidence shows that it was CORE, *not* Champion, that administered the Plans; it was CORE, *not* Champion, that interpreted Plan language and defined its terms; and it was CORE, *not* Champion, that made decisions on the first two levels of review of plaintiffs' claims. Champion abdicated its responsibilities in this regard. In fact, even though Champion purportedly made the final decisions concerning claimants' eligibility through the CRC, the CRC's decisions were finally influenced, if not controlled, by CORE's conduct. (Pl. App. 4). Accordingly, since Champion did not exercise its discretionary authority with respect to significant decisions which were made concerning plaintiffs' claims, this Court should not defer to Champion.

The same considerations that guide the Court's adoption of the *de novo* standard of review, also demonstrate arbitrary conduct on the part of Champion/CORE. The evidence shows that many of the decisions which were made concerning plaintiffs' claims lacked any reasonable basis, and were motivated by Champion/CORE's conflict of interest. Specifically, as will be shown with respect to plaintiffs' individual claims, the evidence lacked any reasonable foundation or substantial basis, and Champion/CORE's decision making amounted to mischaracterizations of plaintiffs' evidence and selective consideration of evidence helpful to Champion/CORE's efforts to terminate disability. *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 361-62 (6th Cir. 2002); *Paese v. Hartford Life & Accident Ins. Co.*, 02 Civ. 9778 (DC), 2004 U.S. Dist. LEXIS 6040, *29-*33 (S.D.N.Y. April 9, 2004).

*Plaintiffs' Claims*

**Plaintiffs' Termination of Benefits Claims:** Pursuant to ERISA, plaintiffs contest the

termination of their benefits and seek "to recover benefits due . . ., to enforce . . . [their] rights . . .,

to clarify [their] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

Defendants contend that four of the plaintiffs—Ms. Finney, Mr. Hill, Mr. McClure and Mr.

Treadway—failed to exhaust their administrative remedies. While ERISA does not speak to

exhaustion, the federal courts have imposed an exhaustion requirement with respect to claims

brought under 29 U.S.C. § 1132(a)(1)(B). However, there are exceptions which clearly apply to this

action. First, there is no requirement to exhaust administrative remedies provided by the Plan if to

do so would be futile. The facts stated above support the conclusion that defendants, by

administering the plan in a manner calculated to deprive participants of benefits in disregard of the

participants' actual entitlement, acted in bad faith and contrary to the interests of Plaintiffs. Given

that the integrity of the appeals process was thus irreparably tainted, further appeal would have been

futile. Courts in the Second Circuit and elsewhere have held that the futility doctrine should be

applied when plan fiduciaries have acted in bad faith or in breach of their fiduciary duties. See

DePace v. Matsushita Elec. Corp. of Am., 257 F. Supp. 2d 543, 558 (E.D.N.Y. 2003); Ludwig v.

Nynex Serv. Co., 838 F. Supp. 769, 781-782 (S.D.N.Y. 1993); Riggs v. A.J. Ballard Tire & Oil Co.,

No. 91-2130, 1992 U.S. App. LEXIS 31134, at *5 (4th Cir. 1992); Healy v. Axelrod Constr. Co.

Defined Benefit Pension Plan and Trust, 787 F. Supp. 838, 842 (N.D. Ill. 1992); Bish, et al. v.

Aquarion Services Co., et al., 289 F. Supp. 2d 134, 149 (D. Conn. 2003); Harrow v. Prudential Ins.

Co. of America, 279 F. 3d 244, 250 (3rd Cir. 2002).

In addition, there should be no requirement to exhaust if defendants have failed to adhere to

17

the requirements of ERISA in their notice of denial to claimants pursuant to 29 U.S.C. § 1133; or

if the Plan has failed to provide a fair process and procedure with the proper decisionmaker; or with

respect to plaintiffs' claims for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3).  "District

courts in the Second Circuit have routinely dispensed with the exhaustion prerequisite where

plaintiffs allege a statutory ERISA violation." DePace v. Matsushita Elec. Corp. of Am., 257 F. Supp.

2d 543, 558 (E.D.N.Y. 2003) (citing Gray v. Briggs, 1998 U.S. Dist. LEXIS 10057, 1998 WL

386177, *7 (S.D.N.Y. July 7, 1998) ("there is no exhaustion requirement in the Second Circuit with

respect to statutory ERISA claims").  As DePace explains, a claim for breach of fiduciary duty

involves interpretation of the statute rather than the provisions of the plan. DePace, 257 F. Supp. 2d

at 558 (E.D.N.Y. 2003). As such, it is the province of the judiciary. Id. (citing Amaro v. Continental

Can Co., 724 F.2d 747, 751 (9th Cir. 1984)).

   The record shows that Mr. Treadway did request review of the decision. (NB 22: Treadway-

42, 43).  His request for review was followed by a letter from his counsel requesting his claims

records and a psychological evaluation.  (NB 22: Treadway-51).  Defendants never responded to

counsel's request or provided review of Mr. Treadway's claim.  Defendants' claim that Mr.

Treadway withdrew his appeal is unsupported by the record.[8]  Since defendants failed to respond to

Mr. Treadway's request for review, his claim is deemed denied, and is subject to a *de novo* standard

of review.

   Mr. McClure also attempted review through counsel.  (NB 17: McClure-35).  The record

---

   [8] Defendants rest this argument on some handwritten notes from the Champion file
which indicate *Champion's* intent to request that Mr. Treadway withdraw his appeal since he had
applied for retirement.  (NB 22: Treadway-50).  There is no indication that Mr. Treadway ever
intended to withdraw his appeal, and in fact, his counsel's subsequent request substantiates his
intent to pursue review.  (NB 22: Treadway-51).

shows that defendants received his counsel's letter and never responded. Counsel subsequently requested information regarding the status of the appeal, but still received no response. (NB 17: McClure-48). Thus, Champion was aware of counsel's intent, and never responded as to whether the appeal was proceeding. Champion's failure to respond to Mr. McClure's counsel should be deemed a denial.

In any event, since CORE was acting without authority in its review of claims, and since CORE's notice did not comply with ERISA standards, exhaustion should be not required.[9] 29 C.F.R. § 2560.503-1(f). Most importantly, the record is clear that any effort to seek administrative review by any of the plaintiffs would have been futile, given the results of the administrative review in other cases in the record and Champion/CORE's total failure to consider chronic pain and vocational factors in their review. (*See* Pl. App. 4).

***Plaintiffs' Claim under 29 U.S.C. § 1133:*** Pursuant to 29 U.S.C. § 1133, plaintiffs have contested the fact that Champion failed to provide a full and fair review in connection with their claims. Plaintiffs contend that given Champion/CORE's violations of the statutory requirements, this Court should reverse the decisions concerning plaintiffs' claims, and decide their rights to benefits *de novo*.

Defendants claim in their opening brief that there is no right of action under 29 U.S.C. § 1133. While it is true that § 1133 appears to merge in its requirements with plaintiffs' termination of benefits claim—in other words, defendants' wholesale failures to provide adequate reviews pursuant to the statute resulted in their denial of benefits to each plaintiff—plaintiffs contend that

---

[9] Neither Mr. McClure's, Ms. Finney's, or Mr. Hill's letters of denials provide the specific information required by 29 U.S.C. § 1133 (notice as to specific information needed to establish disability).

the requirements are independent, and entitle the plaintiffs to relief for all of the plaintiffs for the multiple procedural violations. *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000); *L.I. Headstart Child Development Ser., Inc. v. Frank*, 165 F.Supp 2d 367 (EDNY 2001) (allegations sufficient to state claim against attorneys for aiding and abetting breach of fiduciary duty under ERISA).

**Plaintiffs' breach of fiduciary duty claims:** In their fourth claim for relief, plaintiffs claim Champion breached its fiduciary duties (BFD) in its general procedural violations which resulted in the denials of plaintiffs' claims. Clearly, the above conduct of defendants establishes evidence in support of plaintiffs' claims. As stated in their initial brief, ERISA establishes standards by which fiduciaries exercise their authority in administering and implementing terms of ERISA plans. 29 U.S.C. § 1104. In *Varity Corp. v. Howe*, 516 U.S. 489 (1996), the United States Supreme Court found that a fiduciary could be held liable for a breach of these duties under 29 U.S.C. § 1132(a)(3). *See also*, *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270 (2nd Cir. 1992).

Defendants contend that the statute of limitations has expired on a number of plaintiffs' claims for BFD. Under 29 U.S.C. §1109, "Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries...shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore ...any profits...and shall be subject to such other equitable or remedial relief as the court may deem appropriate." The fiduciary has a duty to act in the best interest of the individuals with which it has a legal fiduciary duty. Under 29 U.S.C. §1113, the statute of limitations for a fiduciary breach of duty is the earlier of "six years after the date of the last action which constituted a part of the breach violation or, in the case of an omission, the latest date on which the fiduciary

could have cured the breach"; or "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation, except in the case of fraud or concealment."  In the case of fraud or concealment, the statute of limitations is six years after the date of discovery.

Actual knowledge is defined as "knowledge of all the material facts necessary to understand that some type of claim exists, knowledge of the harmful consequences of a transaction or actual harm. *Caputo v. Pfizer,* Inc., 89 F.Supp. 2d 237, 239 (D. Conn. 2000) (quoting *Maher v. Strachan shipping Co.*, 68 F.3d 951 (5th Cir. 1995). *Broga, et al. v. Northeast Utilities*, Civ. No. 3:96CV2114 (D. Conn. Aug 18 1999).

Thus, the pertinent statute requires that any such action be brought within three years of a participant's knowledge of the breach by the fiduciary.  With respect to 5 of the plaintiffs, this action was brought within three years of the final decision of Champion which was the culmination of its breach.[10]  With respect to the other plaintiffs, their actions were brought within three years of their knowledge of the breach.  Plaintiffs did not receive sufficient facts to have actual knowledge of the breach until the discovery in this case—and more specifically, depositions of Champion's primary managers, including Mary Lee Dixon.  Although plaintiffs had alleged conduct of defendants upon information and belief prior to these depositions, it was the discovery of this information which solidified their claims.  Accordingly, plaintiffs' BFD claims are timely.

### All of Champion/CORE's Decisions in this Action Should Be Set Aside  on the Grounds That They Violated the Law and Their Responsibilities under the Plans

Champion/CORE's generalized pattern and practice in its review and termination of LTD benefits had, of course, general repercussions.  While each of the plaintiffs alone was denied a full

---

[10]  Plaintiffs Whitley, Hill, Metcalf, Reece and Treadway fall into this category.

21

and fair review and has grounds for reversal, the deficiencies in the procedure should lead to more generalized relief.

Specifically, because the procedure itself was tainted by Champion/CORE's ill motives, their decisions cannot be trusted, and should be set aside. These general grounds for reversal are based on policy considerations which affected all of the reviews.

### Champion/CORE's Failure to Consider Pain and Other Subjective Symptoms

As previously discussed, Champion/CORE refused to consider pain and other subjective symptoms as a component of disability under the Plans. Their refusal to consider pain was based not on the Plan language; it was based on their policy, which was acknowledged by their witnesses and reflected in their decisions. (NB 75, Taylor Dep., 38, L. 19-21) (CORE required "objective information" to substantiate disability.); (NB 75, Dixon Dep., 130-34, 137-38, 156, 161, 164, 168, 171, 174, 177-78, 181, 184) (Champion did not take into consideration pain). This policy constitutes a violation of ERISA standards.

As previously argued, ERISA requires that an administrator consider a claimant's pain and other subjective symptoms in determining the claimant's disability. *Connors*, 272 F.3d at 136 -37 (2d Cir. 2001) ("The subjective evidence of appellant's pain, based on her own testimony and medical reports of examining physicians, is more than ample to establish her disability, if believed."); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979) ; *Krizek v. CIGNA Group Ins.*, 345 F.3d 91 (2d Cir. 2003) (plaintiff may be incapacitated, despite significant accomplishments, when they were achieved at the cost of severe pain). In *Quigley v. The Unum Life Insurance Co.*, 340 F. Supp. 2d 215, 224 (D. Conn. 2004), defendant plan administrator disregarded plaintiff's complaints of pain to her treating physician in denying disability benefits. In reversing the plan administrator's

determination and granting summary judgment in favor of plaintiff, the court held that "where the record reveals well-documented complaints of chronic pain, and there is no evidence in the record to contradict the claimant's complaints, the claim administrator, and the court, cannot discredit the claimant's subjective complaints." *Id.*

Nor may a reviewing physician disregard the patient's reports of pain, and a treating doctor's reports of pain, merely because they are not supported by objective evidence. *Chan v. Hartford Life Ins. Co.*, 02 Civ. 2943 (LMM), 2004 U.S. Dist. LEXIS 17962 , *23-*24 (S.D.N.Y. Sept. 8, 2004); *Cortes v. Metlife, Inc.*, 122 F.Supp.2d. 121, 132 (D.P.R. 2000).  Finally, a plan administrator may not disregard pain by calling it something else.  *See Petroff v. Verizon North, Inc. Long -Term Disability Income Plan*, Civil Action No. 02-318 Erie, 2004 U.S. Dist. LEXIS 8138, *45 (W.D.Pa. May 4, 2004) (plan called plaintiff's symptoms "periodic discomforts").

In short, while an administrator does not have to believe evidence of chronic pain or other subjective symptoms reported by a claimant in support of disability; the administrator has to consider it in its decision.  Consideration of subjective evidence means determining its credibility.  Credibility of reports of subjective symptoms can be determined through interviews of the plaintiff, the objective findings of the treating physician (and other medical providers), and the consistency of complaints with the other evidence in the case.  *Connors v. Connecticut General Life Ins. Co.*, 272 F.3d 127, 136 -37 (2d Cir. 2001)*; Pollini v. Raytheon Disability Employee Trust*, 54 F.Supp. 2d 54, 59-60 (D. Mass. 1999).

Almost every plaintiff suffered from debilitating pain.  Many suffered from the disease of fibromyalgia or back injuries or conditions which are known to cause chronic severe pain as a major symptom.  (*See, e.g.*, Pl. LR 56 St., ¶ 61).  Champion/CORE's policy excluding consideration of

chronic pain and other subjective symptoms rendered it impossible for plaintiffs to meet the Plan

definition of total disability, as applied.  Their policy in this regard is reflected in their repeated

statements in the CORE reports, Champion denial letters, and the CRC minutes to the effect that the

claimants' "did not provide clinical analysis" and "there are no objective findings to report."  (*See,*

*e.g.*, NB 2: CRC-0014).[11]  For example:

- Ms. Whitley's claim: Ms. Whitley repeatedly described her pain in graphic terms—"my bones feel like they are coming out;" an IME physician found her pain chronic and disabling in 1995, describing her case as one of the "worse cases I have ever seen;" Travelers agreed that because of Ms. Whitley's pain, she was totally disabled from her fibromyalgia which was well-documented in the record; nevertheless, Champion/CORE disregarded this evidence in their decisions.  (Pl. LR 56 St., ¶¶ 757, 760, 763).

- Ms. Boone's claim: Ms. Boone consistently reported her pain to her doctors; her treating physician, Dr. Queen, noted that because of her pain she could not handle her personal needs; nevertheless, Champion/CORE disregarded her pain in terminating her disability, stating that Ms. Boone's "subjective symptomatology" is not demonstrable by objective findings.  (NB 1: Boone-0146).

- Mr. Haynes' claim: Mr. Haynes had two surgical procedures on his back; he consistently reported so much pain that he was unable to function most of the time; his treating physician believed, based on her history with Mr. Haynes, that he had done everything he could to continue working, but in the end, he failed a work hardening program to return him to work; and he had to undergo counseling to accept the fact that he was no longer able to work because of his pain; Champion/CORE disregarded these symptoms in their termination of their benefits.  (Pl. LR 56 St., ¶ 317).

- Mr. Smith's claim: Mr. Smith had four surgeries on his back, resulting in lamenectomies, fusion and the insertion of metal plates and other hardware to stabilize his spine; he has consistently reported severe and chronic pain which has presented him from functioning; his vocational consultant, based on interviews and examination found he was credible in his complaints; he was unable to complete the

---

[11]     Generally, as pointed out in the discussion of the individual cases, there were objective conditions which accounted for the subjective symptoms, as seen in some of the above examples.  But the point here is that even purely subjective symptoms, if credible, can be the basis of total disability under ERISA.

FCE in a single sitting because he was in so much pain; nevertheless, Champion/CORE totally disregarded his pain in terminating his disability. (Pl. LR 56 St., ¶ 652).

As stated, these are but a few of the examples of Champion/CORE's policies to disregard pain and other subjective symptoms as an element of disability. And their policies are reflected, as well, in the FCEs and IMEs which were used to support their determinations. In fact, in none of the cases did Champion/CORE determine that a plaintiff was not credible; or that her complaints of pain should not be believed; they just disregarded the evidence completely.

Champion/CORE's policy of disregarding pain and other subjective symptoms violates the law. Based on this policy which was carried out in all of the cases, their procedure was fatally flawed. Accordingly, the results of that unlawful procedure—the termination of all the plaintiffs' benefits—must be reversed.

### Champion/CORE Failed to Consider Vocational Factors

A participant is "totally disabled" under the Plans if he is unable "to engage in work for profit for which he is reasonably qualified by training, education and experience." (Pl. App. 2). According to the Plan language in this definition, a fiduciary cannot make a determination of total disability without considering and identifying jobs which the plaintiff is "reasonably qualified" to perform in the economy. Champion/CORE gave no more than superficial attention to this vocational component of each plaintiff's disability.

Several courts have held that failure to consider availability of employers capable of accommodating plaintiffs precludes termination of benefits. *See e.g. Schaub v. Consolidated Freightways*, 895 F. Supp. 1136 (S.D. Ind. 1995); *Jones v. Aetna U.S. Healthcare*, 136 F. Supp. 2d 1122 (C.D. Cal. 2001); *Ruder v. Commonwealth Edison Disability Plan*, 2000 WL 1741921 n.4

(N.D. Ill. 2000) ("it is also not clear that these were positions that were even available in the local economy"); *Lasser v. Reliance Standard Life Ins. Co.*, 146 F. Supp. 2d 619 (D.N.J. 2001); *Postma v. Paul Revere Life Ins. Co.*, 223 F.3d 533, 536 (7th Cir. 2000); *Willis v. Baxter International, Inc.*, 175 F.Supp.2d 819, 825 (W.D.N.C. 2001). Such evidence is particularly needed where there are conflicts in the evidence. *Caldwell v. Life Insurance Co.*, 287 F.3d 1276, 1289-1290 (10th Cir. 2002) (citing *Fasano-ITT Hartford Life & Accident Ins. Co.*, 230 F.3d 415, 420-421 (1st Cir. 2000); *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 476 (7th Cir. 1998); *McKenzie v. Gen. Tel. Co. of California*, 41 F.3d 1310, 1317 (9th Cir. 1994); *Regula v. Delta Family-Care Disability Survivorship Plan*, 266 F.3d 1130, 1141 n.6 (9th Cir. 2001); *Gunderson v. W.R. Grace & Co. Long Term Disability Income Plan*, 874 F. 2d 496, 499 (8th Cir. 1989); *Potter v. Connecticut Gen. Life Ins. Co.*, 901 F.2d 685, 686 (8th Cir. 1990)).

Champion/CORE made no effort to determine the vocational component of disability with respect to any of the claims. Other than providing a TSA[12]—a superficial analysis based on generalized statistics prepared by CORE's Costs Review Services Department—Champion/CORE considered no vocational information in making their determination. Given the definition of total disability under the Plan language, this omission was also fatal to the entire review procedure.

Under the hourly Plan language, "total disability" from any occupation "means the inability to engage in any occupation or business for wage for profit for which [the participant] . . . is or becomes reasonably qualified by training, education or experience." (Pl. App. 2). The salaried Plan

---

[12] As a routine, the TSA was usually provided after the claim was on its way to Champion's CRC. Thus, this report was apparently used, not for the purpose of determining a plaintiff's vocational capacity, but for the purpose of bolstering the record in support of CORE's termination. (*See e.g.*, Pl. LR 56 St., ¶ 102).

language is almost identical. *Id.* This definition, then, requires some consideration of whether there is any such "occupation or business" for which the claimant is *then* qualified. In order to make that determination, a fiduciary must consider the listed factors of training, education and work experience.

Significantly, the importance of vocational evidence in making benefit determinations has been emphasized by CORE's own expert. (Pl. App. 5).

> [T]his type of insurance *defines* long term disability as a total disability to engage in <u>any</u> *gainful* employment or occupation for which the employee is qualified, or may reasonably become qualified based upon determinants such as education, job training or work experience and at a salary level equivalent to the basic long term disability level.

(NB 75: Taylor Dep., Exh. 6; Pl. App. 5, p. 2). The same expert, noted the obvious: "All other things being equal, a disability claimant with a four year college degree has relatively better chance of obtaining gainful employment than a disability claimant with a high school diploma." *Id.* He emphasizes that even if there are transferable skills, a labor market survey should be conducted since:

> the employee must still be able to find an actual job in their own local area to be considered gainfully employable. To do this, the investigation into and analysis of current labor market information is [sic] next step in the process of determining employability. This requires a combination of databases, practical experience, attention to national, regional and local business trends and diligent use of the telephone to do direct contact and survey potential employers within specific local labor market areas. It is axiomatic that sparsely populated rural labor market areas offer relatively fewer employment opportunities and demonstrably lower prevailing salaries than major metropolitan labor areas. Thus, the probability of demonstrating gainful employability directly correlates with the urban demographics of a given market area as well as unique employment trends which may vary from one urban labor market to another.

*Id.*, p. 5.  The CORE expert also noted other common factors:

> which may variably affect a decision on whether to approve or deny
> continued long term disability benefits based upon gainful
> employability including (1) the expected chronicity and prognosis of
> the disability, (2) the claimant's age, (3) the claimant's receipt of
> benefits from other compensation programs, notably, Social Security
> Disability Insurance, and (4) the status of any pending litigation
> initiated by the claimant.

*Id.*, p. 4-5.[13]

The above principles are directly applicable to this case, and rest on the Plan language and

common sense.  Whether a claimant is totally disabled from any occupation cannot be determined

in a vocational vacuum.  The definition in the Plans—whether the participant is unable to

work—depends on whether the person is employable in any job that exists.  If no employer will hire

a claimant because of her medical condition, she is disabled.  Reliance on an FCE tester or an IME

doctor who speculates that, theoretically, a claimant can do some job, without considering the

claimant's vocational limitations—whether because of the limitations of age, education and the other

commons factors, or the limitations of geography—is *per se* arbitrary and without a reasonable

basis.[14]  CORE did nothing in these actions to consider the vocational limitations of the plaintiffs.

All of the plaintiffs live in the rural, mountainous area of western North Carolina.  Most of the

plaintiffs were of an older age.  Virtually all of the plaintiffs had chronic conditions with severe pain.

---

[13]  The CORE expert's article also observes that "if a claimant has been approved for
Social Security benefits, there may exist *prima facie* evidence to support a finding of continued
long term disability."  *Id.*, at p. 5.

[14]  The CORE expert's article provides several scenarios which are quite instructive in
how fiduciaries operating under the same definition of total disability with respect to LTD plans
should apply vocational factors.  The contrast between these scenarios and CORE's actions with
respect to each of the plaintiff's claims demonstrates the deficiencies in Champion/CORE's
procedures in this case.

In fact, prior to CORE's involvement, Travelers prepared profiles of some of the plaintiffs. The profiles included the above recognized factors, including age, education, and the degree of impairment, and made assessments as to whether an effort should be made to provide training or other assistance and helping the claimant to become "reasonably qualified" for a new occupation. With respect to each of the plaintiffs who was profiled in this manner, Champion/Travelers that no vocational rehabilitation should be considered because the claimant was "too impaired." (See, e.g. Pl. LR 56 St., ¶ 307 (Mr. Haynes)). In their later review of these claims, Champion/CORE did not mention or explain the fact that Champion had previously found the claimant totally disabled and not subject to rehabilitation. This omission of any consideration of prior inconsistent positions is another indication of the selective review performed by Champion/CORE.

Perhaps the best indicator of the plaintiffs' vocational disability is Champion's own response when asked whether a plaintiff, whom CORE had determined was no longer totally disabled, could be re-employed at Champion. In virtually every case, Champion was given the opportunity to provide reasonable accommodations or re-employment to the plaintiff; and in every case, Champion refused. Generally, the employee refusing to consider re-employment was Sharon Spain, Champion's contact person in the Canton, North Carolina, plant, who was generally so enthusiastic about CORE's termination efforts. *See, e.g.*, Pl. LR 56 St., ¶ 478.

In addition to disregarding vocational factors, CORE's Dr. Beavers actually denied that the above common factors were even relevant. In Mr. Smith's claim, Mr. Smith's vocational consultant, Randy Adams (along with his counsel), recognized that Mr. Smith's age—in addition to his limited education and other factors—rendered him unemployable, given his substantial impairment. (Pl. LR 56 St., ¶ 649). Dr. Beavers flatly denied that age was a relevant factor. (Pl. LR 56 St., ¶ 657). And

29

in the Rule 30(b)(6) deposition of CORE, CORE's representative, Mr. Taylor testified that age was not a factor in disability decisions. (NB 75: Taylor Dep.).

Champion/CORE's position that vocational factors are irrelevant are contrary to the Plan definition, the experience of vocational consultants, including CORE's own expert; and common sense. Champion/CORE's disregard of vocational factors with respect to all of the plaintiffs is a fatal deficiency in their procedure.

### Champion/CORE's Failure to Acknowledge its Prior Inconsistent Decisions with Respect to Most of the Plaintiffs Is Fatal to its Procedure

As previously pointed out, most of the 14 plaintiffs had been certified for total disability from any occupation by Champion and in some cases, CORE. (Pl. App. 1). Some of the plaintiffs have been on total disability for years when they were terminated. Nevertheless, Champion/CORE recognized no obligation to consider their prior inconsistent decisions or to explain any change of condition or circumstances which justified a change in the plaintiff's status.

Under any reasonable and principled review process, such explanation is called for. While the Plan language does not explicitly require any particular burden of proof on the part of the fiduciary, ERISA standards require that a fiduciary act "in the interest of the participant" in making all decisions concerning the Plan. Even under deferential standards, the courts prohibit "arbitrary and capricious" decisions. A decision to terminate a claimant who has been previously certified, perhaps over a long period of time, for total disability under the same Plan language, is arbitrary unless explained by some change in the claimant's conditions or change in the evidence.

In *Connors v. Connecticut General Life Co.*, 272 F.3d 127 (2nd Cir. 2001), the court recognized this principle in reversing the district court's judgment in favor of the administrator in

an LTD case. Finding that the plaintiff had received LTD benefits for "fifty-four months" before it terminated its benefits, and "almost 30 months over the second, more stringent definition," the court found error in the district court's failure to consider the administrator's "reversal in policy preceded by no significant change in Connors' physical condition." The court indicated that it was arbitrary conduct to change a claimant's disability status of a claimant who had been on total disability for years without explanation.

Champion/CORE's utter failure to recognize any obligation to support a change in its decision is arbitrary at best, and arrogant at worst. Champion/CORE's failure in this disregard renders the entire procedure deficient.

## INDIVIDUAL CLAIMS

### ELIZABETH CASE BOONE

#### Ms. Boone is Totally Disabled under the Plan

Ms. Boone is totally disabled under the Plan from seven neck surgeries with fusions from C3-C7 (cervical discs), diffuse fibromyalgia and cervical spondylosis. (Pl. LR 56 St., ¶ 61). She was certified for total disability under the Plan for 11 years. Her two treating specialists confirmed during CORE's review that she remained disabled. In plaintiffs' brief in support of their motion for summary judgment, plaintiffs argue the facts establishing Ms. Boone's total disability which are incorporated by reference. *(See* Pl. Brief, pp. 19-24).

#### Defendants' Contentions

In their argument in support of their motion, defendants ignore the opinions of Ms. Boone's treating physicians and rely on (1) Dr. Beavers' unsupported statement that Ms. Boone's treating physician, Dr. Vargo, had indicated she was "not sure" that Ms. Boone was disabled; (2) the IME

31

of Dr. Shields; (3) the "CORE Peer Review" of Dr. Alan Marks; and (4) the TSA of CORE's Costs Services Department. (*See* Def. Brief, pp. 13-16). Defendants have mischaracterized the evidence and the standards of disability, and have ignored the substantial evidence in support of Ms. Boone's claim. Plaintiffs will address these facts briefly, with reference to the plaintiffs' initial brief for a more specific discussion.

**Dr. Beavers' statement concerning Dr. Vargo's opinion:** Dr. Beavers, in an internal computer note, quoted Ms. Boone's treating physician, Dr. Vargo, as stating that she was "not sure" of Ms. Boone's continuing total disability. (Pl. LR 56 St., ¶ 87).[15] Dr. Vargo's documentation before and after Dr. Beavers' quote demonstrates that she was totally convinced that her long-time patient, Ms. Boone, was credible in her complaints of pain and was totally disabled from any kind of work. (Pl. LR 56 St., ¶ 97). Dr. Beavers' note deserves no weight given his role in almost all of the plaintiffs' cases in pushing for termination of disability. *See § ___, supra*. If Dr. Beavers had truly been interested in gaining the truth, he would have requested some documentation of any "uncertainty" from Dr. Vargo. There is no such documentation. In fact, after Dr. Beavers made his note, Dr. Vargo confirmed, with objective findings, that Ms. Boone would not "return to gainful employment." (Pl. LR 56 St., ¶ 97). This letter, written after Dr. Beavers' hearsay statement, is clearly the best evidence of Dr. Vargo's opinion.

**IME of Dr. Shields:** Dr. Shields' IME was not a reasonable basis to terminate Ms. Boone's LTD benefits. Dr. Shields emphasized the severe pain which Ms. Boone had consistently reported

---

[15] As pointed out previously, the fact that a doctor is "not sure" of any opinion is not the point. The prevailing evidentiary standard requires only that a doctor have an opinion to a reasonable degree of professional certainty. It is doubtful that any physician could honestly express any greater certainty.

to him, stated that additional evaluation was needed, and provided a qualified opinion that Ms. Boone could never return to regular full-time work but could engage in part-time work "5-6 hours/day, 5 days/week." (Pl. LR 56 St., ¶ 79, 83). At CORE's insistence, Dr. Shields then altered his finding, stating that Ms. Boone could perform sedentary work for "6 hours per day, 5 days per week." (Pl. LR 56 St., ¶ 85). As pointed out previously, Dr. Shields' explanation for his reversal was untrue. (Pl. LR 56 St., ¶ 86). Given the qualification of his opinions—that further evaluation should be pursued—and the CORE-induced alteration of his opinion, Dr. Shields' report should not be given any weight. In any event, as argued previously, Dr. Shields' opinion that Ms. Boone could perform some part-time work does not render her able to work under the Plan.

**CORE Peer Review report of Dr. Marks:** Dr. Marks, a CORE physician who provided a brief report, based his opinion primarily on his review of Dr. Shields' IME. (NB1: Boone-398). Dr. Marks never saw Ms. Boone, never interviewed her concerning her reports of pain, and did not review all of her treatment records, instead relying on the IME and CORE's transmittal request asking whether he could "uphold the previous denial." *Id*. Dr. Vargo's records. Nevertheless, he concluded that Ms. Boone "cannot be thought of as disabled," apparently since her reports of pain were "subjective." *Id*. Dr. Marks, adhering to the CORE policy, applied an erroneous standard in his disregard of Ms. Boone's pain. This report should be seen for what it is—a CORE-produced conclusion from a CORE consultant in an effort to bolster the record for termination.

**TSA:** As argued previously, CORE's TSA is essentially meaningless given its source, the lack of individualized consideration of facts concerning Ms. Boone, and its failure to make any effort to determine Ms. Boone's ability to find and sustain employment given her restrictions and her severe chronic pain. *See § ___, supra*.

**Champion/CORE Did Not Engage in a Full and Fair Review Process in Terminating Ms. Boone's LTD Benefits**

Plaintiffs have argued, with significant support, that this Court should perform a *de novo* review of each claim. However, even under an arbitrary and capricious standard of review, Champion/CORE would be entitled to no deference unless they had engaged in a reasoned decision making process, fairly considering all of the facts and opinions in context, and arriving at their conclusion based on substantial evidence. *See § ___, supra.* As the following demonstrates, there was no reasoned decision making process or full and fair review of Ms. Boone's claim. Specifically, it was *not* reasonable on the part of Champion/CORE:

• To disregard Ms. Boone's two long-time treating physicians, who consistently determined, based on years of treatment, that Ms. Boone was totally disabled because of the objectively documented deterioration of her spine after multiple surgeries, and her resulting chronic pain.

• To terminate disability based on the one-time IME by Dr. Shields, whose credibility was low given the alteration of his report, and whose opinions were qualified by his recognition that Ms. Boone needed further evaluation, that she could, at most, engage in part-time work.

• To terminate disability based on the statement that there were no "demonstrable objective findings to qualify for medical disability" given the extensive evidence depicting and quantifying the deterioration of Ms. Boone's cervical spine, which, according to her treating experts, would account for her disabling pain. (Pl. LR 56 St., ¶¶ 61-65; NB 1: Boone-13).

• To disregard Ms. Boone's consistent reports of disabling pain, in view of the repeated references to her pain throughout her medical records. (Pl. LR 56 St., ¶ 66).

• To terminate Ms. Boone's LTD benefits based on the report of the CORE consultant who never examined Ms. Boone, and who adopted wholesale the qualified IME conducted by Dr. Shields.

• To base the termination of Ms. Boone's LTD benefits on a TSA which failed to consider Ms. Boone's vocational disability in the context of her individualized circumstances.

• To terminate Ms. Boone's LTD benefits based on a hearsay statement by CORE's doctor, Dr. Beavers, that Dr. Vargo was "not sure" of Ms. Boone's total disability, in view of the consistent strong opinions expressed by Dr. Vargo throughout the record that Ms. Boone remained

34

totally disabled.

   •     To prejudice the CRC review in stating the issue to be determined as follows: "Denial of further LTD benefits as employee was released to return to work in restricted capacity and does not meet the definition of disability."  (NB 1: Boone-1).

   •     To conclude that Ms. Boone was able to work based on a finding that she could, at most, perform part-time work, since even this finding would not remove her from the definition of total disability under the Plan.

### Conclusion

   Ms. Boone is totally disabled under the Plan, as demonstrated repeatedly in the record. Champion recognized her total and permanent disability prior to Champion's efforts to reduce its LTD rolls.  On November 21, 1996, in its annual review, Champion determined that Ms. Boone had not improved, and that she "will never RTW [return to work] because of pain, cries easily, and seeks medical attention—not appropriate for rehab [rehabilitation] . . ."  (NB 1: Boone-195).  Following that review, there was no indication that Ms. Boone ever improved in her condition.  To the contrary, Ms. Boone's condition has continued to worsen over the years.  Ms. Boone's LTD benefits should be reinstated.


### ROSA LEE BROOKSHIRE

### Ms. Brookshire is Totally Disabled under the Plan

   As established in plaintiffs' brief in support of their motion for summary judgment,  Ms. Brookshire is totally disabled under the Plan. (*See* Pl.  Brief, pp.  24-29)*.*  Plaintiffs incorporate by reference the facts stated therein in support of her claim.  Champion certified Ms.  Brookshire's total disability for three (3) full years prior to CORE's intervention.  She suffered for years with chronic lower back pain and disc degeneration which eventually became disabling.  (NB 4:CRC-989).

35

Despite the fact that the evidence indicated that Ms. Brookshire's condition continued to deteriorate, Champion/CORE terminated her long term disability benefits on January 30, 1998, when she was nearly 61 years of age.

### Defendants' Contentions

Defendants' Rule 56(a)(1) Statement of Facts and their Memorandum of Law in support of their motion for summary judgment mirror the many deficiencies in the Champion/CORE claims review process. *(See* Def. Brief, pp. 15-18). Both under-report and minimize Ms. Brookshire's physical problems and ignore her tenacious battle with back pain from approximately 1980 until she came out of work in 1995. Nevertheless, defendants contend Ms. Brookshire's claim received full and fair review. It did not.

The defendants relied on (1) an incomplete review of the medical evidence; (2) CORE's Dr. Beavers' suspect hearsay account of a telephone conversation with Dr. Mulholland; (3) an FCE which defendants falsely claim was conducted at Dr. Mulholland's suggestion; (4) an IME by Dr. Andrew Rudins; (5) a TSA performed by a CORE employee; and (6) a "Peer Review Analysis".

**Incomplete Review of Medical Evidence:** In their brief, defendants refer to Ms. Brookshire's disabling condition as "chronic low back pain and obesity." *(See* Def. Brief, p. 15). Defendants ignore a number of other physical problems from which she suffered. (See Pl. LR 56 St., ¶ 111). Defendants also ignore the fact that Ms. Brookshire's long-time treating orthopaedist, Dr. Harley, who had managed her back pain since 1980 (See NB 4: CRC-1137), noted four days before her final termination of benefits, "very obvious progression of the degenerative arthritis in her lumbar spine." (Pl. App. 18; NB 4: CRC-989). Defendants used an incomplete quote to mischaracterize Dr. Harley as supporting Champion/CORE's conclusion that Brookshire did not

satisfy the "any occ" disability standard. (*See* Def. Brief, p. 16-17).

**Dr. Beavers' statement concerning Dr. Mulholland's opinion:**  CORE's Dr. Beavers spoke by telephone on July 23, 1997 with Dr. Mulholland, a family physician who had assumed Ms. Brookshire's care.  Dr. Beavers reported "her doctor is not claiming that she is disabled from any occupation."  (NB 4: CRC-1068). In fact, exactly one month prior, Dr. Mulholland had certified in an Attending Physician's Statement that Ms. Brookshire was totally disabled from any occupation and would never be able to resume any work. (NB 4: CRC-1072). Apparently, Dr. Mulholland told Dr. Beavers that he had not done the original disability certification on Ms. Brookshire since he inherited her as a patient.  Regardless, the fact that a doctor is "not sure" of an opinion is not decisive.  Rather, the prevailing evidentiary standard requires only that the doctor have an opinion to a reasonable degree of professional certainty, and clearly, Dr. Mulholland had expressed that opinion in his Attending Physician Statement of June 23, 1997.

When asked subsequently to complete a Modification Checklist because "...you did not feel Ms. Brookshire was disabled from any occupation...", (NB 4: CRC-1066), Dr. Mulholland refused and wrote: "This patient needs a disability evaluation to determine what she is qualified to do.  I do not provide this service. Thank you." (NB 4: CRC-1064).  His response belies the opinion attributed to him by Dr. Beavers.  There is also nothing in the record to indicate that Dr. Beavers communicated to Dr. Mulholland an accurate and complete standard or definition of disability from the Plan itself.  Certainly, Champion's Attending Physician Statement Forms do not contain the full and complete Plan definition of disability.  (i.e., NB 4: CRC-1071-1072).

**FCE:** On September 18, 1997 CORE instructed therapist Susan Kimel to do an FCE, and to consider only impairment related to "chronic degenerative lumbar disc disease with osteoarthritis."

37

(NB 4: CRC-1057).  Thus, CORE sought to ignore the impact of her many other physical problems.

Moreover, there is nothing in the record to indicate Ms. Kimel was competent to express vocational

conclusions.   Reacting to that incompetence, Dr. Mulholland wrote CORE on October 16, 1997

that "as far as I'm concerned, she is disabled until she is fully evaluated by a disability physician. I

do not consider her evaluation by the physical therapist to be reason enough to put her back to work."

(Pl. App.16; NB 4: CRC-1028).  Although it was but a "snapshot" of Ms. Brookshire's ability to

function, CORE/Champion exaggerated the utility of the FCE.  (Pl. App. 5, p. 11).

     **IME:** Dr. Rudins' IME upon which the defendants rely did not rise to the "full evaluation"

recommended by Dr. Mulholland and required by law.  First, Dr. Rudins saw Ms. Brookshire only

once, on December 2, 1997.  Second, he stated that the primary record he reviewed was Ms. Kimel's

"snapshot" FCE of September 18, 1997. Like the FCE, the IME was but a "snapshot" taken by a

doctor to whom she was unknown.   Dr. Rudins was not provided, and thus could not review,  the

medical records from Dr. Goodwin, Ms. Brookshire's long time treating family physician who first

declared her disabled, or those from Dr. Harley, her long time treating orthopaedist, or those  from

Dr. Lipsey, the specialist in occupational orthopaedics who had also treated her. (Pl. LR 56 St. ¶

158).  Deprived of a full and fair historical understanding of Ms. Brookshire's medical problems,

Dr. Rudins' IME is not adequate to justify termination of her benefits.

     Moreover, Dr. Rudins' IME contained an inconsistency that defendants failed to reconcile:

while he opined that  Ms. Brookshire was able to return to work with restrictions immediately, on

the other hand he also recommended a work tolerance program. Apparently, he felt that she needed

the work tolerance program before she could attempt restricted employment.   CORE totally ignored

his recommendation.

Finally, Dr. Rudins' hypothesis that Ms. Brookshire was immediately employable after a work tolerance program is refuted by the fact that Champion itself immediately advised that the mill was "unable to accommodate modifications." (Pl. LR 56 St. ¶159(e)).

**TSA:** On July 1, 1998, five months after benefits had already been terminated, CORE's employee Jennifer Mikeska performed a TSA on Ms. Brookshire. Like the FCE and the IME, the TSA is yet another "snapshot" of the employee's vocational potential. Because it was performed by a CORE employee and not an independent vocational expert, because it was done by a CORE employee in Texas, who never met or talked with Ms. Brookshire, and because the TSA did not include a true labor market survey, it is not reliable.

The TSA itself is flawed by inconsistency. Ms. Mikeska first claimed the TSA only considered the position of rewinder operator, Ms. Brookshire's job at Champion for 16 years, but then proceeded to consider her remote employment as a nurses' assistant in evaluating what jobs might be appropriate for her. (NB 4: CRC-962, 984). The TSA also failed to discuss the impact of Ms. Brookshire's pain and medications on her ability to obtain and sustain gainful employment. Finally, the TSA was misused by CORE in its July 15, 1998 "Denial Meeting." A memo from that meeting stated that the TSA "revealed manager positions." (NB 4: CRC-977). In fact, none of the positions listed in the TSA were "manager positions." Like Dr. Rudins' IME, the TSA is deficient in many ways, and certainly cannot be relied upon in the termination of Ms. Brookshire's benefits.

**CORE Peer Review Analysis:** As was its pattern and practice, on or about July 10, 1998 (more than five months after it had decided to terminate Ms. Metcalf's benefits), CORE employed a physician to do a "Peer Review Analysis" which, of course, supported termination of disability benefits. Like the IME and the TSA, CORE's Peer Review Analysis should be seen for what it is—a

39

CORE-produced document from a CORE consultant to support CORE's denial of disability. Dr. Nemunaitis never saw or spoke to Ms. Brookshire. Apparently willing to consider only "objective evidence," he essentially ignored the effects of either Ms. Brookshire's chronic pain or her medications on her ability to obtain and sustain gainful employment. Also, Dr. Nemunaitis supposedly reviewed some of Ms. Brookshire's x-rays, MRI, and CT scans. However, he either failed to review or ignored the most recent 1998 x-rays which objectively established "very obvious progression of degenerative arthritis in her lumbar spine." (Pl. App. 18). For the reasons set forth, and because it relied on an unreliable IME, an equally unreliable TSA, and a flawed FCE, the Peer Review Analysis itself was flawed and thus unreliable.

### Champion/CORE Did Not Engage in a Full and Fair Review Process in Terminating Ms. Brookshire's LTD Benefits

Plaintiffs have argued, with significant support, that this Court should perform a *de novo* review of each claim. However, even under an arbitrary and capricious standard of review, Champion/CORE would be entitled to no deference unless they had engaged in a reasoned decision making process, fairly considering all of the facts and opinions in context, and arriving at their conclusion based on substantial evidence. *See § ___, supra.* As the following demonstrates, there was no reasoned decision making process or full and fair review of Ms. Brookshire's claim. Specifically, it was *not* reasonable on the part of Champion/CORE:

•      To disregard the historical evidence of her disability from Ms. Brookshire's long time treating family physician, Dr. Goodwin, who had initially and consistently determined that she was totally disabled, based on objectively documented progressive and degenerative lumbar disc disease and osteoarthritis of the spine.

- To present Ms. Brookshire's claim to the CRC Committee in biased and conclusory terms. Specifically, the CRC was told that the issue for their determination was as follows: "Issue: denial of further LTD benefits as employee was released to return to work in restricted capacity and does not meet the definition of disability." (See NB 3: Brookshire-1). This statement of the "issue" was biased and unfair, and indicates to the Committee the conclusion their employer, Champion, desired. It does not fairly and accurately reflect the Plan definition of disability.

- To ignore vocational factors such as age (Ms. Brookshire was nearly 61 when terminated), lack of education (10th grade education), difficulty spelling, limited work experience, and lack of true transferrable skills. When Champion had considered such factors earlier, it determined she was not a candidate for vocational rehabilitation. (Pl. App. 13).

- To refuse to consider supplementary evidence such as her Affidavit, a vocational counselor's report, her Social Security Administration Disability Award and additional medical records submitted during her appeal, culminated in an incomplete and unfair review that either misrepresented or ignored both medical and vocational factors.

### Conclusion

Ms. Brookshire was recognized for several years as being totally disabled under the Plan. Her disability is amply demonstrated in the record and was unquestioned by Champion until CORE intervened and began its denial-oriented process. A full and fair review would have established Ms. Brookshire's continued total disability under the Plan. Her benefits should be reinstated.

41

# HARRISON  YOUNG CLARK

## Mr.  Clark is Totally Disabled under the Plan

Plaintiffs' brief in support of their motion for summary judgment reviews the facts that established Mr. Clark's total disability from 1991 and continuing in 1998, and those facts are hereby incorporated by reference. (*See* Pl.  Brief, pp. 29-32).  Mr.  Clark suffered but  survived a serious on-the-job injury in November 1984, when he was struck in the back by a runaway log.  The injury kept him out of work for 18 months and left him with a 25-30% impairment of his spine (Pl.  LR 56 St. ¶ 187-189).   Understanding that injury and its consequences (chronic pain syndrome, recurrent herniated disc, nerve impingement, prolonged recurrent depression, restless leg or Ekbom syndrome, sleep disturbance, fibromyalgia, myositis, and chronic lumbar strain) is critical to any full and fair evaluation of his disability claim.   However, nowhere in the defendants' Local Rule 56(a)1 Statement or in their brief in support of  summary judgment do they mention this serious on-the-job injury.

Rather, the defendants essentially ignored  his 1984 injury and its consequences, and chose to under-report those and other problems in their review  of his claim.  This is consistent with their pattern and practice.  For instance, when CORE hired a physical therapist to do an FCE on Mr. Clark in  October of  1997, CORE indicated that Mr.  Clark's diagnoses were but two: Ekbom syndrome and fibromyalgia.  (NB 6:CRC-1572).   A month later, on  November 10, 1997, when CORE nurse Carol Bishop prepared  "an IME Chart Preparation Form" for a physiatrist from whom she apparently sought an IME, Mr.  Clark's diagnoses were reduced to one: fibromyalgia. (NB 6: CRC-1579).    Although Mr. Clark's combination of problems was increasingly ignored and/or under-reported by Champion/CORE, there is little or no indication in the record that  Clark's

42

condition actually improved in the six years Champion recognized his long term disability. To the contrary, his condition worsened, and the evidence demonstrates that he was disabled from any occupation for which he was reasonably qualified by training, education or experience.

### Defendants' Contentions

Defendants' brief attempts to justify Champion/CORE's termination of benefits after certifying long term disability for six years. (*See* Def. Brief, pp. 18-22). In voting to uphold the termination of benefits, the Claims Review Committee considered "Plan provisions" and the following: (1) CORE's Dr. Beavers' account of his 8/25/97 telephone conversation with Clark's treating orthopaedist, Dr. Eglinton; (2) a 10-15-97 FCE; (3) a 11-5-97 "Modification Checklist"; (4) a 1/12/98 IME and Modifications Checklist by Dr. Rudins; (5) a TSA; and (6) Dr. Mills' letter (NB 6: CRC - 19, 20).

**Dr. Beavers' Statement Concerning Dr. Eglinton's Opinion:** On August 21, 1997, Dr. Eglinton, under threat of criminal and civil penalties, signed an Attending Physician's Statement indicating that Mr. Clark's condition was unimproved and that he was totally disabled for any occupation. (Pl. App. 20). However, four days later, on August 25, 1997, CORE's Dr. Beavers telephoned Dr. Eglinton and changed Dr. Eglinton's opinion. The record does not contain a full account of that conversation, but Dr. Eglinton's notes indicate he thought he was speaking with an independent medical examiner when he spoke with Dr. Beavers, whom he believed to be with "J.B. Beavers, Inc." (NB 6: CRC-1554). It is impossible to tell if Dr. Eglinton was just confused or was actually deceived by Dr. Beavers as to Beavers' actual role in the evaluation of Mr. Clark's disability. The record also does not indicate what definition of disability Dr. Beavers communicated to Dr. Eglinton.

43

It is clear, however, that Dr. Beavers', the Claims Review Committee [hereafter "CRC"] and defendants' brief characterize that conversation in a way that Dr. Eglinton did not. Beavers reported: "he [Eglinton] says that he is not disabled from any occupation, and that there are jobs he could do." (Pl. LR 56 St. ¶ 213). The CRC adopted Beavers' characterization of the conversation: "Dr. Eglinton said that Mr. Clark 'is not disabled from any occupation and that there are jobs he could do.' " (NB 6: CRC -19). Defendants' initial brief recite Beavers' and the CRC's characterization verbatim. (*See* Def. Brief, p. 19).

Dr. Eglinton's notes are somewhat different: "talked with independent medical examiner for Champion Paper concerning Mr. Clark...I cannot certify Harrison totally and completely disabled from all work activity. All they can do at this time is to repeat a functional capacity and see where he stands. We will be happy to send copies of all our notes to J.B. Beavers, Inc." ( NB 6: CRC-1554). Dr. Beavers, the Claims Review Committee and defendants' brief all ignore and offer no explanation for the fact that four days prior to the conversation with Beavers, Eglinton had certified Harrison Clark "totally disabled for "any occupation." Either Dr. Eglinton was making a distinction between disability "from any occupation" and disability from "all work activity," or his opinion had changed abruptly. Why the change? Had his conversation with Dr. Beavers left him misinformed as to the Plan's definition of disability? Whether Dr. Eglinton was vacillating or confused, questions were raised that should have been addressed by a full and fair review of Mr. Clark's claim. Because these questions were left unanswered, the review was not full or fair.

**10-15-97 Robbins FCE:** CORE next obtained an FCE from physical therapist Charlie Robbins on October 15, 1997. The Claims Review Committee misunderstood or misquoted the FCE as finding "Mr. Clark is capable of a sedentary physical demand level of work."(NB 6: CRC -19) .

44

That was error.  Mr. Robbins actually noted Mr.  Clark's intense pain level and  concluded that due to high pain levels and Mr.  Clark's hesitation to complete all tests, he [Robbins] was "unable to indicate that he is capable of returning to work."  (NB 5: Clark-220, 221).  The last question on the FCE form signed by Charlie Robbins asked , "Can Patient Work Now?" to which Mr.  Robbins responded, "No."   (NB 5: Clark-222).  Defendants' brief offers no explanation or defense of the CRC's erroneous reliance on the FCE.  *Def. Brief, pp. 19-23.*

**11-5-97 Eglinton "Modification Checklist":**  The CRC considered the Modification Checklist and said it indicated "...Mr. Clark can work 4-6 hours a day, 3-4 days a week in a sedentary job with restrictions." (NB 6: CRC-20).  The CRC failed to discuss the restrictions which apparently included: "...modifications as specified by the FCE [see discussion above] and by his lumbar spinal stenosis."  (NB 5: Clark -226). Dr. Eglinton required that the plaintiff be able to regularly change positions and wrote: "I believe patient is hard of hearing."  (NB 5: Clark -226).   Neither the CRC minutes nor defendants' brief  reveal any consideration of the impact of the extensive restrictions on Mr. Clark's employability, or any investigation into the question of  Mr. Clark's possible hearing problems.  *Def. Brief, pp. 19-23.*

**IME:**  Dr.  Rudins performed an IME on January 12, 1998, the only time he ever saw Mr. Clark.  Although he speculated that Mr.  Clark could potentially work at a sedentary level, 8 hours a day with significant restrictions, his realistic opinion was that   "Considering that Mr.  Clark has been out of work for essentially 7 years, the **probability** of his being able to return to a productive job is quite low," (emphasis added).  (Pl. LR 56 St. ¶ 218; *Pl. Brief, p. 31-32).*  Nonetheless the CRC relied heavily on the Rudins IME and the modifications checklist he completed at defendants' request in its decision to deny Mr. Clark's appeal of the termination of his benefits.  (NB 6: CRC -

20) Defendants' brief, like the CRC minutes, offers no explanation or defense for ignoring Dr. Rudins' opinion that "the probability of his being able to return to a productive job is quite low." *Def. Brief, pp. 19-23.* Ignoring the probable and denying benefits based on the possible was not reasonable, it was not fair, and, thus, Mr. Clark's benefits should be reinstated.

### Conclusion

CORE employee Joan Callahan-Barlowe noted in an email on November 30, 1998 concerning Mr. Clark's appeal, "this is an expedited appeal, if he wants to call it an appeal." (NB 41: CE-1351). Her comments suggest what careful scrutiny makes obvious: the claims review and appeal process afforded Mr. Clark was not reasonable, full or fair. Because Champion failed to provide the full and fair review mandated by law, benefits should be reinstated.

### FRANZISKA FINNEY

### Ms. Finney is Totally Disabled under the Plan

Ms. Finney is totally disabled under the Plan from disc degeneration, fibromyalgia, osteoarthritis and chondromalacia of the patella at the L5-S1 and C5-6, 6-7 levels of her spine. (Pl. LR 56 St., ¶ 161). From 1994 through 1997, Ms. Finney was certified for disability under the Plan. In plaintiffs' brief in support of their motion for summary judgment, plaintiffs argue the facts establishing Ms. Finney's total disability which are incorporated by reference. (*See* Pl. Brief, pp. 33-36).

### Defendants' Contentions

In support of their motion, defendants ignore the consistent opinions of Ms. Finney's treating physicians, who have consistently determined her disability and rely on (1) the FCE of Ms. Kimel; and (2) Dr. Osbahr's June 11, 1997 statement, which conflicts with his previous statements, and

which was based upon the flawed and inaccurate FCE. (*See* Def. Brief, pp. 23-24). Defendants have mischaracterized the evidence and the standards of disability, and have ignored the substantial evidence in support of Ms. Finney's claim. Plaintiffs will address these facts briefly, with reference to the plaintiffs' initial brief for a more specific discussion.

**Dr. Osbahr:** Dr. Al Osbahr, Champion's company doctor, who had treated Ms. Finney in the past, submitted two Attending Physician's Report of Physical Capacity, one dated March 31, 1995 and the other dated May 24, 1995, in which he documents that Ms. Finney is limited to "3-4 hours per day" part-time work. (NB 7:Finney- 227, 232). On April 17, 1996, Dr. Osbahr states, "No change from status" with PT [physical therapy] or aquatics. (NB 7: Finney 256). Consistent with his earlier documentation of Ms. Finney's condition, Dr. Osbahr's June 11, 1997 Attending Physician's Statement states that Ms. Finney's prognosis is "unimproved", indicates a total disability period through "indefinite", and also states it is "unclear and indefinite" as to when Ms. Finney will be able to resume any work. The report contradicts itself in that it also states, subsequent to contact from CORE, that Ms. Finney could work at a sedentary, clerical type position. However, CORE ignored the unfavorable portion of Dr. Osbahr's statement and concluded that he (Osbahr) stated that Finney was not totally disabled from any occupation because she "can do sedentary work". (Pl. LR 56 St., ¶ 275).

Dr. Osbahr's office note, upon which CORE/Champion also bases the upholding of the denial of Ms. Finney's LTD claim, states, "If trained or posses [sic] skills for white collar jobs, she could do light work activities only." (Pl. LR 56 St., ¶ 275). As evidenced by the record, Ms. Finney does not have the training, education or experience for the types of jobs Dr. Osbahr identified as appropriate for her. (Pl. LR 56 St., ¶ 258-260). Accordingly, termination of Ms. Finney's benefits

based upon her alleged physical ability to perform a job for which she has no training, education or experience is unreasonable. Dr. Osbahr's opinion that Ms. Finney could do some type of white collar job does not render her able to work under the Plan.

Dr. Osbahr's change of opinion, after CORE contact, is suspect at best. As the Champion doctor, Dr. Osbahr clearly has a conflict of interest. Therefore, his opinion should be discounted.

**FCE of Ms. Kimel:** The FCE performed by Ms. Kimel was not a reasonable basis to terminate Ms. Finney's LTD benefits.  Ms. Finney's treating physicians documented the severe pain and chronic fatigue which Ms. Finney consistently reported. However, pain and chronic fatigue were not considered in determining Ms. Finney's functional capacity, thus making the FCE inherently flawed and unreliable. Accordingly, CORE's and the Plan's reliance upon the FCE in terminating her disability, and particularly in light of its failure to perform a vocational analysis to determine whether Ms. Finney had the education, training or experience to perform jobs within the FCE's restrictions, violated the Plan.

### Champion/CORE Did Not Engage in a Full and Fair Review Process in Terminating Ms. Finney's LTD Benefits

Plaintiffs have argued, with significant support, that this Court should perform a *de novo* review of each claim.  However, even under an arbitrary and capricious standard of review, Champion/CORE would be entitled to no deference unless it had engaged in a reasoned decision making process, which fairly considered all of the evidence in the case in context, and arrived to its conclusion based on substantial evidence.  *See § ___, supra*.  As the following demonstrates, there was no reasoned decision-making process, or full and fair review of Ms. Finney's claim. Specifically, it was *not* reasonable on the part of Champion/CORE:

48

• To disregard Ms. Finney's long-time treating physicians who consistently determined, based on years of treatment, that Ms. Finney was disabled because of her severe pain and chronic fatigue.

• To terminate disability based on the one-time FCE by Ms. Kimel, particularly given the failure to consider Ms. Finney's level of pain and fatigue in concluding that Ms. Finney could engage in light-duty work.

• To disregard completely Ms. Finney's consistent reports of disabling pain, in view of the repeated references to her pain throughout her medical records.

• To terminate Ms. Finney's LTD benefits based on the report of the Champion doctor, whose statements were inconsistent and contradictory, and who adopted wholesale the qualified FCE conducted by Ms. Kimel.

• To base the termination of Ms. Finney's LTD benefits on the FCE, which failed to consider Ms. Finney's vocational disability in the context of her individualized circumstances.

• To terminate Ms. Finney's LTD benefits based on a statement by Champion's doctor, Dr. Osbahr, who stated that "If trained or posses [sic] skills for white collar jobs, she could do light work activities only", without considering that Ms. Finney was not qualified by training, education or experience for this type of job.

• To conclude that Ms. Finney was not disabled based on a finding that she could, at most, perform white collar jobs, since this finding would remove her from the definition of total disability under the Plan.

## Conclusion

Ms. Finney is totally disabled under the Plan, as demonstrated repeatedly in the record.

Champion recognized her total and permanent disability prior to its efforts to reduce its LTD rolls and

CORE's involvement in her claim.

The review of Ms. Finney's claim took the route commonly utilized by Champion/CORE

to terminate disability. After CORE contracted with Champion, CORE began assembling

documentation in an effort to undermine Ms. Finney's disability. In a pattern and practice consistently

utilized by CORE, it ignored medical and vocational evidence substantiating Ms. Finney's disability.

Although CORE recognized as a potential complication Ms. Finney's "intractable, chronic pain" and "chronic fatigue" in its August 27, 1997 Confidential Service Report (NB 7: Finney 22), it failed to consider these complications in arriving at its determination that Ms. Finney was "not disabled as defined in the Plan", and upheld its termination on appeal. As documented, Ms. Finney's condition, despite aggressive treatment, remains "unimproved". Her benefits should be reinstated.

## WILEY H. HAYNES

### Mr. Haynes is Totally Disabled under the Plan

Mr. Haynes is totally disabled under the Plan. He suffers from long-standing back and knee injuries and was certified for LTD benefits from 1993 to 1997. Mr. Haynes' treating physician has consistently determined, based on objective findings and his credible reports of chronic pain, that he is not able to work. (Pl. LR 56 St., ¶ 327). In plaintiffs' brief in support of their motion for summary judgment, plaintiffs argue the facts establishing Mr. Haynes' total disability which are incorporated by reference. (*See* Pl. Brief, pp. 37-42).

### Defendants' Contentions

In their argument in support of their motion, defendants ignore the opinions of Mr. Haynes' treating physician and rely on (1) Peer Review Analysis; (2) the FCE of Susan Kimel; (3) the IME of Dr. Johnson; and (4) the TSA of CORE's Costs Services Department. (*See* Def. Brief, pp. 48-56). Defendants have mischaracterized the evidence and the standards of disability, and have ignored the substantial evidence in support of Mr. Haynes' claim. Plaintiffs will address these facts briefly, with reference to the plaintiffs' initial brief for a more specific discussion.

**CORE's Peer Review Analysis:** Champion/CORE first relies on a peer review analysis of CORE consultant, Dr. William Augerson. He determined, reportedly in conjunction with Mr.

50

Haynes' treating physician, Dr. Queen, that Mr. Haynes could perform some sedentary work with "appropriate training." (NB 8: Haynes-123). In fact, Dr. Queen did not confirm the statement of Dr. Augerson when asked to do so, and has consistently certified Mr. Haynes' disability from any work based on the objective evidence of his back injuries and chronic pain. (Pl. LR 56 St., ¶ 327; NB 8: Haynes-123,127).

In any event, Mr. Haynes never received training. In fact, Champion conducted two vocational rehabilitation profiles which found that due to Mr. Haynes' age, education, and experience—and even in view of Mr. Haynes' interest in returning to work—that he was "too impaired" to be rehabilitated for work. (Pl. LR 56 St., ¶ 307). And Champion, through Sharon Spain, refused to accommodate Mr. Haynes or to consider him for re-employment. (Pl. LR 56 St., ¶ 314, 324).

**FCE:** The defendants rely primarily on the FCE of Ms. Kimel. As previously pointed out, Ms. Kimel had done an earlier FCE to determine whether Mr. Haynes could return to his regular job and found that, despite his best efforts, he could not return to work without a significant "risk of re-injury." (Pl. LR 56 St., ¶ 294). In her FCE of October 18, 1997, Ms. Kimel ignores that she had earlier conducted testing of Mr. Haynes. As a result of the test, Ms. Kimel finds that Mr. Haynes is able to perform sedentary work. (Pl. LR 56 St., ¶ 312). As previously argued, Kimel's FCE is flawed because it fails to consider Mr. Haynes' chronic and severe pain. The evidence demonstrates that following the three-hour FCE, Mr. Haynes had a dramatic escalation of his pain which resulted in his going to bed for two days on a heating pad. (Pl. LR 56 St., ¶ 312). Given these deficiencies, the FCE is unreliable as an indication of Mr. Haynes' ability to work on a sustained basis, 8 hours per day, 40

51

hours per week, in any occupation.

**IME:** Finally, the defendants rely on the IME of Dr. Johnson. As previously argued, Dr. Johnson's IME was based almost entirely on the flawed FCE. The IME is unreliable evidence of Mr. Haynes' ability to work. Sharon Spain, Champion's contact person for CORE, commented regarding Dr. Johnson's IME: "Good, Dr. Johnson did a good job." (Pl. LR 56 St., ¶ 315).

**TSA:** As argued repeatedly in plaintiffs' argument, CORE's TSA is essentially meaningless given its source, the lack of individualized consideration of the facts concerning the claimant, and its failure to make any effort to determine Mr. Haynes' vocational ability to find and sustain employment given his restrictions and severe and chronic pain. *See § ___, supra.*

### Champion/CORE Did Not Engage in a Full and Fair Review Process in Terminating Mr. Haynes' LTD Benefits

Plaintiffs have argued, with significant support, that this Court should perform a *de novo* review of each claim. However, even under a modified arbitrary and capricious standard of review, Champion/CORE would be entitled to no deference unless they had engaged in a reasoned decision-making process, fairly considering all of the facts and opinions in context, and arriving at their conclusion based on substantial evidence. *See § ___, supra.* As the following demonstrates, there was no reasoned decision-making process or full and fair review of Mr. Haynes' claim. Specifically, it was *not* reasonable on the part of Champion/CORE:

•    To disregard Mr. Haynes' long-time treating physician who consistently determined, based on years of treatment, that Mr. Haynes was totally disabled because of the objectively documented back injuries and surgeries and his resulting chronic pain.

•    To terminate disability on the one-time IME by Dr. Johnson which was based primarily on a flawed FCE.

•    To terminate disability based on the ground that there were no objective findings to

52

support Mr. Haynes' disabling pain, given the objective evidence of Mr. Haynes' spine and back injuries, which, according to his doctors, would account for his disabling pain.

•    To disregard Mr. Haynes' consistent reports of disabling pain in view of the repeated references to his pain throughout his medical record.

•    To terminate Mr. Haynes' LTD benefits based on the report of the CORE consultant who never examined Mr. Haynes and who disregarded pain as a component of his disability.

•    To base the termination of Mr. Haynes' LTD benefits on a TSA which failed to consider Mr. Haynes' vocational disability in the context of his individualized circumstances.

•    To terminate Mr. Haynes' LTD benefits based on a hearsay statement by CORE's consultant, Dr. Augerson, who questioned Dr. Queen's opinion, in view of the consistent strong opinions expressed by Dr. Queen throughout the record that Mr. Haynes remained totally disabled.

•    To determine Mr. Haynes' ability to work based on a three-hour FCE test which resulted in the escalation of Mr. Haynes' severe pain to such a degree that he was forced to go to bed for two days on a heating pad.

•    To base the termination of LTD benefits on an FCE which was inconsistent with the technician's prior findings, and which failed to explain the basis for its conclusions that Mr. Haynes could return to work at a full-time basis based on the limited activities and limited time conducted, without consideration of Mr. Haynes' resulting pain.

•    To terminate the disability of Mr. Haynes after previously certifying him from total disability from any occupation without finding some significant or material change in circumstances in his condition.

### Conclusion

There is no substantial evidence to support Champion/CORE's actions in terminating Mr. Haynes' disability. Mr. Haynes is totally disabled under the Plan. He should be reinstated to his LTD benefits.

### DARRELL KEITH HILL

### Mr. Hill is Totally Disabled Under the Plan

Mr. Hill is totally disabled under the Plan from traumatic injuries to his right leg and post-

traumatic degenerative arthritis, as well as eight surgeries on his right ankle and foot, culminating in the amputation of his right leg. (Pl. LR 56 St., ¶ 338). He was certified for total disability under the Plan for 8 years and his treating specialist confirmed during CORE's review that he remained disabled. In plaintiffs' brief in support of their motion for summary judgment, plaintiffs argue the facts establishing Mr. Hill's total disability which are incorporated by reference. (*See* Pl. Brief, pp. 42-47).

### Defendants' Contentions

In their argument in support of their motion, defendants ignore the opinions of Mr. Hill's treating physician and rely on (1) the alleged results of an IME, although its contents are unknown because defendants have failed to produce it; (2) the TSA of CORE's costs services department; and (3) CORE's physician consultant. (*See* Def. Brief, pp. 57-60). Defendants have mischaracterized the evidence and the standards of disability, and have ignored the substantial evidence in support of Mr. Hill's claim. Plaintiffs will address these facts briefly, with reference to the plaintiffs' initial brief for a more specific discussion.

**IME:** CORE indicates that an IME was conducted concerning Mr. Hill. (NB 10:Hill-0118). However, no record of the IME appears in Mr. Hill's claims file. (Pl. LR 56 St., ¶ 357). However, CORE's alleged findings of disability are based upon the "results" of the IME. Accordingly, there is no independent evidence in the record to support Champion/CORE's finding that Mr. Hill is not disabled.

**TSA:** As argued repeatedly in plaintiffs' prior initial brief and in this brief, CORE's TSA is essentially meaningless, given its source, the lack of individualized consideration of the facts concerning the claimant, and its failure to make any effort to determine Mr. Hill's vocational ability

to find and sustain employment given his restrictions and severe and chronic pain. *See § ___, supra*.

**CORE's Physician Consultant:** CORE indicates that its physician consultant reviewed selected records and "results" of the IME and based upon this information, determined that Mr. Hill would be capable of performing sedentary work activities. However, without a review of all of Mr. Hill's medical records, and more importantly an examination of Mr. Hill, the physician consultant would not have full and complete information regarding Mr. Hill's condition. An opinion based upon select, incomplete and inaccurate information would be unreliable. Mr. Hill's treating physician, who has examined and treated Mr. Hill extensively and is familiar with his entire medical history, is in the best position to determine Mr. Hill's disability.

### Champion/CORE Did Not Engage in a Full and Fair Review Process in Terminating Mr. Hill's LTD Benefits

Plaintiffs have argued, with significant support, that this Court should perform a *de novo* review of each claim. However, even under an arbitrary and capricious standard of review, Champion/CORE would be entitled to no deference unless it had engaged in a reasoned decision-making process, which fairly considered all of the evidence in the case in context, and arrived to its conclusion based on substantial evidence. *See § ___, supra*. As the following demonstrates, there was no reasoned decision-making process, or full and fair review of Mr. Hill's claim. Specifically, it was *not* reasonable on the part of Champion/CORE:

• To disregard Mr. Hill's long-time treating physician who consistently determined, based on years of treatment, that Mr. Hill was totally disabled because of his extensive surgeries and continued intermittent infections related to the amputation of his leg and resulting chronic pain.

• To terminate disability based on an IME of unknown content while only its "results" were provided to the physician consultant.

• To disregard completely Mr. Hill's consistent reports of disabling pain in view of the repeated references to his pain throughout his medical records.

•      To base the termination of Mr. Hill's LTD benefits on the TSA which failed to consider Mr. Hill's vocational disability in the context of his individualized circumstances.

•      To conclude that Mr. Hill was not disabled based on a finding that he could perform jobs for which he was not qualified by training, education or experience. In fact, not only was Mr. Hill unqualified by training, education or experience for the jobs listed by the TSA, he also lacked the mental aptitude and the minimum performance criteria for performing the jobs identified by CORE.

•      To base the termination of Mr. Hill's LTD benefits on the CORE Physician Consultant's opinion which was based upon partial records review, an inaccurate TSA, and who never examined Mr. Hill.

### Conclusion

There is no substantial evidence to support Champion/CORE's actions in terminating Mr. Hill's disability.  Mr. Hill is totally disabled under the Plan.  His LTD benefits should be reinstated.

### JUDITH CASE KIRKPATRICK

### Ms.  Kirkpatrick is Totally Disabled Under the Plan

Ms.  Kirkpatrick is yet another long time Champion employee who became unable to work, and whose disability was consistently recognized by Champion for several years. Plaintiffs' brief in support of their motion for summary judgment sets forth the facts establishing her total disability, which facts are incorporated by reference herein.  (*See* Pl.  Brief, pp.  47-52).

Despite having suffered two on-the-job back injuries in 1991 and 1992, Ms. Kirkpatrick continued to work until symptoms associated with her  injuries such as bilateral leg pain, together with  degenerative  disc  disease,  connective  tissue  disease  with  fibromyalgia,  and  generalized osteoarthritis forced her out of work in November of 1993.  (Pl.  LR 56 St.  ¶¶ 374, 375).  Champion recognized Ms. Kirkpatrick's total  disability for over four years before CORE's final review resulted in termination of benefits. For example, a  May 15, 1997 CORE claims diary noted that "based on all the clinical and vocational information, the employee continues to be T & P from any occupational."

(Pl. App. 40, NB 45:CE-1577).

However, in May of 1998 CORE undertook a denial-oriented process initiated by a telephone call from its own Dr. Beavers to Ms. Kirkpatrick's treating physician, Dr. Mendelsohn, which eventually culminated in termination, despite no improvement in her physical condition, which had actually worsened over the years. In justifying its actions, CORE relied on (1) Dr. Beavers' account of the conversation and its impact on Dr. Mendelsohn; (2) a TSA; and (3) a "Peer Review Analysis." By ignoring some evidence, minimizing other evidence and mischaracterizing still other evidence, defendants manipulated the means to achieve its desired result: denial. Champion/CORE's review was not reasoned, it was not full and it was not fair.

### Defendants' Contentions

Once again, Defendants' brief reflects the deficiencies of the Champion/CORE denial process, failing to mention critical information such as Ms. Kirkpatrick's two on-the-job back injuries and the consequences thereof, and under-reporting her plethora of physical problems, which included degenerative disc disease; connective tissue disease with fibromyalgia; generalized osteoarthritis; degenerative arthritis; progressive bone loss through the back (osteopenia); moderate degenerative changes through her upper and lower extremities; trochanteric bursitis; inflammatory polyarthropy; chronic advanced periodonitis; and numbness in both hands, feet and ankles. (Pl. LR 56 St. ¶¶ 379, 382, 383). Following Dr. Beavers' lead, Defendants' brief ignores the overwhelming and consistent evidence of disabling and intractable pain in Ms. Kirkpatrick's case, as did Champion/CORE, and erroneously applied an evidentiary standard whereby only objective evidence would be considered. (*See* Def. Brief, pp. 29-31).

**Dr. Beavers' Statement Concerning Dr. Mendelsohn**: Ignoring Ms. Kirkpatrick's family

doctor, Dr. Brown, her orthopaedist/spine specialist, Dr. Blaricom, and her dentist, Dr. Gillespie, who treated her long-standing periodontitis which was related to bone loss, and ignoring bone density studies, x-rays and MRI's, Dr. Beavers chose to challenge Dr. Mendelsohn, Ms. Kirkpatrick's rheumatologist. Although Dr. Mendelsohn had certified to Champion on several occasions that Ms. Kirkpatrick was disabled, he also indicated at times that in theory, there was a possibility that she might be able to do light, sedentary work. (Pl. LR 56 St. ¶392). Nevertheless, he occasionally couched those possibilities in terms of reality: i.e., "she has no job experience with [light, sedentary type work];" (NB 12:CRC-2011); i.e. she "cannot work because there is no job with a less than sedentary focus...she is really not able to work;" (Pl. LR 56 St. ¶410; Pl. App. 40); i.e. "she really can't [work], but if a job were around where she could sit, change position at will and not have to perform fine motor activities with her hands, maybe. For all intent and purpose, this EE is T & P disabled." (Pl. LR 56 St. ¶410; Pl. App. 40). All of these statements originated with Dr. Mendelsohn, and were consistent with his Attending Physician Statements certifying disability, until Dr. Beavers called.

Following his conversation with Dr. Mendelsohn, Beavers generated a CORE diary memo noting that "she has some back pain and osteoporosis but no objective findings to suggest she is totally disabled." (Pl. LR 56 St. ¶416). That incorrect and unsupported assumption became the basis for CORE's continued course of denial-oriented actions. Dr. Beavers memorialized his assumption, together with language that did not state the Plan's full and accurate definition of disability, in a letter written on CORE letterhead to Dr. Mendelsohn dated May 5, 1998, which he filled out and prepared for Dr. Mendelsohn's signature. (Pl. LR 56 St. ¶417). Dr. Beavers effectively put words in Dr. Mendelsohn's mouth, and Mendelsohn signed the letter saying she could do "sedentary or sit-stand

work, 6 hrs. per day, 5 days per week," on May 11, 1998.  (Pl. LR 56 St. ¶418).

However, when Ms. Kirkpatrick later discussed the matter with Dr. Mendelsohn, he told her

that Dr. Beavers informed him that based on the Plan, he should consider Ms. Kirkpatrick totally

disabled only if she was bedridden, or was unable to dress herself and otherwise care for her personal

needs.  (Pl. LR 56 St. ¶419).  Obviously, Dr. Mendelsohn's understanding of the Plan definition was

inaccurate, to say the least.  However, the damage was done, and Ms. Kirkpatrick, officially disabled

for four years, was now on her way to denial.

**TSA:** Despite Dr. Mendelsohn's follow-up notes of August 27, 1998, which indicated that

"patient has longstanding degenerative arthritis, chronic low back pain, muscle aching, soreness and

stiffness, sleep disturbance and marked muscle spasm," and "patient is not able to return to work at

this point," (Pl. LR 56 St. ¶429), CORE ordered its own employee, Jennifer Mikeska, to perform a

TSA in December of 1998.  Though lengthy, the TSA report appears largely computer-generated, and

it contains little or no documentation of Ms. Mikeska's qualifications to make vocational

recommendations; it did not identify any jobs within Ms. Kirkpatrick's restrictions and training; it

contained no labor market survey.  (Pl. LR 56 St. ¶432).  It did amusingly suggest that Ms.

Kirkpatrick's experience cleaning out boxcars at Champion might, with vocational retraining, aid her

in becoming a reservationist or ticket distributor at the public railways stations.  Apparently Ms.

Mikeska  was unaware that Canton, North Carolina lacked a public railway station.

**Peer Review Analysis:** Dr. Alan Marks' less than one page "Peer Review Analysis" dated

December 11, 1998 shows on its face that it was ordered by CORE for the express purpose of

upholding denial, rather than for the purpose of aiding in a full and fair review of Ms. Kirkpatrick's

claim.  The form lists the following as "Reason for referral: Can the denial be upheld of long term

disability benefits?" (NB 11: Kirkpatrick-0167). The only data Dr. Marks reviewed was a Champion referral form with submitted clinical highlights - hardly a full and fair review. He summarily concluded "yes, uphold the previous denial." As was typical of CORE Peer Review Analysis physicians, Dr. Marks never saw Ms. Kirkpatrick, or spoke with her, nor in this case did he even speak to any of her treating physicians. While he mentions an August 1998 note claiming that the patient is not able to return to work (presumably Dr. Mendelsohn's note of August 27, 1998 discussed above), Dr. Marks dismisses it on the grounds that "progress notes do not indicate any change in her condition supporting that the patient had become disabled." The glaring absence of a change in condition existed earlier, when despite being disabled for four years, Ms. Kirkpatrick was found by Dr. Beavers to be able to work; he had coerced enough of a concession from Dr. Mendelsohn to pretend her condition had improved, although it had actually deteriorated as substantiated by Mendelsohn's August 1998 notes. Clearly, the Peer Review Analysis was but a device utilized by CORE to buttress its denial of benefits.

### Champion/CORE Did Not Engage in a Full and Fair Review Process in Terminating Ms. Kirkpatrick's LTD Benefits

Plaintiffs have argued, with significant support, that this Court should perform a *de novo* review of each claim. However, even under an arbitrary and capricious standard of review, Champion/CORE would be entitled to no deference unless they had engaged in a reasoned decision making process, fairly considering all of the facts and opinions in context, and arriving at their conclusion based on substantial evidence. *See § ___, supra*. As the following demonstrates, there was no reasoned decision making process or full and fair review of Ms. Kirkpatrick's claim. Specifically, it was *not* reasonable on the part of Champion/CORE:

60

•    To ignore vocational evidence previously considered by Travelers and CORE prior to the 1998 denial process, such as the Vocational Rehabilitation Profile for LTD completed on May 19, 1994 by case manager Gloria Lopez, which put Ms. Kirkpatrick in the lowest possible score category, indicating she was not to be referred for rehab review. (Pl. LR 56 St. ¶395, Pl. App. 38).

•    To ignore CORE's own rheumatologist, Dr. Rose Fife, who concluded on July 19, 1996 that Ms. Kirkpatrick was only capable of doing "less than sedentary work." (Pl. LR 56 St. ¶386, Pl. App. 39). Query as to what would constitute "less than sedentary work," a category not recognized by the Dictionary of Occupational Titles. (See DOT, Vol. 11, 4th ed., p. 1013).

•    To ignore CORE's own diary memo of July 22, 1996 stating that "given the EE's age, lack of transferrable skills, (worked as a laborer for 17 yrs.) and 12th grade education, we recommend disability from performing any occ and cont of LTD benefits." (Pl. LR 56 St. ¶405, Pl. App. 40).

•    To ignore repeated certifications of disability by treating physicians. ( Pl. LR 56 St. ¶ 414).

•    To ignore Ms. Kirkpatrick's "Personal Profile Evaluation" ( Pl. LR 56 St. ¶ 393).

•    To ignore Ms. Kirkpatrick's handwritten statements of June 14, 1998 and October 6, 1998, describing in detail her pain, its daily impact on her, the pain medications she was taking, and concluding with the following statement: "There is not a day goes by that my lower back, hips & legs hurt so bad that I have to take pain medicine. Because of all the medication that I take, I do not function very well. I am telling you from the bottom of my heart that I can not go back to work." (Pl. LR 56 St. ¶ 431).

•    To ignore supplemental materials submitted by Ms. Kirkpatrick during her appeal, including her affidavit, a vocational assessment report by Dr. Benson Hecker, a licensed vocational counselor who found her unemployable at the time of termination of benefits, a copy of the Social Security Award of disability, and comprehensive medical records, many of which had not been obtained by Champion/CORE in its review. (Pl. LR 56 St. ¶438).

## Conclusion

Champion's "review" of CORE's recommendations amounted to no more than a rubber stamp. Champion's legal department prepared 133 pages of documents for its Claims Review Committee, hand-numbered and arranged in no particular order. Of the 133 pages, only 48 pages (36%) were either medical and/or vocational records. Predictably, the Committee, on December 15, 1998, affirmed CORE's recommendation for denial, and why not? As CORE had so proudly pointed

out in its Confidential Service Report #3 dated May 14, 1998, "Savings Projections" and a "Savings Analysis" of Ms. Kirkpatrick's claim showed that in denying her further benefits, Champion would save $49,826.25, which it would have paid out to Ms. Kirkpatrick "if it had not been for [CORE] case management's intervention and assessment in this case." (Pl. LR 56 St. ¶ ¶441, 442; Pl. App. 41). Simply stated, Champion/CORE failed to conduct a reasoned review process; their review was selective and biased, rather than full and fair. Denial of Ms. Kirkpatrick's long term disability benefits was a denial of justice, and should be overturned by this Court.

### LOIS L. LYNN

### Ms. Lynn is Totally Disabled under the Plan

Ms. Lynn is totally disabled under the Plan from a rare, life-long chronic lung disease known as bronchiectasis. (Pl. LR 56 St., ¶ 448). She was certified for total disability under the Plan for 6 years. Her two treating pulmonary specialists confirmed during CORE's review that she remained disabled. In plaintiffs' brief in support of their motion for summary judgment, plaintiffs argue the facts establishing Ms. Lynn's total disability which are incorporated by reference. (*See* Pl. Brief, pp. 52-60). Plaintiffs will address these facts briefly, with reference to the plaintiffs' initial brief for a more specific discussion.

### Defendants' Contentions

In their argument in support of their motion, defendants ignore the opinions of Ms. Lynn's treating specialists and rely on (1) the opinion of Ms. Lynn's family doctor, Dr. Freeman; (2) the IME of Dr. McCarrick; (3) the statement of Dr. Beavers questioning the opinion of Ms. Lynn's pulmonary specialist; and (4) the TSA of CORE's Costs Services Department. (*See* Def. Brief, pp. 68-79). Defendants have mischaracterized the evidence and the standards of disability, and have ignored the

substantial evidence in support of Ms. Lynn's claim. Plaintiffs will address these facts briefly, with reference to the plaintiffs' initial brief for a more specific discussion.

**Dr. Freeman's Review:** Defendants first relied on the opinion of Dr. Nancy Freeman, Ms. Lynn's family physician. Dr. Freeman, at Dr. Beavers' urging, provided an opinion that Ms. Lynn was able to perform sedentary work for up to 6-8 hours per day. (Pl. LR 56 St., ¶ 471-472). Dr. Freeman did not treat Ms. Lynn for her respiratory conditions, and Dr. Freeman had no known expertise in treating this rare lung disease. (Pl. LR 56 St., ¶ 472). Dr. Freeman's treatment records document that she did not treat Ms. Lynn's pulmonary condition. Champion/CORE's reliance on a family physician, in the face of consistent certifications of total disability by Ms. Lynn's treating specialists, is unsupportable.

**IME of Dr. McCarrick:** Defendants also rely in their brief on the IME of Dr. McCarrick. Dr. McCarrick was hired by CORE to conduct an IME. He examined Ms. Lynn on a single occasion on May 5, 1998. Following his examination, Dr. McCarrick recognized the serious nature of Ms. Lynn's lung disease, and the serious risk of exposure which she would encounter at work. (Pl. LR 56 St., ¶ 465). In response to a request for his functional assessment, Dr. McCarrick stated that he was unable to make a functional assessment. *Id*. Nevertheless, between May, 1998 and November, 1998, Dr. McCarrick made at least 4 contradictory statements concerning Ms. Lynn's disability. (Pl. LR 56 St., ¶ 488). In one he accused Champion of misquoting him in Champion's decision. Nevertheless, ultimately at CORE's Dr. Beavers' insistence, Dr. McCarrick concluded that Ms. Lynn could perform sedentary work of up to 6 hours per day. (Pl. LR 56 St., ¶ 488).

Dr. McCarrick's opinion is not believable. It is inconceivable that a finder of fact, faced with the various inconsistencies in Dr. McCarrick's various statements, would consider his opinion as to

Ms. Lynn's work capacity credible or reliable.  It clearly was *not*.

What is also inexplicable is that, faced with all of Dr. McCarrick's inconsistencies, CORE's Dr. Beavers and its Denial Committee decided not to commission another IME.  Instead, they submitted Ms. Lynn's claim to the CRC based on this unreliable evidence.  (Pl. LR 56 St., ¶ 488).  The CRC upheld the termination.  (Pl. LR 56 St., ¶ 489).

**Dr. Beavers' statement concerning Dr. Boerner's opinion:**  Dr. Beavers, in an internal computer note, stated that Ms. Lynn's treating physician, Dr. Boerner, had indicated that Ms. Lynn "doesn't look that sick" when he sees her, "though she complains of frequent upper respiratory infections," and that he was "reluctant to give and [sic] opinion."  (NB 13: Lynn-219).  In fact, Dr. Boerner had offered his opinion repeatedly that Ms. Lynn was "100% disabled," as recently as two months before Dr. Beavers made his call.  (Pl. LR 56 St., ¶ 470).  There is no documentation from Dr. Boerner to substantiate Dr. Beavers' characterizations, which are unclear in any event.[16]  Finally, Dr. Lipham, another specialist, agreed with Dr. Boerner's assessment of Ms. Lynn's total disability after Dr. Beavers' note, and Dr. Beavers, as well as Champion, ignored his opinion.  (Pl. LR 56 St., ¶ 455).  Dr. Beavers is not believable, and his vague statement does not support termination.

**TSA:**  As argued repeatedly in plaintiffs' argument, CORE's TSA is meaningless, given its source, the lack of individualized consideration of the facts concerning Ms. Lynn, and its failure to make any effort to determine Ms. Lynn's vocational ability to find and sustain employment given her restrictions, and her severe and chronic pain.  *See § ___, supra.*

**Champion/CORE Did Not Engage in a Full and Fair Review Process in Terminating**

---

[16]  What is missing from the brief note is what Dr. Beavers asked Dr. Boerner, and how he asked it.  What seems most likely from Dr. Boerner's response, as described, is that he was annoyed at being interrogated by Dr. Beavers, who was intent on accomplishing his objective.

**Ms. Lynn's LTD Benefits**

Plaintiffs have argued, with significant support, that this Court should perform a *de novo* review of each claim. However, even under an arbitrary and capricious standard of review, Champion/CORE would be entitled to no deference unless they had engaged in a reasoned decision-making process, fairly considering all of the facts and opinions in context, and arriving at their conclusion based on substantial evidence. *See § ___, supra.* As the following demonstrates, there was no reasoned decision-making process or full and fair review of Ms. Lynn's claim. Specifically, it was *not* reasonable on the part of Champion/CORE:

• To disregard Ms. Lynn's three treating specialists, Dr. Hapke, Dr. Lipham and Dr. Boerner, who consistently determined, based on years of treatment, that Ms. Lynn was totally disabled because of her disease of bronchiectasis and recurrent infections.

• To terminate Ms. Lynn's LTD benefits based on a hearsay statement by CORE's doctor, Dr. Beavers, who indicated that Dr. Boerner was unable to support Ms. Lynn's total disability, in view of the consistent opinions expressed by Dr. Boerner throughout the record that Ms. Lynn remained totally disabled.

• To rely on Ms. Lynn's family physician, who never treated her pulmonary condition, for an opinion concerning her disability based on her rare lung disease, in view of the consistent opinions of her three treating pulmonary specialists that she was disabled.

• To rely on the opinion of Dr. McCarrick in his IME that Ms. Lynn was able to perform sedentary work for 6 hours per day, given his total lack of credibility from his multiple inconsistent statements.

• To conclude that Ms. Lynn was able to work based on a finding that she could, at most, perform part-time work, since even this finding would not remove her from the definition of total disability under the Plan.

• To base the termination of Ms. Lynn's LTD benefits on the TSA, which failed to consider Ms. Lynn's vocational disability in the context of her individualized circumstances.

• To terminate the disability of Ms. Lynn after previously certifying her from total disability from any occupation without finding some significant or material change in circumstances in her condition.

• To conclude that Ms. Lynn, who was 62 years old at the time of her final denial, could return to work in any occupation.

## Conclusion

As previously set forth, a note in the record relates a conversation with Ms. Lynn's treating specialist, Dr. Edith Hapke, who stated that because of Ms. Lynn's rare illness, "she is sitting on a ticking time bomb that could explode at any time;" and that of five patients the specialist had treated over the years with this condition, "two of them have already died." The doctor noted that Ms. Lynn is "completely drug resistant," that she has recurring infections, and that her "problem is her persistent and chronic bronchial infections," and that she is "never infection-free as the infections can go from bad to worse and are completely drug resistant." (Pl. LR 56 St., ¶ 450).

Ms. Lynn's condition has not improved. There have been no material changes in her condition to justify a change in Champion/CORE's decision.

Ms. Lynn is totally and permanently disabled. There is no prospect that she could ever return to work at her age, and given her condition. Ms. Lynn should be immediately reinstated to her LTD benefits.

### WILSON DANIEL McCLURE

### Mr. McClure is Totally Disabled under the Plan

Mr. McClure is totally disabled due to spondyloarthritis and its resulting severe pain and physical limitations. He was certified for total disability under the Plan for 7 years. His treating specialist confirmed during CORE's review that he remained disabled. In plaintiffs' brief in support of their motion for summary judgment, plaintiffs argue the facts establishing Mr. McClure's total disability which are incorporated by reference. *See Pl. Br., pp. 60-65*.

## Defendants' Contentions

In their argument in support of their motion, defendants ignore the opinions of Mr. McClure's treating physician and rely only upon the IME of Dr. Stephenson. *See Def. Brief, 38-40.* Defendants have mischaracterized the evidence and the standards of disability, and have ignored the substantial evidence in support of Mr. McClure's claim. Plaintiffs will address these facts briefly, with reference to the plaintiffs' initial brief for a more specific discussion.

**Mr. McClure's Treating Physician, Dr. Rardin:** Mr. McClure's treating rheumatologist, Dr. Rardin, documented Mr. McClure's disability and impairment based on his treatment of Mr. McClure from 1989 throughout his disability, and has certified Mr. McClure's continuing disability under the Plan. (Pl. LR 56 St., ¶ 504; Pl. App. 54-55). Dr. Rardin, as Mr. McClure's treating rheumatologist, is in the best position to determine Mr. McClure's disability because he has examined and treated Mr. McClure personally, and is able to treat Mr. McClure's condition over an extended period of time. Accordingly, Dr. Rardin's opinion is the most reliable source regarding Mr. McClure's disability.

**IME of Dr. Stephenson:** Dr. Ruffin Stephenson's one-time evaluation of Mr. McClure by a CORE- arranged IME found that while unable to perform his prior job, Mr. McClure could perform "some type of sedentary work or desk job" under limitations and restrictions. (Pl. LR 56 St., ¶ 512). Dr. Stephenson noted Mr. McClure's chronic pain. However, Dr. Stephenson fails to reconcile Mr. McClure's debilitating pain in concluding his work capacity. Additionally, Dr. Stephenson did not review Mr. McClure's entire medical history, stating he reviewed "some records". (NB 17: McClure 14). Accordingly, if viewed objectively, Dr. Stephenson's report is not sufficient to constitute substantial evidence to support the denial of Mr. McClure's claim, considering Mr. McClure's long

history of disability as substantiated by the medical reports and Mr. McClure's own statements and those of his treating physicians. Additionally, Dr. Stephenson's opinion that Mr. McClure could perform "some type of sedentary work or desk job which would permit him to move around, and to avoid standing or walking for the most part" does not render him able to work under the Plan.

**Vocational Evidence:** Mr. McClure worked in maintenance at Champion for over 22 years prior to his disability. Champion/CORE failed to provide any vocational evidence regarding sedentary positions for which Mr. McClure was qualified by training, education or experience. The lack of *any* vocational evidence speaks volumes.

### Champion/CORE Did Not Engage in a Full and Fair Review Process in Terminating Mr. McClure's LTD Benefits

Plaintiffs have argued, with significant support, that this Court should perform a *de novo* review of each claim.  However, even under an arbitrary and capricious standard of review, Champion/CORE would be entitled to no deference unless it had engaged in a reasoned decision-making process, which fairly considered all of the evidence in the case in context, and arrived to its conclusion based on substantial evidence.  *See § ___, supra*.  As the following demonstrates, there was no reasoned decision-making process, or full and fair review of Mr. McClure's claim. Specifically, it was *not* reasonable on the part of Champion/CORE:

• To disregard Mr. McClure's long-time treating physician, who consistently determined, based on years of treatment, that Mr. McClure was totally disabled because of his condition and resulting chronic pain and fatigue.

• To terminate disability based on the one-time IME by Dr. Stephenson, given that he saw Mr. McClure only briefly on one occasion, did not review Mr. McClure's entire medical history, and failed to consider pain in his conclusion that Mr. McClure could do sedentary work.

• To disregard completely Mr. McClure's consistent reports of disabling pain, in view of the repeated references to pain throughout his medical records.

68

•    To base the termination of Mr. McClure's LTD benefits based solely on a medical opinion, and with complete disregard to Mr. McClure's vocational disability in the context of his individualized circumstances.

•    To terminate the disability of Mr. McClure after previously certifying him from total disability from any occupation without finding some significant or material change in circumstances in his condition.

•    To conclude that Mr. McClure was not disabled based on a finding that he could perform sedentary work, for which he had no training, education or experience, since this finding would remove him from the definition of total disability under the Plan.

## Conclusion

Mr. McClure is totally disabled under the Plan, as demonstrated repeatedly in the record.

Champion recognized his total and permanent disability prior to Champion's efforts to reduce its LTD

rolls, and CORE's consideration of his claim. From 1989 to 1996, Champion consistently determined

Mr. McClure permanently and totally disabled because of his disease and related conditions, including

chronic pain and resulting functional limitations and restrictions. Mr. McClure's condition has

continued to worsen over the years. Mr. McClure's benefits should be reinstated.

## CELIA DARLENE METCALF

### Ms. Metcalf is Totally Disabled under the Plan

As established in plaintiffs' brief in support of their motion for summary judgment, Ms.

Metcalf is totally disabled under the Plan. *See Pl. Brief, pp. 65-69.*  Plaintiffs incorporate by

reference the facts stated therein in support of Ms. Metcalf's claim.  As noted, Champion certified

Ms. Metcalf's total disability for approximately 34 months prior to termination of her benefits.  She

worked for Champion for eighteen (18) years before she came out of work as a result of a medley of

physical problems which eventually disabled her. (Pl. LR 56 St. ¶530). Despite the fact that there

was no objective evidence that Ms. Metcalf's condition had improved, and in flagrant disregard of

the opinion of treating physician Dr. Buehler that she was disabled from any occupation, Champion's

Claims Review Committee upheld the termination of her long term disability benefits on June 15,

2000.

### Defendants' Contentions

Defendants' Rule 56(a)(1) Statement of Facts and their Memorandum of Law in support of

their motion for summary judgment track the many deficiencies in the Champion/CORE claims

review process. *See Def. Brief, pp. 35-38.* Both documents are notable for their under-reporting and

minimization of Ms. Metcalf's physical problems and the pain resulting therefrom, and are devoid

of any recognition of her tenacious battle with pain from a variety of physical problems, including

two on-the-job injuries (Pl. LR 56 St. ¶¶ 530, 531) for many years prior to coming out of work in

April, 1997. There is little or no explanation as to why Ms. Metcalf's consistent and persistent

reports of disabling pain were discredited despite her demonstrated work ethic and demonstrated

willingness to work while her pain was manageable.

Defendant's brief, like the Claims Review Committee, is silent as to the significance of the

April 14, 2000 letter of her treating physician, Dr. Erich G. Buehler, wherein he advised Champion

International that "Because of her significant wrist and arm tendonitis, she is currently unable to

participate in any work or occupation and is at this point totally disabled." (Pl. LR 56 St. ¶ 551(e);

Def. Brief, pp. 35-38; NB 16: Metcalf CRC- 033-034).

The Brief also embraces, as did CORE and the Claims Review Committee, an unjustified

speculation or hypothesis that some employer somewhere would do what Champion would not -

provide sedentary employment to this 52 year old lady who had never had a sedentary job in her life,

and who required significant accommodations for her restrictions. Despite these deficiencies,

defendants contend they provided a full and fair review of Ms. Metcalf's claim. A close evaluation of the facts indicates otherwise.

In upholding the termination of Ms. Metcalf's LTD benefits, Champion relied on (1) CORE's Dr. Beavers' account of a 10-20-99 telephone conversation with Dr. Mendelsohn; (2) Dr. Beaver's recommendation "not to certify disability from any occupation"; (3) a "Peer Review Analysis" by a doctor who neither examined nor talked with the Plaintiff but nonetheless pronounced "There is no objective medical substantiation for total disability after 11/13/99"; (4) SCORE's indication that "most of the medical information [submitted by counsel in support of her appeal of the denial of benefits] predated Ms. Metcalf's dates of disability and did not impact the original denial of benefits on 11/13/99"; and (5) SCORE's Vocational Analysis Report which identified various jobs that Ms. Metcalf might perform. For the reasons set out below, Champion's reliance on this "evidence" was misplaced and demonstrates that its review of Ms. Metcalf's claim was much less than full or fair.

**Dr. Beavers' Account of 10-20-99 Conversation with Dr. Mendelsohn:** On October 19, 1999, Dr. Mendelsohn had signed, under the threat of possible criminal and/or civil penalties for "any misrepresentation or any false, incomplete, or misleading information," an Attending Physician Statement wherein he indicated his opinions that Ms. Metcalf was disabled from any occupation, her condition was "unimproved" and that she would be totally disabled "indefinitely". (NB 16: Metcalf - CRC 2540-2541). In retrospect, it is ironic how "indefinite" Dr. Mendelsohn's opinion as to her total disability from any occupation truly was.

Apparently, later that same day he received a telephone call from CORE's champion, Dr. Beavers. After a conversation with Dr. Beavers, Dr. Mendelsohn noted: "Dr. Beavers called asking about work capacity. I feel she could do sedentary work if she was inclined and such work was

available." (NB 16: CRC-2614).   Other than his encounter with Dr. Beavers, the record offers no explanation  for the dramatic change in Dr. Mendelsohn's opinion. However, the Claims Review Committee had no apparent difficulty in relying on the opinion of a physician who evidently changed his mind within the span of a few hours or minutes.  A full and fair review of her claim requires more than a bland acceptance of such a dramatic change of opinion.

One explanation for the change in Dr. Mendelsohn's opinion may be that he was not given an accurate and complete standard or definition of disability from the Plan itself.  As set out elsewhere, Beavers routinely mis-communicated the Plan definition of disability from any occupation.


**Dr. Beaver's Recommendation Not to Certify Disability From Any Occupation:** Dr. Beavers, CORE's medical director, was anything but a fair and impartial evaluator of the disability claims of Ms. Metcalf and the other plaintiffs.  His desire to find an excuse to terminate benefits is obvious when one reviews the record in Metcalf as well as the other claims.  A more thorough discussion of his bias is set out elsewhere in this brief.  In his last note before talking to Dr. Beavers, on September 20, 1999, Dr. Mendelsohn documents Ms. Metcalf's need for 6 medications to manage her physical problems (even while disabled): Fosamax, Vioxx 25 mg per day, Ultram up to 6 per day, Norflex up to twice a day, Effexor 150 SR q a. m. and Pamelor at 25 to 50 mg at night. (NB 16: CRC 2614).  Full and fair review would inquire into the impact of those medications on her ability to obtain and sustain competitive employment.  But not Dr. Beavers.   Reliance on a biased source such as Dr. Beavers does not comport with full and fair review.

**CORE Peer Review Analysis:** After Ms. Metcalf appealed the termination of her benefits, on June 7, 2000, CORE retained Dr. Jerome Siegel to render a   "Peer Review Analysis" which, of

72

course, supported termination of disability benefits. Dr. Siegel never saw or spoke to Ms. Metcalf. He acknowledged but dismissed Ms. Metcalf's chronic pain, although he did admit that Ms. Metcalf's chronic pain complaints and periodic exacerbations of her pain "are quite distressing to the patient." (Pl. App. 66).

Dr. Siegel totally ignored the March 20, 2000 note of Ms. Metcalf's family physician, Dr. Erich Buehler, who stated: "She is being denied for her disability insurance claim and requests that I write a letter. I will do this stating that she is currently disabled because of her baseline medical condition as well as that of her hands [pain in left wrist and thumb from arthritis], although this disability [left wrist and thumb] may not be permanent." (NB 15: Metcalf- 133). Not surprisingly, Dr. Siegel also had no comment on the letter Dr. Buehler wrote on April 14, 2000 stating that Ms. Metcalf was totally disabled. (Pl. App. 64).

**SCORE's Characterization of Evidence Submitted by Plaintiff's Counsel:** To justify disregarding the evidence submitted by plaintiff's counsel, the Claims Review Committee noted "SCORE stated that most of the medical information predated Ms. Metcalf's dates of disability and did not impact the original denial of benefits on ll/13/99." If the review had been full and fair, the Claims Review Committee would have wanted and considered evidence that provided a historical or longitudinal perspective on Ms. Metcalf's struggle with the many physical problems she faced. In assessing the legitimacy of her pain complaints, it is important to know the extent of Ms.Metcalf's efforts to get better prior to her going out on disability. Moreover, a full and fair review by the Claims Review Committee would have demonstrated an independent review of the records, and not a simple adoption of SCORE's opinion.

**SCORE's Vocational Analysis Report:** The notes of the Claims Review Committee indicate

that in its final termination of Ms. Metcalf's benefits, the Committee specifically considered the "fact" that "SCORE's Vocational Analysis Report...identified various jobs that Ms. Metcalf **might** perform," (emphasis added).   Despite the obvious uncertainty of the Vocational Analysis as to Ms. Metcalf's employability and the fact that the analysis  included no meaningful labor market survey by the analyst in Maine of a job market in North Carolina for a lady she had never met or talked with, the Claims Review Committee offered this analysis as supportive of its decision to terminate. (NB 16: CRC - 034).  In the hurried and unfair review by the Claims Review Committee, the theoretical possibility of employment was sufficient - it is not under the law of the United States.

### Conclusion

Defendants' brief seeks to obscure the fact that Ms. Metcalf's benefits were terminated as a consequence of a process full of bureaucratic "sound and fury" ("VA," "TSA," "PRA"),  but signifying nothing more than a mockery of the mandated full and fair evaluation of a real world ability to obtain and sustain any occupation for which she was reasonably qualified by training, education or experience.  Because the process was neither full nor fair, because Ms. Metcalf was and is disabled by the combination of her many problems, her benefits should be reinstated.

### CHARLES R.  REECE

### Mr. Reece is Totally Disabled under the Plan

Of the fourteen plaintiffs, only one had worked longer at Champion  than Charles Reece.  For over twenty-six years he was employed in Canton as a machine mechanic.  As shown in plaintiffs' brief in support of their motion for summary judgment, he became totally disabled under the Plan. *See Pl. Brief, pp. 69-73.*  Plaintiffs incorporate by reference the facts stated in their initial brief in support of Mr.  Reece's claim.

Mr. Reece's disabling condition arose from congestive cardiomyopathy, with symptoms of exertional dyspnea, fatigue, shortness of breath, orthopnea and pedal edema  (Pl. LR 56 St. ¶ 584). He had also been diagnosed with emphysema, colitis, pancreatitis, and cirrhosis of the liver.   (Pl. LR 56 St. ¶ 593 ).  Despite Champion having paid Mr. Reece long-term disability benefits from 1995 to 1998, CORE recommended termination in October of 1998, and Champion upheld the denial in March of 1999.  A full and fair review would have revealed that Mr. Reece remained disabled from cardiomyopathy and the attendant symptoms which severely limited his activities of daily living and rendered him unemployable.

### Defendants' Contentions

In support of their motion, defendants attempted to validate Champion/CORE's termination of benefits. *See Def. Brief, pp. 39-42* .  Ignoring the initial and consistent opinions of Mr. Reece's treating cardiologist, Dr. Patel, defendants chose to rely instead on the following devices in justifying the denial  of Mr. Reece's disability:  (1) First Peer Review Analysis; (2) CORE's Modification Checklist; (3) an IME;  (4)  a  TSA; and (5) a second Peer Review Analysis.

**First Peer Review Analysis:** On January 23, 1998, Dr. Chester Conrad performed a Peer Review Analysis at CORE's request.  Conrad was not a treating physician of Mr. Reece; the record does not indicate that he ever examined Mr. Reece or even spoke with Mr. Reece.  He merely reviewed a Champion referral form and clinical highlights submitted by Champion.  The reason for referral was stated as follows:  "Is this employee disabled from performing any occupation?"  (Pl. LR56 St. ¶ 606).  This statement does not fully and accurately set forth the Plan definition of disability.  Moreover, Dr. Conrad pointed out that Mr. Reece "has evidently not had a recent exercise test, so there is no objective measure of present exercise capacity, but from the available clinical

75

information it appears that the patient probably has moderate impairment of exercise capacity." (Id.) Despite this deficiency, Dr. Conrad opined that "there is however no specific indication that the patient would not be capable of performing sedentary work." (NB 19: CRC-2391). Arguably, there is no specific indication that Mr. Reece would be capable of performing such work; Dr. Conrad's analysis merely expressed hypothetical possibilities rather than documenting realistic assessments of Mr. Reece's employability.

**CORE'S Modification Checklist:** Ignoring Dr. Patel, Mr. Reece's treating cardiologist at the VA Hospital who had apparently left Asheville by the time CORE was conducting its review, CORE solicited a Modification Checklist from a physician's assistant at the VA Medical Center, Mr. Doug Burnett. Burnett was contacted by the Peer Review Analysis physician, Dr. Conrad, and subsequently on March 31, 1998, completed a Modification Checklist indicating that Mr. Reece could work 8 hours a day, 5 days a week. (Pl. LR 56 St. ¶608). However, there is nothing in the record to indicate the basis for Burnett's opinions reflected in the checklist, and it contradicts his prior opinion expressed in an Attending Physician's Statement dated December 9, 1997, where he had certified Mr. Reece as totally disabled for any occupation as well as for his regular occupation. (Pl. LR 56 St. ¶¶602, 603). Apparently Dr. Conrad's conversation with Mr. Burnett had an effect similar to the conversations of Dr. Beavers with attending physicians in other plaintiffs' cases.

**IME:** CORE then ordered an IME from a Dr. Keogh in July of 1998, stating that "this case is referred at this time for an any occupation review, meaning is this employee capable of performing any occupation 6 hours a day, 5 days per week." (Pl. LR 56 St. ¶610). Again, CORE did not accurately and fully set out the Plan definition of disability from any occupation. Morever, Dr. Keogh's IME contained several deficiencies. (Pl. LR 56 St. ¶611). First of all he only reviewed

three old medical records of Mr. Reece's, two from 1995 and one from 1996. Secondly, he acknowledged in his report that he did not do an EKG on Mr. Reece during the IME, despite the fact that Dr. Keogh was a cardiologist being asked to evaluate a patient diagnosed with cardiomyopathy. That diagnosis was plainly listed on the IME chart preparation form. Not only did Dr. Keogh not perform an EKG; as he stated in his IME report, "no tests were performed on this visit." (NB 19: CRC-2404). Finally, even CORE employee Jennifer Mikeska, who later performed a TSA on Mr. Reece, pointed out that Dr. Keogh's IME contained an apparent contradiction, inasmuch as he first opined that it would be okay for Mr. Reece to attempt to return to his previous occupation at Champion, a position that Ms. Mikeska pointed out was a medium level job. However, Dr. Keogh went on to say that he thought Mr. Reece could return to work with the restriction of not lifting more than 10 pounds, a restriction which Ms. Mikeska noted would put Mr. Reece on the sedentary rather than medium job level. Finally, Dr. Keogh acknowledged that Mr. Reece's functional capacity needed to be assessed via a stress test in order to get some objective quantification of what he could do, but he did not do the stress test. (NB 19: CRC-2404). In this instance, CORE did not want objective evidence. Despite the questions raised by the IME, it was relied upon heavily in the termination of Mr. Reece's benefits.

**TSA:** CORE employee Mikeska performed a TSA on October 5, 1998, and relied on Keogh's IME despite its recognized infirmities. Despite the contradiction in the IME, Ms. Mikeska produced a TSA but admitted "if the physician declares Mr. Reece with sedentary restrictions, there is a narrow chance of him returning to work." (NB 19: CRC-2413).

The TSA itself contained several flaws, including the absence of any documentation as to Ms. Mikeska's qualifications for conducting a TSA; the lack of a labor market survey; and a failure to

consider vocational factors such as Mr. Reece's age, lack of education and lack of experience at anything other than a machinery mechanic. (Pl. LR 56 St. ¶613). When Ms. Mikeska considered Mr. Reece's work experience as a maintenance machinist, she concluded that there were two job titles she considered appropriate for him, claiming he would still be implementing and using the same methods, tools, equipment and work aids: jeweler, and jeweler's apprentice. (NB 19: CRC-2414). That a machine mechanic and a jeweler would be considered to use the same methods, tools, equipment and work aids, strains credulity.

**Second Peer Review Analysis:** After CORE and Champion terminated his long-term disability benefits, Mr. Reece retained an attorney to assist him in his appeal. Thereafter, CORE ordered yet another Peer Review Analysis, this time from a Dr. Gerald Evans, who like Dr. Conrad, never saw Mr. Reece or even spoke with him. The reason for referral as stated in Dr. Evan's Peer Review Analysis Report was as follows: "On appeal, can the original independent medical exam decision of denial of long-term disability be upheld?" (NB 19: CRC-2429). Clearly this second Analysis was solicited not in an attempt to attain a full and fair review of Mr. Reece's claim, but to uphold CORE's denial of his benefits. Dr. Evans merely reviewed the Champion referral form, clinical highlights submitted by Champion, and CORE's previous review before he summarily concluded that the denial should be upheld. Despite the flaws in Dr. Keogh's IME, Dr. Evans pronounced Dr. Keogh's assessment "detailed and specific," and described its findings as "objective." (NB 19: CRC-2429). Evans ignored the IME's lack of an EKG or any evaluation of Mr. Reece's exercise capacity.

**Champion/CORE Did Not Engage in a Full and Fair Review Process in Terminating**

**Mr. Reece's LTD Benefits**

Plaintiffs have argued, with significant support, that this Court should perform a *de novo* review of each claim.  However, even under an arbitrary and capricious standard of review, Champion/CORE would be entitled to no deference unless they had engaged in a reasoned decision making process, fairly considering all of the facts and opinions in context, and arriving at their conclusion based on substantial evidence.  *See § ___, supra*.  As the following demonstrates, there was no reasoned decision making process or full and fair review of Mr. Reece's claim.  Specifically, it was *not* reasonable on the part of Champion/CORE:

•     To ignore treating physician Dr. Patel's repeated diagnoses and certifications of disability, including his July 12, 1995 note that Mr. Reece was an AMA Class 4 (complete limitation) cardiac patient.  (Pl. LR 56 St. ¶588).

•     To ignore CORE's own notepad of January 30, 1997, which stated that "the employee has a myriad of medical issues, cirrhosis of the liver, congestive cardiomyopathy, and an estimated ejection fraction of 15 - 20%, will never return to work."  (Pl. LR 56 St. ¶591).

•     To ignore CORE's memo dated February 24, 1997 that stated Mr. Reece had "an ejection fraction of 15 - 20%.  He will never be able to return to work.  He has to have frequent rest periods and he has exertional exhausted with chest pain.  The APS is current and the EE has abnormal EKG."  (Pl. LR 56 St. ¶592).

•     To ignore Mr. Reece's Personal Profile Evaluations of February 24, 1997 and November 14, 1997.  (Pl. LR 56 St. ¶¶600, 601).

•     To ignore Champion's own vocational rehabilitation referral completed on September 1, 1998 by case manager Mary Kane.  She gave Mr. Reece a score of 13, which meant that he was not referred to vocational rehabilitation.  Significantly, she also indicated "employer has no position available for employee/employee is terminated."  (Pl. LR 56 St. ¶612, Pl. App. 73).

## Conclusion

Despite struggles with alcoholism and various health problems, Charles Reece served Champion for 26½ years as a laborer and lubrication/oiler mechanic.  In that position he was on his feet for 6½ to 7 hours a day.  (Pl. LR 56 St. ¶582).  He was expected to lift, to stoop, and to crawl.

79

(Id.) He fulfilled his duties year after year until a combination of problems, including congestive cardiomyopathy, forced him out of work in 1995. Mr. Reece would have preferred to have been healthy and able to work, as evidenced by his statement to IME physician Keogh that he would have liked to have attempted to return to his previous occupation. However, reality dictated otherwise. A full and fair review, a reasoned decision-making process, would have confirmed what Mr. Reece's treating cardiologist, Dr. Patel, knew when he first certified him for disability: that he would not be able to return to work. The fact that Champion, his long time employer, could not accommodate his restrictions and refused to offer employment following its own review of his claim, is a powerful repudiation of the opinions and conclusions espoused by Champion/CORE in its various denial devices. Mr. Reece is totally disabled under the Plan and his benefits should be reinstated.

## HARRY L. SMITH

### Mr. Smith is Totally Disabled under the Plan

Mr. Smith is totally disabled from multiple surgeries on his back, including a lamenectomy, fusion, and insertion of metal rods to stabilize his spine. He has been diagnosed with additional disc problems at other levels of his spine. He has suffered from severe and chronic pain in his back and legs. (Pl. LR 56 St., ¶¶ 632-636). He was certified by Champion for total disability under the Plan for four years. Mr. Smith's treating specialist confirmed during CORE's review that he remained disabled. (Pl. LR 56 St., ¶ 639). In plaintiffs' brief in support of their motion for summary judgment, plaintiffs argue the facts establishing Mr. Smith's total disability, which are incorporated by reference. *See Pl. Brief, pp. 73-81.*

### Defendants' Contentions

In their argument in support of their motion, defendants rely on (1) the FCE of Susan Kimel; (2) the IME of Dr. Johnson; (3) the TSA of CORE's Costs Services Department; and (4) CORE's Peer Review Analysis. *See Def. Brief, pp. 109-119*.  Defendants have mischaracterized the evidence and the standards of disability, and have ignored the substantial evidence in support of Mr. Smith's claim.  Plaintiffs will address these facts briefly, with reference to the plaintiffs' initial brief for a more specific discussion.

**FCE:** Defendants rely primarily on an FCE which was conducted by Susan Kimel.  Ms. Kimel, whose qualifications remain unknown, conducted an FCE on Mr. Smith which was necessarily divided into two days.  The total time period of the test was approximately 4 hours and 45 minutes.  However, after the commencement of testing, Mr. Smith's pain was so severe that he had to stop.  Ms. Kimel interrupted the test and Mr. Smith went home.  Mr. Smith took medication to relieve his pain and tried to rest, but was unable to sleep because of his pain.  Nevertheless, consistent with his work ethic and history, Mr. Smith returned the next morning and did his best to complete the FCE. (Pl. LR 56 St., ¶ 648).

Ms. Kimel determined, based purely on Mr. Smith's ability to perform certain physical tasks for a relatively short period of time, that Mr. Smith was able to engage in full-time light work activity.  As noted previously, Ms. Kimel fails to note in her report the fact that Mr. Smith was unable to continue the physical activity required in the FCE for over 2-3 hours at a time.  Ms. Kimel additionally failed to note in her report that Mr. Smith had experienced debilitating pain, requiring increased medication, which prevented him from sleeping after the first segment of the FCE.  Ms. Kimel's failure to report these facts reveals that she was performing a mere mechanical function in directing Mr. Smith to perform the physical tasks and noting his limited results.  Under these

81

circumstances, there is no basis for Ms. Kimel's ultimate findings. (Pl. LR 56 St., ¶ 649).

The FCE of Mr. Smith is one of the most revealing items of evidence in this entire action. If Champion/CORE truly wanted to determine Mr. Smith's ability to work, it would have required a competent FCE to determine his physical capacities. If Ms. Kimel had truly been qualified to determine Mr. Smith's disability, she would have considered the unusual facts surrounding the test and his chronic pain in reaching her conclusions. If Champion/CORE had truly wanted to determine Mr. Smith's ability to work, it would have required answers to the questions presented by Mr. Smith's vocational consultant, Randy Adams. (Pl. LR 56 St., ¶ 649).

Ms. Kimel's FCE of Mr. Smith is flawed and cannot provide reliable evidence in support of Champion/CORE's determination.

**IME:** Defendants also rely on the IME of Dr. Peter Johnson. Significantly, Dr. Johnson was suggested for an IME by Champion's contact person, Sharon Spain. (Pl. LR 56 St., ¶ 647).

In any event, as previously noted, Dr. Johnson's IME proves nothing other than the fact that Mr. Smith was unable to return to work in his regular occupation. In his first report, Dr. Johnson stated that he was unable to reach any conclusion concerning Mr. Smith's ability to perform sedentary/light work from his examination and the record. (Pl. LR 56 St., ¶ 647). He recommended an FCE. Following the FCE, Dr. Johnson wrote a cryptic addendum stating that Mr. Smith was able to perform sedentary or light work based on the FCE. (Pl. LR 56 St., ¶ 650).

Since the IME doctor's opinions were based entirely on a flawed FCE, the IME provides no support for defendants' termination of Mr. Smith's benefits.

**TSA:** As argued repeatedly, CORE's TSA is meaningless given its source, the lack of individualized consideration of the facts concerning the claimant, and its failure to make any effort

to determine Mr. Smith's vocational ability to find and sustain employment given his restrictions and severe chronic pain. *See § ___, supra.*

**Peer Review Analysis:** Finally, defendants contend that a CORE peer review analysis supports their termination of Mr. Smith's LTD benefits. (NB 20: Smith-286). A CORE consultant, Dr. John Nemunaitis, was asked, "in light of the previous FCE, IME, would you recommended [sic] upholding the earlier determination of denial?" Dr. Nemunaitis did not interview Mr. Smith or consider his reports of chronic and debilitating pain. He found, without discussing the flaws in the FCE/IME, as described above, that there was no "objective data" to support disability. Under these circumstances, the CORE consultant's opinion does not provide a reliable basis for Champion/CORE's termination.

### Champion/CORE Did Not Engage in a Full and Fair Review Process in Terminating Mr. Smith's LTD Benefits

Plaintiffs have argued, with significant support, that this Court should perform a *de novo* review of each claim. However, even under an arbitrary and capricious standard of review, Champion/CORE would be entitled to no deference unless they had engaged in a reasoned decision making process, fairly considering all of the facts and opinions in context, and arriving at their conclusion based on substantial evidence. *See § ___, supra.* As the following demonstrates, there was no reasoned decision making process or full and fair review of Mr. Smith's claim. Specifically, it was *not* reasonable on the part of Champion/CORE:

•        To disregard Mr. Smith's treating physicians who determined that Mr. Smith was totally disabled because of the objectively documented deterioration of his spine after multiple surgeries, and his resulting chronic pain.

•        To terminate disability based on an FCE which, as demonstrated above, is flawed in its omissions of any explanation—or even mention—of Mr. Smith's inability to complete the test and

83

to conduct the required activity for over 2 to 3 hours in a day.

• To terminate disability based on an FCE which is flawed in its omission of any consideration of the critical factor of Mr. Smith's pain and his need in the middle of the test to rest and take medication.

• To terminate disability based on a flawed FCE which does not consider the after-effects of chronic and debilitating pain caused by the limited activity required in the test.

• To terminate disability based on the IME of Dr. Johnson, which was based entirely on a flawed FCE.

• To terminate disability based on the ground that there were no "objective findings" to support Mr. Smith's disabling pain, given the objective x-rays and scan results depicting and quantifying the massive deterioration of Mr. Smith's spine, which, according to his treating experts, would account for his disabling pain.

• To disregard completely Mr. Smith's consistent reports of disabling pain, in view of the repeated references to his pain throughout his medical records.

• To terminate Mr. Smith's LTD benefits based on the report of the CORE consultant who never examined Mr. Smith, and who disregarded the critical component of pain.

• To base the termination of Mr. Smith's LTD benefits on the TSA which failed to consider Mr. Smith's vocational disability in the context of his individualized circumstances.

• To terminate the disability of Mr. Smith after previously certifying him from total disability from any occupation without finding some significant or material change in circumstances in his condition.

### Conclusion

Mr. Smith is permanently and totally disabled from any occupation under the Plan.

Champion/CORE's termination of his benefits is totally without basis. There is no legitimate ground

to support Champion/CORE's determination.

Accordingly, Mr. Smith should be reinstated to his LTD benefits.

### DOLPHUS LUTHER TREADWAY, JR.

### Mr. Treadway is Totally Disabled Under the Plan

84

Mr. Treadway, a 23-year employee of Champion, is totally disabled under the Plan, as established in plaintiffs' brief in support of their motion for summary judgment. *See Pl. Brief, pp. 81-86.* Plaintiffs incorporate by reference the facts stated in their initial brief in support of Mr. Treadway's claim.

With an 8th grade education, Mr. Treadway worked at Champion for years operating heavy equipment and loading and unloading wood chips as a chip handler. (Pl. LR 56 St. ¶ 673). Following the emergence of a heart condition, a heart attack and bypass surgery in April 1994, and a hospitalization for chest pain and unstable angina in late 1995, Mr. Treadway became totally disabled from his employment with Champion on December 20, 1995. (Pl. LR 56 St. ¶¶ 674, 675, 676). He began receiving LTD benefits on June 19, 1996, and on July 31, 1998, 30 months from the onset of his disability, CORE recommended a continuation of long term disability benefits pending an IME. (Pl. LR 56 St. ¶¶ 676, 687, 691).

Following Champion's September 15, 1997 certification that Mr. Treadway was disabled from any occupation under the Plan, at some point in mid-1998, CORE's medical director, Dr. Beavers intervened. (Pl. LR 56 St. ¶ 694). Mr. Treadway's benefits were terminated effective December 31, 1998. (Pl. LR 56 St. ¶ 708). Although medical records in the Claims file are quite scarce, CORE/Champion obtained enough evidence to know that Mr. Reece had been diagnosed with coronary artery disease, coronary artery bypass graft, exertional angina, cardiac eschemia, myocardial infarction, hypertension, cephalalgia and edema; his family had a history of heart disease; and his heart condition had been classified as Class IV - the most severe according to the American Heart Association standard (Class 4). (Pl. LR 56 St. ¶¶ 677, 678, 683).

**Defendants' Contentions**

85

Defendants contend without merit in their brief that Mr. Treadway withdrew his appeal or about February 24, 1999. *See Defendants' Brief, p. 48.* Defendants' reliance on copies of an unsigned, handwritten note and ignoring of the ongoing documented efforts by Mr. Treadway's attorney at the time, Tom Ramer, to appeal the termination of benefits is totally unfounded. (NB 22: Treadway-050; 051, 044, 046)

Defendants' brief also largely ignores all events and evidence prior to CORE's review of Mr. Treadway' claim, and attempts to support Champion/CORE's termination of his LTD benefits. *See Def. Brief, pp. 46-48.* Defendants relied on an IME, a stress test, an electrocardiogram, and a TSA in justifying denial.

Even from those documents and tests, however, Mr. Treadway's total disability is apparent. As pointed out in plaintiffs' initial brief, there is unrefuted evidence that he had chest pain with even mild activities such as walking to and from his mailbox 50 yards from home, or walking on a treadmill for seven (7) minutes, as revealed by the stress test. (Pl. LR 56 St. ¶ 699). Defendants' own internal notepad memo dated November 20, 1996 references as its source Mr. Treadway's treating physician Dr. Linger and states that the author of the notepad memo called Dr. Linger's office and spoke with someone named Ann, who pulled Mr. Treadway's chart and indicated that:

> "this EE has had no improvements. He continues to be very afraid of activity because it increases his chest pain. He has pain at rest as well. Questions the RTW issue, and she states that there is nothing in his record other than a copy of a disability form which indicated that the EE will not ever RTW due to his cardiac status. He is a Class 4 which is a complete limitation per the AHA." (Pl. App. ¶ 80).

**IME:** Among the very few medical records in Mr. Treadway's claims' review file are two letters from the IME physician, Dr. Juan Aldrich, dated June 29, 1998 dated August 21, 1998,

together with reports of a stress test and an ECG , performed after the IME. Dr. Aldrich only saw Mr. Treadway once. Based on that one-time exam, the two subsequent tests, and any review which he undertook, Dr. Aldrich opined that Mr. Treadway was able to do sedentary work. (Pl. LR 56 St. ¶ 695). Dr. Aldrich's first letter refrained from making any conclusions concerning Mr. Treadway's ability to return to work, indicating that tests such as the echocardiogram and the stress test would permit him to address those issues. His first letter recommended psychological testing or counseling that could perhaps be of assistance, inasmuch as Mr. Treadway suffered from fear and anxiety concerning his heart problems in light of the fact that his father died at age 51 of a myocardial infarction, a 61 year old brother had a heart attack in his early 50's, and a sister had also developed some form of heart disease. The initial IME report is essentially inconclusive.

**Stress Test:** On July 23, 1998, Mr. Treadway underwent a stress test during which he developed dyspnea (shortness of breath) and angina (chest burning) with radiation to his left arm, which progressed with exercise. (Pl. LR 56 St. ¶ 699). The test administrator stopped the test after seven (7) minutes for two listed reasons: "Adequate test" and "angina" *Id.* Given that Mr. Treadway began developing shortness of breath, chest burning, and pain radiating to his arm after only seven (7) minutes on the treadmill, the stress test supports a finding of continued total disability rather than employability.

**ECG and Second Adlrich Letter:** On August 6, 1998, an echocardiogram was done on Mr. Treadway . It indicated wall abnormalities in his left ventricle, an overall ejection of fraction of approximately 50%, "left ventricular hypertrophy, trivial aortic valve sclerosis and mild mitral regurgitation." (NB 22: Treadway-17). Inexplicably, Dr. Aldrich then opined that Mr. Treadway was capable of returning to work with restrictions or modifications. There is nothing to explain why

87

Dr. Aldrich believed Mr. Treadway was capable of working 8 hours a day, 5 days a week when the July 23, 1998 stress test revealed that he could not walk on a treadmill for even seven (7) minutes without suffering chest burning and pain radiating into his left arm and shortness of breath to such a degree that the administrator suspended the test. (Pl. LR 56 St. ¶ 701). Dr. Aldrich again raised the issue of psychological counseling in his second letter, as he believed that fear had become a major problem for this patient. Neither Champion nor CORE ever followed up on Dr. Aldrich's suggestions of psychological evaluations or counseling for Mr. Treadway or asked him to reconcile his opinion of employability with the fact that Mr. Treadway could not complete a normal stress test.

**TSA:** CORE obtained a TSA on September 1, 1998, which was deficient for reasons fully set out in plaintiffs' initial brief. *See, Plaintiff's Brief, p. 85-86.*

### Champion/CORE Did Not Engage in a Full and Fair Review Process in Terminating Mr. Treadway's LTD Benefits

Plaintiffs have argued, with significant support, that this Court should perform a *de novo* review of each claim. However, even under an arbitrary and capricious standard of review, Champion/CORE would be entitled to no deference unless they had engaged in a reasoned decision making process, fairly considering all of the facts and opinions in context, and arriving at their conclusion based on substantial evidence. *See § ___, supra.* As the following demonstrates, there was no reasoned decision making process or full and fair review of Ms. Kirkpatrick's claim. Specifically, it was *not* reasonable on the part of Champion/CORE:

• To adopt, without further consideration or investigation of any relevant facts, CORE's findings with total reliance on CORE's recommendation, as was its standard practice according to Champion LTD Administrator, Mary Lee Dixon. (Pl. LR 56 St. ¶ 714, 716).

• To apparently not take into account vocational factors such as Mr. Treadway's age (54), his educational level (8th grade), his absence from work for several years following Champion's

prior recognition of his disability, and Champion's unwillingness to consider him for re-employment.

•    To refuse to consider Champion/CORE the additional evidence Mr. Treadway submitted, including his Affidavit, a Vocational Assessment of Dr. Henry Wong, a copy of his Social Security Administration Disability Award, and updated medical records.

### Conclusion

The claims review file contained 241 pages; only 18 were medical records, including two copies of the TSA. (Pl. LR 56 St., ¶ 724).    There were no records from any of Mr. Treadway's treating physicians, no Attending Physician Statements. The 18 pages constituted a mere 7% of the Champion claims review documents, and were all essentially CORE-generated or CORE-commissioned documents. Nearly devoid of medical and vocational evidence, the file is not the product of a full and fair review. Mr. Treadway is totally disabled from any occupation for which he is reasonably qualified by training, education or experience and his benefits should be reinstated.

### MARTHA BURNETTE WHITLEY

### Ms. Whitley is Totally Disabled under the Plan

Ms. Whitley is totally disabled under the Plan. Ms. Whitley has been certified as totally disabled since 1988. She has long suffered from chronic pain due to fibromyalgia and other related diseases which, according to a 1995 IME retained by Travelers, Champion's prior administrator, resulted in "extreme severe symptoms . . . , probably as bad or worse as [sic] anyone I have seen in my entire practice. . . ." (Pl. LR 56 St., ¶ 741; Pl. App. 88). The doctor noted that Ms. Whitley's "[f]unctional limitations are extreme and I do not think she could be employable at this time or in the foreseeable future." *Id.*[17]

---

[17]    The IME was commissioned to support termination because of allegations that Ms. Whitley was actually working in a hair salon—allegations that were ultimately proven untrue. Defendants indicate that the CRC's ultimate reversal of Champion's initial decision to terminate

Ms. Whitley's condition continued to deteriorate. Prior to CORE's review in 1997, Champion recognized that Ms. Whitley suffered severe disabling pain, and that unless there was "convincing evidence" of her ability to work, "termination of benefits would not be appropriate." *See, e.g.*, Pl. LR 56 St., ¶ 740; Pl. App.1. It was apparently Sharon Spain, Champion's contact person in the Canton, North Carolina plant, who first pushed CORE to be "aggressive" in questioning Ms. Whitley's disability status. (Pl. LR 56 St., ¶ 749; Pl. App. 89). CORE then undertook a course to remove Ms. Whitley from the LTD rolls. In doing so, Champion/CORE relied primarily on an FCE and IME, both of which were ultimately inconclusive, and neither of which addressed the historical disability caused by Ms. Whitley's chronic pain.

In their argument in support of their motion, defendants ignore the opinions of Ms. Whitley's treating physicians and rely on (1) an FCE of Mr. Hoechstetter; (2) an IME of Dr. Rudins; and (3) a TSA of CORE's Costs Services Department. *See Def. Brief, pp. 123-137*. Defendants have mischaracterized the evidence and the standards of disability, and have ignored the substantial evidence in support of Ms. Whitley's claim. Plaintiffs will address these facts briefly, with reference to the plaintiffs' initial brief for a more specific discussion.

**FCE of Hoechstetter:** Defendants rely heavily on the FCE of Mr. Hoechstetter which was reported on July 7, 1997. (Pl. LR 56 St., ¶ 754). In fact, Mr. Hoechstetter found that Ms. Whitley was unable, because of her pain, to meet the maximum requirements of sedentary work. (Pl. LR 56

---

Ms. Whitley's benefits at that time resulted from a "principled process," and indicate that, for that reason, the process which led to the ultimate termination of her benefits should have credibility. Def. Br., pp. ___. The 1995 reversal of Champion's initial decision to terminate Ms. Whitley's benefits resulted from the CRC's determination that Ms. Whitley had *not* been working, as initially charged in an investigative report, and also, from the IME which confirmed unequivocally that Ms. Whitley continued to be totally disabled from work. *See*, Pl. LR 56 St., ¶ 741-742.

St., ¶ 754).  While Mr. Hoechstetter apparently concludes that Ms. Whitley can perform some of the requirements of sedentary work, he qualifies his findings, emphasizing that Ms. Whitley was unable to perform certain activities for over 4 hours per day.  Mr. Hoechstetter also recommends pain management to try to alleviate some of the disabling symptoms of Ms. Whitley's pain. *Id.*

The FCE does not support defendants' contentions that Ms. Whitley was able to work.

**IME of Dr. Rudins:** Defendants also rely on the IME of Dr. Rudins.  While Dr. Rudins includes a conclusory statement (apparently without ever reviewing the FCE) that Ms. Whitley theoretically could perform at a sedentary level, he emphasizes that "considering that she has been out of work since 1988, however, the chance of her successfully returning to work is quite low." (Pl. LR 56 St., ¶ 757).  Dr. Rudins also recognizes the debilitating aspects of Ms. Whitley's pain and notes that "the degree to which she would be able to tolerate various activities is difficult to predict in the long term, since it is subjective pain that is limiting her."  (Pl. LR 56 St., ¶ 757).

Dr. Rudins' IME is internally inconsistent and raises more questions than it provides answers.

**TSA:** As argued repeatedly, CORE's TSA is meaningless, given its source, the lack of individualized consideration of the facts concerning the claimant, and its failure to make any effort to determine Ms. Whitley's vocational ability to find and sustain employment, given her restrictions and severe and chronic pain.  *See § ___, supra.*

**Herpes Zoster:** Defendants state in their brief that the condition "that her physician now is certifying as a disabling condition" is herpes zoster.  Def. Br., p. ___.  This statement is misleading. Dr. Queen, Ms. Whitley's treating physician, along with Dr. Stephenson and other professionals, consistently supported Ms. Whitley's total disability under the Plans from 1988 to 1998 based on her chronic pain from her fibromyalgia and other diseases.  (Pl. LR 56 St., ¶ 736).

91

However, what Dr. Queen did state—and CORE's medical consultant agreed—was that with the pain from the new condition of herpes zoster "superimposed on her . . . chronic pain" Ms. Whitley was unquestionably totally disabled from any occupation.  (Pl. LR 56 St., ¶ 775).  And since this condition had arisen prior to Champion/CORE's initial decision terminating Ms. Whitley's benefits, the condition should be considered in determining total disability under the Plan.  (Pl. LR 56 St., ¶ 781-783).

### Champion/CORE Did Not Engage in a Full and Fair Review Process in Terminating Ms. Whitley's LTD Benefits

Plaintiffs have argued, with significant support, that this Court should perform a *de novo* review of each claim.  However, even under an arbitrary and capricious standard of review, Champion/CORE would be entitled to no deference unless they had engaged in a reasoned decision making process, fairly considering all of the facts and opinions in the case in context, and arriving at their conclusion based on substantial evidence.  *See § ___, supra*.  As the following demonstrates, there was no reasoned decision making process, or full and fair review of Ms. Whitley's claim.  Specifically, it was *not* reasonable on the part of Champion/CORE:

• To disregard Ms. Whitley's long-time treating physician who consistently determined, based on years of treatment, that Ms. Whitley was totally disabled because of her chronic pain.

• To disregard completely Ms. Whitley's consistent reports of disabling pain, in view of the repeated references to her pain throughout her medical records.

• To terminate Ms. Whitley's benefits based on an FCE which expressly recognizes that Ms. Whitley is unable to perform all of the requirements of sedentary work.

• To terminate benefits based on the IME of Dr. Rudins which notes that the prospects for Ms. Whitley "successfully returning to work is quite low."

• To base the termination of Ms. Whitley's LTD benefits on the TSA which failed to consider Ms. Whitley's vocational disability in the context of her individualized circumstances.

92

• To make a determination as to the onset of Ms. Whitley's condition of herpes zoster—a condition which was unquestionably disabling—without obtaining the documentary information from Ms. Whitley's medical records which would substantiate that date.

### Conclusion

In some respects, Ms. Whitley's claim most clearly illustrates the motives of Champion/CORE in 1997 to 1999, and their "aggressive" efforts to remove Ms. Whitley from the LTD rolls. After years of certifying her disability; after an IME in 1995 had, without qualification, confirmed her total and permanent disability; after Travelers and CORE had both recognized that Ms. Whitley's condition was unchanging (or perhaps worsening), and that she was totally disabled; after noting in 1996 that an FCE would be a "waste of money;" CORE, with the support of Sharon Spain, Champion's contact person, adopted an "aggressive" approach in 1997 and through its "intervention," terminated her benefits. Sharon Spain was "pleased with the IME results" of Dr. Rudins and informed CORE that she would "support a denial" based on the CORE Denial Committee's recommendation (Pl. LR 56 St.,¶ 760). CORE noted in its report recommending the termination of benefits that "Dr. Queen would not release Ms. Whitley to work, even after two requests by case management." (Pl. LR 56 St., ¶ 765). The record shows that CORE, ignoring the consistent opinions of the treating physician, was determined to terminate Ms. Whitley.

Ms. Whitley is totally disabled under the Plan. She is totally disabled from her fibromyalgia, and was before the onset of her condition of herpes zoster. She is totally disabled from her herpes zoster, a condition which was covered under the Plan. Ms. Whitley's benefits should be reinstated.

### CONCLUSION

The present action is exceptional for an ERISA LTD case in many respects. First, it is rare that multiple plaintiffs join together to pursue their remedies under ERISA for the denials of their

claims.  While each plaintiff has distinct medical conditions, the 14 plaintiffs are joined by the circumstances of Champion/CORE's conduct and motives in the termination of their claims.

For that reason, and based on the evidence presented, plaintiffs are seeking extraordinary relief.  For purposes of this response, plaintiffs request that defendants' motion be denied in its entirety.  With respect to plaintiffs' motion, plaintiffs have requested that this long ordeal—the deprivation of their long term disability benefits for years when they need them most—be brought to an end.  In short, plaintiffs seek immediate relief by this Court; if there are issues to be tried, plaintiffs request a trial without delay; upon resolution of the issues by trial or through plaintiffs' motion, plaintiffs request that they be reinstated to their long term disability benefits.

This the 13th day of May, 2005.

THE PLAINTIFFS
HARRY L. SMITH, ET AL


BY:_____

WILLIAM B. BARNES (CT0268)
Rosenstein & Barnes
1100 Kings Hwy. East
P.O. Box 687
Fairfield, CT 06432
Tel (203) 367-7922
Fax (203) 367-8110
E-mail wbarnes@rosenbar.com

ROBERT M. ELLIOT (CT21210)
Elliot Pishko Morgan, P.A.
426 Old Salem Road
Winston-Salem, NC 27101
Tel (336) 724-2828
Fax (336) 724-3335
E-mail rmelliot@epmlaw.com

94

RICHARD B. HARPER
Harper Law Office
Post Office Box 395
Sylva, NC 28779
Tel (828) 586-3305
Fax (828) 586-4795
E-mail rbharper@dnet.net

**CERTIFICATE OF SERVICE**

I certify that a copy of the Plaintiffs' Brief in Response to Defendants' Motion for Summary

Judgment was sent by Mail on May 13, 2005 to the following:


ADDRESSEES:

Bruce M. Steen, Esq.
McGuire Woods
Bank of America Corporate Center
100 North Tryon St., Suite 2900
Charlotte, NC 28202

Barry J. Waters, Esq.
Murtha Cullina, LLP
Whitney Grove Sq.,
Two Whitney Ave.,
P.O. Box 704
New Haven, CT 06503-0704


_____
ROBERT M. ELLIOT