IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HARRY L. SMITH, LOIS L. LYNN, | ) | |
| DARRELL KEITH HILL, ELIZABETH | ) | |
| CASE BOONE, WILEY H. HAYNES, | ) | |
| ROSA LEE BROOKSHIRE, HARRISON | ) | CIVIL ACTION NUMBER |
| YOUNG CLARK, FRANZISKA FINNEY, | ) | 3:02cv00212 (CFD) |
| JUDITH CASE KIRKPATRICK, WILSON | ) | |
| DANIEL McCLURE, CELIA DARLENE | ) | |
| METCALF, CHARLES R. REECE, | ) | |
| DOLPHUS LUTHER TREADWAY, JR., | ) | |
| and MARTHA BURNETTE WHITLEY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHAMPION INTERNATIONAL | ) | |
| CORPORATION, LONG TERM | ) | |
| DISABILITY BENEFITS PLAN FOR | ) | |
| SALARIED EMPLOYEES OF | ) | |
| CHAMPION INTERNATIONAL | ) | |
| CORPORATION #506, LONG TERM | ) | |
| DISABILITY BENEFITS PLAN FOR | ) | |
| CERTAIN HOURLY EMPLOYEES OF | ) | |
| CHAMPION INTERNATIONAL | ) | |
| CORPORATION #703; INTERNATIONAL | ) | |
| PAPER COMPANY; and CORE, INC. | ) | |
| | ) | |
| Defendants. | ) | MAY 13, 2005 |
| _____ | ) | |

## PLAINTIFFS' LOCAL RULE 56(a)(2) RESPONSE TO DEFENDANTS' STATEMENT OF FACTS

Pursuant to Local Rule 56(a)(2), plaintiffs hereby submit this response to defendants' Local

Rule 56(a)(2) Statement of Facts.

**Table of Contents**

|  | Paragraphs |
|---|---|
| Salaried LTD Plan & Hourly LTD Plan | 1-21 |
| Elizabeth Boone | 22-68 |
| Rosa Lee Brookshire | 69-111 |
| Harrison Clark | 112-152 |
| Franziska Finney | 153-176 |
| Wiley Haynes | 177-213 |
| Darrell Hill | 214-230 |
| Judith Kirkpatrick | 231-258 |
| Lois Lynn | 259-295 |
| Celia Metcalf | 296-340 |
| Wilson McClure | 341-362 |
| Charles Reece | 363-392 |
| Harry Smith | 393-428 |
| Dolphus Treadway | 429-446 |
| Martha Whitley | 447-495 |

## The Salaried LTD Plan & Hourly LTD Plan

1.     Plaintiffs are former employees of Champion International and participants in either

the Salaried LTD Plan or Hourly LTD Plan (collectively referred to as "the Plans").  See Complaint,

¶4 (Dkt. Entry 1). <u>See also</u> Plan 0001-0047 (terms of Salaried LTD Plan and Plan 0049-0099)(NB 66); Plan 0049-0099 (terms of the Hourly LTD Plan)(NB 66).[1]

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 1.

2.    As participants in either the Hourly LTD Plan or Salaried LTD Plan, Plaintiffs were eligible to apply for long term disability benefits pursuant to the Plans.

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 2.

3.    The purpose of both of these Plans was to provide a source of income to a participating Employee who was prevented from engaging in active employment as a result of a total disability, as that term was defined by each Plan. <u>See</u> Plan 0006, 0053 (NB 66).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 3.

4.    Pursuant to the Salaried LTD Plan, for the first thirty months, a participant was eligible for long term disability benefits if he was unable "to perform the duties of his employment with the Employer as a result of an injury which occurs or a sickness which first manifests itself while employed by the Employer . . . ." <u>See</u> Plan 0014 (NB 66).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 4.

5.    Similarly, pursuant to the Hourly LTD Plan, for the first thirty months, a participant was eligible for long term disability benefits if he was unable "to perform the duties of his employment with the Employer as a result of an injury which occurs or an illness which first manifests itself while employed by the Employer . . . ." <u>See</u> Plan 0060 (NB 66).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 5.

---

[1]    Pursuant to their March 31, 2005, Joint Stipulation, the parties have filed the documents which may be relevant to plaintiffs' claims for benefits. The citation form "(NB__)" refers to the notebook in which the document being cited is found.

6.    The period of disability referred to in ¶¶4 and 5 is commonly referred to as the participant's "own occupation" or "own occ" period of long term disability ("LTD") benefits.

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 6.

7.    Pursuant to the Salaried LTD Plan, at the conclusion of the "own occ" period, a participant is entitled to continuing LTD benefits only if he or she is unable "to engage in _any_ occupation or business for wage or profit for which he is or may become reasonably qualified by training, education or experience." See Plan 0014 (emphasis added)(NB 66).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 7.

8.    Similarly, pursuant to the Hourly LTD Plan, at the conclusion of the "own occ" period, a participant is entitled to continuing LTD benefits only if he or she is unable "to engage in _any_ occupation or business for wage or profit for which he is or becomes reasonably qualified by training, education or experience." See Plan 0060 (emphasis added)(NB 66).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 8.

9.    The period of disability referred to in ¶¶7 and 8 is commonly referred to as the participant's "any occupation" or "any occ" period of LTD benefits.

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 9.

10.    Pursuant to both Plans, Champion International's Pension and Employee Benefits Committee ("PEBC") was the Plan Administrator and had "the power and authority in its sole, absolute, and uncontrolled discretion to control and manage the operation and administration of the Plan(s)" and had "all powers necessary to accomplish these purposes" including the responsibility and authority to "determin[e] all questions relating to the eligibility of Employees to participate" and to

4

"interpret[] the provisions of the Plan(s) . . . . "  <u>See</u> Plan 0009, 0024-0025 (Salaried LTD Plan) &
Plan 0055, 0072-0073 (Hourly LTD Plan)(NB 66).

> **RESPONSE:** As to the facts asserted in ¶ 10, plaintiffs state that according to the Plan's
> Administrative Provisions, the "Committee has the power to administer and
> interpret" the Plan(s) in its "sole, absolute and uncontrolled discretion" as
> "deemed necessary or advisable and ***which are not inconsistent with the***
> ***express terms hereof or ERISA***." (emphasis added)  NB 66: Plan 24.

11.     However, by express plan provision, the PEBC appointed the Plan Supervisor, defined
as Champion International's Employee Benefits Department, to act on its behalf and delegated parts
of its powers to the Plan Supervisor.  <u>See</u> Plan 0009, 0013, 0023-0024, 0055-0056, 0059, 0072-0073
(NB 66).

> **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 11.

12.     In addition, both Plans granted the PEBC the authority to appoint a subcommittee to,
among other things, interpret the Plans and make claims decisions.  <u>See</u> Plan 0023-0024, 0072-0073
(NB 66).  Pursuant to that authority, the PEBC appointed the Claims Review Committee to interpret
the Plans and make claims decisions,  <u>See</u> PEBC 02421, 02424 (NB 64), and the claims procedure
under the Plans is a two-step process.

> a.     First, a participant or beneficiary may seek benefits (or challenge the
> termination of benefits) by filing a claim with the Plan Supervisor.  The Plan
> Supervisor then generally has ninety days to review and decide the claim.  <u>See</u>
> Plan 0029, 0079 (NB 66).

b.      If the Plan denies the claim at the first step, the participant or beneficiary may, within sixty days of receipt of the adverse benefits decision, file a request for review.  The Plan's Claims Review Committee then generally has sixty days to review and decide the claim.  See Plan 0031-32, 0081-82 (NB 66).

**RESPONSE:** As to the facts asserted in ¶ 12, Plaintiffs state that the PEBC appointed the Claims Review Committee with the "authority and responsibility of sustaining or overruling the denial of a claim under the Company's benefit programs subject to ERISA." Plaintiffs deny that the Plans, as written, explicitly include a challenge to a termination of benefits. Plaintiffs admit the remaining facts asserted in ¶ 12, with the exception of the characterization of the claims procedure as a "two-step process". NB 66: Plan 29, 31-32, 79, 81-82.

13.      According to each Plan, "if there is a difference of opinion as to whether a Participant meets the requirements of Total Disability under either Plan, the decision of the Plan Supervisor shall be final and conclusive."  See Plan 0015, 0061 (NB 66).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 13.

14.      Participation in the each Plan "shall terminate . . . the date the Participant otherwise no longer meets or complies with the terms, provisions and/or requirements for participation in the Plan." See Plan 0016, 0063 (NB 66).

**RESPONSE:** As to the facts asserted in ¶ 14, plaintiffs state that under *Section 3 Participation* of the Plan, the referenced quote is one of five subparagraphs listed under *Section 3.2, Cessation of Participation*, and accordingly is one of

6

five circumstances under which participation in the Plan shall terminate. NB 66: Plan 16, 63.

15.    In order to assist in determining participant eligibility, the Plan Supervisor may require the Participant to "submit to an examination by a Physician selected by the Plan Supervisor when and as often as it may reasonably require."  See Plan 0019, 0067 (NB 66).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 15.

16.    Participants are required to submit to the Plans "such documents, evidence, medical data or other information" as the Plan Supervisor considers necessary for the administration of the participant's continuing eligibility for benefits.  See Plan 0027-0028, 0077 (NB 66).

**RESPONSE:**  Plaintiffs deny the facts asserted in ¶ 16. NB 66: Plan 27-28, 77.

17.    CORE, Inc. provides employee absence management services to employers, third party administrators and insurance carriers.  CORE's services include Integrated Disability Management, Peer Review Analysis, and other services including case management services.  See Affidavit of Andrew Bernstein which was attached to CORE, Inc.'s Local Rule 9(c)(1) Statement (Dkt. Entry 14).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 17; and further assert that the record in this case reflects additional actions on the part of CORE.

18.    Effective January 1, 1996, CORE and Champion International entered into a Services Agreement whereby CORE furnished disability evaluation services to Champion.  See CORE 0001-0039 (NB 67).

**RESPONSE:** As to the facts asserted in ¶ 18, plaintiffs admit that CORE and Champion entered into a Services Agreement providing that CORE would furnish certain disability evaluation services to Champion in order to reduce its costs, and that

it would make no decisions concerning eligibility; it is further asserted that CORE exceeded the scope of this agreement in its determinations of the plaintiffs' claims. NB 67: CORE 1-39.

19.    Effective January 1, 1999, CORE, Champion and Sedgwick Claims Management Services entered into a SCORE Services Agreement whereby CORE and Sedgwick furnished disability management services to Champion.  See CORE 0040-0067 (NB 67).

**RESPONSE:** As to the facts asserted in ¶ 19, plaintiffs admit that SCORE and Champion entered into a Services Agreement providing that SCORE would furnish certain disability evaluation services to Champion in order to reduce its costs, and that it would make no decisions concerning eligibility; it is further asserted that SCORE exceeded the scope of this agreement in its determinations of the plaintiffs' claims. NB 67: CORE 1-39.

20.    In June 2000, pursuant to a merger agreement, Champion International became a subsidiary of International Paper Company ("International Paper").  In December 2000, Champion merged into International Paper.

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 20.

21.    As a result of International Paper's acquisition of Champion in 2000, responsibility for administering the Plans and paying benefits pursuant to those Plans was transferred to International Paper for those employees found to be disabled prior to January 1, 2001.  The Plans, the PEBC, the Claims Review Committee, and the Plan Supervisor, as defined by the Plans, ceased to operate. Champion International terminated CORE's involvement in the SCORE Services Agreement effective December 31, 2000.

**RESPONSE:** Plaintiffs lack sufficient knowledge to admit or deny the facts asserted in ¶ 21.

### Elizabeth Case Boone's Claim for Benefits

22.    Plaintiff Elizabeth Case Boone ("Boone") worked as an hourly employee at Champion International's facility in Canton, North Carolina.  Boone's hire date was August 23, 1976.  Boone 0314 (NB 1).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 22.

23.    Boone's last day of active employment with Champion International was May 4, 1987.  See Boone 0314 (NB 1).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 23.

24.    Boone was approved for short-term disability benefits, which commenced on May 5, 1987, and terminated effective November 2, 1987.  See Boone 0001, 0313 (NB 1).

**RESPONSE:**  As to the facts asserted in ¶ 24, plaintiffs admit that Boone received short-term disability benefits from May 5, 1987 through November 2, 1987, when her short term disability benefits were exhausted. Plaintiffs further state that effective November 3, 1987, Ms. Boone's claim converted to a long term disability claim when Champion determined that she was "still wholly and continuously disabled" and recommended long term disability benefits effective November 3, 1987. NB 1: Boone 313.

25.    The last position Boone held with Champion International prior to qualifying for disability benefits was that of a cutter sort checker.  See Boone 0001 (NB 1).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 25.

9

26.    As a Champion International employee, Boone was eligible to apply for long-term disability income ("LTD") benefits under the Hourly LTD Plan.

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 26.

27.    In applying for benefits under the Hourly LTD plan, Boone described her condition as "cervical disc. cervical radiculopathy," and, in support of her claim for these benefits, Boone submitted an Attending Physician's Statement which stated "patient had anterior cervical diskectomy, with interbody fusion C4-5 on 6-23-87 and the patient continues to have neck pain." See Boone 0339, 0341 (NB 1).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 27.

28.    On  November 23, 1987, the Plan notified Boone that it had approved her application for LTD benefits effective November 3, 1987.  At that time, the Plan advised Boone that her "LTD benefits may continue for 24 months provided you are wholly and continuously disabled and are unable to perform each and every duty of your regular job."  See Boone 0034 (NB 1).  However, Champion specifically cautioned Boone that:

> "[a]fter the first 24 months, benefits will continue up to your retirement date only if you are under the regular care of a licensed and qualified physician and are unable to work at any job, within the Company or elsewhere, for which you are reasonably qualified by your education, training, or experience."

See Boone 0034 (NB 1).

**RESPONSE:** As to the facts asserted in ¶ 28, plaintiffs admit that Ms. Boone was informed that she would receive benefits as stated. However, Champion further documented Ms. Boone's continuing long term disability status on its "To Put Employee on LTD" form dated November 13, 1987, in which Champion

documented "Date employee is to stop receiving LTD 12/01/2011". **NB 1: Boone 274**.

29.    Boone's monthly benefit amount from the Hourly LTD Plan was $200.00.  See Boone 0034, 0313-0315 (NB 1).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 29.

30.    Under the Hourly LTD Plan, Boone's continuation of LTD benefits depended on certification of Boone's continuing disability.  See Plan 0067 (NB 66).

**RESPONSE:** As to the facts asserted in ¶ 30, plaintiffs state that under the terms of the Plan, "Upon the request of the Plan Supervisor, the Participant may be required to submit to an examination by a Physician selected by the Plan Supervisor when and as often as it may reasonably require". NB 66: Plan 67.

31.    From November 1991 through November 1997, the Plan periodically provided Boone forms to submit so the Plan could periodically review her claim to verify the status of her disability. Boone complied with the Plan's requests for information and the information submitted to the Plan supported the continuation of LTD benefits.  See Boone 0232-0234, 0245-0279, 0282-0284, 0285-0287, 0290, 0294-0304, 0306-0311, 0327-0335, 0469-0470,  00476-0483, 0500, 0504-0505 (NB 1).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 31.

32.    On November 13, 1997, the Plan requested Boone to provide additional personal profile and medical information for the Plan's periodic review of her claim.  See Boone 0447 (NB 1).

**RESPONSE:** As to the facts asserted in ¶ 32, plaintiffs admit that correspondence from CORE dated November 13, 1997 requested that Ms. Boone provide personal

and medical information as part of its annual review process of Ms. Boone's disability status. NB 1: Boone 447.

33.     In response to this request for information, Boone submitted a Personal Profile Evaluation dated November 19, 1997 describing her present physical or psychiatric complaints and limitations as "left side of my body, arm, neck, back, leg, and foot." See Boone 0441-0444 (NB 1). In this evaluation, Boone answered that she did not expect to return to either her last occupation or any occupation. See Boone 0443 (NB 1).

   **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 33.

34.     Also in response to this request for information, Boone submitted various medical records and an Attending Physician Statement from Jill Vargo, M.D., on which Dr. Vargo stated that Boone was ambulatory, verified that Boone's condition had not improved or regressed, and diagnosed her disabling condition as fibromyalgia.  Without completing the restriction and limitation section of the Attending Physician Statement, Dr. Vargo stated that Boone was totally disabled from any occupation.  See Boone 0439-0440 (NB 1).

   **RESPONSE:** As to the facts asserted in ¶ 34, plaintiffs admit that Jill S. Vargo, M.D.
                 completed an Attending Physician Statement dated 11/26/97 which stated that
                 Ms. Boone's prognosis remained unimproved, she was totally disabled, and
                 would never be able to resume any work. NB 1: Boone 440.

35.     In reviewing Boone's continuation of LTD benefits under the "any occupation" definition of disability, the Medical Director for the Champion Disability Management Program, J.D. Beavers, M.D., M.P.H., spoke with Boone's treating physician by telephone on December 11, 1997. Dr. Vargo advised Dr. Beavers that "there are no objective findings to report.  There is no synovitis.

She simply complains of pain all over."  Boone's treating physician stated "she's not sure if [Boone] is any-occupation disabled."  <u>See</u> Boone 0217 (NB 1).

> **RESPONSE:** As to the facts asserted in ¶ 35, plaintiffs admit that the claims file contains a document wherein Dr. Beavers indicates that he spoke with Dr. Vargo on December 11, 1997.  It is admitted that note, apparently generated by Dr. Beavers, attributes to Dr. Vargo a statement that "there are no objective findings to report. There is no synovitis. She simply complains of pain all over" and "she's not sure if [Boone] is any-occupation disabled". NB 1: Boone 217. It is denied Dr. Vargo made the statement because it directly contradicts the 11/26/97 Disability Benefit Attending Physician Statement in which she stated patient is now totally disabled and in her opinion would never be able to resume any work. NB 1: Boone 224. Further, in correspondence addressed to Champion dated March 24, 1998, Dr. Vargo states, "I do not ever expect Ms. Boone to improve to the point where she can return to gainful employment." NB 1: Boone 20. Additionally, by correspondence dated July 16, 1998 to Champion, Dr. Vargo states, "There has been no change in her condition and I do not suspect that there are [sic] will ever be any improvement in her condition to the point that she would be able to be gainfully employed at any level of employment. Thus she will now have two physicians who are stating that there has not been any change in her condition since her initial disability and it is not anticipated that she will ever be well enough to do even sedentary work". NB 1: Boone 55.

13

36.    Consequently, Dr. Beavers recommended to "not certify any-occupation disability." His rationale for this recommendation was "there is no objective evidence of disability."  However, because Dr. Vargo would not clear Boone to return to work, Dr. Beavers recommended that, if further evaluation is needed, the Plan should obtain an Independent Medical Examination ("IME") with a physiatrist.  See Boone 0217 (NB 1).

**RESPONSE:** As to the facts asserted in ¶ 36, plaintiffs admit that despite Ms. Boone's treating board certified rheumatologist's refusal to clear Ms. Boone to return to work, Dr. Beavers recommended to "not certify any-occupation disability". Plaintiffs further state that because Ms. Boone's treating board certified rheumatologist refused to clear Ms. Boone to return to work, Dr. Beavers requested an IME in order to acquire an opinion that Ms. Boone could return to work, thereby justifying the removal of Ms. Boone from Champion's long term disability benefits plan, thus providing credibility for CORE's claimed ability to provide cost savings, and significant monetary gain for Champion. NB 1: Boone 217; Boone 366.

37.    Pursuant to Dr. Beavers' recommendation, the Plan scheduled an IME of plaintiff with Charles R. Shields, M.D.  See Boone 0437, 0430, 0428-0429 (NB 1).

**RESPONSE:** As to the facts asserted in ¶ 37, plaintiffs admit that the Shields IME was scheduled by UNIVAL at the request of the Disability Management Program at CORE, Inc. See NB 1: Boone 430.

38.    Dr. Shields reviewed Boone's medical records and, on February 3, 1998, examined Boone.  See Boone 0159-0165 (NB 1).  According to Dr. Shields, the focus of Boone's pain "is at the

suboccipital level giving a general feeling of severe pain which she has difficulty describing . . . it is worse with walking, standing, sitting, or bending, or being in any position." Boone further complained that she feels she is getting worse.  See Boone 0161 (NB 1).

> **RESPONSE:** As to the facts asserted in ¶ 38, plaintiffs deny that Dr. Shields "examined" Ms. Boone. Plaintiffs admit that Dr. Shields noted that Ms. Boone had a total of seven neck surgeries with fusions from C-3 through C-7 and Dr. Shields further noted that "Dr. Moody feels that she has a pseudoarthrosis still at the C-6 7 level". The remaining facts as asserted in ¶ 38 are admitted. NB 1: Boone 159, 161.

39.     Dr. Shields was unable to find any absolute sensory deficits to light touch, found Boone's motor strength to be "within normal limits and certainly there is no focal area of weakness," and was unable to find any specific atrophy.  Moreover, Dr. Shields noted "interestingly enough she only has eight of the eighteen usually fibromyalgic tender points.  Some of the controls are also positive."  See Boone 0162 (NB 1).

> **RESPONSE:** As to the facts asserted in ¶ 39, plaintiffs admit that while factually accurate, it is an incomplete summary of Dr. Shields' findings because the Defendants reference only portions of Dr. Shields' findings which are selective in nature, taken out of context and as such significantly alter its interpretation. Plaintiffs state that Dr. Shields' report viewed in its entirety is the best evidence of its content. NB 1: Boone 159-165.

40.     Among other things, Dr. Shield diagnosed Boone with "left sided body pain which has been diagnosed as fibromyalgia, though today's examination does not fit the criteria absolutely" and

recommended that Boone "can work five to six hours a day at a sedentary physical demand level with specific restrictions to the left side of the body." Dr. Shields also "believe[d] that they could increase the number of hours that [Boone] would be able to work up to 40 hours a week." See Boone 0164 (NB 1).

> **RESPONSE:** As to the facts asserted in ¶ 40, plaintiffs admit that while factually accurate, it is an incomplete summary of Dr. Shields' findings. NB 1: Boone 163.

41.     In addition to the IME, Dr. Shields completed a Modification Checklist dated February 3, 1998, which indicated that Boone could not return to her regular occupation but could return to work with modifications "now." See Boone 0215 (NB 1). He stated that Boone could work 5 to 6 hours a day, five days a week, and certified Boone's physical modification as "sedentary only," with lifting restriction of 10 lbs, standing restriction of 1-2 hours, sitting restriction as 5-6 hours and walking restrictions of "for personal needs only." See Boone 0215 (NB 1). Dr. Shields further verified Boone had no upper or lower extremity restrictions on her right side and no restrictions for overhead reaching. See Boone 0215 (NB 1). Dr. Shields also completed a Physician's Report of Physical Capacity, received by the Plan on February 12, 1998, that verified the information on the Modification Checklist. See Boone 0418-0419 (NB 1).

> **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 41.

42.     On February 19, 1998, Dr. Shields, the IME physician, supplemented his opinion regarding Boone's condition and stated that Boone "can work up to 6 hours per day, 5 days per week with the restrictions given." See Boone 0417 (NB 1). See also Boone 0201 (NB 1).

> **RESPONSE:** As to the facts asserted in ¶ 42, plaintiffs state that in response to contact from CORE, Dr. Shields altered his opinion to state that Ms. Boone could work at

least 6 hours per day, which would meet the plan's requirement for full time employment, thereby justifying the removal of Ms. Boone from Champion's long term disability benefits plan, thus providing credibility to CORE's claimed ability to provide cost savings, and significant monetary gain for Champion. NB 1: Boone 201, 366.

43.    On March 3, 1998, CORE recommended "a denial of continued LTD benefits initially effective 11/05/87 given the results of the independent medical exam which indicate the employee can perform sedentary work" and "work at a sedentary physical demand level 6 hours a day, 5 days a week." In its report, CORE also noted that Boone's own treating physician (Dr. Vargo) was "not sure" if Boone was disabled from any occupation. See Boone 0412-0415 (NB 1).

RESPONSE: Plaintiffs admit the facts asserted in ¶ 43, but state that the reference to Ms. Boone's treating physician's opinion directly contradicts her extensive documented statements that Ms. Boone is totally disabled. NB 1: Boone 20, 216, 224.

44.    On March 9, 1998, the Plan notified Boone that it was terminating her LTD benefits because "the Independent Medical Examination has determined you are able to perform sedentary work" and she, therefore, was not disabled as defined in the Plan. The Plan informed Boone of her right to appeal the decision and enclosed a copy of the Appeal Rights & Process. See Boone 0031-0032 (NB 1).

RESPONSE: As to the facts asserted in ¶ 44, plaintiffs state that the notification was on CORE letterhead dated March 9, 1998, signed by J.D. Beavers, MD. NB 1: Boone 31-32.

17

45.     The Plan subsequently notified Boone that her LTD benefits would terminate on April 30, 1998.  See Boone 0073-0074 (NB 1).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 45.

46.     On or about April 8, 1998, the Plan Supervisor received a March 24, 1998, letter from Dr. Vargo in which she asserted that, based on her opinion "as a board certified rheumatologist and in following this patient over a long period of time, I can say that there has not been a substantial change in her disability status."  See Boone 0240-0241 (NB 1).  Dr. Vargo concluded in her letter that she did "not ever expect Ms. Boone to improve to the point where she can return to gainful employment."  She stated that, "if this letter does not serve the purpose of reinstating her disability, then I have advised my patient to obtain legal counsel."  See Boone 0240 (NB 1).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 46.

47.     By letter dated April 8, 1998, Boone appeal the denial of her claim for benefits but failed to provide any additional clinical information regarding her claim for benefits.  See Boone 0027-0028 (NB 1).

   **RESPONSE:** As to the facts asserted in ¶ 47, plaintiffs admit that Ms. Boone submitted correspondence dated April 8, 1998 appealing the denial of her claim for continued benefits and provided an extensive description of her painful, disabling condition to be considered with her appeal.  NB 1: Boone 27-28.

48.     On April 29, 1998, CORE commissioned Alan Marks, M.D., to conduct a Peer Review Analysis of Boone's claim and determine whether Boone was disabled from any occupation, and whether another IME should be conducted.  See Boone 0396 (NB 1).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 48.

49.     Dr. Marks reviewed the submitted medical records and concluded on May 7, 1998, that Boone was not disabled from any occupation nor would he recommend another IME.  See Boone 0398 (NB 1).   According to Dr. Marks, "[p]atients with neck pain, left arm and leg pain, without demonstrable neurological abnormalities (weakness, hyperesthesia, hyperesthesias, upper motor neuron findings) cannot be thought of as being disabled from any occupation, even though the individual patient may feel incapable of holding down a job."  See Boone 0398 (NB 1).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 49.

50.     On May 13, 1998, CORE recommended that the Plan "uphold the previous denial of LTD benefits, effective 3/2/98, based on the CORE physician consultant's decision on appeal, that the employee is not disabled from performing any occupation."  CORE noted that Dr. Shields concluded in his IME report that Boone could work at a sedentary demand level six hours per day, five days per week, and that Dr. Marks concluded in his independent peer review that Boone "is not disabled from any occupation."  See Boone 0144-0146 (NB 1).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 50.

51.     On June 25, 1998, Congressman Charles Taylor wrote Champion International on behalf of Boone.  See Boone 0015-0021 (NB 1).  He requested the Plan to review Boone's claim for benefits and submitted to the Plan Dr. Vargo's previously referenced March 24, 1998, letter to Champion International, See Boone 0020-0021, and April 6, 1998, office notes from Sean R. Maloney, M.D.  See Boone 0017-0019 (NB 1).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 51.

52.     On July 2, 1998, the Plan Supervisor notified Boone that her April 8, 1998 correspondence was treated as an initial claim under ERISA and advised Boone that, "[b]ased on the

review by CORE, our decision is to uphold the denial of LTD benefits." <u>See</u> Boone 0013-0014 (NB

1). The Plan stated in its letter to Boone that

> "[w]e have reviewed the documentation provided by you from Dr. Jill Vargo. A CORE
> physician reviewed the above information and determined that you are not disabled from any
> occupation. He also stated 'The rheumatology notes and the independent medical exam notes
> do not reveal any neurological abnormalities nor areas of weakness, this is largely subjective
> symptamology without demonstrable objective findings to qualify for medical disability.'"

<u>See</u> Boone 0013 (NB 1). In her letter, Ms. Dixon further advised Boone of her rights to obtain further

review of her claim and enclosed a copy of the Hourly LTD Plan for reference. <u>See</u> Boone 0014 (NB

1).

     **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 52.

53.    By letter dated August 16, 1998, Boone appealed the denial of her claim for benefits.

Boone stated that she had "severe pain in [her] leg and hip and left side of [her] body" and expressed

her hope that Champion International "will take into consideration my reports from the doctors." <u>See</u>

Boone 0010 (NB 1).

     **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 53.

54.    Although her letter of appeal did not provide any additional clinical information, <u>See</u>

Boone 0010 (NB 1), in the several weeks between the July 2, 1998, denial of her claim and her August

16, 1998, appeal, Boone did submit additional information to the Plan.

     **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 54.

55.    More specifically, by the time of her August 16, 1998, appeal, Boone had submitted

to the Plan correspondence from John Stringfield, M.D., dated July 2, 1998, in which he reported that

he was currently treating Boone for her medical problems that include "hiatal hernia with

gastroesophageal reflux disease, chronic sleep disturbance, and most significantly a history of cervical

spine disease" and concluded that he supports "this patient's continued disability." See Boone 0066-0070 (NB 1). Boone also submitted office notes from Dr. Maloney dated May 18, 1998, in which he noted that "Ms. Boone's gait appears normal. Active range of motion of both upper extremities is normal, as is strength in both upper extremities." See Boone 0069 (NB 1).

> **RESPONSE:** As to the facts asserted in ¶ 55, plaintiffs admit that while factually accurate, it is an incomplete summary of Dr. Maloney's findings because the defendants selectively reference portions of Dr. Maloney's findings which are taken out of context and as such significantly alter its interpretation. Plaintiffs state that Dr. Maloney's report viewed in its entirety is the best evidence of its content. NB 1: Boone 69.

56.    By letter dated July 16, 1998, Dr. Vargo stated that, in her opinion, Boone was "unable to be employed at any level of job including sedentary." See Boone 0012 (NB 1).

> **RESPONSE:** As to the facts asserted in ¶ 56, plaintiffs state that Dr. Vargo's July 16, 1998 letter states that Ms. Boone now has two physicians who are stating that there has not been any change in her condition since her initial disability and it is not anticipated that she will ever be well enough to do even sedentary work. NB 1: Boone 12.

57.    As noted above, Boone appealed the denial of her claim by letter dated August 16, 1998. See Boone 0010 (NB 1). On September 3, 1998, the Plan commissioned a Transferable Skills Analysis ("TSA") of Boone. See Boone 0096-0114 (NB 1).

> **RESPONSE:** As to the facts asserted in ¶ 57, plaintiffs state that CORE commissioned the Transferable Skills Analysis. NB 1: Boone 96-114.

21

58.    The TSA considered Boone's work experience at Champion International as a paper sorter and counter and concluded "there are a number of jobs Ms. Boone could perform that are within the same occupational category, yet in different industries." The TSA identified various occupational titles that conformed with Boone's physical restrictions and skills. See Boone 0096-0099 (NB 1).

RESPONSE: As to the facts asserted in ¶ 58, plaintiffs state that a TSA was performed that was flawed in failing to consider her pain and inaccurate in identifying jobs for which Ms. Boone was not reasonably qualified by training, education or experience. NB 23: Boone 35-43.

59.    On September 11, 1998, the Plan notified Boone that the Plan's Claims Review Committee was scheduled to consider her appeal at its September 24, 1998, meeting. The Plan invited Boone to provide no later than September 11, 1998, any additional information she wished the Committee to consider. See Boone 0007 (NB 1).

RESPONSE: Plaintiffs deny the facts asserted in ¶ 59. NB 1: 7.

60.    The only information Boone provided to the Plan were three documents already in the claims file. See Boone 0116-0119 (NB 1).

RESPONSE: Plaintiffs deny the facts asserted in ¶ 60.

61.    On September 24, 1998, the Claims Review Committee discussed Boone's appeal of the Plan's denial of her claim for LTD benefits. After the Committee reviewed Boone's file and discussed its contents, it voted to uphold the denial of Boone's claim for LTD benefits. See CRC 0704-0708 (NB 2). See also CRC 0709-0954 (NB 2).[2]

_____

[2]    The Chair of the Committee "ordered that a copy of the documentation relative to the requests for review previously distributed to the Committee, as well as the Transferable Skills

(continued...)

22

**RESPONSE:** As to the facts asserted in ¶ 61, plaintiffs admit that the Committee discussed Ms. Boone's claim; however, the Committee was operating under a conflict of interest in that all Committee members were Champion employees, were aware that there were significant cost savings associated with upholding the denial of benefits, thereby providing significant monetary gain for their employer, Champion. Accordingly, the Claims Review Committee failed to consider the objective medical evidence, failed to consider chronic pain, failed to consider all of the evidence and placed inordinate weight to the evidence supporting the denial. NB 2: CRC 709-954.

62.     The Committee relied on, *inter alia*, the following information in reaching its decision to uphold the denial of Boone's LTD claim:

"The Committee noted that Boone's doctors, while stating she was disabled, did not provide any clinical analysis other than opinion. An Independent Medical Evaluation was conducted by Dr. Shields on 2/3/98. Dr. Shields, in a 7 page report, after setting forth his conclusions and primary diagnosis, stated that Ms. Boone can work 5-6 hours a day at a sedentary physical demand level with specific restrictions to the left side of the body. The Committee reviewed the Physician's Report of the Physical Capacity and the Modifications Checklist that Dr. Shields completed which restated that Ms. Boone could work 5-6 hours a day, 5 days a week, sit 5-6 hours, stand 1-2 hours, lift up to 10 pounds, and operate a motor vehicle, with restrictions.

Further, the Committee noted that on 12/11/97 Dr. Beavers of CORE (the Plan's medical reviewer) discussed Ms. Boone with her doctor, Dr. Vargo. While Dr. Vargo would not clear Ms. Boone to return to work, Dr. Vargo was "not sure" if she is any-occupation disabled and said that "there are no objective findings to report."

Further a Transferable Skills analysis identified various occupations that Ms. Boone might perform."

―――――――――――――

² (...continued)
Analysis brought to the meeting, be filed with the minutes of the meeting." See CRC 0704, CRC 0709-0954 (NB 2).

23

See CRC 0705 (NB 2).

> **RESPONSE:** As to the facts asserted in ¶ 62, plaintiffs state that the Committee, in failing to consider all of the evidence, failing to consider Ms. Boone's chronic pain, failing to review all of the evidence objectively, and placing inordinate weight to evidence supporting the denial, failed to provide Ms. Boone with a full and fair review, in violation of the Plan. NB 2: CRC 709-954.

63.    On October 21, 1998, the Plan notified Boone that the Claims Review Committee met on September 24, 1998, and decided to uphold the denial of her claim for benefits. The Plan described to Boone the basis of its decision that she was not entitled to disability benefits. See Boone 0005-0006 (NB 1).

> **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 63.

64.    By letter dated October 28, 1998, Boone's former legal counsel notified the Plan that he had been retained to represent Boone in her appeal and requested information regarding appealing the adverse benefits decision. See Boone 0047 (NB 1).

> **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 64.

65.    The Plan responded to Boone's former legal counsel on November 12, 1998, and informed him that "the decision of the Plan's Claims Review Committee is the final administrative step under ERISA and the Plan." See Boone 0003 (NB 1).

> **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 65.

66.    Approximately one year later, by letter dated September 10, 1999, Boone's current legal counsel notified Champion International that they had been retained by Boone concerning her claim

for LTD benefits, and requested copies of all plan documents related to the Hourly LTD Plan and Boone's claims file.  See Boone 0964-0965 (NB 25).

> **RESPONSE:** As to the facts asserted in ¶ 66, plaintiffs admit that by letter dated September 10, 1999, Boone's current legal counsel notified Champion as stated.

67.     Champion International and the Plan complied with Boone's counsel's request.  See Boone 0962, 0959-0960, 0956-0957 (NB 25).

> **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 67.

68.     On April 10, 2001, which was two and one-half years after the Claims Review Committee denied her appeal and approximately eighteen months after the Plan complied with her counsel's request for information, Boone's counsel requested the Plan to "reconsider[] . . . the decision to terminate [Boone's] benefits."  See Boone 0951 (NB 25).  Boone's counsel submitted to International Paper medical and other information they alleged supported Boone's claim for LTD benefits.  See Boone 0951-0955, 0508-0512, 0035-0043, 0585-0947, 0514-0584 (NB 25). (NB 25).

> **RESPONSE:** As to the facts asserted in ¶ 68, plaintiffs admit that because in denying Ms. Boone's continued long term disability benefits the Plan failed to consider the objective medical evidence, failed to consider chronic pain, failed to consider all of the evidence, and placed inordinate weight to the evidence supporting the denial, plaintiffs' counsel submitted medical records and other objective information and documentation so that Champion could conduct a full and fair review of Ms. Boone's claim.

**Rosa Brookshire's Claim for Benefits**

25

69.     Plaintiff Rosa Brookshire ("Brookshire") worked as a Rewind Operator at Champion International's facility in Canton, North Carolina.  Brookshire's date of hire was October 15, 1979.  See Brookshire 0237 (NB 3).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 69.

70.     Brookshire's last date of active service was January 3, 1995.  See Brookshire 0001 (NB 3).  She alleged that she ceased work due to chronic low back pain and obesity, See Brookshire 0160 (NB 3), and received short-term disability benefits from January 3, 1995, until June 4, 1995.  See Brookshire 0001 (NB 2).

**RESPONSE:**  As to the facts asserted in ¶ 70,  Plaintiffs admit that Ms. Brookshire's last date of service was January 3, 1995 and that she received short-term disability benefits from January 3, 1995 until June 4, 1995.  It is denied that she ceased work "due to chronic low back pain and obesity."  The evidence shows that her disability resulted from a medley of problems including degenerative lumbar disc disease, osteoarthritis of the spine/ lumbar facet joint arthritis, and chronic disabling back pain secondary to degenerative disc disease, and that her obesity was related to weight gain over the years as her back problems worsened, leading to a diagnosis of obesity with poor muscle tone, and that additional physical problems developed after she was initially disabled from work.  See Pl. LR 56 St. ¶ 109 - 112.

71.     As a Champion International hourly employee, Brookshire was eligible to apply for disability income benefits pursuant to Hourly LTD Plan.

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 71.

72.    On May 5, 1995, Champion International advised Brookshire that she might be eligible for LTD benefits.  <u>See</u> Brookshire 0221-0222 (NB 3).  Champion International thereafter submitted an LTD Claim Form on Brookshire's behalf.  <u>See</u> Brookshire 0214 (NB 3).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 72.

73.    In order to evaluate Brookshire's claim for LTD Benefits, Brookshire was scheduled for a Functional Capacity Evaluation ("FCE") with Susan Kimel, P.T., at Haywood Rehabilitation Center in Clyde, North Carolina.  <u>See</u> Brookshire 0163-0167 (NB 3).  At the conclusion of the testing and evaluation, Ms. Kimel reported that Brookshire was "able to work at the SEDENTARY-LIGHT Physical Demand Level for an 8 hour day . . . " and that "[h]er specific acceptable Leg Lift capacity was 18 lbs. and Torso Lift Capacity was 0 lbs."  <u>See</u> Brookshire 0163 (NB 3).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 73.

74.    The Plan also evaluated an Ergonomic Job Analysis Checklist and a Job Analysis for Brookshire's Rewinder Operator position.  <u>See</u> Brookshire 0168-0174 (NB 3).  Upon review of the FCE and job specific materials, the Plan determined that Brookshire was disabled from her occupation as a Rewinder Operator.  <u>See</u> Brookshire 0160, 0152-0153 (NB 3).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 74.

75.    On July 26, 1995, the Plan notified Brookshire that her application for LTD benefits had been approved effective June 5, 1995.  <u>See</u> Brookshire 0152-0153 (NB 3).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 75.

76.    The Plan also notified Brookshire that in order to continue receiving LTD benefits beyond the "own occupation" period, she must be "unable to do any job for which [she was]

reasonably qualified by [her] training, education and experience," and that approval of her claim will terminate when she is "no longer disabled as defined in the plan." See Brookshire 0152-0153 (NB 3).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 76.

77.    Brookshire's monthly benefit from the Plan was $361.12. See Brookshire 0159 (NB 3).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 77.

78.    On May 22, 1996, CORE recommended to the Plan that Brookshire's "LTD benefit [be extended] through 6/4/97 at which time LTD Case Management will review whether [Brookshire] is totally and permanently disabled from any occupation." See Brookshire 0133-0134 (NB 3).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 78.

79.    When Brookshire reached the expiration of her initial "own occupation" period of benefits, the Plan began to collect information to determine whether she could satisfy the more stringent "any occ" or "any occupation" disability definition, thereby entitling Brookshire to benefits beyond the initial thirty months of benefits. See Brookshire 0119-0120 (NB 3).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 79.

80.    On June 23, 1997, David Mulholland, M.D., completed an Attending Physician Statement indicating Brookshire's diagnosis as "degenerative disc disease" and "obesity." See Brookshire 0121-0122 (NB 3). Dr. Mulholland opined that Brookshire would "never" be able to return to perform her previous job and that she would "never" be able to resume any work due to her back pain. See Brookshire 0122 (NB 3). Dr. Mulholland also indicated that Brookshire was diagnosed previously by Earnest Goodwin, M.D. See Brookshire 0121 (NB 3). Dr. Mulholland's

Report of Physical Capacity indicated that Brookshire could work zero hours and that it was "unknown" when she would be released to full-time work activity.  See Brookshire 0125 (NB 3).

      **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 80.

      81.     On June 30, 1997, Brookshire submitted a Personal Profile Evaluation in which she stated that she was only capable of returning to her previous occupation if her back problems could be eliminated.  See Brookshire 0127, 0130 (NB 3).  Brookshire also reported that she served as a nursing assistant for twenty years prior to working at Champion International.  See Brookshire 0128-0129 (NB 3).

      **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 81 as stated.  On June 18, 1997, rather than on June 30, 1997, Ms. Brookshire completed a  Personal Profile Evaluation as required by CORE.  In response to the question, "do you expect to return to your last occupation, either on a full-time or part-time basis?" She responded: "only if they can eleminate [sic] my back problems." She indicated that from 1959 to 1979, her occupation was "nursing assistance,"  and her usual duties were "changed beds, give baths, help patients." See NB 3: Brookshire 129 - 130.

      82.     On July 23, 1997, the Plan's consulting physician, Dr. Beavers, spoke with Dr. Mulholland by telephone.  During that conversation, Dr. Mulholland stated that he "inherited" Brookshire as a patient, "never disabled her himself," and that "she is probably capable of sedentary work."  See Brookshire 0118 (NB 3).  After this conversation, the Plan asked Dr. Mulholland to prepare a Modification Checklist.  See Brookshire 0116-0117 (NB 3).

**RESPONSE:**   Plaintiffs deny the facts asserted in ¶ 82 as stated.  It is admitted that the claims file contains a document wherein Dr. Beavers indicates that he spoke with Dr. Mulholland on July 23, 1997.  It is admitted that note, apparently generated by Dr. Beavers, attributes to Dr. Mulholland a statement that " he inherited this patient from a purchased practice, and has never disabled her himself."  See NB 3: Brookshire 118.  However, that statement, attributed by Beavers to Mulholland, is incorrect.  Exactly one month prior to Dr. Beavers' notation, Dr. Mulholland had signed an Attending Physician's Statement indicating that Ms. Brookshire was totally disabled from any occupation, and that she would never be able to resume any work.  See NB 4: Brookshire CRC-1072, 1073.  It is admitted that Dr. Beavers claims that Dr. Mulholland said "she is probably capable of sedentary work."  It is admitted that Dr. Beavers also reported "he gives no findings or symptoms which suggest that she is totally disabled."  Again, Dr. Beavers' claims are in conflict with the Attending Physician's Statement of June 23, 1997, wherein Dr. Mulholland indicated that Ms. Brookshire was totally disabled from any occupation, would never be able to resume any work, and suffered back pain with activities of daily living.  See NB 4: Brookshire CRC-1072.   On July 24, 1997, CORE, rather than "the Plan," asked Dr. Mulholland to complete a Modification Checklist.

83.    Dr. Mulholland refused to prepare the Modification Checklist and, instead, opined that Brookshire needed a "disability evaluation to determine what she is qualified to do." <u>See</u> Brookshire

0114 (NB 3). Pursuant to Dr. Mulholland's recommendation, the Plan scheduled Brookshire for a

Functional Capacity Evaluation ("FCE"). See Brookshire 0111 (NB 3).

     **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 83.

     84.     On September 18, 1997, Susan Kimel, P.T., examined Brookshire and conducted an

FCE. See Brookshire 0084-0101 (NB 3).

     **RESPONSE:** As to the facts asserted in ¶ 84, Plaintiffs deny that physical therapist Susan

          Kimmel "examined" Ms. Brookshire. Plaintiffs admit that she conducted an

          FCE on September 18, 1997. See NB 3:Brookshire-84.

     85.     Based on her examination, Ms. Kimel reported that Brookshire "is able to work at the

LIGHT Physical Demand Level for an 8 hour day . . ." with a thirty pound lifting restriction and a

working height restriction of twelve inches. See Brookshire 0084-0086 (NB 3). Ms. Kimel found

that Brookshire could "occasionally" sit, walk, stand, and could "occasionally" engage in forward

bending and overhead reaching. See Brookshire 0095 (NB 3).

     **RESPONSE:** As to the facts asserted in ¶ 85, Plaintiffs deny that Ms. Kimmel conducted an

          "examination" of Ms. Brookshire. Otherwise, said paragraph is admitted.

     86.     Ms. Kimel also noted that Brookshire "failed 12% of her Validity Criteria giving her

an Equivocal Validity Profile, indicating partial submaximal effort" but that "[r]etesting with

maximum effort would in our opinion yield a functioning ability less than the MEDIUM Physical

Demand Level." See Brookshire 0084 (NB 3).

     **RESPONSE:** Plaintiffs admit that the facts asserted in ¶ 86 are accurate, but incomplete.

          Prior to the evaluation, "Ms. Brookshire was informed that she would not be

asked to perform any activity she did not feel she could perform, and she could stop any test secondary to pain if she so desired." See NB 3: Brookshire 92.

87.    On October 2, 1997, the Plan forwarded the results of the FCE to Dr. Mulholland and requested that he prepare a Modification Checklist based on his evaluation of the FCE. See Brookshire 0081 (NB 3).

> **RESPONSE:** Plaintiffs deny the facts asserted stated in ¶ 87 as stated. On October 2, 1997, CORE forwarded the FCE results to Dr. Mulholland and requested that he complete a Modification Checklist "based on your evaluations of the patient as well as the FCE results." See NB 3: Brookshire 81.

88.    Dr. Mulholland responded on October 16, 1997, and refused to comment on Brookshire's disability. He stated that he did not perform disability physicals nor did he "disable people or recommend them to be disabled." Dr. Mulholland noted that Brookshire's previous physician, Dr. Goodwin, considered her "disabled." Based on Dr. Goodwin's opinion, Dr. Mulholland stated "she is disabled until she is fully evaluated by a disability physician." Dr. Mulholland, Brookshire's treating physician, also asked that the Plan refrain from any additional contact with his office. See Brookshire 0079 (NB 3). Dr. Mulholland stated that "disability is between you and your clients. Please leave me out of it." See Brookshire 0079 (NB 3).

> **RESPONSE:** As to the "facts" asserted in ¶ 88, Plaintiffs deny the first sentence. Dr. Mulholland did comment on Ms. Brookshire's disability to the extent that he stated, "I do not consider her evaluation by the physical therapist to be reason enough to put her back to work." See NB 4: Brookshire CRC-1028. Except that Dr. Mulholland told a CORE nurse, Kristin Haydon, and not "the Plan,"

32

not to call his office or ask him to comment again on this matter, Plaintiffs

admit the remaining sentences of said paragraph, but for a fuller understanding

of Dr. Mulholland's response, see Pl. LR 56 St., p.36-37,  ¶ 156 - 157, and the

full text of Dr. Mulholland's letter of October 16, 1997 to Kristin Haydon of

CORE  in NB 3: Brookshire 79.

89.     To further evaluate Brookshire's medical condition, the Plan scheduled Brookshire for

an Independent Medical Examination ("IME") with a physiatrist, Andrew Rudins, M.D., at the

Southeastern Spine Center in Asheville, North Carolina.  See Brookshire 0075 (NB 3).

**RESPONSE:** Plaintiffs deny the facts asserted in  ¶ 89 as stated.  The Rudins IME was

scheduled by UNIVAL at the request of the Disability Management Program

at CORE, Inc. - not "the Plan."  See NB 3: Brookshire 75.

90.     Dr. Rudins examined Brookshire on December 2, 1997.  See Brookshire 0068-0071

(NB 3).  Prior to examining Brookshire, Dr. Rudins reviewed Brookshire's September 28, 1997, FCE,

Brookshire's Personal Profile Evaluation, and Dr. Mulholland's Attending Physician Statement.  Dr.

Rudins also examined x-rays of Brookshire's lumbar spine performed in June 1995, an MRI performed

in September 1992, and a CT scan of the lumbar spine done in April 1994.  See Brookshire 0069-

0070 (NB 3).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 90, and state that Plaintiffs' LR 56 St.,

p. 37, ¶ 158, incorrectly asserts that Dr. Rudins did not review any of Ms.

Brookshire's x-rays or MRI's.

91.    Upon examination, Brookshire reported that she had pain across the very lower lumbosacral spine, occasional numbness in the right lateral buttock, and pain in the middle three toes on her right foot.  See Brookshire 0068 (NB 3).

> **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 91 as stated.  The Defendants' very incomplete summary of Ms. Brookshire's report of her pain to Dr. Rudins is denied as stated.  With respect to her pain, Dr. Rudins' history reveals "the gradual onset of low back pain, primarily about 10 to 15 years ago, with her legs beginning to bother her about 8 to 10 years ago.  The pain has gradually progressed, to the point that she went on disability in 1995. She currently describes pain across the very lower lumbo-sacral spine that extends into the buttocks.   She has been having more muscle spasms in her buttocks for the past 3 to 4 months.  The pain does extend down the lateral thighs to the knee, again right much more than left.  The pain never fully resolves.  She has the best relief, however, if she lays down in a fetal position, predominately on her right side.   She also describes some intermittent occasional numbness, primarily in the right lateral buttock into the very proximal lateral thigh.  She also has been noticing pain in the middle three toes, again on the right much more than on the left."   See NB 3: Brookshire-68.

92.    Brookshire's physical examination revealed that she was "quite tender in the sacrum extending into the buttocks"; that "on the right, she develops low back pain about 45 degrees, and is able to tolerate SLR to about 60 degrees, though with increased back pain"; has "negative neutral hip

rotations"; and "shows a slight tendency to lose her balance during toe and heel walking." See Brookshire 0070 (NB 3).

     **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 92.

93.    Brookshire's examination, however, further revealed that Brookshire is able to walk normally and successfully, has "no visible deformity to her low back," she "forward flexes to her knees, and extends about 5 to 10 degrees at most"; has "no superficial tenderness"; "no pain with pseudo-rotation or cervical axial loading"; and "shows no signs evidence of overreaction without any obvious pain behaviors." See Brookshire 0070 (NB 3).

     **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 93 as stated. It is admitted that she could perform toe and heel walking successfully despite a slight tendency to lose her balance. It is admitted that she forward flexes to her knees and extends about 5 to 10 degrees at most, and that Dr. Rudins noted no "superficial tenderness" "no pain with pseudo-rotation or cervical axil loading", and noted "she shows no evidence of over-reaction without any obvious pain behaviors." See NB 3: Brookshire 70.

94.    The x-rays, MRI and CT scan presented to Dr. Rudins for review showed "some disc space narrowing . . .", "mild bulge" and "degenerative changes to the lumbar spine as well as disc bulging," but no "significant abnormal motion on flexion/extension" and "no evidence in any case of any significant neurological impingement." See Brookshire 0070 (NB 3).

     **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 94.

95.    Dr. Rudins diagnosed Brookshire with "degenerative disc disease of the lumbar spine, with associated myofascial pain on a chronic basis, and obesity." According to Dr. Rudins, Brookshire

was "presently at a light physical demand level" and could "work at some occupation" eight hours per day, five days per week with restrictions including maximum lifting capacity of fifteen pounds. See Brookshire 0070-0071, 0073 (NB 3).

> **RESPONSE:** Plaintiffs admit that the facts asserted in ¶ 95 are accurate, but incomplete. Dr. Rudins' restrictions also included "maximal lifting capacity of 15 pounds on an occasional basis, 10 pounds frequently and 5 pounds constantly. She should be allowed to frequently change positions, at a minium of once an hour from sitting to standing to walking. She is unable to do any significant degree of bending, twisting, squatting, kneeling, or crawling. Pushing and pulling is limited to 30 pounds occasionally, 20 pounds frequently, and 10 pounds constantly." See NB 3: Brookshire 71.

96.    On December 18, 1997, the Plan notified Brookshire that her LTD benefits had been terminated because she could not satisfy the "any occupation" standard of total disability pursuant to Dr. Rudin's finding that she was "able to work 8 hours per day, 5 days per week in a light duty capacity." The Plan also informed Brookshire of her right to request review of this decision. See Brookshire 0059-0060 (NB 3).

> **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 96 as stated. It is admitted that by letter dated December 18, 1997, J.D. Beavers, identified in the letter as Medical Director of CORE's Champion Disability Management Program, wrote Ms. Brookshire on CORE letterhead and stated "we are unable to approve your continued disability." It is also noted that he incompletely cited the "any occupation" definition of total disability as the applicable plan section, and

informed Ms. Brookshire that she had the "right to appeal this decision."  NB

3: Brookshire 59 - 60.

97.    On February 2, 1998, Brookshire requested reconsideration of the Plan's decision to

deny her benefits.  Brookshire also submitted page four of Dr. Rudin's IME Report and stated "I do

not believe I can perform at the level that has been decided for me. Doctor Andrew Rudins states that

for all practical purposes the partial disability I have are permanent . . . ."  See Brookshire 0048-0049

(NB 3).

> **RESPONSE:** Plaintiffs deny the  facts asserted in ¶ 97 as stated. It is denied that it was the
>
> Plan's decision to deny her benefits.   The decision to deny was made by
>
> CORE.  See Pl. LR 56 St., p. 39, ¶ 163 - 165.   It is also denied that she spelled
>
> "perform" correctly.  She wrote, "I do not believe I can preform [sic] at the
>
> level that has been decide [sic] for me."  NB 3:Brookshire 48.

98.    On May 1, 1998, the Plan notified Brookshire that her February 2, 1998, letter had been

treated as an initial claim under ERISA, and advised Brookshire that, "[b]ased on the review by

CORE, our decision is to uphold the denial of LTD benefits."  The Plan explained the basis of its

decision – including her treating physician's statement that he "does not provide disability physicals

nor does he disable people or recommend them to be disabled" – and informed Brookshire of her right

to appeal the decision.  See Brookshire 0045-0046 (NB 3).

> **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 98.

99.    On May 22, 1998, Brookshire's former legal counsel appealed the Plan's decision to

deny her claim for benefits.  See Brookshire 0037-0044 (NB 3).

> **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 99.

100.    In support of her appeal, Brookshire submitted a January 26, 1998, progress note from

Stewart J. Harley, M.D., and the Notice of Award of benefits from the Social Security Administration.

See Brookshire 0039-0044 (NB 3).  The progress note indicated that Brookshire "has degenerative

arthritis in her lumbar spine" and stated

> "[t]his lady says she is unable to work because of severity of her pain.  If this lady does return
> to work, she should return to work under the guidelines of the functional capacities evaluation.
> Reviewing the guidelines of the FCE, I think she could return to work but with severe
> restrictions  . . . ."

See Brookshire 0039 (NB 3).  Brookshire also noted her subjective belief that she was unable to

perform any of the requirements of work because of severe back pain.  See Brookshire 0038 (NB 3).

**RESPONSE:**  Plaintiffs deny the facts asserted in ¶ 100 as stated.  It is  admitted that Dr.

Harley's diagnosis, in addition to the diagnosis quoted by defendants, also

included  "chronic disabling back pain secondary to DDD L4-5, L5-S1."  See

NB 3:Brookshire-39.  Further, the complete quote of Dr. Harley also said "if

the patient is unable to perform that highly restricted job because of her

persistence of pain, then I think this lady should remain on long-term disability

until her retirement commences."  NB 3: Brookshire 40.

101.    By Notice of Award dated July 30, 1995, the U.S. Social Security Administration

notified Brookshire that her application for Social Security disability income benefits had been

approved. The Social Security Administration concluded that Brookshire became disabled effective

January 2, 1995, and was eligible for payment beginning July 1995.  See Brookshire 0146-0148 (NB

3).[3]

---

[3]    The Plan previously received a copy of this Notice of Award on July 30, 1997.  See
                                                                                    (continued...)

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 101, except that as to the facts asserted in ¶101, f.n. 3, plaintiffs have no way of knowing if and when the Plan received a copy of this Notice, so the footnote is denied for lack of firsthand knowledge.

102.    To assist in reviewing Brookshire's appeal, the Plan commissioned Jennifer Mikeska, MRC, to perform a Transferable Skills Analysis.  By Report dated July 1, 1998, Ms. Mikeska identified Brookshire's transferable skills as "Comparing," "Taking Instructions-Helping," and "Tending" based on her sixteen-year employment history with Champion International and her eighteen years of experience as a nursing assistant.  See Brookshire 0021 (NB 3).  Ms. Mikeska reported that there were several positions Brookshire could perform related to her nursing experience and several sedentary and light occupational titles which Brookshire could perform based on the skills associated with the position she held at Champion International.  See Brookshire 0021-0032, 0034 (NB 3).

**RESPONSE:** Plaintiffs deny the facts asserted in ¶ 102 as stated.  Jennifer Mikeska, a CORE employee, performed the Transferrable Skills Analysis at the request of her employer, not "the Plan."   NB 3: Brookshire 21 -32.  Moreover, Plaintiffs believe the TSA was not commissioned "to assist in reviewing Brookshire's appeal," but rather was solicited to support CORE's recommendation of denial.

---

     [3]   (...continued)
Brookshire 0146 (NB 3).

103.     The Plan also commissioned John Nemunaitis, M.D., to conduct a Peer Review Analysis of Brookshire's appeal. Dr. Nemunaitis completed his review on July 10, 1998. Dr. Nemunaitis reviewed the July 1, 1998, Transferable Skills Analysis, Dr. Harley's progress notes submitted in support of Brookshire's appeal, the December 2, 1997, IME performed by Dr. Rudins, Dr. Mulholland's June 23, 1997, Attending Physician Statement, the December 12, 1998, Modification Checklist, the December 15, 1997, Champion Return to Work form, the September 28, 1997, FCE, correspondence from Dr. Mulholland, and the December 18, 1997, case management notes. See Brookshire 0019, 0063-0064 (NB 3).

> **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 103 as stated. The Peer Review Analysis was commissioned by CORE, not "the Plan." NB 3:Brookshire 19-20. Moreover, the stated reason for referral was as follows: "On the basis of the existing information, including the TSA and new information from Dr. Harley, would you uphold the previous denial of benefits (the guidelines of which mandate that an EE must be disabled from any occupation) or would you recommend obtaining another independent medical exam?" This does not accurately and fully set out the "guidelines" of a "denial of benefits," and essentially skews the analysis. See NB 3:Brookshire-19.

104.     Based on his review, Dr. Nemunaitis recommended that "the decision of denial be upheld, for the patient is not disabled for any occupation." Dr. Nemunaitis based his recommendation on the rationale that there "is no objective verification of a radiculopathy" in Brookshire's x-rays, MRI and CT Scan, that the FCE indicated Brookshire was "able to work at a light physical demand level for an eight hour day," that Brookshire's lifting capacity during the IME and other RCC's were

40

appropriate, and that the IME "did not verify radiculopathy nor acute disc pathology." Dr. Nemunaitis further opined that another IME was not necessary.  See Brookshire 0019-0020 (NB 3).

> **RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 104.

105.    On August 27, 1998, the Plan informed Brookshire that her claim for benefits would be reviewed at the September 24, 1998, Claims Review Committee meeting.  The Plan encouraged Brookshire to provide any additional information she wished to be considered by the Committee.  See Brookshire 0012 (NB 3).

> **RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 105.

106.    The Claims Review Committee considered Brookshire's claim at its meeting on September 24, 1998.  See CRC 0704-0708 (NB 4).  The Committee reviewed Brookshire's claims file, including notes from the Plan's consulting physician's conversation with Brookshire's treating physician, Dr. Mulholland, indicating that Brookshire was "probably capable of sedentary work," Dr. Rudin's December 2, 1997, IME, and all medical records submitted to the Plan on Brookshire's behalf. During the meeting, the Committee examined this information against the Plan's definition for total disability and voted to uphold the decision to deny Brookshire's claim for LTD benefits.  See CRC 0705-0706, 0955-1210 (NB 4).[4]

> **RESPONSE:**  Plaintiffs deny the facts asserted in ¶ 106 as stated, but do admit that the CRC
>
> evidently met on September 24, 1998; however, at the time Plaintiffs' counsel
>
> prepared Plaintiffs' LR 56 Statement, one copy of the notebooks did not

---

[4]    The Chair of the Committee "ordered that a copy of the documentation relative to the requests for review previously distributed to the Committee, as well as the Transferable Skills Analysis brought to the meeting, be filed with the minutes of the meeting."  See CRC 0704-0706, 0955-1210 (NB 4).

contain the minutes from the September 24, 1998 CRC meeting, and therefore Plaintiffs stated in its LR 56 Statement that there was nothing in the claims file to indicate that the meeting took place. See Pl. LR 56 St., p. 43, ¶ 175. Plaintiffs' counsel has now examined co-counsel's copy of the notebooks and found therein two sets of minutes from that meeting, one of which appears to be incomplete; a partial set of said minutes appears in NB 4 at p. CRC -13 to CRC-15, and what appears to be a complete set of minutes immediately follows the partial set but bears the page numbers CRC -704 to CRC -708. Thus it appears that Pl. LR 56 St., p. 43, ¶ 175, is incorrect. The second sentence of ¶ 106 is denied; plaintiffs do not know to what extent the CRC reviewed Brookshire's claims file. Also, Dr. Beavers is more accurately described as CORE's Medical Director than as "the Plan's consulting physician." Plaintiffs admit that the CRC voted to uphold the denial decision. The minutes of the September 24, 1998 meeting indicate that six cases were reviewed in three hours, indicating that approximately thirty minutes were allotted for each case. NB 4: Brookshire 704, 708. Plaintiffs deny the facts asserted in footnote 4 of ¶104 as stated, for lack of information. Plaintiffs admit that the facts asserted in that footnote are a quote from the CRC minutes, but plaintiffs have no way of knowing what documentation was filed with the minutes.

107. On October 23, 1998, the Plan informed Brookshire of its decision to uphold the denial of her claim for LTD benefits. See Brookshire 0545-0546 (NB 3).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 107.

108.    On November 3, 1998, Brookshire's former legal counsel requested copies of documents which formed the basis for the Plan's denial.  See Brookshire 0544 (NB 3).  The Plan complied with this request on November 12, 1998.  See Brookshire 0543 (NB 3).

**RESPONSE:** As to the facts asserted in ¶ 108, the first sentence is admitted.  The second sentence of ¶ 108  is denied, because the record does not reveal what documents were attached to the letter of November 12, 1998 wherein Champion stated that it was complying with the request of November 3, 1998. See NB 3:Brookshire 543.

109.    On November 10, 2000, Brookshire's current legal counsel informed Champion International that they had been consulted by Brookshire regarding her claim for LTD benefits, and requested Brookshire's claims file and copies of the Plan documents.  See Brookshire 0290 (NB 26).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 109.

110.    The Plan complied with Brookshire's counsel's request and sent them copies of Brookshire's claims file and the Plan documents.  See Brookshire 0267-0288 (NB 26).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 110.

111.    On March 22, 2001,which was two and one-half years after the Claims Review Committee denied her appeal, Brookshire's counsel requested the Plan to "reconsider[] . . . the decision to terminate [Brookshire's] benefits."  See Brookshire 0262-0266 (NB 26).  Brookshire's counsel submitted to International Paper medical and other information they alleged supported Brookshire's claim for benefits.  See Brookshire 0292-0295, 0004-0011, 0011A-0011C, 0296-0542 (NB 26).

**RESPONSE:** As to the facts asserted in ¶ 111, plaintiffs admit that because in denying Ms.. Brookside's continued long term disability benefits the Plan failed to consider the objective medical evidence; failed to consider chronic pain; failed to consider all of the evidence; and placed inordinate weight on the evidence supporting denial, plaintiffs' counsel submitted medical records and other objective information and documentation so that Ms. Brookshire's claim could be reviewed objectively and in its entirety. (NB:3, NB:4).

### Harrison Clark's Claim for Benefits

112.    Plaintiff Harrison Y. Clark ("Clark") worked as an hourly employee at Champion International's facility in Canton, North Carolina. His hire date was May 25, 1981, and his last day of active employment was December 9, 1990. See Clark 0004, 0186 (NB 5).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 112.

113.    Between December 10, 1990 and June 9, 1991, Clark received short-term disability benefits from Champion International. See Clark 0001 (NB 5).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 113.

114.    As a Champion International employee, Clark was eligible to apply for LTD benefits under the Hourly LTD Plan.

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 114.

115.    On April 30, 1991, Clark applied for LTD benefits. See Clark 0032-0033 (NB 5). Clark reported that he was disabled due to "chronic back pain – myositis-fibromyalgia and ekbom syndrome or restless leg syndrome." See Clark 0040-0041 (NB 5). See also Clark 0042, 0034-0038 (NB 5).

44

**RESPONSE:** Plaintiff's deny the facts asserted in ¶ 115 as stated. Specifically, plaintiffs deny that Clark applied for LTD benefits on April 30, 1991, and state that the document defendants cite in support of that assertion, which was dated April 30, 1991, was not Clark's application for LTD benefits, but rather was an "Hourly Employee's Disability Benefits Questionnaire" completed and signed by Champion's Local Designated Employee Benefits Administrator, Elsie S. Harkins. See NB 5: Clark 32, 33. Mr. Clark actually applied for LTD benefits on June 10, 1991, as shown by the "Hourly Employee's Application for Disability Benefits" form signed by Harrison Young Clark and dated June 10, 1991. See NB 5:Clark 40, 41. As to the assertion in the second sentence of ¶ 115 that "Clark reported that he was disabled due to 'chronic back pain - myositis-fibromyalgia and ekbom syndrome or restless leg syndrome,' " Plaintiffs admit that the phrase is listed in Clark's Application for Disability Benefits in response to item 9, which instructs the applicant to "describe the accident or illness." See NB 5:Clark 40, 41. "Fibromyaliga, Ekbom syndrome or restless leg syndrome" are also listed by Dr. Daniel L. Eglinton, MD in his Attending Physician's Statement of June 18, 1991, as cited by defendants. See NB 5:Clark 42, 43. Plaintiffs would also state that Plaintiff's medical history as noted in the Vocational Rehabilitation Report of Stephen D. Carpenter, M.Ed.,C.R.C., C.I.R.S., another document cited by defendants in support of their ¶ 115 statement, also mentions a work-related back injury that occurred in 1984; it further states that "the injured worker has attempted to return to

45

work several times, but completely stopped all work activity on 12/20/90 because of chronic moderate to severe low back pain radiating into both legs on a sustained basis," and mentions multiple diagnostic studies that "revealed degenerative back impairments with slight bulging disk...the injured worker continues to experience easy fatigue, muscle spasms, sleep disturbance and chronic pain with 'restless legs' which cause a significant sleep disturbance...medical records substantiate diagnosis of chronic back pain syndrome with fibromyalgia, mild degenerative changes on multiple radiologic evaluations, and 'restless leg syndrome or Ekboms Syndrome." See NB 5:Clark 34.

116.    By letter dated July 29, 1991, the Plan notified Clark that he was eligible for LTD benefits and advised that LTD benefits "may continue for 24 months provided you are wholly and continuously disabled and are unable to perform each and every duty of your regular job." See Clark 0047 (NB 5). The Plan specifically advised Clark that "after the first 24 months, benefits will continue up to your retirement date only if you are under the regular care of a licensed and qualified physician and are unable to work at any job, within the company or elsewhere, for which you are reasonably qualified by your education, training, or experience." See 0047 (NB 5).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 116.

117.    Effective June 10, 1991, Clark's benefit was $164.25 per month. See Clark 0044-0046 (NB 5). Effective September 1, 1991, Clark's LTD benefit was $190 per month. See Clark 0049-0050 (NB 5).

**RESPONSE:** Plaintiffs deny the facts asserted in ¶ 117 as stated.  Plaintiffs admit that defendants originally calculated Clark's monthly LTD benefits to be $164.25, but that apparently was a miscalculation, according to Champion's Mary Lee Dixon, who wrote Clark that "during a recent review of your file, we found that the calculation of your Long Term Disability Benefit is incorrect."  (NB 5:Clark 49).  Dixon stated that the correct monthly benefit was $190.00.  (NB 5:Clark 49).

118.    During the next several years, in order to determine Clark's ongoing entitlement to LTD benefits, the Plan conducted periodic reviews of Clark's medical condition.  See Clark 0053-0058, 0064, 0068-0084, 0104-0114, 0173-0189 (NB 5).[5]

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 118, except that Plaintiffs deny the facts asserted  in footnote 5 of said paragraph.  It is admitted that on January 13, 1994, Champion and Clark entered into a settlement of Mr. Clark's workers' compensation claim then pending against Champion and that the consideration for that settlement was $90,000.00.  It is denied that employee agreed to release Champion from any liability for Clark's long term disability benefits. (See NB

---

[5]     On January 13, 1994, Clark entered into a settlement agreement with Champion International for workers' compensation benefits, in which Clark agreed, in consideration for a lump sum payment by Champion International in the amount of $90,000.00, to release Champion International from any liability for Clark's LTD benefits.  See Clark 0085-0103 (NB 5).  Due to this release and the language in the Hourly LTD Plan that mandates that workers compensation benefits offset LTD benefits, Clark's LTD benefits were suspended.  See Clark 0116, 0132-0134, 0137-0140, 0143-0144, 0146-0147, 0155-0156 (NB 5).  The parties agreed Clark would be entitled to continuing medical benefits under the Hourly LTD Plan but not a monthly payment until Clark reimbursed the Plan for the overpayment of LTD benefits caused by the workers compensation settlement.  See Complaint, ¶133 (Dkt. Entry 1).  Clark continued to receive medical benefits under the Hourly LTD Plan until the benefits later were terminated.

5: Clark 090, paragraph 5 of the workers' compensation settlement agreement).

It is admitted that long term disability benefits were suspended pursuant to Champion "policy." (NB 5: Clark 0116). It is denied that the workers' compensation agreement "released" long term disability benefits or that the hourly long term disability plan mandates that the workers' compensation benefits offset long term disability benefits. None of the defendants' citations to the evidentiary record were to Plan language – only "policy" was cited as a basis for the claimed offset. (NB 5: Clark 0116) It is admitted that Clark was to continue to receive medical benefits and he did so until they were terminated.

119.    For example, on June 17, 1997, CORE contacted Clark and asked him to provide updated medical information regarding his condition and to submit several updated LTD forms. <u>See</u> 0191-0192 (NB 5).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 119.

120.    On August 21, 1997, Clark's treating physician, Dr. Eglinton submitted an Attending Physician's Statement on which he diagnosed Clark with restless leg syndrome and fibromyalgia, noted that his condition was unimproved, and stated that Clark is totally disabled from any occupation. <u>See</u> Clark 0194-0195 (NB 5). Dr. Eglinton further submitted part of a physical capacity examination sheet which indicated that, in his opinion, Clark could not work at all with the limitations described. <u>See</u> Clark 0196 (NB 5).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 120.

121.    Clark also submitted a Personal Profile Evaluation dated July 15, 1997, on which he described his present condition as "chronic back pain syndrome, restless legs syndrome or knew [sic] as ekbom's syndrome, chronic myofacial fibromyalgia, can't stand, walk, sit, or lay long at any time due to chronic pain, bend, push, pull or climb, lift, also degenerative disc disease." See Clark 0197-0200 (NB 5).

> **RESPONSE:**    As to the facts asserted in ¶ 121, Plaintiffs would admit the paragraph with the exception of one word that is misquoted from Mr. Clark's Personal Profile Evaluation dated July 15, 1997: defendants say that Mr. Clark wrote that he could not "stand, walk, sit, or lay long at **any** time due to chronic pain..." when what the form reveals Mr. Clark wrote was that he could not "stand, walk, set [sic] or lay long at **one** time due to chronic pain..."  (See NB 5:Clark-197).

122.    Dr. Eglinton also submitted to the Plan his office notes dated July 23, 1997, and August 25, 1997.  See Clark 0202 (NB 5).  In his August 25 office note, Dr. Eglinton stated that he had:

> "[t]alked with independent medical examiner for Champion Paper concerning Mr. Clark.  At this time, the patient has not gone out of the category where he is disabled from his work alone but goes into a permanent disability rating.  As I stated before, I cannot certify Harrison is totally and completely disabled from all work activity.  All they can do at this time is to repeat a functional capacity and See where he stands."

See Clark 0202 (NB 5).

> **RESPONSE:**    Plaintiffs deny the facts asserted in ¶ 122 as stated; it is not known to whom Dr. Eglinton's office notes dated July 23, 1997 and August 25, 1997 were submitted.  Further, defendants omit the last sentence of Dr. Eglinton's office note of August 25, 1997, which said "We will be happy to send copies of all our notes to JB Beavers, Inc."  (See NB 5: Clark- 202).

123.     In his August 25, 1997, office note, Dr. Eglinton was referencing a conversation he had

with Dr. Beavers of Champion International's Disability Management program, who described the

conversation as follows:

> "According to the doctor this patient has true restless legs syndrome, also known as Ekbom
> syndrome.  The symptoms are that he can't sit still or sleep well.  However he says that when
> he <u>Sees</u> him in his office, he looks good. He says that he is not disabled from any occupation
> and that there are jobs he could do.  He recommends that he have an FCE."

<u>See</u> Clark 0214 (NB 5).  Based on this information from Clark's treating physician, Dr. Beavers

recommended that the Plan "not certify disability from any occupation" because "his doctor is not

supporting the claim of disability from any occupation.  If further evaluation is contemplated I would

recommend an FCE done at Asheville Rehabilitation with Charlie Robbins."  <u>See</u> Clark 0214 (NB 5).

**RESPONSE:**  Plaintiffs deny the facts asserted in ¶ 123 as stated.  Defendants assert that "Dr.

Eglinton was referencing a conversation he had with Dr. Beavers of Champion

International's Disability Management program," when Dr. Eglinton's note

states that he "talked with independent medical examiner for Champion Paper

concerning Mr. Clark."  (*See* NB 5: Clark 202).  Clearly, either Dr. Beavers

held himself out to Dr. Eglinton as an independent medical examiner, or Dr.

Eglinton was under the impression that Dr. Beavers was an independent

medical examiner, whose employer  Dr. Eglinton understood to be  "JB

Beavers, Inc." as noted above.  As to defendants' quote in ¶ 123 from Dr.

Beavers' description of the conversation, plaintiffs admit that what defendants

quote comes from Dr. Beavers' "Physician Review Note" that appears at NB

5:Clark 214.  As to defendants' assertion that Dr. Beavers recommended that

50

the Plan not certify disability from any occupation based on information from Clark's treating physician, Plaintiffs admit only that the recommendation appears in Dr. Beavers' Physician Review Note, and the last quote in ¶ 123 comes from Dr. Beavers' Physician Review Note.

124.    Pursuant to Dr. Beavers' recommendation, the Plan commissioned Charles Robbins, P.T., at Asheville Rehabilitation, to evaluate Clark's functional capacity.  See Clark 0216, 0218 (NB 5).

**RESPONSE:** Plaintiffs deny the facts asserted in ¶ 124 as stated.  CORE hired Charles Robbins, P.T., at Asheville Rehabilitation, to do an FCE on Mr. Clark, but the FCE Request Form sent from CORE employee Carole Bishop to Charlie Robbins listed only two diagnoses, namely, "Ekbom syndrome" and "Fibromyalgia," and failed to mention Mr. Clark's on the job injury in 1984, where he was working under a bark tumbler and was hit in the lower back by logs that had fallen about twenty feet (see NB 5:Clark 41), and which Mr. Clark mentioned on his initial application for LTD, nor did it mention his chronic back pain syndrome that, coupled with the Ekbom syndrome and fibromyalgia, had led to his initial disability.  See "Medical History" contained in Stephen D. Carpenter's Vocational Rehabilitation Report dated May 28, 1991  which stated that "medical records substantiate diagnosis of **chronic back pain syndrome** with fibromyalgia, mild degenerative changes on multiple radiologic evaluations, and 'restless leg syndrome or Ekboms Syndrome," emphasis added.  See NB 5:Clark 34.  See also Mr. Carpenter's

51

later Vocational Rehabilitation Report dated March 2, 1992, where he stated

after reviewing updated medical records that the updated records "confirm that

the patient has developed a chronic pain profile." See NB 5:Clark 53. See also

Mr. Clark's initial application for LTD which listed "chronic back pain" in

addition to "myositis - fibromyalgia and Ekbom syndrome or restless leg

syndrome" in response to item 9, "describe the accident or illness." See NB

5:Clark 40.

125.    Mr. Robbins conducted a Functional Capacity Evaluation ("FCE") of Clark on October

15, 1997, and noted that, based on "all the submaximal efforts documented during Maximum

Voluntary Effort Test and Jamar Hand Grip Testing as well as mild positive found on Waddell's

testing, [Clark's] overall effort is considered submaximal and therefore I am unable to validate the test

results today." See Clark 0220-0223 (NB 5). Mr. Robbins concluded that:

> "[b]ased on the material handling capabilities as observed today, the physical demand level
> of work is sedentary . . . Because of high pain levels and hesitation by Mr. Clark to complete
> all tests, I am unable to indicate that he is capable of returning to work. Note a submaximal
> effort on consistency testing today. I anticipate with a maximal effort, performance would be
> improved."

See Clark 0220-0223 (NB 5).

**RESPONSE:** Plaintiffs admit that the facts asserted in ¶ 125 are accurate but partial quotes

from Robbins' FCE; defendants fail to note that Mr. Robbins stated that Mr.

Clark did not want to attempt some of the testing because he felt too weak, nor

did they note that Mr. Clark rated his pain intensity on the day of the FCE "at

a # 8 (intense) on the Numerical Pain Scale. He notes that in the past 30 days

has varied from an 8 to a 10 (emergency)." NB 5:Clark 220.

52

126.    On October 23, 1997, CORE then forwarded a Modification Checklist to Clark's treating physician, Dr. Eglinton.  See Clark 0224 (NB 5).  Dr. Eglinton completed this checklist on November 15, 1997, indicating Clark may initially work 4-6 hours a day, 3-4 days a week with an increase in hours as tolerated.  See Clark 0226 (NB 5).  Clark's treating physician stated that Clark could perform a "sedentary job only, may walk for personal needs only, may sit 30 minutes with position changes, and may stand  30 minutes with position changes."  See Clark 0226 (NB 5).

> **RESPONSE:** Plaintiffs admit the facts asserted in the first sentence of ¶ 126.  As to the second sentence, defendants assert that Dr. Eglinton completed a modification checklist on November 15, 1997, but the document itself appears to have been signed by Dr. Eglinton on November 5, 1997.  See NB 5:Clark 226.

127.    CORE forwarded the Modification Checklist to the Plan and recommended that Clark undergo an Independent Medical Examination ("IME").  See Clark 0227 (NB 5).  See also Clark 0229-0231 (CORE's report recommending a continuation of LTD benefits "while awaiting the results of the impending IME")(NB 5).

> **RESPONSE:** As to the facts alleged in the first sentence of ¶ 127, it is not apparent from the document defendants cite (NB 5: Clark 227) what CORE forwarded to the Plan; the document cited is an IME "Chart Preparation Form." As to the second sentence of ¶ 127, or the second cite (NB 5: Clark  229-231), that document is a CORE Case Management Report recommending a continuation of LTD benefits "while awaiting the results of the impending IME."

128.    The Plan then commissioned Andrew Rudins, M.D., to conduct an IME of Clark.  See Clark 0235 (NB 5).

**RESPONSE:** As to the facts alleged in ¶128, plaintiffs deny that "the Plan" then

commissioned Andrew Rudins, MD, to conduct an IME of Clark.  Rather, the

Disability Management Program at CORE, Inc.  asked UNIVAL to schedule

Mr. Clark's IME with Dr. Andrew Rudins.  NB 5:Clark-235.

129.    Dr. Rudins reviewed Clark's medical records, reviewed Clark's medical symptoms and

history, and, on January 12, 1998, examined Clark.  See Clark 0236-0240 (NB 5).  According to Dr.

Rudins, Clark summarized his condition as:

> "if he does nothing, he gets by pretty well.  He is able to do some light yard work.  His walking
> tolerance is about 20 minutes, after which he needs to sit.  He is unable to sit for any prolonged
> period of time, often requiring changing positions.  He is able to do some very light lifting,
> perhaps 5 to 10 pounds at most, but still does drop objects."

See Clark 0236 (NB 5).

**RESPONSE:** As to the facts alleged in ¶ 129, plaintiffs lack sufficient knowledge to know

precisely what Dr.  Rudins reviewed.  Therefore any allegations as to the first

sentence in ¶ 129 are denied with the exception of the date of the IME

examination; plaintiffs admit that Dr.  Rudins examined Mr. Clark on January

12, 1998.  As to the quote from the IME report that appears in ¶ 129, plaintiffs

admit that it is an accurate but incomplete quote from Dr. Rudins' IME report.

NB 5:Clark-235-240.

130.    At the conclusion of his examination of Clark, Dr. Rudins opined that Clark suffered

from a chronic lumbar sprain, "fibromyalgia by history, but no significant findings to suggest this

diagnosis on physical exam," restless legs syndrome, and severe chronic pain/disability syndrome

related to all of the other diagnoses.  See Clark 0238 (NB 5).  According to Dr. Rudins, "Mr. Clark's

54

perception of his disability is much greater than any objective evidence indicates." <u>See</u> Clark 0238

(NB 5).  Dr. Rudins concluded:

> "that Mr. Clark does have a work capacity, though at a sedentary level at 8 hours per day.  He should be allowed to frequently change positions i.e. sit to stand to walk at least every 15 minutes.  He should avoid any extensive or repetitive bending or twisting.  Maximal lifting is 10 pounds on an occasional basis.  I expect that if he is unable to return back to a productive job, his actual capabilities will more than likely improve if he is able to stay on the job."

<u>See</u> Clark 0239 (NB 5).  Dr. Rudins concluded that Clark had at least a "full time sedentary capacity."

In fact, according to Dr. Rudins, Clark "really has no significant objective findings to limit him to a

sedentary work capacity.  This restriction is based predominantly on his past history and submaximal

performance on the FCE."  <u>See</u> Clark 0239 (NB 5).

> **RESPONSE:** As to the facts alleged in ¶ 130, plaintiffs deny that Dr. Rudins opined that Clark suffered from "a chronic lumbar sprain"; rather, Dr. Rudins' IME report lists "a chronic lumbosacral sprain" as the first of four impressions.  As to all other facts alleged in ¶ 130, it is admitted that the quotes from Dr. Rudins are accurate but incomplete quotes from his IME report.  Defendants failed to quote Dr. Rudins' conclusion that "considering that Mr. Clark has been out of work for essentially 7 years, the probability of his being able to return to a productive job is quite low."  (See NB 5: Clark 239).

131.    On January 12, 1998, Dr. Rudins completed a Modification Checklist which indicated

that Clark could return to work on January 12, 1998, with the following modifications: sedentary job

only; 8 hours a day, 5 days per week; may lift up to 10 pounds; may walk, sit, or stand 15 minutes at

a time; no modification to the upper extremity, avoidance of repetitive use of the lower extremity with

use being limited to 15 minutes at a time.  <u>See</u> Clark 0241 (NB 5).

55

**RESPONSE:** As to the facts alleged in ¶ 131, plaintiffs admit that Dr. Rudins completed a Modification Checklist on January 12, 1998 indicating that Mr. Clark could return to work that day. However, plaintiffs deny that the remainder of ¶ 131 is a full and complete listing of the modifications Dr. Rudins indicated. Specifically, defendants state in ¶ 131 that Dr. Rudins indicated that Mr. Clark "may lift up to 10 pounds." The Modification Checklist states that Mr. Clark "occasionally may lift up to 10 pounds only." NB 5:Clark-241. Also, defendants' recitation of Dr. Rudins' modifications failed to list the restriction of "no frequent bending/twisting." Id.

132.    By letter dated February 4, 1998, Dr. Beavers, Medical Director of the Champion Disability Management Program, notified Clark that the Plan was terminating his LTD benefits because he no longer met any occupational definition of disability and, therefore, was "not disabled as defined in the Plan." Dr. Beavers advised Clark that "the 1/12/98 Independent Medical Examination found you able to perform sedentary work 8 hours per day 5 days per week with some restrictions." See Clark 0250-0251 (NB 5). Dr. Beavers informed Clark of his right to appeal the decision and enclosed a copy of the Appeal Rights & Process. See Clark 0251 (NB 5). See also Clark 0255, 0257 (notice to Clark that his disability benefits will terminate effective March 31, 1998)(NB 5).

**RESPONSE:** As to the allegations of ¶ 132, plaintiffs deny that Dr. Beavers was the Medical Director of the Champion Disability Management Program, but rather Dr. Beavers was an employee of CORE. It is admitted that Dr. Beavers signed a letter dated February 4, 1998 to Mr. Clark as the Medical Director of the

Champion Disability Management Program, but the letter is on CORE letterhead.  As to the allegation that Dr. Beavers stated  that the Plan was terminating Mr. Clark's LTD benefits because he  "no longer met any occupational definition of disability" that language does not appear *per se* in Dr. Beavers' letter.  Rather, Dr. Beavers stated as follows: "the explanation below indicates why your claim has not been approved, the applicable Plan sections; not disabled as defined in the Plan."  NB 5:Clark-250.  The letter does advise Mr. Clark that the January 12, 1998 IME found him able to perform sedentary work, 8 hours per day, 5 days per week with some restrictions. Plaintiffs admit that Dr. Beavers informed Clark of his right to appeal, but do not have sufficient information to know whether or not a copy of the Appeals Rights and Process was included as the letter indicates.  As to the final two documents cited in defendant's ¶ 132, it is admitted that the document appearing at NB 5: Clark 255 is a letter from Mary Lee Dixon, Champion Benefits Service Coordinator to Mr. Clark telling him that his LTD benefits would terminate on March 31, 1998.  As to the document appearing in NB 5: Clark 257, plaintiffs lack sufficient information to identify the document; it appears to be perhaps a memo from Mary Lee Dixon to Edie Craig, and it states that Mr. Clark is no longer eligible for LTD benefits.

133.    On April 3, 1998, Clark's former legal counsel requested the Plan to review its decision to terminated Clark's LTD benefits.  See Clark 0262-0263 (NB 5).  Clark's counsel informed the Plan that the Social Security Administration had continued Clark's benefits until at least August 1, 2004,

and further advised that Clark "is unable to engage in any occupation or business for wage or profit for which he is or become reasonably qualified by training, education, or experience." Clark's counsel did not provide any additional clinical information regarding Clark's condition.  See Clark 0262 (NB 5).[6]

> **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 133 as stated.  Plaintiffs admit the first two sentences of the paragraph.  Plaintiffs deny that Mr. Clark's counsel "did not provide any additional clinical information regarding Clark's condition." Plaintiff's counsel informed the Plan that Mr. Clark had been seeing Dr. Harned and Lisa Gould for his major depressive disorder. See NB 5: Clark-262-263.  Plaintiffs deny the facts asserted in footnote 6 to this paragraph as stated.  As to the footnote, the first sentence is admitted.  The second sentence is denied as stated; it is admitted that Mr. Clark's letter referenced no medical records, but it did provide a historical perspective on his disability.  See NB 5: Clark 262-263.  The third sentence of the paragraph is admitted.  Dr. Harned also advised that the current Axis I diagnosis was "major depressive disorder, recurrent, moderate."  See NB 5: Clark 0261.  The fourth sentence of footnote 6 is admitted.

---

[6]    On March 10, 1998, prior to his counsel's request for review, Clark forwarded a letter to the Plan Supervisor setting forth the history of his injury.  See Clark 0258-0260 (NB 5).  At that time, he did not provide any additional clinical information regarding his condition.  See Clark 0258-0260 (NB 5).  By letter dated March 10, 1998, Clark's psychiatrist, Robert Harned, M.D., advised the Plan that he had been treating Clark for his depression since March 2, 1998, and that Clark "has had milder levels of depression in the past, but his current medical condition and stress over his disability status caused an episode that has been more severe."  Dr Hamed failed to address whether Clark could return to work.  See Clark 0261 (NB5).

134.    The Plan then commissioned Frank Nisenfeld, M.D., to conduct a Peer Review Analysis of Clark's claim and determine whether Clark was disabled from any occupation, and whether another IME should be conducted.  See Clark 0264 (NB 5).

RESPONSE:  As to the facts alleged in ¶ 134, plaintiffs deny that "the Plan" commissioned Frank Nisenfeld, MD to conduct a Peer Review Analysis of Mr. Clark's claim; rather the Peer Review Analysis was commissioned by CORE, as indicated on the Case Report from Dr. Nisenfeld.  See NB 5: Clark 266.  Moreover, Plaintiffs deny that the Peer Review Analysis was to determine whether Mr. Clark was disabled from any occupation; it was commissioned to support CORE's recommendation of denial.  The "Internal Peer Review Referral Form" from CORE to Dr. Nisenfeld states as the reason for referral as follows: "This employee was denied disability from any occupation based on a FCE and an able IME performed by a physiatrist.  The employee has submitted the attached material requesting an appeal of the denial.  Also attached is the IME report.  Is the employee disable[d] from any occupation based on the information provided (ie: can you uphold the original denial) or would you recommend another IME?"  NB5: Clark-264.

135.    Dr. Nisenfeld reviewed Clark's file and claim and, on April 28, 1998, concluded that Clark was not disabled from any occupation nor would he recommend another IME.  See Clark 0266 (NB 5).  According to Dr. Nisenfeld:

"[t]here was no documentation of anything in the records which would totally disable him from any and all employment.  The fact that he is unable to do heavy physical labor does not physically disqualify him from all work.  An additional IME is not needed to arrive at these conclusions, and the need for additional information does not appear to be present."

59

Clark 0266 (NB 5).

> **RESPONSE:** As to the facts alleged in ¶ 135, plaintiffs lack sufficient information to know
> to what extent Dr. Nisenfeld reviewed Mr. Clark's file and claim, and therefore
> deny the allegations in the first sentence of ¶ 135 that "Dr. Nisenfeld reviewed
> Clark's file and claim." Plaintiffs admit that Dr. Nisenfeld concluded that Mr.
> Clark was not disabled from any occupation, and admit that Dr. Nisenfeld did
> not recommend another IME. Plaintiffs admit that the quote in ¶135 comes
> from Dr. Nisenfeld's Case Report dated April 28, 1998.

136.    On April 30, 1998, CORE recommended that the Plan uphold the denial of Clark's claim for LTD benefits effective February 3, 1998, "based on the CORE INC. physician consultant's decision on appeal, that the employee is not disabled from performing any occupation." See Clark 0268-0271 (NB 5).

> **RESPONSE:** Plaintiffs admit the facts asserted in ¶136.

137.    On May 29, 1998, the Plan informed Clark's counsel that the Plan considered her April 3, 1998, letter to be an initial claim and notified Clark's counsel that the Plan had denied Clark's claim for benefits because Clark did not satisfy the definition of disability as defined by the Plan. The Plan informed Clark's counsel that the Plan had reviewed, *inter alia*, Clark's medical records from Dr. Van Blaricom, Dr. Harned and Dr. Eglinton, the results of Clark's FCE, the Social Security Administration's letter of award and a vocational rehabilitation report regarding Mr. Clark. See Clark 0272 (NB 5). The Plan advised her of Clark's rights to obtain further review of his claim for LTD benefits. See Clark 0272-0273 (NB 5).

> **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 137.

138.    By letter dated July 27, 1998, Clark's legal counsel requested a review of the Plan's decision to deny Clark's claim for LTD benefits.  Clark's counsel did not provide any additional clinical information supporting Clark's claim for benefits.  <u>See</u> Clark 0276 (NB 5).

> **RESPONSE:**  As to the facts alleged in ¶ 138, plaintiffs admit the first sentence and deny the second sentence.  Specifically, Clark's counsel did mention additional clinical information — i.e. that Mr. Clark had been evaluated by a Dr. Byron. See NB 5: Clark 275.

139.    On September 2, 1998, CORE commissioned a Transferable Skill Analysis ("TSA") to be performed on Clark to determine whether Clark had transferable skills given the restrictions defined by the IME physician.  <u>See</u> Clark 0278 (NB 5).

> **RESPONSE:**  As to the facts alleged in ¶ 139, it is admitted that CORE commissioned a TSA on September 2, 1998.  However, it is not clear from the documents cited whether the person to whom the request for a TSA was transmitted was given the restrictions defined by the IME physician.  See NB 5: Clark 278. Moreover, Plaintiffs deny that the TSA was commissioned to determine whether Mr. Clark has transferrable skills;  rather it was sought to  support CORE's recommendation of denial.

140.    Jennifer Mikeska performed the TSA on September 3, 1998, at the conclusion of which she determined that Clark had the following transferable skills: compiling, coordinating, copying, speaking/signaling, taking instructions/helping, operation/controlling, and handling.   From this list of transferable skills, Ms. Mikeska identified several occupational titles that conformed with Clark's physical restrictions and the listed skills.  <u>See</u> Clark 0283-0286 (NB 5).

**RESPONSE:** As to the facts alleged in ¶ 140, it is admitted that Jennifer Mikeska performed a TSA on Mr. Clark on September 3, 1998, and that the "transferrable skills" listed in ¶ 140 are the same skills listed in Ms. Mikeska's TSA. It is not clear from Ms. Mikeska's report how the occupational titles she identified conformed with Mr. Clark's physical restrictions and the listed skills. Therefore, the remainder of ¶ 140 is denied. NB 5:Clark-283-286.

141. On September 15, 1998, CORE recommended that the Plan "uphold the denial of LTD benefits, originally effective 2/3/98, based on the results of the Transferable Skills Analysis which found several job titles which should be considered appropriate for this employee." See Clark 0280-0282 (NB 5).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 141.

142. On November 6, 1998, the Plan notified Clark's counsel that Clark's claim would be reviewed at the Claims Review Committee's December 2, 1998, meeting. The Plan advised Clark's counsel that this would be the final appeal under ERISA and invited Clark's counsel to submit, no later than November 25, 1998, any new or additional documentation or evidence that Clark is totally disabled and unable to engage in any work at all. See Clark 0198 (NB 5).

**RESPONSE:** The facts alleged in ¶ 142 do not appear in the document cited by defendants (NB 5: Clark-198). Rather these facts appear in NB 5: Clark 325-326. Therefore, plaintiffs deny that the facts alleged in ¶ 142 are found in NB 5: Clark 198, but admit these facts as they appear in NB 5: Clark 325-326.

143.    By letter dated November 24, 1998, Clark's counsel forwarded to the Committee a medical note from Craig A. Mills, M.D., in which Dr. Mills stated that Clark was "totally disabled from his fibromyalgia" and "is unable to work." See Clark 0327-0328 (NB 5).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶143.

144.    Based on this supplemental information and prior to the Claims Review Committee's review of Clark's claim, CORE requested another Peer Review Analysis with the following instruction to the physician: "Please contact the attending physician and report your opinion of the employee's disability status." See Clark 0299-0300 (NB 5).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 144.

145.    On November 30, 1998, William Augerson, M.D., an outside consultant retained by CORE, contacted Dr. Mills by telephone.  Dr. Mills informed Dr. Augerson that the office note "stating the claimant is unable to work, and has trouble standing for long periods" was a mere quote of "what he thought a rheumatologist and orthopedic surgeon had concluded about disability." See Clark 0299-0300 (NB 5).  Dr. Mills advised Dr. Augerson that he only treated Clark for his diabetes (not fibromyalgia) and that "he could not provide information about impairments of [activities of daily living] nor any compelling reason why sedentary work was impossible." See Clark 0300 (NB 5).

**RESPONSE:** Plaintiffs deny the facts as stated in ¶ 145.  Plaintiffs lack sufficient information to know whether or not Dr. Augerson was "an outside consultant retained by CORE"; plaintiffs lack sufficient information to know whether Dr. Augerson actually contacted Dr. Mills by telephone on November 30, 1998, or what was said in the conversation; this appears to be Dr. Augerson's version

63

of the conversation.  As to the remaining allegations of ¶ 145,  plaintiffs admit

that these are partial quotes from Dr. Augerson's Peer Review Analysis."

146.    Based on his review of Clark's medical records and his conversation with Clark's

treating physician, Dr. Augerson reported that "he cannot conclude this claimant is totally disabled,

though impaired, sedentary work should be possible."  See Clark 0300 (NB 5).

**RESPONSE:** As to the facts alleged in ¶ 146, plaintiffs lack sufficient information to know

the basis of  Dr. Augerson's conclusion.  Specifically, plaintiffs have no idea

to what extent Dr. Augerson reviewed Mr. Clark's medical records.  Plaintiffs

have  no  information  concerning  the  alleged  conversation  between  Dr.

Augerson and Dr. Mills.  Plaintiffs admit that Dr. Augerson reported that "he

cannot conclude this claimant is totally disabled, though impaired, sedentary

work should be possible."

147.    On December 2, 1998, the Claims Review Committee discussed Clark's appeal of the

denial of his claim for LTD benefits.  After the Committee reviewed Clark's file and discussed its

contents, it voted to uphold the denial of Clark's claim for LTD benefits.  See CRC 1349-1351 (NB

6).  See also CRC 1352-1643 (NB 6).[7]

**RESPONSE:** As to the facts alleged in ¶ 147, plaintiffs admit that the Claims Review

Committee apparently met on December 2, 1998; however, plaintiffs have no

way of knowing to what extent Mr. Clark's appeal was discussed.  Plaintiffs

---

[7]    The Chair of the Committee "ordered that a copy of the documentation relative to the
requests for review previously distributed to the Committee, as well as the Transferable Skills
Analysis brought to the meeting, be filed with the minutes of the meeting."  See CRC 1349-1351,
1352-1643 (NB 6).

have no way of knowing the extent of the Committee's review of his file. Therefore, plaintiffs deny all facts as stated in ¶ 147 with the exception of the last statement — i.e., plaintiffs admit that the CRC voted to uphold the denial of Mr. Clark's claim for LTD benefits. As to the facts asserted in footnote 7 to this paragraph, plaintiffs admit that the quote is from the CRC meeting minutes of December 2, 1998, but plaintiffs have no way of knowing what documentation was actually filed with the minutes, and specifically deny that the TSA was included therein. NB 6:CRC 1349-51, 1352-1643.

148.    The Committee relied on, *inter alia*, the following information in reaching its decision to uphold the denial of Clark's LTD claim.

"On 8/25/97, Dr. Beavers of CORE had a discussion with Dr. Eglinton, Mr. Clark's doctor. Dr. Eglinton said that Mr. Clark 'is not disabled from any occupation and that there are jobs he could do.' On 10/15/97, a Functional Capacity Evaluation found that Mr. Clark is capable of a sedentary physical demand level of work. Dr. Eglinton signed a Modification Checklist on 11/5/97 stating that Mr. Clark can work 4-6 hours a day, 3-4 days a week in a sedentary job with restrictions. An Independent Medical Evaluation was performed by Dr. Rudins on 1/12/98. Dr. Rudins found that Mr. Clark 'does have a work capacity, though at a sedentary level at 8 hours per day' with restrictions. Dr. Rudins also stated that he 'really has no significant objective findings to limit him to a sedentary work capacity' and that 'his work capacity can be potentially increased.' Dr. Rudins' Modification Checklist stated that Mr. Clark can work 8 hours a day, 5 days a week in a sedentary job. A Transferable Skills Analysis identified potential jobs that Mr. Clark could perform.

Mr. Clark's attorney, Lori Loftis, submitted additional information in this case by letter dated 11/24/98. With that letter she forwarded Dr. Mill's evaluation of Mr. Clark. The Committee considered Dr. Mill's report, noting that both Ms. Loftis and Dr. Mills made several conclusions regarding Mr. Clark's medical condition which were not supported by the objective information. Dr. Mills discussed Mr. Clark's diabetes but did not say that Mr. Clark was disabled due to diabetes.

See CRC 1350-1351 (NB 6).

**RESPONSE:** As to the facts alleged in ¶ 148, plaintiffs admit that the quote that appears in

¶ 148 is a quote from the CRC minutes of their December 2, 1998 meeting. However, plaintiffs have no way of knowing what the committee relied on in reaching its decision.

149.    On January 29, 1999, the Plan notified Clark's counsel that the Claims Review Committee met on December 2, 1998, and decided to uphold the denial of his claim for benefits. The Plan described to Clark the basis of its decision that he was not entitled to disability benefits. See Clark 0329-0330 (NB 6).

**RESPONSE:** As to the facts alleged in ¶ 149, plaintiffs deny that the document cited supports the facts alleged. Plaintiffs believe that while defendants cite NB 6: Clark 329-330, the cite should in fact be to NB 5: Clark 329-330. Based on the letter that appears in NB 5: Clark 329-330, plaintiffs admit that on January 29, 1999, the Plan notified Clark's counsel that the Claims Review Committee met on December 2, 1998 and decided to uphold the denial of his claim for benefits.

150.    On September 10, 1999, eight months after the Claims Review Committee denied Clark's appeal, Clark's current legal counsel notified the Plan that they had been retained by Clark concerning his claim for benefits. Clark's counsel requested Clark's claims file and copies of plan documents related to the Hourly LTD Plan. See Clark 0741-0743 (NB 27).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 150.

151.    The Plan and Champion International complied with Clark's counsel's request for information. See Clark 0739, 0736-0737, 0733-0734 (NB 27).

**RESPONSE:** The plaintiffs admit the facts asserted in ¶ 151.

152.    By letter dated December 11, 2000, which was almost two years after the Claims Review Committee had denied Clark's appeal, and more than a year after the Plan had responded to Clark's request for information, Clark's counsel requested the Plan to "reconsider[] . . . . the decision to terminate [Clark's] benefits." <u>See</u> Clark 0722 (NB 27). Clark's counsel submitted to International Paper medical and other information they alleged supported Clark's claim for benefits. <u>See</u> Clark 0722-0726, 03234-0351, 0354-0412 (NB 27).

> **RESPONSE:** As to the facts asserted in ¶152, plaintiffs admit that because in denying Mr. Clark's continued long term disability benefits the Plan failed to consider the objective medical evidence; failed to consider chronic pain; failed to consider all of the evidence; and placed inordinate weight on the evidence supporting the denial, plaintiffs' counsel submitted medical records and other objective information and documentation so that Mr. Clark's claim could be reviewed objectively and in its entirety. (NB:5, NB:6).

### Franziska Finney's Claim for Benefits

153.    Plaintiff Franziska Finney ("Finney") worked as an hourly employee at Champion International's facility in Canton, North Carolina. Her original hire date was August 9, 1983, and her last day of active employment was November 6, 1994. <u>See</u> Finney 0157, 0181 (NB 7).

    **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 153.

154.    Beginning on November 7, 1994, Finney received short-term disability benefits from Champion International. <u>See</u> Finney 0190 (NB 7).

    **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 154.

155.    On November 9, 1994, Al Osbahr, M.D., completed a Temporary Disability Initial Report regarding Finney.  See Finney 0190 (NB 7).  Dr. Osbahr diagnosed Finney with "chronic supinator pain."  According to Dr. Osbahr, Finney could "return to work with limitations" but could not resume her full duties.  See Finney 0190 (NB 7).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 155.

156.    Dr. Osbahr then referred Finney to Susan Kimel, P.T., at Haywood Rehabilitation Center for a Functional Capacity Evaluation ("FCE") on November 11, 1994.  See Finney 0193-214 (NB 7).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 156

157.    Ms. Kimel examined Finney and, based on her examination, concluded that Finney "is able to work at the LIGHT-MEDIUM Physical Demand Level for an 8 hour day according to the Dictionary of Occupational Titles, U.S. Department of Labor, 1991."  See Finney 0193 (NB 7).  Ms. Kimel based her findings on the fact that Finney had a 0% Functional Strength Deficit which indicated that Finney's "impairment does not appear to be having an impact on her functional ability."  See Finney 0193 (NB 7).

**RESPONSE:**  As to the facts asserted in ¶ 157, plaintiffs deny that Ms. Kimel "examined" Ms. Finney. As to the remaining facts asserted in ¶ 157, plaintiffs state Ms. Kimel's FCE findings were flawed and inaccurate in failing to consider Ms. Finney's pain in its conclusions. (NB 7: 193).

158.    As a Champion International employee, Finney was eligible to apply for LTD benefits pursuant to the Hourly LTD Plan, and Finney began receiving LTD benefits at the conclusion of her

68

short-term disability period because she was not able to return to her own occupation.  See Finney 0191 (NB 7).

>    **RESPONSE:**  As to the facts asserted in ¶ 158, plaintiffs admit that when Ms. Finney's short term disability benefits were exhausted at the conclusion of her short-term disability period, Ms. Finney's claim converted to a long term disability claim when Champion determined that she was "still wholly and continuously disabled" and therefore eligible for benefits under the Plan. See NB 7: Finney 190, 227.

159.    From November 1994 through August 1997, the Hourly LTD Plan periodically provided Finney forms to submit so the Plan could review her claim to verify the status of her disability.  Finney complied with the Plan's requests for information and the information submitted to the Plan supported the continuation of LTD benefits through the "own occupation period" as defined by the Plan.  See Finney 0258-0259, 0260, 0265, 0216-0235, 0243-0250, 0253-0259 (NB 7).

>    **RESPONSE:**  As to the facts asserted in ¶ 159, plaintiffs admit that subsequent to Champion's approval of Ms. Finney's long term disability claim, Ms. Finney cooperated fully with Champion by providing the requested forms and information, and Champion continually confirmed her eligibility for benefits under the terms of the Plan. NB 7: Finney 216-235, 243-250, 253-260, 265.

160.    By early 1997, Finney was approaching the more stringent "any occ" standard for determining whether she was entitled to continuing LTD benefits.

> **RESPONSE:** As to the facts asserted in ¶ 160, plaintiffs state that after thirty months, the Plan converts from the own occupation standard to the any occupation standard.

161.    On April 1, 1997, Finney submitted a Personal Profile Evaluation dated April 1, 1997, on which she described her physical complaints and limitations as "fibromyalgia, degenerative disc disease C5-6 and C6-7, L5-S1 disk, sclerosis of the SIJs bilaterally, spondyloarthritis, chenoromalacia of the patella, high blood pressure."  See Finney 0261-0264 (NB 7).   In this evaluation, Finney responded that she expected to return to work at her last occupation "as my health and cond. Allows me to."  See Finney 0263 (NB 7).

> **RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 161, with the exception that Ms. Finney listed chondromalacia of the patella. NB 7: Finney 261.

162.    On June 11, 1997, Dr. Osbahr submitted an Attending Physician's Statement in which he stated that Finney was not totally disabled from any occupation because she "can do sedentary work."  See Finney 0266-0267 (NB 7).

> **RESPONSE:** As to the facts asserted in ¶ 162, plaintiffs state that Dr. Osbahr's Attending Physician's Statement documents  (1) that Ms. Finney's prognosis is "unimproved", (2) a total disability period through "indefinite", and (3) it is unclear and indefinite as to when in his opinion Ms. Finney will be able to resume any work. NB 7: Finney 267.

163.    Dr. Osbahr also completed a Physician's Report of Physical Capacity on which he estimated that Finney could, *inter alia*, sit, stand and walk seven to eight hours per shift, make repetitive use of both feet for seven to eight hours per shift, could twist, climb, reach above shoulder

70

level, crouch and stoop, kneel, balance and push three to four hours per shift, could use both hands for "low speed assembly" for seven to eight hours per shift, and could use both hands for "high speed assembly" for one to two hours per shift.  See Finney 0273-0274 (NB 7).

> **RESPONSE:** As to the facts asserted in ¶ 163, plaintiffs state that Dr. Osbahr qualifies the validity of the Physician's Report of Capacity by stating, "I have not Rx'd [treated] pt since 2/1996." NB 7: Finney 274.

164.    Dr. Osbahr then ordered another FCE so he could accurately evaluate Finney's functional capacities.  See Finney 0266 (NB 7).  See also Finney 0273-0274 (NB 7).

> **RESPONSE:** As to the facts asserted in ¶ 164, plaintiffs state that the FCE was ordered at the request of CORE. Plaintiffs lack sufficient information to admit or deny the remaining facts  asserted in ¶ 164.  NB 7: Finney 273-274.

165.    On July 23, 1997, an FCE of Finney was performed at Haywood Regional Rehabilitation Center which noted:

> "Ms. Finney presents with multiple pain complaints that she attributes mainly to arthritis and fibromyalgia.  Subjectively, she is pain limited in most functional activities with ratings of 7/10.  Objectively, she demonstrates the ability to sustain work at a light pdd."

See Finney 0270 (NB 7).  The FCE recommended that Finney pursue a position with the restriction that she can only function at the light level, lift a maximum of 20 pounds, and carry a maximum of 20 pounds.  See Finney 0270 (NB 7).

> **RESPONSE:** As to the facts asserted in ¶ 165, plaintiffs state that the FCE recommendations were as stated; however, the FCE was seriously flawed and inaccurate in failing to consider Ms. Finney's pain.
>
> NB 7: Finney 270.

166.    Thereafter, Finney's treating physician, Dr. Osbahr, noted the following on his progress records:

> "The functional capacity evaluation done 7/23/97 to assess current status. Last FCE 2 years ago. No identified symptom magnification on FCE. Left capabilities 20 lbs. from floor to overhead. Push/pull 60 lbs force maximum with pain. Grip below average 50 lb force. Carry 20 lbs 100 feet. This places her in the light work capacity. She is not able to do usual work activities here at Champion. If trained or posses skills for white collar jobs, she could do light work activities only."

See Finney 0271 (NB 7).

> **RESPONSE:** As to the facts asserted in ¶ 166, plaintiffs state that Dr. Osbahr's progress record is inaccurately quoted. NB 7: Finney 271.

167.    On August 25, 1997, CORE recommended "denial of LTD benefits at the any occupation point, based on the FCE findings and Dr. Osbahr's agreement that the employee can perform light duty work activities." See Finney 0022 (NB 7). CORE's report to the Plan included the following:

> "Ms. Finney remains out of work since 11/7/94. In 5/96, Dr. Osbahr noted that the employee could perform sedentary work but remained disabled from her medium duty work at Champion. Dr. Osbahr noted in a 6/97 Report of Physical Capacity that Ms. Finney could sit, stand and walk for 7-8 hours but that activities were 'anticipated capabilities' and the employee 'needs another FCE.' Case Management obtained a prescription for a Functional Capacity Evaluation from Dr. Osbahr which was subsequently performed on 7/23/97. The FCE found that Ms. Finney could perform light duty work for an eight hour period.'"

See Finney 0021-0023 (NB 7).

> **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 167. (NB 7: Finney-21-23).

168.    On August 26, 1997, the Plan notified Finney that it was terminating her LTD benefits because she was "not disabled as defined in the Plan." See Finney 0020 (NB 7). The Plan stated that

its denial of Finney's claim for benefits was "based on the 7/23/97 Functional Capacity Evaluation (FCE)" which concluded that Finney was "able to perform light duty work for 8 hours per day." See Finney 0020 (NB 7). The Plan informed Finney of her right to appeal the decision and enclosed a copy of the Appeal Rights & Process. See Finney 0020 (NB 7). The Plan also informed Finney that her LTD benefits would terminate effective September 30, 1997. See Finney 0017-0018 (NB 7).

> **RESPONSE:** As to the facts asserted in ¶ 168, plaintiffs state CORE informed Ms. Finney that, "We are unable to approve your disability" because she was "Not disabled as defined in the Plan" and informed her of her appeal rights. NB 7: Finney 20.

169. On October 1, 1997, Finney appealed the termination of her LTD benefits. See Finney 0010-0016 (NB 7). Finney provided a synopsis of her medical condition and stated:

> "I know with my pain, sleeplessness, chronic fatigue, fibromyalgia and other discomfort, that I am not able to function at home with my housework, shopping, etc. without stress and having to stop and take periodic rests. I feel that I am unable to function wisely and safely at any type of job at this time due to my disabilities."

Finney 0012 (NB 7). Finney submitted x-ray findings and physician notes from Jane Brummer, M.D., dated August 30, 1997. These physician notes included Dr. Brummer's diagnosis of sponylarthritis, degenerative disc disease, and fibromyalgia in 1994, the July 1997 FCE that found Finney "to have the ability to do sustained work at only a light level," and Dr. Osbahr's subsequent assessments of Finney's ability to return to work with limitations. See Finney 0015 (NB 7).

> **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 169.

170. On December 22, 1997, CORE recommended "upholding of the previous denial of further long term disability benefits" because "FCE testing in 7/97 found the employee able to work in a light duty position for a full day, findings supported by the employee's physician at that time.

Upon appeal, no new information was submitted in support of disability from any occupation." See Finney 0009, 0007-0009 (NB 7).

> **RESPONSE:** As to the facts asserted in ¶ 170, plaintiffs admit that CORE's recommendations were as stated; however, plaintiffs deny the accuracy of CORE's statements. NB 7: 7-9.

171.    CORE relied on, *inter alia*, Dr. Brummer's August 30, 1997, physician notes addressing Finney's work status, and Dr. Brummer's subsequent refusal to complete a Modification Checklist. CORE also reported to the Plan that CORE's occupational health physician spoke to Dr. Brummer during which Dr. Brummer reported that she "ha[d] no opinion about this employee's disability status" and "was not qualified to make a determination about disability in this case." See Finney 0007-0008 (NB 7).

> **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 171.  (NB 7: Finney-7).

172.    On February 9, 1998, the Plan advised Finney that her October 1, 1997, correspondence was treated as an initial claim denial under ERISA and further advised Finney that, "[b]ased on the review by CORE, our decision is to uphold the denial of LTD benefits." See Finney 0002-0003 (NB 7). The Plan informed Finney that

> "[w]e have reviewed the documentation provided by you from Dr. Jane Brummer and Dr. Richard Lang with Haywood Regional Medical Center. This information does not substantiate your disability as being totally and permanently disabled from any occupation as defined in the Plan."

See Finney 0002-0003 (NB 7). The Plan further advised Finney that she was entitled to obtain further review of the denial of her claim by notifying Champion in writing within sixty days of receipt of the denial and enclosed a copy of the Hourly LTD Plan for reference. See Finney 0003 (NB 7).

> **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 172.

173.    Finney did not request further review of the denial of her LTD claim.

**RESPONSE:** Plaintiffs deny the facts asserted in ¶ 173. (NB 28: Finney 24-312).  Plaintiffs further state that Ms. Finney did not request further review because she did not understand her rights under the Plan.  Plaintiffs further state that upon receipt of the February 9, 1998 decision upholding the denial of Ms. Finney's claim in spite of the overwhelming evidence of her continued disability, based on the other evidence in the record, it would have been futile for her to do so.

174.    By letter dated September 10, 1999, which was one year and seven months after the Plan denied Finney's claim and instructed her that she had sixty days to appeal the claims denial, Finney's current legal counsel requested copies of all plan documents related to the Hourly LTD Plan and Finney's claims file.  See Finney 0322 (NB 28).

**RESPONSE:** As to the facts asserted in ¶ 174, plaintiffs admit that by letter dated September 10, 1999, Finney's current legal counsel notified Champion as stated.

175.    The Plan and Champion International complied with Finney's counsel's request and sent to them copies of Finney's claims file and the relevant plan documents.  See Finney 0320, 0317-0318, 0314-0315 (NB 28).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 175.

176.    On December 11, 2000, which was two and one-half years after the Plan denied Finney's claim and more than a year after the Plan complied with Finney's counsel's request for information, requested the Plan to "reconsider[] . . . the decision to terminate [Finney's] benefits." See Finney 0024 (NB 28).  Finney's counsel submitted to International Paper medical and other information they alleged supported Finney's claim for benefits.  See Finney 0024-0312 (NB 28).

**RESPONSE:** As to the facts asserted in ¶ 176, plaintiffs admit that because in denying Ms. Finney's continued long term disability benefits the Plan failed to consider the objective medical evidence, failed to consider chronic pain, failed to consider all of the evidence, and placed inordinate weight to the evidence supporting the denial, plaintiffs' counsel submitted medical records and other objective information and documentation so that the Plan could conduct a full and fair review of Ms. Finney's claim.

### Wiley Haynes' Claim for Benefits

177.    Plaintiff Wiley Haynes ("Haynes") worked as a Machine Back Tender at Champion International's facility in Canton, North Carolina.  Haynes' date of hire was December 23, 1958.  <u>See</u> Haynes 0039 (NB 8).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 177.

178.    Haynes' last day of active service was August 3, 1993.  Haynes received short-term disability benefits from August 4, 1993, until March 1, 1994.  <u>See</u> Haynes 0003 (NB 8).

**RESPONSE:** Plaintiffs admit that Mr. Haynes' last day of active service was August 3, 1993.

Plaintiffs deny the remaining facts asserted in ¶ 178. (NB 8: Haynes 46.

179.    As a Champion International hourly employee, Haynes was eligible to apply for disability income benefits pursuant to the Hourly LTD Plan.

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 179.

180.    On January 13, 1994, Champion International submitted an LTD Claim Form on Haynes' behalf. Haynes identified "low back syndrome/degenerative discognic disease" as the alleged cause of disability. See Haynes 0039 (NB 8).

76

**RESPONSE**: Plaintiffs admit the facts asserted in ¶ 180, with the exception that Champion completed and submitted the LTD Claim Form and therefore Champion identified the cause of disability. NB 8: Haynes 39.

181.   On February 21, 1994, the Plan notified Haynes that his application for LTD benefits had been approved.  See Haynes 0044-0045 (NB 8).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 181.

182.   The Plan also informed Haynes that "in order to continue receiving Long Term Disability benefits, [he] must be totally disabled as defined in the policy"; that after the first 24 months he needed to be considered "totally and permanently disabled" or "unable to do any job for which [he was] reasonably qualified by [his] training, education and experience"; and that approval of his claim would be terminated when he was "no longer disabled as defined in the plan."  See Haynes 0044-0045 (NB 8).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 182 NB 66: Plan 60.

183.   Haynes' LTD benefit was $805 per month.  See Haynes 0052 (NB 8).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 183.

184.   On December 10, 1994, the Social Security Administration notified Haynes that his application for Social Security disability income benefits had been approved.  The Social Security Administration concluded that Haynes became disabled effective August 4, 1993, and was eligible for payment beginning in February 1994.  See Haynes 0075-0077 (NB 8).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 184.

185.   As Haynes approached the expiration of his initial "own occupation" period of benefits, the Plan began to collect information to determine whether Haynes could satisfy the more stringent

"any occupation" disability definition, thereby entitling Haynes to benefits beyond the initial thirty month period.  On August 15, 1995, the Plan requested Haynes to provide an Authorization to Disclose Information and a Personal Profile Evaluation.  See Haynes 0083 (NB 8).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 185.

186.    On August 28, 1995, Haynes completed his Personal Profile Evaluation in which he indicated that "with [his] back & limitations" he could not return to work at this time."  See Haynes 0085-0088 (NB 8).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 186.

187.    On September 1, 1995, Kate T. Queen, M.D., Haynes' treating physician, submitted an Attending Physician Statement in which she stated that Haynes "has worked very hard in Rehab programs to return to work—But without success. Recommend long term-total Disability." Dr. Queen submitted examination notes which included her opinion that Haynes had "severe degenerative disc disease, lumbar spine with osteoarthritis and intermittent sciatica."  See Haynes 0089-0093 (NB 8). In her Physician's Report of Physical Capacity prepared on August 30, 1995, Dr. Queen opined that Haynes could work zero hours per day and was unlikely to ever return to full-time work activity.  See Haynes 0091-0093 (NB 8).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 187.

188.    On September 29, 1995, after reviewing the information Haynes submitted, the Plan determined that Haynes qualified for LTD benefits under the "any occupation" standard.  See Haynes 0095 (NB 8).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 188.

189.     As part of its periodic review of Haynes' disability status, the Plan contacted Haynes on March 27, 1996, and requested that he update his medical information by providing a Personal Profile Evaluation, Authorization for Release of Information, and Attending Physician Statement. See Haynes 0097 (NB 8).

> **RESPONSE:** As to the facts asserted in ¶ 189, plaintiffs state that CORE contacted Mr. Haynes and requested updated medical information. NB 8: Haynes 97.

190.     In response to this request, Dr. Queen completed an Attending Physician Statement on April 9, 1996, in which she opined that Haynes was totally disabled from any occupation.  Dr. Queen declined to complete the "Restrictions and Limitations" portion of the Attending Physician Statement and, instead, stated that Haynes "would have to have [a] physician capacity eval ? we do not do these evals."  See Haynes 0101-0102 (NB 8).

> **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 190.

191.     Dr. Queen then referred Haynes to Susan Kimel, P.T., at Haywood Rehabilitation Center in Clyde, North Carolina, for a Functional Capacity Evaluation ("FCE").  See Haynes 0105-0116 (NB 8).

> **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 191.

192.     Ms. Kimel found and reported that Haynes could not squat, kneel or crawl, but could sit and reach "frequently" and could stand, walk, bend and climb "occasionally."  Based on these and additional functional assessments, Ms. Kimel concluded that Haynes was "able to work at the SEDENTARY-LIGHT Physical Demand Level for an 8 hour day."  See Haynes 0106-0107 (NB 8).

**RESPONSE:** As to the facts asserted in ¶ 192, plaintiffs admit that the FCE conclusions were as stated. However, the FCE was seriously flawed and inaccurate in that it failed to consider Mr. Haynes' pain. NB 8: Haynes106-107.

193.    On November 27, 1996, the Plan contacted Dr. Queen, Haynes' treating physician, and requested that she prepare a Modification Checklist for Haynes based on her review of the FCE results.  Dr. Queen refused to complete the Modification Checklist.  See Haynes 0119-0121 (NB 8).

**RESPONSE:** As to the facts asserted in ¶ 193, plaintiffs state that CORE contacted Dr. Queen. Plaintiffs lack sufficient knowledge to admit or deny the remaining facts asserted in ¶ 193. NB 8: Haynes 119-121.

194.    To further assist in the ongoing review of Haynes' disability status, the Plan referred the Haynes matter to William Augerson, M.D., for a Peer Review Analysis.  The Plan asked that Dr. Augerson assess whether Haynes' "disabilities preclude all forms of work at any occupation."  See Haynes 0122 (NB 8).

**RESPONSE:** As to the facts asserted in ¶ 194, plaintiffs state that CORE referred the matter to William Augerson, M.D., for a peer review analysis. Plaintiffs lack sufficient knowledge to admit or deny the remaining facts asserted in  ¶ 194**.** NB 8: Haynes 122.

195.    Dr. Augerson reviewed Haynes' medical records, the Plan's referral form and spoke with Dr. Queen.  Dr. Augerson reported that "[t]he claimant has limited ability to walk very far, to lift, bend or stand for prolonged periods."  Dr. Augerson, however, also reported that

"[t]he attending physician says she determined disability in the context of the jobs available for the patient and no one had previously discussed vocational rehab efforts with her. The attending physician agrees with the Haywood assessment that the patient can move some, sit, drive, and could, with accommodations, perform some sedentary work if he had the requisite skills. I and the attending physician therefore do not conclude that the patient is disabled from

all work, though he is significantly impaired. I agree with attending physician that the patient might require some vocational instruction to perform sedentary work."

See Haynes 0123-0125 (NB 8).

> **RESPONSE:** As to the facts asserted in ¶ 195, plaintiffs deny that Dr. Augerson reviewed all of Mr. Haynes' medical records. As to the remaining facts asserted in ¶ 195, plaintiffs admit that Dr. Augerson's findings are as quoted. However, it is denied Dr. Queen made the statements attributed to her since they contradict her well-documented opinion of Mr. Haynes' total disability. NB 8: Haynes 123-125.

196.    On December 18, 1996, the Plan asked Dr. Queen to elaborate in writing regarding her conversation with Dr. Augerson in which she indicated that Haynes could perform a sedentary job with proper training.  See Haynes 0126 (NB 8).

> **RESPONSE:** As to the facts asserted in ¶ 196, plaintiffs state that CORE contacted Dr. Queen and tried to induce her to document that Mr. Haynes was able to work, which she refused to do. ¶ 195. NB 8:Haynes 126.

197.    Dr. Queen responded on January 7, 1997.  She noted that the Plan already had her office notes summarizing Haynes' complaints and limitations in its possession.  She also stated that she couldn't "offer any other objective or . . . further clarification of [Haynes'] current status."  See Haynes 0127 (NB 8).

> **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 197.

198.    After receiving Dr. Queen's response, the Plan commissioned Peter Johnson, M.D., at the Asheville Rehabilitation Center in Asheville, North Carolina, to conduct an Independent Medical Examination ("IME") of Haynes.  See Haynes 0128 (NB 8).  The Plan asked Dr. Johnson to analyze

whether Haynes "was medically able or not able to perform the essential functions required by any occupation."  See Haynes 0129-Haynes 0131 (NB 8).

>    **RESPONSE:**  As to the facts asserted in ¶ 198, plaintiffs state that because Dr. Queen refused to state that Mr. Haynes could return to work, CORE commissioned Peter Johnson, M.D. Plaintiffs admit the remaining facts as asserted in ¶ 198. NB 8: Haynes 128.

199.    Dr. Johnson examined Haynes on January 20, 1997.  Dr. Johnson's examination revealed that Haynes has "had recurrent back problems and is left with chronic back pain which is regional in nature" and his "degenerative disk changes as well as arthritic changes in his back and in the small joints of his hands and in the weight bearing joints by history."  Dr. Johnson also stated that, "in my medical opinion, [Haynes] is at maximum medical improvement, and further investigations and treatment will not significantly alter his medical or functional status."  Dr. Johnson concluded

>    "based on the results of his Functional Capacity Evaluation and my examination, I feel that he is able to function at a sedentary physical demand level.  Specifically, he would have restrictions on material handling and would require flexible posture. He could not squat or kneel, or crawl but would be able to work 40 hours a week within the limits of his Functional Capacity Evaluation."

See Haynes 0132 (NB 8).

>    **RESPONSE:**  As to the facts asserted in ¶ 199, plaintiffs deny that Dr. Johnson examined Mr. Haynes. As to the remaining facts asserted in ¶ 199, plaintiffs admit Dr. Johnson's conclusion is as quoted, however, his opinion is unreliable because it was based upon the flawed and inaccurate FCE. NB 8: 132.

200.    On February 6, 1997, after considering the results of the FCE, the Peer Review Analysis, the Attending Physician Statement and the results of the IME, the Plan notified Haynes that

his LTD benefits had been terminated.  See Haynes 0136-0138, 0139-0141 (NB 8).  The Plan also informed Haynes of his right to request review of the Plan's decision.  See Haynes 0140-0141 (NB 8). The Plan subsequently notified Haynes that his LTD benefits would be terminated effective February 28, 1997.  See Haynes 0150 (NB 8).

   **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 200. NB 8, 150.

   201.    On February 17, 1997, Haynes requested a review of the Plan's decision.  In support of his request, Haynes stated that he suffered from a degenerative back condition as well as carpal tunnel syndrome, tendonitis in his hands and shoulders, and degeneration of his right knee joint. Haynes also stated that he could not participate in normal life activities, including attending church services, ball games and the movies.  Haynes further noted that there are times that he cannot button his shirt, put on his socks or get into a tub without assistance.  See Haynes 0142-0145 (NB 8).

   **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 201.

   202.    Along with his request for reconsideration, Haynes submitted examination notes and a letter from Dr. Queen, dated February 19, 1997, in which Dr. Queen stated that Haynes "has a long-standing history of degenerative disc disease and generalized osteoarthritis with involvement in multiple joints."  Dr. Queen further stated that she had "serious concerns" about the conclusion that Haynes could perform sedentary work.  According to Dr. Queen, Haynes "repeatedly explains that he has difficulty with certain activities of daily living and has never been able to sit or stand for any period of time since he had his last exacerbation of back pain and found it necessary to accept disability."  See Haynes 0146-0147, 0148-0149 (NB 8).

   **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 202.

203.    Dr. Queen's examination notes indicate that Haynes has "C-spine . . . discomfort on all arcs of motion"; "significant restriction in lateral rotation"; "mild discomfort in the groin, but particularly discomfort in the low back with manipulation of the hip"; and "difficulty assuming an upright position." The examination notes, however, also show Haynes' "[s]houlder range of motion is maintained"; "wrist and small hand joints [are] without any clear evidence for synovitis or tendonitis at this time"; and no "focal swelling or discoloration of the right mid foot." See Haynes 0148 (NB 8).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 203.

204.    By letter dated May 9, 1997, Dr. Queen submitted additional examination notes. Dr. Queen indicated that Haynes had been in touch with her on two different occasions to report intolerance to medication. She stated in her April 25, 1997, examination notes that Haynes reported increased pain over the last two weeks due to a "very mild increase in his activity level." The notes also indicate that he is "ambulating with a cane" due to pain in his knee. See Haynes 0151-0153 (NB 8).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 204.

205.    After reviewing the information submitted by Haynes and Dr. Queen in support of Haynes' appeal, the Plan notified Haynes on June 17, 1997, of its decision to uphold the denial of his claim for LTD benefits.  The Plan specifically informed Haynes that

> "[w]e have reviewed the additional documentation provided by you and Dr. Kate T. Queen. This information was previously reviewed and discussed by CORE with Dr. Queen. You had a Functional Capacity Evaluation performed on October 10, 1996 prescribed by the above Physician. Also, you had an Independent Medical Evaluation performed on January 20, 1997 of which both found you able to perform sedentary/light duty work at 8 hours per day. Therefore, you do not meet the definition of disability as defined in the Plan."

The Plan also informed Haynes of his right to appeal the Plan's decision. See Haynes 0154, 0155-0156 (NB 8).

**RESPONSE:** Plaintiffs deny the facts asserted in ¶ 205. (NB 8: Haynes-154-156).

206.    Haynes subsequently appealed the Plan's denial.  In support his appeal, Haynes noted his disagreement with the conclusions of his IME and stated that he lives with pain every day, that he has "good days and bad days" and that he feels that he cannot hold down a job due to his arthritis.  See Haynes 0157-0161 (NB 8).  On July 29, 1997, Haynes' wife also submitted a statement in support of Haynes' appeal along with pictures of his hands during a "recent flare-up" of his arthritis.  See Haynes 0162-0164 (NB 8).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 206.

207.    By letter dated August 20, 1997, Dr. Queen submitted an "update" on Haynes' clinical information.  Dr. Queen stated she recently received "clear evidence for rheumatoid arthritis on [Haynes'] laboratory testing."  Dr. Queen did not submit the results of the laboratory tests.  Dr. Queen again noted that Haynes continues to struggles with low back pain, peripheral joint pain, stiffness and increasing swelling.  See Haynes 0165-0166 (NB 8).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 207, but further state that Dr. Queen's August 20, 1997 letter concludes, "I think it is very important to review the decision recently made indicating that Mr. Haynes was capable of returning to regular employment, because I think for a variety of reasons this is an inappropriate and unrealistic decision". NB 8: Haynes 166.

208.    On August 27, 1997, the Plan acknowledged receipt of Haynes' appeal and informed him that the Plan's termination of his LTD benefits would be reviewed by the Claims Review Committee.  The Plan encouraged Haynes to provide any additional information he wished to be considered by the Committee.  See Haynes 0167, 0180 (NB 8).

85

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 208.

209.    The Claims Review Committee discussed Haynes' claim at its November 25, 1997, meeting.  See CRC 0009-0011, 0508-0511 (NB 9).  The Committee reviewed Haynes' claims file, records submitted by Haynes' treating physician, Dr. Queen, the results of the October 21, 1996, FCE, and Dr. Johnson's January 20, 1997, IME in which Dr. Johnson opined that Haynes was capable of functioning at a sedentary demand level.  During the meeting, the Committee examined this information against the Plan's definition for total disability and voted to uphold the decision to deny Haynes' claim for LTD benefits.  See CRC 0508-0511, 0512-0680 (NB 9).[8]

> **RESPONSE:** As to the facts asserted in ¶ 209, plaintiffs admit that the Committee discussed Mr. Haynes' claim; however, the Committee failed to conduct a full and fair review of Mr. Haynes' claim because it was operating under a conflict of interest in that all Committee members were Champion employees, were aware that there were significant cost savings associated with upholding the denial of benefits, thereby providing significant monetary gain for their employer, Champion.  Accordingly, the Claims Review Committee failed to consider the objective medical evidence; failed to consider chronic pain; failed to consider all of the evidence; and placed inordinate weight to the evidence supporting the denial. NB 9: CRC 508-680.

210.    On December 26, 1997, the Plan informed Haynes of its decision to affirm the previous denial of his claim for LTD benefits.   See Haynes 0178-0179 (NB 8).

---

[8]    The Chair of the Committee "ordered that a copy of the documentation relative to the requests for review previously distributed to the Committee, be filed with the minutes of the meeting."  See CRC 0508-0511, 0512-0680 (NB 9).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 210.

211.    Almost two years later, by letter dated September 10, 1999, Haynes's legal counsel requested copies of Haynes' claims file and all plan documents related to the Hourly LTD Plan. <u>See</u> Haynes 0407 (NB 29).

**RESPONSE:** As to the facts asserted in ¶ 211, plaintiffs admit that by letter dated September 10, 1999, the referenced documentation was requested. NB 29: Haynes 407.

212.    On November 22, 1999, the Plan and Champion International complied with Haynes' counsel's request for information. <u>See</u> Haynes 0399 (NB 29). <u>See</u> also Haynes 0407, 0405, 0404 (NB 29).

**RESPONSE:** Plaintiffs deny the facts asserted in ¶ 212.

213.    By letter dated November 22, 2000, which was almost three years after the Claims Review Committee denied Haynes' benefits appeal and one year after the Plan complied with Haynes' counsel's request for information, Haynes' current legal counsel requested the Plan to "reconsider[] . . . the decision to terminate [Haynes'] benefits." <u>See</u> Haynes 0411 (NB 29). Haynes' counsel submitted to International Paper medical and other information they alleged supported Haynes' claim for benefits. <u>See</u> Haynes 0411-0419, 0421-0438, 0440-0810 (NB 29).

**RESPONSE:** As to the facts asserted in ¶ 213, plaintiffs admit that because in denying Mr. Haynes' continued long term disability benefits the Plan failed to consider the objective medical evidence; failed to consider chronic pain; failed to consider all of the evidence; and placed inordinate weight to the evidence supporting the denial, Plaintiffs' counsel submitted medical records and other objective

information and documentation so that Champion could conduct a full and fair review of Mr. Haynes' claim.

**Darrell Hill's Claim for Benefits**

214.     Plaintiff Darrell Keith Hill ("Hill") worked as an hourly employee at Champion International's facility in Canton, North Carolina. Hill's date of hire was June 21, 1972. See Hill 0161 (NB 10).

**RESPONSE:** As to the facts asserted in ¶ 214, Plaintiffs state that Mr. Hill's date of hire was June 12, 1972. Plaintiffs admit the remaining facts asserted in ¶ 214. (NB 10: Hill 161).

215.     Hill's last day of active service was November 5, 1990. Hill had injured his right ankle and leg, and subsequently had a below the knee amputation of his right leg. He thereafter received short-term disability benefits from Champion International. See Hill 0118-0120 (NB10).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 215.

216.     As a Champion International hourly employee, Hill was eligible to apply for disability income benefits pursuant to the Hourly LTD Plan, and the Plan initially approved Hill for LTD benefits on May 6, 1991. See Hill 0118-0120 (NB 10).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 216.

217.     In 1998, as part of the Plan's periodic review of Hill's disability status, Hill's claim was referred to CORE's physician consultant. See Hill 0118 (NB 10).

**RESPONSE:** As to the facts asserted in ¶ 217, plaintiffs admit that from November, 1990 and for the subsequent eight years, Champion determined that Mr. Hill met the Plan's definition for disability. However, in 1998, although there had been no

88

improvement in Mr. Hill's condition, and in fact his condition had continued

to deteriorate, Mr. Hill's case was referred by CORE to CORE's physician

consultant.  NB 10: Hill 118.

218.    CORE's physician consultant reviewed the notes from Hill's attending physician, J.M.

Dement, M.D., See Hill 0118, 0134 (NB 10), and then "made several attempts to contact [Dr.

Dement], but without success." See Hill 0118 (NB 10).

> **RESPONSE:** As to the facts asserted in ¶ 218, plaintiffs state CORE's Confidential Service
>
> Report #5 dated July 29, 1998 states that CORE's physician consultant
>
> reviewed **recent** attending physician office notes and made several attempts to
>
> contact Mr. Hill's treating physician, but without success. NB 10: Hill 118.

219.    Therefore, to further evaluate Hill's disability status, the Plan scheduled Hill for an

Independent Medical Examination ("IME"), which was performed on June 25, 1998.  Upon

examination, the IME physician opined that Hill could work eight hours per day, five days per week

in a sedentary job with restrictions.  See Hill 0118-0120 (NB 10).

> **RESPONSE:** As to the facts asserted in ¶ 219, plaintiffs state that CORE scheduled an
>
> Independent Medical Examination for Mr. Hill; however, no documentation
>
> regarding the IMExamination has been produced by the defendants,
>
> accordingly, plaintiffs lack sufficient knowledge to admit or deny the
>
> remaining facts asserted in ¶ 219. (NB 10: Hill 118-120).

220.    The Plan also commissioned Jennifer Mikeska, MRC, to perform a Transferable Skills

Analysis.  By report dated July 27, 1998, Ms. Mikeska analyzed Hill's transferable skills, education,

functioning and employment history, including his experience as a Millwright, Roll Repairer,

Machinist and Machinist Apprentice, and concluded that three positions were suitable for Hill. See Hill 0121 (NB 10).

> **RESPONSE:** As to the facts asserted in ¶ 220, plaintiffs admit that CORE commissioned Ms. Mikeska to perform a Transferable Skills Analysis regarding Mr. Hill. As to the remaining facts asserted in ¶ 220, plaintiffs state that the TSA was severely flawed and inaccurate because the jobs identified as appropriate for Mr. Hill were inappropriate because Mr. Hill did not meet the required aptitudes as determined by the Apticom test results and also did not meet the minimum performance criteria for physical demands in these jobs. (NB 30: Hill 22).

221.  On July 19, 1998, the Plan informed Hill that his LTD benefits had been terminated because he could not satisfy the Plan's definition of Total Disability. More specifically, the Plan informed Hill that

> "[t]he independent medical examination found you capable of work 8 hours per day, 5 days per week in a sedentary job. The Transferable Skills Analysis revealed skills that can be utilized in jobs of a Drafter Assistant, a Drafter Apprentice, and a Stuffer (toy sport equipment production)."

The Plan informed Hill of his right to a review of this decision, See Hill 0115-0116 (NB 10), and notified him that his benefits would terminate on October 31, 1998. See Hill 0123 (NB 10).

> **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 221.

222.  On October 1, 1998, Hill's wife submitted information from the North Carolina Employment Security Commission regarding the Drafter, Drafting Apprentice and Toy Stuffer positions. See Hill 0126-0133 (NB 10). Hill's wife disagreed with the conclusion that these positions were applicable to her husband. She also submitted progress notes from J.M. Dement, M.D., indicating that Hill's

90

"stump is benign. Examination of the knee reveals small local area of discomfort on the lateral thermal condyle. The rest of the knee examination is really quite benign. There is no effusion. He has excellent strength, good control with [the] prosthesis on, there is quadriceps atrophy. Some of this [is] obviously chronic and long-standing in nature. The patient feels very confident when he is ambulating. The pain is markedly decreased . . . He does not wish to take any medication. . . ."

See Hill 0134 (NB 10).

> **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 222.

223.    By letter dated October 19, 1998, Hill's wife requested a review of the Plan's decision to deny her husband's claim for continuing LTD benefits. She reported that Hill "does not sleep at night," has difficulty assisting her with housework, and that, in her opinion, there is no way that he "could hold down a job" or perform the jobs suggested by the Plan. See Hill 0152-0154 (NB 10). She also stated that she believed that denying him LTD benefits would result in a greater cost to Champion International because she works at Champion International and he would be covered by her healthcare plan sponsored by Champion International. See Hill 0154 (NB 10).

> **RESPONSE:** As to the facts asserted in ¶ 223, plaintiffs admit that Mr. Hill's wife requested a review of her husband's denial for continued long term disability benefits and further state that Ms. Hill's October 19, 1998 correspondence viewed in its entirety is the best evidence of its content. NB 10: Hill 152-154.

224.    Hill's wife also submitted additional medical records including a letter from Paul Conrad, M.D. In his letter, Dr. Conrad indicated that he started treating Hill in August 1998, and reported that Hill "suffers from chronic gout and high blood pressure" and had "extensive problems with this ankle on the right secondary to an injury in the past and in December 1995 had a below the knee amputation." Dr. Conrad, however, opined that Hill had been doing reasonably well since his amputation with his prosthesis and he "otherwise Seems to be in good health." See Hill 0136 (NB 10).

The additional records submitted included Dr. Dement's progress notes from December 1995 through July 1998, which had previously been submitted to the Plan.  See Hill 0137-0151 (NB 10).

      **RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 224.

225.    In order to evaluate Hill's request for reconsideration, the Plan asked its consulting physician to review the materials submitted by Hill and on Hill's behalf (including Dr. Dement's progress notes and Dr. Conrad's letter), the results of the IME, the Transferable Skills Analysis and all information provided by Hill's spouse.  See Hill 0156-0158 (NB 10).  Upon review, the Plan's consulting physician concurred with the results of the IME and opined that Hill would be physically capable of performing "[s]edentary work activities."  See Hill 0157 (NB 10).

      **RESPONSE:**  As to the facts asserted in ¶ 225, plaintiffs admit that CORE asked its consulting physician to review the referenced information and documentation with the exception of documentation regarding an Independent Medical Examination, as no such report has been produced. NB 10: Hill 156-158.

226.    On February 17, 1999, the Plan informed Hill of its decision to uphold the denial of his claim for continuing LTD benefits.  The Plan also notified Hill that he had a right to appeal the denial.  See Hill 0159-0160 (NB 10).

      **RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 226.

227.    Hill did not appeal the Plan's decision to terminate his LTD benefits.

      **RESPONSE:**  Plaintiffs deny that Mr. Hill did not appeal the decision to terminate his LTD benefits. NB 10: Hill 126-134, 152-154; NB 30: Hill 2-100.  However, plaintiffs state that upon receipt of the February 17, 1999 decision upholding the denial of Mr. Hill's claim in spite of the overwhelming evidence in support

of his total disability, and based upon the other evidence in the record, it would

have been futile for Mr. Hill to appeal the denial.

228.    By letter dated September 10, 1999, Hill's legal counsel requested copies of Hill's

claims file and all plan documents related to the Hourly LTD Plan.  See Hill 0110 (NB 30).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 228.

229.    On November 22, 1999, the Plan and Champion International complied with Hill's

counsel's request for information.  See Hill 0102 (NB 30).  See also Hill 0107 (NB 30).

**RESPONSE:**  Plaintiffs deny the facts asserted in ¶ 229 based upon non-production of the

Independent Medical Examination report. (NB 30: Hill 118-120).

230.    On December 27, 2000, almost two years after the Plan denied his request for benefits

and informed him of his right to appeal, Hill's legal counsel requested the Plan to "reconsider[] . . . the

decision to terminate [Hill's] benefits."  See Hill 0002 (NB 30).  Hill's counsel submitted to

International Paper medical and other information they alleged supported Hill's claim for benefits.

See Hill 0002-0100 (NB 30).

**RESPONSE:**  As to the facts asserted in ¶ 230, plaintiffs admit that because in denying Mr.

Hill's continued long term disability benefits the Plan failed to consider the

objective medical evidence; failed to consider chronic pain; failed to consider

all of the evidence; and placed inordinate weight to the evidence supporting the

denial, plaintiffs' counsel submitted medical records and other objective

information and documentation so that the Plan could conduct and full and fair

review of Mr. Hill's claim. (NB 30: Hill 2-100).

**Judith Kirkpatrick's Claim for Benefits**

93

231.    Plaintiff Judith C. Kirkpatrick ("Kirkpatrick") worked as an hourly employee at Champion International's facility in Canton, North Carolina. Her hire date was November 1, 1976 and her last day of active employment was November 21, 1993. See Kirkpatrick 0018 (NB 11).

**RESPONSE:** Plaintiffs admit the facts as alleged in ¶ 231, except to note that there is a five day discrepancy in the records concerning her last day of work. See NB 12:CRC-1935, 1939 for November 26, 1993; *see* NB 11:Kirkpatrick-18 for November 21, 1993.

232.    Between November 26, 1993, and May 26, 1994, Kirkpatrick received short-term disability benefits from Champion International. See Kirkpatrick 0018 (NB 11).

**RESPONSE:** Plaintiffs admit the facts alleged in ¶ 232.

233.    As a Champion International employee, Kirkpatrick was eligible to apply for LTD benefits pursuant to the Hourly LTD Plan and, prior to the expiration of her short-term disability benefits, Kirkpatrick applied for LTD benefits, citing "IV disc disease" and "connective tissue disease with fibromyalgia" as the cause of her alleged disability. See Kirkpatrick 0018-0020 (NB 11). See also Kirkpatrick 0021, 0027-0028, 0033-0034, 0045 (NB 11).

**RESPONSE:** As to the facts stated in ¶ 233, plaintiffs admit that as a Champion employee Kirkpatrick was eligible to apply for LTD benefits and did so prior to the expiration of her short term disability benefits. However, plaintiffs deny that the "IV disc disease and connective tissue disease with fibromyalgia" were the sole cause of her disability as implied in defendants' ¶ 233. Plaintiffs would refer to Pl. LR 56 St. ¶ 374 and 375 for more inclusive listings of her physical problems.

94

234.    The Plan approved Kirkpatrick's claim for LTD benefits effective May 27, 1994.  <u>See</u> Kirkpatrick 0044 (NB 11).

> **RESPONSE:**  As to the facts alleged in ¶ 234, plaintiffs admit the facts but deny that the defendants' cite is correct.  Defendants cite to NB 11: Kirkpatrick 44, a document which does not contain the date that Ms. Kirkpatrick's LTD benefits began.

235.    Kirkpatrick's LTD benefit was $386.25 per month.  <u>See</u> Kirkpatrick (NB 11).

> **RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 235.

236.    Pursuant to the Hourly LTD Plan, Kirkpatrick's continuation of LTD benefits depended on certification of Kirkpatrick's continuing disability.  <u>See</u> Plan 0067 (NB 66).  In addition, to qualify for continuing benefits after the first twenty-four months of LTD benefits, the participant must be unable to engage in any occupation or business for which he is or becomes reasonably qualified by training, education or experience.  <u>See</u> Plan 0060 (NB 66).

> **RESPONSE:**  Plaintiffs deny the facts asserted in ¶ 236 as stated.  Under the terms of the Plan "upon the request of the Plan Supervisor, the Participant may be required to submit to an examination by a Physician selected by the Plan Supervisor when and as often as it may reasonably require." NB 66: Plan 67.  The actual Plan language does not use the word "certification" anywhere.

237.    The Plan, through the Champion Disability Management Program and CORE, thereafter conducted periodic reviews of Kirkpatrick's continuing eligibility for LTD benefits.  <u>See</u> Kirkpatrick 0065-0066, 0073, 0066-0070, 0071-0072, 0058, 0077, 0073, 0089-0092, 0095-0096, 0097-0099 (NB 11).

95

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 237.

238.    On March 27, 1998, Champion's Disability Management Program requested from Kirkpatrick additional personal profile and medical information.  See Kirkpatrick 0105 (NB 11).

> **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 238 as stated.  Plaintiff admits that on March 27, 1998, Champion's Disability Management Program wrote Ms. Kirkpatrick on CORE letterhead and informed her that Champion had retained CORE to assist its Employee Benefits Department and the Plan Supervisor in reviewing her claim for long term disability benefits.  The letter did request a Personal Profile Evaluation and Authorization for Release of Information, and an Attending Physician's Statement from Ms. Kirkpatrick. See NB 11: Kirkpatrick 105.

239.    In response, Kirkpatrick submitted a Personal Profile Evaluation dated April 8, 1998, in which she stated that she had "constant pain from her waist to the bottom of her foot, left shoulder, elbow and hands," and "swelling in her hands, knees, calves of legs and feet."  See Kirkpatrick 0106-0107 (NB 11).  Kirkpatrick reported that she had "gone to a psychologist to help deal with the pain but she had to quit because she could not afford it."  See Kirkpatrick 0106-0107 (NB 11).  She also confirmed that she did not need special help to take care of her personal needs and grooming, but did not anticipate returning to her occupation or any other type of occupation.  See Kirkpatrick 0089 (NB 11).

> **RESPONSE:** As to the facts alleged in ¶ 239, plaintiffs admit that they are an accurate but incomplete summary of Ms. Kirkpatrick's response.

240.    Kirkpatrick also submitted an Attending Physician statement dated April 23, 1998, signed by Dr. Mendelsohn, which confirmed his diagnosis of "generalized OA [osteoarthritis] and fibromyalgia." Dr. Mendelsohn stated that Kirkpatrick had not regressed or improved. Kirkpatrick 0109-0110 (NB 11).

RESPONSE: Plaintiffs admit the facts alleged in ¶ 240.

241.    In reviewing Kirkpatrick's continuation of LTD benefits, the Medical Director for the Champion Disability Management Program, J.D. Beavers M.D., M.P.H., spoke by telephone with Kirkpatrick's treating physician, Dr. Mendelsohn. Dr. Mendelsohn advised Dr. Beavers that he believed Kirkpatrick "could do sedentary work." Dr. Mendelsohn further stated that he was willing to put that professional opinion in writing. See Kirkpatrick 0113 (NB 11).

RESPONSE: Plaintiffs deny the facts as stated in ¶ 241. Plaintiffs admit that a physician review note of Dr. J.D. Beavers indicates that he spoke by telephone with Ms. Kirkpatrick's physician, Dr. Mendelsohn. However, plaintiffs lack sufficient information to know what Dr. Mendelsohn advised Dr. Beavers, and would state simply that ¶ 241 is an incomplete quote of Dr. Beavers' Physician Review Note of May 5, 1998. (NB 11: Kirkpatrick 113)

242.    On May 5, 1998, Dr. Beavers forwarded to Dr. Mendelsohn a letter which confirmed Dr. Mendelsohn's statement that Kirkpatrick "is not totally disabled from any occupation and could, for instance, do sedentary or sit-stand work of some kind for 6 hours per day five days per week." See Kirkpatrick 0114 (NB 11). On May 11, 1998, Dr. Mendelsohn verified in writing to CORE that Judith Kirkpatrick "can do sedentary or sit-stand work, 6 hours per day, five days per week." See Kirkpatrick 0115 (NB 11).

**RESPONSE:** Plaintiffs deny the facts asserted in ¶ 242 as stated.  Plaintiffs admit that Dr.
Beavers forwarded to Dr. Mendelsohn a letter which appears to have been
filled out by Dr.  Beavers prior to it being forwarded to Dr. Mendelsohn.
Plaintiffs admit that Dr. Mendelsohn signed the form on CORE letterhead
submitted to him by Dr.  Beavers, and completed for him by Dr. Beavers,
indicating that Ms.  Kirkpatrick could do sedentary or sit-stand work, 6 hours
per day, five days per week as alleged in ¶ 242, but deny that the letter
confirms Dr. Mendelsohn's prior opinion.  See Pl. LR St. 56, ¶ ¶ 416 - 419.

243.    By this point in time, Kirkpatrick was subject to the more stringent "any occupation"
definition of total disability which governed Kirkpatrick's LTD benefits after the first twenty-four
months of LTD benefits.

**RESPONSE:** Plaintiffs admit the facts asserted  in  ¶ 243.

244.    After reviewing Kirkpatrick's continuing eligibility for LTD benefits, Dr. Beavers
concluded that Kirkpatrick should not be certified disabled from any occupation based on the fact that
"there is no objective medical substantiation of total disability."  See Kirkpatrick 0113 (NB 11).
CORE then recommended that the Plan terminate Kirkpatrick's LTD benefits.  See Kirkpatrick 0120
(NB 11).

**RESPONSE:** As to the facts alleged in ¶ 244, plaintiffs are without sufficient information to
know what Dr. Beavers reviewed concerning Ms. Kirkpatrick's eligibility for
LTD benefits.   Plaintiffs admit that Dr. Beavers recommended that Ms.
Kirkpatrick not be certified disabled from any occupation, and that his stated
rationale was "there is no objective medical substantiation of total disability,"

as he wrote in his Physician Review Note of May 5, 1998.  Plaintiffs admit that CORE then recommended that the Plan terminate Ms. Kirkpatrick's LTD benefits.

245.    By letter dated May 12, 1998, the Plan notified Kirkpatrick that it was terminating her LTD benefits because her treating physician, Dr. Mendelsohn, released her to work in a sedentary job six hours per day, five days per week effective May 11, 1998.  See Kirkpatrick 0117-0118 (NB 11). Kirkpatrick, therefore, failed to satisfy the Plan's "any occupation" disability definition.  The Plan advised Kirkpatrick that she had a right to appeal the decision and enclosed a copy of the applicable appeal procedures.  See Kirkpatrick 0117-0118 (NB 11).  Kirkpatrick's LTD benefits terminated effective June 30, 1998.  See Kirkpatrick 0123 (NB 11).

**RESPONSE:** Plaintiffs deny the facts in ¶ 245 as stated.  Ms. Kirkpatrick was notified by letter dated May 12, 1998 on CORE stationary by Dr. Beavers that her LTD benefits were being terminated, and stated as an explanation that she was not disabled as defined in the Plan, and that her treating physician, Dr. Mendelsohn, had released her to work in a sedentary job six hours per day, five days per week effective May 11, 1998.  NB 11: Kirkpatrick 117-118.  Plaintiffs deny as alleged in ¶ 245 that Ms. Kirkpatrick failed to satisfy the Plan's "any occupation" disability definition (See Pl. LR 56 St.  ¶ 425), but admits that it appeared to be CORE's position at that time.  Plaintiffs admit part of the last sentence of ¶ 245 - i.e. – that the Plan advised her of her right to appeal; however, plaintiffs lack sufficient information to know if a copy of the applicable proceedings was enclosed.

246.    On June 14, 1998, Kirkpatrick sent a letter to the Plan describing her current medical condition.  She did not provide any additional clinical information regarding her condition.  <u>See</u> Kirkpatrick 0124-0126 (NB 11).  <u>See</u> also Kirkpatrick 0128 (NB 11).

**RESPONSE:**  Plaintiffs admit the first sentence of ¶ 246, and deny the second sentence of ¶ 246.  Kirkpatrick's letter did provide additional information concerning her pain, her medications and what her doctor had told her.  See NB 11: Kirkpatrick 124-125.  See NB 11: Kirkpatrick 124-125.

247.    By letter dated August 7, 1998, the Plan notified Kirkpatrick that the Plan considered her June 14, 1998, letter to be an initial claim under the Plan.  The Plan informed Kirkpatrick that, after reviewing her initial claim, the Plan had decided to uphold the denial of LTD benefits.  <u>See</u> Kirkpatrick 0129 (NB 11).  The Plan stated that Kirkpatrick did not meet the definition of disability as defined by the Plan because "Dr. Mendelsohn released you to return to work in a sedentary job 6 hours per day, 5 days per week effective May 11, 1998."  The Plan noted that Kirkpatrick did not submit any additional clinical information for review.  <u>See</u> Kirkpatrick 0129 (NB 11).

**RESPONSE:**  Plaintiffs admit the facts alleged in ¶ 247, with the exception of the last sentence.  As to the allegation that "the Plan noted that Kirkpatrick did not submit any additional clinical information for review," Plaintiffs would admit that the Plan Benefits Services Coordinator, Mary Lee Dixon stated in that