letter that the Plan's decision to uphold the denial for LTD benefits was made "because no additional clinical information was submitted for review." However, plaintiffs deny that there was no additional clinical information contained in her letter of June 14, 1998; it contained detailed information concerning her medications and her physical problems.  NB11:Kirkpatrick-124-126.

248.    On October 6, 1998, Kirkpatrick sent a letter to the Plan Supervisor describing her current medical condition and medications.  She did not provide any additional clinical information, but did state that "on my visit with Dr. Mendelsohn in August, I showed him your letter.  He told me he had replied to CORE stating that I could not return to Champion."  See Kirkpatrick 0133-0134.[1]

**RESPONSE:**  As to the facts alleged in ¶ 248, plaintiffs admit that Ms. Kirkpatrick sent a letter to the Plan Supervisor dated October 6, 1998.  However, plaintiffs deny that she did not provide any additional clinical information.  The quote from Ms. Kirkpatrick's letter contained in ¶ 248 is accurate but incomplete.  See NB 11: Kirkpatrick 133-134.  Plaintiffs deny the fact asserted in Footnote 9 to  ¶ 248 as stated.  It is admitted that she was in the "any occupation" phase, but the relevant inquiry under the Hourly L.T.D. Plan is whether she could engage in any occupation or business  for wage or profit for which he is or becomes  reasonably qualified by training, education or experience.  NB 66: Plan 060.

---

[1] Because Kirkpatrick was in the "any occ" phase, the relevant inquiry under the Hourly LTD Plan was not whether Kirkpatrick could return to Champion, but, rather, whether Kirkpatrick could return to work at any occupation.  See Plan 0060 (NB 66).

249.    The Plan treated Kirkpatrick's October 6, 1998, letter as an appeal and notified her on

November 6, 1998, that the Plan's Claims Review Committee would review her claim for

benefits.  See Kirkpatrick 0136-0137 (NB 11).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 249.

250.    In its November 6, 1998, letter, the Plan advised Kirkpatrick that, under the terms of the

Hourly LTD Plan, "in order to receive benefits after the 30th month in which the benefits first

began (which would include six months of STD and the first twenty-four months of LTD

benefits), an individual must be totally disabled and unable to 'engage in any occupation or

business for wage or profit for which he is or becomes reasonably qualified by training,

education, or experience." See Kirkpatrick 0136 (NB 11).  The Plan also notified Kirkpatrick

that "it is important that you provide any new or additional documentation or evidence that you

are totally disabled and unable to engage in any work at all" and asked Kirkpatrick to "forward

any such documentation or evidence" to the Plan by November 25, 1998, so that it could be

included in the materials to be considered by the Plan's Claims Review Committee.  See

Kirkpatrick 0136-0137 (NB 11).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 250.

251.    In response to the Plan's invitation to submit additional information, Dr. Mendelsohn

forwarded to the Plan for inclusion in the claims record before the Committee his office notes

from July 6, 1998, and August 27, 1998.  In his July 6, 1998, office notes, Dr. Mendelsohn stated

that Kirkpatrick "would not be able to return to her previous job description at Champion that she

can only now do just mild sedentary type activities up to 6 hours a day." See Kirkpatrick 0139

(NB 11).  In his August 27, 1998, office notes, Dr. Mendelsohn stated that Kirkpatrick "is not

able to return to work at this point and will never be able to return to any heavy lifting, carrying, straining type activities such as she had at Champion." See Kirkpatrick 0140 (NB 11).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 251.

252.    Kirkpatrick also submitted to the Plan a letter dated November 30, 1998, in which she stated that "I have no formal education, do not know the first thing about computers.  I'm not dumb, but I do have a hard time consternation.  I live by myself so I do not have anyone that helps me."  See Kirkpatrick 0141 (NB 11).  Kirkpatrick did not submit any documentation relating to her vocational abilities.

**RESPONSE:** As to the facts asserted in ¶ 252, plaintiffs admit that Ms. Kirkpatrick submitted a letter to the Plan dated November 30, 1998, and admit that ¶ 252 contains a partial quote from that letter.  Plaintiffs deny that Kirkpatrick did not submit any documentation relating to her vocational abilities, inasmuch as the letter itself addresses the issue of her vocational abilities.  See NB 11: Kirkpatrick 141.

253.    The Plan then commissioned Vocational Counselor Jennifer Mikeska, MRC, to conduct a Transferable Skills Analysis ("TSA") to aid its review of Kirkpatrick's claim for continuing LTD benefits.  The Vocational Counselor evaluated Kirkpatrick's work history, education, and medical limitations.  By report dated December 8, 1998, the Vocational Counselor concluded that Kirkpatrick had transferable skills and that there were several occupational titles within Kirkpatrick's previous work field that Kirkpatrick could perform that were within her sedentary restrictions.  See 0143-0146, 0147-0166 (NB 11).

**RESPONSE:** As to the facts asserted in ¶ 253, plaintiffs deny that "the Plan" commissioned Vocational Counselor Jennifer Mikeska, MRC to conduct a TSA to aid its review

103

of Ms. Kirkpatrick's claim; rather, CORE commissioned the TSA. Further,

plaintiffs deny that the TSA was commissioned to "aid its review of Kirkpatrick's

claim for continuing LTD benefits," and believes that the TSA was in actuality

commissioned to support CORE's denial of Ms. Kirkpatrick's claim for LTD

benefits. Plaintiffs have no way of knowing what Ms. Mikeska evaluated in terms

of Ms. Kirkpatrick's work history, education, and medical limitations. Plaintiffs

admit that Ms. Mikeska listed four transferrable skills in her TSA, but deny that

Ms. Mikeska concluded that there were several occupational titles within

Kirkpatrick's previous work field that she could perform within her sedentary

restrictions. In fact, Ms. Mikeska stated "there were no sedentary occupational

titles found with the same occupational category of the two positions Ms.

Kirkpatrick held." See NB 11: Kirkpatrick 143.

254.    Prior to the Claims Review Committee's deliberations, the Plan also commissioned a Peer

Review Analysis to evaluate the previous denial of Kirkpatrick's claim for continuing LTD

benefits. See Kirkpatrick 0167 (NB 11). The Peer Review Analysis was performed by Alan

Marks, M.D., a rheumatologist. Dr. Marks reviewed the clinical documentation submitted to him

and recommended that the Plan uphold the previous denial of Kirkpatrick's claim for LTD

benefits. Dr. Marks concluded that Kirkpatrick "should be able to perform sedentary work with a

restriction of no repetitive bending or lifting." See Kirkpatrick 0167 (NB 11).

**RESPONSE:** Plaintiffs deny the facts as stated in ¶ 254. Specifically, plaintiffs deny that "the

Plan" commissioned the Peer Review Analysis, and state that CORE

commissioned the Peer Review Analysis referred to in ¶ 254. See NB 11:

Kirkpatrick 167 (CORE letterhead).  Plaintiffs have no way of knowing what Dr. Marks reviewed in performing his "Peer Review Analysis," and do not know what clinical documentation was submitted to him by CORE.  Dr. Marks, under "review data" on his case report, indicated that he reviewed "CHAM Referral Form, submitted clinical highlights." NB 11:Kirkpatrick-167. There is nothing whatsoever in Dr. Marks' Peer Review Analysis to indicate that he ever examined Ms. Kirkpatrick or spoke with her, yet, he did apparently conclude that she should be able to perform sedentary work with restrictions.  See NB 11: Kirkpatrick-167.

255.    On December 11, 1998, the Claims Review Committee met and discussed Kirkpatrick's claim for benefits.  After the Committee reviewed Kirkpatrick's file and discussed its contents, it voted to uphold the denial of Kirkpatrick's claim for LTD benefits.  See CRC 1933, 1934-1935, 1937-2106 (NB 12).[2]

**RESPONSE:** As to the facts asserted in ¶ 255, plaintiffs admit that the Claims Review Committee met on December 11, 1998.  However, plaintiffs lack sufficient information to know what the committee reviewed, and what contents of Ms. Kirkpatrick's file they discussed.  Plaintiffs admit that the CRC voted to uphold the denial of her benefits.  Plaintiffs admit the facts asserted in Footnote 10 to ¶ 248.

256.    In reaching it decision to uphold the denial of Kirkpatrick's LTD claim, the Committee relied on the following information:

---

[2]  The Chair of the Committee ordered that a copy of the documentation relative to the requests for review previously distributed to the Committee, be filed with the minutes of the meeting. See CRC 21-23, 1933, 1934-1935, 1937-2106 (NB 12).

"On 3/24/94 and 4/30/96, Dr. Mendelsohn, Ms. Kirkpatrick's doctor, stated that she could

do light sedentary work.  On 5/5/98, Dr. Beavers, of CORE, talked with Dr. Mendelsohn,

who said that there are 'no objective findings to suggest she is totally disabled and that

she could do sedentary work, 6 hours/day, 5 days/week.  On 7/6/98, Dr. Mendelsohn

stated that Ms. Kirkpatrick 'can only now do just mild sedentary type activities up to 6

hours a day."  On 8/27/98, he further stated that 'Patient is not able to return to work at

this point and will never be able to return to any heavy lifting, carrying, straining type

activities such as she had at Champion. A Transferable Skills analysis identified various

other job she could perform."

See CRC 0705 (NB 12).

> **RESPONSE:** As to the facts alleged in ¶ 256, plaintiffs admit that the quote in ¶ 256 is
>
> taken from the minutes of the Claims Review Committee meeting of
>
> December 11, 1998.  However, plaintiffs lack sufficient information to
>
> know what the committee relied on in reaching its decision. and deny the
>
> facts asserted in this paragraph for lack of first hand information.

257.    On January 29, 1999, the Plan notified Kirkpatrick that the Claims Review

Committee had denied her claim for continuing LTD benefits.  See Kirkpatrick 0286-0287 (NB

12).

> **RESPONSE:** The facts alleged in ¶ 257 are not found in NB 12 as defendants assert, but
>
> rather NB 11: Kirkpatrick 286-287.  Plaintiffs admit that by letter dated

January 29, 1999, the Plan notified Ms. Kirkpatrick that the Claims

Review Committee had denied her claim for continuing LTD benefits.

258.    On February 2, 2001, which was over two years after the Plan denied Kirkpatrick's appeal, Kirkpatrick's legal counsel requested the Plan to "reconsider[] . . . the decision to deny [Kirkpatrick's] benefits." See Kirkpatrick 0168 (NB 31). Kirkpatrick's counsel submitted medical and other information to International Paper which they alleged supported Kirkpatrick's claim for LTD benefits. See Kirkpatrick 0168-0284 (NB 31).

**RESPONSE:**  Plaintiffs deny the facts asserted in ¶ 258 as stated. Plaintiffs admit that

Kirkpatrick's counsel requested reconsideration on Feb. 2, 2001, and while

this may have been more than two (2) years after the CRC upheld the

denial, it was less than two (2) years from the time plaintiff's counsel

received notice of the denial. See NB 12: Kirkpatrick 286-287. Plaintiffs

admit that because in denying Ms. Kirkpatrick's continued long term

disability benefits, the Plaintiff failed to consider the objective medical

evidence; failed to consider chronic pain; failed to consider all the

evidence; and placed inordinate weight on the evidence supporting the

denial, Plaintiff's counsel submitted medical records and other objective

information and documentation so that Ms. Kirkpatrick's claim could be

reviewed objectively and in its entirety. (NB:11, NB: 12).

## Lois L. Lynn's Claim for Benefits

107

259.    Plaintiff Lois L. Lynn ("Lynn") worked as a salaried employee at Champion International's facility in Canton, North Carolina.  Her date of hire was February 1, 1977, and her last day of active employment was December 31, 1991.  See Lynn 0358 (NB 13).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 259.

260.    The last position Lynn held with Champion International prior to qualifying for disability benefits was that of an Executive Secretary.  See Lynn 0357 (NB 13).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 260.

261.    Between January 1, 1992, and June 29, 1992, Lynn received short-term disability benefits from Champion International.  See Lynn 0358 (NB 13).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 261.

262.    As a Champion employee, Lynn was eligible to apply for long-term disability income ("LTD") benefits under the Salaried LTD Plan.

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 262.

263.    Lynn applied for LTD benefits and described her condition as "bronchiectasis with recurrent, drug resistant infections."  See Lynn 0356 (NB 13).  See also Lynn 0184 (June 22, 1992, attending physician statement diagnosing Lynn with "bronchiectasis, bilaterally productive since childhood, status post resection left lower lobe and right middle lobe of lung, chronic bronchitis, and chronic peptic ulcer disease"), 0183 & 0185 (correspondence from treating physician)(NB13).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 263.

264.    On August 26, 1992, the Plan notified Lynn that it had approved her application for LTD benefits, effective August 23, 1992.  See Lynn 0361 (NB 13).  The Plan advised Lynn

that her "LTD benefits may continue for 24 months provided you are wholly and continuously disabled and are unable to perform each and every duty of your job." See Lynn 0361-0362 (NB 13). The Plan also informed Lynn that:

> "[a]fter the first 24 months, benefits will continue up to your retirement date only if you are under the regular care of a licensed and qualified physician and are unable to work at any job, within the Company or elsewhere, for which you are reasonably qualified by your education, training, or experience."

See Lynn 0361 (NB 13).[3]

> **RESPONSE:** As to the facts asserted in ¶ 264, plaintiffs deny that the Plan notified Ms. Lynn that her LTD benefits were effective August 23, 1992. The remaining facts asserted in ¶ 264 are admitted. NB 13: Lynn 361.

265.    Pursuant to the terms of the Salaried LTD Plan, Lynn's right to continuing LTD benefits depended on certification of Lynn's continuing disability, and the Plan continued to evaluate Lynn's claims on a periodic basis. See Lynn 0190-196, 0197-0216, 0277-0290, 0328-0339, 0340-0348, 0365-0368, 0370-371, 0429, 0478-0485 (NB 13).

> **RESPONSE:** As to the facts asserted in ¶ 265, plaintiffs state that under the terms of the Plan, "Upon the request of the Plan Supervisor, the Participant may be required to submit to an examination by a Physician selected by the Plan Supervisor when and as often as it may reasonably require". (NB 66: Plan-19).  Plaintiffs further state

---

[3] The Plan estimated Lynn's net monthly benefit from the Salaried LTD Plan to be $912.51. See Boone 0361 (NB 13). This benefit calculation included an estimated Social Security benefit offset of $984.00. See Lynn 0361-363 (NB 13). The Social Security Administration initially denied Lynn's claim, but, upon reconsideration, granted her monthly benefits in the amount of $931.00. See Lynn 0349-0350, 0189 (NB 13). Lynn's net monthly LTD benefit then was adjusted to $978.51, through the date of her normal retirement on August 1, 2001. See Lynn 0424-0427 (NB 13).

that subsequent to the Plan's first notification to Ms. Lynn dated

August 26, 1992 that it had approved her application for benefits

under the Long Term Disability Plan, and for the next five

consecutive years, the Plan periodically reviewed Ms. Lynn's claim

and consistently and continuously determined that Ms. Lynn was

"wholly and continuously disabled" and, accordingly, met the

Plan's definition of disability under both the own occupation and

more restrictive any occupation standard. NB 13: Lynn 361.

266.    On June 17, 1997, and August 1, 1997, Champion's Disability Management

Program requested additional personal profile and medical information from Lynn to facilitate

the Plan's periodic review of Lynn's claim for continuing LTD benefits.  See Lynn 0375-0377

(NB 13).

> **RESPONSE:**  As to the facts asserted in ¶ 266, plaintiffs state that on June 17, 1997,
>
> CORE requested personal profile and medical information from Ms. Lynn,
>
> and on August 1, 1997, CORE requested Ms. Lynn to provide an
>
> authorization for release of information, allegedly to facilitate periodic
>
> review of Ms. Lynn's claim for continuing LTD benefits. NB 13: Lynn
>
> 375-377.

267.    By this time, Lynn was in the more stringent "any occ" period as defined by the

Salaried LTD Plan.

> **RESPONSE:**  As to the facts asserted in ¶ 267, plaintiffs admit that as of June, 1997, the
>
> Plan had certified for approximately three years that Ms. Lynn was totally

110

disabled under the more stringent any occupation definition as defined by the Plan.

268.     In response, Lynn submitted a Personal Profile Evaluation dated July 16, 1997, describing her present physical complaints and limitations as "frequent respiratory infections requiring antibiotics and bed rest; chronic fatigue, shortness of breath." See Lynn 0213-0216 (NB 13).  Lynn indicated that her daily activities consisted of the following:

> "When I do not have an active infection I am able to do light housework, some shopping, and limited visiting with friends and family.  I continue at least 30 minutes of walking on a flat surface at least 12 times a month for exercise.  Most of my time is spent reading and crocheting."

See Lynn 0213 (NB 13).  In this evaluation, Lynn answered that she did not expect to return to either her last occupation or any occupation.  See Lynn 0215 (NB 13).

**RESPONSE:** As to the facts asserted in ¶ 268, plaintiffs admit that while factually accurate, it is an incomplete summary of Ms. Lynn's July 16, 1997 Personal Profile Evaluation because defendants selectively referenced portions of  Ms. Lynn's statement, taken out of context and as such significantly alter its interpretation. Plaintiffs state that Ms. Lynn's Personal Profile Evaluation viewed in its entirety is the best evidence of its content. NB 13: Lynn 213.

269.     Lynn also submitted an Attending Physician Statement from Robert Boerner, M.D., who failed to complete the restrictions and limitations part of the Statement and merely noted "pt 100% disabled due to lung disease." See Lynn 0514 (NB 13).  Lynn also submitted an incomplete Physician's Report of Physical Capacity from Dr. Boerner that only noted "patient

111

100% disabled due to lung disease" in the margin and failed to provide any of the requested physical capacity information.  See Lynn 0217-0218 (NB 13).

> **RESPONSE:** As to the facts asserted in ¶ 269, plaintiffs admit that the referenced Attending Physician Statement and Physician's Report of Physical Capacity from Robert Boerner state, "Pt 100% disabled due to lung disease." (NB 13: Lynn 217-218).

270.    On August 26, 1997, CORE requested Dr. Boerner to send to the Plan "the last six months of office notes, including test results and consultations."  See Lynn 0381 (NB 13).  In response, Dr. Boerner forwarded his office notes dated December 11, 1996 and June 25, 1997. See Lynn 0384-0385 (NB 13).  According to Dr. Boerner's June 25, 1997, office note, Lynn was stable, had little wheezing, had a clear sinus drain, and a cough.  See Lynn 0384 (NB 13).

> **RESPONSE:** As to the facts asserted in ¶ 270, plaintiffs admit that Dr. Boerner sent the referenced office notes to CORE. As to the remaining facts asserted in ¶ 270,  Plaintiffs state that while factually accurate, it is an incomplete summary of Dr. Boerner's June 25, 1997 office note because defendants selectively reference portions of Dr. Boerner's June 25, 1997 office note which are taken out of context and as such significantly alter its interpretation. Plaintiffs state that Dr. Boerner's office note viewed in its entirety is the best evidence of its content. (NB 13: Lynn 383-385).

271.    On September 8, 1997, while reviewing Lynn's continuing entitlement to LTD benefits under the "any occupation" definition of disability, Dr. Beavers, the Medical Director for

Champion's Disability Management Program, spoke with Dr. Boerner and Lynn's primary care physician, Dr. Freeman.  Dr. Beavers noted:

> "According to Dr. Boerner, her pulmonologist, he <u>Sees</u> her twice a year and she doesn't look that sick when he <u>Sees</u> her, though she complains of frequent upper respiratory infections.  When asked about disability he was very reluctant to give an opinion saying that he can't comment and hasn't been looking at her from that point of view.  He suggested I talk to her primary care physician, Dr. Nancy Freeman.  Dr. Freeman said she has no true disabling condition and can do sedentary work.  She has takes [sic] antibiotics when she gets infections but her pulmonary function has been stable.  Her pulmonary impairment was described as a moderate obstruction."

<u>See</u> Lynn 0219 (NB 13).  Based on this information, Dr. Beavers recommended that the Plan not certify Lynn's claim for continuing disability benefits because "neither physician is supporting her claim.  Her pulmonary function impairment does not suggest disability from any occupation.  There is no subjective data that suggests she is disabled from any occupation."  <u>See</u> Lynn 0219 (NB 13).

> **RESPONSE:** As to the facts asserted in ¶ 271, plaintiffs admit that the claims file contains a document apparently generated by Dr. Beavers of CORE wherein he indicates that he spoke with Dr. Boerner and Dr. Freeman on September 9, 1997. It is denied that Dr. Boerner made the statement attributed to him by Dr. Beavers since it directly contradicts Dr. Boerner's Physician's Report of Physical Capacity completed just weeks earlier in which he states that Ms. Lynn is "100% disabled due to lung disease." NB 13: Lynn 217.

272.    CORE then contacted Dr. Freeman, Lynn's primary care physician, and requested that she complete a Modification Checklist outlining Lynn's current work capacity.  <u>See</u> Lynn

113

0379-0380 (NB 13).  Dr. Freeman responded on September 10, 1997, and verified that Lynn

could return to work with modifications on September 11, 1997.  See Lynn 0225 (NB 13).  Dr.

Freeman certified that Lynn could work 6-8 hours per day, 5 days per week, with a modification

of "sedentary job only."  Dr. Freeman gave Lynn lifting restrictions of paper work only, walking

restrictions of "for personal needs only," sitting restrictions of 6-8 hours, and standing restrictions

of 15-20 minutes at a time. See Lynn 0225 (NB 13).  Dr. Freeman noted that Lynn could not

work in an area with high humidity or dust.  See Lynn 0225 (NB 13).  Dr. Freeman provided no

restrictions to Lynn's use of her upper or lower extremities.  See Lynn 0225 (NB 13).

> **RESPONSE:** As to the facts asserted in ¶ 272, plaintiffs admit Dr. Freeman's
>
> documentation is accurately stated; however, plaintiffs state that Dr.
>
> Freeman did not treat Mr. Lynn for her disabling condition and therefore
>
> did not know Ms. Lynn's restrictions and limitations related to her
>
> bronchiectasis. NB 13: Lynn 410-411.

273.    On January 19, 1998, the Plan notified Lynn that it was terminating her LTD

benefits.  The Plan informed Lynn that she "was not disabled as defined in the Plan" because "Dr.

Nancy Freeman has released you to work 6-8 hours per day at a sedentary job."  See Lynn 0226-

0227 (NB 13).  The Plan notified Lynn of her right to appeal the decision and enclosed a copy of

the Appeal Rights & Process.  See Lynn 0027 (NB 13).

> **RESPONSE:** As to the facts asserted in ¶ 273, plaintiffs state that the referenced
>
> correspondence to Ms. Lynn was on CORE letterhead and signed by J.D.
>
> Beaver, M..D. NB 13: Lynn 226-227.

274.    On January 20, 1998, Lynn wrote to Dr. Freeman advising her that Champion

International was terminating her LTD benefits on Dr. Freeman's recommendation that Lynn was

able to return to work.  Lynn asked Dr. Freeman to reconsider that recommendation.  She stated

in her letter to Dr. Freeman that, "since you [Freeman] do not treat my primary problems, I feel

that perhaps you were a little premature with your determination."  See Lynn 0410-0411 (NB 13).

> **RESPONSE:** As to the facts asserted in ¶ 274, plaintiffs state that while factually
>
> accurate, it is an incomplete summary of Ms. Lynn's January 20, 1998
>
> letter to Dr. Nancy Freeman because Defendants selectively reference
>
> portions of Ms. Lynn's January 20, 1998 letter which are taken out of
>
> context and significantly alter its interpretation. Plaintiffs state that Ms.
>
> Lynn's January 20, 1998 letter viewed in its entirety is the best evidence of
>
> its content. NB 13: 410-411.

275.    On February 17, 1998, Lynn requested a review of the Plan's decision to

discontinue her LTD benefits.  Lynn enclosed a letter from her current pulmonary doctor, Harry

J. Lipham, M.D., dated February 3, 1998, which advised Lynn that he had reviewed her history

and exam, gone over her lung functioning tests, and chest x-rays, etc. and finds that she has a

"significant degree of bronchiectasis with frequent and recurrent infections that are inadequately

controlled and serve as an ongoing source of disability."  See Lynn 0460-0462 (NB 13).  Dr.

Lipham further opined that "the exposure of the person [with bronchiectasis] in the workplace to

ambient viruses causes progression of their bronchiectasis disease and thus someone with your

degree of bronchiectasis should be disabled to prevent progression of their disease."  See Lynn

0462 (NB 13). Lynn had just begun Seeing Dr. Lipham, so there were no supporting physician

notes enclosed. See Lynn 0462 (NB 13).

      **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 275.

      276.    On April 7, 1998, the Plan notified Lynn that it had scheduled her for an

Independent Medical Examination ("IME") with James McCarrick, M.D., a pulmonary medicine

specialist. The IME was scheduled for May 5, 1998. See Lynn 0397 (NB 13).

      **RESPONSE:** As to the facts asserted in ¶ 276, plaintiffs admit that UNIVAL informed

                Ms. Lynn that pursuant to a request from CORE, it had scheduled an

                appointment for Ms. Lynn for an alleged Independant Medical

                Examination with James McCarrick, M.D. NB 13: Lynn 397.

      277.    Dr. McCarrick reviewed Lynn's medical records and, on May 5, 1998, conducted

an IME of Lynn. See Lynn 00465-0476 (NB 13). According to Dr. McCarrick, Lynn "related at

this time she experiences shortness of breath with any incline. She does, however, perform

gardening tasks and can walk on flat surfaces ad lib." See Lynn 0465 (NB 13). Dr. McCarrick

further noted:

> "She has a cough productive [sic] occasional yellowish or white phlegm. She was
> recently placed on cycling antibiotics by Dr. Harry Lipham of Waynesville, utilizing
> ciprofloxacin and bactrim for the first ten days of each month. Since that time three and a
> half months ago, she has not sustained any further lung infections and is actually feeling
> better."

See Lynn 0466 (NB 13). From this examination and history, Dr. McCarrick stated that:

> "[i]t is my impression that the patient does have clinically significant bronchiectasis.
> Clearly, this is a progressive disease which has a progressive nature to it. Although her
> symptoms are not consistent with typical items that we search for assessing impairment
> such as pulmonary function studies and general performance, it should be commented
> that she is at increased risk for developing infections on exposure to various populations.

These infections could be potentially significant in her case, and it is likely that she would require more antibiotic care and increased hospitalization is she had them."

See Lynn 0468 (NB 13).  From this impression, Dr. McCarrick ultimately concluded "I am unable to determine any other factors which would preclude her from going to work."  See Lynn 0468 (NB 13).[4]  See also Lynn 0320 (NB 13).

> **RESPONSE:** As to the facts asserted in ¶ 277, plaintiffs state that while factually accurate, it is an incomplete summary of Dr. McCarrick's report because defendants selectively reference portions of Dr. McCarrick's IME report which are taken out of context and significantly alter its interpretation. Plaintiffs state that Dr. McCarrick's IME report viewed in its entirety is the best evidence of its content. NB 13: Lynn 465-468.

278.    On May 26, 1998, the Plan asked Dr. McCarrick to clarify the results of his IME.  See Lynn 0413 (NB 13).  In response, Dr. McCarrick verified that Lynn was not at a significantly higher risk of infection from working in a sedentary job than she is from her usual daily activities.  He confirmed that Lynn is able to work at least six hours per day, five days per week in a sedentary capacity.  See Lynn 0321 (NB 13).

> **RESPONSE:** As to the facts asserted in ¶ 278, plaintiffs state that Dr. McCarrick submitted a Modification Checklist to Unival in which regarding hourly modifications he stated, "Unknown. Not **...** with assessing functional

---

[4] Prior to the IME, the Plan requested Dr. McCarrick to "examine the patient with special attention to the condition of 'bronchiectasis' and any other complaints the patient has within your specialty."  The Plan advised Dr. McCarrick that the purpose of the IME was to "determine if the patient is medically ABLE OR NOT ABLE to perform the essential duties required by ANY OCCUPATION."  See Lynn 0398 (NB 13).

status". NB 13: Lynn 320. However, plaintiffs further state that within a week of completing the Modification Checklist in which he stated that he could not assess Ms. Lynn's functional status, and in response to Unival's request dated May 6, 1998, Dr. McCarrick completed an IME Addendum Form on which he stated that Ms. Lynn was able to work at least six hours per day, five days per week in a sedentary capacity. Regarding footnote 13 of ¶ 278, Plaintiffs admit that in its April 7, 1998 correspondence addressed to Dr. McCarrick, Unival inaccurately stated the Plan's definition of total disability by stating, "The plan language defines Total Disability as the "inability to engage in ANY occupation or business."  NB 13: Lynn 321, 398.

279.     CORE also commissioned Jennifer Mikeska, MRC, to perform a Transferable Skills Analysis ("TSA") of Lynn.  The purpose of the TSA was to evaluate Lynn's education and work history to determine if Lynn had transferable skills given the restrictions defined by Dr. Freeman and Dr. McCarrick.  The TSA revealed that Lynn had transferable skills and that, even given her medical restrictions, could perform numerous jobs.  See Lynn 0322-0323 (NB 13).

**RESPONSE:** As to the facts asserted in ¶ 279, plaintiffs admit that CORE commissioned Ms. Mikeska to perform a Transferable Skills Analysis regarding Ms. Lynn. However, plaintiffs state that the Transferable Skills Analysis was flawed and inaccurate in that the jobs Ms. Mikeska identified for Ms. Lynn were inappropriate and should not have been recommended

given her education, training, and experience, as well as her limitations

and restrictions. (NB 32: Lynn 148-149).

280.    On June 10, 1998, CORE recommended "upholding the previous denial of LTD

benefits based on the TSA and the IME physician's statement that he believes the employee is

able to work at least 6 hours per day, 5 days per week in a sedentary capacity." <u>See</u> Lynn 0233

(NB 13).  CORE noted Dr. Freeman's initial determination that Lynn was able to return to work

6-8 hours per day, 5 days per week and Dr. McCarrick's concurrence with that assessment during

his IME of Lynn.  <u>See</u> Lynn 0231-0233 (NB 13).

     **RESPONSE:**  Plaintiffs deny the facts asserted in ¶ 280. (NB  13: Lynn 253; NB 32:

            Lynn 148-149).

281.    On July 7, 1998, the Plan advised Lynn that the Plan was treating her February 17,

1998, letter as an initial claim under ERISA and further advised Lynn that, "[b]ased on the

review by CORE, our decision is to uphold the denial of LTD benefits." <u>See</u> Lynn 0236-0238

(NB 13).  The Plan informed Lynn that the Plan

    "reviewed the documentation provided by you from Dr. Harry Lipham.  As a result of this
    information you were sent for an Independent Medical Exam on 5/5/98 with Dr. James
    McCarrick.  Dr. McCarrick states 'that you do have a clinically significant degree of
    bronchiectasis.'  However, it is of his opinion that you are able to work at least 6 hours
    per day, 5 days per week in a sedentary capacity.  Therefore, you do not meet the
    definition of disability as defined in the Plan."

<u>See</u> Lynn 0236 (NB 13).  The Plan also advised Lynn of her rights to obtain further review of her

claim.  <u>See</u> Lynn 0237 (NB 13).

     **RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 281.

282.    On July 23, 1998, Lynn appealed the denial of her claim for continuing LTD benefits.  She "enclosed copies of documents previously sent to Ms. Dixon," but did not provide any additional clinical information in support of her appeal.  See Lynn 0457-0459 (NB 13).

> **RESPONSE:** As to the facts asserted in ¶ 282, plaintiffs state that while factually accurate, it is an incomplete summary of Ms. Lynn's July 23, 1998 letter because Defendants referenced only portions of Ms. Lynn's July 23, 1998 letter which were selective in nature, taken out of context and as such significantly alters its interpretation. Plaintiffs state that Ms. Lynn's letter viewed in its entirety is the best evidence of its content. (NB 13: Lynn 457-459).

283.    On August 3, 1998, the Plan notified Lynn that the Plan's Claims Review Committee would consider her appeal at its September 24, 1998, meeting.  See Lynn 0489-0490 (NB 13).  The Plan advised Lynn that the Committee's review of her claim would constitute her last appeal and would be "final and binding."  The Plan invited Lynn to submit any additional documentation to support her claim that she is totally disabled and cannot engage in any work at all.  See Lynn 0489-0490 (NB 13).

    **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 283.

284.    On August 17, 1998, Lynn sent a letter to the Plan, and an August 11, 1998, statement from her physician, Harry Lipham, M.D., in which he reported that

> "Lois Lynn has 'a significant degree of bronchiectasis with frequent and recurrent infections that are inadequately controlled and serve as an ongoing source of disability. In addition, the exposure of the person in the work place to ambient viruses causes progression of their bronchiectasis disease and thus someone with your degree of bronchiectasis should be disabled to prevent progression of their disease."

Lynn 0245 (NB 13).  Lynn also attached medical documentation from Dr. Hapke that had

previously been provided to the Salaried LTD Plan.

     **RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 284.

     285.    Lynn also submitted an August 24, 1998, statement signed by Dr. McCarrick in

which he stated that he had been "misquoted in Mary Lynn Dixon's letter to Lois Lynn on July 7,

1998."  According to Dr. McCarrick, he "did not say Lois Lynn could 'work 6 hours per day, 5

days per week in a sedentary capacity.'"  <u>See</u> Lynn 0491-0492 (NB 13).

     **RESPONSE:**  As to the facts asserted in ¶ 285, plaintiffs state that while factually

               accurate, it is an incomplete summary of Dr. McCarrick's August 24, 1998

               statement because defendants selectively referenced portions of Dr.

               McCarrick's August 24, 1998 statement which were taken out of context

               and significantly alter its interpretation. Plaintiffs state that Dr.

               McCarrick's August 24, 1998 statement viewed in its entirety is the best

               evidence of its content. NB 13: Lynn 492.

     286.    On September 24, 1998, the Claims Review Committee discussed Lynn's appeal

of the denial of her claim for LTD benefits.  After the Committee reviewed Lynn's file and

discussed its contents, it voted to "table its decision pending receipt of a report from CORE

resolving contradictions in the statements from Dr. McCarrick, the Independent Medical

Evaluator."  <u>See</u> CRC 0706 (NB 14).[5]

---

    [5]  The Chair of the Committee "ordered that a copy of the documents relative to the requests
for review previously distributed to the Committee, as well as Transferable Skills Analyses brought
to the meeting, be filed with the minutes of the meeting."  <u>See</u> CRC 0704, 1211-1345 (NB 14).

**RESPONSE:** Plaintiffs deny the facts asserted in ¶ 286.

287.    Dr. Beavers then contacted Dr. McCarrick by telephone on October 1, 1998, and reported that "Dr. McCarrick says that he has not changed the opinion he expressed on his IME and follow-up letters.  That opinion is that she is not totally disabled.  He has told her this frankly."  See Lynn 0156 (NB 13).  See also Lynn 0176 (NB 13).

> **RESPONSE:** As to the facts asserted in ¶ 287, plaintiffs admit that the claims file
>
> contains a document apparently generated by Dr. Beavers of CORE dated
>
> October 1, 1998 wherein he indicates that he spoke with Dr. McCerrick
>
> [sic] who allegedly says that in his opinion Ms. Lynn is not totally
>
> disabled.  However, the referenced note directly contradicts Dr.
>
> McCarrick's August 24, 1998 written statement. (NB 13: Lynn 492).

288.    The Plan then asked CORE to verify in writing whether Dr. McCarrick wished to retract his August 24, 1998, statement in light of his October 1, 1998, conversation with Dr. Beavers during which Dr. McCarrick stated that Lynn was not totally disabled.  See Lynn 0158-0160 (NB 13).

**RESPONSE:** Plaintiffs deny the facts asserted in ¶ 288.

289.    In response to CORE's inquiry, Dr. McCarrick again confirmed, in writing, that Lynn "can" work at least 6 hours per day, 5 days per week in a sedentary capacity.  See CRC 1298-1299 (NB 14).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 289.

290.    At its November 13, 1998, meeting, the Claims Review Committee again discussed Lynn's claim for LTD benefits.  See CRC 1346-1348 (NB 14).  After the Committee

reviewed Lynn's file, discussed its contents, and verified that Dr. McCarrick's apparent

contradictions were clarified, it voted to uphold the denial of Lynn's claim.  See CRC 1346-1347

(NB 14).

> **RESPONSE:** As to the facts asserted in ¶ 290, plaintiffs admit that the Committee
>
> discussed Ms. Lynn's claim; however, the Committee was operating under
>
> a conflict of interest in that all Committee members were Champion
>
> employees, were aware that there were significant cost savings associated
>
> with upholding the denial of benefits, thereby providing significant
>
> monetary gain for their employer, Champion.  Accordingly, the Claims
>
> Review Committee failed to consider the objective medical evidence;
>
> failed to consider all of the evidence; and placed inordinate weight to the
>
> evidence supporting the denial. NB 9: CRC 508-680.

291.    In deciding to deny Lynn's appeal and deny her claim for LTD benefits, the

Committee relied on the following information:

> "On 9/9/97, Dr. Beavers from CORE had a conversation with Dr. Freeman, Ms. Lynn's
> primary care doctor.  Dr. Freeman stated that Ms. Lynn "has no truly disabling condition
> and could do sedentary work."  Her pulmonary impairment was described as a moderate
> obstruction.
>
> An Independent Medical Examination dated 5/5/98 performed by Dr. McCarrick, a
> pulmonologist, indicated that Ms. Lynn has clinically significant bronchiectasis, but he
> was unable to determine any other factors which would preclude her from going to work.
> An IME Addendum Form dated 5/26/98 stated that she is not at a higher risk of infection
> from working in a sedentary job and that she could return to work for at least 6 hours per
> day, 5 days per week in a sedentary capacity.  The letter from Dr. McCarrick dated
> 8/24/98 caused the Committee to table its decision pending a definitive statement relative
> to her employability.  CORE received a statement from Dr. McCarrick that Ms. Lynn can
> work at least 6  hours per day, 5 days per week in a sedentary capacity.

A Transferable skills analysis identified various jobs that Ms. Lynn might perform."

See Lynn 1347-1348 (NB 14)

> **RESPONSE:** As to the facts asserted in ¶ 291, plaintiffs admit that the Committee
> discussed Ms. Lynn's claim; however, the Committee was operating under
> a conflict of interest in that all Committee members were Champion
> employees, were aware that there were significant cost savings associated
> with upholding the denial of benefits, thereby providing significant
> monetary gain for their employer, Champion.  Accordingly, the Claims
> Review Committee failed to consider the objective medical evidence;
> failed to consider chronic pain; failed to consider all of the evidence; and
> placed inordinate weight to the evidence supporting the denial. (NB 9:
> CRC 508-680).

292.    On November 30, 1998, the Plan notified Lynn that the Claims Review

Committee met on November 13, 1998, to consider the appeal of her denial of benefits under the

Salaried LTD Plan and had concluded that the denial of benefits should be upheld.  See Lynn

0151-0152 (NB 14).

> **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 292.

293.    On September 10, 1999, approximately nine months after the final denial of

Lynn's claim, Lynn's current legal counsel notified Champion International that they had been

retained by Lynn concerning her claim for LTD Benefits.  They requested Lynn's claims file and

copies of the plan documents.  See Lynn 0445 (NB 32).

> **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 293.

294.    The Plan and Champion International complied with Lynn's counsel's request for information.  See Lynn 0443, 0440, 0437-0438 (NB 32).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 294.

295.    On December 28, 2000, which was more than two years after the final claims denial and more than one year after the Plan and Champion International complied with Lynn's counsel's request for information, Lynn's counsel requested the Plan to "reconsider[] . . . the decision to terminate [Lynn's] benefits."  See Lynn 0132 (NB 32).  Lynn's counsel submitted to International Paper medical and other information they alleged supported Lynn's claim for benefits.  See Lynn 0132-0150, 0556, 0561-1043 (NB 32).

**RESPONSE:** As to the facts asserted in ¶ 295, plaintiffs state that because in denying Ms. Lynn's continued long term disability benefits the Plan failed to consider the objective medical evidence; failed to consider all of the evidence; and placed inordinate weight to the evidence supporting the denial, Plaintiffs' counsel submitted medical records and other objective information and documentation so that the Plan could conduct a full and fair review of Ms. Lynn's claim. (NB 32: Lynn 132-1043).

### Celia Metcalf's Claim for Benefits

296.    Plaintiff Celia D. Metcalf ("Metcalf") worked as an hourly employee at Champion International's facility in Canton, North Carolina.  Her hire date was April 23, 1979, and her last day of active employment was April 13, 1997.  See Metcalf 0006, 0026 (NB 15).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 296.

297.    The last position Metcalf held with Champion prior to qualifying for short-term disability benefits was rewinder assistant.  See Metcalf 0038 (NB 15).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 297.

298.    Metcalf received short-term disability benefits under Champion International's Short-Term Disability Plan from April 16, 1997, until October 12, 1997.  See Metcalf 0003 (NB 15).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 298.

299.    As a Champion International employee, Metcalf was eligible to apply for LTD benefits under the Hourly LTD Plan.

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 299.

300.    On October 8, 1997, Champion's Disability Management Program notified Metcalf that she might be eligible for LTD benefits and requested that she provide certain information to CORE as soon as possible "to avoid delays or interruptions in your benefit."  See Metcalf 0017 (NB 15).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 300.

301.    On October 9, 1997, Metcalf submitted a Disability Request Form on which she stated that she was filing for a "temporary disability" and described condition as a "heal spur."  See Metcalf 0018 (NB 15).

**RESPONSE:**  Plaintiffs deny the facts asserted in ¶ 301.  The document to which defendants cite  in support of the facts alleged therein is a "Disability Request Form."  The form is unsigned and does not appear to have been filled out in Celia Darlene Metcalf's handwriting, when one compares the

126

handwriting on that form (NB 15: Metcalf 18) with another form

completed and signed by Darlene C. Metcalf (NB 15: Metcalf 26-27).

302.    Metcalf also submitted a Personal Profile Evaluation dated October 12, 1997,

wherein she described her complaints as:

> "neck and shoulder pain going into the arms and hands, degenerative disc disease phase II, lumbar pain, fibromyalgia (1979), depression because of constant pain, osteoporosis [sic](Jan 08, 1997), broken wrist (Dec. 7, 1996), compressed fractures in neck T2 T3 (Jan 08, 1997), surgery on heel spur . . . heel spur, right foot. Plantar fascia—surgery on both feet 4-13-97 and 5-1-97, bulging disc –L4 L5. Pain in both feet, left hip, shoulders and neck. Have trouble standing, climbing steps . . . ."

See Metcalf 0020 (NB 15). Metcalf stated that she did not need any special care of her personal

needs "other than taking extra time in doing things." See Metcalf 0020 (NB 15). Metcalf also

confirmed on this evaluation that "I have been released to go back to work by Dr. Osbahr but

Gerald Ray says he cannot meet my restrictions 1. No lift > 45 lbs. no overhead > 35 lbs 2.carry

40 lbs. 3. push/pull 65 lbs." See Metcalf 0022 (NB 15).

**RESPONSE:** As to the facts alleged in ¶ 302, plaintiffs admit that Ms. Metcalf

submitted a Personal Profile Evaluation dated October 12, 1997 (See NB

15: Metcalf 20-23). However, the quote in defendant's ¶ 302 wherein Ms.

Metcalf described her complaints is somewhat incomplete. Moreover, the

statement that "Metcalf stated that she did not need any special care of her

personal needs 'other than taking extra time in doing things' "

mischaracterizes Ms. Metcalf's response in that it fails to fully and fairly

report Ms. Metcalf's response. Plaintiffs admit that the last sentence in ¶

127

302 is an accurate quote of a portion of Ms. Metcalf's response on the

third page of her Personal Profile Evaluation. NB 15: Metcalf 22.

303.    Metcalf also submitted an Employee Statement dated October 21, 1997, See

Metcalf 0026-0029 (NB 15), and a Physician's Report of Physical Capacity from Al Osbahr,

M.D., dated October 17, 1997.  See Metcalf 0024-0025 (NB 15).  According to Dr. Osbahr's

Physician's Report of Physical Capacity, Metcalf had certain restrictions related to bending over,

twisting, reaching above shoulder level (overhead limit 35 lbs), and lifting (no more than 25 lbs

continually and 26-50 lbs 33-66% of the time), but could work seven to eight hours per day.  See

Metcalf 0025 (NB 15).

**RESPONSE:** Plaintiffs admit the facts asserted in the first sentence of ¶ 303.  As to the

facts asserted in the second sentence of ¶ 303 concerning Dr. Osbahr's

Physician's Report of Physical Capacity, plaintiffs admit that the second

sentence is an accurate but incomplete report of Dr. Osbahr's

recommendations.  It fails to state that Dr. Osbahr indicated it was

"unclear" when he anticipated releasing the patient to full time work

activity.  It fails to report that Dr. Osbahr suggested that Ms. Metcalf

become involved in physical therapy, a work hardening program, and

psychological counseling. It fails to report that Dr. Osbahr had referred

this patient to another doctor for additional medical testing/evaluation.

NB 15: Metcalf 25.

304.    Metcalf also submitted a November 5, 1997, Attending Physician's Statement

from Dr. Osbahr in which he noted that Metcalf had an MRI performed in 1997 demonstrating a

compressed fracture of the T2 and T3, suffered from osteoporosis, a lumbar disc bulging and a heel spur.  See Metcalf 0031 (NB 15).  Dr. Osbahr stated that Ms. Metcalf was disabled from her own occupation but was not totally disabled from any occupation.  See Metcalf 0032 (NB 15).

     **RESPONSE:**  Plaintiffs admit the facts as alleged in ¶ 304.

     305.    On November 19, 1997, the Plan notified Metcalf that her claim for LTD benefits had been approved.  The Plan advised Metcalf that to "qualify for the first 24 months of Long Term Disability benefits, you must be under the regular care of a physician and your physician must certify that you are unable to perform any part of your regular job" – the "own occupation" phase.  See Metcalf 0036 (NB 15).  The Plan also advised Metcalf that "in order for your Long Term Disability benefits to continue beyond 24 months, you must be considered totally and permanently disabled.  This means you are unable to do any job for which you are reasonably qualified by your training, education, and experience" – the "any occupation" phase.  See Metcalf 0036 (NB 15).  See also Metcalf 0035 (CORE's recommendation that Metcalf's claim for LTD benefits be approved)(NB 15).

     **RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 305, except to note that the notice came on CORE letterhead.  (The Plan notified Metcalf vs. CORE notified Metcalf.  The letter came from Carol Bishop, Champion Disability Management Program, but was on CORE letterhead.)  NB 15: Metcalf 36.

     306.    On September 24, 1998, Dr. Beavers, the Medical Director of the Champion International Disability Management Program, spoke by telephone with Steven Mendelsohn, M.D., See Metcalf 0060 (NB 15), one of Metcalf's treating physicians.  During that conversation, Dr. Mendelsohn stated that Metcalf "could do sedentary work but he doesn't think she will ever

be able to return to full duty again."  <u>See</u> Metcalf 0060 (NB 15).  Because Metcalf was still in the

"own occupation" period of disability benefits,  Dr. Beavers recommended that the Plan continue

LTD benefits "for one year.  She can return to work at sedentary work only."  <u>See</u> Metcalf 0060

(NB 15).

> **RESPONSE:** Plaintiffs deny the facts asserted in  ¶ 306 as stated.  As to the first
>
> sentence, plaintiffs believe Dr. Beavers was a CORE employee; plaintiffs
>
> admit he spoke with her treating physician, Dr. Mendelsohn, on September
>
> 24, 1998.  As to the second sentence, plaintiffs admit it is a partial quote
>
> for Dr. Beaver's Physician Review Note, but plaintiffs have no way of
>
> knowing what was actually said during the conversation; the quote is an
>
> incomplete summary of the note, and fails to state that Dr. Beavers' note
>
> also said "The  doctor says she has a non-specific connective tissue
>
> disorder.  She has a positive ANA at a low titer (1/640), elevated ESR
>
> (57), hyprthyroidism, rash, low grade fevers, and objective joint swelling
>
> and synovitis intermittently.  She is treated with NSAIDS.  The doctor says
>
> she could do sedentary work but he doesn't think she will ever be able to
>
> return to full duty again.  She also had a compression fracture of t2,3."  As
>
> to the third sentence, plaintiffs deny that Dr. Beavers' recommendation
>
> was made as defendants allege, because she was still in the "own
>
> occupation" per___, and would point out that Dr. Beavers stated rationale
>
> in his note for recommendation to certify disability for a year was because

"she has objective evidence of non-specific systemic inflammatory

condition."  See NB 15: Metcalf 60.

307.    As Metcalf approached the expiration of her "own occupation" period of benefits,

the Plan began to gather information to determine whether Metcalf could satisfy the more

stringent "any occ" or "any occupation" disability definition; thereby entitling Metcalf to

continuing LTD benefits.  See Metcalf 0064-0066, 0073-0074 (NB 15).

> **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 307 as stated.  The paragraph states
>
> that "the Plan" began to gather information, whereas the document cited in
>
> NB 15: Metcalf 64-66 is on SCORE stationary, as is the document cited in
>
> NB 15: Metcalf 73.

308.    In August and September 1999, Metcalf submitted Personal Profile Evaluations in

which she indicated that "Dr. Mendelsohn states that I will not be returning to full or part time to

any job due to muscle weakness and fatigue."  See Metcalf 0075-0078 (NB 15).  She described

fibromyalgia, depression, bulging disc at the L4-5, compression fracture at T2-3, degenerative

disc disease, osteoporsis and midline disc bulges L5-S1 as the basis for her disability.  See

Metcalf 0075 (NB 15).  See also Metcalf 0067-0070 (NB 15).

> **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 308 as stated.  The Personal Profile
>
> Evaluation from which defendants quote was signed by Ms. Metcalf on
>
> October 9, 1999 rather than in August and September as defendants allege.
>
> See NB 15: Metcalf 78.  As to the facts asserted in the second sentence of
>
> ¶ 308, plaintiffs admit that the items listed in the second sentence were
>
> listed by Ms. Metcalf in response to the first instruction on the Personal

Profile Evaluation which stated "provide us with a detailed description of your present condition."  See NB 15: Metcalf 75.

309.    In September and October 1999, Metcalf's treating physician, Dr. Mendelsohn, completed Attending Physician Statements in which he stated that Metcalf was totally disabled. He diagnosed Metcalf with "CTD, Generalized OA and fibromyalgia" and noted that her condition had not regressed or improved.  See Metcalf 0071-0072 (NB 15).  See also Metcalf 0079-0080 (NB 15).

RESPONSE:  Plaintiff admits the facts asserted in ¶ 309.

310.    Dr. Beavers, the Plan's physician consultant, then reviewed Metcalf's claim for benefits under the "any occ" definition.  See Metcalf 0082 (NB 15).  On October 20, 1999, Dr. Beavers spoke again by telephone with Dr. Mendelsohn; this time to determine whether Metcalf satisfied the more stringent "any occupation" definition of total disability which now governed Metcalf's LTD benefits.  According to Dr. Mendelsohn, Metcalf "is not totally disabled but continues to be able to do sedentary work."  See Metcalf 0082 (NB 15).

RESPONSE:  Plaintiffs deny the facts asserted in ¶ 310 as stated.  First of all, Dr. Beavers is identified as "the Plan's physician consultant" when plaintiffs believe that he was a CORE employee.  Secondly, plaintiffs are without sufficient information to know what Dr.  Beavers did in reviewing Ms. Metcalf's claim.  Thirdly, what appears in NB 15: Metcalf 82 is Dr. Beavers' version of his conversation with Dr. Mendelsohn.  Plaintiff is without firsthand information of what the doctors said to each other during this telephone conversation.   NB 15: Metcalf 82.

132

311.    On that same day, October 20, 1999, Dr. Mendelsohn verified in writing that "Celia Metcalf may work with the above restriction" – that is, "sedentary work only." See Metcalf 0081 (NB 15).

> **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 311 as stated.  On October 20, 1999,
> Dr. Beavers wrote a letter on CORE stationary to Dr. Mendelsohn and
> stated that "from our discussion I understand that she can work with the
> following permanent restrictions: sedentary work only." There was a place
> on the form for Dr. Mendelsohn to sign, and he did so on October 20,
> 1999, but the writing itself was generated by Dr. Beavers, and for
> defendants to state that Dr. Mendelsohn "verified this in writing" is to
> mischaracterize the communication.  Dr. Beavers composed the letter, and
> sent it to Dr.  Mendelsohn for his signature.  NB 15: Metcalf 81.

312.    Dr. Beavers recommended that Metcalf's LTD benefits be terminated based on the "any occupation" definition "because there is no objective medical substantiation of disability and no disabling provider." See Metcalf 0082 (NB 15).

> **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 312 as stated, inasmuch as plaintiffs
> lack firsthand information as to why Dr. Beavers made his
> recommendations.  The quote that defendants list in ¶ 312 is taken from a
> document that is identified as a Physician Review Note of October 20,
> 1999, wherein Dr. Beavers did recommend that Ms. Metcalf not be
> certified disabled from any occupation based on the rationale "that there is
> no objective medical substantiation of disability and no disabling

133

provider."  While plaintiffs admit that this was the recommendation and

rationale of Dr. Beavers, plaintiffs disagree with the recommendation and

rationale, and do not admit to its truth.  Moreover, Dr. Beavers, in his own

Physician Review Note of September 24, 1998, as discussed above, noted

**"objective** joint swelling" and stated, **"**she has **objective** evidence of non-

specific systemic inflammatory condition**,"** emphasis added.  NB 15:

Metcalf 60.

313.    On October 26, 1999, CORE commissioned Lisa Bossardt, a Vocational

Rehabilitation Consultant, to perform a Vocational Rehabilitation Analysis of Metcalf.  The

purpose of Ms. Bossardt's evaluation was to assess Metcalf's education and work history to

determine if Metcalf has transferable skills given the restrictions defined by Dr. Mendelsohn.

See Metcalf 0083-0089 (NB 15).

> **RESPONSE:**  Plaintiffs deny the facts asserted in ¶ 313 as stated, and state that SCORE
>
> rather than CORE hired Lisa Bossardt to perform a Transferrable Skills
>
> Analysis of Ms. Metcalf, according to the SCORE facsimile transmission
>
> from SCORE nurse Carol Bishop to Lisa Bossardt.  See NB 15: Metcalf
>
> 83.  The purpose of Ms. Bossardt's evaluation is not indicated in any of
>
> the pages cited in support of ¶ 313.

314.    Ms. Bossardt, noting that Metcalf's functional capacity included a permanent

restriction of sedentary work, performed both a Vocational and a Transferable Skills Analysis.  In

her report dated November 1, 1999, Ms. Bossardt concluded that "it appears that there are

suitable employment opportunities for Ms. Celia Metcalf within her Sedentary Duty physical

capacity and geographic area.  Potential wages in these employment options range from $6.00 to $8.00 per hour as determined by contact with the North Carolina Employment Security Commission."  See Metcalf 0090-0097 (NB 15).

> **RESPONSE:**  Plaintiffs deny the facts asserted in ¶ 314 as stated, and would point out that Ms.  Bossardt claimed to perform a "Vocational and Transferrable Skills Analysis," but stated therein that Ms. Metcalf had been employed from April 23, 1979 to April 16, 1997 as a "Rewind Assistant Operator and **Scale Clerk**," (emphasis added). However there is nothing in the record to indicated that Ms. Metcalf was ever employed during those years as a **"Scale Clerk."** She had indicated on a Personal Profile Evaluation that she had worked for one year (1966-1967) as a cashier and **sales** clerk, (emphasis added).  See NB 15: Metcalf 92,  as opposed to NB 15: Metcalf 21.  Apparently, Ms. Bossardt read "sales clerk" and included in her Vocational Analysis that Ms. Metcalf had worked from 1979-1997 as a Rewind Assistant Operator and "Scale Clerk." To the extent that Ms. Bossardt analyzed Ms. Metcalf's vocational history as a Scale Clerk, her vocational history analysis is flawed, and plaintiffs would deny that her conclusions concerning employment opportunities for Ms. Metcalf were accurate.  Also, Ms. Bossardt's analysis incorrectly stated that the length of time Ms. Metcalf worked as a carpet yarn tester (1971 to 1999, as opposed to 1971 to 1979, the latter being correct.  See NB 15: Metcalf 93, 55).

135

315.    On November 15, 1999, CORE recommended to the Plan that Metcalf's LTD benefits be terminated effective November 13, 1999.  CORE cited and relied on, *inter alia*, Dr. Mendelsohn's opinion that Metcalf could do sedentary work, and the vocational analysis indicating there were suitable work opportunities for Ms. Metcalf within her sedentary duty physical capacity.  See Metcalf 0099-0101 (NB 15).

> **RESPONSE:**  As to the facts asserted in ¶ 315, plaintiffs admit the first sentence of said paragraph.  As to the facts asserted in the second sentence, plaintiffs are without sufficient information to know what CORE relied on in making its recommendation, and therefore deny said facts, the sentence does reflect the statement from CORE's CSR report of November 15, 1999.  See NB 15: Metcalf 101.

316.    On November 15, 1999, the Plan notified Metcalf that her claim for continuing LTD benefits had been terminated because Metcalf was not disabled as defined by the Plan.  See Metcalf 0102-0103 (NB 15).  The Plan cited Dr. Mendelsohn's opinion that Metcalf was capable of performing sedentary duty work and the Transferable Skills Analysis which indicated there were suitable employment opportunities for her within her sedentary duty and physical capacity limitations.  The Plan advised Metcalf that she had a right to appeal the decision and enclosed a copy of the applicable appeal procedures.  See Metcalf 0102-0105 (NB 15).

> **RESPONSE:**  Plaintiffs deny the facts asserted in ¶ 316 as stated.  "The Plan" did not notify Ms. Metcalf that her claim had been terminated; rather SCORE, "a shared enterprise of Sedgwick and CORE, Inc.," wrote Ms. Metcalf on November 15, 1999.  See NB 15: Metcalf 102.   SCORE did refer to Dr.

136

Mendelsohn's October 20, 1999 letter, and also referred to the November 1, 1999 Transferrable Skills Analysis and its November 15, 1999 letter to Ms. Metcalf. Plaintiffs admit that a letter from SCORE did inform Ms. Metcalf that she had the right to appeal the decision.

317. By letter dated December 6, 1999, Metcalf requested that the Plan review her claim for LTD benefits, but did not provide any additional information regarding her claim. See Metcalf 0107 (NB 15).

> **RESPONSE:** The plaintiffs deny the facts asserted in ¶ 317 as stated. By letter dated December 6, 1999 to a Ms. Conley, a SCORE employee, Ms. Metcalf requested a review on her claim. See NB 15: Metcalf 102.

318. On December 13, 1999, the Plan acknowledged Metcalf's request for review and advised her that the Plan was "willing to consider any additional information which would support a change in [its] decision." See Metcalf 0108 (NB 15). On January 7, 2000, the Plan Supervisor denied Metcalf's claim for continuing benefits. See Metcalf 0112 (NB 15).

> **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 318 as stated. On December 13, 1999, SCORE, rather than "the Plan", acknowledged receipt of Ms. Metcalf's request for review, and indicated that SCORE was willing to consider any additional information which would support a change in their decision. She was advised that she could request a further review of a denial by writing to Champion International Corporation. See NB 15: Metcalf 108. Defendants fail to mention in ¶ 318 that Ms. Metcalf did respond on December 17, 1999 with a second letter to Ms. Conley,

137

wherein she explained that she was still having the same symptoms and problems that she had had for nearly twenty years. She stated "the muscle fatigue and constant pain are with me every day. They do not ever leave. I feel that I still have the inability to perform duties required by any employer as my whole body is affected. The more I try to do, the more my muscles are affected. I feel that anyone who has not seen me or been around me cannot know what a struggle I have from day (sic to day). I feel they cannot make a fair judgment on my health. In April, my disability will have been three years at Champion. I have seen Linda Gregory at Haywood Vocational Opportunities, and she feels I would not benefit from their establishment. I did send a copy of the letter signed by Dr. Mendelsohn to his office. My appointment for December 17, 1999 has been rescheduled by his office for December 28, 1999. I am requesting a review on my claim. I will know more after my visit with Dr. Mendelsohn. Sincerely, Celia Darlene Metcalf." See NB 15: Metcalf 109-110. Plaintiffs admit that on January 7, 2000, Champion's Claims Manager wrote Ms. Metcalf and denied her claim for continuing benefits.

319.    Metcalf then sent three letters to the Plan in which she advised the Plan that she was "still having the same symptoms and problems of the fibromyalgia that I have had for nearly twenty years. The muscle fatigue and constant pain are with me every day. They do not ever leave. I feel that I still have the inability to perform duties required by any employer, as my whole body is affected." She advised the Plan that she had spoken with Dr. Mendelsohn on

138

December 28, 1999, and was advised that "Champion does not have any sedentary work."  She

stated that her "status has not changed from the beginning of my disability.  It was approved in

the beginning and Social Security has approved my disability.  I am requesting a review and will

be Seeing my family doctor for a further examination."  Metcalf did not submit any other

information in support of her claim for benefits.  See Metcalf 0109-0112 (December 17, 1999,

letter); Metcalf 0113 (January 17, 2000, letter); Metcalf 0114-0115 (March 6, 2000, letter).

> **RESPONSE:**  Plaintiffs deny the facts asserted in ¶ 319 as stated.  First of all, ¶ 319
>
> states that Metcalf **then** sent three letters to "the Plan" which apparently
>
> means the letters were sent **after** the January 7, 2000 decision to deny her
>
> continuing benefits.  However, the first letter from which defendants quote
>
> was sent December 17, 1999, which was prior to the January 7, 2000
>
> decision. The first quote in ¶ 319 comes from Ms. Metcalf's letter of
>
> December 17, 1999.  The second quote comes from her January 17, 2000
>
> letter, and plaintiffs admit that she advised "the Plan" that she had spoken
>
> with Dr. Mendelsohn on December 28, 1999, and that he had told her that
>
> Champion did not have any sedentary work, as defendants assert in ¶ 319.
>
> Finally, plaintiffs deny that Metcalf did not submit any other information
>
> in support of her claim for benefits, inasmuch as her letter of March 6,
>
> 2000 informed "the Plan" that since her last review she was being treated
>
> for carpal tunnel and arthritis in her hands, and also for high blood
>
> pressure, and this information would constitute "other information in
>
> support of her claim for benefits." See NB 15: Metcalf 115.

139

320.    On March 8, 2000, the Plan notified Metcalf that her claim had been referred to the Plan's Claims Review Committee for review, that she would be notified of the date when the Committee was scheduled to meet and discuss her claim.  The Plan reiterated the language of the Hourly LTD Plan and informed Metcalf that this definition required her to "be unable to use [her] skills to work at any job, not just [her] former job with Champion" to continue to receive LTD benefits.  See Metcalf 0116 (NB 15).  The Plan invited Metcalf to forward, no later than April 3, 2000, any documentation or evidence supporting her claim that she is totally disabled and unable to engage in any work at all.  See Metcalf 0116 (NB 15).

**RESPONSE:**  Plaintiffs admit the facts as alleged in ¶ 320.

321.    By letter dated April 12, 2000, Metcalf's legal counsel contacted the Plan and, on Metcalf's behalf, requested an extension of time for submitting materials concerning Metcalf's condition.  See Metcalf 0117 (NB 15).  The Plan granted Metcalf's counsel's request.

**RESPONSE:**  As to the facts asserted in ¶ 321, plaintiffs admit the first sentence.  As to the second sentence, there is no cite to the record for the statement that "the Plan granted Metcalf's counsel's request," so Plaintiffs are unable to respond thereto with specificity, but believe it to be true.

322.    On May 4, 2000, Metcalf forwarded to the Plan a letter written by Erich G. Buehler, M.D., of Waynesville Family Practice.  Dr. Buehler reported that he evaluated Metcalf in his office on March 20, 2000, and concluded that "because of her significant wrist and arm tendonitis, she is currently unable to participate in any work or occupation and is at this point totally disabled."  See Metcalf 0119-0120 (NB 15).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 322.

323.    On May 31, 2000, Metcalf's legal counsel requested another extension of time for submitting materials concerning Metcalf's claim for benefits.  See Metcalf 0121 (NB 15).

**RESPONSE:** Plaintiff's admit the facts asserted in ¶ 323.

324.    The Plan notified Metcalf's counsel that he had until June 6, 2005, to submit additional information because the Claims Review Committee was scheduled to meet on June 15, 2000, to review Metcalf's claim.  See Metcalf 0122 (NB 15).

> **RESPONSE:** As to the facts asserted in ¶ 324, plaintiffs believe that the paragraph contains a typographical error, and that the Plan notified Metcalf counsel that he had until June 6, **2000** rather than June 6, **2005** as asserted to submit additional information. The remainder of the facts asserted in ¶ 324 are admitted.

325.    On June 5, 2000, Metcalf's counsel submitted to the Plan medical records from Blue Ridge Bone & Joint Clinic, Haywood Regional Medical Center, Harris Regional Hospital, Dr. Coy Brown, Dr. J. Thomas, Asheville Arthritis Center, Waynesville Family Practice, Smoky Mountain Foot Clinic, William B. Owen, Junaluska Orthopaedics, Midway Medical Center, and Paul Stapf.  See Metcalf 0123-0414 (NB 15).

> **RESPONSE:** As to the facts asserted in ¶ 325, there appears to be a typographical error in that a doctor's name is listed incorrectly; specifically "Dr. J.  Thomas" should be "Dr. J. Thomas McClure" of Mountain Orthopaedic Associates, PA.  Further, William B.  Owen is not identified as a doctor in ¶ 325, and should be.  Finally, Paul Stapf is not identified as a doctor of chiropractic and should be.  ¶ 325 also fails to indicate that Ms. Metcalf's counsel also

141

stated that he would be forwarding additional information regarding her

claim via facsimile on Tuesday, June 6, 2000. Otherwise, plaintiffs admit

the facts as asserted in ¶ 325.

326.    The majority of the materials submitted by Metcalf's counsel either were

previously submitted by Metcalf or irrelevant to Metcalf's medical condition at the time the Plan

denied her claim for continuing LTD benefits in November of 1999. See Metcalf 0123-0414

(NB 15).

>    **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 326. Specifically, plaintiffs deny that
>
>    the majority of the materials submitted by Metcalf's counsel were
>
>    "irrelevant to Metcalf's medical condition at the time the Plan denied her
>
>    claim," and would state that in order to facilitate a full and fair review of
>
>    Ms. Metcalf's claim, it was necessary to consider Ms. Metcalf's complete
>
>    medical history. See NB 15: Metcalf 123-414.

327.    For instance, in the records submitted from Paul Stapf, P.C., Mr. Stapf stated that

"I have not examined/treated this individual since 1992 and really have no idea of her present

health status." See Metcalf 0126 (NB 15). The documents Metcalf submitted from the Blue

Ridge  Bone and Joint Clinic were mostly dated 1994 and centered on  Metcalf's initial

fibromyalgia symptoms. See Metcalf 0158-0167 (NB 15). There was one medical note dated

July 1, 1997, that discussed plantar fascias of both her feet but that was irrelevant to the time

period of the LTD denial. See Metcalf 0166-0167 (NB 15).

>    **RESPONSE:** Plaintiffs deny the facts as asserted in ¶ 327. Specifically,
>
>    plaintiffs state that Paul Stapf's professional designation is

incorrect — he is a "D.C." not a "P.C.," and is a "Dr." not a "Mr." Further, plaintiffs deny that his records were irrelevant, and would state that Ms. Metcalf had suffered an on-the-job injury in 1989 of acute muscle strain, and despite her injury, returned to work.  See Pl. LR 56 St. ¶ 531.  The records from Dr. Stapf indicated that she consulted with his office from 1979 until 1992, and that her onset of symptoms was non-traumatic but usually related to a strenuous incident.  These records thus go toward establishing the fact that despite having had an on-the-job injury of acute muscle strain, and despite having physical problems that required regular chiropractic treatment for years, Ms. Metcalf continued to work for a number of years before her symptoms worsened to the point of taking her out of work in 1997.  As to the allegations of irrelevancy concerning the documents submitted from Blue Ridge Bone & Joint Clinic that were mostly dated 1994 and centered on Ms. Metcalf's initial fibromyalgia symptoms, plaintiffs state that the initial diagnosis of an on-going and eventually disabling medical condition was certainly relevant to a full and fair review of said disability.  As to the relevancy of the July 1, 1997 medical note, it addressed a physical condition that may have contributed to Ms. Metcalf's overall disability and is not irrelevant. See Pl. LR 56 St. ¶ 533.

328.    According to the records from Waynesville Family Practice and Dr. Buehler,
Metcalf first saw Dr. Buehler on November 19, 1999, which was four days after the Plan denied
her claim for continuing LTD benefits.  Those records demonstrate the following:

**RESPONSE:**  Plaintiffs deny the facts  asserted in ¶ 328 as stated.  As to the records

from Dr. Buehler at Waynesville Family Practice, his November 19, 1999

records are  relevant in the full and fair evaluation of her appeal of the

Plan's decision to deny her claim for continuing LTD benefits.

a.    Dr. Buehler's office notes dated November 19, 1999, indicate that Metcalf
"presents with a chief complaint of swelling at the base of her neck 2 days with trouble
moving her neck.  This came on fairly suddenly 2 days ago, hasn't really improved any."
Dr. Buehler noted that her examination revealed spasm of the muscles in the neck worse
on the left than the right and he prescribed Daypro.  See Metcalf 0128 (NB 15).

**RESPONSE:**  As to the facts asserted in ¶ 328a, plaintiffs admit that while factually

accurate, it is an incomplete summary of Dr. Buehler's office notes dated

November 19, 1999.  The defendants fail to state that Dr.  Buehler's office

notes of that date also indicate that Ms. Metcalf's past medical history was

"notable for osteoporosis, fibromyalgia, degenerative discs, compression

fractures at T2 and T3 with bulging discs, hypoglycemia, complete

hysterectomy." See NB 15: Metcalf-128.   Again, these notes speak to the

medley of physical problems Ms. Metcalf suffered which should be

considered in a full and fair evaluation of her disability.

b.      Dr. Buehler examined Metcalf on January 19, 2000, for tingling and pain

in Metcalf's left hand going into her arm.  He noted that "her grip was getting

worse.  She has a little bit of a problem on the right hand but not as severe.  She

used to work at Champion, doing a lot of repetitive motion.  She's been disabled

for 3 years with fibromyalgia, however."  See Metcalf 0128 (NB 15).  Dr. Buehler

further noted that Metcalf has "no visible deformity or swelling or redness

however. Strength otherwise fairly normal in the upper extremities, no abnormal

neurologic function noted otherwise."  See Metcalf 0129 (NB 15).  He diagnosed

Metcalf with carpal tunnel syndrome and mild des Quervain's tenosynovitis,

placed her in a left-handed cockup splint to wear at night, and increased her

dosage of Vioxx.  See Metcalf 0129 (NB 15).

**RESPONSE:**  As to the facts as asserted in ¶ 328b, plaintiffs admit that while they are

factually accurate, it is an incomplete summary of Dr. Buehler's office

notes from his examination of Ms. Metcalf on January 19, 2000.  See NB

15:Metcalf-129.

c.      Metcalf then saw Dr. Buehler for a follow-up visit on February 17, 2000,

where he noted that Metcalf's "wrist is perhaps a little bit better, but not

significantly so."  An examination of her wrist revealed continued tenderness and

mild swelling with minimal erthema" and he asked Metcalf to come back in 3-4

weeks for a follow-up visit.  See Metcalf 0129 (NB 15).  It was during this follow-

up visit on March 20, 2000, that Dr. Buehler noted that Metcalf "is being denied

for her disability insurance claim and requests that I write a letter.  I will do this

145

stating that she is currently totally disabled because of her baseline medical condition as well as that of her hands, although this disability may not be permanent." See Metcalf 0133 (NB 15).  There is no indication in these notes that Dr. Buehler reviewed the definition of total disability when making his assessment nor is there any indication in the record that Dr. Buehler ever treated Metcalf for her "baseline medical condition."  See Metcalf 0127-0135 (NB 15).

**RESPONSE:**   As to the facts as asserted in ¶ 328c, plaintiffs would admit that the first and second sentences are factually accurate but incomplete summaries of Dr. Buehler's office notes from his examination of Ms.  Metcalf on February 17, 2000 when he was continuing to treat her for carpal tunnel syndrome.  As to the remaining allegations in ¶ 328c, plaintiffs would deny them as stated, and would point out that during a follow up visit for carpal tunnel syndrome on March 20, 2000, Dr.  Buehler noted that Ms. Metcalf was "being denied for her disability insurance claim and requested I write a letter.  I will do this stating that she is currently totally disabled because of her baseline medical condition, as well as that of hands, although this disability may not be permanent." See NB 15:Metcalf-133. However, Dr. Buehler also noted that Ms. Metcalf had "other medical problems including arthritis in her hand, hypothyroidism, depression/fibromyalgia, etc.  persist, will continue current meds there." Id. As to defendant's allegation that there is no indication in these notes that Dr. Buehler reviewed the definition of total disability when making

146

his assessment, plaintiffs would state that there is no indication in these notes that he did not review the definition.  Moreover, there is an indication in the record that Dr. Buehler took note of her other medical problems which he itemized as stated herein.

d.    On April 24, 2000, Dr. Buehler examined Metcalf for a follow-up on hypertension and pain in her bowels.  He noted "hypertension, now well-controlled."  Metcalf 0135 (NB 15).  There is no indication in the record that Dr. Buehler ever treated Metcalf after this April 24, 2000, visit.  <u>See</u> Metcalf 0135 (NB 15).

**RESPONSE:** As to the first two sentences of ¶ 328d, plaintiffs would admit that these are factually accurate but incomplete summaries of Dr.  Buehler's office notes of April 24, 2000.  Defendants fail to state that Dr. Buehler in addition to noting "hypertension now well controlled," also noted probable rectal problems  were causing pain, and listed ten medications Ms. Metcalf was taking at the time: Fossamax, Synthroid, Effexor, hydroxychloroquine sulfate, Vioxx, Ultram, Norflex, hydrochlorothiazide, Accupril and Nortriptyline.  See NB 15:Metcalf-135.  As to the assertion in the last sentence of ¶ 328d, Plaintiffs admit that NB 15 contains no medical records from Dr. Buehler after 4/24/00, but this is not necessarily because he did not treat Metcalf after that date; rather, that particular set of records was complied only four or five weeks following that 4/24/00 visit, and was

147

submitted to Champion on June 4, 2000 by Metcalf's counsel as part of her appeal. See NB 15:Metcalf-123.

329.    Metcalf's legal counsel also submitted office notes from J. Thomas McClure, M.D., of Mountain Orthopedic dated February 23, 2000, which was three months after Champion denied LTD benefits.  See Metcalf 0136-0138 (NB 15).  Dr. McClure's office notes on this same date verify that Metcalf "complains of approximately a five-year progressive history of pain in her left wrist and thumb.  This is located mainly around the base of the thumb.  It does radiate up the arm some.  She notes this is worse with activity.  She has mainly an aching-type pain with stiffness in her thumb."  Dr. McClure diagnosed Metcalf with degenerative joint disease of the carpometacarpal articulation in the left thumb and possible carpal tunnel syndrome, talked to her about the possibility of injecting Metcalf's thumb joint, and noted that Metcalf "is not really having severe pain at the current time."  He then placed her in a carpometacarpal thumb fit band. See Metcalf 0137-0138 (NB 15).  There is no evidence in the record that Metcalf was treated by Dr. McClure after this February 23, 2000, office visit.

> **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 329 as stated.  Records from an orthopaedist dated February 23, 2000 were relevant to the ongoing full and fair evaluation of Ms. Metcalf's claim for disability.

330.    Metcalf's counsel also submitted office notes from Dr. Mendelsohn which were not initially reviewed by the Plan or the Plan's consultants.  See Metcalf 0148-0155 (NB 15).  These notes demonstrate the following:

a.    On June 29, 1998, Dr. Mendelsohn noted "Patient with a smoldering CTD and fibromyalgia who is continuing to have increasing whole body pain, aching, soreness,

stiffness, and feelings of frustration. Her husband has not been particularly supportive."

Dr. Mendelsohn's impression was that Metcalf had smoldering CTD which is behaving

like SLE complicated now more by arthralgia and fibromyalgia. He recommended a

follow-up visit in three months. See Metcalf 0148 (NB 15).

**RESPONSE:**    As to the facts alleged in ¶ 330a, plaintiffs would point out that defendants

did not analyze in ¶ 330 records of Dr. Mendelsohn from August 4, 1994;

September 28, 1994; September 27, 1994; December 2, 1997; January 14,

1998; March 17, 1998; and April 28, 1998. Defendants' treatment of Dr.

Mendelsohn's records in ¶ 330 begins with his notes of June 29, 1998.

The quote from Dr. Mendelsohn's June 29, 1998 notes in ¶ 330a is

accurate but incomplete, and failed to mention that Dr. Mendelsohn

"discussed at length about the role of stress with the above, and that this is

a likely contributor to her increasing pain." See NB 15:Metcalf-148.

b.    On September 28, 1998, while Metcalf was still under the "own

occupation" period of LTD benefits, Dr. Mendelsohn made the notation

that "we discussed long-term disability. The patient is clearly not to the

point where she could return to gainful employment at Champion, and I

suggested she apply for long-term disability." See Metcalf 0149. Metcalf

returned to Dr. Mendelsohn on November 30, 1998. He noted there was

increasing fibromyalgia soreness, encouraged Metcalf to engage in more

exercise, and noted a follow-up visit in three months. See Metcalf 0150

(NB 15).

**RESPONSE:** As to the facts alleged in ¶ 330b concerning Dr. Mendelsohn's notes of

September 28, 1998, plaintiffs would admit that the two sentences quoted

are accurate but incomplete quotes from his note of said date.  Defendants

failed to fully quote Dr. Mendelsohn's note in context, which stated

"patient with long standing CTD with increasing fibromyalgic type

complaints, muscle tightening throughout the neck, upper and lower back

region, she is still not resting all that well and is having increasing overall

anxiety...she has marked muscle tightness in the neck, shoulder and low

back region..." See NB 15:Metcalf-149.  As to the defendants' statement

concerning Dr. Mendelsohn's November 30, 1998 office notes, while the

defendants mention that Dr. Mendelsohn noted increasing fibromyalgia

soreness, they failed to quote that Dr.  Mendelsohn described Ms. Metcalf

as having "a connective tissue disease and considerable fibromyalgic type

soreness...she is still not resting all that well during the day and still has

fairly low energy levels...musculoskeletal exam is pertinent for moderate

degenerative change throughout the upper and lower extremities.  The

neck, shoulders and back are all somewhat sore and stiff w/o localizing

tender spots or neurologic deficits."  See NB 15:Metcalf-150.

c.      On March 1, 1999, Dr. Mendelsohn examined Metcalf and reported that:

"patient with a generalized OA fibromyalgic condition who continues to have a
multitude of symptoms, mostly recently with tiredness and fatigue to the point
where her face and jaw get tired with just eating.  She has an upcoming disability
hearing and can feel a fair amount of stress with the above.  She is still quite sore
overall but is taking no anti-inflammatory or analgesic medications . . . ."

<u>See</u> Metcalf 0151 (NB 15).  Dr. Mendelsohn prescribed Celebrex, a long acting analgesic, and indicated that he would <u>See</u> her in three months.  That follow-up visit on June 1, 1999, did not indicate any significant change in Metcalf's condition.  <u>See</u> Metcalf 0152 (NB 15).

**RESPONSE:** As to the facts alleged in ¶ 330c, plaintiffs admit that the quote is an accurate but incomplete quote from Dr. Mendelsohn's March 1, 1999 office note, and that while defendants noted that Ms. Metcalf "is taking no anti-inflammatory or analgesic medications" they fail to note that at that time she was still on Effexor XR and Norflex.  As to the statement that Dr. Mendelsohn prescribed Celebrex, plaintiffs admit that he indicated in his note a trial of Celebrex as a long acting analgesic anti-inflammatory.  Defendants also failed to note that Dr. Mendelsohn noted her musculoskeletal exam was "pertinent for moderate degenerative change throughout the upper and lower extremities with no warmth or erythema about the joint.  She has soreness in the left thumb and I can appreciate no carpal tunnel signs.  Neck is somewhat stiff...knees, ankles and feet show some moderate degenerative changes." Defendants do not mention Dr. Mendelsohn's notes from June 1, 1999 where his impression continued to note "generalized OA, mild osteoporosis, and considerable fibromyalgia." See NB 15:Metcalf-151.

151

d.    Dr. Mendelsohn examined Metcalf again on September 20, 1999, and

noted that Metcalf was "pertinent for mild degenerative changes throughout the

upper and lower extremities.  Muscles around the neck, shoulders, low back girdle

area are somewhat tight and stiff on ROM with tender spots throughout.

However, I can appreciate no warmth or erythema about the joints and no

significant loss of [range of motion]."  See Metcalf 0153 (NB 15).

**RESPONSE:**  As to the allegations in ¶ 330d, plaintiffs admit said ¶ is accurate but

incomplete.  Defendants fail to mention that Dr. Mendelsohn continued to

list as his impressions of Ms. Metcalf's "smoldering CTD, marked

fibromyalgia, and borderline osteoporosis." See NB 15:Metcalf-153.

e.    Dr. Mendelsohn also made a note that, on October 19, 1999, "Dr. Beavers

called advising about [Metcalf's] work capacity.  I feel she could do sedentary

work if she was inclined and such work was available."  See Metcalf 0153 (NB

15).

**RESPONSE:**  Plaintiffs admit the facts alleged in ¶ 330e.

f.    Metcalf returned to See Dr. Mendelsohn on December 28, 1999.

In his office notes, Dr. Mendelsohn reports:

"Pertinent for moderate degenerative changes about the upper and lower
extremities.  She has no warmth about the joints.  Although her hips are more sore
than usual they have good [range of motion].  Appreciated no deformities.  She
has no localizing weakness or neurologic deficits ***but pain far in excess of
findings***.

See Metcalf 0154 (emphasis added)(NB 15).  Dr. Mendelsohn noted that he "discussed

about long term disability as she does not qualify under the present Champion guidelines.

152

She will need to find some form of gainful employment that she can do in a sedentary way." See Metcalf 0154 (NB 15).

**RESPONSE:**   As to the allegations in ¶ 330f, plaintiffs admit that Metcalf returned to see Dr. Mendelsohn on December 28, 1999, and that the first quote listed in defendant's ¶ 330f is accurate but incomplete.  Defendants fail to mention that Dr. Mendelsohn noted "patient with long standing CTD associated with a positive ANA and diffuse myalgias and arthralgias.  She also has a considerable fibromyalgic sleep disturbance condition.  She is on plaquenil, Vioxx, Ultram, still taking Fosamax, Effexor 75mg in the morning." He also listed as his impressions "CTD and fibromyalgia with a chronic pain syndrome and depression." See NB 15:Metcalf-154. Plaintiffs admit  that the last two sentences of ¶ 330f are an accurate but incomplete quote of Dr. Mendelsohn's December 28, 1999 office note.  Id.

g.    On March 30, 2000, Dr. Mendelsohn examined Metcalf again and noted that he "tried to encourage her to be as active as she is comfortable getting back to some sedentary type activity if she can find gainful employment.  Unfortunately jobs have been quite limited with her background." See Metcalf 0155 (NB 15).

**RESPONSE:**   Plaintiffs admit that the facts alleged in ¶ 330g are an accurate but incomplete quote from Dr.  Mendelsohn's March 30, 2000 examination of Ms. Metcalf.  Defendants failed to note that Dr. Mendelsohn stated in his notes that Ms.  Metcalf "has not been able to get back to any kind of gainful employment." See NB15:Metcalf-155.  He also listed as

153

impressions "generalized OA, Hx of CTD and a positive ANA doing well on plaquenil, osteoporosis on Fosamax, and fibromyalgia doing fairly well with Effexor and Pamelor." Id.

331.    The remaining medical records submitted by Metcalf's counsel either were irrelevant to, or did not support her claim for LTD benefits.

a.    All documents from Haywood Regional Medical Center/Occupation Health Services are dated 1996 and refer to Metcalf's previous symptoms of fibromyalgia which necessitated Champion International placing her on restricted duty. See Metcalf 0168-0187 (NB 15). Of particular note are Metcalf's Functional Capacity Test results dated December 3, 1996, which indicated that "testing suggests that the patient perceives herself as rating below a sedentary physical demand level which is inconsistent with her actual performance." See Metcalf 0179 (NB 15).

**RESPONSE:** Plaintiff denies the facts as stated in ¶ 331. As to the facts alleged in ¶ 331a, plaintiffs would state that documents from Haywood Regional Medical Center/Occupation Health Services dated 1996 which refer to Ms. Metcalf's previous symptoms of fibromyalgia are indeed relevant in providing a historical perspective on her disability. As to defendant's quote from Metcalf's FCE results dated December 3, 1996, the quote is accurate but incomplete, and fails, for example, to point that the FCE also reported "patient stopped all lifting tasks at the reported 'occasional' weight due to intense left shoulder and cervical spine pain ranging from 7-10 on a scale of ten." See NB 15: Metcalf-177.

154

b.      All documents from Harris Regional Hospital were dated 1997 and
referred to Metcalf's endoscopic plantar fasciotomy on both feet, which are irrelevant to
Metcalf's denial of LTD benefits.  See Metcalf 0188-0206 (NB 15).

**RESPONSE:**  As to defendant's statements concerning documents from Harris Regional

Hospital dated 1997 which referred to surgeries she had on both feet,

plaintiffs would deny defendants' assertion that these records are

irrelevant, and would state that a full and fair evaluation of Ms. Metcalf's

disability would certainly include medical records of surgeries performed

on both feet, which would reasonably seem to be important in an

evaluation of the impact of the medley of physical problems she suffered

on her ability to obtain and sustain gainful employment.  See Pl. LR 56 St.

¶ 540.

c.      All documents from Dr. Coy Brown, Optometrist, related to Metcalf's
vision and were irrelevant to Metcalf's denial of continuation of LTD Benefits.  See
Metcalf 0207-0210 (NB 15).

**RESPONSE:**  Plaintiffs deny the facts asserted in ¶ 331c as stated.  These records were

submitted by Metcalf's counsel in an attempt to obtain and provide as

complete a record of plaintiff's medical history as possible.

d.      All documents from Banks Smokey Mountain Foot Clinic were dated
1996 and 1997 and referred to Metcalf's endoscopic plantar fasciotomy on both feet.  See
Metcalf 0211-0257 (NB 15).  According to a September 12, 1997, office note, Metcalf
presented "90% relieved of right heel pain and 100% left" and was subsequently

155

discharged from the Foot Clinic's care.  <u>See</u> Metcalf 0257 (NB 15).  Therefore, these

documents also were irrelevant to Metcalf's medical condition at the time the Plan denied

her claim for continuing LTD benefits.

**RESPONSE:**    As to the facts alleged in the first and third sentence of ¶ 331d, plaintiffs

would state that documents from Banks Smokey Mountain Foot Clinic

dated 1996 and 1997 which referred to Ms. Metcalf's surgery on both feet

would be relevant in a full and fair evaluation of her disability.

e.    All documents from William B. Owen, Jr., M.D. (that were not Haywood

County Hospital) were dated 1995 and 1996 and refer to a twisted knee and pain in

Metcalf's right wrist caused by a fall.  <u>See</u> Metcalf 0258-0264 (NB 15).

**RESPONSE:**    Plaintiffs deny the facts asserted in ¶ 331e as stated.  Concerning

documents from Dr. Owen dated 1995 and 1996, plaintiffs would state that

Ms. Metcalf suffered a right radius fracture and left ankle sprain on

December 8, 1995, but returned to work on February 21, 1996.  These

facts indicate that Ms. Metcalf, even after having suffered various injuries,

did return to work until a combination of her medical problems and a

worsening of her symptoms forced her out of work, would be relevant to a

full and fair review of her claim.   Pl. LR 56 St. ¶ 531.

f.    All documents from Junaluska Orthopaedics were dated 1993 and 1994

and refer to back pain.  <u>See</u> Metcalf 0265-0271 (NB 15).

**RESPONSE:**    Plaintiffs deny the facts asserted in ¶ 331f as stated. Concerning

documents from Junaluska Orthopaedics dated 1993 and 1994 which refer

to back pain, plaintiffs would state that an initial diagnosis of back pain was relevant to establishing that Ms. Metcalf had long standing back problems, and that she continued to work even after being forced to seek treatment for those problems until a worsening of her symptoms, and a combination of physical problems, forced her out of work. See Pl. LR 56 St. ¶ 531.

g.    All documents from Midway Medical Center range from 1978 to 1998 and are either irrelevant to Metcalf's present condition or are copies of medical documents from Metcalf's other medical providers which previously were provided to the Plan. See Metcalf 0272-0412 (NB 15).

**RESPONSE:** As to the allegations of ¶ 331g, plaintiffs would again state that prior medical records were submitted in an attempt to provide as complete a medical history as possible to facilitate a full and fair evaluation of Ms. Metcalf's claim. Prior history of medical problems would certainly be relevant in evaluating and establishing a longitudinal perspective on the development of Ms. Metcalf's disability, and in meeting the legal mandate of a full and fair review. See the Plan in NB 66.

332.    On June 7, 2000, Jerome Siegal, M.D., a medical consultant retained by CORE, reported that he had reviewed all case notes, medical records, and progress notes and concluded that "there is no objective medical substantiation for total disability after 11/13/99" and that "there is no information to indicate an objective basis that the patient is unable to perform

sedentary work.  There has been no trial or attempt at sit down work noted."  <u>See</u> Metcalf 0413-0414 (NB 15).

> **RESPONSE:** As to the facts alleged in ¶ 332, plaintiffs would admit that Dr. Jerome Siegal was a medical consultant retained by CORE.  Plaintiffs lack sufficient information to know what Dr. Siegal reviewed in making his conclusions. Plaintiffs would note that Dr. Siegal never examined Ms. Metcalf himself, and his review appears to discount and ignore the contributions of pain to disability.  If Dr. Siegal reviewed Dr. Beavers' notes of September 24, 1998, he would have noted "objective joint swelling and synovitis intermittently."  See Pl. App. 59.   These were Dr. Beavers' notes from a discussion with Dr. Mendelsohn, Ms.  Metcalf's treating physician, and also, Dr. Beavers stated in his rationale for certifying Ms. Metcalf's disability from her own occupation for one year that "she has objective evidence of non-specific systemic inflammatory condition." Thus, even Dr. Beavers at one time acknowledged objective evidence of Ms. Metcalf's disability.  See Pl.  App.  59.

333.    On June 13, 2000, Metcalf's counsel forwarded additional medical records to the Plan from Dr. Leonard Verges and Mission St. Joseph's Hospital and requested that such medical records be included in the materials to be reviewed by the Plan's Claims Review Committee.  <u>See</u> Metcalf 0418-0482 (NB 15).

> **RESPONSE:** Plaintiffs admit the facts stated in ¶ 333.

334.    On June 14, 2000, CORE informed the Plan that it had reviewed the additional

medical records submitted by Metcalf's counsel, but "the newly submitted information does not

impact the original denial of 11/13/99, as the information does not support a total disability at the

time of the 11/13/99 denial."  See Metcalf 0483 (NB 15).

> **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 334 as stated. The communication of
>
> June 14, 2000 came from SCORE, a shared enterprise of Sedgwick and
>
> CORE, Inc.  Plaintiffs would admit that the quote from this
>
> communication is an accurate but incomplete quote from a facsimile
>
> transmission cover sheet. See NB 15:Metcalf-483.

335.    On June 15, 2000, the Plan's Claims Review Committee discussed Metcalf's

appeal of the denial of her claim for continuing LTD benefits.  After the Committee reviewed

Metcalf's file and discussed its contents, it voted to uphold the denial of Metcalf's claim for

continuing LTD benefits.  See CRC 2456-2459, 2460-2943 (NB 16).[6]

> **RESPONSE:** As to the facts alleged in ¶ 335, plaintiff has no first hand information
>
> upon which she can either admit or deny the first sentence.  Plaintiff
>
> admits that her counsel received a letter dated June 16, 2000 from William
>
> C.  Foster, Senior Associate Counsel for Champion, and that Mr. Foster's
>
> letter states that the Plan's Claims Review Committee met on June 15,
>
> 2000 to consider Ms.  Metcalf's appeal, and that the denial of benefits had
>
> been upheld.  Plaintiff has no way of knowing what the committee

---

[6]  The Chair of the Committee "ordered that a copy of the documentation relative to the requests for review previously distributed to the Committee be filed with the minutes of the meeting."  See CRC 2456, 2460-2943 (NB 16).

reviewed or what it discussed at that meeting, and thus denies the facts as

alleged in ¶ 335 for lack of first hand information.  As to the facts alleged

in ¶ 335, footnote 14, plaintiffs admit that the footnote is an accurate quote

from the June 15, 2000 CRC meeting minutes, but Plaintiffs have no way

of knowing what documentation was actually filed with the minutes.

336.     In reaching its decision to uphold the denial of Metcalf's LTD claim, the

Committee relied on the following information:

"On 10/20/99, Dr. Beavers spoke with Metcalf's physician, Dr. Mendelsohn, who
stated that she 'is not totally disabled but continues to be able to do sedentary work . . . there is no
significant new finding that would disable her.'  Dr. Beavers recommended not to certify
disability from any occupation.  LTD benefits were denied based on Dr. Mendelsohn's release.

On appeal Ms. Metcalf and her attorney, Robert Elliott, submitted additional medical
information.  SCORE reviewed the information, and a Peer Review Analysis determined that
'There is no objective medical substantiation for total disability after 11/13/99 . . . There is no
information however to indicate on an objective basis that the patient is unable to perform
sedentary work.'  In addition, SCORE stated that most of the medical information submitted
predated Ms. Metcalf's dates of disability and did not impact the original denial of benefits on
11/13/99.

SCORE's Vocational Analysis Report identified various jobs that Ms. Metcalf might
perform."

See CRC 2456-2457 (NB 16).

**RESPONSE:** As to the facts alleged in ¶ 336, plaintiff lacks first hand information upon

which to either admit or deny the facts as alleged and therefore denies the

same.  Plaintiffs would admit that ¶ 336 contains accurate but incomplete

quotes from Foster's letter of June 16, 2000.  Plaintiffs would further

admit that because in denying Ms. Metcalf's continued long term disability

benefits the Plan failed to consider all of the objective medical evidence;

> failed to consider chronic pain; failed to consider all of the evidence; and
> placed inordinate weight on the evidence supporting the denial, Plaintiffs'
> counsel submitted medical records and other objective information and
> documentation so that Ms. Metcalf's claim could be reviewed objectively
> and in its entirety.

337.    On June 16, 2004, the Plan notified Metcalf that the Claims Review Committee
met on June 15, 2000, to consider her claim for LTD benefits and decided to uphold the denial of
her claim.  See Metcalf 0528-0529 (NB 15).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 337.

338.    On August 10, 2000, Metcalf's counsel requested copies of Metcalf's claims file
and the plan documents.  See Metcalf 0484 (NB 33).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 338.

339.    The Plan and Champion International complied with Metcalf's counsel's request
for plan and claim information.  See Metcalf 0002, 0486 (NB 33).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 339.

340.    On February 20, 2001, which was eight months after the Claims Review
Committee denied Metcalf's appeal and claim for benefits, Metcalf's current counsel requested
the Plan to "reconsider[] . . . the decision to terminate [Metcalf's] benefits."  See Metcalf 0487
(NB 33).  Metcalf's counsel submitted medical and other information to International Paper they
alleged supported her claim for benefits.  See Metcalf 0484-0286, 2, 0487-0526 (NB 33).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 340.

### Wilson McClure's Claim for Benefits

161

341.    Plaintiff Wilson Daniel McClure ("McClure") worked as a Maintenance Supervisor at Champion International's facility in Canton, North Carolina.  McClure's last day of active service was February 1, 1989.  See McClure 0017, 0021 (NB 17).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 341.

342.    McClure began receiving short-term disability benefits under Champion International's short-term disability plan on February 1, 1989.  See McClure 0021 (NB 17).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 342.

343.    As a Champion International salaried employee, McClure was eligible to apply for disability income benefits pursuant to the Salaried LTD Plan, and his application for LTD benefits was approved in August 1989.  See McClure 0022 (NB 17).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 343.

344.    As part of its periodic review of McClure's disability status, the Plan scheduled McClure for an Independent Medical Examination ("IME") on July 15, 1996, with C. Ruffin Stephenson, M.D., of Greenville, South. See McClure 0013 (NB 17).

**RESPONSE:**  As to the facts asserted in ¶ 344, Plaintiffs state that UNIVAL on behalf of CORE scheduled Mr. McClure's Independent Medical Examination with C. Ruffin Stephenson, M.D. NB 17: McClure 13, 14.

345.    McClure refused to submit to the examination.  On June 28, 1996, the Plan contacted McClure and notified him that, pursuant to the terms of the Plan, his refusal to cooperate would result in the termination of his LTD benefits, effective August 1, 1996.  See McClure 0013 (NB 13).

**RESPONSE:** As to the facts asserted in ¶ 345, plaintiffs state that Mr. McClure traveled at his own expense to Greenville, South Carolina for an IME with Dr. Stephenson on July 15, 1996.

346.    McClure eventually complied with the Plan's request and submitted to the IME. Dr. Stephenson reviewed McClure's medical records, including x-rays, and, on July 15, 1996, examined McClure.  See McClure 0014-0018 (NB 17).

**RESPONSE:** As to the facts asserted in ¶ 346, Plaintiffs state that Dr. Stephenson's Rheumatology Evaluation dated July 15, 1996 states that he did have "some records". NB 17: McClure 14.

347.    During the examination, McClure reported that he "had pain in his right knee" that "ultimately spread to a fairly generalized pain in the upper and lower extremities primarily affecting the hands . . . ."  Dr. Stephenson's review of McClure's x-rays showed "normal sacroiliac, hips, hands and feet."  See McClure 0014-0016 (NB 17).  Dr. Stephenson's physical exam revealed tenderness in McClure's ankle and "slight restriction in lateral flexion to the right and left" in his cervical spine.  Dr. Stephenson's examination also indicated that McClure's "[e]lbows, wrists, MCP's and IP's look normal  . . . ," "grip strength Seems to be fairly good" and "hips are normal."  See McClure 0017 (NB 17).

**RESPONSE:** As to the facts asserted in ¶ 347,   Plaintiffs state that while factually accurate, it is an incomplete summary of Dr. Stephenson's July 15, 1996 Rheutatology Evaluation because defendants selectively referenced portions of Dr. Stephenson's July 15, 1996 evaluation taken out of context and significantly alter its interpretation. Plaintiffs state that Dr.

163

Stephenson's July 15, 1996 evaluation viewed in its entirety is the best

evidence of its content. NB 17: McClure 14-18.

348.    Based on his physical examination of McClure and his review of McClure's

medical records, Dr. Stephenson noted that there was no evidence of "rheumatoid disease . . . nor

any definite evidence of spondyloarthropathy . . . ."  Dr. Stephenson concluded that McClure

could not perform the duties of his Maintenance Supervisor position but stated McClure would

"certainly. . . be able to do some type of sedentary work or desk job, particularly one where he

could get up and move around when his back gets stiff and sore, and would allow him such

freedom as that."  See McClure 0017-0018 (NB 17).

> **RESPONSE:** As to the facts asserted in ¶ 348,   plaintiffs state that while factually
>
> accurate, it is an incomplete summary of Dr. Stephenson's July 15, 1996
>
> Rheumatology Evaluation because Defendants referenced only portions of
>
> Dr. Stephenson's July 15, 1996 evaluation which were selective in nature,
>
> taken out of context and as such significantly alters its interpretation.
>
> Plaintiffs state that Dr. Stephenson's July 15, 1996 evaluation viewed in
>
> its entirety is the best evidence of its content. NB 17: McClure 14-18.

349.    On October 16, 1996, the Plan notified McClure that, based on the results of Dr.

Stephenson's IME, the Plan was terminating his LTD benefits because he was not disabled as

defined by the Plan.  The Plan also informed McClure of his right to request a review of this

decision.  See McClure 0023-0025 (NB 17).  See also McClure 0021-0023 (NB 17).

> **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 349.

350.     On December 13, 1996, McClure's former legal counsel requested review of the Plan's determination.  He outlined McClure medical history, including treatment by Donald L. Mullis, M.D., Kate T. Queen, M.D., and E.B. Goodwin. M.D.  He also submitted the Social Security Administration's decision granting McClure's claim for disability income benefits.[7]  See McClure 0027-0029 (NB 17).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 350.

351.     On January 6, 1997, the Plan notified McClure that it was treating his counsel's December 13, 1996, letter as an initial claim for benefits, and that he would receive a response to his claim within ninety days unless special circumstances required an extension of time to 180 days.  The Plan also invited McClure to provide any additional information he wished to submit for review.  See McClure 0030 (NB 17).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 351.

352.     McClure did not offer any additional information in support of his claim for benefits.

**RESPONSE:**  Plaintiffs deny the facts asserted in ¶ 352. (NB 34: McClure 80-270).

353.     After viewing the documentation submitted by McClure and comparing the information to the results of the IME, the Plan decided to uphold the denial of the McClure's claim for LTD benefits.  See McClure 0031 (NB 17).

**RESPONSE:**  Plaintiffs deny the facts asserted in ¶ 353. (NB 17: McClure 31).

---

[7]     On February 28, 1993, McClure filed for disability income benefits with the U.S. Social Security Administration.  On January 26, 1995, the Social Security Administration granted his claim for benefits, effective February 1, 1989.  See McClure 0002-0006 (NB 17).

354.    On April 9, 1997, the Plan notified McClure of its decision to deny his claim for LTD benefits.  The Plan informed McClure that it had based its decision on the results of the IME which indicated that he "would be able to do some type of sedentary work or desk job . . ." and the May 9, 1994, examination notes of McClure's treating physician Dr. Queen which indicated that McClure had the physical capacity to perform other types of work other than the job he was performing at Champion International.  The Plan also informed McClure that he had sixty days to appeal the Plan's determination.  See McClure 0032-0034 (NB 17).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 354.

355.    On July 1, 1997, McClure's counsel notified the Plan Supervisor that he had received the Plan's April 9, 1997, denial of McClure's claim for LTD benefits.  He indicated that he was in the process of collecting medical information and requested an additional sixty days to collect such records.  See McClure 0035 (NB 17).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 355.

356.    More than fifteen months later, by letter dated October 19, 1998, McClure's counsel contacted the Plan Supervisor to inquire about the status of McClure's claim.  According to McClure's counsel, he "ha[d] been informed by [McClure] that [the Plan had] received various additional medical evidence regarding [McClure's] claim for long term disability benefits following the decision of April 9, 1997."  McClure's counsel inquired as to whether the Plan ever had "receive[d] additional medical evidence in the form of documents from Mr. McClure."  See McClure 0036 (NB 17).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 356.

357.    The Plan Supervisor investigated the suggestion that McClure had submitted additional materials and, on November 16, 1998, informed McClure's counsel that the Plan had never received any additional information from or on behalf of McClure.  See McClure 0036 (NB 17).

> **RESPONSE:** As to the facts asserted in ¶ 357, plaintiffs admit that Mr. McClure was informed by letter dated November 16, 1998 that no additional materials had been received.  (NB 17: McClure 36).

358.    McClure never appealed the denial of his claim for benefits.

> **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 358.  Plaintiffs state that Mr. McClure attempted to exhaust his administrative remedies through counsel, and received no response from Champion/CORE; and defendants' failure to respond should be deemed a denial; and in any event, based on other evidence in the administrative record, any further response would have been futile. (NB 17: McClure 32-36; 283).

359.    One year later, by letter dated November 22, 1999, McClure's current legal counsel, informed Champion International that they had been consulted by McClure regarding his claim for LTD benefits, and requested McClure's claims file and copies of the Plan documents.  See McClure 0279 (NB 34).

> **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 359.

360.    The Plan complied with McClure's counsel's request and  sent to them copies of McClure's claims file and relevant plan documents.  See McClure 0277, 0276, 0272 (NB 34).

> **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 360.

361.    On July 3, 2000, McClure filed suit in the General Court of Justice Superior Court Division, Forsyth County, North Carolina.  See McClure 0071-0076 (NB 34).  McClure later voluntarily dismissed that suit.

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 361.

362.    On December 28, 2000, which was more than three and one-half years after the Plan denied his initial claim and invited him to seek a review of that denial, McClure's counsel requested the Plan to "reconsider[] . . . the decision to terminate [McClure's] benefits." McClure's counsel submitted to International Paper medical and other information they alleged supported McClure's claim for benefits.  See McClure 0080-0270 (NB 34).

**RESPONSE:**  As to the facts asserted in ¶ 362, plaintiffs state that because in denying Mr. McClure's continued long term disability benefits the Plan failed to consider the objective medical evidence; failed to consider chronic pain; failed to consider all of the evidence; and placed inordinate weight to the evidence supporting the denial, Plaintiffs' counsel submitted medical records and other objective information and documentation so that the Plan could conduct and full and fair review of Ms. Lynn's claim. NB 32: Lynn 132-1043.

**Charles Reece's Claim for Benefits**

363.    Plaintiff Charles R. Reece ("Reece") worked as an Oiler Mechanic at Champion International's facility in Canton, North Carolina.  His date of hire was January 27, 1969.  See Reece 0002 (NB 18).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 363.

168

364.    Reece's last day of active service was June 26, 1995.  See Reece 0004 (NB 18).

Between June 27, 1995 and January 24, 1996, Reece received short-term disability benefits from

Champion International.  See Reece 0002 (NB 18).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 364.

365.    As a Champion International hourly employee, Reece was eligible to apply for

disability income benefits pursuant to the Hourly LTD Plan.

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶365.

366.    Champion International submitted an LTD Claim Form on Reece's behalf to

Traveler's Insurance Company, which, at that time, served as the third-party claims processor for

the Hourly LTD Plan.  Reece listed "congestive cardiomyopathy" as the cause of disability.  See

Reece 0004 (NB 18).

**RESPONSE:**  Plaintiffs admit the facts asserted in the first sentence of ¶366.  Plaintiffs

deny the facts asserted  in the second sentence as stated.  The Long Term

Disability Claim form was signed by Traci Palkowski and not by Mr.

Reece himself; Traci Palkowski, who completed the form, listed

congestive cardiomyopathy as the cause of disability. See NB 18:Reece-4.

367.    On January 25, 1996, the Plan notified Reece that his application for LTD benefits

had been approved.  The Plan further informed Reece that it would

"continue to certify your workplace absence by contacting your physician provider to
obtain current medical information. You will also be contacted periodically by a CORE
Service Representative to discuss your daily routine and current medical situation."

See Reece 0071 (NB 18).

169

**RESPONSE:** Plaintiffs deny the facts  asserted in ¶ 367 as stated.  CORE, rather than

"the Plan," notified Mr. Reece on January 25, 1996 that his application

had been approved.  The letter was from Champion Disability Case

Manager, Roger Libby, but was on CORE stationary.  See NB 18:Reece-

71.

368.    As part of its periodic review of Reece's disability status, the Plan contacted Reece

on December 30, 1997, and requested that he update his medical information by providing a

Personal Profile Evaluation, Authorization for Release of Information, Attending Physician

Statement, and Physician's Report of Physical Capacity or Psychiatric Functional Capacity

Evaluation.  See Reece 0079 (NB 18).

**RESPONSE:** Plaintiffs deny the facts asserted  in ¶ 368 as stated.  First of all, CORE

rather than "the Plan" contacted Mr. Reece; secondly, the contact was via

letter dated January 30, 1997, not December 30, 1997.  NB 18: Reece 79.

Plaintiffs admit that the correspondence on CORE stationary dated January

30, 1997 requested that Mr. Reece provide the forms itemized in ¶ 368.

See NB 18:Reece-79.

369.    Reece completed his Personal Profile Evaluation on February 14, 1997.  See

Reece 0101-0104 (NB 18).  In the Evaluation, Reece noted that he did not know whether he

would return to his former occupation as a mechanic.  Reece also indicated that he did not intend

170

to return to another occupation on a full or part-time basis due to his belief because of his "health reasons another Co. or facility will not hire me."  See Reece 0103 (NB 18).[8]

> **RESPONSE:** Plaintiffs admit the first two sentences in ¶ 369, but deny that Mr. Reece indicated that he did not "intend" to return to another occupation on a full or part time basis.  Rather, the question asked Mr.  Reece if he **expected** to return to some other type of occupation on a full or part time basis, to which he responded "No - because of health reasons another Co. or facility will not hire me," (emphasis added). See NB 18: Reece 103.  As to footnote number 16 at the end of ¶ 369, plaintiffs deny the facts as asserted and state that the additional Personal Profile Evaluation referred to in said footnote, submitted on December 8, 1997 is not found in NB 19 as defendants cite, but rather in NB 18.  See NB 18: Reece 109-112.  As to the quote from said document, plaintiffs admit that the quote contained in footnote 16 is an accurate but incomplete quote from the Personal Profile Evaluation.   See NB 18:Reece-109-112.

370.    Reece also submitted a February 5, 1997, Attending Physician Statement prepared by Cardiologist Gutuam K. Patel, M.D..  Dr. Patel indicated that Reece's condition had "improved" but that it was "unknown" whether Reece would be able to return to work.  See Reece 0082 (NB 18).  Dr. Patel further indicated in his Physician's Report of Physical Capacity that Reece was currently capable of working zero hours per day.  See Reece 0083-0084 (NB 18).

---

[8]  In an additional Personal Profile Evaluation submitted on December 8, 1997, Reece indicated that he did not expect to return to work or some other type of occupation on full or part-time basis because "nothing is available at this time."  See Reece 0111, 0109-0112 (NB 19).

Dr. Patel also referred Reece to Robert Hanich, M.D., for a second opinion on Reece's condition. See Reece 0038-0041 (NB 18).

> **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 370 as stated. Mr. Reece submitted a February 5, 1997 Attending Physician Statement, but the doctor's name is incorrectly asserted in ¶ 370. The statement was prepared by Dr. Nachiket V. Patel, MD, a cardiologist in Asheville, North Carolina, rather than Gutuam K. Patel as asserted by defendants. See NB 18: Reece 82. Dr. Patel did indicate that Mr. Reece's condition had improved, but that it was unknown as to when he might recover to perform his duties. He also indicated that Mr. Reece was totally disabled from performing his occupation, and indicated that he was currently capable of working zero (0) hours per day. The AP statement listed cardiomyopathy (heart trouble) and left ventricular rhombosis (blood clot - left ventrical heart) as Mr. Reece's diagnosis. See NB 18:Reee-82. Plaintiffs admit the facts asserted in the last sentence of ¶ 370.

371. Dr. Hanich examined Reece and determined that Reece had "class II congestive heart failure." See Reece 0040 (NB 18). In addition to various medications, Dr. Hanich recommended that Reece engage in a "regular walking program." See Reece 0040-0041 (NB 18).

> **RESPONSE:** As to the facts asserted in ¶ 371, plaintiffs admit that while factually accurate, it is an incomplete summary of Dr. Hanich's diagnosis, Dr. Hanich also stated that Mr. Reece "presents with an advanced congestive

cardiomyopathy of unclear etiology," NB 18: Reece 40.  ¶ 371 also asserts

an accurate but incomplete statement of Dr. Hanich's recommendation.

Plaintiffs state that Dr. Hanich's report viewed in its entirety is the best

evidence of its content.  NB 18: Reece 38-41.  For example, defendants

fail to note that Mr. Hanich reviewed Mr. Reece's July 1995 "new onset

heart failure symptoms predominately characterized by orthopnea, limiting

dyspnea, and pedal edema."  NB 18: Reece 38.  Defendants fail to mention

that Dr. Hanich noted his recent VA work up which was "remarkable for

marked left ventricular dysfunction on echo with an estimated ejection

fraction of 20%, global hypokinesis, an echo density at the left ventricular

apex and under the aortic valve leaflet suggestive of thrombus, mild to

moderate mitral regurgitation and moderate tricuspid insufficiency." NB

18: Reece 38-39.  Defendants fail to mention that Dr. Hanich noted that

after being placed on "Coumadin, ACE inhabitation, nitrates and diuretics,

he symptomatically improved.  The patient has, however, continued to

have difficulty with fatigue and exertional intolerance."  NB 18: Reece 39.

Defendants fail to mention the nine (9) medications Dr. Hanich listed Mr.

Reece was taking including: Thiamin, Lanoxin, folate, spironolactone,

Lasix, potassium, captopril, nitro patch, coumadin.  NB 18: Reece 39.

Defendants fail to mention the various diagnosis Dr. Hanich noted under

past medical history: "ulcerative colitis, chronic pancreatitis, cirrhosis."

NB 18: Reece 39.  Defendants fail to mention Dr. Hanich's review of an

173

ECG that showed an estimated ejection fraction in the left ventricle of 15%. Id. Defendants fail to mention four of Dr. Hanich's five listed assessments: 1. marked congestive cardiomyopathy with estimated ejections fraction of 15-20% (unchanged with two months of abstinence from alcohol) - etiology less clear. 2. Nonspecific ST-T wave changes and left anterior hemiblock on EKG. 3. Chronic smoker. 4.Left ventricular mural thrombus. 5. Class II congestive heart failure (largely fatigue and exertional intolerance). Defendants did mention the 5th assessment, Class II congestive heart failure. NB 18: Reece 40. Again, the three and one-half page document viewed in its entirety is the best evidence of its content. NB 18: Reece 38-41.

372.    As Reece approached the conclusion of his "own occupation" benefits period, the Plan began to collect information to determine whether Reece could satisfy the more stringent "any occ" or "any occupation" disability definition. For example, in order to fully evaluate whether Reece was disabled from any occupation, the Plan referred Reece's claim for LTD benefits to Chester Conrad, M.D., a cardiologist, for a Peer Review Analysis. See Reece 0119-0121 (NB 18).

**RESPONSE:** Plaintiffs deny the facts as asserted in ¶ 372. Specifically, CORE rather than "the Plan" is responsible for the Internal Peer Review Referral Form referred to in ¶ 372. See NB 18:Reece-119. Plaintiff admits that the CORE Internal Peer Review Referral Form was sent to Chester Conrad, MD.

174

373.    Dr. Conrad reviewed Reece's December 8, 1997, Personal Profile Evaluation, the December 9, 1997, Attending Physician Statement, and the December 11, 1997, Physician's Report of Physical Capacity.  Dr. Conrad also spoke with Doug Burnett, P.A., Reece's attending health care provider.  Based on his review, Dr. Conrad reported that "there is no clear evidence that the patient's functional impairment would preclude him from performing any occupation." See Reece 0120-0121 (NB 18).  According to Dr. Conrad, Reece's attending health care provider

> "indicated that [Reece] has been clinically stable, with no recent overt heart failure . . . that [Reece] would be considered Class II (i.e. comfortable at rest, with slight limitation of physical activity, and some symptoms with ordinary activity) . . . [and] that [Reece] would probably not be capable of doing work involving heavy physical exertion, [but] could likely do work that was largely sedentary."

See Reece 0121 (NB 18).

**RESPONSE:** As to the facts asserted in ¶ 373, plaintiffs lack sufficient information to know what Dr. Conrad reviewed, and therefore deny the facts as asserted. Plaintiffs admit that Dr. Conrad's Peer Review Analysis indicated that he reviewed the documents listed in ¶ 373, and that he spoke with Dough Burnett, a physician's assistant, because Dr. Patel, Mr. Reece's cardiologist was no longer at the VA Medical Center in Asheville. Plaintiffs admit that the quotes contained in ¶ 373 are accurate but incomplete quotes from Dr. Conrad.  Plaintiffs point out that Dr. Conrad noted that "the patient has evidently not had a recent exercise test." See NB 18: Reece-121. Plaintiffs deny that physician's assistant Doug Burnett was Mr. Reece's "attending healthcare provider." NB 18.

175

374.    On February 6, 1998, the Plan asked Reece's healthcare provider to confirm that Reece "could do sedentary work."  See Reece 0122 (NB 18).  In response, Reece's healthcare provider completed a Modification Checklist on which he indicated that Reece could work eight hours per day five days per week; lift up to twenty five pounds; walk two blocks; sit, stand and change positions as needed; and climb two flights of stairs.  The Modification Checklist further indicated that Reece could perform sedentary work.  See Reece 0123 (NB 18).  Vladimir Curkovik, M.D., later verified the Modification Checklist.  See Reece 0127 (NB 18).

> **RESPONSE:**  Plaintiffs deny the facts  asserted in ¶ 374 as stated.  CORE, rather than "the Plan," asked physician's assistant Doug Burnett to complete the Modification Checklist.  Plaintiffs admit the assertions concerning the checklist restrictions, but deny that Vladimir Curkovik "verified" it.  Plaintiffs admit only that his name appears at the bottom of another copy of the checklist (NB 18:Reece-420), but nothing in the record indicates he ever examined Mr. Reece.  See NB 18.

375.    On July 1, 1998, the Plan scheduled Reece for an Independent Medical Examination ("IME") with Michael Keogh, M.D., a cardiologist in Clyde, North Carolina.  See Reece 0131-0132 (NB 18).

> **RESPONSE:**  Plaintiffs deny the facts  asserted in ¶ 375 as stated.  CORE, rather than "the Plan" scheduled Mr. Reece for an IME with Asheville Cardiology.  Further, the documents cited by defendants indicate that CORE asked Baseline Medical, Inc., a company in New York, to schedule Mr. Reece's IME with Dr. Keogh.  It also appears from the record that the  CORE IME

Chart Preparation Form was made out for an IME cardiologist at Asheville

Cardiology. The Baseline Medical Inc. letter informed Mr. Clark that his

IME was with Dr. Keogh at Haywood Regional Medical Center in Clyde.

NB 18: Reece-131-132.

376. Dr. Keogh reviewed Reece's medical records, including a radiology diagnostic

report, a report from Dr. N.V. Patel, and a report from Dr. Hanich, and, on July 30, 1998,

examined Reece. See Reece 0133-0134 (NB 18). Based on his review and examination, Dr.

Keogh concluded that Reece had "class two congestive heart failure due to nonischemic dilated

cardiomyopathy" and that Reece "is capable of performing some occupation." See Reece 0134

(NB 18). Dr. Keogh's report further indicated that Reece preferred to try to return to his previous

occupation and that Dr. Keogh thought that this would be "okay" for Reece. See Reece 0134

(NB 18).

> **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 376 as stated, having have no
>
> independent information concerning what Dr. Keogh reviewed in terms of
>
> Mr. Reece's medical records. Dr. Keogh's report indicates that he
>
> reviewed three items: 1. a radiology diagnostic report dated February 7,
>
> 1996; 2. a report from Dr. N.V. Patel dated July 19, 1995; 3. a report
>
> from Dr. Robert Hanich dated August 29, 1995. Plaintiffs admit Dr.
>
> Keogh noted that he had congestive heart failure and opined that Reece
>
> "is capable of performing some occupation," but plaintiffs would point out
>
> that Dr. Keogh was not given the Plan definition of disability; rather, he

177

was asked "is this employee capable of performing any occupation six hours per day, five days per week?" See NB 18: Reece -131.

377.    Dr. Keogh also completed a Modification Checklist on which he indicated that Reece could work six to eight hours per day, four to five days per week; lift up to ten pounds; and walk, sit, stand and change positions "as needed." See Reece 0135 (NB 18). Dr Keogh further opined in an addendum to his IME report that Reece could "work at least 6 hours per day 5 days per week." See Reece 0139 (NB 18).

>    **RESPONSE:** As to the facts asserted in ¶ 377, plaintiffs admit the first sentence.
>
>    Plaintiffs deny as to the facts asserted in the second sentence concerning Dr. Keogh's Addendum to his IME Report and point out that the Addendum was solicited by CORE, See NB 18: Reece 138, and that the Addendum was not signed by Dr. Keogh. See NB 18: Reece 139.

378.    To further assist in determining whether Reece was disabled from performing any occupation, the Plan commissioned Jennifer Mikeska, MRC, to perform a Transferable Skills Analysis. See Reece 0143-0144 (NB 18).

>    **RESPONSE:** As to the facts alleged in ¶ 378, plaintiffs deny that "the Plan" commissioned a TSA "to further assist in determining whether Reece was disabled from performing any occupation." The TSA was requested by CORE, (see NB 18: Reece 143), and performed by a CORE employee; plaintiffs believe the TSA was not commissioned to assist in determining whether or not Mr. Reece was disabled, but rather was commissioned to support a denial of disability. NB18:Reece-143.

379.    By report dated October 5, 1998, Ms. Mikeska concluded that Reece does have "transferable skills that are vocationally appropriate and applicable to the same occupational category as well as to others" and that "[t]hese skills should enable him to return to the working community."  See Reece 0143 (NB 18).

> **RESPONSE:** As to the facts alleged in ¶ 379, plaintiffs admit that this is an accurate but incomplete quote from the TSA, and would also point out that Ms. Mikeska stated "if the physician declares Mr. Reece with sedentary restrictions, there is a narrow chance of him returning to work." See NB 18: Reece 143.

380.    On October 9, 1998, the Plan notified Reece that it was terminating his LTD benefits on the grounds that he was not disabled as defined by the Plan.  The Plan also informed Reece that he had the right to appeal the denial of his claim for LTD benefits.  See Reece 0153-0154 (NB 18).  The Plan notified Reece that, effective December 31, 1998, his LTD benefits would terminate.  See Reece 0155 (NB 18).

> **RESPONSE:** Plaintiffs deny the facts  asserted in ¶ 380 as stated.  CORE, rather than "the Plan" notified Mr. Reece on October 9, 1998 that his LTD benefits were being terminated.  The letter came from Dr. J.D. Beavers who was listed as the Medical Director of Champion Disability Management Program, but is on CORE stationary.  NB 18: Reece 153.  Dr. Beavers did inform Mr. Reece that he had the right to appeal the denial.   NB 18:Reece-154. The last sentence of ¶380 is admitted.

179

381.    On December 4, 1998, Reece's former legal counsel requested the Plan to review the termination of Reece's LTD benefits.  See Reece 0157 (NB 18).

> **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 381 as stated. Mr. Reece's former legal counsel requested Dr. J.D. Beavers at CORE, Inc. to consider counsel's letter of December 4, 1998 as Notice of Appeal. NB 18:Reece-157.

382.    In order to evaluate Reece's request for reconsideration, the Plan submitted Reece's claim to Gerald Evans, M.D., for a Peer Review Analysis.  After the completion of his review, Dr. Evans, a cardiologist, concluded that the claim denial should be upheld.  Dr. Evans found Dr. Keogh's IME report to be "detailed and specific" and agreed that Reece "should be able to work at least 6 hours per day, 5 days per week and over time increase that to 8 hours per day." See Reece 0159, 0160-0162 (NB 18).

> **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 382 as stated  First, plaintiffs believe CORE rather than "the Plan" submitted Mr. Reece's claim to Gerald Evans, MD for Peer Review Analysis. NB 18: Reece 158.  Secondly, plaintiffs believe CORE submitted the claim to Dr. Evans not "in order to evaluate Reece's request for reconsideration," as alleged in ¶ 382, but rather to solicit support for CORE's denial of Mr. Reece's benefits. CORE's "Internal Peer Review Analysis Referral Form" for Dr. Evans said "This employee was denied continued L.T.D. benefits at the initial A/O Review in 10/98.  He is now appealing.  Please review the attached 'new information submitted upon appeal.' **Can the original IME decision**

180

**of denial be upheld?**" NB 18: Reece 158, emphasis added.  As to the

remaining facts alleged in ¶ 382, plaintiff states that it appears from Dr.

Evans' Peer Review Analysis that the only materials he reviewed were

"CHAM Referral Form, submitted clinical highlights, and previous CORE

review." NB 18: Reece 159.  Plaintiffs admit that Dr. Evans recommended

that the denial should be upheld.  The facts asserted in the last sentence of

¶ 382 are accurate but incomplete quotes from Dr. Evans' Peer Review

Analysis. NB 18:Reece-159.  Id.

383.    On March 15, 1999, Reece's legal counsel notified the Plan that Reece disagreed

with the conclusions of the Transferable Skills Analysis.  More specifically, Reece's counsel did

not believe Reece had the training or experience for the jobs selected.  See Reece 0163 (NB 18).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 383.

384.    On March 24, 1999, the Plan notified Reece that based on the Plan's "any

occupation" disability definition, the Plan had upheld the denial of his claim for LTD benefits.

The Plan reiterated that the IME physician, Dr. Keogh, "determined that [Reece] was capable of

working 6 hours per day, 5 days per week with restrictions. Therefore, [Reece] does not meet the

definition of disability as defined in the Plan." See Reece 0164-0165 (NB 18).  The Plan

informed Reece of his right to appeal this adverse benefits decision.  See 0165 (NB 18).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 384.

385.    On May 27, 1999, Reece's former legal counsel appealed to the Plan's Claims

Review Committee the Plan's decision to uphold the denial of his LTD benefits.  See Reece

0166-0167 (NB 18).  Reece submitted a report from Bruce Holt, R.N., Certified Case Manager,

Certified Life Care Planner, of Armstrong & Associates, Inc.  Mr. Holt reviewed Reece's medical

records and recommended "another opinion with a cardiologist, <u>outside of Haywood County</u>, to

include a current echocardiogram to evaluate left ventricular ejection fraction, cardiac efficiency,

ability to undertake physical activities, and definition of physical demand level of work."  <u>See</u>

Reece 0171 (NB 18).  Mr. Holt's recommendation was based, in part, on the fact that it had "been

almost a year since Mr. Reece's last examination."  <u>See</u> Reece 0170 (NB 18).  Mr. Holt did not

offer any rationale for his belief that Reece should be examined by a cardiologist "outside of

Haywood County."

     **RESPONSE:**  Plaintiff admits the facts as alleged in ¶ 385.

     386.    The Plan acknowledged receipt of Reece's appeal and informed Reece that the

Plan's Claims Review Committee would meet on September 9, 1999, to review his claim.  <u>See</u>

Reece 0278-0279 (NB 18).  The Plan also invited Reece to submit any additional documentation

or evidence showing that Reece is "totally disabled and unable to engage in any work at all."  <u>See</u>

Reece 0279 (NB 18).

     **RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 386.

     387.    The Claims Review Committee discussed Reece's claim for benefits at its

September 9, 1999, meeting.  <u>See</u> CRC 2263-2265 (NB 19).  The Committee reviewed Reece's

claims file and all information submitted by Reece and his counsel, including, the January 23,

1998, Peer Review analysis which "found there was no clear evidence that Mr. Reece's functional

impairment would preclude him from performing any occupation"; the March 31, 1998,

Modification Checklist prepared by Reece's health care provider noting Reece "may work 8

hours/day, 5 days/week in a sedentary job"; Dr. Keogh's July 20, 1998, IME report in which he

stated that Reece "is capable of performing some occupation and is not disabled from all employment"; Dr. Keogh's Modification Checklist in which he indicated that Reece could work six to eight hours per day; the Transferable Skills Analysis which identified various jobs that Mr. Reece could perform; and Reece's Notice of Award from the Social Security Administration.[9] See CRC 2266-2441 (NB 19).

> **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 387 as stated.  Plaintiffs have no firsthand knowledge as to what the Claims Review Committee (CRC) discussed and reviewed in its meeting of September 9, 1999.  Plaintiffs note that in the minutes from the CRC meeting of that day, the committee noted "the  Transferable Skills Analysis which identified various jobs that Mr. Reece could perform." The minutes fail to reveal that the TSA identified only two jobs that he could supposedly perform, one as a jeweler, and the other as a jeweler's apprentice.  Plaintiffs admit the facts asserted in footnote 17 to ¶ 387.  As to the CRC meeting minutes' reference to a Dr. Curkovic as "the attending physician", plaintiffs refer to their response to ¶374 above; there is nothing in the record to indicate that Mr. Reece had an attending physician by that name. NB 18.   He is believed to be a doctor who signed an APS completed by physician

---

[9] On June 22, 1996, the United States Social Security Administration notified Reece that his application for Social Security disability income benefits had been approved. The Social Security Administration concluded that Reece became disabled effective June 28, 1995, and was eligible for payment beginning in December 1995.  See Reece 0076-0078 (NB 18).

assistant, Doug Burnett, (NB 18:Reece-420), but nothing in the record

indicates that Dr. Curkovic ever saw Mr. Reece.  NB 18.

388.    During the meeting, the Committee examined this information against the Plan's

definition for Total Disability and voted to uphold the denial of benefits.   See CRC 2263-2265

(NB 19).[10]

> **RESPONSE:**  Plaintiffs deny the facts asserted in ¶ 388 as stated,  having no independent
>
> information upon which to know how the committee examined
>
> information against the Plan's definition for total disability.  Plaintiffs
>
> admit that the committee voted to uphold the denial of Mr. Reece's
>
> benefits.  As to the facts alleged in footnote 18 to ¶ 388, plaintiffs admit
>
> that the minutes from the CRC meeting on September 9, 1999 contain a
>
> statement that the chairman ordered that a copy of the documentation
>
> relative to the request for review previously distributed to the committee
>
> be filed with the minutes of the meeting, but plaintiffs have no way of
>
> knowing whether or not that was done.

389.    On September 14, 1999, the Plan notified Reece's legal counsel that his appeal

had been denied.  The Plan notified Reece's counsel that the Committee's actions represented the

"final appeal as required by Section 503 of the Employee Retirement Income Security Act of

1974."  See Reece 0275-0276 (NB 18).

> **RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 389.

---

[10]  The Chair of the Committee "ordered that a copy of the documentation relative to the
requests for review previously distributed to the Committee be filed with the minutes of the
meeting."  See CRC 2263, 2266-2441 (NB 19).

390.    On October 11, 1999, Reece's current legal counsel informed Champion International that they had been consulted by Reece regarding his claim for LTD benefits, and requested Reece's claims file and copies of the Plan documents.  See Reece 0181 (NB 35).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 390.

391.    The Plan complied with Reece's counsel's request and sent to them copies of Reece's claims file and the relevant plan documents.  See 0179, 0178, 0173 (NB 35).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 391.

392.    More than one year later, on December 29, 2000, Reece's counsel requested the Plan to "reconsider[] . . . the decision to terminate [Reece's] benefits."  See Reece 0185 (NB 35). Reece's counsel submitted to International Paper medical and other information they alleged supported Reece's claim for benefits.  See Reece 0185-0274 (NB 35).

**RESPONSE**: As to the facts asserted in ¶ 392, Plaintiffs admit that because in denying Mr. Reece's continued long term disability benefits the Plan failed to consider the objective medical evidence; failed to consider chronic pain; failed to consider all of the evidence; and placed inordinate weight on the evidence supporting the denial, Plaintiff's counsel submitted medical records and other objective information and documentation so that Mr. Reece's claim could be reviewed objectively and in its entirety.

**Harry Smith's Claim for Benefits**

393.    Plaintiff Harry L. Smith ("Smith") worked as a Recovery Supervisor-Shift Foreman at Champion International's facility in Canton, North Carolina.  Smith's date of hire was January 10, 1969.  See Smith 0005 (NB 20).

185

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 393.

394.    Smith's last day of active employment was May 23, 1993.  <u>See</u> Smith 0005 (NB 20).  Smith began receiving short-term disability benefits from Champion International on May 20, 1993.  Those benefits terminated on November 15, 1993.  <u>See</u> Smith 0002 (NB 20).

**RESPONSE:** As to the facts asserted in ¶ 394, Plaintiffs deny that Mr. Smith's last day of active employment was May 23, 1993. The remaining facts asserted in ¶ 394 are admitted. NB 20: Smith 43.

395.    As a Champion International salaried employee, Smith was eligible to apply for disability income benefits pursuant to the Salaried LTD Plan.

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 395.

396.    On October 7, 1993, Champion International advised Smith that he might be eligible for LTD benefits, <u>See</u> Smith 0039-0040 (NB 20), and a Champion International benefits administrator subsequently submitted an LTD Claim Form on Smith's behalf.  The LTD Claim form listed Smith's "back" as the cause of disability.   <u>See</u> Smith 0043 (NB 20).  Smith's Statement of Claim form, dated October 29, 1993, indicated that the nature of his illness was "Disk Rupture and Spinal Stenosis."  <u>See</u> Smith 0050-0051 (NB 20).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 396.

397.    On December 22, 1993, the Plan notified Smith that his application for LTD benefits had been approved effective November 16, 1993.  <u>See</u> Smith 0079-0080 (NB 20).  The Plan notified Smith that "in order to continue receiving Long Term Disability benefits, you must be totally disabled as defined by the policy"; that after the first 24 months he needed to be considered "totally and permanently disabled" or "unable to do any job for which [he was]

186

reasonable qualified by [his] training, education and experience"; and, that approval of his claim would terminated when he is "no longer disabled as defined in the plan." See Smith 0080 (NB 20).

> **RESPONSE:** As to the facts asserted in ¶ 397, Plaintiffs state that the December 22, 1993 correspondence viewed in its entirety is the best evidence of its content.

398.    Smith's monthly benefit was $3,278.33.  See Smith 0081 (NB 20).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 398.

399.    On April 18, 1994, the U.S. Social Security Administration notified Smith that his application for Social Security disability income benefits had been approved, effective May 19, 1993.  In its Notice of Award, the Social Security Administration noted that the "doctors and other trained personnel who decided that you are disabled expect your health to improve. Therefore, we will review your case in February 1995. . . ."  See Smith 0101-0103 (NB 20).[11]

> **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 399.

400.    On June 1, 1995, the Plan notified Smith that in order to receive benefits beyond November 16, 1995, he would have to be "totally disabled from any occupation" as provided by the Plan.  See Smith 0130 (NB 20).

> **RESPONSE:** As to the facts asserted in ¶ 400, plaintiffs state that by letter dated June 1, 1995, Mr. Smith was informed that in order to receive benefits beyond

---

[11]  As a result of his receipt of Social Security benefits, Smith's benefit pursuant to the Plan was reduced to $2,079.33, effective June 1, 1994.  See Smith 0105-0109 (NB 20).  Effective September 1, 1994, Smith's LTD benefit pursuant to the Plan was reduced further to $1,480.33 per month because one of his dependents also had been approved for Social Security benefits.  See Smith 0114-0118 (NB 20).

November 16, 1995, he would have to be "totally disabled from any

occupation" as provided by the Plan. Further, the evidence shows that

from November, 1993 and for the subsequent three years, Mr. Smith's

long term disability claim was periodically reviewed and Champion

consistently and continuously determined that Mr. Smith was totally

disabled as defined by the Plan under the more restrictive any occupation

standard. However, in October, 1997, contrary to the overwhelming

evidence of Mr. Smith's continued total disability, although there had been

no improvement in Mr. Smith's condition, and in fact his condition had

continued to deteriorate, Champion determined Mr. Smith not disabled

from performing any occupation. NB 20: Smith 130.

401.    On January 30, 1997, as part of its periodic review of Smith's disability status, the

Plan requested that Smith provide a Personal Profile Evaluation, Authorization for Release of

Information, Attending Physician Statement and Physicians Report of Physical Capacity or

Psychiatric Functional Capacity Evaluation.  See Smith 0145 (NB 20).  See also Smith 0146,

0147 (NB 20).

> **RESPONSE:** As to the facts asserted in ¶ 401, plaintiffs state that the referenced
>
> information was requested by CORE, as the January 30, 1997
>
> correspondence was sent on CORE letterhead and signed by CORE
>
> employee Christine Gude. NB 20: Smith 145.

402.    As part of the review, the Plan's consulting physician interviewed Smith on March

3, 1997.  Smith reported that he had "good days and bad days" and that his condition was "worse

in colder weather." See Smith 0143 (NB 20). Smith also reported in his Personal Profile Evaluation that he did not feel he would be "physically able to hold down a full or part time Job or my Past Job or Any Job at this time." See Smith 0153 (NB 20).

> **RESPONSE:** As to the facts asserted in ¶ 402, plaintiffs admit that the claims file contains a document apparently generated by CORE personnel which contains the statement allegedly made by Mr. Smith. However, Plaintiffs state that it is an incomplete summary of the referenced CORE document because Defendants referenced only portions of said document, which were selective in nature, taken out of context and as such significantly alters its interpretation. Plaintiffs state that the referenced CORE document viewed in its entirety is the best evidence of its content. NB 20: Smith 167-168.

403.   The Plan's consulting physician also interviewed the physicians who Smith had identified as his treating physicians: Dr. Culclasure (on April 7, 1997) and Dr. Shields (on April 23, 1997). See Smith 0143 (NB 20). Dr. Culclasure reported that he saw Smith once and couldn't make any comments about his alleged disability. See Smith 0143 (NB 20). Dr. Shields reported that Smith has several significant problems, but could not "confirm or deny [that Smith] is disabled from any occupation." Dr. Shields felt that a formal work capacity evaluation should be done to clarify Smith's disability status. See Smith 0143 (NB 20). Dr. Culclasure agreed that a Functional Capacity Evaluation ("FCE") was necessary to determination Smith's restrictions. See Smith 0159 (NB 20).

**RESPONSE:** As to the facts asserted in ¶ 403, plaintiffs admit that the claims file contains a document apparently generated by various CORE personnel which contains the statements allegedly made by Mr. Smith's treating physicians. However, plaintiffs state that the documentation is inaccurate in that prior to the date of the document generated by Dr. Beavers regarding Mr. Smith's one-time treatment by Dr. Culclasure, Mr. Smith had been to Dr. Culclasure at Carolinas Pain Management for treatment on four separate occasions for epidural steroid injections in an effort to alleviate his agonizing back pain. Additionally, plaintiffs state that it is an incomplete summary of the CORE document because defendants referenced only portions of said document, which were selective in nature, taken out of context and as such significantly alters its interpretation. Plaintiffs state that the referenced CORE document viewed in its entirety is the best evidence of its content. (NB 20: Smith 159).

404.    After speaking with Smith's treating physicians and reviewing Smith's records, the Plan's consulting physician noted that Smith "clearly has many problems and has been out of work for a long time. Though there is not enough objective evidence to certify disability from any occupation at this time, an FCE might make this clearer." See Smith 0168 (NB 20). Therefore, on July 11, 1997, the Plan scheduled Smith for an Independent Medical Examination ("IME") with Peter G. Johnson, M.D., of Clyde, North Carolina. See Smith 0184 (NB 20).

**RESPONSE:** Plaintiffs deny the facts asserted in ¶ 404. Plaintiffs further state that CORE scheduled the IME. (NB 20: Smith-168; 184).

405.    Dr. Johnson reviewed Smith's medical history and examined Smith on August 4, 1997.  In his IME report, Dr. Johnson stated that Smith had a "failed back syndrome" and he concluded that Smith was at maximum medical improvement.  See Smith 0187-0188 (NB 20). Dr. Johnson recommended an FCE to "give additional information to determine Mr. Smith's functional status" and, specifically, whether Smith had "any work capacity at the sedentary or light physical demand level."  See Smith 0188 (NB 20).

> **RESPONSE:** As to the facts asserted in ¶ 405, plaintiffs state that the claims file contains an Independent Medical Examination report prepared by Dr. Johnson which contains the referenced statements. However, Plaintiffs state that it is an incomplete summary of the IME report because the selections referenced by the Defendants referenced only portions of said document, which were selective in nature, taken out of context and as such significantly alters its interpretation. Plaintiffs state that the

referenced IME report viewed in its entirety is the best evidence of its content. Plaintiffs further state that the Defendants, for their own monetary gain at the expense of the plaintiffs, have consistently skewed the evidence and manipulated the facts by taking them out of context and by omitting facts favorable to the plaintiffs to justify their continued denial of long term disability benefits to which plaintiffs are entitled. NB 20: Smith 185-188.

406.    Pursuant to Dr. Johnson's recommendation, the Plan contacted Smith's treating physician Dr. Charles Shields, and requested a prescription for an FCE.  Dr. Shields agreed and referred Smith to Registered Physical Therapist Susan Kimel at Haywood Rehabilitation Center in Clyde, North Carolina.  See Smith 0190-0191, 0213 (NB 20).

**RESPONSE:** Plaintiffs deny the facts asserted in ¶ 406.

407.    The FCE of Smith was conducted on September 25, 1997, and September 26, 1997.  <u>See</u> Smith 0191, 0191-0207 (NB 20).  At the conclusion of the testing and evaluation, Ms. Kimel concluded that Smith was "able to work at the LIGHT Physical Demand Level for an 8 hour day."  <u>See</u> (NB 20).

> **RESPONSE:** Plaintiffs admits the facts asserted in ¶ 407. However, plaintiffs state that it is an incomplete summary of the FCE report because the selections referenced by the Defendants were only portions of said document, which were selective in nature, taken out of context and as such significantly alter its interpretation. Plaintiffs state that the referenced FCE report viewed in its entirety is the best evidence of its content. Plaintiffs state that the FCE was inaccurate and incomplete in that it failed to state the significant pain Mr. Smith suffered during the FCE. Ms. Kimel failed to note that the FCE had to be performed over a two day period because Mr. Smith's pain was so great on the first day that it had to be discontinued and rescheduled to the next day. Additionally, Mr. Smith had to take extra pain medication to compensate for the pain caused by the FCE. NB 20: 191-207.

408.    Dr. Johnson, the IME physician, then reviewed the FCE Report.  Dr. Johnson then opined that Smith could "work full time in the Light Physical Demand Level . . . ."  <u>See</u> Smith 0210 (NB 20).

**RESPONSE:** As to the facts asserted in ¶ 408, plaintiffs admit that Dr. Johnson's opinion is as stated. However, Dr. Johnson's opinion is unreliable because it was based upon the flawed and inaccurate FCE. NB 20: Smith 210.

409.    On October 29, 1997, the Plan notified Smith that it was terminating his LTD benefits.  Based on its review of Dr. Johnson's IME report, the Plan concluded that Smith failed to satisfy the Plan's "any occupation" disability definition.  See Smith 0216-0217 (NB 20).  The Plan notified Smith that his LTD benefits would terminate effective November 30, 1997.  See Smith 0219 (NB 20).

**RESPONSE:** As to the facts asserted in ¶ 409, plaintiffs state that correspondence on CORE letterhead and signed by Roger Libby, a CORE employee, informed Mr. Smith that he was not disabled as defined in the Plan, although the Plan had determined Mr. Smith disabled as defined by the Plan under both the own occupation and the more restrictive any occupation standard for the past three years and although his condition continued to deteriorate during this period of time. NB 20: Smith 219.

410.    On December 5, 1997, Smith's legal counsel requested review of the Plan's decision to terminate Smith's LTD benefits.  See Smith 0220-0221 (NB 20).  Smith requested review of the Plan's decision on the grounds that Smith

"is, as noted, by his physicians, a failed back syndrome case wherein he has undergone some four (4) back surgeries in order to try and get better. That effort has failed and he lives with continuous pain. He is frequently unable to sleep, much less work. He averages less than five (5) hours of sleep per night and is on medications to try and assist him to live with the pain."

193

See Smith 0220 (NB 20).  Smith's counsel also indicated that he would provide the Plan with

additional information supporting his appeal on or before January 4, 1998.  See Smith 0221 (NB

20).

>    **RESPONSE:** As to the facts asserted in ¶ 410, plaintiffs state that the claims file
>
>    contains the referenced December 5, 1997 correspondence. However,
>
>    plaintiffs state that it is an incomplete summary of the December 5, 1997
>
>    correspondence because the selections by the defendants referenced only
>
>    portions of said document, which were selective in nature, taken out of
>
>    context and as such significantly alters its interpretation. Plaintiffs state
>
>    that the referenced IME report viewed in its entirety is the best
>
>    evidence of its content. NB 20: Smith 221.

411.    On January 2, 1998, Smith submitted x-rays, a  December 17, 1997, Vocational

Evaluation commissioned by his counsel and performed by Randy L. Adams, M.Ed., and an

evaluation prepared on April 29, 1997, by James C. Johnson, M.D., for the Social Security

Administration.  See Smith 0237-0240, 0222-0236, 0241-0247 (NB 20).

>    **RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 411.

412.    Based on a vocational interview and vocational testing of Smith, Mr. Adams

opined that Smith was "not employable in any job in the national economy." See Smith 0234

(NB 20).  Mr. Adams made his determination, in part, on the grounds that Smith "would be

limited to unskilled work" because the skills learned in his position as shift supervisor were not

transferable; jobs in the clerical area could not be considered due to low academic performance;

jobs in the sales category would be greatly limited to simple cashier positions which would not

required involved ledger work or balancing of the cash register; jobs in the service category

would range in the light to medium physical demand level, requiring the individual to stand and

walk for extended periods; and, jobs in the industrial category at the unskilled level would

require an individual to remain in static positions for long periods of time.  Mr. Adams also took

issue with the FCE performed by the examiner recommended by Smith's treating physician

because the examination only lasted four hours and forty-five minutes.  See Smith 0230, 0231-

0233 (NB 20).

> **RESPONSE:**  As to the facts asserted in ¶ 412, plaintiffs admit that Randy L. Adams,
>
> M.Ed., CVE performed a vocational evaluation of Mr. Smith dated
>
> December 17, 1997, which was provided to the defendants. Plaintiffs
>
> further state that Randy L. Adams' Vocational Evaluation viewed in its
>
> entirety is the best evidence of its content. NB 20: Smith 222-240.

413.    Dr. Johnson noted in his report that Smith has "[s]evere degenerative disc disease

status post op lumbosacral fusion from L-3 to S-1."  According to Dr. Johnson, Smith had

"marked limitation of extension beyond neutral in the standing position and has lost considerable

lateral bending, rotation and thoracolumbar flexion . . ."; he had "recurrent leg pain and some

intermittent sensory loss in the lateral aspect of his right ankle and foot"; and, "the right lower

extremity both at the knee and ankle" are definitely depressed "by comparison with the left side."

See Smith 0174-0175 (NB 20).  Dr. Johnson also noted that Smith had "full range of motion" in

the upper extremities; "no muscular problems"; "no neurologic problems"; "full use of his hands

with no impairment to perform dexterous movements"; "good ability to grasp and raise his arms

over his head"; and "full range of motion in his hips, knees and all joints of the lower

extremities." See Smith 0174 (NB 20).

> **RESPONSE:** As to the facts asserted in ¶ 413, plaintiffs admit that the Disability
>
> Determination Evaluation performed by James C. Johnson, M.D. and
>
> dated 4/29/97 was provided to the defendants as stated.  However,
>
> plaintiffs state that it is an incomplete summary of Dr. Johnson's
>
> evaluation because defendants referenced only portions of said document,
>
> which were selective in nature, taken out of context and as such
>
> significantly alters its interpretation. Plaintiffs state that the referenced
>
> evaluation viewed in its entirety is the best evidence of its content. NB 20:
>
> Smith 172-175.

414.    The Plan forwarded to Dr. Beavers, its consulting physician, for review the

information it received from Smith, the September 25, 1997 FCE, and the October 13, 1997 IME

report.  See Smith 0248-0250 (NB 20).

> **RESPONSE:** As to the facts asserted in ¶ 414, plaintiffs admit that the claims file
>
> contains a document apparently generated by Beavers which states that he
>
> reviewed the "new material on this case, including the VOC assessment".
>
> NB 20: Smith 248.

415.    Dr. Beavers analyzed the vocational assessment submitted by Mr. Smith, and

disagreed with Mr. Adams' view that Smith's age was relevant to his claim for LTD benefits.  See

Smith 0248 (NB 20).[12]  He also rejected Mr. Adams' view that the FCE was suspect because it

lasted "only" four hours and forty-five minutes; in Dr. Beavers' view, the FCE "was as thorough

an FCE as I have ever Seen."  See Smith 0248 (NB 20).  Dr. Beavers also disagreed with Mr.

Adams' comment that a man of fifty-one years of age could not undertake a new job and learn

new skills.  See Smith 0248 (NB 20).

> **RESPONSE:**  Plaintiffs lack sufficient knowledge to admit or deny the facts asserted in ¶
>
> 415. ( NB 20: Smith 172-175).

416.    Dr. Beavers concluded that he "did not See any information, medical or otherwise,

that would justify overturning the denial of the claim that this employee is totally disabled form

any occupation."  See Smith 0248-0251 (NB 20).

> **RESPONSE:**  Plaintiffs deny that ¶ 416 is an accurate quotation of Beavers' February 3,
>
> 1998 note. NB 20: Smith 248.

417.    On July 6, 1998, the Plan notified Smith that it upheld the denial of his claim for

LTD benefits.  See Smith 0253-0255 (NB 20).  In reaching this determination, the Plan reviewed

Dr. James Johnson's Report, Mr. Adams' Vocational Evaluation, Dr. Charles Johnson's IME and

the September 25, 1997 FCE.  See Smith 0253 (NB 20).

> **RESPONSE:**  As to the facts asserted in ¶ 417, plaintiffs admit that by letter dated July 6,
>
> 1998, Mr. Smith was informed that the denial of his claim for LTD
>
> benefits was upheld. The remaining facts asserted in ¶ 417 are denied. NB
>
> 20: Smith 253-255.

---

[12]  Age is not a factor in either Plan's definition of "disability."  See Plan 0060 (Hourly LTD
Plan) & 0014 (Salaried LTD Plan)(NB 20).

418.    On September 2, 1998, Smith's legal counsel appealed to the Plan's Claims
Review Committee the Plan's termination of Smith's LTD benefits.  See Smith 0257-0259 (NB
20).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 418.

419.    On November 6, 1998, the Plan notified Smith's counsel that the Plan's Claims
Review Committee would review Smith's claim on December 2, 1998, and invited Smith to
provide "any new or additional document or evidence that [Smith] is totally disabled and unable
to engage in any work at all."  See Smith 0262-0263 (NB 20).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 419.

420.    On November 23, 1998, Smith submitted additional information for consideration
including a letter dated November 19, 1998, from his former treating physician Dr. Culclasure,
an office note from Keith M. Maxwell, M.D., and, a November 18, 1998 Electro Diagnostic
Consultation Report by Andrew Rudins, M.D.  See Smith 0264-0269 (NB 20)

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 420

421.    The office note from Dr. Maxwell indicated the Smith met with him to review his
CT myelogram that showed "moderate relatative stenosis at L2/3 secondary to disk protrusion
and probably ligament hypertrophy" and "some elements of aracnoiditis." See Smith 0266 (NB
20).  Dr. Maxwell also recommended a nerve conduction study, See Smith 0267 (NB 20),
completed on November 18, 1998, by Dr. Rudins.  According to Dr. Rudins

> "there is electrophysiologic evidence for chronic right L5-S1 radiculopathies, though a
> lumbosacral plexopathy could not be absolutely ruled out.  No abnormal spontaneous
> activity was present to indicate active denervation, but this can occur with a slowly
> progressive process, which is likely in this case."

See Smith 0268 (NB 20).

> **RESPONSE:** As to the facts asserted in ¶ 421, plaintiffs state that while factually
>
> accurate, it is an incomplete summary of Dr. Maxwell's October 26, 1998
>
> office note because defendants referenced only portions said document,
>
> which were selective in nature, taken out of context and as such
>
> significantly alters its interpretation. Plaintiffs state that Dr. Maxwell's
>
> October 26, 1998 office note viewed in its entirety is the best evidence of
>
> its content.  NB 20: Smith 266.

422.    Dr. Culclasure's November 19, 1998, letter noted that he examined Smith and

reviewed his medical records.  The records reviewed included Dr. Rudins' nerve conduction

study and the vocational evaluation performed by Mr. Adams.  Dr. Culclasure diagnosed Smith

with "severe lumbar degenerative disc disease, L5 and S1 radiculopathies and lumbar post-

laminectomy syndrome" and opined that Smith was "totally disabled and unable to engage in any

occupation or business for wage or profit for which he is qualified by training education or

experience."  See Smith 0265 (NB 20).

> **RESPONSE:** As to the facts asserted in ¶ 422, plaintiffs admit that ¶ 422 accurately
>
> reflects Dr. Culclasure's diagnoses as stated in his November 19, 1998 and
>
> further states,  "It is my opinion that Mr. Smith is totally disabled and
>
> unable to engage in any occupation or business for wage or profit for
>
> which he is qualified by training, education or experience". Plaintiffs deny
>
> the remaining facts asserted in  ¶ 422. NB 20, Smith 265.

423.    The Claims Review Committee discussed Smith's claim at its December 2, 1997, meeting.  The Committee reviewed Smith's claims file and voted to table its decision pending the completion of a review of Smith's doctors' reports included with a November 23, 1998, letter from Smith's attorney and the results of a Transferable Skills Analysis.  See CRC 1349-1351 (NB 21).[13]

RESPONSE:  Plaintiffs admit the facts asserted in ¶ 423.

424.    Jennifer Mikeska, MRC, completed the Transferable Skills Analysis on December 5, 1998.  See Smith 0271-0285 (NB 21).  Ms. Mikeska reported that Smith "does have transferable skills that are vocationally appropriate and applicable to the same occupational group and category."  See Smith 0271(NB 21).  According to Ms. Mikeska, Smith's transferable skills should enable [Smith] to return to the work community."  Based on Smith's "employment history with Champion," and, more specifically, Smith's position as a recovery operator helper which he held for twenty-five years at Champion," Ms. Mikeska identified several jobs considered appropriate for Smith.  See Smith 0271-0285 (NB 21).

RESPONSE:  As to the facts asserted in ¶ 424, Plaintiffs admit that Ms. Mikeska performed a transferable skills analysis which was flawed and inaccurately and improperly identified jobs that Mr. Smith could perform. NB 20: Smith 222-240.

425.    The Plan then commissioned a Peer Review Analysis of Smith's claim, which was completed on December 10, 1998, by John Nemunaitis, M.D., a Physical Medicine and

---

[13]    The Chair of the Committee "ordered that a copy of the documentation relative to the requests for review previously distributed to the Committee be filed with the minutes of the meeting."  See CRC 1349, 1644-1932 (NB 21).

Rehabilitation Specialist.  See Smith 0286-0287 (NB 20).  Dr. Nemunaitis reviewed, *inter alia*,

Dr. Culclasure's November 19, 1998, letter, Dr. Rudins' November 18, 1998, nerve conduction

study, Dr. Maxwell's office notes, the September 25 & 26, 1997, FCE, and the August 4, 1997,

IME.  At the conclusion of his review, Dr. Nemunaitis opined that the newly submitted

information did not substantiate Smith's claim that he was totally disabled and unable to function

at light duty physical demand level.  Dr. Nemunaitis, therefore, recommended that the "earlier

determination of denial should be upheld."  See Smith 0287 (NB 20).

> **RESPONSE:**  Plaintiffs deny the facts asserted in ¶ 425.  Plaintiffs assert that the
>
> documents cited above are the own best evidence of their content. (NB 20:
>
> Smith 287).

426.    The Claims Review Committee then reconvened on December 11, 1998, and

considered Smith's claim for benefits.  See CRC 0023 (NB 21).  The Committee reviewed

Smith's claims file, the information submitted by Smith's counsel, Dr. Nemunaitis' Peer Review

Analysis, the Transferable Skills Analysis performed by Ms. Mikeska, Dr. Peter Johnson's IME

Report, the September 25, 1997, FCE, Mr. Adams' Vocational Evaluation, Smith's x-rays, Dr.

James Johnson's Disability Determination Evaluation, Dr. Culclasure's November 19, 1998,

letter, Dr. Maxwell's office note, and Dr. Rudins' Report.  The Committee examined this

information against the Plan's definition for total disability and voted to uphold the decision to

deny Smith's claim for LTD benefits.  See CRC 1933-1935 (NB 21).

> **RESPONSE:**  As to the facts asserted in ¶ 426, Plaintiffs admit that the Committee
>
> discussed Mr. Smith's claim; however, the Committee was operating
>
> under a conflict of interest in that all Committee members were Champion

employees, were aware that there were significant cost savings associated

with upholding the denial of benefits, thereby providing significant

monetary gain for their employer, Champion.  Accordingly, the Claims

Review Committee failed to consider the objective medical evidence;

failed to consider chronic pain; failed to consider all of the evidence; and

placed inordinate weight to the evidence supporting the denial.  NB 21:

CRC 1931-1935.

427.    On January 29, 1999, the Plan notified Smith that based on the Plan's "any

occupation" disability definition, the Plan upheld the denial of his claim for LTD benefits.  See

Smith 0288-0289 (NB 20).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 427

428.    On January 9, 2001, one year after the Plan denied Smith's claim for LTD

benefits, Smith's current counsel requested the Plan to "reconsider[] . . . the decision to terminate

[Smith's] benefits."  See Smith 0290 (NB 36).  Smith's counsel submitted to International Paper

medical and other information they alleged supported Reece's claim for benefits.  See Smith

0290-0589 (NB 36).

**RESPONSE:**  Plaintiffs deny the facts asserted in ¶ 428. NB 36: Smith 290-589.

### Dolphus Treadway's Claim for Benefits

429.    Plaintiff Dolphus L. Treadway ("Treadway") worked as a Chip Deliverer at

Champion International's facility in Canton, North Carolina.  He was an hourly employee and his

is date of hire was April 17, 1972.  See Treadway 0008 (NB 22).

**RESPONSE:** Plaintiffs deny the facts asserted in ¶429 as stated. There are two different

dates of hire for Mr. Treadway in the record:  May 17, 1972 (see NB

51:CE-489, CE-392) and April 17, 1972 ( NB 22: Treadway- 8).  As to the

allegation concerning the fact that Mr. Treadway worked as a Chip

Deliverer, plaintiffs would respond that more specifically he was a "First

Operator" which required him to operate heavy equipment and load and

unload wood chips as a wood handler.  Plaintiffs admit Treadway worked

at Champion's Canton facility.  See NB 51: CE 486.  As to the last

sentence, plaintiffs admit he was an hourly employee, but there is a one

month discrepancy in the records concerning his date of hire.  NB 51: CE-

489, 392 shows May 17, 1972; NB 22: Treadway-8 shows April 17, 1972.

430.     Treadway's last day of active service was December 20, 1995.  See Treadway

0007 (NB 22).  Treadway was diagnosed with coronary artery disease, See Treadway 0029 (NB

22), and received and exhausted the short-term disability benefits available to him from

Champion International.  See Treadway 0029 (NB 22).

**RESPONSE:** As to the facts asserted in ¶ 430, plaintiffs admit the first sentence; as to

the diagnosis of coronary artery disease in the second sentence, plaintiff

would admit that was one diagnosis, but would also point out that Mr.

Treadway had a myocardial infarction (heart attack) and bypass surgery in

April 1994, and lower back surgery.  See NB 22: Treadway 10,11; NB 51:

CE 489.  For a more complete listing of Mr. Treadway's diagnoses, see Pl.

LR 56 St.  ¶ 677, which stated that Mr. Treadway had been diagnosed with

"coronary artery disease (CAD), coronary artery bypass graft, exertional angina,  cardiac ischemia, myocardial infarction, hypertension, cephalalgia and edema."  See NB 22: Treadway 10, 11; NB 51: CE 379, 381, 452, 486, 489. Plaintiffs admit that Mr. Treadway received short-term disability benefits.

431.    As a Champion International hourly employee, Treadway was eligible to apply for disability income benefits pursuant to the Hourly LTD Plan.

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 431.

432.    Treadway applied for LTD benefits, and, on June 27, 1996, the Plan notified Treadway that his application for LTD benefits had been approved, effective June 19, 1996.  See Treadway 0003-0004 (NB 22).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 432.

433.    Treadway's LTD benefit was $556.17 per month.  See Treadway 0003 (NB 22).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 433.

434.    When Treadway reached the expiration of his initial "own occupation" period of benefits, the Plan began to collect information to determine whether Treadway could satisfy the more stringent "any occupation" disability definition, thereby entitling Treadway to benefits beyond the initial thirty months of benefits.

**RESPONSE:**  Plaintiffs admit  the facts asserted in ¶ 434.

435.    In order to assist in this determination, the Plan scheduled Treadway for an Independent Medical Examination ("IME") with Juan L. Aldrich, M.D., FACC, a cardiologist in Hendersonville, North Carolina.  See Treadway 0010-0012 (NB 22).  Dr. Aldrich reviewed

204

Treadway's medical records, family medical history, medications and, on June 29, 1998,

examined Treadway.  See Treadway 0010-0012 (NB 22).  According to Dr. Aldrich

> "the issue at hand is [Treadway's] exercise capacity. He has not returned to work in spite of two stress tests which have revealed reasonable exercise capacity. The second test did reveal a somewhat shorter length of exercise on the same protocol."

See Treadway 0011 (NB 22).  Therefore, Dr. Aldrich recommended "an echocardiogram for left

ventricular function and a stress thallium (the same test performed in December 1995)" to

address Treadway's condition "precisely."  See Treadway 0012 (NB 22).

> **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 435 as stated.  First, Unival in Ann
>
> Arbor, Michigan, rather than "the Plan" scheduled Mr. Treadway for an
>
> IME with Dr. Juan Aldrich.  See NB 22: Treadway 10.  Plaintiff lacks
>
> independent information to know what Dr. Aldrich reviewed prior to
>
> examining Mr. Treadway on June 29, 1998.  Plaintiff would further state
>
> that the quotes from Dr.  Aldrich's letter of June 29, 1998, which appear in
>
> ¶ 435 are accurate but incomplete quotes, and fail to state that Dr. Aldrich
>
> recommended, in addition to an echocardiogram and a stress thalium test,
>
> medication modification, and psychological evaluation and counseling.
>
> See NB 22:Treadway-12.

436.    Pursuant to Dr. Aldrich's recommendation, the Plan scheduled Treadway for a

stress test and an echocardiogram.  See Treadway 0013-0018 (NB 22).  Upon review of the

results of the stress test and echocardiogram, Dr. Aldrich concluded that Treadway was "capable

of returning back to work" with the restrictions noted in the modification checklist.  See

Treadway 0022-0023 (NB 22).  The Modification Checklist prepared by Dr. Aldrich indicated

that Treadway could work eight hours per day, five days per week, lift up to twenty-five pounds, walk up to one thousand feet, stand for six hours and walk up two flights of stairs.  See Treadway 0024 (NB 22).  Dr. Aldrich further noted that Treadway's

> "ability could be even greater with less restriction if some revamping of his medical therapy could be performed. This is primarily based on the fact that this patient began to have burning discomfort in the chest presumably angina pectoris from peri-infarction ischemia at a heart rate of 110 though he was able to increase his rate up to 140 without ischemic electrocardiographic changes.  With higher does of beta blockers, I believe that this patient's subjective discomfort could be lessened and possibly his exercise capacity enhanced further. Even having said this, it is still not clear whether the burning in the chest is truly cardiac ischemia since the EKG revealed no change [and the] thallium scan revealed minimal peri-infraction redistribution which is a very common finding."

See Treadway 0022 (NB 22).

> **RESPONSE:**  Plaintiffs deny the facts as stated in ¶ 436, and would state that again, CORE rather than "the Plan" is believed to have scheduled Mr. Treadway for his stress test and echocardiogram.  NB 22: Treadway-10, 21.  Further, the quotes contained in ¶ 436 from Dr. Aldrich's letter of August 21, 1998 to Sandy Greco, RN for Unival in Ann Arbor, Michigan, are accurate but incomplete quotes from said letter, and fail to state that Dr. Aldrich once again raised the issue of psychological counseling as he believed that "fear has become a major problem for this patient." See NB 22: Treadway-23.

437.    To further assist in determining whether Treadway satisfied the "any occupation" disability definition, the Plan commissioned Jennifer Mikeska, MRC, to perform a Transferable Skills Analysis.  See Treadway 0025-0027 (NB 22).  By report dated September 1, 1998, Ms. Mikeska noted that Treadway's transferable skills included comparing, tending and taking instructions-helping.  Ms. Mikeska examined Treadway's employment history and concluded that

Treadway "is capable of working as a chip deliverer which is the position he previously held at Champion."  See Treadway 0025 (NB 22).  She also identified several additional jobs considered appropriate for Treadway.  See Treadway 0025-0027 (NB 22).

> **RESPONSE:**  Plaintiffs deny the facts asserted in ¶ 437 as stated.  Once again, plaintiffs believe that CORE or more specifically, "Cost Review Services," a CORE, Inc.  company, rather than "the Plan" commissioned Jennifer Mikeska to perform a TSA on Mr. Treadway.  NB 22: Treadway 25.  Plaintiffs would note that the three transferrable skills listed in ¶ 437 are the entire list of transferrable skills identified by the TSA.  NB 22: Treadway 25.  Ms. Mikeska noted no other skills other than the three skills of "comparing, tending and taking instructions-helping." Ms. Mikeska did express an opinion that Mr. Treadway was capable of working as a chip deliverer, which was the position he previously held at Champion.  While Ms. Mikeska also identified several additional jobs she considered appropriate for Mr. Treadway, there is nothing whatsoever in her TSA report to indicate how he was to perform those jobs in light of his previously diagnosed multiple cardiac conditions, and restrictions imposed upon him.  See NB 22:Treadway 25-34.

438.    On September 11, 1998, based on, *inter alia*, the IME report and the Transferable Skills Analysis, the Plan notified Treadway that it was terminating his LTD benefits because he was "[n]ot disabled as defined in the Plan."  See Treadway 0035-0036 (NB 22).  See also Treadway 0029-0031 (NB 22).  The Plan informed Treadway that

"[t]he final independent Medical Examination determination made after reviewing your 7/23/98 Stress Thallium Test, and your 8/6/98 Echo Cardiogram found you capable of working 8 hours per day, 5 days per week with restrictions of no lifting of more than 25 pounds, and no stair climbing of more than 2 flights, standing 6 hours and walking 1000 feet. A Transferable Skills Analysis found you capable of working as a Chip Deliverer. Other positions have also been identified."

See Treadway 0035-0036 (NB 22). The Plan notified Treadway of his right to request reconsideration of the decision, See Treadway 0036 (NB 22), and that his LTD benefits would terminate effective December 31, 1998. See Treadway 0039 (NB 22).

**RESPONSE:** Plaintiffs deny the facts asserted in ¶ 438 as stated. Specifically, CORE, rather than "the Plan" notified Mr. Treadway that his LTD benefits were being terminated. NB 22: Treadway 35. More specifically, the letter came from J.D. Beavers, MD who signed the correspondence as Medical Director of Champion Disability Management Program, but wrote the letter on CORE letterhead. Id. The letter did notify Mr. Treadway of his right to appeal the decision, and did refer to his IME, stress test, echocardiogram and TSA. NB22:Treadway-36.

439. On December 22, 1998, Treadway's legal counsel appealed the Plan's termination of Treadway's LTD benefits. See Treadway 0042 (NB 22). See also Treadway 0043-0045 (NB 22).

**RESPONSE:** Plaintiffs deny the facts asserted in ¶ 439 as stated. Specifically, Mr. Treadway's legal counsel had written Dr. Beavers on September 30, 1998.

208

See NB 22: Treadway 37-38. Plaintiffs do admit that Mr. Treadway's

counsel specifically appealed the Plan's termination of Mr. Treadway's

LTD benefits on December 22, 1998. Mr. Treadway's counsel also wrote

Ms. Mary Lee Dixon, Benefits Services Coordinator for Champion

International on February 4, 1999 requesting responses to prior letters.

See NB 22: Treadway 43.

440.    On February 8, 1999, the Plan notified Treadway's counsel that it was treating his

December 22, 1998, letter as an initial claim for benefits, and that Treadway would receive a

response to his claim within ninety days, unless special circumstances warranted an extension to

180 days. See Treadway 0046-0047 (NB 22).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 440.

441.    The Plan further informed Treadway's counsel that, pursuant to the Plan, "[in] the

event he did not receive a response, [he] should consider [his] claim denied" and that he,

thereafter, would have a right to appeal the decision to the Champion International Vice

President-Benefits for further review of the claim. See Treadway 0046-0047 (NB 22).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 441.

442.    The Plan also provided to Treadway's counsel "the transferable skills analysis,

Independent Medical Exam results and modification checklist from Dr. Juan Aldrich, reports

from Haywood Regional Medical Center and stress test report from Haywood County Hospital."

See Treadway 0046 (NB 22).

**RESPONSE:** Plaintiff admits the facts asserted in ¶ 442.

209

443.    On or about February 24, 1999, Treadway withdrew his claim for Benefits.  See
Treadway 0050 (NB 22).

> **RESPONSE:** Plaintiffs deny the facts asserted in ¶ 443. Defendants rely on someone's
> handwritten, unsigned  notes that say "per call from Janice EE has signed
> ret forms eff 2/1/99.  Loc contact EE re: dropping appeal on LTD & and
> has requested a letter from attorney stating withdrawing appeal.  Let go
> thru appeal & not start Pension with/o signing waiver.  Check with/
> Sharon - does he have to sign waiver for LTD?" See NB 22:Treadway-50.
> On March 12, 1999 Mr. Treadway's attorney wrote Ms. Mary Lee Dixon
> at Champion International Corporation, requesting  a psychological
> evaluation of Mr. Treadway as recommended by the IME physician, Dr.
> Aldrich.  See NB 22: Treadway- 51.  His attorney closed his letter stating
> "as always, your kind cooperation in our **appeal** of this matter is greatly
> appreciated," emphasis added.  NB22:Treadway -51. Clearly, Mr. Reece
> had not withdrawn his appeal.

444.    On October 11, 1999, Treadway's current legal counsel informed Champion
International that they had been consulted by Treadway regarding his claim for LTD benefits, and
requested copies of Treadway's claims file and plan documents.  See Treadway 0061 (NB 37).

> **RESPONSE:** Plaintiffs admit the facts asserted in ¶444.

445.    The Plan complied with Treadway's counsel's request and sent to them copies of
Treadway's claims file and relevant plan documents.  See Treadway 0058, 0053 (NB 37).

> **RESPONSE:** Plaintiffs admit the facts asserted in ¶445.

446.     On January 9, 2001, which was more than two years and three months after the Plan denied Treadway's claim for continuing benefits, more than two years after Treadway filed the appeal he later withdrew, and more than one year after the Plan responded to Treadway's request for information, Treadway's counsel requested the Plan to "reconsider[] . . . the decision to terminate [Treadway's] benefits." See Treadway 0065 (NB 37). Treadway's counsel submitted to International Paper medical and other information they alleged supported Treadway's claim for benefits. See Treadway 0065-243 (NB 37).

RESPONSE: Plaintiffs deny the facts asserted in ¶ 446 as stated. Specifically, Plaintiff Treadway denies that he withdrew his appeal or his request for review of his claim or that he ever expressed any intent to do so; Mr. Treadway further asserts that he requested review of the termination of his benefits, that his request was followed by a letter from his counsel requesting information and a new evaluation, that he never received any response from Champion/CORE; therefore, defendants' failure to respond should be deemed a denial; and in any event, based on the evidence in the record, any appeal of Mr. Treadway's claim would have been futile. (NB 22 : Treadway-51). See Response to ¶443.

As to the other facts asserted in ¶ 446, Plaintiffs admit that because in denying Mr. Treadway's continued long term disability benefits the Plan failed to consider the objective medical evidence; failed to consider chronic pain; failed to consider all of the evidence; and placed inordinate weight on the evidence supporting the denial, Plaintiffs' counsel submitted

211

medical records and other objective information and documentation so that
Mr. Treadway's claim could be reviewed objectively and in its entirety.

### Martha Whitley's Claim for Benefits

447.    Plaintiff Martha B. Whitley ("Whitley") worked as an hourly employee at
Champion International's facility in Canton, North Carolina.  Her hire date was April 8, 1980.
See Whitley 0206, 0002, 0116 (NB 23).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 447.

448.    Whitley's last day of active employment was March 29, 1988.  See Whitley 0206
(NB 23).  At that time, she held the position of package sealer, machine (i.e., stencil finisher).
See Whitley 0189 (NB 23).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 448.

449.    Whitley began receiving short-term disability benefits under Champion
International's Short-Term Disability Plan on March 30, 1988.  Those benefits terminated on
September 27, 1988.  See Whitley 0205 (NB 23).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 449.

450.    As a Champion International hourly employee, Whitley was eligible to apply for
disability income benefits pursuant to the Hourly LTD Plan.

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 450.

451.    On or about September 28, 1988, Whitley began receiving benefits pursuant to the
Hourly LTD Plan.  Her disabling diagnosis was fibromyalgia.  See Whitley 0206, 0244-0359
(NB 23).

**RESPONSE:** As to the facts asserted in ¶ 451, Plaintiffs admit that Ms. Whitley's disabling diagnoses were fibromyalgia, depression, chronic pain syndrome and herpes zoster. NB 23: Whitley 206, 244-359.

452.     On September 9, 1994, the Plan Supervisor notified Whitley that she no longer met the requirements for continuation of LTD benefits under the more stringent "any occupation" disability definition because the Plan had been "advised that you own and operate Tonya's Hair house and have done so since October 1, 1988." <u>See</u> Whitley 0011-0013 (NB 23).  Because Whitley had been engaging in an occupation or business for wage and profit, the Plan Supervisor terminated her benefits retroactive to October 1, 1988.  <u>See</u> Whitley 0011 (NB 23).

**RESPONSE:** Plaintiffs deny that Ms. Whitley had been engaging in an occupation for wage and profit. Plaintiffs admit the remaining facts asserted in ¶ 452.

453.     The Plan based its decision to terminate LTD benefits on an investigative report prepared by Morgan Associates, a private investigative service, which observed Whitley cutting hair at Tonya's Hair House.  <u>See</u> Whitley 0005-0010 (NB 23).

**RESPONSE:** Plaintiffs deny the facts asserted in ¶ 453.

454.     By letter dated October 10, 1994, Whitley's legal counsel requested the Plan to review the denial of Whitley's continuing LTD benefits.  <u>See</u> Whitley 0020-0056 (NB 23). Whitley asserted that the hair salon was owned and operated by Whitley's husband.  <u>See</u> Whitley 0033-0056 (NB 23).  Whitley's counsel also submitted the U.S. Social Security Administration's December 19, 1989, Notice of Award granting Whitley Social Security benefits effective March 29, 1988, <u>See</u> Whitley 0024-0032 (NB 23), and a letter from Kate Queen, M.D., of Mountain Medical Center dated October 3, 1994.  Dr. Queen stated that she had been treating Whitley for

213

six or seven years, that she had diagnosed Whitley with fibromyalgia, that Whitley "had diffuse muscoskeletal pain and soft tissue tenderness," and that Whitley "remains currently unable to engage in any occupation or business for wage or profit for which she is reasonably qualified by training, education or experience."  Whitley 0022-0023 (NB 23).

> **RESPONSE:**  As to the facts asserted in ¶ 454, plaintiffs state that while factually accurate, it is an incomplete summary of Dr. Queen's October 3, 1994 letter because defendants referenced only portions of said document, which were selective in nature, taken out of context and as such significantly alters its interpretation. Plaintiffs state that Dr. Queen's October 3, 1994 letter viewed in its entirety is the best evidence of its content.  NB 23: Whitley 22-23.

455.    The Plan notified Whitley and her counsel that it would treat her counsel's October 10, 1994, letter as an initial claim and review it within ninety days.  See Whitley 0057 and 0058 (NB 23).

> **RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 455.

456.    On December 7, 1994, the Plan notified Whitley's counsel that it had upheld the denial of her claim for continuing LTD benefits because Whitley did not meet the "any occupation" definition of disability under the Hourly LTD Plan.  The Plan's decision was based on the fact that "Tonya's Hair House was visited on more than one occasion by investigators retained by the Plan and they observed your client actually at work as a beautician," and further "other employees at Tonya's hair house stated that Mrs. Whitley was the proprietor and worked as a beautician."  Whitley 0059-0060 (NB 23).  The Plan advised Whitley and her counsel that

they could request a review of the denial of LTD benefits within sixty days of receipt of the denial letter.  Whitley 0060 (NB 23).

**RESPONSE:** Plaintiffs deny the facts asserted in ¶ 456.

457.    On January 31, 1995, Whitley's new legal counsel appealed the denial of her claim for continuing LTD benefits.  See Whitley 0062-0066 (NB 23).  In support of Whitley's appeal, her counsel submitted a January 6, 1995, letter from Glenn Arrants, M.D., in which he advised that he had counseled Whitley since January 18, 1994, noted that Whitley "has multiple physical problems that affect her mental and emotional states of mind," and concluded that "due to her mental pains she cannot maintain any physical activity for consistent, measurable lengths of time."  See Whitley 0064 (NB 23).  Whitley also submitted a January 10, 1995, letter from Dr. Queen in which Dr. Queen noted that Whitley "has a severe and incapacitating problem with fibromyalgia," and "has never been able to regain full independent function and an ability to meet not only the demands of her own personal care and the care of her family at home, as well as work related responsibilities."  Dr. Queen stated that "based on her pain and impairments she has in function that [Whitley] would not be able to engage in any occupation or business for wage or profit for which she is reasonably qualified by training, education, or experience."  See Whitley 0066 (NB 23).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 457.

458.    On May 5, 1995, the Plan notified Whitley's counsel that the Plan's Claims Review Committee would consider Whitley's claim at its May 12, 1995, meeting.  See Whitley 0071 (NB 23).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 458.

459. On May 12, 1995, the Claims Review Committee reviewed Whitley's claims file, including the investigative reports stating that Whitley had been actively at work at her business and had a "current cosmetology license." See CRC 0320-0322 (NB 24). The Committee decided to postpone a final decision until Whitley could be examined by an independent medical examiner and her counsel could be provided copies of the investigative reports and an opportunity to comment on their contents. See CRC 0320-0322 (NB 23).[14]

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 459.

460. By letter dated June 29, 1995, the Plan notified Whitley's counsel of its decision to postpone its decision, and that an Independent Medical Examination ("IME") of Whitley had been scheduled for July 6, 1995, with C.R. Stephenson, M.D., of Greenville, South Carolina. The Plan also sent to Whitley's counsel copies of the investigative reports and asked her counsel to respond to the reports. See Whitley 0072-0073 (NB 23).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 460.

461. Dr. Stephenson reviewed Whitley's medical records and, on August 14, 1995, conducted his IME of Whitley. See Whitley 0079-0081 (NB 23).[15] According to Dr. Stephenson, Whitley "is tender everywhere, literally. There may be some accentuation over the tender points of fibromyalgia, but by and large she is tender absolutely everywhere she is touched." See Whitley 0080 (NB 23). From his IME, Dr. Stephenson diagnosed Whitley with

---

[14] The Chair of the Committee "ordered that a copy of the documentation relative to the requests for review previously distributed to the Committee be filed with the minutes of the meeting." See CRC 0320, 0323-0482 (NB 23).

[15] The IME had to be rescheduled for August 14, 1995, so that Dr. Stephenson would have adequate time to review Whitley's medical records. See Whitley 0074-0078 (NB 23).

fibromyalgia and chronic fatigue, and concluded that he did not believe that Whitley was

"employable at this time or in the foreseeable future." See Whitley 0081 (NB 23).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 461.

462.    On September 13, 1995, the Claims Review Committee again considered

Whitley's claim for continuing LTD benefits.  After reviewing the claims materials, including Dr.

Stephenson's IME report, the Committee overruled the previous decision denying Whitley's claim

for benefits and reinstated her LTD payments.  See CRC 0062-0064 (NB 24).[16]

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 462.

463.    Pursuant to the terms of the Plan, Whitley was required to periodically certify her

continuing disability status.  Such a review was conducted in 1996, and, at the conclusion of the

review, CORE recommended the continuation of Whitley's LTD benefits.  See Whitley 0114-

0117, 0116, 0118-0119, 0120-0121 (NB 23).

**RESPONSE:** As to the facts asserted in ¶ 463, plaintiffs state that under the terms of the

Plan, "Upon the request of the Plan Supervisor, the Participant may be

required to submit to an examination by a Physician selected by the Plan

Supervisor when and as often as it may reasonably require". NB 66: Plan

67.

464.    On June 16, 1997, Dr. Queen completed an Attending Physician Statement where

she identified Whitley's diagnosis as fibromyalgia.  Although she stated that Whitley was totally

---

[16]   The Chair of the Committee "ordered that a copy of the documentation relative to the requests for review previously distributed to the Committee be filed with the minutes of the meeting." See CRC 0062, 0067-0319 (NB 24).

217

disabled from both her regular occupation and any other occupation, Dr. Queen did not identify

Whitley's restrictions or limitations.  See Whitley 0122-0123 (NB 23).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 464.

465.    On July 5, 1997, Whitley submitted a Personal Profile Evaluation where she

detailed her present condition as "fibromyalgia-feel like I have the flu all the time ache all over,

sore, swelling, neck turns numb."  See Whitley 0124-0127 (NB 23).  According to Whitley, she

expected to return to some other type of occupation on a full-time or part-time basis "if I get able

to."  See Whitley 0126 (NB 23).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 465.

466.    On July 7, 1997, Whitley's treating physician referred her to Thomas

Rehabilitation Hospital for a Functional Capacity Evaluation ("FCE") "to assist with assessing

the client's disability status."  See Whitley 0128-0140 (NB 23).  According to the FCE report,

"Whitley completed test activities at the SEDENTARY physical demand level of work.

Performance in testing was limited by moderate material handling difficulty and reported pain."

See Whitley 0128, 0139 (NB 23).  The report further concluded:

> "Based on performance in testing: sitting, standing, forward reaching, handling and
> fingering are limited to the frequent basis.  Walking, stair climbing, stooping, overhead
> reaching and bended reaching are limited to the occasional basis.  Ladder climbing,
> kneeling, crouching and crawling are impaired.  Floor to bench height lifting, lifting
> above shoulder height and 2 hand carrying are limited to 10 lbs at the occasional basis."

Whitley 0139 (NB 23).

> **RESPONSE:** As to the facts asserted in ¶ 466, plaintiffs state that at the request of
> CORE, Ms. Whitley's treating physician referred her for an FCE. As to the
> remaining facts asserted in ¶ 466, plaintiffs state that while factually
> accurate, it is an incomplete summary of the FCE because defendants
> referenced only portions of said document, which were selective in nature,

218

taken out of context and as such significantly alters its interpretation. Plaintiffs state that the FCE viewed in its entirety is the best evidence of its content. Plaintiffs further state that the defendants, for their own monetary gain at the expense of the plaintiffs, have consistently skewed the evidence and manipulated the facts by taking them out of context and by omitting facts favorable to the plaintiffs to justify their continued denial of long term disability benefits to which plaintiffs are entitled. NB 23: Whitley 128-140.

467.     Whitley submitted medical notes from Mark L. Moody, M.D., dated August 5, 1997, which indicated that a "cervical scan shows some slight disc bulging present at 5-6 and 6-7, but no nerve root impingement." <u>See</u> Whitley 0141 (NB 23). The notation further indicated that Whitley "has been complaining of some left upper extremity tingling. I feel this is part of the fibromyalgia picture . . . we will not have her follow-up on a regular basis." <u>See</u> Whitley 0141 (NB 23).

**RESPONSE:** Plaintiffs admit the facts asserted in ¶ 467.

468.     After receiving the FCE, CORE requested Whitley's treating physician, Dr. Queen, to complete a Modification Checklist. On September 15, 1997, Dr. Queen completed this modification checklist which states "I do not feel patient can return to regular employment. Is on . . . medication in an effort to manage her fibromyalgia so that she can function." <u>See</u> Whitley 0142 (NB 23).

**RESPONSE:** As to the facts asserted in ¶ 468, plaintiffs state that the referenced quote is incomplete, and in its entirety, Dr. Queen's quote states, "I do not feel patient can return to regular employment. Is on multiple medications in an effort to manage her fibromyalgia - so that she

can function at home. Has been through multiple rehab programs

w/o success". NB 23: Whitley 142.

469.     The Plan then scheduled Whitley for an IME with Andrew Rudins, M.D.  Dr.

Rudins reviewed Whitley's medical records, her symptoms and medical history, and, on

December 3, 1997, examined Whitley.  See Whitley 0143-0146 (NB 23).  According to Dr.

Rudins, Whitley complained:

> "of a lot of pain in her anterior knees into the anterior tibias proximally . . . numbness in
> her left lateral neck . . . trouble with her left upper extremity . . . pain in both buttocks into
> the lateral hip . . . pain in the midline in the lumbosacaral spine . . . numbness in her feet
> and burning in her heels and arches . . . swelling in her hands, usually in the summer . . .
> pain around her neck . . . sleeps poorly, often awakening during the night . . . sitting
> appears to be the most difficult."

See Whitley 0143 (NB 23).  Dr. Rudins further noted "from a functional standpoint she is

basically independent in all her [activities of daily life], though she admits her husband

occasionally helps her out of the tub."  See Whitley 0144 (NB 23).

**RESPONSE:**  As to the facts asserted in ¶ 469, plaintiffs state that Unival scheduled the

IME. NB 23: Whitley 143. As to the remaining facts asserted in ¶ 469,

plaintiffs state that while factually accurate, it is an incomplete summary

of the FCE because defendants referenced only portions of said document,

which were selective in nature, taken out of context and as such

significantly alters its interpretation. Plaintiffs state that the IME viewed in

its entirety is the best evidence of its content.NB 23: Whitley 143-146.

470.    Dr. Rudins diagnosed Whitley as having "fibromyalgia, with resultant chronic pain syndrome, with some evidence of symptom magnification with 3 out of 5 Waddell signs positive."  See Whitley 0145 (NB 23).  According to Dr. Rudins, Whitley also had "underlying multilevel degenerative disc disease, that is likely contributing a mild amount to her overall symptom complex."  See Whitley 0145 (NB 23).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 470.

471.    Dr. Rudins concluded that "Whitley does have a full time work capacity, at the sedentary to light level."  He stated that Whitley's "restrictions to sedentary to light activities with a 10 pound lifting restriction should be considered permanent, since I do not See any change in the foreseeable future."  See Whitley 0146 (NB 23).

**RESPONSE:**  Plaintiffs state that while factually accurate, it is an incomplete summary of the Dr. Rudins' conclusions because defendants referenced only portions of said document, which were selective in nature, taken out of context and as such significantly alters its interpretation. Plaintiffs state that Dr. Rudins' report viewed in its entirety is the best evidence of its content. NB 23: Whitley 143-146.

472.    On December 12, 1997, Dr. Rudins completed a Modification Checklist on which he indicated that Whitley could return to work on December 3, 1997, with the following modifications: sedentary job only; lift up to 10 pounds; may walk, sit, and stand up to 30 minutes; must change positions every 30 minutes; avoid repetitive use of her upper extremities; and no excessive bending, twisting, or squatting.  See Whitley 0152 (NB 23).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 472.

221

473.    On December 22, 1997, J.D. Beavers, M.D., the Medical Director for the

Champion Disability Management Program, notified Whitley that the Plan was terminating her

LTD benefits because she was "not disabled as defined in the Plan." See Whitley 0154-0155

(NB 23).  Dr. Beavers informed Whitley that "the independent medical evaluation found you are

able to perform sedentary to light duty work." See Whitley 0154-0155 (NB 23).  Whitley,

therefore, did not satisfy the "any occupation" definition of disability under the hourly LTD Plan.

See also Whitley 0156-0158 (NB 23).

>    **RESPONSE:** As to the facts asserted in ¶ 473, plaintiffs admit that J.D. Beavers, M.D.,
>
>    an employee of CORE, notified Ms. Whitley of the termination of her
>
>    LTD benefits, and the reasons therefor. Plaintiffs deny the remaining facts
>
>    asserted in ¶ 473.  NB 23: Whitley 161.

474.    The Plan notified Whitley that her LTD benefits would terminate effective

January 31, 1998.  See Whitley 0159 (NB 23).  The Plan also informed Whitley that she had the

right to appeal the adverse decision and provided her a document describing her appeal rights.

See Whitley 0155 (NB 23).

>    **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 474.

475.    On February 20, 1998, Whitley's former legal counsel requested the Plan to

review the termination of Whitley's LTD benefits.  See Whitley 0161 (NB 23).

>    **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 475.

476.    In support of Whitley's appeal, her counsel submitted a May 11, 1998, Notice

from the Social Security Administration indicating Whitley's Social Security benefits would

continue, See Whitley 0165 (NB 23), and two letters dated February 23, 1998, and May 5, 1998,

from Dr. Queen, Whitley's treating physician.  In her February 23 letter, Dr. Queen stated that "this patient has had significant and continuing problems with pain and fatigue as a consequence of her fibromyalgia that have not responded to repeated efforts at rehabilitation and management."  <u>See</u> Whitley 0164 (NB 23).  In her May 5 letter, Dr. Queen stated that, in her opinion, Whitley "currently remains unable to work at a level sufficient to maintain regular employment."  <u>See</u> Whitley 0167-0168 (NB 23).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 476.

477.    On May 27, 1998, CORE commissioned Alan Marks, M.D., a specialist in rheumatology, to conduct a Peer Review Analysis of Whitley's claim.  CORE asked Dr. Marks to address the issue of whether Whitley was "disabled from any occupation."  CORE asked Dr. Marks whether he agreed with the previous denial or would recommend a second IME.  <u>See</u> Whitley 0169 (NB 23).  Dr. Marks reviewed Whitley's claim and, on June 3, 1998, reported that he "concur[red] with the independent medical examiner.  I believe this patient is capable of sedentary work."  <u>See</u> Whitley 0169 (NB 23).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 477.

478.    On June 8, 1998, CORE recommended that the Plan "uphold the previous denial of LTD benefits, effective 12/19/97."  CORE based its recommendation on, *inter alia*, Dr. Marks' determination "that the employee is capable of sedentary work,"  <u>See</u> Whitley 0172-0174 (NB 23), and Dr. Rudins' IME in which he concluded that Whitley has "a fulltime work capacity, at sedentary to light level."  <u>See</u> Whitley 0172 (NB 23).  <u>See</u> also Whitley 0170 (NB 23).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 478.

223

479.    On July 13, 1998, the Plan notified Whitley that the Plan had decided to uphold the denial of her claim for continuing LTD benefits.  See Whitley 0175-0176 (NB 23).  The Plan advised Whitley that the decision was based on the results of the IME and a CORE physicians' subsequent review of the documentation.  See Whitley 0175-0176 (NB 23).  The Plan advised Whitley of her right to appeal the decision.  See Whitley 0176 (NB 23).

RESPONSE:  Plaintiffs admit the facts asserted in ¶ 479.

480.    On July 30, 1998, Whitley's legal counsel requested the Plan to review the denial of Whitley's claim for continuing LTD benefits.  See Whitley 0180 (NB 23).  Whitley's legal counsel re-submitted the May 11,1998, Notice from the Social Security Administration and the May 5, 1998, letter from Dr. Queen.

RESPONSE:  Plaintiffs admit the facts asserted in ¶ 480.

481.    On October 22, 1998, Whitley's counsel submitted an October 15, 1998, letter from Dr. Queen in which Dr. Queen stated that she saw Whitley on October 15 and "continue to find her severely impaired with chronic and unrelenting non-articular musculoskeletal pain.  Her pain has been further complicated by *the recent development of herpes zoster*."  See Whitley 0183-0184 (emphasis added)(NB 23).  Dr. Queen stated that Whitley was "disabled from engaging in any occupation or business for wage or profit."  See Whitley 0184 (NB 23)."

RESPONSE:  As to the facts asserted in ¶ 481, plaintiffs admit that Dr. Queen's letter states, "I **continue** to find Mrs. Whitley totally disabled from engaging in any occupation or business for wage or profit". NB 23: Whitley 184.

482.    On November 5, 1998, based on "the new information regarding the herpes zoster," CORE commissioned Rose S. Fife, M.D., a rheumatology and internal medicine

224

specialist, to conduct a Peer Review Analysis of Whitley's claim.  See Whitley 0185, 0186-0187

(NB 23).  Dr. Fife reviewed Whitley's claim and spoke to Dr. Queen, Whitley's treating

physician.  Dr Fife concluded that Whitley was totally disabled and that the "disabling diagnosis

now is herpes zoster superimposed on a chronic pain syndrome." See Whitley 0186(NB 23).  Dr.

Fife concluded, however, that Whitley's "herpes zoster is not related to her underlying condition."

See Whitley 0186 (NB 23).

> **RESPONSE:** As to the facts asserted in ¶ 482, plaintiffs state that while factually
>
> accurate, it is an incomplete summary of Dr. Fife's analysis because
>
> defendants referenced only portions of said document, which were
>
> selective in nature, taken out of context and as such significantly alters its
>
> interpretation. Plaintiffs state that Dr. Fife's report viewed in its entirety is
>
> the best evidence of its content. NB 23: Whitley 186-187.

483.    The Plan also commissioned Jennifer Mikeska, a vocational rehabilitation

specialist, to conduct a Transferable Skills Analysis of Whitley, to determine if Whitley had

transferable skills given the restrictions defined by Dr. Rudins.  Ms. Mikeska completed her

analysis on December 8, 1998, and concluded that Whitley "does have transferable skills that are

vocationally appropriate and applicable to the different occupational groups and categories." See

Whitley 0189, 0189-0193 (NB 23).

> **RESPONSE:** As to the facts asserted in ¶ 483, plaintiffs admit that CORE
>
> commissioned Ms. Mikeska to perform a Transferable Skills Analysis
>
> regarding Ms. Whitley, which was flawed and inaccurate in that the jobs
>
> Ms. Mikeska identified for Ms. Whitley were inappropriate and should not

have been recommended for Ms. Whitley because she does not meet the

required aptitudes as determined by the Apticom test results and also does

not meet the minimum performance criteria for physical demands in these

jobs. NB 38: Whitley 374.

484.    On December 21, 1998, CORE reported to the Plan Supervisor that the physician

who completed the Peer Review Analysis had concluded that Whitley's "herpes zoster is not

related to [her] condition of fibromyalgia, the original disabling diagnosis.  The employee is

totally disabled at this time with the disabling diagnosis being herpes zoster superimposed on a

chronic pain syndrome."  CORE also reported that Whitley was "not vocationally disabled based

on the results of the Transferable Skills Analysis."  See Whitley 0194-0197 (NB 23).

RESPONSE:  Plaintiffs deny the facts asserted in ¶ 484.

485.    On January 18, 1999, the Plan notified Whitley's counsel that Whitley's claim

would be considered by the Plan's Claims Review Committee, and invited Whitley's counsel to

submit any new or additional documentation or evidence that might support Whitley's claim for

benefits.  See Whitley 0198 (NB 23).

RESPONSE:  Plaintiffs admit the facts asserted in ¶ 485.

486.    The Plan's Claims Review Committee discussed Whitley's claim at its March 2,

1999, meeting.  See CRC 2107-2110 (NB 24).  After the Committee reviewed Whitley's claim, it

voted to "table its decision to its next meeting on March 11, 1999, pending receipt of additional

information from CORE regarding the date of the on-set of Ms. Whitley's herpes zoster."  A

subsequent disability after denial of benefits would be irrelevant to Whitley's claim.  The

Committee, therefore, needed to determine the date of the onset of Whitley's herpes zoster; her current disabling condition.  See CRC 2110 (NB 24).

**RESPONSE:**  Plaintiffs deny the facts asserted in ¶ 486.

487.    On March 3, 1999, Victor Paganucci, on behalf of the Committee, See CRC 2107 (NB 24), directed CORE to ask Dr. Fife "to determine the date of diagnosis and on-set of herpes zoster."  If Whitley's "on-set of the herpes zoster was after the termination of benefits, it would have no bearing on the termination of benefits and the appeal therefrom."  See Whitley 0199 (NB 23).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 487.

488.    That same day, CORE asked Dr. Fife to report as to whether Whitley's herpes zoster was present in January 1998 when her claim for continuing LTD benefits was denied.  See Whitley 0200 (NB 23).

**RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 488.

489.    Dr. Fife spoke to Whitley's treating physician and reported on March 10, 1999, that, according to Whitley's treating physician, Whitley's herpes zoster began in April, 1998, See Whitley 0200 (NB 23), which was four months after the denial of Whitley's claim for continuing LTD benefits.

**RESPONSE:**  Plaintiffs deny the facts asserted in ¶ 489.

490.    The Claims Review Committee discussed Whitley's claim again at its March 11, 1999, meeting.  See CRC 2111-2116 (NB 24).  After the Committee reviewed Whitley's file and discussed its contents, it voted to uphold the denial of Whitley's claim.  See CRC 2115-2116 (NB 24).  The Committee noted that

"[d]uring the appeal process, Dr. Queen, Ms. Whitley's doctor, stated in a letter dated 10/15/98 that Ms. Whitley's pain 'has been further complicated by the recent development of herpes zoster.' A CORE physician then stated that Ms. Whitley was disabled 'with disabling diagnosis being herpes zoster superimposed on a chronic pain syndrome.' However, upon further investigation, CORE determined that the on-set of the herpes zoster was in 4/98 and therefore after the original denial of benefits on 1/31/98.

See CRC 2115 (NB 24). The Committee determined that its review should focus only on Whitley's alleged disabling condition at the time her claim for continuing LTD benefits was denied – that is, January 1998. Whitley's herpes zoster did not begin until April 1998, and, therefore, was not a factor in the original denial of benefits and should not be considered in the appeal process." See CRC 2115 (NB 24).[17]

**RESPONSE:** Plaintiffs deny the facts asserted in ¶ 490.

491.    Prior to the onset of herpes zoster, the FCE of Whitley indicated that Whitley "completed test activities at the SEDENTARY physical demand level or work" and Dr. Rudins' December 3, 2007, IME report indicated that Whitley has "a full time work capacity, at the sedentary to light level." In addition, a Transferable Skills Analysis identified various jobs that Whitley could perform. Whitley, therefore, was not entitled to LTD benefits. See CRC 2115-2116 (NB 24).

**RESPONSE:** Plaintiffs deny the facts asserted in ¶ 491. (NB 38: Whitley 370).

492.    On March 30, 1999, the Plan notified Whitley's counsel that the Claims Review Committee met on March 2 and 11, 1999, to consider the appeal of the denial of Whitley's claim

---

[17]   The Chair of the Committee "ordered that a copy of the documentation relative to the requests for review previously distributed to the Committee be filed with the minutes of the meeting." See CRC 2111, 2117-2235 (NB 24).

228

and had voted to uphold the denial of her claim for continuing LTD benefits.  See Whitley 0787-
0788 (NB 23).

      **RESPONSE:** Plaintiffs admit the facts asserted in ¶ 492.

      493.    On August 10, 2000, almost eighteen months after the Plan denied Whitley's final

appeal, Whitley's current legal counsel informed Champion International that they had been

consulted by Whitley regarding her claim for LTD benefits, and requested copies of Whitley's

claims file and plan documents.  See Whitley 0201 (NB 23).

      **RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 493.

      494.    The Plan complied with Whitley's counsel's request and sent to them copies of

Whitney's claims file and the Plan documents.  See Whitley 0202, 0203 (NB 23).

      **RESPONSE:**  Plaintiffs admit the facts asserted in ¶ 494.

      495.    On February 20, 2001, almost two years after the Claims Review Committee

denied her appeal, Whitley's counsel requested the Plan to "reconsider[] . . . the decision to

terminate [Whitley's] benefits."  See Whitley 0360 (NB 38).  Whitley's counsel submitted to

International Paper medical and other information they alleged supported Whitley's claim for

benefits.  See Whitley 0360-0365, 0366-0386, 0520-0785 (NB 38).

      **RESPONSE:** As to the facts asserted in ¶ 495, Plaintiffs state that because in denying

                Ms. Whitley's continued long term disability benefits the Plan failed to

                consider the objective medical evidence; failed to consider chronic pain;

                failed to consider all of the evidence; and placed inordinate weight to the

                evidence supporting the denial, Plaintiffs' counsel submitted medical

records and other objective information and documentation so that Ms.

Whitley's claim could be reviewed objectively and in its entirety.

### PLAINTIFFS' LOCAL RULE 56(a)(2) STATEMENT OF DISPUTED FACTS

Plaintiffs believe that summary judgment should be granted in their favor as a matter of

law for the reasons stated in their Brief in Support of Motion for Summary Judgment and

accompanying Rule 56(a)1 Statement. If summary judgment is not granted, the factual claims

made in Plaintiffs' Rule 56(a)1 statement fully set forth the issues to be tried, and for reasons of

economy those factual claims are incorporated herein by reference as if fully set out herein as

Plaintiff's Disputed Issues of Material Fact pursuant to Local Rule 56(a)2.

This the ___ day of May, 2005.

THE PLAINTIFFS
HARRY L. SMITH, ET AL

BY:_____

WILLIAM B. BARNES (CT0268)
Rosenstein & Barnes
1100 Kings Hwy. East
P.O. Box 687
Fairfield, CT 06432
Tel (203) 367-7922
Fax (203) 367-8110
E-mail wbarnes@rosenbar.com

ROBERT M. ELLIOT (CT21210)
Elliot Pishko Morgan, P.A.
426 Old Salem Road
Winston-Salem, NC 27101
Tel (336) 724-2828
Fax (336) 724-3335
E-mail rmelliot@epmlaw.com

RICHARD B. HARPER
Harper Law Office
Post Office Box 395
Sylva, NC 28779
Tel (828) 586-3305
Fax (828) 586-4795
E-mail rbharper@dnet.net

**CERTIFICATE OF SERVICE**

I certify that a copy of the Plaintiffs' Local Rule 56(a)(2) Response to Defendants'

Statement of Facts was sent by Mail on May 13, 2005 to the following:

**ADDRESSEES:**

Bruce M. Steen, Esq.
McGuire Woods
Bank of America Corporate Center
100 North Tryon St., Suite 2900
Charlotte, NC 28202

Barry J. Waters, Esq.
Murtha Cullina, LLP
Whitney Grove Sq.,
Two Whitney Ave.,
P.O. Box 704
New Haven, CT 06503-0704

_____
ROBERT M. ELLIOT

232