## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| HARRY L. SMITH, LOIS L. LYNN, DARRELL KEITH HILL, ELIZABETH CASE BOONE, WILEY H. HAYNES, ROSA LEE BROOKSHIRE, HARRISON YOUNG CLARK, FRANZISKA FINNEY, JUDITH CASE KIRKPATRICK, WILSON DANIEL McCLURE, CELIA DARLENE METCALF, CHARLES R. REECE, DOLPHUS LUTHER TREADWAY, JR., and MARTHA BURNETTE WHITLEY, | ) ) ) ) ) ) ) ) ) ) ) ) ) CIVIL ACTION NO. 302CV212(CFD) |
| Plaintiffs, | ) ) |
| v. | ) PLAINTIFF'S REPLY TO ) DEFENDANTS' RESPONSE ) TO PLAINTIFFS' MOTION |
| CHAMPION INTERNATIONAL CORPORATION; LONG TERM DISABILITY BENEFITS PLAN FOR SALARIED EMPLOYEES OF CHAMPION INTERNATIONAL CORPORATION #506; LONG TERM DISABILITY BENEFITS PLAN FOR CERTAIN HOURLY EMPLOYEES OF CHAMPION INTERNATIONAL CORPORATION #703; and INTERNATIONAL PAPER COMPANY, | ) FOR SUMMARY JUDGMENT ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

## OPENING STATEMENT

In 1971, Champion established its LTD plans. In doing so, Champion expressed the purpose

of the Plans "to provide a source of income to eligible employees who were prevented from engaging

in active employment" as a result of disability. (NB 66: Plan-6, 53). Plaintiffs and other employees

of Champion were encouraged to participate in these benefits and to pay premiums to Champion

with this purpose in mind—that in the event they encountered the unfortunate circumstance of

disability, they would receive some financial protection, little as it might be, in the replacement of a portion of their incomes.

The 14 plaintiffs bring to life the purposes of the Plans. These individuals, separate as they are in terms of their personal histories and medical conditions, are bound together by their common circumstances:

- Each plaintiff has limited education;

- Each plaintiff had an excellent work history with Champion and demonstrated a strong work ethic;

- Each plaintiff has a severe medical condition, including chronic pain and subjective symptoms;

- Each plaintiff, under the treatment of his/her treating physician, went out of work and was continuously certified for total disability under the Plans prior to CORE's involvement;

- Each plaintiff depended on his/her LTD benefits;

- Each plaintiff was ultimately terminated from disability by Champion/CORE and was told that he/she could work, although Champion refused to consider re-employment; and

- Each plaintiff was an older employee at the time of termination.

In response to these circumstances, defendants, like Champion/CORE before them, profess total authority in their decisions; they claim the unfettered power to act, at whim, in their administration of the Plans; and they seek total unaccountability in arguing that this Court must defer to their decisions in terminating the plaintiffs' benefits.

Defendants' positions are nowhere more evidenced than in their arguments concerning the critical definition of total disability. (*See* Pl. App. 2). Defying logic and reality, as well as their own prior decisions, defendants argue:

2

- That age and availability of jobs are irrelevant in determining disability (Def. Mem. Resp. SJ, pp. 30-31);

- That Champion's refusal to accommodate any restrictions of the plaintiffs is irrelevant (Def. Mem. Resp. SJ, pp. 33-34);

- That they have no obligation to explain their prior inconsistent determinations and statements (Def. Mem. Resp. SJ, pp. 40-41);

- That they have no responsibility to be consistent over time (Def. Mem. Resp. SJ, pp. 40-41); and

- That an individual who is able to perform some part-time work—apparently, at any level, at any reduced wage—is not disabled  (Def. Mem. Resp. SJ., p. 31).

In short, defendants' positions, like Champion/CORE's positions before them, are reminiscent of the declaration of the character in Lewis Carroll's classic: "When I use a word, it means just what I choose it to mean—neither more nor less." [1]

ERISA does not support these views of the boundless power of the administrator.  The very foundation of ERISA is in trust.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989).  Trust principles require that the administrator act in the interest of the participants, as well as the Plans; which, in turn, requires that the administrator adhere to integrity and reason in its decision making process.  Champion/CORE failed to live up to these standards in every way.  Ultimately, the 14 individual plaintiffs are bound together by the unfortunate consequences of Champion/CORE's denial–oriented process.

### Relief Requested

Plaintiffs have brought four claims against the defendants.  Plaintiffs' primary claims are for termination of benefits under 29 U.S.C § 1132(a)(1)(B) (first and second claims for relief).  Plaintiffs

---

[1] *Alice's Adventures in Wonderland* (1865)

have alleged the same facts in support of their claims for violation of 29 U.S.C. § 1133 (third claim) and breach of fiduciary duty (fourth claim).  The facts support plaintiffs' allegations that Champion/CORE breached their duties under ERISA, denied plaintiffs a full and fair review, and wrongfully terminated their benefits.  Plaintiffs contend they are entitled to their monetary benefits and appropriate injunctive relief.

Specifically, plaintiffs request that this Court (1) set aside Champion/CORE's decisions terminating each plaintiff's LTD benefits, as a matter of law, based on the facts established in the record; and (2) that the Court reinstate each plaintiff's benefits without delay, based on the evidence in the record under *de novo* review.[2]

## ARGUMENT

### Standard of Review

Champion deals with conflict of interest which can change the standard of review in almost entirely abstract terms.  The Second Circuit in *DeFelice v. American Int'l Life Assurance Co. of New York*, 112 F.3d 61 (1997), held that the conflict of interest when the decisionmaker and the payor are the same person, combined with procedural irregularities, can trigger de novo review.  *See also Locher v. UNUM Life Ins. Co. of America*, 389 F.3d 288 (2d Cir. 2004).  Where, as here, the financial conflict of interest is very strong, it is highly unlikely that there was individual consideration of claims, and there is good reason to believe that financial considerations poisoned the final result, de novo review is appropriate.

### *Champion Surrendered its Role to CORE*

---

[2] Plaintiffs specifically and respectfully request that the Court avoid the additional substantial delays and issues of fairness which would follow any remand of these cases for reconsideration by the defendants.

There were no rules, procedures, criteria or regulations to assist Champion's decisionmakers under the plans, or governing the consideration of LTD claims under the plans, other than the language of the plans themselves and their summary plan descriptions. (NB 75, Tab 1, Lehman Dep. p. 88-90). There were no guidelines or definitions of disabling diseases or conditions for use by individuals involved in the claims review process. (NB 75, Tab 1, Lehman Dep. p. 98-99). Champion had no formal or written policies on the criteria for reviewing LTD claims. (NB 75, Tab 5, Dixon Dep. 121-22).

Ms. Dixon, the nominal administrator, had only a high school education and lacked medical and vocational training. (NB 75, Tab 5, Dixon Dep. 31-32). She did not make disability determinations. (NB 75, Tab 5, Dixon Dep. 25, 34). All she did was set up the file and send it to CORE. (NB 75, Tab 5, Dixon Dep. 20). It was CORE's responsibility to gather all of the medical and vocational data pertaining to a claim. (NB 75, Tab 1, Lehman Dep. p. 177; NB 75, Tab 5, Dixon Dep. 24). CORE decided when and if to deny claims. (NB 75, Tab 5, Dixon Dep. 102). CORE, and CORE alone, decided whether a person was permanently disabled. (NB 75, Tab 5, Dixon Dep. 187).

When there was a first level appeal, Ms. Dixon sent whatever information she had to CORE, (NB 75, Tab 5, Dixon Dep. 102, 106, 112), which made the decision. (NB 75, Tab 5, Dixon Dep. 116). Ms. Dixon never made any independent investigation of the facts in connection with the appeal. (NB 75, Tab 5, Dixon Dep. 114-15). Ms. Dixon took statements made by CORE at face value and had no way of knowing whether the events described in CORE's reports ever took place. (NB 75, Tab 5, Dixon Dep. 160, 170-71). Ms. Dixon did not interview the claimant, the claimant's doctors or any vocational people who had given opinions. (NB 75, Tab 5, Dixon Dep. 115). Ms. Dixon did not attempt to reconcile conflicting statements in the medical evidence; she let CORE do

5

that. (NB 75, Tab 5, Dixon Dep. 115).  Ms. Dixon made no distinction between the opinion of a

treating doctor and the results of an IME. (NB 75, Tab 5, Dixon Dep. 136).  She couldn't have

reconciled conflicts if she wanted to, since she didn't have either the information or the expertise.

(NB 75, Tab 5, Dixon Dep. 116-17).  All she had was one report from CORE. (NB 75, Tab 5, Dixon

Dep. 116).

        Ms. Dixon gave no weight in the appeal process to the fact that Champion had previously

found the employee totally and permanently disabled; she followed what CORE said about the

employee. (NB 75, Tab 5, Dixon Dep. 129).  Ms. Dixon acknowledged that she did not take the

applicant's age into account in deciding appeals unless CORE did; the same was true with the

employee's pain level, the employee's education, the employee's work history, with functional

capacity evaluations, if any, and with any additional medical information sent in by the employee.

(NB 75, Tab 5, Dixon Dep. 130-34, 137-38, 156, 161, 164, 168, 171, 174, 177-78, 181, 184).  Ms.

Dixon assumed that CORE had considered all relevant factors, (NB 75, Tab 5, Dixon Dep. 132), and

made no independent findings. (NB 75, Tab 5, Dixon Dep. 147-48).

        CORE maintained the claims record.  Champion sent CORE copies of all its LTD files, but

CORE did not send Champion copies of its files. (NB 75, Tab 5, Dixon Dep. 81).  Significantly, the

record maintained by Champion during the appeal process was incomplete; there were many items

CORE had which Champion did not. (NB 75, Tab 5, Dixon Dep. 107, 109, 119).

        Champion considered the decision on disability of a physician chosen by the plan supervisor

conclusive. (NB 75, Tab 1, Lehman Dep. p. 86-87).  The decision of a CORE doctor was final. (NB

75, Tab 1, Lehman Dep. p. 87-88). The plan supervisor did not choose physicians - CORE did,

without any rules or other limitations imposed by Champion. (NB 75, Tab 1, Lehman Dep. p. 87-88).

### *CORE Had Unlimited Discretion*

CORE had virtually unlimited discretion to handle Champion's long term disability claims as it saw fit.  The initial claims went to CORE, not to Champion. (NB 75, Tab 1, Lehman Dep. 71). When an application package came back to CORE, it was assigned to one of the six LTD nurse case managers, one of whom would review it and tell Ms. Dixon whether the applicant was disabled. (NB 75, Tab 6, Taylor Dep. 26, L. 6 through 27, L. 20).   Champion considered CORE's action a determination, not a recommendation, because the Pension and Employee Benefits Committee of Champion had delegated this authority to CORE. (NB 75, Tab 1, Lehman Dep. 43, 71-72, 75, 162). CORE, not Champion, sent the original determination letter to the applicant. (NB 75, Tab 1, Lehman Dep. 113)

CORE's discretion was not trammeled by rules and definitions.  The case handling procedures were not written down. (NB 75, Tab 6, Taylor Dep. 30, L. 21 through 31, L. 2).  In the words of Glenn Taylor, CORE's 30(b)(6) deposition representative, CORE simply engaged in "disability management." (NB 75, Tab 6, Taylor Dep. 30, L. 21 through 31, L. 2).  No policy and procedure manual, or any similar document, governed CORE's work for Champion. (NB 75, Tab 6, Taylor Dep. 116, L. 24 through 117, L. 5).  There were no guidelines or manuals to assist CORE employees in applying plan definitions.  (NB 75, Tab 6, Taylor Dep. 130, L. 19 through 131, L. 5; 144, L. 12-18; 144, L. 5-18).  CORE required "objective information" to substantiate disability. (NB 75, Tab 6, Taylor Dep. 38, L. 19-21).  There were no protocols to use in dealing with subjective complaints such as pain or weakness. (NB 75, Tab 6, Taylor Dep.  226, L. 4-10).  CORE used its own versions of "own occupation" and "any occupation".  (NB 75, Tab 6, Taylor Dep. 134, L. 14-16).  CORE interpreted such language in the plan for itself.  (NB 75, Tab 6, Taylor Dep. 140, L. 1-

24).  The CORE nurses didn't know the definition of Long Term Disability. (NB 75, Tab 6, Taylor Dep. 141, L. 4-6).  CORE never asked Champion to explain the meaning of plan provisions, (NB 75, Tab 6, Taylor Dep. 133, L. 5-8 through 134, L. 13; 146, L. 17-23), and did not consult with Champion on these issues. (NB 75, Tab 6, Taylor Dep. 144, L. 19-24 through 145, L. 2; 144-45, L. 19-24 and 1-2).  CORE interpreted the "own occupation" and "any occupation" sections in the plan. (NB 75, Tab 6, Taylor Dep. 134, L. 14-16).  CORE likewise interpreted the definition of "total disability" for itself.  (NB 75, Tab 6, Taylor Dep. 140, L. 9-15).  Mr. Taylor, CORE's 30(b)(6) deposition representative, could not recall any occasion when CORE went to Champion and asked how to apply plan terms to a particular person. (NB 75, Tab 6, Taylor Dep.  146, L. 17-23).

### CORE Substituted Statistical Averages
### Derived from Companies Other than Champion for
### Individual Assessment of Champion Employee Claims

"WorkAbility" was the system CORE used to handle Champion LTD claims. (NB 75, Tab 6, Taylor Dep. 31, L. 3-22).  It was designed to substitute statistical averages for individual assessment of claims.  CORE tried to eliminate the subjective element - a private doctor's view of his patient's disability- in favor of "objective protocols," that is, statistical findings generated by the WorkAbility system. (NB 75, Tab 6, Taylor Dep. 250, L. 19 through 251, L. 20; 254, L. 14 through 255, L. 13; see also 254, L. 14-24 and 255, L. 1-18).  CORE required "objective information" to substantiate disability. (NB 75, Tab 6, Taylor Dep. 38, L. 19-21).  The WorkAbility computer program gave the CORE nurse using it a recommendation for length of disability based on the information she fed it.  WorkAbility compared the claim information fed to it to similar claims in the past with the same diagnosis and same preexisting conditions and spat out how long the Champion employee could be expected to be out of work. (NB 75, Tab 6, Taylor Dep. 221, L. 14-24

8

through 222, L. 6).

### *CORE's Decisions Were Driven by Money*

There is unusually strong evidence that CORE's decisions were driven by money. Mr. Taylor testified that CORE's goal, its "mentality", was to save money. (NB 75, Tab 6, Taylor Dep. 123, L. 22 through 124, L. 2). Reduction in claims was inherent in the process. (NB 75, Tab 6, Taylor Dep. 241, L.11-14). CORE spoke to reducing costs; all things being equal, CORE's work should cut costs. (NB 75, Tab 6, Taylor Dep. 241, L. 11-14; 242, L. 6-8) . It was an objective of SCORE to reduce the number of employees transitioning to LTD. (NB 75, Tab 6, Taylor Dep. 263, L. 7-13). The WorkAbility protocols on average produced shorter lengths of disability. (NB 75, Tab 6, Taylor Dep. 257, L. 10-21).

CORE had a financial incentive to find employees not disabled. CORE's work was reviewed by Champion at intervals; if it was not performing CORE would not get a new contract. (NB 75, Tab 6, Taylor Dep. 106, L. 10-19). In addition, the agreements provided for incentive fees. (NB 75, Tab 6, Taylor Dep. 96, L. 103; see Service Agreement dated Jan. 1, 1996, Exhibit B and page 37 of Exhibit C).

CORE gave a presentation to Champion about its program and gave out a book called "Champion Disability Medical Management Program." (NB 75, Tab 1, Lehman Dep. p. 208). Mr. Lehman, Ms. Dixon's boss, attended the presentation and saw the book. (NB 75, Tab 1, Lehman Dep. p. 207-08). The book outlines the financial benefits to Champion, expressed as both reduced payouts and return on investment, of CORE's WorkAbility approach. (NB 75, Tab 1, Lehman Dep. p. 208-11). CORE gave Champion sample quarterly reports, not only on payouts by the plan, but the difference between the LTD claims which employees would make based on their own doctors

and the claims which CORE would approve based on reports from its staff members.  CORE would approve fewer claims. (NB 75, Tab 1, Lehman Dep. p. 214).  CORE told Champion that the savings likely to result from CORE's efforts could be calculated by comparing Champion's existing LTD costs to those of existing CORE customers. (NB 75, Tab 1, Lehman Dep. p. 215-16).  These reports would show costs savings from CORE's work. (NB 75, Tab 1, Lehman Dep. p. 218-19).

Detailed performance metrics - key performance indicators meant to measure CORE's performance - are stated in the Service Agreements. (NB 75, Tab 6, Taylor Dep. 99, L. 18-22; 105, L. 16-18; Service Agreement dated Jan. 1, 1996 in NB 67, Exhibit C, pages 35-36; Service Agreement dated Jan. 1, 1999 in NB 67, Exhibit B, page 23).  CORE also conducted surveys. (NB 75, Tab 6, Taylor Dep. 97, L. 9 through 98, L. 12; see Service Agreement dated Jan. 1, 1996 in NB 67, Exhibit C, page 35).  Exhibit B to the Service Agreements describes analytical reports CORE was supposed to send Champion. (NB 75, Tab 6, Taylor Dep. 96, L. 12-18).  Every quarter CORE sent Champion Disability Performance Reports stating what CORE had done in that quarter and previous quarters.  (NB 75, Tab 6, Taylor Dep. 76, L. 6 through 78, L. 16).[3]  Every month CORE and SCORE sent Champion a monthly budget report. (NB 75, Tab 6, Taylor Dep. 79, L. 21 through 80, L. 5; 82, L. 18-22; 83, L. 2-10; 84, L. 3-13; 96, L. 23 through 97, L. 8; see, e.g., CE4614-5062).  The Disability Performance Reports showed the value of the savings CORE was generating for Champion. (NB 75, Tab 6, Taylor Dep. 120, L. 12-14).  It was also possible for Champion to draw financial conclusions from a downward trend in the number of open cases.  (NB 75, Tab 6, Taylor

---

[3]  CORE did not produce to Plaintiffs the Disability Performance reports for the last quarter of 1997, all of 1988 and the third quarter of 2000 (Taylor, Dep. 78, L. 17 through 79, L. 10).  Mr. Taylor could not explain why those reports were missing.  (NB 75, Tab 6, Taylor Dep. 78, L. 17 through 79, L. 14).  The reports which CORE did produce were CE2603 through 3823. (NB 75, Tab 6, Taylor Dep. 80, L. 6 through 82, L. 17).

Dep. 127, L. 20 through 130, L. 15).

CORE made a point of telling Champion, not just how much money it had saved in the aggregate by denying claims, but how much money it had saved by denying a single claim. CORE sent Champion documents called "Confidential Service Report" or "CSR." (NB 75, Tab 6, Taylor Dep. 91, L. 14-20; NB 75, Tab 1, Lehman Dep. 245). The nurse manager who recommended denial of benefits used a worksheet in one of CORE's computer systems, the Managed Care Software ("MCS"), to calculate the savings to Champion from CORE's activities in that particular case. The "potential cost" would be the indemnity limit for the employee. The "actual cost" would be the amount paid. The savings would be the difference between the two. (NB 75, Tab 6, Taylor Dep. 236, L. 19-24 through 237, L. 2). The savings calculations, and the final figures, were then cut and pasted into the WorkAbility system and included in the Confidential Service Reports sent Champion. (NB 75, Tab 6, Taylor Dep. 120, L. 1 through 122, L. 20; NB 75, Tab 1, Lehman Dep. 245). Sometimes the savings were expressed in months of disability payments eliminated, (NB 75, Tab 6, Taylor Dep. 122, L. 13-20); other times the number of months saved was multiplied by the amount of disability payments to produce a dollar figure saved. (NB 75, Tab 6, Taylor Dep. 122, L. 3-7).[4]

---

[4] Champion makes much of the fact that not all of the Confidential Service Reports in the claims records of the Plaintiffs here contain paragraphs showing the savings to Champion attributable to CORE's denial of benefits. But CORE and Champion did not produce all of the Confidential Service Reports. We know this because Confidential Service Reports were numbered sequentially in chronological order, (NB 75, Tab 6, Taylor Dep. 71, L. 15 through 72, L. 3), and many reports are missing. The Treadway file, for example, contained Confidential Service Report No. 6, but not CSRs 1 through 5 (NB 75, Tab 6, Taylor Dep. 72, L. 4-15; CE376-497). CORE's representative testified that all documents relating to the Plaintiffs here were produced, (NB 75, Tab 6, Taylor Dep. 59, L. 12-23), but it is clear that they were not. Neither CORE nor Champion have explained why these Confidential Service Reports are missing. Since suppression of CSRs which show savings is strongly in Champion's interest, this Court is entitled to conclude that many, if not all, of the missing CSRs contained savings analyses showing Champion exactly how much money CORE had saved by denying Plaintiffs benefits.

*The Claims Review Committee Decisions*
*Had an Inadequate Basis and Were*
*Tainted by CORE's Cost Savings Analysis*

The members of the Claims Review Committee could not have made intelligent decisions about the Plaintiff's claims. They received no training in review and administration of disability claims, medical evaluation of disability claims, medicine, vocational aspects of such claims, medical aspects of such claims, impact of pain on ability to function, specific medical problems or effect of medications. (NB 75, Tab 2, Lewis Dep. 27, L. 22 through 29, L. 8). Three to five days before the meeting, (NB 75, Tab 2, Lewis Dep. 23, L. 8-20), each member was given several binders, each up to six inches thick, one per case, (NB 75, Tab 2, Lewis Dep. 24, L. 21-22). The reasons for the denial appeared in the binders. (NB 75, Tab 3, Gorski Dep. 94, L. 12-14). A brief chronological header prepared by a paralegal employed in the office of Champion's general counsel appeared in the front of the binder. (NB 75, Tab 3, Gorski Dep. 56, L.25 through 57, L. 10). There were no narrative summaries of the cases. (NB 75, Tab 3, Gorski Dep. L. 19-21). At the beginning of the meeting the paralegal would give a short summary, lasting perhaps two minutes, of each case. (NB 75, Tab 3, Gorski Dep. 64, L. 6-15). As many as nine cases could be considered in a single meeting, which could last as few as two hours. (NB 75, Tab 2, Lewis Dep. 24, L. 7; 31, L. 9-10).

There are three reasons why the Committee could not have given each case a fair and independent review. The first is that CORE's analysis, upon which the members relied, was based on statistical averages, not individualized consideration of the merits of the claim. The second reason is the magnitude of the job. The CRC members could not possibly have made a fair and independent evaluation of these appeals with the materials and time given them. It has taken more than 300 pages of analysis, compiled by teams of lawyers, to explain the Plaintiff's cases to this

12

court.  Finally, the deliberations were contaminated by analyses of cost savings.  Each binder contained CORE's entire file. (NB 75, Tab 6, 56, L. 7 through 57, L. 22).  Nothing was omitted. (NB 75, Tab 4, 70, L. 8-15).  CORE's Confidential Service Reports must, therefore, have been in the binders.  The members saw CORE's reports. (NB 75, Tab 2, Lewis Dep. 32, L. 20-21).  The members must, therefore, have seen those portions of the Confidential Service Reports which broke out the savings to Champion of each denial of benefits.  This information, while of value to Champion management, tainted the deliberations of the CRC.

### Supplementary Materials

In their response to plaintiffs' motion, defendants argue that the additional evidence submitted by each plaintiff should not be considered because the administrative record closed upon Champion/CORE's final decision on each claim, and that there is no basis to consider the evidence under the arbitrary and capricious standard of review.  (Def. Mem. Resp. SJ., pp. 20-24).[5]  Plaintiffs provided the legal basis for supplementing the claims records.  In summary, defendants' process fell far short of the standards of a full and fair review.  Plaintiffs' supplementary materials were designed to fill the considerable voids in the claims records, particularly with respect to vocational evidence.  Given the ambiguities in the records (as pointed out in arguments concerning each individual plaintiff's claims) and the unresolved questions and inconsistencies in the facts obtained by CORE,

---

[5]   As an apparent aside, defendants emphasize that the supplementary materials were presented months to years after the record had closed.  (Def. Mem. Resp. SJ, pp. 25-27).  Plaintiffs do not contend otherwise. In fact, given the deficits in defendants' claims records, it took a substantial amount of time to obtain all of the evidence establishing each plaintiff's disability.  In every case, the evidence was presented prior to filing suit, well before the expiration of the statute of limitations, and the defendants can show no prejudice and no good reason for their refusal to consider the evidence. In any event, defendants never indicated that they refused to review the evidence due to any particular time lapse; rather, as a matter of policy, they presumably would have refused to consider the evidence at any point after their final decision.

the evidence should be considered. *Vega v. Natl. Life Ins. Serv., Inc.*, 188 F. 3d 287 (5th Cir. 1999).

There is another reason supporting consideration of the supplementary evidence. ERISA, 29 U.S.C. § 1133, and its regulations, require that in its termination decisions, the fiduciary must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review." 29 U.S.C. § 1133 (2). A full and fair review requires notice "setting forth the specific reasons for such denial" 29 U.S.C. § 1133 (1). An essential component of the notice requires that the fiduciary provide "a description of any additional material or information necessary for the claimant to perfect the claim and any explanation of why such material . . . is necessary." 29 CFR § 2560.503-1(g).

Defendants violated this requirement in every case. The record establishes that with respect to each plaintiff's claim, neither CORE's initial decision letter nor Mary Lee Dixon's second level decision letter include any description of additional evidence necessary to support the claim.[6] *Id.* Since Champion/CORE failed to give the requisite notice to each plaintiff, defendants' efforts to exclude relevant evidence concerning each plaintiff's disability should be rejected. *Cook v. The New York Time Group LTD Plan*, 2004 U.S. Dist. LEXIS 1259 (S.D.N.Y. 2004).

### Vocational Evidence

Plaintiffs have argued at length that defendants' failure to consider the vocational component of disability, as a matter of general policy, was a fatal flaw in its review process. (Pl. Br. Resp. SJ, pp. 25-30). Defendants claim that they have no obligation to consider vocational factors such as age or the availability of jobs since these factors are not explicitly included in the Plan definition of

---

[6] *See also* NB 1: Boone-31, 13; NB 6: CRC-1602, 1624 (Clark); NB 7: Finney-20, 2; NB 8: Haynes-210, 155; NB 10: Hill-115, 159; NB 12: CRC- 2068 (Kirkpatrick); NB 13: Lynn-47, 57; NB 16: CRC-2560, 2569 (Metcalf); NB 19: CRC-2423 (Reece); NB 20: Smith-216, 253; NB 22: Treadway-35; and NB 24: CRC-2189, 2210 (Whitley).

disability. (Def. Mem. Resp. SJ., p. 29-31). Defendants' position has no basis in reality or common sense, and smacks of arbitrary decision making on their part.

It goes without saying that the purpose of LTD insurance is to provide financial security income for those who are physically or mentally unable to work in any occupation (after 30 months). (NB: Plan-6, 53). As employees earn these benefits, they trust that in the unfortunate event that they are unable to work because of disability, they will receive some limited income to enable them to provide for themselves and their families. It defies logic and fairness to define disability in such a way as to exclude those who are unable to obtain employment because of age, disability and background, because, theoretically, they are employable in the abstract. Indeed, an LTD plan which gives such latitude to an administrator to define *out* disabled participants provides no real protection whatsoever. Defendants' rationalization is unsupportable. In any event, to the extent the definition is ambiguous, it should be construed in favor of the plaintiffs. *Cook v. The New York Time Group LTD Plan*, 02 Civ. 9154 (GEL), 2004 U.S. Dist. LEXIS 1259 (S.D.N.Y. Jan. 30, 2004).

**Age:** Defendants attempt to justify ignoring the impact of an impaired employee's age on his/her employability, claiming that "age ...[is] not an element...of the LTD plans' disability definition." (*See*, Def. Mem. Resp. SJ, p. 29). Defendants' statement is misleading, to say the least. The LTD plans' definitions of disability also make no explicit reference to a participant's physical or mental capacity and, yet, clearly those are relevant factors in assessing a participant's ability to work. (*See*, Pl. App. 2). Even the defendants "read into" the Plan definitions of total disability the necessity of considering an injured or ill employee's residual physical and mental capacity. Similarly, reason and common sense compel consideration of a participant's age in any full and fair evaluation of his or her ability to "engage in any occupation or business for wage or profit for which he is or

15

becomes reasonably qualified by training, education, or experience." *See Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 744 (2004)(where the Court construed the pension provisions at issue "as a matter of common sense").[7]

At one time Champion considered "age" to be implicit in the plan definition of "total disability" from any occupation, and therefore relevant to whether a participant was entitled to LTD benefits. For instance, with respect to Ms. Kirkpatrick's claim, a Vocational Rehabilitation Profile prepared by Champion's prior administrator determined that based on Ms. Kirkpatrick's net monthly benefit, **age**, education, medical status, and the fact that "ER [employer] has no position available for this claimant," she was not a candidate for rehabilitation to enable her to return to employment. (*See* Pl. LR 56 St., ¶ 395, *admitted* by defendants, Def. LR 56(a)(2) St., ¶ 395). Subsequently, CORE considered "age" to be relevant to the Plan definition, as well, noting that "[g]iven the EE's [employee's] **age**, lack of transferrable skills (worked as a laborer for 17 yrs) and 12th grade education, we recommend disability from performing any occ and cont of LTD benefits." (*See*, Pl. LR 56 St., ¶ 405, *admitted* by defendants, Def. LR 56 St.(a)(2) St. ¶ 405) (emphasis added). CORE then issued its Confidential Service Report #1 recommending that "[i]n light of Ms. Kirkpatrick's **age**, education, and lack of transferrable skills, we recommend continuation of her LTD benefits." (*See* Pl. LR 56 St. ¶ 406, admitted by defendants, Def. LR 56(a)2 St., ¶ 406).

In addition, CORE's experts have written that "factors which may variably affect a decision

---

[7] In support of their position that they be allowed to "read in" or "read out" whatever critical elements of total disability they so choose, defendants cite *Armstrong v. Liberty Mutual Assurance Company*, 273 F. Supp. 395, 404-405 (S.D. N. Y. 2003). (*See* Def. Mem. Resp. SJ, p. 30). That case involved consideration of a plan definition which explicitly included "age" as a factor to be considered in evaluating the disability of an "insured." While the plan language in *Armstrong* is more explicit, the decision certainly does not stand for the proposition that a plan administrator can ignore reality and common sense in its application of plan provisions.

on whether to approve or deny continued long term disability benefits based upon gainful employability include . . .the claimant's age...." (*See*, Pl. App. 5). Thus, Champion and CORE have recognized the obvious relevance of age as a factor of disability both before and after Champion/CORE's decisions in the present action.  Inexplicably, in their strident argument that age is irrelevant under the Plan definition of disability, defendants fail to acknowledge their various inconsistent positions.

**Available jobs:** As CORE's own experts attest, the availability of jobs in the local economy—whether explicitly or implicitly required by the Plan definition—is a key consideration in the determination of a claimant's disability. (*See* Pl. App. 5; Pl. Br. Resp. SJ, p. 27-28).  It matters not to the individual plaintiffs that they may have some skills that could enable them to work in a job available somewhere in the country if they are unemployable in their own geographical area. To argue to the contrary is to render the definition of disability meaningless.

**Full-time v. part-time:** Taking their argument a step further, defendants contend that the ability to work in a part-time job excludes one from the definition of disability.  (*See* Def. Mem. Resp. SJ., p. 31).  Apparently, under defendants' reasoning, a person who can perform some sedentary job for a few hours per week is not disabled under the Plans.  Indeed, Champion/CORE terminated several of the plaintiffs who, according to Champion/CORE, could only perform part-time work. (*See* Pl. LR 56 St., ¶ 79 (Boone); ¶ 465 (Lynn); ¶ 754 (Whitley)).  Under this novel interpretation of disability, defendants would have almost absolute license to deny or terminate benefits of disabled participants at their whim.

**Supplementary Vocational Assessments:** As discussed above, defendants contend that the

vocational assessments provided with the supplementary material should not be considered.[8]  For the reasons stated above, these assessments fill voids in the evidence resulting from Champion/CORE's efforts to terminate benefits. (*See* Pl. Br. Resp. SJ, p. 25).

**Champion's failure to rehire claimants:** Defendants contend that Champion's refusal to rehire any of the plaintiffs is irrelevant to the issues presented in this action.  (Def. Mem. Resp. SJ, p. 34).  As previously discussed, Champion's failure to accommodate *any* of the 14 plaintiffs in *any* type of job is not only relevant, but indicative of Champion's motives. In short, in view of the plaintiffs' excellent work records with Champion, Champion's refusal to consider re-employing them is persuasive evidence of each plaintiff's unemployability. (*See* Pl. Br. Resp. SJ, p. 29).

## Subjective Symptoms Such As Pain

As a matter of law, pain and other subjective symptoms must be considered in determining a participant's total disability under the Plans.  *Connors v. Connecticut General Life Ins. Co.*, 272 F.3d 127, 136 -37 (2d Cir. 2001).  Defendants concede this requirement, as they must, but suggest that Champion/CORE considered the plaintiffs' complaints of chronic pain in making their decisions terminating plaintiffs' benefits.  (Def. Mem. Resp. SJ, p. 39).  The record does not support this assertion.

Mary Lee Dixon indicated in her deposition testimony that as a matter of policy, CORE determined what factors would be considered in determining disability.  Glenn Taylor testified that as a matter of policy, a claimant's subjective symptomatology, including pain, was not sufficient to establish total disability under the Plans.

The records in the individual cases bear out that pain was not seriously considered.  As

---

[8]  With respect to Mr. Smith's claim, the assessment of vocational consultant, Randy Adams is a part of the original claims record (Pl. LR 56 St., ¶ 649).

discussed at length with respect to the individual plaintiffs, chronic pain and other subjective symptoms was a major component of most, if not all, of the plaintiffs' claims. While Champion and its prior administrator, Travelers, had previously given weight to these factors, CORE clearly did not. In fact, time and again, CORE's Dr. Beavers indicated, directly or indirectly, that a claimant's pain was not sufficient to support disability. (NB 20: Smith-250) ("References to chronic pain are 'subjective and there is no objective substantiation that this is disabling.'").[9] Time and again, CORE and Champion terminated benefits of the plaintiffs without any investigation or consideration of their complaints of chronic pain. A survey of all of the decisions made by CORE and Champion with respect to the plaintiffs' claims reflects that Champion/CORE either dismissed plaintiffs' complaints as "subjective," or disregarded them altogether. Neither CORE, Dixon nor the CRC ever discussed a plaintiff's chronic pain or other subjective symptoms in terminating benefits.[10]

Citing their response to plaintiffs' initial statement of facts, defendants argue that they did consider the plaintiffs' pain, apparently through some of the underlying FCEs and IMEs on which they base their decisions. (*See* Def. Resp. to Pl. LR 56 St. ¶¶ 79(c), 159(c), 173(c), 313(d), 512(d), 650(c), and 757(d)). At most, the evidence relied upon by defendants shows that some of the physicians performing the IMEs of plaintiffs acknowledged that the respective plaintiffs were complaining of chronic pain; however, it also seems clear that the IME physicians, perhaps acting under the direction of CORE's Dr. Beavers, applied the same standards as those applied by CORE,

---

[9] Generally, there were substantial "objective findings" to support complaints of pain, but they were ignored by CORE. (*See* Pl. Br. Resp., p. 13).

[10] The noted decisions with respect to each plaintiff are found in the record as follows: (*See* n. 3. *See also*: NB 1: Boone-5; NB 2: CRC-13; NB 6: CRC-1349; NB 5: Clark-329; NB 9: CRC-9; NB 8: Haynes-178; NB 12: CRC-1935; NB 13: Lynn-151; NB 16: CRC-2456; NB 19: CRC-2263; NB 18: Reece-275; NB 20: Smith-262; and NB 24: CRC-27.)

disregarding or discounting chronic pain as a basis for total disability. (*See, e.g.,* NB 20: Smith-250). *See also, Krizek v. CIGNA Group Inc.*, 345 F.3d 91, 102 (2nd Cir. 2003)(while the decision maker is not required to accept a plaintiff's complaints of pain as credible, "it cannot dismiss complaints of pain as legally insufficient evidence of disability"). Neither Champion/CORE's decisions or the underlying reports on which they relied reflect that anyone considered a plaintiff's complaints in the context of his/her physical conditions and medical history, and made a determination as to whether the complaints were credible. Defendants failed to do so for the obvious reason that they had adopted an unlawful policy of disregarding complaints of chronic pain and subjective symptoms.

There are a number of cases in point which have been discussed throughout plaintiffs' briefs. (Pl. Br. Resp. SJ., ¶¶ 23-25). One of the more pointed examples arises from Ms. Whitley's claim. Ms. Whitley suffers from severe and chronic pain caused by fibromyalgia. She had been certified as totally disabled since 1988, primarily because of her chronic pain. Upon consideration of her continuing disability in 1995, Champion's prior administrator, Travelers, commissioned an IME by Dr. Stephenson. Dr. Stephenson found that Ms. Whitley suffered from severe pain "probably as bad or worse as [sic] anyone I have seen in my entire practice" and determined that she was totally disabled on that basis. (Pl. LR 56 St., ¶ 741). Travelers and Champion agreed. (Pl. LR 56 St., ¶ 740).[11] However, with the encouragement of Champion's contact person, Sharon Spain, CORE ignored all this prior evidence and commissioned a new IME by another doctor, Dr. Rudins. In his evaluation, based on his one-time examination, Dr. Rudins devoted few words to Ms. Whitley's

---

[11] In fact, Travelers' case manager wrote at some length about the disabling symptoms of fibromyalgia and the credibility of Ms. Whitley's complaints, and noted that Ms. Whitley should be considered totally disabled until there was "convincing evidence" of some change in her circumstances. (Pl. LR 56 St., ¶ 740). The first year after CORE took over, it was agreed that there had been no improvement, and that further testing would be "a waste of money." (Pl. LR 56 St., ¶ 750).

chronic pain, the most critical component of her disability; and determined that Ms. Whitley could perform sedentary work on a sustained, albeit part-time basis; although he acknowledged that her prospects of returning to employment were "quite low." (Pl. LR 56 St., ¶ 757). Champion/CORE terminated benefits, without a word of discussion about Ms. Whitley's pain.

Ms. Whitley's claim, along with others, demonstrates that, in spite of defendants' arguments to the contrary, Champion/CORE adhered to its stated policy that subjective complaints of chronic and severe pain would not be considered as a basis for continuing total disability. The record is unequivocal. Champion/CORE's policy to disregard pain is undeniable. Champion/CORE's refusal to consider subjective complaints of chronic pain as a basis for continuing total disability renders its entire process unlawful under ERISA, and, in itself, supports plaintiffs' motion that the decisions terminating plaintiffs' disability must be set aside. *Connors v. Connecticut General Life Ins. Co.*, 272 F.3d 127, 136 -37 (2d Cir. 2001); *Krizek v. CIGNA Group Ins.*, 345 F.3d 91 (2nd Cir. 2003).

### Prior Certifications of Disability

Plaintiffs have argued strongly, as a matter of common sense, that Champion's failure to explain or even acknowledge its prior certifications of most of the plaintiffs' total disability from any occupation in their decisions terminating benefits was arbitrary *per se*, and violated the principles set forth by the courts of this circuit. Characterizing plaintiffs' contentions as a "novel presumption," defendants claim that Champion/CORE could, at any time, reverse their prior decisions without explanation or any reasonable basis. (Def. Br. Resp. SJ, p. 40).

There is nothing novel about plaintiffs' argument that Champion/CORE's prior decisions must be considered. It is reasonable to assume that a claimant who is determined to be totally disabled under the any occupation standard will continue to be totally disabled unless his condition improves.

21

It is reasonable to require that after Champion has made its determination of disability of a claimant, it be consistent in its application of the same definition and standards in its periodic reviews thereafter.  It is reasonable to require and expect that any change in Champion's decision with respect to a claimant's total disability under the same definition, be accompanied with some explanation to support its reversal.  It is reasonable to conclude that Champion's reversal of its prior determination of total disability under the same definition, with no evidence that the claimant has improved, is arbitrary and irrational conduct which violates ERISA's standards.  It is a reasonable inference that such conduct arises from Champion/CORE's wrongful motives in their efforts to reduce their LTD rolls.

The Second Circuit recognized this principle in *Connors v. Connecticut General Life Ins. Co.*, 272 F.3d 127, 136 -37 (2d Cir. 2001).  As previously discussed, in *Connors*, the Second Circuit, noting the unexplained inconsistency in the administrator's reversals of its prior certifications of total disability under the same definition without explanation, set aside the termination decision.  The court's reasoning that the district court had "misperceived the procedural status" of the case reflected its acknowledgment of the common sense notion that a fiduciary's decision making conduct should be consistent and reasonable, and that any reversal of a prior decision should be supported with explanation.[12]

Essentially, defendants argue that they should be able to make decisions with absolute impunity.  Their discretionary authority does not go that far.  In exercising their authority, defendants

---

[12] This Court's decision in *Piscottano v. Metropolitan Life Ins. Co.*, 118 F.Supp 2d 200 (D. Conn. 2000), decided prior to *Connors*, does not reflect any contrary notion.  In *Piscottano*, the court simply noted that there is no legal presumption of disability arising  from a prior certification, and that upon periodic reviews, a fiduciary could change its decision based on some rational basis.  The fiduciary in that case clearly acknowledged and explained the change in its decision.

must still adhere to reasonable standards. Their unexplained reversals of prior certifications violated all standards of reasonableness.

### FCEs/IMEs/TSAs

Plaintiffs challenged Champion/CORE's use of FCEs to support their general efforts to reduce their LTD costs, as well as in individual cases. (Pl. Br. Supp. SJ, p. 18). Defendants defend their use of FCEs in general, and their primary tester, Susan Kimel, specifically. (Def. Mem. Resp. SJ, p. 42). FCEs provide but a *snapshot* of a person's functioning capacity, and any projections to conclusions concerning a claimant's ability to sustain such activity on a full-time basis are suspect, at best. (Pl. App. 3, 5). The tester's qualifications are critical in determining the validity of the test and its results. *Id.* As previously argued, there is nothing in the record concerning Ms. Kimel's qualifications or those of other testers; and there is plenty in the record to indicate that Ms. Kimel's conclusions could not provide a rational basis for termination of benefits. (*See* Pl. Br. Resp. SJ, pp. 9-11). Ms. Kimel's test results bear no apparent relation to a claimant's ability to work full-time, 8 hours per day, 40 hours per week; and her opinions should not be believed.[13]

Champion/CORE's reliance on IMEs is just as suspect.[14]    As previously discussed,

---

[13]    Defendants' only defense of Ms. Kimel is that two of the plaintiffs were reportedly referred to Ms. Kimel for the FCEs by their treating physicians. There is nothing in the record to indicate that such referrals reflected any particular degree of trust in the results of the test. In fact, the referrals were generally initiated by CORE.

[14]    Similar to their defense of FCEs, defendants' only defense of Champion/CORE's use of IMEs is to point out that two of the IME physicians who evaluated the plaintiffs, Ms. Boone and Ms. Brookshire, were the treating physicians for the plaintiff, Mr. Smith. (Def. Mem. Resp. SJ, p. 42). The defendants miss the point. In casting doubt on Champion/CORE's undue use of IMEs, plaintiffs are not arguing that every IME physician is ill-motivated; plaintiffs only contend that an IME must be viewed in the context of what it is—a one-time limited evaluation by a non-treating physician— and contrasted to the opinions of treating physicians who have treated a plaintiff repeatedly over a period of time, and are in a position to judge a plaintiffs' character, work ethic and credibility concerning his/her subjective complaints of pain. IME physicians were in no position to judge a

IMEs—one-time examinations by non-treating physicians—can provide helpful information in the review process. However, Champion/CORE's general practice of invariable reliance on IMEs over plaintiffs' treating physicians, reveals their motives in the *cherry-picking* of evidence to support their decisions to terminate plaintiffs' benefits.[15]

Finally, defendants attempt to defend Champion/CORE's use of TSAs, which were provided by CORE's Cost Services Department, generally after CORE had made its decision. (*See*, Pl. Br. Resp. SJ, p., 26, n.12). Defendants contend, with reference to the TSA concerning Mr. Reece, in particular, that the evaluator considered individualized characteristics in reaching her conclusions. (Def. Mem. Resp. SJ, p. 43). The CORE employee was provided basic information to plug into her database, including a plaintiff's prior position for Champion, a general statement of medical restrictions and education. (*See*, Pl. LR 56 St., ¶ 667). However, the record reflects that that was the extent of the information received by the employee. In other words, the employee never considered or received information concerning a plaintiff's chronic pain, other subjective symptoms, projected absenteeism, the availability of any jobs in the economy (local, state or national) which would fit the job titles suggested by the employee's database and, any need for training. The TSA should be seen for what it was—an academic exercise bearing little or no relation to the actual availability of jobs for these plaintiffs.

_____

plaintiff's complaints of pain, and generally made no attempt to do so.

[15] As part of this general pattern, Champion/CORE often ignored any qualifying reports made by evaluating doctors and their IMEs. (*See* Pl. LR 56 St., ¶ 757). As previously pointed out, the contrast in Dr. Beavers' *cross-examination* of plaintiffs' treating physicians to his total silence in the face of inconsistencies and qualifying information in IMEs, is another, of many, indications of his bias. (*See* Pl. Br. Resp. SJ, pp. 11-12).

## Other Factors

Plaintiffs challenged other deficiencies in Champion/CORE's procedures which resulted in the termination of benefits of the plaintiffs. Plaintiffs argue that the fact that the Social Security Administration found each of the plaintiffs totally disabled from any work should have been considered by Champion/CORE in their reviews. (Pl. Br. Supp. SJ, p. 17). Defendants indicate that they considered the decisions with respect to some of the claims; that the Administration's findings were not included in some of the records; and in any event, that the Administration's determination of disability is not incumbent on a plan administrator under ERISA. (Def. Mem. Resp. SJ, p. 34-38). Whatever their rationalizations, the record reflects that the Social Security Administration, applying the same essential definition of total disability—that the claimant is unable to work in any gainful activity—found each plaintiff totally disabled. While not dispositive, as pointed out in plaintiffs' prior argument, this evidence should be considered. Champion/CORE gave no consideration to the Administration's findings of disability of the plaintiffs.

Plaintiffs charge, with considerable support from the record, that Champion/CORE discounted reports from plaintiffs' treating physicians who were well acquainted with their problems and had treated them for years. The record shows repeated examples. (*See, e.g.*, Pl. LR 56 St., ¶ 68 (Boone); ¶ 770 (Whitley)). Defendants contend that they "were not required to distinguish, rebut, explain or even mention plaintiffs' treating physicians," citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003), in support. (Def. Mem. Resp. SJ, pp. 38-39). Defendants have mischaracterized *Nord's* holding. While the Supreme Court noted that ERISA administrators did not have to give "special weight" to the opinions of treating physicians, it also emphasized that administrators could not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating

physician." 538 U.S. at 834. Through their selective consideration and reliance on evidence in support of termination, Champion/CORE repeatedly disregarded and discounted the opinions of the treating physicians of the plaintiffs. While plaintiffs have argued each of the individual claims separately, this overall pattern is an additional factor warranting a reconsideration of all the claims.

## INDIVIDUAL PLAINTIFFS

### ELIZABETH CASE BOONE

Ms. Boone is totally disabled and has been disabled under the Plan since 1987 as a result of seven neck surgeries with fusions from C3-C7 (cervical discs), diffuse fibromyalgia and cervical spondylosis. (Pl. LR 56 St., ¶ 61). Plaintiffs have provided specific facts establishing Ms. Boone's claim in support of their motion, and in response to defendants' motion, which are incorporated by reference. (*See* Pl. Br. Supp. SJ, pp. 19-24; Pl. Br. Resp. SJ, pp.31-35; Pl. LR 56 St., ¶¶ 55-104).

In their response to plaintiffs' motion, defendants essentially rely on the same information argued in their opening brief, and refuted in plaintiffs' briefs. (Def. Mem. Opp. SJ, pp. 43-44). Without repeating prior discussion, plaintiffs reply as follows:

- **Dr. Beavers' statement that Dr. Vargo (Ms. Boone's treating specialist) was "not sure" of her determination of disability:** Defendants repeat their contentions that Ms. Boone's treating physician, Dr. Vargo, was "not sure" of her determination of Ms. Boone's disability. (Def. Br. Resp., p. 43). Responding to defendants' contentions: Dr. Beavers' notes do not constitute *Dr. Vargo's documentation*. (Def. Br. Resp., p. 43). Further, the Beavers-generated record is unreliable, particularly given his predilection to create supporting documentation. (*See* Pl. Br. Resp. SJ, p.6). Dr. Vargo's *documented* opinions supporting Ms. Boone's disability consistently, specifically and convincingly refute Dr. Beavers' hearsay statement in the record.[16]

---

[16] As plaintiffs have pointed out, even if Dr. Vargo had agreed that she was "not sure" of her opinion, this statement, by itself, would not support defendants' termination as absolute certainty of

- **IME of Dr. Shields:** Defendants defend Dr. Shields' IME, indicating that his initial report that Ms. Boone could work "5-6 hours per day, 5 days per week," was consistent with his "Addendum," in which he changed his opinion to state that Ms. Boone could work "6 hours per day, 5 days per week," at the specific request of CORE's Dr. Beavers.  (Def. Mem. Opp. SJ, p. 44).  Defendants gloss over the deficiencies in Dr. Shields' IME.  The initial report clearly states that additional evaluation was needed, and that Ms. Boone could never return to full-time work but could engage in part-time work "5-6 hours/day, 5 days/week." (Pl. LR 56 St., ¶¶ 79, 83).  Additional evaluation was never provided.  The significance of the discrepancy between "5-6 hours/day" and "6 hours/day" is emphasized by Champion/CORE's request that Dr. Shields change his report in this regard.  Dr. Shields amended his opinion, at Dr. Beavers' request, with a rationalization which the record proves false. (Pl. LR 56 St., ¶¶ 85-86).  Defendants ignore issues concerning Dr. Shields' credibility and CORE's motives, and the other issues raised in plaintiffs' argument.

- Defendants fail to address other issues raised in support of plaintiffs' motion, including Ms. Boone's objective medical evidence, involving multiple cervical spine operations; the severe, chronic pain as a result of Ms. Boone's condition; blatant disregard for the opinions of Ms. Boone's treating physicians; and the lack of complete and accurate vocational evidence. Defendants' failure to consider these factors deprived Ms. Boone of a full and fair review, in violation of the Plan.

Ms. Boone continues to be totally disabled.  Defendants are unable to justify termination.

Plaintiffs' motion should be granted, and her LTD benefits reinstated.

### ROSA LEE BROOKSHIRE

Ms. Brookshire is totally disabled and has been disabled under the Plan since January 3, 1995 as a result of chronic lower back pain, disc degeneration and other conditions which eventually

---

an opinion is neither required nor should it be expected.  Dr. Beavers never asked his IME physicians whether they were "sure" of their opinions.  In fact, in a number of cases, uncertainty was indicated. (*See* Pl. Br. Resp. SJ, pp. 7-9).  Thus, his quotation, without explanation, is meaningless at best, and misleading at worst.

became disabling.  (Pl. LR 56 St., ¶¶ 109, 111, 112, 115).  Plaintiffs have provided specific facts establishing Ms. Brookshire's claim in support of their motion and in response to defendants' motion, which are incorporated by reference.  (*See* Pl. Br. Supp. SJ, pp. 24-29; Pl. Br. Resp. SJ, pp. 35-41; Pl. LR 56 St., ¶¶ 105-179).

In their response to plaintiffs' motion, defendants essentially rely on the same information argued in their opening brief and refuted in plaintiffs' briefs.  (Def. Mem. Resp. SJ, pp. 44-46). Without repeating prior discussion, plaintiffs reply as follows:

- Defendants assert at the outset of their Memorandum in Opposition to Plaintiff's Motion for Summary Judgment that "[P]laintiffs also allege that Brookshire's treating physician, Dr. Mulholland, 'certified that Ms. Brookshire was disabled from any occupation'." (Def. Br. Resp. SJ, p.44). Plaintiffs' "allegation" was, however, admitted without comment by the defendants: "On June 23, 1997, Dr. David Mulholland (who had taken over Dr. Goodwin's practice) indicated that Ms. Brookshire was unimproved since January 1994, and was totally disabled for any occupation, and would, in his opinion, never be able to resume any work." (Pl. LR 56 St., ¶ 139 admitted at Def. LR 56(a)2 St., ¶ 139).

- Defendants also ignore Dr. Rudins' recommendation of a work tolerance program as a condition to his IME opinion that Ms. Brookshire might be able to work. Champion/CORE ignored that portion of his opinion, and the defendants have persisted in refusing to address that recommendation in their briefs. (Def. Br. Supp. SJ, pp. 15-18; Def. Resp. SJ, pp. 44-46).

- Most critically, defendants assert that "...a participant's age or whether jobs exist for the participant in the local, state or national economy" are not relevant to a determination of whether that person is totally disabled under the Plan. (See, Def. Br. Resp. SJ, p. 46). Thus, defendants persist in their argument that they were not required to determine that the plaintiff was really able to do a real job in order to terminate her benefits. In essence, defendants assert that if any of the plaintiffs

including Ms. Brookshire was theoretically capable of doing a theoretical job, then Champion could terminate benefits.

However, at one time, Champion had considered relevant Ms. Brookshire's age and whether the employer had a position available for her. (See Pl. App. 13, Vocational Rehabilitation Profile dated July 20, 1995). And, CORE's own employees have written that an employability assessment needs to consider "the demographic and employment conditions within the claimant's local labor market" and "the claimant's age." (See Pl. App. 5, p. 2).

Ms. Brookshire continues to be totally disabled. Defendants are unable to justify termination. Plaintiffs' motion should be granted, and her LTD benefits reinstated.

## HARRISON YOUNG CLARK

Mr. Clark is totally disabled and has been disabled under the Plan since December 10, 1990, as a result of an on-the-job injury on November 14, 1984, and the degenerative back condition resulting therefrom as well as other physical problems including chronic pain syndrome, recurrent depression, restless leg syndrome, sleep disturbance, and fibromyalgia. (Pl. LR 56 St.,¶¶ 183, 187, 188, 189). Plaintiffs have provided specific facts establishing Mr. Clark's claim in support of their motion, and in response to defendants' motion, which are incorporated by reference. (*See* Pl. Br. Supp. SJ, pp. 29-32; Pl. Br. Resp. SJ, pp. 42-46 ; Pl. LR 56 St., ¶¶ 180-256).

In their response to plaintiffs' motion, defendants essentially rely on the same information argued in their opening brief, and refuted in plaintiffs' briefs. (Def. Mem. Resp. SJ, pp. 46-47). Without repeating prior discussion, plaintiffs reply as follows:

- The Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment discussing Mr. Clark's claim is very brief. Most of the questions raised by the evidence itself and in plaintiff's brief are simply ignored. For instance, defendants offer no explanation of why Dr. Eglinton felt compelled to apparently change his

opinion as to Mr. Clark's disability immediately after a conversation with CORE's Dr. Beavers. On or about August 21, 1997, Dr. Eglinton, under threat of criminal and civil penalties, signed an Attending Physician's Statement indicating that Mr. Clark's condition was unimproved and that he was totally disabled from any occupation. (Pl. App. 20). Four (4) days later, on August 25, 1997, Dr. Beavers contacted Dr. Eglinton by telephone. Thereafter, Dr. Eglinton reported "I cannot certify Harrison totally and completely disabled from all work activity." (See Pl. Br. Resp. SJ, pp. 43-44). The defendants ignore that apparently dramatic change in Dr. Eglinton's opinion, and offer no assurance that Dr. Eglinton was not misled by Dr. Beavers as to the applicable standard for determination of total disability. (Def. Mem. Resp. SJ, pp. 46-47).

- Defendants also reject as a "selective quotation" Dr. Rudins' statement that "considering that Mr. Clark has been out of work for essentially seven years, the probability of his being able to return to a productive job is quite low." (Pl. LR 56 St., ¶ 218). Although contending that Dr. Rudins' indication that Mr. Clark could perform sedentary work was "unequivocal", defendants offer no adequate explanation as to why the "probability" of Mr. Clark not being able to work was ignored by the Claims Review Committee, and the possibility of his being able to do sedentary work was credited. (Pl. Br. Resp. SJ, pp. 45-46; Def. Mem. Resp. SJ, pp. 47).

Mr. Clark continues to be totally disabled. Defendants are unable to justify termination. Plaintiffs' motion should be granted, and his LTD benefits reinstated.

## FRANZISKA FINNEY

Ms. Finney is totally disabled and has been disabled under the Plan since 1994 as a result of disc degeneration at the L5-S1 and C5-6, 6-7 levels of her spine, fibromyalgia, osteoarthritis and chondromalacia of the patella. (Pl. LR 56 St., ¶ 263). Plaintiffs have provided specific facts establishing Ms. Finney's claim in support of their motion, and in response to defendants' motion, which are incorporated by reference. (*See* Pl. Br. Supp. SJ, pp. 33-37; Pl. Br. Resp. SJ, pp. 46-50;

30

Pl. LR 56 St., ¶¶ 263-287).

In their response to plaintiffs' motion, defendants essentially rely on the same information argued in their opening brief, and refuted in plaintiffs' briefs. (Def. Mem. Opp. SJ, pp. 47-48). Without repeating prior discussion, plaintiffs reply as follows:

- **Dr. Osbahr:** Defendants contend that plaintiffs fail to acknowledge that Dr. Osbahr was Ms. Finney's treating physician. (Def. Br. Resp., p. 47). This is erroneous; plaintiffs have consistently identified Dr. Osbahr as Ms. Finney's treating physician. (*See* Pl. Br. Supp. SJ, p. 34; Pl. LR 56 St., ¶ 264; Pl. Br. Resp. SJ, p. 47; Pl. LR Resp. ¶ 166) Nonetheless, Dr. Osbahr's significance in this claim is his consistent confirmation of Ms. Finney's continued disability under the Plan from 1994 to 1997. (Pl. Br. Supp. SJ, p. 34) However, after contact from CORE, the administrator hired by his employer, Dr. Osbahr suddenly abandoned his prior consistently documented opinion of Ms. Finney's total disability to indicate that Ms. Finney could perform sedentary, clerical work, for which she was not qualified or could reasonably become qualified by training, education or experience. Ignoring all of the evidence favoring Ms. Finney's total disability, and based solely upon the one inconsistent and qualified statement by Dr. Osbahr, defendants terminated Ms. Finney's LTD benefits. Such actions are arbitrary and capricious.

- **Vocational Evidence:** Defendants state that "the Plan attempted to obtain information" from the vocational counselor who met and evaluated Ms. Finney and determined that Ms. Finney was unable to work at any kind of job for an 8-hour shift, regardless of what type of work. (Def's Mem. Opp. SJ, pp. 47-48) Considering CORE's aggressive and relentless actions replete throughout the record in seeking evidence unfavorable to plaintiffs, its failure to acquire easily obtainable vocational evidence of which it had knowledge exemplifies its failure to provide a full and fair review of Ms. Finney's claim.

- **Exhaustion:** Ms. Finney did not understand that by not requesting another review of her denied claim she was waiving her rights to pursue her claim. Further, based on the

31

evidence in the record, it would have been futile for her to request further review, since during the entire appeals process the Plan failed to consider evidence supportive of plaintiff's claims, and merely rubber stamped CORE's recommendations.

Ms. Finney continues to be totally disabled.  Defendants are unable to justify termination. Plaintiffs' motion should be granted, and her LTD benefits reinstated.

### WILEY H. HAYNES

Mr. Haynes is totally disabled under the Plan.  He suffers from long-standing back and knee injuries and was certified for LTD benefits from 1993 to 1997.  Mr. Haynes' treating physician has consistently determined, based on objective findings and his credible reports of chronic pain, that he is not able to work.  (Pl. LR 56 St., ¶ 327).  Plaintiffs have provided specific facts establishing Mr. Haynes' claim in support of their motion, and in response to defendants' motion, which are incorporated by reference.  (*See* Pl. Br. Supp. SJ, pp. 37-42; Pl. Br. Resp. SJ, pp. 50-53; Pl. LR 56 St., ¶¶ 288-332).

In their response to plaintiffs' motion, defendants essentially rely on the same information argued in their opening brief, and refuted in plaintiffs' briefs.  (Def. Mem. Opp. SJ, p. 48).  Without repeating prior discussion, plaintiffs reply as follows:

- **FCE:** Without addressing any of the other issues raised by plaintiffs' motion, defendants' attempt to support the deficiencies in the record concerning the FCE of Mr. Haynes.  (Def. Mem. Opp. SJ, p. 48).  Defendants contend that the record documents that Ms. Kimel was a staff physical therapist at Haywood Rehabilitation Center, and that Mr. Haynes was referred to Haywood by his treating physician.  Ms. Kimel's position as a physical therapist does not necessarily qualify her to conduct an FCE, much less to leap to conclusions concerning Mr. Haynes' ability to work from a 2-3 hour test.  The fact that Mr. Haynes' treating physician referred Mr. Haynes to Haywood at the request of CORE merely indicates CORE's procedure rather than any

acknowledgment of the validity of the test or the qualifications of the person administering the test. (*See*, Pl. LR 56 St., ¶ 312). As argued previously, Mr. Haynes' FCE was clearly deficient, and cannot establish a reasonable basis to terminate his benefits in view of the overwhelming evidence in his support.

•   Defendants fail to address other issues raised in support of plaintiffs' motion, including: Mr. Haynes' treating physicians' adamant certifications of his total disability, Mr. Haynes' debilitating pain, CORE-identified clinical complications, and lack of vocational evidence. The failure to consider the above factors deprived Mr. Haynes of a full and fair review, in violation of the Plan.

Mr. Haynes continues to be totally disabled. Defendants are unable to justify termination. Plaintiffs' motion should be granted, and his LTD benefits reinstated.

### DARRELL KEITH HILL

Mr. Hill is totally disabled and has been disabled under the Plan since 1990 as a result of chronic, long-standing injuries to his right leg requiring eight surgeries and an eventual amputation. Mr. Hill also suffers from persistent infections, particularly on his stump, and other disabling symptoms such as post-traumatic degenerative arthritis, gout, low back pain, degenerative arthritis of multiple disks, lateral epicondolitis of the right elbow, and pyorrhea, resulting in removal of his teeth. (Pl. LR 56 St., ¶ 338). Plaintiffs have provided specific facts establishing Mr. Hill's claim in support of their motion, and in response to defendants' motion, which are incorporated by reference. (*See* Pl. Br. Supp. SJ, pp. 42-47; Pl. Br. Resp. SJ, pp. 53-56; Pl. LR 56 St., ¶¶ 333-366).

In their response to plaintiffs' motion, defendants essentially rely on the same information argued in their opening brief, and refuted in plaintiffs' briefs. (Def. Mem. Opp. SJ, pp. 48-49). Without repeating prior discussion, plaintiffs reply as follows:

•   **TSA:** Defendants base their denial of Mr. Hill's LTD claim upon a transferable skills analysis performed by Ms. Mikeska in which she identified jobs allegedly suitable for

Mr. Hill. However, the TSA was fatally flawed because Mr. Hill did not meet the required aptitudes nor the minimum performance criteria for physical demands in these jobs. (Pl. LR 56 Resp. ¶ 220) Additionally, Mr. Hill was not qualified and could not become reasonably qualified by training, education or experience for the jobs identified by Ms. Mikeska. Defendants' failure to identify appropriate jobs for Mr. Hill was in violation of the Plan.

- **Exhaustion:** After receiving the second denial of his claim, despite the overwhelming evidence submitted to the Plan confirming his continued disability, it became apparent to Mr. Hill that further attempts to pursue his claim would be fruitless. Further, based on the evidence in the record, it would have been futile for him to request further review, since during the entire process the Plan failed to consider evidence supportive of plaintiff's claims, and merely rubber stamped CORE's decisions. Additionally, defendants' focus on this procedural irregularity is particularly ironic given the fact that defendants have failed to produce the alleged IME upon which the denial of Mr. Hill's LTD claim is based.

Mr. Hill continues to be totally disabled. Defendants are unable to justify termination, particularly in light of the non-production of the IME. Plaintiffs' motion should be granted, and Mr. Hill's LTD benefits reinstated.

### JUDITH CASE KIRKPATRICK

Ms. Kirkpatrick is totally disabled and has been disabled under the Plan since November 26, 1993 as a result of two on-the-job back injuries sustained in 1991 and 1992, and the leg pain, degenerative disc disease, connective tissue disease with fibromyalgia and generalized osteoarthritis that she developed subsequent to her on-the-job injuries. (Pl. LR 56 St., ¶¶ 374, 375). Plaintiffs have provided specific facts establishing Ms. Kirkpatrick's claim in support of their motion, and in response to defendants' motion, which are incorporated by reference. (*See* Pl. Br. Supp. SJ, pp. 47-52; Pl. Br. Resp. SJ, pp. 56-62; Pl. LR 56 St., ¶¶ 367-441).

In their response to plaintiffs' motion, defendants essentially rely on the same information argued in their opening brief, and refuted in plaintiffs' briefs.  (Def. Mem. Resp. SJ, pp.  49-50). Plaintiffs rely on their prior explanation as to the deficiency of the review accorded Ms.  Kirkpatrick. Without repeating prior discussion, plaintiffs reply as follows:

- In reply to Defendants' Memorandum Opposing Summary Judgment, plaintiffs point out that the defendants offered no explanation for the Savings Analysis provided by CORE that "It is anticipated that the employee would have continued to receive LTD benefits until her indemnity limit date if it had not been for [CORE] Case Management's assessment and intervention of this case."  (Pl.  App. 42, p. 3)

Ms. Kirkpatrick continues to be totally disabled.  Defendants' review of her claim was selective and biased, rather than full and fair.  Defendants are unable to justify termination. Plaintiffs' motion should be granted, and her LTD benefits reinstated.

### LOIS L. LYNN

Ms. Lynn is totally disabled under the Plan from a rare, life-long chronic lung disease known as bronchiectasis.  (Pl. LR 56 St., ¶ 448).   She was certified for total disability under the Plan for 6 years.  Ms. Lynn's two treating pulmonary specialists confirmed during CORE's review that she remained disabled.  Plaintiffs have provided specific facts establishing Ms. Lynn's claim in support of their motion, and in response to defendants' motion, which are incorporated by reference.  (*See* Pl. Br. Supp. SJ, pp. 52-60; Pl. Br. Resp. SJ, pp. 62-66; Pl. LR 56 St., ¶¶ 448-115).

In their response to plaintiffs' motion, defendants essentially rely on the same information argued in their opening brief, and refuted in plaintiffs' briefs.  (Def. Mem. Opp. SJ, pp. 50-52). Without repeating prior discussion, plaintiffs reply as follows:

- **Ms. Lynn's treating specialists:** Defendants charge that there was no "consensus" among Ms. Lynn's treating pulmonary specialists that she is disabled.  (Def. Mem.

Opp. SJ., p. 50).  Defendants question whether Dr. Boerner, one of Ms. Lynn's treating pulmonary specialists, agreed to Ms. Lynn's disability, despite his certification that Ms. Lynn was "100% disabled" just months before CORE recommended termination.  (Pl. LR 56 St., ¶ 470).  Defendants based their argument on a notation by CORE's Dr. Beavers that Dr. Boerner "was very reluctant to give an opinion" concerning Ms. Lynn's disability.  However, Dr. Boerner never documented reservations concerning his opinion and nothing in Dr. Beavers' quotation, even if believed, rescinds his certification.  Dr. Beavers' hearsay statement has no probative value in disproving Ms. Lynn's disability.

- **The opinion of Ms. Lynn's family physician:** Defendants continue to rely on the opinion of Dr. Freeman, Ms. Lynn's family physician with no pulmonary specialty, despite the fact that Dr. Freeman did not treat Ms. Lynn for her rare, life-threatening lung disease.  (Def. Mem. Opp. SJ., p. 50; *see also*, Pl. LR 56 St., ¶ 472).  This is ironic in that it is  inconceivable that, if the shoe were on the other foot, a family physician's opinion would supersede specialists' opinions in Champion/CORE's certifying disability. Nevertheless, given Dr. Freeman's opinion's lack of foundation and its inconsistency with more substantial evidence in the case, this evidence is insufficient to support the termination.

- **IME of Dr. McCarrick:** Labeling plaintiffs' attacks on Dr. McCarrick's IME as "convoluted", defendants indicate that Dr. McCarrick's opinions were consistent in finding that Ms. Lynn could work in a part-time capacity.  In fact, Dr. McCarrick first stated that he could not assess Ms. Lynn's "functional status." (*See*, Pl. Br. Supp. SJ, p. 56).  Days later, at the request of Dr. Beavers, Dr. McCarrick, in an apparent change of position, opined that Ms. Lynn was capable of working part-time. Dr. McCarrick subsequently rescinded that opinion, stating that he had been "misquoted" in Champion's statement that he had determined that she [Ms. Lynn] could work. Once again solicited by Dr. Beavers, Dr. McCarrick incredibly reversed his opinion again to state that Ms. Lynn could work part-time. (Pl. Br. Supp. SJ., pp. 56-57; Pl. LR 56 St., ¶ 465).   There is nothing "convoluted" about this argument: given Dr. McCarrick's inconsistent statements, his conclusion, under any normal tests of

36

credibility, lacks any credible basis upon which to terminate Ms. Lynn's benefits.

- Defendants fail to address other issues raised in support of plaintiffs' motion, including failing to consider the objective medical evidence, particularly the December 7, 1995 pulmonary function tests which evidenced moderate to severe obstruction. (Pl. LR 56 St., ¶ 465).

Ms. Lynn continues to be totally disabled. Defendants' are unable to justify termination. Plaintiffs' motion should be granted, and her LTD benefits reinstated.

## CELIA DARLENE METCALF

Ms. Metcalf is totally disabled and has been disabled under the Plan since April 15, 1997 as a result of a medley of physical problems which disabled her after almost eighteen years of service to Champion (Pl. LR 56 St., ¶¶ 528, 530-535). Plaintiffs have provided specific facts establishing Ms. Metcalf's claim in support of their motion, and in response to defendants' motion, which are incorporated by reference. (*See* Pl. Br. Supp. SJ, pp. 65-69; Pl. Br. Resp. SJ, pp. 69-74; Pl. LR 56 St., ¶¶ 526-578).

In their response to plaintiffs' motion, defendants essentially rely on the same information argued in their opening brief, and refuted in plaintiffs' briefs. (Def. Mem. Resp.SJ, pp. 52-53). As is typical, the defendants have ignored the medley of physical problems from which Ms. Metcalf suffers. (Def. Mem. Resp. SJ, pp. 52-53; Pl. LR 56 St., ¶ 530). Without repeating prior discussion, plaintiffs reply as follows:

- Defendants offer no explanation for why the conversation with Dr. Beavers would lead Dr. Mendelsohn to change his opinion as to Ms. Metcalf's employability within a matter of minutes or hours. (See, Def. Mem. Resp. SJ, pp. 52-53; Pl. Br. Resp. SJ, pp. 71-72).

- Defendants' response brief also is silent as to why on June 15, 2000, the Claims Review Committee apparently ignored the March 20, 2000 note of Ms. Metcalf's

family physician, Dr. Buehler who stated that "...she is currently disabled because of her base line medical condition as well as that of her hands [pain in left wrist and thumb from arthritis], although this disability [left wrist and thumb] may not be permanent." (See, Def. Mem. Resp. SJ, pp. 52-53; Pl. Br. Resp. SJ, p. 73, citing, NB 15: Metcalf-133; NB 16: CRC-033- 034)

Ms. Metcalf continues to be totally disabled. Defendants are unable to justify termination. Plaintiffs' motion should be granted, and her LTD benefits reinstated.

## WILSON McCLURE

Mr. McClure is totally disabled and has been disabled under the Plan since 1989 as a result of spondylarthritis, resulting in severe limitations. (Pl. LR 56 St., ¶ 497). Plaintiffs have provided specific facts establishing Mr. McClure's claim in support of their motion, and in response to defendants' motion, which are incorporated by reference. (*See* Pl. Br. Supp. SJ, pp. 60-65; Pl. Br. Resp. SJ, pp. 67-69; Pl. LR 56 St., ¶¶ 492-525).

In their response to plaintiffs' motion, defendants essentially rely on the same information argued in their opening brief, and refuted in plaintiffs' briefs. (Def. Mem. Opp. SJ, pp. 53-54). Without repeating prior discussion, plaintiffs reply as follows:

• **Exhaustion:** Mr. McClure, through counsel, requested review of Champion's denial, and further requested an extension of time to submit additional documentation evidencing Mr. McClure's total disability. However, Champion failed to respond to this request. Plaintiff subsequently, through counsel, requested information regarding the status of his claim; however, no review of Mr. McClure's claim was provided. (Pl. LR 56 St. ¶¶ 521-524) Accordingly, it was clear to Mr. McClure, based upon the previous denial despite overwhelming evidence in support of his continued disability, that further attempts to pursue his claim were fruitless. Further, based on the evidence in the record, it would have been futile for him to request further review, since during the entire process the Plan failed to consider evidence supportive of plaintiff's claims,

38

and merely rubber stamped CORE's recommendations. Plaintiff's counsel subsequently provided extensive documentation regarding Mr. McClure's continued disability. However, in its consistent pattern of refusing to provide a full and fair review of plaintiffs' claims, the Plan refused and continues to refuse to even consider this evidence.

•   **IME:** The basis for defendants' denial of Mr. McClure's claim, the IME by Dr. Stephenson, with its qualifications and limitations regarding the type of sedentary job Mr. McClure could allegedly perform, exemplifies the enthusiasm with which Champion removed LTD participants from its rolls. The medical evidence shows that Mr. McClure's pain was so intense that he was unable to tend to his own personal needs, and Dr. Stephenson fails to reconcile Mr. McClure's pain with his ability to work. (Pl. LR St. ¶ 554) Additionally, there is *no vocational evidence whatsoever* regarding any jobs for which Mr. McClure is qualified or could reasonably become qualified considering his education, training or experience. Plaintiffs suggest that defendants' lack of *any vocational evidence* suggests that there is no sedentary job, particularly given the limitations as outlined by Dr. Stephenson, for which Mr. McClure is qualified under the terms of the Plan. Defendants' failure to consider the vocational aspect of Mr. McClure's claim violated the Plan.

Mr. McClure continues to be totally disabled. Defendants are unable to justify termination. Plaintiffs' motion should be granted, and Mr. McClure's LTD benefits reinstated.

## CHARLES R. REECE

Mr. Reece is totally disabled and has been disabled under the Plan since June 27, 1995 as a result of congestive cardiomyopathy and other conditions. (Pl. LR 56 St., ¶¶ 583, 584). Plaintiffs have provided specific facts establishing Mr. Reece's claim in support of their motion, and in response to defendants' motion, which are incorporated by reference. (*See* Pl. Br. Supp. SJ, pp. 69-73; Pl. Br. Resp. SJ, pp. 74-80; Pl. LR 56 St., ¶¶ 579-626).

In their response to plaintiffs' motion, defendants essentially rely on the same information

argued in their opening brief, and refuted in plaintiffs' briefs.  (Def. Mem. Resp.SJ, pp.54-55).  Without repeating prior discussion, plaintiffs reply as follows:

- The defendants ignore the fact that Dr.  Keogh recommended that a stress test be performed to provide "some objective quantification of what he can do regarding physical activity." (Pl. Br. Supp. SJ, pp 72).  Champion and CORE both ignored this recommendation, and their briefs continue that tactic.

- The defendants' brief also ignores the Vocational Rehabilitation Referral Guidelines evaluation of Mr.  Reece on September 1, 1998 by Mary Kane which determined that he was not a candidate for vocational rehabilitation. (Pl. App. 73).  The evaluation was "to determine the appropriateness of the referral for vocational rehabilitation services during the 'any occ' review phase of LTD."  Among the factors to be considered were the person's "age," and whether the employer had a position available for the employee. (Pl.  App.  73; NB 19: CRC-2406-2407).  As elsewhere this vocational evidence was ignored by the Champion Claims Review Committee and continues to be ignored in defendants' briefs.

Mr.  Reece  continues to be totally disabled.  Defendants are unable to justify termination.  Plaintiffs' motion should be granted, and his LTD benefits reinstated.

### HARRY L. SMITH

Mr. Smith is totally disabled from multiple surgeries on his back, including a laminectomy, fusion, and insertion of metal rods to stabilize his spine.  He has been diagnosed with additional disc problems at other levels of his spine.  He has suffered from severe and chronic pain in his back and legs. (Pl. LR 56 St., ¶¶ 632-636).  He was certified by Champion for total disability under the Plan for four years.  Mr. Smith's treating specialist confirmed during CORE's review that he remained disabled.  (Pl. LR 56 St., ¶ 639).  Plaintiffs have provided specific facts establishing Mr. Smith's claim in support of their motion, and in response to defendants' motion, which are incorporated by reference. (*See* Pl. Br. Supp. SJ, pp. 73-81; Pl. Br. Resp. SJ, pp. 80-84; Pl. LR 56 St., ¶¶ 627-669).

In their response to plaintiffs' motion, defendants essentially rely on the same information argued in their opening brief, and refuted in plaintiffs' briefs. (Def. Mem. Opp. SJ, pp. 55-56). Without repeating prior discussion, plaintiffs reply as follows:

- **FCE:** Defendants rely on the FCE conducted by Susan Kimel in support of their termination of Mr. Smith's benefits. Plaintiffs argued at length in each of their prior briefs why Ms. Kimel's report has no probative value. In short, the evidence of record shows that the FCE was interrupted for the night since Mr. Smith could not complete the testing in a single sitting of approximately two hours due to his intense pain. However, Ms. Kimel, failing to mention that fact, found that Mr. Smith could perform full-time work on a sustained basis—8 hours per day, 40 hours per week. (Pl. Br. Supp. SJ, p. 77-78; Pl. Br. Opp. SJ, p. 81-82). Defendants, without even attempting to address the internal inconsistencies in the report[17], simply attack plaintiffs' argument questioning Ms. Kimel's qualifications.[18] Ms. Kimel's qualifications are nowhere established in the record; and in fact, in Mr. Smith's FCE, she indicates her function as merely ministerial—recording the results of her machines—and that there was no thoughtful basis for her broad conclusions that Mr. Smith could work in a full-time job. Defendants fail to address these or other issues raised concerning Ms. Kimel's FCE.

- **TSA:** Defendants defend their TSA of Mr. Smith by CORE's Cost Services Department, contending that the employee who prepared the report considered Mr.

---

[17] Plaintiffs' vocational consultant, Randy Adams, provided helpful expertise in demonstrating the total invalidity of Ms. Kimel's report. (See, Pl. LR 56 St., ¶ 649; Pl. App. 78).

[18] Ms. Kimel's FCE of Mr. Smith reveals the inadequacies in general. The limitations of these tests, and the questionable value of the FCE as a basis for terminating disability has been pointed out in professional critiques. (*See*, Pl. App. 2, 4). With respect to Mr. Smith, residual functioning secondary to chronic pain was simply more demonstrable in proving the invalidity of the test since Mr. Smith's performance of the test had been interrupted by his intense pain which required medication and a night's sleep to get over the first two hours of testing. (Pl. LR 56 St., ¶ 648).

Smith's personal characteristics.  In fact, the TSA only considered Mr. Smith's education and prior position with Champion, and, assuming his limitations to sedentary/light activity, made broad conclusions concerning his transferrable skills. The report was challenged by Mr. Smith's vocational consultant, Randy Adams, for its failure to assess Mr. Smith's aptitudes and other limitations.  (Pl. LR 56 St., ¶ 649). Defendants make no effort to defend the report from these challenges.  As previously argued, the lack of any individualized consideration, and any available jobs in the economy which Mr. Smith could perform, the report has no probative value.[19]  (*See* Pl. Br. Supp. SJ, pp. 77-78).

- Defendants fail to address other issues raised in support of plaintiffs' motion; specifically, disregarding the x-rays of Mr. Smith's spine evidencing the severity of his condition. Incredibly, despite this completely objective evidence of Mr. Smith's disabling condition, defendants deny his claim based allegedly upon lack of "objective findings." Further, extensive vocational evidence was presented which substantiated Mr. Smith's non-employability. The lack of consideration of objective evidence and the dismissal of Mr. Smith's credible vocational evidence denied Mr. Smith a full and fair review, in violation of the Plan.

Mr. Smith continues to be totally disabled.  Defendants are unable to justify termination.

Plaintiffs' motion should be granted, and his LTD benefits reinstated.

### DOLPHUS LUTHER TREADWAY, JR.

Mr. Treadway  is totally disabled and has been disabled under the Plan since December 20,

---

[19]  Defendants acknowledge that the TSA did not consider Mr. Smith's age or the availability of jobs in the economy, and contends that these factors are not relevant to the definition of total disability under the Plans.  (Def. Mem. Resp. SJ., p. 56).  As argued above, considering the purpose of LTD plans in general—to provide disability benefits to those who, because of their medical disabilities, are unable to work—and the emphasis of the Plan definition—that one who is unable to "engage in work for wage or profit"—demonstrate that all relevant factors bearing on a disabled employee's ability to get work should be considered.  (*See*, Pl. App. 4) (Where a CORE expert discussed at length the various factors determining an employee's total disability under an identical Plan definition, including age, geographical location and the transferability of skills).

1995 as a result of a heart attack and by-pass surgery and unstable angina. (Pl. LR 56 St., ¶¶ 673, 674, 675). Plaintiffs have provided specific facts establishing Mr. Treadway's claim in support of their motion, and in response to defendants' motion, which are incorporated by reference. (*See* Pl. Br. Supp. SJ, pp. 81-86; Pl. Br. Resp. SJ, pp. 85-89; Pl. LR 56 St., ¶¶ 670-724).

In their response to plaintiffs' motion, defendants essentially rely on the same information argued in their opening brief, and refuted in plaintiffs' briefs. (Def. Mem. Resp. SJ, p 56. ). Without repeating prior discussion, plaintiffs reply as follows:

- Defendants contend Mr. Treadway withdrew his appeal. Defendants base their claim that Mr. Treadway withdrew his claim for benefits (See Def. Mem. Resp. SJ, p. 56) on the following unsigned handwritten notation:

> MLD [?] 2/24/99
> Per call from Janice
> EE has signed Ret forms
> eff [?]
> 2/1/99.
>
> Loc [?] contact EE re:
> droping [sic] appeal on LTD
> & [?] had requested a letter
> from attorney stating
> withdrawing appeal.
>
> Let go thru
> appeal & not
> start Pension w/o
> signing waiver.
>
> check w/ Sharon -
> does he have to sign
> waiver for - LTD?

(See, NB 22: Treadway-0050). The defendants cite no "letter from attorney stating withdrawing appeal" and ignore the March 12, 1999 letter from plaintiff's counsel at that time, Thomas F. Ramer, to Mary Lee Dixon concluding "As always, your kind cooperation in our **appeal** of this matter is greatly appreciated." (emphasis added; NB 22: Treadway-0051).

Mr. Treadway continues to be totally disabled. Defendants are unable to justify termination.

43

Plaintiffs' motion should be granted, and his LTD benefits reinstated.

**MARTHA BURNETTE WHITLEY**

Ms. Whitley is totally disabled under the Plan. Ms. Whitley has been certified as totally disabled since 1988. She has long suffered from chronic pain due to fibromyalgia and other related diseases which, according to a 1995 IME retained by Travelers, Champion's prior administrator, resulted in "extreme severe symptoms . . . , probably as bad or worse as [sic] anyone I have seen in my entire practice. . . ." (Pl. LR 56 St., ¶ 741; Pl. App. 88). The doctor noted that Ms. Whitley's "[f]unctional limitations are extreme and I do not think she could be employable at this time or in the foreseeable future." *Id.*[20]

Ms. Whitley's condition continued to deteriorate. Prior to CORE's review in 1997, Champion recognized that Ms. Whitley suffered severe disabling pain and that unless there was "convincing evidence" of her ability to work, "termination of benefits would not be appropriate." *See, e.g.*, Pl. LR 56 St., ¶ 740; Pl. App.1. At the behest of Champion's Sharon Spain, who pushed CORE to be "aggressive" in questioning Ms. Whitley's disability status, CORE undertook a course to remove Ms. Whitley from the LTD rolls. (Pl. LR 56 St., ¶ 749; Pl. App. 89). In doing so, Champion/CORE relied primarily on an FCE and IME, both of which were ultimately inconclusive, and neither of which addressed the historical disability caused by Ms. Whitley's chronic pain.

---

[20] The IME was commissioned to support termination because of allegations that Ms. Whitley was actually working in a hair salon—allegations that were ultimately proven untrue. Defendants indicate that the CRC's ultimate reversal of Champion's initial decision to terminate Ms. Whitley's benefits at that time resulted from a "principled process," and indicate that, for that reason, the process which led to the ultimate termination of her benefits should have credibility. The 1995 reversal of Champion's initial decision to terminate Ms. Whitley's benefits resulted from the CRC's determination that Ms. Whitley had *not* been working, as initially charged in an investigative report, and also, from the IME which confirmed unequivocally that Ms. Whitley continued to be totally disabled from work. *See*, Pl. LR 56 St., ¶ 741-742.

44

In their argument in support of their motion, defendants ignore the opinions of Ms. Whitley's treating physicians and rely on (1) an FCE of Mr. Hoechstetter; (2) an IME of Dr. Rudins; and (3) a TSA of CORE's Costs Services Department.  (*See* Def. Brief, pp. 123-137).   Defendants have mischaracterized the evidence and the standards of disability, and have ignored the substantial evidence in support of Ms. Whitley's claim.  Plaintiffs have provided specific facts establishing Ms. Whitley's claim in support of their motion, and in response to defendants' motion, which are incorporated by reference.  (*See* Pl. Br. Supp. SJ, pp. 87-95; Pl. Br. Resp. SJ, pp. 89-93; Pl. LR 56 St., ¶¶ 725-784).

In their response to plaintiffs' motion, defendants essentially rely on the same information argued in their opening brief, and refuted in plaintiffs' briefs.  (Def. Mem. Opp. SJ, p. 57).  Without repeating prior discussion, plaintiffs reply as follows:

- **FCE:**  Defendants charge plaintiffs with "manipulation of the Whitley record" in their argument concerning Ms. Whitley's FCE.  No manipulation of the record is necessary to conclude that the FCE, conducted by Ronald Hoechstetter, is, at minimum, ambiguous in its findings.  At one point, Mr. Hoechstetter finds that Ms. Whitley was unable to perform some of the necessary requirements of sedentary activity for more than four hours per day; and that Ms. Whitley was unable to "perform the maximum requirements of sedentary activity."  (*See* Pl. LR 56 St., ¶ 754; NB 24: CRC-2163).  At another point, as emphasized by defendants, Mr. Hoechstetter finds that "Ms. Whitley completed test activity at the sedentary physical demand level of work." (NB 24: CRC-2163).  A CORE employee noted, upon inquiry of Mr. Hoechstetter,  "that the time of the FCE the EE was only capable of a 4 hour work day.  He also states that that does not mean that she could not 'work up to a full day.'  Also noted that on the assessment job placement considerations he noted that she was limited in her capabilities in [many] aspects." (NB 52: CE-170).  There has been no "manipulation" of Mr. Hoechstetter's report—he confirmed that Ms. Whitley was unable to perform

full-time work.

- Defendants conspicuously fail to address Ms. Whitley's diagnosis of herpes zoster—a diagnosis which all who reviewed her file agreed disabled her. Defendants cannot justify their termination of Ms. Whitley's benefits in the face of the overwhelming evidence of her total disability due to her underlying condition of fibromyalgia and her disease of herpes zoster. This is amply demonstrated by defendants' failure to address the irrefutable evidence, which plaintiffs have emphasized, that Champion/CORE wrongfully applied the Plan definition and acted on false information in determining the onset date of Ms. Whitley's debilitating disease.

- Defendants fail to address other issues raised in support of plaintiffs' motion, including Ms. Whitley's excruciatingly painful condition, as described by Dr. Stephenson: "extreme severe symptoms" and "probably as bad or worse as [sic] anyone I have seen in my entire practice"; and the CORE-generated TSA, which failed to consider both Ms. Whitley's limitations and her pain. Last but not least, defendants' denial of Ms. Whitley's claim after a previous extensive evaluation and investigation in which defendants determined that she was disabled under the Plan, particularly given that her condition continued to deteriorate, defies logic. Such actions are the very definition of arbitrary and capricious.

Ms. Whitley continues to be totally disabled. Defendants are unable to justify termination. Plaintiffs' motion should be granted, and her LTD benefits reinstated.

## CONCLUSION

This is an extraordinary action. Champion's motives are relatively clear from the circumstantial evidence presented. CORE's tactics are even more clear. There are few ERISA LTD cases, if any, which involve so many plaintiffs who, having been previously certified for total disability, have been terminated within a relatively short period of time as a result of the identifiable actions and common practices of the administrator. There are few, if any, cases which reveal such obvious bias in the decision making process.

46

Plaintiffs' action is not about paper. It is not simply about "claims records." Plaintiffs' action is about 14 committed, hard working individuals living in the mountains of North Carolina who commonly suffer, not only from the various disabilities that impair them, but from the deprivation of their benefits which they earned, in this time of their greatest need.

Plaintiffs respectfully request that this Court correct these wrongs, and reinstate their benefits at once.

## REQUEST FOR ORAL ARGUMENT

In accordance with the Order of this Court, plaintiffs request oral argument on their claims as soon as practicable.

Respectfully submitted, this the ___ day of May, 2005.

THE PLAINTIFFS
HARRY L. SMITH, ET AL


BY:_____
WILLIAM B. BARNES (CT0268)
Rosenstein & Barnes
1100 Kings Hwy. East
P.O. Box 687
Fairfield, CT 06432
Tel (203) 367-7922
Fax (203) 367-8110
E-mail wbarnes@rosenbar.com

ROBERT M. ELLIOT (CT21210)
Elliot Pishko Morgan, P.A.
426 Old Salem Road
Winston-Salem, NC 27101
Tel (336) 724-2828
Fax (336) 724-3335
E-mail rmelliot@epmlaw.com

RICHARD B. HARPER
Harper Law Office
Post Office Box 395
Sylva, NC 28779
Tel (828) 586-3305
Fax (828) 586-4795
E-mail rbharper@dnet.net

## CERTIFICATE OF SERVICE

I certify that a copy of the Plaintiffs' Reply to Defendants' Response to Plaintiffs' Motion for Summary Judgment was sent by Mail on May 27, 2005 to the following:

ADDRESSEES:

Bruce M. Steen, Esq.
McGuire Woods
Bank of America Corporate Center
100 North Tryon St., Suite 2900
Charlotte, NC 28202

Barry J. Waters, Esq.
Murtha Cullina, LLP
Whitney Grove Sq.,
Two Whitney Ave.,
P.O. Box 704
New Haven, CT 06503-0704

_____
ROBERT M. ELLIOT, ESQ.

48