IN THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HARRY L. SMITH, LOIS L. LYNN, DARRELL KEITH HILL, ELIZABETH CASE BOONE, WILEY H. HAYNES, ROSA LEE BROOKSHIRE, HARRISON YOUNG CLARK, FRANZISKA FINNEY, JUDITH CASE KIRKPATRICK, WILSON DANIEL McCLURE, CELIA DARLENE METCALF, CHARLES R. REECE, DOLPHUS LUTHER TREADWAY, JR., and MARTHA BURNETTE WHITLEY, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. 302CV212(CFD) |
| v. | ) ) | |
| CHAMPION INTERNATIONAL CORPORATION; LONG TERM DISABILITY BENEFITS PLAN FOR SALARIED EMPLOYEES OF CHAMPION INTERNATIONAL CORPORATION #506; LONG TERM DISABILITY BENEFITS PLAN FOR CERTAIN HOURLY EMPLOYEES OF CHAMPION INTERNATIONAL CORPORATION #703; and INTERNATIONAL PAPER COMPANY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | PLAINTIFFS' SUPPLEMENTARY BRIEF |
| Defendants. | ) | |

## INTRODUCTION

Each Plan at issue in this action promises "to provide a source of income to eligible employees who were prevented from engaging in active employment as a result of 'Total Disability' as defined in the Plan." NB 66, Plan – 0006 (salaried); Plan – 0053 (hourly). The 14 plaintiffs in this action were deprived of this income promised by their Plans when Champion/CORE terminated their benefits during CORE's administration of the Plans from 1996-2000, some 8-11 years ago. At the time of termination, each plaintiff was medically disabled from any active work; some had been on disability for years without question from Champion or its prior administrator, Travelers; most, if not all, had been rejected for re-employment with Champion; and all, except Ms. Whitley, were at or approaching advanced age.

Each plaintiff is deserving of relief from this Court through the reinstatement of benefits. Indeed, in order to uphold principles of trust, which form the foundation of ERISA, this Court should reject the conduct of the defendants which is so evident in the patterns that arise from the evidence in this case. Otherwise, it is respectfully submitted that there is no trust. And the administrative scheme of ERISA becomes a cover for improper conduct which violates its principles.

The parties have comprehensively briefed the facts and legal principles

2

governing these claims.[1]  And this Court has conducted oral argument in which the parties were permitted to highlight their points.  Plaintiffs do not intend in this filing to reiterate every argument -- to the contrary, plaintiffs incorporate their prior arguments with respect to the evidence and issues. The purpose of this brief is simply to supplement plaintiffs' arguments with any additional authorities which have come to light since their briefing three years ago; and to respond to arguments of counsel at oral argument.

### Standard of Review

Plaintiffs have argued strongly that this Court should conduct its own *de novo* review in this action based on the evidence that (1) Champion/CORE was acting under a blatant conflict of interest when they terminated the plaintiffs from their benefits; and (2) the designated fiduciary under the Plans exercised no independent, individualized discretion with respect to plaintiffs' claims, and are, therefore, entitled to no deference.

***Conflict of interest***:  In *Sullivan v. LTV Aerospace and Defense Co.,*  82 F.3d 1351 (2d Cir. 1991), the Second Circuit found a conflict of interest influencing the decision-making process, which required *de novo* review.  The

---

[1] Plaintiffs' briefs include the following: Brief in Support of Plaintiffs' Motion for Summary Judgment ("Pl. Supp. Br."); Plaintiffs' Brief in Response to Defendants' Motion for Summary Judgment ("Pl. Resp. Br."); and Plaintiffs' Reply to Defendants' Response to Plaintiffs' Motion for Summary Judgment Brief ("Pl. Reply Br.").  In addition, plaintiffs will cite their Appendix, filed in support of their motion as "Pl. App., __;" and Plaintiffs' Local Rule 56(a)1 Statement of Undisputed Facts as "Pl. LR St, ¶__."

conflict was based on facts that the company had a "structured conflict," that the company was experiencing financial problems, and that there were improprieties in how the administrator carried out its responsibilities. The court found that summary judgment was properly denied. See also, *Defelice v. American International Life Assurance Company of New New York*, 112 F.3d 61 (2d Cir. 1997 ) (in addition to "structural conflict" when payee/decider is the same entity, court should consider factors which show influence of conflict, including evidence that appeals committee was composed entirely of employees of administrator, and there existed no established criteria for determining appeal); *Locher v. UNUM Life Ins. Co. of Am.*, 389 F.3d 288, (2d Cir. 2004) (similar analysis with respect to issue of submitting additional evidence for "good cause"); *Mikrut v. UNUM Life Insurance Company*, 2006 US Dist. Lexis 92265 (D. Conn. 2006) (structural conflict of interest, coupled with unreasonable handling of claim, where pain and other evidence presented by plaintiff was ignored shows conflict influence decision-making process; de novo review granted; fair and reasonable review of record requires finding of disability).

In *Thal v. Metropolitan Life Ins. Co.*, 2006 U.S. Dist. Lexis 92370, (D. Conn. 2001), this Court denied summary judgment to defendant on the standard of review, finding the evidence raised genuine issues of material fact concerning the

4

conflict of interest and its influence on the decision-making process. The evidence tending to prove a conflict included facts tending to prove the plaintiff was truly disabled, and that there was an inherent structured conflict, and that there were various deficiencies in the claims review process. *See also, Merrill v. Hartford Life and Accident Insurance Co.*, 503 F.Supp.2d 531 (D. Conn. 2007) (conflict of interest influenced decision-making process, based on evidence of structural conflict and unreasoned decision; treating physician ignored; denial overturned).

Plaintiffs have discussed at length the evidence establishing a conflict of interest for Champion/CORE which infected the decision-making process regarding each of their claims. See Pl. Supp. Br., 2-7; Pl. Resp. Br., 2016. Defendants challenged this evidence at oral argument. To highlight, the following evidence brings this action within the principles of *Sullivan* and *Defelice*, as well as this Court's decision in *Thal* above:

- By the mid-1990s Champion was paying $421,820 per month in disability claims, and most of that amount was paid for claims of disabled former employees of its Canton, North Carolina plant.[2]

- Champion was investigating its LTD process claims through its LTD Committee.

- At some point in the late 1990s, Champion was exploring the possibility of selling the company, and particularly its Canton, North Carolina plant; a plan which ultimately was carried out when International acquired

---

[2] The high number of claims of workers in this business is indicative of the tendency of this type of work to "wear down" employees over a period time, until they become unable to work in later years.

5

Champion in the year 2000, and the Canton, North Carolina plant was sold.

- CORE was hired with the promise to reduce Champion's costs in its LTD program.

- With respect to the denial of plaintiffs' claims, CORE submitted savings analyses, boasting of the savings of benefits resulting from "our intervention." *See, e.g.*, Pl. App. 37. CORE (through its manager, Glenn Taylor) testified that it maintained savings records on all of its cases and provided that information to Champion on a periodic basis. There is no basis on which to conclude, as defendants argued at oral argument, that because CORE only had existing records concerning some of the plaintiffs, that they stopped reporting savings to Champion.

- The pattern of conduct of Dr. Beavers of CORE, and Sharon Spain of Champion reveals their motives to reduce the disability rolls[3] and save money. Pl. Supp., Br. 5-7; *See, e.g.,* Pl. App., 89 (where Spain states, with respect to Ms. Whitley, "how aggressive" CORE could be in its evaluation).

- The Champion Review Committee (CRC) was composed exclusively of Champion employees from mid-management up, who rubberstamped CORE's decisions at least 90% of the time; while available evidence shows that the CRC sent some cases back to CORE for further review, it does not show that the CRC ever rejected a CORE denial. Pl. App. 4.

Short of reading the minds of the key players, the above facts establish a strong inference that Champion/CORE was acting under a conflict which ultimately influenced their denials of plaintiffs' claims. And, the cost savings

---

[3] Defendants argued at oral argument that the disability rolls were not reduced significantly during CORE's reign. This evidence does not give a clear and full picture for two reasons. First, the evidence is quite limited -- neither Champion nor CORE were able to provide a full record of their disabled employees. Second, the pattern shows that CORE's work had just started at the time the company was sold -- from 1997 to 2000, and that accordingly, there was not sufficient time for the results to show.

records alone are sufficient to reveal defendants' improper motives.  While there are clearly genuine issues of fact concerning defendants' argument for a deferential standard, plaintiffs contend that the facts are sufficient to establish the need for this Court's *de novo* review.  *Thal, supra.* Under the decisions of this circuit, the *de novo* standard of review is appropriate in this case.  *Merrill v. Hartford Life and Accident Insurance Co.*, 503 F.Supp.2d 531 (D. Conn. 2007) (conflict of interest influenced decision-making process, based on evidence of structural conflict and unreasoned decision; treating physician ignored; denial overturned).

**No discretion exercised by fiduciary:** The courts of this circuit have recognized, as have other federal courts, that the failure of the fiduciary to exercise discretion eliminates the very basis for a deferential standard of review. Specifically, in theory, the deferential standard is appropriate because a fiduciary has been entrusted with the legal obligation to act in the interests of the Plan and its beneficiaries, and the discretionary authority to make reasoned and principled decisions in the administration of the Plan.  If the fiduciary fails to exercise its discretion, then, in effect, there is nothing to defer to, and a *de novo* standard of review is mandated.  *Daniel v. UnumProvident Corp.,* 2008 U.S. App. LEXIS 1396, (2d Cir. 2008) (unpublished) (the court recognized this principle, and found issues of fact for trial as to whether the parent corporation had properly assumed

7

fiduciary responsibility); and *Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98 (2d Cir. 2005) ("we conclude that we may give deferential review only to actual exercises of discretion. A 'deemed denied' claim is not denied by any exercise of discretion, but by operation of law, and is entitled to *de novo* review.").

The facts are undisputed that the fiduciaries of the Plan totally abdicated their discretionary authority to determine eligibility issues to CORE, who clearly was not a fiduciary. In *Smith, v. Champion*, 220 F.Supp. 2d 124 (D.Conn. 2002), this Court granted summary judgment to CORE, based on its contracts with Champion which documented that CORE had a limited advisory role in making recommendations concerning eligibility and coverage issues to Champion. NB 76, Dep. Exh. 5-6. Of course, the record belies CORE's representations to the Court in support of its successful motion,[4] demonstrating, instead, that CORE assumed, without any delegation from Champion, total authority in the administration of Champion's LTD Plans to investigate claimants, determine strategies for denial, obtain evidence, define terms of the Plans, and deny claims. The Champion LTD Manager, Mary Lee Dixon, who *had* the delegated authority from the Plan Supervisor to make the initial decisions, was nothing more than a pawn of CORE in the process. Pl. Resp. Br., 5-6.

---

[4] As the Court's record will show, CORE's motion was made early in these proceedings, against plaintiffs' opposition, without the benefit of any discovery.

Defendants make no attempt to refute these facts. Instead, they argue, essentially, that these violations of the Plan language don't matter because Champion, through its CRC, made the final decisions. The substantial evidence shows that the CRC simply rubberstamped CORE's decisions. Pl. Resp. Br., 7; Pl. App., 4. There is no evidence that the CRC exercised any independent individualized discretion; the committee members -- all of whom were Champion employees -- were given disorganized stacks of paper, containing information compiled exclusively by CORE, to review in a short period of time in one sitting;[5] there were no rules or guidelines for CRC's review. *See Locher,* 389 F.3d 288; *Defelice,* (claims review committee, composed exclusively of employees of conflicted administrator "hardly a neutral decision making body"). In the vast majority of appeals, the CRC approved CORE's decision; and in those in which the CRC did not initially approved CORE's decisions, the cases were sent back to CORE for additional information or review. Pl. App., 4. Given CORE's influence on the final result, the CRC's involvement at the final stage of denial is irrelevant.

Accordingly, since the Plan language was ignored by Champion, and Champion's fiduciaries exercised no independent discretionary authority, plaintiffs

---

[5] The record shows that members were given voluminous records concerning 6-8 claims several days before a meeting, to be discussed at the meeting, under the leadership of Champions lawyer in a limited time. Cite.

are entitled to *de novo* review.

**Exhaustion:**     Defendants contend that four of the plaintiffs—Ms. Finney, Mr. Hill, Mr. McClure and Mr. Treadway -- failed to exhaust their administrative remedies.  As the Second Circuit recently held, the failure to exhaust administrative remedies is an affirmative defense -- it is not jurisdictional.  *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, (2d Cir. 2005) (exhaustion requirement not jurisdictional, but an affirmative defense on which defendant has burden of proof).     And as pointed out in plaintiffs' prior briefs, there are circumstances recognized by the courts which relieve claimants from the requirement of exhaustion, including estoppel and futility.  *Id*.     Plaintiffs have argued previously that, given defendants' blatant conflicts of interest which influenced the decision-making process, as well as the procedural irregularities in Champion's abdication of its responsibilities under the Plan, the futility doctrine should relieve these plaintiffs from any responsibility to exhaust remedies.  *Id*.

With respect to Mr. Treadway and Mr. McClure, there is no substantial credible evidence that they failed to exhaust their remedies.  It is undisputed that Mr. Treadway appealed CORE's decision at the second level, NB 22: 42-42; and that Champion/CORE never finally decided his appeal.  Defendants' argument that Mr. Treadway failed to exhaust, based on an ambiguous and unsubstantiated

computer entry suggesting that Mr. Treadway was considering withdrawing his appeal, is without merit as a matter of law, particularly in view of the fact that his attorney subsequently wrote a letter to Champion inquiring about his "appeal." Champion/CORE never bothered to respond to this letter. Pl. Resp. Br., 18. *See Tholke v. Unisys Corp.*, 96 Fed. Appx. 762; 2004 U.S. App. LEXIS 8816; 33 Employee Benefits Cas. (BNA) 2057 (2d Cir. 2004) ("meeting minutes" of administrator concerning a treating physician's oral representations not sufficient to resolve inconsistencies in documentation). Accordingly, Mr. Treadway's claim was "deemed denied," and is now subject to *de novo* review.[6] *Burke v. Kodak Ret. Income Plan* , 336 F.3d 103 (2d Cir. 2003) (district court properly found that a spouse, who was seeking survivor benefits, had not failed to exhaust her administrative remedies where employer's notice was inadequate; and its denial letter referred to a handbook containing opaque language); *Nichols v. Prudential Ins. Co. of Am.*, 406 F.3d 98 (2d Cir. 2005) ("we conclude that we may give deferential review only to actual exercises of discretion. A 'deemed denied' claim is not denied by any exercise of discretion, but by operation of law, and is entitled to *de novo* review").

---

[6] Of course, plaintiffs contend above that all of plaintiffs' claims should be decided on *de novo* review because of Champion/CORE's conflict of interest, and Champion's failure to exercise fiduciary responsibility. However, Champion's failure to decide Mr. Treadway's appeal provides an additional ground for a non-deferential standard of review with respect to his case.

Similarly, the record shows that Mr. McClure clearly expressed his intent to appeal, and that his attorney requested additional time to submit evidence in support of his appeal. Pl. Resp. Br., 19. Champion/CORE failed to respond in any manner, suggesting, in their silence, their approval. Under these circumstances, defendants should be estopped from denying that Mr. McClure appealed, and his claims should be "deemed denied."

### All of Champion/CORE's Decisions in this Action Should Be Set Aside on the Grounds That Champion/CORE Violated the Law and Their Responsibilities under the Plans

Champion/CORE's generalized pattern and practice in its review and termination of LTD benefits had, of course, general repercussions. While each of the plaintiffs alone was denied a full and fair review and has grounds for reversal, the deficiencies in the procedure should lead to more generalized relief.

Specifically, because the procedure itself was tainted by Champion/CORE's ill motives, their decisions cannot be trusted, and should be set aside. These general grounds for reversal are based on policy considerations which affected all of the reviews.

### *Champion/CORE's Failure to Consider Pain and Other Subjective Symptoms*

In their prior filings, and at oral argument, plaintiffs have argued at some

length that Champion/CORE failed to consider pain and other subjective symptoms in the determination of each plaintiff's disability.  *See* Pl. Supp. Br., 15-16; Pl. Resp. Br., 22-24; Pl. Reply Br., 18-21.  In a number of cases the decisions reflect this fact.  *See, e.g.,* plaintiff Boone (where evidence indicated that plaintiff had the worst case of fibromyalgia, and suffered with excruciating pain; but the denial disregards pain because "symptomatology" is "subjective", NB 1: Boone - 0146); plaintiff Smith (where evidence indicates that he has a spine that is deteriorated to the extent that steel rods and screws are necessary to permit him to function, and that he suffers from debilitating pain; nevertheless, the decision states that there is no "objective basis" for the pain to support disability, Pl. LR St. ¶ 652).  And, in fact, the CORE 30(b)(6) witness, Mr. Taylor, confirmed that CORE, as a matter of policy, required "objective evidence" to support disability based on pain.  NB 75, Tab 6, pp. 38-39.

As exemplified above, each of the plaintiffs established that pain was a significant limitation on his/her ability to function on a day-to-day basis, let alone work in a full-time job.  *See* examples provided in Pl. Resp. Br., 22-25; Pl. Reply Br., 18-21. Nevertheless, Champion/CORE ignored their debilitating conditions in denying plaintiffs' claims.  Champion/CORE's failure to consider pain and other subjective symptoms requires a reversal of all decisions.  *Krizek v. CIGNA Group,*

*Inc.*, 345 F.3d 91 (2d Cir. 2003). *Alexander v. Winthrop*, 497 F.Supp.2d 429 (EDNY 2007) (plaintiff unable to work in any occupation because of severe, chronic pain; found disabled under *de novo* standard); *Mikrut v. UNUM Life Insurance Company*, 2006 US Dist. Lexis 92265 (D. Conn.  2006) (structural conflict of interest, coupled with unreasonable handling of claim, where pain and other evidence presented by plaintiff was ignored shows conflict influence decision-making process; de novo review granted; fair and reasonable review of record requires finding of disability).

### Champion/CORE Failed to Consider Vocational Factors

A participant is "totally disabled" under the Plans if he is unable "to engage in any occupation or business for wage or profit for which he is or may become reasonably qualified by training, education and experience." Pl. App. 2.[7]  The express intent of the LTD Plan is "to provide a source of income to eligible employees who were prevented from engaging in active employment as a result of 'Total Disability' as defined in the Plan."  NB 66, Plan – 0006.  As argued previously, based on the Plan definition, a fiduciary cannot make a determination of total disability without considering the vocational components of disability.

Nevertheless, CORE determined during its administration that it would no

---

[7] The hourly plan differs slightly in the following wording: "'Total Disability' means the inability to engage in any occupation or business for wage or profit for which he is *or becomes* reasonably qualified by training, education or

longer consider such factors as age, the availability of jobs and other aspects relevant to a claimant's ability to work in determining whether a claimant was disabled under the Plan definition. NB 75, Tab 7, 61-66. CORE's Rule 30(b)(6) witness, Mr. Taylor, stated that under CORE's review, it would make "no determination of [claimant's] vocational abilities." NB 75, Tab 6, 141. Defendants' consideration of vocational factors was limited to having a CORE employee in its Cost Review Department run a transferable skills analysis (TSA) as a matter of routine in most of the cases, just before the final appeal to the CRC. *See*, NB 75, Tab 6,

Defendants continue to argue that age is irrelevant, and that they have no obligation under the Plan definition to determine a claimant's actual ability to get a job, as opposed to her theoretical capacity of working somewhere in a theoretical job. At oral argument, defendants argued that the Plan definition was not a "gainful employment" definition, and that since the definition was silent as to age and other vocational factors, these factors should not be considered.

Champion/CORE's argument is not credible. First, the fact that the Plan definition does not include an explicit reference to "age" or the "availability of jobs" is meaningless. The definition is also silent as to the requirement of a

---

experience." Pl. App. 2.

physical or mental impairment; certainly, defendants do not argue or contend that a claimant's medical conditions should not be considered. To the extent that the definition is ambiguous, the ambiguity must be interpreted against Champion, the drafter of the Plan. *Gibbs v. CIGNA Corp.*, 440 F.3d 571, (2d Cir. 2006). And its interpretation must be reasonable in view of the intent of the Plan -- to provide disability benefits to those who are unable, both physically and vocationally, to work. Second, defendants' argument is inconsistent with Champion's prior assessments of disability under the same Plan definitions. Third, the argument is inconsistent with CORE's own experts who recognized the critical importance of vocational and other factors (such as a Social Security decision in favor of a claimant) in assessing disability under the same Plan definition. Finally, the argument is directly inconsistent with the decisions of this circuit.

Prior to CORE's involvement, Champion clearly recognized that the Plan definition of disability required a realistic vocational assessment in which the claimant's medical conditions, education, and age would be considered. *See, e.g.,* Pl App. 47. The previous administrator, Travelers, used a form for the consideration of vocational rehabilitation which explicitly included numerical ratings for age, education, net monthly benefit and other factors relevant to the claimant's ability to return to work, and the company's motivation to finance

16

rehabilitation efforts. *Id.* The final "score" on the form determined whether vocational rehabilitation should be attempted -- *i.e.*, whether the administrator believed that, with some rehabilitation, the claimant would be able to return to work in spite of his/her disability. *Id.* Many of the plaintiffs have Travelers profiles in their files; all were determined to be disabled and not a prospect for rehabilitation, and all were rejected by Champion (Sharon Spain) for re-employment without explanation.

Defendants make no effort to explain this inconsistency except to say that the form was designed for a different reason -- to determine the claimants' rehabilitation prospects -- a distinction without any meaningful difference. Clearly, the assessment of a claimant's capacity for rehabilitation recognizes that the claimant is totally disabled and because of his age and other factors, will not be able, even with some rehabilitation, to "engage in any occupation or business for wage or profit for which he is or may become reasonably qualified by his training, education and experience."

As pointed out previously, CORE's own experts, in advising disability consultants as to the determination of disability under ERISA plans, debunk the superficial response that age and the availability of jobs are not necessary components of the determination of a claimant's ability to work. Thus, CORE's

own experts, interpreting a similar or identical plan definition of "total disability" as the Plan definition at issue in this action recognize the obvious---in order to determine a claimant's disability, a fiduciary must consider the vocational components of disability -- which include her age, the chronicity of her symptoms, the availability of work in the local economy, and any decision on disability by the Social Security Administration.  Pl. App. 5.

A recent decision of the Second Circuit confirms that ERISA requires what the objective experts know -- that a person's disability cannot be determined without a full and fair consideration of the critical vocational factors of employability.  In *Demirovic v. Building Service 32 B-J Pension Fund et al.*, 467 F.3d 208 (2d Cir. 2006), the Court of Appeals reviewed the plaintiff's appeal from the district court's grant of summary judgment to the defendants who had denied plaintiff LTD benefits.  The plaintiff's primary argument was that the Plan had failed to consider her vocational limitations in determining that she was not disabled.  The court, employing the deferential standard of review, agreed with plaintiff and found that, in ignoring vocational factors, the Plan had acted arbitrarily, and failed to provide a full and fair review.

In reaching its conclusion, the court found that, although the Plan had considered sufficient medical evidence that plaintiff was *"physically* capable of

performing some form of sedentary work," the Plan gave "no consideration whatsoever to whether Demirovic could in fact *find* such sedentary work." 467 F.3d at 213 (emphasis provided). The Court explained: "This is not an abstract concern. Demirovic is in her late 50s; she has worked as an unskilled manual laborer for nearly 30 years; and her facility with the English language is sufficiently limited that she required her son to act as a translator during her examination by Dr. Brown." *Id.* In rejecting the Plan's argument that it was not required to consider vocational factors, the court reviewed the Plan definition, which was substantially similar to that presented in the present case, and observed:

> [T] his language requires that a determination of disability be based on medical evidence of bodily injury or disease; it does not require that the critical determination of whether the claimant is able to engage in any further gainful employment be made without consideration of a claimant's vocational characteristics, or without consideration of the sort of work that is actually available in the economy. Indeed, without such consideration, implicit or explicit, it is hard to understand what "unable... to engage in further employment" might mean. A determination of "employability" cannot be purely a medical diagnosis.

*Id.* The court also explicitly rejected the Plan's contention that the specific language of the Plan definition did not require consideration of vocational factors.

> However, like the language of the Plan itself, the language of the SPD neither expressly requires that the Fund take a claimant's individual vocational circumstances into account when determining her ability to perform "gainful employment," nor expressly forecloses the Fund from doing so. The question before us is whether the SPD's language

19

may reasonably be interpreted -- as it appears the Fund interprets it -- so strictly as to deny benefits to any claimant who is physically capable, in the abstract, of any kind of work whatsoever, regardless of the claimant's individual vocational circumstances. We hold that it may not.

*Id.*

The court relied heavily on two prior decisions of the Tenth and Eleventh Circuits which construed similar definitions to require consideration of vocational circumstances. *See, Helms v. Monsanto Co., Inc.*, 728 F.2d 1416 (11th Cir. 1984); and *Torix v. Ball Corp.*, 862 F.2d 1428 (10th Cir. 1988). In *Helms*, the Eleventh Circuit, construing a plan definition which defined total disability as having an impairment "so as to be prevented thereby from engaging in any occupation or employment for remuneration or profit," quoted approvingly from a prior decision which rejected a "strict, literal construction of such a provision which would deny benefits to the disabled if he should engage in some minimal occupation, such as selling peanuts or pencils, which would yield only a pittance." And in *Torix*, the Tenth Circuit, considering a plan which, like the Plan in the present action, defined total disability as "an inability to pursue any occupation or employment for wages or profit as result of bodily injury or disease," agreed with plaintiff that the plan "had acted arbitrarily and capriciously in determining that he was not totally disabled, without 'tak[ing] into account his age, limited educational background,

and the unavailability of suitable employment in the area." The court also cited

with approval decisions from other circuits which found that a definition of

disability cannot be interpreted so narrowly that a claimant "must be *utterly*

*helpless* to be considered disabled," or "*essentially non-conscious*." [8] 467 F.3d at

215 (emphasis provided).

> The court concluded:

> The phrase "any gainful employment" in the context of Demirovic's
> insurance plan may not reasonably be read as denying benefits to a
> person who is *physically* capable of any employment whatsoever, so
> long as it [sic] earns a nominal profit. Nor may it be read as allowing
> an administrator to disregard a claimant's individual vocational
> circumstances. To do so would "render[] the plan's promise of a
> disability pension hollow for all but the most grievously incapacitated
> claimants," [citation omitted], would deprive plan participants of their
> reasonable expectations, and is arbitrary and capricious. A finding
> that a claimant is physically capable of sedentary work is meaningless
> without some consideration of whether she is vocationally qualified
> to obtain such employment, and to earn a reasonably substantial
> income from it, rising to the dignity of an income or livelihood,
> though not necessarily as much as she earned before the disability.

467 F.3d at 215.

The court finally pointed out that the consideration of vocational factors did

not have to take any particular form -- that an administrator could use vocational

rehabilitation consultants, TSAs, Social Security Medical-Vocational Guidelines,

---

[8] *Compare* Dr. Beaver's interpretation of the provisions in admonishing several of the plaintiff's treating physicians to find their patients able to work since they were not "bedridden," or unable to take care of their personal needs. Pl. Resp. Br.,9.

or it could "conduct its own inquiry including a more traditional analysis of a claimant's age, training and experience."   Finding that the plan had given no consideration to the plaintiff's vocational circumstances, the court reversed the district court's grant of summary judgment.

Other courts have followed the clear logic of *Demirovic*.  *See, e.g. Karce v. Building Service 32B-J. Pension Fund*, 2006 US Distr. LEXIS 79818 (SDNY 2006) (administrator failed to provide full and fair review with respect to conflicting medical evidence; remanded for further consideration of medical and vocational factors of disability); *Solnin v. GE Group Life Assurance Co.*, 2007 US Distr. LEXIS 20955 (EDNY 2007) (administrator failed to provide full and fair review in considering medical evidence; and failed to assess plaintiffs vocational capacity; denial not supported by substantial evidence); *Nerys v. Building Service 32B-J. Health Fund*, 2007 US Distr.   LEXIS 25289 (SDNY 2007) (summary judgment denied to administrator for failure to consider plaintiff's vocational limitations; administrator's denial arbitrary and capricious).

Defendants in the present action may challenge the applicability of *Demirovic* on two grounds.  First, they may argue that the definitions are different -- *i.e.,* that Champion's Plan does not define disability in terms of an inability to perform "gainful employment" or "remunerative employment."  As stated above,

Champion's definition states that a claimant is disabled if she is unable "to engage in *any occupation or business for wage or profit,*" which is the same thing. And Champion's definition is almost identical to the definition at issue in *Torix* on which the court relied. There is no requirement that any magic words be used in the definition of disability to require consideration of vocational circumstances. Given the express intent of the Plan in this action to provide income to those unable to engage "in active employment"; and the specific terms of the definition which emphasize that the claimant must be unable to engage in actual employment -- an "occupation or business for wage or profit," before they come within the definition of disability; the individual's vocational circumstances are clearly applicable.

Second, defendants have argued that the TSA provided in some of plaintiffs' cases -- which is the *only* vocational information considered by Champion/CORE -- reflect sufficient consideration of vocational circumstances of each plaintiff. In the context of this action, it is critical to review the TSAs reported by CORE's employees to determine what information they actually provide which could support the determination that each claimant was able to work.

A case in point is Harry Smith. Mr. Smith's disability has been discussed at length throughout the briefs and at oral argument. When Mr. Smith's case was on

23

administrative review, his attorney (Mr. Harper) submitted a vocational evaluation conducted by Randy Adams, a certified vocational evaluator. Mr. Adams' report and curriculum vita appear in several places in the record. *See, e.g.,* NB 21, CRC-1868; and Pl. App., 78. Mr. Adams conducted a thorough review of Mr. Smith's medical treatment, history and conditions; his functional limitations, including pain; his psychological and social history; and his work history. Mr. Adams conducted vocational testing and reported the results in detail. He also observed Mr. Smith's demeanor during the testing, and noted that "Mr. Smith was attentive, although distracted by pain and needed to take numerous breaks." *Id.*, at CRC-1875-76. Ultimately, Mr. Adams determined that Mr. Smith had no transferable skills for various reasons explained in detail in his report. *Id,* CRC-1878. Consequently, Mr. Smith would be limited to unskilled work. Mr. Adams' findings, in part, are as follows:

> Due to the fact that Mr. Smith's skills are not transferable, and not taking into consideration any physical restrictions, Mr. Smith would be limited to unskilled work. Based on the vocational testing, jobs in the clerical area could not be considered due to his low academic performance. Jobs in the sales category would be greatly limited to simple cashier positions which would not require involved ledger work or balancing of the cash register. Almost all jobs in the service category would range in the light to medium physical demand level, requiring the individual to stand and walk for extended periods of time (i.e., ticket taker at a movie house, host in a restaurant, security guard, dishwasher, etc.). The fact that functional capacity evaluation limits Mr. Smith to standing up to one-third of the day, walking up to

one-third of the day, and sitting up to one-third of the day it would indicate that the individual would have to sit, stand, and walk on an alternating basis. These positions would not generally provide this convenience.

Jobs in the industrial category at the unskilled level would require individuals to remain in static positions for long periods of time in order to perform certain tasks. Machine operators, graters and sorters, assemblers, Packers, etc., would all require an individual to stay at the workstation for long periods of time. Based on the functional capacity evaluation, Mr. Smith could not perform these types of jobs. Furthermore, based on the functional capacity evaluation, Mr. Smith's ability to utilize arm's controls isn't "medium." Also based on the vocational testing, his hand and finger dexterity is quite low indicating that his ability to do repetitive work on a production basis would not be appropriate. Most of these jobs, especially at the unskilled level, are done on a production basis.

Pl. App. 78, Smith-0233.

The TSA performed by CORE's Ms. Mikeska presents a stark contrast. *See, id*, CRC-1916. First, it appears that Ms. Mikeska received very little information concerning the facts which would determine Mr. Smith's employability. She apparently received a "profile sheet" indicating that Mr. Smith had worked for Champion for 25 years as a Recovery Operator Helper; that he had some additional experience with Champion; and that he was a Vietnam Veteran. She also apparently knew Mr. Smith's approximate age, although she does not make any reference to it as a relevant factor. Finally, although it is far from clear, she must have received Mr. Smith's FCE indicating that Mr. Smith could perform light duty

work with certain general limitations.[9]  With that information Ms. Mikeska apparently plugged the DOT number of Mr. Smith's prior occupation into the computer, which then spit out a number of different titles, which she concludes he could perform.  The TSA does not indicate that these computerized titles represent actual jobs in the national economy, much less the local economy.

CORE's TSA cannot constitute reliable, much less "substantial," evidence of Mr. Smith's employability.  And the fact that Ms. Mikeska did not even attempt to address the many obstacles to his gaining an actual job, as Mr. Adams did in his report, renders her TSA meaningless.[10]  A reasoned view of the TSA regarding Mr. Smith, as well as other plaintiffs, compels the conclusion that the TSAs in this and other plaintiffs' cases were provided solely as a check-off on a CORE form, late in the administrative review just before the final appeal to the CRC -- *not* as any real effort to determine the individualized vocational factors relevant to a claimant's ability to work in an "occupation or business for wage or profit."[11]

---

[9] Of course, plaintiffs have argued that FCE conducted on Mr. Smith is totally unreliable, and even somewhat deceptive. *See* Adams report, *id.*

[10] Plaintiff's argument against the TSAs run in this case is not an indictment of the use of TSAs in general.  As *Demirovic* contemplates, the TSA can be properly utilized as one of a number of tools which an administrator can use in assessing a claimant's employability.  However, standing alone in this case, the TSA simply does not, by any stretch, fulfill the requirements of *Demirovic* and ERISA.

[11] The TSA also pales in comparison with the analysis of CORE's own experts.  In their article, the CORE experts analyze a claimant's vocational facts under two different scenarios.  In order to determine each claimant's employability, the experts consider the specific characteristics of each claimant -- his age, the chronicity of his pain and other medical conditions, his past experience, and the availability of jobs within his geographical area. Pl. App. 5, (case studies).  What the CORE experts advise in their article is what is required under the law of ERISA -- at least

26

The files of the other plaintiffs suffer from the same fatal deficiency. For example, where CORE had, without explanation or authority, determined that an individual who could work part-time, at least six hours per day, was able to work, the TSAs failed to even reflect that limitation.[12] *See, e.g.,* plaintiff Lynn (where plaintiff was limited to 6 hours per day, TSA includes no mention of limitation, Pl. LR St. ¶¶ 448, 465-66); plaintiff Boone (same, Pl. LR St. ¶ 102); plaintiff Whitley (same Pl. LR. St. ¶ 750).

Champion/CORE utterly failed to consider age, the availability of jobs, and any other individualized vocational factors in any of plaintiffs' cases. For that reason alone, the termination decisions must be overturned.

### Champion/CORE's Failure to Acknowledge its Prior Inconsistent Decisions, Social Security decisions, and to weigh fairly the opinions of Treating Physicians with Respect to Most of the Plaintiffs Is Fatal to its Procedure

Plaintiffs have thoroughly briefed the issues of whether Champion/CORE failed to acknowledge its prior inconsistent decisions; whether it failed to take into consideration the decisions of the Social Security Administration, finding each of the plaintiffs disabled; and whether it gave appropriate and fair weight to the

---

in any case where there are issues concerning a claimant's vocational limitations which determine an essential component of the definition of disability under the Plan.

[12] As plaintiffs have argued throughout these proceedings, CORE's unilateral determination that a work limitation of six hours per day, 30 hours per week, was not a disabling limitation under the definition of disability is without basis or explanation. And it illustrates the type of decision-making that was being done by the non-fiduciary, CORE, in these cases, which is one of many factors that should require *de novo* review on the part of this Court. But the point here is that, regardless of the definition of disability, any proper application of vocational factors must consider that

opinions of plaintiffs' treating physicians. *See* Pl. Supp. Br.; Pl. Resp. Br.; Pl. Reply. Br.. In addition, plaintiff submits the following additional authorities on each of these points.

**Prior inconsistent decisions**: *See Courter v. First UNUM Life Ins. Co.*, 159 Fed. Appx. 213; 2005 U.S. App. LEXIS 27395 (2d Cir. 2005) (unpublished) (under arbitrary and capricious review, court found that administrator, who had previously acknowledged plaintiff's total disability, failed to show any improvement in his condition; "UNUM had the burden of showing that Courter could actually return to work before it terminated his benefits... The record suggests that while some of plaintiff's symptoms may have shown improvement, there is much evidence of the persistence of plaintiff's chronic conditions during the internal appeals process. The evidence leads us to the firm conclusion that defendant's decision that plaintiff was no longer disabled was arbitrary and capricious."). *Rappa v. Connecticut General Life Insurance Co.*, 2007 US Distr. LEXIS 91094 (EDNY 2007) (administrator's denial of disability reversed since reversal, rather than remand, proper where decision to deny benefits is unreasonable; arbitrary and capricious standard; FCE inadequate; TSA based on faulty FCE, thus inadequate; prior acknowledgment of disability, coupled with no improvement, rendered decision arbitrary and capricious).

the employee is unable to work full time.

**Failure to consider Social Security Administration decisions:** *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, (2d Cir. 2005) (district court which reversed the administrator's denial of disability, acted properly in considering the SSA's findings as some evidence of total disability).

**Failure to give fair weight to the opinions of Treating Physicians:** *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, (2d Cir. 2005) (district court which reversed the administrator's denial of disability, acted properly in considering treating physicians' opinions; administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician"). *Towner v. CIGNA Life Insurance Co.*, 419 F.Supp.2d 172 (D. Conn. 2006) (*de novo* review; plaintiff entitled to recover disability benefits); *Merrill v. Hartford Life and Accident Insurance Co.*, 503 F.Supp.2d 531 (D. Conn. 2007) (conflict of interest influenced decision-making process, based on evidence of structural conflict and unreasoned decision; treating physician ignored; denial overturned).

**Unreliable evidence:** The decision in *Tholke v. Unisys Corp.*, 96 Fed. Appx. 762; 2004 U.S. App. LEXIS 8816; 33 Employee Benefits Cas. (BNA) 2057 (2d Cir. 2004) is directly applicable to a number of plaintiffs' claims, where defendants rely on their own journal entries which are inconsistent with the documentary

evidence in the record. In *Tholke* the evidence indicated a critical inconsistency between the doctor's documentation and his oral statements, as noted in the administrator's meeting notes. The court noted the inconsistencies, and the fact that the doctor had "made no revisions to reflect the position he supposedly took during the phone conversation," and found that the inconsistency was never resolved. The court also felt "bolstered" by the "perfunctory" manner in which the administrator had conducted its administrative review, as well as a note in the record in which the company revealed its bias: "[W]e do not believe that she is disabled. We feel that she is 'milking' an auto accident which occurred... If possible -- please don't make it easy!" *Compare* to Pl. Resp. Br., 7-9; Pl. App.89.

## CONCLUSION

As the Second Circuit has noted, where an administrator is conflicted, "[p]laintiffs are utterly helpless against the whim of the conflicted body's interpretation of the facts," and "the fairness of the ERISA appeals process cannot be established using only the record before the administrator." "In such circumstances, the courts *must* exercise fully their power to review [benefits determinations] *de novo* and to be substitute administrators." *Defelice*, 112 F3d at 65-66.

In *Demirovic*, the Second Circuit held that providing a fair and realistic

interpretation of disability standards under ERISA is critical, and "reflects the 'most important purpose' of ERISA, which is 'to assure American workers that they may look forward with anticipation to [total disability] … with financial security and dignity, and without fear that this period of life will be lacking in the necessities to sustain them as human beings within our society.'" [Citation omitted]. 467 F.3d at 215.   Champion/CORE violated these standards, and deprived these plaintiffs of their "financial security and dignity" as they faced the consequences of living their final years into retirement without benefits or income.

For that reason, and based on the evidence presented, plaintiffs are seeking extraordinary relief.  With respect to defendants' motion, plaintiffs request that it be denied in its entirety.  With respect to plaintiffs' motion, plaintiffs have requested immediate relief by this Court; if there are issues to be tried, plaintiffs request a trial without delay; upon resolution of the issues by trial or through plaintiffs' motion, plaintiffs request that they be reinstated to their long term disability benefits, from which they were wrongly terminated. *Rappa v. Connecticut General Life Insurance Co.*, 2007 US Distr. LEXIS 91094 (EDNY 2007) (administrator's denial of disability reversed since reversal, rather than remand, proper where decision to deny benefits is unreasonable).

This the 28th day of April, 2008.

/s/ Robert M. Elliot
ROBERT M. ELLIOT (CT21210)
Elliot Pishko Morgan, P.A.
426 Old Salem Road
Winston-Salem, NC 27101
Tel (336) 724-2828
Fax (336) 724-3335
E-mail rmelliot@epmlaw.com

RICHARD B. HARPER
Harper Law Office
Post Office Box 395
Sylva, NC 28779
Tel (828) 586-3305
Fax (828) 586-4795
E-mail rbharper@dnet.net

SHEILA ROSENSTEIN
1100 Kings Hwy. East
P.O. Box 687
Fairfield, CT 06432
Tel (203) 367-7922
Fax (203) 367-8110

32

## CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2008, a copy of the foregoing Plaintiffs' Supplementary Brief was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

ADDRESSEES:

Bruce M. Steen, Esq.
McGuire Woods
Bank of America Corporate Center
100 North Tryon St., Suite 2900
Charlotte, NC 28202

Barry J. Waters, Esq.
Murtha Cullina, LLP
Whitney Grove Sq.,
Two Whitney Ave.,
P.O. Box 704
New Haven, CT 06503-0704

/s/ Robert M. Elliot
ROBERT M. ELLIOT (CT21210)
Elliot Pishko Morgan, P.A.
426 Old Salem Road
Winston-Salem, NC 27101
Tel (336) 724-2828
Fax (336) 724-3335
E-mail rmelliot@epmlaw.com