## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HARRY SMITH, et al. | : | |
| Plaintiffs | : | |
| | : | CIVIL ACTION NO.: |
| v. | : | 3:02-cv-212 (CFD) |
| | : | |
| CHAMPION INTERNATIONAL | : | |
| CORPORATION, et al. | : | |
| Defendants | : | |

## RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Table of Contents

I.  Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -4-
II. Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -4-
        A.   Champion's Long Term Disability Plans. . . . . . . . . . . . . . . . . .  -5-
        B.   CORE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -6-
III. Summary Judgment Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -7-
IV. The Plaintiffs' Claims for Denial of ERISA Benefits. . . . . . . . . . . . . . . . . . . .  -9-
        A.   Exhaustion of Plan Remedies. . . . . . . . . . . . . . . . . . . . . . . . . .  -9-
                1.   Futility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -10-
                2.   Notice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -11-
                3.   Individual Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -12-
                        a.   Dolphus Luther Treadway, Jr.. . . . . . . . . . . . . .  -12-
                        b.   Franziska Finney. . . . . . . . . . . . . . . . . . . . . . . .  -13-
                        c.   Darrell Keith Hill. . . . . . . . . . . . . . . . . . . . . . . .  -14-
                        d.   Wilson Daniel McClure. . . . . . . . . . . . . . . . . . .  -16-
        B.   Standard of Review of Merits of Claims. . . . . . . . . . . . . . . . . .  -19-
                1.   Conflict of Interest. . . . . . . . . . . . . . . . . . . . . . . . . .  -20-
                2.   Failure to Exercise Discretion. . . . . . . . . . . . . . .  -21-
                3.   The Arbitrary and Capricious Standard. . . . . . . .  -22-
        C.   Scope of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -24-
        D.   Relevant Considerations in Evaluating Total Disability. . . . . . . . . . . .  -25-
                1.   A Previous Decision to Award Benefits. . . . . . . . . . . .  -25-
                2.   "Subjective" Aspects of Disability. . . . . . . . . . . . . .  -25-
                3.   "Any Occupation". . . . . . . . . . . . . . . . . . . . . . . . . .  -28-
        E.   Reasonableness of the Benefits Determinations. . . . . . . . . . . . . . . . .  -29-
                1.   The Administrator was Arbitrary and Capricious in
                     Terminating Boone, Brookshire, Clark, Haynes,
                     Kirkpatrick, Lynn, Reece, Smith, and Whitley's Benefits
                     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -29-
                        a.   Transferable Skills Analyses . . . . . . . . . -30-
                        b.   Individual Claims
                             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -34-
                             (1)   Elizabeth Case Boone. . . . . . . .  -34-
                             (2)   Rosa Lee Brookshire. . . . . . . . .  -42-
                             (3)   Harrison Young Clark. . . . . . . .  -47-
                             (4)   Wiley Haynes. . . . . . . . . . . . . . .  -56-
                             (5)   Judith Case Kirkpatrick. . . . . . .  -64-
                             (6)   Lois Lynn. . . . . . . . . . . . . . . . . . .  -70-
                             (7)   Charles R. Reece. . . . . . . . . . . .  -74-
                             (8)   Harry L. Smith. . . . . . . . . . . . . .  -80-
                             (9)   Martha Whitley. . . . . . . . . . . . . .  -86-
                        c.   Remedies. . . . . . . . . . . . . . . . . . . . . . . . .  -94-

        2.     <u>Genuine Issues of Material Fact Preclude Grant of</u>
                <u>Summary Judgment to any Party as to Celia Darlene</u>
                <u>Metcalf</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -97-

V.    <u>Counts Three and Four: Breach of ERISA Statutory Requirements under § 1133</u>. . . -103-

VI.   <u>Conclusion</u>  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -105-

I.    Introduction

The plaintiffs, fourteen former employees of defendant Champion International Corporation ("Champion"), brought this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., alleging nonpayment of long term disability ("LTD") benefits by Champion, its long term disability plans, its successor International Paper Company, and CORE, Inc., a consultant for Champion.[1]

In Count One three former salaried employees seek benefits under the Long Term Disability Benefits Plan for Salaried Employees of Champion International Corporation #506.  In Count Two the remaining plaintiffs, former hourly manual laborers and low- to semi-skilled workers at Champion's Canton, North Carolina paper mill, seek benefits under the Long Term Disability Benefits Plan for Hourly Employees of Champion International Corporation #703.  In Count Three the plaintiffs assert violations of 29 U.S.C. § 1133.  In Count Four the plaintiffs assert violations of 29 U.S.C. § 1132(a)(3).  The plaintiffs and the remaining defendants have filed cross motions for summary judgment.[2]

II.    Background

Champion was a corporation organized under New York law.  Until May 2000, Champion was engaged in the paper manufacturing business and had its headquarters in Greenwich, Connecticut.  Defendant International Paper Company is a New York corporation

---

[1] In 2002, United States District Judge Goettel granted summary judgment as to the Defendant CORE.  Smith v. Champion Intern. Corp., 220 F. Supp. 2d 124 (D. Conn. 2002).

[2] The plaintiffs' motion for summary judgment only discusses the claims raised in Counts One and Two.  Accordingly the Court will treat the plaintiffs' motion as one for partial summary judgment.

with its principal place of business in Stamford, Connecticut.  In June 2000, International Paper

acquired Champion's stock and assets through a merger agreement.  In December 2000,

Champion merged into International Paper.[3]

> A.    Champion's Long Term Disability Plans

Champion had two self-funded long term disability plans (collectively the "plans"): the

Long Term Benefits Plan for Salaried Employees of Champion (the "salaried employees plan")

and the Long Term Benefits Plan for Hourly Employees of Champion (the "hourly employees

plan").  Both plans provide long term disability coverage, calculated as a percentage of monthly

earnings, to employees who become "totally disabled" as defined by the plans.

The plans were administered by the Champion Pension and Employee Benefits

Committee, which Champion's board of directors appointed.  In turn, the Committee appointed

the Employee Benefits Department of Champion to be "Plan Supervisor."

The plans began to provide long term disability coverage six months after the onset of

disability.  During the first thirty months[4] after the onset of disability, both plans defined "total

disability" as "the inability of an Employee to perform the duties of his employment with the

Employer."  This is commonly known as "own occupation" disability.

After thirty months, "total disability" is defined as "the inability to engage in any

occupation or business for wage or profit for which [the participant] is or may become reasonably

qualified by training, education or experience."  Salaried Employees Plan at 9; see also Hourly

---

[3] The defendants make no argument that Champion or International Paper is an improper party to this action.  For the sake of simplicity, the Court will refer to the remaining defendants as "Champion."

[4] This thirty-month period includes the six-month short term disability period.

Employees Plan at 8 ("'Total Disability' means the inability to engage in any occupation or

business for wage or profit for which [the participant] is or becomes reasonably qualified by

training, education or experience.")  An employee is entitled to long term disability benefits as

long as he or she remains totally disabled.  The Plan Supervisor may require the employee to

"undergo a physical examination at periodic intervals" to determine if the employee remains

disabled.

Coverage is excluded during any period in "which there is a determination by a Physician

selected by the Plan Supervisor that the Participant does not meet the definition of Total

Disability."

Under the terms of the plans, Champion had "the power and authority in its sole, absolute

and uncontrolled discretion to control and manage the operation and administration of the

Plan[s]" including the right to "determine all questions relating to the eligibility of Employees to

participate," to " determine the amount and kind of benefits payable to any Employee," and to

"interpret[] the provisions of the Plan(s)."

B.    CORE

CORE is a Massachusetts corporation with which Champion contracted to assist it in

managing its long term disability program.  Effective January 1, 1996, CORE and Champion

entered into a Services Agreement.  The Services Agreement provided, inter alia, (1) that

Champion would retain full and sole authority and responsibility for determining who was

eligible to receive benefits and the amount of benefits to be paid under any plan sponsored by

Champion; (2) that CORE would make written recommendations to Champion concerning

employees' eligibility for benefit payments; (3) that CORE would have no responsibility for any

benefit or medical care decisions; and (4) that CORE would not be deemed to be the "appropriate named fiduciary" as defined by ERISA or have any other fiduciary duties under ERISA as a result of the Services Agreement.  Prior to 1996, a division of The Travelers Companies ("Travelers") provided disability management services to Champion.

CORE used a system called "WorkAbility" to determine the presumed time an employee would be out of work for any given medical condition.  According to the plaintiffs, CORE recommended that Champion terminate disability payments if an employee was out of work longer than this presumed time.

Effective January 1, 1999, CORE, Champion, and Sedgwick Claims Management entered into a "SCORE Services Agreement," whereby CORE and Sedgwick furnished disability management services to Champion.

According to the plaintiffs, CORE and SCORE exceeded the scope of the Services Agreement and made all benefits decisions.  The plaintiffs maintain that Champion's Plan Supervisor merely rubber-stamped CORE's benefits determinations.

III.    <u>Summary Judgment Standard</u>

Although, as set forth below, this case involves the review of an administrative record, the familiar summary judgment standard applies.  <u>See</u> <u>Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.</u>, 440 F.3d 571, 575 (2d Cir. 2006).  The burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).  A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)); accord Miner v. City of Glen Falls, 999 F.2d 655, 661 (2d Cir. 1993). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

Where the nonmoving party has the burden of proof at trial, the moving party need only demonstrate that there is a lack of evidence to support the nonmovant's claim. Celotex, 477 U.S. at 323-25; Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 95 (2d Cir. 1998). Once the movant has established a prima facie case demonstrating the lack of a genuine issue of material fact, the nonmoving party must provide enough evidence to support a jury verdict in its favor. Anderson, 477 U.S. at 248; Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). A plaintiff, as the nonmovant, may not rely on conclusory statements or mere contentions that the evidence in support of summary judgment is not credible. Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993). Similarly, a plaintiff may not rest "merely on allegations or denials" in its complaint to demonstrate the existence of a genuine issue of material fact. Fed. R. Civ. P. 56(e). Therefore, after discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. Celotex, 477 U.S. at 323. When addressing a motion for summary judgment, the Court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992). Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant, 923 F.2d at 982.

IV.    The Plaintiffs' Claims for Denial of ERISA Benefits (Counts One and Two)

    A.    Exhaustion of Plan Remedies (Finney, Hill, McClure & Treadway)

    The defendants argue that four of the plaintiffs, Franziska Finney, Darrell Keith Hill, Wilson Daniel McClure, and Dolphus Luther Treadway, Jr., failed to exhaust the administrative remedies available to them under the plans. Thus, the defendants maintain that they are entitled to summary judgment on these four plaintiffs' claims for denial of benefits.

    These plaintiffs argue that the exhaustion requirement should be waived[5] because (1) it would have been futile to exhaust Champion's appeals process; and (2) Champion failed to provide a notice of denial consistent with ERISA's requirements, or a fair appeals process. In addition, Treadway and McLure argue that they attempted to exhaust plan remedies, but that Champion never responded to their appeals.

    ERISA requires both that employee benefit plans have reasonable claims procedures in place and that plan participants avail themselves of these procedures before turning to litigation. See 29 C.F.R. § 2560.503-1 (1998) (detailing requirements of claims procedures, including notification of adverse decisions within ninety days and the availability of a full and fair review of the initial determination); see also Jones v. UNUM Life Ins. Co. of Am., 223 F.3d 130, 140 (2d Cir. 2000) (noting that "there is a 'firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases'") (quoting Kennedy v. Empire Blue Cross & Blue Shield, 989 F.2d 588, 594 (2d Cir. 1993)). Unless a "clear and positive showing" is made that it

---

[5] The plaintiffs also argue that exhaustion requirements only apply to their claims of denial of benefits, and not to their claims in Counts Three and Four. However, as set forth below in text the Court finds that the defendants are entitled to summary judgment as to these counts for other reasons.

would be futile for the claimant to pursue her claim through the internal claims process, "that remedy must be exhausted prior to the institution of litigation." Jones, 223 F.3d at 140 (internal quotation marks omitted).

1.     Futility

Allegations of bad faith or breach of fiduciary duties may be sufficient to establish futility. See, e.g., DePace v. Matsushita Elec. Corp. of Am., 257 F. Supp. 2d 543, 560 (E.D.N.Y. 2003) ("In cases where the plan fiduciary has acted in bad faith . . . courts have invoked the futility doctrine and waived exhaustion as a precondition for judicial review . . .") (internal citations omitted). However, allegations that an administrator initially unreasonably denied a benefits claim are insufficient to establish futility. Greifenberger v. Hartford Life Ins. Co., 131 Fed. Appx. 756, 759 (2d Cir. 2005) (holding that allegations that administrator "denied coverage for long term disability benefits that were properly due under the policy" were insufficient to establish futility).

These plaintiffs argue that it would have been impossible to obtain a full and fair review from Champion because of CORE's domination of the claims review process, conflicts of interest that affected the review of claims by both CORE and Champion, and Champion's failure to consider all of the relevant factors in evaluating disability claims.

Under the terms of the plans, beneficiaries may "file a claim regarding the nonpayment of a Plan benefit" by writing to the plan administrator. The Plan Supervisor is then required to decide the claim within a "reasonable period of time" not to exceed ninety days absent special circumstances. If the "nonpayment" is upheld, then the plans permit the beneficiary to seek further review by writing within sixty days or a longer period that is "reasonable and related to

-10-

the nature of the benefit which is the subject of the Claim and to other attendant circumstances." This is the final review and was performed by the Claims Review Committee, a delegate of Champion's Pension and Employee Benefits Committee.  The members of the Claims Review Committee received a complete copy of each beneficiary's claims file,[6] reviewed the file, and then met to discuss the file with the other members of the Committee.  The Committee would then vote to uphold denial of benefits, to reinstate benefits, or request additional information. The Court finds that Champion has presented evidence that it provided a meaningful opportunity for administrative review by the Claims Review Committee, and that the plaintiffs have failed to raise a genuine issue of material fact that pursuing these opportunities would have been futile.

2.   <u>Notice</u>

The plaintiffs argue that McClure, Finney, and Hill received inadequate notice of denial because their denial letters did not include "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary," as required by 29 C.F.R. § 2560.503-1(f) (1997).

"'Defendants who give inadequate notice of the right to administratively appeal a denial of benefits are thus precluded . . . from asserting failure to exhaust administrative remedies as a defense.'"  <u>Strom v. Siegel Fenchel & Peddy P.C. Profit Sharing Plan</u>,  497 F.3d 234, 246 (2d Cir. 2007) (quoting <u>Veltri v. Building Service 32B-J Pension Fund</u>, 393 F.3d 318, 324 (2d Cir. 2004)).  However, a participant is "required to exhaust even if [he or] she was ignorant of the proper claims procedure."  <u>Davenport v. Harry N. Abrams, Inc.</u>,  249 F.3d 130, 134 (2d Cir.

---

[6] As noted below in text, the Claims Review Committee did not always receive the full file.

-11-

2001).  Thus, a participant will not be excused from exhausting administrative remedies because an individual communication from the administrator does not strictly meet ERISA requirements. See, e.g., Kent v. United of Omaha Life Ins. Co., 96 F.3d 803, 807-08 (6th Cir. 1996); Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co., 32 F.3d 120, 127 (4th Cir. 1994); Halpin v. W.W. Grainger, Inc., 962 F.2d at 693-94; Davidson v. Prudential Ins. Co. of Am., 953 F.2d 1093, 1096 (8th Cir. 1992); Crocco v. Xerox Corp., 956 F. Supp. 129, 142-43 (D. Conn. 1997), aff'd in part and rev'd in part on other grounds, Crocco v. Xerox Corp., 137 F.3d 105, 108 (2d Cir. 1998); but see Nichols v. Prudential Ins. Co. of Am., 406 F.3d 98, 106-08 (2d Cir. 2005) (holding that substantial compliance with ERISA requirements by the administrator cannot delay accrual of the right to sue).

### 3.    Individual Claims

          Turning to the claims made by the individual plaintiffs, the Court finds that there is a genuine issue of material fact concerning whether Treadway exhausted his administrative remedies.  However, the Court finds that Finney, Hill, and McClure have failed to raise a genuine issue of material fact concerning exhaustion.

### a.    Dolphus Luther Treadway, Jr.

          Treadway was hired as an hourly employee by Champion in 1972.  He worked as a "Chip Deliverer" or "First Operator" until December 1995, when he left on short term disability related to coronary artery disease, and myocardial infarction (heart attack).  In June 1996, he was awarded long term disability benefits.

          In June 1998, the Plan initiated a review of Treadway's condition to determine if he was eligible for continued benefits under the any occupation definition of disability.  Following this

review on September 11, 1998, CORE notified Treadway that his LTD benefits were being terminated. Treadway appealed the termination of his benefits by at least December 1998.

According to unsigned handwritten notes in Champion's records "per call from Janice EE has signed ret forms eff 2/1/99. Loc contact EE re: dropping appeal on LTD & and has requested a letter from attorney stating withdrawing appeal. Let go thru appeal & not start Pension with/o signing waiver. Check with/ Sharon - does he have to sign a waiver for LTD?" On March 12, 1999, Treadway's counsel wrote to Mary Lee Dixon concerning the status of Treadway's appeal. He did not indicate that the appeal had been withdrawn.

The Court finds that there is a genuine issue of material fact concerning whether Treadway withdrew his appeal, or Champion failed to act on that appeal. Accordingly, summary judgment is denied as to all parties on this basis as to Treadway.

b.    Franziska Finney

Champion hired Finney as an hourly employee in 1983. Finney began receiving short term disability benefits on November 7, 1994. When Finney's short term disability benefits were exhausted, her claim converted to a long term disability claim.

On August 26, 1997, Finney was informed by letter on CORE letterhead that her long term disability benefits were being terminated because she was "not disabled as defined in the Plan." The letter indicated that the decision was "[b]ased on the 7/23/97 Functional Capacity Evaluation (FCE)" which found that Finney was "able to perform light duty work for 8 hours per day." The letter also informed Finney of her right to appeal.

On October 1, 1997, Finney appealed the termination of her benefits and submitted recent medical records. On December 22, 1997, CORE recommended "upholding of the previous

-13-

denial of further long term disability benefits."

On February 9, 1998, the Plan advised Finney that "[b]ased on the review by CORE, our decision is to uphold the denial of LTD benefits." The letter summarized the information CORE reviewed and concluded that "[t]his information does not substantiate your disability as being totally and permanently disabled from any occupation as defined in the Plan." The letter noted the applicable Plan terms and advised Finney that she was entitled to further review by notifying Champion in writing within sixty days of receipt of the denial.[7] Finney did not request further review within that time period.[8]

While the denial letters Champion issued may not have provided guidance on information Finney could have submitted to supplement her claim, they provided sufficient notice of the right to seek further review and the method for doing so. Finney did not avail herself of this opportunity within the time allowed by the Plan. Accordingly, Finney has not presented evidence raising a genuine issue of material fact that the exhaustion requirement should be waived in her case.

Because Finney has not presented evidence suggesting that she exhausted her administrative remedies, or that exhaustion should be excused, summary judgment is granted in favor of the defendants.

      c.    <u>Darrell Keith Hill</u>

---

[7] The letter did not notify Finney that she could appeal within any reasonable period of time.

[8] Almost three years later, in December 2000, Finney requested that the Plan reconsider its decision to terminate her benefits. The Court finds Finney has not raised a genuine issue of material fact that this delay was "reasonable and related to the nature of the benefit which is the subject of the Claim and to other attendant circumstances."

Champion hired Hill as an hourly employee in 1972.  In November 1990, Hill injured his right ankle and leg, and subsequently had a below the knee amputation of his right leg.  Hill thereafter received short term disability from Champion.  In May 1991, Champion approved Hill's claim for long term disability benefits.

In 1998, Champion initiated a review of Hill's eligibility for benefits.  CORE scheduled Hill for an Independent Medical Examination ("IME"), which was apparently performed on June 25, 1998.  The report of the Independent Medical Examination was not included in the administrative record provided to the Court.

On July 29, 1998, the Plan informed Hill that his long term disability benefits had been terminated and that he had a right to have this decision reviewed.  The denial letter indicated that Hill's claim was not approved because he was "[n]ot disabled as denied in the Plan."  It continued, "The Independent Medical Examination found you capable of work 8 hours per day, 5 days per week in a sedentary job.  The Transferable Skills Analysis revealed skills that can be utilized in jobs of a Drafter Assistant, a Drafter Apprentice, and a Stuffer (toy - sport equipment production.)"  On the same date, in a document titled "Confidential Service Report #5" Core reported that "Case Management's assessment and intervention" had saved Champion $75,850.

On October 1, 1998, Hill's wife submitted additional information to support Hill's claim, including information suggesting that the conclusions of the Transferable Skills Analysis were unreasonable.  By letter dated October 19, 1998, Mrs. Hill requested review of the Plan's decision to terminate her husband's disability benefits.

In response, CORE asked its consulting physician to review Hill's claim.  The consulting physician's report was not included in the administrative record provided to the Court.

On February 17, 1999, the Plan informed Hill that it was upholding denial of his claim for continued benefits, and informed Hill that he had a right to appeal the denial. The denial letter included a description of a CORE physician consultant's conclusions after reviewing the medical documentation submitted by Hill. It also noted that "we have completed a Transferable Skills Analysis that determined that you have skills to perform other occupations."

Hill did not respond to this letter until September 1999, when his attorney requested copies of Hill's claim file and all Plan documents. Then, in December 2000, Hill requested reconsideration of the decision to terminate his benefits.[9]

Evidence that CORE evaluated cost savings in reviewing Hill's eligibility for benefits does not amount to a clear and positive showing that exhaustion would have been futile. Similarly, while the denial letters Champion issued may not have provided guidance on information Hill could have submitted to supplement his claim, they provided sufficient notice of the right to seek further review and the method for doing so. Hill did not avail himself of this opportunity within the time allowed by the Plan. Accordingly, Hill has not presented evidence raising a genuine issue of material fact that the exhaustion requirement should be waived in his case and summary judgment is granted in favor of the defendants.

d.    Wilson Daniel McClure

McClure worked as a Maintenance Supervisor for Champion until February 1, 1989, when he began receiving short term disability benefits. In August 1989, he began receiving long term disability benefits.

---

[9] The Court finds that Hill has not raised a genuine issue of material fact that this delay was "reasonable and related to the nature of the benefit which is the subject of the Claim and to other attendant circumstances."

-16-

As part of a periodic review of McClure's eligibility, CORE scheduled McClure for an Independent Medical Examination with Dr. C. Ruffin Stephenson in July 1996. Dr. Stephenson concluded that McClure could not perform the duties of his Maintenance Supervisor position, but that he would "be able to do some type of sedentary work or desk job, particularly one where he could get up and move around when his back gets stiff and sore, and would allow him such freedom as that."

On October 16, 1996, CORE notified McClure that, based on the results of Dr. Stephenson's Independent Medical Examination, the Plan was terminating his long term disability benefits. The letter noted that "[a]ccording to the IME findings, you are not disabled from any occupation." The letter indicated that McClure was "entitled to obtain further review of this initially denied claim" and instructed McClure to include "the reason you believe your claim should be treated differently [including] any new, additional facts or medical information you consider important for us to give your appeal proper consideration."

On December 13, 1996, McClure requested through counsel that Champion review termination of his benefits and submitted medical records and the Social Security Administration's decision granting his claim for disability benefits.

On April 9, 1997, the Plan notified McClure of its decision to deny his claim for long term disability benefits. The denial letter informed McClure that Champion had based its decision on the Independent Medical Examination and May 9, 1994 examination notes from McClure's treating physician indicating that McClure had the physical capacity to perform work other than the job he had performed at Champion. The letter also informed McClure that he had

sixty days to appeal[10] the Plan's determination and attached a copy of the Independent Medical

Examination.

On July 1, 1997, over eighty days after the date on the denial letter, McClure's counsel

notified the Plan that he had received the Plan's April 9, 1997, denial of McClure's claim for

long term disability benefits.  He indicated that he was in the process of collecting medical

information and requested an additional sixty days to collect such records.  Champion did not

respond to this request.

Over a year later, on October 19, 1998, McClure's counsel wrote the following letter to

Champion:

> I have been informed by Wilson D. McClure that you have received various
> additional medical evidence regarding his claim for long term disability benefits
> following the decision of April 9, 1997 . . . Please let me know the status of his claim
> and whether or not you did receive additional medical evidence in the form of
> documents from Mr. McClure.

A note on this letter indicates, "Per Kelly @ Core has not rec'd any add'l info re: appeal

since denied claim of 4-9-97," and "Called attorney to advise that we have never rec'd any add'l

info for review."

Because McClure did not request additional time to collect medical evidence until the

period to appeal the April 1997 denial had elapsed,[11] and because he has not presented evidence

---

[10]  The letter did not notify McClure that he could appeal within any reasonable period of
time.

[11] Although Finney, Hill, and McClure do not argue that tolling should be applied, the
Court notes that they have failed to establish a sufficient basis for tolling.  In particular, "to merit
equitable relief, a plaintiff must have acted with reasonable diligence during the time period she
seeks to have tolled. . . . Importantly, a want of diligence by a plaintiff's attorney generally will
not prompt a court to provide relief from a limitations period by way of an equitable toll."
Chapman v. ChoiceCare Long Island Term Disability Plan, 288 F.3d 506, 512 (2d Cir. 2002)

that additional medical evidence was ever actually submitted to CORE, the Court finds that McClure has failed to establish a genuine issue of material fact concerning whether he exhausted Champion's administrative remedies.

Further, while the denial letters Champion issued may not have strictly complied with all ERISA requirements, they provided sufficient notice of the right to seek further review and the method for doing so.  McClure did not avail himself of this opportunity within the time allowed by the Plan.[12]  Accordingly, like Finney and Hill, McClure has not presented evidence suggesting that the exhaustion requirement should be waived in his case.

Because McClure has failed to create a genuine issue of material fact that he exhausted available administrative remedies, or should be excused from exhausting such remedies, summary judgment is granted in favor of the defendants.

B.      Standard of Review of Merits of Claims

"[A] denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948 (1989).  Where the plan grants discretion to the administrator to determine eligibility and construe the terms of the plan, the administrator's decision is ordinarily reviewed to determine whether it was arbitrary and capricious.  See Pagan

---

(internal citations omitted) (holding that plaintiff's mental illness, which interfered with her counsel's ability to determine whether she wished to file an administrative appeal of a disability benefits denial, might constitute a sufficient basis for equitable tolling in ERISA context).

[12] Although McClure did eventually seek further review, he has not raised a genuine issue of material fact that delay in doing so was "reasonable and related to the nature of the benefit which is the subject of the Claim and to other attendant circumstances."

v. NYNEX Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995).

The plaintiffs concede that the plans confer discretion on Champion. However, they argue that they are nonetheless entitled to a de novo review because (1) Champion/CORE operated under a conflict of interest, or (2) Champion/CORE failed to exercise its discretion in making benefits determinations.

      1.    <u>Conflict of Interest</u>

After oral argument on the motion for summary judgment, the United States Supreme Court issued its decision in <u>Metropolitan Life Ins. Co. v. Glenn</u>, 128 S.Ct. 2343 (2008). In <u>Glenn</u> the Court held that when the entity that administers an employee benefits plan "both determines whether an employee is eligible for benefits and pays benefits out of its own pocket . . . this dual role creates a conflict of interest. 128 S.Ct. at 2346. That conflict is "a factor in determining whether the plan administrator has abused its discretion in denying benefits." <u>Id.</u> The significance of this factor "depend[s] upon the circumstances of the particular case." <u>Id.</u>; <u>see also</u> <u>Firestone Tire and Rubber Co.</u>, 489 U.S. at 115, 109 S.Ct. 948 ("if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion").

The plaintiffs argue that Champion/ CORE operated under a conflict of interest. Specifically, the plaintiffs argue that the inherent structural conflict under which any self-funded plan operates influenced Champion's benefits determinations, and that CORE was conflicted by its desire to preserve its consulting contract with Champion. Champion admits that CORE provided "savings information" in "Confidential Service Reports" generated in response to five of the fourteen plaintiffs' claims for benefits. CORE also provided detailed information about

disability rates and trends among Champion employees.

"[C]onflicts are but one factor among many that a reviewing judge must take into account" and weigh against one another. Metropolitan Life Ins. Co. v. Glenn, 128 S.Ct. 2343, 2351 (2008). The Court finds that the plaintiffs have not presented evidence that Champion's conflict was so severe that it alone rendered Champion's claims process arbitrary and capricious. Accordingly, for the purposes of summary judgment the Court will give the conflict substantial weight in evaluating the defendants' motion, and a de minimis weight in evaluating the plaintiffs' motion.

### 2.     Failure to Exercise Discretion

In addition, the plaintiffs argue that they are entitled to a de novo review because Champion/CORE did not actually exercise any discretion granted to it under the plan. The plaintiffs maintain that CORE's WorkAbility system removed any individualized discretion from benefits decisions.

"[F]ailure to exercise . . . discretion [vested in the plan administrator], requires de novo review of the denial of benefits." Nichols v. Prudential Ins. Co. of America, 406 F.3d 98, 101, 109 (2d Cir. 2005) (holding that plaintiff was entitled to de novo review where plan administrator failed to exercise discretion by failing to act on appeal within regulatory period); see also Strom v. Siegel Fenchel & Peddy P.C. Profit Sharing Plan, 497 F.3d 234, 243 (2d Cir. 2007) (de novo review required because administrators' benefits "decision" was not based on interpretation of key plan term).

However, uniform application of a policy that "was itself a discretionary decision in the first instance" does not constitute failure to exercise discretion and does not support de novo

review of a benefits determination consistent with such a policy.  Krauss v. Oxford Health Plans, Inc., 517 F.3d 614, n.7 (2d Cir. 2008).

In order to be entitled to deference the Plan Administrator must be the entity that exercises discretion.  Allison v. Unum Life Ins. Co., No. CV 04-0025, 2005 WL 1457636, *8 (E.D.N.Y. Feb. 11, 2005) (applying de novo standard where plan language vested discretion in plan administrator, but a different entity exercised discretion without proper delegation).

Considering the evidence in the light most favorable to the plaintiffs, the Court finds that no reasonable fact finder could conclude that Champion's Claims Review Committee failed to examine the administrative record and make individualized benefits determinations. Accordingly, the Court will not deviate from deferential review for this reason.[13]

3.     The Arbitrary and Capricious Standard

"A decision is arbitrary and capricious if it is without reason, unsupported by substantial evidence or erroneous as a matter of law."  Zervos v. Verizon New York, Inc., 277 F.3d 635, 646 (2d Cir. 2002) (internal quotation marks omitted).  Substantial evidence "is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker and] . . . requires more than a scintilla but less than a preponderance."  Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir. 1995) (internal quotation marks omitted, alteration in the original).  Additionally, a decision must be "based on a consideration of the relevant factors."  Id.  (internal quotation marks omitted).

_____

[13] However, as noted above in text, at this stage, the Court must assume that Treadway did not withdraw his appeal, and that Champion failed to act on that appeal.  If the Court ultimately determines that Treadway did not withdraw his appeal then it will review his claim de novo.  Nichols v. Prudential Ins. Co. of America, 406 F.3d at 101, 109.

Accordingly, in resolving the pending motions, the Court must determine whether there are genuine issues of material fact concerning the evidence before the Administrator, and the factors it considered.  See Wojciechowski v. Metro Life Ins. Co., 1 Fed. Appx. 77, 79, 2001 38264, at *1 (2d Cir. Jan. 12, 2001).  If there are no such genuine issues of material fact, then the Court must determine "whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits."  Leahy v. Raytheon Co., 315 F.3d 11, 17 (1st Cir. 2002).

A decision may also be arbitrary and capricious if it was rendered after less than a full and fair review.  See Cohen v. Metropolitan Life Ins. Co., 485 F. Supp. 2d 339, 353 (S.D.N.Y. 2007) (holding that participant was denied "full and fair review" where administrator obtained additional material from treating professionals in connection with an appeal without informing participant); Soron v. Liberty Life Assurance Co., 318 F. Supp. 2d 19, 28 (N.D.N.Y. 2004) (holding that participant was denied "full and fair review" where administrator did not disclose relevant evidence until after final review).

ERISA requires every benefit plan to "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."  29 U.S.C. § 1133.  "The purpose of the full and fair review requirement is to provide claimants with enough information to prepare adequately for further administrative review or an appeal to the federal courts."  Juliano v. Health Maint. Org. of N.J., Inc., 221 F.3d 279, 287 (2d Cir. 2000) (internal quotations and citations omitted).  "At the very least, a full and fair review requires that the fiduciary inform the participant or beneficiary of

the evidence that the fiduciary relied upon and provide an opportunity to submit written

comments or rebuttal documents." Lidoshore v. Health Fund 917, 994 F. Supp. 229, 236-37

(S.D.N.Y. 1998) (internal quotations and citation omitted); Crocco v. Xerox Corp., 956 F. Supp.

129, 139 (D. Conn. 1997) (the plan administrator "must also inform the participant of what

evidence he relied upon and provide him with an opportunity to examine that evidence and to

submit written comments or rebuttal documentary evidence."), aff'd in relevant part, 137 F.3d

105, 108 (2d Cir. 1998). Thus, ERISA regulations require every appeals procedure to provide

that the claimant or his duly authorized representative an opportunity to "[r]eview pertinent

documents; and . . . [s]ubmit issues and comments in writing." 29 C.F.R. § 2560.503-l (g)

(1998). The plans contain similar provisions.

     C.    <u>Scope of Review</u>

     In an ERISA case, review is ordinarily limited to the administrative record. See, e.g.,

Krizek v. Cigna Group Ins., 345 F.3d 91, 97 (2d Cir. 2003). However, a court may expand its

review for good cause. Good cause is most often found where there was a conflict of interest and

a defect in the procedures followed during administrative review. See, e.g., Id. at 98, n.3

("[D]istrict courts [should] resolve the conflict issue in advance and, only upon finding 'good

cause,' permit the parties to introduce evidence beyond the administrative record.").

     The plaintiffs argue that they are entitled to rely on documents outside of the

administrative record because of the alleged conflict of interest discussed above. The Court does

not find that good cause exists to expand its review beyond the administrative record as to most

of the plaintiffs.[14]  The additional documents offered by the plaintiffs either should have been offered to the Administrator during its review, or were created after the fact and not relevant to the plaintiffs' conditions at the time their claims were denied.

      D.    Relevant Considerations in Evaluating Total Disability

The plaintiffs argue that Champion failed to consider a number of important factors in evaluating their eligibility for continued benefits.  Champion maintains that these factors were not relevant to determining eligibility under the terms of the plans.  The Court finds that previous eligibility determinations, evidence of pain and other "subjective" aspects of disability, and all other circumstances related to the plaintiffs' ability to pursue an occupation are relevant to determining whether the plaintiffs were entitled to continued benefits, and thus, whether Champion was rational in terminating their benefits.

        1.    A Previous Decision to Award Benefits

If benefits are terminated absent any change in the participant's medical condition, or the applicable policy language, the previous decision to award benefits is relevant in evaluating the reasonableness of terminating benefits.  See Connors v. Conn. Gen. Life Ins. Co.,  272 F.3d 127, 136 (2d Cir. 2001) (noting significance of a decision to terminate long term disability benefits absent any evidence of a change in the plaintiff's condition).

        2.    "Subjective" Aspects of Disability

"This Circuit has long held that the subjective element of pain is an important factor to be considered in determining disability."  Mimms v. Heckler, 750 F.2d 180, 185 (2d Cir. 1984),

---

    [14] However, if after further review the Court concludes that Treadway never withdrew his appeal, the Court will consider additional evidence submitted by the parties as to this plaintiff.

quoted by Connors, 272 F.3d at 136.  Even when a plan gives the administrator discretionary

authority, the administrator may only evaluate the credibility of the claimant's subjective

complaints of pain; the administrator may not dismiss the claimant's subjective pain as legally

insufficient evidence.  Krizek v. Cigna Group Ins., 345 F.3d 91, 101-02 (2d. Cir. 2003) ("[W]hile

a district judge is not required to accept a plaintiff's subjective complaints as credible, it cannot

dismiss complaints of pain as legally insufficient evidence of disability.") (internal quotation

marks omitted); Short v. UNUM Life Ins. Co., No. Civ. 302CV827 (MRK), 2003 WL 22937720,

at *6, *9 (D. Conn. Dec. 3, 2003) (noting that even when the plan administrator has discretionary

authority, the administrator still has a duty to consider all relevant evidence, including subjective

evidence).  Indeed, when credible evidence is before the administrator, "subjective pain may

serve as the basis for establishing disability, even if such pain is unaccompanied by positive

clinical findings or other 'objective' medical evidence."  Marcus v. Califano, 615 F.2d 23, 27

(2d. Cir. 1979); see also Lijoi v. Cont'l Cas. Co., 414 F. Supp. 2d 228, 245 (E.D.N.Y. 2006)

(holding that "credible complaints of pain . . . cannot be disregarded" even though plan terms

required participant to submit "objective medical findings" to substantiate a disability claim).

However, the administrator need not find a participant disabled every time subjective

evidence of pain is presented.  For example, if the plan administrator determines that the

participant's subjective complaints of pain are inconsistent with objective medical evidence, the

administrator may reasonably discount the participant's credibility and thus properly deny

disability benefits.  See Williams v. Aetna Life Ins. Co., 509 F.3d 317, 322-23 (7th Cir. 2007)

(noting that while an administrator may not reasonably require "objective" evidence of pain or

fatigue, it may require "accurate documentation from a treating physician that the claimant's

subjective symptoms of pain or fatigue limit his functional abilities in the workplace").

The evaluation of and weight given to subjective and objective evidence is largely dependent on the circumstances of a particular case. In this case, many of the plaintiffs suffer from fibromyalgia, a condition diagnosed by subjective pain.[15] The Merck Manual of Diagnosis and Therapy 321 Mark H. Bears et al. eds., (Merck Research Laboratories 18th ed. 2006) (fibromyalgia "is suspected in patients with generalized pain and tenderness, especially disproportionate to the physical findings.") It would thus be unreasonable to require objective evidence to support a diagnosis of fibromyalgia. Accordingly, even if the participant's subjective reports are not supported by objective medical evidence, the participant's subjective pain by itself may constitute sufficient evidence of a disability.[16] Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003) (noting that "fibromyalgia is a disabling impairment and that 'there are no objective tests which can conclusively confirm the disease.'")

While an administrator may look to objective evidence to evaluate the credibility or severity of reports of pain, it is arbitrary and capricious to deny a disability claim solely based on

---

[15] Fibromyalgia is characterized by widespread chronic pain in the muscles, ligaments, and tendons, combined with fatigue and multiple tender points. There is no "specific histologic abnormality." The Merck Manual of Diagnosis and Therapy 321-22 Mark H. Bears (Merck Research Laboratories 18th ed. 2006). "Patients tend to be stressed, tense, anxious, fatigued, striving, and sometimes depressed." Id. at 321.

[16] The defendants rely on a number of district court cases in support of their argument that it is reasonable for a plan administrator to require objective evidence of fibromyalgia or other disabling conditions. See, e.g., Maniatty v. Unumprovident Corp., 218 F. Supp. 2d 500 (S.D.N.Y. 2002); Couture v. UNUMProvident Corp., 315 F. Supp. 2d 418 (S.D.N.Y. 2004); Parisi v.UnumProvident Corp., No. 3:03CV01425 (DJS), 2007 WL 4554198 (D. Conn. Dec. 21, 2007); Fitzpatrick v. Bayer Corp., No. 04 Civ. 5134 (RJS), 2008 WL 169318 (S.D.N.Y. Jan. 17, 2008); Solass v. Delta Family-Care Disability and Survivorship Plan, No. 03Civ. 8680 (LAP), 2005 WL 735965 (S.D.N.Y. Mar. 29, 2005). To the extent these cases are inconsistent with Connors and Krizek, the Court does not find them to be persuasive.

the unavailability of such evidence.  See Crawford v. Bowen, No. 87 CV 2862, 1989 WL 88005, at *2 (E.D.N.Y. July 31, 1989) ("The fact that the clinical findings do not substantiate the severity of pain alleged by the claimant is not a sufficient ground for denying claimant disability benefits if other evidence demonstrates that claimant suffers from debilitating back pain."); Oliver v. Coca Cola Co., 497 F.3d 1181, 1195-99 (11th Cir. 2007) (holding that administrator was arbitrary and capricious in requiring objective evidence of pain where the plan did not specifically require such evidence or exclude coverage for pain related disabilities), vacated in part on other grounds on petition for reh'g, 506 F.3d 1316 (11th Cir. 2007).[17]

3.      "Any Occupation"

"A finding that a claimant is physically capable of sedentary work is meaningless without some consideration of whether [he or] she is vocationally qualified to obtain such employment, and to earn a reasonably substantial income from it, rising to the dignity of an income or livelihood, though not necessarily as much as she earned before disability."  Demirovic v. Bldg. Serv. 32 B-J Pension Fund, 467 F.3d 208, 213-14 (2d Cir. 2006) ("[A] reasonable interpretation of a claimant's entitlement to payments based on a claim of 'total disability' must consider the claimant's ability to pursue gainful employment in light of all the circumstances.")  Thus, an administrator must consider whether a beneficiary has "the vocational capacity to perform any type of work . . . that actually exists in the national economy."  Id. at 215.

Age is a relevant factor in determining vocational capacity.  Id. at 213, 216; see also SSR 83-10 "Determining Capability to do other Work—the Medical-Vocational Rules of Appendix

---

[17] At a deposition in this case, Glenn Taylor, a CORE representative answered "yes" when asked "Did CORE require objective information in order to substantiate disability."

2" available at 1983 WL 31251 (noting that age must be considered to determine a claimant's vocational adaptability).[18]

  Although the plaintiffs have presented evidence that CORE interpreted the plans to exclude these considerations, neither party has presented evidence that Champion itself interpreted the plans in such a way (or that Champion explicitly adopted CORE's interpretation). To the extent that any of the benefits determinations in this case implicitly turn on the plans being interpreted in this manner, the Court finds that such an interpretation is unreasonable as a matter of law.

  E. <u>Reasonableness of the Benefits Determinations</u>

    1. <u>The Administrator was Arbitrary and Capricious in Terminating Boone, Brookshire, Clark, Haynes, Kirkpatrick, Lynn, Reece, Smith, and Whitley's Benefits</u>

  The Court finds that Champion was arbitrary and capricious in terminating Elizabeth Case Boone, Rosa Lee Brookshire, Harrison Young Clark, Wiley Haynes, Judith Case Kirkpatrick, Lois Lynn, Charles R. Reece, Harry L. Smith, and Martha Whitley's long term disability benefits.

  This section has three parts. The first discusses a problem common to Champion's review of many of the plaintiffs' claims. The second examines the individual plaintiffs' claims, and the Court's reasons for finding that, as a matter of law, Champion did not afford these plaintiffs a full and fair review. Further, as set forth more fully below, the Court finds that Champion was unreasonable in evaluating Boone, Clark, Haynes, and Whitley's claims. The

---

  [18] Indeed, Champion's "Vocational Rehabilitation Referral Guidelines" consider age an important factor in determining "the feasibility of this employee succeeding with vocational services."

final section sets forth the considerations relevant to determining an appropriate remedy for each plaintiff.

a.     Transferable Skills Analyses

_____Champion relied on "Transferable Skills Analyses" in determining that many of the plaintiffs had skills that would permit them to return to work consistent with their physical limitations.  Most of these analyses suffered from serious flaws and were an inadequate basis for determining that the plaintiffs were vocationally qualified to work at "any occupation or business for wage or profit for which [they were] or may become reasonably qualified by training, education or experience."

Because these analyses applied the same methods, the Court will discuss the flaws it has identified in general, before turning to the reasonableness of benefits determinations made for the individual plaintiffs based in part on these analyses.

Most of the Transferable Skills Analyses were performed by Jennifer Mikeska, MRC,[19] for Cost Review Services, a division of CORE.  Mikeska identified the plaintiffs' work histories by referring to their "profile sheets," presumably the "Personal Profile Evaluations" completed by the plaintiffs.  The Administrative Record does not reflect that Mikeska interviewed any of the plaintiffs in connection with these analyses, or that she spoke with anyone at Champion to obtain information about the plaintiffs' work histories.  Mikeska then apparently used these profile sheets to determine which positions in the Dictionary of Occupational Titles most closely corresponded to the plaintiffs' past occupations.

The Dictionary of Occupational Titles (4th Ed., Rev. 1991) ("DOT") is a publication of

---

[19] Master of Rehabilitation Counseling.

the Department of Labor.  Although it was last updated in 1991, it is commonly used to

determine alternative occupations in Social Security and private disability cases. See, e.g., Krizek

v. Cigna Group Ins., 345 F.3d 91, 96 (2d Cir. 2003) (ERISA); Jasinski v. Barnhart, 341 F.3d

182, 183 (2d Cir. 2003) (Social Security).  The DOT includes a variety of information about each

listed occupation, reflected in numerical codes in the occupation title and "trailer." DOT,

"Introduction: Parts of the Occupational Definition."  This information includes the industry,

worker functions involved in the occupation, the date the definition was last updated, the level of

specific vocational preparation required, and the reasoning, language, and math skills required.

DOT, "Appendix C: Components of the Definition Trailer."  "Worker functions" are divided into

functions related to "data," "people," and "things."  DOT, "Appendix B: Explanation of Data,

People, and Things."  For example, a highly responsible position might require "mentoring"

others, while a less responsible position would require "taking instructions–helping" others.

Id. (noting that worker functions may be seen as a "hierarchy only in the most general sense.")

    Mikeska used the "worker function" codes in the DOT to determine each plaintiff's

"transferable skills."  For example, Mikeska concluded that Boone's transferable skills were

"comparing," "taking-instructions," and "handling," the least responsible worker functions in

each category.  Mikeska then searched for occupational titles within the plaintiffs' exertional

limitations, that used the same worker functions, and were within the same work field or

otherwise were similar to the plaintiffs' prior occupations.  In evaluating some of the plaintiffs,

Mikeska also considered non-exertional physical limitations and the level of vocational

preparation necessary to perform alternative occupations.  Some of the evaluations also reflect

that Mikeska considered whether alternative occupations were obsolete.

As described in more detail below, the Transferable Skills Analyses performed by CORE suffer from some or all of the following defects:

First, Mikeska did not obtain sufficient information about the plaintiffs' work histories, instead relying on brief job descriptions.  An accurate assessment of a claimant's work history is critical to a valid Transferable Skills Analysis.  Creech v. UNUM Life Ins. Co. of N. Am., 162 Fed. Appx. 445, 457-60 (6th Cir. 2006) (per curiam) (holding that reliance on Transferable Skills Analysis based on an inaccurate description of prior work was arbitrary and capricious). "Neither an occupational title by itself nor a skeleton description is sufficient" to determine activities involved in past work experience.  SSR 82-41 "Work Skills and Their Transferability as Intended by the Expanded Vocational Factors Regulations Effective February 26, 1979," available at 1982 WL 31389.[20]  In addition, while "people are not expected to do more complex jobs than they have actually performed," id., some of the analyses suggest alternate occupations at a higher skill level than the prior occupations Mikeska identified.

Next, Mikeska unreasonably treated "worker functions" as skills.  "A skill is knowledge of a work activity which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through performance of an occupation which is above the unskilled level. . . . A skill gives a person a special advantage over unskilled workers

---

[20] Although Champion is obviously not bound by the Social Security Administration's policy statements, the Court finds these policy statements relevant in evaluating the Transferable Skills Analyses performed by CORE, particularly since both rely on the DOT.  See Rabuck v. Hartford Life and Accident Ins. Co., 522 F. Supp. 2d 844, 877 n.12 (W.D. Mich. 2007) (noting that it was appropriate to consider the DOT and the Selected Characteristics of Occupations Defined in the Dictionary of Occupational Titles, also published by the Department of Labor, in the ERISA context); cf. Metropolitan Life Ins. Co. v. Glenn, 128 S.Ct. 2343, 2347 (2008) (describing "any occupation" standard as a "Social-Security-type standard").

in the labor market." Id.; see also The American Heritage College Dictionary, 3rd ed. (defining "skill" as "proficiency, facility, or dexterity that is acquired or developed through training or experience.")  The worker functions reflect the level of skill involved in a position, and some of the more responsible functions may indicate the existence of particular skills.  However, worker functions, particularly less responsible worker functions, are not themselves skills.

Further, in some cases, Mikeska failed to consider non-exertional limitations including (1) intellectual and psychological limitations, including those related to the side effects of prescription medications and pain; (2) limited manual dexterity; and (3) a limited ability to remain seated for an extended period of time.  Such non-exertional limitations can be important aspects of vocational capacity.  See Rabuck v. Hartford Life and Accident Ins. Co., 522 F. Supp. 2d 844, 876-77 (W.D. Mich. 2007) (holding that failure to consider non-strength limitations of former company president with short-term memory limitations rendered Transferable Skills Analysis "incredible").  For low skill, sedentary and light duty positions, bilateral manual dexterity, and the ability to remain in a particular posture are important non-exertional limitations.  SSR 83-14, "Capability to Do Other Work--the Medical-Vocational Rules as a Framework for Evaluating a Combination of Exertional and Nonexertional Impairments," available at 1983 WL 31254 ("[B]ilateral manual dexterity is necessary for the performance of substantially all unskilled sedentary occupations.");  SSR 83-12 "Capability to Do Other Work--the Medical-vocational Rules as a Framework for Evaluating Exertional Limitations Within a Range of Work or Between Ranges of Work" available at 1983 WL 31253 (noting that only a few highly skilled sedentary positions permitted changes of position at will), cited by Nelson v. Bowen, 882 F.2d 45, 48-49 (2d Cir. 1989).  Similarly, Mikeska failed to consider the

plaintiffs' ages in determining whether they could reasonably adapt to a new occupation.

Finally, Mikeska failed to consider whether the alternate occupations she identified still existed in the national economy. Many of the occupational titles in the DOT, including most of the occupations identified for the plaintiffs in this case, were lasted updated in 1977. Some of these were obviously obsolete by the mid-1990's. Accordingly, the identification of an alternate occupation in the DOT was not necessarily an adequate indication that an alternate occupation actually existed in the national economy.

> b.    Individual Claims
> (1)    Elizabeth Case Boone

In 1976, Elizabeth Boone was hired as an hourly employee at Champion's facility in Canton, North Carolina. In 1987, while she was working as a "cutter sort checker," Boone applied for disability benefits. Boone was approved for short term disability benefits in May 1987 and left active employment. In November 1987, Boone's claim converted to a long term disability claim, and Champion determined that Boone was "still wholly and continuously disabled" because of neck pain. In particular, according to Boone's treating physician, she underwent an "anterior cervical diskectomy, with interbody fusion C4-5."

Over the next ten years, Boone's eligibility was periodically reviewed. After each review, Champion found that Boone's medical condition was largely unchanged and that her eligibility continued "based on the chronicity and persistence of [her] symptoms." Core Case Management Confidential Service Report #1 dated November 21, 1996.

In 1997, the Plan requested additional personal and medical information from Boone. In response to this request, Boone submitted, among other materials, a report from her treating

physician, Dr. Jill Vargo, a rheumatologist,[21] stating that she was totally disabled from any occupation. In reviewing Boone's eligibility for continuation of benefits, Dr. J.D. Beavers, a physician and Medical Director for CORE, spoke with Dr. Vargo. According to Dr. Beavers' notes, Dr. Vargo indicated that there were no objective findings to report, and that "she's not sure if [Boone] is any-occupation disabled."[22]

Dr. Beavers recommended that Champion "not certify any-occupation disability," but Dr. Vargo refused to authorize Boone to return to work. As a result, Champion referred Boone to an Independent Medical Examination with Dr. Charles Shields, a physiatrist.[23] Dr. Shields concluded that Boone could work up to six hours a day "with 1 hour changes of position."[24] Dr. Shields also noted that Boone had limited or no ability to use her left hand for repetitive tasks, grasping, and tasks requiring manual dexterity.

On March 3, 1998, CORE recommended "a denial of continued LTD benefits. . . given the results of the independent medical exam." Confidential Service Report #3. In the same document, CORE commented on the savings terminating Boone's benefits would achieve: "Please refer to the estimated savings analysis for the LTD benefit period. . . . It is estimated that without the intervention of LTD Case Management, the employee would continue to receive

---

[21] Rheumatologists specialize in arthritis and other diseases of the joints, muscles and connective tissues. Charles B. Clayman, The American Medical Association Encyclopedia of Medicine 871 (Random House 1989).

[22] The parties dispute whether Dr. Beavers' notes accurately reflect Dr. Vargo's opinion.

[23] A physiatrist is a medical doctor who specializes in physical medicine. Stedman's Medical Dictionary, (27th Ed.) (Lippincott, Williams & Wilkins 2000).

[24] The parties dispute whether Dr. Shields ever actually examined Boone.

LTD benefits through the age of 65." Id.

On March 9, 1998, in a letter on CORE letterhead, Dr. Beavers notified Boone that her long term disability benefits would be terminated.

In a letter dated March 24, 1998, Dr. Vargo stated that "as a board certified rheumatologist and in following this patient over a long period of time, I can say that there has not been a substantial change in her disability status." Dr. Vargo continued that she did "not expect Ms. Boone to improve to the point where she can return to gainful employment." On April 8, 1998, Boone appealed the termination of her benefits.

On April 29, 1998, CORE commissioned Dr. Alan Marks, a rheumatologist, to conduct a "Peer Review Analysis" of Boone's appeal. Dr. Marks concluded that Boone was not disabled and that another Independent Medical Examination was not indicated because "[p]atients with neck pain, left arm and leg pain, without demonstrable neurological abnormalities . . . cannot be thought of as being disabled from any occupation, even though the individual may feel incapable of holding down a job." As a result, CORE recommended that the Plan "uphold the previous denial of LTD benefits."

By letter date July 2, 1998, the Plan Supervisor notified Boone that Champion's "decision is to uphold the denial of LTD benefits" and advised her of her rights to obtain further review of her claim.

On August 16, 1998, Boone again appealed denial of her claim for long term disability benefits. Her appeal was supported by reports from two additional treating physicians, Dr. John Stringfield and Dr. Sean Maloney. Dr. Stringfield reported that he supports "this patient's continued disability." Dr. Maloney noted that Boone was "currently disabled and unable to do

-36-

even sedentary work on a consistent basis." Medical notes dated April 6, 1998. Dr. Vargo also

submitted an additional letter concluding that Boone was "unable to be employed at any level of

job including sedentary." Letter dated July 16, 1998.

On September 3, 1998, the Plan commissioned a Transferable Skills Analysis of Boone.

The Transferable Skills Analysis identified fifteen occupational titles–such as clip-on sunglasses

inspector, asbestos shingle inspector, and cuff folder–as appropriate for Boone.

On September 24, 1998, Champion's Claims Review Committee met to consider Boone's

appeal. After a three-hour meeting, in which five other cases were also considered, the

Committee voted to uphold denial of Boone's claim. Champion informed Boone of its final

decision on October 21, 1998.

The Claims Review Committee explained its decision to deny Boone's final appeal of the

termination of her benefits as follows:

> Ms. Boone's doctors, while stating she was disabled, did not provide any
> clinical analysis other than opinion. An Independent Medical Evaluation was
> conducted by Dr. Shields on 2/3/98. Dr. Shields . . . stated that Ms. Boone can work 5-
> 6 hours a day at a sedentary physical demand level with specific restrictions to the left
> side of the body. The Committee reviewed the Physician's Report of Physical
> Capacity and the Modifications Checklist that Dr. Shields completed which restated
> that Ms. Boone could work 5-6 hours a day, 5 days a week, sit 5-6 hours, stand 1-2
> hours, lift up to 10 pounds, and operate a motor vehicle with restrictions.
> Further, . . . on 12/11/97 Dr. Beavers of CORE . . . discussed Ms. Boone with
> her doctor, Dr. Vargo. While Dr. Vargo would not clear Ms. Boone to return to work,
> Dr. Vargo was "not sure" if she is any-occupation disabled and said that "there are no
> objective findings to report."
> Further, a Transferable Skills analysis identified various occupations that Ms.
> Boone might perform.

This determination was unreasonable because it was based on (1) disregard of whether

Boone's pain precluded her from working; and (2) an inadequate Transferable Skills Analysis.

Further, Boone was denied a full and fair review.

(a)    <u>Disregard of "Subjective Evidence"</u>

The record contains ample evidence establishing the severity of Boone's pain.[25]

_____

[25] <u>See, e.g.</u>, medical notes from Dr. L.S. Van Blaricom dated October 22, 1987 ("We ended up fusing only C4 because it was a larger defect but I was disturbed because she was in much more pain postoperatively than the average patient and eventually, her very large bone graft at C4 showed some fragmentation of the anterior margin."); letter from Dr. Vargo dated August 28, 1991 ("prolonged activity of any sort seems to aggravate her chronic pain."); medical note from Dr. Vargo dated June 17, 1994 ("Her chief complaint is left leg pain which starts in the left buttock and radiates down the lateral leg to her foot.  This is the same pain she has had for years. . . . Approximately five days ago, she developed intense left sided occipital headaches which been unrelieved with Vicodin."); Diary memo (presumably by Travelers) dated October 17, 1994 ("Very bad headaches continue . . . . When they come EE goes to bed until resolved.  If she doesn't goto [sic] bed, they become so bad, leads to vomiting."); Diary memo dated August 10, 1995 ("Based on Claimant's limited education and chronic pain not a candidate for rehab."); CORE Case Management Report dated November 21, 1996 ("She is unable to maintain any one position and cannot bend, kneel, lift, stoop or reach overhead without experiencing an increase in the overall pain.  Furthermore, this physician [Dr. Vargo] feels that she would not be able to perform even sedentary work due to the fact that she is totally focused on her pain level.  Based on the employee's experience, training and length of time out of work, coupled with the physical symptoms, the attending physician continues to deem the employee totally and permanently disabled from performing any occupation.  Recommendation: . . . A continuation of the LTD benefits . . . based on the chronicity and persistence of symptoms."); Medical notes from Dr. Vargo dated October 16, 1997 ("She has chronic pain on the left side of her body."); IME by Dr. Shields dated February 3, 1998 ("The focus of the pain is at the suboccipital level giving a general feeling of severe pain. . . . She lays down four to six times a day because of the pain."); Medical notes from Dr.  Maloney dated April 6, 1998 ("She requires frequent rests during the day, including lying down for treatment of neck and back pain. Ms. Boone complains of severe headaches and sensations of numbness, tingling, and weakness along the left side of the body. . . . Assessment: 1. Chronic, severe myofascial pain in the neck, shoulders, low back and hips associated with degenerative disc disease of the cervical spine. 2. Severe fibromyalgia associated with increased anxiety, reactive depression, and sleep disturbance.  3. Ms. Boone also exhibits some slowness of speech and difficulty with word finding."); letter from Boone dated April 8, 1998 ("The left side of my body is in pain all of the time. . . I can not  stand or sit long period of time if I need to lie down I do."); medical notes from Dr. Stringfield dated May 18, 1998 ("Assessment: 1. Persistent, severe fibromyalgia with sleep disturbance, increased anxiety and aerobic deconditioning.  2. Status-post seven cervical spine procedures with fusion between C3 and C6 and a nonunion between C6 and C7.  There is noted persistent muscle spasm in the neck with loss of lordotic curve."); letter from Dr. John Stringfield dated July 2, 1998 ("The patient has chronic neck and shoulder pain which has been significant."); letter from Dr. Vargo dated

-38-

Champion never found that this evidence was less than credible, or that Boone's pain levels were insufficient to prevent her from working.  Instead, it appears that Champion and CORE adopted the analysis of Dr. Marks that:

> Patients with neck pain, left arm and leg pain, without demonstrable neurological abnormalities . . . cannot be thought of as being disabled from any occupation, even though the individual patient may feel incapable of holding down a job.  To qualify for medical disability, employees must have objective organic abnormalities on physical exam, rather than a belief that they cannot work because of chronic pain.

Dr. Alan Marks, Peer Review Analysis for CORE dated May 7, 1998, quoted in CORE Confidential Service Report #1 dated May 13, 1998.

Failure to consider chronic pain and subjective evidence of disability permeates Boone's claims file.[26]  Most importantly, it is in the language used to explain the Claims Review Committee's decision to deny Boone's appeal.[27]  There is no evidence in the record suggesting that Boone's reports of pain were not credible, and the only evidence suggesting that she was

---

July 16, 1998 ("Because of her chronic pain I do not feel that she could work consistently enough at any type of job."); letter from Boone dated August 16, 1998 ("I have severe pain in my leg and hip and left side of my body.")

[26] See, e.g., Benefits denial letter dated July 2, 1998 ("In reaching our decision, we have relied on the following: . . .'this is largely subjective symptomalogy without demonstrable objective findings to qualify for medical disability.'"); CORE, Confidential Service Report #1; note from Dr. Beavers dated December 11, 1997 ("REcommendation [sic]: Do not certify any-occupation disability. . . Rationale: There is no objective evidence of disability."); I.M.E. Chart Preparation Form dated December 12, 1997 ("Please review for any occupation . . . If the employee has no work capacity what are the objective findings to support a disability.")

[27] The Court notes that despite Champion and Core's apparent conclusion that there was no objective evidence that Boone suffered from a physical abnormality underlying her pain, there appears to be significant evidence of such "abnormalities."  See, e.g., medical notes from Dr. Stringfield dated May 18, 1998 ("There was noted [on plain x-rays] a non-union at C6,7 and reversal of the normal curvature of the cervical spine due to muscle tightness or spasm.  There was also noted mild bony encroachment on the left neural foramen at C6,7.").

able to work was tainted by a failure to appropriately consider Boone's pain.  The Court finds

that Champion has failed to raise a genuine issue of fact about whether it adequately considered

Boone's pain in terminating her benefits.[28]

> (b)     The Transferable Skills Analysis was not a
>         Sufficient Basis for Concluding that Boone had
>         Residual Vocational Capacity

Even if Boone were indeed able to work six hours per day with the restrictions identified

by Dr. Shields, the Transferable Skills Analysis commissioned by CORE was an inadequate basis

for concluding that Boone had residual vocational capacity.  The Transferable Skills Analysis

was flawed because (1) it did not attempt to locate positions that were compatible with Boone's

full range of physical limitations; (2) it included positions at a higher skill level than appropriate

given Boone's work history; and (3) it did not attempt to confirm dated occupational information.

The Transferable Skills Analysis was based on physical restrictions of "[s]edentary - no

repetitive l[ef]t side lifting; no exposure to moving equipm[e]nt."  In addition to these

restrictions, according to Dr. Shields, Boone was unable to use her left hand for repetitive tasks,

could only perform light grasping tasks with her left hand one to two hours a day, and could not

perform any tasks requiring firm grasping or manual dexterity with her left hand.  Further, Dr.

Shields noted that Boone would need to be able to change positions on an hourly basis.

However, the Transferable Skills Analysis did not attempt to locate positions in which these

---

[28] Although Champion points to the fact that Dr. Shields' Independent Medical
Examination included a description of Boone's pain, this is not sufficient to establish a genuine
issue of material fact in light of the instructions for preparing the Independent Medical
Examination, Dr. Shields' own "Recommendations" section, and Champion's evaluation of the
Independent Medical Examination, all of which indicated that objective findings were required to
establish disability.

limitations would not be an obstacle.[29]

At the time her benefits were terminated, Boone was fifty-one years old and had obtained a General Equivalency Degree ("GED").  According to the DOT, Boone's work experience was at the unskilled level.  Accordingly, the inability to remain in one position for a prolonged period, or to use both of her hands on a regular basis, or for tasks requiring dexterity were substantial limitations of Boone's ability to perform sedentary work.

Further, the Transferable Skills Analysis would not have been an adequate analysis even of the vocational capacity of someone without Boone's physical limitations.  Nine of the fifteen positions identified by the Transferable Skills Analysis required greater skill than Boone's prior work.[30]  All of the occupational titles were last updated in 1977 and many of the positions were likely obsolete by 1998, the date of the analysis (e.g., positions related to asbestos or typewriters).[31]  See, e.g. DOT ¶ 679.687-010 (asbestos shingle inspector); ¶ 706.687-026 (typewriter type inspector).  Champion made no effort to determine whether these positions still existed in the national economy, or whether they were still performed in a similar manner in

_____

[29] In contrast, in Kirkpatrick's Transferable Skills Analysis, the following note is included: "All jobs classified in the Classification of Jobs resource require reaching, handling, and fingering to a degree.  The titles listed include one of the following combinations: reaching and handling frequently and fingering never or all movements, reaching, handling, and fingering on a frequent basis.  There were several other titles which could have been listed, yet they required reaching, handling, and/or fingering constantly which was not within Ms. Kirkpatrick's restrictions."

[30] In contrast, in Kirkpatrick's Transferable Skills Analysis, Mikeska excluded positions "not within appropriate SVP levels which indicate how long it takes a person to be able to perform the job satisfactorily."

[31] Indeed, in the Transferable Skills Analysis Mikeska prepared for Kirkpatrick she noted that a position related to typewriters "may no longer exist with the evolution of computers and the new technology."

1998.

Finally, because the Transferable Skills Analysis was not performed until just prior to the Claims Review Committee's evaluation of Boone's claim, Boone was not provided an opportunity to rebut its conclusions. Thus, Boone was denied a full and fair review.

Failure to consider the relevant factors also renders a benefits determination arbitrary and capricious. The Court finds that, reviewing the evidence in the administrative record in the light most favorable to the defendants and with deference, the evidence establishes that pain made it impossible for Boone to work. Champion was arbitrary and capricious in failing to consider Boone's pain an adequate basis for disability, in relying on a clearly inadequate Transferable Skills Analysis to determine that Boone had residual vocational capacity, and in failing to provide a full and fair review. Accordingly, summary judgment is granted in favor of Boone.

(2)    <u>Rosa Lee Brookshire</u>

Rosa Lee Brookshire was hired by Champion as an hourly employee in 1979. Brookshire worked as a "Rewinder Operator."

In January 1995, Brookshire left work on short term disability related to degenerative lumbar disc disease, osteoarthritis and obesity. In May 1995, Champion submitted a Long Term Disability claim on Brookshire's behalf. On July 13, 1995, Susan Kimel, a physical therapist, performed a Functional Capacity Evaluation on Brookshire to evaluate her eligibility for benefits. Kimel determined that Brookshire was "able to work at the SEDENTARY-LIGHT Physical Demand Level for an 8 hour day." Thus, the Plan determined that Brookshire was disabled from her position as a Rewinder Operator, a medium physical demand position, and approved her claim for long term disability benefits effective June 5, 1995.

On April 19, 1996, CORE notified Brookshire that it would be conducting an annual review of her long term disability claim.  In response, CORE received a statement from Brookshire's attending physician, Dr. Ernest Goodwin, which stated that Brookshire had severe pain and was disabled from any occupation.  Based on this report and a personal profile evaluation completed by Brookshire, CORE decided to continue Brookshire's long-term disability benefits until June 4, 1997, at which point it would re-examine her claim under the Plan's "any occupation" standard.

CORE re-opened its review of Brookshire's disability claim in June 1997.  On June 23, 1997, Dr. David Mulholland, Brookshire's new attending physician, reported that Brookshire would never be able to return to her previous position.  Dr. Mullholland further stated that Brookshire could work zero hours and that it was "unknown" when she would be released to full-time work activity.  On July 23, 1997, Dr. Beavers called Dr. Mulholland.  According to Dr. Beavers' notes of the call, Dr. Mulholland indicated that Brookshire was "probably capable of sedentary work."  Following his phone conversation with Dr. Beavers, Dr. Mulholland suggested Brookshire be given "a disability evaluation to determine what she is qualified to do," and prescribed a second Functional Capacity Evaluation for Brookshire.  A Functional Capacity Evaluation was subsequently administered by Kimel in September 1997.  Kimel concluded that Brookshire could work at the LIGHT Physical Demand Level for an 8 hour day.[32]

In October 1997, the Plan requested that Dr. Mulholland prepare a Modification

---

[32] While "Brookshire was informed that she would not be asked to perform any activity she did not feel she could perform, and she could stop any test secondary to pain if she so desired," Kimel found that Brookshire was performing at "partial submaximal effort."  Kimel also found that "[r]etesting with maximum effort would in our opinion yield a functioning ability less than the MEDIUM Physical Demand Level."

Checklist.  Dr. Mulholland stated, "I, myself, do not perform disability physicals nor do I disable people or recommend them to be disabled . . . I will not comment on Ms. Brookshire's disability."  Dr. Mulholland deferred to the opinion of Brookshire's previous physician (Dr. Goodwin), stating that Brookshire was "disabled until she is fully evaluated by a disability physician."  Id.  Dr. Mulholland also asked CORE to stop contacting his office.

Thereafter, CORE scheduled Brookshire for an Independent Medical Examination with Dr. Andrew Rudins, a physiatrist.  In December 1997, Dr. Rudins physically examined Brookshire and reviewed her September 1997 Functional Capacity Evaluation, Dr. Mulholland's physician's statement, Dr. Goodwin's physician's review note, x-rays of Brookshire's spine taken in 1995, an MRI performed in 1992, and a CT scan of her spine taken in 1994.  Dr. Rudins diagnosed Brookshire with "[d]egenerative disc disease of the lumbar spine, with associated myofascial pain on a chronic basis, and obesity."  Dr. Rudins concluded that:

> Ms. Brookshire is presently at a light physical demand level.  I believe that she is capable of working full time 8 hours per day, but at a maximal lifting capacity of 15 pounds on an occasional basis, 10 pounds frequently, and 5 pounds constantly.  She should be allowed to frequently change positions, at a minimum of once an hour from sitting to standing to walking.  She is unable to do any significant degree of bending, twisting, squatting, kneeling, or crawling.  Pushing and pulling is limited to 30 pounds occasionally, 20 pounds frequently, and 10 pounds constantly.

Finally, Dr. Rudins noted that Brookshire's "partial disability and current restrictions are for all practical purposes permanent, though as noted above, she may potentially be able to increase her capabilities through a work hardening program."  Champion reviewed Dr. Rudins' proposed restrictions and responded that it was unable to accommodate such restrictions at that time.

By letter dated December 18, 1997, on CORE letterhead, Dr. Beavers informed

-44-

Brookshire that her long term disability benefits were being terminated because she was "not disabled as defined in the Plan." The denial letter referenced Dr. Rudins' report, which stated that Brookshire could work eight hours per day, five days per week, as support for Champion's decision to terminate her benefits. Id. On February 2, 1998, Brookshire requested reconsideration of the decision, but submitted no new medical information. On May 1, 1998, Champion notified Brookshire that, based on the information she had submitted, the "information does not substantiate your disability" and therefore Champion decided to "uphold the denial of LTD benefits."

On May 22, 1998, Brookshire appealed the termination of her benefits. In support of her appeal, Brookshire submitted a January 1998 progress note from Dr. Stewart J. Harley, and a Notice of Award of benefits from the Social Security Administration.[33] Dr. Harley reviewed Brookshire's x-rays from 1994 and 1995, as well as the x-rays taken on January 26, 1998. He wrote, "There is very obvious progression of the degenerative arthritis in her lumbar spine." Dr. Harely diagnosed Brookshire with "chronic disabling back pain secondary to DDD [degenerative disc disease] L4-5, L5-S1." Dr. Harley also concluded that Brookshire "could return to work but with severe restrictions." He continued, "If the patient is unable to perform that highly restricted job because of her persistence of pain, then I think this lady should remain on long-term disability until her retirement commences."

In July 1998, Mikeska performed a Transferable Skills Analysis on Brookshire. Mikeska determined that there were several sedentary and light duty positions Brookshire could perform.

---

[33] The Social Security Administration found Brookshire to be disabled effective January 2, 1995 and she became eligible for social security benefits beginning in July 1995.

CORE also commissioned Dr. John Nemunaitis, a Physical Medicine/Rehabilitation specialist, to conduct a peer review analysis of Brookshire's appeal.  After reviewing Brookshire's claim, Nemunaitis recommended that "the decision of denial be upheld, for the patient is not disabled for any occupation."

On August 27, 1998, the Plan informed Brookshire that her claim for benefits would be reviewed at the September 24, 1998, Claims Review Committee meeting.  The letter did not inform Brookshire of the Transferable Skills Analysis or its results.

After meeting and reviewing Brookshire's claim, the Claims Review Committee voted to uphold the denial of Brookshire's claim.  Brookshire was informed of the denial on October 23, 1998.  According to its meeting minutes the Committee voted to uphold termination of Brookshire's benefits because:

> Dr. Mulholland had not disabled her and felt that "she is probably capable of sedentary work . . ." The FCE found that Ms. Brookshire is able to work at the light physical demand level for an 8-hour day. . . Dr. Rudins found that Ms. Brookshire can "work at some occupation" with restrictions. . . The [IME] modifications checklist stated that Ms. Brookshire can work 8 hours a day, 5 days a week . . . Dr. Harley stated that "I think she could return to work but with severe restrictions."

_____Brookshire argues that Champion's denial of her long term disability benefits should be reversed because Champion did not accord her a full and fair review of her claim.

The Court finds that Champion's conclusion that Brookshire had the capacity to work at the sedentary level was supported by substantial evidence in the Record, and that Brookshire has not raised a genuine issue of material fact that Champion disregarded contrary evidence or failed to consider the appropriate factors in making this determination.  However, Champion did not notify Brookshire that it was seeking an additional evaluation of her vocational capacity in connection with the appeal nor did it give her a copy of the Transferable Skills Analysis so as to

enable her to exercise her right to submit issues and comment in writing.  Because of Brookshire's age, limited education, history of low-skill work, and the scope of her physical restrictions, her residual vocational capacity was an important issue in determining whether she was disabled from any occupation.  Thus, Brookshire was denied a full and fair review.  Champion's failure to comply with ERISA's full and fair review mandate rendered its decision arbitrary and capricious.  Accordingly, summary judgment is granted in favor of Brookshire.

(3)    <u>Harrison Young Clark</u>

Champion hired Harrison Clark as an hourly employee in May 1981.  In 1984, Clark suffered a work-related back injury.  Clark returned to work approximately eighteen months after the injury, and was assigned work as a "lab tester."  Some time later, he was transferred to more physically demanding work in the causticizing area of Champion's plant.  Clark remained in this position for less than a year, before being removed because of his physical limitations.  Clark remained out of work for several months before being returned to work by Champion as a production clerk.  In this position, Clark was responsible for filing manifest copies.

Clark stopped "all work activity" in December 1990 because of "chronic moderate to severe low back pain radiating into both legs on a sustained basis," among other problems.  Vocational Rehabilitation Report dated May 28, 1991.  Clark began receiving short term disability benefits in December 1990.  In June 1991, Clark applied for long term disability benefits and, in July 1991, the Plan approved his claim.

In May 1991, a Vocational Rehabilitation Report was performed by Stephen Carpenter, a Vocational Rehabilitation Counselor.  Carpenter noted that Clark "has great difficulty with his concentration and does not pay attention well because he is focused on his severe back pain."

-47-

According to Carpenter, Clark reported "that he must constantly change positions with regard to walking, standing, and sitting every 10 to 15 minutes." Carpenter also noted that Clark had an eighth grade education and concluded that Clark was not employable.

In March 1992, Carpenter evaluated Clark a second time. Carpenter noted that Clark continued to have limitations related to sitting, standing and walking and that he had difficulty sleeping at night. Carpenter again concluded that Clark was not employable.

On September 15, 1992, Clark was awarded Social Security disability benefits following a hearing before J. Cleve Miller, an administrative law judge. Judge Miller concluded in his Decision that Clark "has a combination of impairments, including severe pain, borderline intellectual functioning, and adjustment disorder with physical complaints, which prevents him from engaging in substantial gainful activity at any level of exertion in the national economy." Although the full Decision, including this analysis, was in Clark's claims file, it was not provided to the Claims Review Committee.

In December 1993, Champion evaluated Clark's eligibility for continued benefits under the "any occupation" standard. In reviewing Clark's eligibility, Travelers noted that Vocational Assessments by Carpenter provided an "excellent detailed hx [history]." The review concluded that Clark was eligible for benefits under the "any occupation" standard "based on documented dx [diagnosis], 2 voc[ational] assessments indicating e[mploye]e not employable and e[mploye]e's indication of severe limitations."

In January 1994, Clark entered into a $90,000 lump sum settlement agreement with Champion for workers' compensation benefits. The parties agreed that this amount would be "considered to be ONE HUNDRED SEVENTY-FIVE AND 71/100 ($175.71) per month" and

-48-

that Clark's "entitlement to monthly benefit payments for long-term disability will be offset by the amount paid pursuant to this Agreement."

Thereafter, Champion continued to review periodically Clark's eligibility for continued disability benefits.

In June 1997, CORE contacted Clark and requested updated medical information. On August 21, 1997, Dr. Daniel Eglinton, Clark's treating physician and an orthopaedist, submitted an Attending Physician's Statement indicating that Clark suffered from restless leg syndrome[34] and fibromyalgia.[35] According to Dr. Eglinton, Clark was totally disabled from any occupation and could not work at all. The statement also indicated that Clark could only sit, stand, and walk for thirty minutes at a time.

However, after speaking with Dr. Beavers, Dr. Eglinton submitted office notes indicating that he could not "certify Harrison is totally and completely disabled from all work activity."

Based on Dr. Eglinton's office notes, Dr. Beavers recommended that the Plan "not certify disability from any occupation." Next, CORE referred Clark for a Functional Capacity Evaluation with Charles Robbins, P.T. During his evaluation, Clark indicated that his pain

---

[34] Restless Leg Syndrome results in uncomfortable sensations in the legs accompanied by an irresistible urge to move about. Charles B. Clayman, The American Medical Association Encyclopedia of Medicine 866 (Random House 1989). Restless Leg Syndrome often results in an inability to sleep and thus causes exhaustion. The Merck Manual of Diagnosis and Therapy 1843 (Mark H. Beers et al. eds., Merck Research Laboratories 18th ed. 2006)

[35] Fibromyalgia is characterized by widespread chronic pain in the muscles, ligaments, and tendons, combined with fatigue and multiple tender points. There is no "specific histologic abnormality" and pain may be "disproportionate to the physical findings." The Merck Manual of Diagnosis and Therapy 321-322 (Mark H. Beers et al. eds., Merck Research Laboratories 18th ed. 2006). "Patients tend to be stressed, tense, anxious, fatigued, striving, and sometimes depressed." Id.

intensity was "at a #8 (intense) on the Numerical Pain Scale" and that "in the past 30 days has varied from an 8 to a 10 (emergency)." Robbins concluded that "because of high pain levels and hesitation by Mr. Clark to complete all tests, I am unable to indicate that [Clark] is capable of returning to work." However, Robbins noted that Clark's "overall effort is considered submaximal" and anticipated that "with a maximal effort, performance would be improved." Robbins also completed a modification checklist indicating that Clark could sit at most 33% of a workday, stand for up to 33% of a day, and perform repetitive leg or arm movements for up to 33% of a day.

On October 23, 1997, CORE forwarded a Modification Checklist to Dr. Eglinton. Dr. Eglinton completed the Checklist and indicated that Clark could work four to six hours a day, three to four days a week at a sedentary job with restrictions. In particular, Dr. Eglinton found that Clark should be permitted to change positions between sitting and standing at least every thirty minutes. Dr. Eglinton also noted that Clark might have hearing deficits. In response, CORE recommended that Clark undergo an Independent Medical Examination.

Dr. Rudins was commissioned to complete the Independent Medical Examination of Clark. Dr. Rudins noted that Clark had experienced difficulty performing a clerical position before stopping work because of pain and concentration problems. Dr. Rudins also reported that Clark was "unable to sit for any prolonged period of time, often requiring changing positions." Dr. Rudins diagnosed Clark with a chronic lumbosacral sprain, restless leg syndrome, and severe chronic pain/disability syndrome. Dr. Rudins opined that "Mr. Clark's perception of his disability is much greater than any objective evidence indicates."

Dr. Rudins concluded that Clark could work "at a sedentary level at least 8 hours per day"

as long as he was allowed to change positions at least every fifteen minutes.  However, he also found that Clark "really has no significant objective findings to limit him to a sedentary work capacity.  This restriction is based predominantly on his past history and submaximal performance on the FCE."

On February 4, 1998, Dr. Beavers notified Clark that his long term disability benefits would be terminated because he was "not disabled as defined in the Plan."  Dr. Beavers informed Clark of his right to appeal the decision.  On the same date, CORE forwarded a Confidential Service Report to Champion indicating that "estimated savings to date" on Clark's claim were $4,469.36 and noting that "[i]t is anticipated that the employee would have remained on LTD benefits if it had not been for Case Management's intervention."

On April 3, 1998, Clark requested that the Plan review its decision to terminate his benefits.  In support of his request for review, Clark noted that the Social Security Administration had continued his social security benefits until August 2004.  Clark also submitted a letter describing the history of his disability and a letter from Dr. Robert Harned, a psychiatrist, indicating that Clark suffered from major depressive disorder.

CORE commissioned Dr. Frank Nisenfeld to conduct a peer review analysis of Clark's claim.  Dr. Nisenfeld reviewed a "CHAM referral form and submitted medical records" and concluded that "[t]here was no documentation of anything in the records which would totally disable him from any and all employment."  Peer Review Analysis dated April 21, 1998.  Dr. Nisenfeld noted that Clark "did light work for a while and did okay, but the back deteriorated when he was returned to the physical demands at work . . . . The fact that he is unable to do heavy physical labor does not physically disqualify him from all work."  Id.  Thus, Dr.

Nisenfeld's conclusion may have been affected by a misunderstanding about Clark's work history.

On April 30, 1998, CORE recommended that the Plan uphold denial of Clark's claim for long term disability benefits effective February 3, 1998, "based on the CORE Inc. physician consultant's decision on appeal, that the employee is not disabled from performing any occupation." On May 29, 1998, the Plan informed Clark that his claim was denied and informed him of his right to obtain further review. By letter dated July 27, 1998, Clark's legal counsel requested a review of the Plan's decision.

On September 2, 1998, CORE commissioned a Transferable Skill Analysis to be performed on Clark. Mikeska performed the Transferable Skills Analysis and identified several occupational titles that she found conformed with Clark's physical restrictions and listed skills. Thus, CORE recommended that the Plan "uphold the denial of LTD benefits."

On November 6, 1998, the Plan notified Clark's counsel that Clark's claim would be reviewed at the Claims Review Committee's December 2, 1998 meeting. The letter did not indicate that CORE had commissioned a Transferable Skills Analysis of Clark, nor did it inform Clark of the results.

In advance of the meeting, Clark forwarded to the Committee a medical note from Dr. Craig A. Mills indicating that Dr. Mills found that Clark was "totally disabled from his fibromyalgia" and "is unable to work." In response, CORE requested another peer review analysis from Dr. William Augerson, an internist. Dr. Augerson was instructed to "contact the attending physician and report your opinion of the employee's disability status." According to Dr. Augerson, Dr. Mills' note only related what Dr. Mills "thought a rheumatologist and

orthopedic surgeon had concluded about disability" and that he had only treated Clark for
diabetes.  Further, according to Dr. Augerson, Dr. Mills "could not provide information about
impairments of [activities of daily living] nor any compelling reason why sedentary work was
impossible."  Thus, Dr. Augerson reported that "he cannot conclude this claimant is totally
disabled, though impaired, sedentary work should be possible."

On December 2, 1998, the Claims Review Committee met and voted to uphold the denial
of Clark's claim for long term disability benefits.  The plan considered the following in deciding
to terminate Clark's benefits:

> On 8/25/97, Dr. Beavers of CORE had a discussion with Dr. Eglinton, Mr.
> Clark's doctor.  Dr. Eglinton said that Mr. Clark "is not disabled from any occupation
> and that there are jobs he could do".  On 10/15/97, a Functional Capacity Evaluation
> found that Mr. Clark is capable of a sedentary physical demand level of work.  Dr.
> Eglinton signed a Modification Checklist on 11/5/97, stating that Mr. Clark can work
> 4-6 hours a day, 3-4 days a week in a sedentary job with restrictions.  An Independent
> Medical Evaluation was performed by Dr. Rudins on 1/12/98.  Dr. Rudins found that
> Mr. Clark "does have a work capacity, though at a sedentary level at 8 hours per day"
> with restrictions.  Dr. Rudins also stated that he "really has no significant objective
> findings to limit him to a sedentary work capacity" and that "his work capacity can be
> potentially increased".  Dr. Rudins' Modification Checklist stated that Mr. Clark can
> work 8 hours a day, 5 days a week in a sedentary job.  A Transferable Skills Analysis
> identified potential jobs that Mr. Clark could perform.
> Mr. Clark's attorney, Lori Loftis, submitted additional information in this case
> by letter dated 11/24/98.  With that letter she forwarded Dr. Mill's [sic] evaluation of
> Mr. Clark.  The Committee considered Dr. Mill's [sic] report, noting that both Ms.
> Loftis and Dr. Mills made several conclusions regarding Mr. Clark's medical
> condition which were not supported by any objective information.  Dr. Mills
> discussed Mr. Clark's diabetes but did not say that Mr. Clark was disabled due to
> diabetes.

On January 29, 1999, Clark was informed of the Committee's decision.

This determination was arbitrary and capricious because it was based on an inadequate
Transferable Skills Analysis, and Clark was denied a full and fair review.

(a)     Inadequate Transferable Skills Analysis

_____The Transferable Skills Analysis was not a valid basis for determining that Clark had residual vocational capacity.  The Transferable Skills Analysis made assumptions unsupported by the administrative record about Clark's skill levels, and failed to take into consideration Clark's full range of physical, and cognitive or psychological limitations.

_____According to the Transferable Skills Analysis, Clark's prior positions with Champion were, "Production Clerk," "Caustisizer," and "Laboratory Clerk."  In 1984 when he was injured, Champion described Clark as a "transfer pool employee [who] works on any job where there is a need."  Around 1988, Clark was assigned to work as a "Vacancy Replacement" in "Caustisizing," but did not stay in this position long because of his physical limitations.  In 1991, Champion described Clark's most recent position as "Transfer Pool Employee–Human Resources At time absence began–Production Log Clerk–Desk Job Clerk Work–Filing–."

Clark's 1991 and 1992 Vocational Reports provide additional information about Clark's work history indicating that he worked as a laboratory clerk and production clerk only briefly, and that he did not acquire any transferable skills from these positions.  According to the 1992 report, Clark's "Production Clerk" position was "an unskilled clerical job filing manifest copies."

In contrast, the 1998 Transferable Skills Analysis applied DOT code 221.167-018 (Production Coordinator) to Clark's "production clerk" position.  This code corresponds to a skilled position requiring one to two years of specialized training.  According to the DOT, a production coordinator "[s]chedules and coordinates flow of work within or between departments of [a] manufacturing plant to expedite production."  There is no basis in the Administrative Record for finding that Clark performed this position.

_____The Court finds that there are issues of fact concerning whether Champion appropriately

considered evidence that Clark's subjective pain prevented him from working even at the

sedentary exertional level.  However, resolving these issues in favor of the defendants, Clark

could work at most at the sedentary level with changes in position at least every thirty minutes.[36]

Clark's ability to work was further reduced by his limited education and job skills.  Because

these factors constitute significant limitations of Clark's ability to perform sedentary work, a

vocational analysis should have considered them.  Reliance on a Transferable Skills Analysis that

did not consider these factors was a clear error of judgment.

In addition, Clark was not informed of the Transferable Skills Analysis, or that CORE

was seeking additional information from Dr. Mills for the purposes of Clark's appeal.  Clark had

no opportunity to rebut the Transferable Skills Analysis, or to comment on the additional

information provided by Dr. Mills.  Clark was thus denied a full and fair review.

The Court further finds that the decision of the Claims Review Committee was arbitrary

and capricious because the full text of the Judge Miller's Decision evaluating Clark's eligibility

for Social Security disability benefits was not before the Committee.[37]  Accordingly, summary

---

[36] According to Carpenter's 1991 report, the sedentary positions Champion created for Clark "required no strenuous physical demands, and the injured worker was able to adjust his standing, walking, and sitting as needed."  Nonetheless, according to Carpenter, Clark was "unable to continue this job . . . because of chronic moderate to severe low back pain on a sustained basis."

[37] While a benefits determination "is not arbitrary and capricious simply because it differs from that of the [Social Security Administration],"  Nelson v. Unum Life Ins. Co. of Am., 421 F. Supp. 2d 558, 571 (E.D.N.Y. 2006),  the Committee nevertheless was required to review the Social Security decision because it was one piece of evidence in the administrative record.  See Crocco v. Xerox Corp., 956 F. Supp. 129, 139 (D. Conn. 1997), aff'd in relevant part 137 F.3d 105, 28(2d Cir. 1998) ("[T]he plan's fiduciary must consider any and all pertinent information reasonably available to him."); Neely v. Pension Trust Fund of the Pension, Hospitalization and Benefit Plan of the Elec. Indus., No. 00 CV 2013(SJ), 2004 WL 2851792, at *11 (E.D.N.Y. Dec. 8, 2004).
In this case the Administrative Law Judge's ruling was particularly relevant because it

judgment is granted in favor of Clark.

(4)    Wiley Haynes

Haynes was hired as an hourly employee by Champion in 1958. In 1979, he underwent

back surgery. Despite persistent pain, he returned to work at Champion after recovering. See,

e.g., Independent Medical Evaluation dated January 20, 1997. In 1990, Haynes underwent a

second back surgery and again returned to work despite "regional low back pain" and "recurrent

flare-ups." Id. In August 1993, when Haynes was working as a "Machine Back Tender," he left

work on short term disability related to degenerative disc disease and degenerative joint disease.

Haynes attempted to return to work and completed a "work hardening" program, but was

unsuccessful; after working for four hours he was in too much pain to continue.[38]  See, e.g.,

Attending Physician Statement dated February 3, 1994 ("This patient has worked hard in rehab

program and has tried very hard to return to work–without success.").

On February 21, 1994, the Plan approved Haynes' claim for long term disability benefits.

_____

commented on the credibility of Clark's reports of pain, and discussed non-exertional limitations
on his ability to work. Lijoi v. Cont'l Cas. Co., 414 F. Supp. 2d 228, 246 (E.D.N.Y. 2006)
(noting the importance of an "explicit credibility determination made by [an administrative law
judge], after a full hearing with live testimony").

[38] According to Dr. Queen:
[Haynes] was actually very excited about his response to physical therapy and
enthusiastic that he might be able to return to his job and perform adequately.
     The patient found that after approximately 2 ½ hours of work that he began to
have increasing back discomfort with burning. This was initially relieved with sitting,
but within the next several hours was severe, even in the seated position. By the time
the patient returned home, he had a severe exacerbation of back discomfort which
took the application of heat, ice and the application of a TENS unit.
     The patient was unable to return to work the following day and has made the
decision to seek long-term disability which has been difficult for him to accept.
Medical notes dated February 3, 1994.

At that time, Travelers determined that Haynes was not a candidate for rehabilitation because of factors including his age.  Vocational Rehabilitation Profile dated February 22, 1994 (noting that Haynes was "too impaired at present" for rehabilitation).  In December 1994, the Social Security Administration notified Haynes that his application for Social Security disability benefits had been approved.

In August 1995, the Plan requested information from Haynes to determine whether he was disabled from any occupation.[39]  Haynes' treating physician, Dr. Kate T. Queen, submitted an Attending Physician Statement indicating that she had diagnosed Haynes with "severe deg[enerative] disc dz. [disease], lumbar spine w/ osteoarthritis and intermittent sciatica.  S/P [status post] surgery x2."[40]  Attending Physician Statement, August 29, 2005.  Dr. Queen again noted that Haynes "has worked very hard in rehab program to return to work - But without success.  Recommend long term - total disability."  She concluded that Haynes could not sit, stand, walk, or perform tasks requiring manual dexterity to any degree in a work environment.  Physician's Report of Physical Capacity dated August 30, 1995.  Dr. Queen also submitted medical records indicating that Haynes had recently suffered an episode of severe back pain after attempting to start a lawnmower.  Medical notes dated August 17, 1995.  During that eight day period, Haynes was unable to stand upright, spent his days in bed, and crawled to use the bathroom.  Id.  Haynes also submitted a personal profile evaluation indicating that he could not

---

[39] Although the "any occupation" standard would not have applied until early 1996, the parties agree that the Plan determined that Haynes was eligible for benefits under the "any occupation" standard in September 1995.

[40] "Sciatica is pain along the sciatic nerve."  The Merck Manual of Diagnosis and Therapy 327-328 (Mark H. Beers et al. eds., Merck Research Laboratories 18th ed. 2006).  "Symptoms include pain radiating from the buttocks down the leg."  Id.

"sit or stand for any length of time."  Personal Profile Evaluation dated August 25, 1995

(indicating that Haynes was able to drive for thirty minutes at a time).

On September 29, 1995, the Plan determined that Haynes qualified for benefits under the

"any occupation" standard.  At that time, Travelers again concluded that Haynes was not a

candidate for rehabilitation despite his desire to return to work.  Vocational Rehabilitation Profile

dated September 29, 1995.

In March 1996, CORE requested updated medical information from Haynes.[41]  In

response, Dr. Queen completed an Attending Physician Statement indicating that Haynes was

unimproved and totally disabled from any occupation.  Dr. Queen also submitted medical records

indicating that Haynes had a "continuing need for caution about activities" because of

"intermittent exacerbations [of his back pain] with routine daily activities."  Medical notes dated

February 14, 1996.  For example, the notes reported that, after sneezing, Haynes suffered a

"exacerbation" of his back pain requiring several days of bed rest.  Id.

However, Dr. Queen declined to complete the "Restrictions and Limitations" portion of

the Statement because "we do not do these evals."  Instead, Dr. Queen referred Haynes to Kimel

for a Functional Capacity Evaluation.

Kimel concluded that Haynes could "work at the SEDENTARY-LIGHT Physical

Demand Level for an 8 hour day."  Functional Capacity Evaluation dated October 21, 1996.  The

---

[41] According to Haynes, he submitted a Personal Profile Evaluation in March 1996.
However, this document does not appear in the records submitted to the Court.  Because the
documents in Haynes' claims file are not Bates stamped with continuous numbers it is
impossible to draw any inference about whether Champion received this document.  The
documents in the Claims Review Committee file are continuously numbered.  Accordingly, it is
possible to determine that the document was not submitted to the Claims Review Committee.

FCE found that Haynes could sit up to 66% of a workday and could stand 33% of the day. Kimel also concluded that Haynes had "good fine motor skills," but that he was "classified at the Low Speed Assembly classification." Kimel also noted that Haynes limped and that his movement patterns were a "good correlation with the pain rating."

On November 27, 1996, CORE contacted Dr. Queen and requested that she prepare a Modification Checklist for Haynes based on the FCE, but Dr. Queen did not complete the Checklist. CORE then requested that Dr. Augerson complete a Peer Review Analysis of Haynes' claim. According to Dr. Augerson:

> The claimant has limited ability to walk very far, to lift, bend or stand for prolonged periods. His disability has been psychologically devastating for the patient and the record documents substantial cooperation by the patient with physical aspects of rehabilitation.
> The attending physician says she determined disability in the context of the jobs available for the patient and no one had previously discussed vocational rehab efforts with her. The attending physician agrees with the . . . [FCE] that the patient can move some, sit, drive, and could, perform some sedentary work if he had the requisite skills.
> I and the attending physician therefore do not conclude that the patient is disabled from all work, though he is significantly impaired.
> I agree with the attending physician that the patient might require some vocational instruction to perform sedentary work.

Peer Review Analysis, December 4, 1996.

CORE asked Dr. Queen to elaborate on her statement to Dr. Augerson that Haynes "can perform a sedentary job with proper training." Dr. Queen responded by summarizing Haynes' medical problems and noting that he was "limited in his activities because of his back condition;" osteoarthritis in his hands, his foot, and his knees; plantar fascitis; and carpal tunnel syndrome. Dr. Queen also noted that Haynes was totally and permanently disabled under the Social Security Disability Program, but concluded that she was unable to

"offer any other objective or substitutive way . . . [to clarify] his current status."

CORE next commissioned Dr. Peter Johnson to conduct an Independent Medical Examination of Haynes. Dr. Johnson noted that Haynes was flexed at the waist and neck, unable to heel or toe stand, had a reduced lumbar lordotic curve, and that he had a "mild antalgic gait."[42] Independent Medical Evaluation, January 20, 1997. Dr. Johnson also noted that Haynes made frequent position changes during his interview and examination and that he had marked back and leg weakness. Id. According to Dr. Johnson, Haynes reported that he was unable to walk for more than five minutes, that his sleep was disturbed by pain, and that he required periodic bed rest lasting days at a time. Id. Dr. Johnson found that Haynes "had recurrent back problems and is left with chronic back pain which is regional in nature" and had "degenerative disk changes as well as arthritic changes in his back and in the small joint of his hands and in the weight bearing joints by history." Id. However, based on the results of the functional capacity evaluation, Dr. Johnson concluded that Haynes could work at the sedentary physical demand level. Id.

On February 6, 1997, the Plan notified Haynes that his long term disability benefits had been terminated and informed Haynes of his right to request review of the Plan's decision.

On February 17, 1997, Haynes requested review of the Plan's decision. In support of his appeal Haynes submitted a personal statement indicating that he suffered from a degenerative back condition, carpal tunnel syndrome, tendonitis, and degeneration of his right

---

[42] An antalgic gait is assumed in order to avoid or lessen pain. Stedman's Medical Dictionary (27th ed. 2000).

knee joint.  February 17, 1997 letter.  In the letter, Haynes indicated that the FCE lasted

between forty-five minutes and one hour.  Id.  Haynes reported that he had recently visited an

emergency room because of his pain.  Id.  According to Haynes' statement, he could not

participate in activities such as attending church services, sporting events, or movies because

he was unable to stand or sit for a long enough period of time.  Id.  He also reported that he

was unable to complete a two-day painting class because of pain.  Id.  Further, Haynes stated

that, at times, he was unable to perform basic self-care, such as buttoning his shirt, putting on

socks, or entering the bathtub without assistance.  Id.

     Haynes also submitted examination notes and a letter from Dr. Queen dated February

19, 1997.  Dr. Queen's letter stated that Haynes "has a long-standing history of degenerative

disc disease and generalized osteoarthritis with involvement in multiple joints."  February 19,

1997 letter.  Dr. Queen wrote that she had "serious concerns" about the conclusion that

Haynes could perform sedentary work because "he has difficulty with certain activities of

daily living and has never been able to sit or stand for any period of time."  Id.

     By letter dated May 9, 1997, Dr. Queen submitted additional examination notes and

indicated that Haynes reported increased pain due to a "very mild increase in his activity

level" and that he was "ambulating with a cane" due to pain in his knee.  April 25, 1997

Medical Notes.  After reviewing this information, the Plan notified Haynes that it had

decided to uphold the denial of his claim for long term disability benefits and informed

Haynes of his right to appeal the Plan's decision.

     Haynes appealed this decision, stating that he disagreed with the conclusion of the

Independent Medical Examination.  Haynes reported that the Functional Capacity Evaluation

caused his "pain index to go up to about an (8)" and that following the exam he "was in bed on a heating pad for (2) days." Haynes reiterated that he had trouble dressing himself because of his pain and reported that his pain recently was so bad that he had to use crutches to ambulate.

In addition, Haynes' wife submitted photographs of his hands depicting the results of his arthritis. These photographs are included in Haynes' claims file, but are not in the Claims Review Committee binder.

By letter dated August 20, 1997, Dr. Queen submitted an update on Haynes' medical condition reiterating his difficulties with sitting and standing and indicating that she now was able to diagnose him with having rheumatoid arthritis, in addition to his ongoing problems with low back pain, peripheral joint pain, stiffness, and swelling. Dr. Queen further stated that she thought that the decision that Haynes was capable of returning to work was "inappropriate and unrealistic."

On August 27, 1997, the Plan informed Haynes that the Claims Review Committee would consider his appeal. At its November 25, 1997 meeting, the Committee voted to uphold the denial of Haynes' claim for benefits. On December 26, 1997, the Plan informed Haynes of its decision. According to the meeting minutes, the Committee denied Haynes' appeal because the Functional Capacity Evaluation indicated that Haynes was "able to work at the sedentary-light physical demand level for an 8 hour day" and the Independent Medical Evaluation indicated that he was "able to function at a sedentary physical demand level; and that he would have restrictions on material handling and would require flexible postures; that he could not squat, kneel or crawl but would be able to work 40 hours per week within the

-62-

limits of the Functional Capacity Evaluation."

(a)    The Aggregate Evidence does not Support a
Rational Termination of Benefits

Reviewing the aggregate evidence in Haynes' claims file in the light most favorable to the

defendants, the Court finds that it does not support a rational decision to terminate Haynes'

benefits.  Haynes' presented overwhelming evidence that he suffered from periodic debilitating

pain.[43]  While there was some evidence that Haynes could perform at the sedentary exertional

level on a one-time basis, there was no evidence that Haynes could sustain this level of

performance on a daily basis.  Indeed, attempting to return to work, completing the functional

capacity evaluation, and even ordinary daily activities caused Haynes to suffer incapacitating

pain.  Dr. Queen warned that any increase in his activity level would further exacerbate Haynes'

pain.  The record does not suggest that Haynes' reports of pain were unreliable, or that Champion

questioned its intensity.

_____

[43] In addition to the evidence referred to in text above, see, e.g., Medical notes from Dr. Queen dated March 19, 1993 ("The patient continues to have intermittent episodes of low-back pain with a flare-up of back pain which can be precipitated with minimal activity.  The patient has severe pain which required strict bed rest for 1-2 weeks."); Medical notes from Dr. Queen dated November 22, 1993 ("has difficulty with certain activities around the house.  Has daily pain.  Is able to get some relief with recumbancy."); December 1, 1993, Initial Evaluation by Kimel ("Mr. Haynes presents with a very painful back.  He is currently unable to stand erect.  He must lean on the table, or lie down.  Sitting is not comfortable for him."); January 23, 1994, Statement of Claim ("On my bad days I cannot sit long enough to eat a meal.  I have trouble dressing because of sore + stiffness – Need someone to drive me to doctor's office."); December 6, 1994, Personal Profile ("I have pain walking, standing, sitting + cannot lift any object that weighs 30 lbs. or more.  I walk with a cane on my bad days to steady myself."); Medical notes from Dr. Queen dated February 19, 1997 ("History of chronic back low back pain status post lumbar spine surgery on two occasions with disabling back dysfunction . . . . Continues to have significant back pain, continues to be very limited in his ability to sit or stand for any period of time. . . . The patient has difficulty assuming upright position, tends to walk slightly flexed at the waist."); Medical notes from Dr. Queen dated April 25, 1997 ("The patient is ambulating with a cane in his right hand because of his knee pain.").

(b)     Failure to Consider Vocational Limitations

_____Further, even if Haynes was able to perform at the sedentary level on a sustained basis,

Champion was unreasonable in failing to consider his vocational limitations; an issue raised by

CORE's own peer reviewer.  As Dr. Augerson noted, Haynes was "significantly impaired" and

"might require some vocational instruction to perform sedentary work."  Further, in 1997,

Haynes was fifty-eight years old, had been out of work for an extended period, and had a limited

ability to sit, stand, and walk.  However, Champion made no attempt to evaluate Haynes'

residual vocational capacity to determine whether he was "reasonably qualified by training,

education or experience" for any position.  Accordingly, Champion's decision to terminate

Haynes' benefits was arbitrary and capricious and summary judgment is granted in favor of

Haynes.[44]

(5)     Judith Case Kirkpatrick

Champion hired Kirkpatrick as an hourly employee at Champion in 1976.  Her most

recent position was as a "poly recovery helper."  In November 1993, Kirkpatrick left Champion

on short term disability.  Kirkpatrick received short term disability benefits until May 1994.  In

May 1994, Kirkpatrick began receiving long term disability benefits.

In July 1996, CORE commissioned a "peer review analysis" of Kirkpatrick's continued

eligibility for benefits under the "any occupation" standard.  The report prepared by Dr. Rose Fife

concluded that Kirkpatrick "could perform less than sedentary work, such as that which would

have no repetitive use of the upper extremities, if she were appropriately trained, and if such

---

[44] Further, the Claims Review Committee's decision was also arbitrary and capricious because it did not have all of the material Haynes submitted before it.

work were available." CORE recommended continuation of Kirkpatrick's benefits "[i]n light of Ms. Kirkpatrick's age, education, and lack of transferable skills." Confidential Service Report #1, July 22, 1996.

In May 1997, Dr. Steven Mendelsohn, a rheumatologist and Kirkpatrick's treating physician, noted that Kirkpatrick's condition was unimproved, but that "she could possibly do a light sedentary type work but she has no job experience with the above." Attending Physician Statement dated May 9, 1997. In its May 1997 Service Report, CORE noted that Dr. Mendelsohn "continues to feel that medically and vocationally [Kirkpatrick] continues to be disabled from performing any occupation." Confidential Service Report #2 dated May 15, 1997.

In March 1998, Champion and CORE initiated a review of Kirkpatrick's continued eligibility for benefits. In response, Kirkpatrick submitted a Personal Profile Evaluation dated April 8, 1998. Kirkpatrick indicated that she had "constant pain from her waist to the bottom of her foot, left shoulder, elbow and hands," and "swelling in her hands, knees, calves of legs and feet." According to Kirkpatrick she had sought the assistance of a psychologist to help deal with the pain but had to quit because she could not afford continued care.

Kirkpatrick also submitted an Attending Physician statement dated April 23, 1998, from Dr. Mendelsohn. Dr. Mendelsohn confirmed a diagnosis of "generalized OA [osteoarthritis] and fibromyalgia" and noted that Kirkpatrick was still unimproved.

In reviewing Kirkpatrick's claim, Dr. Beavers called Dr. Mendelsohn. According to Dr. Beavers' notes, Kirkpatrick "has some back pain and osteoporosis but no objective findings to suggest she is totally disabled. . . .The doctor [Mendelsohn] feels that she could do sedentary work and is willing to put that in writing." Dr. Beavers recommended terminating Kirkpatrick's

benefits because "[t]here is no objective medical substantiation of total disability."

Thereafter, on May 11, 1998, Dr. Mendelsohn signed a statement prepared by CORE indicating that Kirkpatrick "is not totally disabled from any occupation and could, for instance, do sedentary or sit-stand work of some kind for 6 hours per day five days per week."

As a result, CORE recommended that Champion terminate Kirkpatrick's long term disability benefits. By letter on CORE letterhead and dated May 12, 1998, Kirkpatrick was informed that her long term disability benefits were being terminated. Kirkpatrick's benefits terminated on June 30, 1998.

In a Service Report dated May 14, 1998, CORE reported that it estimated that terminating Kirkpatrick's benefits would save Champion $49,826.25. Confidential Service Report #3, dated May 14, 1998.

On June 14, 1998, Kirkpatrick sent a letter to the Plan describing her current medical condition, her problems with pain, and her medications. Kirkpatrick reported taking 500 mg of Chlorzoxazone, 6 ultram, 1500 mg relafen, 100 mg zoloft, and 10 mg ambien daily, and indicated that these medications interfered with her ability to work. On August 7, 1998, the Plan informed Kirkpatrick that it was upholding termination of her long term disability benefits because she had not provided any additional clinical information.

On October 6, 1998, Kirkpatrick sent a letter to the Plan Supervisor describing her current medical condition and medications. In particular, Kirkpatrick noted that "[b]ecause of all the medication that I take, I do not function very well."

The Plan treated Kirkpatrick's letter as an appeal and notified her on November 6, 1998, that the Claims Review Committee would review her claim for benefits. Dr. Mendelsohn

-66-

forwarded the Committee his office notes from July and August 1998.  In his July office notes,

Dr. Mendelsohn indicated that Kirkpatrick "would not be able to return to her previous job

description at Champion that she can only now do just mild sedentary type activities up to 6

hours a day."  In his August office notes, Dr. Mendelsohn states that Kirkpatrick "is not able to

return to work at this point and will never be able to return to any heavy lifting, carrying,

straining type activities such as she had at Champion."  On November 30, 1998, Kirkpatrick

submitted a letter that stated, "I have no formal education, do not know the first thing about

computers.  I will be 55 years old in February, I'm not dumb, but I do have a hard time

consternation [sic]."

　　　　CORE directed Mikeska to perform a Transferable Skills Analysis to aid in review of

Kirkpatrick's claim for continuing benefits.  Mikeska concluded that seven positions were

appropriate for Kirkpatrick.

　　　　CORE then commissioned Dr. Marks to conduct a Peer Review Analysis of Kirkpatrick's

claim.  According to Dr. Marks' notes, he reviewed a "CHAM Referral Form, [and] submitted

clinical highlights."  Dr. Marks concluded that Kirkpatrick "should be able to perform sedentary

work with a restriction of no repetitive bending or lifting."

　　　　On December 11, 1998, the Committee met to review Kirkpatrick's claim.  The

Committee voted to uphold denial of Kirkpatrick's claim for benefits.  Claims Review

Committee Meeting Minutes, dated December 11, 1998.  According to the meeting minutes,

Kirkpatrick's benefits were terminated because her attending physician, Dr. Mendelsohn, made

inconsistent statements about whether Kirkpatrick could work, and a Transferable Skills Analysis

"identified various other jobs she could perform."  In particular, the minutes noted that in May

1998, Dr. Mendelsohn told Dr. Beavers that "there are 'no objective findings to suggest she is totally disabled' and that she could do sedentary work."

On January 29, 1999, the Plan informed Kirkpatrick that her claim had been denied.

(a)     Inadequate Transferable Skills Analysis

There are genuine issues of material fact concerning whether it was reasonable for Champion to determine that Kirkpatrick could work at the sedentary exertional level.  However, even resolving these in favor of the defendants, the Transferable Skills Analysis was an inadequate basis for determining that there were occupations Kirkpatrick could perform within her physical limitations.  The Transferable Skills Analysis did not consider Kirkpatrick's full range of physical or psychological limitations and did not attempt to confirm dated occupational information.

According to the "summary" section of the Transferable Skills Analysis, Mikeska "carefully considered the fine motor movement for which [Kirkpatrick] had restrictions." Mikeska determined that positions requiring "frequent" reaching, handling or fingering were appropriate for Kirkpatrick, but that positions requiring "constant" reaching, handling or fingering were not appropriate.  All of the positions Mikeska identified required frequent reaching, handling or fingering.[45]

However, there is no basis in the record for finding that Kirkpatrick could perform tasks requiring any repetitive use of her upper extremities or repetitive fine motor movements.  Dr. Fife noted this restriction in her 1996 peer review analysis.  Kirkpatrick reported that she had

_____

[45] One of the positions Mikeska identified required constant reaching, handling, and fingering despite the limitation Mikeska acknowledged.

-68-

difficulty fastening buttons and fixing her hair.  Personal Profile Evaluation, April 15, 1996.

Kirkpatrick also reported that she could not "hold on to items," and that her hands hurt and were

swollen.  In 1997, Kirkpatrick again reported "I cannot hold on to things - bad to drop things."

Personal Profile Evaluation, May 1, 1997.  There is no suggestion in the record that this was

incorrect or unreliable, or that Kirkpatrick's ability to use her hands and arms improved between

1996 and 1998.[46]

Further, the Transferable Skills Analysis did not consider other limitations including

Kirkpatrick's psychological condition and the side effects of her medications in evaluating her

ability to adapt to a new occupation.  In particular, depression and several of Kirkpatrick's

medications are related to drowsiness or fatigue.  Indeed, Kirkpatrick reported difficulty

concentrating.  The administrative record does not call into doubt that Kirkpatrick suffered from

depression or that she took these medications.

In addition, as with the other Transferable Skills Analyses prepared by Mikeska, the

Department of Labor had not updated most of the occupational titles since 1977.  While Mikeska

noted that a position related to typewriters was likely obsolete, many of the positions were also

likely outdated.  Champion made no effort to determine whether these positions still existed in

the national economy, or whether they were still performed in a similar manner in 1998.

Taken together, including positions requiring frequent reaching, handling, and fingering,

---

[46] In an August 1997 medical report, Dr. Mendelsohn noted that Kirkpatrick had "improved neck, shoulder, and back pain with far less tightness," but he also noted that she had "some soreness in the neck, shoulders, hands, and feet."  Then, in November 1997, Dr. Mendelsohn noted that "[t]he neck, shoulders, and back are also quite stiff and tight."  Medical note, November 20, 1997.  In February 1998, Dr. Mendelsohn noted that Kirkpatrick suffered from "increasing back and pelvic soreness."  Medical note, February 17, 1998.

and failing to evaluate vocational obstacles related to limited manual dexterity, alertness, or concentration, and failing to consider whether suggested occupations existed in the national economy made the Transferable Skills Analysis Unreliable.

Finally, because Champion did not request the Transferable Skills Analysis until just prior to the Claims Review Committee's evaluation of Kirkpatrick's claim, Kirkpatrick had no opportunity to rebut its conclusions.  Thus, Kirkpatrick was denied a full and fair review.

Champion was arbitrary and capricious in relying on the Transferable Skills Analysis and in denying Kirkpatrick a full and fair review.  Accordingly, summary judgment is granted in favor of Kirkpatrick.  However, as set forth below, the Court finds that there are genuine issues of fact material to determining whether remand would be an adequate remedy.

(6)     <u>Lois Lynn</u>

Champion hired Lois Lynn as a salaried employee in 1977.  Lynn's last position at Champion was as an Executive Secretary.  In January 1992, Lynn left Champion on short term disability related to "bronchiectasis with recurrent, drug resistant infections."[47]  In August 1992, the Plan approved Lynn's application for long term disability benefits.

Thereafter, Champion periodically reviewed Lynn's eligibility to continue receiving benefits.  In July of 1997, CORE initiated one such review.  In response Lynn submitted a Personal Profile Evaluation in which she stated that she suffered from "frequent respiratory infections requiring antibiotics and bed rest; chronic fatigue, [and] shortness of breath."  Lynn

---

[47] Bronchiectasis is "an abnormal condition of the bronchial tree characterized by irreversible dilation and destruction of the bronchial walls."  <u>Mosby's Medical, Nursing & Allied Health Dictionary</u> 244 (6th ed. Elsevier Science 2002).  The condition is usually caused by bronchial infection and can result in a cycle of infection and blocked airways.  <u>Id.</u>

indicated that when she did not have an active infection she was able to do light housework,

some shopping, and limited visiting with friends and family, that she walked thirty minutes,

about every other day for exercise, and that she spent most of her time reading and crocheting.

Lynn also submitted an Attending Physician Statement from her pulmonologist, Dr. Robert

Boerner, indicating that she was "100% disabled due to lung disease."

On August 26, 1997, CORE requested that Dr. Boerner send the Plan "the last six months

of office notes, including test results and consultations." In response, Dr. Boerner sent notes

dated December 11, 1996, and June 25, 1997. According to Dr. Boerner's June notes, Lynn was

stable with little wheezing, clear sinus drain, and a cough.

On September 8, 1997, Dr. Beavers spoke with Dr. Boerner and Lynn's primary care

physician, Dr. Nancy Freeman. According to Dr. Beavers, Dr. Boerner said that Lynn did not

appear particularly ill when he saw her, and that Lynn's primary care physician would be better

able to assess her degree of disability. Dr. Beavers reported that, Dr. Freeman said that Lynn

"has no true disabling condition and can do sedentary work."

CORE subsequently requested that Dr. Freeman complete a Modification Checklist for

Lynn. On September 11, 1997, Dr. Freeman responded indicating that Lynn could work six to

eight hours per day, five days per week at a sedentary job. Dr. Freeman noted that Lynn could

not work in an area with high humidity or dust.

By letter on CORE letterhead and dated January 19, 1998, Lynn was notified that her long

term disability benefits were being terminated. The letter also informed Lynn of her right to

appeal the decision. On January 20, 1998, Lynn wrote to Dr. Freeman and asked her to

reconsider her recommendation. In particular, Lynn wrote, "since you do not treat my primary

problems, I feel that perhaps you were a little premature with your determination."

On February 17, 1998, Lynn requested a review of the termination of her benefits.  Lynn enclosed a letter from her current pulmonary doctor, Dr. Harry Lipham, which stated that Lynn had a "significant degree of bronchiectasis with frequent and recurrent infections that are inadequately controlled and serve as an ongoing source of disability."  Further, according to Dr. Lipham, "the exposure of the person [with bronchiectasis] in the workplace to ambient viruses causes progression of their bronchiectasis disease and thus someone with your degree of bronchiectasis should be disabled to prevent progression of their disease."

On May 5, 1998, Lynn was seen by Dr. James McCarrick, a pulmonary specialist commissioned by CORE, for an independent medical examination.  Dr. McCarrick stated:

> It is my impression that the patient does have clinically significant bronchiectasis. Clearly, this is a progressive disease . . . she is at increased risk for developing infections on exposure to various populations.  These infections could be potentially significant in her case, and it is likely that she would require more antibiotic care and increased hospitalization if she had them.

Dr. McCarrick concluded that he was "unable to determine any other factors which would preclude her from going to work."

On May 26, 1998, the Plan sent Dr. McCarrick an "IME Addendum Form."  The form asked whether Lynn was "really at a significantly higher risk of infection from working in a sedentary job than she is from her usual daily activities."  In response, Dr. McCarrick wrote "no."  The form also asked whether Lynn was able to work at least six hours per day, five days per week in a sedentary capacity.  Dr. McCarrick wrote "Yes" and initialed the form.

CORE also commissioned Mikeska to perform a Transferable Skills Analysis of Lynn.

Mikeska identified a number of positions that she believed were suitable for Lynn.[48]

On June 10, 1998, CORE recommended "upholding the previous denial of LTD benefits based on the TSA and the IME physician's statement that he believes the employee is able to work at least 6 hours per day, 5 days per week in a sedentary capacity."

On July 7, 1998, the Plan advised Lynn of its decision to deny her claim. The denial letter noted that Dr. McCarrick stated that she could work at least thirty hours per week. However, it did not refer to the Transferable Skills Analysis or to Dr. McCarrick's statement that Lynn was not at a higher risk of infection while working.

On July 23, 1998, Lynn appealed the denial of her claim for continuing benefits. On August 3, 1998, the Plan notified Lynn that the Plan's Claims Review Committee would consider her appeal at its September 24, 1998 meeting. The letter did not inform Lynn of the Transferable Skills Analysis or of the "IME addendum."

In addition to other materials, Lynn also submitted a statement from Dr. McCarrick stating that he "did not say Lois Lynn could 'work 6 hours per day, 5 days per week in a sedentary capacity.'"

On September 24, 1998, the Claims Review Committee reviewed Lynn's appeal and voted to "table its decision pending receipt of a report from CORE resolving contradictions in the statements from Dr. McCarrick, the Independent Medical Evaluator." September 24, 1998, Meeting Minutes.

According to Dr. Beavers, he contacted Dr. McCarrick, and Dr. McCarrick indicated that

---

[48] Although the report of the Transferable Skills Analysis is undated it is referred to in a June 10, 1998 Confidential Service Report.

he had not "changed the opinion he expressed on his IME and follow-up letters. That opinion is that she is not totally disabled." Dr. Beavers faxed Mr. McCarrick a note asking him to check a box indicating whether Lynn could or could not work thirty hours per week in a sedentary capacity. The form was returned to CORE with a check next to "can."

At its November 13, 1998 meeting, the Claims Review Committee again discussed Lynn's claim; it voted to uphold the denial. According to its meeting minutes, the Committee relied on Dr. Beavers' report that Dr. Freeman stated that Lynn had "'no truly disabling condition and could do sedentary work,'" and Dr. McCarrick's conclusion that Lynn was "not at a higher risk of infection from working in a sedentary job."

On November 30, 1998, the Plan notified Lynn of its decision.

The Court finds that there are genuine issues of material fact concerning whether Champion was reasonable in evaluating Lynn's claim.[49] However, Champion did not notify Lynn that it had conducted a Transferable Skills Analysis, that it had obtained an "IME Addendum" from Dr. McCarrick, or that it was seeking an additional opinion from him in connection with the appeal. Thus, Lynn was precluded from exercising her right to "[s]ubmit issues and comment in writing" on these areas. Champion's failure to comply with ERISA's full and fair review mandate rendered its decision arbitrary and capricious. Accordingly, summary judgment is granted in favor of Lynn. However, as set forth below, the Court finds that there are genuine issues of fact material to determining whether remand would be an adequate remedy.

(7)    Charles R. Reece

---

[49] In particular, the Court notes that in August 1992, Dr. Edith Hapke wrote that "continuation of gainful employment or any employment will present a threat to Mrs. Lynn's remaining health and a risk to her life expectancy."

Champion hired Reece as an hourly employee in 1969. In his last position at Champion, Reece was as an "Oiler Mechanic." In 1995, Reece left work because of symptoms related to cardiomyopathy.[50] Between June 27, 1995 and January 24, 1996, Reece received short-term disability benefits. On January 25, 1996, CORE informed Reece that his claim for long term disability benefits had been approved.

In November 1997, CORE initiated a review of Reece's eligibility for benefits under the "any occupation" standard. Among other material, Reece submitted a personal profile evaluation in which he indicated that, while his condition was improving, he "still gets dizzy [at] times when I get up too fast, gets short of breath at times, tires easily still cannot climb stairs, or lift heavy objects." Personal Profile Evaluation dated December 8, 1997.

Reece also submitted an Attending Physician Statement prepared by Veterans Administration Physicians Assistant Doug Burnett. Attending Physicians Statement dated December 9, 1997. Burnett indicated that Reece suffered from cardiomyopathy and left ventricular thrombosis[51] resulting in Class III functional capacity. However, Burnett also indicated that Reece had not had a recent exercise test. Burnett concluded that Reece could sit, stand, and walk intermittently for one hour each during an eight hour shift, and that he was totally disabled from any occupation.

CORE then requested a "Peer Review Analysis" by Dr. Chester Conrad, a cardiologist. Dr. Conrad concluded that "there is no clear evidence that the patient's functional impairment

---

[50] "Cardiomyopathy is a general term reflecting disease of the myocardium." The Merck Manual of Diagnosis and Therapy 656 (Merck Research Laboratories 18th ed. 2006).

[51] A left ventricular thrombosis is a clot in the left ventrical of the heart. Stedman's Medical Dictionary 1871 (28th ed Lippincott, Williams & Wilkins 2006)

would preclude him from performing any occupation." Dr. Conrad also spoke to Burnett. According to Dr. Conrad, Burnett "indicated that [Reece] . . . would be considered Class II (i.e. comfortable at rest, with slight limitation of physical activity, and some symptoms with ordinary activity) . . . [and] that [Reece] would probably not be capable of doing work involving heavy physical exertion, [but] could likely do work that was largely sedentary."

At CORE's request, in March 1998 Burnett completed a new Modification Checklist indicating that Reece could perform sedentary work eight hours per day five days per week. In June 1998, Dr. Vladimir Curkovik co-signed the Modification Checklist.

On July 1, 1998, CORE scheduled Reece for an Independent Medical Examination with Dr. Michael Keogh, a cardiologist. Dr. Keogh concluded that Reece had "class two congestive heart failure due to nonischemic dilated cardiomyopathy"[52] and that Reece "is capable of performing some occupation." However, Dr. Keogh noted that Reece could not lift more than ten pounds, or do anything requiring him to stand quickly. CORE requested an Addendum to the Independent Medical Examination. A modification checklist was prepared indicating that Reece could work at least thirty hours per week, but could not lift more than ten pounds, or work on ladders.

In September 1998, CORE completed a Vocational Rehabilitation Screening to "determine the feasibility of [Reece] succeeding with vocational services." The Screening concluded that Reece was not a suitable candidate for vocational services.

Nonetheless, on October 5, 1998, CORE asked Mikeska to perform a Transferable Skills

---

[52] In nonischemic dilated cardiomyopathy the left ventricle of the heart is enlarged, dilated and weak, thus reducing the heart's ability to pump blood. Stedman's Medical Dictionary 230 (28th ed Lippincott, Williams & Wilkins 2006).

Analysis on Reece.  Mikeska concluded that Reece had "transferable skills that are vocationally appropriate and applicable to the same occupational category as well as to others" and that "[t]hese skills should enable him to return to the working community."  However, the only positions the TSA identified within Reece's exertional limitations were jeweler and jeweler's apprentice.  Mikeska also stated "if the physician declares Mr. Reece with sedentary restrictions, there is a narrow chance of him returning to work."

On October 9, 1998, CORE notified Reece that his long term disability benefits were being terminated based on the results of the independent medical examination and Transferable Skills Analysis.  On December 4, 1998, Reece requested a review of his claim.

In response, CORE submitted Reece's file to Dr. Gerald Evans, a cardiologist, for a Peer Review Analysis.  Dr. Evans agreed that Reece "should be able to work at least 6 hours per day, 5 days per week and over time increase that to 8 hours per day."

On March 15, 1999, Reece notified the Plan that he disagreed with the conclusions in the Transferable Skills Analysis.  In particular, Reece indicated that he did not believe he had the training or experience for the jobs selected.

On March 24, 1999, the Plan notified Reece that it had decided to uphold denial of his claim for continuing benefits.  On May 27, 1999, Reece appealed to the Claims Review Committee.  Reece submitted a report from Bruce Holt, R.N. recommending that Reece be reevaluated by another cardiologist.

On September 9, 1999, the Committee voted to uphold denial of Reece's claim.  The Committee noted that "A Modification Checklist was signed on 3/31/98 by D. Burnett, a physician's assistant, stating that Mr. Reece may work 8 hours/day, 5 days/ week in a sedentary

job, and Dr. Curkovic, the attending physician, signed this Modification Checklist on 6/25/98 . . .

A Transferable Skills Analysis identified various jobs that Mr. Reece could perform."  Minutes

of the Meeting of the Claims Review Committee, September 19, 1999.

(a)    Transferable Skills Analysis

_____The Court finds that Champion's conclusion that Reece had the capacity to work at the

sedentary level was supported by substantial evidence in the Record, and that there is no genuine

issue of fact suggesting that Champion was arbitrary or capricious in reaching this conclusion.

However, the Court finds that Champion was arbitrary and capricious in concluding that Reece

was "reasonably qualified" for a sedentary occupation.

The Transferable Skills Analysis was flawed because the only sedentary positions it

identified would have required Reece to undergo an "unreasonable" amount of training.

The parties agree that Reece worked as an Oiler Mechanic.  In preparing the Transferable

Skills Analysis, Mikeska assumed that an Oiler Mechanic was a Maintenance Machinist. [53]

According to the DOT, a Maintenance Machinist:

> Sets up and operates variety of machine tools, and fits and assembles parts to fabricate
> or repair machine tools and maintain industrial machines, applying knowledge of
> mechanics, shop mathematics, metal properties, layout, and machining procedures:
> Observes and listens to operating machines or equipment to diagnose machine
> malfunction and determine need for adjustment or repair. Studies blueprints, sketches,
> machine parts or specifications to determine type and dimensions of metal stock
> required.  Measures, marks, and scribes dimensions and reference points on metal
> stock surfaces, using such measuring and marking devices as calibrated ruler,
> micrometer, caliper, and scriber.  Dismantles machine or equipment, using handtools
> or power tools, to examine parts for defect or to remove defective part. Replaces
> defective part with new part or repairs or reproduces part from various kinds of metal
> stock, using handtools, such as scraper, file, and drill, and machine tools, such as
> lathe, milling machine, shaper, borer, and grinder.  Assembles and test operates

_____

[53] The parties do not dispute that an "Oiler Mechanic" is a "Maintenance Machinist."

machine to verify correction of malfunction.  Maintains and lubricates machine tools and equipment.  May weld parts, using arc or gas welding equipment.  May repair or replace faulty wiring, switches, or relays.

DOT ¶ 600.280-042.

_____According to Reece, his usual duties were to "oil machinery."  Personal Profile Evaluation dated February 24, 1997.  In their Rule 56 Statements the parties agreed that Reece was responsible for "oiling, lubricating and maintaining the machines."

The only sedentary positions the Transferable Skills Analysis identified were "Jeweler" and "Jeweler Apprentice."  According to the DOT, a jeweler:

> Fabricates and repairs jewelry articles, such as rings, brooches, pendants, bracelets, and lockets: Forms model of article from wax or metal, using carving tools.  Places wax model in casting ring, and pours plaster into ring to form mold.  Inserts plaster mold in furnace to melt wax.  Casts metal model from plaster mold.  Forms mold of sand or rubber from metal model for casting jewelry.  Pours molten metal into mold, or operates centrifugal casting machine to cast article.  Cuts, saws, files, and polishes article, using handtools and polishing wheel.  Solders pieces of jewelry together, using soldering torch or iron.  Enlarges or reduces size of rings by sawing through band, adding or removing metal, and soldering ends together.  Repairs broken clasps, pins, rings, and other jewelry by soldering or replacing broken parts.  Reshapes and restyles old jewelry, following designs or instructions, using handtools and machines, such as jeweler's lathe and drill.  Smooths soldered joints and rough spots, using hand file and emery paper.

DOT ¶ 700.281-010.  This is a skilled position requiring two to four years of specific vocational preparation.  Even a jeweler's apprentice is required to have two to four years of specific vocational preparation.  DOT ¶ 700.281-014.

While Reece likely acquired skills from working as an Oiler Mechanic, the Transferable Skills Analysis did not identify skills that would amount to or substitute for specific vocational preparation for work as either a jeweler or a jeweler's apprentice.  There is nothing in the Record or the DOT to suggest that Reece was reasonably qualified to perform tasks such as working with

molds, gemstones, or precious metals.  Accordingly, it was unreasonable for the Transferable

Skills Analysis to conclude that Reece was "reasonably qualified by training, education or

experience" to work as a jeweler or jeweler's apprentice.

Accordingly, the Court finds that Champion was arbitrary and capricious in relying on

Reece's Transferable Skills Analysis to determine that Reece had the vocational capacity to work

at any occupation within his exertional limitations.  Thus, summary judgment is granted in favor

of Reece.

(8)     <u>Harry L. Smith</u>

Smith worked as a "Recovery Supervisor-Shift Foreman" at Champion.  Champion hired

Smith in 1969, and he worked until 1993, when he left on short term disability.  On April 18,

1994, the Social Security Administration notified Smith that his application for disability benefits

had been approved, but that his claim would be reevaluated in 1995.  Smith began receiving long

term disability benefits from Champion in November 1993.

In 1997, CORE initiated a review of Smith's continued eligibility for disability benefits.

In his March 1997 Personal Profile Evaluation, Smith indicated that he had "difficulty in sitting

& standing for an extended period of time.  Almost constant pain and limited movement prevents

most average activities.  Severe upper & lower back pain partial to complete numbness in right

leg."  Smith reported that he was "someone who is unable to do much of anything without

suffering severe consequences of pain and immobility from a short to an extended period of time.

I[n] other words, 'I dearly pay for things I do.'"  March 10, 1997 Personal Profile Evaluation.

Dr. Beavers interviewed Smith's treating physicians, Drs. Culclasure and Shields.

According to Dr. Beavers, Dr. Culclasure reported that he could not comment on Smith's

-80-

disability.  Dr. Shields reported that he could not "confirm or deny [that Smith] is disabled from any occupation."  Notes Dated April 23, 1997.  Dr. Beavers concluded that Smith "clearly has many problems and has been out of work for a long time.  Though there is not enough objective evidence to certify disability from any occupation at this time, an FCE might make this clearer." Id.  Therefore, CORE scheduled an Independent Medical Examination of Smith with Dr. Peter D. Johnson.

In his August 1997 report, Dr. Peter Johnson concluded that Smith had "failed back syndrome" and recommended a Functional Capacity Evaluation to determine whether Smith had "any work capacity at the sedentary or light physical demand level."

Thus, at CORE's request Dr. Shields referred Smith to Kimel for an FCE.  Smith's FCE was conducted over a two day period in September 1997 because his pain was so great on the first day that it had to be discontinued and rescheduled for the next day.  Additionally, Smith had to take extra pain medication to compensate for the pain caused by the FCE.  Nonetheless, Kimel concluded that Smith was "able to work at the LIGHT Physical Demand Level for an 8 hour day."  Kimel noted Smith could sit, stand, or walk one to thirty three percent of an eight hour day, and that he could never bend, squat, kneel or crawl.  Kimel found that Smith had poor fine motor skills.

After reviewing the FCE, Dr. Peter Johnson concluded that Smith could "work full time in the Light Physical Demand Level, within the limits of the Functional Capacity Evaluation."

On October 29, 1997, CORE notified Smith that his long term disability benefits would not be continued.  On December 5, 1997, Smith requested review of the decision to terminate his benefits.  In support of his request for review, Smith submitted x-rays, a Vocational Evaluation

performed by Randy Adams, a certified vocational evaluator, and a report prepared by Dr. James

Johnson for the Social Security Administration.

The Vocational Evaluation was based on a review of Smith's medical records, including

the functional capacity examination and an interview with Smith.  During the interview, Smith

reported that he could sit for forty-five minutes, and stand for thirty minutes before needing to

change positions.  Smith also reported that he could walk for ten to twenty minutes.  According

to Adams, Smith was required to lie down for thirty minutes to an hour six times a day.  Adams'

observations of Smith during the interview substantiated Smith's self-reporting:  According to

Adams, Smith changed positions between sitting and standing eleven times; was distracted by

pain; and began to "lean over supporting himself on objects" later in the two hour and forty-five

minute interview.  Adams suggested that Smith suffered from moderate depression.

Adams also evaluated Smith's job skills: He found that Smith's skills were specific to the

job he performed at Champion and not transferable.  He concluded that Smith read at a fifth

grade level, and that his math skills were at an eighth grade level.  After testing, Adams

concluded that Smith's manual dexterity was below the first percentile in both hands.  As a result

of his physical and vocational limitations, Adams concluded that Smith was "not employable in

any job in the national economy."

After reviewing this information, Dr. Beavers concluded that he "did not see any

information, medical or otherwise, that would justify overturning the denial of the claim that this

employee is totally disabled from any occupation."  In particular, Dr. Beavers noted that he

"fail[ed] to see that [Smith's age was] in any way relevant to his claim to be totally disabled" and

that "it is not reasonable to consider him unable to undertake a new job and learn new skills."

Dr. Beavers also noted that to the extent that the Vocational Evaluation relied on Smith's reports of chronic pain, "[t]his is entirely subjective and there is no objective substantiation that this is disabling." <u>See also</u> CORE Confidential Service Report #1, dated February 10, 1998 (quoting Dr. Beavers).

On July 6, 1998, the Plan informed Smith that it upheld the denial of his claim for long term disability benefits, and on September 2, 1998, Smith appealed this decision.

On November 6, 1998, the Plan informed Smith that the Claims Review Committee would review his claim. Smith submitted a letter from Dr. Culclasure, his former treating physician, an office note from Dr. Keith Maxwell, and an Electrodiagnostic Consultation Report by Dr. Andrew Rudins.

The note from Dr. Maxwell's office indicated that Smith had "moderate relative stenosis[54] at L2/3 secondary to disk protrusion and probably ligament hypertrophy" and "some elements of arachnoiditis."[55]

The letter from Dr. Culclasure indicated that Smith has "severe lumbar degenerative disc

---

[54] Spinal stenosis is a narrowing of the spinal canal with possible resulting neural compression. <u>Mosby's Medical, Nursing & Allied Health Dictionary</u> 1615 (6th ed. Elsevier Science 2002).

[55] Arachnoiditis, or arachnitis, is a pain disorder caused by the inflammation of one of the membranes that surround the nerves of the spinal cord and brain. Charles B. Clayman, <u>The American Medical Association Encyclopedia of Medicine</u> 128 (Random House 1989).

disease, L5 and S1 radiculopathies[56] and lumbar post-laminectomy[57] syndrome." Dr. Culclasure concluded that Smith was "totally disabled and unable to engage in any occupation or business for wage or profit for which he is qualified by training education or experience." Dr. Rudins' report concluded that "[t]here is electrophysiological evidence for chronic right L5-S1 radiculopathies."

On December 2, 1997, the Committee reviewed Smith's claim and voted to table its decision pending review of the above materials and completion of a Transferable Skills Analysis of Smith.

Mikeska completed the TSA on December 5, 1997 concluding that Smith "does have transferable skills that are vocationally appropriate and applicable to the same occupational group and category." Mikeska also identified several jobs considered appropriate for Smith.

The Plan also commissioned Dr. Nemunaitis to conduct a peer review analysis of Smith's claim. After reviewing "clinical highlights," Dr. Nemunaitis concluded that the newly submitted information did not contain objective findings or documentation to substantiate Smith's claim that he was totally disabled and unable to function at a light duty physical demand level.

The Committee reconvened on December 11, 1998, and voted four to one to uphold denial of Smith's claim. In support of this decision the Committee noted that:

> When Dr. Shields began treating Mr. Smith, he could neither confirm or deny

---

[56] Radiculopathy is a disease of the spinal nerve roots. Symptoms include "severe pain and, occasionally, loss of feeling in the area supplied by the affected nerves." Charles B. Clayman, The American Medical Association Encyclopedia of Medicine 847 (Random House 1989).

[57] Laminectomy is the surgical removal of part of a vertebra to relieve pressure on the spinal cord. Charles B. Clayman, The American Medical Association Encyclopedia of Medicine 625 (Random House 1989).

whether Mr. Smith was disabled from any occupation . . . a Functional Capacity Evaluation was done which concluded that "Mr. Smith is able to work at the LIGHT Physical Demand Level for an 8 hour day". Dr. Peter Johnson reviewed the FCE and . . . stated that Mr. Smith "can work full time in the Light Physical Demand Level".

Mr. Smith's attorney, Richard Harper, forwarded a Vocational Evaluation by Randy Adams that Mr. Harper had commissioned. In addition, Mr. Harper forwarded x-rays and a Disability Determination Evaluation by Dr. James Johnson. These reports concluded that Mr. Smith is disabled from any occupation. Mr. Harper also sent additional information from a pain specialist, Dr. Culclasure; office notes from Dr. Maxwell reviewing Mr. Smith's CT myelogram; and a report on an Electrodiagnostic Consultation by Dr. Rudins.

CORE reviewed the information submitted by Mr. Harper and determined that there were no objective findings to substantiate that Mr. Smith is disabled and unable to work at the light physical demand level. A Transferable Skills Analysis identified various jobs that he could perform.

Claims Review Committee Minutes dated December 11, 1998.

The Court finds that there are genuine issues of fact material to determining whether Champion's denial was based on substantial evidence and consideration of the relevant factors. In particular, the administrative record could be interpreted to indicate that Champion never appropriately considered Smith's subjective complaints and evidence substantiating these limitations in evaluating his disability. Conversely, the record does contain at least some evidence that Smith could work.

However, the Court finds that Champion did not provide Smith with a "full and fair review." Champion did not notify Smith that it was seeking an additional evaluation of Smith's vocational capacity in connection with the appeal nor did it give Smith a copy of the Transferable Skills Analysis so as to enable him to exercise his right to "[s]ubmit issues and comment in writing." Champion's failure to comply with ERISA's full and fair review mandate rendered its decision arbitrary and capricious. Thus, summary judgment is granted in favor of Smith. However, as set forth below, the Court finds that there are genuine issues of fact material to

determining whether remand would be an adequate remedy.

(9)   <u>Martha Whitley</u>

Champion hired Martha Whitley as an hourly employee in 1980.  Whitley worked as a

"package sealer, machine (i.e., stencil finisher)."  Whitley began receiving short term disability

benefits due to, among other conditions, fibromyalgia in March 1988.  Around September 1988,

Whitley began receiving long term disability benefits.

On September 9, 1994, the Plan supervisor notified Whitley that she no longer met the

requirements for continuation of long term disability benefits because the Plan had been "advised

that you own and operate Tonya's Hair house and have done so since October 1, 1988."  In

response to Whitley's appeal of this decision,[58] Whitley was referred to Dr. C.R. Stephenson for

---

[58] According to the Plan, it based its decision to terminate Whitley's benefits on the report of a private investigator who observed Whitley cutting hair at Tonya's Hair House.

    On October 10, 1994, Whitley requested that the Plan review the denial of her continuing long term disability benefits.  Whitley asserted that the hair salon was owned and operated by her husband and submitted medical records indicating that she remained disabled.  In particular, Whitley submitted a letter from Dr. Queen indicating that Whitley suffered from fibromyalgia and "had diffuse muscoskeletal pain and soft tissue tenderness."  Dr. Queen concluded that Whitley "remains currently unable to engage in any occupation or business for wage or profit for which she is reasonably qualified by training, education or experience."

    On December 7, 1994, the Plan notified Whitley that it was upholding its decision.  According to the Plan its decision was based on the fact that "Tonya's Hair House was visited on more than one occasion by investigators retained by the Plan and they observed [Whitley] actually work as a beautician."

    On January 31, 1995, Whitley appealed the denial of her claim for continuing long term disability benefits.  In support of her appeal, Whitley submitted a January 6, 1995 letter from Dr. Glenn Arrants indicating that Whitley "has multiple physical problems that affect her mental and emotional states of mind."  Dr. Arrants concluded that "due to her mental pains she cannot maintain any physical activity for consistent, measurable lengths of time."  Whitley also submitted a letter from Dr. Arrants dated January 10, 1995 and indicating that Whitley "has a severe and incapacitating problem with fibromyalgia," and "has never been able to regain full independent function and an ability to meet not only the demands of her own personal care and the care of her family at home, as well as work related responsibilities."  Dr. Queen again concluded that Whitley "would not be able to engage in any occupation or business for wage or

-86-

an Independent Medical Examination. According to Dr. Stephenson, Whitley was "tender

everywhere, literally."  Dr. Stephenson concluded that Whitley suffered from fibromyalgia and

chronic fatigue, and concluded that he did not believe that Whitley was "employable at this time

or in the foreseeable future."  As a result, on September 13, 1995, the Committee overruled the

previous decision denying Whitley's claim for benefits and reinstated her long term disability

payments.

In 1996, the Plan initiated a review of Whitley's continued eligibility for benefits.  In

response, Whitley submitted, among other materials, an Attending Physician Statement prepared

by Dr. Queen indicating that Whitley was totally disabled from both her regular occupation and

any other occupation.

At CORE's request, Dr. Queen referred Whitley for a Functional Capacity Evaluation.

According to the FCE report, "Whitley completed test activities at the SEDENTARY physical

demand level of work."  The test further identified limitations on Whitley's ability to work,

including that she could only sustain this level of exertion for four hours a day.  The FCE also

indicated that Whitley required frequent changes in position between sitting and standing,[59] and

that Whitley could only perform tasks requiring "handling" or "fingering" 66% of the time over a

four hour period.

After receiving the FCE, Dr. Queen completed a Modification Checklist at CORE's

---

profit for which she is reasonably qualified by training, education, or experience."
        On May 5, 1995, the Plan informed Whitley that the Plan's Claims Review Committee
would consider her claim.  The Plan voted to postpone a final decision on Whitley's claim until
Whitley could be examined by an independent medical examiner and her counsel had an
opportunity to review and comment on the contents of the investigative reports.

[59] In particular, the FCE reported that over the course of a four hour work day Whitley
could sit no more than 66% of the time.

request.  Dr. Queen stated that "I do not feel patient can return to regular employment.  Is on

multiple medications in an effort to manage her fibromyalgia - so that she can function at home."

Whitley was then scheduled for an Independent Medical Examination with Dr. Rudins.

Dr. Rudins diagnosed Whitley with having "fibromyalgia, with resultant chronic pain syndrome,

with some evidence of symptom magnification with 3 out of 5 Waddell signs July 28, 2008

positive."  Dr. Rudins also noted that Whitley had "underlying multilevel degenerative disc

disease, that is likely contributing a mild amount to her overall symptom complex."  Dr. Rudins

concluded that "Whitley does have a full time work capacity, at the sedentary to light level" and

set forth restrictions on her ability to work.  These restrictions included that "She should be

allowed to frequently change positions, at minimum once every 30 minutes.  Ideally she should

be able to either sit or stand, and walk as necessary . . . . the chance for her successfully returning

to work is quite low."  Dr. Rudins also noted that Whitley had been unable to use the Champion

Fitness Center in the past four weeks because of shingles.

On December 22, 1997, Dr. Beavers notified Whitley that her long term disability

benefits would be terminated.  On February 20, 1998, Whitley requested that the Plan review the

termination of Whitley's long term disability benefits.  In support of her appeal, Whitley

submitted documents from the Social Security Administration indicating that her Social Security

benefits would continue, and two letters from Dr. Queen.  One of the letters from Dr. Queen

indicated that Whitley was "unable to work at a level sufficient to maintain regular employment."

On May 27, 1998, CORE commissioned Dr. Alan Marks, a rheumatologist, to conduct a

peer review analysis of Whitley's claim.  Dr. Marks concluded that he "concur[red] with the

independent medical examiner.  I believe this patient is capable of sedentary work."  On July 13,

1998, the Plan notified Whitley that it had decided to uphold the denial of her claim for continuing benefits because, according to Dr. Marks, "the submitted records do not support a certifiable medical cause of her disability."

On July 30, 1998, Whitley appealed this denial. On October 22, 1998, Whitley submitted an October 15, 1998 letter from Dr. Queen indicating that she continued "to find [Whitley] severely impaired with chronic and unrelenting non-articular musculoskeletal pain. Her pain had been further complicated by the recent development of herpes zoster." Dr. Queen concluded that Whitley was "disabled from engaging in any occupation or business for wage or profit."

Based on this letter, CORE commissioned Dr. Rose D. Fife, a rheumatology and internal medicine specialist, to conduct a peer review analysis of Whitley's claim. Dr. Fife concluded that Whitley was totally disabled and that the "disabling diagnosis now is herpes zoster superimposed on a chronic pain syndrome." Dr. Fife concluded that Whitley's "herpes zoster is not related to her underlying condition." Dr. Fife also suggested that a psychiatric exam would be necessary to determine Whitley's capacity to work.

CORE also asked Mikeska to conduct a Transferable Skills Analysis of Whitley, to determine whether Whitley had transferable skills within the restrictions defined by Dr. Rudins. In a report dated December 8, 1998, Mikeska concluded that Whitley "does have transferable skills that are vocationally appropriate and applicable to the different occupational groups and categories" and identified ten appropriate sedentary positions.

On January 18, 1999, the Plan notified Whitley that her claim would be considered by the Claims Review Committee. The letter did not refer to the Transferable Skills Analysis.

The Committee voted to "table its decision to its next meeting on March 11, 1999,

pending receipt of additional information from CORE regarding the date of on-set of Ms.

Whitley's herpes zoster."  CORE then asked Dr. Fife to report on whether Whitley's herpes

zoster was present in January 1998, when her claim for continuing benefits was denied.

Champion maintains that Dr. Fife spoke to Whitley's treating physician and reported that,

according to the treating physician, the herpes zoster began in April 1998.

On March 30, 1999, the Plan notified Whitley's counsel that the appeal of the denial of

Whitley's claim for continued benefits was denied.

(a)    Failure to Consider Evidence that Shingles was
Present Prior to Benefits being Terminated

In denying Whitley's appeal of the termination of her benefits the CRC noted that:

A CORE physician then stated that Ms. Whitley was disabled "with the disabling
diagnosis being herpes zoster superimposed on a chronic pain syndrome."  However,
upon further investigation, CORE determined that the on-set of the herpes zoster was
in 4/98 and therefore after the original denial of benefits on 1/31/98.  Therefore, the
herpes zoster was not a factor in the original denial of benefits and should not be
considered in the appeal process.

Champion Claims Review Committee Minutes dated March 11, 1999.

However, on December 3, 1997, Dr. Rudins conducted an Independent Medical

Examination of Whitley.  Dr. Rudins noted that Whitley had been attending the Champion

Fitness Center "but not in the last four weeks due to flu and shingles."  Shingles is the common

name for herpes zoster, an illness related to the chicken pox virus.  The Merck Manual of

Diagnosis and Therapy 1609 (Mark H. Beers et al. eds., 18th ed. Merck Research Laboratories

2006).  Although an outbreak of shingles typically resolves within a few weeks, pain may remain

for an extended period of time if postherpetic neuralgia develops.  Id.  According to the peer

review analysis commissioned by CORE, Whitley suffered from "severe, post herpetic neuralgia

-90-

in a thoracic distribution of the left chest." Peer Review Analysis by Dr. Rose Fife dated November 13, 1998. Accordingly, it was clear error for the Claims Review Committee to conclude that Whitley did not have shingles prior to termination of her benefits and to fail to consider this condition in evaluating her eligibility for continued benefits.

(b)    Failure to Consider Evidence of Subjective Pain

The Court's principle reason for concluding that Champion was unreasonable in terminating Whitley's benefits was its failure to recognize that she developed shingles prior to that termination; moreover, the administrative record concerning Whitley indicates that "subjective" evidence of pain and Whitley's psychological condition were not given due weight in evaluating her ability to return to work in 1998.[60] Indeed, Dr. Fife recommended that a psychiatric evaluation be performed to accurately assess Whitley's ability to work, and this recommendation appears to have been ignored. Peer Review Analysis dated November 12, 1998.

The administrative record contains ample evidence that Whitley's reports of pain were credible and that her psychological condition complicated her ability to cope with that pain, to work, or to train for a new position.[61] Indeed, in 1995 the Claims Review Committee did

---

[60] Peer Review Analysis by Dr. Marks dated June 3, 1998 ("Work-related disability must be assessed per objective abnormalities on exam and/or via laboratory and x-ray data, rather than upon subjective complaints. . . . While the degree and duration of her symptoms portend a poor prognosis in terms of pain relief, the submitted records do not support a certifiable medical cause of her disability."); Independent Medical Examination by Dr. Rudins dated December 3, 1997 ("Ms. Whitley does not have any significant purely objective findings. She has significant tenderness to palpation, and multiple subjective complaints, with the primary one being pain. . . . The degree to which she would be able to tolerate various activities is difficult to absolutely predict in the long term, since it is subjective pain that is limiting her.").

[61] See, e.g., Department of Health and Human Services Decision granting Social Security disability benefits dated December 19, 1989 ("According to Dr. Queen . . . it was very difficult in the condition of fibromyalgia to objectively predict that a person can reliably lift and carry any given number of pounds, stand or walk for any specified number of hours, or sit on a regular

consider "subjective evidence," and found that Whitley's "subjective pain condition" was

disabling.  Champion Claims Review Committee Minutes dated September 13, 1995.  The

administrative record does not suggest that Champion doubted Whitley's credibility or that

Whitley's pain was insufficient to prevent her from working.

(c)     <u>Inadequate Transferable Skills Analysis</u>

Like Boone, even if Whitley were indeed able to work with the restrictions identified by

Dr. Rudins, the Transferable Skills Analysis commissioned by CORE was an inadequate basis

for concluding that Whitley had residual vocational capacity.  Whitley's Transferable Skills

Analysis was flawed because it did not attempt to locate positions that were compatible with

---

basis. . . . There were extreme difficulties in maintaining social functioning and she often
experienced deficiencies of concentration, persistence, or pace that resulted in failure to complete
tasks in a timely manner. . . .The claimant has severe fibromyalgia with myofacial overlay,
fatigue, pain, borderline intellectual functioning, a panic disorder with agoraphobia, and
psychological factors affecting physical conditions. . . . The claimant's subjective complaints are
credible and supported by the medical evidence of record and by the [administrative law judge's]
observations of the claimant."); August 14, 1995 Rheumatology Evaluation by Dr. Ruffin
Stephenson ("The patient has extremely severe symptoms . . . probably as bad or worse than
anyone I have seen in my entire practice, though I think there may be an overriding component of
depression which may make her coping abilities difficult, and may increase the amount of pain
she experiences."); Personal Profile Evaluation by Martha Whitley dated April 18, 1996 ("pain -
fatgue [sic] - swelling - sowerness [sic] - my body aches like the flu my bones fells [sic] like my
bones are comming [sic] out [of] my skin some days I gain 10-25 lbs of fluid a day."); Personal
Profile Evaluation by Martha Whitley dated June 4, 1997 ("feel like I have the flue [sic] all the
time ach[e] all over, sore, swelling neck turns numb."); FCE dated July 7, 1997 (reporting ability
to work at the sedentary level limited to four hours per day"); letter from Dr. Queen dated
February 23, 1998 ("Mrs. Whitley has a chronic and unrelenting problem with non-articular
musculoskeletal pain."); letter from Dr. Queen dated May 5, 1998 ("It is my opinion that the
patient currently remains unable to work at a level sufficient to maintain regular employment.");
Peer Review Analysis by Dr. Fife dated November 13, 1998 ("Superimposed on this background
of chronic pain, she has now developed acute pain due to herpes zoster.  This makes it
impossible for her to perform any kind of work at present. . . . a psychiatric evaluation is
recommended as part of the future assessment of her ability to work as she has documented
psychological overlay to her chronic complaints.")

Whitley's full range of physical and psychological limitations.

Dr. Rudins found that Whitley was able to work at the sedentary level, with changes in position between sitting, standing, and walking at least every thirty minutes. Dr. Rudins further found that Whitley should avoid repetitive use of either arm. The FCE, on which Champion seemed to rely, found that Whitley could work at the sedentary level, but identified restrictions even beyond those found by Dr. Rudins. The FCE found that Whitley could work no more than four hours per day and that her ability to "handle" or "finger" was limited even during this period.

The Transferable Skills Analysis made no attempt to locate positions that accommodated these restrictions, instead suggesting that Whitley train to become a stenographer, a position requiring constant sitting and fingering. As noted above, unskilled sedentary positions almost always require bilateral manual dexterity and rarely permit changes of position at will. Like Boone, Whitley had a high school level education and a history limited to unskilled work.

In addition, the Transferable Skills Analysis made no effort to determine whether Whitley's psychological problems, her "deficiencies of concentration, persistence, or pace," and her "borderline intellectual functioning" would permit her to adapt to a new occupation.

Further, the Transferable Skills Analysis might not have been an adequate analysis even of the vocational capacity of someone without Whitley's physical limitations. Two of the positions identified required more sophisticated "worker functions" than Whitley's prior occupation. All but one of the positions had not been updated by the Department of Labor since 1977. While it was less apparent that the positions identified as suitable for Whitley were obsolete, no efforts were made to determine whether the positions remained part of the national

economy.

Finally, because Whitley was not informed of the Transferable Skills Analysis, she had no opportunity to rebut its conclusions.  Thus, Whitley was denied a full and fair review.

Even reviewing the administrative record in the light most favorable to Champion and with deference, Champion has failed to present a genuine issue of material fact suggesting that it was not arbitrary and capricious in terminating Whitley's benefits.  Accordingly, summary judgment is granted in favor of Whitley.

c. <u>Remedies</u>

"[I]f upon review a district court concludes that the Trustees' decision was arbitrary and capricious, it must remand to the Trustees with instructions to consider additional evidence unless no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a 'useless formality.'"  <u>Miller v. United Welfare Fund</u>, 72 F.3d 1066, 1071, 1072 (2d Cir. 1995) (suggesting that remand might not be required if "the evidence in the administrative record pointed only in favor of granting the claim").  However, "a remand of an ERISA action seeking benefits is inappropriate 'where the difficulty is not that the administrative record was incomplete but that a denial of benefits based on the record was unreasonable.'"  <u>Zervos v. Verizon N.Y., Inc.</u>, 277 F.3d 635, 648 (2d Cir. 2002) (noting that remand is inappropriate where it "serve[s] primarily to give the defendants an opportunity to retool a defective system"); <u>Zuckerbrod v. Phoenix Mut. Life Ins. Co.</u>, 78 F.3d 46, 51 n.4 (2d Cir. 1996)).

(1) <u>Boone, Clark, Haynes, and Whitley</u>

The Court finds that remand of Boone, Clark, Haynes and Whitley's claims to Champion's successor would be an unnecessary formality.

-94-

During periods in which Boone's severe and chronic pain were considered, both

Champion and CORE repeatedly determined that Boone was entitled to benefits.  See, e.g.,

CORE Case Management Confidential Service Report #1 dated November 21, 1996

(recommending "A continuation of LTD benefits . . . based on the chronicity and persistence of

symptoms").  Further, because disregard of Boone's subjective complaints so thoroughly

permeated review of Boone's claim, a new Independent Medical Examination and vocational

analysis would be required to determine that it was proper to terminate Boone's benefits.  As set

forth above, Boone has presented ample and compelling evidence that she was disabled in 1998,

and at this point no additional evidence could produce a reasonable determination that she was

not disabled ten years ago.

The evidence establishing that Clark had no residual vocational capacity was so clear, and

the Transferable Skills Analysis in his case was so unreasonable that no new evidence could

produce a reasonable conclusion permitting termination of Clark's benefits.

Similarly, despite questions CORE's own peer reviewer raised about Haynes' vocational

capacity, Champion unreasonably failed to consider his residual vocational capacity at all in

terminating Haynes' benefits.  Further, Champion unreasonably relied on evidence that Haynes

could perform at a sedentary physical capacity on a one-time basis to conclude that he could

work on an ongoing basis, ignoring evidence that Haynes' disability was periodic in nature and

that he required a recovery period after sedentary-light level exertion.

The Claims Review Committee would not have–or could not have reasonably–upheld

termination of Whitley's benefits if it had considered the appropriate factors and realized that

Whitley had shingles before 1998.  The Claims Review Committee conceded that Whitley was

-95-

totally disabled by shingles.  Further, in September 1995, the CRC decided to continue Whitley's

benefits, and the administrative record indicates that Whitley's medical condition did not

improve between 1995 and 1998.

Champion is ordered to reinstate Boone, Clark, Haynes and Whitley's benefits retroactive

to the date of termination.  The parties shall submit further briefing concerning the additional

relief they seek including attorneys fees, costs and interest.

(2)     Kirkpatrick, Lynn, and Smith

For the purposes of summary judgment, the Court cannot determine whether remand of

Kirkpatrick, Lynn, and Smith's cases to Champion's successor would be appropriate or a useless

formality.  Although remand may be appropriate in these cases based on Champion's failure to

provide a full and fair review, the Court may determine, after deciding remaining issues of fact,

that the benefits determinations were also unreasonable.  In these circumstances, remand would

not be warranted.

Accordingly, the parties shall submit a report to the Court stating whether the claims of

these plaintiffs should be remanded at this point or whether the claims should proceed to trial to

resolve the issue of whether remand is appropriate, i.e., to determine whether Champion's claims

decisions were unreasonable based on the records before Champion.

(3)     Reece and Brookshire

Reece and Brookshire's claims are remanded to the Administrator to reevaluate their

vocational capacity as of October 1998 and December 1997 respectively.  In reevaluating their

claims, the Administrator should permit them to submit vocational assessments based on the

documentation of their medical conditions in the original record, and their training, education,

and experience as of October 1998 (Reece) and December 1997 (Brookshire).  The parties are

directed to submit further guidelines for review on remand.

> 2.    Genuine Issues of Material Fact Preclude Grant of Summary Judgment to
>       any Party as to Celia Darlene Metcalf

Champion hired Celia Metcalf as an hourly employee in 1979.  Her last position was as a

"rewinder assistant."  Metcalf began receiving short term disability benefits on April 16, 1997,[62]

after undergoing a plantar fasciotomy.

In August 1998, CORE initiated a review of Metcalf's eligibility for continued benefits.

Metcalf submitted a personal profile evaluation reporting that she suffered from "osteopor[o]sis;

fibromyalgia . . . depression . . . Phase II degenerative disk disease, rectocele . . . broken wrist . . .

heel spur, [and] plantar fascia." Personal profile evaluation, August 14, 1998.  Metcalf reported

that she needed help getting dressed because she had difficulty operating buttons and zippers, and

that she suffered "falling spells."

Metcalf also submitted an Attending Physician Statement completed by Dr. Mendelsohn.

Mendelsohn diagnosed Metcalf with "NOS CTD"[63] and fibromyalgia and concluded that she was

totally disabled.  Attending Physician Statement, September 2, 1998.

On September 24, 1998, Dr. Beavers spoke by telephone with Dr. Mendelsohn.

According to Dr. Beavers, Dr. Mendelsohn indicated that Metcalf "could do sedentary work, but

he doesn't think she will ever be able to return to full duty again."  Dr. Beavers recommended

that Metcalf's long term disability payments be continued for the following year because "she has

---

[62] Metcalf also had several prior periods of extended absence from work related to
medical problems.

[63] Non-specific connective tissue disorder.

objective evidence of non-specific systemic inflammatory condition."

In 1999, SCORE began a review of Metcalf's claim to determine whether she qualified for disability under the any occupation standard.  In August 1999, Metcalf submitted a Personal Profile Evaluation in which she reported that she suffered from muscle pain, spasms, fatigue and depression.  She also noted that she wore only pants with elastic waistbands because she could not operate a zipper, but she reported that she did occasional crochet and crafts.  See also October 9, 1999 Personal Profile Evaluation ("I have to get someone to help me with fasteners, zippers, jewelery [sic].").

Metcalf also submitted an Attending Physician Statement from Dr. Mendelsohn indicating that Metcalf was totally disabled due to "CTD [connective tissue disorder], Generalized OA [osteoarthritis] and fibromyalgia."  Attending Physician Statement September 27, 1999; see also Attending Physician Statement October 19, 1999 (indicating that Metcalf was totally disabled from any occupation).

In response, Dr. Beavers called Dr. Mendelsohn.  According to Dr. Beavers, Dr. Mendelsohn indicated that Metcalf "is not totally disabled but continues to be able to do sedentary work."  On October 20, 1999, Dr. Beavers sent a letter on CORE letterhead to Dr. Mendelsohn stating "from our discussion I understand that [Metcalf] can work with the following permanent restrictions: sedentary work only."  Dr. Mendelsohn signed the letter and returned it to Dr. Beavers.  Dr. Mendelsohn's medical records indicate that he spoke with Dr. Beavers and told Dr. Beavers that he felt that Metcalf "could do sedentary work if she was inclined and such work was available."

Dr. Beavers recommended that Metcalf's long term disability benefits be terminated

"because there is no objective medical substantiation of disability and no disabling provider."

On October 26, 1999, SCORE commissioned Lisa Bossardt, a Vocational Rehabilitation Consultant, to perform a Vocational Rehabilitation Analysis of Metcalf. The Vocational Analysis included a summary of Metcalf's medical records. Bossardt concluded that "it appears that there are suitable employment opportunities for Ms. Celia Metcalf within her Sedentary Duty physical capacity and geographic area. Potential wages in these employment options range from $6.00 to $8.00 per hour as determined by contact with the North Carolina Employment Security Commission."[64] Vocational Analysis, November 1, 1999.

On November 15, 1999, SCORE recommended that Metcalf's long term disability benefits be terminated. On the same date, SCORE notified Metcalf that her claim for continuing benefits under the "any occupation" standard was denied based on her treating physician's statement that she could work and the results of the Transferable Skills Analysis.

By letter dated December 6, 1999, Metcalf requested a review of her claim. On December 13, 1999, SCORE sent a letter to Metcalf requesting "any additional information which would support a change in our decision."

On December 17, 1999, Metcalf sent a letter to the Plan indicating that "I feel that I still have the inability to perform duties required by any employer as my whole body is affected. The more I try to do the more my muscles are affected." On January 7, 2000, the Plan upheld the decision to deny continuing benefits because Metcalf had provided "no additional objective

---

[64] According to Metcalf, the Vocational Analysis was unreasonable because it assumed that Metcalf had worked as a "scale clerk" without support from the record. However, in her August 1999 Personal Profile Evaluation Metcalf indicated that the usual duties of her position at Champion included "scale clerk of #19 machine."

information."

On January 17, 2000, Metcalf again wrote to the Plan requesting review and indicating that she had been informed that "Champion does not have any sedentary work." On March 6, 2000, Metcalf again wrote to Champion. She informed the Plan that she was also being treated for carpal tunnel and arthritis in her hands, and for high blood pressure. She suggested that Dr. Beavers pressured Dr. Mendelsohn to say that she was not disabled and that Dr. Beavers provided an incorrect standard for evaluating disability.[65]

On March 8, 2000, Champion informed Metcalf that her claim would be submitted to the Claims Review Committee and invited her to submit additional information.

On March 30, 2000, Dr. Mendelsohn examined Metcalf and noted that he "tried to encourage her to be as active as she is comfortable getting back to some sedentary type activity if she can find gainful employment. Unfortunately jobs have been quite limited with her background."

On May 4, 2000, Metcalf submitted a letter written by Dr. Erich Buehler. Dr. Buehler reported that "because of her significant wrist and arm tendonitis, [Metcalf] is currently unable to participate in any work or occupation and is at this point totally disabled." On March 8, 2000, the Plan notified Metcalf that her claim had been referred to the Claims Review Committee.

On June 5, 2000, Metcalf submitted additional medical records to provide the full history of her disabling conditions.[66] These records reflect that Metcalf suffered back, arm, and leg pain

---

[65] According to Metcalf, "Dr. Mendelsohn told me he was asked 'If I were ready for a nursing home.' he replied [']no['] He was also asked 'If I could dress myself?['] he replied with a 'yes.'"

[66] In the record submitted to the Court, many of these pages were photocopied poorly and are illegible.

and fatigue beginning in the early 1980's.  See, e.g., Medical Notes from Dr. William Owen,

September 4, 1984 (noting that Metcalf reported "chronic history of problems with multiple

joint, especially the back"); Medical Notes from Dr. Queen, June 21, 1988 (noting that another

doctor had opined that "her sense of fatigue was coming from a combination of depression and

fatigue that muscoskeletal patients experience").  The records also indicate that Metcalf had

suffered from periodic bouts of depression since at least the 1970's.  In addition, the records

noted worsening problems with Metcalf's hands over the previous five years.  See, e.g., January

19, 2000 Medical Note from Dr. Buehler; February 17, 2000 Medical Note from Dr. Buehler;

March 20, 2000 Medical Note from Dr. Buehler; February 23, 2000 New Patient History from

Dr. McClure.  Among these records was a note from Dr. Buehler indicating that he would write a

letter indicating that Metcalf "is currently totally disabled because of her baseline medical

condition as well as that of her hands, although this disability may not be permanent."

        The records also included office notes dated December 28, 1999, from Dr. Mendelsohn

indicating that Metcalf "has no localizing weakness or neurologic deficits but pain far in excess

of findings."  Further, the notes indicated that Dr. Mendelsohn "discussed about long term

disability as she does not qualify under the present Champion guidelines.  She will need to find

some form of gainful employment that she can do in a sedentary way."

        On June 6, 2000, counsel for Metcalf sent Champion a follow-up letter listing Metcalf's

medical diagnoses and medications.

        On June 7, 2000, Dr. Jerome Siegal, an Occupational and Internal Medicine consultant

retained by CORE, reported that

        The patient has long standing fibromyalgia with chronic pain complaints and periodic
        exacerbations of pain that are quite distressing to the patient.  There is no information

-101-

however to indicate on an objective basis that the patient is unable to perform sedentary work. There has been no trial or attempt at sit down work noted.

On June 14, 2000, SCORE informed the Plan that "the newly submitted information does not impact the original denial of 11/13/99, as the information does not support a total disability at the time of the 11/13/99 denial."

On June 15, 2000, the Committee voted to uphold the denial of Metcalf's claim for continuing long term disability benefits. According to the meeting minutes the Committee voted to deny Metcalf's appeal because:

> Dr. Beavers spoke with Ms. Metcalf's physician, Dr. Mendelsohn, who stated that she "is not totally disabled but continues to be able to do sedentary work . . . there is no significant new finding that would disable her". . . . LTD benefits were denied based on Dr. Mendelsohn's release. . . . SCORE reviewed the [additional] information [Metcalf submitted on appeal], and a Peer Review Analysis determined that "There is no objective medical substantiation for total disability after 11/13/99 . . . There is no information however to indicate on an objective basis that the patient is unable to perform sedentary work" . . . . SCORE's Vocational Analysis Report identified various jobs that Ms. Metcalf might perform.

June 15, 2000 Claims Review Committee Meeting Minutes.

Metcalf was informed of the Committee's decision on June 16, 2000.

The Court finds that there are genuine issues of fact material to determining whether Champion was arbitrary and capricious in terminating Metcalf's benefits. In particular, the administrative record could be interpreted to indicate that Champion never appropriately considered Metcalf's subjective complaints in evaluating her disability.

Further, the Claims Review Committee's findings do not refer to Dr. Buehler's conclusion that Metcalf was disabled because of the condition of her hands, or to Metcalf's history of depression. Finally, while the Vocational Analysis appears to have been significantly more thorough than others in this case, it may not have adequately considered factors such as

-102-

Metcalf's manual dexterity.

Conversely, Metcalf provided somewhat inconsistent evidence that her medical problems prevented her from engaging in sedentary work. The record does contain some evidence that Metcalf could work. The record could also be found to indicate that Champion appropriately compared the objective medical evidence to Metcalf's subjective complaints and determined that her subjective complaints lacked credibility in light of the available objective evidence and a determination by one of her treating physicians that she was able to work.

Accordingly, summary judgment is denied to all parties.

V.    Counts Three and Four: Breach of ERISA Statutory Requirements under § 1133 and
      Breach of Fiduciary Duty

_____In Count Three, the plaintiffs claim that Champion denied them a full and fair review in violation of 29 U.S.C. § 1133. In Count Four, they claim that the defendants breached their fiduciary duties. They seek equitable relief for both violations pursuant to 29 U.S.C. § 1132 (a)(3).

United States Code, Chapter 29, Section 1132(a)(3) gives plan participants the right to sue for equitable relief from practices that violate ERISA. 29 U.S.C. § 1132(a)(3). However, a plaintiff may not bring suit under § 1132(a)(3) where § 1132(a)(1)(B) would provide "adequate" relief for the plaintiff's claimed injury. Varity Corp. v. Howe, 516 U.S. 489, 515 (1996); see also Tritt v. Automatic Data Processing, Inc. Long Term Disability Plan Adm'r, No. 3:06-cv-2065 (CFD), 2008 WL 2228841, at *5 (D. Conn. May 27, 2008).

ERISA gives plaintiffs several enforcement mechanisms. Varity Corp., 516 U.S. at 513 (quoting ERISA § 2(b)); see Devlin v. Empire Blue Cross & Blue Shield, 274 F.3d 76, 89 (2d Cir. 2001). Should a claim for a wrongful denial of benefits under § 1132(a)(1)(B) be

unavailable to a particular plaintiff, § 1132(a)(3) provides a "safety net" to ensure that improper

administration of the plan may still be remedied.  Devlin, 274 F.3d at 89 (discussing Varity

Corp., 516 U.S. at 512-13).  Plaintiffs may recover under both §§ 1132(a)(1)(B) and 1132(a)(3)

so long as the ultimate relief granted under § 1132(a)(3) is "appropriate equitable relief." Id. at

89-90; see 29 U.S.C. § 1132(a)(3).  While claims under § 1132(a)(3) may be brought regardless

of whether ERISA provides other remedies, Devlin, 274 F.3d at 89, "where Congress provided

adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief,

in which case such relief normally would not be 'appropriate.'"  Varity Corp., 516 U.S. at 515.

The determination of "appropriate" equitable relief lies within the district court's discretion.

The Court must take into account the policies underlying ERISA, the "'special nature and

purpose of employee benefit plans,'" and all other available remedies.  Frommert v. Conkright,

433 F.3d 254, 272 (2d Cir. 2006) (quoting Varity Corp., 516 U.S. at 515); Devlin, 274 F.3d at 89.

Additionally, equitable remedies under ERISA must be narrowly limited to "'those categories of

relief that were typically available in equity.'"[67]  Great-West Life & Annuity Ins. Co. v. Knudson,

534 U.S. 204, 210 (2002) (quoting Mertens v. Hewitt Assocs., 508 U.S. 248, 256 (1993)

(emphasis in original)); cf. Smith v. Champion Intern. Corp., 220 F.Supp.2d 124, 128-129  (D.

Conn. 2002) (noting that § 1133 does not give rise to a private cause of action for compensatory

---

[67] Since a claim for monetary compensation seeks a remedy "at law," it is not properly
pursued under § 1132 (a)(3) even if presented as a claim in equity.  Great-W. Life & Annuity Ins.
Co. v. Knudson, 534 U.S. 204, 210 (2002) ("Almost invariably . . . suits seeking (whether by
judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the
plaintiff are suits for 'money damages,' . . . since they seek no more than compensation for loss
resulting from the defendant's breach of legal duty. And [m]oney damages are, of course, the
classic form of legal relief.") (internal citations and quotation marks omitted); Frommert, 433
F.3d at 270.

-104-

or punitive relief").

The Court concludes that the majority of the remedies the plaintiffs seek under § 1132(a)(3) would not be "appropriate" in light of the relief they seek under § 1132(a)(1)(B). The majority of the ostensibly equitable relief the plaintiffs seek under § 1132(a)(3) is also encompassed within their § 1132(a)(1)(B) claims to enforce the Plan's terms and their rights under the Plan.[68] Further, the plaintiffs make no allegations under § 1132(a)(3) that could not be remedied through their § 1132(a)(1)(B) claims. Frommert, 433 F.3d at 270 ("Because adequate relief is available under [§ 502(a)(1)(B)], there is no need on the facts of this case to also allow equitable relief under § 502(a)(3)."); Gerosa v. Savasta & Co., Inc., 329 F.3d 317, 321 (2d Cir. 2003) ("In determining the propriety of a remedy, we must look to the real nature of the relief sought, not its label.") (citations omitted).

If warranted, the plaintiffs' request for the Court to appoint an impartial and independent administrator could constitute "appropriate" equitable relief. However, the plaintiffs have not presented any evidence suggesting that the plans would not afford them a full and fair review as now administered by International Paper. Accordingly, they have not raised a genuine issue of material fact suggesting that this relief is warranted.

Thus, summary judgment is granted in favor of the defendants as to the plaintiffs' claims for relief pursuant to § 1132 (a)(3) in both counts three and four.

VI.    Conclusion

The defendants' Motion for Summary Judgment [Dkt. # 91] is GRANTED in part and

---

[68] Indeed, as set forth above in the analysis of Counts one and two, the Court orders the defendants to pay certain wrongfully terminated benefits and to conduct a full and fair review of certain plaintiffs' claims.

DENIED in part.  It is GRANTED as to all of the plaintiffs' claims in Counts Three and Four and as to Hill, Finney and McClure's claims in Count Two.  It is DENIED as to the claims of the remaining plaintiffs in Counts One and Two.

The plaintiffs' Motion for Summary Judgment [Dkt. # 94] is GRANTED in part and DENIED in part.  It is GRANTED as to the claims made by Boone, Brookshire, Clark, Haynes, Whitley, and Reece.  It is GRANTED in part as to the claims made by Kirkpatrick, Lynn, and Smith in Counts One and Two.  It is DENIED as to the claims made by the remaining plaintiffs in Counts One through Four.

By **September 19, 2008**, the parties are to submit a joint report on the status of this case including the issues raised in the body of this decision, the scheduling of additional proceedings, and whether a settlement conference would be fruitful.

**SO ORDERED** this 26th day of August 2008 at Hartford, Connecticut.

/s/ Christopher F. Droney
CHRISTOPHER F. DRONEY
United States District Judge